# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| IN RE: GEISINGER HEALTH AND EVANGELICAL COMMUNITY HOSPITAL HEALTHCARE WORKERS ANTITRUST LITIGATION | Case No. 4:21-cv-00196-MWB<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Nichole Leib, Kevin Brokenshire, Diane Weigley, and Jessica Sauer ("Plaintiffs"), individually and on behalf of a class of similarly situated individuals, bring this action for damages and injunctive relief under the antitrust laws of the United States and the laws of the Commonwealth of Pennsylvania against Geisinger Health ("Geisinger") and Evangelical Community Hospital ("Evangelical") (collectively, "Defendants").

## I.    SUMMARY OF THE ACTION

1.    This class action challenges an illegal agreement between two competitors, Geisinger and Evangelical, not to recruit (or "poach") each other's physicians, nurses, psychologists, therapists, and other healthcare professionals ("Healthcare Workers") (the "No-Poach Agreement").

2.    The No-Poach Agreement covered Defendants' Healthcare Workers in a region in central Pennsylvania that includes Union, Snyder, Northumberland, Montour, Lycoming, and Columbia counties, and the cities of Danville and Lewisburg, where Geisinger Medical Center and Evangelical are headquartered, respectively ("Central Pennsylvania"). The following map depicts the relevant Central Pennsylvania geographic region:



*Source*: Complaint ¶ 47, *United States v. Geisinger Health, et al.*, No. 4:20-cv-01383-MWB, ECF No. 1 (M.D. Pa. Aug. 5, 2020) ("DOJ Compl.").

3.      This No-Poach Agreement was intended to, and did, reduce competition for Healthcare Workers in Central Pennsylvania and, as a result, suppressed the job mobility and wages of Plaintiffs and the members of the proposed Class (defined below) below the levels that would have prevailed but for the illegal No-Poach Agreement.

4.     The Department of Justice ("DOJ") has recently issued the following guidance about the anticompetitive effects of no-poach agreements like the one at issue in this case: "When companies agree not to hire or recruit one another's employees, they are agreeing not to compete for those employees' labor. Robbing employees of labor market competition deprives them of job opportunities, information, and the ability to use competing offers to negotiate better terms of employment. Under the antitrust laws, the same rules apply when employers compete for talent in labor markets as when they compete to sell goods and services."[1]

5.     Geisinger and Evangelical reached their unlawful horizontal agreement at the highest levels of their organizations, through secretive verbal exchanges that were later confirmed by emails, which they agreed to conceal from outsiders, their respective employees who make up the proposed Class, and the public. As described below, Defendants' senior executives periodically reaffirmed, monitored, and policed the No-Poach Agreement.

6.     The No-Poach Agreement began at least as early as 2010, and may have existed even earlier. It continued until at least August 5, 2020, when the DOJ

---

[1] *See* No-Poach Approach, Dep't of Justice Antitrust Div. (Sept. 30, 2019), https://www.justice.gov/atr/division-operations/division-update-spring-2019/no-poach-approach (last visited Mar. 18, 2021).

brought a civil antitrust action to enjoin Geisinger's partial acquisition of Evangelical. *See* DOJ Compl.

7.    The DOJ Complaint alleges that Geisinger's proposed partial acquisition of Evangelical would fundamentally reduce competition for healthcare services and raise the likelihood of continued unlawful coordination between Defendants. *Id.* ¶ 6. The DOJ complaint alleges a history of collusion between Defendants—that Geisinger and Evangelical have a history of "picking and choosing when to compete with each other"—including that Defendants' senior executives entered into the No-Poach Agreement that is the focus of this case. *Id.* ¶¶ 40-42.

8.    Geisinger and Evangelical took affirmative steps to conceal their unlawful No-Poach Agreement from Plaintiffs, the Class, and the general public. For example, at one time during the class period, Geisinger's website advertised: "For your hard work, you'll be rewarded with a competitive salary and a comprehensive benefits package, including health insurance, compensated vacation time and holidays, a 401(k) plan and more." It now states that: "Our competitive compensation and benefits package helps you and your loved ones stay healthy, meet your financial goals and thrive professionally and personally."[2] Similarly, Evangelical's website advertises, "Highly competitive salary with bonus dollars

---

[2] "Benefits," Geisinger Health, https://www.geisingerjobs.org/geisinger-benefits (last visited Mar. 18, 2021).

available."[3] Defendants did not disclose on their respective websites (or anywhere else) that they had an agreement not to compete for each other's employees. Defendants' salaries were not "competitive" because they were not competing with each of their main sources of competition for labor—namely, each other—and thus were able to pay less-than-competitive wages to their Healthcare Workers.

