# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| IN RE: GEISINGER HEALTH AND EVANGELICAL COMMUNITY HOSPITAL HEALTHCARE WORKERS ANTITRUST LITIGATION | Case No. 4:21-cv-00196-MWB |

# MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT AND, ALTERNATIVELY, TO STRIKE CLASS ACTION ALLEGATIONS

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ................................................................................1

PROCEDURAL HISTORY.................................................................3

STATEMENT OF FACTS .................................................................3

LEGAL STANDARD..........................................................................5

ARGUMENT .......................................................................................7

I.    PLAINTIFFS LACK ARTICLE III AND ANTITRUST STANDING. .......7

    A.    Plaintiffs lack Article III standing to sue. ...........................7

        i.    Plaintiffs fail to allege that they sought work at other hospitals or were otherwise injured by the alleged conspiracy. ...................................................................7

        ii.    Plaintiffs fail to plausibly allege market power in a properly defined labor market and are thus unable to claim they were indirectly injured through lower wages...........9

    B.    Plaintiffs lack antitrust standing.......................................15

        i.    Plaintiffs have not shown they have suffered antitrust injury. ...................................................................16

        ii.    Plaintiffs' claimed injuries from the wage-based theory are too remote to confer antitrust standing. .............17

II.    PLAINTIFFS FAIL TO ALLEGE FACTS SUFFICIENT TO SUPPORT A SECTION 1 CONSPIRACY UNDER THE SHERMAN ACT. ...................................................................19

    A.    Plaintiffs' conspiracy claim is based on a single communication that fails to establish the existence of a "no-poach" (or any) agreement. .........................................................19

    B.    Plaintiffs allege no facts regarding the most basic aspects of a Section 1 conspiracy.........................................................20

i

      i.     The single, undated email is not direct evidence of a conspiracy. ...............................................................21

      ii.    The DOJ action does not salvage Plaintiffs' Complaint, as it was not a "no-poach" case, but a challenge to a proposed collaboration agreement between Geisinger and Evangelical. ................................................................22

III.   THE COURT SHOULD STRIKE PLAINTIFFS' OVERBROAD CLASS ALLEGATIONS. ............................................................22

    A.    Plaintiffs' class allegations lack Rule 23(b) predominance. ..............23

    B.    The Proposed Class is unascertainable. .............................................27

    C.    Plaintiffs' claims and those of the Proposed Class fail to meet Rule 23(a)(3) typicality. ......................................................................29

IV.   PLAINTIFFS LACK STANDING AND OTHERWISE FAIL TO STATE A CLAIM UNDER PENNSYLVANIA'S UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW...........................31

    A.    Plaintiffs lack standing to sue, because they are not purchasers of consumer goods or services. ..........................................................32

    B.    Plaintiffs fail to satisfy the UTPCPL's remaining requirements. ......33

    C.    Plaintiffs fail to specify the UTPCPL section allegedly violated. .....34

CONCLUSION ......................................................................................................35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen–Myland, Inc. v. IBM Corp.*,
  33 F.3d 194 (3d Cir. 1994) ...............................................................13

*Anadarko Petroleum Corp. v. Commonwealth*,
  206 A.3d 51 (Pa. Commw. Ct. 2019), *rev'd on other grounds*, No.
  81 MAP 2019, 2021 WL 1114660 (Pa. Mar. 24, 2021) ....................35

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).................................................................3, 6, 15

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of
  Carpenters*,
  459 U.S. 519 (1983)...........................................................16, 18, 19

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990)........................................................................16

*Balderston v. Medtronic Sofamor Danek, Inc.*,
  285 F.3d 238 (3d Cir. 2002) ...........................................................32

*In re Bath and Kitchen Fixtures Antitrust Litig.*,
  No. 05-cv-00510 MAM, 2006 WL 2038605 (E.D. Pa. July 19,
  2006) ...............................................................................................21

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...............................................6, 11, 20, 34, 35

*Bldg. Materials Corp. of Am. v. Rotter*,
  535 F. Supp. 2d 518 (E.D. Pa. 2008) ..............................................13

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977)........................................................................16

*Carrera v. Bayer Corp.*,
  727 F.3d 300 (3d Cir. 2013) ...........................................................27

*Center City Periodontists, P.C. v. Dentsply Int'l, Inc.*,
  321 F.R.D. 193 (E.D. Pa. 2017) ...........................................................................28

*City of Pittsburgh v. West Penn Power Comp*,
  147 F.3d 256 (3d Cir. 1998) ................................................................................16

*Com. of Pa. ex. rel. Zimmerman v. PepsiCo, Inc.*,
  836 F.2d 173 (3d Cir. 1988) ...........................................................................20, 21

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013).................................................................................................24

*Commonwealth v. Chesapeake Energy Corp.*,
  247 A.3d 934 (Pa. 2021) ......................................................................................31

*In re Comp. of Managerial, Prof'l, & Tech. Emps. Antitrust Litig.*,
  No. 02–2924 (AET), 2003 WL 26115698 (D.N.J. May 27, 2003) ...................24

*Const. Party of Penn. v. Aichele*,
  757 F.3d 347 (3d Cir. 2014) ..................................................................................5

*Cosm. Gallery, Inc. v. Schoeneman Corp.*,
  495 F.3d 46 (3d Cir. 2007) ..................................................................................21

*Cromar Co. v. Nuclear Materials & Equip. Corp.*,
  543 F.2d 501 (3d Cir. 1976) ................................................................................16

*Cupp v. Alberto-Culver USA, Inc.*,
  310 F. Supp. 2d 963, 970 (W.D. Tenn. 2004) ...................................................12

*DeFazio v. Gregory*,
  836 A.2d 935 (Pa. Super. 2003) ....................................................................32, 33

*E. Tex. Motor Freight Sys., Inc. v. Rodriguez*,
  431 U.S. 395 (1977).................................................................................................26

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992).................................................................................................14

*Edmonson v. Lincoln Nat. Life Ins. Co.*,
  725 F.3d 406 (3d Cir. 2013) ...................................................................................7

*Feeney v. Disston Manor Pers. Care Home, Inc.*,
849 A.2d 590 (Pa. Super. Ct. 2004) .................................................................35

*Finkelman v. Nat'l Football League*,
810 F.3d 187 (3d Cir. 2016) ......................................................................5, 8, 9

*Gen. Tel. Co. of the Sw. v. Falcon*,
457 U.S. 147 (1982)........................................................................................7, 26

*Gonzalez v. Corning*,
317 F.R.D. 443 (W.D. Pa. 2016) .......................................................................28

*Gordon v. Lewistown Hosp.*,
272 F. Supp. 2d 393 (M.D. Pa. 2003), *aff'd*, 423 F.3d 184 (3d Cir.
2005) .....................................................................................................................14

*Gottlieb v. Tropicana Hotel & Casino*,
109 F. Supp. 2d 324 (E.D. Pa. 2000).................................................................32

*Hayes v. Wal-Mart Stores, Inc.*,
725 F. 3d 349 (3d Cir. 2013) .............................................................................28

*In re High-Tech Emp. Antitrust Litig.*,
985 F. Supp. 2d 1167 (N.D. Cal. 2013).............................................................27

*Holmes v. Sec. Inv'r Prot. Corp.*,
503 U.S. 258 (1992).....................................................................................17, 18

*Hyland v. HomeServices of Am., Inc.*,
771 F. 3d 310 (6th Cir. 2014) ...........................................................................21

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010) ....................................................................6, 19, 21

*InterVest, Inc. v. Bloomberg, L.P.*,
340 F.3d 144 (3d Cir. 2003) ..............................................................................20

*In re Iowa Ready-Mix Concrete Antitrust Litig.*,
768 F. Supp. 2d 961 (N.D. Iowa 2011) ...............................................................9

*Joint Stock Soc'y v. UDV N. Am., Inc.*,
266 F.3d 164 (3d Cir. 2001) ................................................................................5

*Katz v. Aetna Cas. & Sur. Co.*,
    972 F.2d 53 (3d Cir. 1992) .................................................................. 32

*Kern v. Lehigh Valley Hosp., Inc.*,
    108 A.3d 1281 (Pa. Super. 2015) ....................................................... 33

*Khalid v. Microsoft Corp.*,
    No. C19-130-RSM, 2020 WL 1674123 (W.D. Wash. Apr. 6, 2020) ............... 10

*Kline v. Sec. Guards, Inc.*,
    196 F.R.D. 261 (E.D. Pa. 2000) .......................................................... 29

*Lewis v. Atlantic States Ins. Co.*,
    No. 08-1040, 2008 WL 11342459 (W.D. Pa. Nov. 10, 2008) .................... 31, 33

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
    998 F.2d 1144 (3d Cir. 1993) .............................................................. 16

