IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GEISINGER HEALTH AND EVANGELICAL COMMUNITY HOSPITAL HEALTHCARE WORKERS ANTITRUST LITIGATION | No. 4:21-CV-00196<br><br>(Chief Judge Brann) |

MEMORANDUM OPINION

JUNE 3, 2022

In this antitrust class action suit against Geisinger Health and Evangelical Community Hospital—concerning the Defendants' alleged agreement not to recruit each other's skilled healthcare workers in central Pennsylvania—the parties have reached an impasse over a discovery dispute. Specifically, the Plaintiffs seek documents and data regarding all Geisinger and Evangelical employees from a specified period. The Defendants object to the requests as overbroad, arguing that the Plaintiffs' definition of "employee" impermissibly includes (1) non-healthcare workers who are not part of the putative class, and (2) workers outside the relevant market of central Pennsylvania. The Court agrees with the Defendants and instructs the parties to proceed with discovery using a narrower definition of "employee" consistent with the term "Healthcare Workers" as defined in the Plaintiffs' Consolidated Class Action Complaint.

I.      **Background**

The Plaintiffs initiated this antitrust class action in February 2021, alleging that Geisinger and Evangelical entered a so-called "no poach" agreement whereby the two competing health systems, which dominate the healthcare market in central Pennsylvania, agreed not to recruit each other's healthcare workers.[1] On March 18, 2021, the Plaintiffs filed their Consolidated Class Action Complaint ("Amended Complaint"), which includes the following description of the suit:

> This class action challenges an illegal agreement between two competitors, Geisinger and Evangelical, not to recruit (or "poach") each other's physicians, nurses, psychologists, therapists, and other healthcare professionals ("Healthcare Workers").[2]

In detailing the contours of the putative class, the Amended Complaint describes the defined "Healthcare Workers" as individuals with "specialized training and knowledge, including specialized schooling, advanced academic degrees, specialized occupational skills and knowledge, licensing and certification requirements, and specialized on-the-job training and experience."[3] Further, the Amended Complaint provides that "[t]he No-Poach Agreement covered Defendants' Healthcare Workers in a region in central Pennsylvania that includes

---

[1]   Doc. 1.
[2]   Doc. 46 ¶ 1.
[3]   *Id*. ¶ 35; *see also id*. ¶ 36 ("Defendants view Healthcare Workers as possessing important skills and experiences that cannot be readily found in employees in other professional or occupational fields.").

Union, Snyder, Northumberland, Montour, Lycoming, and Columbia counties."[4] Although the Plaintiffs allege that "[t]he No-Poach Agreement began at least as early as 2010, and may have existed even earlier," they limited the "Class Period" to "January 2011 through such time as [the] Defendants' anticompetitive conduct ceased."[5]

The Defendants filed a joint motion to dismiss the Amended Complaint in May 2021,[6] which the Court denied in part on November 16, 2021.[7] Shortly thereafter, the Plaintiffs served their Revised First Set of Requests for Production ("RFPs"), consisting of forty-four (44) separate requests.[8] The parties have been negotiating the scope of production since January 2022 and agreed on all aspects of the Plaintiffs' RFPs, save one: the scope of employees on whom the Defendants must produce relevant documents and data.[9]

The Plaintiffs' RFPs include twenty-four (24) requests that concern the Defendants' "Employees,"[10] which the Plaintiffs define as follows:

> [A]ny current or former executive, manager, salesperson, secretary, staff member, messenger, agent, worker, independent contractor, or other Person who is or was employed by, or did work in exchange for Compensation,

---

[4] *Id.* ¶ 2.
[5] *Id.* ¶¶ 6, 67.
[6] Doc. 51.
[7] Doc. 66; Doc. 67.
[8] Doc. 91-1, Ex. 1 (Plaintiffs' RFPs).
[9] Doc. 91 at 1, 5.
[10] *Id.* at 1 n.1 ("The disputed RFPs include Nos. 8, 9, 10, 11, 13, 14, 15, 17, 18, 20, 21, 22, 24, 25, 26, 27, 28, 32, 33, 34, 35, 36, 37, and 39.").

