# EXHIBIT A



TAYLOR HOLLINGER / *ASSOCIATE*
d 215.875.3087 | thollinger@bm.net

September 8, 2023

**VIA EMAIL**
Rosa M. Morales
CROWELL & MORING LLP
590 Madison Avenue
New York, NY 10022

**Re:**   *In re Geisinger Sys. Servs. and Evangelical Cmty. Hosp. Healthcare Workers Antitrust Litig.*, No. 4:21–cv–196 (MWB) (M.D. Pa.)

Counsel,

     Plaintiffs write in response to the Parties' meet and confer last Friday, September 1 regarding Plaintiffs' collection and production.

     Although Plaintiffs had requested that Defendants produce a specific list of discovery questions in advance of our call, Defendants declined this request. Moreover, as we expressed during our call, Plaintiffs continue to believe that many of these questions are irrelevant, overly burdensome, and far exceed the scope of the Court's instructions at our July 21 status conference that Plaintiffs should respond to Defendants' Interrogatory No. 11. Plaintiffs have made a fulsome, timely response to Defendants' Interrogatory No. 11. However, as a show of continued good faith and willingness to promptly conclude Plaintiffs' discovery, Plaintiffs write here to respond in detail to these questions.

     Plaintiffs' responses below are intended to demonstrate the general reasonableness of Plaintiffs' ESI collection methods and are not an invitation for a negotiation about the particulars of Plaintiffs' methods of ESI collection and production. This is particularly true given i) Plaintiffs' prior invitations on July 26 and August 2 for Defendants to proffer search terms that they would like to have run on Plaintiffs' documents, which Defendants declined, and ii) Plaintiffs' subsequent provision on August 24 of anticipated search terms, to which Defendants did not respond. After the failure by Defendants to meaningfully engage in this process, any attempt to quibble with the particulars of how the most recent extensive collection and ongoing review and production is done will not be well taken.

     Plaintiffs here provide certain additional information requested on the call, as well as reasons for declining to provide other information, as follows and as organized by questions raised on the September 1, 2023 meet and confer.

* * *



### I.     Inquiries Regarding Preservation Efforts

As a general matter, Plaintiffs provided a fulsome response, subject to Plaintiffs' objections, to Defendants' Interrogatory No. 11. This included Defendants' request for "all instructions provided to each custodian and non-custodial data manager to preserve potentially responsive documents under their control, and the dates of any such instructions" as well as "all additional steps taken to preserve in place or via collection potentially responsive documents, for each custodian and non-custodial source." Plaintiffs' Amended Responses and Objections to Defendants' Interrogatory No. 11 at 5–6 ("ROG 11 Response").

Many of the additional questions that Defendants raised on the September 1, 2023 meet and confer, however, implicate attorney-client privilege as they expressly request or would refer to Plaintiffs' confidential communications with counsel. These questions, insofar as they appear aimed at identifying a failure to properly preserve documents, are also irrelevant and not proportional to the needs of the case, and the burden of the proposed discovery outweighs its likely benefit. Defendants have not made and cannot make any credible assertion that Plaintiffs deleted or destroyed responsive ESI after they became aware of this litigation. There is accordingly nothing to warrant discovery of the minute details of Plaintiffs' preservation efforts. Moreover, the documents requested are irrelevant to Plaintiffs' affirmative case or any potential defense, for the documents and evidence relating to the alleged no-poach conspiracy and its competitive effects are in the custody, possession, and control of Defendants, as is the data relevant to determining classwide impact and damages.

Nevertheless, Plaintiffs provide certain additional information requested on the call, as well as reasons for declining to provide other information, as follows.

Q:     When did the proposed class representatives retain Plaintiffs' counsel?

A:     Mr. Brokenshire retained Berger Montague as counsel in this case on Jan. 27, 2021.

Ms. Leib retained Berger Montague as counsel in this case on Jan. 31, 2021.

Q:     When were Plaintiffs' counsel first made aware of the sources of information enumerated in Defendants' July 21 letter?

A:     Plaintiffs direct Defendants to Plaintiffs' Amended Responses and Objections to Defendants' Interrogatory No. 11 ("ROG 11 Responses"), which describe how, in January 2022 and throughout June, July, and August 2022, Plaintiffs' counsel engaged in multiple discussions with Plaintiffs regarding the expected discovery in this case and sources of documents specifically responsive to Defendants' Requests for Production ("RFPs"). Specifically:



> Plaintiffs' counsel communicated with Plaintiffs regarding each RFP to determine what potentially responsive documents exist, if any, and how such documents might be identified, collected, and produced. Plaintiffs' counsel discussed potential sources of responsive documents with Plaintiffs and instructed each Plaintiff to pull his or her records for any document responsive to Defendants' RFPs, without any limitation for file date or location.

