**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE GEISINGER SYSTEM SERVICES AND EVANGELICAL COMMUNITY HOSPITAL HEALTHCARE WORKERS ANTITRUST LITIGATION | Case No. 4:21-cv-00196-MWB |
| | *Class Action* |
| | June 14, 2024 |

**DEFENDANTS' JOINT MEMORANDUM IN SUPPORT OF
THEIR JOINT MOTION TO EXCLUDE THE TESTIMONY
OF PLAINTIFFS' EXPERT, PROFESSOR ALAN P. MANNING**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................1

SUMMARY OF PROFESSOR MANNING'S EXPERT OPINIONS .....................4

LEGAL STANDARD ....................................................................................8

ARGUMENT ...............................................................................................10

     I.    PROFESSOR MANNING'S OPINION ON CLASS-WIDE EFFECTS IS ENTIRELY THEORETICAL AND IS NOT SUPPORTED BY ANY EMPIRICAL ANALYSIS OR DATA; PROFESSOR MANNING ACKNOWLEDGES THAT A DETAILED STATISTICAL ANALYSIS IS NEEDED TO PROVE CLASS-WIDE EFFECTS AND CONCEDES THAT HE DID NOT DO ANY STATISTICAL ANALYSIS. ................................................11

     II.   PROFESSOR MANNING'S OPINION ON CLASS-WIDE EFFECTS LACKS ANY METHODOLOGY, AND IMPERMISSIBLY RELIES ON UNTESTED ASSUMPTIONS.......22

     III.  PROFESSOR MANNING'S OPINION DOES NOT FIT THE FACTS OF THE CASE AND THUS IS NOT HELPFUL .................26

REQUEST FOR HEARING .............................................................................29

CONCLUSION ............................................................................................29

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allen v. Foxway Transp., Inc.*,
2024 WL 388133 (M.D. Pa. Feb. 1, 2024)......................................................9, 10

*Apotex, Inc. v. Cephalon, Inc.*,
321 F.R.D. 220 (E.D. Pa. 2017)..........................................................................29

*Bauer v. Bayer A.G*,
564 F. Supp. 2d 365 (M.D. Pa. 2008)..................................................................26

*Bruno v. Bozzuto's, Inc.*,
311 F.R.D. 124 (M.D. Pa. 2015) ....................................................................9, 10

*Calhoun v. Yamaha Motor Corp., U.S.A*,
350 F.3d 316 (3d Cir. 2003) .................................................................................9

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)..................................................................................*passim*

*Elcock v. Kmart Corp.*,
233 F.3d 734 (3d Cir. 2000) ...............................................................................21

*General Elec. Co. v. Joiner*,
522 U.S. 136 (1997)...........................................................................................10

*Oddi v. Ford Motor Co.*,
234 F.3d 136 (3d Cir. 2000) .........................................................................10, 21

*In re Paoli R.R. Yard PCB Litigation*,
35 F.3d 717 (3d Cir. 1994) .................................................................................28

*Pennsylvania State University v. Keystone Alternatives LLC*,
2023 WL 2385917 (M.D. Pa. Mar. 6, 2023) ......................................................29

*Pennsylvania State Univ. v. Vintage Brand, LLC*,
2024 WL 456139 (M.D. Pa. Feb. 6, 2024)..........................................8, 9, 10, 29

*SEC v. ITT Educational Srvs, Inc*.,
311 F. Supp. 3d 977 (S.D. Ind. 2018).................................................................10

*Sikkelee v. Precision Automotive Corp.*,
    522 F. Supp. 3d 120 (M.D. Pa. 2021)..................................................................22

*Thomas J. Kline, Inc. v. Lorillard, Inc.*,
    878 F.2d 791 (4th Cir. 1989) .................................................................................9

*In re TMI Litig.*,
    193 F.3d 613 (3d Cir. 1999) ........................................................................20, 26

*Tyger v. Precision Drilling Corp.*,
    832 F. App'x 108 (3d Cir. 2020) .........................................................................21

*U.S. v. Downing*,
    753 F.2d 1224 (1985)............................................................................................28

*UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*,
    949 F.3d 825 (3d Cir. 2020) ............................................................................9, 20

*Wood v. Showers*,
    822 F. App'x 122 (3d Cir. 2020) .........................................................................21

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.2d 254 (2012).......................................................................................28, 29

## Other Authorities

Fed. R. Evid. 702 .............................................................................*passim*

Fed. R. Evid. 704 ....................................................................................10

## INTRODUCTION

***"I mean, if you ask a question like, you know, was there class-wide – a, you know, class-wide effect, then you would ultimately need a statistical analysis to – that's an empirical question requiring statistical analysis."*** Deposition of Alan P. Manning taken May 9, 2024 ("Manning Dep.") at 227:8-12.

***"I didn't do a statistical analysis, no."*** Manning Dep. at 78:17-18. ***"I have done no statistical analysis in this case."*** *Id*. at 176:8-11.

In their Consolidated Amended Class Action Complaint, Plaintiffs Nichole Leib and Kevin Brokenshire ("Plaintiffs") allege that Defendants Geisinger System Services ("Geisinger") and Evangelical Community Hospital ("Evangelical") (collectively, "Defendants") engaged an illegal agreement not to recruit each other's physicians, nurses, psychologists, therapists, and other healthcare professionals ("Healthcare Workers") (the "alleged agreement"). Plaintiffs further claim that the alleged agreement was intended to, and did, reduce competition for Healthcare Workers in Central Pennsylvania and, as a result, suppressed the job mobility and wages of Plaintiffs and the members of the proposed Class below the levels that would have prevailed but for the alleged agreement.[1] *See* Consolidated Amended Class Action Complaint, ECF No. 101, at ¶¶ 1, 3.

