# EXHIBIT 50

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

                 Plaintiff,

                 v.

GEISINGER HEALTH

and

EVANGELICAL COMMUNITY
HOSPITAL,

                 Defendants.

Civil Action No.:

## COMPLAINT

The United States of America brings this civil antitrust action to enjoin
Geisinger Health's partial acquisition of Evangelical Community Hospital.
Defendants' agreement creates substantial financial entanglements between these
close competitors and reduces both hospitals' incentives to compete aggressively.
As a result, this transaction is likely to substantially lessen competition and
unreasonably restrain trade, resulting in harm to patients in the form of higher
prices, lower quality, and reduced access to high-quality inpatient hospital services
in central Pennsylvania.

## I.  INTRODUCTION

1.      Geisinger and Evangelical are, respectively, the largest health system and largest independent community hospital in a six-county region in central Pennsylvania.  For many patients in this region, Geisinger and Evangelical are close substitutes for the provision of inpatient general acute-care services.  As the CEO of Evangelical explained in an interview describing the transaction with Geisinger, "if you don't get your care here [at Evangelical], you get it there [at Geisinger]."

2.      Geisinger competes for virtually all of the services that Evangelical provides, with Geisinger also offering some high-end, specialized services that Evangelical does not offer.  This competition between Geisinger and Evangelical has improved the quality, availability, and price of inpatient general acute-care services in the region.

3.      In late 2017, Evangelical announced to Geisinger and other industry participants that it was considering selling itself or entering into a strategic partnership with another hospital system or healthcare entity.  This announcement raised concerns for Geisinger, which had long feared that Evangelical could partner with a hospital system or insurer to compete even more intensely with Geisinger. A more effective competitor could put Geisinger's revenues at risk.

2

4.      In an effort to forestall that outcome and eliminate existing competition from Evangelical, Geisinger sought to acquire Evangelical in its entirety, making a bid for its rival that was substantially larger than any comparable offer.  During negotiations, however, both Geisinger and Evangelical recognized that a merger between the two hospitals would likely be blocked on antitrust grounds.  So instead, Defendants tried a strategy to avoid antitrust scrutiny.

5.      On February 1, 2019, Defendants agreed to a partial acquisition—self-styled as a "Collaboration Agreement."  As part of this agreement, Geisinger acquired a 30% interest in Evangelical.  In exchange, Geisinger pledged to provide $100 million to Evangelical for investment projects and intellectual property licensing.

6.      The $100 million pledge, however, was not made altruistically and is certainly not without strings.  The partial-acquisition agreement ties Geisinger and Evangelical together in a number of ways, fundamentally altering their relationship as competitors and curtailing their incentives to compete independently for patients.  Patients and other purchasers of healthcare in central Pennsylvania likely will be harmed as a result of this diminished competition.

## II.   JURISDICTION AND VENUE

7.     This Court has subject-matter jurisdiction under Section 4 of the Sherman Act, 15 U.S.C. § 4, Section 15 of the Clayton Act, 15 U.S.C. § 25, and 28 U.S.C. §§ 1331, 1337, and 1345.

8.     Defendants are engaged in activities that substantially affect interstate commerce.  Defendants provide healthcare services for which employers, insurers, and individual patients remit payments across state lines.  Defendants also purchase supplies and equipment that are shipped across state lines, and they otherwise participate in interstate commerce.

9.     Venue is proper under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. §§ 1391(b) and (c).

10.    This Court has personal jurisdiction over each Defendant.  Geisinger and Evangelical are both incorporated in the Commonwealth of Pennsylvania with their principal place of business located in the Middle District of Pennsylvania.

## III.   DEFENDANTS AND THE AGREEMENT

11.    Geisinger Health is an integrated healthcare provider of hospital and physician services.  Geisinger operates 12 hospitals in Pennsylvania and New Jersey and owns physician practices throughout Pennsylvania, with a significant presence in the central and northeastern portions of the state.  Geisinger also operates urgent-care centers and other outpatient facilities in Pennsylvania and

New Jersey. As of April 2020, the Geisinger system employed approximately 32,000 employees, including 1,800 physicians.

12. Geisinger's flagship hospital, Geisinger Medical Center, is located in Danville, Pennsylvania, and is licensed to accommodate 574 overnight patients. Geisinger operates three other hospitals in the area: Geisinger Shamokin (70 beds), Geisinger Jersey Shore (25 beds), and Geisinger Bloomsburg (76 beds). In addition, Geisinger operates several urgent-care centers and other outpatient facilities within the area.

