**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE GEISINGER SYSTEM SERVICES AND EVANGELICAL COMMUNITY HOSPITAL HEALTHCARE WORKERS ANTITRUST LITIGATION | No. 4:21-cv-196 (MWB) *Class Action* August 6, 2024 |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

TABLE OF ABBREVIATIONS ............................................................................ v

I.  INTRODUCTION ................................................................................... 1

II.  RELEVANT FACTUAL BACKGROUND ............................................... 3

    A.  Named Plaintiffs ........................................................................... 3

    B.  Defendants' Recruiting, Hiring, and Compensation Practices .......... 7

        (1)  Geisinger .............................................................................. 7

        (2)  Evangelical ......................................................................... 12

III.  LEGAL STANDARD .............................................................................. 15

IV.  ARGUMENT ........................................................................................ 16

    A.  PLAINTIFFS AND CLASS MEMBERS LACK STANDING. ...... 16

    B.  INDIVIDUALIZED ISSUES AMONG PROPOSED CLASS
        MEMBERS PREDOMINATE OVER COMMON
        QUESTIONS. ................................................................................ 20

        (1)  Plaintiffs fail to illustrate the broad spectrum of class jobs
            belongs in a single, geographically limited relevant
            market. ............................................................................... 21

        (2)  Plaintiffs cannot establish common impact because they
            fail to causally link their theories of harm and damages. ........... 25

        (3)  Plaintiffs' impact methodology predicts harm for more
            than a *de minimis* number of unharmed class members. ............. 28

        (4)  Even if admitted, Prof. Leamer's model contains
            significant flaws that prevent Plaintiffs from
            demonstrating classwide harm. ...................................... 29

        (5)  Plaintiffs cannot show classwide injury because they
            completely ignore the record, and rely on fictitious
            conceptions of "internal equity" and "imagined"
            compensation structures. ................................................ 31

    C.  PLAINTIFFS' CLASS IS UNASCERTAINABLE. ....................... 35

V.  CONCLUSION ...................................................................................... 35

i

# TABLE OF AUTHORITIES

**Cases**                                                                                            **Page(s)**

*Allen v. Ollie's Bargain Outlet, Inc.*,
    37 F.4th 890 (3d Cir. 2022) ...............................................................................16

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013)......................................................................................21, 22

*Atl. Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990)............................................................................................17

*Bishop v. GNC Franchising LLC*,
    403 F.Supp.2d 411 (W.D. Pa. 2005), *aff'd*, 248 F. App'x 298 (3d
    Cir. 2007) ...........................................................................................................21

*Borozny v. Raytheon Techs. Corp.*,
    2023 WL 348323 (D. Conn. Jan. 20, 2023) .....................................................21

*Callahan v. A.E.V., Inc.*,
    182 F.3d 237 (3d Cir. 1999) ..............................................................................25

*Carrera v. Bayer Corp.*,
    727 F.3d 300 (3d Cir. 2013) ..............................................................................35

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)..............................................................................................29

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011)............................................................................................21

*Finkelman v. Nat'l Football League*,
    810 F.3d 187 (3d Cir. 2016) ..............................................................................17

*Hayes v. Wal-Mart Stores, Inc.*,
    725 F.3d 349 (3d Cir. 2013) ..............................................................................26

*Hernandez v. Superintendent of SCI-Dallas*,
    2019 WL 4278977 (M.D. Pa. Sept. 10, 2019)..................................................22

*In re Blood Reagents Antitrust Litig.*,
    783 F.3d 183 (3d Cir. 2015) ..............................................................................20

*In re Broiler Chicken Growers Antitrust Litig. (No. II)*,
2024 WL 2117359 (E.D. Okla. May 8, 2024)........................................21, 22, 33

*In re High-Tech Emp. Antitrust Litig.*,
289 F.R.D. 555 (N.D. Cal. 2013)...................................................................32, 33

*In re High-Tech Emp. Antitrust Litig.*,
985 F.Supp.2d 1167 (N.D. Cal. 2013)...............................................................33

*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3d Cir. 2008) ..............................................................................15

*In re Lamictal Direct Purchaser Antitrust Litig.*,
957 F.3d 184 (3d Cir. 2020) ..............................................................................29

*In re Niaspan Antitrust Liitig.*,
397 F.Supp.3d 668 (E.D. Pa. 2019)...................................................................17

*In re Niaspan Antitrust Litig.*,
464 F.Supp.3d 678 (E.D. Pa. 2020)...................................................................28

*In re Niaspan Antitrust Litig.*,
67 F.4th 118 (3d Cir. 2023) ........................................................................16, 35

*In re Plastics Additives Antitrust Litig.*,
2010 WL 3431837 (E.D. Pa. Aug. 31, 2010) ...................................................28

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
725 F.3d 244 (D.C. Cir. 2013)....................................................................29, 30

*In re Ry. Indus. Emp. No-Poach Antitrust Litig.*,
395 F.Supp.3d 464 (W.D. Pa. 2019)............................................................32, 33

*Johnston v. HBO Film Mgmt., Inc.*,
265 F.3d 178 (3d Cir. 2001) ..............................................................................20

*Marcus v. BMW of N. Am., LLC*,
687 F.3d 583 (3d Cir. 2012) ..............................................................................16

*Nitsch v. DreamWorks Animation SKG Inc.*,
315 F.R.D. 270 (N.D. Cal. 2016)................................................................22, 33

*Sanneman v. Chrysler Corp.*,
191 F.R.D. 441 (E.D. Pa. 2000)............................................................20

*Seaman v. Duke Univ.*,
2018 WL 671239 (M.D.N.C. Feb. 1, 2018) ................................22, 33

*Sheet Metal Workers Loc. 441 Health & Welfare Plan v.
GlaxoSmithKline, PLC*,
2010 WL 3855552 (E.D. Pa. Sept. 30, 2010) ....................................29

*Sloane v. Gulf Interstate Field Servs., Inc.*,
2017 WL 1105236 (M.D. Pa. Mar. 24, 2017) ...................15, 25, 26

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)..............................................................................17

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442 (2016)......................................................................15, 27

*Value Drug Co. v. Takeda Pharms., U.S.A., Inc.*,
2022 WL 17177267 (E.D. Pa. Nov. 23, 2022) ..................................16

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)..............................................................................16

*Weisfeld v. Sun Chem. Corp.*,
84 F. App'x 257 (3d Cir. 2004) ...........................................19, 20, 34

**Rules**

Fed. R. Civ. P. 23 ...........................................................................*passim*

Fed. R. Civ. P. 23(a)..............................................................................15

Fed. R. Civ. P. 23(b) .............................................................................15

Fed. R. Civ. P. 23(b)(2)..........................................................................15

Fed. R. Civ. P. 23(b)(3)............................................................15, 20, 25

Fed. R. Evid. 702 ....................................................................................2

## TABLE OF ABBREVIATIONS

| Abbreviation | Definition |
|---|---|
| "Complaint" or "CAC" | Consolidated Amended Class Action Complaint (Feb. 2, 2023) (ECF No. 101) |
| *Daubert*-EL | Defendants' Memorandum in Support of Their Joint Motion to Exclude Testimony of Plaintiffs' Expert, Prof. Edward Leamer (June 14, 2024) (ECF No. 184) |
| Defendants | Geisinger System Services and Evangelical Community Hospital |
| Evangelical | Evangelical Community Hospital |
| Geisinger | Geisinger System Services |
| "Mem." | Plaintiffs' Memorandum of Law in Support of Motion for Class Certification (June 14, 2024) (ECF No. 178) |
| Named Plaintiffs | Nichole Leib and Kevin Brokenshire |
| "Ex." | Refers to an Exhibit in the Declaration of Stefan M. Meisner in Support of Defendants' Joint Opposition to Plaintiffs' Motion for Class Certification, unless otherwise defined in this table |
| ABD (Ex. 33) | Deposition transcript of Amy Brayford, EVP and Chief of Staff at Geisinger, taken on June 27, 2023 |
| ACD (Ex. 23) | Deposition transcript of Amy Coleman, Lead Compensation Analyst at Geisinger, taken on June 15, 2023 |
| AHD (Ex. 41) | Deposition transcript of Angela Hummel, Former Vice President of Human Resources at Evangelical, taken on July 18, 2023 |
| ALD (Ex. 36) | Deposition transcript of Angela Lahr, Vice President of Clinical Operations at Evangelical, taken on June 22, 2023 |
| AMD | Deposition transcript of Prof. Alan Manning, taken on May 9, 2024, ECF No. 192-8 |
| BD1 | Deposition transcript of Named Plaintiff Kevin Brokenshire, taken on July 6, 2023, ECF No. 192-9 |
| BD2 (Ex. 6) | Deposition transcript of Named Plaintiff Kevin Brokenshire, taken on July 7, 2023 |