9.    Geisinger and Evangelical monitored each other's compliance with the unlawful No-Poach Agreement and communicated regarding deviations from it in order to enforce compliance. For instance, after learning that Geisinger potentially took actions contrary to the No-Poach Agreement by recruiting Evangelical nurses, Evangelical's CEO wrote to her counterpart at Geisinger, asking, "Can you please ask that this stop[?] Very counter to what we are trying to accomplish." DOJ Compl. ¶ 42. Upon receiving this message, the Geisinger executive forwarded the email to Geisinger's Vice President of Talent Acquisition, instructing her to "ask your staff to stop this activity with Evangelical." *Id.*

10.    The No-Poach Agreement was made and enforced privately, confidentially, and at the highest levels of the organizations, and thus, Geisinger and Evangelical succeeded in concealing the No-Poach Agreement from Plaintiffs and the members of the Class. But for the DOJ's investigation of a proposed

---

[3] "Meaningful relationships: It's who we are." Evangelical Community Hospital, https://www.evanhospital.com/data/uploads/contentblock/Careers-emergency-medicine.pdf (last visited Mar. 18, 2021).

acquisition between the Defendants, and the resulting publication of the DOJ

Complaint exposing the No-Poach Agreement, the existence of the anticompetitive

No-Poach Agreement might have remained permanently hidden.

11.    Ultimately, the No-Poach Agreement reduced competition for

Healthcare Workers and, as a result, it reduced Plaintiffs' job mobility and enabled

Defendants to pay their employees, including members of the Class, less than they

would have been paid absent the No-Poach Agreement. The No-Poach Agreement

is a *per se* unlawful restraint of trade under the federal antitrust laws, violated

Pennsylvania law, and injured Plaintiffs and the members of the Class.

## II.    JURISDICTION AND VENUE

12.    Plaintiffs bring this action to recover treble damages, costs of suit, and

reasonable attorneys' fees, arising from Geisinger's and Evangelical's violations of

Section 1 of the Sherman Act, 15 U.S.C. § 1, and Pennsylvania's Unfair Trade

Practices and Consumer Protection Law, 73 P.S. §§ 201-1-201-9.3.

13.    The Court has subject matter jurisdiction pursuant to Sections 4 and

16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331, 1337, and

1367.

14.    Venue is proper in this judicial district pursuant to Section 12 of the

Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c), and (d) because a

substantial part of the events giving rise to Plaintiffs' claims occurred in this

District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and both Geisinger and Evangelical are headquartered in this District.

## III.   THE PARTIES

15.    Plaintiff Nichole Leib is a citizen and resident of the state of Pennsylvania. Ms. Leib has worked as a registered nurse in the operating room at Geisinger Medical Center in Danville, Pennsylvania since July 2011. Ms. Lieb was injured in her business or property by reason of the violation alleged herein.

16.    Plaintiff Kevin Brokenshire is a citizen and resident of the state of Pennsylvania. Mr. Brokenshire worked as a registered nurse in the operating room at Geisinger Medical Center in Danville, Pennsylvania, from July 2010 to March 2018. Mr. Brokenshire was injured in his business or property by reason of the violation alleged herein.

17.    Plaintiff Diane Weigley is a citizen and resident of the state of Georgia. Ms. Weigley worked as a registered nurse at Evangelical Community Hospital in Lewisburg, Pennsylvania, from March 2014 to August 2017. Ms. Weigley was injured in her business or property by reason of the violation alleged herein.

18.    Plaintiff Jessica Sauer is a citizen and resident of the state of Pennsylvania. Ms. Sauer worked from October 2019 to August 2020 as a patient

access representative (or nursing assistant) at Geisinger Medical Center in Danville, Pennsylvania. Ms. Sauer was injured in her business or property by reason of the violation alleged herein.

19.    Defendant Geisinger is the largest health system in Central Pennsylvania. It is an integrated healthcare provider of hospital and physician services headquartered in Danville, Pennsylvania. Geisinger employs approximately 32,000 employees, including 1,800 physicians and 5,000 nurses. Geisinger Medical Center, located in Danville, Pennsylvania, is Geisinger's flagship hospital. It is licensed to accommodate 574 overnight patients. Geisinger operates three other hospitals in Central Pennsylvania: Geisinger Shamokin, Geisinger Jersey Shore, and Geisinger Bloomsburg. Geisinger also operates urgent care centers and other outpatient facilities in Pennsylvania.

20.    Geisinger has a history of acquiring community hospitals in Pennsylvania. Geisinger acquired six hospitals in Pennsylvania from 2012 to 2017. Three of the four hospitals that Geisinger owns in Central Pennsylvania— Shamokin, Jersey Shore, and Bloomsburg—were formerly independent hospitals and two of those hospitals were the subject of previous antitrust challenges by the government.

21.    Defendant Evangelical is the largest independent community hospital in Central Pennsylvania and is headquartered in Lewisburg, Pennsylvania.

Evangelical employs approximately 1,800 employees, including 170 physicians and 5,000 nurses. The hospital is licensed to accommodate 132 overnight patients. Evangelical also owns numerous physician practices in Central Pennsylvania and operates an urgent care center and several other outpatient facilities.

22.     Defendants acted as the principals of or agents for the unnamed co-conspirators with respect to the acts, violations, and common course of conduct alleged herein.

23.     Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as defendants in this lawsuit, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint and have performed acts and made statements in furtherance of the No-Poach Agreement and other anticompetitive conduct.