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) .......................................................... 5, 7, 8, 15

*Marcus v. BMW of N. Am., LLC*,
    687 F.3d 583 (3d Cir. 2012) ........................................................... 29, 30

*McCray v. Fid. Nat. Title Ins. Co.*,
    682 F.3d 229 (3d Cir. 2012) ................................................................. 8

*Multiple Energy Techs., LLC v. Under Armour, Inc.*,
    No. 2:20-cv-664-NR, 2021 WL 807722 (W.D. Pa. Mar. 3, 2021) .................... 11

*Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.*,
    268 F. Supp. 3d 1071 (C.D. Cal. 2017) .............................................. 11

*Premier Comp Sols. LLC v. UPMC*,
    377 F. Supp. 3d 506 (W.D. Pa. 2019) ................................................. 17

*In re Processed Egg Prod. Antitrust Litig.*,
    881 F.3d 262 (3d Cir. 2018) .............................................................. 15

*ProMedica Health Sys., Inc. v. F.T.C.*,
    749 F.3d 559 (6th Cir. 2014) ............................................................. 15

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Circ. 1997)..............................................................13

*Riviello v. Chase Bank USA, N.A.*,
No. 3:19-CV-0510, 2020 WL 1129956 (M.D. Pa., Mar. 4, 2020)....................34

*Roman v. Cessna Aircraft Co.*,
55 F.3d 542 (10th Cir. 1995) ...............................................................17

*Romeo v. Pittsburgh Assocs.*,
787 A.2d 1027 (Pa. Super. 2001) .........................................................35

*In re Rutter's Inc. Data Sec. Breach Litig.*,
No. 1:20-cv-382, 2021 WL 29054 (M.D. Pa. Jan. 5, 2021) ........................32, 33

*In re Ry. Indus. Emp. No-Poach Antitrust Litig.*,
395 F. Supp. 3d 464 (W.D. Pa. 2019)........................................................*passim*

*In re Schering Plough Corp. ERISA Litig.*,
589 F.3d 585 (3d Cir. 2009) ...............................................................29

*Seaman v. Duke Univ.*,
No. 1:15–CV–462, 2018 WL 671239 (M.D.N.C. Feb. 1, 2018).................24, 27

*Semenko v. Wendy's Int'l, Inc.*,
No. 2:12-CV-0836, 2013 WL 1568407 (W.D. Pa. Apr. 12, 2013) ........23, 27, 31

*United States v. Carilion Health Sys.*,
707 F. Supp. 840 (W.D. Va. 1989) ......................................................15

*United States v. Geisinger Health, et al.*,
No. 4:20-cv-01383-MWB (M.D. Pa. Aug. 5, 2020) .................................4, 5, 22

*Vanderklok v. United States*,
868 F.3d 189. (3d Cir. 2017) ...............................................................14

*Varsity Brands, Inc. v. Star Athletica, LLC*,
No. 2:10-cv-02508-BBD-cgc, 2011 WL 13097063 (W.D. Tenn.
Oct. 31, 2011) ..................................................................................11

*Weisfeld v. Sun Chemical Corp.*,
No. 02–4478, 2004 WL 4515 (3d Cir. 2003) .........................................25, 26

*Wheeler v. Travelers Ins. Co.,*
    22 F.3d 534 (3d Cir.1994) ...................................................................7


**Statutes**

73 Pa. Stat. § 201-1 ..........................................................................34

73 Pa. Stat. §§ 201-1 through 201-9.3 ..........................................3, 34

73 Pa. Stat. § 201-2(4)(i)-(xxi) ..........................................................35

73 Pa. Stat. § 201-3.1 ........................................................................34

73 Pa. Stat. § 201-9 ...........................................................................34

73 Pa. Stat. § 201-9.2 ...................................................................32, 33

73 Pa. Stat. § 201-9.2(a) ...................................................................32

Clayton Act, Section 4, 15 U.S.C. § 12 ...........................................15

Sherman Act, Section 1, 15 U.S.C. § 1 .....................................*passim*


**Other Authorities**

Fed. P. Civ. R. 12(b)(6)....................................................................1, 6

Fed. R. Civ. P. 12(b)(1)....................................................................1, 5

Fed. R. Civ. P. 23 ........................................................................*passim*

Fed. R. Civ. P. 23(a)......................................................................26, 29

Fed. R. Civ. P. 23(b) ...........................................................................23

Fed. R. Civ. P. 23(c)(1)(A) .........................................................1, 6, 23

Fed. R. Civ. P. 23(d)(1)(D) .........................................................1, 6, 23

Geisinger, *Pharmacy Jobs,* https://www.geisinger.org/sites/pharmacy-
    jobs. (last visited May 13, 2021) .................................................33

Health, *Health Care Facilities Search By Range of Miles*,
https://sais.health.pa.gov/commonpoc/content/publiccommonpoc/r
angeSearch.asp (last visited Apr. 21, 2021) .......................................................14

Patient Access Representative, https://aci.edu/patient-access-
representative/ (last visited April 29, 2021) ........................................................3

Geisinger Health[1] ("Geisinger") and Evangelical Community Hospital ("Evangelical") (together, "Defendants") respectfully submit this memorandum in support of their joint motion to dismiss the Consolidated Class Action Complaint (ECF No. 46)[2] under Fed. R. Civ. P. 12(b)(1) and (6), and, alternatively, to strike the Class Action Allegations under Fed. R. Civ. P. 23(c)(1)(A) and 23(d)(1)(D).

## INTRODUCTION

Relying on a *single*, *undated* statement about soliciting nurses on Facebook, Plaintiffs allege without any other support a *decade-plus*-long conspiracy between Geisinger and Evangelical "not to recruit (or 'poach') each other's physicians, nurses, psychologists, therapists, and other healthcare professionals." CAC ¶ 1. Even more, Plaintiffs seek to represent a class of *all* "Healthcare Workers" formerly or currently employed by Defendants over the course of more than ten years. Plaintiffs' attempt to build a vast conspiracy upon such a slender reed fails for multiple reasons.

*First*, Plaintiffs lack constitutional and antitrust standing to bring this case. Plaintiffs do not allege they tried to work at another hospital or would have been recruited but for the alleged conspiracy, so Plaintiffs cannot show they were actually

---

[1] Geisinger Health is misidentified as a defendant in the Complaint. Geisinger Health does not employ any of the Plaintiffs or any others who make up the putative class. Acceptance of the allegations in the Complaint as true for purposes of this motion is not an admission that Geisinger Health is a proper party.

[2] Hereinafter referred to as the "Complaint" or "CAC."

injured. And Plaintiffs' theory of indirect harm through lower wages is fundamentally flawed because it relies on a deficient market definition.

*Second*, Plaintiffs have not plausibly pled an antitrust conspiracy. The single, undated alleged statement about soliciting nurses on Facebook does not establish the existence or scope of an agreement between Geisinger and Evangelical, let alone a covert conspiracy lasting over a decade not to "hire" each other's employees. Indeed, the alleged agreement can be no broader than one not to solicit, which is unsupported other than by insufficient conclusory assertions and generic recitations of the legal elements. The single, undated statement also only mentions nurses. And the Complaint contains no facts showing Defendants agreed not to hire one another's employees or to fix wages. But by conflating the allegation of "not to recruit" with a "no-poach" agreement, Plaintiffs use confusing imagery throughout their Complaint that should not distract from their lack of factual allegations that Defendants formed an agreement *not to hire* each other's "healthcare" employees.

*Third*, the Court should strike the class allegations because the Complaint, on its face, demonstrates the purported class cannot meet the Rule 23 requirements of predominance, ascertainability, and typicality. The facially overbroad class allegations are like those struck at the pleading stage in *In re Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464 (W.D. Pa. 2019) ("*Railway*").

*Fourth*, because they are not "purchasers" of consumer goods or services,

Plaintiffs lack standing to sue and otherwise are unable to state a claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL").

## PROCEDURAL HISTORY

On February 3, 2021, three plaintiffs filed a class action complaint against Defendants in *Leib, et al. v. Geisinger Health, et al.*, 4:21-cv-00196-MWB (M.D. Pa.) ("*Leib* Compl.). Days later, on February 12, 2021, another plaintiff filed a nearly identical class action complaint, *Sauer v. Geisinger Health, et al.*, 4:21-cv-00263-MWB (M.D. Pa.) ("*Sauer* Compl.). The cases were later consolidated (ECF No. 43) and Plaintiffs filed this Consolidated Class Action Complaint (ECF No. 46). The Complaint alleges violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and an unspecified provision of Pennsylvania's UTPCPL, 73 P.S. §§ 201-1-201-9.3.