3

for the responding Defendant during the Relevant Period.[11]

The Defendants consider this definition impermissibly overbroad, as it includes workers who are not part of the proposed class and who are therefore unrelated to this suit.[12]

The parties have worked to resolve this disagreement but without success. Geisinger and Evangelical provided the Plaintiffs with comprehensive lists of job titles for all their employees—which collectively totaled more than 8,500 positions—so that the Plaintiffs could identify which positions fall under the term "Healthcare Workers" as defined in the Amended Complaint.[13] The Plaintiffs reviewed the lists and identified approximately 8,100 positions that they believe should be included as "Healthcare Workers."[14] The Defendants objected, arguing that the Plaintiffs "includ[ed] personnel who are obviously not 'skilled' Healthcare Workers delivering patient care, such as 'treasury analyst,' 'tax manager,' 'payroll clerk,' 'desktop support specialist,' 'supply chain contract coordinator,' 'graphic designer,' and 'underwriter.'"[15] The Defendants then refused to make a counterproposal, leaving the parties at the present impasse.[16]

---

[11] Doc. 91-1, Ex. 1 (Plaintiffs' RFPs) ¶ 13.
[12] Doc. 91 at 5–9.
[13] *Id*. at 6; *see also id.* at 4 ("Evangelical provided a list of 466 job titles and Geisinger provided lists of 7,918 and 3,597.").
[14] *Id*. at 4, 6.
[15] *Id*. at 6.
[16] *Id*. at 4.

On May 13, 2022, the parties filed a joint letter requesting a telephonic discovery conference on the instant discovery dispute.[17] The Court held the telephonic conference with counsel for the parties on June 1, 2022,[18] and is now prepared to address the issue.

## II. Law

Under the Federal Rules of Civil Procedure, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."[19] Consistent with this language, the United States Court of Appeals for the Third Circuit holds that "the scope of discovery under the Federal Rules is unquestionably broad."[20] That said, the Third Circuit explains that "this right is not unlimited and may be circumscribed."[21] Relevant here, in the class action context, courts generally do not permit plaintiffs to obtain discovery on entities and individuals outside the class definition and beyond the scope of the allegations in the complaint.[22] This comports with the

---

[17] Doc. 91.
[18] Doc. 92.
[19] Fed. R. Civ. P. 26(b)(1).
[20] *Bayer AG v. Betachem, Inc.*, 173 F.3d 188, 191 (3d Cir. 1999).
[21] *Id*.
[22] *See, e.g.*, *Thomas v. Cendant Mortgage*, 2005 WL 579903, at *3 (E.D. Pa. Mar. 11, 2005) (denying discovery beyond class definition because "discovery is not intended as a fishing expedition permitting the speculative pleading of a case first and then pursuing discovery to support it") (quoting *Zuk v. Eastern Pa. Psychiatric Institute of the Medical College of Pa.*, 103 F.3d 294, 299 (3d Cir. 1996)); *Flores v. Bank of America*, 2012 WL 6725842, at *2 (S.D. Cal. Dec. 27, 2012) (denying discovery designed "to search for other customers of Defendants with claims similar to those of the Plaintiffs" as a "fishing expedition" that "would be unduly burdensome for Defendants to further respond"); *Basset v. Tenn. Valley*

Advisory Committee's admonition that parties "have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings."[23]

### III.  Analysis

The Plaintiffs' requests for discovery concerning all Geisinger and Evangelical employees substantially exceed the scope of the Amended Complaint, which focuses exclusively on skilled workers involved in delivering patient care.[24] Although they acknowledge the dichotomy between their discovery requests and Amended Complaint, the Plaintiffs nevertheless argue that they are entitled to this broader collection of employee information because "the materials sought are plainly relevant to [the] Defendants' no-poach agreement."[25] The Court disagrees.

The Plaintiffs identify three reasons why they believe information on all Geisinger and Evangelical employees is relevant to the case. First, the Plaintiffs assert "there is reason to believe that the illicit agreement between [the] Defendants may have extended beyond hiring and recruitment for healthcare workers."[26] But if that's the case, the Plaintiffs should again amend their Complaint and provide allegations that support a broader class definition. They

---

*Authority*, 2010 WL 2044545, at *2 (W.D. Ky. May 21, 2010) (denying discovery requests "to obtain the names of employees outside the definition of the class" as "beyond the present claims of this action, and therefore irrelevant").
[23] Fed. R. Civ. P. 26, Advisory Committee Notes (2000 Amendments).
[24] *See* Doc. 46 ¶¶ 35–36.
[25] Doc. 91 at 2.
[26] *Id*.