ROG 11 Responses at 5-6. Plaintiffs also have provided the most recent date on which collection for each source was completed below.

Plaintiffs decline, however, to enumerate specific dates that Plaintiffs' counsel was made aware of each source Defendants listed in their July 21 letter, as this is irrelevant, unduly burdensome, and protected by attorney-client privilege. There is no demonstrated need for this information; there has been no showing that any potentially-relevant ESI was deleted or destroyed. Plaintiffs have collected from any sources in Defendants list where there was an expectation that there may be responsive documents, and Plaintiffs have not withheld any identified responsive documents from production.

Q: When did Plaintiffs implement preservation efforts? What did these preservation efforts entail for each of the sources outlined in Defendants' July 21 letter? What was the deletion/retention policy for each of these sources and how were they changed, if at all?

A: As described in our Amended Responses and Objections to Defendants' Interrogatory No. 11, Plaintiffs' counsel discussed with each class representative at the outset of this litigation regarding their obligation to preserve potentially responsive documents. ROG 11 Response at 5. The exact content of these conversations about Plaintiffs' preservation efforts is subject to attorney client privilege, but Plaintiffs were generally instructed to maintain data and documents, whether in paper or electronic form, relating to the litigation during the pendency of the case.

Neither Plaintiff has a regular retention policy for any documents beyond the obligations described to them by counsel. Plaintiffs decline to provide specific information about the automatic deletion/retention policies for each source Defendants have identified because such discovery is irrelevant and not proportional to the needs of the case and because the burden of the proposed discovery outweighs its likely benefit. Defendants have not made and cannot make any credible assertion that Plaintiffs deleted or destroyed responsive ESI; Defendants' request for the details of the retention policies for every email account, app, or job site that Plaintiffs used is based on nothing more than speculation, and the burden of responding to this question is not warranted.

Page 4 of 11     

### II.     Inquiries Regarding ESI Collection

Q:     What is the full date range of all documents collected, specifying the earliest and latest dates reflected in the collection?

A:     Plaintiffs collected documents from each source without limiting the collected documents by date range. As to the "date range of all documents," Plaintiffs provide here the earliest and latest date listed in the "Parent Date" metadata field for each ESI source:

|  |  |
|---|---|
| Mr. Brokenshire's cell phone: | 12/30/2020 – 08/09/2023 |
| Mrs. Brokenshire's email: | 04/17/2004 – 08/10/2023 |
| Ms. Leib's email: | 09/25/2012 – 08/17/2023 |
| Ms. Leib's laptop: | 12/31/1979[1]  – 08/24/2023 |
| Ms. Leib's iPad: | 01/01/1980[2] – 08/12/2023 |
| Ms. Leib's cell phone: | 07/24/2020 – 08/26/2023[3] |
| Ms. Leib's Facebook: | 08/11/2021 – 08/26/2023 |
| Ms. Leib's Indeed: | 12/27/2020 – 09/08/2023[4] |
| Ms. Leib's LinkedIn: | 09/05/2023[5] |
| Ms. Leib's DaVita profile: | 09/08/2023[6] |
| Ms. Leib's UHG profile: | 09/08/2023[7] |

Q:     Defendants requested that Plaintiffs share the ESI collection logs used by their ESI consultants and technicians.

A:     Plaintiffs decline to provide ESI collection logs. Even assuming such a deep dive into Plaintiffs' collection process was appropriate or contemplated by the Court's instructions at our July 21 status conference—it is not, and it was not—

---

[1] Excluding files which reflect irrelevant dates, the earliest "Parent Date" on this device is 09/26/2006.

[2] Excluding files which reflect irrelevant dates, the earliest "Parent Date" on this device is 05/27/2007.

[3] This date is inclusive of her Facebook data collection. Excluding these files, the latest "Parent Date" on this device is 08/11/2023.

[4] All of the data collected from Indeed.com reflects one of two "Parent Dates": 12/27/2020 (a single attachment), or 09/08/2023 (the date of collection).

[5] All of the data collected from LinkedIn reflects a single "Parent Date": 09/05/2023.

[6] All of the data collected from DaVita reflects a single "Parent Date": 09/08/2023.

[7] All of the data collected from UHG reflects a single "Parent Date": 09/08/2023.



Page 5 of 11

production of the ESI logs is not necessary for Defendants to fully understand Plaintiffs' production efforts. Indeed, on the September 1 meet and confer, Plaintiffs asked what information was needed from these logs that would not otherwise be available and noted that Plaintiffs would take any requests for additional, specific information under consideration. Defendants have not made any specific requests.

### A.   Inquiries specific to each email account:

Q:   What was the data collected from each email account, besides the inbox?

A:   For both the Verizon account belonging to Ms. Leib and the AOL account belonging to Mrs. Brokenshire, the entire mailbox was collected. Any emails within "Deleted" or "Sent" folders, as well as any emails that were migrated to specific folders, were collected and included in our review process. To the extent separate "Calendar" information exists on these accounts apart from email data, Plaintiffs did not specifically collect this information.