---

[1] Defendants dispute the existence of the alleged agreement, dispute that any agreement caused harm, dispute that any harm was experienced class-wide, and dispute that Plaintiffs' claims are suitable for class certification.

Plaintiffs proffer Professor Alan Manning's expert opinion[2] to support their motion for class certification on the limited issue of whether any harm from the alleged agreement would have had broad class-wide effects.[3] Professor Manning's opinion should be excluded because (i) it is based on insufficient facts and no data; (ii) it is not the product of reliable principles and methods, but rather is based on untested and unsupported assumptions; and (iii) Professor Manning has not reliably applied the principles and methods in his report to the facts of the case. Thus, his expert opinion is not admissible pursuant to Federal Rule of Evidence ("FRE") 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

Professor Manning testified repeatedly in his deposition that a detailed statistical analysis is required to establish class-wide effects of the alleged agreement. Yet he concedes that he conducted no statistical analysis at all. This admission alone is sufficient to preclude his expert opinion.

Professor Manning's opinion is entirely theoretical and is neither supported by *any* data analysis nor tethered to the facts of this case. He concedes that he did not rely on any documents, testimony, facts, or data relating to named Plaintiffs

---

[2] Professor Manning submitted an Opening Report on January 16, 2024 ("Manning Op.") (**Exhibit "A"**), a Rebuttal Report on April 19 ("Manning Reb."), (**Exhibit "B"**), and was deposed on May 9, 2024 ("Manning Dep.") (**Exhibit "C"**).

[3] Plaintiffs rely on a different expert, Professor Edward Leamer, to support their theories of liability and damages in connection with their motion for class certification. Defendants also are moving to exclude Professor Leamer's opinion.

Nichole Leib or Kevin Brokenshire. Professor Manning also did not review other key information in the case, but instead relied on a handful of documents and a few deposition transcripts cherry-picked by Plaintiffs' counsel. Accordingly, in addition to not being supported by any data, Professor Manning's report also is based on insufficient and selective facts. His proposed expert testimony is simply not helpful.

Professor Manning's expert report and opinion suffer numerous other fatal defects. He bases his conclusion on two untested assumptions: (1) he "express[es] no conclusion on whether the Defendants, in fact, entered into an anticompetitive agreement," but assumes that they did; and (2) he does not opine on whether any alleged agreement had a "generally suppressive effect on compensation," but instead, he assumes such an effect and then opines that it **likely** would be "widespread and common" across the putative Class.

With regard to his first major assumption, although Professor Manning assumed the existence of the alleged agreement, he did not make any assumptions about the scope of the alleged agreement – or what types of solicitation it did or did not preclude – in order to conclude that it likely had class-wide effects. He also did not analyze what types of recruiting and solicitation Defendants did do. Without a clear statement of the challenged behavior, it is not possible to evaluate economic evidence of harm and impact on an individual, much less a class basis. Similarly, with regard to his second major assumption, Professor Manning admits that he

conducted no statistical data analysis to determine whether the alleged agreement had a generally suppressive effect on compensation – an analysis which he confirms must be done to reach such a conclusion. Moreover, although Professor Manning stated in his report that his conclusion of class-wide effects was "likely" – a term he concedes means not proven – because of Defendants' "pay structure" and "internal equity", his report contains no analysis of either Defendants' pay structure or internal equity. He admitted in his deposition that he conducted no such analysis.

Professor Manning's opinion is precisely the type of unreliable, untested, insufficiently supported, and unhelpful testimony that FRE 702 and *Daubert* require be barred from admission. His proposed expert testimony should be excluded.

## SUMMARY OF PROFESSOR MANNING'S EXPERT OPINIONS

Professor Manning expressly limits his opinion only to whether, assuming the alleged agreement existed, and assuming it had a "generally suppressive effect on compensation," that effect would have been experienced "widespread across the members of the putative Class". Manning Op. ¶¶ 7, 10; Manning Dep. at 83:15-24, 89:21-90:1. Specifically, Professor Manning summarizes his conclusion as follows:

> There is evidence, common to the Class, which shows that an under-compensatory effect flowing from the alleged No-Poach Agreement is likely to have been widespread across members of the Class. In other words, while I express no conclusion on whether the Defendants, in fact, entered into an anticompetitive agreement, I conclude that if it is shown that they did enter into such an anticompetitive agreement, all or nearly all Class

> Members would have been impacted. My conclusion that
> all or nearly all Class Members would have been impacted
> is not limited to just those employees who would have
> been poached in the absence of the alleged Agreement.
> Instead, given the nature of Defendants' hiring and pay
> structure, I find that the economic effects from
> Defendants' alleged Agreement would have been
> widespread and common.

Manning Op. ¶ 10.

Professor Manning gives two reasons for his conclusion. First, he states: "[w]orkers commonly use friends and colleagues as sources of information about labor market opportunities. An artificial restriction on the flow of information about job opportunities in the labor market—such as the No-Poach Agreement alleged in this case—will have made it harder for all workers to determine whether they were being compensated at a competitive rate in their current job and is likely to have affected whether they sought other opportunities." Manning Op. ¶ 11(i). Second, he states: "[i]nternal equity is an important consideration in determining compensation for employees in the same compensation structure for many employers. The evidence in this case demonstrates that internal equity was an important concern for the Defendants in setting their own compensation. This means that compensation in many job classifications in the same structure is not determined on a purely individual basis and would extend the impact of the alleged No-Poach Agreement to employees who were not actively seeking to work at the other Defendant." Manning Op. ¶ 11(ii).