13. Geisinger also operates Geisinger Health Plan, an insurance company that sells commercial health insurance, Medicare, and Medicaid products. Geisinger Health Plan has approximately 600,000 members.

14. Geisinger has a history of acquiring community hospitals in Pennsylvania. From 2012 to 2017, Geisinger acquired six hospitals in Pennsylvania. Three of the four hospitals that Geisinger owns in the area, Shamokin, Jersey Shore, and Bloomsburg, were formerly independent hospitals, and two of those hospitals were the subject of previous antitrust challenges.

15. Evangelical Community Hospital is an independent community hospital in Lewisburg, Pennsylvania. The hospital is licensed to accommodate 132 overnight patients. As of December 2018, Evangelical employed approximately 1,800 individuals and had 170 physicians on staff. Evangelical also owns a

number of physician practices in central Pennsylvania and operates an urgent-care center and several other outpatient facilities.

**A. Defendants are close competitors in central Pennsylvania**

16.     Geisinger and Evangelical both provide inpatient general acute-care services to patients in central Pennsylvania and together provide care for the vast majority of patients living in Danville and Lewisburg, Pennsylvania, and the surrounding communities.

17.     Defendants are particularly close competitors in the six-county area in central Pennsylvania comprised of Union, Snyder, Northumberland, Montour, Lycoming, and Columbia counties.

18.     This six-county area has benefitted from competition between Geisinger and Evangelical.  Geisinger and Evangelical are each other's closest competitor for many services and compete on dimensions that include quality, scope of services, and price.  According to a Geisinger Health Plan executive, Geisinger and Evangelical "care for the same people and populations."  Geisinger and Evangelical recognize that they compete closely to provide inpatient general acute-care services, which include orthopedics, women's health, cardiac, and

6

general surgery services.  Geisinger and Evangelical also recognize that they

compete to win patients at the expense of the other.

19.     The competition between Geisinger and Evangelical to attract patients

is reflected in their plans for capital investments.  When planning for the future,

competition between Geisinger and Evangelical affects the capital investments

each chooses to make.  For example, in 2016, when Evangelical's CEO was

explaining to the hospital's board why she recommended constructing a new

orthopedic facility, she said that Evangelical was "vulnerable to GMC [Geisinger

Medical Center] in orthopedics."  Similarly, in considering capital expenditures for

certain improvements to its facilities in 2018, Geisinger cited Evangelical's

competitive activities.

20.     Geisinger and Evangelical also compete against each other in their

negotiations with insurers.  For example, insurers have used Evangelical's lower

prices for inpatient general acute-care services to negotiate lower prices for those

services from Geisinger.

21.     Geisinger and Evangelical also have engaged in direct price

competition for members of several religious communities that include Amish and

Mennonite practitioners, who Defendants refer to as the "Plain Community."

Members of the Plain Community generally pay their medical bills directly and do

not rely on any form of health insurance.  In 2018, for example, an Evangelical

physician obtained, and circulated to Evangelical executives, Geisinger's then-current Plain Community discount program. After learning about Geisinger's newly lowered prices, Evangelical lowered its prices in response, and Evangelical's CFO sent a letter to members of the Plain Community with the new pricing "[s]o that they would know that our rates were lower." Evangelical's CEO observed that Plain Community business "has recently become more competitive as Geisinger has significantly reduced its prices," prompting Evangelical "to reduce its prices to the Plain Community in order to remain competitive."

### B. Recognizing that a full merger would create an illegal "monopoly," Geisinger proposed a partial acquisition that would increase coordination

22.     As early as 2016, Geisinger had identified that "[a]lignment" with Evangelical would provide it with "[d]efensive positioning against expansion by [UPMC] and/or affiliation with [another] competitor." When Geisinger learned that Evangelical had engaged in a process to find a strategic partner or acquirer, Geisinger was concerned that Evangelical would partner with a different hospital system.

23.     Geisinger would have strongly preferred to fully acquire Evangelical and initially submitted a bid for a full acquisition, as it has done in the past with other community hospitals. Given the competition described above, however, Defendants quickly recognized that a full acquisition would likely violate the

antitrust laws. Evangelical's CEO explained in a video interview that "the state and federal government looks at these kinds of things for antitrust . . . and you can't create a monopoly. And so you know the reality of it is even if they wanted to, Geisinger would not have been able to acquire us." Geisinger's documents similarly note that a full acquisition of Evangelical "[p]resented serious anti-trust concerns."