| Abbreviation | Definition |
|---|---|
| BLD (Ex. 22) | Deposition transcript of Brion Lieberman, Chief Human Resources Officer at Geisinger, taken on October 24, 2023 |
| BR | Prof. Laurence Baker's Expert Report, dated March 8, 2024 (corrected), ECF No. 188-9 |
| BWD (Ex. 91) | Deposition transcript of Brian Wolfe, Vice President of Physician and Clinical Practices at Evangelical, taken on May 24, 2023 |
| DMD (Ex. 28) | Deposition transcript of Daniel McGann, Evangelical's Compensation Coordinator, taken on June 22, 2023 |
| ECD (Ex. 12) | Deposition transcript of Elyse Chadderdon, Provider Recruiter and Retention Coordinator at Evangelical, taken on May 17, 2023 |
| ELD | Deposition transcript of Prof. Edward Leamer, taken on May 14, 2024, ECF No. 192-4 |
| JCD (Ex. 30) | Deposition transcript of Julene Campion, Vice President, Recruitment, Organizational Development, and Learning at Geisinger, taken on May 4, 2023 |
| JLD (Ex. 21) | Deposition transcript of Jeffrey Lowry, Associate Vice President of Recruitment at Geisinger, taken on June 7, 2023 |
| JMD (Ex. 31) | Deposition Transcript of Jeanette Mitteer, Business Intelligence Developer at Evangelical, taken on May 17, 2023 |
| JSD (Ex. 7) | Deposition transcript of James Stopper, Chief Financial Officer and Senior Vice President of Finance at Evangelical, taken on June 20, 2023 |
| KAD (Ex. 38) | Deposition transcript of Kendra Aucker, Chief Executive Officer at Evangelical, taken on October 31, 2023 |
| KBD (Ex. 84) | Deposition transcript of Katy (Root) Baralt, Nurse Senior Recruiter at Geisinger, taken on May 5, 2023 |
| KCD (Ex. 25) | Deposition transcript of Kristi Cellitti, Recruitment Director at Geisinger, taken on June 6, 2023 |
| KMD (Ex. 16) | Deposition transcript of Kelly Moore, Associate Vice President, Compensation at Geisinger, taken on May 10, 2023 |

| Abbreviation | Definition |
|---|---|
| LD1 | Deposition transcript of Nichole Leib, Named Plaintiff, taken on June 29, 2023, ECF No. 192-7 |
| LD2 (Ex. 4) | Deposition transcript of Nichole Leib, Named Plaintiff, taken on December 8, 2023 |
| LR1 | Prof. Edward Leamer's Expert Report, dated January 16, 2024 (Corrected), ECF No. 188-3 |
| LR2 | Prof. Edward Leamer's Rebuttal Expert Report, dated April 19, 2024, ECF No. 188-10 |
| MKD (Ex. 32) | Deposition transcript of Mark Krammes, a Certified Registered Nurse Anesthetist ("CRNA") at Geisinger, taken on August 22, 2023 |
| MMD (Ex. 29) | Deposition transcript of Matthew McKinney, Director of Provider Recruitment at Geisinger, taken on May 3, 2023 |
| MR2 | Prof. Alan Manning's Rebuttal Expert Report, dated April 19, 2024, ECF No. 188-11 |
| RFAS (Ex. 1) | Plaintiffs' Objections and Responses to Defendants' First Requests for Admission, dated October 16, 2023 |
| ROGS1 (Ex. 75) | Plaintiffs' Objections and Responses to Defendants' First Set of Interrogatories, dated November 11, 2022 |
| ROGS2 (Ex. 76) | Plaintiffs' Revised Objections and Responses to Defendants' First Set of Interrogatories, dated February 13, 2023 |
| ROGS3 | Plaintiffs' Supplemental Objections and Responses to Defendants' Interrogatories 1-35, dated April 30, 2024, ECF No. 192-6 |
| RSD (Ex. 85) | Deposition transcript of Rachel Smith, Vice President of People and Culture at Evangelical, taken on July 20, 2023 |
| TPD (Ex. 40) | Deposition transcript of Tamara Persing, Chief Nursing Officer at Evangelical, taken on August 16, 2023 |

## I.    INTRODUCTION

Plaintiffs ask the Court to certify a one-size-fits-all class of "Healthcare Workers" consisting of a wide spectrum of jobs, from personal care assistant, to nursing assistant, to lab technician, to registered nurse, to gynecologic oncologist, to neurosurgeon, and all the many "other healthcare professionals" in between.   No court has ever done so, and neither should the Court here.   Class treatment for such a broad and varied class is inappropriate under Rule 23 for many reasons.

*First*, Named Plaintiffs fail to show they were injured (as they must to prove standing) by the currently asserted conduct—that Defendants agreed not to "directly solicit" each other's "Healthcare Workers," restricting their knowledge of information about job opportunities, thereby reducing employee mobility between Defendants and suppressing wages.   Both Named Plaintiffs, however, were aware of job opportunities at Defendants during the class period.   Plaintiff Nichole Leib worked at both Defendants *twice* during the class period alleged in the Complaint.

*Second*, Plaintiffs' theory depends upon proposed class members being unaware of job opportunities at Defendants due to the alleged agreement.   But they ignore that Defendants utilized a myriad of recruiting tactics, including "direct solicitation," to compete aggressively for workers against one another and other healthcare and non-healthcare firms, including outside the alleged hospital-only, six-county market.   Plaintiffs also offer no evidence that any individual lacking such

awareness actually exists and make no effort to adduce any such evidence, leaving unanswered whether any class member can be identified who fits Plaintiffs' theory of injury. Rather, Plaintiffs contend that (i) some unquantified lack of job opportunity information for some undefined set of class members (ii) reduced job mobility which, in turn, (iii) suppressed wages for the entire class. But Plaintiffs offer no evidence on points (i) and (ii), and ignore evidence that worker movement (point (ii)) between Defendants remained unaffected during the alleged class period.

*Third*, Plaintiffs fail to draw any causal connection between the alleged misconduct and class members' harm (*i.e.*, lower compensation), or show that harm is common to the class. Instead, Plaintiffs concoct a methodology of impact that is flawed and unreliable as it does not consider real-world evidence regarding how Geisinger and Evangelical actually recruit, hire, and compensate their employees. As a result, Plaintiffs' proposed methodology yields "false positives" by predicting harm to individuals outside of the proposed class who could not have been harmed by the alleged misconduct. Further, Plaintiffs' proposed methodology fails numerous standard tests for reliability, and predicts harm for some class members but not for others when disaggregated by year, Defendant, or job type, indicating that it fails to satisfy the standards for class certification under Rule 23.[1]

---

[1] Defendants' motions to strike the testimony and reports of Plaintiffs' experts, Professors Edward Leamer and Alan Manning, under *Daubert* and FRE 702 are concurrently pending before this Court. ECF Nos. 175 and 182.

*Fourth*, Plaintiffs rely on "imagined" compensation structures and a common human resources concept, "internal equity," as the mechanisms they contend spreads harm throughout the class, but ignore evidence of Defendants' actual compensation structures and application of internal equity.  In fact, Defendants consider internal equity only among employees with similar job responsibilities, qualifications, and experience—not across all class members, as Plaintiffs assert.  For harm to spread classwide, however, Defendants would have to have wage structures such that, when a single class member's pay changes, every other class member's pay changes—but there is no evidence to support such a structure and Plaintiffs' experts concede Defendants do not have such a structure.