24.     When this Complaint refers to any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity acted by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, or of the corporation's or limited liability entity's business.

IV.    **FACTUAL ALLEGATIONS**

   A.    **Trade and Commerce**

25.    During the Class Period (defined below), Geisinger and Evangelical employed members of the proposed Class in Pennsylvania, including in this District.

26.    The No-Poach Agreement has substantially affected interstate commerce throughout Pennsylvania and the United States and has caused antitrust injury throughout Pennsylvania and the United States.

   B.    **Geisinger and Evangelical Dominate Healthcare Services in Central Pennsylvania**

27.    Geisinger is the largest health system in Central Pennsylvania, and Evangelical is the largest independent community hospital in Central Pennsylvania. No other company offers the scope of services and resources that Geisinger and Evangelical provide in Central Pennsylvania, and Defendants are the dominant employers of Healthcare Workers in Central Pennsylvania.

28.    For example, Geisinger and Evangelical both provide inpatient, general acute care services to patients in Central Pennsylvania. Geisinger accounts for approximately 55 percent and Evangelical accounts for approximately 17 percent of inpatient general acute-care services provided in Central Pennsylvania for a total of 72 percent of that market. Defendants' respective market shares for many healthcare services are consistent with their market share for inpatient

general acute care services.

29.     Consistent with Defendants' dominance in providing healthcare services in Central Pennsylvania, Defendants are also the dominant employers of Healthcare Workers in Central Pennsylvania. Together, during the proposed Class Period, Defendants have employed approximately 70 to 75 percent of hospital Healthcare Workers in Central Pennsylvania. Defendants have also employed a dominant share of non-hospital Healthcare Workers in Central Pennsylvania.

30.     Geisinger and Evangelical both offer a wide range of medical care and support to patients across a range of specialties, including orthopedics, women's health, surgical care, diabetes care, pain medicine, physical therapy, and primary care, among other areas. Indeed, Geisinger and Evangelical are aware that they compete to attract patients. Geisinger and Evangelical "care for the same people and populations[,]" according to a Geisinger Health Plan executive. DOJ Compl. ¶ 18. "[I]f you don't get your care here [at Evangelical], you get it there [at Geisinger][,]" Evangelical's CEO explained in an interview. *Id.* ¶ 1.

31.     The competition between Geisinger and Evangelical to attract patients is reflected in their capital investment plans. The competition affects the capital investments each decides to make when engaging in business planning. When Evangelical's CEO was justifying her recommendation of construction of a new orthopedic facility to Evangelical's board of directors in 2016, for example, she

explained that Evangelical was "vulnerable to GMC [Geisinger Medical Center] in orthopedics." DOJ Compl. ¶ 19. Similarly, Geisinger cited Evangelical's competitive activities in considering capital expenditures for certain facility improvements in 2018. *Id.*

32.    Because Geisinger and Evangelical are direct competitors in the provision of healthcare services in Central Pennsylvania, they would also ordinarily compete directly for the employment of Healthcare Workers. One important respect in which Defendants would have competed with each other would be through soliciting and/or hiring each other's employees. Because of Defendants' dominance as providers of healthcare to patients in Central Pennsylvania, Defendants are also the dominant employers of Healthcare Workers in Central Pennsylvania.

33.    Consequently, for those Healthcare Workers looking to work in healthcare in Central Pennsylvania, Geisinger and Evangelical are the largest and most important employers. Because Geisinger and Evangelical would vigorously compete for each other's employees in the absence of the No-Poach Agreement, such competition would enhance more widespread discovery of salary information, increase job mobility and, as a result, increase the pay for *all* of Defendants' Healthcare Workers. Consequently, the reduction in competition through the No-Poach Agreement has broadly injured Plaintiffs and members of the Class.

**C.    The Market for the Services of Healthcare Workers in Central Pennsylvania**

34.    The No-Poach Agreement is *per se* illegal under the federal antitrust laws, and thus, there is no requirement to define the relevant product or geographic markets. As the DOJ made clear in guidance it issued in 2016: "Naked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third-party intermediary, are per se illegal under the antitrust laws."[4] But, to the extent a relevant market need be defined for any reason, it is for the services of Healthcare Workers in the Central Pennsylvania region.

35.    Healthcare Workers have specialized training and knowledge, including specialized schooling, advanced academic degrees, specialized occupational skills and knowledge, licensing and certification requirements, and specialized on-the-job training and experience.

36.    Defendants view Healthcare Workers as possessing important skills and experience that cannot readily be found in employees in other professional or occupational fields. One reason that Defendants entered into the illegal No-Poach Agreement was that retaining these Healthcare Workers would require increasing financial retention incentives in a competitive market for Healthcare Workers' services. Conversely, limiting a primary source of competition for Healthcare

---

[4] Dep't of Justice Antitrust Div. and Fed. Trade Comm'n, ANTITRUST GUIDANCE FOR HUMAN RESOURCES PROFESSIONALS, at 3 (Oct. 2016), https://www.justice.gov/atr/file/903511/download (last visited Mar. 18, 2021).