## STATEMENT OF FACTS[3]

Plaintiffs are three registered nurses and a patient access representative.[4] CAC ¶¶ 15-18. All are current or former employees of either Geisinger or Evangelical. *Id.* They claim that Defendants agreed "not to recruit (or 'poach') each other's . . .

---

[3] The factual allegations described below are taken from Plaintiffs' Complaint and materials incorporated by reference, and are accepted as true solely for purposes of this motion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[4] A patient access representative is "an administrative assistant who is responsible for overseeing the admittance and dismissal of patients and visitors from healthcare facilities." ACI Medical and Dental School, In Demand Career Spotlight Series – Patient Access Representative, https://aci.edu/patient-access-representative/ (last visited April 29, 2021).

Healthcare Workers." *Id.* ¶ 1. The term "Healthcare Workers" is defined as "physicians, nurses, psychologists, therapists, and other healthcare professionals." *Id.* But the term "other healthcare professionals" is left undefined. Notably, the definition of Healthcare Workers does not even specifically include Plaintiff Sauer's occupation, patient access representative. *Id.* ¶ 18.

According to Plaintiffs, the alleged conspiracy has continued since "at least as early as 2010, and may[be] even earlier."[5] *Id.* ¶ 6. It was supposedly in place throughout Central Pennsylvania (*id.* ¶ 2), despite that three of the four plaintiffs worked at only one Geisinger location—Geisinger Medical Center in Danville—and the other at Evangelical Community Hospital in Lewisburg (*id.* ¶¶ 15-18).

Plaintiffs' conspiracy claim rests on a single, undated email allegedly between employees at Geisinger and Evangelical allegedly about soliciting nurses on Facebook. *Id.* ¶ 61. This email, in turn, is taken from a single paragraph of a civil complaint filed by the U.S. Department of Justice ("DOJ") challenging a 2019 transaction between Geisinger and Evangelical. *United States v. Geisinger Health, et al.*, No. 4:20-cv-01383-MWB, ECF No. 1, ¶ 42 ("DOJ Complaint"). The DOJ Complaint *did not* assert a "no-poach" claim. In fact, DOJ settled the case on May

---

[5] Plaintiffs' original, pre-consolidated complaints alleged—without any factual support—that the "agreement" "began by May 2015, [and] likely existed earlier" (*Sauer* Compl. ¶ 6; *Leib* Compl. ¶ 6). The Consolidated Class Action Complaint inexplicably changed the date to "at least as early as 2010, and may have existed earlier" without providing any factual basis for doing so. CAC ¶ 6.

3, 2021, and permitted Defendants to move forward with a modified transaction. *Id.*, ECF No. 46 (Competitive Impact Statement ("CIS")). The CIS filed by DOJ describing the settlement did not mention a "no-poach" conspiracy. *Id.*

Despite insufficient allegations of a Section 1 conspiracy and injury, Plaintiffs seek to represent a vast and diverse putative class of all "Healthcare Workers" who worked at Defendants from "January 2011" onward. CAC ¶ 67.

## LEGAL STANDARD

The Article III "case or controversy" requirement for constitutional standing "has three elements, all of which must be met: (1) the plaintiff must have suffered an injury in fact; (2) there must be a causal nexus between that injury and the conduct complained of; and (3) it must be likely that the injury will be redressed by a favorable judicial decision." *Joint Stock Soc'y v. UDV N. Am., Inc.*, 266 F.3d 164, 175 (3d Cir. 2001) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). A motion to dismiss for lack of Article III standing is "properly brought [under] Rule 12(b)(1), because standing is a jurisdictional matter." *Const. Party of Penn. v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014). "[T]o survive a motion to dismiss for lack of standing, a plaintiff 'must allege facts that affirmatively and plausibly suggest that it has standing to sue.'" *Finkelman v. Nat'l Football League*, 810 F.3d 187, 194 (3d Cir. 2016) (affirming dismissal of antitrust claims for inadequately pleading standing). Conclusory or speculative assertions are insufficient. *Id.*

To avoid dismissal under Rule 12(b)(6), a complaint must also provide "factual content," that, "accepted as true," "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Courts must dismiss a complaint that fails to support a claim because it contains *no* specific set of facts showing entitlement to relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). And a court cannot "accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678; *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 326 (3d Cir. 2010) (ignoring conclusory statements merely reciting elements of offense). The Supreme Court in *Twombly* instructed that: "The costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint." 550 U.S. at 558 (citations omitted).

Further, the Federal Rules of Civil Procedure permit courts to strike overbroad and facially deficient class allegations before requiring the parties to engage in costly fact and expert discovery as part of class certification. Rule 23(c)(1)(A) requires that courts determine "[a]t an early practicable time . . . whether to certify the action as a class action." *Railway*, 395 F. Supp. 3d at 496-97 (striking overbroad class allegations at pleading stage). Rule 23(d)(1)(D) allows the court to "require that the pleadings be amended to eliminate allegations" regarding "absent persons." This is

particularly proper when, as here, the "issues are plain enough from the pleadings to determine whether class certification is appropriate." *Railway*, 395 F. Supp. 3d at 497 (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982)).

## ARGUMENT

## I.  PLAINTIFFS LACK ARTICLE III AND ANTITRUST STANDING.

### A.  Plaintiffs lack Article III standing to sue.

#### i.  Plaintiffs fail to allege that they sought work at other hospitals or were otherwise injured by the alleged conspiracy.

Plaintiffs fail to show they suffered actual injury from the alleged conspiracy. For constitutional standing, Plaintiffs must plead "injury in fact" that is "concrete and particularized," and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citations omitted). This "ensure[s] that plaintiffs have a 'personal stake' or 'interest' in the outcome" of the case. *Wheeler v. Travelers Ins. Co.*, 22 F.3d 534, 537 (3d Cir.1994). The injury must also be "causally connected and traceable to an action of the defendant," a standard "akin to 'but for' causation." *Edmonson v. Lincoln Nat. Life Ins. Co.*, 725 F.3d 406, 418 (3d Cir. 2013).

The restraint at issue in this case is an alleged agreement between Geisinger and Evangelical "not to recruit (or 'poach') each other's physicians, nurses, psychologists, therapists, and other healthcare professionals." CAC ¶ 1. There are no evidentiary allegations that Defendants agreed to not "hire" each other's

employees (*see* Part II, *infra*) and Plaintiffs *do not* claim that Defendants agreed to fix wages. Importantly, Plaintiffs do not allege that any of them *ever wanted or sought* a position at another hospital or employer besides Geisinger or Evangelical, much less that they would have been hired but for the alleged agreement.

Because Plaintiffs do not allege they ever sought work at another hospital, they have not pled a "particularized injury" affecting them "in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. Nor do Plaintiffs plead facts showing they would have been recruited or hired by another hospital but for the alleged conspiracy. And they cannot bootstrap standing for themselves on absent class members who might have tried to work at another employer, because, "[i]n the context of class actions, Article III standing 'is determined vis-a-vis the named parties.'" *McCray v. Fid. Nat. Title Ins. Co*., 682 F.3d 229, 243 (3d Cir. 2012).

The Third Circuit affirmed dismissal of a similar class action complaint for lack of Article III standing. In *Finkelman*, plaintiffs wished to, but could not, watch Super Bowl XLVIII at MetLife Stadium, and later sued the NFL over its ticketing policies. 810 F.3d at 188-89. Plaintiff Hoch-Parker thought to, but did not, buy a ticket in the secondary market because of its high price. *Id.* The court held he lacked standing because; he did not buy a ticket, he "suffered no more injury than any of the possibly tens of thousands of people who thought about purchasing a ticket to the Super Bowl and chose not to." *Id.* at 195. Nor was there the requisite causal

link, because "[d]emand for Super Bowl tickets was so great that Hoch–Parker might have been unable to obtain any tickets at his preferred price even if the NFL had made *all* tickets to the Super Bowl available to members of the general public." *Id.* at 196. The court said that its conclusion "is not a hard call." *Id.* This case is even clearer because Plaintiffs here do not even allege having made any effort to switch jobs, whereas the *Finkelman* plaintiff at least attempted to attend the Super Bowl by researching the availability of tickets online. *Id.* at 195.

### ii. Plaintiffs fail to plausibly allege market power in a properly defined labor market and are thus unable to claim they were indirectly injured through lower wages.

Unable to allege an injury-in-fact necessary for constitutional standing, Plaintiffs try a different—but equally deficient—tactic claiming that they "received lower compensation from Geisinger and Evangelical than they otherwise would have received in the absence of the No-Poach Agreement." CAC ¶ 80. But this relies on a key conclusory and unsupported allegation: that the two hospitals are "the dominant employers of Healthcare Workers in Central Pennsylvania." *Id.* ¶ 38.