cannot, however, submit discovery requests beyond the present claims of this action in hopes that the material produced will allow them to subsequently expand the scope of the litigation.[27] Courts routinely reject such "fishing expeditions" as beyond the scope of permissible discovery.[28]

Second, the Plaintiffs argue that "even if [the] Defendants' no-poach agreement targeted healthcare workers only, no-poach agreements between horizontal competitors for labor are nonetheless well-understood to have widespread effects both across groups of employees as well as firm-wide."[29] But, again, this theory of relevance extends beyond the current scope of the case and concerns a possible expansion of the putative class—albeit based here on a theory of indirect harm. Accordingly, as with the Plaintiffs' first relevance rationale, this argument undermines the Plaintiffs' position by affirming the invalidity of their overly broad discovery requests.

Third, the Plaintiffs contend that compensation data "for unaffected employees, if there are any, can serve as a benchmark (when appropriate) to measure harm to the affected employees."[30] But as an initial matter, it is unclear

---

[27] *See Basset*, 2010 WL 2044545 at *2.
[28] *See Thomas*, 2005 WL 579903 at *3; *Flores*, 2012 WL 6725842 at *2.
[29] Doc. 91 at 2–3.
[30] *Id*. at 3. On this point, the Plaintiffs also claim that compensation data for unaffected employees (as well as "evidence regarding [the] Defendants' hiring and recruitment practices in general") will help "demonstrate the extent to which compensation for different jobs moves together, which informs how the harm of the no-poach agreement can be broadly felt across a company." *Id*. But as with the Plaintiffs' first two stated relevancy rationales, this

how data regarding a subset of employees unrelated to those in the putative class could serve as a useful benchmark for calculating any salary diminution attributable to the alleged no-poach agreement.[31] Moreover, as the Defendants argue, the Plaintiffs' "requests for all-employee data for benchmarking is unwarranted because the Defendants have already agreed to produce data for Healthcare Workers in Central Pennsylvania dating as far back as 2008, well before the alleged conspiracy began in 2011, which would permit benchmarking focused on the Healthcare Workers the Plaintiffs allege were harmed in this case."[32] Put differently, the data the Defendants have agreed to produce (concerning the relevant employees, but prior to the alleged agreement) will provide a more applicable benchmark than data concerning unrelated employees.

During the June 1, 2022, status call with the Court, counsel for the Plaintiffs argued that the pre-2011 data is insufficient for benchmarking purposes because it is unclear when the alleged conspiracy began. But on this, the Plaintiffs again exceed the scope of the class definition in the Amended Complaint. Although the Plaintiffs allege that "[t]he No-Poach Agreement began at least as early as 2010, and may have existed even earlier," they define the putative class as "[a]ll natural

---

argument concerns harm felt by individuals outside the putative class, which places it beyond the scope of permissible discovery.

[31] *See id*. at 9 (describing the compensation data request as seeking "irrelevant data regarding non-healthcare workers, who are not part of the putative class or [the] Plaintiffs' claims").

[32] *Id*. (cleaned up).

---

persons who worked at [Geisinger] or [Evangelical] from January 2011 through such time as the Defendants' anticompetitive conduct ceased ('Class Period')."[33] In so doing, the Plaintiffs set the parameters for the period in which the alleged anticompetitive conduct occurred. If the Plaintiffs believe they mistakenly defined the class period too narrowly, that is an issue that must be addressed at the pleadings stage; they cannot now use discovery to broaden the scope of the suit beyond the class definition and class period provided in the Amended Complaint.[34]

## IV. Conclusion

For purposes of discovery, the Plaintiffs are limited by the allegations in the Amended Complaint. The Plaintiffs construed this case as concerning skilled healthcare workers involved in delivering patient care. Accordingly, to the extent the Plaintiffs seek discovery on Geisinger and Evangelical employees, they are limited to documents and data related to those skilled healthcare workers.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge

---

[33] Doc. 46 ¶¶ 6, 46.
[34] *See Thomas*, 2005 WL 579903 at *3; *Flores*, 2012 WL 6725842 at *2; *Basset*, 2010 WL 2044545 at *2.