Q:   What was the size of the collection by GB and by count?

A:   For the Verizon account, 6.75GB of data was collected, including 62,267 documents.

For the AOL account, 2.44GB of data was collected, including 4,901 documents.

### B.   Inquiries specific to each cell phone:

Q:   What type of cell phones do Plaintiffs use?

A:   Ms. Leib uses an iPhone, and Mr. Brokenshire uses a Samsung Android.

Q:   What was the method used to collect the data (*e.g.*, physical, Logikcull)?

A:   Mr. Brokenshire's phone data was collected using "Cellebrite UFED Logical Collection" methodology. Ms. Leib's phone data was collected using iTunes Backup Encrypted data. Due to bandwidth and connection, Plaintiffs used iTunes and encrypted a backup. Both collections were made remotely.



Q: Did you collect data from applications (*e.g.*, messaging apps like WhatsApp and Slack)?

A: No. Plaintiffs did not separately collect data from any phone applications, because there was no reason to believe that any such applications contained potentially responsive information.

Q: What was the size of the collection by GB and by count?

A: For Ms. Leib's iPhone, 34.7GB of data was collected, including 9,539 documents.

For Mr. Brokenshire's Android phone, 10.1GB of data was collected, including 7,615 documents.

Q: Did Plaintiffs collect texts from cloud storage?

A: No. Plaintiffs did a full collection of texts from each cell phone. Plaintiffs did not separately collect from cloud storage for Plaintiffs phones because they do not use the cloud for storage.

Q: Were any backups from cell phones identified and collected?

A: No cell phone backups were identified for either Plaintiff.

### C. Inquiries specific to each tablet:

Q: What type of tablet was collected?

A: Ms. Leib's iPad data was collected. Mr. Brokenshire does not use any tablet or similar device.

Q: What was the method used to collect the data (*e.g.*, physical, Logikcull)?

A: Ms. Leib's iPad data was collected using iTunes Backup Encrypted data. Due to bandwidth and connection, Plaintiffs used iTunes and encrypted a backup. The collection was made remotely.

Q: What was the size of the collection by GB and by count?

A: For Ms. Leib's iPad, 620MB of data was collected, including 573 documents.



Q: Did you collect data from applications (*e.g.*, messaging apps like WhatsApp and Slack)?

A: No. Plaintiffs did not separately collect data from any tablet applications, because there was no reason to believe that any such applications contained potentially responsive information.

Q: Did you collect data from cloud storage?

A: No. Ms. Leib does not use iCloud storage for her iPad.

Q: Were any backups identified or collected?

A: No iPad backups were identified.

### D. Inquiries specific to each social media account:

Q: What was the method applied to collect the social media?

A: A request was sent to LinkedIn, Facebook, and Indeed to provide profile data archives of Ms. Leib's accounts.

For UHG and DaVita, this option was not available, so Plaintiffs' counsel used X1 Social Discovery, a website screen-capture tool, to capture the UHG and DaVita profiles page by page.

Mr. Brokenshire does not use social media for job application purposes. Plaintiffs' counsel do not believe any responsive or relevant information exists here, so no social media account information was collected for Mr. Brokenshire.

Q: What else was collected besides messages? Was there any filter applied to these collections, including search terms?

A: All profile data for LinkedIn, Facebook, and Indeed was included in the archive requests. Facebook contains all the data in JSON format and was not limited to messages. JSON is typically used to ingest the profile data into a machine-readable format. Indeed and LinkedIn contain CSV or TXT files of all data within each profile, and is the only format provided by each platform. UHG and DaVita contain screen captures of all profile-related pages. No keyword searching or date filtering was performed on any profile download request or screen capture.



Q: Did you collect an audit trail of user activity on the platform (*e.g.*, what groups joined, what groups unjoined, dates thereof)?

A: No. This request is not within the scope of the Court's instructions during our July 21 status conference; it is irrelevant and not proportional to the needs of the case; and the burden of the proposed discovery outweighs its likely benefit. Defendants have made no credible showing that any responsive—let alone relevant—evidence will be found in the user audit trails, and Plaintiffs have no reason to believe there will be. Defendants' request is based on nothing more than speculation, and the burden of responding to this question is not warranted.

Q: What email address is associated with these social media accounts? Was this email address collected?

A: Ms. Leib only uses her Verizon email account for social media purposes, including for each source collected in this litigation.

### E. *Inquiries specific to each laptop:*

Q: What was the method applied to collect?

A: Ms. Leib's Lenovo laptop data was collected using FTK Imager software. A complete, bit-by-bit imaging of this device was collected.

Q: What was the size of the collection, by GB and by count?