Professor Manning acknowledges that he does not express an opinion on two key assumptions that he was given by Plaintiffs' counsel, and which form the foundation of his opinion on class-wide impact. First, Professor Manning "express[es] no conclusion on whether the Defendants, in fact, entered into an anticompetitive agreement." Manning Op. ¶ 10; Manning Dep. at 83:15-24; 99:25-100:6. Second, Professor Manning does not opine on whether any alleged agreement had a "generally suppressive effect on compensation." Manning Op. ¶ 7; Manning Dep. at 89:21-90:1. Rather, he assumes such an effect and then opines that it would be "widespread and common" across the putative Class.

In connection with preparing his expert report and formulating his expert opinion, Professor Manning concedes that he did not review any documents produced by Plaintiffs, did not read the deposition transcripts of named Plaintiffs Nichole Leib and Kevin Brokenshire, and did not interview either of the two named Plaintiffs or any other member of the putative Class. Manning Dep. at 74:18-75:5; 76:22-77:14. Indeed, when he prepared his opening report, Professor Manning did not have any data on what job information or job opportunities Nicole Leib, Kevin Brokenshire or any other putative Class member had or had access to. *Id*. at 77:14-23. Likewise, Professor Manning did not have any data on any recruitment of Nicole Leib or Kevin Brokenshire. *Id*. at 77:25-78-9 ("No. I mean I don't rely on anything relating to those individuals.")

Significantly, Professor Manning repeatedly acknowledges that a detailed statistical analysis is required to establish class-wide effects. *See*, *e.g.*, Manning Dep. at 226:18-227:13; 230:2-18. Nevertheless, he concedes that he did not do any statistical analysis in connection with his expert report or his opinion in this case. *See*, *e.g.*, Manning Dep. at 90:24-91:12; 204:3-4; 227:25-228:7.[4] Thus, his opinion and conclusions are not supported by any empirical analysis. As a result, in his report Professor Manning repeatedly qualifies his conclusions with the word "*likely*" which he concedes he uses because his conclusion cannot be proven without a detailed statistical analysis. *See*, *e.g.*, Manning Dep. at 98:2-18; 227:18-228:7 ("I mean it's [the word 'likely'] there to denote that in order to actually come to a conclusion about what the effect was would require a statistical analysis … it was not part of my assignment.")

In contrast, Professor Laurence Baker, Defendants' expert, identified in his March 8, 2024 report,[5] numerous fatal flaws that demonstrate the unreliability of Professor Manning's opinion and its lack of fit to the facts of this case. *See* Baker Rpt. at ¶¶ 169-212. Unlike Professor Manning, Professor Baker did conduct a

---

[4] *See* Argument Section I, *infra*, for numerous additional citations to Professor Manning's deposition transcript where he acknowledges the need to conduct a detailed statistical analysis and where he admits that he did not conduct any statistical analysis.

[5] Professor Baker's March 8, 2024 Report ("Baker Rpt.") is attached as **Exhibit "D"**.

detailed statistical analysis and determined that there were no class-wide effects from the alleged agreement. *See* Baker Rpt. at ¶¶ 194-212.

Although Professor Manning assumed the existence of the alleged agreement, and, conceded it did not have a "no-hire component" (Manning Dep. at 103:17-20), he would not acknowledge what specific types of solicitation he assumed were precluded or not precluded by the alleged agreement. *See, generally,* Manning Dep. at 104-126. Professor Manning did not make any assumptions about the scope of the alleged agreement in order to conclude that it had class-wide effects. Manning Dep. at 126:12-16. Similarly, although Professor Manning stated in his report that his conclusion of class-wide effects was "likely" because of Defendants' "pay structure" and "internal equity", his report contains no analysis of either Defendants' pay structure or internal equity. *See* Manning Op.

## LEGAL STANDARD

FRE 702 and *Daubert* limit the admissibility of expert testimony to ensure proposed expert opinions are relevant and reliable. Expert testimony may be proffered only if: (i) "the testimony is based on sufficient facts or data"; (ii) "the testimony is the product of reliable principles and methods"; and (iii) the expert has reliably applied "the principles and methods to the facts of the case." Fed. R. Evid. 702; *Daubert*, 509 U.S. at 597. Failure to satisfy any of the above factors renders the proposed expert testimony inadmissible. *Pennsylvania State Univ. v. Vintage Brand,*

*LLC*, 2024 WL 456139, at *7 (M.D. Pa. Feb. 6, 2024) ("The text of Rule 702 contains no exception to these requirements, so if they are not satisfied, an expert cannot testify before the 'trier of fact.'") (quoting *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020)).

Because "expert evidence can be both powerful and quite misleading," district courts must perform a gatekeeping function to exclude expert opinions that fail to meet these standards. *Allen v. Foxway Transp., Inc.*, 2024 WL 388133, at *2 (M.D. Pa. Feb. 1, 2024); FRE 702; *UGI Sunbury LLC*, 949 F.3d at 834 (articulating multi-factor reliability test, including whether: (1) expert is "qualified"; (2) "testimony is reliable and relates to matters requiring scientific, technical, or specialized knowledge;" and (3) testimony is "'sufficiently tied to the facts of the case,' so that it 'fits' the dispute").[6] Experts must "possess specialized expertise" to opine on "specific opinions" (*Calhoun v. Yamaha Motor Corp., U.S.A,* 350 F.3d 316, 322 (3d Cir. 2003)), and such expertise must be based on experience outside the courtroom, not "simply by accumulating experience in testifying." *Thomas J. Kline, Inc. v.*

---

[6] In this Circuit, district courts also require that experts' opinions have "good grounds" based on a non-exhaustive, multi-factor test that considers, in relevant part, whether (1) a methodology is testable; (2) the expert's methodology has been peer-reviewed; (3) the method is generally accepted; (4) the expert is qualified; and (5) the methodology has been applied to "non-judicial uses." *Penn State*, 2024 WL 456139, at *7-8 (quoting *Sunbury LLC*, 949 at 833-34). While not exhaustive and no individual factor is dispositive (*id.* at *8), this Court has excluded testimony where "several factors [were] not met." *Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 144 (M.D. Pa. 2015).