24.     Instead of a full merger, Geisinger and Evangelical concocted the complicated partial-acquisition agreement at issue in this case, in part, to avoid antitrust scrutiny. After the letter of intent for the agreement was signed, for example, a senior employee at Geisinger wrote that the agreement was "[k]inda smart really" because it "[d]oes not require AG [Attorney General] approval." Nevertheless, the Antitrust Division learned of the agreement and opened an antitrust investigation shortly after the agreement was executed.

25.     Initially, Defendants' partial-acquisition agreement was replete with provisions evidencing Geisinger's intent to substantially limit competition by controlling its close competitor and replacing competition with "cooperation" (as would occur in a full merger), such as Geisinger's right to appoint six members to the Evangelical board of directors, the potential for Geisinger to fund revenue lost by Evangelical, proposed joint ventures in areas where Defendants historically competed, and Geisinger's right to have a say in who would be Evangelical's Chief

9

Executive Officer.  As a senior Geisinger employee testified, "one of Geisinger's objectives was to integrate . . . to the fullest extent possible."

26.     Defendants twice amended their partial-acquisition agreement in response to some of Plaintiff's concerns.  Nevertheless, the provisions of the transaction illuminate Geisinger's motivation for doing this deal, which survives despite these amendments.  More importantly, the anticompetitive effects of the agreement also survive.  The amendments simply do not rectify the fundamental problems with the agreement:  Geisinger has acquired a significant ownership interest in its close competitor and imposed significant entanglements between the two, likely leading to an impermissible substantial lessening of competition between Geisinger and Evangelical.

27.     As with a full merger, this partial-acquisition transaction would lessen competition between Geisinger and Evangelical as they cooperate and look for "wins" for both firms.  As Evangelical's CEO described in an interview discussing the deal, "there's an economic principle called co-opetition.  And you can cooperate, and you can compete.  And as long as both sides find wins, it works."  Such statements are predictive of how these close competitors are likely to behave if this transaction is allowed to proceed: they will coordinate their activity to "find wins" at the expense of robust competition.  Consumers will be on the losing end of this bargain as prices increase and access to high-quality services is diminished.

### C. The transaction is likely to substantially lessen competition between Geisinger and Evangelical

28.    Defendants' transaction links Geisinger and Evangelical together in a number of ways that fundamentally alter the relationship between them, reducing their incentives to attract all patients away from each other by competing on the quality, scope, and availability of inpatient general acute-care services. The agreement also is likely to lead Geisinger to raise prices to commercial insurers and other purchasers of inpatient general acute-care services, resulting in harm to the consumer.

29.    ***Financial entanglement***.  Under the agreement, Geisinger has acquired a 30% interest in Evangelical, its close rival.  In exchange, Geisinger has committed to pay $100 million to Evangelical over the next several years and is poised to remain a critical source of funding to Evangelical for the foreseeable future.  The $100 million consists of $90 million in cash—$88 million of which is earmarked for specified projects approved by Geisinger and $2 million of which is for unspecified projects that Geisinger must approve—and $10 million in attributed value for intellectual property that Geisinger would license to Evangelical.

30.    These financial arrangements establish an indefinite partnership between Evangelical and Geisinger.  As a senior Geisinger employee put it,

through this investment, Evangelical is "tied to us" so "they don't go to a competitor." As a result, Evangelical is likely to avoid competing to enhance the quality or scope of the services it offers, which would attract patients from Geisinger, its part owner.

31.     This financial entanglement also reduces Geisinger's incentives to compete by investing in improvements that would attract patients from Evangelical. If Geisinger expands its services or improves the quality of its services in areas in which it competes with Evangelical, it would attract patients at Evangelical's expense, reducing the value of Geisinger's 30% interest in Evangelical.

32.     Thus, as a result of this transaction, both Defendants have the incentive to pull their competitive punches—incentives that would not exist in the absence of the agreement.