At bottom, common sense regarding Plaintiffs' untenable class is confirmed by the "rigorous analysis" required for class certification.  Individualized issues about the recruiting, hiring, and compensation of hundreds of Defendants' different jobs—some requiring extremely specialized skillsets, with different alternative job options defining different markets for each position—predominate over common issues.  The Court should deny Plaintiffs' Rule 23 motion.

## II.     RELEVANT FACTUAL BACKGROUND

### A. Named Plaintiffs

**<u>Plaintiff Nichole Leib</u>**.  Named Plaintiff Leib is a registered nurse ("RN") who has worked at Geisinger Medical Center ("GMC") since July 2011, ████████

██████████████████████████████████████████████████

███████████.  LD1 116:8-24; ROGS3 at 6.  █████████████████

██████████████████████████████████████████████████

████████████████████████████████████.  *Id.* 10-11.

Ms. Leib's employment at Geisinger overlapped with her employment at Evangelical twice during the class period alleged in the Complaint.  CAC ¶ 67.  ████

██████████████████████████████████████████████████

█████████████████.  LD1 51:15-52:8. ██████████████████████

████████████████████████████████████████.  *Id.* 123:4-7;

Ex. 77.  ███████████████████████████████████████

██████████████████████████████████████████████.  LD1

170:19-173:11.████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████.  *Id.*;

Ex. 81.  She currently works both as a flex RN at Geisinger and full-time at Evangelical.  LD1 88:15-89:2.  ████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████.″ *Id.* 249:18-251:7.



ROGS3 at 17-20; RFAS at 5.

ROGS3 at 5-11.

*Id.*

**Plaintiff Kevin Brokenshire.**

BD1 65:22-66:10.

---

[2] LD1 64:17-70:15, 262-263, 268:12-269:16, 273-274, 289:9-290:1, 294:19-22; ROGS3 at 20; Exs. 2 at x663; 79.

[3] Exs. 3 at I37, I52; 78; 80; LD1 197:6-198:23, 229:19-234:6, 246:25-248:7, 253:17-254:4; LD2 66:15-68:2.

[4] LD1 177:13-183:15, 197:4-198:23, 229:19-234:24, 252:25-254:4.



*Id.* 84:21-85:8.

Ex. 5 at x590-91; BD1 62:14-19.

RFAS at 9.

. BD2 240:21-244:3.

. RFAS at 8.

BD1 170:2-172:15.

BD1 147-148, 153, 163-165.

ROGS3 at 19.

BD2 244:20-247:22.

*Id.* 248:2-11.

*Id.* 248:15-249:25.

████████████████████████████████

████████████████████████████████

██████████████████████  BD1 138:2-17, 149:12-24. █

████████████████████████████████

████████████████████  *Id.* 136:21-137:25.

## B. Defendants' Recruiting, Hiring, and Compensation Practices

During the class period, Defendants used various strategies to recruit, hire, and set compensation for Healthcare Workers depending on, *inter alia*, employee type and whether they were "hard-to-fill" positions.

### (1) Geisinger

Geisinger is an integrated health system with nearly 150 locations, including ten hospitals, clinical care facilities, pharmacies, health plan, a medical school, and a nursing school.  Ex. 93.  Geisinger employs over 25,000 employees (including over 1,700 physicians) offering a broad spectrum of services such as transplant surgery, addiction medicine, and a Level IV trauma center. BR ¶ 56 n.113.

**Recruiting and hiring practices.**  Geisinger employs ████ recruiting and hiring specialists to meet its HR talent needs.  JCD 15:12-14, 17:4-10.   For Healthcare Workers, Geisinger organizes recruiting and hiring by (i) Providers (*i.e.*, physicians and advanced practitioners) and (ii) Non-Providers (*i.e.*, all other class positions).  JCD 20:5-11, 148:11-22; MMD 18:17-21.

Throughout the class period, Geisinger used various recruiting tools to attract Healthcare Workers in and outside of the alleged six-county market, including from Evangelical.[5]  For example, recruiting methods include: (1) direct messaging via online platforms, email, and text; (2) posting on its website; (3) posting on job boards or websites, *e.g.*, LinkedIn, Indeed, Doximity, Nurse.com, American Hospital Association, Association Job Boards, and others; (4) local and regional virtual and on-site job fairs; (5) internal referrals, with incentive bonuses; (6) online, print, and radio advertising; (7) outreach to various regional and national organizations, including chambers of commerce, and affinity professional groups; and (8) in certain cases, "cold-calling."[6]  These recruitment tactics, and corresponding geographic markets (from local to global), varied by position.  BR ¶¶ 36-40, 117-18, 121-22.

Geisinger did not commonly use the types of "direct solicitation" that Plaintiffs and their experts currently assert—*e.g.*, cold-calling—to generate leads because doing so was costly and of limited utility. BR ¶¶ 22, 44; JCD 50:17-51:23; Ex. 50 at x762.  Rather, direct solicitation was normally used for "a small percentage" of typically "hard-to-fill" positions, such as CRNAs or physicians.[7]

---

[5] Exs. 34; 43 (nurses); 64 (physicians); 69 (other Healthcare Workers); 86 (advanced practitioners); ABD 39:4-47:9; Ex. 48 x917-18.

[6] Exs. 35 ("Channel Plan," "RN 2019"); 51; 52 at x521-28; 64; 87; 88; 89; ABD 36:9-39:2; JLD 103:3-17, 144:15-147; MMD 32:4-36:16, 167:18-169:23; JCD 50:17-51:23; BR ¶ 37.

[7] JLD 144:15-147; JCD 51:10-52:2; KBD 33:15-35:7, 66:6-21.

Geisinger was concerned about relying on recruiting methods that might impact patient care, such as cold-calling physicians or nurses, because direct contact during business hours might distract healthcare professionals from delivering care to patients and reflect negatively on Geisinger.  MMD 34.

Geisinger did not usually direct physician recruiting efforts toward Evangelical or other healthcare providers near a Geisinger location, ███████████ ████████████████████████████████████████████████████████████████ ████████████████████████████ MMD 179:14-180:11. ██████████████████ ████████████████████████████████████████████████████████████████ ██████ Exs. 59 § 3.2; 68 § 3.2. For several Geisinger facilities (including its primary campus in Danville), this radius includes Evangelical. BR ¶¶ 110-11, Exh. 10.

Throughout the class period, Geisinger always had open nursing positions for nurses.  Geisinger experienced severe nursing shortages at times, particularly during the COVID-19 pandemic, which was consistent with industrywide nurse shortages.[8]

**Compensation-setting practices**.  Geisinger sets base salary ranges for its approximately ██████ job families by ████████████████████████████████ ███████████████████████████████████████████████████ ██████████

---

[8] LD1 249:18-251:7; BD1 147:23-148:4-18; Exs. 24; 48 at x913; 55 at x706-10; 63 at x678.

[9] KMD 68:18-71:13; Exs. 14; 27; 72; 83 at x698-716.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████[10] These surveys collect compensation information from numerous hospitals, clinics, long-term care, and assisted living and rehabilitation facilities, in and outside the alleged six-county market, including nationally.[11]   Some surveys, *e.g.*, for physicians, include comparable large hospital systems, *e.g.*, Mayo Clinic (MN), and some salary composites, *e.g.*, for nurses, exclude Evangelical because of its relatively smaller size.  Exs. 18 at x988; 62 at x568-69.  Employers in each survey (including whether they are non-hospitals) vary by position.[12]

████████████████████████████████████████████

Internal equity is a common business approach that aims to ensure "fairness" in pay among specific individuals whose qualifications, experience, and skills are the same. KMD 57:8-60:13; DMD 130:9-19.  Geisinger applied internal equity comparisons or adjustments narrowly—*i.e.,* ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████     ACD 44:10-46; KMD 68:18-71:1.████████

████████████████████████████████████████████████████

---

[10] BLD 110:8-24; ACD 90:2-24; Exs. 14; 17; 18; 19; 20 at x551-54, x570-73, x580-83; 83 at x711.
[11] ACD 107:10-108:4; Exs. 15; 19; 20 at x450-53; BR ¶¶ 90-91, Exh. 6.
[12] *See, e.g.*, Exs. 19 at x487-89; 20 at x442-53; 62 at x568-73.