Workers' services via a No-Poach Agreement allowed Defendants to pay lower wages to their Healthcare Workers than they would have paid absent the No-Poach Agreement.

37.     Because of their specialized training, knowledge, and skills, Healthcare Workers are extremely valuable to employers in the healthcare industry. Healthcare Workers would not view jobs in other professions or fields to be an adequate economic substitute for their jobs as Healthcare Workers. Indeed, because of the investments in education, certification, licensing, and other professional requirements and experience, it is expensive and difficult to become a Healthcare Worker, and Healthcare Workers cannot readily capitalize on those investments in other industries. Further, healthcare employers do not see employees from other industries as substitutes for Healthcare Workers.

38.     Defendants operate the dominant and most prominent healthcare facilities in Central Pennsylvania, and they are the dominant employers of Healthcare Workers in Central Pennsylvania. Additionally, given licensing, marketing, and professional contacts developed over time, Healthcare Workers tend to stay within a given geographic area for purposes of career development.

39.     Consequently, a small but substantial, non-transitory decrease or stagnation in pay will not cause Healthcare Workers in Central Pennsylvania to switch jobs outside of the healthcare industry in Central Pennsylvania. Nor would a

small but substantial, non-transitory decrease or stagnation in pay cause Healthcare

Workers in Central Pennsylvania to seek similar jobs outside of Central

Pennsylvania.

40.    As alleged above, during the Class Period, Defendants collectively

employed a dominant share of Healthcare Workers in Central Pennsylvania and

thus together exercised monopsony power over the market for Healthcare Workers

in Central Pennsylvania during the Class Period.

**D.    Competition for Healthcare Workers in the Absence of a
        No-Poach Agreement**

41.    In a properly functioning and lawfully competitive labor market,

Geisinger and Evangelical would aggressively compete for Healthcare Workers by

recruiting and hiring from each other. Indeed, Geisinger's flagship hospital

(Geisinger Medical Center) and Evangelical are only approximately 17 miles apart.

As a result, but for the No-Poach Agreement, Geisinger and Evangelical would

have been key competitors in the labor market for Healthcare Workers, and

competition between them would have driven up compensation for Healthcare

Workers.

42.    Competition for Healthcare Workers through recruiting and lateral

hiring has a significant impact on such workers' compensation in several ways:

43.    *First*, when healthcare providers become aware of attractive outside

opportunities for their Healthcare Workers, the threat of losing these employees to

15

a competitor encourages an employer to preemptively increase compensation to increase morale and competitive positioning and ultimately to retain valuable labor. If certain healthcare providers do not react to competition, their Healthcare Workers may be receptive to recruiting by a rival employer or seek positions that offer more generous compensation and benefits elsewhere.

44.     Once a Healthcare Worker has received an offer from a rival employer, retaining that employee may require a disruptive increase in compensation for one individual. Increasing information and compensation for one person will have more widespread salary effects across a company and market. One such mechanism for this widespread effect is salary discovery, in which information about competing salaries causes higher compensation even among those employees not actively looking to switch employers. Another such mechanism is "internal equity" within organizations, where employers endeavor to maintain parity in pay levels across employees within the same categories as well as maintain certain compensation relationships among employees across different categories.

45.     In a market untainted by their anticompetitive coordination, Geisinger and Evangelical would have had an incentive to preempt lateral departures by paying their Healthcare Workers well enough that they would become less likely to seek or pursue outside opportunities. Preemptive retention measures would

therefore have led to increased compensation for all Healthcare Workers.

46.     *Second*, the availability of desirable positions at competing employers forces employers to reactively increase compensation to retain Healthcare Workers who are likely to join a competitor. This can occur both when a particular Healthcare Worker or group of Healthcare Workers becomes interested in switching employers and the current employer responds by offering a compensation increase to retain them, or when an employer responds to overall attrition rates among its Healthcare Workers by increasing compensation levels. In the former scenario, even a targeted increase designed to retain specific Healthcare Workers will put upward pressure on the entire organization's compensation structure.

47.     The positive compensation effects of hiring Healthcare Workers from competitors are not limited to the particular individuals who seek new employment or to the particular individuals who would have pursued new positions but for the No-Poach Agreement. Instead, the effects of a restraint in the labor market as a result of a No-Poach Agreement (and the effects of suppressing recruiting and hiring pursuant to the No-Poach Agreement) commonly impact all individuals in positions subject to the restraint.

48.     Conversely, suppression of competition for cross-hiring and recruitment serves as a drag on compensation that permeates throughout an

17

organization. The No-Poach Agreement enabled Geisinger and Evangelical to target the impact of their coordination on the employees most likely to command disruptive increases that, through processes of internal equity and salary discovery, would have led to increases that would have benefited all their employees.