For their wage-based theory of harm to work, Plaintiffs must plausibly allege that Geisinger and Evangelical hold market power in a properly defined labor market. *Cf. In re Iowa Ready-Mix Concrete Antitrust Litig.*, 768 F. Supp. 2d 961, 976 (N.D. Iowa 2011) (dismissing antitrust conspiracy claim and stating "[b]ald allegations that the defendants are 'competitors' certainly do not suffice to cross the

line from possibility to plausibility"); *Khalid v. Microsoft Corp.,* No. C19-130-RSM, 2020 WL 1674123, at *7 (W.D. Wash. Apr. 6, 2020) (dismissing Section 2 monopolization complaint for lack of antitrust injury where plaintiff "only alleged market share without providing market analysis"). There would otherwise be no plausible impact on wages. To illustrate, if a market has 100 competing employers, then an agreement between two of those competitors not to recruit each other's workers could not possibly suppress wages because 98 other employers would compete for their labor and, thus, the arrangement could easily be bypassed.

While Plaintiffs make conclusory allegations that Geisinger and Evangelical are the "dominant employers of Healthcare Workers in the Central Pennsylvania region" CAC ¶¶ 27-33, this is legally insufficient and is where their wage-based theory falls apart. Plaintiffs define the relevant market as one "for the services of Healthcare Workers in Central Pennsylvania." *Id.* ¶ 34. Plaintiffs also define "Healthcare Workers" as "physicians, nurses, psychologists, therapists, and other healthcare professionals." *Id.* ¶ 1. This market definition is facially deficient, and therefore does not support any claimed "indirect" injury that is "fairly traceable" to the alleged conduct for several reasons.

First, Plaintiffs' inclusion of the open-ended term "other healthcare professionals" creates confusion as to which jobs are even included in the product market. Plaintiffs provide no means by which to distinguish between employees

who work directly with patients (*e.g.*, doctors, social workers, inpatient care nurses), employees who facilitate healthcare services (*e.g.*, ultrasound or MRI technicians), and employees who do not interact with patients but keep the hospital running (*e.g.*, billing specialists, administrative assistants, cleaning staff). The imprecision is significant because adding any of these jobs would expand the scope of the market.

Such ambiguity in market definition is fatal to antitrust suits. *See Multiple Energy Techs., LLC v. Under Armour, Inc*., No. 2:20-cv-664-NR, 2021 WL 807722, at *2 (W.D. Pa. Mar. 3, 2021) (dismissing complaint, stating plaintiff "has not pled the bare minimum required to define the contours of the relevant market" because it was unclear which products were included); *Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc*., 268 F. Supp. 3d 1071, 1084 (C.D. Cal. 2017) (dismissing antitrust claim where "ambiguities make Plaintiff's market definition unsustainable on its face," making unclear which products were included); *Varsity Brands, Inc. v. Star Athletica, LLC*, No. 2:10-cv-02508-BBD-cgc, 2011 WL 13097063, at *5 (W.D. Tenn. Oct. 31, 2011) (dismissing antitrust counterclaim where "'market for cheerleader uniforms and accessories [] within the United States' [was] too vague" for the court to "determine [its] precise contours," where "accessories could refer to clothing products like socks and shoes or non-clothing products like pom-poms and megaphones"). And failure to provide Defendants fair notice of the allegations itself warrants dismissal. *See Twombly*, 550 U.S. at 555.

In *Cupp v. Alberto-Culver USA, Inc.*, a similarly open-ended market was deemed "insufficient and fatally vague." 310 F. Supp. 2d 963, 970 (W.D. Tenn. 2004). Plaintiffs there alleged a product market of "exclusive salon hair care products," without defining "hair care products." *Id.* at 970-72. Dismissing the complaint because of the deficient market definition, the court said that the "description 'hair care products' is itself so vague that it [was] at a loss as to what sorts of products to include," because "those products could include shampoos, cosmetics, hair rinses, styling aids, or something more." *Id.* at 971. The court reasoned: "Each category considered could expand the relevant market further, and [plaintiffs] do not indicate how broad the category is." *Id.* at 971-72. Plaintiffs' undefined term "other healthcare professionals" here is just as ambiguous.

Second, Plaintiffs improperly limit the product market to healthcare employers, excluding other potential employers that compete for the same workers, including schools, retirement homes, risk adjustment departments, and other industries. Plaintiffs allege no facts explaining why workers would not view these other employers as reasonable substitutes. The ambiguity in Plaintiffs' definition of "other healthcare workers" further compounds the problem. If the services of social workers, cleaning staff, and administrative assistants are included in the market, it is a matter of common sense that these jobs are not unique to the healthcare industry.

Plaintiffs also vaguely define the geographic market as "the Central

Pennsylvania region." CAC ¶ 34. As with the product market, there are also no well-pled facts to support this gerrymandered geographic market, which conveniently includes Geisinger and Evangelical but excludes several employers in the region, including Hershey Medical Center, UPMC Lock Haven, Mount Nittany, St. Luke's-Miners, and others. *Id.* ¶ 2. Plaintiffs claim that Pennsylvania licensing requirements and local networks prevent Healthcare Workers from seeking jobs outside of Union, Snyder, Northumberland, Montour, Lycoming, and Columbia counties. *Id.* ¶¶ 2, 38. But state licensing requirements do not prevent Healthcare Workers from seeking jobs beyond those counties but still within the state. Nor is it an excuse that some employees' first choice might be to work in those counties versus others, because "[i]nterchangeability implies that one product is roughly equivalent to another for the use to which it is put; while there might be some degree of preference for the one over the other, either would work effectively." *Allen–Myland, Inc. v. IBM Corp.*, 33 F.3d 194, 206 (3d Cir. 1994).

The proposed market is thus deficient because it "clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Circ. 1997). Plaintiffs' bare assertions about substitutability are the type of "legal conclusion couched as a factual allegation" that courts do not accept. *Bldg. Materials Corp. of Am. v. Rotter*, 535 F. Supp. 2d 518, 525 (E.D. Pa. 2008).

13

Third, even if the market was limited to just healthcare employers in Central Pennsylvania, Plaintiffs fail to plausibly allege that Defendants have market power in that market. Market power ordinarily requires that defendant hold a "predominant share" of a properly defined market, *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 (1992), in addition to "other relevant factors—such as the strength of competitors or barriers to entry of competitors," *Gordon v. Lewistown Hosp.*, 272 F. Supp. 2d 393, 420 (M.D. Pa. 2003), *aff'd*, 423 F.3d 184 (3d Cir. 2005).

In this case, Plaintiffs concede that the product market includes employment in "hospital" *and* "non-hospital" settings. CAC ¶ 29. While Plaintiffs claim—with no factual support—that Defendants "have employed approximately 70 to 75 percent of hospital Healthcare Workers in Central Pennsylvania," they allege no such shares for *non-hospital* jobs. *Id.* Indeed, Plaintiffs disregard the *more than fifty other* "healthcare facilities" just within a 17-mile radius of Geisinger Medical Center's zip code (17822) in Danville alone that also compete with Defendants for Healthcare Workers.[6] And even if the market were limited to just hospitals, Plaintiffs notably disregard other large hospitals in the region, such as University of Pittsburgh Medical Center, that was nearly twice the size of Evangelical throughout most of the

---

[6] Pennsylvania Dep't of Health, *Health Care Facilities Search By Range of Miles*, https://sais.health.pa.gov/commonpoc/content/publiccommonpoc/rangeSearch.asp (last visited Apr. 21, 2021). The court can judicially notice "information [that] is publicly available on government websites." *Vanderklok v. United States,* 868 F.3d 189, 205, n.16. (3d Cir. 2017).

relevant period (until March 2020).  DOJ Compl. ¶ 52.

Plaintiffs wrongly equate Defendants' market shares for *hospital services* as a proxy for *healthcare labor* market power.  CAC ¶ 28.  The market for the sale of inpatient hospital services to patients and insurers articulated in the DOJ Complaint is based on alleged patient preferences to consume inpatient hospital services locally.  DOJ Compl. ¶¶ 47-50.  The DOJ offered no analysis regarding "non-hospital" markets[7] or the market for healthcare labor at issue here.  Plaintiffs' allegation that Defendants have "a dominant share of non-hospital Healthcare Workers" (CAC ¶ 29) is conclusory and must be ignored.  *See Iqbal*, 556 U.S. at 678.