A: Plaintiffs collected 106GB of data from this source, including 41,080 documents.

Q: Does Mr. Brokenshire have a shared computer?

A: Mr. Brokenshire occasionally uses his wife's work computer for certain specific tasks, including for his deposition in this case. However, he has never used this laptop in any way such that potentially responsive documents might exist on this device. Moreover, this laptop is the property of Mrs. Brokenshire's employer, Luzerne County Community College, not Mr. Brokenshire or his wife. Any collection from this device is neither necessary nor appropriate.

Q: Does Mr. Brokenshire use any other devices other than his phone?

A: Based on extensive discussions with Mr. Brokenshire regarding his use of devices to store or create potentially responsive ESI, Plaintiffs' counsel does not believe any such additional device to exist.



### III. Inquiries Regarding the Post-collection and Review Process

Q: When did Plaintiffs complete their collections?

A: Plaintiffs conducted their most recent collection of these sources on the following dates:

| | |
|---|---|
| Mr. Brokenshire's cell phone: | 08/10/2023 |
| Mrs. Brokenshire's email: | 08/10/2023 |
| Ms. Leib's email: | 08/17/2023 |
| Ms. Leib's laptop: | 08/23/2023 |
| Ms. Leib's cell phone: | 08/11/2023 |
| Ms. Leib's iPad: | 08/11/2023 |
| Ms. Leib's Facebook: | 08/31/2023 |
| Ms. Leib's LinkedIn: | 08/31/2023 |
| Ms. Leib's Indeed: | 09/05/2023 |
| Ms. Leib's DaVita profile: | 09/08/2023 |
| Ms. Leib's UHG profile: | 09/08/2023 |

Q: What search terms were applied to each source?

A: Plaintiffs shared the search terms with Defendants on Aug. 24, 2023. No other search terms were applied throughout collection or review.

Q: Were any exclusions applied to the data (*e,g.*, file types)?

A: No exclusions or filters were applied during the collection of these sources.

Q: Did Plaintiffs apply any limiters before applying search terms?

A: No limiters or content filters were applied prior to applying the search terms shared with Defendants.

Q: Do Plaintiffs have hit reports for the search terms by source? If so, please produce.

A: Plaintiffs requested Defendants to provide an exemplar hit report for our consideration, in order to streamline Plaintiffs' provision of this information in the



form and with the information Defendants find useful, if reasonable. Defendants agreed to produce such an exemplar hit report but have not yet done so.

Q: After applying search terms, what was the method of review (*e.g.*, linear, TAR, de-duplication, email threading)?

A: After applying search terms to each collected ESI source, Plaintiffs manually reviewed the resulting universe for responsiveness. Responsive documents were then manually de-duplicated, as contemplated by the ESI Protocol. ECF No. 90 at §III.E. Put simply, Plaintiffs did not produce lesser-included threads within responsive email threads. Plaintiffs did not utilize Tool-Assisted Review technology during this review.

Q: How did we handle review of documents that do not have text and cannot be searched?

A: For Mr. Brokenshire's cell phone, Plaintiffs manually reviewed all photographs for responsiveness, in order to identify the native version of the single responsive photograph he described during his deposition. This document has been identified and will be produced in native format in our next rolling production. Plaintiffs also confirmed that there were no further responsive documents on Mr. Brokenshire's cell phone.

Plaintiffs otherwise had no reason to believe that any non-text documents would include responsive information. These documents accordingly were not reviewed.

### IV.  Inquiries Regarding Plaintiffs' Objections to Defendants' Interrogatory No. 11

During the September 1, 2023 meet and confer, Defendants requested that Plaintiffs enumerate all information withheld on the basis of the objections that Plaintiffs made to Interrogatory No. 11.  Specifically, Defendants asked Plaintiffs to enumerate the information withheld on the basis of attorney-client privilege, attorney work product doctrine, and any other applicable privilege. Defendants also asked that Plaintiffs identify any information withheld on the basis that the information sought seeks information from third-parties, including any consultant or vendor.

In response, Plaintiffs requested that Defendants identify any purported deficiencies in Plaintiffs' ROG 11 Responses so that Plaintiffs can address any claimed gaps directly and inform Defendants as to whether they will provide that information or are withholding it on privilege or other grounds. Indeed, where Defendants have made requests for certain additional information, Plaintiffs have expressly declined to provide



further information on the basis of privilege (*e.g.*, specifics as to the instructions made to Plaintiffs regarding preservation). Plaintiffs remain willing to work with Defendants to address any specific questions they have, to the extent that it is arguably within the bounds of Interrogatory No. 11 and proportional to the needs of the case.

\* \* \*

Plaintiffs remain available to meet and confer on these issues at our mutual convenience.

Sincerely,

*[signature: Taylor Hollinger]*

Taylor Hollinger

*cc: Counsel of record*