*Lorillard, Inc.*, 878 F.2d 791, 800 (4th Cir. 1989); *Allen*, 2024 WL 388133, at *2.

An expert's methodology must also be rigorous, not "haphazard, intuitive inquiry," and conclusions must be "sufficiently tied" to that methodology. *Penn State*, 2024 WL 456139, at *7 (quotations omitted). As such, methodologies based on *ipse dixit* are inadmissible under FRE 702. *See Oddi v. Ford Motor Co.*, 234 F.3d 136 (3d Cir. 2000); *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Finally, expert testimony must fit "the facts of the case [such] that it will aid the jury in resolving a factual dispute." *Allen*, 2024 WL 388133 at *3 (quotations omitted). This "helpfulness" requirement necessitates a "valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 592; *Bruno*, 311 F.R.D. at 136 (quotations omitted) (requiring sufficient nexus "'between the scientific research or test result . . . and [the] particular disputed factual issues'" to help jury). Testimony that "merely tell[s] the jury what result to reach" or draws legal conclusions, thereby "usurping the province of the judge to instruct on the law," is inadmissible. FRE 704 Adv. Comm. Note; *SEC v. ITT Educational Srvs, Inc.*, 311 F. Supp. 3d 977, 985-86 (S.D. Ind. 2018) (excluding *ipse dixit* opinion given "significant analytical gap between [opinions] and [underlying] facts and law").

## ARGUMENT

To satisfy *Daubert's* requirements, Professor Manning must apply sound methodologies and robust economic analysis to the actual facts of the case to reach

his expert opinions. He has failed to do so. Rather, Professor Manning has relied on unsupported assumptions and untested theories to presume "likely" common impact where there is none. Moreover, Professor Manning's opinions lack factual support and no statistical analysis of possible class-wide impact. Indeed, he concedes that a detailed statistical analysis must be conducted to establish class-wide impact and yet admits that he conducted no statistical analysis at all. He also relies on limited, cherry-picked documents and testimony and thus his opinion is a poor fit for this case because he admits that the record he relies on is incomplete.

**I.     PROFESSOR MANNING'S OPINION ON CLASS-WIDE EFFECTS IS ENTIRELY THEORETICAL AND IS NOT SUPPORTED BY ANY EMPIRICAL ANALYSIS OR DATA; PROFESSOR MANNING ACKNOWLEDGES THAT A DETAILED STATISTICAL ANALYSIS IS NEEDED TO PROVE CLASS-WIDE EFFECTS AND CONCEDES THAT HE DID NOT DO ANY STATISTICAL ANALYSIS.**

***The proposed expert testimony of Professor Manning is not based on sufficient facts or data***.

Professor Manning's expert report is entirely theoretical. He acknowledges that "I didn't work with data in this case." Manning Dep. at 64:2-3. Despite this acknowledgement, when asked, "[h]ow would you know the theory is correct if you – if it's not tested with empirical data?", Professor Manning responded candidly, "I mean, ultimately, I think yes, a theory – you probably need data very broadly determined to decide whether a theory is – is true or – or not." Manning Dep. at 51:23-52:8. He conceded in his deposition that he did not do any statistical analysis

to test the theories asserted in his expert report. Manning Dep. at 79:19-21.

Indeed, Professor Manning repeatedly acknowledges that a detailed statistical analysis is required to establish class-wide effects. "I mean, if you ask a question like, you know, was there class-wide – a, you know, class-wide effect, then you would ultimately need a statistical analysis to – that's an empirical question requiring statistical analysis." Manning Dep. at 227:8-12; s*ee*, *also*, Manning Dep. at 194:10-194:25; 196:23-197:3; 206: 20-25; 208:17-23; 226:18-227:13; 230:2-18.

For example, when asked a hypothetical about whether an agreement not to solicit 10 people was likely to have a greater class-wide effect in a company that has 200 employees as compared to a company with 200,000 employees, Professor Manning stated: "I mean, in order to answer that question – that is ultimately an empirical question, whether it does or it doesn't, so I would say, again, let's go to a statistical analysis of what was the effect of that conduct on compensation." Manning Dep. at 138:23-139:5. Similarly, Professor Manning stated that in order to determine whether a non-solicitation agreement was causally related to a reduction in compensation, you would have to do a "statistical analysis using multivariant regressions" … "if you have done that in an appropriate way, what you are finding is the causal effect of the conduct on compensation." Manning Dep. at 148:10-23. Critically, Professor Manning conceded the following:

> Q.    Hypothetically, you could not determine the
> class-wide effects of a non-solicitation agreement without

conducting a multivariable -- multivariable statistical analysis, correct?

ATTORNEY KANE: Objection to form.

THE WITNESS: I mean, there's a statement which is "never say never" –

Q.    Okay.

A.    -- and, you know, so if you're saying "never" -- is there no conceivable situation in which you wouldn't use a multiple variant regression? I -- I mean, I don't know. I haven't thought about it, certainly not in terms of assignment here in my opinion. Obviously, you know, it's a very common standard method to -- to use.

Q.    ***And someone would have to do that in order to interpret whether there was a class-wide effect of the alleged restriction in this case***?

A.    ***There needs to be an assessment of what was the effect of conduct on compensation, yes.***

Manning Dep at 149:13-150:14 (emphasis added).