33.     ***Improper influence***. The agreement also gives Geisinger influence over Evangelical, including over its ability to partner with others in the future. The agreement gives Geisinger rights of first offer and first refusal with respect to any future joint venture, competitively significant asset sale, or change-of-control transaction by Evangelical, which ensures that Geisinger will have the opportunity to interfere if Evangelical attempts to enter into any of these transactions with a healthcare entity other than Geisinger. These rights deter collaborations between

12

Evangelical and other entities that compete with Geisinger because Geisinger is given advance notice and is able to delay or prevent the collaboration. Such collaborations are and have been an important dimension of quality competition among hospitals. For example, if Evangelical wanted to enter into a joint venture with a health system to enhance its cardiology services to better compete against Geisinger, Geisinger would receive advance notice and could exercise its rights of first offer or first refusal to attempt to prevent this competition.

34. Geisinger can also improperly influence Evangelical through its right to approve Evangelical's use of funds. The agreement allocates funds to Evangelical for specific projects or service-line initiatives in specified amounts (*e.g.*, $20 million for women's health initiatives), including $2 million for "other mutually agreeable Strategic Project Investment projects." In addition, if Evangelical wants to spend any funds originating from Geisinger for purposes other than those described in the agreement, it needs Geisinger's approval. The transaction affords Geisinger the right to withhold that approval if it believes that the project would enable Evangelical to compete in a way that Geisinger does not like.

35. ***Less independent expansion and more anticompetitive cooperation***. For years, Evangelical has independently expanded in a number of service lines that compete for patients against service lines offered by Geisinger. The

agreement, however, lessens Evangelical's incentives to expand because it likely will not want to bite the hand that feeds it by disrupting its relationship with Geisinger. Evangelical instead may seek to cooperate with Geisinger, effectively agreeing not to compete. For example, after the transaction with Geisinger, an Evangelical executive deleted recommendations to independently expand Evangelical's orthopedic offerings from a draft of Evangelical's three-year strategic plan and instead focused on Evangelical's partnership with Geisinger in this area. Orthopedics is a service line in which Evangelical historically has competed closely with Geisinger, to the benefit of patients who need orthopedic care. Even though Defendants claim to have abandoned the joint venture involving orthopedic services that was originally described in the partial-acquisition agreement, if this transaction is not rescinded or enjoined, they are more likely to avoid competition with each other as a result of their financial and other entanglements.

36. ***Sharing of competitively sensitive information***. Further facilitating coordination, the transaction provides the means for Geisinger and Evangelical to share competitively sensitive information by enabling ongoing interactions between them. For example, the agreement provides the opportunity and means for Defendants to share competitively sensitive information when Evangelical requests that Geisinger disburse funds for strategic projects under the agreement

because the agreement requires that these requests be "supported by appropriate business plans." This request necessarily would require sharing competitively sensitive information.

37.     The transaction also requires Evangelical to inform Geisinger about any strategic partnerships, joint ventures, or other major transactions with other hospital systems before those transactions are executed. In addition, Geisinger's approval rights over certain Evangelical capital improvements provide additional opportunities for Defendants to inappropriately share competitively sensitive information. These requirements will give Geisinger advance notice of its competitor's strategic moves and will facilitate discussions between Geisinger and Evangelical about Evangelical's strategic plans.

38.     Evangelical has publicly stated that it already has cooperative relationships with Geisinger, which increases the likelihood that Defendants will share such competitively sensitive information. In fact, Defendants have already shared important competitive information as part of the agreement. In discussions regarding joint ventures, Evangelical's CEO sent her counterpart at Geisinger a document that detailed her thinking on Evangelical's strategic growth options. The transaction continues to contemplate joint ventures between the Defendants, and the inappropriate sharing of competitively sensitive information is likely to continue.

39.    ***Increased prices***.  The transaction also creates incentives for Geisinger to raise prices to commercial insurers and other purchasers of inpatient general-acute care services.  Because Geisinger now owns 30% of Evangelical, it benefits when patients choose Evangelical instead of Geisinger because the value of its ownership interest in Evangelical increases.  This ability to partially recover the value of lost patients through its ownership of Evangelical gives Geisinger greater bargaining leverage in negotiations with insurers and the ability to set higher prices for patients who lack insurance.

### D. Defendants have a history of picking and choosing when to compete with each other, which this partial acquisition will exacerbate, deepening coordination at the expense of competition

40.    Although Geisinger and Evangelical are competitors for patients in central Pennsylvania, they have previously engaged in coordinated behavior, picking and choosing when to compete and when not to compete.  This tendency to coordinate their competitive behavior is reflected by Evangelical's CEO's view of "co-opetition."