███████████████████████████████████████████████████

████████████████████████████████████████ MMD
236:16-237:4; Ex. 47.   In addition, █████████████████████
████████████████████████████ who could receive supplemental
compensation (*e.g.*, shift, overtime, and bonus pay) above their base wages that
varies from individual to individual.[13]

Geisinger determined compensation differently for physicians compared to
other Healthcare Workers during the class period.  Base salaries for physicians were
determined in a similar manner as base salaries for other Healthcare Workers:███
██████████████████████████████████ KMD 31:9-
32:4; Ex. 27 at x036.  Physicians' supplemental pay was unique.  Before 2016,
physicians' compensation was based████████████████████████████
████████████████████████████ KMD 97:13-99:14.
In 2017, ████████████████████████████████████████
███████████████████████████ *Id.*; Ex. 27 at x027-28.
And even more so than for other employees, physicians fall into many different
specialties and earn many different types of pay that are subject to factors specific
to the individual.  For example, salaries for physicians ████████████████
███████████████████████████████████████████████

---

[13] Exs. 47 at x677-79; 46 at x751; 73 at x1999-2014; BR ¶¶ 161, 211, 217 n.380.

███████████████████████████████████

████████ Exs. 8-11; 73 at x012-14; ECD 36:4-9, 122:17-20. ██████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████ *E.g.*, Ex. 68 at x579-80; MMD 179:22-180:11.

**(2) Evangelical**

In contrast, Evangelical is an independent community hospital in Lewisburg, Pennsylvania with only a small number of family medicine and physical therapy satellite offices outside of Lewisburg. ECD 40:21-42:20; DMD 56:19-58:16. Evangelical has approximately 1,900 to 2,000 total employees, including 200 physicians in approximately 15 specialties. KAD 38:9-12; TPD 20:22-25; BWD 45:17-24, 103:14-17. To ensure coverage for patient services it does not offer, Evangelical has Medical Services Agreements with other hospitals.[14]

**Recruiting and hiring practices**. Healthcare worker recruitment at Evangelical is performed by two separate departments: (1) the Vice President of Physician and Clinic Practices and a dedicated recruiter for physicians and advanced practitioners ("Providers"); and (2) other healthcare workers ("Non-Providers") are

---

[14] ECD 46:18-47:21, 115:15-118:4; BWD 126:17-127:7; ALD 72:9-18.

recruited by the ████ employees in the Department of People and Culture.[15]

During the class period, Evangelical utilized different recruitment methods to recruit Providers and Non-Providers.  Non-Provider recruitment efforts used a third-party recruiter which engaged in a variety of passive and active recruiting methods, such as posting jobs to Evangelical's website and other locations, advertising positions, social media marketing, and direct outreach to candidates.[16]  Before engaging an outside recruiter in 2020, Evangelical's Non-Provider recruitment ████

████████████████████████████████████████████████████████

████████████████.  RSD 42:6-43:17. Evangelical recruiters did not cold-call Non-Providers.  DMD 100:20-102:1; AHD 29:7-23.

Evangelical used separate third-party agencies to recruit Providers.  BWD 40:12-25; RSD 24:14-21; ECD 103:5-25.  For example, Evangelical posted positions on its website and third-party job boards, attended job fairs, and engaged in direct marketing (*e.g.*, via email, text message and physical mailing campaigns), and cold-called "at times."  BWD 46:25-47:11, 49:18-50:21, 83:2-87:11; ECD 13:25-27:25.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[15] BWD 26:4-27:5, 51:3-15; RSD 24:22-25:8; ECD 10:14-11:13; DMD 47-48.
[16] RSD 31:21-33:4; DMD 99:4-101:6; ALD 52:21-53:14; AHD 27:18-29:23; KAD 44:6-20; Ex. 57 at x645, x647.

████████████████████████████.[17]

**Compensation-setting practices**.   As with recruiting, Evangelical's compensation-setting practices for Providers and Non-Providers were  ████

████████████████████████████████████████████████████████████

████████████████████████   Non-Provider recruiters used salary data from regional surveys.  RSD 80:22-81:6; Exs. 65 at x396; 53; 60.  Provider recruiters looked at statewide and nationwide surveys, and relied on separate external salary data for benchmarking.  BWD 53:15-54:16; JSD 49:17-25.  ████████████

████████████████████████████████████████████████████████████

██████████████████████████████   BWD 54:4-24; ECD 31:3-32:10, 125:22-126:12; Ex. 67.  ████████████████████████████████

██████████████████████████████████   ECD  36:19-37:19, 121:23-122:24; Exs. 42; 44; 49; 70.

████████████████████████████████████████████████

████████████████████████████████████████ ██ ████

████████████████████████████████████████████████

████████ █ ██████████████████████████████   had

---

[17] BWD 50:15-51:2, 87:8-15, 208:5-18; ECD 54:18-55:3, 99:7-100:15, 107:4-108:9; Ex. 58 at x921-22.
[18] RSD 78:3-79:2; BWD 105:4-106:12; DMD 43:16-44:5; Ex. 61.
[19] JMD 30:19-31:15; ALD 56:20-57:6; DMD 129:18-130:19.

14

final approval of physician compensation, and the ████████████████████████

made compensation decisions for other healthcare worker positions.[20]

## III.   LEGAL STANDARD

Rule 23 of the Federal Rules of Civil Procedure requires that plaintiffs seeking class treatment show, "by a preponderance of the evidence," that the class satisfies numerosity, commonality, typicality, and adequacy under Rule 23(a), and a Rule 23(b) prong—here, that common questions of law or fact predominate over any individualized inquiry and a class action is superior to individual actions.  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3d Cir. 2008); FRCP 23(b)(3).[21]  This means that "issues common to the class [must] predominate over those affecting only individual class members."  *Sloane v. Gulf Interstate Field Servs., Inc.*, 2017 WL 1105236, at *21 (M.D. Pa. Mar. 24, 2017); *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (same).  In antitrust cases, common issues must predominate regarding: (1) any "violation of the antitrust laws[,]" (2) "individual injury[,]" and (3) "measurable damages."  *Hydrogen Peroxide*, 552 F.3d at 311.  And where, as here, an "expert's model is the basis for a plaintiff's claim of classwide impact and causation," courts must "rigorously examine the soundness of that model at the class certification stage," and certify the class "only" after finding

---

[20] BWD 28:11-17, 30:16-31:6; ECD 32:23-33:21, 89:20-90:12, 121:19-22.
[21] Plaintiffs waived by omission their request for a Rule 23(b)(2) injunctive class.

it "methodologically sound." *Value Drug Co. v. Takeda Pharms., U.S.A., Inc.*, 2022 WL 17177267, at *10 (E.D. Pa. Nov. 23, 2022) (denying class certification).

To do so, courts must conduct a "rigorous analysis" of evidence offered in support, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011), "requir[ing] more than allegations, initial evidence, or a threshold showing," *Allen v. Ollie's Bargain Outlet, Inc.*, 37 F.4th 890, 901 (3d Cir. 2022) (citation omitted). Courts "must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits—including disputes touching on elements of the cause of action." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 591 (3d Cir. 2012).