### E. Geisinger's and Evangelical's Strategic Management of Their Healthcare Workers' Compensation Levels

49.    Geisinger and Evangelical strategically managed their Healthcare Workers' internal compensation levels to achieve certain objectives, including to:

(a)    Maximize both internal and external equity;

(b)    Maintain approximate compensation parity among Healthcare Workers within the same practices (*e.g.*, Psychiatry, Hospital Medicine, Emergency Medicine, Community Medicine, Nursing) and seniority categories (*e.g.*, those with two years or less experience, those with over two years of experience);

(c)    Maintain certain compensation relationships among Healthcare Workers across different categories (for example, among physicians relative to nurses or between the Psychiatry and Emergency Medicine practices);

(d)    Avoid discrimination on the basis of race and gender;

(e)    Maintain high Healthcare Worker morale and productivity;

(f)    Retain Healthcare Workers; and

(g)    Attract new and talented Healthcare Workers.

50.    To accomplish these objectives, Geisinger and Evangelical set internal compensation levels for different Healthcare Workers categories that apply to all such employees within those categories. Defendants also compared compensation levels across different Healthcare Worker categories to ensure internal equity as between categories. Geisinger and Evangelical also regularly analyze and update their Healthcare Worker compensation structures in a process that involves the senior executives who entered into, implemented, and enforced the No-Poach Agreement.

51.    While Geisinger and Evangelical sometimes engaged in negotiations regarding compensation levels with individual Healthcare Workers, these negotiations occurred from a starting point of the pre-existing and pre-determined compensation level. The eventual compensation any particular Healthcare Worker receives is either entirely determined by the preset level or is materially influenced by it.

52.    Thus, if operating under competitive and lawful conditions, Geisinger and Evangelical would have recruited and hired Healthcare Workers from each other, driving the pay for all workers in those classifications up through the mechanism of internal equity, in which employers endeavor to maintain parity within the organization among workers of similar job categories, or to maintain relative compensation relationships across job categories. Geisinger and

19

Evangelical both understood this during the Class Period and avoided paying their Healthcare Workers more by entering into the No-Poach Agreement and by agreeing not to compete for employees.

### F.   Geisinger and Evangelical Have a History of Coordination

53.   Defendants have a history of choosing when to compete with each other, which has deepened coordination at the expense of competition. Specifically, Geisinger and Evangelical have historically cooperated and sought out "wins" for both organizations at the expense of competition and their employees. As Evangelical's CEO described in an interview discussing Geisinger's proposed partial acquisition of Evangelical, "[T]here's an economic principle called co-opetition. And you can cooperate, and you can compete. And as long as both sides find wins, it works." DOJ Compl. ¶ 27. Such statements epitomize how these close competitors have behaved in the past: they have coordinated their activities to "find wins" at the expense of robust competition. *Id.* Geisinger's and Evangelical's Healthcare Workers have been on the losing end of this bargain as the No-Poach Agreement has suppressed competition for their labor as well as their pay.

54.   Furthermore, Evangelical has publicly stated that it already has cooperative relationships with Geisinger, which suggests that they have exchanged competitively sensitive information. In fact, the DOJ Competitive Impact

Statement accompanying its recent settlement with Defendants, which is based on documentary evidence produced to the DOJ, confirmed that Defendants have already shared important competitive information as part of the proposed partial acquisition. *See* Competitive Impact Statement, at 3, 9, 14-15, *United States v. Geisinger Health, et al.*, No. 4:20-cv-01383-MWB, ECF No. 46 (M.D. Pa. Mar. 3, 2021) ("Competitive Impact Statement"); DOJ Compl. ¶ 38. For example, Evangelical's CEO sent her counterpart at Geisinger a document detailing her thinking on Evangelical's strategic growth options in their discussions regarding joint ventures. *Id.*

55.    The history and prevalence of the coordination between Geisinger and Evangelical suggests that the No-Poach Agreement goes back many years. Moreover, there may have been other, similar agreements in light of Geisinger's history of acquiring community hospitals in Pennsylvania. As alleged above, Geisinger acquired six hospitals in Pennsylvania from 2012 to 2017. Shamokin, Jersey Shore, and Bloomsburg—three of the four hospitals that Geisinger owns in Central Pennsylvania—were formerly independent hospitals and two of those hospitals were the subject of previous antitrust challenges by the government.

56.    Geisinger and Evangelical's senior executives had "regular touch base meetings" in which they discussed various topics, including their respective

strategic growth options. DOJ Compl. ¶ 41. These meetings provided opportunities to discuss, enter into, and enforce the No-Poach Agreement.

57.     The DOJ Complaint also notes as further evidence of cooperation the fact that Geisinger shared confidential information with Evangelical, including the terms of a physician loan forgiveness agreement, which Geisinger uses as an important tool to recruit physicians. DOJ Compl. ¶ 41. Such information sharing is further evidence of the Defendants acting as conspirators and cooperators, rather than as competitors for the services of Healthcare Workers.

58.     Based on the foregoing facts, and others as more fully set forth in the DOJ Complaint, the DOJ sought to block Geisinger's proposed equity stake in Evangelical because it would substantially lessen competition and lead to even more collusion between the entities in the future.