### B.    Plaintiffs lack antitrust standing.

Not only do Plaintiffs lack constitutional standing for their claims, they also lack antitrust standing.  In antitrust cases like this one, plaintiffs "must do more than satisfy [*Lujan*'s] familiar three-part test" for Article III standing; they must establish antitrust standing as well.  *In re Processed Egg Prod. Antitrust Litig.*, 881 F.3d 262, 268 (3d Cir. 2018).  This is because, under Section 4 of the Clayton Act, monetary damages for antitrust violations are only available to those individuals "whose

---

[7] Courts have found markets for specialized services, *e.g.*, brain surgery and organ transplants, to be much broader than for general acute inpatient care, as patients are willing to travel much farther for the former.  *See, e.g.*, *ProMedica Health Sys., Inc. v. F.T.C.*, 749 F.3d 559, 566 (6th Cir. 2014) (tertiary services); *United States v. Carilion Health Sys.*, 707 F. Supp. 840, 847-48 (W.D. Va. 1989) (same).  This highlights the failings of relying on consumer inpatient care markets to define healthcare labor markets in this case.

protection is the fundamental purpose of the antitrust laws." *Cromar Co. v. Nuclear Materials & Equip. Corp.*, 543 F.2d 501, 506 (3d Cir. 1976). The Supreme Court established the factors for antitrust standing in *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* ("*AGC*"), 459 U.S. 519 (1983):

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165-66 (3d Cir. 1993) (citing *AGC,* 459 U.S. at 545).

### i. Plaintiffs have not shown they have suffered antitrust injury.

Plaintiffs have not made the threshold showing of antitrust injury necessary for antitrust standing. Antitrust injury is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful," *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977), meaning that Plaintiffs' actual injuries must "stem[] from a competition-*reducing* aspect or effect" of the alleged conspiracy. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 329 (1990). "If antitrust injury is not found, further inquiry is unnecessary." *City of Pittsburgh v. West Penn Power Co.,* 147 F.3d 256 (3d Cir. 1998).

To establish antitrust injury, Plaintiffs here must *at least* show they tried, but were unable to find work elsewhere because the alleged conspiracy actually harmed competition for their labor, resulting in Plaintiffs' lowered wages and job immobility. *Cf. Roman v. Cessna Aircraft Co.*, 55 F.3d 542, 543 (10th Cir. 1995) (finding plaintiff had sufficiently alleged antitrust standing where *he had applied for a position at the rival company* and was told that he was denied the job *because* of alleged no-hire agreement). Plaintiffs allege no such facts. The flawed market definition (*see supra*, Part I.A.ii) is further problematic because "[a]ssessing antitrust injury necessarily involves consideration of the relevant product and geographic markets." *Premier Comp Sols. LLC v. UPMC*, 377 F. Supp. 3d 506, 524-25 (W.D. Pa. 2019) (citations omitted). These defects are fatal to Plaintiffs' antitrust standing.

> ### ii.     Plaintiffs' claimed injuries from the wage-based theory are too remote to confer antitrust standing.

The remoteness of Plaintiffs' claimed injuries from the alleged conspiracy is another reason for dismissal. The Supreme Court deems the directness of injury from a violation as "central" to antitrust standing. *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 269 (1992) (citations omitted). This is so for several reasons:

> First, the less direct an injury is, the more difficult it becomes to: ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors. Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of

injury from the violative acts, to obviate the risk of multiple recoveries. . . .

*Id.* at 269-70.

Plaintiffs here offer no plausible claim that they were directly harmed by the alleged conspiracy, yet they nonetheless claim they were indirectly harmed by low wages. CAC ¶ 11. Plaintiffs' wage-based theory of injury depends on a series of faulty assumptions: (i) Evangelical and Geisinger are "key competitors in the labor market for Healthcare Workers" (*id.* ¶ 41); (ii) when a hospital learns that its rival may try to hire one of its employees, the hospital may offer the employee higher wages to preemptively or reactively prevent the employee from leaving (*id.* ¶¶ 43-45); and (iii) increasing wages for one employee will increase wages for all other employees, even those not looking to switch jobs (*id.* ¶¶ 44, 46).

The attenuated causal chain is fatal under the third and fourth *AGC* factors for antitrust standing. Here, the employees most directly impacted by the alleged "conspiracy" would be those who applied, or would have been recruited, to work elsewhere—not the named Plaintiffs, who allege no facts establishing they meet these criteria. *AGC* is instructive. There, two unions sued an association of construction contractors for coercing landowners and other third parties to divert business to nonunion companies. 459 U.S. at 527-28. The Supreme Court held the unions lacked antitrust standing because the "chain of causation between the Union's injury and the alleged restraint . . . contains several somewhat vaguely defined links."

18

*Id.* at 540.  As in *AGC*, other employees here would be more directly impacted by the alleged conspiracy and therefore better positioned to seek redress.  Relatedly, permitting the class action to proceed on behalf of indirectly injured plaintiffs risks an award of duplicative damages and also raises questions about apportionment of damages between directly and indirectly injured employees—issues that further weigh against antitrust standing under the *AGC* framework.  *Id.* at 545.

## II. PLAINTIFFS FAIL TO ALLEGE FACTS SUFFICIENT TO SUPPORT A SECTION 1 CONSPIRACY UNDER THE SHERMAN ACT.

### A. Plaintiffs' conspiracy claim is based on a single communication that fails to establish the existence of a "no-poach" (or any) agreement.

Plaintiffs' entire complaint hinges on a single alleged email communication that does not support their broad conspiracy claim.  Indeed, the communication does not even establish an agreement, much less a decade-plus-long conspiracy.  To prove a violation of Section 1 of the Sherman Act, a plaintiff must show "a unity of purpose or a common design and understanding or a meeting of minds."  *Brokerage*, 618 F.3d at 315.  According to Plaintiffs:

> [A]fter learning that Geisinger was using Facebook to recruit Evangelical's nurses, Evangelical's CEO emailed her counterpart at Geisinger, stating, 'Can you please ask that this stop[?]  Very counter to what we are trying to accomplish.'  The Geisinger senior executive forwarded the email to Geisinger's Vice President of Talent Acquisition, instructing her to 'ask your staff to stop this activity with Evangelical.'

CAC ¶ 61 (citation omitted).  Plaintiffs allege nothing more.  This does not establish

that the Geisinger employee agreed to refrain from recruiting Evangelical employees. At most, the single, undated email reflects a request to "stop" soliciting nurses via Facebook with no indication of assent, which is not enough. *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003) ("Unilateral activity by a defendant, no matter the motivation, cannot give rise to a section 1 violation.").

### B. Plaintiffs allege no facts regarding the most basic aspects of a Section 1 conspiracy.

Even if this single, undated alleged communication could be used to infer some sort of agreement, or request for agreement, regarding nurses at some unalleged point in time, it certainly is insufficient to support Plaintiffs' conclusory allegation of a decade-plus-long conspiracy to refrain from recruiting or hiring all "Healthcare Workers" employed by Defendants. When evaluating the sufficiency of a complaint alleging an antitrust conspiracy, "[o]nly allegations of conspiracy which are particularized will be deemed sufficient." *Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988); *see also Twombly,* 550 U.S. at 565 n.10 (dismissing complaint for failing to allege "specific time, place, or person involved in the alleged conspiracies"). Aside from the single, undated email, the Complaint only contains conclusory statements about the alleged conspiracy. Even the email does not establish what types of Healthcare Workers other than "nurses" were subject to the alleged conspiracy, when the purported agreement was first formed, or how it came about. The absence of these foundational facts warrants

dismissal. *See, e.g., In re Bath and Kitchen Fixtures Antitrust Litig.,* No. 05-cv-00510 MAM, 2006 WL 2038605, at *4 (E.D. Pa. July 19, 2006) ((quoting *Black & Yates, Inc. v. Mahogany Assoc., Inc.,* 129 F. 2d 226, 231-32 (3d Cir. 1941) (dismissing for failure to allege "date of the conspiracy, its attendant circumstances or where, when or by whom the statements at issue were made"); *PepsiCo,* 836 F.2d at 182 (affirming dismissal of conspiracy claim regarding unspecified contracts with unnamed other entities to achieve unidentified competitive effects).

### i. The single, undated email is not direct evidence of a conspiracy.

Nor is the single, undated email direct evidence of a conspiracy. Direct evidence "*is explicit and requires no inferences* to establish the proposition or conclusion being asserted." *Brokerage,* 618 F.3d at 324 n.23 (emphasis added). Such evidence has been referred to as "the smoking gun." *Cosm. Gallery, Inc. v. Schoeneman Corp*., 495 F.3d 46, 52 (3d Cir. 2007). Direct evidence must be so explicit that it is "tantamount to an acknowledgement of guilt." *Hyland v. HomeServices of America, Inc.,* 771 F. 3d 310, 318 (6th Cir. 2014) (citation omitted).