Similarly, in numerous other contexts in his deposition, Professor Manning stated that an economic question could not be answered without a statistical analysis. For example:

- When asked to compare the impact of a non-solicitation agreement on an employee who never learns of a job opportunity as compared to one who learns of the opportunity contemporaneously through other means, Professor Manning replied, "I mean I can't say there would be different

effects because that would require an analysis of those two hypothetical situations. So maybe, maybe not. But that – you could not answer that question without that statistical analysis." Manning Dep. at 169:8-14.

- When asked whether numerous demographic factors would have any impact on the effect of the alleged agreement on different subgroups of the putative Class, Professor Manning replied, "They might; they might not. But the way in which you would answer that question is to do a statistical analysis of the effect of the conduct on compensation in which you look for different effects across different types of workers." Manning Dep. at 175:14-176:6. When asked whether he did such an analysis in this case, Professor Manning replied that "I have done no statistical analysis in this case." *Id*. at 176:8-11.

- When asked about instances of upward pressures on wages faced by Defendants such as a statewide increase in the minimum wage and whether those pressures would shift pay for the entire class upward under his theory of pay structure and internal equity, Professor Manning replied, "I mean, that – when you put the word 'theoretical' in – in that question, but – actually, to me, that is an empirical question, whether it ripples to the top. And again, you would require a statistical analysis of whatever pressure you're studying in order to decide, you know, what

the effect was, how it [a]ffected different groups of workers, and so on."
Manning Dep. at 200:17-24.

• When asked whether he agreed that economic theory predicts that non-
solicitation agreements would likely lead to less mobility and less
movement [of employees], Professor Manning responded, "No. I mean,
that depends – I mean, there isn't really economic theory, as one thing,
which has those predictions. I mean, I can think of some economic
theories in which yes, and I can think of some economic theories in
which no. And, again, you know which of these theories is relevant in
any particular situation, you would have to have a – you know, an
empirical inquiry." Manning Dep. at 246:7-18.

• When asked whether strong competition from firms other than
Geisinger and Evangelical for new nurse or physician graduates that
caused Geisinger and Evangelical to have to raise starting salaries
would cause wages to go up throughout the entire organizations due to
internal equity, Professor Manning responded: "I mean, that would be
ultimately an empirical question that you just asked, and now you
would need a statistical analysis of the data to determine whether that
was or was not the case." Manning Dep. at 194:10-25.

- When asked about whether hypothetical non-solicitation agreements directed to certain types of employees could affect other types of employees, Professor Manning responded as follows:

  > Q.     Right. And you can't know whether there's zero -- more than zero harm without doing a statistical analysis?

  > A.     No. A statistical analysis is important in these kind of cases to actually know what was the impact of the conduct on – on compensation.

  > Q.     And that's not something you did as part of your work?

  > A.     That was not part of my assignment, no.

Manning Dep. at 264:2-12. *See also* Manning Dep. at 137:14-24 (would need to do a statistical analysis to work out the effect of a hypothetical non-solicitation agreement on compensation).

Nevertheless, Professor Manning concedes that he did not do **_any_** statistical analysis in connection with his expert report or his opinion in this case. *See*, *e.g.*, Manning Dep. at 78:11-25; 79:19-21; 90:24-91:12; 129:7-12; 130:21-25; 131:15-20; 136:3-6; 137:14-24; 142:2-8; 151:5-20; 166:9-25; 176:8-11; 192:21-193:4; 204:3-4; 227:25-228:7. As just two of many examples from the testimony cited above:

> Q.     Did you do anything to test whether the alleged agreement suppressed job mobility?

A.    I didn't do any statistical analysis of job mobility –

Q.    Okay.

A.    or movement –

Q.    Okay.

A.    -- no.

Q.    Did you do anything to test whether the alleged agreement suppressed wages of the Plaintiffs and members of the proposed Class?

A.    I did no statistical analysis, no.

Manning Dep. at 90:24-91:12

Thus, Professor Manning's opinion and conclusions are not supported by any empirical analysis. As a result, in his report Professor Manning repeatedly qualifies his conclusions with the word "*likely*" which he concedes he uses because his conclusion cannot be proven without a detailed statistical analysis. *See*, *e.g.*, Manning Dep. at 98:2-18; 227:18-228:7 ("I mean it's [the word 'likely'] there to denote that in order to actually come to a conclusion about what the effect was would require a statistical analysis … it was not part of my assignment.")

Q.    And you speak in terms of likely effect rather than actual effect, correct?

A.    I'm not doing any statistical analysis of what the actual effect is.

> Q.     Okay. So "likely effect" connotes that it's theoretical and not empirically tested, correct?
>
> ATTORNEY KANE: Objection to form.
>
> A.     I – I – yes, I mean, it's not a statistical analysis. So, I mean, I'm not sure I would personally use the word "theoretical," but it's not a statistical analysis … of what the actual effect is.

Manning Dep. at 98:2-18.

When asked why he qualified his ultimate conclusion in the case – his opinion that "an under-compensatory effect flowing from the alleged No-Poach Agreement is **likely** to have been widespread across members of the Class," Professor Manning explained that he used likely because a statistical analysis, which he did not do, would be needed to establish actual effects:

> Q.     Well, I don't think I need to go through all of them. [the times "likely" is used in Professor Manning's Opening Report] I'll just ask you a couple. Let's go to Page 4 of your opening report. The very heading says, The Suppressive Effect on Compensation as a result of the Alleged No-Poach Agreement Would Likely Have Been Experienced by All, or Nearly All, Class Members. Do you see that?
>
> A.     Yes.
>
> Q.     And -- and that's a reflection of the concept we just talked about, that it likely would in theory, but it would have to be proven by an empirical analysis, correct?
>
> A.     Yeah. If you were to replace the words "would likely" by "was, you know, experienced by all," you would need an empirical analysis to do that.