41.    Defendants' prior acts of coordination, which are beneficial only to themselves, reinforce their dominant position for inpatient general acute-care services in central Pennsylvania.  Defendants' coordination comes at the expense of greater competition and has taken various forms:

16

- Leaders from Defendants have had "regular touch base meetings," in which they discussed a variety of topics, including strategic growth options.

- Geisinger has shared with Evangelical the terms of its loan forgiveness agreement, which Geisinger uses as an important tool to recruit physicians.

- Geisinger and Evangelical established a co-branded urgent-care center in Lewisburg that included a non-compete clause. As Evangelical's head of marketing explained to the board, the venture allowed Evangelical "to build volume to our urgent care with Geisinger as a partner rather than potentially as a competitor."

42. More concerning, senior executives of Defendants entered into an agreement not to recruit each other's employees—a so-called no-poach agreement. Defendants' no-poach agreement—an agreement between competitors, reached through verbal exchanges and confirmed by email from senior executives—reduces competition between them to hire hospital personnel and therefore directly harms healthcare workers seeking competitive pay and working conditions. Defendants have monitored each other's compliance with this unlawful agreement, and deviations have been called out in an effort to enforce compliance. For example, after learning that nurses at Evangelical were being recruited by Geisinger via Facebook, the CEO of Evangelical wrote to her counterpart at Geisinger, asking: "Can you please ask that this stop[?] Very counter to what we are trying to accomplish." After receiving the message, the Geisinger executive forwarded the email to Geisinger's Vice President of Talent Acquisition, instructing

17

her to "ask your staff to stop this activity with Evangelical." Defendants' no-poach agreement works to insulate Defendants' businesses from competition for healthcare professionals.

43.     This history of coordination between Defendants increases the risk that the additional entanglements created by the partial-acquisition agreement will lead Geisinger and Evangelical to coordinate even more closely at the expense of consumers when it is beneficial for them to do so. Moreover, this history makes clear that Defendants' self-serving representations about their intent to continue to compete going forward—despite all of the entanglements created by the partial-acquisition agreement—cannot be trusted.

## IV.    THE RELEVANT MARKET

### A. Inpatient general acute-care services are a relevant product market

44.     A relevant product market in which to analyze the effects of the partial-acquisition agreement is the sale of inpatient general acute-care services. This product market encompasses a broad cluster of inpatient medical and surgical diagnostic and treatment services offered by both Geisinger and Evangelical that require an overnight hospital stay, including many orthopedic, cardiovascular, women's health, and general surgical services.

45.     It is appropriate to evaluate the agreement's likely effects across the cluster of inpatient general acute-care services. These specific services are not

18

substitutes for each other (*e.g.*, obstetrics care is not a substitute for hip replacement surgery), but it is appropriate to consider them within one relevant product market because the services are offered to patients under similar competitive conditions by similar market participants.  There are no practical substitutes for this cluster of inpatient general acute-care services.

46.     The relevant market excludes outpatient services and specialized services that are offered by Geisinger but not Evangelical because these services are offered under different competitive conditions than inpatient general acute-care services.  Outpatient services are services that generally do not require an overnight hospital stay, and some outpatient services are provided in settings other than hospitals.  Health plans and the vast majority of patients who use inpatient general acute-care services would not switch to outpatient services in response to a price increase.  Similarly, the relevant market excludes the more specialized services that are offered by Geisinger but not Evangelical, such as certain advanced cancer services and organ transplants.  These services treat medical conditions that require more specialized medical training or equipment, so patients have a different set of competitive options for them.

## B. The six-county area in central Pennsylvania is a relevant geographic market

47.    The relevant geographic market is no larger than the six-county area that comprises the Pennsylvania counties of Union, Snyder, Northumberland, Montour, Lycoming, and Columbia (the "six-county area"). This area encompasses the cities of Danville and Lewisburg, where Geisinger Medical Center and Evangelical are respectively located. The hospitals are approximately 17 miles apart. The map below illustrates the relevant geographic market and the locations of the hospitals in it.



48.     The Horizontal Merger Guidelines ("Merger Guidelines") issued by the U.S. Department of Justice and Federal Trade Commission set forth the relevant test for geographic market definition: whether a hypothetical monopolist of the relevant services within the geographic area could profitably impose a small but significant and non-transitory increase in price (here, reimbursement rates for inpatient general acute-care services). If so, the boundaries of that geographic area are an appropriate geographic market.