The Third Circuit also requires that "class [members be] 'currently and readily ascertainable based on objective criteria.'" *In re Niaspan Antitrust Litig.*, 67 F.4th 118, 129-30 (3d Cir. 2023). A class is ascertainable when (1) "defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Id.* at 130. Part of the "rigorous analysis," failure to "propose a classification method with evidentiary support to meet the ascertainability requirement" by a "preponderance of the evidence" is fatal to class certification. *Id.*

## IV. ARGUMENT

### A. PLAINTIFFS AND CLASS MEMBERS LACK STANDING.

In antitrust class actions, plaintiffs seeking to certify a class must not only

establish they have Article III standing—*i.e.*, that they suffered an "actual," "concrete and particularized" injury that is "not conjectural or hypothetical" (*Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016))[22]—but that they suffered "antitrust injury."   Antitrust injury is "of the type that the antitrust laws were intended to prevent and *that flows* from that which makes the defendant's acts unlawful"—meaning, Plaintiffs' *actual injuries must* "*stem[]* from a competition-*reducing* aspect or effect" of the alleged conduct.   *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 329 (1990) (emphases added); *In re Niaspan Antitrust Liitig.*, 397 F.Supp.3d 668, 689 (E.D. Pa. 2019) ("[T]he purpose of the antitrust injury requirement is to prove that the theory of unlawful conduct, *i.e.* the theory of liability, was in fact responsible for causing harm to plaintiffs.").   Plaintiffs' antitrust theory of liability depends on Plaintiffs and class members being unaware of jobs at Defendants, impacting their ability to negotiate salaries, and "suppress[ing] the[ir] job mobility and wages[.]" CAC ¶ 3.  Plaintiffs have not shown that *any* individual, including themselves, was unaware of job opportunities at Defendants during the

---

[22] Defendants do not concede Plaintiffs suffered *any* harm.  *See, e.g.*, BR § V-VI; *supra* § I.  Indeed, Plaintiffs' sole "evidence" that they suffered suppressed wages are Profs. Leamer's and Manning's deeply flawed analyses.  *Daubert*-EL § I-II; Manning-*Daubert* at I-III; *supra* § IV.B.5.  Barring this "economic" evidence, Plaintiffs would lack Article III standing, requiring dismissal of their claims.  *See, e.g.*, *Finkelman v. Nat'l Football League*, 810 F.3d 187, 195-96 (3d Cir. 2016) (dismissing case after named plaintiffs lacked Article III standing).

class period, and many class members could not even have been injured at all.

For example, both Plaintiffs testified they were aware ██████████████ nursing positions at both Defendants, in part because of "nurse shortages" at both, throughout the class period. [23]   In fact, Ms. Leib worked at both Defendants concurrently *twice* during the class period alleged in the Complaint, which Plaintiffs have now changed to avoid addressing this inconvenient fact ████████████████ ████████████████████████████████████████████████████████████████ ████████   *See supra* § II.A; Ex. 82.  In 2021, Ms. Leib rejoined Evangelical full time, ███████████████████████████████████████████   demonstrating her ability to negotiate better compensation.  *See supra* § II.A; Ex. 81.

Mr. Brokenshire, on the other hand, could not have been directly solicited by either Defendant through many of Defendants' recruiting methods, ███████████ ██████████████████████████████████████████████████████████   *See* *supra* § II.A.  Despite these obstacles, he *was* aware of RN positions at Evangelical, as well as others in and outside the six-county area, which he simply ███████ apply for.  *Id.*  In fact, Mr. Brokenshire was confident he could simply ██████ ████████████████████████████████████████████████   BD2 at 249:19-24. And as did Ms. Leib, he received █████████████████████████████████

---

[23] LD1 250:3-20; BD1 147:23-148:18, 153:4-12.
[24] LD1 51:6-53:4, 130:21-132:23; LR1 ¶ 9 n.9.

███████████████████████████████████████████   *See supra* § II.A.

Given these facts, Plaintiffs could not have been injured by the now asserted misconduct.   *Weisfeld* is illustrative.   There, the Third Circuit held that plaintiff failed to show antitrust injury where plaintiff alleged a class was deprived of job opportunities because of a no-hire agreement, but the named plaintiff *did not seek outside employment.   Weisfeld v. Sun Chem. Corp.*, 84 F. App'x 257, 263 (3d Cir. 2004).   Likewise, Plaintiffs here suffered no antitrust injury when both were aware of opportunities at Defendants (and others), and either pursued them for more compensation or failed to do so for reasons independent of the alleged conduct.

Nor can Plaintiffs establish standing for several groups who could not have been harmed by the alleged conduct, especially physicians.   Defendants' expert, Prof. Laurence Baker, discusses the importance of ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

admittedly, not the alleged conduct.   BR ¶¶ 60-63, 212, 221 n.393; ELD 85:19-25. Besides physicians, other proposed class members also could not have been harmed by the alleged conduct, including low-skilled workers, workers newly hired from a non-Defendant, and those in positions that Geisinger offers but Evangelical does not. BR ¶¶ 16, 56, 174-76.   And, for each of these groups, Prof. Baker's analysis further shows that any wage variance that could be measured among Healthcare Workers

19

was likely caused by factors other than the alleged agreement.  BR § V.B.

With so many uninjured class members, including Named Plaintiffs, to determine whether anyone "lost employment opportunities, an individualized inquiry may be required for each class member," which also defeats predominance, as demonstrated below (see *infra* § IV.B).  *Weisfeld*, 84 F. App'x at 263.

## B. INDIVIDUALIZED ISSUES AMONG PROPOSED CLASS MEMBERS PREDOMINATE OVER COMMON QUESTIONS.

As required by Rule 23(b)(3), Plaintiffs have not established with classwide evidence that common issues predominate over individualized ones for two overarching reasons.  *First*, Plaintiffs depend on unreliable expert testimony that fails *Daubert* admissibility standards and thus, fails to satisfy Rule 23.  *See In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015) (Plaintiffs "cannot rely on challenged expert testimony, when critical to class certification" "unless" it survives *Daubert*.).  *Second*, significant individualized inquiries to determine class membership would predominate, rendering class treatment inappropriate.  *See Sanneman v. Chrysler Corp.*, 191 F.R.D. 441, 455 (E.D. Pa. 2000) (refusing to certify class requiring "mini-hearing[s]" to determine class membership).[25]

---

[25] Similarly, Plaintiffs cannot show class treatment is superior under Rule 23(b)(3), as these individualized inquiries would pose "severe manageability problems." *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 185, 194 (3d Cir. 2001).

(1) **Plaintiffs fail to illustrate the broad spectrum of class jobs belongs in a single, geographically limited relevant market.**

Plaintiffs incorrectly contend they need not define a relevant market, and must "only" establish "whether the conspiracy's existence is susceptible to classwide proof[.]" Mem. at 4.   The predominance inquiry "begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011).   Plaintiffs here do not assert a wage-fixing or no-hire claim—nor could they.   Instead, they claim Defendants agreed not to directly solicit each other's Healthcare Workers, and "exercised monopsony [or "market"] power over the market for Healthcare Workers" in the alleged six-county area to suppress class members' wages.   CAC ¶ 40; Mem. at 22-23.   Because they assert the alleged agreement suppressed wages, Plaintiffs must define a relevant labor market to assess whether Defendants had market power sufficient to control wages in the alleged six-county area as part of the predominance inquiry.   *See, e.g.*, *Bishop v. GNC Franchising LLC*, 403 F.Supp.2d 411, 422 (W.D. Pa. 2005), *aff'd*, 248 F. App'x 298 (3d Cir. 2007) ("[*Per se*] Section 1" claims require "proof of relevant markets[.]"); *Borozny v. Raytheon Techs. Corp.*, 2023 WL 348323, at *10 n.6 (D. Conn. Jan. 20, 2023) (same, to show where "anticompetitive effect [] occur[ed]").

To support their argument, Plaintiffs rely on two inapposite cases—*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013) and *In re Broiler Chicken Growers Antitrust Litig. (No. II)*, 2024 WL 2117359 (E.D. Okla. May 8, 2024).