**G.     Geisinger and Evangelical's No-Poach Agreement**

59.     While Geisinger and Evangelical are purportedly close competitors in Central Pennsylvania, they often coordinated their conduct to their collective benefit and to Class members' collective injury. Evangelical's CEO's view of "co-opetition" served as a purported justification for anticompetitive behavior (*see*, *supra*, ¶ 53). Defendants' acts of coordination, which only benefit themselves, reinforce their collective dominant position for inpatient general acute services in Central Pennsylvania as well as provide an unfair advantage to them by artificially

reducing the amounts that each system has to pay its employees through their No-Poach Agreement.

60.    With a backdrop of the cooperative relationship between supposed competitors, Geisinger and Evangelical's senior executives entered into the No-Poach Agreement—an agreement not to recruit each other's Healthcare Workers. They reached this understanding orally, which various emails confirm.

61.    An example of Defendants' coordination in furtherance of the No-Poach Agreement: after learning that Geisinger was using Facebook to recruit Evangelical's nurses, Evangelical's CEO emailed her counterpart at Geisinger, stating, "Can you please ask that this stop[?] Very counter to what we are trying to accomplish." DOJ Compl. ¶ 42. The Geisinger senior executive forwarded the email to Geisinger's Vice President of Talent Acquisition, instructing her to "ask your staff to stop this activity with Evangelical." *Id.*

62.    The foregoing exchange also demonstrates that the agreement predated this correspondence *and* Geisinger and Evangelical monitored their No-Poach Agreement, thereby ensuring that it would be effective and have its desired impact: lessening competition in the market for Healthcare Workers. Moreover, the DOJ Complaint suggests that DOJ has further documentary evidence of the unlawful No-Poach agreement and other conduct suggesting coordination between the purported competitors.

63.     As alleged above, Defendants' coordination has taken various forms and comes at the expense of greater competition for Healthcare Workers. Geisinger's and Evangelical's senior executives even monitored each other's adherence to the No-Poach Agreement and have pointed out deviations to enforce compliance therewith. Geisinger and Evangelical's No-Poach Agreement effectively and illegally insulated their organizations from competition for Healthcare Workers.

### H.     Geisinger and Evangelical Concealed the No-Poach Agreement from the Public and the Proposed Class

64.     Geisinger and Evangelical actively concealed their illegal No-Poach Agreement from the public and the proposed Class. As alleged above, it was the practice of both Defendants to advertise that they had "competitive salaries" and not to disclose the existence of the No-Poach Agreement to their Healthcare Workers or to the public. As further alleged above, however, Defendants would monitor and enforce each other's compliance with the No Poach Agreement.

65.     Additionally, when one Defendant's Healthcare Worker attempted to apply to the other Defendant, executives at both organizations often engaged in secret back-channel communications concerning the applicant as a means of enforcing and abiding by the No-Poach Agreement—without the applicant's knowledge. Further, Geisinger and Evangelical entered into the No-Poach Agreement orally (the existence of which various emails confirm), affirmatively

avoiding memorializing the Agreement in a written agreement despite its broad application and multi-year duration, opting instead to train new executives about the Agreement's existence on a primarily oral basis. The reason for this practice was to avoid alerting the public and the proposed Class of the No-Poach Agreement's existence and, thus, to deter potential investigations, litigation, and to perpetuate the Agreement's illegal effects.

66.    But for information made public in the DOJ Complaint, Plaintiffs would have remained unaware that the No-Poach Agreement existed. Because of the secrecy of the No-Poach Agreement and Geisinger's and Evangelical's acts of concealment, Plaintiffs and the Class did not and could not have known before August 5, 2020, when the DOJ filed the Complaint against Geisinger and Evangelical, that Geisinger and Evangelical were engaged in an illegal conspiracy to suppress Healthcare Worker wages by restraining recruitment and hiring of one another's Healthcare Workers. Further, the secrecy of the No-Poach Agreement and Defendants' acts of concealment would have thwarted any reasonable effort to discover the No-Poach Agreement before that date.

## V.    CLASS ACTION ALLEGATIONS

67.    Plaintiffs bring this action on behalf of themselves and all others

similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and

23(b)(3). The Class is defined as:

> All natural persons who worked at Geisinger Health or Evangelical
> Community Hospital as Healthcare Workers from January 2011
> through such time as Defendants' anticompetitive conduct ceased
> ("Class Period").

> Excluded from the Class are members of Defendants' boards of
> directors, Defendants' senior executives who entered into and/or
> enforced the No-Poach Agreement, and any and all judges assigned to
> hear or adjudicate any aspect of this litigation and their judicial staff.

68.    Plaintiffs do not yet know the exact size of the Class because such

information is in the exclusive control of Geisinger and Evangelical. Based upon

publically available information, there are at least thousands of Class members.

Joinder of all members of the Class is therefore impracticable.

69.    Class members are easily ascertainable based on, among other things,

the employment records of the Defendants.