Here, the email falls short of that high threshold. Not only does the email fail to state that the Geisinger employee assented to refrain from recruiting Evangelical nurses on Facebook, it is undated and otherwise provides no insight about the scope of an alleged agreement. Further, the Complaint states that the email referred to nurse recruiting (CAC ¶ 61); there is no mention of "physicians . . . psychologists,

21

therapists, and other healthcare professionals," all supposedly subject to the "no-poach" agreement (*id.* ¶ 1). The email is thus not direct evidence of any conspiracy, let alone a decade-plus-long conspiracy involving all Healthcare Workers.

       ii.      **The DOJ action does not salvage Plaintiffs' Complaint, as it was not a "no-poach" case, but a challenge to a proposed collaboration agreement between Geisinger and Evangelical.**

The DOJ's civil enforcement action does not cure the infirmities in Plaintiffs' allegations either. The DOJ's suit against Defendants did not allege an antitrust violation based on a "no-poach" agreement. Rather, it sought to unwind Geisinger's 2019 investment in Evangelical Community Hospital that, in the DOJ's view, impacted competition in the market for "inpatient general acute-care services," not in any labor market. DOJ Compl. ¶ 16. Notably, the DOJ's CIS filed in this Court does not even mention a "no-poach" conspiracy. *United States v. Geisinger Health, et al.*, No. 4:20-cv-01383-MWB, ECF No. 46. And the CIS states that the DOJ is "satisfied" that "the relief" obtained therein "will remedy the anticompetitive effects alleged in the [DOJ] Complaint" and "achieves all or substantially all of the relief" it would have gotten had it gone to trial. *Id.* at 18.

## III.    THE COURT SHOULD STRIKE PLAINTIFFS' OVERBROAD CLASS ALLEGATIONS.

The court should strike Plaintiffs' overbroad class allegations. Three registered nurses and a patient access representative seek to represent a vastly disparate class of all "Healthcare Workers" who were employed at Geisinger or

Evangelical over the course of over a decade (the "Proposed Class"). CAC ¶ 67. Plaintiffs seek to certify this overbroad class even though they fail to allege whether they ever sought or were denied a job by another employer. Instead, Plaintiffs lump in all employees who may have tried seeking work at another employer with those who made no such effort, claiming that all such individuals suffered depressed wages and job immobility from the alleged "conspiracy." *Id.* ¶¶ 1, 2, 6.

Courts may strike class allegations that, like here, are facially overbroad and legally deficient before discovery and class certification to streamline litigation and avoid significant resource expenditure. *See Semenko v. Wendy's Int'l, Inc.*, No. 2:12-CV-0836, 2013 WL 1568407, at *2 (W.D. Pa. Apr. 12, 2013) (striking class allegations at pleading stage); *Railway*, 395 F. Supp. 3d 464, 514 (same). Rule 23(c)(1)(A) states: "*At an early practicable time* after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action." (Emphasis added). And Rule 23(d)(1)(D) allows courts to "require that the pleadings be amended to eliminate allegations about representation of absent persons."

No costly discovery is necessary to confirm what is clear from the face of the Complaint: Plaintiffs' overbroad Proposed Class cannot satisfy Rule 23.

### A. Plaintiffs' class allegations lack Rule 23(b) predominance.

Plaintiffs' overbroad class allegations fail to meet Rule 23(b)(3)'s

"predominance" requirement.  To satisfy predominance in a Section 1 conspiracy action, plaintiffs must show "(1) that the existence of individual injury resulting from the alleged antitrust violation . . . [is] capable of proof at trial through evidence that [is] common to the class rather than individual to its members; and (2) damages resulting from that injury [are] measurable on a class-wide basis through use of a common methodology."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 30 (2013) (quotations omitted).

Courts reject broad classes in cases involving alleged anticompetitive employment practices where common proof of injury and damages would not predominate over individual ones.  *See, e.g.*, *Railway*, 395 F. Supp. 3d at 506 (rejecting, on motion to strike, plaintiffs' allegations of broad class of skilled and non-skilled railway workers as lacking Rule 23 predominance); *In re Comp. of Managerial, Prof'l, & Tech. Emp.  Antitrust Litig.*, No. 02–2924 (AET), 2003 WL 26115698, at *3 (D.N.J. May 27, 2003) (holding proposed class of oil/petrochemical non-union managerial, professional, and technical workers as too disparate and "will differ . . . [for] all positions . . . that [comprise] the putative class"); *Seaman v. Duke Univ.*, No. 1:15–CV–462, 2018 WL 671239, at *9 (M.D.N.C. Feb. 1, 2018) (same).

In *Railway*, plaintiffs sought to certify a broad class of skilled and non-skilled railway workers including "all employees regardless of title, position, or status." 395 F. Supp. 3d at 506.  Plaintiffs alleged defendant rail equipment suppliers had

entered into an overarching "no-hire" conspiracy to reduce labor competition and

suppress wages. *Id.* Striking plaintiffs' class allegations on the pleadings and before

discovery for lack of Rule 23 predominance, the court reasoned that:

> [A]ntitrust impact may be proven on a class-wide basis for all
> employees, e.g., evidence that the compensation structures for all
> defendants were so rigid that the compensation of all class members,
> including employees with skills specific to the railway equipment
> supply industry and employees without skills specific to that industry,
> were tethered together. . . . The allegations for a class of all employees
> are conclusory in that respect and the court cannot discern from the
> allegations anything about the compensation structures of defendants.

*Id.* at 514.[8] Notably, the court rejected plaintiffs' "conclusory allegations" regarding

defendants' compensation structures—which are mimicked in Plaintiffs' Complaint

in this case[9]—as lacking "sufficient factual allegations" to state a prima facie case

that antitrust impact is capable of class-wide proof for "all" railway workers. *Id.* at

---

[8] *See also Weisfeld v. Sun Chemical Corp.*, No. 02–4478, 2004 WL 45152, at *1, *6
(3d Cir. 2003) (rejecting overbroad class requiring consideration of "numerous
individual factors," including non-competes, salary history, education, willingness
to relocate, and ability to seek work in other industries utilizing same skillset).

[9] *Compare, e.g.*, CAC ¶¶ 42-44 (regarding *proactive* compensation increases) *with*
Compl. at ¶ 36, *In re: Railway Ind. Emp. No-Poach Antitrust Litig.*, No. 18-798
(W.D. Pa. Oct. 12, 2018), ECF No. 88 ("*Railway* Compl.") (copying nearly
verbatim) *and* Compl. at ¶ 37, *Seaman v. Duke*, No. 1:15-cv-00462-CCE-JLW (M.D.
N.C. Oct. 4, 2017), ECF No. 109 ("*Duke* Compl.") (same); CAC ¶ 46 (regarding
*reactive* compensation increases) *with Railway* Compl. ¶ 37 (copying nearly
verbatim), *and Duke* Compl. ¶ 38 (same); CAC ¶ 47 (regarding impacts of
competitive hiring on salaries of all employees), *with Railway* Comp. ¶ 39 (copying
nearly verbatim), *and Duke* Compl. ¶ 40 (same); CAC ¶¶ 49-51 (regarding
objectives and process of maintaining compensation levels), *with Duke* Compl. ¶¶
41-43 (copying nearly verbatim).

514.  The Court should similarly reject Plaintiffs' conclusory allegations here.

The Third Circuit's concerns over "individualized inquiries" and "individual factors" are heightened in this case.  Plaintiffs' expansive Proposed Class would include a mix of Healthcare Workers in all positions, and their liability and damages claims are simply not amenable to common proof.  And, as in *Weisfeld* and *Railway*, the requisite inquiry into hiring practices, salary histories, employee contract terms, professional qualifications, education levels, niche specializations, willingness to relocate, desire or attempt to switch jobs, and fungibility within labor markets—all relevant to an employee's alleged injury—will require too many individualized inquiries to satisfy Rule 23 predominance.

Further, it defies logic that, absent the alleged agreement, Defendants would have recruited *all* such Healthcare Workers, or that every employee would have been injured by such an agreement, or that three nurses and a patient access representative could represent such a diverse class of healthcare employees subject to such varied employment terms.  Rule 23(a) "effectively limit[s] the class claims to those fairly encompassed" by Plaintiffs' claims, *Falcon*, 457 U.S. at 156, and thus, Plaintiffs "must be part of the class and possess the same interest and suffer the same injury" as class members.  *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (quotations omitted).

In sum, the Complaint lacks any factual allegations plausibly demonstrating:

(i) that the alleged agreement—which relies solely on a single statement regarding soliciting nurses via Facebook—could possibly impact recruiting and wages for all of Defendants' Healthcare Workers in Central Pennsylvania regardless of skill level and employment terms; (ii) how three nurses and a patient access representative could represent all employee categories at Defendants; or (iii) why the countless individualized issues for each employee category swept into the broad putative class of all Healthcare Workers would not overwhelm the common issues.  *See, e.g., Seaman*, 2018 WL 671239, at *2-3 (denying class certification of "all" defendants' physicians, nurses, and skilled medical staff); *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1171, 1174 (N.D. Cal. 2013) (denying class certification of "all" salaried employees "who worked for Defendants between 2005 and 2009" in U.S.).  Given these defects, the Court should strike Plaintiffs' class allegations now to avoid wasteful discovery and expert analysis over employee categories that Plaintiffs cannot possibly represent here.  *See Semenko,* 2013 WL 1568407, at *2.