-18-

Q.     And that's why you chose the word "likely" in that context?

A.     I mean, I can't remember exactly what I was thinking, but, I -- I mean, I – when I used that particular choice of words, but, I mean, I think it's sort of saying that – trying to make this distinction that, you know, the point is that -- to know what the effect actually  was requires a statistical analysis -- was not part of my assignment.

Q.     Right. And just to give you one more -- and then we'll move on from this point -- in Paragraph 10, which is the summary of your conclusions, in -- in that indented paragraph, the very first sentence, There is evidence common to the Class, which shows that an undercompens- -- undercompensatory effect flowing from the alleged no-poach agreement is likely to have been widespread across members of the Class. The same question: ***You used the word "likely" there because that couldn't be proven without a detailed statistical analysis, correct?***

***A.   Yes. Ultimately, we're interested in what was the effect, and that requires a detailed statistical analysis.***

Manning Dep. at 228:21-230:18 (emphasis added).

In contrast, Professor Laurence Baker, Defendants' expert, identified in his March 8, 2024 report, numerous fatal flaws that demonstrate the unreliability of Professor Manning's opinion and its lack of fit to the facts of this case. *See* Baker Rpt. at ¶¶ 169-212. Unlike Professor Manning, Professor Baker did conduct a detailed statistical analysis and determined that there were no class-wide effects from the alleged agreement. *See* Baker Rpt. at ¶¶ 194-212. In Professor Baker's

report, he laid out three criteria that Defendants' salary structure would need to satisfy to generate class-wide harm. *See* Baker Rpt. at ¶¶ 169-193. He then used empirical analyses to show that Defendants' compensation practices do not satisfy these criteria. *Id* at ¶ 194. He illustrated this in two ways. *Id*. First, changes in pay for one category or level of employees often do not flow through to changes in pay for all other categories or levels of employees. *Id*. Second, there is substantial variation in workers' compensation within and across job categories and levels, which indicates that individualized factors can and do influence compensation decisions, and that pay is not set in a formulaic way based on only a worker's job category and level. *Id*.

Professor Manning himself repeatedly concedes that a statistical analysis is required to establish the very conclusion that he makes in his expert report – that the alleged agreement would likely have class-wide effects – and yet he did no such analysis. Professor Manning's proposed expert testimony is not based on sufficient facts or data and is not admissible under FRE 702 or *Daubert*.

In *UGI Sunbury,* 949 F.3d 825 (3d Cir. 2020), the Third Circuit found that it was an abuse of discretion to admit expert testimony when the expert opinions were "speculative and subjective" and lacked "quantifiable data to explain or clarify his assumptions" and the expert failed to "support[] the application of [his] theory" to the issue in the case. The Court quoted its earlier decision in *In re TMI Litig.*: "[I]t

is impossible to test a hypothesis generated by a subjective methodology because the only person capable of testing or falsifying the hypothesis is the creator of the methodology."

In *Tyger v. Precision Drilling Corp.*, 832 F. App'x 108 (3d Cir. 2020), the Third Circuit affirmed this Court's decision to exclude the testimony of a chemical hygiene expert as unreliable where the expert "lacked quantitative data" to support his opinions. Without such data, his opinions "lacked good grounds" and were properly excluded. *Tyger* cited *Oddi*, 234 F.3d at 156 ("*Daubert* . . . require[s] more than [a] haphazard, intuitive inquiry") and *Elcock v. Kmart Corp.*, 233 F.3d 734, 755 (3d Cir. 2000) (expert opinion overly reliant on assumptions without "sufficient factual predicates" is a "castle made of sand").

Similarly, in *Wood v. Showers*, 822 F. App'x 122 (3d Cir. 2020), the Third Circuit affirmed this Court's decision to exclude a criminologist because he did not "provide a basis for concluding that his proposed testimony was the product of reliable principles and methods." The expert's report did not provide any background on development of the policing standards referenced in his report, did not explain how those standards were developed, did not address whether those standards were ever tested or subjected to peer review, and did not comment on the general acceptance of those standards.

In *Sikkelee v. Precision Automotive Corp.*, 522 F. Supp. 3d 120 (M.D. Pa. 2021), this Court precluded expert testimony concerning the value of household services provided by the deceased where the opinions "appear[] to have been pulled out of a hat." The expert in that case did "not even offer existing data to link his conclusion to" and there was "no way for the Court to assess [his] methodology because [he] provides nothing more than conclusory assurances that his expert opinion is reliable." "[A]n expert's say-so does not satisfy *Daubert* on its own."

## II.  PROFESSOR MANNING'S OPINION ON CLASS-WIDE EFFECTS LACKS ANY METHODOLOGY, AND IMPERMISSIBLY RELIES ON UNTESTED ASSUMPTIONS.

***The proposed expert testimony of Professor Manning is not the product of reliable principles and methods.***

Professor Manning acknowledges that he does not express an opinion on two key assumptions that he was given by Plaintiffs' counsel, and which form the foundation of his opinion on class-wide impact. First, Professor Manning "express[es] no conclusion on whether the Defendants, in fact, entered into an anticompetitive agreement." Manning Op. ¶ 10; Manning Dep. at 83:15-24; 99:25-100:6. Second, Professor Manning does not opine on whether any alleged agreement had a "generally suppressive effect on compensation." Manning Op. ¶ 7; Manning Dep. at 89:21-90:1 (Q. "Were you asked to opine on whether there was a generally suppressive effect on compensation?" A. "No."). Rather, he assumes such an effect

and then opines that it would likely be "widespread and common" across the putative Class.