49.     In this case, a hypothetical monopolist of inpatient general acute-care services within the six-county area could profitably impose a small but significant and non-transitory increase in the price of inpatient general acute-care services for at least one hospital in the six-county area. In general, patients choose to seek care close to their homes or workplaces, and residents of the six-county area also prefer to obtain inpatient general acute-care services locally. Thus, the availability of these services outside of the six-county area is not sufficient to prevent a hypothetical monopolist from profitably imposing a price increase.

50.     In addition, health plans that offer healthcare networks in the six-county area do not consider hospitals outside of that area to be reasonable substitutes in their networks for hospitals within that area. Because residents of the six-county area strongly prefer to obtain inpatient general acute-care services from within the six-county area, a health plan that did not have hospitals in the six-

county area likely could not successfully market a network to employers and patients in the area. Thus, a health plan would not exclude from its network a hypothetical monopolist of all inpatient general acute-care services in the six-county area in response to a small but significant price increase.

## V. ANTICOMPETITIVE EFFECTS

### A. The market for inpatient general acute-care services in central Pennsylvania is highly concentrated

51.    Market concentration is one useful indicator of the level of competitive vigor in a market and of the likely competitive effects of a transaction involving competitors. The more concentrated a market, and the more a transaction would increase concentration in a market, the more likely it is that a transaction—even a partial acquisition—will result in a meaningful reduction in competition.

52.    Geisinger currently accounts for approximately 55% of inpatient general acute-care services provided in the six-county area. Evangelical accounts for approximately 17% of that market. Defendants together thus account for approximately 71% of the relevant market. Defendants' internal documents report shares that are consistent with these shares for inpatient general acute-care services in general and for many service lines. The other competitor of significance in the six-county area is the University of Pittsburgh Medical Center ("UPMC"), which

operates two hospitals in Williamsport and Muncy. UPMC also used to operate a hospital in Sunbury, but that hospital permanently closed on March 31, 2020.

53.     The shares of total discharges of patients receiving inpatient general acute-care services from hospitals in the six-county area between the fourth quarter of 2018 and third quarter of 2019 are shown in the table below. These shares likely understate the Defendants' current shares because they include discharges from UPMC's Sunbury hospital, which has now closed, and some patients who would have used Sunbury are likely to choose Defendants' hospitals instead.

| Hospital System | Share |
|---|---|
| Geisinger | 54.6% |
| Evangelical | 16.7% |
| UPMC | 26.7% |
| Community Health System | 2.0% |

54.     As these shares illustrate, the relevant market is highly concentrated. The Merger Guidelines measure market concentration by using the Herfindahl-Hirschman Index ("HHI"), which is calculated by summing the square of individual firms' market shares. Under the Merger Guidelines, a market is considered to be highly concentrated if the HHI is above 2,500. Defendants' partial-acquisition agreement would operate in a market that is already highly concentrated, with an HHI of 3,979.

55.     Under the Merger Guidelines, a merger that significantly increases concentration in a highly concentrated market is presumed to be unlawful. A full

merger between Geisinger and Evangelical would trigger the presumption of illegality under the Merger Guidelines by a wide margin, resulting in a post-merger HHI of 5,799 and an increase of 1,820. A partial acquisition that creates the incentive and ability for two close competitors to coordinate in such a highly concentrated market poses a similar danger to consumers.

### B. The partial acquisition will diminish Evangelical's and Geisinger's incentives to compete against each other for patients

56.    Geisinger is by far the largest health system in the six-county region and within central Pennsylvania. It already enjoys a competitive advantage over its smaller competitors. By allowing Geisinger to partially acquire Evangelical and creating substantial entanglements between the two hospitals, the agreement will likely substantially lessen competition as Evangelical will have less incentive to compete for patients against the Geisinger behemoth—its financial partner—than it would have had it remained independent and not partnered with its closest competitor.

57.    Similarly, the transaction reduces Geisinger's incentives to compete for patients against Evangelical. Any patient that Geisinger attracts from Evangelical will diminish the value of Geisinger's interest in Evangelical, and Geisinger will also benefit from increasing coordination with its close rival.

58.     Competition between hospitals like Geisinger and Evangelical benefits patients in a number of ways, including by providing convenient access to high quality services.  Hospitals also compete to be included in health insurers' networks.