Mem. at 4 n.15.   But *Amgen* did not address whether relevant markets must be defined at the class stage; rather, the court there rejected defendant's argument that "certification must be denied unless [plaintiff] *proves* materiality," an element of the underlying claims.   568 U.S. at 459.   *Broiler Chicken* is an out-of-circuit opinion "without any precedential, or persuasive, value" in this court.   *Hernandez v. Superintendent of SCI-Dallas*, 2019 WL 4278977, at *2 n.1 (M.D. Pa. Sept. 10, 2019).   Unlike here, where Plaintiffs seek to certify a broad, varied class of "all Healthcare Workers," *Broiler Chicken* involved a nationwide cartel conspiring to restrict recruiting and fix the wages of a homogeneous class of chicken growers through "take-it-or-leave-it" contracts that included "nearly identical [payment] terms" industrywide.   2024 WL 2117359, at *2.[26]

Plaintiffs nonetheless *do* allege a relevant market—namely, the hospital-only, six-county market where Defendants purportedly "collectively employed over 75% of Healthcare Workers and over 90% of hospital employees", giving them sufficient "monopsony power" to suppress class members' job mobility and wages.   Mem. at 10.   But this alleged market is deficient, as it is based on Prof. Leamer's unreliable

---

[26] Plaintiffs' other "no-poach" cases also are inapposite (Mem. at 30 n.110), as all involve much narrower classes than the one Plaintiffs seek to certify here.   *E.g.*, *High-Tech II* ("technical" workers, after rejecting "all employees" in *High-Tech I*); *Seaman v. Duke Univ.*, 2018 WL 671239 (M.D.N.C. Feb. 1, 2018) (medical faculty-only, after rejecting all medical and non-medical); *Nitsch v. DreamWorks Animation SKG Inc.*, 315 F.R.D. 270 (N.D. Cal. 2016) (animators only).

analysis.  *See Daubert*-EL at 25-30.  He does not use standard tests to define relevant markets, such as the Hypothetical Monopsonist Test, instead erroneously relying on a "Commuting Zone" as a proxy to define a hospital-only labor market that excludes one of the alleged counties.  LR1 ¶ 60.  *See Daubert*-EL at 25-29.

Economic literature explains why applying a standard economic approach to defining labor markets is critical to consider class members' alternative employment options.  BR ¶¶ 74-75, 107.  For example, highly-skilled workers like physicians tend to have job options different from lower-skilled jobs given physicians' higher levels of education, qualifications, certifications, extensive training, and areas of specialization.  *Id.* ¶ 114.  Plaintiffs' other expert, Prof. Manning, concedes that, "if you're not qualified as a doctor, you can't apply for work as a doctor."  AMD 92:20-21.  To illustrate, pediatric oncology is a niche specialty, requiring years of training beyond medical school,[27] and specialists have a very limited market of potential employers across the country; smaller hospitals, like Evangelical, often do not offer such positions at all.  BR ¶¶ 56-58.  By contrast, "nurses" include a broad swath of positions that are consistently in high demand at hospitals of all sizes nationwide, in large part due to chronic shortages that span decades, as well as at non-hospital

---

[27] *See Careers in Pediatric Hematology/Oncology*, Am. Soc'y of Pediatric Hematology/Oncology, 3, https://aspho.org/uploads/career-development/Career_Pathways.pdf (requiring training of four years of medical school, three of pediatric residency, and three of hematology/oncology fellowship).

employers like home health agencies, nursing and rehabilitation centers, and senior living centers—all seen as "competitor[s]" by Geisinger. *Id.* ¶¶ 96-97, Exh. 7. This is borne out in the record, which shows that Defendants recruited physician and nursing candidates in geographies much broader than the six-county area Plaintiffs allege is relevant here. *See supra* § II.B. *See, e.g.*, Ex. 54 at x275-80. Assessing a class member's job options would therefore require individualized analysis of their alternative employers and geographic areas.

Plaintiffs' alleged hospital-only, six-county market contradicts evidence showing the market is not limited to hospitals. For example, Geisinger consistently and vigorously competes with many hospital, non-hospital healthcare, and non-healthcare employers in and outside the alleged six-county market for the same labor.[28] Prof. Leamer does not dispute, and in fact concedes, that 25 percent of putative class members work in a *non-hospital* setting. ELD 275:25-276:8.

Similarly, the record shows that individuals applying to either Defendant applied to other employers inside *and* outside of the alleged six-county geography. Exs. 45 at x917; 66 at x910; DMD 99:4-18; MMD 31:10-15; BR ¶¶ 94, 97. Geisinger recruited certain employees on a national or global level, BR ¶¶ 115-18,

---

[28] *Supra* § II.B.1; Exs. 15 at x788-92; 66 (physicians); 56 at x761-63 (advanced practitioners); 13; 74; KCD 38:3-9 (nurses); Ex. 26 at x191; ROGS1 at 9 (former plaintiff applied for, and was offered, ███████████████ KCD 139:8-140:12 (other Healthcare Workers); ABD 82:9-83; ELD 275:25-276:8; JCD 29:22-30:20 (competition); BR ¶¶ 86-112, Exhs. 7-8.

120 n.249, demonstrating the absurdity of a market limited to only six adjacent counties or only hospital employers, as Plaintiffs claim.  *E.g.*, MMD 31:10-15.

Former and current Plaintiffs demonstrate the need for individualized inquiry to determine the relevant market.  Ms. Leib and former Plaintiffs Jessica Sauer and Brittany Gresh applied, and received offers, for jobs from non-hospital healthcare competitors. ROGS1 at 9; ROGS2 at 7-10; ROGS3 at 6-9.  Ms. Sauer worked as a health insurance agent after leaving Geisinger, and was a minor for a portion of the class period, significantly limiting her job options.  Exs. 94; 90 at AB304.  Ms. Gresh was a travel nurse in various states and has left healthcare.  ROGS2 at 7-10; Ex. 92. She and former Plaintiff Diane Weigley were recruited as passive candidates by Geisinger's recruiting partner, Cielo. Exs. 37 at J2374; 71 at J27258.

Plaintiffs' failure to properly define a relevant market and show common questions predominate on this threshold issue means they fail to establish predominance under Rule 23(b)(3).  *See Sloane*, 2017 WL 1105236, at *22 (holding predominance unmet when plaintiffs "offer[ed] [no] evidence or likely sources of evidence [] resolv[ing] questions common [to] the class [] in one stroke").

### (2) Plaintiffs cannot establish common impact because they fail to causally link their theories of harm and damages.

To certify a class, Plaintiffs must "prov[e] a causal connection between the antitrust violation and actual damage suffered"—a necessary step to establish injury in antitrust cases.  *Callahan v. A.E.V., Inc.*, 182 F.3d 237, 250 (3d Cir. 1999) (quotes

omitted).   Plaintiffs' expert's opinions are premised on an alleged "no-direct-solicitation" agreement between Defendants.  LR1 ¶ 7; ELD 52:16-18.  But Plaintiffs identify no class member, including Named Plaintiffs, who would have been "directly solicited" but-for the alleged conduct—nor have they shown one could make such a determination.  This missing causal link precludes Plaintiffs' ability to show classwide harm, and individualized issues are needed to determine who, if anyone, would have been "directly solicited" under Plaintiffs' alleged theory.

Individualized questions are required to show whether any class member was harmed, including to determine: (1) who felt "special" if and when directly solicited (ELD 159:15-160:9); (2) whether they were a "passive" or "active" candidate (*id.* at 96:18-102:8);[29] (3) they would have responded positively to a "direct solicitation" (*id.* at 96:18-102:8); or (4) ███████████████████████████████████ ██████████████████████████████████████  (MR2 ¶ 8).   These questions directly correspond to whether a class member "sustained any injury at all"—raising fundamental standing problems, *see supra* § IV.A.  *See Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 360 (3d Cir. 2013).  These questions illustrate that the answer to these standing problems will not be classwide, but specific to the individual, and putative class "members [] will need to present evidence that varies

---

[29] Plaintiffs' theory depends on the conduct reducing information about jobs, but the extent of loss varied among active and passive candidates.  ELD 136:17-24.

from member to member," defeating predominance.  *Tyson Foods*, 577 U.S. at 453.