70.    There are many questions of law and fact common to the Class as a

whole, including:

(a)    Whether, when, and how Geisinger and Evangelical entered

into the No-Poach Agreement;

(b)     Whether Geisinger and Evangelical concealed the existence of the No-Poach Agreement from Plaintiffs and the members of the Class;

(c)     Whether Geisinger's and Evangelical's conduct violated Section 1 of the Sherman Act;

(d)     Whether the No-Poach Agreement is a *per se* violation of the Sherman Act;

(e)     Whether Geisinger and Evangelical violated Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-1-201-9.3;

(f)     Whether the No-Poach Agreement restrained trade, commerce, or competition for Healthcare Workers between Geisinger and Evangelical;

(g)     Whether Plaintiffs and the Class have suffered antitrust injury; and

(h)     the appropriate measure of damages.

71.    These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual members of the Class.

72.    Plaintiffs' claims are typical of the claims of the Class.

73.    Plaintiffs will fairly and adequately represent the interests of, and have no conflicts of interest with, the Class.

74.     Plaintiffs have retained counsel experienced in antitrust and class action litigation to represent themselves and the Class.

75.     This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action. By contrast, prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications and be inefficient and burdensome to the parties and the Court.

## FIRST CLAIM FOR RELIEF
### (Violation of the Sherman Act, 15 U.S.C. § 1)

76.     Plaintiffs reallege and incorporate by reference each of the averments contained in the preceding paragraphs of this Complaint.

77.     Geisinger and Evangelical entered into and engaged in the unlawful horizontal No-Poach Agreement in restraint of trade and commerce, as described above, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The No-Poach Agreement is a *per se* violation of Section 1 of the Sherman Act.

78.     The acts done by Geisinger and Evangelical as part of, and in furtherance of, their agreements, understandings, contracts, combinations or conspiracies were authorized, ordered, or done by their respective senior executives while actively engaged in the management of Defendants' affairs.

79.   Defendants collectively possess monopsony power in the relevant market. Through their No-Poach Agreement, Defendants harmed competition in the relevant market.

80.   The unlawful No-Poach Agreement had the following effects, among others:

   a.   Competition between Geisinger and Evangelical for Healthcare Workers was suppressed, restrained, or eliminated; and

   b.   Plaintiffs and members of the Class have received lower compensation from Geisinger and Evangelical than they otherwise would have received in the absence of the No-Poach Agreement and, as a result, have been injured and have suffered damages in an amount according to proof at trial.

81.   Defendants' No-Poach Agreement had no procompetitive benefits or justifications. The No-Poach Agreement provided no efficiencies or other benefits that would offset the substantial competitive harms described above.

82.   As a direct and proximate result of Defendants' illegal No-Poach Agreement, members of the Class have suffered injury and have been deprived of the benefits of free and fair competition for their labor on the merits.

83.   Accordingly, Plaintiffs and members of the Class seek three times their damages caused by Defendants' violation of Section 1 of the Sherman Act,

the costs of bringing suit, reasonable attorneys' fees, injunctive relief, and a

declaration that such agreement is unlawful.

## SECOND CLAIM FOR RELIEF
### (Violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-1-201-9.3)

84.    Plaintiffs reallege and incorporate by reference each of the factual

averments contained in the preceding paragraphs of this Complaint.

85.    Geisinger and Evangelical engaged in unfair methods of competition

and unfair acts and practices in the conduct of trade or commerce described above

in violation of P.S. §§ 201-1-201-9.3.

86.    Specifically, Geisinger and Evangelical engaged in the deceptive

practice of advertising "competitive salaries" even though they agreed not to

recruit each other's Healthcare Workers, suppressing competition for them and

their pay.

87.    Defendants' No-Poach Agreement had the purpose and effect of: (a)

substantially eliminating competition between Geisinger and Evangelical for

Healthcare Workers in Central Pennsylvania, and (b) artificially suppressing the

compensation of Plaintiffs and the Class to levels below those that would be

present in a competitive market.

88.    As a direct and proximate result of Geisinger's and Evangelical's No-

Poach Agreement, Plaintiffs and members of the Class have suffered injury and

have been deprived of the benefits of free and fair competition on the merits.

89.    The unfair, deceptive, and unlawful No-Poach Agreement had the following effects, among others:

(a)    Competition between Geisinger and Evangelical for Healthcare Workers was suppressed, restrained, or eliminated; and

(b)    Plaintiffs and members of the Class have received lower compensation from Geisinger and Evangelical than they otherwise would have received in the absence of the No-Poach Agreement and, as a result, have been injured and have suffered damages in an amount according to proof at trial.

90.    The acts done by Geisinger and Evangelical as part of, and in furtherance of, their contracts, combinations, or conspiracies were authorized, ordered, or done by their respective senior executives while actively engaged in the management of Defendants' affairs.

91.    The No-Poach Agreement is a violation of 73 P.S. §§ 201-1-201-9.3.

92.    Accordingly, Plaintiffs and members of the Class seek their damages caused by Defendants' violation of 73 P.S. §§ 201-1-201-9.3, the costs of bringing suit, reasonable attorneys' fees, injunctive relief, and a declaration that such agreement is unlawful.