## B.    The Proposed Class is unascertainable.

The Proposed Class is unascertainable because it lacks any objective criteria to determine who falls within it.  The Third Circuit has said that "ascertainability and a clear class definition" "mandate[] a rigorous approach *at the outset*" of a class action to "save[] the resources of both the courts and the parties" and avoid "individualized fact-finding or 'mini-trials.'"  *Carrera v. Bayer Corp.*, 727 F.3d 300,

307 (3d Cir. 2013) (emphasis added). Ascertainability requires a plaintiff to show that (1) "the class [is] defined with reference to objective criteria," and (2) and there is "a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Hayes v. Wal-Mart Stores, Inc.*, 725 F. 3d 349, 355 (3d Cir. 2013).[10]

The Proposed Class includes all "Healthcare Workers"—*i.e.*, "physicians, nurses, psychologists, therapists, and other healthcare professionals"—who have worked at Geisinger or Evangelical "since January 2011 through such time as Defendants' anticompetitive conduct ceased." CAC ¶¶ 1, 67. Plaintiffs simply assert that "[c]lass members are easily ascertainable based on, among other things, the employment records of Defendants." *Id.* ¶ 69.

But these few lines provide no objective criteria through which the Court can identify members of the Proposed Class, let alone a way by which to identify who may have been impacted by the alleged conspiracy. The class definition leaves the term "other healthcare professionals" entirely open-ended. Thus, the Proposed Class could include social workers, ultrasound or MRI technicians, nurse billing

---

[10] *See e,g.*, *Gonzalez v. Corning,* 317 F.R.D. 443, 505 (W.D. Pa. 2016) (denying class of purchasers whose shingles "degranulated or deteriorated" for lacking objective criterion to ascertain them); *Center City Periodontists, P.C. v. Dentsply Int'l, Inc.,* 321 F.R.D. 193, 214 (E.D. Pa. 2017) (denying class of dentists who "were using a public water source" for their equipment for lacking feasible method of determining what water source each Plaintiff used).

specialists, administrative assistants, food service employees, cleaning staff, and others. The Court and Defendants are left to guess whether it could be all, some, or none. The Complaint therefore does not meet "the minimum requirement of defin[ing] the class in a way that enables the court to determine whether a particular individual is a class member." *Kline v. Sec. Guards, Inc.*, 196 F.R.D. 261, 266, 268 (E.D. Pa. 2000) (denying class certification as it was "impossible to definitively identify class members prior to individualized fact-finding and litigation").

### C. Plaintiffs' claims and those of the Proposed Class fail to meet Rule 23(a)(3) typicality.

Finally, Plaintiffs' claims are not "typical of the claims" of the Proposed Class, as required by Rule 23(a)(3). "Typicality" can be measured by "three distinct, though related, concerns": (1) the "legal theory" and "factual circumstances underlying the theory" of the class representatives "must the same as those of the class"; (2) class representatives "must not be subject to a defense that is both inapplicable to many" class members and "likely to become a major focus of the litigation"; and (3) the "interests and incentives" of the class and of the class representatives "must be sufficiently aligned." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 599 (3d Cir. 2009). Typicality "derives its independent legal significance from its ability to screen out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present." *Marcus v. BMW*

*of N. Am., LLC*, 687 F.3d 583, 598 (3d Cir. 2012). Thus, "a plaintiff's claim [must] arise[] *from the same event, practice or course of conduct* that gives rise to the claims of the class members" and be "based on the *same legal theory* as the claims of the class." *Id.* (citation omitted) (emphases added).

The single, undated email relates to recruiting "nurses" on Facebook and no other "Healthcare Workers" in the Proposed Class, including Plaintiff Sauer, a "patient access representative" (CAC ¶ 18). There are no well-pled allegations regarding a conspiracy impacting the other Healthcare Workers. It is also impossible to ascertain from the Complaint whether *any* plaintiff—including the patient-facing "operating room" nurses (Leib and Brokenshire)—even suffered the type of injury they allege all Healthcare Workers did—*i.e.*, suppressed wages and job immobility. *See supra* Part I. They allege no facts and, thus, it is unclear whether Plaintiffs' claims even arise "from the same event, practice or course of conduct" and share the "same legal theory" as those of the class. 687 F. 3d at 598.[11]

The "facts and evidence needed to prove the claims of each member of the

---

[11] Geisinger and Evangelical do not even compete in the employment of all types of Healthcare Workers. As the DOJ Complaint notes, Geisinger offers certain "outpatient" and "specialized" services that Evangelical does not, like "certain advanced cancer services and organ transplants." DOJ Compl. ¶ 46. Logically, workers specializing in these services would not be hired at Evangelical. And any impact on their mobility would therefore not flow from the alleged conspiracy, but from the absence of a position at Evangelical. The "legal or factual position" of Plaintiffs' claims vis-à-vis the claims of these Healthcare Workers would therefore be "markedly different," and atypical. *Marcus*, 687 F.3d at 598.

proposed class" here would "be unique to each claimant" and require "a highly individualized inquiry." *Semenko*, 2013 WL 1568407, at *9 (striking allegations for lacking typicality). Because proof of Plaintiffs' claims would "not prove [those] of other class members," their class allegations must be stricken. *Id*. (citation omitted).

## IV. PLAINTIFFS LACK STANDING AND OTHERWISE FAIL TO STATE A CLAIM UNDER PENNSYLVANIA'S UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW.

Plaintiffs take a kitchen-sink approach in their Complaint by also asserting a violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), claiming Defendants advertised "'[c]ompetitive salaries' even though they agreed not to recruit each other's Healthcare Workers." CAC ¶ 86. The claim rests entirely on general references to "competitive salary" and "competitive compensation" on Defendants' websites. *Id*. ¶ 8.

The UTPCPL is a consumer-protection statute that "is restricted to claims that are legitimately of a consumer nature." *Lewis v. Atlantic States Ins. Co.,* No. 08-1040, 2008 WL 11342459, at *3 (W.D. Pa. Nov. 10, 2008); *see also Commonwealth v. Chesapeake Energy Corp.*, 247 A.3d 934, 947 (Pa. 2021) ("[T]he UTPCPL provides protection to the consumer/purchaser . . . from unfair and deceptive practices of . . . sellers"). Therefore, to recover damages under the UTPCPL, Plaintiffs must (1) be purchasers of goods or services that are (2) primarily for personal, family, or household use, (3) have justifiably relied on the allegedly

deceptive conduct, and (4) suffered an ascertainable loss as a result.  *See In re Rutter's Inc. Data Sec. Breach Litig.* ("Rutter's")*,* No. 1:20-cv-382, 2021 WL 29054, at *18 (M.D. Pa. Jan. 5, 2021) (reciting elements of 73 P.S. § 201-9.2(a)).  Plaintiffs cannot meet these elements for several reasons.

**A.**    **Plaintiffs lack standing to sue, because they are not purchasers of consumer goods or services.**

Plaintiffs lack standing to sue for the simple fact that their claim is unrelated to purchases.  The UTPCPL expressly states that only *purchasers, not sellers*, can sue for damages.  73 P.S. § 201-9.2; *see*, *e.g.*, *Balderston v. Medtronic Sofamor Danek, Inc.*, 285 F.3d 238, 242 (3d Cir. 2002) (affirming dismissal because plaintiff was not a purchaser); *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) ("[T]he statute unambiguously permits only persons who have purchased or leased goods or services to sue.").

The Complaint states that Plaintiffs supplied healthcare labor services, for which Defendants paid them wages.  CAC ¶ 36.  Plaintiffs therefore do not allege any actionable "purchases," a term that is defined according to its "common and approved usage."  *DeFazio v. Gregory,* 836 A.2d 935, 939 (Pa. Super. 2003); *Gottlieb v. Tropicana Hotel & Casino,* 109 F. Supp. 2d 324, 331 (E.D. Pa. 2000). The analysis is straightforward.  As explained in *DeFazio*: "The terms of the UTPCPL sections are unambiguous . . . .  Furthermore, we conclude that 'purchases' in Section 201–9.2 cannot be defined as 'sells.'  Therefore, we hold that a seller

cannot bring a private action under Section 201-9.2." 836 A.2d at 939. Plaintiffs are not purchasers entitled to recover damages under the statute.