Although Professor Manning assumed the existence of the alleged agreement, and conceded it did not have a "no-hire component" (Manning Dep. at 103:17-20), he would not acknowledge what specific types of solicitation he assumed were precluded or not precluded by the alleged agreement. *See, generally,* Manning Dep. at 104-126. Professor Manning did not make any assumptions about the scope of the alleged agreement in order to conclude that it had class-wide effects. Manning Dep. at 126:12-16. Indeed, he conceded that he did not have any concrete evidence of a single person who was definitely not aware of an employment opportunity or other employment information as a result of the alleged agreement. Manning Dep. at 132:8-16.

Similarly, although Professor Manning stated in his report that his conclusion of class-wide effects was "likely" because of Defendants' "pay structure" and "internal equity", his report contains no analysis of either Defendants' pay structure or internal equity. *See* Manning Op.; *see*, *e.g.*, Manning Dep. at 188:22-193:4:

> Q.    …. apart from using the word "pay structure," which I will agree with you is – appears frequently in your report, are there any paragraphs in your report where you have any detail explaining how the pay structure works and what the parameters of them are?
>
> A.    No, because I didn't think that was really part of my assignment…

Id. at 188:22-189:6.

Professor Manning did not do any statistical analysis of the pay structures that Defendants have. Manning Dep. at 193:2-4. Instead, he described pay structures in general as "ubiquitous":

> Q.     So it's fair to say once you determined that there was at least some sort of pay structure, you felt it was not necessary to understand the parameters or the mechanics of the pay structure in this case?
>
> ATTORNEY KANE: Objection to form.
>
> THE WITNESS: I mean, I understand it in very general terms because these are ubiquitous. We have you know, there are jobs – there are different categories of jobs, and there are pay ranges for jobs. And this is what employers -- you know, this is what employers do.
>
> Q.     Right. But I'm asking about in this particular case, did you feel you needed to understand the parameters of the pay structures at Geisinger and Evangelical in order to reach your opinion?
>
> A.     Beyond the way -- the way I've just categorized pay structures in general, no. I just wanted to -- you know, they have pay structures of that general form. The detail beyond that, I did not see as relevant for my opinion.

Manning Dep. at 190:3-191:5.

Professor Manning also did not do any analysis of who competed with Geisinger and Evangelical for employees because "[t]hat was not part of my assignment." Manning Dep. at 198:4-8. He also did not believe where Geisinger and

-24-

Evangelical recruit and with what type of employers they compete for labor was "part of my assignment":

> Q.     And so did you -- do you know, for instance, whether or not either or both Defendants recruit outside of the Central Pennsylvania area as defined by the Plaintiffs in their Complaint?
>
> A.     No. Again, that was not part-time [sic] [of] my assignment.
>
> Q.     Okay. Do you know whether either of the Defendants compete with entities that are not hospitals for employees?
>
> A.     Again, that was not part of my assignment, so I don't have an opinion on that.

Manning Dep. at 198:9-20.

Similarly, Professor Manning could not point to any documents in the case that show one group of employees getting less pay and then another group getting less pay because of the reduction in pay to the first group. Manning Dep. at 214:18-24. He did not view that as being part of his assignment. *Id*.

Professor Manning also did not study the range of employees included in the proposed Class. Manning Dep. at 254:16-20. He did not do so because "that wasn't part of my assignment to define the Class." *Id*. Instead, he took "the Class presented to me." Manning Dep. at 255:21-256:2.

Professor Manning has no methodology to identify evidence of class-wide effects, and his opinion about class-wide effects is incomplete and based on

inadmissible and unreliable *ipse dixit*. *See, e.g.*, *In re TMI Litig.*, 193 F.3d 613, 677 (3d Cir. 1999) (subsequent history omitted) (rejecting assumption[s] [un]grounded in sound methodology"); *Bauer v. Bayer A.G*, 564 F. Supp. 2d 365, 379 (M.D. Pa. 2008)(same). Professor Manning's opinion should be excluded.

## III.   PROFESSOR MANNING'S OPINION DOES NOT FIT THE FACTS OF THE CASE AND THUS IS NOT HELPFUL

*Professor Manning has not reliably applied his principles and methods to the facts of the case.*

In connection with preparing his expert report and formulating his expert opinion, Professor Manning relied on a very limited number of documents and deposition testimony listed in Appendix "B" to his opening report that were provided to him by Plaintiffs' counsel. Manning Op. Appendix "B"; Manning Dep. at 73:22-25; 74:25-75:5; 75:17-19; 76:3-21. He "didn't work with data in this case." Manning Dep. at 64:2-3. Professor Manning did not rely on any documents produced by Plaintiffs. Manning Dep. at 74:18-21. He did not rely on the deposition transcripts of named Plaintiffs Nichole Leib and Kevin Brokenshire. Manning Dep. at 74:22-24; 76:22-77:5. He did not interview either of the two named Plaintiffs or any other member of the putative Class. Manning Dep. at 77:6-77:14. Professor Manning did not have any data on what job information or job opportunities Nicole Leib, Kevin Brokenshire or any other putative Class member had or had access to. *Id*. at 77:14-23. Professor Manning also did not have any data on any recruitment of Nicole Leib

or Kevin Brokenshire. *Id*. at 77:25-78-9 ("No. I mean I don't rely on anything relating to those individuals.")

Had Professor Manning reviewed documents and deposition testimony of Plaintiffs, he would have learned that named Plaintiff, Nichole Leib, worked for both Defendants *twice* during the class period alleged in the Complaint. Plaintiffs' Amended Revised Objections and Responses to Defendants' First Set of Interrogatories dated June 28, 2023 at pp. 4–5 (attached as **Exhibit "E"**). Professor Manning's failure to rely on any information relating to Plaintiffs is just one of many examples of his reliance on incomplete and cherry-picked information.