59.     Hospitals compete to attract patients to their facilities by offering high quality care, a broad scope of services, amenities, convenience, customer service, and attention to patient satisfaction.  To provide these services, hospitals expand service lines, hire specialists, family care physicians, and nurses, purchase modern equipment and technology, open specialized facilities, and continuously make other improvements.  These investments improve access to healthcare, lower wait times, and improve the quality of care for all patients, including Medicare, Medicaid, and uninsured patients.

60.     Anticompetitive effects arising out of this transaction are likely to occur from the combination of Geisinger's influence over Evangelical, Defendants' reduced incentives to expand and improve services, and the facilitation of information sharing and coordination between Geisinger and

Evangelical. These anticompetitive effects are likely to lead to a reduction in the quality, scope, and availability of inpatient general acute-care services.

### C. The partial acquisition is also likely to lead to increased health insurance prices

61.     Hospitals compete for patients not only through the quality of the services they offer, but also through participation in health insurers' networks. Hospitals and insurers negotiate prices (called reimbursement rates) as part of their negotiations about whether, and under what conditions, a hospital will be included in an insurer's network. The bargaining positions of a hospital and an insurer during these negotiations depend on whether there are other nearby, comparable hospitals that are available to the insurer. Competition among hospitals limits any individual hospital's leverage with insurers and enables insurers to negotiate lower reimbursement rates and other terms that reduce healthcare costs. Less costly care benefits patients and their employers in the form of lower premiums, copays, and deductibles.

62.     Even if Geisinger and Evangelical continue to negotiate separately with commercial health insurers, the partial-acquisition agreement creates incentives for Geisinger to increase its rates and enhances its ability to do so. Geisinger's incentive to raise its rates flows from its 30% interest in Evangelical. Before the partial acquisition, Geisinger did not benefit from patients going to

Evangelical.  With the agreement, Geisinger's 30% ownership of Evangelical now allows Geisinger to benefit when patients choose Evangelical because the value of Geisinger's ownership interest increases as a result of the profits that Evangelical earns.  This dynamic gives Geisinger an incentive to raise its reimbursement rates to commercial insurers because the agreement increases Geisinger's bargaining leverage, allowing it to profitably impose a price increase.  The agreement will thus result in higher healthcare costs for consumers.

63.     Similarly, Geisinger's 30% interest in Evangelical reduces its incentive to compete aggressively with Evangelical on prices to the Plain Community.  In the six-county area, hospitals compete directly on discounted prices offered to the Plain Community.  Members of the Plain Community usually do not have commercial insurance and pay for medical services out of pocket. With the partial acquisition, if Geisinger raises prices to Plain Community members and some of those members choose Evangelical instead as a result, Geisinger still captures 30% of the value of the profits generated from the patients who chose Evangelical.  In addition, the entanglements between Geisinger and Evangelical are likely to cause Evangelical to avoid directly competing against Geisinger on the prices it offers to the Plain Community, resulting in higher prices for those patients.

## VI. ABSENCE OF COUNTERVAILING FACTORS

64.     Geisinger's acquisition of a 30% stake in its close competitor is not reasonably necessary to achieve any of the benefits that Defendants tout in connection with this transaction.  For example, Defendants claim the partial-acquisition agreement will improve Evangelical's electronic medical records system.  But Evangelical could have licensed Geisinger's electronic medical records software without this transaction, and Defendants were in discussions to do so long before this transaction was under consideration.

65.     Evangelical also could have obtained funds for capital improvements from sources other than Geisinger, its closest competitor.  At the time Evangelical executed the agreement with Geisinger, it was in a strong financial position, had been profitable for the last five years, and already had decided that it had the financial wherewithal to move forward on the major capital improvement project that now has been funded in part by its competitor and partial owner.

66.     Finally, Evangelical's placement in the most favored tier of Geisinger Health Plan's commercial insurance products does not require the partial-acquisition agreement.  To the contrary, agreements between hospitals and insurers that offer favorable placement in commercial insurance products in exchange for favorable rates are common and do not require the entanglements created by the partial-acquisition agreement.

28

67.     For these reasons, there are no transaction-specific efficiencies that outweigh the likely competitive harms of the proposed transaction; indeed, there are no transaction-specific efficiencies to weigh against the harm.