> **(1)**     **Plaintiffs provide no evidence of reduced mobility—one of the alleged injuries—and admit it "can't [be] measure[d]."**

Plaintiffs contend the alleged agreement suppressed both class wages *and* employee mobility, which they define as an individual's sufficient awareness about alternative job opportunities such that they could move from the current position to the new one with movement to a new firm the culmination of mobility.  Mem. at 14-15; ELD 110:17-24 & LR1 ¶ 100.  But Plaintiffs conduct no mobility analysis and present no evidence that limited mobility affected any class member. ELD 114:1-18, 123:5-7. Plaintiffs' expert, Prof. Leamer, contends that mobility is "a personal decision" to the individual and one "can't measure mobility" outside a "real-world" context—requiring individualized inquiry. ELD 114:14-18, 133:3-5.  Plaintiffs' other expert, Prof. Manning, testified that a statistical analysis is needed to measure the impact the alleged agreement would have on mobility (as distinguished from compensation).   AMD 114:10-115:5.  Neither of Plaintiffs' experts offers an affirmative, empirical analysis of mobility or movement, ignoring evidence showing movement remained unabated throughout the class period. ELD 116:17-25, 123:5-7.  Defendants' expert, Prof. Baker, conducted four tests of employee movement and found no evidence that movement between Defendants changed during the class period, which is inconsistent with Plaintiffs' theory of harm.  BR § IIIA.

Plaintiffs do not provide any empirical evidence that any actual employees

were unaware of job opportunities.  Abundant evidence shows class members sought and obtained jobs at Defendants and non-Defendants during the class period.[30]

### (3) Plaintiffs' impact methodology predicts harm for more than *a de minimis* number of unharmed class members.

Plaintiffs cannot prove classwide injury because more than a *de minimis* number of uninjured class members are present in the class.  BR §§ III.B.2-4, VI.A, ¶¶ 220-22.  More than a *de minimis* number of unharmed class members defeats predominance, because individual inquiries would be required to determine whether any class member was harmed.  *See Niaspan*, 464 F.Supp.3d 678, 715-17 (E.D. Pa. 2020) (12.2% unharmed "defeat[s] predominance"); *In re Plastics Additives Antitrust Litig.*, 2010 WL 3431837, at *16 (E.D. Pa. Aug. 31, 2010) (over 60%).

Prof. Baker has found unharmed members exceed the Third Circuit's precedent of 12.2 percent, which defeats predominance—specifically, at least ██ percent were unharmed, and at least ██ percent were either not harmed or likely not harmed.  BR ¶¶ 173-79, n.333, Exh. 19.[31]  Additional proposed class members are likely unharmed but they cannot be identified without individualized inquiry, *e.g.*, active job seekers, employees who would not have been directly solicited regardless

---

[30] BR § III.A, Exhs. 1-3; Exs. 39; 43 at x917; MKD 77:18-78:23, 90:8-91; RSD 41.
[31] For example, at least ██ percent were low-wage workers who could work at non-hospitals and non-healthcare employers; ██ percent were newly hired from an employer other than a Defendant; and ██ percent were physicians ████████ ██████████████████████████████████████████ and admittedly, not the alleged conduct. BR § VI.A, Exh. 19; ELD 79-80.

of the alleged agreement, employees who hold positions Evangelical does not

employ but Geisinger does, and ███████████████████████████████████

BR ¶¶ 179, 221, § III.B.3.  Because unharmed class members exceed this Circuit's

*de minimis* precedent, Plaintiffs' class fails. *Sheet Metal Workers Loc. 441 Health*

*& Welfare Plan v. GlaxoSmithKline, PLC*, 2010 WL 3855552, at *28 (E.D. Pa. Sept.

30, 2010) (rejecting class with "a great many persons who [] suffered no injury"); *In*

*re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 192 (3d Cir. 2020)

(vacating class where "averag[ing]" masked unharmed class members).

> **(4) Even if admitted, Prof. Leamer's model contains significant flaws that prevent Plaintiffs from demonstrating classwide harm.**
>
>> **a)  Prof. Leamer's flawed regression model shows harm for non-class members unaffected by the alleged conduct.**

Prof. Leamer's model yields "false positives," showing harm to non-class

members not affected by the alleged conduct.  BR ¶¶ 153-56.  Plaintiffs' injury and

damages model "must be consistent" with their liability case, which is not possible

if it "identifies damages that are not the result of the wrong." *Comcast Corp. v.*

*Behrend*, 569 U.S. 27, 35, 37 (2013).  If the model "purports to quantify the injury

in fact to all class members", but "also detects injury where none could exist," then

"no reliable means of proving classwide injury in fact" exists.  *In re Rail Freight*

*Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252-53 (D.C. Cir. 2013).  If true, as

here, such "critique" "shred[s] plaintiffs' case for certification." *Id.* at 252.

Prof. Leamer's model shows harm to healthcare and non-healthcare workers outside the alleged six-county market who could not have been impacted by the alleged conduct.  BR ¶¶ 153-55.  Because his model "purports to quantify the injury in fact to all class members", and "detects injury where none could exist," it is not a "reliable means of proving classwide injury[.]" *Rail Freight*, 725 F.3D 252-53.

### b) Prof. Leamer's model fails tests of robustness, indicating that it cannot adequately measure classwide harm.

Prof. Leamer's methodology for measuring classwide harm contains significant failures and crumbles under well-accepted tests of robustness:

- Prof. Leamer does not estimate his regression model separately for each job category and year, but doing so reveals widely disparate wage impacts across job categories, or none at all (*e.g.*, physicians). *Daubert*-EL at 14-16, 32; BR ¶ 159, Exh. 17.  Similarly, estimating his regression model separately for each Defendant and year demonstrates patterns inconsistent with the nature or timing of the alleged agreement. BR ¶¶ 157-58, Exh. 16.

- Though Prof. Leamer's wage regression purportedly predicts wages but-for the alleged agreement, his model has error ranges that subsume the entire wage effect for many class members.  *Daubert*-EL at 17; BR ¶¶ 205-6, Exhs. 26, 27.

- Prof. Leamer's model suffers from omitted variable bias and fails to sufficiently account for variables like the COVID-19 pandemic and Affordable Care Act distorts the alleged wage impact.  *Daubert*-EL at 35; BR ¶¶ 147-48, 162-67.

- In calculating the "hourly rate," Prof. Leamer fails to account for all types of pay (*e.g.*, shift, overtime, bonus pay) and the distribution of time spent earning each type. *Daubert*-EL at 33-34; BR ¶ 161. Including all forms of compensation in Prof. Leamer's regression, in addition to adding a set of interaction terms to account for the COVID-19 pandemic and replacing the flawed "share of the county population with health insurance" variable with an alternative measure of healthcare demand, results in no wage effect. BR § V.B.-V.C.

- Prof. Leamer fails to adopt his own definition of the conspiracy period, and

assumes that the conspiracy period began in 2014 for the purposes of his wage regression on the instruction of Plaintiffs' counsel, resulting in an artificial boost of damages of ███ *Daubert*-EL at 24-25, 34-35; BR ¶¶ 29, 217.

- Prof. Leamer fails to conduct a time series benchmark analysis. Had he conducted such a test, Prof. Leamer would have found that wages for class members are as high, or higher, and grew as much, or more, than wages for non-class members in Pennsylvania during the class period. BR ¶¶ 137-45.

- Prof. Leamer's model includes a control variable that is highly correlated with another independent variable (the conduct variable), which means the model cannot reliably distinguish between the effects of the two. BR ¶ 149, Exh. 39.

These errors and failures of common tests are detrimental to Plaintiffs' class. Beyond being unreliable under *Daubert*, Prof. Leamer's model is in fact *inconsistent* with Plaintiffs' theory of harm and produces nonsensical results. BR ¶ 15. And, even if admitted, his model cannot adequately predict classwide injury. *Id.* ¶ 168.

### (5) Plaintiffs cannot show classwide injury because they completely ignore the record, and rely on fictitious conceptions of "internal equity" and "imagined" compensation structures.