## VI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter judgment on their behalf and that of the Class by adjudging and decreeing that:

A.     This action may be maintained as a class action, with Plaintiffs as the designated Class representatives and their counsel as Class counsel;

B.     Defendants engaged in a trust, contract, combination, or conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-1-201-9.3, and that Plaintiffs and the members of the Class have been damaged and injured in their business as a result of this violation;

C.     The alleged conduct be adjudged and decreed to be a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, or in the alternative, a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, under the rule of reason;

D.     The alleged conduct be adjudged and decreed to be a violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-1-201-9.3;

E.     Plaintiffs and the members of the Class recover threefold the damages determined to have been sustained by them as a result of the conduct of Geisinger and Evangelical complained of herein and that judgment be entered against Geisinger and Evangelical for the amount so determined;

F.     Judgment be entered against Geisinger and Evangelical in favor of Plaintiffs and each member of the Class, for restitution and disgorgement of ill-gotten gains as allowed by law and equity as determined to have been sustained by them;

G.     For prejudgment and post-judgment interest;

H.     For equitable relief, including a judicial determination of the rights and responsibilities of the parties;

I.     For attorneys' fees;

J.     For costs of suit; and

K.     For such other and further relief as the Court may deem just and proper.

## VII.  JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial for all claims and issues so triable.

Dated:  March 18, 2021                    */s/ Eric L. Cramer*

<div style="margin-left:auto">

Eric L. Cramer (PA Bar No. 69289) (*Pro Hac Vice*)
Shanon Jude Carson (PA Bar No. 85957)
Mark R. Suter (PA Bar No. 322922) (*Pro Hac Vice*)
**BERGER MONTAGUE PC**
1818 Market Street
Suite 3600
Philadelphia, PA 19103
Phone: (215) 875-4604
Fax: (215) 875-5707
ecramer@bm.net
scarson@bm.net
msuter@bm.net

Daniel J. Walker (*Pro Hac Vice*)
**BERGER MONTAGUE PC**
2001 Pennsylvania Avenue, NW
Suite 300
Washington, DC 20006
Phone: (202) 559-9745
Fax: (215) 875-5707
dwalker@bm.net

Adam J. Zapala (*Pro Hac Vice*)
Elizabeth T. Castillo (*Pro Hac Vice*)
James G.B. Dallal (*Pro Hac Vice*)
Tamarah P. Prevost (*Pro Hac Vice*)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Phone: (650) 697-6000
Fax: (650) 697-0577
azapala@cpmlegal.com
ecastillo@cpmlegal.com
jdallal@cpmlegal.com
tprevost@cpmlegal.com

</div>

Alexander E. Barnett (*Pro Hac Vice*)
**COTCHETT, PITRE & McCARTHY, LLP**
40 Worth Street, 10th Floor
New York, NY 10013
Phone: (212) 201-6820
abarnett@cpmlegal.com

*Interim Co-Lead Counsel for Plaintiffs and the Proposed Class*

Ira Neil Richards (PA Bar No. 50879)
**SCHNADER HARRISON SEGAL & LEWIS LLP**
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103-7286
Phone: (215) 751-2503
irichards@schnader.com

Roberta D. Liebenberg (PA Bar No. 31738) (*Pro Hac Vice*)
Gerard A. Dever (PA Bar No. 85291) (*Pro Hac Vice*)
Mary L. Russell (PA Bar No. 58581) (*Pro Hac Vice*)
**FINE, KAPLAN, AND BLACK, R.P.C.**
One South Broad St., 23rd Floor
Philadelphia, PA 19107
Phone: (215) 567-6565
rliebenberg@finekaplan.com
gdever@finekaplan.com
mrussell@finekaplan.com

*Attorneys for Plaintiff Jessica Sauer and the Proposed Class*

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 18th day of March 2021 a true and correct copy of this **CONSOLIDATED CLASS ACTION COMPLAINT** was filed with the Court's Case Management/Electronic Case Filing System and served upon all counsel known to be representing the Defendants, including:

Chahira Solh
CROWELL & MORING LLP
3 Park Plaza, Ste. 20th Floor
Irvine, CA 92614-8505
Phone: (949) 798-1367
csolh@crowell.com

Stefan M. Meisner
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington, DC 20004
Phone: (202) 624-2500
smeisner@crowell.com

Daniel T. Brier
Donna A. Walsh
Richard L. Armezzani
MYERS BRIER & KELLY LLP
425 Spruce Street, Suite 200
Scranton, PA 18503
Phone: (570) 342-6100
dbrier@mbklaw.com
dwalsh@mbklaw.com
rarmezzani@mbklaw.com

*Attorneys for Defendant Geisinger Health*

Norman Armstrong, Jr.
Christopher Yook
KING & SPALDING
1700 Pennsylvania Avenue
Washington, DC 20006
Phone: (202) 626-8979
narmstrong@kslaw.com
cyook@kslaw.com

Carol A. Steinour Young
Devin J. Chwastyk
MCNEES WALLACE & NURICK LLC
100 Pine Street, P.O. Box 1166
Harrisburg, PA 17108-1166
Phone: (717) 232-8000
csteinour@mcneeslaw.com
dchwastyk@mcneeslaw.com

*Attorneys for Defendant Evangelical Community Hospital*

*/s/ Eric L. Cramer*