## B. Plaintiffs fail to satisfy the UTPCPL's remaining requirements.

Plaintiffs also fail to satisfy several other elements of standing. *First*, healthcare labor services are not "goods or services primarily for personal, family or household purposes," as is required in a private UTPCPL suit. *Cf. Lewis*, 2008 WL 11342459, at *1 (finding business insurance policy not for personal use). *Second*, the Complaint is completely devoid of allegations about Plaintiffs' justifiable reliance. *See Rutter's*, 2021 WL 29054, at *19 (holding UTPCPL claims "must sufficiently allege an ascertainable loss that stems from one's justifiable reliance on the defendant's wrongful conduct.").[12] Here, Plaintiffs do not claim they even *saw* the statements on Defendants' websites, much less that the mention of "competitive salaries" or "competitive compensation"[13] caused them to accept or reject

---

[12] *Kern v. Lehigh Valley Hosp., Inc.*, 108 A.3d 1281, 1290 (Pa. Super. 2015) (holding plaintiff "had to demonstrate that he and all prospective class members justifiably relied on the [defendant's] alleged violations of the UTPCPL.").

[13] Plaintiffs claim that "at one time during the class period"—without specifying when—Geisinger's website advertised: "For your hard work, you'll be rewarded with a competitive salary and a comprehensive benefits package, . . ." but that it "now" states: "Our competitive compensation and benefits package helps you and your loved ones stay healthy, meet your financial goals and thrive professionally and personally." CAC ¶ 8. This is not true. In fact, both statements currently appear on Geisinger's website. The former at: https://www.geisinger.org/sites/pharmacy-jobs. (last visited May 13, 2021). The latter is embedded on that same webpage where it reads "competitive salary and a comprehensive benefits package." Plaintiffs'

employment offers. *Third*, the conclusory statement that Plaintiffs "received lower compensation . . . than they otherwise would have" because of such statements (CAC ¶ 89) is insufficient to plead ascertainable loss. *See Riviello v. Chase Bank USA, N.A.*, No. 3:19-CV-0510, 2020 WL 1129956, at *4 (M.D. Pa., Mar. 4, 2020) (allegations of mere "repeated disruption of any business affairs" are insufficiently ascertainable).

## C. Plaintiffs fail to specify the UTPCPL section allegedly violated.

Plaintiffs' claim suffers another fatal defect: they fail to even state *which* provision in the UTPCPL is at issue, instead referring broadly to *every statutory section* (73 P.S. §§ 201-1-201-9.3) save only for the effective date of the law. CAC ¶ 91. The overbreadth is evident in that the cited sections include those that have nothing to do with the alleged conduct, such as the short title of the statute (73 P.S. § 201-1), as well as a provision authorizing the attorney general to promulgate regulations (73 P.S. § 201-3.1) and a section regarding the appointment of receivers following the dissolution of businesses (73 P.S. § 201-9). Such lack of specificity warrants dismissal because it fails to "give the defendant fair notice of what the claim

---

inaccuracies reveal the weaknesses in the reliance element of their claim. Indeed, Plaintiffs joined Geisinger in 2008 (Brokenshire), 2011 (Leib), and 2019 (Sauer), and could not have relied on references appearing on Geisinger's website today to accept positions then. CAC ¶¶ 15-16, 18. Weigley joined Evangelical in 2014, but Plaintiffs make no allegations about Evangelical's salary advertisements. *Id.* ¶ 17.

is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. The ambiguity

is fatal to Plaintiffs' claim because, "to state a [UTPCPL] claim, a plaintiff must

allege one of the 'unfair or deceptive practices' set forth in 73 P.S. § 201-2(4)(i)-

(xxi)." *Romeo v. Pittsburgh Assocs.*, 787 A.2d 1027, 1033 (Pa. Super. 2001).[14]

Plaintiffs thus lack standing for their UTPCPL claim.[15]

## CONCLUSION

Plaintiffs' attempt to take a single allegation from an unrelated complaint to

prop up a decade-plus-long conspiracy affecting all "Healthcare Workers" across

"Central Pennsylvania" fails. These deficiencies also render Plaintiffs' class

allegations implausible. The Court should scrutinize Plaintiffs' allegations

carefully, as *Twombly* cautioned against allowing deficient complaints like this one

to open the door to massive discovery common in antitrust cases. Defendants

respectfully request that the Court dismiss Plaintiffs' Complaint, or alternatively,

strike their class allegations.

---

[14] *See Feeney v. Disston Manor Pers. Care Home, Inc*., 849 A.2d 590, 598 (Pa. Super. 2004) (affirming dismissal where plaintiff "points to no specific [UTPCPL] provisions" that "were violated").

[15] To the extent Plaintiffs are attempting to allege that the mere existence of an alleged no-poach agreement violates the UTPCPL, such a claim fails as well. The Commonwealth Court has rejected a similar effort to argue that an allegedly anticompetitive agreement intrinsically violates the UTPCPL. *Anadarko Petroleum Corp. v. Commonwealth*, 206 A.3d 51, 60-61 (Pa. Commw. Ct. 2019), *rev'd on other grounds*, No. 81 MAP 2019, 2021 WL 1114660 (Pa. Mar. 24, 2021).

Dated: May 17, 2021

Respectfully submitted,

By: */s/Norman Armstrong, Jr.*
Norman Armstrong, Jr. (*pro hac vice*)
Shannon M. Kasley (*pro hac vice*)
Christopher Yook (*pro hac vice*)
KING & SPALDING LLP
1700 Pennsylvania Avenue
Washington, DC 20006
Phone: (202) 626-8979
narmstrong@kslaw.com
skasley@kslaw.com
cyook@kslaw.com

Carol A. Steinour Young
Devin J. Chwastyk
MCNEES WALLACE & NURICK LLC
100 Pine Street, P.O. Box 1166
Harrisburg, PA 17108-1166
Phone: (717) 232-8000
csteinour@mcneeslaw.com
dchwastyk@mcneeslaw.com

*Attorneys for Defendant Evangelical Community Hospital*

By: */s/Stefan M. Meisner*
Stefan M. Meisner (*pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington, DC 20004
Phone: (202) 624-2500
smeisner@crowell.com

Chahira Solh (*pro hac vice*)
CROWELL & MORING LLP
3 Park Plaza, Ste. 20th Floor
Irvine, CA 92614
Phone: (949) 798-1367
csolh@crowell.com

Rosa M. Morales (*pro hac vice*)
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, NY 10022
Phone: (212) 895-4261
rmorales@crowell.com

Daniel T. Brier
Donna A. Walsh
Richard L. Armezzani
MYERS BRIER & KELLY LLP
425 Spruce Street, Suite 200
Scranton, PA 18503
Phone: (570) 342-6100
dbrier@mbklaw.com
dwalsh@mbklaw.com
rarmezzani@mbklaw.com

*Attorneys for Defendant Geisinger Health*

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this 17th day of May 2021, a true and correct copy of the **MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT AND, ALTERNATIVELY, TO STRIKE CLASS ACTION ALLEGATIONS** was filed with the Court's Case Management/Electronic Filing System and Server upon all counsel known to be representing the Plaintiffs, including:

Eric L. Cramer
Shanon Jude Carson
Mark R. Suter
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Phone: (215) 875-4604
Fax: (215) 875-5707
ecramer@bm.net
scarson@bm.net
msuter@bm.net

Daniel J. Walker
BERGER MONTAGUE PC
2001 Pennsylvania Avenue, NW
Suite 300
Washington, DC 20006
Phone: (202) 559-9745
Fax: (215) 875-5707
dwalker@bm.net

Adam J. Zapala
Elizabeth T. Castillo
James G.B. Dallal
Tamarah P. Prevost
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road
Burlingame, CA 94010
Phone: (650) 697-6000

Ira Neil Richards
SCHNADER HARRISON SEGAL& LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103-7286
Phone: (215) 751-2503
irichards@schnader.com

Roberta D. Liebenberg
Gerard A. Dever
Mary L. Russell
FINE, KAPLAN, AND BLACK, R.P.C.
One South Broad St., 23rd Floor
Philadelphia, PA 19107
Phone: (215) 567-6565
Fax: (215) 568-5872
rliebenberg@finekaplan.com
gdever@finekaplan.com
mrussell@finekaplan.com

*Attorneys for Plaintiff Jessica Sauer and the Proposed Class*

Fax: (650) 697-0577
azapala@cpmlegal.com
ecastillo@cpmlegal.com
jdallal@cpmlegal.com
tprevost@cpmlegal.com

Alexander E. Barnett
COTCHETT, PITRE & McCARTHY,
LLP
40 Worth Street, 10th Floor
New York, NY 10013
Phone: (212) 201-6820
abarnett@cpmlegal.com

*Attorneys for Plaintiffs Nichole Leib, Kevin Brokenshire, and Diane Weigley and the Proposed Class*

*/s/ Chahira Solh*
Chahira Solh