Similarly, as set forth in section II, *supra*., although Professor Manning stated in his report that his conclusion of class-wide effects was "likely" because of Defendants' "pay structure" and "internal equity", his report contains no analysis of either Defendants' pay structure or internal equity. *See* Manning Op.; *see*, *e.g.*, Manning Dep. at 188:22-193:4. Professor Manning also did not do any analysis of who competed with Geisinger and Evangelical for employees because "[t]hat was not part of my assignment." Manning Dep. at 198:4-8. He did not believe where Geisinger and Evangelical recruit and with what type of employers they compete for labor was "part of my assignment". Professor Manning could not point to any documents in the case that show one group of employees getting less pay and then another group getting less pay because of the reduction in pay to the first group.

Manning Dep. at 214:18-24. He did not view that as being part of his assignment. *Id.* Professor Manning also did not study the range of employees included in the proposed Class. Manning Dep. at 254:16-20. He did not do so because "that wasn't part of my assignment to define the Class." *Id.* Instead, he took "the Class presented to me." Manning Dep. at 255:21-256:2.

Rule 702 requires that the expert's testimony must assist the trier of fact. As the Third Circuit stated in *U.S. v. Downing*, 753 F.2d 1224, 1237 (1985), admissibility depends in part on "the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case." *See Daubert*, 509 U.S. at 591 (explicitly adopting the "fit" requirement of *Downing*). "Thus, even if an expert's proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge for purposes of the case." *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 743 (3d Cir. 1994).

In *ZF Meritor, LLC v. Eaton Corp.*, 696 F.2d 254, 291 (2012), the Third Circuit held that the district court did not abuse its discretion by excluding expert damages in an antitrust case because the projections "bore insufficient indicia of reliability" to be submitted to a jury. The Third Circuit stated that "an expert may construct a reasonable offense-free world as a yardstick for measuring what, hypothetically, would have happened 'but for' the defendant's unlawful activities."

But an expert must use actual financial data in constructing the world. *Id.*at 292. If the expert relies on third-party estimates, he must be able to demonstrate why. *Id.* Here, like in *ZF Meritor*, Professor Manning did not apply his methodology to the facts of this case and did not rely on actual data to construct the analysis.

Professor Manning's opinion also is a poor fit for this case because he admits that the record he relies on is incomplete. *See Pennsylvania State University v. Keystone Alternatives LLC*, 2023 WL 2385917, at *13 (M.D. Pa. Mar. 6, 2023)("[T]he opinion is based on an unreliable methodology given [the expert's] admission at his deposition that the information reviewed by him was incomplete . . . render[ing] his opinion in this regard speculative and inherently unreliable."); *Apotex, Inc. v. Cephalon, Inc.*, 321 F.R.D. 220, 235 (E.D. Pa. 2017) (excluding opinions that "lack[ed] factual basis," and made "untenable assumptions" that were "not factually accurate"). As a result, his opinion should be excluded.

## REQUEST FOR HEARING

Defendants respectfully request a hearing on their Joint Motion to exclude the testimony of Professor Manning.

## CONCLUSION

Because Professor Manning's opinions are inadmissible under the Federal Rules of Evidence and *Daubert*, the Court should exclude Professor Manning's expert opinion and both of his reports in their entirety.

Dated: June 14, 2024                              Respectfully submitted,

*By:  /s/ Theodore H. Jobes*                      By:  */s/Stefan M. Meisner*
Stephanie Resnick                                Stefan M. Meisner (*pro hac vice*)
Theodore H. Jobes                                CROWELL & MORING LLP
John Fuller                                      1001 Pennsylvania Avenue NW
FOX ROTHSCHILD LLP                               Washington, DC 20004
2000 Market Street, 20th Floor                   Phone: (202) 624-2500
Philadelphia, PA 19103-3222                      smeisner@crowell.com
Telephone: (215) 299-2000
sresnick@foxrothschild.com
tjobes@foxrothschild.com                         Chahira Solh (*pro hac vice*)
jfuller@foxrothschild.com                        CROWELL & MORING LLP
                                                 3 Park Plaza, Ste. 20th Floor
                                                 Irvine, CA 92614
Norman Armstrong, Jr. (*pro hac vice*)           Phone: (949) 798-1367
KIRKLAND & ELLIS LLP                             csolh@crowell.com
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Phone: (202) 389-3180                            Rosa M. Morales (*pro hac vice*)
norman.armstrong@kirkland.com                    CROWELL & MORING LLP
                                                 Two Manhattan West
*Attorneys for Defendant Evangelical*            375 Ninth Avenue
*Community Hospital*                             New York, NY 10001
                                                 Phone: (212) 895-4261
                                                 rmorales@crowell.com

                                                 Daniel T. Brier
                                                 Donna A. Walsh
                                                 Richard L. Armezzani
                                                 MYERS BRIER & KELLY LLP
                                                 425 Spruce Street, Suite 200
                                                 Scranton, PA 18503
                                                 Phone: (570) 342-6100
                                                 dbrier@mbklaw.com
                                                 dwalsh@mbklaw.com
                                                 rarmezzani@mbklaw.com

                                                 *Attorneys for Defendant Geisinger*
                                                 *System Services*

## CERTIFICATE OF SERVICE

I, Theodore H. Jobes, hereby certify that a true and correct copy of the foregoing Defendants' Joint Memorandum in Support of Their Joint Motion to Exclude the Testimony of Plaintiffs' Expert, Professor Alan P. Manning was served upon all counsel of record via electronic mail and electronic filing this 14th day of June 2024.

<em>/s/ Theodore H. Jobes</em>
Theodore H. Jobes