68.     In addition, entry or expansion into the relevant market is unlikely to eliminate the anticompetitive effects of the partial-acquisition agreement because entry and expansion are not likely to be timely, likely, or sufficient to offset the agreement's anticompetitive effects. The construction of a new hospital that offers inpatient general acute-care services would require significant time, expenditures, and risk. Moreover, the six-county area is unlikely to attract greenfield entry by a new hospital due to declining demand for inpatient general acute-care services and low population growth. Indeed, no new hospitals have been built in the six-county area for more than 10 years, and UPMC's Sunbury hospital closed in March 2020.

69.     Enjoining the partial-acquisition will not require undue disruption of Defendants' businesses. Geisinger and Evangelical have not implemented many of the provisions of the agreement because, on October 1, 2019, they entered into a hold-separate agreement with the United States to maintain the status quo pending an investigation of the agreement by the Antitrust Division. The hold-separate agreement requires Geisinger and Evangelical to cease certain activities contemplated by the agreement, including making most expenditures, integrating

IT systems, and planning joint ventures.  The hold-separate agreement remains in force until this Court makes a final decision.

## VII.   VIOLATIONS ALLEGED

### COUNT I

### (Section 1 of the Sherman Act)

70.    Plaintiff alleges and incorporates paragraphs 1 through 69 of this complaint as if set forth fully herein.

71.    Geisinger and Evangelical have market power in the sale of inpatient general acute-care services in the six-county area.

72.    The partial-acquisition agreement is an agreement between Defendants to unreasonably restrain trade.  The partial-acquisition agreement is a contract, combination, or conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

### COUNT II

### (Section 7 of the Clayton Act)

73.    Plaintiff alleges and incorporates paragraphs 1 through 72 of this complaint as if set forth fully herein.

74.    The partial-acquisition agreement likely substantially lessens competition in the relevant geographic market for inpatient general acute-care services in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

75.     Among other things, the partial-acquisition agreement has and is likely to continue to cause Defendants:

(a)     to coordinate their competitive behavior with respect to inpatient general acute-care services;

(b)     to increase their prices for inpatient general acute-care services to insurers, self-paying patients, and other purchasers of healthcare; and

(c)     to reduce quality, service, and investment with respect to inpatient general acute-care services or to diminish future improvements in these areas.

## VIII. REQUEST FOR RELIEF

76.     Plaintiff requests that:

(a)     the agreement between Geisinger and Evangelical be adjudged to violate Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 7 of the Clayton Act, 15 U.S.C. § 18;

(b)     the Court order (i) Defendants to rescind or be enjoined permanently from carrying out the subject agreement; (ii) Geisinger to divest to Evangelical its 30% ownership interest in Evangelical; and (iii) Defendants be permanently

enjoined and restrained from carrying out any other transaction that would allow Geisinger to partially acquire Evangelical;

(c)     Plaintiff be awarded the costs of this action; and

(d)     Plaintiff be awarded any other relief that the Court deems just and proper.

Dated: August 5, 2020

Respectfully submitted,

**FOR PLAINTIFF UNITED STATES OF AMERICA:**


/s/ Makan Delrahim
MAKAN DELRAHIM
Assistant Attorney General for Antitrust


/s/ Bernard A. Nigro, Jr.
BERNARD A. NIGRO, JR.
Principal Deputy Assistant Attorney
General


/s/ Kathleen S. O'Neill
KATHLEEN S. O'NEILL
Senior Director of Investigations
& Litigation


/s/ Eric D. Welsh
ERIC D. WELSH
Chief
Healthcare and Consumer Products
Section

/s/ Lee F. Berger
LEE F. BERGER

CECILIA CHENG
CHRIS S. HONG
DAVID C. KELLY
GARRETT LISKEY
NATALIE MELADA
DAVID M. STOLTZFUS

Attorneys for the United States

U.S. Department of Justice
Antitrust Division
450 5th Street, NW, Suite 4100
Washington, D.C. 20530
Tel.: (202) 598-2698
E-mail: lee.berger@usdoj.gov

DAVID J. FREED
United States Attorney

/s/ Richard D. Euliss
RICHARD D. EULISS
Assistant Unites States Attorney
DC 999166
United States Attorney's Office
228 Walnut Street, 2nd Floor
P.O. Box 11754
Harrisburg, PA 17108-1754
Phone:  717-221-4462
Fax:      717-221-4493
Richard.D.Euliss@usdoj.gov