Plaintiffs' experts cannot show classwide injury because they fail to demonstrate their "imagine[d]" compensation structures, which depend on a fictitious application of "internal equity," were sufficiently *rigid* to transmit classwide injury. ELD 247:4-20. Plaintiffs' methodology for showing classwide harm requires a *rigid* wage structure to transfer harm from any class member who would be directly impacted by the alleged agreement to all other class members who would not be directly impacted by the alleged agreement. But the record shows Defendants' compensation structures are not so rigid, and Plaintiffs' experts even

disclaim that they are (LR2 ¶ 204; MR2 ¶¶ 30-31), rendering their theory of harm unreliable and legally unsupported: "[F]or a plaintiff in a no-poach wage suppression case to satisfy [] predominance with respect to antitrust impact, there must be evidence that the compensation structures of the defendants in the pertinent industry were so *rigid* that the compensations of *all* class members were tethered together." *In re Ry. Indus. Emp. No-Poach Antitrust Litig.* ("*Railway*"), 395 F.Supp.3d 464, 514 (W.D. Pa. 2019) (emphases added).  Plaintiffs fail to meet their burden here.

For example, in *High-Tech I*—where Prof. Leamer's theories based on purported findings of similar wage structures was rejected—the court refused to certify a class of "all employees" because the evidence did not support a rigid wage structure tethering class members' wages together.  *In re High-Tech Emp. Antitrust Litig.*, 289 F.R.D. 555 (N.D. Cal. 2013).  The court explained that, to show classwide harm for such a disparate class, wage structures must be "so *rigid* that compensation for employees with entirely different titles[, as here,] would necessarily move together through time such that a detrimental impact to an employee with one job title would necessarily result in an impact to other employees in entirely different jobs (*i.e.*, that any impact would ripple across the entire salary structure)."  *Id.* (emphasis added).[32]  Plaintiffs ignore this and instead cite the later opinion, *High-*

---

[32] *High-Tech I* found that evidence in the form of economic theory, documentary evidence, and three statistical analyses was insufficient to show a rigid

*Tech II*, which certified a much narrower class of "technical workers" based on evidence supporting a *rigid* wage structure showing classwide harm for those workers.  985 F.Supp.2d 1167, 1209-10 (N.D. Cal. 2013).

But evidence shows that Defendants' compensation structures are not rigid. *See supra* II.B.  BR ¶¶ 210-12.  Plaintiffs disregard this evidence.  Instead, Prof. Leamer "imagin[es]" that Defendants' compensation structures are based on distribution percentiles linking all Healthcare Workers' wages together in such a way that places "the person with the most experience and best education at the top, [] the second category is 10 percent down, the third [] is 10 percent down, and the fourth [] is 10 percent down," and that "salary structure goes up over time across the board"—"like a flock of birds."   ELD 244:13-5.[33]  But Defendants do not set

---

compensation structure for an "all-employee" class that was capable of transmitting wage suppression classwide.  289 F.R.D. 555.  Plaintiffs' other cases are inapposite, because unlike here, plaintiffs had sufficiently alleged or provided evidence of such a structure for narrower classes.  *E.g.*, *Nitsch*, 315 F.R.D. at 300 (animators only), *Broiler Chicken*, 2024 WL 2117359 (chicken growers only); *Railway*, 395 F.Supp.3d at 514 (denying dismissal based on alleged "rigid" wage structures for railroad workers).  In *Seaman*, where Prof. Leamer offered similar theories, a broader class including medical faculty and non-faculty was rejected, instead certifying a much narrower class of "medical faculty" only because there was evidence that "both Duke and UNC use rigid step-wise pay tiers" for that narrower group of workers.  2018 WL 671239, at **6, 8.

[33] Prof. Leamer admits he does not actually measure whether all class wages would be suppressed if salaries for some were.  ELD 260:2-5.  Nor does he consider whether the underlying mechanisms he assumes are valid or plausible, including whether: the conduct affected a broad or narrow set of recruiting tactics; individuals could learn about jobs through other channels; and physicians would have been impacted.  *Id.* 134:8-18, 155:23-167:17, 171:16-22, 226:6-228:6.

Healthcare Workers' wages by distribution percentiles; rather, ████████

██████████████████████████████████████████████████████

████████████████████████ not *across* the salary bands concocted by Prof.

Leamer's imagination.  LR1 ¶¶ 30, 190; *see supra* § II.B.  Plaintiffs therefore have

not met—and cannot meet—their burden of showing with common proof that the

compensation of the broad spectrum of class members moves together over time.

Plaintiffs and their experts claim lower pay for some unquantified number of

class members led to lower pay for *all* class members, but they cite no evidence of

a single instance where a decrease in the wages of any individual or group of

Healthcare Workers resulted in a reactive decrease for another group of Healthcare

Workers.  ELD 260:2-5; AMD 214:18-215:5. ████████████████████████

████████████████████████████████████████ (BR ¶ 188),

Plaintiffs' experts cited no evidence that ██████ compensation, for example,

increased as well because of "internal equity" and a compensation structure tethering

all class member wages together.

In the absence of a rigid wage structure tethering the pay of class members

where there is instead wide variability among the class, individualized inquiry would

be required to determine whether any class members' wages impacted any others'

wages, particularly, for example, across the ██████ job families at Geisinger alone,

*see supra* § II.B.1.  *See, e.g.*, *Weisfeld*, 84 F. App'x at 263-64 (holding "proposed

class[, which] includes individuals employed in positions that vary widely in terms of skill requirements and responsibilities," falling into more than 20 compensation grades, present "numerous individual factors" that defeat predominance).

### C. PLAINTIFFS' CLASS IS UNASCERTAINABLE.

Plaintiffs' proffered mechanism for identifying class members (Mem. at 35) fails this Court's rigorous analysis, as their proposed class is not ascertainable for two key reasons.  First, Plaintiffs fail to provide a reliable, administratively feasible manner to identify injured class members. *See supra* § IV.B.   Second, Plaintiffs provide no "objective criteria" to determine who are "other healthcare professionals," which now inexplicably excludes certain titles but not others.[34] Identifying class members therefore would require "extensive and individualized fact-finding or mini-trials," rendering the proposed class fatally unascertainable. *Niaspan*, 67 F.4th at 138; *Carrera v. Bayer Corp.*, 727 F.3d 300, 305-08 (3d Cir. 2013) (class members must be identifiable).

### V.   CONCLUSION

Plaintiffs fail to satisfy Rule 23 requirements, and the Court should deny their motion.  Defendants respectfully request an evidentiary hearing and oral argument.

---

[34] Previously, Plaintiffs represented "patient access representative," now excluded, and "nursing assistant," included, were equivalent.  ECF No. 46, ¶ 18; LR ¶ 24.

Dated: August 6, 2024

By: */s/Stefan M. Meisner*
Stefan M. Meisner (*pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington, DC 20004
Phone: (202) 624-2500
smeisner@crowell.com

Chahira Solh (*pro hac vice*)
CROWELL & MORING LLP
3 Park Plaza, Ste. 20th Floor
Irvine, CA 92614
Phone: (949) 798-1367
csolh@crowell.com

Rosa M. Morales (*pro hac vice*)
CROWELL & MORING LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Phone: (212) 895-4261
rmorales@crowell.com

Daniel T. Brier
Donna A. Walsh
Richard L. Armezzani
MYERS BRIER & KELLY LLP
425 Spruce Street, Suite 200
Scranton, PA 18503
Phone: (570) 342-6100
dbrier@mbklaw.com
dwalsh@mbklaw.com
rarmezzani@mbklaw.com

*Attorneys for Defendant Geisinger*
*System Services*

Respectfully submitted,

By: */s/Norman Armstrong, Jr.*
Norman Armstrong, Jr. (*pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Phone: (202) 389-3180
norman.armstrong@kirkland.com

Stephanie Resnick
Theodore H. Jobes
John Fuller
FOX ROTHSCHILD LLP
2000 Market Street, 20th Floor
Philadelphia, PA 19103-3222
Phone: (215) 299-2000
sresnick@foxrothschild.com
tjobes@foxrothschild.com
jfuller@foxrothschild.com

*Attorneys for Defendant Evangelical*
*Community Hospital*

36

<u>**CERTIFICATE OF SERVICE**</u>

I, Stefan M. Meisner, hereby certify that a true and correct copy of the foregoing Memorandum in Support of Defendants' Joint Opposition to Plaintiffs' Motion for Class Certification, was served upon all counsel of record via electronic mail and electronic filing this 6th day of August 2024.

<u>*/s/ Stefan M. Meisner*</u>
Stefan M. Meisner
