# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

IN RE GEISINGER SYSTEM
SERVICES AND EVANGELICAL
COMMUNITY HOSPITAL
HEALTHCARE WORKERS
ANTITRUST LITIGATION

No.: 4:21–cv–00196

Chief Judge Matthew J. Brann

## APPENDIX OF UNPUBLISHED OPINIONS

Pursuant to Local Rule 7.8, Plaintiffs attach the following unpublished opinions cited in Plaintiffs' Memorandum of Law in Support of Motion for Certification of the Settlement Class, Preliminary Approval of the Settlements, Preliminary Approval of the Plan of Allocation, Approval of the Notice Plan, and Approval of the Proposed Schedule for Completing the Settlement Process filed on October 3, 2025:

1. *In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2003 WL 23316645 (E.D. Pa. Sept. 5, 2003);

2. *In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2004 WL 1068807 (E.D. Pa. May 11, 2004);

3. *Binotti v. Duke Univ.*, No. 1:20-cv-00470, 2021 U.S. Dist. LEXIS 225003 (M.D.N.C. Aug. 30, 2021);

4. *In re Blood Reagents Antitrust Litig.*, No. 09-2081, 2015 WL 6123211 (E.D. Pa. Oct. 19, 2015);

5. *Caddick v. Tasty Baking Co.*, No. 2:19-cv-02106-JDW, 2021 WL 1374607 (E.D. Pa. Apr. 12, 2021);

6.  *Chimenti v. Wetzel*, No. 15-3333, 2018 WL 2388665 (E.D. Pa. May 24, 2018);

7.  *In re Chocolate Confectionary Antitrust Litig.*, No. 1:08-md-01935, 2011 U.S. Dist. LEXIS 151516 (M.D. Pa Dec. 12, 2011);

8.  *Davis v. Kraft Foods N. Am., Inc.*, No. 03-6060, 2007 WL 9807443 (E.D. Pa. Aug. 10, 2007);

9.  *Davis v. Kraft Foods N. Am., Inc.*, No. 03-6060, 2007 WL 9807445 (E.D. Pa. Aug. 10, 2007);

10. *In re Domestic Drywall Antitrust Litig.*, No. 2:13-md-02437, ECF No. 427 (E.D. Pa. July 18, 2016);

11. *Ebner v. Merchs. & Med. Credit Corp.*, No. 14-06882, 2017 WL 1079966 (E.D. Pa. Mar. 22, 2017);

12. *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Prac. and Antitrust Litig.*, No. 17-md-2785, ECF No. 2594 (D. Kan. Mar. 11, 2022);

13. *In re Fasteners Antitrust Litig.*, No. 08-md-1912, 2014 WL 285076 (E.D. Pa. Jan. 24, 2014);

14. *In re Fasteners Antitrust Litig.*, No. 08-md-1912, 2014 WL 296954 (E.D. Pa. Jan. 27, 2014);

15. *Fuentes v. Jiffy Lube Int'l, Inc.*, No. 2:18-cv-5174, 2024 U.S. Dist. LEXIS 94102 (E.D. Pa. May 28, 2024);

16. *In re Generic Pharm. Pricing Antitrust Litig.*, No. 16-MD-2724 , ECF No. 2385 (E.D. Pa. Mar. 9, 2023);

17. *Henry v. Brown Univ.*, No. 22-cv-0125, ECF No. 782 (N.D. Ill. Jan. 24, 2025);

18. *Jones v. Commerce Bancorp*, Inc., No. 05-5600-RBK, 2007 WL 2085357 (D.N.J. July 16, 2007);

19. *In re K-Dur Antitrust Litig.*, No. 01-cv-1652, 2008 WL 2699390 (D.N.J. Apr. 14, 2008), aff'd, 686 F.3d 197 (3d Cir. 2012), *reinstated*, No. 10-2077, 2013 WL 5180857 (3d Cir. Sept. 9, 2013);

20. *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, No. 06-cv-01797-MSG, 2015 WL 12843830 (E.D. Pa. Oct. 15, 2015);

21. *Le v. Zuffa, LLC*, No. 15-cv-1045, ECF No. 1053 (D. Nev. Oct. 23, 2024);

22. *Lewis-Abdulhaadi v. Union Sec. Ins. Co.*, No. 21-cv-03805-WB, 2025 WL 1510577 (E.D. Pa. Mar. 20, 2025);

23. *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-02420, 2020 WL 7264559 (N.D. Cal. Dec. 10, 2020) *aff'd* No. 21-15120, 2022 WL 16959377 (9th Cir. Nov. 16, 2022);

24. *Mylan Pharm., Inc. v. Warner Chilcott Pub. Ltd. Co.*, No. 12-cv-3824, 2014 WL 631031 (E.D. Pa. Feb. 18, 2014);

25. *Mylan Pharms., Inc. v. Warner Chilcott Public Ltd*., No. 12-3824, 2014 WL 12778314 (E.D. Pa. Sept. 15, 2014);

26. *In re Neurontin Antitrust Litig.*, Nos. 02-cv-1390, 2011 WL 286118 (D.N.J. Jan. 25, 2011);

27. *In re Neurontin Antitrust Litig.*, No. 02-cv-1830, 2014 WL 12962880 (D.N.J. Aug. 6, 2014);

28. *In re Opana ER Antitrust Litig.*, No. 14-cv-10150, ECF No. 1069 (N.D. Ill. Aug. 24, 2022);

29. *In re Papa John's Emp. and Franchisee Emp. Antitrust Litig.*, No. 3:18-cv-825-BJB, 2025 U.S. Dist. LEXIS 152012 (W.D. Ky. Aug. 7, 2025);

30. *In re Railway Indus. Emp. No-Poach Antitrust Litig.*, No. 18-798, 2020 U.S. Dist. LEXIS 249904 (W.D. Pa. Aug. 26, 2020);

31. *In re Remicade Antitrust Litig.*, No. 17-cv-04326, 2022 WL 3042766 (E.D. Pa. Aug. 2, 2022);

32. *In re Shop-Vac Mktg. & Sales Pracs. Litig.*, No. 12-md-2380, 2016 WL 3015219 (M.D. Pa. May 26, 2016);

33. *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, No. 13-md-2445, 2024 WL 815503 (E.D. Pa. Feb. 27, 2024);

34.  *Thomas v. NCO Fin. Sys., Inc.*, No. CIV.A. 00-5118, 2002 WL 1773035 (E.D. Pa. July 31, 2002);

35.  *In re Tricor Direct Purchaser Antitrust Litig.*, No. 05-cv-340, 2009 WL 10744518 (D. Del. Apr. 23, 2009);

36.  *Vista Healthplan, Inc. v. Cephalon, Inc.*, No. 2:06-CV-1833, 2020 WL 1922902 (E.D. Pa. Apr. 21, 2020);

37.  *In re Wawa, Inc. Data Sec. Litig.*, No. 19-6019, 2021 WL 3276148 (E.D. Pa. July 30, 2021);

38.  *In re Wellbutrin SR Direct Purchaser Antitrust Litig.*, No. 04-cv-5525, 2008 WL 1946848 (E.D. Pa. May 2, 2008); and

39.  *Whiteley v. Zynerba Pharm., Inc.*, No. 19-4959, 2021 WL 4206696 (E.D. Pa. Sept. 16, 2021).

2003 WL 23316645
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

In re: AUTOMOTIVE REFINISHING
PAINT ANTITRUST LITIGATION

No. MDL 1426.
|
Sept. 5, 2003.

*MEMORANDUM*

SURRICK, J.

**\*1** Plaintiffs filed a Consolidated and Amended Class Action Complaint (the "Amended Complaint," Dkt. No. 13) on behalf of all individuals and entities who purchased automotive refinishing paint in the United States directly from Defendants, their predecessors or their controlled subsidiaries from at least as early as January 1, 1993 to at least December 31, 2000 (the "Class Period"). The Amended Complaint alleges that during that period, Defendants conspired to fix, raise, maintain or stabilize prices for automotive refinishing paint sold in the United States, thereby artificially inflating prices for automotive refinishing paint in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiffs seek damages and injunctive relief pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26. The Court certified a Class in this action on October 9, 2002.

On February 26, 2003, Plaintiffs submitted a Motion for Preliminary Approval of Proposed Settlement with Akzo Nobel Car Refinishes B.V. and Akzo Nobel Coatings Inc. and for Authorization to Disseminate Notice (Dkt. No. 81). On March 17, 2003, we granted preliminary approval and directed that notice of the proposed settlement and formal fairness hearing be disseminated to the Class. Since there was no objection at the fairness hearing on September 3, 2003 to this substantial partial settlement, and the Plaintiffs' provided sufficient justification why the settlement is fair, reasonable, and adequate, the Court now grants final approval of this partial settlement with the Akzo defendants (collectively, "Akzo").

I. LEGAL STANDARD

"A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." Fed.R.Civ.P. 23(e). Ultimate approval of a class action settlement requires a determination by the court that it is "fair, adequate, and reasonable." *Eichenholtz v. Brennan,* 52 F.3d 478, 482 (3d Cir.1995). The court makes this determination after holding a formal fairness hearing "at which arguments and evidence may be presented in support of and in opposition to the settlement." Federal Judicial Ctr., *Manual for Complex Litigation* § 30.41, at 237 (3d ed.1995). The proponents of the proposed settlement bear the burden of establishing that it is fair, adequate, and reasonable. *In re General Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 785 (3d Cir.1995).

The Third Circuit has developed a nine-factor test which provides the analytic framework for making this determination. The so-called *Girsh* factors are:

(1) the complexity, expense and likely duration of the litigation;

(2) the reaction of the class to the settlement;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the risks of establishing liability;

(5) the risks of establishing damages;

**\*2** (6) the risks of maintaining the class action through the trial;

(7) the ability of the defendants to withstand a greater judgment;

(8) the range of reasonableness of the settlement fund in light of the best possible recovery; and

(9) the range of reasonableness of the settlement fund in light of all the attendant risks of litigation.

*In re Cendant Corp. Litig.,* 264 F.3d 201, 232 (3d Cir.2001) (citing *Girsh v. Jepson,* 521 F.2d 153, 157 (3d Cir.1975)).

Though the ultimate determination of the fairness of a partial settlement is left to the court, it is appropriate to give substantial weight to the recommendations of experienced attorneys, who have engaged in arms-length

settlement negotiations, in making this determination. *See, e.g.* *Petruzzi's, Inc. v. Darling–Delaware Co., Inc.,* 880 F.Supp. 292, 301 (M.D.Pa.1995) ("The opinions and recommendation of such experienced counsel are indeed entitled to considerable weight."); *Lake v. First Nationwide Bank,* 156 F.R.D. 615, 628 (E.D.Pa.1994) (giving "due regard to the recommendations of the experienced counsel in this case, who have negotiated this settlement at arms-length and in good faith" in assessing whether a settlement was fair, adequate, and reasonable); Alba Conte and Herbert B. Newberg, 4 *Newberg on Class Actions* § 11:47. Also, in fulfilling its role as a fiduciary to the class when evaluating a partial settlement in a class action, the court should ensure that the proposed settlement is not the product of collusion or fraud. *See, e.g., Neuberger v. Shapiro,* 110 F.Supp.2d 373, 380 (E.D.Pa.2000) (noting that no suggestion of collusion between the settling defendant and plaintiff's counsel existed in approving a partial class action settlement).

Where a proposed settlement affects the rights of third parties, "it is not enough to evaluate the fairness of the settlement to the settling parties; the interests of such third parties must be considered." *Eichenholtz,* 52 F.3d at 482. Thus, even non-settling defendants have standing to object "where they can demonstrate that they will suffer some formal legal prejudice as a result of the partial settlement." *Id.* And these objections will be given weight when conducting the fairness analysis.

## II. DISCUSSION

### A. The Girsh Fairness Factors

*1. The complexity, expense and likely duration of the litigation.*

This factor, which "captures 'the probable costs, in both time and money, of continued litigation,' " *In re Cendant Corp. Litig.,* 264 F.3d at 233 (quoting *In re General Motors Corp.,* 55 F.3d at 812), weighs in favor of approval of the proposed settlement. In the instant case, there is little question that–absent settlement by all parties–the litigation will be complex, expensive, and of long duration.

With regard to complexity and duration, the Court makes a number of observations. The case involves numerous defendants who "have an aggregate share of over 90% of the United States market for automotive refinishing paint." (Am.Compl.¶ 39.) Therefore even under the best possible circumstances, the discovery process has the potential to be lengthy and expensive. Moreover, to date,

there have already been discovery disputes between the parties. Under the settlement, Akzo has agreed to provide discovery that should reduce the costs for the remaining parties to the litigation. (Settlement Agreement ¶ 16, 17.) Additionally, logic dictates that a partial settlement should potentially reduce the length of the trial as well as the pre-trial process. With regard to expense, by settling their claim against Akzo both parties save significant resources that would have otherwise been spent in this dispute. The substantial settlement along with the other factors previously discussed suggests that this factor supports approval.

*2. The reaction of the class to the settlement.*

 **\*3** This factor which "attempts to gauge whether members of the class support the settlement," *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 148 F.3d 283, 318 (3d Cir.1998), weighs strongly in favor of approval of the partial settlement, since there were no objectors. [1] Although the lack of objections to a proposed settlement is not dispositive of its fairness, we believe it to be indicative in light of the significant dissemination of notice to the Class regarding the proposed settlement. *See In re Cendant Corp. Litig.,* 264 F.3d at 235 ("The vast disparity between the number of potential class members who received notice of the Settlement and the number of objectors creates a strong presumption that this factor weighs in favor of the Settlement.").

Pursuant to the March 17, 2003 Order of this Court, class notice was mailed to all 52,005 direct purchasers identified by the Defendants in this Class Action. In addition, a summary notice regarding the proposed settlement was published in the national edition of *The Wall Street Journal* on May 5, 2003 and in the May 2003 edition of the automotive refinishing trade publication *Hammer & Dolly.* Any member of the Class had until July 5, 2003 to postmark any objections to the terms of the proposed settlement–this deadline gave prospective objectors at least approximately two months after notice was disseminated to file any objections. No members of the class objected and only 27 members of the class requested exclusion from the class. Though the absence of objection by class members to a partial settlement must not be dispositive, the fact that no such objection was made is persuasive in this instance.

*3. The stage of the proceedings and the amount of discovery completed.*

This third factor " 'captures the degree of case development that class counsel have accomplished prior to settlement.

Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." ' *In re Cendant Corp. Litig.,* 264 F.3d at 235 (quoting *In re General Motors Corp.,* 55 F.3d at 813). Generally, post discovery settlements are viewed as more likely to reflect the true value of a claim as discovery allows both sides to gain appreciation for the likelihood of success and any potential liability. *See Bell Atlantic Corp. v. Bolger,* 2 F.3d 1304, 1314 (3d Cir.1993).

Although it is true that the proceedings in the instant case are in the relatively early stages with discovery ongoing, we find that this factor weighs in favor of approval of the settlement. Plaintiffs to date have been provided with the hundreds of thousands of documents produced in conjunction with the Department of Justice investigation. While an appreciable amount of discovery may still exist, this initial discovery has provided the parties with sufficient information to make an informed judgment on the partial settlement. *See In re Cendant Corp. Litig.,* 264 F.3d at 236 (upholding approval partially based on this factor though settlement was reached early in the discovery process). Furthermore, due to the possibility of joint and several liability for the Defendants in the present antitrust conspiracy claim, Plaintiffs' settlement with Akzo will not have a negative impact on their ability to recover damages should the nonsettling Defendants be found liable. *See In re Linerboard Antitrust Litig.,* 203 F.R.D. 197, 208 (E.D.Pa.2001). When one defendant offers to settle with the class,

> **\*4** the plaintiffs may retain the right to seek recovery against nonsettling defendants for all their claims, including claims raised against the settling defendant. The nonsettling defendants in these circumstances are entitled to credit any aggregate judgment against them with the value of the settlement proceeds paid by the settling defendant to the class.

Alba Conte and Herbert B. Newberg, 4 *Newberg on Class Actions* § 12:18 (updated Jan. 2003); *see also* 6 *Newberg on Class Actions* § 18:57 (noting that nonsettling defendants remain liable for the entire amount of damage, "unless the settling defendants have arranged to have their sales removed from litigation as part of the settlement"). Despite the fact

that the case has not proceeded past the discovery phase, for the reasons stated above this factor also mitigates in favor of approval of the partial settlement.

### 4. The risks of establishing liability and damages.

These two factors, discussed together, both "attempt[ ] to measure the expected value of litigating the action rather than settling it at the current time." *In re Cendant Corp. Litig.,* 264 F.3d at 238, (quoting *In re General Motors Corp.,* 55 F.3d at 816). These factors both weigh in favor of approval of the partial settlement. At the outset, we observe that since the lawsuit will continue against the remaining defendants, and (as discussed above) since the remaining defendants are jointly and severally liable for the damages, the partial settlement with one defendant will not negatively impact the class' prospects of further recovery at trial from the nonsettling Defendants.

Though the partial settlement will not affect the ability to achieve monetary damages from the nonsettling parties, the court still must ensure that the settlement will not hamper remaining proceedings. The Manual for Complex Litigation warns that courts "should be reluctant to approve partial settlements containing provisions that might interfere with further proceedings, such as those attempting to limit further discovery." *Manual for Complex Litigation* § 30.46. Provisions seeking to limit discovery "may be problematic if other parties need discovery from a settling party, particularly in light of the limits on nonparty discovery." *Manual for Complex Litigation* § 23.22. Therefore, such provisions should take into consideration the continuing need for discovery. *Id.* Because discovery limitations can impact the remainder of litigation, the court in its role as fiduciary to the plaintiff class should ensure that such limitations will not create problems in further proceedings. *See In re Cendant Corp. Litig .,* 264 F.3d 286, 296 (3d Cir.2001) (noting that "[t]he court must be assured that the settlement secures an adequate advantage for the class in return for the surrender of litigation rights against the defendants"). Here we observe that the discovery provisions in the proposed settlement require Akzo to retain documents pursuant to court order and agreement between counsel, and to cooperate in the discovery proceedings. Akzo has agreed to produce transaction data as required pursuant to the parties' September 9, 2002 stipulation. (Settlement Agreement ¶ 16, 17.) Although they do limit Akzo's obligations, the discovery-related terms of the proposed settlement appear to be designed to promote the cooperation of Akzo with regard to future discovery requests.

*5. The risks of maintaining the class action through the trial* .

**\*5** The court in *Prudential Ins. Co.,* 148 F.3d at 321, found the examination of this factor to be perfunctory "[b]ecause the district court always possesses the authority to decertify or modify a class that proves unmanageable, ..., [t]here will always be a 'risk' or possibility of decertification, and consequently the court can always claim this factor weighs in favor of settlement." Though the Class in the instant case seems unified and without dissent—judging from the lack of objections to the partial settlement—the inherent difficulties in bringing a class action to trial justify the use of this factor as further support for the partial settlement.

*6. The ability of the defendants to withstand a greater judgment.*

This factor "is concerned with whether the defendants could withstand a judgment for an amount significantly greater than the Settlement." *In re Cendant Corp. Litig.,* 264 F.3d at 240. Thus, the Court considers whether Akzo could withstand a judgment for an amount significantly greater than $18,750,000, the amount of the proposed settlement. *See id.* In the present case, the Court must make this decision with little financial information. The information the Court presently has is limited to these facts: Akzo's market share in the market for automotive refinishing is approximately six percent (6%), Defendants have an aggregate share of over 90% of the same market, and the sale of automotive refinishing paint in the United States exceeded $2 billion in 2000. (Am.Comp.¶ 39.) Thus, it would appear that in 2000, Akzo's sales were approximately $120 million. However, this estimated sales figure has minimal value in determining whether Akzo could withstand a significantly greater judgment without further information. Notwithstanding the lack of information, we observe that a settlement of $18,750,000 must be seriously considered under any circumstances.

*7. The reasonableness of the settlement in light of the best possible recovery and in light of all of the attendant risks of litigation.*

The final two factors are combined because they together ask the court to analyze how the settlement looks compared to the best and worst case scenarios, or as another court put it, "[t]his inquiry measures the value of the settlement itself to determine whether the decision to settle represents a good value for a relatively weak case or a sell-out of an otherwise strong case." *In re Chambers Dev. Sec. Litig.,* 912

F.Supp. 822, 839 (W.D.Pa.1995). As in the above discussion, this Court is hampered in its analysis by a lack of financial information as well as the indeterminable amount of risk associated with the procedural status of this case at the present time. What is known, is that the proposed partial settlement is in the amount $18,750,000. Akzo's market share in the subject market is approximately six percent (6%). Plaintiffs' Amended Complaint alleges that Defendants have an aggregate share of over 90% of the United States market for automotive refinishing paint,[2] and that sales of automotive refinishing paint in the United States exceeded $2 billion in 2000. Again, this means that the Akzo's sales in 2000 exceeded $120 million.

**\*6** This settlement compares favorably to other settlements in antitrust price-fixing class actions approved within this Circuit, in that it provides for a cash payment equal to 4.2% of Akzo's sales of automotive refinishing paint for the four years during the Class Period in which it had its highest sales totals. *See In re Plastic Tableware Antitrust Litig.,* 1995 WL 723175 at \*1 (E.D.Pa. Dec. 4, 1995) (settlement equal to 3.5% of sales); *Axelrod v. Saks & Co.,* 1981 WL 2031 at \*1 (E.D.Pa. Feb. 23, 1981) (settlement equal to 3.7% of sales). Moreover, as Plaintiffs point out, the nonsettling Defendants face joint and several liability for Plaintiffs' antitrust conspiracy claim, and it appears that the remaining Defendants are financially stable. *See, e.g., In re Linerboard Antitrust Litig.,* 203 F.R.D. at 208 (acknowledging the joint and several liability of antitrust co-conspirators). Though the above analysis does not conclusively justify whether the settlement is reasonable in relation to the best or worst case scenario, the Court can say without hesitation that it is fair when compared to similar actions. Without further information, that fact is enough to ensure that this factor should not persuade the Court to reject the terms of the partial settlement.

*B. Other Considerations*

We also observe that this partial settlement is the product of negotiations between experienced attorneys, and is therefore entitled to deference. There is no evidence that the proposed settlement is the product of collusion or fraud. Finally, we note that none of the nonsettling defendants have asserted any objections on the grounds that they will suffer some formal legal prejudice as a result of the settlement with Akzo.

IV. CONCLUSION

For the foregoing reasons, we will grant final approval of the partial settlement between the Plaintiff Class and Akzo. As we

noted in our March 17, 2003 Memorandum and Order, the use of the settlement fund to cover any attorneys fees and other litigation costs must be approved by the Court after notice to the Class and after hearing.

An appropriate Order will be entered.

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 23316645

---

## Footnotes

1       Although Class Member Lopack Auto Body Service, Inc. initially filed objections to the proposed settlement between Plaintiffs and Akzo (Dkt. No. 99, filed July 10, 2003), these objections were subsequently withdrawn on August 18, 2003 (Dkt. No. 105).

2       Defendants BASF Aktiengesellschaft ("BASF AG") and BASF Aktiengesellschaft Coatings ("BASF Coatings") have challenged this Court's jurisdiction to adjudicate claims against them. Issues related to the challenge are currently pending before the Third Circuit.

---

End of Document                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2004 WL 1068807
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

In re: AUTOMOTIVE REFINISHING
PAINT ANTITRUST LITIGATION

No. MDL NO. 1426.
|
May 11, 2004.

*MEMORANDUM & ORDER*

SURRICK, J.

**\*1** Plaintiffs filed a Consolidated and Amended Class Action Complaint (the "Amended Complaint") on behalf of all individuals and entities who purchased automotive refinishing paint in the United States directly from Defendants, their predecessors or their controlled subsidiaries from at least as early as January 1, 1993, to at least December 31, 2000 (the "Class Period"). The Amended Complaint alleges that during that period, Defendants conspired to fix, raise, maintain or stabilize prices for automotive refinishing paint sold in the United States, thereby artificially inflating prices for automotive refinishing paint in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiffs seek damages and injunctive relief pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26. The Court certified a Class by stipulation of the parties on October 9, 2002.

Presently before the Court is Plaintiffs' Motion for Preliminary Approval of a Proposed Settlement with E.I. DuPont de Nemours and Company, DuPont Performance Coatings, Inc. (collectively "DuPont"), and BASF Corporation, and for Authorization to Disseminate Notice (Doc. No. 120).

I. The Terms of the Settlement

The Settlement Agreement (Doc. No. 120 Ex. 1) provides that in exchange for settlement of the Class's claims, DuPont and BASF will pay the class a total of $48,000,000, as well as provide certain discovery to Plaintiffs. Specifically, BASF will pay $12,000,000 and DuPont will pay $36,000,000. In addition to the cash payment, BASF and DuPont will provide Plaintiffs copies of certain documents; provide Plaintiffs with sales transactional data from 1990 to 2002; permit Plaintiffs to interview and depose former employees; and provide, upon request, written declarations with respect to documents provided during litigation, and if necessary, produce a witness at trial to authenticate those documents.

II. Standard for Partial Approval

Pursuant to Federal Rule of Civil Procedure 23, "the court must approve any settlement, voluntary dismissal, or compromise of the claims, issues, or defenses of a certified class." FED. R. CIV. P. 23(e)(1)(A). Final approval of a class action settlement requires the district court to determine whether "the settlement is fair, adequate, and reasonable." *Stoetzner v. United States Steel Corp.,* 897 F.2d 115, 118 (3d Cir.1990) (citing *Walsh v. Great Atlantic and Pacific Tea Co., Inc.,* 726 F.2d 956, 965 (3d Cir.1983); *see also In re Cendant Corp. Litig.,* 264 F.3d 201, 231 (3d Cir.2001). Prior to granting final approval, however, we must first decide whether preliminary approval should be granted. The MANUAL FOR COMPLEX LITIGATION (Fourth) § 21.632 (2004) describes this process:

> Review of a proposed class action settlement generally involves two hearings. First, counsel submit the proposed terms of settlement and the judge makes a preliminary fairness evaluation. In some cases, this initial evaluation can be made on the basis of information already known, supplemented as necessary by briefs, motions, or informal presentations by parties.... The judge must make a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms and must direct the preparation of notice of the ... proposed settlement, and date of the fairness hearing.

**\*2** "In evaluating a settlement for preliminary approval, the court need not reach any ultimate conclusions on the issues of fact and law that underlie the merits of the dispute." *Thomas v. NCO Financial Systems,* No. Civ. A. 00–5118, 2002 WL 1773035, at \*5 (E.D.Pa. July 31, 2002) (quoting *Detroit v. Grinnell Corp.,* 495 F.2d 448, 456 (2d Cir.1974)).

Instead, the court must determine whether "the proposed settlement discloses grounds to doubt its fairness or other obvious deficiencies, such as unduly preferential treatment of class representatives or of segments of the class, or excessive compensation for attorneys, and whether it appears to fall within the range of possible approval...." *Id.* (citing *In re Prudential Sec. Inc. Limited P'ship Litig.,* 163 F.R.D. 200, 209 (S .D.N.Y.1995); MANUAL FOR COMPLEX LITIGATION (Third) § 30.41 (1995)). This analysis often focuses on whether the settlement is the product of "arms-length negotiations." *See, e.g. Thomas,* 2002 WL 1773035, at *5; *Tenuto v. Transworld Sys., Inc.,* No. Civ. A. 99–4228, 2001 WL 1347235, at *1 (E.D.Pa. Oct. 31, 2001).

The proposed partial settlement presently before us provides for the payment of $12,000,000 by BASF and $36,000,000 by DuPont. The $48,000,000 in cash payments represents approximately two percent of BASF's and DuPont's sales of automotive refinishing paint in the United States for the four years during the Class Period in which they registered their highest sales totals. (Doc. No. 120 at 10.) The partial settlement that we recently approved between Plaintiff Class and Akzo in the amount of $18,750,000 represented 4.2% of Akzo's sales of automotive refinishing paint in the United States for the four years during the Class Period in which Akzo had its highest sales. [1] (Mem. and Order of March 17, 2003.) This settlement amount is also within a range of settlements reached in other antitrust class actions. *See In re Linerboard Antitrust Litig.,* MDL No.1261, 2004 WL 870685, at *4 (E.D.Pa. Apr. 21, 2004) (settlement represents 1.62% of sales from class period); *See In re Plastic Tableware Antitrust Litig.,* No. 94–CV–3564, 1995 WL 723175, at *1 (E.D.Pa. Dec. 4, 1995) (3.5% of sales); *Fischer Bros., Inc. v. Mueller Brass Co.,* 630 F.Supp. 493, 499 (E.D.Pa.1985) (0.2% of sales); *Axelrod v. Saks & Co.,* Civil Action Nos. 76–3805, 76–4011, 77–172, 1981 WL 2031, at *1 (E.D.Pa. Feb. 23, 1981) (3.7% of sales).

At this juncture, we see no reasons to doubt the fairness of this settlement. The settlement was reached after extensive arms-length negotiation between very experienced and competent counsel for Plaintiff Class, BASF and DuPont. Moreover, this settlement does not affect the joint and several liability of the remaining Defendants in this alleged conspiracy. [2] In addition, the settling Defendants have agreed to provide assistance to Plaintiffs in pursuing this case against the remaining Defendants as referenced hereinabove. Under all the circumstances, we will grant preliminary approval of this settlement.

## III. Notification of the Class

**\*3** Rule 23(e)(1)(B) provides that "[t]he Court must direct notice in a reasonable manner to all class members who would be bound by the proposed settlement, voluntary dismissal, or compromise." FED. R. CIV. P. 23(e)(1)(B). Here, Plaintiffs' proposed method for notifying the class is identical to the method used for notification of the class with regards to the Akzo settlement. Specifically, Plaintiffs propose providing individual, first-class mailed notice to the extent practicable. Plaintiffs propose that this Notice be mailed, postage prepaid, to all entities identified by Defendants within fourteen (14) days of the granting of the Preliminary Approval. Furthermore, Summary Notice will be published in the *Wall Street Journal* and in the automotive refinishing paint industry trade journal *Hammer & Dolly.* This method of notice conforms with Rule 23. *See In re Prudential Ins. Co Am. Sales. Litig.,* 148 F.3d 283, 326–27 (3d Cir.1998). Moreover, we approved this method for notifying the class regarding the Akzo Settlement. We see no reason to find fault with it now. The proposed forms of notice to class members attached to the request for preliminary approval are approved subject to any modifications contained within the attached order, and we will direct that notice to the Class members regarding the proposed settlement be disseminated.

Plaintiffs and settling Defendants agree that there is no need for an additional opt-out period pursuant to Rule 23(e)(3) because Class members were already given the opportunity to opt-out prior to approval of the Akzo Settlement. (Doc. No. 120 at 13 n. 4.) Plaintiffs point to the *In re Linerboard* class action, where the Court approved three partial-settlements but only allowed one opportunity to opt-out. *See In re Linerboard,* 2004 WL 870685 (approval of third partial settlement); 296 F.Supp.2d 568 (E.D.Pa.2003) (approval of second partial settlement); 292 F.Supp.2d 631 (E.D.Pa.2003) (approval of first partial settlement). We agree with Plaintiffs and settling Defendants that it is not necessary to have a second opt-out period here. The determination of the necessity for an additional opt-out under Rule 23(e)(3) is within the discretion of the Court. We are aware of no significant developments since the approval of that opt-out that would require us to provide for a second opt-out period. *See* MANUAL FOR COMPLEX LITIGATION (Fourth) § 21.611 (2004). Moreover, Class members still have the opportunity to object to the terms of the Settlement.

An appropriate Order follows.

## ORDER

AND NOW, this _____ day of May, 2004, upon consideration of Plaintiffs' Motion for Preliminary Approval of Agreement of a Proposed Settlement With E.I. DuPont de Nemours and Company, DuPont Performance Coatings, Inc. (collectively "DuPont"), and BASF Corporation and for Authorization to Disseminate Notice (Doc. No. 120), a Motion to which DuPont and BASF consent, it is ORDERED that the Motion is GRANTED. It is further ORDERED as follows:

**\*4** 1) The Agreement of Settlement between the Plaintiff Class and DuPont and BASF is hereby preliminarily approved and the Class shall receive notice of the proposed settlement in accordance with the terms of this Order.

2) The Court previously certified the Class, and pursuant to our Order of March 17, 2003, a Notice of Pendency and Proposed Partial Settlement of Class Action and Hearing on Settlement Approval was sent to Class Members in April, 2003, advising them of their right to be excluded from the Class. This opportunity to opt-out complied with the requirements of Fed.R.Civ.P. 23(e)(3). There is no need for an additional opt-out period.

3) The Forms of Notice attached to the Agreement of Settlement as Exhibits "B" and "C" are approved, subject to the deadline modifications stated herein, pursuant to Fed.R.Civ.P. 23. On or before May 24, 2004, Plaintiffs' counsel shall send via first class mail a long form Notice, in substantially the same form as Exhibit "B," to all direct purchasers identified by Defendants in response to paragraph 2 of our Order of March 17, 2003. Plaintiffs' counsel shall retain a record of those so notified.

4) Within ten (10) days after mailing the long form Notice referred to in paragraph 3 above, Plaintiffs' counsel shall publish a Summary Notice, in substantially the same form as Exhibit "C," in one national edition of *The Wall Street Journal* and shall initiate publication of the Summary Notice in the next edition of the Automotive Refinishing Paint trade publication *Hammer & Dolly*.

5) Any member of the Class who wishes to object to the terms of the Agreement of Settlement between the Class and the DuPont Defendants and the BASF Defendants must do so in writing, postmarked no later than August 9, 2004, and shall otherwise comply with the requirements set forth in the Notices. Plaintiff Class shall provide the non-settling Defendants with a copy of each objection received.

6) The litigation against Dupont and BASF is stayed except as required by the Agreement of Settlement.

7) The Court will hold a hearing on September 1, 2004, in Courtroom 8A, United States Courthouse, 6th and Market Streets, Philadelphia, PA at 2:00 p.m. to consider whether the Agreement of Settlement should be approved as fair, reasonable and adequate to the Class. The date and time of the hearing shall be subject to adjournment by the Court without further notice to members of the Class other than that which may be posted at the United States Courthouse.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 1068807

---

## Footnotes

1    The Azko settlement was reached before termination without indictment of the grand jury investigation by the Department of Justice.

2    We are advised that the remaining Defendants, PPG Industries and the Sherwin–Williams Defendants, represent approximately one-half of the combined market share of all Defendants for automobile refinishing paint products in the United States.

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 Neutral

As of: October 3, 2025 8:25 PM Z

# *Binotti v. Duke Univ.*

United States District Court for the Middle District of North Carolina

August 30, 2021, Decided; August 30, 2021, Filed

Case No. 1:20-CV-470

**Reporter**
2021 U.S. Dist. LEXIS 225003 *

LUCIA BINOTTI, individually and on behalf of all others similarly situated, Plaintiff. v. DUKE UNIVERSITY, Defendant.

**Prior History:** *Binotti v. Duke Univ., 2020 U.S. Dist. LEXIS 218677 (M.D.N.C., Nov. 9, 2020)*

## Core Terms

Settlement, class member, notice, class action, antitrust, adequacy, proposed settlement, final approval, cy pres, negotiations, parties, no-poach, damages, certification, Appointment, factors, funds

**Counsel: [\*1]** For Duke University, Defendant: JAMES P. COONEY III, LEAD ATTORNEY, SARAH MOTLEY STONE, WOMBLE BOND DICKINSON (US) LLP, Charlotte, NC; ASHLEY BASS, DEREK LUDWIN, COVINGTON & BURLING LLP, Washington, DC; BRENT F. POWELL, WOMBLE BOND DICKINSON (US) LLP, Winston-Salem, NC.

For Lucia Binotti, individually and on behalf of all others similarly situated, Plaintiff: ANNE B. SHAVER, DEAN M. HARVEY, LIN Y. CHAN, JALLE H. DAFA, YAMAN SALAHI, LIEFF CABRASER HEIMANN & BERNSTEIN LLP, San Francisco, CA; M. TRAVIS PAYNE, EDELSTEIN AND PAYNE, Raleigh, NC; DANIEL C. LYON, ELLIOT MORGAN PARSONAGE PLLC, Charlotte, NC.

**Judges:** Catherine C. Eagles, UNITED STATES DISTRICT JUDGE.

**Opinion by:** Catherine C. Eagles

## Opinion

### ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT

This matter is before the Court on motion by Plaintiff Dr. Lucia Binotti for final approval of a class action settlement with Duke University ("Duke"). A final fairness hearing at which counsel for all parties and Class Members had an opportunity to appear was held on August 25, 2019. The Court having considered the motion, all other papers filed concerning that motion, and all other pertinent documents and pleadings, and counsel and all interested parties having been **[\*2]** heard at a final fairness hearing, **GRANTS** Plaintiff's motion, enters final judgment, and dismisses this action with prejudice.

#### FACTORS FOR CLASS CERTIFICATION

The proposed Settlement Class is defined as:

All natural persons employed by Duke University or the University of North Carolina, Chapel Hill from October 1, 2001 through February 5, 2018, as a faculty member. Excluded from the Class are: members of the boards of directors and boards of trustees, boards of governors, senior administrators of Duke and UNC, unpaid faculty, and faculty with an academic appointment at the School of Medicine; and any and all judges and justices, and chambers' staff, assigned to hear or adjudicate any aspect of this litigation.

Doc. 58 at 4-5.

When a settlement is reached before *Rule 23* certification, a class may be certified solely for the purposes of settlement. *Covarrubias v. Capt. Charlie's Seafood, Inc., No. 2:10-CV-10-F, 2011 U.S. Dist. LEXIS 72636, 2011 WL 2690531, at \*2 (E.D.N.C. July 6, 2011)*.

The parties seeking class certification must meet the four prerequisites of *Federal Rules of Civil Procedure 23(a)(1) through (4)*: numerosity, commonality, typicality, and adequacy. *Fed. R. Civ. P. 23(a); Cerrato v. Durham Pub. Sch. Bd. of Educ., No. 1:16CV1431,*

*2017 U.S. Dist. LEXIS 216318, 2017 WL 2983301, at \*2 (M.D.N.C. Mar. 17, 2017)*. The Court will certify the class for purposes of settlement.

First, the Settlement Class—which has over 15,000 members—is so numerous that joinder of all members is impracticable.

Second, commonality is satisfied because **[\*3]** the common question of whether Duke and UNC entered into an unlawful agreement is "dispositive and over-shadow[s] other issues." *Lienhart v. Dryvit Sys., Inc., 255 F.3d 138, 146 (4th Cir. 2001)*. Specifically, the following major factual and legal issues are common to the Settlement Class: whether Duke and UNC entered into a no-poach agreement restraining recruitment and hiring, the agreement's scope and duration, and its effect on compensation.

Third, Dr. Binotti—who has worked as a non-medical faculty member at UNC since 1990, Doc. 1 at ¶ 9, and allegedly was paid less during the Class Period as a result of the alleged agreement—has claims that are typical of the Settlement Class. *Deiter v. Microsoft Corp., 436 F. 3d 461, 466 (4th Cir. 2006)* ("[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members."). Dr. Binotti shares with the Settlement Class Members the same alleged injuries arising from the same alleged conduct: suppression of their compensation due to the alleged no-poach agreement.

Lastly, Dr. Binotti adequately represents the class. "The adequacy inquiry . . . serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prod., Inc. v. Windsor, 117 S. Ct. 2231, 2250 (1997)*. The Court has carefully evaluated whether Dr. Binotti adequately **[\*4]** represents the Class, as intra-class conflicts may arise where, as here, some of the Class claims are potentially time-barred, if the settlement value of one set of claims (e.g., "timely" or "time-barred") is substantially higher than the other. *See In re Cmty. Bank of N. Va. Mortg. Lending Pracs. Litig., 795 F.3d 380, 389 (3d Cir. 2015)*; *In re Corrugated Container Antitrust Litig., 643 F.2d 195, 220 (5th Cir. 1981)*. However, a conflict will only defeat the adequacy requirement if it is fundamental. *Sharp Farms v. Speaks, 917 F.3d 276, 295 (4th Cir. 2019)*. A conflict is not fundamental if all class members: (1) "share common objectives and the same factual and legal positions," and (2) have the same interest in proving the defendant's liability. *Id.* (citation omitted). Here, Dr. Binotti and the Class have the same interest in

proving that Duke's conduct violated antitrust laws and suppressed compensation and mobility as a result. *See In re Ins. Brokerage Antitrust Litig., 579 F.3d 241, 272-73 (3d Cir. 2009)* (rejecting a time-period conflict argument because the class members "shared a unified interest" in establishing liability). There is nothing to indicate that any unnamed Class Members would assert a different legal or factual position to prove Duke's liability or to measure the damages resulting from the alleged conspiracy. *See Sharp Farms, 917 F.3d at 295* (holding a fundamental conflict existed where, because of divergent legal theories, the settlement "would provide broader relief to [part of] **[\*5]** the settlement class at the expense of [other] class members . . ."). Approximately 95% of Class Members have claims in both periods, Doc. 51 at ¶ 4, and share Dr. Binotti's interest in maximizing damages for both periods. Moreover, the adequacy of the settlement does not rest only on the value of one set of claims; each set of claims had strengths and weaknesses and after careful investigation and consideration, Dr. Binotti and her counsel concluded that that there was no basis to value the claims of one period differently than the other. Doc. 49-1 at ¶¶ 5-6. There appears to be a reasonable and rational basis to distribute the settlement funds evenly throughout the Class Period, as proposed in the Settlement Agreement. *See Boyd v. Coventry Health Care Inc., 299 F.R.D. 451, 461 (D. Md. 2014)* ("The proposed allocation need not meet standards of scientific precision, and given that qualified counsel endorses the proposed allocation, the allocation need only have a reasonable and rational basis.") (citation omitted); *see also In re Corrugated Container Antitrust Litig., 643 F.2d at 220* (suggesting circumstances in which an "even spread" across two time periods might be appropriate). Considering the percentage of Class Members with claims in both periods and the similar valuation of the claims, any intra-class **[\*6]** conflict arising from the fact that the Class Period covers "timely" and "time-barred" claims is minimal and is not a fundamental conflict sufficient to defeat the adequacy requirement at this stage.

Class certification is therefore appropriate if the predominance and superiority requirements of *Rule 23(b)(3)* are satisfied. *Fed. R. Civ. P. 23(b)(3)*. First, "questions of law or fact common to class members [must] predominate over any questions affecting only individual members . . .." *Id.* Second, "a class action [must be] superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.* In settlement-only certification cases, "a district court need not inquire whether the case, if tried, would present

2021 U.S. Dist. LEXIS 225003, *6

intractable management problems, see *Fed. Rule Civ. P. 23(b)(3)(D)*, for the proposal is that there be no trial." *Windsor, 117 S. Ct. at 2248*.

    a. Here, predominance is met because the significant legal and factual questions pertinent to the underlying cause of action that can be answered with common proof and without individual inquiries include (1) whether Duke entered an agreement violating the antitrust law; (2) whether the agreement injured Plaintiff and the Class; and (3) whether damages can be measured through a common method. *See In re Titanium Dioxide Antitrust Litig., 284 F.R.D. 328, 344 (D. Md. 2012)*. The same **[*7]** is true for impact and damages. Proof of injury is not individualized, it instead depends on a common theory that pay structures at Duke and UNC were systematically suppressed, thus affecting all class members.
    b. Superiority is also satisfied. Class treatment of the legal issues identified in this case would be superior to other procedures for the handling of the claims. No other litigation concerning this matter and filed by any of the parties involved in the present action is currently pending. Furthermore, this Court has a substantial interest in the resolution of the issues raised in this litigation occurring in a single forum.

Based on these findings and reasons, the Court hereby certifies the Settlement Class under *Rule 23(b)(3)*.

The Court hereby appoints Dr. Binotti and her counsel as Settlement Class Representative and Settlement Class Counsel.

Appointment of Dr. Binotti as Settlement Class Representative is appropriate because she is a member of the Settlement Class, she has adequately represented the interests of the Settlement Class in the past, and there is nothing to indicate that she will be unable to represent those interests in the future.

Appointment of Lieff, Cabraser, Heimann & Bernstein, **[*8]** LLP (LCHB), Elliot Morgan and Parsonage, P.A. (EMP), and Edelstein & Payne (EP) as Settlement Class Counsel is appropriate. In evaluating the appointment of class counsel, courts must consider: (i) counsel's work in identifying or investigating claims; (ii) counsel's experience in handling the types of claims asserted; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class. *Fed. R. Civ. P. 23(g)(1)(A)*.

Counsel's work in identifying and investigating the claims at issue in this action dates back many years. *See* Doc. 49-1 at ¶ 8, Doc. 41 at ¶ 13. LCHB and EMP successfully negotiated a settlement for the medical faculty at UNC and Duke in *Seaman v. Duke University*, No. 1:15-cv-00462 (M.D.N.C.), an action arising out of the same alleged no-poach agreement. Doc. 41 at ¶ 13; Doc. 49-1 at ¶¶ 8. Through discovery in that litigation, counsel obtained documentary evidence and elicited witness testimony revealing the alleged agreement stretched beyond the medical schools. Doc. 41 at ¶ 13.

Second, LCHB, EMP, and EP have significant experience handling class actions, including antitrust and employment class actions. Doc. 44 at ¶¶ 3-12; Doc. 43 at ¶¶ 3-7.

Third **[*9]** and relatedly, LCHB, EMP, and EP have demonstrated their knowledge of the applicable law by successfully negotiating a Settlement here and the *Seaman* settlement and by successfully defending against part of Duke's motion for judgment on the pleadings, despite the unsettled case law underlying some of its theories for proving liability. Doc. 33 at 3-4. Counsel thereafter renewed settlement discussions with Duke, recognizing the risks of litigation for both sides. Doc. 49-1 at ¶¶ 11-13.

Fourth, LCHB, EMP, and EP have devoted ample resources to litigating this action and to negotiating the Settlement. *Id.* at ¶¶ 9-13; Doc. 43 at ¶¶ 8-9; Doc. 44 at ¶¶ 13-14.

## FACTORS FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

1. Dr. Binotti's motion for final approval of the proposed Settlement is **GRANTED**.

Unless otherwise defined herein, all terms that are capitalized herein shall have the meanings ascribed to those terms in the Settlement Agreement.

The Court makes the following FINDINGS under *Federal Rule of Civil Procedure 23*:

a."It has long been clear that the law favors settlement." *United States v. Manning Coal Corp., 977 F.2d 117, 120 (4th Cir. 1992)*. This is particularly true in class actions. *Reed v. Big Water Resort, LLC, No. 2:14-cv-101583-DCN, 2016 U.S. Dist. LEXIS 187745, 2016 WL 7438449, at *5 (D.S.C. May 26, 2016)* (noting the "strong judicial policy in favor of settlements, particularly

in the class action context" (citation [*10] omitted)); 4 William B. Rubenstein et al., *Newberg on Class Actions* § 13.44 & n.1 (5th ed. 2018) ("*Newberg*") (collecting cases).

The Court previously granted preliminary approval of the Settlement, finding that it was fair, reasonable, and adequate, and that the Court was likely to grant final approval of the Settlement pursuant to *Federal Rule of Civil Procedure 23(e)(2)*. *See* Doc. 55. Accordingly, notice to the Class was distributed on June 28, 2021, pursuant to the Court-approved notice plan. Doc. 65 ¶ 3. The Class had 30 days to object or, if eligible, to opt-out of the Settlement. There was only one objection and only 8 Class Members opted out. Supp. Decl. of Amy Fringer, Doc. 68 ¶ 4; Second Supp. Decl. of Amy Fringer, Doc. 70-4 ¶ 2. "[T]aking account all of the information learned during [the notice process], the court [now] decides whether or not to give 'final approval' to the settlement." *Newberg* § 13:1.

A class settlement may be approved if it is "fair, reasonable, and adequate." *Fed. R. Civ. P. 23(e)(2)*; *In re Jiffy Lube Sec. Litig., 927 F.2d 155, 158-59 (4th Cir. 1991)*. "In applying this standard, the Fourth Circuit has bifurcated the analysis into consideration of fairness, which focuses on whether the proposed settlement was negotiated at arm's length, and adequacy, which focuses on whether the consideration [*11] provided the class members is sufficient." *Beaulieu v. EQ Indus. Servs., Inc., No. 5:06-CV-00400BR, 2009 U.S. Dist. LEXIS 63574, 2009 WL 2208131, at *23 (E.D.N.C. July 22, 2009)* (citing *Jiffy Lube, 927 F.2d at 158-59*).

A four-factor test is applied to determine the fairness of a proposed settlement: "(1) the posture of the case at the time the proposed settlement was reached, (2) the extent of discovery that had been conducted, (3) the circumstances surrounding the settlement negotiations, and (4) counsel's experience in the type of case at issue." *2009 U.S. Dist. LEXIS 63574, [WL] at *24*.

All four fairness factors favor approval here, as the Court held at preliminary approval. *See* Doc. 55 at 11-12. The Settlement was reached after adversarial litigation, including Duke's Motion for Judgment on the Pleadings, which involved complex questions of law prompting the Court to grant permission for the Parties to supply supplemental briefing. Docs. 28, 32. Further, Class Counsel's work in the *Seaman* litigation set the stage for these settlement negotiations. Class Counsel also retained qualified economic experts to estimate the extent to which the alleged misconduct suppressed

Class pay. Doc. 41 at ¶ 5. Counsel for both sides had sufficient information to evaluate the costs and benefits of settlement at this juncture. The parties' negotiations were adversarial and at arm's-length. The negotiations [*12] were facilitated through the capable work of a neutral third-party mediator, Jonathan Harkavy. Finally, counsel for Dr. Binotti have extensive experience in antitrust and class action litigation, and their informed opinion is entitled to weight.

The Court assesses the adequacy of the Settlement through the following factors: "(1) the relative strength of the plaintiffs' case on the merits, (2) any difficulties of proof or strong defenses the plaintiffs would likely encounter if the case were to go to trial, (3) the expected duration and expense of additional litigation, (4) the solvency of the defendants and the probability of recovery on a litigated judgment, and (5) the degree of opposition to the proposed settlement." *Beaulieu, 2009 U.S. Dist. LEXIS 63574, 2009 WL 2208131, at *26* (citing *Jiffy Lube, 927 F.2d at 158*; *Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 855 F. Supp. 825, 828-29 (E.D.N.C. 1994)*).

As to the first and second factors, Dr. Binotti has adequately explained both the strengths and risks associated with continued litigation of her claims and trial. In particular, though Dr. Binotti had evidence of liability, Duke was prepared to introduce contrary evidence that the alleged no-poach agreement either did not exist or was not in force during the Class Period. Settlement is also favorable at this stage given the Court's decision that the claims [*13] for damages before 2016 are barred by the statute of limitations, Doc. 33 at 2, 4-5, and for damages after 2016, the Class would face the challenge of persuading a jury that Duke and UNC continued their alleged no-poach agreement even after Dr. Seaman filed her complaint on June 9, 2015. Dr. Binotti could have sought reconsideration of the decision or an appeal, but there is no guarantee Dr. Binotti would have prevailed. Considering these risks, the $19 million monetary recovery reflects a strong result for the Class. The proposed allocation plan is fair and reasonable as it will compensate class members on a pro rata basis according to the degree of alleged harm they suffered.

As to the third factor, the parties were fully informed about the strengths and weaknesses of the evidence. Continued litigation would involve considerable time and expense for the parties and the Court and risked the chance of no recovery for the Class. The Settlement guarantees Class Members significant monetary and

injunctive relief.

The fourth factor is irrelevant because there is no indication that Duke would be unable to satisfy a judgment.

The fifth factor, the degree of opposition to the Settlement, can **[\*14]** be evaluated because the Class has had an opportunity to comment in response to the notice program. Only one Class Member objected to the Settlement and the proposed request for attorney's fees and reimbursement of costs, and he did not object to the proposed allocation plan or the proposed service award for Dr. Binotti. Doc. 65 at ¶ 10; Doc. 70-4 ¶ 2; id. at p 4-5. Furthermore, only eight Class Members exercised their right to opt out of the Class. Doc. 68 at ¶ 4. In other words, over 99% of Class Members have chosen to release their claims against Duke in exchange for relief under the Settlement. The small number of exclusion requests is a strong indication of widespread support for the Settlement and that the Settlement is fair, reasonable, and adequate. *See In re Mills Corp. Sec. Litig., 265 F.R.D. 246, 257 (E.D. Va. 2009)* ("[A]n absence of objections and a small number of opt-outs weighs significantly in favor of the settlement's adequacy."); *Flinn v. FMC Corp., 528 F.2d 1169, 1173 (4th Cir. 1975)* ("The attitude of the members of the class, as expressed directly or by failure to object, after notice, to the settlement, is a proper consideration for the trial court . . . ."). The only objection filed did not turn on the adequacy of the settlement amount. *See* Doc. 70-4 at p 4-5.

In addition, Duke University **[\*15]** provided the required notice of the proposed settlement under the provisions of the *Class Action Fairness Act, 28 U.S.C. § 1715*, to the Attorney General of the United States, the Antitrust Division of the Department of Justice, and the various attorneys-general for all states and territories. *See* Docs. 71 ¶¶ 4, 7; 71-1. This included the Attorney General of North Carolina. Doc. 71-1 at 6 (column 2). The notices attached the materials required by CAFA, including the proposed settlement agreement and plan of allocation. Doc. 71 at ¶ 5; *see* Doc. 71-1. No governmental officer made any objection to the settlement, which also tends to indicate the settlement is appropriate.

The Court therefore concludes that the Settlement and proposed Plan of Allocation are fair, reasonable, and adequate and satisfy the criteria for final approval under *Federal Rule of Civil Procedure 23*.

## Notice to Class Members

The Class notice was delivered by mail and e-mail to all Class Members. *See* Docs. 65 at ¶ 3, 65-1, 65-2. The mail and e-mail notices clearly explained Class Members' rights, including the nature of the action, the Class definition, the legal issues, Class Members' rights to make an appearance with an attorney, Class Members' right to request exclusion, Class Members' right **[\*16]** to object to the Settlement, and the binding effect of a Class judgment. *See Fed. R. Civ. P. 23(c)(2)(B)(i)-(vii)*. The Notice apprised Class Members of Class Counsel's intent to seek 25% of the common fund as attorney's fees, to request reimbursement of costs, and to request a service award for Dr. Binotti.

Notice was also given through a case-specific website that published all relevant litigation documents and settlement notices, and which received over 4,652 unique visits. *See* Doc. 65 at ¶ 4. Additionally, the Settlement Administrator established a toll-free telephone number and handled calls from over 197 Class Members concerning the Settlement. *Id.* at ¶ 8.

The Court finds that the notice program effectively apprised Class Members of their rights, was the best practicable under the circumstances, and complied with all due process requirements. *See Fed. R. Civ. P. 23(e)(1)(B)* (notice must be given to class "in a reasonable manner"); *Domonoske v. Bank of Am., N.A., 790 F.Supp.2d 466, 472 (W.D. Va. 2011)* ("In the context of a class action, the due process requirements of the *Fifth Amendment* require reasonable notice combined with an opportunity to be heard and withdraw from the class.") (cleaned up).

The Notice given by Duke University complied with the requirements of the Class Action Fairness Act. *See* Docs. 71; 71-1.

## Designation **[\*17]** of *Cy Pres* Recipient

"[A] *cy pres* distribution is designed to be a way for a court to put any unclaimed settlement funds to their 'next best compensation use, e.g., for the aggregate, indirect, prospective benefit of the class.'" *Klier v. Elf Atochem N. Am., Inc., 658 F.3d 468, 474 (5th Cir. 2011)* (quoting *Masters v. Wilhelmina Model Agency, Inc., 473 F.3d 423, 436 (2d Cir. 2007)*. *Cy pres* recipients must promote the objectives of the underlying statutes at issue and benefit the interests of the class members.

*See Nachshin v. AOL, 663 F.3d 1034, 1040 (9th Cir. 2011)* (noting that *cy pres* distribution should be guided by the objectives of the underlying statutes, target the plaintiff class, and provide reasonable certainty that class members will benefit); *accord, Krakauer v. Dish Network, LLC, No. 1:14-CV-333, , 2020 U.S. Dist. LEXIS 199112, 2020 WL 6292991, at *7 (M.D.N.C. Oct. 27, 2020)*. Generally, courts approve *cy pres* distributions "only when more redistribution is no longer feasible." *Newberg* § 12:32.

Pursuant to the parties' Settlement, a *cy pres* distribution is only contemplated if further redistribution of unclaimed funds to Class Members would not be economically feasible. *See* Settlement, Doc. 41-1, ¶ IV(A)(8). Dr. Binotti proposes that the Court designate the American Antitrust Institute (AAI) as the *cy pres* recipient. The AAI is an independent, nonprofit organization devoted to promoting competition that protects consumers, businesses, and society. **[*18]** Its mission includes "research, education, and advocacy on the benefits of competition and the use of antitrust enforcement as a vital component of national and international competition policy." *See, Mission and History*, AM. ANTITRUST INST., https://www.antitrustinstitute.org/about-us/ (last visited August 10, 2021). Further, the AAI has a track record of advocating specifically against no-poach agreements on behalf of workers. *See, e.g.*, Randy Stutz, *AAI Issues New White Paper on the Antitrust Treatment of Labor-Market Restraints*, AM. ANTITRUST INST. (July 31, 2018), https://www.antitrustinstitute.org/work-product/2246/ .

Having reviewed the organization's purpose and considered its nexus to this case and to the advancement of Class Members' interests, the Court concludes that the AAI is an appropriate *cy pres* recipient. Should unclaimed funds remain for which further redistribution would be economically unfeasible, the Settlement Administrator is authorized to disburse those funds to the AAI, consistent with the terms of the Settlement Agreement.

For these reasons and based on the record before it, the Court **GRANTS** Plaintiff's motion for final approval of the Settlement.

**IT IS SO ORDERED [*19]** , this the 30th day of August, 2021.

/s/ Catherine C. Eagles

UNITED STATES DISTRICT JUDGE

**End of Document**

In re Blood Reagents Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015-2 Trade Cases P 79,330

2015 WL 6123211

United States District Court, E.D. Pennsylvania.

IN RE BLOOD REAGENTS
ANTITRUST LITIGATION .

MDL No. 09–2081
|
Signed 10/19/2015

**MEMORANDUM**

DuBOIS, District Judge

**TABLE OF CONTENTS**

I. INTRODUCTION...——

II. BACKGROUND...——
A. BACKGROUND ON BLOOD REAGENTS...——

B. CREATION OF DUOPOLY BY ORTHO AND IMMUCOR...——

C. POST–DUOPOLY PRICE INCREASES...——6

   1. Operation Create Value...——

   2. Blood Bank Leadership Program...——

D. THE ALLEGED PRICE–FIXING CONSPIRACY...——

E. 2005 Price Increases...——

F. 2008 PRICE INCREASES...——

III. APPLICATION OF DAUBERT...——
A. DR. BEYER'S DAMAGES METHODOLOGIES...——

B. STANDARD OF REVIEW UNDER DAUBERT...——

C. LEGAL STANDARD: ANTITRUST IMPACT AND DAMAGES...——

D. ANALYSIS OF ORTHO'S DAUBERT CHALLENGES...——

E. DAUBERT CONCLUSION...——

IV. RECERTIFICATION OF THE CLASS...——
A. LEGAL STANDARD...——

B. DISCUSSION...——

   1. Class Definition and Ascertainability...——

   2. Rule 23(a) Requirements...——

   3. Rule 23(b)(3) Requirements...——

     i. Predominance...——

     ii. Superiority...——

V. CONCLUSION...——

**I. INTRODUCTION**

**\*1** In these consolidated antitrust actions, plaintiffs allege that the two leading producers of blood reagents — Immucor, Inc. ("Immucor") and Ortho Clinical Diagnostics, Inc. ("defendant" or "Ortho") — conspired to unreasonably restrain trade and commerce in violation of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. By Order and Memorandum dated August 22, 2012, the Court granted plaintiffs' Motion for Class Certification. [1] Plaintiffs thereafter finalized a settlement with Immucor. By Order dated September 6, 2012, the Court granted plaintiffs' Motion for Final Approval of the Settlement with Immucur.

On September 5, 2012, Ortho filed a Petition for Permission to Appeal the Court's August 22, 2012 decision granting class certification, pursuant to Federal Rule of Civil Procedure 23(f), in the U.S. Court of Appeals for the Third Circuit. Ortho's Petition was granted on October 25, 2012.

On April 8, 2015, the Third Circuit vacated and remanded this Court's Order granting plaintiffs' Motion for Class Certification on the ground that it relied on the decision of the U.S. Court of Appeals for the Third Circuit in Behrend v. Comcast Corp., 655 F.3d 182 (3d Cir. 2011), which was reversed by the Supreme Court, Comcast Corp. v. Behrend, 133 S. Ct. 1426 (2013). On remand, the Third Circuit directed that the Court "decide in the first instance which of [defendant's] reliability attacks, if any, challenge those aspects of plaintiffs' expert testimony offered to satisfy Rule

Case 4:21-cv-00196-MWB   Document 249-1   Filed 10/07/25   Page 20 of 482

In re Blood Reagents Antitrust Litigation, Not Reported in Fed. Supp. (2015)
2015-2 Trade Cases P 79,330

23 and then, if necessary, to conduct a Daubert inquiry before assessing whether the requirements of Rule 23 have been met." In re Blood Reagents Antitrust Litig., 783 F.3d 183, 188 (3d Cir. 2015). Presently before the Court are the parties' post–remand briefs addressing plaintiffs' expert Dr. John C. Beyer's methodologies for calculating classwide damages under Daubert. For the reasons set forth below, the Court rejects Ortho's Daubert challenges, and recertifies the following class pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3):

> All individuals and entities who purchased traditional blood reagents in the United States directly from defendants Immucor, Inc., and Ortho–Clinical Diagnostics, Inc. at any time from November 4, 2000[2] through the present. Excluded from the Class are defendants, and their respective parents, subsidiaries and affiliates, as well as any federal government entities.

## II. BACKGROUND

**\*2** Between 2000 and 2009, defendants increased the prices of their blood reagent products by significant percentages. Many products' prices rose by more than 2000% during that period. (See Beyer Report, Pls.' Mot. Ex. 1, at 13, 14.) The parties agree that some part of this increase resulted from the creation of a duopoly in the blood reagents industry in 1999 as a result of the acquisition of numerous manufacturers of blood reagents by defendants over a period of several years. However, plaintiffs allege that an unlawful horizontal price–fixing agreement that began in November 2000 accounts for much of the increase.

### A. BACKGROUND ON BLOOD REAGENTS

Blood reagents are used to identify properties of human blood. Most large purchasers of blood reagents are blood donor centers and hospitals, which use them to test whether the blood of a potential donor is compatible with the blood of a potential recipient. (See Report of Teresa Harris ("Harris Report"), Pls.' Mot. Ex. 2, at 3.) Under applicable FDA regulations, Blood Bank and Transfusion Standards promulgated by the American Association of Blood Banks

("AABB"), and other rules, a blood donor center must test a donor's ABO group and Rh type and perform an antibody screen each time he or she donates. (Id. at 9.) A hospital must conduct similar tests on a recipient before providing a blood transfusion. (Id.)

There are two basic categories of blood reagents: traditional and automated. Although both Ortho and Immucor sold products in both categories throughout the class period, the putative class in this case includes only purchasers of traditional blood reagents ("TBR"). When using TBR, laboratory technicians test blood manually in test tubes and interpret the results. (Id. at 6.) "Automated" or "proprietary" blood reagents ("ABR"), on the other hand, are often used with specialized equipment. (Id.) They allow quicker testing while requiring less skill and decreasing the risk of technician error. (See, e.g., Pls.' Mot. Ex. 22, at 13 (citing the benefits of ABR as "[s]ignificant labor reduction," "[i]ncreased productivity/efficiency," and "[i]ncreased patient safety").) ABR tend to be more expensive than TBR. (See, e.g., Weiss Decl., Pls.' Reply Ex. 149, ¶ 14.) The parties dispute the extent to which defendants' customers were able to use TBR and ABR interchangeably.

During the class period, Ortho and Immucor each sold more than forty different TBR products. (See, e.g., Harris Report Ex. C.) A list provided by plaintiffs' industry expert, Teresa Harris, shows that most Ortho TBR products had an equivalent Immucor TBR product. (See id.; see also, e.g., Poynter Decl. ¶ 29.) Ms. Harris testified in her deposition that a few of the products that she paired in the list are not identical. (See Harris Dep., Def.'s Opp. Ex. B, at 64– 65, 143–44.) However, she opines that those nonidentical pairs "perform exactly the same function." (Harris Reply Report, Pls.' Reply Ex. B, at ¶ 3.)

The blood–reagents market features significant barriers to entry. Most importantly, a prospective entrant must obtain FDA approval before beginning to market and sell blood reagents. This process takes several years. (See, e.g., Pls.' Mot. Ex. 9, at 4 (2003 interview in which Immucor CEO Edward Gallup stated, "[T]he FDA is very often our friend.... [S]ix years is a long time — but, even if it were half that, it's still a huge barrier to entry."); Pls.' Mot. Ex. 62, at 1 (Immucor strategy document stating that "[t]here are high barriers to entry. To enter the market, a company must meet FDA Regulations, which takes approximately five to six years to gain approval.").) Toward the end of the class period, in or around 2008, two new TBR producers entered the market.

(See, e.g., Def.'s Opp. 18–19.) The two new producers are not involved in any of the post–remand issues.

## B. CREATION OF DUOPOLY BY ORTHO AND IMMUCOR

**\*3**  In the 1980s and 1990s, the TBR market was highly competitive, with more than a dozen competitors. (Pls.' Mot. Ex. 9, at 2.) During that period, there was intense price competition, (see, e.g., id.; Pls.' Mot. Ex. 10, at 1), and TBR prices and profitability were low, (see, e.g., Pls.' Mot. Ex. 5, at 4 (showing Immucor's gross profits declining steadily between 1995 and 2000)). As a result, Immucor approached bankruptcy, (see, e.g., Pls.' Mot. Ex. 7), and Ortho considered exiting the TBR industry, (see, e.g., Pls.' Mot. Ex. 12, at 12), in those years.

In the 1990s, Immucor began to acquire competing TBR producers. (See, e.g., Pls.' Mot. Ex. 9, at 3; Pls.' Mot. Ex. 19, at 1.) After Immucor acquired Gamma Biological in 1998 and the Biological Corporation of America in 1999, Immucor and Ortho had a duopoly in the United States TBR market. (See, e.g., Pls.' Mot. Ex. 10, at 1; Pls.' Mot. Exs. 22–24.) Defendants anticipated that this market consolidation would allow them to raise prices and increase their profitability. (See, e.g., Pls.' Mot. Ex. 19 (statement of Immucor CEO that "by buying up its competition and consolidating the marketplace into two key players, Immucor can raise its prices"); cf. Pls.' Mot. Ex. 21.) Immucor's market share in North America was slightly larger than Ortho's throughout the class period. (See, e.g., Pls.' Mot. Exs. 22–24 (showing Immucor with a market share of approximately 55% and Ortho with a market share of approximately 45% in 1999 and 2007).)

## C. POST–DUOPOLY PRICE INCREASES

### 1. Operation Create Value

Shortly after Ortho and Immucor created their duopoly, Ortho developed a pricing strategy it called "Operation Create Value" ("OCV"). (See, e.g., Pls.' Mot. Ex. 43, at 1.) Ortho began work on OCV, with the assistance of a consulting firm, at least as early as October 1999. (Id.) Pursuant to OCV, Ortho decided to increase the prices it charged all TBR customers by 25% in 2000 and by an additional 25% in 2001. (Pls.' Mot. Ex. 45, at 1; see also Pls.' Mot. Ex. 47, at 13.) Ortho anticipated that it would impose additional "increases yearly thereafter until profitability achieved." (Pls.' Mot. Ex. 45, at 1; see also Pls.' Mot. Ex. 54, at 10 (describing OCV as consisting of

"5+ years of annual 25% price increases").) In developing the strategy, Ortho focused heavily on whether Immucor would follow its price increases and, if so, when the Immucor price increases would take place. (See, e.g., Pls.' Mot. Ex. 47, at 20–22, 39.) Ortho rejected larger proposed price increases — as large as 100% per year — because of the risk of customer loss. (See, e.g., Def.'s Opp. Ex. 46.)

Ortho implemented the first 25% price increase under OCV in April 2000. (Pls.' Mot. Ex. 49, at 1; Pls.' Reply Ex. 156.) Many customers did not actually experience a price increase at that time, however, because Ortho could not increase customers' prices until their existing contracts expired. (See Beyer Reply Report, Pls.' Reply Ex. A, at ¶ 73; 7/26/12 Hr'g Tr. 97; Poynter Decl., Pls.' Reply Ex. 150, at ¶ 31.) As a result, Ortho's average TBR prices increased by less than 25% in 2000. (See, e.g., 7/26/12 Hr'g Tr. 188–91 (testimony of Dr. Peter Bronsteen, defendant's economic expert, that average prices of particular TBR products increased by about 10% between 1999 and 2000).)

Immucor implemented similar price increases around the same time. For example, in an October 2000 email, Immucor's CEO, Edward Gallup, told a shareholder that Immucor had begun to increase customers' prices in June 2000 as their existing contracts ended. (Pls.' Mot. Ex. 50, at 1; see also Poynter Decl. ¶ 4 (stating that "Immucor implemented an approximately 20% price increase on traditional blood reagents in June 2000").) Gallup wrote that it was Immucor's goal "to affect [sic] a 10–20% price increase over the next 12 months to all domestic customers." (Id.; see also Pls.' Mot. Exs. 51–52; Poynter Decl. ¶ 5 ("Immucor wanted to target 20% price increases on blood reagents over the next 12 months.").) Gallup further explained, "While there is always some risk of losing customers, early indications are that our only competitor in the U.S. (Ortho Clinical Diagnostics division of [Johnson & Johnson] ) is doing the same." (Pls.' Mot. Ex. 50, at 1–2.)

### 2. Blood Bank Leadership Program

**\*4**  In the fall of 2000, Ortho considered a different, more aggressive pricing strategy that came to be known as the Blood Bank Leadership Program ("BBLP"). An internal Ortho document dated September 15, 2000, enumerated three options: (1) "stay the course" by continuing the 25% annual price increases planned under OCV, (2) exit the TBR market altogether, or (3) enact the BBLP. (Pls.' Mot. Ex. 54, at 2.)

Case 4:21-cv-00196-MWB   Document 249-1   Filed 10/07/25   Page 22 of 482

In re Blood Reagents Antitrust Litigation, Not Reported in Fed. Supp. (2015)
2015-2 Trade Cases P 79,330

Ortho hoped that the larger price increases under the BBLP would increase gross profit margins on all of its TBR products to at least 40%. (Id. at 4.) In considering whether to implement the BBLP, as with OCV, Ortho focused on the risk that Immucor might not "follow aggressively." (Id. at 11.) As early as October 30, 2000, Ortho developed price lists under the BBLP and prepared to inform its customers of the price increases. [3] (Pls.' Mot. Ex. 56.) The BBLP price increases varied by TBR product but resulted in an overall increase of 200 to 300 percent in TBR prices between 2000 and 2002. (Pls.' Mot. Ex. 11, at 3; see also Pls.' Mot. Ex. 56.)

### D. THE ALLEGED PRICE–FIXING CONSPIRACY

Plaintiffs allege that defendants began to engage in unlawful pricing–related communications at an annual meeting of the AABB. The meeting took place in Washington, D.C., between November 4, 2000, and November 8, 2000, and Ortho and Immucor executives were in attendance. (See, e.g., Pls.' Mot. Ex. 59, at 1.)

At the AABB meeting, Immucor executives watched a presentation in which Ortho announced the BBLP price increases. (See, e.g., Thorne Dep., Pls.' Mot. Ex. 60, at 206; DeMezzo Dep., Pls.' Mot. Ex. 153, at 88.) [4] Ortho's president, Catherine Burzik, also stopped by the Immucor booth and introduced herself to Mike Poynter, an Immucor executive. (Poynter Decl. ¶ 7.) She asked Poynter to "pass [her business card] along to Ed Gallup, [Immucor's CEO,] because she wanted to speak with him." (Id.) "Ms. Burzik told [Poynter] that she had recently joined Ortho, that Ortho's margins on traditional blood reagents were terrible, and that she wanted to understand the margin situation regarding traditional blood reagents. She also asked if [Poynter] had seen Ortho's presentation and invited [him] to come to the Ortho booth to see it," which he did. (Id. at ¶¶ 7, 10.)

 **\*5** In mid–November 2000, shortly after the AABB meeting, Gallup, Immucor's CEO, asked Judy Thorne, Immucor's Director of Marketing, to meet with an Ortho employee to "find out a range of where Ortho may be considering putting the pricing." (Thorne Dep. 206.) Shortly after Gallup made that request, Thorne had lunch with David Gendusa, a Regional Vice President for Ortho. (Id. at 206, 208.) At the lunch meeting, Gendusa "showed [Thorne] the range that [Ortho was] considering" for about twenty–five TBR products but did not give her a copy of the price list. (Id.) Thorne wrote down the prices for several categories of products, returned to the office, and gave the information to

Gallup. (Id. at 207–09.) Gallup instructed Thorne to "expense the lunch as if he was the person [she] had lunch with," presumably to conceal her communications with Gendusa. (Cangiamilla Dep., Pls.' Reply Ex. 152, at 45–46.)

Immucor changed its pricing strategy drastically after learning of Ortho's plans. On November 17, 2000, Immucor's Vice–President of Sales sent an email stating, "We are going to increase prices around the first of the year so look out. We are going to piss off a lot of people, but Ortho is going to do the same!!! So maybe we will start getting profitable!" (Pls.' Mot. Ex. 64, at 1.) Ortho sent its customers a letter with the BBLP price list on November 21, 2000. (Def.'s Opp. Ex. 27, at ORTHOCD–0834002.) Immucor received a copy of the price list from a customer on December 1, 2000. (Def.'s Opp. Ex. 39.) In 2001 and 2002, Immucor raised prices on its TBR products by between 247% and 400%. (See, e.g., Pls.' Mot. Ex. 62, at 1.) Ortho raised prices on its TBR products by between 200% and 300% during the same period. (See, e.g., Pls.' Mot. Ex. 11, at 3, 5.) The price increases became effective for different customers at different times, depending on when their existing contracts expired. (See, e.g., Def.'s Opp. 27– 28, 30–31.)

### E. 2005 PRICE INCREASES

Plaintiffs allege that the November 2000 communications initiated a lengthy conspiracy through which defendants colluded to impose substantial price increases throughout the class period. While prices rose somewhat between 2002 and 2004, (see, e.g., Beyer Report figs.1–4), the next "major price increase initiative[ ]" was implemented in 2005, (id. ¶ 29).

Both firms increased the prices of their TBR products significantly in 2005. (See, e.g., Pls.' Mot. Ex. 67 (12/20/04 email from Immucor sales representative stating that "Blood Bank reagents went up approximately 300% in 2001 and now they are rising another 125%"); Pls.' Mot. Ex. 88 (4/12/10 internal Ortho email referring to Ortho's 125% price increase in 2005 and "the fact that Immucor also followed"); Beyer Report tbl.7 (showing that the 2005 increase raised the prices of Immucor's top ten TBR products by 115% to 316%).) Plaintiffs have presented evidence that each defendant was confident that the other would not deviate from this strategy. (See, e.g., Pls.' Mot. Ex. 91.)

Plaintiffs also note that both defendants cancelled contracts with important group purchasing organizations ("GPOs") in order to implement the price increase. (See, e.g., Pls.' Mot. Ex. 94, at 2.) According to plaintiffs, the GPOs comprised

Case 4:21-cv-00196-MWB   Document 249-1   Filed 10/07/25   Page 23 of 482

In re Blood Reagents Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015-2 Trade Cases P 79,330

a large share of sales for Immucor and Ortho, which would have made those cancellations highly risky absent collusion. (Pls.' Mot. 21–22; Beyer Report ¶ 36.) The cancellations were nearly simultaneous: for example, both Ortho and Immucor decided to terminate their contracts with one GPO, Premier, during the fall of 2004. (Pls.' Mot. Ex. 94, at 2.) The cancellations of the Premier contract by Ortho and Immucor became effective on December 31, 2004, and January 26, 2005, respectively. (Pls.' Mot. Ex. 96.) Immucor also cancelled its contract with another GPO, Novation, around the same time. (Id.)

With its 2005 price increases, Immucor introduced two new TBR pricing programs. First, in October 2004, Immucor informed its remaining GPO customers that they could obtain "price protection," freezing their TBR prices at 2004 levels for five years, if they purchased Immucor's ABR instrument. (Def.'s Opp. Ex. 70.) Second, Immucor introduced a "Customer Loyalty Program" that separated customers into three pricing tiers depending on their "commitment" to purchasing Immucor's TBR. (See Def.'s Opp. Ex. 71.) Customers that promised to purchase 90% of their TBR from Immucor received "Level II" prices. (Id.) Customers that promised to purchase 70% of their TBR from Immucor received "Level I" prices. (Id.) Customers that did not make such a commitment received "Base" prices. (Id.) In 2005, Base, Level I, and Level II prices increased by 95%, 70%, and 58%, respectively. (Def.'s Opp. Ex. 72.)

### F. 2008 PRICE INCREASES

**\*6**  In March 2008, Ortho implemented a final significant price increase, raising TBR prices by an average of 100%. (Def.'s Opp. Ex. 80, at 2.) Ortho notified customers of the increase in December 2007 and January 2008. (Def.'s Opp. Ex. 81, at 7.) In July 2008, Immucor implemented its own price increase. Having reconfigured its pricing tiers since 2004, Immucor increased prices by 20% for customers in its "Automation" tier [5] and by 50% for customers in its "Base" tier. (Def.'s Opp. Ex. 99.) Price increases varied for TBR products under the other pricing tiers. (Id.) The price increase did not apply to GPOs. (Id.)

### G. PROCEDURAL HISTORY

Plaintiffs filed their Motion for Class Certification on September 16, 2011. In opposition, Ortho argued that plaintiffs had not satisfied Rule 23(b)(3)'s predominance requirement.[6]  Ortho raised numerous reliability attacks

against plaintiffs' proposed common proof demonstrating antitrust impact and damages — namely the damages methodologies offered by plaintiffs' economic expert, Dr. Beyer. By Memorandum and Order dated August 22, 2012, the Court granted plaintiffs' Motion for Class Certification. After conducting a "rigorous analysis of the evidence offered by both parties," In re Blood Reagents Antitrust Litig., 283 F.R.D. 222, 240 (E.D. Pa. 2012), vacated and remanded, 783 F.3d 183 (3d Cir. 2015), the Court rejected defendant's reliability challenges to Dr. Beyer's damages methodologies.

This Court's decision certifying the class was based, in part, on the Third Circuit's then– controlling Behrend v. Comcast Corp., 655 F.3d 182 (3d Cir. 2011), which was reversed by the Supreme Court on March 27, 2013, Comcast Corp. v. Behrend, 133 S. Ct. 1426 (2013). Specifically, this Court determined that plaintiffs had satisfied Rule 23(b)(3) in part by holding that the expert testimony of Dr. Beyer "could evolve to become admissible evidence" at trial. See In re Blood Reagents Antitrust Litig., 283 F.R.D. at 243–45 (quoting Behrend, 655 F.3d at 204 n.13). On September 5, 2012, Ortho filed a Petition for Permission to Appeal Pursuant to Federal Rule of Civil Procedure 23(f), in the Third Circuit. Ortho's Petition was granted on October 25, 2012.

On April 8, 2015, the Third Circuit vacated and remanded this Court's August 22, 2012, Order granting plaintiffs' Motion for Class Certification, holding, in relevant part, as follows:

> Without foreclosing what other conclusions the District Court might reach regarding Comcast's ramifications for antitrust damages models or proving antitrust impact, we believe Behrend's "could evolve" formulation of the Rule 23 standard did not survive Comcast...We join certain of our sister courts to hold that a plaintiff cannot rely on challenged expert testimony, when critical to class certification, to demonstrate conformity with Rule 23 unless the plaintiff also demonstrates, and the trial court finds, that the expert testimony satisfies the standard set out in Daubert.

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 24 of 482

In re Blood Reagents Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015-2 Trade Cases P 79,330

In re Blood Reagents Antitrust Litig., 783 F.3d at 186–87.

The Third Circuit directed the Court to "decide in the first instance which of [defendant's] reliability attacks, if any, challenge those aspects of plaintiffs' expert testimony offered to satisfy Rule 23 and then, if necessary, to conduct a Daubert inquiry before assessing whether the requirements of Rule 23 have been met." Id. at 188. On June 26, 2015, the parties filed post–remand opening briefs. Replies were filed on July 10, 2015. Oral argument was held on July 21, 2015 and July 22, 2015.

## III. APPLICATION OF DAUBERT

**\*7**  Ortho's Daubert challenges before the Court on remand squarely attack Dr. Beyer's proposed methodologies for calculating the damages incurred by individual plaintiffs resulting from the alleged price–fixing conspiracy. Plaintiffs' proof of predominance with respect to antitrust impact and damages rests heavily, although not entirely,[7] on this evidence. Thus, the challenged testimony of Dr. Beyer is "critical to class certification," and must be analyzed under Daubert. See In re Blood Reagents Antitrust Litig., 783 F.3d at 186–87.

### A. DR. BEYER'S DAMAGES METHODOLOGIES

Dr. Beyer's proposed methodologies for calculating damages distinguish between price increases resulting from the creation of a duopoly and price increases resulting from the alleged price–fixing conspiracy. Specifically, Dr. Beyer utilizes a benchmark model to estimate the pricing that would have occurred in a lawful duopoly. He concludes that any differences between those estimated prices and the actual prices charged by defendants resulted from the alleged price–fixing conspiracy.

For the period between 2001 and 2005, Dr. Beyer bases his benchmark on the price increases Ortho planned and partially implemented after the duopoly was created but before defendants allegedly formed their price–fixing conspiracy under the OCV pricing strategy. For that period, Dr. Beyer assumes that both defendants' TBR prices would have increased by 25% per year, as Ortho had planned under OCV.

Dr. Beyer also presents a variation on this OCV benchmark methodology, in which he adjusts the increases in but–for prices, i.e. the estimated prices that "would have prevailed in the same period with no anti-competitive behavior," (Beyer

Report ¶ 88), for individual TBR products to reflect the distribution of actual price increases for different TBR products. (Beyer Reply ¶ 74.) The weighted average but–for price increase, however, remains 25% per year from 2001 to 2005 under this benchmark variation. (Id.; 7/26/12 Hr'g Tr. 309)

For the period between 2006 and the end of the damages period, Dr. Beyer proposes two alternative methods of estimating but–for prices. The first option assumes that TBR prices would have risen at the same rate that Immucor's standard costs rose. The second option makes use of a proposed non–TBR "yardstick" product, RhoGAM, Ortho's brand of Rho(D), a prescription pharmaceutical that is administered to pregnant women.

### B. STANDARD OF REVIEW UNDER DAUBERT

Federal Rule of Evidence 702 provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

**\*8**  "Faced with a proffer of expert scientific testimony...the trial judge must determine...whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." Daubert v. Merrell Dow Pharms., 509 U.S. 579, 592 (1993). This gatekeeping function extends beyond scientific testimony to testimony based on "technical" and "other specialized" knowledge. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999).

Rule 702 has "a liberal policy of admissibility." Pineda v. Ford Motor Co., 520 F.3d 237, 243 (3d Cir. 2008) (quoting

2015-2 Trade Cases P 79,330

Kannankeril v. Terminix Inter., Inc., 128 F.3d 802, 806 (3d Cir. 1997)). As such, the "rejection of expert testimony is the exception and not the rule." Fed. R. Evid. 702 Advisory Committee's Notes.

"Rule 702 embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir.2000) (citing In re Paoli R.R. Yard PCB Litig., 35 F.3d 717 (3d Cir. 1994) ("Paoli II")). The party offering the expert must prove each of these requirements by a preponderance of the evidence. In re TMI Litig., 193 F.3d 613, 663 (3d Cir. 1999).

### 1. Qualifications

To qualify as an expert, "Rule 702 requires the witness to have 'specialized knowledge' regarding the area of testimony." Betterbox Commc'ns Ltd. v. BB Techs., Inc., 300 F.3d 325, 335 (3d Cir. 2002) (quoting Waldorf v. Shuta, 142 F.3d 601, 625 (3d Cir. 1998)). The Third Circuit has instructed courts to interpret the qualification requirement "liberally" and not to insist on a certain kind of degree or background when evaluating the qualifications of an expert. See Waldorf, 142 F.3d at 625. "The language of Rule 702 and the accompanying advisory committee notes make clear that various kinds of 'knowledge, skill, experience, training, or education,' qualify an expert as such." In re Paoli R.R. Yard PCB Litig., 916 F.2d 829, 855 (3d Cir. 1990) (quoting Fed. R. Evid. 702) ("Paoli I").

### 2. Reliability

The reliability requirement of Daubert "means that the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." (Paoli II, 35 F.3d at 742) (quoting Daubert, 509 U.S. at 590). The Supreme Court held in Kumho Tire that the Daubert test of reliability is "flexible" and "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." 526 U.S. at 141–42 (emphasis omitted). In determining whether the reliability requirement is met, courts examine the following factors where appropriate:

(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non–judicial uses to which the method has been put.

United States v. Mitchell, 365 F.3d 215, 235 (3d Cir. 2004) (citing Paoli II, 35 F.3d at 742 n. 8). These factors are neither exhaustive nor applicable in every case. Kannankeril, 128 F.3d at 806– 07.

**\*9** Under the Daubert reliability prong, parties "do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." Paoli II, 35 F.3d at 744 (emphasis omitted). "The evidentiary requirement of reliability is lower than the merits standard of correctness." Id. "As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process — competing expert testimony and active cross–examination — rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." Mitchell, 365 F.3d at 244 (quoting Ruiz–Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 85 (1st Cir. 1998)).

### 3. Fit

For expert testimony to meet the Daubert "fit" requirement, it must "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. "This condition goes primarily to relevance. Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non–helpful." Daubert, 509 U.S. at 591 (citing United

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 26 of 482

In re Blood Reagents Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015-2 Trade Cases P 79,330

States v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1985) (internal quotations omitted)). "'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." Id.

## C. LEGAL STANDARD: ANTITRUST IMPACT AND DAMAGES

"A consumer alleging antitrust violations cannot [recover] damages without showing that he actually paid more than he would have paid in the absence of the violation." City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 265 (3d Cir. 1998) (citing Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, at 200 (1995) (noting that "determining whether antitrust injury is present necessarily involves examining whether there is a causal connection between the violation alleged and the injury")). Thus, "one pursuing antitrust recovery must establish that the damages suffered were caused by the defendant's participation in a scheme repugnant to the antitrust laws." In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1176 (3d Cir. 1993) (citing Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 97 (1977)). This is referred to as antitrust impact.

In price–fixing cases, "causation of injury may be found as a matter of just and reasonable inference from proof of defendants' wrongful acts and their tendency to injure plaintiffs, and from evidence of change in prices not shown to be attributable to other causes." In re Indus. Silicon Antitrust Litig., 1998 WL 1031507, *4 (W. D. Pa. Oct.13, 1998) (citations omitted).

"Once causation is determined,...the actual amount of damages may result from a 'reasonable estimate, as long as the jury verdict is not the product of speculation or guess work.'" Lower Lake Erie, 998 F.2d at 1176 (citing MCI Communications Corp. v. Am. Tel. & Tel. Co., 708 F.2d 1081, 1161 (7th Cir. 1983)). "The relaxed measure of proof is afforded to the amount, not the causation of loss- the nexus between the defendant's illegal activity and the injuries suffered must be reasonably proven." Id. However, a plaintiff's "burden of proving the fact of damage...is satisfied by its proof of some damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage." Danny Kresky Enter. Corp. v. Magid, 716 F.2d 206, 209-10 (3d Cir. 1983).

## D. ANALYSIS OF ORTHO'S DAUBERT CHALLENGES

In its Opening Post–Remand Class Certification Brief, Ortho raises numerous challenges to Dr. Beyer's methodologies for determining antitrust impact and damages under Daubert based on reliability and fit.[8] Those challenges were all previously raised in objection to Plaintiffs' Motion for Class Certification. Although the Court addressed the majority of Ortho's reliability challenges in its August 22, 2012 decision granting plaintiffs' Motion for Class Certification, the Court now assesses those challenges under Daubert in light of the Third Circuit's mandate. The Court addresses each of Ortho's challenges in turn.

### 1. Whether Dr. Beyer's OCV Benchmark Has Failed to Estimate "But– For" Prices Using Established Scientific Techniques

*10 Ortho argues that the OCV benchmark[9] is not a reliable means of estimating but–for prices between 2001 and 2005 because it does not rely on what it contends to be more established scientific techniques, such as regression analysis, but rather is based on cherry-picked Ortho documents. The Court rejects this argument.

Experts frequently use business plans in calculating damages. ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 292 (3d Cir. 2012). The Court "must perform a case–by–case inquiry to determine whether the expert's reliance on the business plan in a given case is reasonable." ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 292 (3d Cir. 2012). After a comprehensive review of the record, the Court finds that Dr. Beyer's reliance on OCV business records in calculating damages for the first part of the class period was reasonable, and concludes that plaintiffs have proved by a preponderance of the evidence that the OCV benchmark is a reliable and fit methodology under Daubert.

First, the OCV benchmark, which provides for annual 25% increases from 2001 through 2005 — resulting in a 305% price increase over five years in the but–for world — accounts for the duopoly market structure. The 25% OCV– based benchmark reflects plans Ortho formed and began to implement after the duopoly was created, thus reflecting its estimate of the prices it would be able to impose given the change in market structure. In re Blood Reagents Antitrust Litig., 283 F.R.D. at 244 (citing (Beyer Report ¶ 95));

2015-2 Trade Cases P 79,330

(7/26/12 Hr'g Tr. 312:14–16) (as OCV was planned after the duopoly was created, the OCV benchmark "holds constant the structure of this industry not from a competitive point of view, but as a duopoly").

Second, contrary to Ortho's assertion, OCV was not merely a consultant's recommendation or a select set of documents. (See Pls. Mot. Ex. 46.) To the contrary, OCV was a "concerted Ortho undertaking," (Beyer Reply ¶ 44), a corporate project, (7/26/12 Hr'g Tr. 311:25–312:2), in which defendant, with the assistance of the Norbridge consulting firm, "considered several price increase scenarios, conducted dozens of customer interviews, and drafted detailed communication plans." (Beyer Reply ¶ 44; Pls. Mot. Exs. 23, 45, 46.) The project was "designed," "acted upon," and subsequently "implemented" by "Senior Ortho employees." (7/26/12 Hr'g Tr. 312:18–19, 310–12; Pls.' Mot. Ex. 23, at 38 (listing Ortho executives on OCV implementation team)); see also In re Actiq Sales & Mktg. Practices Litig., No. 07–4492, 2014 WL 3572932, at *6 (E.D. Pa. July 21, 2014) (rejecting similar challenge by defendant against expert's use of defendant's internal documents in damages model because, inter alia, it was prepared by defendant company and produced to plaintiffs during discovery).

Third, OCV "demonstrated a prudent set of actions on the part of [Ortho] in the context of the duopoly...it accepted moderate risk" as it explicitly considered Immucor's response to the price increases and rejected larger price increases, (See, e.g., Pls.' Mot. Ex. 47, at 20–22, 39, 7/26/12 Hr'g Tr. 313–14). "[T]here was an attempt to quantify th[e] effect [of proposed price increases] and to demonstrate what the loss of revenue would be, and income." (7/26/12 Hr'g Tr. 314:3–5; 318:13–17 ("[I]t reflects an explicit consideration that I would expect as an economist, that a price increase may result in a loss of market share to a competitor and what the implication of that market share loss is....").)

**\*11** Finally, Dr. Beyer saw no evidence that OCV was tainted by cartel activity. As he explained, "I think most important is [that] I can find no business record, no deposition transcript ...to suggest that this action taken beginning late 1999 and into early 2000 was anything but independent, not coordinated behavior." (7/26/12 Hr'g Tr. 314:19–25; Beyer Report ¶¶ 97, 98).

Thus, the Court finds that the OCV plan was "the product of deliberation by experienced businessmen [within Ortho] charting their future course." See Autowest, Inc. v. Peugeot,

Inc., 434 F.2d 556, 566 (2d Cir. 1970) ("holding that damages testimony was admissible because the financial projections that were the basis for the testimony were the product of deliberation by experienced businessmen charting their future course"). As such, it provides a reliable basis for Dr. Beyer's benchmark methodology for the first part of the class period.

Although Ortho criticizes Dr. Beyer for failing to apply regression analysis to calculate damages, Daubert does not mandate the use of such econometric tools. In fact, Dr. Beyer and Dr. Bronsteen agreed that it would be difficult to apply regression analysis reliably in this case. (Beyer Reply ¶¶ 52, 53; 7/26/12 H'rg Tr. 244.) A reliable regression depends on "data with a reasonable degree of integrity." (Id. at ¶ 53.) As Dr. Beyer explained, there is no cost data available from Immucor prior to June 2001, and Ortho has only provided annual cost estimates, which it contends are unreliable. (Id.; see also infra n. 12) Furthermore, the demand measure relied upon by Dr. Beyer is only available every three years, rendering it an "unsuitable measure of demand in an econometric study." (Id.) Dr. Beyer thus concluded that a reliable regression is "best not used" in this case. (Id.) As a consequence, he proposed a set of alternative methodologies that, based on his extensive experience, he believed to be the most reliable and scientific manner in which to calculate damages incurred by individual plaintiffs. (7/26/12 Hr'g Tr. 310–15.)

The Court further concludes that this case is clearly distinguishable from the cases cited by Ortho in support of its argument. In ZF Meritor, LLC, the Third Circuit affirmed the district court's conclusion that plaintiff's expert report on damages based on a one–page set of plaintiff's profit and volume projections for its newly formed business was unreliable. 696 F.3d at 293. The Court held that "although [plaintiff's expert] was generally aware of the circumstances under which the [business plan projections were] created and the purposes for which [they were] used, he lacked critical information that would be necessary for [defendant] to effectively cross– examine him." Id. In this case, Dr. Beyer has relied on a corporate project planned and partially implemented by defendant. As this was Ortho's business plan, rather than an estimate based on plaintiffs' projections, Ortho certainly does not lack critical information necessary for Ortho to effectively cross–examine Dr. Beyer. See In re Actiq Sales & Mktg. Practices Litig., 2014 WL 3572932, at *6. Moreover, the 25% annual increase figure was not derived from a single document, but was based on a corporate pricing strategy implemented after Ortho achieved

its duopoly position in the TBR market. (See Pls.' Mot. Exs. 23, 45, 46)

In Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P., the Court rejected Dr. Beyer's damages methodology in a highly complex monopoly case because it relied on mischaracterized price predictions in defendant's predictive strategy documents and ignored equally reliable predictions found in the same internal documents. 247 F.R.D. 156, 166 (C.D. Cal. 2007). Again, in this case, Dr. Beyer does not rely on a few predictive strategy documents produced by Ortho, but a significant price increase plan, designed and implemented by senior Ortho executives. He has not mischaracterized select statements from the documents upon which he relies — the record evidence demonstrates that after Ortho obtained its duopoly market position, the company planned and actually began to implement annual price increases of 25% in an effort to restore financial health to the company's TBR business. (See Pls.' Mot. Ex. 45, at 1; see also Pls.' Mot. Ex. 47, at 13.)

**\*12** For all these reasons, the Court finds that Dr. Beyer's OCV methodology "provides reliable, relevant, and reasonable support for the assertion that damages can be estimated and quantified on a class–wide basis." In re Chocolate Confectionary Antitrust Litig., 289 F.R.D. 200, 212 (M.D. Pa. 2012).

### 2. Whether Dr. Beyer's OCV Benchmark is Premised on His "Ipse Dixit" About the Timing of Alleged Conspiracy

Defendant next argues that Dr. Beyer's OCV benchmark methodology is unreliable because, despite allegations in the Complaint that the conspiracy began "at least as early as January 1, 2000," it is premised on the conspiracy starting after November 1, 2000, but before November 21, 2000. Defendant contends that Dr. Beyer "conveniently chose the start date of the alleged conspiracy" during this three–week window in November, rather than relying on plaintiffs' allegations in the Complaint to "justify treating Ortho's OCV business plan as a benchmark for duopoly pricing." (Def.'s Post–Remand Br. 16.) The Court rejects this argument.

The Court concludes that this challenge implicates the weight a jury may give Dr. Beyer's testimony, not its admissibility. See In re Urethane Antitrust Litig., 768 F.3d 1245, 1263 (10th Cir. 2014) (defendant's "benchmark–shopping argument does

not implicate the reliability of [expert's] methodology"; refusing to reverse district court based on the defendants' argument that the plaintiffs' expert changed the class period start date to maximize damages); Kleen Products LLC v. International Paper, 306 F.R.D. 585, 603 (N.D. Ill. 2015) (concluding that defendants' argument that expert's damages model was unreliable because it relied on class period alleged in amended complaint, rather than the period initially alleged goes to weight of the testimony, not its admissibility).

Ortho cites no authority for excluding an expert's damages model because he assumed a conspiracy start date that was later than that which was initially alleged in the Complaint, and the Court declines to do so.[10] "[I]t is consistent with sound economic practice to review the factual record and formulate a hypothesis that can then be tested using economic theory — the examination of the factual record is necessary...to confirm that the stories drawn from the data and from the factual record are consistent." In re Processed Egg Products Antitrust Litig., No. 08–2002, 2015 WL 337224, at \*11 (E.D. Pa. Jan. 26, 2015). That is precisely what Dr. Beyer has done. Furthermore, his selection of the OCV benchmark is consistent with plaintiffs' theory of the case — that the November 2000 communications initiated the lengthy conspiracy that followed. See infra Section III(C)(3). By reason of this evidence, the Court amends the class definition to reflect the alleged start date of the conspiracy as November 4, 2000, the first day of the AABB meeting. See supra n. 2.

### 3. Whether Dr. Beyer's Selection of OCV Plan over BBLP Plan As Benchmark was Arbitrary

**\*13** Ortho argues that the OCV benchmark is arbitrary and unscientific because "the timing of OCV and BBLP, in relationship to what Dr. Beyer considers to be the onset of the alleged conspiracy, does not justify his selection of the first Ortho price plan and his disregard of the second." (Def.'s Post–Remand Br. 17.) More specifically, Ortho argues that it finalized plans for BBLP by at least September 2000 and began communicating with customers about the increase prior to the end of September and through October 2000, prior to November, when Dr. Beyer admits there is no evidence of cartel activity. (Id. at 18.) Moreover, Ortho contends that Dr. Beyer's selection of the OCV benchmark is unreliable because he has no factual information upon which to opine that the conspiracy began during the three–week window in November.

In re Blood Reagents Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015-2 Trade Cases P 79,330

The Court rejects this challenge. Dr. Beyer's use of the OCV plan over the BBLP plan as a benchmark is not arbitrary and unscientific. As discussed in its August 22, 2012 decision granting plaintiffs' Motion for Class Certification, Dr. Beyer's use of Ortho's OCV plan, rather than its BBLP plan aligns with "[p]laintiffs' theory — that Ortho began to consider the BBLP before the AABB meetings but would not have executed the plan without explicit assurance that Immucor would follow," and "is consistent with documents showing that the BBLP only became fully operational after the meetings." [11] In re Blood Reagents Antitrust Litig., 283 F.R.D. at 243.

Although Ortho now recasts its argument as a Daubert challenge, the Court's prior ruling remains undisturbed by the Third Circuit's mandate. The Court concludes that this alleged flaw in Dr. Beyer's methodology "may be explored at trial," and "the trier of fact may properly consider [any such] deficiencies in determining the weight to be accorded to his ultimate conclusions." Poust v. Huntleigh Healthcare, 998 F. Supp. 478, 498 (D.N.J. 1998); see Fleischman v. Albany Med. Ctr., 728 F. Supp. 2d 130, 150 (N.D.N.Y. 2010) ("Differences in expert opinion as to which benchmark is more reliable does not render [expert's] opinions unreliable.").

### 4. Whether Dr. Beyer Arbitrarily Shifted Start Date of OCV

Ortho contends that Dr. Beyer's OCV benchmark does not fit the facts of the case because he arbitrarily shifted the start date of OCV from 2000 to 2001 rendering his OCV benchmark arbitrary. In his initial report, based on OCV, Dr. Beyer increased but–for prices by 25% in 2000, but in his Reply Report, Dr. Beyer shifted the initial 25% increase under OCV to 2001. Ortho asserts that Dr. Beyer altered his calculation to reduce the number of TBR with actual prices below the but–for prices between 2000 and 2004.

The Court previously addressed this challenge, stating,

Dr. Beyer provides a persuasive explanation for the change. He explains that he shifted the first but–for price increase because the alleged price–fixing conspiracy did not begin to impact customers until 2001; neither defendant imposed its substantial price increases until early 2001. (Beyer Reply ¶ 73.) Thus, since plaintiffs do not allege that prices increased in 2000 due to unlawful collusion, "it is more

accurate for but–for prices to equal actual prices in 2000 and to have but–for prices only start diverging from actual prices in 2001." (Id.)

In re Blood Reagents Antitrust Litig., 283 F.R.D. at 244 n.14.

Although the Court must now evaluate defendant's challenge through the lens of Daubert, it remains unavailing for the reasons previously stated. To the extent this challenge is relevant, it goes to the probative value of Dr. Beyer's testimony, and may be challenged on cross–examination at trial. See In re Urethane Antitrust Litig., 768 F.3d at 1263 (defendant's "benchmark–shopping argument does not implicate the reliability of [expert's] methodology"); see also Crowley v. Chait, 322 F.Supp.2d 530, 540 (D.N.J. 2004) (stating that "Daubert does not require that an expert's testimony be excluded simply because he admitted and corrected his own mistakes," but rather, that such error correction "strengthens the quality of the expert [testimony]").

### 5. Whether Dr. Beyer Arbitrarily Transformed OCV from a Two–Year to Five–Year Plan

**\*14** Ortho next argues that the OCV benchmark is unreliable and does not fit the facts of the case because Dr. Beyer arbitrarily transformed OCV from a two–year to a five–year plan. Plaintiffs do not contest that the OCV plan was initially designed as a two–year plan. Rather they assert that OCV was designed and implemented to position Ortho for additional price increases after 2001, and that by the Fall of 2000, Ortho contemplated additional 25% annual increases as an alternative to implementing a more substantial "market correction" under the BBLP plan. Thus, they contend that Dr. Beyer's OCV benchmark, which provides for 25% annual increases through 2005, is reliable and fits the case under Daubert.

The Court finds that Dr. Beyer's use of the 25% annual increases from 2001 through 2005 as a benchmark is sufficiently reliable and fits the case, and thus satisfies Daubert. Dr. Beyer relied on several internal documents produced by Ortho that evidence that 1) the OCV plan was designed to position Ortho "for additional price increases" after 2001, (see Pls.' Mot. Ex. 23 ("The 25% + 25% price change balances risk, [and] positions OCD for additional price increases...."); Pls.' Mot. Ex. 45, at 1 (memo from Ortho president describing OCV strategy as "[i]ncreas[ing]

Case 4:21-cv-00196-MWB   Document 249-1   Filed 10/07/25   Page 30 of 482

In re Blood Reagents Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015-2 Trade Cases P 79,330

prices of traditional blood bank products across all customer segments by 25% in 2000 to be followed by an additional 25% increase in 2001 and tak[ing] increases yearly thereafter until profitability achieved"); and 2) that "5+ years of annual 25% price increases" was an alternative price increase strategy considered by Ortho prior to implementing the BBLP plan. (Pls.' Mot. Ex. 54, at 2–4, 10 (describing one strategy option as "stay the course," consisting of "5+ years of annual 25% price increases"); Pls. Mot. Ex. 55, at 5 (describing "upsides" of BBLP plan as "one major market correction vs. 5+ years of annual 25% price increases").)

The documentary evidence cited above is reinforced by the testimony of Ortho executives, which characterizes OCV as a "multi-year price increase strategy of approximately or targeted to near 25 percent year after year." (Hakanson Dep., Pls. Mot. Ex. 161, at 51:5–8; see also Kleinbard Dep., Pls. Mot. Ex. 162A, at 65:15–22 (OCV "was a price increase program that I believe was intended to occur over a number of years [ ] as opposed to, you know, a really, really big price increase...."); Gendusa Dep., Pls. Mot. Ex. 186A, 219:17-21 (in comparing OCV to BBLP, "I think the analogy was pull the band–aid off quick...take one big adjustment and stop having to go to the customers over and over again for smaller increments").)

Plaintiffs need not, for purposes of Daubert, conclusively demonstrate that the OCV plan would have been implemented through 2005 but for the alleged conspiracy. Such a requirement sets the bar too high. See Oddi v. Ford Motor Co., 234 F.3d 136, 156 (3d Cir. 2000). To satisfy Daubert, "[a]n expert's opinion, where based on assumed facts, must find some support for those assumptions in the record. However, mere weaknesses in the factual basis of an expert witness' opinion...bear on the weight of the evidence rather than on its admissibility." McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 801 (6th Cir. 2000) (citations and internal quotation marks omitted). Based on a thorough review of the record, the Court finds that there is sufficient support for Dr. Beyer's extrapolation of the 25% annual increases under OCV beyond 2001. See Id.; see also K.M.C. Co. v. Irving Trust Co., 757 F.2d 752, 765 (6th Cir. 1985) ("long–term projection based on profits annualized from [plaintiff's] operation over just a three month period" admissible where expert's "various figures and assumptions were not purely speculative, but were derived from financial data and competent testimony in the record and based on his personal experience and knowledge").

**\*15** Ortho may test Dr. Beyer's assumptions and conclusions with respect to his use of the OCV benchmark beyond 2001 through cross examination at trial. See Aetna, Inc. v. Blue Cross Blue Shield of Michigan, No. 11–15346, 2015 WL 1497826, at \*4 (E.D. Mich. Mar. 31, 2015) (reaching same conclusion where defendants argued that expert's long term projection of lost profits nine years into the future were unreliable where defendant had not made any business projections greater than three years).

### 6. Whether Dr. Beyer's OCV Benchmark Fails to Account for Salient Economic Factors

Ortho next argues that Dr. Beyer's OCV benchmark does not adjust for cost and demand in calculating the but–for price of TBR between 2001 and 2005, and is therefore unreliable under Daubert. On this issue, it asserts that its standard costs [12] and demand for TBR rose from 2001 through 2004, and that had Dr. Beyer accounted for those increases, it would have had a "huge impact" on his conclusions regarding antitrust impact. (7/26/12 Hr'g Tr. 195:4–14; 196:15– 197:6; Bronsteen Pres., 7/26/12 Hr'g, at 7.) The Court addresses defendant's arguments with respect to demand and costs in turn. [13]

#### i. Demand

**\*16** Although Ortho argues that "[a]ccounting for growth in demand [ ] would have increased Dr. Beyer's but-for prices," (Def.'s Post–Remand Opening Br. 11), the Court concludes that Dr. Beyer's decision not to account for demand in the OCV benchmark is not "so important as to render his analysis unreliable." In re Processed Egg Products Antitrust Litig., 2015 WL 337224, at \*16 (finding absent factors were not crucial to creation of reliable regression, and thus their absence did not render expert's damages model inadmissible).

First, there is record evidence that demonstrates that demand for TBR was "relatively stable" during the class period, and as such, accounting for demand would not impact Dr. Beyer's OCV benchmark methodology. (Beyer Reply ¶ 55 (citing Weiss Declaration ¶ 21).) Although there is evidence in the record showing that there was an annual growth rate of 2–3% for transfused and collected blood between 1999 and 2008, (Beyer Report ¶ 51), Dr. Beyer argues that defendants' transactional records show that demand for TBR during this

period actually declined as large blood banks and hospitals switched to using ABR. (See 7/26/12 Hr'g Tr. 345:6–347:1.) Moreover, Dr. Beyer and Dr. Bronsteen agree that they saw no evidence in the record that TBR price increases were caused by increases in aggregate demand for blood. (Beyer Report, ¶ 54; 7/26/12 Hr'g Tr. 261:2–3 (Dr. Bronsteen: "I don't think I have seen any documents that talk about prices increasing due to aggregate demand in the industry....").)

In any event, even assuming arguendo that demand for TBR increased 2–3% annually, the Court concludes that accounting for these minimal increases would not significantly impact Dr. Beyer's conclusions with respect to antitrust impact and damages in light of the substantial difference between but–for prices, which already account for price increases of 25% annually, and prices in the actual world. (See e.g. Beyer Pres., 7/26/12 Hr'g, at 28.) Thus, the Court will not exclude Dr. Beyer's OCV benchmark methodology on this ground.

## ii. Costs

Ortho argues that standard costs rose significantly from 2001 to 2004, and that accounting for those increases would have increased Dr. Beyer's predicted but–for prices. In support of its argument, Ortho cites to percentage increases in costs of raw materials of as much as 127% and 97% for different product lines from 2000 to 2004 as a reason for its 2005 price increases, (Def.'s Post–Remand Br. 10), and increases in average standard cost for certain TBR in certain years between 2002 and 2004 as greater than 25%, (Bronsteen Report Ex. 4A and 4B; Def.'s Opp. Ex. 120, at 7). Dr. Bronsteen argues that Dr. Beyer should have accounted for such cost increases by adding the raw percentage average annual cost increase to the annual 25% price increases already accounted for under the OCV benchmark. (7/26/12 Hr'g Tr. 196–97.) Accounting for cost increases in that way, according to Dr. Bronsteen, would result in decreasing gross profit margins in the but–for world, and raise but–for prices such that, in many cases, those prices would be higher than actual prices, thus eliminating impact.

In response, Dr. Beyer asserts that he has not ignored costs, as Dr. Bronsteen suggests. (7/26/12 Hr'g Tr. 323:11–14, 324–25.) Rather, he states that he has accounted for costs under his OCV benchmark methodology and that it is unnecessary and inappropriate to further account for any such cost increases. First, Dr. Beyer explains that under OCV, costs were held constant to evaluate each price increase and the resulting

response by Immucor to the price increase on an "apples to apples" basis. (7/26/12 Hr'g Tr. 327:5–18; 421:13–22.) As the OCV plan already accounted for costs in setting 25% annual increases, Dr. Beyer contends that he need not account further for them under the OCV benchmark. (Id.; 7/21/15 Hr'g 30.)

**\*17** Dr. Beyer argues that even if he did further account for costs, it would not have a significant impact on his calculations with respect to antitrust impact and damages. Specifically, he contends that Dr. Bronsteen has overstated the significance of any such cost increases by proposing to adjust the benchmark based on raw percentage increases rather than analyzing the incremental dollar amount increases in costs actually incurred. (7/26/12 Hr'g Tr. 323–26.) Put simply, Dr. Beyer explains that "a percentage increase in costs may seem large," but when the cost is at such a low level, as is the case for many TBR during the class period, those cost increases remain dwarfed by price increases. (7/26/12 Hr'g Tr. 324–25; Beyer Report figs. 1, 2, 3, 4.) In his Reply Report, Dr. Beyer accounts for such cost increases on a dollar amount basis to demonstrate that gross profit margins would still increase significantly in the but–for world, achieving 72% for Immucor, and 62% for Ortho, by 2005, contrary to Dr. Bronsteen's assertion. (7/26/12 Hr'g Tr. 336; Beyer Reply ¶ 55.)

The Court agrees with plaintiffs that Dr. Beyer has not ignored costs for the first part of the damages period. He has persuasively explained and analyzed [14] why such additional increases may not be necessary, but that even if they are, they would not so significantly affect his impact and damages calculations, such that his methodology should be stricken as inadmissible. (See Beyer Reply 23 tbls. 2, 3.) Dr. Bronsteen, in contrast, proposes a method of accounting for any such cost increases — a percentage cost adjustment from 2001 to 2005 that would distort the extent of cost increases during those years. (7/26/12 Hr'g Tr. 196; Beyer Report figs. 1, 2, 3, 4 (showing dramatic differences between price and cost for top-selling Immucor and Ortho TBR).) Moreover, as noted in the Court's August 22, 2012 decision, Dr. Bronsteen did not "perform any analysis to support his suspicion" that accounting for such costs would have increased but–for prices such that plaintiffs would be unable to prevail on the merits. In re Blood Reagents Antitrust Litig., 283 F.R.D. at 244 n.13.

At the post–remand hearing on July 22, 2015, Ortho raised, for the first time, an additional argument with respect to costs. Ortho contends that it had significant "Costs Not in Standard," such that had Dr. Beyer relied on Ortho's actual cost data,

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 32 of 482

In re Blood Reagents Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015-2 Trade Cases P 79,330

rather than its standard cost data, Ortho's gross profit margins would have been in the negative in the but–for world he created. In support of that assertion, defendant relies on one document dated October 17, 2008, that it submitted to the FTC showing that actual cost data between 2003 and 2008 is higher than its standard costs. (See Pls.' Mot. Ex. 171.)

The Court is not persuaded that the October 17, 2008 document renders Dr. Beyer's methodology inadmissible. First, the Court notes that Dr. Beyer did not have any way to analyze or verify the reliability of the data underlying that FTC document, as actual cost data has not been submitted to the Court, nor produced in discovery. See Perma Research & Dev. Co. v. Singer Co., 402 F. Supp. 881, 899 (S.D.N.Y. 1975) ("It has been held repeatedly that where the defendant renders the determination of damages difficult, he must bear the risk of uncertainty created by his own conduct.") (citations omitted), aff'd sub nom., Perma Research & Dev. v. Singer Co., 542 F.2d 111 (2d Cir. 1976). In fact, defendant's own economic expert, Dr. Bronsteen, testified that Dr. Beyer "made the right decision in not using Ortho's cost data." [15] (7/26/12 Hr'g 245:11–12.) Moreover, as plaintiffs explained in the Post-Remand Hearing, extracting actual cost figures from the FTC submission at issue and inputting them into Dr. Beyer's but–for world is essentially comparing apples to oranges. The figures submitted to the FTC rely on different transactional data than the figures provided to plaintiffs, and relied upon by Dr. Beyer in this case. (Compare Pls.' Mot. Ex. 171 with Beyer Report tbl. 2). Finally, the document provides no actual cost data at all for 2001 and 2002.

**\*18** Thus, the Court will not exclude Dr. Beyer's OCV benchmark methodology on this basis, and concludes that the question of whether certain "Costs Not in Standard" should have been accounted for in Dr. Beyer's methodology is "more a question of the accuracy of [his] analysis, not necessarily the methodology [he] used in conducting [his] analysis." In re Actiq Sales & Mktg. Practices Litig., 2014 WL 3572932, at \*9 (rejecting defendant's argument that expert's damages model should be excluded for failing to include certain categories of costs that defendant asserted resulted in inaccurate representations of its profitability).

In sum, the Court finds that plaintiffs have met their burden in establishing that OCV is a reliable and fit benchmark, and that further consideration of cost and demand from 2001 and 2005 would not impact Dr. Beyer's OCV benchmark methodology in such a way as to render his methodology inadmissible. These alleged flaws are appropriate fodder for

cross examination at trial, and Ortho may argue to a jury that further accounting for cost and demand would have resulted in a more precise model. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 580 ("Vigorous cross–examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.") (citation omitted); see also Edwards v. Nat'l Milk Producers Fed'n, No. 11–04766, 2014 WL 4643639, at \*6 (N.D. Cal. Sept. 16, 2014) (holding that expert's failure to consider relevant factors went to the weight of the evidence as opposed to admissibility).

### 7. Whether Dr. Beyer's Use of One Annual But–For Price is Incompatible with Price Dispersion after 2004

Ortho next challenges Dr. Beyer's averaging of but–for prices for TBR after 2004, despite price dispersion in the actual world. Ortho asserts that instead of matching Ortho's price increases, Immucor began to implement its "pricing differentiation strategy" and "price protection plan" to gain additional market share from Ortho in 2004. Ortho also avers that the unreliability of Dr. Beyer's single but–for price is compounded by the fact that there was price dispersion within Immucor's customer base.

In a recent decision addressing Daubert challenges in an antitrust action, Judge Pratter explained with respect to averaging,

> The use of averages in a common impact analysis is controversial, and courts have come down on both sides of the issue at the class certification stage. There is no binding Third Circuit precedent on point, but there are a number of district court opinions discussing the issue, albeit difficult to reconcile...Essentially, the case law seems to compel the court to view averages as at least somewhat suspect, but not as fatally flawed so long as (1) the differentiation among the data being averaged is not so great as to make the use of averages misleading; and (2) there are other indicia that the

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 33 of 482

In re Blood Reagents Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015-2 Trade Cases P 79,330

averages are not concealing the true
story of the data.

In re Processed Egg Products Antitrust Litig., 2015 WL
337224, at *15.

Under these standards, the Court concludes that Dr. Beyer's
use of averaging in the but– for world does not render his
post-2005 damages methodologies inadmissible. First, the
Court concludes that the variance in pricing for TBR in the
actual world was not so significant as to render the use of
averages in the but–for world misleading. Defendant cites
to certain transactional data relied upon by Dr. Beyer to
demonstrate that some Immucor customers paid six times
what other customers paid for particular TBR in 2009.
(Beyer Reply 42, Tbl. 10.) This variance, however, is not
representative of variance among Immucor pricing overall for
other TBR after 2005. (See Beyer Reply, tbls. 6, 7, and 10.)
Pricing was significantly less varied prior to 2009. (See Beyer
Rep., figs. 7, 8, 9, 10.) Moreover, most Ortho customers paid
identical or nearly identical prices throughout the class period.
(Id. at 77 figs. 5–6.)

 *19  Second, in contrast to cases cited by defendant, Dr.
Beyer's use of averaging is limited. Dr. Beyer has established
a separate but–for price for each type of reagent for each
year — constructing more than 2,100 but–for prices for
the different TBR products during the class period. (Beyer
Reply ¶ 90.) Moreover, he does not rely on averages in
the actual world at all; Dr. Beyer has explained that he
will utilize the prices actually paid by defendants' customers
in calculating the damages incurred by individual plaintiffs
(Reply ¶¶ 90–93 ("Because the customer transaction data
is contained in a single database for each defendant and
because the formula is common for all class members, it will
be straightforward to calculate class–wide damages at the
merits stage of the litigation.")); Compare Reed v. Advocate
Health Care, 268 F.R.D. 573 (N.D. Ill.2009) (rejecting expert
testimony where prices were averaged in both actual world
and but-for world). In sum, Dr. Beyer "did much more than
simply compare a monthly average [TBR] price in the actual
and 'but–for' worlds to demonstrate common impact." In re
Flonase Antitrust Litig., 284 F.R.D. 207, 229 (E.D. Pa. 2012)
(rejecting similar challenge).

Finally, as the Court explained in its August 22, 2012
decision, "[w]hat Ortho proposes would exponentially
complicate the calculation of damages in this type of

case. As Dr. Beyer testified, it would require plaintiffs
to estimate 'almost a million' different but–for prices....."
In re Blood Reagents Antitrust Litig., 283 F.R.D. at
243 (internal citations omitted). Although it may be
possible to construct a benchmark that estimates a separate
but–for price for every transaction, Dr. Beyer would
have "no basis other than speculation to estimate [those
prices] quantitatively." (7/26/12 Hr'g 492:18–20). Such
an approach would in fact be less reliable "due to the
'potential...arbitrariness of the assumptions' he would need to
make and the resulting introduction of 'potential error that [he]
wouldn't be able to quantify.'" See Cason–Merenda v. Detroit
Med. Ctr., No. 06–15601, 2013 WL 1721651, at *10 (E.D.
Mich. Apr. 22, 2013) (rejecting same challenge by defendant).

Ortho again fails to cite any case in which plaintiffs were
required to estimate a different but–for price for each and
every individual transaction, as Ortho urges the Court to
require in this case. See In re Cathode Ray Tube (CRT)
Antitrust Litig., No. 07–5944, 2015 WL 4127859, at *21
(N.D. Cal. July 8, 2015) ("[A]ttacking averaged data is a
standard defense tactic in antitrust cases, so it is unsurprising
that courts have often evaluated and approved the appropriate
use of averages."). Nor has defendant conducted any
empirical analysis to confirm that averaging but– for prices
for each TBR in each year "results in any significant bias." In
re Polypropylene Carpet Antitrust Litig., 93 F. Supp. 2d 1348,
1367 (N.D. Ga. 2000) (declining to find plaintiffs' damages
model inadmissible due to their expert's aggregation of data
because although defendant's expert was "'troubled' by this
point, [he] ha[d] conducted no empirical analysis to determine
if in fact the aggregation of quarterly transactions result[ed]
in any significant bias").

For all these reasons, the Court concludes that Dr. Beyer's
use of averaging is not an attempt to evade plaintiffs' burden
of showing common impact and damages. Compare Reed,
268 F.R.D. at 589 (rejecting use of averaging where in
Court's view "plaintiffs ha[d] been coy about their theory of
common impact and their proposed damages methodology").
Rather, the Court is persuaded that this is a reliable means
of demonstrating that nearly all customers who purchased
TBR paid more than they would have in the absence of
the alleged conspiracy, and of measuring those overcharges.
(Beyer Reply ¶¶ 102–05); see In re Wellbutrin XL Antitrust
Litig., 282 F.R.D. 126, 144 (E.D. Pa. 2011) ("The use of
averages in this case does not mask meaningful variations
in overcharges, and it provides a reliable method to provide
a reasonable estimate of the damages based on relevant

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 34 of 482

In re Blood Reagents Antitrust Litigation, Not Reported in Fed. Supp. (2015)
2015-2 Trade Cases P 79,330

purchase data." Thus, the Court concludes that variance in pricing for TBR in the actual world does not render Dr. Beyer's methodologies, which use limited averaging, "inexorably unreliable or unhelpful for Daubert purposes." In re Processed Egg Products Antitrust Litig., 2015 WL 337224, at *15.

### 8. Whether Dr. Beyer's Post-2005 Cost–Margin Benchmark is Unreliable

**\*20** Ortho next challenges Dr. Beyer's use of the cost–margin benchmark to calculate damages incurred from 2006 through the end of the class period. Under Dr. Beyer's cost–margin benchmark, "but–for price[s] change[ ] at the same percentage rate as cost of goods sold." (Beyer Report ¶ 101.) Dr. Beyer relies on Immucor cost data to determine changes in costs under this methodology. Ortho argues that Dr. Beyer's proposed Immucor cost benchmark is unreliable because it ignores other price determinants such as market structure and demand, and because Immucor costs are not a reliable proxy for Ortho costs. The Court rejects these arguments.

Dr. Beyer's use of the cost–margin approach to establish but–for prices after 2005 is a reliable methodology for estimating damages. See In re Online DVD Rental Antitrust Litig., No. 09–2029, 2010 WL 5396064, at *9 (N.D. Cal. Dec. 23, 2010) ("The proposed methodologies that Dr. Beyer sets forth in order to analyze the existence of impact upon the class members — the cost–margin analysis and benchmark approach — are also well-established and find support in the economic literature."), aff'd sub nom., In re Online DVD–Rental Antitrust Litig., 779 F.3d 934 (9th Cir. 2015); In re Dynamic Random Access Memory (DRAM) Antitrust Litig., No. 02– 1486, 2006 WL 1530166, at *10 (N.D. Cal. June 5, 2006) (upholding cost–margin approach at the class certification stage); see also Theon van Dijk and Frank Verboven, Quantification of Damages, 3 Issues In Competition Law And Policy 2331 (ABA Section of Antitrust Law 2008) (discussing cost–markup method of quantifying damages in the absence of appropriate benchmark prices).

Dr. Beyer's cost–margin methodology accounts for market structure, i.e. the duopoly, by maintaining defendants' high gross profit margins achieved by 2005 in the but–for world — 62% for Ortho and 72% for Immucor —throughout the entirety of the class period. (Beyer Report ¶ 101; Beyer Reply 23 tbls. 2, 3.) Dr. Beyer's assumption under the cost–margin approach that "the full amount of variable

costs of manufacturing blood reagents would be passed on to purchasers" directly contrasts "with how the traditional reagents market operated prior to the beginning of the Class Period, when there was intense competition and an inability to increase prices as costs rose." [16] (Beyer Reply ¶ 56; see also In re Blood Reagents Antitrust Litig., 283 F.R.D. at 244 (citing Beyer Report ¶ 101).)

Moreover, the failure to account for demand does not render plaintiffs' cost–margin methodology inadmissible. As the Court discussed supra, there is record evidence demonstrating that the TBR market remained stable during the class period and both experts concede that there is no evidence in the record that TBR price increases were due to increases in demand. See supra Section III(D)(6)(i). Furthermore, even if demand for TBR increased between 2–3% annually, after 2005, which is not clearly demonstrated by the available data, accounting for any such marginal increases in demand in the but–for world would not significantly impact Dr. Beyer's conclusions with respect to antitrust impact and damages, and thus does not render Dr. Beyer's methodology unreliable under Daubert. Id. [17]

**\*21** Finally, the Court concludes that Dr. Beyer has sufficiently demonstrated that year–to– year changes in Immucor cost data are an adequate proxy for the year–to–year changes in Ortho's costs for purposes of calculating damages under the cost–margin approach after 2005 under Daubert. Ortho and Immucor manufactured traditional blood reagents from similar raw materials and were subject to the same regulatory environment. (Beyer Report ¶ 56.) Furthermore, there is no evidence to support Dr. Bronsteen's "speculation" that Ortho's costs may have been rising faster than Immucor's costs after 2005. (Id.) In fact, Dr. Beyer notes that the standard cost data produced by Ortho actually shows costs falling during certain years, which would result in lower but–for prices. (Id.)

Ortho again ignores the fact that the only reason Dr. Beyer relies on the year–to–year changes represented in Immucor's cost data as a proxy for Ortho's changes in cost is the fact that Ortho has not provided any reliable cost data upon which he can rely. (See 7/26/12 Hr'g 245:11–12) (Dr. Bronsteen: "He [Dr. Beyer] made the right decision in not using Ortho's cost data."). It is unclear what alternative data Dr. Beyer could have used in applying the cost– margin approach, as defendant has not demonstrated that more reliable data is available. See In re Actiq Sales & Mktg. Practices Litig., 2014 WL 3572932, at *7 (concluding that plaintiffs' expert had

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 35 of 482

In re Blood Reagents Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015-2 Trade Cases P 79,330

good grounds for relying on defendant's internal document with estimates of costs for particular products from after class period, to calculate product–level profitability, where, inter alia, "it was unclear" what better data existed, and "there ha[d] been no suggestion by [defendants] that better data was available").

The Court concludes, under these circumstances, Dr. Beyer has good grounds for employing the cost–margin approach for the latter half of the class period, using annual changes in Immucor costs as a proxy for changes in Ortho's costs. Thus, Dr. Beyer's cost–margin methodology for calculating damages after 2005 is admissible.

### 9. Whether Use of the RhoGAM Yardstick is Unreliable

Finally, Ortho challenges Dr. Beyer's use of RhoGAM as a yardstick to calculate damages after 2005. Dr. Beyer's yardstick methodology calculates but–for prices for TBR products based on the price behavior of RhoGAM, Ortho's brand of Rho(D) — a prescription pharmaceutical that is administered to pregnant women — during the same period. (Beyer Report ¶ 102.)

Defendant does not dispute the use of a non–TBR yardstick as a methodology for determining antitrust impact and quantifying antitrust damages. See Eleven Line, Inc. v. N. Tex. State Soccer Ass'n, Inc., 213 F.3d 198, 207 (5th Cir. 2000) (noting that "the two most common methods of quantifying antitrust damages are the 'before and after' and 'yardstick' measures"); see also In re Linerboard Antitrust Litig., 305 F.3d 145, 153–55 (3d Cir. 2002) (accepting use of yardstick method for determining antitrust impact and damages on class–wide basis). Ortho challenges the proposed use of the RhoGAM yardstick only on comparability grounds, asserting that there are significant differences in the markets, costs, and demand for TBR and RhoGAM. The Court disagrees, and concludes that Dr. Beyer's proposed RhoGAM yardstick methodology is reliable and fit under Daubert.

Plaintiffs bear the "burden of proving comparability" of their proposed RhoGAM yardstick. Home Placement Serv., Inc. v. Providence Journal Co., 819 F.2d 1199, 1207 (1st Cir. 1987). What is required with respect to comparability of a proposed yardstick product at the Daubert stage is unsettled. Several courts, however, have ruled that under Daubert, "exact correlation is not necessary...the products need only

be fair congeners." [18] Loeffel Steel Products, Inc. v. Delta Brands, Inc., 387 F. Supp. 2d 794, 812 (N.D. Ill. 2005).

**\*22** The Court gleans from that decision, as well as others discussing the showing of comparability that is required under Daubert, that a proposed yardstick must be rejected as inadmissible where the expert testimony is so deficient that the "comparison is manifestly unreliable and cannot logically advance a material aspect of the proposing party's case." Loeffel Steel Products, Inc. 387 F. Supp. 2d 7 at 812 (internal quotation marks omitted). This generally occurs when an expert has failed to perform any substantive analysis of those factors most relevant to comparability. See e.g., Loeffel Steel Products, Inc. v. Delta Brands, Inc., 387 F. Supp. 2d 794, 813 (N.D. Ill. 2005) (rejecting testimony on proposed yardstick where expert "admitted he knew nothing about the respective geographic or product markets or customer bases of the eight companies or of the quality of service or any other relevant factor that would bear upon the question of comparability"); Eleven Line, Inc. v. North Texas State Soccer Ass'n, Inc., 213 F.3d 198 (5th Cir.2000), (rejecting different soccer arenas as comparable businesses at summary judgment where no evidence offered regarding geographical location, size or attractiveness of facilities, size and type of the market served, relative costs of operation, amounts charged, or the number years facilities were run). Ortho has not identified any such deficiencies with respect Dr. Beyer's RhoGAM analysis in this case, nor has the Court.

To the contrary, Dr. Beyer has adequately accounted for the relevant factors, such as "product, firm, and market comparability" in selecting the RhoGAM yardstick. Home Placement Serv., Inc. v. Providence Journal Co., 819 F.2d 1199, 1206 (1st Cir. 1987). Dr. Beyer selected RhoGAM because of the following: (1) the Rho(D) market is a "highly concentrated oligopoly," (2) RhoGAM is an Ortho product, and Ortho had significant market power in the Rho(D) market; (3) demand for Rho(D) is inelastic, (4) the Rho(D) market features high barriers to entry due to FDA regulation, (5) RhoGAM is interchangeable with other Rho(D) products, (6) the same hospitals that were the largest TBR customers also purchased Rho(D), in fact 74% of Ortho RhoGAM customers also purchased TBR, (7) demand for Rho(D) was relatively stable throughout the damages period, and (8) prices for Rho(D) were set based on "the level of competitiveness in the market rather than on cost or demand factors." (In re Blood Reagents Antitrust Litig., 283 F.R.D. at 242 (citing Beyer Reply ¶¶ 61–67); 7/26/12 Hr'g Tr. 329–34.)

Ortho vigorously contests Dr. Beyer's conclusion that the demand and market for the two products were comparable during the latter half of the class period.[19] With respect to demand, the Court is unpersuaded that any differences in demand render Dr. Beyer's RhoGAM yardstick inadmissible. Although Ortho asserts that demand for blood reagents increased substantially during the class period, Dr. Beyer has pointed to evidence that demand was "relatively stable," or increased only incrementally, see supra Section III(D)(6)(ii), just as demand for RhoGAM did during the class period. (See Beyer Reply ¶ 66.) In any event, one of the key factors that Dr. Beyer considered and relied upon in assessing comparability between the two products is the fact that prices for both products were primarily driven by competition in the market, not cost and demand. (Beyer Reply ¶ 67 (and citations therein)). Thus, even if the demand for the two products differed, it would not render the RhoGAM yardstick so dissimilar as to be inadmissible.

**\*23** With respect to differences in the market for the two products, Ortho contends that the presence of a third firm in the Rho(D) market renders RhoGAM an unreliable yardstick. In support of that contention, Ortho relies on evidence that the average RhoGAM selling price increased substantially in the late 1990s when the market for Rho(D) became a duopoly, (see Def.'s Opp. Ex. 123, Kleinbard Decl. ¶ 16), but declined from more than $82.59 per dose in 2003 to an average price of $77.13 per dose by 2004, due to the entrance of a third competitor, Rhophylac, into the market. (Id. at ¶ 25). Dr. Beyer, in contrast, asserts that although the Rho(D) market was a three–firm oligopoly during the latter part of the class period, effectively, there were only two firms operating. (Id. at ¶ 61; 7/26/12 Hr'g 331:1–7.) Specifically, he states that when the third competitor entered the market in 2004, it acquired substantial market share by price competition; whereas Bayer, which had been one of the duopoly partners, became a passive participant, and its market share declined substantially. (Id. at 331:14–19; Beyer Reply ¶ 61.)

The Court concludes that, although there is some evidence in the record that undermines Dr. Beyer's conclusion that Bayer was a passive market participant, Dr. Beyer's comparability analysis passes muster under Daubert. Dr. Beyer has examined the discovery produced in this case, including underlying documents and relevant depositions, and defendants' transactional data for TBR and RhoGAM. Based on that examination, he has proffered a "number of bases upon which he builds his comparison," accounting for those factors most relevant to a comparison between

RhoGAM and TBR. See Washington v. Kellwood Co., No. 05–10034, 2015 WL 2258098, at \*17 (S.D.N.Y. Apr. 21, 2015) (rejecting comparability challenge under Daubert where plaintiffs' expert "proffer[ed] a number of bases upon which he builds his comparison," and "examined a number of underlying documents, including...relevant depositions and case documents"); see also R.F.M.A.S., Inc. v. So, 748 F. Supp. 2d 244, 269 (S.D.N.Y. 2010) ("Unless the information or assumptions that plaintiff's expert [ ] relied on were 'so unrealistic and contradictory as to suggest bad faith,' inaccuracies in the underlying assumptions or facts do not generally render an expert's testimony inadmissible.") (quoting Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC, 571 F.3d 206, 214 (2d Cir.2009)).

"While defendant and its expert may take issue with the ultimate conclusions that can reasonably be drawn from the evidence, we leave it to [defendant's] no–doubt robust efforts at trial to call into question the weight that the jury should accord [Dr. Beyer's] testimony." Washington, 2015 WL 2258098, at \*17. The Court's intervention at this stage would be inappropriate. Id.; Daubert, 509 U.S. at 596.

## E. DAUBERT CONCLUSION

The Court concludes that Dr. Beyer reliably estimated the alleged overcharge caused by the defendants' alleged price–fixing conspiracy, and that his methodologies fit the facts of this case. "[S]hould the jury find that defendants conspired to fix prices, [Dr. Beyer's] proffered testimony will assist the jury in determining the amount of damages, if any, that plaintiffs incurred as a result of that conspiracy." In re Indus. Silicon Antitrust Litig., No. 95–1131, 1998 WL 1031507, at \*4 (W.D. Pa. Oct. 13, 1998). Thus, Dr. Beyer's testimony with respect to his proposed damages methodologies is admissible under Daubert.

## IV. RECERTIFICATION OF THE CLASS

Ortho raises only one argument with respect to class certification in the post–remand proceedings — that plaintiffs cannot comply with Rule 23(b)(3)'s predominance requirement because Dr. Beyer's damages methodologies, which plaintiffs rely on as common proof of antitrust impact and damages, are inadmissible. As the Court has determined that Dr. Beyer's damages methodologies are admissible under Daubert, Ortho's argument with respect to predominance is rejected.

The Third Circuit mandate only impacts the Court's August 22, 2012 decision granting plaintiffs' Motion for Class Certification to the extent it relied on Behrend v. Comcast. Nevertheless, because the Third Circuit vacated the Court's Order granting class certification, the Court analyzes all of the Rule 23(a) and Rule 23(b)(3) requirements under the evidence presented. In doing so, the Court includes those parts of its previous analysis in the August 22, 22, 2012 decision that are not affected by the Third Circuit mandate.

### A. LEGAL STANDARD

**\*24**  Subsection (a) of Federal Rule of Civil Procedure 23 sets out four prerequisites for a class action. The Rule 23(a) requirements are known as numerosity, commonality, typicality, and adequacy. Subsection (b) provides additional requirements for each type of class action. To obtain certification under Rule 23(b)(3), as plaintiffs seek to do in this case, the moving party must show "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). These requirements are known, respectively, as predominance and superiority.

A district court must conduct a "rigorous analysis" in deciding whether to certify a class. See, e.g., In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 306. "[T]he decision to certify a class calls for findings by the court, not merely a 'threshold showing' by a party, that each requirement of Rule 23 is met." Id. at 307. "Factual determinations supporting Rule 23 findings must be made by a preponderance of the evidence." Id.

Moreover, "the court must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits — including disputes touching on elements of the cause of action." Id. at 307. However, "there is no 'claims' or 'merits' litmus test incorporated into the predominance inquiry beyond what is necessary to determine preliminarily whether certain elements will necessitate individual or common proof." Sullivan v. DB Invs., Inc., 667 F.3d 273, 305 (3d Cir. 2011). "[A] district court may inquire into the merits of the claims presented in order to determine whether the requirements of Rule 23 are met, but not in order to determine whether the individual elements of each claim are satisfied." Id. "Finally, the court's obligation to consider all relevant evidence and arguments extends to expert testimony, whether

offered by a party seeking class certification or by a party opposing it." Hydrogen Peroxide, 552 F.3d at 307.

### B. DISCUSSION

During the course of the litigation, Ortho has not disputed that the Rule 23(a) requirements and the Rule 23(b)(3) superiority requirement are satisfied. Nor has defendant challenged the closely tied preliminary inquiries of whether plaintiffs provide a proper class definition and whether the class is ascertainable. The Court thus addresses those issues only briefly and concentrates its analysis on the Rule 23(b)(3) predominance requirement — the focus of Ortho's opposition to plaintiffs' Motion for Class Certification. After a rigorous analysis of the evidence and argument offered by both parties, the Court concludes that plaintiffs have established all of the Rule 23(a) and Rule 23(b)(3) requirements by a preponderance of the evidence.

### 1. Class Definition and Ascertainability

"There are two 'essential prerequisite[s]' to class certification under Rule 23(b)(3): (1) a 'clearly defined class and set of claims, issues, or defenses to be given class treatment'; and (2) 'the class must be currently and readily ascertainable based on objective criteria.'" King Drug Co. v. Cephalon, Inc., No. 06– 1797, 2015 WL 4522855, at *3 n.6 (E.D. Pa. July 27, 2015) (quoting Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 592–93 (3d Cir. 2012)). The class is defined as follows:

> All individuals and entities who purchased traditional blood reagents in the United States directly from defendants Immucor, Inc., and Ortho–Clinical Diagnostics, Inc. at any time from November 4, 2000 [20] through the present. Excluded from the Class are defendants, and their respective parents, subsidiaries and affiliates, as well as any federal government entities.

**\*25**  Defendant has not challenged plaintiffs' class definition at any stage of the litigation, and the Court concludes that the class is clearly defined.

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 38 of 482

In re Blood Reagents Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015-2 Trade Cases P 79,330

With respect to ascertainability, the "inquiry is two-fold, requiring a plaintiff to show that: (1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'" Byrd v. Aaron's Inc., 784 F.3d 154, 163 (3d Cir. 2015) (quoting Hayes v. Wal–Mart Stores, Inc., 725 F.3d 349, 355 (3d Cir. 2013)). Defendant has not argued that plaintiffs' class is not ascertainable. The Court nevertheless concludes that class members can be ascertained by means of defendants' purchase data files. See In re Processed Egg Products Antitrust Litig., 302 F.R.D. 339, 348 (E.D. Pa. 2014) ("Use of company databases constitutes a reliable and feasible method for ascertaining Class Members...."); King Drug Co., 2015 WL 4522855, at *3 (upholding class as ascertainable where plaintiffs identified all potential class members using defendant's records). Thus, the Court determines that the class members are ascertainable from objective criteria by means of an administratively feasible mechanism.

### 2. Rule 23(a) Requirements

#### i. Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Satisfaction of this standard "does not require evidence of the exact number or identification of the members of the proposed class." In re Linerboard Antitrust Litig., 203 F.R.D. 197, 205 (E.D. Pa. 2001). "'Generally, if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the numerosity requirement of Rule 23(a) has been met.'" In re OSB Antitrust Litig., No. 06–826, 2007 WL 2253418, at *2 (E.D. Pa. Aug. 3, 2007) (quoting Ketchum v. Sunoco, Inc., 217 F.R.D. 354, 357 (E.D. Pa. 2003)).

In this case, transactional data produced by defendants shows that thousands of customers purchased TBR directly from defendants during the class period. (See, e.g., Beyer Reply 54–55.) This renders joinder highly impracticable and satisfies the numerosity requirement.

#### ii. Commonality

To satisfy Rule 23(a)(2), there must be "questions of law or fact common to the class." Satisfaction of the commonality requirement requires that plaintiffs demonstrate that their claims "depend upon a common contention," the resolution of which "will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal–Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011). "Commonality does not require an identity of claims or facts among class members; instead, [t]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." Johnston v. HBO Film Mgmt., Inc., 265 F.3d 178, 184 (3d Cir. 2011) (internal quotation marks omitted); see also Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 597 (3d Cir. 2012).

**\*26** "Courts interpreting the commonality requirement in the antitrust area have held that allegations concerning the existence, scope and efficacy of an alleged conspiracy present questions adequately common to class members to satisfy the commonality requirement." Linerboard, 203 F.R.D. at 205 (internal quotation marks omitted); see also, e.g., In re Bulk (Extruded) Graphite Prods. Antitrust Litig., No. 02–6030, 2006 WL 891362, at *5 (D.N.J. Apr. 4, 2006). In this case, plaintiffs' allegations include a number of common issues, including (1) whether defendants conspired to raise, fix, maintain and/or stabilize the price of blood reagents in the United States, (2) the duration of the conspiracy, and (3) the nature and character of the acts performed by defendants in furtherance of the conspiracy. "Resolving the allegations surrounding" defendants' alleged conduct in conspiring to fix TBR prices "will resolve issues that are 'central to the validity of each one of the claims in one stroke.'" In re Flonase Antitrust Litig., 2012 WL 2277840, at *8. This suffices to satisfy the commonality requirement.

#### iii. Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). To conduct the typicality inquiry, the court must examine "whether the named plaintiffs' claims are typical, in common– sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class." Beck v. Maximus, Inc., 457 F.3d 291, 295–96 (3d Cir. 2006). "The typicality requirement is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees." Georgine v. Amchem Prods., Inc., 83 F.3d 610, 631 (3d Cir. 1996). "If a plaintiff's claim arises from the same event, practice or course

of conduct that gives rise to the claims of the class members, factual differences will not render that claim atypical if it is based on the same legal theory as the claims of the class." Marcus, 687 F.3d at 598.

In this case, plaintiffs allege that the same unlawful conduct injured the class representatives and the absent class members. All members of the putative class are direct purchasers of TBR and allege that they made their purchases at supracompetitive prices. This is sufficient to satisfy the typicality requirement. See, e.g., In re Flat Glass Antitrust Litig., 191 F.R.D. 472, 480 (W.D. Pa. 1999) ("[T]he named class members' claims, as well as the claims of the proposed classes, arise from the alleged price–fixing scheme perpetrated by defendants[,] [which is] the linchpin of plaintiffs' amended complaint, regardless of the product purchased, the market involved or the price ultimately paid.").

### iv. Adequacy of Representation

Rule 23(a)(4) requires plaintiffs to show that "the representative parties will fairly and adequately protect the interests of the class." "Whether adequacy has been satisfied 'depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class.'" McDonough v. Toys R Us, Inc., 638 F. Supp. 2d 461, 477 (E.D. Pa. 2009) (quoting New Directions Treatment Servs. v. City of Reading, 490 F.3d 293, 313 (3d Cir. 2007)). "The second factor 'seeks to uncover conflicts of interest between named parties and the class they seek to represent.'" Id. (quoting In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 532 (3d Cir. 2004)).

The first element — the qualification of plaintiffs' attorneys — is satisfied. Plaintiffs' lead counsel has extensive experience in complex antitrust class actions and has ably performed his duties as interim class counsel. The Court concludes that plaintiffs' counsel are "qualified, experienced, and generally able to conduct the proposed litigation." New Directions, 490 F.3d at 313.

**\*27** As to the second element, there is no evidence of any conflict of interest between the named plaintiffs and the absent members of the putative class. Each class member allegedly purchased TBR directly from Ortho or Immucor during the class period at a supracompetitive price. "Each class member holds a strong common interest in establishing

[defendants'] liability for these alleged overcharges." Flonase, 2012 WL 2277840, at \*9.

The Court thus finds that the adequacy requirement is satisfied.

### 3. Rule 23(b)(3) Requirements

To obtain class certification under Rule 23(b)(3), plaintiffs must also demonstrate predominance and superiority by a preponderance of the evidence.

### i. Predominance

Predominance is the only certification requirement contested by defendant. In the post– remand proceedings, Ortho only argues that plaintiffs' cannot satisfy Rule 23(b)(3)'s predominance requirement to the extent discussed supra. For the sake of completeness, the Court nevertheless addresses all the predominance challenges initially raised by defendant in opposition to plaintiffs' Motion for Class Certification.

Rule 23(b)(3) requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "This predominance test asks whether common issues of law or fact in the case predominate over non–common, individualized issues of law or fact." Neale, No. 2015 WL 4466919, at \*13. "Rule 23(b)(3) requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 133 S.Ct. 1184, 1191 (2013) (emphasis in original).

"Predominance 'begins, of course, with the elements of the underlying cause of action.'" Neale, 2015 WL 4466919, at \*13 (quoting Erica P. John Fund, Inc. v. Halliburton Co., 131 S.Ct. 2179, 2184 (2011)). "That is '[b]ecause the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual' and that means that 'a district court must formulate some prediction as to how specific issues will play out." Id. (quoting In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 311 (3d Cir. 2008)). However, Rule 23(b)(3) "does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." (Amgen Inc., 133 S. Ct. at 1196 (internal quotations and alternations omitted)). The

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 40 of 482

In re Blood Reagents Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015-2 Trade Cases P 79,330

Court must engage in a qualitative analysis to determine whether issues common to the class overwhelm individual issues. If so, the predominance requirement is satisfied. Neale, 2015 WL 4466919, at *14 (citations omitted).

In order to prevail at trial, plaintiffs must prove that (1) that defendants violated § 1 of the Sherman Act, (2) the fact of damages arising from the unlawful activity ("antitrust impact"), and (3) the amount of damages sustained because of the unlawful activity. In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 311. Although the predominance analysis is not simply "bean counting," Butler v. Sears, Roebuck and Co., 727 F.3d 796, 801 (7th Cir.2013), the Court analyzes each element in turn to clarify which questions are common to the class, and whether such questions predominate. See Kleen Products LLC, 306 F.R.D. at 593 ("[A]nalyzing each element separately is useful in isolating what questions are common and determining whether those questions predominate.").

### a. Violation of § 1 of the Sherman Act

 *28  In horizontal price–fixing cases, courts routinely hold that common proof predominates in determining whether an unlawful conspiracy existed. See, e.g., Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc., 502 F.3d 91, 105 (2d Cir. 2007); McDonough, 638 F.Supp.2d at 479–80; Lumco Indus., Inc. v. Jeld–Wen, Inc., 171 F.R.D. 168, 172 (E.D. Pa. 1997). Ortho has not argued that evaluation of the particular allegations of concerted action in this case might require individual proof. Thus, plaintiffs have established that common questions predominate with respect to proof of defendant's alleged antitrust violation.

### b. Antitrust Impact

Antitrust impact is the "fact of damage" resulting from a violation of the antitrust laws. Bogosian v. Gulf Oil Corp., 561 F.2d 434, 454 (3d Cir. 1977). "In antitrust cases, impact often is critically important for the purpose of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof." Hydrogen Peroxide, 552 F.3d at 311. "Plaintiffs' burden at the class certification stage is not to prove the element of antitrust impact, although in order to prevail on the merits each class member must do so. Instead, the task for plaintiffs at class certification is to demonstrate that the element of antitrust impact is capable of proof at

trial through evidence that is common to the class rather than individual to its members." Id. at 311–12. Resolving this issue requires the district court to rigorously assess the available evidence and methods by which plaintiffs propose to use the evidence at trial. Id.

In this case, plaintiffs assert that they will prove antitrust impact using five elements of common proof: (1) application of the so–called "Bogosian shortcut," (2) Dr. Beyer's proposed methods of calculating the amount of damage each class member suffered, (3) Dr. Beyer's analysis of the structure of the TBR market, (4) Dr. Beyer's empirical analysis of TBR prices during the class period, and (5) documents produced by defendants. The Court concludes that plaintiffs have established that common issues predominate over individual issues as to antitrust impact.

### 1. Antitrust Impact: Bogosian Shortcut

In Bogosian v. Gulf Oil Corp., 561 F.2d 434 (3d Cir. 1977), the Third Circuit recognized that under certain circumstances, a court considering a class certification motion may presume antitrust impact. Specifically, the Bogosian court held as follows:

> If...a nationwide conspiracy is proven, the result of which was to increase prices to a class of plaintiffs beyond the prices which would obtain in a competitive regime, an individual plaintiff could prove fact of damage simply by proving that the free market prices would be lower than the prices paid and that he made some purchases at the higher price. If the price structure in the industry is such that nationwide the conspiratorially affected prices at the wholesale level fluctuated within a range which, though different in different regions, was higher in all regions than the range which would have existed in all regions under competitive conditions, it would be clear that all members of the class suffered some damage, notwithstanding that there would be

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 41 of 482

In re Blood Reagents Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015-2 Trade Cases P 79,330

variations among all dealers as to the
extent of their damage.

Id. at 455.

Courts often apply this presumption in horizontal price–
fixing cases. See, e.g., In re OSB Antitrust Litig., 2007 WL
2253418, at *4–5; In re Bulk (Extruded) Graphite Prods.
Antitrust Litig., No. 02–6030, 2006 WL 891362, at *11–
13 (D.N.J. Apr. 4, 2006). However, a court must rigorously
analyze the evidence to determine whether Bogosian applies
to a particular case. See Hydrogen Peroxide, 552 F.3d
at 326 (expressing doubt about whether Bogosian applied
where prices were "lower, not higher, at the end of the
class period than at the beginning," production increased
during the class period, and defendants presented evidence
of "substantial price disparities among similarly situated
customers"). Moreover, Bogosian alone does not suffice to
satisfy the predominance requirement; plaintiffs must present
additional evidence that they can establish antitrust impact
using common proof. Id.; see also Am. Seed Co., Inc. v.
Monsanto Co., 271 Fed. App'x. 138, 141 (3d Cir. 2008) ("[I]t
is important that a putative class's presumption of impact
under Bogosian be supported by some additional amount of
empirical evidence.").

 **\*29**  In many ways, this is a straightforward horizontal
price–fixing case brought by direct purchasers of TBR.
The anticompetitive effects of horizontal price–fixing are
obvious. See, e.g., Deutscher Tennis Bund v. ATP Tour, Inc.,
610 F.3d 820, 830 (3d Cir. 2010). Many cases in which
courts reject application of Bogosian involve alleged conduct
whose anticompetitive effect is less straightforward. See, e.g.,
Sheet Metal Workers Local 441 Health & Welfare Plan v.
GlaxoSmithKline, PLC, No. 04–5898, 2010 WL 3855552, at
*21–22 (E.D. Pa. Sept. 30, 2010) (refusing to apply Bogosian
to the claims of indirect purchasers).

Ortho initially argued, however, that Bogosian is inapplicable
for two reasons. First, it relies on the fact that "the alleged
conspiracy...coincided with a substantial reduction in the
number of competitors and the formation of a duopoly
market." (Def.'s Opp. 58.) Therefore, while there were
substantial price increases during the class period, those
increases cannot be presumed to have resulted solely from
collusion. However, defendants' creation of a duopoly by
the acquisition of a number of competitors shortly before
the alleged conspiracy began does not undercut the fact that

prices on many TBR products rose by more than 2000%
during the class period, that those huge increases occurred
very shortly after the alleged collusion began, and that those
huge price increases applied to all customers. Unlike in
Hydrogen Peroxide, there is no evidence that prices decreased
at any time during the class period. Moreover, the damages
methodologies detailed in Dr. Beyer's reports, see supra
Section III(A), estimate the but–for prices that would have
been charged in a lawful duopoly market and calculate
those additional price increases that resulted from the alleged
anticompetitive activity.

Second, Ortho argued that the conspiracy alleged in this
case "encompass[es] dozens of different products, each
with different demand and cost factors." (Def.'s Opp. 58–
59.) However, courts have applied Bogosian even in cases
involving multiple varieties of products. See, e.g., Bulk
(Extruded) Graphite, 2006 WL 891362, at *11. In this
case, where Ortho manufactured an analogue of most TBR
products manufactured by Immucor, it is logical that a
horizontal price–fixing conspiracy encompassing all of those
products would impact all purchasers.

There is thus a strong argument that Bogosian applies to
the facts of this case. Nevertheless, as set forth below, the Court
concludes that other elements of common proof offered by
plaintiffs — most importantly, Dr. Beyer's market structure
analysis and his damages models — suffice to establish
that plaintiffs can prove impact using common evidence
regardless of whether Bogosian applies.

**2. Antitrust Impact: Damages Methodologies**

As discussed supra, plaintiffs offer Dr. Beyer's proposed
methodologies for calculating the damages incurred by
individual plaintiffs as an element of common proof of
impact. Dr. Beyer's methodologies estimate the pricing that
would have occurred in a lawful duopoly. He concludes
that any differences between those estimated prices and the
actual prices charged by defendants resulted from the alleged
price–fixing conspiracy. The important point for purposes
of the impact analysis at the class certification stage is
that, by applying one variation of this benchmark model to
transactional data produced by defendants, Dr. Beyer has
demonstrated that "virtually all customers paid more for
traditional reagents than they would have paid in the absence
of the alleged anticompetitive conduct." (Beyer Reply ¶ 102.)
Dr. Beyer's calculations show that virtually all of defendants'

customers purchased at least one TBR product for more than the but–for price during the class period. (Id. ¶¶ 105–106 & tbls. 18–19.) Thus, the Court concludes that the calculations serve as persuasive evidence of classwide impact.

**\*30**  In addition to Ortho's reliability attacks, which the Court previously rejected in its Daubert discussion, Ortho raised several arguments in opposition to plaintiffs' Motion for Class Certification, which were not reasserted after remand. For the sake of completeness, the Court reiterates its analysis of those arguments here.

First, Ortho argued that Dr. Beyer's conclusions are based on a faulty understanding of antitrust impact. Ortho asserted that it is not enough for plaintiffs to show that a customer paid more than the but–for price for at least one item in at least one transaction. Instead, according to Ortho, plaintiffs must analyze "whether the net effect of the alleged antitrust violation is positive or negative." (Def.'s Surreply 16 (emphasis added).) They must offset class members' losses from the alleged conspiracy against any benefits they received from it. (Id. at 17.) For example, Ortho contended that Dr. Beyer wrongly "overlooks the prospect that higher prices for traditional reagents led to lower prices or lower price increases for proprietary reagents and equipment." (Id.)

The Court rejects this argument. The case on which Ortho relies involved a merger, not a horizontal price–fixing conspiracy. See Kottaras v. Whole Foods Market, Inc., 281 F.R.D. 16 (D.D.C. 2012). Mergers frequently produce pro–competitive efficiencies that outweigh their anti–competitive harm, and courts routinely weigh these countervailing effects as an integral component of merger analysis. See, e.g., id. at 24; see also U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines § 10 (issued Aug. 19, 2010). It is far less plausible, on the other hand, that a price–fixing conspiracy would have offsetting benefits to consumers. See Deutscher Tennis Bund v. ATP Tour, Inc., 610 F.3d 820, 830 (3d Cir. 2010) ("Some categories of restraints, such as horizontal price–fixing..., 'because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable.'" (emphasis added) (quoting United States v. Brown Univ., 5 F.3d 658, 669 (3d Cir. 1993))). Ortho cites no case in which a court required plaintiffs to account for potential decreases in the price of some products as the result of an alleged horizontal price–fixing conspiracy.

At the class certification hearing, Dr. Bronsteen stated that the alleged conspiracy might have caused the prices of some TBR or ABR products to decrease because it gave defendants an incentive to "cheat" on the cartel by cutting prices on products not subject to the conspiracy. (7/26/12 Hr'g Tr. 218–19.) He presented evidence that, while TBR prices were increasing sharply, the prices of some of defendants' leading ABR products were "essentially flat." (Id. at 220.) Moreover, he argued that defendants hoped that increases in the prices of TBR would induce customers to switch from TBR to ABR. (Id.)

The argument that defendants were cheating on the cartel is speculative, at best. Ortho has not persuaded the Court that the "essential flatness" of ABR prices resulted from its alleged conspiracy to fix TBR prices; Ortho has merely suggested that is a possibility. Second, as a practical matter, Ortho's theory — which could be raised in every price–fixing case — would be very difficult to model. Without stronger evidence that a price–fixing conspiracy did, indeed, have offsetting benefits to consumers, plaintiffs in this type of case should not be saddled with analyzing whether a price–fixing conspiracy might possibly have had any negative effect on the price of any product sold by the defendants. Ortho has not cited any nonmerger cases in which courts imposed such a requirement, and this Court will not do so in this case. The Court thus accepts the results of the damages models as persuasive evidence of antitrust impact.

### 3. Antitrust Impact: Market Structure Analysis [21]

**\*31**  Plaintiffs' third element of proof of impact is Dr. Beyer's analysis of the structure of the TBR market. Based on his review of relevant documents and deposition testimony in this case, Dr. Beyer concludes that several features of the blood reagents industry gave "defendants...the incentive to form the alleged conspiracy" and made it impossible for individual purchasers to "avoid [ ] impact from a conspiracy." (Beyer Report 26.) In particular, Dr. Beyer cites (1) the consolidated market, (2) high barriers to entry, (3) inelastic demand for TBR, (4) the interchangeability of defendants' TBR products, (5) defendants' ability to monitor each other's pricing behavior by obtaining price lists from customers, and (6) defendants' unwillingness to deviate from their pricing policies for particular customers. (Id. at 26–35.) Many of these conclusions are supported by the reports of Ms. Harris, plaintiffs' industry expert. (See Harris Report ¶¶ 16, 20, 33.)

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 43 of 482

In re Blood Reagents Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015-2 Trade Cases P 79,330

In its brief in opposition to plaintiffs' Motion for Class Certification, Ortho disputed some of Dr. Beyer's conclusions regarding market structure, arguing that (1) TBR are not interchangeable and, as such, are not commodity products, which consumers perceive to be identical, (2) demand for TBR is not inelastic because TBR and ABR are interchangeable, and (3) recent market entry shows that plaintiffs overstate their claims regarding barriers to entry. However, the report of Ortho's expert, Dr. Bronsteen, does not dispute that the TBR market possessed the structural features Dr. Beyer identifies. Instead, Dr. Bronsteen argues that those structural features are just as consistent with tacit coordination as with unlawful collusion. (Bronsteen Report 34.) He opines that such a market structure "generally make[s] it easier for firms to refrain from aggressive competition and to coordinate their pricing either from an explicit cartel agreement or from tacit coordination." (Id. at 35.) Dr. Bronsteen then concludes that firms often prefer to engage in tacit coordination because, unlike explicit collusion, it is not unlawful. (Id. at 35–36.)

Many courts have accepted market–structure analyses in finding predominance with respect to antitrust impact. See, e.g., In re Linerboard Antitrust Litig., 305 F.3d 145, 153–55 (3d Cir. 2002); In re Air Cargo Shipping Servs. Antitrust Litig., No. 06–1175, 2014 WL 7882100, at *48 (E.D.N.Y. Oct. 15, 2014), OSB, 2007 WL 2253418, at *4–7. However, before accepting such an analysis, the Court must be persuaded that the market–structure factors identified by the plaintiffs' expert do, in fact, exist. See, e.g., In re Plastics Additives Antitrust Litig., No. 03–2038, 2010 WL 3431837, at *7 (E.D. Pa. Aug. 31, 2010) ("While a market with the characteristics described by [the expert] may in theory be vulnerable to a price–fixing conspiracy, we find that the markets at issue in this case do not actually possess those characteristics."). In this case, after weighing the evidence presented by both parties, the Court is persuaded by Dr. Beyer's conclusions regarding the structure of the TBR market.

First, Ortho has not disputed many of the market characteristics identified by Dr. Beyer. Dr. Bronsteen disputes even fewer; his primary argument is that the characteristics are consistent with lawful conduct as well as unlawful conduct. However, the question for the Court at this stage is not whether defendants actually engaged in a price–fixing conspiracy but whether, once a conspiracy is established, plaintiffs will also be able to prove impact through predominantly common proof. Dr. Bronsteen's testimony thus does not discredit Dr. Beyer's market–structure analysis at this stage of the litigation.

Second, the Court is persuaded that most customers viewed TBR products as commodity products during the class period. (See, e.g., Gallup Dep., Pls.' Reply Ex. 151, at 59–60 (stating that most customers "believed that [TBR] [were] like plain white bread: all the products were the same"); Weiss Decl., Pls.' Reply Ex. 149, ¶¶ 11–12 (stating that customers can use TBR "interchangeably" as long as they have FDA approval and that TBR "are almost identical 'commodity' products").) Ortho presented anecdotal evidence that a few purchasers preferred one defendant's TBR for nonprice reasons. (See, e.g., Carbaugh Dep., Def.'s Opp. Ex. C, at 36; Fennema Dep., Defs.' Opp. Ex. D, at 57–59.) The Court finds that isolated testimony less persuasive than the expert report and evidence that plaintiffs offered to the contrary.

*32  Third, Ortho disputed Dr. Beyer's conclusions regarding the inelasticity of TBR demand because ABR constituted a "potential substitute product[ ]" for TBR. (Def.'s Opp. 13.) Ortho explained that, although ABR are more expensive than TBR, they are more efficient and more accurate, which gave customers an incentive to switch despite the increased expense. (Id. at 15– 16.) Moreover, Ortho presented evidence that some class members did switch from TBR to ABR during the class period. (Id. at 14–15.) However, as plaintiffs' counsel argued persuasively at the certification hearing, the decision of some purchasers to switch from TBR to ABR when faced with enormous price increases does not establish elastic demand for TBR. (See 7/26/12 Hr'g Tr. 30–31.) Even where demand is highly inelastic, customers will eventually stop purchasing a product if there is a sufficiently large price increase. See generally IIA Phillip E. Areeda et al., Antitrust Law ¶ 507 (3d ed. 2007). The Court also credits Dr. Beyer's conclusion that, because Ortho and Immucor dominated both the TBR and ABR markets, the possibility that customers would switch from TBR to ABR did not threaten the success of the alleged conspiracy. (See Beyer Report ¶ 63.)

Finally, the entry of two new TBR manufacturers in 2008 — eight years after the alleged price–fixing conspiracy began —does not discredit Dr. Beyer's conclusion that the TBR market features high barriers to entry. A barrier to entry need not prevent competitors from ever entering the market. See generally IIB Areeda et al., supra, at ¶ 420. Dr. Bronsteen agrees with Dr. Beyer that FDA regulation delays entry to the TBR market. (Bronsteen Dep., Pls.' Reply Ex. 148, at 56, 242–23.) It is undisputed that it takes several years for a new

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 44 of 482

In re Blood Reagents Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015-2 Trade Cases P 79,330

competitor to obtain FDA approval and begin to sell TBR. This is a substantial delay, sufficient to render the TBR market conducive to collusion that would impact all customers.

The Court thus accepts Dr. Beyer's analysis of the structure of the TBR market as persuasive evidence supporting a finding of predominance with respect to impact.

### 4. Antitrust Impact: Empirical Pricing Analysis [22]

Fourth, plaintiffs rely on Dr. Beyer's empirical analysis of pricing patterns in the TBR industry during the class period. There are two parts to this analysis. First, Dr. Beyer observes that TBR prices "skyrocketed" during the class period. (Beyer Report 29, tbls. 3–4.) Second, he analyzes the prices defendants charged to individual customers and concludes that prices rose somewhat uniformly. Most Ortho customers paid identical or nearly identical prices throughout the class period. (Id. at 77 figs. 5–6.) Because of Immucor's pricing tiers, Immucor prices exhibit more dispersion. Moreover, some Immucor customers were able to obtain price protection, which locked their 2004 prices in place for five years. Nonetheless, Dr. Beyer states that the prices for Immucors TBR tended to cluster at a handful of pricing points. (Id. at 76.) Further, in his Reply Report, he demonstrates that customers in each of Immucor's pricing tiers and even its price–protected customers paid more than but–for prices. (Beyer Reply 77–88.)

Clearly, the fact that prices rose does not, in and of itself, demonstrate antitrust impact — at trial, plaintiffs must show that they experienced price increases that resulted from anticompetitive conduct. However, a showing that prices behaved similarly across groups of customers contributes to a finding of predominance at the certification stage. Because Ortho's prices were more uniform than Immucor's, this element of proof is more persuasive with respect to Ortho sales than Immucor sales. (Compare Beyer Report fig. 5, with id. figs. 10–11.) As described above, however, Dr. Beyer has showed that, despite price variation, he can demonstrate impact to Immucor purchasers using common proof.

The Court does not find Dr. Beyer's empirical pricing analysis as persuasive as his market analysis or the results of his damages models. Nevertheless, the analysis provides additional support for his assertion that plaintiffs will be able to prove impact using common proof.

### 5. Antitrust Impact: Defendants' Documents

**\*33** Fifth, plaintiffs rely on defendants' internal documents for the proposition that the price increases affected all customers. Most importantly, the documents support plaintiffs' contention that defendants were generally unwilling to negotiate prices with their customers. (See, e.g., Pls.' Mot. Ex. 138, at 4 (email from an Immucor sales representative stating that "[u]nfortunately, the pricing change is firm. It was an increase that was shared with our entire customer base and at this time, there aren't any exceptions being made"); Pls.' Mot. Ex. 139 (email from an Ortho executive stating that "everyone pays the same" for TBR).) Moreover, the documents provide evidence that even where defendants provided discounts from list prices, the discounts remained related to the list prices. (See, e.g., Pls.' Reply Ex. 143 (Ortho document stating that "[a]s list price increases all customer prices change in lock step"); Heflin Decl. ¶ 16 (stating that Immucor's list prices and tiered pricing were set based on Ortho's list prices).) This gives rise to an inference that anticompetitive increases in list prices would also impact customers who were purchasing TBR at a discount. See, e.g., McDonough, 638 F. Supp. 2d at 486 ("[W]hen list prices have been artificially inflated, fixed or proportional discounts from them are equally inflated.").

The Ortho documents, standing alone, would not suffice to prove impact. They do, however, lend support to a finding of predominance.

In summary, after a rigorous analysis of the evidence offered by both parties, the Court concludes that plaintiffs have shown by a preponderance of the evidence that they will be able to demonstrate antitrust impact using predominantly common proof.

### c. Damages

As discussed supra, plaintiffs have offered Dr. Beyer's damages methodologies to show that damages are susceptible to measurement across the entire class. Although Ortho has challenged the reliability and fit of those methodologies under Daubert, it has not argued that individual proof will predominate in calculating damages. The Court concludes that plaintiffs have demonstrated by a preponderance of the evidence they will be able to measure antitrust damages using predominantly common proof.

In re Blood Reagents Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015-2 Trade Cases P 79,330

Dr. Beyer's formula for calculating classwide damages involves the same steps, "[w]hether [used to calculate damages] for one plaintiff or a class of plaintiffs." (Beyer Report ¶ 88.) First, Dr. Beyer calculates the but–for price of each reagent by year based on the methodologies discussed supra, i.e. the OCV benchmark from 2001 through 2005, and either the cost–margin approach or the RhoGAM yardstick from 2006 through the end of the class period. (Beyer Reply ¶ 90.) Second, Dr. Beyer calculates the but–for payments for each transaction by applying the but–for price to the quantities purchased in each transaction. (Id.) Third, Dr. Beyer subtracts the but–for payment from the actual payment to determine the damages for each transaction. (Id.) Fourth, Dr. Beyer sums those differences, i.e. the damages amount for each transaction, for each purchaser plaintiff to determine the damages incurred by that plaintiff. "Because the customer transaction data is contained in a single database for each defendant and because the formula is common for all class members, it will be straightforward to calculate class wide damages at the merits stage of the litigation." (Id. at ¶ 91.)

The Court further concludes that Dr. Beyer's damages methodologies match the sole theory of liability asserted by plaintiffs in this case, and thus "[t]he unique liability/damages disconnect in Comcast" does not defeat class certification." [23] (Pls.' Post–Remand Br. 23.) In Comcast, the Supreme Court reversed the Third Circuit's decision affirming class certification "where the [p]laintiffs only surviving claim alleged one theory of liability and the [p]laintiffs expert based its damages calculations on multiple theories of liability." Hurt v. Commerce Energy, Inc., No. 12-758, 2014 WL 3735460, at *3 (N.D. Ohio July 28, 2014) (summarizing Comcast, 133 S.Ct. at 1433–34). There is no such mismatch presented in this case.

In this case, plaintiffs assert a horizontal price–fixing conspiracy theory — that defendants conspired to fix prices in violation of the Sherman Act, and that prices paid by customers for blood reagents increased as a result. Plaintiffs have set forth this single theory of liability from the outset of the litigation, and Dr. Beyer's damages methodologies, which measure the damages incurred as a result of the alleged price fixing conspiracy, match plaintiffs' theory of liability. See Hurt v. Commerce Energy, Inc., No. 12–758, 2014 WL 3735460, at *3 (N.D. Ohio July 28, 2014) ("[W]ithout assessing the validity of the damages calculations and methodology...this Court notes that the damages model was based on the single theory of liability alleged by the

Plaintiffs. As such, the Plaintiffs['] damages theory appears to be consistent with their liability theory, and Comcast does not require decertification."); see also In re Urethane Antitrust Litig., No. 04–1616, 2013 WL 2097346, at *4 (D. Kan. May 15, 2013) (concluding that plaintiffs' expert "provid[ed] causal links between the single price–fixing conspiracy alleged by plaintiffs at trial and the impact to plaintiffs"), amended, No. 04–1616, 2013 WL 3879264 (D. Kan. July 26, 2013), aff'd, 768 F.3d 1245 (10th Cir. 2014), and aff'd, 768 F.3d 1245 (10th Cir. 2014).

**\*34** Thus, the Court concludes that plaintiffs have shown by a preponderance of the evidence that "common issues of law or fact in the case predominate over non–common, individualized issues of law or fact" with respect to measuring antitrust damages. Neale, No. 2015 WL 4466919, at *13..

### d. Fraudulent Concealment

Finally, in opposition to plaintiffs' Motion for Class Certification, Ortho argued that individual issues related to fraudulent concealment would predominate at trial. That challenge was not reasserted in the post–remand proceedings.

To avoid the four–year statute of limitations on civil antitrust actions under 15 U.S.C. § 15b, plaintiffs must show "(1) fraudulent concealment; (2) failure on the part of the plaintiff to discover his cause of action notwithstanding such concealment; and (3) that such failure to discover occurred [notwithstanding] the exercise of due care on the part of the plaintiff." Linerboard, 305 F.3d at 160 (alteration in original) (internal quotation marks omitted). The first of plaintiffs' class action complaints was filed on May 18, 2009. Thus, claims for damages based on pre–May 18, 2005 purchases of TBR are time–barred unless the purchaser can establish fraudulent concealment. Ortho argued that a finding of predominance is barred by the myriad individual issues that would be involved in analyzing all three elements of fraudulent concealment.

The Court rejects this argument. It is true that an action implicating fraudulent concealment raises some individual issues, including whether an individual plaintiff knew of the alleged violation and whether he exercised due diligence. However, in Linerboard, the Third Circuit held that, in general, "[i]t is the fact of concealment that is the polestar in an analysis of fraudulent concealment." Linerboard, 305 F.3d at 163. The weight of authority is in accord with that holding. See, e.g., In re Pressure Sensitive Labelstock Antitrust Litig.,

In re Blood Reagents Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015-2 Trade Cases P 79,330

No. 03–1556, 2007 WL 4150666, at *21–22 (M.D. Pa. Nov. 19, 2007); In re Flat Glass Antitrust Litig., 191 F.R.D. 472, 488 (W.D. Pa. 1999); see also Newberg on Class Actions § 4:26 (4th ed. 2002) ("Challenges based on the statute of limitations, fraudulent concealment, releases, causation, or reliance often are rejected and will not bar predominance satisfaction because those issues go to the right of a class member to recover, in contrast to underlying common issues of the defendant's liability.").

Nonetheless, there is no per se rule that individual issues regarding fraudulent concealment can never defeat a finding of predominance. If a case presented particularly complex or important individual issues, it might be appropriate to deny class certification. However, this is not such a case. Ortho has not persuaded the Court that here, unlike the typical price–fixing case, individualized issues are the "polestar" of the fraudulent–concealment inquiry. In this case, the fraudulent–concealment issue involves the same mix of individualized and common proof that was present in Linerboard and other cases. There is substantial common evidence that defendants took affirmative acts to conceal their alleged conspiracy — for example, the acts of concealment that surrounded the Thorne/Gendusa lunch in November 2000. Ortho cited evidence regarding individual plaintiffs' suspicions and due diligence. However, that evidence is highly similar to, and no more complex than, the individual evidence that failed to preclude certification in Linerboard. See Linerboard, 305 F.3d 161–62 & n.13. In this case, as in many others, individual issues relating to fraudulent concealment "can be resolved at a later damages phase" if necessary. Linerboard, 305 F.3d at 163. Such issues do not defeat a finding of predominance.

**\*35** Thus, for the reasons stated above, the Court concludes that plaintiffs have satisfied the Rule 23(b)(3) predominance requirement with respect to fraudulent concealment.

### ii. Superiority

With respect to superiority, Rule 23(b)(3) requires that a class action be "superior to other available methods for the fair and efficient adjudication of the controversy." To determine whether the requirement is satisfied, a court must "balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods' of adjudication." Amchem, 83 F.3d at 632. "[S]imilar to the predominance requirement, the requirement of superiority

ensures that resolution by class action will 'achieve economies of time, effort, and expense, and promote...uniformity of decision without sacrificing procedural fairness or bringing about other undesirable results.'" Flonase, 2012 WL 2277840, at *25 (quoting Amchem, 521 U.S. at 615).

The superiority requirement is satisfied in this case, and Ortho does not dispute that point. Certification of the class will promote fairness and efficiency. If the class were not certified, "the numerous individual class members would be forced to file suit individually, producing numerous identical issues in each case that would waste judicial resources and leave all parties vulnerable to unfair inconsistencies." Id. at *26. Many courts have recognized that the cost of maintaining individual actions is frequently prohibitive in this type of antitrust litigation. See, e.g., Wellbutrin, 2011 WL 3563835, at *17; Linerboard, 203 F.R.D. at 223. Due to the many common questions of law and fact involved in the class members' claims, class treatment will promote efficiency. For these reasons, plaintiffs have satisfied the superiority requirement under Rule 23(b)(3).

## V. CONCLUSION

For the reasons set forth above, the following class is recertified pursuant to Rule 23(a) and Rule 23(b):

> All individuals and entities who purchased traditional blood reagents in the United States directly from defendants Immucor, Inc., and Ortho–Clinical Diagnostics, Inc. at any time from November 4, 2000 through the present. Excluded from the Class are defendants, and their respective parents, subsidiaries and affiliates, as well as any federal government entities.

An appropriate order follows.

## All Citations

Not Reported in Fed. Supp., 2015 WL 6123211, 2015-2 Trade Cases P 79,330

2015-2 Trade Cases P 79,330

---

## Footnotes

1   The response and surreply to Plaintiffs' Motion for Class Certification were filed in Ortho's name only because of ongoing settlement discussions between plaintiffs and Immucor.

2   Plaintiffs have asked the Court to certify a class of TBR purchasers "from January 1, 2000 through the present." Since discovery was conducted, however, plaintiffs have consistently asserted that the communications between Ortho and Immucor executives at the AABB meeting, which began on November 4, 2000 initiated the alleged price-fixing conspiracy that followed. Thus, "the Court will exercise its discretion to amend the class definition, sua sponte," Rendler v. Gambone Bros. Dev. Co., 182 F.R.D. 152, 160 (E.D. Pa. 1998), and substitute the date "November 4, 2000" for the date "January 1, 2000."

3   Plaintiffs presented evidence that Ortho did not charge the BBLP prices to any customer until after it allegedly engaged in unlawful price–related conversations with Immucor. At the class certification hearing, the parties disputed the probative value of a slide contained in an October 30, 2000, Ortho presentation regarding the BBLP. The slide is labeled "Communication with Customers," and it lists the names of seven major customers alongside dates ranging from September 27, 2000, to October 20, 2000. (Pls.' Mot. Ex. 56, at 5.) The record contains no evidence regarding the nature of any communications between Ortho and those customers. Ortho contends that the slide establishes that it had already implemented the BBLP prior to the alleged price–fixing conspiracy, which plaintiffs contend began in November 2000. Plaintiffs argue that, even if Ortho engaged in some kind of discussion with select customers in September and October of 2000, Ortho did not finalize the BBLP until after its allegedly unlawful communications with Immucor. On the present state of the record, the Court finds that the slide does not establish that Ortho implemented the BBLP before the American Association of Blood Banks ("AABB") meeting, which began on November 4, 2000.

4   At the class certification hearing, Ortho provided the Court with the Supplemental Declarations of Mike Poynter and Bill Weiss, two Immucor executives. In those declarations, Poynter and Weiss aver that they do not "remember anything being said during [Ortho's] presentation about a 2001 price increases or anything about Ortho's future pricing plans." (Supp. Poynter Decl. ¶ 8; see also Supp. Weiss Decl. ¶ 5.) However, other Immucor employees who attended the AABB meeting testified to the contrary. See supra.

5   Automation tier pricing was awarded to facilities that adhered to the base pricing guidelines, but had Immucor instrumentation. (Def.'s Opp. Ex. 99.)

6   Ortho did not dispute that plaintiffs had satisfied the Rule 23(a) requirements or Rule 23(b)'s superiority requirement.

7   Plaintiffs also assert that they will prove antitrust impact using: (1) application of the so– called "Bogosian shortcut," (2) Dr. Beyer's analysis of the structure of the TBR market, (3) Dr. Beyer's empirical analysis of TBR prices during the class period, and (4) documents produced by defendants. See infra Section IV(B)(3)(i) (b). Defendant does not challenge Dr. Beyer's analysis of the structure of the TBR market, nor his empirical analysis of TBR prices during the class period in its post–remand briefs.

8   Ortho does not challenge the qualifications of Dr. Beyer. Dr. Beyer has more than 40 years of experience in applied micro–economics analysis in the United States, and has testified as an economic expert in numerous antitrust actions during his career. (Beyer Report ¶¶ 2, 3.) He also holds several advanced degrees in economics, including a Ph.D. from the Fletcher School of Law and Diplomacy at Tufts University. (Id. at App'x A.) Upon review of Dr. Beyer's extensive credentials and experience, the Court concludes that plaintiffs have demonstrated by a preponderance of the evidence that Dr. Beyer is qualified in the field of economics.

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 48 of 482

In re Blood Reagents Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015-2 Trade Cases P 79,330

9    Ortho does not dispute the use of a benchmark as a generally accepted methodology for proving antitrust impact and damages. See Nichols v. SmithKline Beecham Corp., No. 00–6222, 2003 WL 302352, at *4 (E.D. Pa. Jan. 29, 2003) (upholding expert's use of benchmark at class certification stage as a "generally accepted methodology for determining impact").

10   The Court further notes that even if it were to accept defendant's challenge that OCV is an inappropriate benchmark because it was implemented after the initially alleged conspiracy start date in January 2000, Dr. Beyer's use of the OCV plan as a benchmark results in a more conservative estimate of damages. In re Linerboard Antitrust Litig., 497 F. Supp. 2d 666, 675 (E.D. Pa. 2007). That is because if Dr. Beyer incorrectly assumed a later start date for the conspiracy, and thus, incorrectly assumed that the OCV benchmark was free of collusion, then Dr. Beyer's "but–for price estimate would be too high, causing his estimate of the overcharge (the difference between actual prices and but–for prices) to be too low." Id.

11   The Court previously ruled that the evidence presented by Ortho was insufficient to conclusively establish that the BBLP was implemented before the AABB meetings, which began on November 4, 2000. In re Blood Reagents Antitrust Litig., 283 F.R.D. at 229 n. 2. That factual finding, which did not rely on expert testimony, is unaffected by the Third Circuit's remand of this case.

12   By letter dated September 9, 2011, counsel for Ortho explained, in relevant part, that the standard cost data produced by Ortho are estimates calculated on a cost per unit basis that are gathered "approximately four to six months prior to each fiscal year as part of [Ortho's] budgeting process. It does not reflect [Ortho's] actual costs of production but is a prediction of what [Ortho's] costs will be for the following fiscal year in a limited number of cost categories," including, for example, costs of raw materials. (See Letter from Paul H. St. Antoine, Esq., Counsel for Ortho, to Jeffrey J. Corrigan, Esq., Counsel for plaintiffs (September 9, 2011).) "Standard cost data is not maintained in [Ortho's] financial accounting system for this entire time period [1998 through 2010], so [Ortho] searched its records and manually compiled the standard cost information to the extent it was readily available." (Id.)

     Ortho's counsel explained in the letter that the specific categories of costs included in standard costs changed over time, and the lists of said categories were not readily accessible. (Id.) Thus, Ortho could not determine "whether the change in standard costs for a given year [was] a result of a change to the definition of standard costs, or a modification to [Ortho's] manufacturing process for a product." (Id.) The letter added that standard costs did not include "shipping to customers, selling, marketing, general administration, research, or capital improvements." (Id.) Those costs not included in the standard cost estimates are referred to by Ortho as "Costs Not in Standard" or "CNIS."

     The Deputy Clerk shall docket a copy of the letter from Ortho's counsel dated September 9, 2011.

13   Ortho cites two cases in which courts have rejected economic analysis as unreliable in failing to account for market factors not attributable to the alleged misconduct. See, e.g., Blue Cross and Blue Shield United of Wisconsin v. Marshfield Clinic, 152 F.3d 588, 593 (7th Cir. 1998) (rejecting statistical study which failed to adjust for any other factor that could have affected the independent variable, price in clinical services, except for one, thus effectively attributing the "entire difference [in price]...to the [anticompetitive conduct.]"); Lantec, Inc. v. Novell, Inc., 2001 U.S. Dist. LEXIS 24816, *19, 2001 WL 36647946 (D. Utah Feb. 13, 2001) (rejecting Dr. Beyer's methodology as "fail[ing] to address in sufficient manner or degree salient factors not attributable to the defendant's alleged wrongdoing that may have caused the harm alleged").

     The Court finds those cases inapposite. Neither case involved an alleged price fixing conspiracy, nor a proposed benchmark methodology for calculating damages. In fact, the Lantec decision did not address expert testimony regarding a proposed damages model at all, but rather considered testimony provided by Dr. Beyer on the relevant product market definition in a non– class monopoly action involving software markets.

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 49 of 482

In re Blood Reagents Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015-2 Trade Cases P 79,330

Moreover, <u>Blue Cross</u> is a summary judgment opinion, and thus the Court did not apply <u>Daubert</u> as the standard for reviewing the expert testimony. In any event, this case is distinguishable because Dr. Beyer has considered and analyzed costs and demand. <u>See</u> Patel v. Verde Valley Med. Ctr., No. 05–1129, 2009 WL 5842049, at *4 (D. Ariz. Mar. 31, 2009) (distinguishing case from <u>Lantec</u> because "although flawed in some respects," for omitted certain data, expert's benchmark, was not "totally without foundation").

14    Dr. Beyer uses the standard cost data produced by Ortho to calculate gross profit margins for Ortho in the but–for world, but again notes that Ortho has represented that its standard cost data is not reliable. (Beyer Reply ¶ 55 n.116; <u>see supra</u> n.12)

15    The Court is concerned about defendant's use of its failure to produce reliable cost data as both a sword and shield in this case. Ortho has represented since 2011 that the standard cost data it produced to plaintiffs is unreliable. (<u>See</u> Letter from Paul H. St. Antoine, Esq., Counsel for Ortho, to Jeffrey J. Corrigan, Esq., Counsel for plaintiffs (September 9, 2011).) At the same time, Ortho has repeatedly asserted that Immucor's cost data is not a reliable proxy for its own cost data. (<u>See</u> Def.'s Post–Remand Br. 32–33.) Moreover, as noted above, Ortho's actual cost data was never produced to plaintiffs, and it is unclear whether Ortho maintains actual cost data at all. (<u>See</u> Letter from Jeffrey J. Corrigan, Counsel for plaintiffs, to the Court (July 27, 2015) (detailing Ortho's responses to cost data–related interrogatories).) Thus, it is particularly difficult to assess the extent of Ortho's cost increases during the class period — and based on the standard cost data produced to plaintiffs, it appears that Ortho's standard costs may have even been declining in certain years. (<u>See</u> Beyer Reply 23, Tbls. 2, 3.) Although the absence of reliable cost data does not relieve plaintiffs of the burden of demonstrating by a preponderance of the evidence that Dr. Beyer's expert testimony is reliable, it does undermine defendant's argument that Dr. Beyer's OCV benchmark methodology should be excluded on this ground.

The Deputy Clerk shall docket a copy of the letter from plaintiffs' counsel dated July 27, 2015.

16    Despite the fact that costs actually decreased in certain years for particular Ortho products, Dr. Beyer did not alter the but–for price of those products to reflect those decreases. (Beyer Reply ¶ 56 n.118.) This is another way in which Ortho's market power as a duopolist is accounted for under Dr. Beyer's cost-margin methodology.

17    At the Post–Remand Hearing, Ortho raised the argument that the cost–margin approach is an unreliable method for establishing but–for prices in this case because the but–for world is a duopoly. That argument is unavailing. As Ortho's own economic expert Dr. Bronsteen has explained, the literature on duopoly includes "a wide range" of models, "and the predictions of the duopoly models range from situations where a duopoly could replicate perfect competition to models where the duopoly replicates a monopoly pricing...." (7/26/15 Hr'g Tr. 167:12–20; <u>see also</u> Id. at 387:6–11 (Dr. Beyer: "[W]hat oligopoly theory teaches us [is] that behavioral reactions, responses, by one or the other oligopolist, even in a duopoly, can mean that prices simply...can go to the competitive or to the monopoly level.").) Thus, to argue that the cost– margin approach cannot be applied when the market structure is a duopoly merely because it is only appropriate in perfectly competitive marketplaces oversimplifies the range of behavior firms may exhibit in duopolies. Furthermore, Ortho fails to cite to any cases rejecting the cost– margin approach to assessing damages based on the fact that the market structure is a duopoly, as it urges the Court do in this case. Thus, the Court does not exclude Dr. Beyer's cost-approach methodology on this basis.

18    The Court applied that standard in its August 22, 2012 decision, and concluded that RhoGAM and TBR were "fair congeners." In re Blood Reagents Antitrust Litig., 283 F.R.D. at 245.

Many courts, however, have held that the question whether plaintiffs have met their burden of proving comparability should be left to the trier of fact to resolve because comparability challenges generally involve

2015-2 Trade Cases P 79,330

weighing facts. See In re Prograf Antitrust Litig., No. 11–02242, 2014 WL 7641156, at *3 (D. Mass. Dec. 23, 2014) (citing decisions that have declined to resolve factual issues underlying comparability analysis in the context of Rule 702 motions); see also 1 Am. Bar Ass'n, Antitrust Law Developments 786 (7th ed. 2012) ("Whether the plaintiff has met this burden of showing comparability ordinarily is a question for the trier of fact.").

19   Ortho also asserts that Dr. Beyer has not compared costs between the two products. The Court will not exclude Dr. Beyer's yardstick methodology on this ground because 1) Ortho has not produced RhoGAM cost data (Beyer Reply ¶ 58 fn.124); 2) even if cost changes varied significantly for RhoGAM during the class period, it would support Dr. Beyer's contention that, like prices for TBR, RhoGAM prices were primarily driven by the level of competition, rather than cost and demand (Id. at ¶67); and 3) there are other significant reasons proffered by Dr. Beyer as to why RhoGAM is a reliable yardstick. (See supra (citing Beyer Reply ¶¶ 61-67).)

20   The Court reiterates that it amends the class definition, sua sponte, to substitute the date "November 4, 2000" for the date "January 1, 2000."

21   Defendant has not challenged this expert testimony under Daubert in the post–remand proceedings.

22   The Court reiterates that this expert testimony has not been challenged under Daubert in the post–remand proceedings.

23   Ortho did not raise any additional challenges under Comcast beyond those discussed supra.

---

**End of Document**      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 51 of 482

Caddick v. Tasty Baking Company, Not Reported in Fed. Supp. (2021)

2021 WL 1374607
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

William CADDICK, Stephen Hopkins, individually and
on behalf of all similarly situated individuals, Plaintiff
v.
TASTY BAKING COMPANY, Defendant

Case No. 2:19-cv-02106-JDW
|
Signed 04/12/2021

**Attorneys and Law Firms**

Charles J. Kocher, Mcomber Mcomber & Luber P.C.,
Marlton, NJ, Simon Bahne Paris, Saltz Mongeluzzi Barrett
& Bendesky, P.C., Horsham, PA, Patrick Howard, Saltz
Mongeluzzi Barrett & Bendesky, Philadelphia, PA, for
Plaintiffs William Caddick, Stephen Hopkins.

Simon Bahne Paris, Saltz Mongeluzzi Barrett & Bendesky,
P.C., Horsham, PA, Charles J. Kocher, Mcomber Mcomber &
Luber P.C., Marlton, NJ, for Plaintiff Raymond S. Keeler.

K. Clark Whitney, Dean J. Shauger, Jessica Bocchinfuso,
Joshua Brand, Ogletree Deakins Nash Smoak & Stewart PC,
Philadelphia, PA, Kevin P. Hishta, Ogletree Deakins Nash
Smoak & Stewart PC, Atlanta, GA, for Defendant.

## MEMORANDUM

JOSHUA D. WOLSON, J.

 *1  The parties to this case ask the Court for preliminary
approval of a proposed settlement of the collective claims
under the Fair Labor Standards Act and class claims under
Pennsylvania, New Jersey, and Maryland state law. After
reviewing the facts and the proposed agreement, the Court
grants the motion for preliminary approval and preliminarily
certifies three classes for claims under state laws. However,
the Court also concludes that the confidentiality provision in
the proposed agreement would frustrate the purpose of the
FLSA, so the Court will narrow it.

## I. BACKGROUND

### A. Factual Allegations

Tasty manufactures, distributes, and sells baked products.
Tasty entered into contracts with individual distributors,
including William Caddick, Stephen Hopkins, Raymond
Keeler, and Anthony Bertino (the "Class Reps"), who
purchase distribution rights to sell and distribute Tasty
products to customers. The Class Reps operate in
Pennsylvania, New Jersey, or Maryland.

The Class Reps allege that Tasty exerts significant control
over the distributors' work. Tasty determines product prices,
negotiates with retail customers regarding pricing and
merchandising, adjusts orders, and dictates how distributors
stock shelves and participate in marketing initiatives. The
Class Reps also allege that Tasty pays distributors based on
a "complicated system" in which distributors purchase the
products from Tasty at prices that Tasty sets. (ECF No. 1, ¶
19.) Once a distributor sells the products to the customer, the
distributor receives credit for the products' ultimate sale price,
plus a commission if applicable. The Class Reps contend that
Tasty and store customers negotiate this price without any
meaningful input from distributors.

Tasty classifies distributors, including the Class Reps, as
independent contractors. As a result, Tasty makes certain
deductions to distributors' weekly pay and does not pay them
overtime. The Class Reps argue, however, that Tasty should
have classified them as employees and seek damages for
unpaid overtime wages under the FLSA and reimbursement
for deductions that they contend were unlawful under
Pennsylvania, New Jersey, or Maryland law.

### B. Procedural History

Messrs. Caddick and Hopkins filed the initial complaint in
this Court on May 15, 2019, on behalf of themselves and a
class of distributors. In their Complaint, they alleged claims
for unpaid overtime under the FLSA, improper pay deduction
under the Pennsylvania Wage Payment and Collection Law,
and recovery of certain expenses under the theory of
unjust enrichment. The Court dismissed Plaintiffs' unjust
enrichment claim on December 17, 2019. On January 24,
2020, the Court granted a motion for conditional certification
of the FLSA claims. The FLSA Collective Action is defined
as "[a]ll persons in the United States who, pursuant to a
'Distribution Agreement' or a similar written contract, are
or have performed work as 'Distributors' for Tasty Baking
Company during the period commencing three years prior to
the commencement of this action through the close of the
Court-determined opt-in period and who file a consent to

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 52 of 482

Caddick v. Tasty Baking Company, Not Reported in Fed. Supp. (2021)

join this action pursuant to 29 U.S.C. § 216(b)." There are currently 56 collective action members.

**\*2** Mr. Bertino filed a case in the District of New Jersey, alleging class claims under the New Jersey Wage and Payment Law. On November 17, 2020, in light of the parties' settlement discussions, the New Jersey Court transferred that action to this Court, and the Court consolidated the cases. On February 16, 2021, the Class Reps filed a Second Amended Complaint that adds Mr. Keeler as a party. Mr. Keeler brings Maryland Wage and Payment Collection Law claims on behalf of himself and a class of Maryland distributors. All Class Reps premise their claims on the allegation that Tasty improperly classifies its distributors as independent contractors.

### C. The Settlement

As a result of their negotiations, the Parties agreed to a settlement that includes monetary and non-monetary relief to the Class Reps and the classes they seek to represent. The settlement includes any individual who operated under a "distributor agreement with Tasty during a Covered Period out of a warehouse in either Pennsylvania, New Jersey, or Maryland; and who did not previously sign individually, or on behalf of a business entity, a distributor agreement or an amendment containing an arbitration agreement with a class action waiver." (ECF No. 62-2 at ¶ 3.6.) There are 119 individuals in the Pennsylvania class, 54 individuals in the New Jersey class, and 53 in the Maryland class. The settlement also covers those 56 individuals who opted into the FLSA action.

Pursuant to the terms of the settlement, Tasty will create a total settlement fund of $3,150,000, which provides: (i) payment to Class and Collective Members; (ii) service award to each of the named plaintiffs for $5,000 each; (iii) attorneys' fees of $1,050,000. In exchange, Plaintiffs and class members who choose to participate in the settlement agree not to disclose the final settlement amount and to release Tasty from any past claims based on the alleged misclassification of putative class members and FLSA collective members as independent contractors.

Additionally, the settlement fund includes a payment of $3,500 each to current distributors who sign, date, and cash their settlements as consideration for agreeing to the terms of the arbitration agreement. The arbitration agreement adds alternative dispute procedures and includes a class action waiver. The Parties have agreed on a third-party settlement

administrator who will provide notice to all the members of the FLSA collective and the class actions.

## II. LEGAL STANDARD

Review of proposed Rule 23 class settlement typically proceeds in two steps: (1) a preliminary approval and (2) a subsequent fairness hearing. *See In re Nat'l Football League Players' Concussion Inj. Litig.*, 961 F. Supp. 2d 708, 713–14 (E.D. Pa. 2014). Although Rule 23 process governs class action settlements and not FLSA collective actions, courts in this Circuit apply the two-step process to FLSA claims. *See, e.g., Williams v. Aramark Sports, LLC*, No. CIV.A. 10-1044, 2011 WL 4018205, at \*9 (E.D. Pa. Sept. 9, 2011) ("For essentially the same reasons the Court found that the Rule 23 requirements were met, the Court also finds that the FLSA collective action requirements are met in this case."); *Hall v. Accolade, Inc.*, No. CV 17-3423, 2019 WL 3996621, at \*3 n. 2 (E.D. Pa. Aug. 23, 2019)(preliminarily approving FLSA collective action based on two-step Rule 23 approval process).

Preliminary approval of a proposed class action settlement is left to the discretion of the trial court. *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 317 (3d Cir. 1998). "The fair, reasonable and adequate standard is lowered, and the court is required to determine whether the proposed settlement discloses grounds to doubt its fairness or other obvious deficiencies...." *Nat. Football League*, 961 F. Supp. 2d at 714 (quoting another source). Nevertheless, "[p]reliminary approval is not simply a judicial 'rubber stamp' of the parties' agreement." *Id.* Rather, it is "based on an examination of whether the proposed settlement is 'likely' to be approved under Rule 23(e)(2)." *Wood v. Saroj & Manju Invs. Philadelphia LLC*, No. CV 19-2820-KSM, 2020 WL 7711409, at \*10 (E.D. Pa. Dec. 28, 2020) (citing Fed. R. Civ. P. 23(e)(1)(B)(i) and other sources).

**\*3** Where settlement precedes class certification, a court may preliminarily certify the class for purposes of providing notice. *See In re Nat. Football League Players Concussion Inj. Litig.*, 775 F.3d 570, 581-82 (3d Cir. 2014); *see also Amchem v. Windsor*, 521 U.S. 591, 620-22 (1997). Certification at this stage is not final. *See In re CertainTeed Corp. Roofing Shingle Prods. Liab. Litig.*, 269 F.R.D. 468, 476 (E.D. Pa. 2010) (citing *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods.*, 55 F.3d 768, 786 (3d Cir. 1995)). "Final certification *vel non* of the class is determined by the court at the same time as the court rules on whether the final settlement agreement is to be approved." *Id.*

This Court's prior FLSA conditional certification (ECF No. 42-43) is sufficient at the preliminary approval stage to permit the FLSA collective members to receive the appropriate court-approved notice of this settlement. But the Court has yet to certify state law classes. Accordingly, the Court will first analyze whether to certify the state law classes and then whether to approve the terms of the proposed Settlement Agreement preliminarily.

## III. DISCUSSION

### A. Class Certification

To succeed on a class certification motion, a plaintiff must satisfy all four requirements of Rule 23(b). *See Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 183 (3d Cir. 2001). Rule 23(a) requires a showing of: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy. *See Fed. R. Civ. P. 23(a).* If these four requirements are satisfied, a plaintiff must show that at least one subsection of Rule 23(b) is met. In this case, Plaintiffs seek certification pursuant to Rule 23(b)(3). Rule 23(b)(3) contains two explicit requirements: predominance and superiority. *See Carrera v. Bayer Corp.*, 727 F.3d 300, 305 (3d Cir. 2013). Courts conducting this anlaysis as part of a preliminary approval motion can conduct a "less rigorous analysis" that will be required at the final approval stage. *In re: Amtrak Train Derailment In Philadelphia, Pa.*, No. 15-MD-2654, 2016 WL 1359725, at * 4 (E.D. Pa. Apr. 6, 2016).

### 1. Rule 23(a) factors

#### a. Numerosity

To satisfy the numerosity requirement, a plaintiff must show that the proposed class is so numerous that joinder of all members is impracticable. This generally requires more than 40 class members. *See In re Modafinil Antitrust Litig.*, 837 F.3d 238, 249-50 (3d Cir. 2016). Plaintiffs have shown that each state class includes more than 40 members, making Joinder not practicable.

#### b. Commonality

The commonality requirement requires a plaintiff to demonstrate that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality does not require the perfect identity of questions of law or fact among all class members. *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 486 (3d Cir. 2015). Instead, a plaintiff seeking class certification must demonstrate that his claims "depend upon a common contention," the resolution of which "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 US 338, 350 (2011). There can be legal and factual differences among the class members, as long as the defendant subjected them all to the same harmful conduct. The commonality bar is not a high one. *See Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013).

**\*4** The Class Reps have cleared this low bar. For each of their proposed classes, there are at least two common questions: (1) whether class members were misclassified as independent contractors; and (2) whether Tasty took improper deductions from class members in violation of Pennsylvania, New Jersey, or Maryland state law.

#### c. Typicality

The typicality factor aids a court in determining whether "maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interest of the class members will be fairly and adequately protected in their absence." *Marcus v. BMW of North America, LLC*, 687 F.3d 583, 594 (3d. Cir. 2012) (citation omitted). A plaintiff can meet this requirement when his claims "arise from the same alleged wrongful conduct." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 532 (3d Cir. 2004). To determine whether a named plaintiff is so different as to prevent a finding of typicality, a court must address three distinct concerns: "(1) the claims of the class representative must be the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class." *Id.* at 598. The Third Circuit has set a "low threshold" for typicality, such that even "relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct."

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 54 of 482

Caddick v. Tasty Baking Company, Not Reported in Fed. Supp. (2021)

*In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 428 (3d Cir. 2016) (quotes omitted).

The Class Reps satisfy the typicality requirement. They worked as distributors in their respective states and claim that Tasty misclassified them as independent contractors rather than employees. This is the same issue that affects all members of each putative class. Moreover, no unique defense applies only to class representatives. Finally, class representatives' interests are sufficiently aligned with the class members' interests because both seek the wage and hour protections of their respective state laws.

#### d. Adequacy

This final 23(a) factor considers both the plaintiff's and counsel's adequacy to represent the class. "Whether adequacy has been satisfied 'depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class.' " *McDonough v. Toys R Us, Inc.*, 638 F. Supp. 2d 461, 477 (E.D. Pa. 2009) (quoting *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007)). "The second factor 'seeks to uncover conflicts of interest between named parties and the class they seek to represent.' " *Id.* (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 532 (3d Cir. 2004)).

The Court sees nothing to call into question the adequacy of class representatives. They assert the same claims as class members and are not in any way antagonistic to other members. The Court also concludes that their counsel easily satisfies the adequacy threshold. Class counsel has experience prosecuting class actions, and at least one other court in this district has found class counsel adequate. *See Wood*, 2020 WL 7711409, at *6 ("Saltz, Mongeluzzi & Bendesky, P.C.— are qualified to 'fairly and adequately represent the interests of the class.' ").

#### 2. Rule 23(b) Factors

#### a. Predominance

**\*5** Predominance requires the Court to find "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (internal quotation marks omitted). The predominance requirement "does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013) (internal punctuation omitted). Nevertheless, "[t]o assess whether predominance is met at the class certification stage, a district court must determine whether the essential elements of the claims brought by the putative class are 'capable of proof at trial through evidence that is common to the class rather than individual to its members.' " *Gonzalez v. Corning*, 885 F.3d 186, 195 (3d Cir. 2018).

Plaintiffs bring claims for violations of their respective state's wage laws. Each claim's threshold question is whether Tasty properly classified its distributors as independent contractors rather than employees under the specific test applicable to that state law. Although the tests vary, the New Jersey, Maryland, and Pennsylvania tests each emphasize the employer's right to exercise control over the employee. *See, e.g., Williams v. Jani-King of Phila. Inc.*, 837 F.3d 314, 319-21 (3d Cir. 2016) ("[T]he right to control, rather than actual control, is the most important of the factors."); *Baltimore Harbor Charters, Ltd. v. Ayd*, 780 A.2d 303, 318-19 (Ct. App. Md. 2001) ("In applying these factors, the court emphasized that the most crucial consideration is the right to exercise complete control over the work, including its details.") (quoting another source). Likewise, "[i]n order to satisfy part A of the [New Jersey's] 'ABC' test, the employer must show that it neither exercised control over the worker, nor had the ability to exercise control in terms of the completion of the work." *Hargrove v. Sleepy's, LLC*, 106 A.3d 449, 459 (N.J. 2015).

Thus, common questions will predominate over individual inquiries in determining whether Tasty properly classified distributors as independent contractors. The focus in resolving these claims will be on the right to control. Distributor agreements and other documents regarding Tasty's policies are common to the class and shed light on whether Tasty exercised control over its distributors. *See, e.g. Carr v. Flowers Foods, Inc.*, No. CV 15-6391,

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 55 of 482

Caddick v. Tasty Baking Company, Not Reported in Fed. Supp. (2021)

2019 WL 2027299, at *16 (E.D. Pa. May 7, 2019) ("[T]he right to control is susceptible to class-wide proof, based on the Distributor Agreements and Flowers' common policies regarding the large chain accounts, training, and oversight."). Accordingly, predominance inquiry is satisfied for each state law claim.

### b. Superiority

The superiority analysis calls for a determination that a class action is the best method of achieving a "fair and efficient adjudication of the controversy." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154 (3d Cir. 2001), *as amended* (Oct. 16, 2001) (citing Fed. R. Civ. P. 23(b)(3)). This requires a "balance, in terms of fairness and efficiency, [of] the merits of a class action against those of 'alternative available methods' of adjudication." *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 632 (3d Cir. 1996) (citing another source). In determining whether a class action is the superior method to adjudicate a controversy, courts should consider: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D).

 **\*6** As applied to state law classes, these factors weigh in favor of class litigation. The number of class members, the common interest of class members, and the prevalence of common questions of law and fact make class action a more efficient vehicle for resolving these claims. Additionally, concentrating all three class actions in this Court results in considerable efficiency gains given the many similar issues across the claims. Plaintiffs satisfied this and other class action requirements. The Court will, therefore, preliminary certify the Pennsylvania, Maryland, and New Jersey classes pursuant to Rule 23(b)(3).

### B. Proposed Settlement Agreement

#### 1. Rule 23(e) Factors

"In evaluating a class action settlement under Rule 23(e), a district court determines whether the settlement is fundamentally fair, reasonable, and adequate." *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 592 (3d Cir. 2010) (citing Fed. R. Civ. P. 23(e)). In making this determination, district courts consider whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23.

#### a. Adequate representation

This factor focuses "on the actual performance of counsel acting on behalf of the class." Fed. R. Civ. P. 23 Advisory Committee Notes (Dec. 1, 2018). Here, class counsel expanded considerable time and effort on this case, engaged in extensive discovery, "including reviewing and analyzing a substantial volume of documents, Tasty's business model, the bakery delivery business and the nature of the distributors' work." (ECF No. 62-1 at 14.) Based on this, the counsel fully evaluated the strengths and weaknesses of the claims and defenses before reaching the proposed settlement agreement. (*Id.* at 13-14.) Thus, this factor weighs in favor of preliminary approval.

#### b. Arm's length negotiation

The parties agreed to settle this case after a full-day mediation session and a series of calls with a mediator.

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 56 of 482

Caddick v. Tasty Baking Company, Not Reported in Fed. Supp. (2021)

"[T]he participation of an independent mediator in settlement negotiations virtually [e]nsures that the negotiations were conducted at arm's length and without collusion between the parties." *Bellum v. Law Offices of Frederic I. Weinberg & Assocs., P.C.*, No. 15-2460, 2016 WL 4766079, at *6 (E.D. Pa. Sept. 13, 2016) (citation and quotation omitted). This factor weighs in favor of preliminary approval.

### c. Adequacy of relief

#### i. Costs, risks, and delay of trial

This factor balances the "relief that the settlement is expected to provide to class members" against "the cost and risk involved in pursuing a litigated outcome." Fed. R. Civ. P. 23 Advisory Committee Notes (Dec. 1, 2018). Plaintiffs acknowledge the risks of proceeding with their claims to the certification, summary judgment, and trial stages of this litigation. These include: (1) whether plaintiffs can establish that they are employees and not independent contractors; (2) whether any of the FLSA overtime exemptions apply; and (3) whether plaintiffs receive "wages" under Pennsylvania, New Jersey, or Maryland law.

#### ii. The proposed method of distributing relief

Under this factor, the Court "scrutinize[s] the method of claims processing to ensure that it facilitates filing legitimate claims ... [and] should be alert to whether the claims process is unduly demanding." Fed. R. Civ. P. 23 Advisory Committee Notes (Dec. 1, 2018). The settlement agreement provides individualized notices to each class member. Distributors who have not previously signed an arbitration agreement with a class action waiver will automatically receive notice of this settlement. Those who do not exclude themselves from the case will receive a check for their settlement share without having to file a claim. In other words, unless class members explicitly ask to be excluded, they will be paid. The settlement notice also explains how to raise objections and opt-out of the settlement.

#### iii. Terms of proposed attorney's fees

**\*7** The proposed attorneys' fees are $1,050,000 out of $3,150,000. This equals a 33% attorney's fees award. Another

court in this district has observed that "the average attorney's fees percentage in [class action settlements] was 31.71% and that the median fee award was 33.3%." *Williams*, 2011 WL 4018205, at *10 (citing *Boone v. City of Philadelphia*, 668 F. Supp. 2d 693, 714 (E.D. Pa. 2009)). Accordingly, all the considerations under this factor—whether relief is adequate—weigh in favor of preliminarily approving the settlement agreement.

#### d. Whether the proposal treats class members equitably relative to each other

FLSA and state law class members will receive payments based on the same calculation. "The settlement share allocation is individually determined based on transactional data from each Settlement Class Member's distributorship and the number of weeks each such distributor worked within the applicable period. (ECF No. 62-1 at 18-19.)" This calculation takes into account both the estimated overtime and the deductions. Because the proposed settlement treats class members equitably relative to each other, this factor weighs in favor of preliminary approval.

### 2. Additional settlement terms

The present settlement agreement includes an arbitration agreement with a class action waiver as a condition to participating in the settlement. The Court must, therefore, determine whether the arbitration term is "fundamentally fair, reasonable, and adequate." *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 592 (3d Cir. 2010) (citing Fed. R. Civ. P. 23(e)).

Here, parties assert that they negotiated the terms of the arbitration agreement and that "this negotiated exchange yeld[ed] an additional fair and reasonable term." (ECF No. 62-1 at 20.) And, upon the preliminary review of the arbitration agreement, the Court does not see "grounds to doubt its fairness or other obvious deficiencies" *In re Nat'l Football League Players' Concussion Inj. Litig.*, 301 F.R.D. 191, 198 (E.D. Pa. 2014). The arbitration agreement includes a direct additional payment of $3,500. Class members will be provided with a one-page summary explaining arbitration and Class Counsel will be available to fully inform class members about the pros and cons of arbitration. Moreover, courts in this circuit routinely find arbitration clauses enforceable in the employment context. *See, e.g., Zimmer v. CooperNeff*

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 57 of 482

Caddick v. Tasty Baking Company, Not Reported in Fed. Supp. (2021)

*Advisors, Inc.*, 523 F.3d 224, 229 (3d Cir. 2008); *Blair v. Scott Specialty Gases*, 283 F.3d 595, 604 (3d Cir. 2002).

### 3. FLSA factors

Congress enacted the FLSA to "protect all covered workers from substandard wages and oppressive working hours[.]" *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981). Parties may settle FLSA claims by seeking district court approval. *See Kraus v. PA Fit II, LLC*, 155 F. Supp.3d 516. 522 (E.D. Pa. 2016). When evaluating settlements, a court first determines whether the settlement concerns a "bona fide dispute." *Id. at 523* (quotation omitted). If a bona fide dispute exists, courts assess whether the settlement is fair and reasonable. *See Kauffman v. U-Haul Int'l, Inc.*, No. 16-cv-4580, 2019 WL 1785453, at *2 (E.D. Pa. Apr. 24, 2019) (citation omitted). And finally, courts must ensure that the settlement does not frustrate the FLSA's purpose. *Id.*

"A proposed settlement resolves a bona fide dispute where its terms 'reflect a reasonable compromise over issues, such as ... back wages, that are actually in dispute.'" *Kraus*, 155 F. Supp. 3d. at 523 (quotation omitted). "A dispute is 'bona fide' where it involves 'factual issues rather than legal issues such as the statute's coverage and applicability.'" *Flores v. Eagle Diner Corp.*, No. 18-cv-1206, 2019 WL 3943355, at *9 (E.D. Pa. Aug. 21, 2019) (quotation omitted). "[F]or a bona fide dispute to exist, ... there must be evidence of the defendant's intent to reject or actual rejection of that claim when it is presented." *Kraus*, 155 F. Supp. 3d at 530.

 **\*8** This case presents a bona fide dispute. Plaintiffs (including the Class Reps and opt-in plaintiffs) submitted a claim for unpaid overtime wages under the FLSA based on Tasty misclassifying them as independent contractors. Tasty maintains that plaintiffs are independent contractors and denies the amount claimed as damages. Had this matter not settled, resolution of these issues would have involved a fact-intensive inquiry. The parties settled this case to avoid the risks and uncertainty of further litigation.

The settlement is also fair and reasonable. Courts in this circuit have held that the inquiry into whether a settlement should be approved under the FLSA "largely overlap[s]" with Rule 23 analysis. *Williams*, No. CIV.A. 10-1044, 2011 WL 4018205, at *9. As explained above, Rule 23 factors support preliminarily approving the proposed settlement.

Finally, the Court must determine whether the proposed settlement furthers or impermissibly frustrates the implementation of the FLSA in the workplace. Generally, courts find that all-encompassing release provisions that preclude plaintiffs from raising unrelated claims against their employer are too broad and frustrate FLSA's purpose. *See, e.g. Solkoff v. Pennsylvania State Univ.*, 435 F. Supp. 3d 646, 660 (E.D. Pa. 2020)("The broad release of claims that includes unrelated claims and claims unknown to the plaintiff frustrates the purpose of the FLSA....."); *Howard v. Philadelphia Hous. Auth.*, 197 F. Supp. 3d 773, 779 (E.D. Pa. 2016)("If the Court blindly approved the waiver of "any and all Claims" "concerning the termination of Plaintiff's employment," the Court risks judicially endorsing a waiver of Plaintiff's other statutorily protected rights.... And such judicial endorsement exceeds the court's judicial approval role under the FLSA."). But release provisions that limit future claims to the specific litigation are sufficiently narrow to pass muster. *See, e.g., O'Mara v. Creative Waste Sols., LLC*, No. CV 19-2021, 2020 WL 2513571, at *6 (E.D. Pa. May 15, 2020); *Singleton v. First Student Mgmt. LLC*, No. CIV.A. 13-1744 JEI, 2014 WL 3865853, at *9 (D.N.J. Aug. 6, 2014). The release provision here releases Tasty from any past claims "based on the alleged misclassification [of collective action and class members] as independent contractors...." (ECF 62-2 at ¶ 3.24.) Because the release is sufficiently tailored both temporally and factually to Plaintiffs' allegations in this litigation, the Court sees no issue with the release provision contained in the proposed settlement agreement.

Similarly, the arbitration agreement does not frustrate FLSA's purpose. The Supreme Court has held that arbitration agreements containing waivers of the right to bring class or collective actions over employment-related disputes are enforceable under the Federal Arbitration Act. *See Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612, 1632 (2018). In doing so, the Court noted that the FLSA allows agreements for individualized arbitration. *See id. at 1626*; *see also Gaffers v. Kelly Servs., Inc.*, 900 F.3d 293, 296 (6th Cir. 2018)("[B]ecause the FLSA does not "clearly and manifestly" make arbitration agreements unenforceable, we hold that it does not displace the Arbitration Act's requirement that we enforce the employees' agreements as written."). Thus, the Arbitration Agreement is acceptable.

The Court cannot say the same for the confidentiality provision of the settlement agreement, however. Generally, courts that have considered the issue have concluded

that confidentiality agreements that prohibit plaintiffs from discussing settlement agreements with their coworkers are too broad and frustrate FLSA's purpose. *Compare Mabry v. Hildebrant*, No. 14-cv-5525, 2015 WL 5025810, at *2–3 (E.D. Pa. Aug. 24, 2015) (disapproving confidentiality clause that allowed the plaintiff to disclose terms of agreement only with his "spouse, attorney, and/or accountant") *and Altenbach v. Lube Ctr., Inc.*, No. 08-cv-02178, 2013 WL 74251, at *3 (M.D. Pa. Jan. 4, 2013) (declining to approve settlement agreement prohibiting the plaintiff and class counsel from disclosing "any specific information concerning the Settlement with the Defendant, such as the settlement amount, to any person or agency") *with McGee v. Ann's Choice, Inc.*, No. CIV.A. 12-2664, 2014 WL 2514582, at *3 (E.D. Pa. June 4, 2014) (approving confidentiality clause that prohibited the plaintiff from speaking with media but otherwise permitted the plaintiff to share terms with "friends, family, employees, and individuals not affiliated with the media.").

**\*9** The confidentiality agreement here prohibits plaintiffs from "publicizing or disclosing the specific monetary amounts each individual is to receive under this settlement, either directly or indirectly, ... to any media, ... the public generally, or any individual or entity." (ECF 62-2 at ¶ 15.12.) In its current state, the confidentiality agreement is too broad because the reference to "any individual or entity" extends to those that the settlement covers.

District courts reviewing proposed FLSA settlements may require litigants to limit the scope of the confidentiality agreement. *See O'Mara v. Creative Waste Sols., LLC*, No. CV 19-2021, 2020 WL 2513571, at *6 (E.D. Pa. May 15, 2020); *see also Bettenger*, 2015 W 279754, at *8. The Court will do so here. Therefore, the Court will approve the settlement only to the extent that the confidentiality agreement allows plaintiffs to discuss the terms of their settlement with other Tasty distributors. The Court recognizes that such an approval alters the Parties' deal, and it will give the Parties seven days to opt out of their settlement in light of this change.

**C. Notice**

### a. Rule 23(e) Factors

Under Rule 23, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1)(B). Such notice

> "must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)."

*Id.*

The parties have agreed on separate notices for: (1) FLSA collective action members; (2) class members who are not FLSA opt-ins; and (3) distributors who are both state class and FLSA collective action members. Within this scheme, each proposed notice explains the nature of the action and the terms of the settlement. Additionally, current distributors' notice will also include information about the arbitration and class action waiver agreement. The Court finds that these essential terms use simple and straightforward language and not legalese. The Court finds that the notice program is robust and is likely to ensure that all members receive notice of the claims and their rights with respect to the settlement.

### IV. CONCLUSION

The Court will preliminarily approve the settlement, with the confidentiality clause modified as described. The parties shall have seven days from the date of this decision to inform the Court that they have opted out of the settlement in light of the Court's changes. An appropriate Order follows.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 1374607

---

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 59 of 482

Chimenti v. Wetzel, Not Reported in Fed. Supp. (2018)

2018 WL 2388665

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.

Salvatore CHIMENTI, et al.

v.

John WETZEL, et al.

CIVIL ACTION NO. 15-3333

|

Filed 05/24/2018

**Attorneys and Law Firms**

Angus R. Love, Su Ming Yeh, PA Institutional Law Project, David Rudovsky, Kairys Rudovsky Messing Feinberg & Lin, LLP, Stephen D. Brown, Christine C. Levin, Rose Marie Wong, Dechert LLP, Philadelphia, PA, Ethan Solove, Structure Law Group, LLP, San Jose, CA, for Salvatore Chimenti, et al.

Vincent R. Mazeski, Chief Counsel's Office Pennsylvania Dept. of Corrections, Mechanicsburg, PA, Caitlin J. Goodrich, Weber Gallagher, Philadelphia, PA, Noah Evan Katz, Weber Gallagher, Scranton, PA, Samuel H. Foreman, Weber Gallagher Simpson Stapleton Fires & Newby, LLP, Pittsburgh, PA, for John Wetzel, et al.

**MEMORANDUM**

John R. Padova, District Judge

**\*1**  Plaintiffs Salvatore Chimenti, Daniel Leyva, and David Maldonado have brought this lawsuit against John Wetzel, the Secretary of the Pennsylvania Department of Corrections (the "DOC"), and Paul Noel, the Chief Medical Director of the DOC (collectively the "DOC Defendants"), as well as two companies that have contracted to provide medical services for the DOC and officials and employees of those companies (collectively the "Medical Defendants"), asserting claims regarding the medical care provided to DOC inmates who have been diagnosed with Hepatitis C viral infections ("HCV"). Specifically, Plaintiffs contend that the DOC Defendants have violated their rights under the Eighth Amendment and the Pennsylvania Constitution by adopting a policy for the treatment of inmates with chronic HCV that fails to provide them with appropriate medical care.[1] Plaintiffs seek injunctive relief requiring the DOC Defendants

to formulate and implement a Hepatitis C treatment policy that (1) meets the community standards of care for patients with chronic HCV; (2) ensures that inmates with chronic HCV are treated with medically necessary and appropriate direct-acting antiviral drugs ("DAAs"); and (3) provides ongoing monitoring and medical care in accordance with the standard of care for such patients' liver fibrosis and cirrhosis.

Plaintiffs seek to represent a class of similarly situated inmates of the DOC who have at least twelve weeks remaining to serve on their sentences. Before the Court is Plaintiffs' Renewed Motion for Class Certification, which is opposed by the DOC Defendants.[2] For the following reasons, the Motion is granted.

**I. FACTUAL BACKGROUND**

Plaintiffs Chimenti, Leyva, and Maldonado all suffer from chronic HCV and were, at the time of the filing of this action, incarcerated in correctional institutions that are part of the DOC. (See Compl. (Docket No. 1) ¶¶ 1-2; DOC Defs.' Ans. to Compl. (Docket No. 30) ¶¶ 1-2.) Beginning in 2011, the United States Food and Drug Administration ("FDA") approved DAAs for the treatment of Hepatitis C. (Trooskin Rpt., Pls.' Resp. to Mot. for Summ. J., Ex. A at 2.) These drugs, which include Harvoni, are capable of achieving a "sustained virologic response," which means "the elimination of the virus[,] for more than 90% of patients." (Id. at 2-3.) Prior to the development of DAAs, the standard of care "was a three-drug treatment containing boceprevir or telaprevir, interferon and ribavirin" that "provided, at best, a 70% cure rate, and was accompanied by significant adverse side effects such as anemia, insomnia, anxiety, depression, nausea, bone pain, muscle [pain], liver failure, joint pain, memory loss, and death." (Id. at 2.) Plaintiffs' expert, Dr. Stacey Trooskin, has opined that the use of DAAs is now "the standard of medical care for the treatment of all HCV individuals." (Id. at 3.)

**\*2**  When Chimenti, Leyva, and Maldonado first asked to be treated with DAAs, their applications were rejected by the DOC. Chimenti began requesting treatment with DAAs in late 2013, but Defendants denied his requests. (Pls.' Counterstatement of Add'l Facts ("PSAF") ¶¶ 225-30; DOC Defs.' Resp. to Pls.' Counterstatement of Add'l Facts ("DRPCAF") ¶¶ 225-30.) Chimenti filed grievances asking for treatment with DAAs in early 2014, but his grievances were denied because the DOC did not have a Hepatitis C protocol and had put all Hepatitis C treatment on hold. (PSAF ¶¶ 226-28; DRPCAF ¶¶ 226-28.) Chimenti has suffered from

Stage 4 Cirrhosis since at least 2000. (Pls.' Resp. to Mot. for Summ. J., Ex. U at 5.) In October 2015, Chimenti was diagnosed with liver cancer. (PSAF ¶ 232; DRPCAF ¶ 232.) Chimenti was treated with DAAs beginning in October 2016. (PSAF ¶ 236; DRPCAF ¶ 236.)

Leyva filed a grievance with the DOC on January 13, 2015, asking to be treated with the new Hepatitis C drugs. (Pls.' Resp. to Mot. for Summ. J., Ex. V at 2.) The DOC upheld his grievance, but told him that it was evaluating its treatment options and developing a new treatment protocol and, in the meantime, would only monitor patients with HCV. (Id. at 3.) On March 4, 2015, Leyva sent a letter to the DOC expressing his concern with having to wait for treatment while the DOC developed a new treatment protocol for Hepatitis. (See id. at 4.) The DOC responded that it was continuing to monitor inmates with HCV while it evaluated treatment options. (Id.) On April 7, 2015, Leyva filed a new grievance, asking to be treated with Harvoni. (Id. at 5.) That grievance was denied. (Id. at 7-19.) Leyva still has not received treatment with DAAs. (1st Am. Class Action Compl. ("1st Am. Compl." ¶ 68; DOC Defs.' Ans. to 1st Am. Compl. ¶ 13.) Maldonado also filed a grievance asking to be treated with the latest DAAs, but his grievance was rejected because the DOC was developing a new treatment protocol. (1st Am. Compl. ¶¶ 73-74; DOC Defs.' Ans. to 1st Am. Compl. ¶ 16.) The DOC has not treated Maldonado with DAAs. (DOC Defs.' Ans. to 1st Am. Compl. ¶ 16.)

The DOC issued a new protocol for the treatment of HCV on November 7, 2016. (DOC Defs.' Statement of Material Facts ("SMF") ¶ 40; Pls.' Resp. to SMF ¶ 40.) The Hepatitis C Treatment Protocol does not require the DOC to treat all inmates with HCV with DAAs. Instead, the Protocol requires the DOC to treat the sickest inmates first, and it bases its treatment decisions on an inmate's fibrosis score. (SMF ¶¶ 45, 53; Pls.' Resp. to SMF ¶¶ 45, 53.) Fewer than 10% of DOC inmates with chronic HCV have been treated with DAAs under the Protocol. (PSAF ¶ 178; DRPCAF ¶ 178.)

Plaintiffs seek to represent the following Class:

> all persons who are currently incarcerated in a Pennsylvania Department of Corrections ("DOC") facility with a diagnosed condition of chronic Hepatitis C, and who have at least twelve (12) weeks or more remaining to serve on their sentences, and who have a life expectancy of over one year.

(Renewed Mot. for Class Cert. at 2.) As of September 20, 2017, the DOC held 7521 inmates who have been infected with Hepatitis C, 5265 of whom have chronic HCV. (Wenhold Decl., DOC Defs.' Mot. for Summ. J., Ex. F, ¶¶ 15-16.) The DOC has treated 297 of those inmates who have chronic HCV with DAAs. (Id. ¶ 17.)

The First Amended Complaint states four claims for relief. Count I asserts a claim pursuant to 42 U.S.C. § 1983 on behalf of the three named Plaintiffs and the Class for deliberate indifference to the serious medical needs of prisoners infected with HCV in violation of the Eighth Amendment to the United States Constitution. Count II asserts a claim on behalf of the three named Plaintiffs and the Class for violation of Article I, § 13 of the Pennsylvania Constitution. Count III asserts a claim for medical malpractice against all Defendants on behalf of Chimenti. Count IV asserts a claim against Correct Care Solutions and Wexford for medical malpractice on behalf of Chimenti. Plaintiffs seek an injunction on behalf of themselves and the Class ordering the DOC to:

> **\*3** (a) formulate and implement a Hepatitis C treatment policy that meets the community standards of care for patients with Hepatitis C, (b) that members of the Class be treated with medically necessary and the appropriate direct-acting antiviral drugs based on individual medical testing and medical evaluation regarding each individual's Hepatitis C status, and (c) that members of the [C]lass receive ongoing monitoring and medical care per the standard of care for their individual level of liver fibrosis and cirrhosis, including but not limited to appropriate access to and evaluation by a hepatologist and assessment regarding their need for partial or full liver transplant.

Case 4:21-cv-00196-MWB     Document 249-1     Filed 10/07/25     Page 61 of 482

Chimenti v. Wetzel, Not Reported in Fed. Supp. (2018)

(Id. ¶ 98.) Plaintiffs also seek compensatory and punitive damages for Chimenti, reasonable attorney's fees and costs, and such other relief as the Court deems just and equitable. (Id. ¶¶ 99-102.)

## II. LEGAL STANDARD

In order to be certified, a class action " 'must satisfy the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3).' " In re Modafinil Antitrust Litig., 837 F.3d 238, 248 (3d Cir. 2016) (quoting Marcus v. BMW of N.A., LLC, 687 F.3d 583, 590 (3d Cir. 2012) ). "The party seeking certification bears the burden of establishing each element of Rule 23 by a preponderance of the evidence." Marcus, 687 F.3d at 591 (citing In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 307 (3d Cir. 2009) ). Thus, Plaintiffs must establish the following four elements:

> (1) the class must be "so numerous that joinder of all members is impracticable" (numerosity); (2) there must be "questions of law or fact common to the class" (commonality); (3) "the claims or defenses of the representative parties" must be "typical of the claims or defenses of the class" (typicality); and (4) the named plaintiffs must "fairly and adequately protect the interests of the class" (adequacy of representation, or simply adequacy).

In re Cmty. Bank of N. Va., 622 F.3d 275, 291 (3d Cir. 2010) (quoting Fed. R. Civ. P. 23(a)(1)-(4) ). If Plaintiffs are able to satisfy these requirements, "we consider whether the class meets the requirements of one of three categories of class actions in Rule 23(b)." In re Nat'l Football League Players Concussion Injury Litig., 821 F.3d 410, 426 (3d Cir.), cert. denied sub nom. Gilchrist v. Nat'l Football League, 137 S. Ct. 591 (2016), and cert. denied sub nom. Armstrong v. Nat'l Football League, 137 S. Ct. 607 (2016). Plaintiffs ask us to certify the Class under Rule 23(b)(2), which applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. (23)(b)(2).

The DOC Defendants oppose class certification on three grounds. They first argue that the Class is not sufficiently numerous to be certified. They next argue that the named Plaintiffs do not have claims that are typical of the claims of the absent Class members. They finally argue that, because

the named Plaintiffs' claims are not typical, they would not be adequate representatives of the members of the Class. [3]

## III. DISCUSSION

### A. The Rule 23(a) Factors

#### 1. Numerosity

**\*4** The United States Court of Appeals for the Third Circuit has stated that there is " '[n]o minimum number of plaintiffs ... required to maintain a suit as a class action.' " Modafinil, 837 F.3d at 249 (first alteration in original) (quoting Stewart v. Abraham, 275 F.3d 220, 226 (3d Cir. 2001) ). However, in general, " 'if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met.' " Id. at 250 (quoting Stewart, 275 F.3d at 226-27, and citing Robidoux v. Celani, 987 F.2d 931, 936 (2d Cir. 1993) ). "At the other end of the spectrum, the Supreme Court has stated in dicta that a class of fifteen was 'too small to meet the numerosity requirement.' " Id. (quoting Gen. Tel. Co. of the Nw, Inc. v. EEOC, 446 U.S. 318, 331 (1980) ).

The DOC Defendants argue that the class is not sufficiently numerous to support certification because only seven current DOC inmates had satisfied the Prison Litigation Reform Act's ("PLRA") exhaustion requirement with respect to the claims asserted in this action prior to the filing of the Complaint. The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The United States Court of Appeals for the Eleventh Circuit has held that "a class of prisoner-plaintiffs certified under Rule 23(b)(2) satisfies the PLRA's administrative exhaustion requirement through 'vicarious exhaustion,' i.e., when 'one or more class members ha[s] exhausted his administrative remedies with respect to each claim raised by the class.' " Chandler v. Crosby, 379 F.3d 1278, 1287 (11th Cir. 2004) (alteration in original) (quoting Jones 'El v. Berge, 172 F. Supp. 2d 1128, 1133 (W.D. Wis. 2001) and citing Hattie v. Hallock, 8 F. Supp. 2d 685, 689 (N.D. Ohio 1998) ). The Eleventh Circuit explained that it reached this holding for two reasons. "First, this rule advances the purpose of administrative exhaustion, which, we have stated (albeit in the employment context), 'is to put the [administrative

Case 4:21-cv-00196-MWB   Document 249-1   Filed 10/07/25   Page 62 of 482

Chimenti v. Wetzel, Not Reported in Fed. Supp. (2018)

authority] on notice of all issues in contention and to allow the [authority] an opportunity to investigate those issues.' " Id. (alterations in original) (quoting Griffin v. Carlin, 755 F.2d 1516, 1531 (11th Cir. 1985) ). "Second, a different rule, e.g., one requiring all class members to exhaust their administrative remedies, 'could impose an intolerable burden upon the inmate complaint review system.' " Id. (quoting Jonas 'El, 172 F. Supp. 2d at 1131-32). "Moreover, in cases like this one, where the composition of the class is subject to constant change beyond the class members' control, it could be extraordinarily difficult for all class members to exhaust administrative remedies before filing suit." Id. (citing Jonas 'El, 172 F. Supp. 2d at 1131).

The United States Court of Appeals for the Third Circuit has not yet addressed "vicarious exhaustion," but other courts have permitted it in § 1983 class actions filed by inmates. See Hubbard v. Danberg, Civ. A. No. 07-745-GMS, 2010 WL 883776, at *6 n.9 (D. Del. Mar. 10, 2010) (citing Chandler, 379 F.3d 1278; and Meisberger v. Donahue, 245 F.R.D. 627 (S.D. Ind. 2007) (additional citation omitted) ), aff'd, 408 Fed.Appx. 553 (3d Cir. 2010). For example, the United States Court of Appeals for the Fifth Circuit, like the Eleventh Circuit, has determined that the exhaustion of administrative remedies by one class member is sufficient to satisfy the PLRA's exhaustion requirement for the entire class. See Gates v. Cook, 376 F.3d 323, 330 (5th Cir. 2004) (concluding that one plaintiff's satisfaction of the Mississippi Department of Corrections' Administrative Remedy Program was "enough to satisfy the requirement for the class" (citations omitted) ). District Courts in other Circuits have also held that "the PLRA's exhaustion requirement is limited to the class representatives." Decoteau v. Raemisch, 304 F.R.D. 683, 687 (D. Col. 2014) (citing Chandler, 379 F.3d at 1287; Gates, 376 F.3d at 330; and Jackson v. District of Columbia, 254 F.3d 262, 269 (D.C. Cir. 2001) ); see also Butler v. Suffolk Cty., 289 F.R.D. 80, 97 (E.D.N.Y. 2013) (finding that "whether the purported class members have exhausted their administrative remedies is irrelevant to the class certification analysis" where the class representatives have satisfied the PLRA exhaustion requirement); Scott v. Clarke, 64 F. Supp. 3d 813, 832 n.10 (W.D. Va. 2014) (concluding that the efforts of the named plaintiffs and several other class members, who fully exhausted their prison medical grievances, "easily support[ed] a finding of PLRA exhaustion on behalf of the entire class").

**\*5** We agree with the Eleventh Circuit's reasoning in Chandler and we conclude that, if any of the named

Plaintiffs, Chimenti, Leyva, and Maldonado, have satisfied the PLRA's administrative exhaustion requirement, the exhaustion requirement is satisfied for all of the absent class members through vicarious exhaustion. See Chandler, 379 F.3d at 1287. As we discussed above, Chimenti, Leyva, and Maldonado all filed grievances with respect to the DOC's refusal to treat them with DAAs. The DOC contends that Leyva did not fully exhaust his administrative remedies in accordance with the PLRA before this suit was filed. However, the DOC Defendants do not suggest that either Chimenti or Maldonado has failed to satisfy the PLRA's exhaustion requirement. Consequently, we conclude that the PLRA's exhaustion requirement is satisfied through vicarious exhaustion and that the class is not limited to the seven prisoners with HCV who have personally exhausted their administrative remedies with respect to treatment with DAAs.

The DOC Defendants have submitted evidence that, as of September, 2017, the DOC held 4968 inmates who have chronic HCV and had not been treated with DAAs. (Wenhold Decl. ¶¶ 15-17.) We conclude that a class of 4968 inmates is sufficiently " 'numerous that joinder of all members is impracticable.' " In re Cmty. Bank, 622 F.3d at 291 (quoting Fed. R. Civ. P. 23(a)(1) ), and that the proposed class thus satisfies the numerosity requirement, Modafinil, 837 F.3d at 249-50 (quotation and citation omitted).

## 2. Commonality

Commonality requires " 'a plaintiff to show that 'there are questions of law or fact common to the class.' " Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 349 (2011) (quoting Fed. R. Civ. P. 23(a)(2) ). Consequently, Plaintiffs' claims "must depend upon a common contention ... [and] [t]hat common contention ... must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Id. "Rule 23(a)(2)'s commonality requirement 'does not require identical claims or facts among class member[s].' " Marcus, 687 F.3d at 597 (alteration in original) (quoting Chiang v. Veneman, 385 F.3d 256, 265 (3d Cir. 2004), abrog. on other grounds by Hydrogen Peroxide, 552 F.3d at 318 n.18). " 'For purposes of Rule 23(a)(2), even a single common question will do.' " Id. (quoting Dukes, 564 U.S. at 359; and citing In re Schering Plough Corp. ERISA Litig., 589 F.3d 585, 597 (3d Cir. 2009) ).

Plaintiffs assert that the following two questions of fact are both central to their claims and common to all of the members of the proposed class:

1. Whether the treatment regimens utilizing the DAA drugs are the proper, necessary, and standard course of treatment in the medical community; and

2. Whether denial of treatment regimens utilizing the DAA drugs to the Proposed Class will cause injury to the class members, including unnecessary pain and suffering, chronic illness, and death.

(Pls.' Mem. at 13.) Plaintiffs also maintain that this case presents a common question of law, i.e., "whether the DOC's current Hepatitis C Protocol violates the Eighth Amendment to the U.S. Constitution and Article I § 13 of the Pennsylvania Constitution in denying thousands of inmates necessary medical care." (Id. at 14.) Moreover, the injunctive relief that Plaintiffs seek on behalf of the class involves changing the DOC's policies with regard to treatment of all inmates with chronic HCV.

Plaintiffs' claims for injunctive relief on behalf of the putative class are based on Defendants' policy regarding the treatment of inmates with chronic HCV. Thus, in connection with their Eighth Amendment and Pennsylvania constitution claims, "all class members share the common question of whether the [DOC] Defendants' policy or custom of withholding treatment with DAA drugs from individuals who have been or will be diagnosed with chronic HCV constitutes deliberate indifference to a serious medical need." Postawko v. Missouri Dep't of Corr., Civ. A. No. 16-4219, 2017 WL 3185155, at *7 (W.D. Mo. July 26, 2017) (finding that element of commonality is satisfied in class action asserting 8th Amendment claim against the Missouri Department of Corrections because "all class members share the common question of whether the Defendants' policy or custom of withholding treatment with DAA drugs from individuals who have been or will be diagnosed with chronic HCV constitutes deliberate indifference to a serious medical need") (appeal docketed Sept. 19, 2017). See also Graham v. Parker, Civ. A. No. 16-1954, 2017 WL 1737871, at *1, *4 (M.D. Tenn. May 4, 2017) (finding that element of commonality is met in class action challenging the constitutionality of "the State of Tennessee's policies and procedures for inmates with Hepatitis C" where the proposed class is made up of all inmates with Hepatitis C infections and Plaintiffs challenge "the official policies and practices applicable to all inmates with Hepatitis C"); Stafford v. Carter, Civ. A. No.

17-0289, 2018 WL 1140388, at *5-6 (S.D. Ind. Mar. 2, 2018) (concluding that the commonality requirement is satisfied in class action challenging the constitutionality of the Indiana Department of Corrections' treatment of prisoners who suffer from chronic HCV where the Defendants' policies regarding the treatment of HCV formed the basis of the common questions of fact and law). Moreover, the relief Plaintiffs seek on behalf of the putative class is an injunction changing the DOC's Hepatitis C Protocol in a manner that will affect all DOC inmates with HCV. See Hoffer v. Jones, 323 F.R.D. 694, 697-98 (N.D. Fla. 2017) (concluding that plaintiffs satisfied the commonality requirement in class action challenging the constitutionality of medical care provided by Florida Department of Corrections to inmates with HCV where there were common questions involving the appropriate standard of care for persons with chronic HCV and whether a failure to meet that standard violates the Eighth Amendment, and the relief sought with respect to the class was "limited to changing Defendant's policies and practices"). We conclude, accordingly, that the commonality requirement is met in this case.

### 3. Typicality

**\*6** "The concepts of typicality and commonality are closely related and often tend to merge." Marcus, 687 F.3d at 597 (citing Baby Neal v. Casey, 43 F.3d 48, 56 (3d Cir. 1994) ). "Typicality, however, derives its independent legal significance from its ability to 'screen out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present.' " Id. at 598 (quoting 7A Charles Alan Wright et al., Federal Practice and Procedure § 1764 (3d ed. 2005) ). In order to "determine whether a plaintiff is markedly different from the class as a whole, we consider the attributes of the plaintiff, the class as a whole, and the similarity between the plaintiff and the class." Id. (citing Schering Plough, 589 F.3d at 597). In making our determination, we consider the following three factors:

"(1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced by that theory and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the

representative must be sufficiently aligned with those of the class."

Id. (quoting Schering Plough, 589 F.3d at 599). However, "[i]f a plaintiff's claim arises from the same event, practice or course of conduct that gives rises to the claims of the class members, factual differences will not render that claim atypical if it is based on the same legal theory as the claims of the class." Id. (citing Hoxworth v. Blinder, Robinson & Co., 980 F.2d 912, 923 (3d Cir. 1992) ). Indeed, the Third Circuit has "set a 'low threshold' for typicality." In re Nat'l Football League, 821 F.3d at 428 (quoting Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 183 (3d Cir. 2001) ). " 'Even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct.' " Id. (quoting In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 311 (3d Cir. 1998) ).

Plaintiffs contend that the typicality requirement is met in this case because the claims of Chimenti, Leyva, and Maldonado arise from the same policy as the claims of the members of the putative class, namely the DOC's customs and policies regarding the treatment of HCV. Specifically, they assert that all three of the named Plaintiffs suffer from chronic HCV and are presently, or have been, denied treatment with DAAs pursuant to the DOC's policies. Plaintiffs rely on Postawko, in which the court found that the typicality requirement was met because the claims of the named plaintiffs and the class they sought to represent all arose from the Missouri Department of Corrections' policies for treating inmates with chronic HCV, including their policy of denying treatment with DAAs to certain inmates based on the severity of their disease. Postawko, 2017 WL 3185155, at *11. The Postawko court found that the named plaintiffs' claims that those policies violated their Eighth Amendment rights were "identical to the claims that could be raised by any member of the class." Id. The Postawko court further found that "all putative class members share a common injury of having these policies applied to them and as a result, suffering a significant risk of harm" and, therefore, the named plaintiffs were typical "because they, too, are exposed to the same risk. Like the remainder of the class, they are HCV-positive inmates to which the alleged policy has been applied and who have not been treated with DAA drugs." Id. (citing Alpern v. UtiliCorp. United, Inc., 84 F.3d 1525, 1540 (8th Cir. 1996) ); see also Graham, 2017 WL 1737871, at *5 (concluding that "Plaintiffs' claims are typical of the claims of the class because

they are seeking declaratory, injunctive class-wide relief only that may benefit the entire class").

**\*7** The DOC Defendants argue, however, that Chimenti, Leyva, and Maldonado are not typical of the class they seek to represent because they are subject to unique defenses. Specifically, the DOC Defendants argue that Chimenti is not a typical plaintiff because he has received treatment with DAAs and has brought individual claims against Defendants for medical malpractice. The DOC Defendants also argue that Leyva is not a typical plaintiff because he is subject to the defense that he failed to exhaust his administrative remedies prior to filing suit. Finally, the DOC Defendants argue that Maldonado is not typical because he is subject to the defense that his claims are moot because he is no longer incarcerated by the DOC.

### a. Chimenti

Plaintiffs request certification of a class of individuals who seek injunctive relief. As we discussed above, Plaintiffs seek an injunction that will require Defendants to do the following:

> (a) formulate and implement a Hepatitis C treatment policy that meets the community standards of care for patients with Hepatitis C, (b) that members of the Class be treated with medically necessary and the appropriate direct-acting antiviral drugs based on individual medical testing and medical evaluation regarding each individual's Hepatitis C status, and (c) that members of the class receive ongoing monitoring and medical care per the standard of care for their individual level of liver fibrosis and cirrhosis, including but not limited to appropriate access to and evaluation by a hepatologist and assessment regarding their need for partial or full liver transplant.

(1st Am. Compl. ¶ 98.) Chimenti has already received treatment with DAAs and, accordingly, no longer personally needs the second of the three items in the requested injunction.

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 65 of 482

Chimenti v. Wetzel, Not Reported in Fed. Supp. (2018)

(PSAF ¶ 232; DRPCAF ¶ 232.) However, there is no basis on the record before us upon which we could determine that Chimenti has no interest in requiring the DOC Defendants to formulate and implement a policy for the treatment of Hepatitis C that meets community standards of care or that he no longer needs monitoring and medical care for Cirrhosis or liver fibrosis. Furthermore, Chimenti's claims for monetary damages pursuant to § 1983 and his medical malpractice claims are based on the same basic facts as the claims for injunctive relief on behalf of the class pursuant to § 1983 and the Pennsylvania Constitution, i.e., Defendants' failure to develop a policy to treat all inmates who have chronic HCV in accordance with community standards, which involves the use of DAAs. We conclude that the factual differences between Chimenti and the members of the putative class are not pronounced and that Chimenti satisfies the "low threshold" for typicality in this case, In re Nat'l Football League, 821 F.3d at 428 (quotation omitted), since his claims for monetary damages arise from the same policy and practice as the class's claim for injunctive relief. We further conclude, accordingly, that Plaintiffs have satisfied the typicality requirement as to Chimenti.

### b. Leyva

The DOC Defendants contend that Leyva is not typical because he is subject to the defense that he failed to exhaust his administrative remedies in accordance with the PLRA prior to filing the instant lawsuit. Specifically, the DOC Defendants argue that Leyva did not exhaust his administrative remedies prior to filing suit because the DOC's Secretary's Office of Inmate Grievances and Appeals did not issue a decision at the third level on Leyva's grievance until September 8, 2015, nearly three months after this action was initiated on June 12, 2015. [4] "If exhaustion is incomplete when an inmate files suit, dismissal is mandatory." Turner v. Sec'y Pa. Dep't of Corr., 683 Fed.Appx. 180, 182 n.1 (3d Cir. 2017) (citing Porter v. Nussle, 534 U.S. 516, 524 (2002); and Nyhuis v. Reno, 204 F.3d 65, 77 n.12 (3d Cir. 2000) ). Moreover, "[a]n inmate cannot cure non-compliance with [the PLRA] by exhausting remedies after filing his complaint." Id. (citation omitted).

**\*8** Leyva filed two grievances regarding the DOC's failure to treat his HCV with DAAs. The first was filed on January 13, 2015 and upheld on January 15, 2015. (See Pls.' Resp. to Mot. for Summ. J., Ex. V at 2-3. [5] ) However, even though Leyva's appeal was upheld, he did not receive treatment with

DAAs, and he filed a second grievance on April 7, 2015. (See id. at 5.) Leyva's second grievance was denied on April 17, 2015 and he appealed the denial of that grievance on April 25, 2015. (Id. at 7-8.) He filed his third level appeal on May 13, 2015, which was denied by the Secretary's Office of Inmate Grievances and Appeals on September 8, 2015. (Id. at 10, 19.) We therefore find that Leyva did not exhaust his second grievance regarding treatment of his HCV with DAAs prior to the filing of the instant lawsuit on June 12, 2015.

Consequently, Leyva is subject to the defense that he did not exhaust his administrative remedies prior to bringing suit. This defense, however, is not unique to Leyva, as the DOC Defendants have asserted that it applies to nearly all members of the putative class. Moreover, we have determined that vicarious exhaustion applies in this case. See Chandler, 379 F.3d at 1287. Since there is no question that Chimenti and Maldonado have properly exhausted their administrative remedies pursuant to the PLRA, the defense of failure to exhaust is not "likely to become a major focus of [this] litigation." Marcus, 687 F.3d at 598 (quotation omitted). Consequently, we conclude that Leyva's failure to fully exhaust his administrative remedies with respect to his second grievance prior to filing suit does not destroy his typicality in this case. We further conclude, accordingly, that Plaintiffs have satisfied the typicality requirement as to Leyva.

### c. Maldonado

The DOC Defendants argue that Maldonado is not a typical plaintiff because he has been released from the custody of the DOC and his claim is now moot. [6] Maldonado was paroled on May 15, 2017. (DOC Defs.' Mot. for Summ. J. Ex. H at 2.) Plaintiffs filed their initial Motion for Class Certification on June 12, 2015 and their Renewed Motion for Class Certification on October 2, 2017. (See Docket Nos. 2, 94.) The Supreme Court has held that "an action brought on behalf of a class does not become moot upon expiration of the named plaintiff's substantive claim." United States Parole Comm'n v. Geraghty, 445 U.S. 388, 404 (1980). Consequently, even if Maldonado's personal claim on the merits is now moot, because he is no longer in the custody of the DOC, " 'he retains a "personal stake" in obtaining class certification sufficient to assure that Art. III values are not undermined.' " Williams v. Sec'y Pa. Dep't of Corr., 447 Fed.Appx. 399, 403 (3d Cir. 2011) (quoting Geraghty, 445 U.S. at 404). Thus, "so long as a plaintiff files a motion to certify a class when he still has a live claim, the mooting of that claim while the motion is

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 66 of 482

Chimenti v. Wetzel, Not Reported in Fed. Supp. (2018)

pending precludes the court from reaching the merits but does not preclude it from deciding the certification motion." Gayle v. Warden Monmouth Cty. Corr. Inst., 838 F.3d 297, 305 (3d Cir. 2016) (citing Holmes v. Pension Plan of Bethlehem Steel Corp., 213 F.3d 124, 135 (3d Cir. 2000); and Geraghty, 445 U.S. at 397). As the Third Circuit has explained, "a plaintiff's claim that he should represent the class is one that is 'presented ... in a concrete factual setting and [with] self-interested parties vigorously advocating opposing positions,' and such a claim 'remains as a concrete, sharply presented issue' even if the plaintiff's individual claims expire." Id. at 305-06 (alterations in original) (quoting Geraghty, 445 U.S. at 403-04). Moreover, "Geraghty's relation-back doctrine encompasses successive, substantially similar motions to certify unless and until certification has been finally resolved on Rule 23 grounds. Id. at 307. We conclude that this "relation back" doctrine applies to Maldonado even though he was paroled prior to the filing of Plaintiffs' Renewed Class Certification Motion because the first Motion for Class Certification was not decided on the merits, but was withdrawn by agreement of the parties on August 31, 2015. (See August 31, 2015 Stipulation and Order, Docket No. 21.) Since Maldonado was in the custody of the DOC at the time the original Motion for Class Certification was filed, we conclude that, notwithstanding his subsequent parole, he has "a 'personal stake' in obtaining class certification sufficient to assure that Art. III values are not undermined," Williams, 447 Fed.Appx. at 403 (quotation omitted), and his claim for class certification is not moot. Plaintiffs have, therefore, satisfied the typicality requirement as to Maldonado. For the above stated reasons, we conclude that the typicality requirement is met as to all three named Plaintiffs in this case.

### 4. Adequacy of representation

**\*9** "Rule 23(a)(4) requires class representatives to 'fairly and adequately protect the interests of the class.' " In re Nat'l Football League, 821 F.3d at 428 (quoting Fed. R. Civ. P. 23(a)(4) ). This requirement "tests the qualifications of class counsel and the class representatives. It also aims to root out conflicts of interest within the class to ensure that all class members are fairly represented in the negotiations." Id. With respect to class counsel, "the adequacy requirement assures that counsel possesses adequate experience, will vigorously prosecute the action, and will act at arm's length from the defendant." In re Cmty. Bank of N. Virginia Mortg. Lending Practices Litig., 795 F.3d 380, 389 (3d Cir. 2015) (citation omitted). We have reviewed the biographies of

Plaintiffs' counsel that were submitted in connection with the instant Motion and we conclude that class counsel possess more than adequate experience in both representing prisoners and prosecuting class actions. Moreover, class counsel's representation of Plaintiffs over the more than two years that this case has been ongoing shows that they will vigorously prosecute this action and act at arm's length from Defendants. We further conclude that Plaintiffs' counsel are clearly qualified to represent the putative class in this action.

With respect to the class representatives, " 'the linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class.' " Id. at 393 (quoting Dewey v. Volkswagen Aktiengesellschaft, 681 F.3d 170, 183 (3d Cir. 2012) ). The DOC Defendants argue that the named Plaintiffs will not be adequate representatives for the same reasons that their claims are not typical of the claims of the putative class. We have already rejected these arguments. We conclude that the interests of the named Plaintiffs are sufficiently aligned with the interests of the putative class that the named Plaintiffs will be adequate representatives. Accordingly, we further conclude that Plaintiffs have satisfied the adequacy of representation requirement.

### B. Rule 23(b)(2)

Plaintiffs seek certification of the class pursuant to Rule 23(b)(2), which provides that we may certify a class action if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The Third Circuit has held that Rule 23(b)(2) 'is almost automatically satisfied in actions primarily seeking injunctive relief' from systemic violations of basic rights." P.V. ex rel. Valentin v. Sch. Dist. of Philadelphia, 289 F.R.D. 227, 235 (E.D. Pa. 2013) (quoting Baby Neal, 43 F.3d at 58, 64; and citing Weiss v. York Hosp., 745 F.2d 786, 811 (3d Cir. 1984) ). As the Third Circuit has explained, "the injunctive class provision was designed specifically for civil rights cases seeking broad declaratory or injunctive relief for a numerous and often unascertainable or amorphous class of persons." Baby Neal, 43 F.3d at 59 (quotation omitted). "What is important for purposes of satisfying Rule 23(b)(2) is that the relief sought by the named plaintiffs benefits the entire class." P.V., 289 F.R.D. at 236 (citing Baby Neal, 43 F.3d at 59).

The First Amended Complaint alleges that the DOC's Hepatitis C Protocol "creates a rationing system for the

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 67 of 482

Chimenti v. Wetzel, Not Reported in Fed. Supp. (2018)

treatment of inmates with" DAAs, resulting in the denial of treatment with DAAs "to over 98% of inmates with Chronic Hepatitis C, in direct conflict with community health standards." (1st Am. Compl. ¶¶ 29-30.) Plaintiffs seek injunctive relief on behalf of the class that would require the DOC to implement a new Hepatitis C treatment policy that meets community health standard and results in the treatment of patients with medically necessary and appropriate DAAs. (Id. ¶ 98.)

We conclude that the class satisfies Rule 23(b)(2) because the DOC's Hepatitis C Protocol applies to all members of the class and the requested injunctive relief would provide relief to all class members. See Postawko, 2017 WL 3185155, at *13 (finding that class of individuals in the custody of the Missouri Department of Corrections who have been diagnosed with chronic HCV and have not been provided treatment with DAAs satisfied Rule 23(b)(2) because the Missouri Department of Corrections had a policy of refusing to consider DAA treatment for an inmate who did not have sufficiently advanced symptoms of chronic HCV and the injunctive relief sought by the class would require defendants to formulate a new policy in accordance with the current standard of care). See also Hoffer, 323 F.R.D. at 699 (concluding that "certification under Rule 23(b)(2) is appropriate because a single injunction or declaratory judgment would provide relief to each member of the proposed class. Specifically, if this Court enters an injunction forcing Defendant to change FDC's policies and practices with respect to HCV treatment, then each member of the proposed class will be able to enjoy those changes."); Stafford, 2018 WL 1140388, at *8 (concluding that proposed class of inmates of the Indiana Department of Corrections diagnosed with chronic HCV satisfied the requirements for certification pursuant to Rule 23(b)(2) "[b]ecause this action seeks injunctive relief to prevent future allegedly illegal deprivations of civil rights" (quotation and citation omitted) ).

## IV. CONCLUSION

**\*10** For the foregoing reasons, we conclude that Plaintiffs have satisfied their burden of "establishing each element of Rule 23 by a preponderance of the evidence." Marcus, 687 F.3d at 591. Accordingly, we certify the following class for the purpose of seeking injunctive relief pursuant to Rule 23(b)(2): all persons who are currently incarcerated in a Pennsylvania Department of Corrections facility with a diagnosed condition of Chronic Hepatitis C, and who have at least twelve (12) weeks or more remaining to serve on their sentences, and who have a life expectancy of over one year. An appropriate Order follows.

## All Citations

Not Reported in Fed. Supp., 2018 WL 2388665

---

## Footnotes

1    Plaintiff Chimenti has also brought personal claims for medical malpractice against all Defendants.

2    The Medical Defendants do not oppose Plaintiffs' Renewed Motion for Class Certification.

3    The DOC Defendants also contend that we should deny the instant Motion because most of the Class members lack standing as "[f]uture inmates do not have standing to belong in this action where any future injury is not actual or imminent. Current inmates with a fibrosis level of zero lack requisite injury for standing." (DOC Defs.' Brief at 4.) The DOC Defendants, however, have not explained this argument or supported it with reference to evidence or legal authority. Accordingly, we do not consider this argument in the context of the instant Motion.

4    The DOC Defendants briefly refer to this argument in their Brief in Opposition to Renewed Motion to Class Certification, but do not discuss it in detail. The DOC Defendants explain the basis of this argument in their Brief in Support of their Motion for Summary Judgment. Since the Motion for Summary Judgment also forms part of the record before us, we have referred to that document to gain an understanding of the basis of their argument.

5       Plaintiffs' Reply to the DOC's Answer to their Motion for Class Certification cross-references their discussion of this issue in their Response to the Motion for Summary Judgment, so we have considered the argument Plaintiffs make in their Summary Judgment Response and the evidence that they have submitted in connection with that Response.

6       This is another argument that the DOC Defendants only briefly mention in their Brief in Opposition to Renewed Motion to Class Certification and discuss more extensively in their Motion for Summary Judgment. See n.4, supra.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 Positive
As of: October 2, 2025 12:15 AM Z

## *In re Chocolate Confectionary Antitrust Litig.*

United States District Court for the Middle District of Pennsylvania

December 12, 2011, Decided

MDL DOCKET NO. 1935; Civil Action No. 1:08-MDL-1935

**Reporter**
2011 U.S. Dist. LEXIS 151516 *; 2011-2 Trade Cas. (CCH) P77,726; 2011 WL 6981200

IN RE: CHOCOLATE CONFECTIONARY ANTITRUST LITIGATION. This Document Applies to: All Indirect Purchaser for Resale Class Actions

**Subsequent History:** Affirmed by, Motion denied by *In re Chocolate Confectionary Antitrust Litig., 2012 U.S. App. LEXIS 5757 (3d Cir. Pa., Mar. 20, 2012)*

**Prior History:** *In re Chocolate Confectionary Antitrust Litig., 2011 U.S. Dist. LEXIS 37026 (M.D. Pa., Apr. 4, 2011)*

## Core Terms

Settlement, purposes, class member, antitrust, resale, notice, class action, purchasers, indirect, unfair, chocolate candy, subsidiaries, affiliates, provisions, approves

**Counsel:** [*1] For Michael McNamara, on behalf of himself and all others similarly situated, Plaintiff: Christopher Lovell, LEAD ATTORNEY, Lovell Stewart Halebian, LLP, New York, NY; Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; James J. McCarthy, Jr., LEAD ATTORNEY, McCarthy Weisberg Cummings, P.C., Harrisburg, PA; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA; Craig M. Essenmacher, Peggy J. Wedgworth, Lovell Stewart Halebian LLP, New York, NY.

For Katherine Woodman, Plaintiff: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Gregory P. Hansel, LEAD ATTORNEY, Preti, Flaherty, Beliveau, Pachios & Haley, LLC, Portland, Me; Roger P. Poorman, LEAD ATTORNEY, Spence, Custer, Saylor, Wolfe & Rose, LLC, Johnstown, PA; Steven Dane Irwin, LEAD ATTORNEY, David V. Weicht, Leech Tishman Fuscaldo & Lampl, LLC, Pittsburgh, PA; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA.

For Glenn Coffey, t/d/b/a Candy Man, individually and on behalf of all others similarly situated, Plaintiff: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; [*2] David V. Weicht, Steven Dane Irwin, LEAD ATTORNEYS, Leech Tishman Fuscaldo & Lampl, LLC, Pittsburgh, PA; Gregory P. Hansel, LEAD ATTORNEY, Preti, Flaherty, Beliveau, Pachios & Haley, LLC, Portland, Me; Joseph C. Kohn, LEAD ATTORNEY, Douglas A. Abrahams, William E. Hoese, Kohn Swift & Graf, P.C., Philadelphia, PA; Roger P. Poorman, LEAD ATTORNEY, Spence, Custer, Saylor, Wolfe & Rose, LLC, Johnstown, PA; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA; Joshua R. Carver, PRO HAC VICE, Preti Flaherty Beliveau & Pachios LLP, Portland, ME; Randall B. Weill, Preti, Flaherty, Beliveau & Pachios, LLP, Portland, ME.

For The Lorain Novelty Co., Inc., Individually and on behalf of a class of all those similarly situated, Plaintiff: Adam J. Pessin, LEAD ATTORNEY, Fine Kaplan and Black, R.P.C., Philadelphia, PA; Allen D. Black, Gerard A. Dever, Roberta D. Liebenberg, LEAD ATTORNEYS, Fine, Kaplan and Black, R.P.C., Philadelphia, PA; Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Howard J. Sedran, LEAD ATTORNEY, Levin, Fishbein, Sedran & Berman, Philadelphia, PA; Jayne A. Goldstein, LEAD ATTORNEY, Shepherd, Finkelman, Miller  [*3] & Shah, LLP, Media, PA; Jeffrey B. Gittleman, LEAD ATTORNEY, Barrack, Rodos & Bacine, Philadelphia, PA; Jeffrey S. Istvan, LEAD ATTORNEY, Fine Kaplan and Black, RPC, Philadelphia, PA; Joseph Goldberg, LEAD ATTORNEY, PRO HAC VICE, Freedman Boyd Hollander Goldberg & Ives, P.A., Albuquerque, NM; Rees Griffiths, LEAD ATTORNEY, CGA Law Firm, York, PA; Ria C. Momblanco, LEAD ATTORNEY, Fine, Kaplan and Black RPC, Philadelphia, PA; Simon B. Paris, LEAD ATTORNEY, Saltz, Mongeluzzi, Barrett & Bendesky, P.C., Philadelphia, PA; Thomas A. Muzilla, LEAD ATTORNEY, The Muzilla Law Firm LLP, Cleveland, OH; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA; William D. Marvin, LEAD ATTORNEY, Cohen Placitella & Roth, P.C., Philadelphia, PA; Donald L Perelman, Fine, Kaplan and Black, RPC, Philadelphia, PA.

For Mandel Tobacco Company, Inc., on behalf of itself and all others similarly situated, Plaintiff: Adam J. Levitt, LEAD ATTORNEY, Mary J. Fait, Wolf Haldenstein Adler Freeman & Herz LLC, Chicago, IL; Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Fred T. Isquith, LEAD ATTORNEY, Wolf Haldenstein Adler Freeman & Herz LLP, New York,  [*4] NY; Lee C. Swartz, LEAD ATTORNEY, Tucker, Arensberg, P.C., Harrisburg, PA; Stephen M.

Greecher, Jr., LEAD ATTORNEY, Tucker Arensberg, P.C., Harrisburg, PA; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA.

For Stephen L. LaFrance Pharmacy, Inc., Plaintiff: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Dianne M. Nast, LEAD ATTORNEY, Roda & Nast, P.C., Lancaster, PA; Jason S. Kilene, LEAD ATTORNEY, PRO HAC VICE, Gustafson Gluek PLLC, Minneapolis, MN; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA.

For Richard Miller, Marcia Miller, on behalf of themselves and all others similarly situated, Plaintiffs: Barry C. Barnett, LEAD ATTORNEY, Susman Godfrey LLP, Dallas, TX; Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Krishna B. Narine, LEAD ATTORNEY, Law Office of Krishna B. Narine, PC, Huntingdon Valley, PA; Rachel S. Black, LEAD ATTORNEY, Susman Godfrey, LLP - Seattle, Seattle, WA; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA.

For Western Skier, Ltd., individually and on behalf of all others similarly  [*5] situated, Plaintiff: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA; Warren Rubin, LEAD ATTORNEY, Law Offices Bernard M. Gross, P.C., Philadelphia, PA.

For CNS Confectionery Products, LLC, Plaintiff: Bernard Persky, Gregory S. Asciolla, LEAD ATTORNEYS, Labaton Sucharow LLP, New York, NY; Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Kevin P Roddy, LEAD ATTORNEY, Wilentz Goldman & Spitzer P.A.,

Woodbridge, NJ; Klari Neuwelt, LEAD ATTORNEY, Law Office of Klari Neuwelt, New York, NY; Mark S. Shane, LEAD ATTORNEY, Shane and White, LLC, Edison, NJ; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA; Seth R Gassman, Labaton Sucharow LLP.

For Winn Corporation, on behalf of themselves and all others similarly situated, Plaintiff: Bernard Persky, Gregory S. Asciolla, LEAD ATTORNEYS, Labaton Sucharow LLP, New York, NY; Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Kevin P Roddy, LEAD ATTORNEY, Wilentz Goldman & Spitzer P.A., Woodbridge, NJ; Mark S. Shane, LEAD ATTORNEY, [*6] Shane and White, LLC, Edison, NJ; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA; Seth R Gassman, Labaton Sucharow LLP.

For Akisa Matsuda, on behalf of herself and all others similarly situated, Plaintiff: Bryan L. Clobes, LEAD ATTORNEY, Cafferty Faucher LLP, Philadelphia, PA; Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Kevin P Roddy, LEAD ATTORNEY, Wilentz Goldman & Spitzer P.A., Woodbridge, NJ; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA.

For Eric Lense, on behalf of himself and all others similarly situated, Plaintiff: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Kevin P Roddy, LEAD ATTORNEY, Wilentz Goldman & Spitzer P.A., Woodbridge, NJ; Mark S. Goldman, LEAD ATTORNEY, Goldman Scarlato & Karon PC, Conchohocken, PA; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA.

For Diane Chiger, on behalf of herself and all others similarly situated, Plaintiff: Aaron M.

Sheanin, LEAD ATTORNEY, Elizabeth C. Pritzker, Girard Gibbs LLP, San Francisco, CA; Daniel A. Small, LEAD ATTORNEY, Cohen Milstein [*7] Sellers & Toll PLLC, Washington, DC; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA; Jonathan Shub, Seeger Weiss LLP, Philadelphia, PA.

For Stephen Snow, Comwest Industries Inc., Plaintiffs: Benjamin F. Johns, LEAD ATTORNEY, Chimicles & Tikellis LLP, Haverford, PA; Bernard Persky, Gregory S. Asciolla, LEAD ATTORNEYS, Labaton Sucharow LLP, New York, NY; Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA; Seth R Gassman, Labaton Sucharow LLP.

For Michael W. DeMarshall, Plaintiff: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Eugene A. Spector, Jay S. Cohen, LEAD ATTORNEYS, William G. Caldes, Spector Roseman Kodroff & Willis, P.C., Philadelphia, PA; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA.

For STLE Corporation, individually and on behalf of all others similarly situated, Plaintiff: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Michael M. Buchman, LEAD ATTORNEY, Pomerantz Haudek Block Grossman & Gross LLP, New [*8] York, NY; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA.

For Webb's Candies, Inc., Individually and on behalf of a class of all those similarly situated, Plaintiff: Allan Steyer, Jayne A. Peeters, LEAD ATTORNEYS, Steyer Lowenthal Boodrookas Alvarez & Smith LLP, San Francisco, CA; Christopher J. Cormier, LEAD ATTORNEY, Cohen, Milstein, Hausfeld & Toll, P.L.L.C.,

Washington, DC; Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Hilary K. Ratway, LEAD ATTORNEY, William P. Butterfield, Hausfeld LLP, Washington, DC; Michael D. Hausfeld, LEAD ATTORNEY, Hausfeld LLC, Washington, DC; Seth R Gassman, LEAD ATTORNEY, Labaton Sucharow LLP, New York, NY; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA.

For International Wholesale, Inc., on behalf of itself and all others similarly situated, United Customs Distribution, on behalf of itself and all others similarly situated, United Wholesale, on behalf of itself and all others similarly situated, Weaver Nut Company, on behalf of itself and all others similarly situated, Royal Enterprises Corporation, Plaintiffs: Beverly L Tse, David E Kovel, [*9] Peter S. Linden, LEAD ATTORNEYS, Kirby McInerney LLP, New York, NY; Daniel Hume, LEAD ATTORNEY, Kirby McInernney LLP, New York, NY; Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA.

For Robert Philipson, Individually and on behalf of all others similarly situated, Plaintiff: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Walter W. Cohen, LEAD ATTORNEY, Kevin J. Kehner, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA; Manuel J. Dominguez, Berman DeValerio, Palm Beach Gardens, FL.

For Valos House of Candy, individually and on behalf of all others similarly situated, Original Fowler's Chocolate Co., Inc., Individually and on behalf of all others similarly situated, Paula Wolner, on behalf of herself and all others similarly situated, PITCO Foods, Individually and on Behalf of a Class of All Those Similarly Situated, John H. Brosius, Jane A. Balzer, Afrim Dzelili, on behalf of themselves and all others similarly situated, Daphne Matalene, D Controls, Inc., on behalf of itself and all others similarly situated, Jonathan Benjamin, [*10] on behalf of himself and all others similarly situated, Adrianne Shienvold, on behalf of herself and all others similarly situated, Autry Greer & Sons, Inc., Tanya O. Butts, on behalf of themselves and all others similarly situated, Marc Lavin, Jill Lavin, on behalf of themselves and all others similarly situated, Daniel Klein, on behalf of himself and all others similarly situated, Ellen Widom, on behalf of herself and all others similarly situated, George Patterson, individually and on behalf of a class action of all others similarly situated, Carmen Pellitteri, individually and on behalf of all similarly situated, Dacia Lower, on behalf of herself and all others similarly situated, Molly Wagman, on behalf of herself and all others similarly situated, Cheryl Currie, Long Leaf Vending Inc., Individually and on behalf of a class of all those similarly situated, Northlake Pizza and Subs, LLC, Superior Office Snacks of Nebraska, Inc., Snacks for a Purpose, Inc., Oasis Distributors, Inc., LLG Enterprises of SE Wisconsin, LLC, d/b/a The Snack Store, on Behalf of Themselves and All Others Similarly Situated, Wendy M. Cresswell, Erin Goss, Plaintiffs: Daniel A. Small, LEAD ATTORNEY, Cohen [*11] Milstein Sellers & Toll PLLC, Washington, DC; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA.

For Stephanos Sgouros, individually and on behalf of all others similarly situated, Plaintiff: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA; Timothy D Battin, Straus & Boies, LLP, Fairfax, VA.

For The Kroger Co., Safeway Inc., Walgreen

Co., Hy-Vee, Inc., Plaintiffs: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Douglas H Patton, James T Almon, Richard Alan Arnold, Scott E Perwin, William J. Blechman, LEAD ATTORNEYS, Kenny Nachwalter, P.A., Miami, FL; Joseph T. Lukens, LEAD ATTORNEY, Hangley, Aronchick, Segal & Pudlin, Philadelphia, PA; Steven D. Shadowen, LEAD ATTORNEY, Hangley Aronchick Segal & Pudlin, Harrisburg, PA; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA.

For Affiliated Foods, Inc., Plaintiff: Anthony J. Bolognese, LEAD ATTORNEY, Joshua H. Grabar, Bolognese& Associates, LLC, Philadelphia, PA; Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers  [*12] & Toll PLLC, Washington, DC; David P. Germaine, LEAD ATTORNEY, VANEK VICKERS & MASINI PC, CHICAGO, IL; Joseph T. Lukens, LEAD ATTORNEY, Hangley, Aronchick, Segal & Pudlin, Philadelphia, PA; Joseph M. Vanek, LEAD ATTORNEY, Vanek, Vickers & Masini, P.C., Chicago, IL; Linda P. Nussbaum, LEAD ATTORNEY, Grant & Eisenhofer P.A., New York, NY; Richard L. Coffman, LEAD ATTORNEY, The Coffman Law Firm, Beaumont, TX; Robert N. Kaplan, LEAD ATTORNEY, Kaplan Fox & Kilsheimer LLP, New York, NY; Steven D. Shadowen, LEAD ATTORNEY, Hangley Aronchick Segal & Pudlin, Harrisburg, PA; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA.

For Canteen Company of Utica-Rome, Inc., Plaintiff: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA; W. Joseph Bruckner, Lockridge, Grindal & Nauen, Minneapolis, MN.

For Lori Ann Hongach, on behalf of herself and all others similarly situated, Esther Naomi Lieberman, Eugenia Miceli, on behalf of herself and all others similarly situated, Plaintiffs: Barry C. Barnett, LEAD ATTORNEY, Susman Godfrey LLP, Dallas, TX; Daniel  [*13] A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Rachel S. Black, LEAD ATTORNEY, Susman Godfrey, LLP - Seattle, Seattle, WA; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA.

For Brookshire Brothers, Ltd., on behalf of itself and on behalf of all others similarly situated, Plaintiff: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; H. L. Montague, Jr., LEAD ATTORNEY, Berger & Montague, P.C., Philadelphia, PA; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA; Ruthanne Gordon, Berger & Montague, PC, Philadelphia, PA.

For Meijer, Inc., Meijer Distribution, Inc., Publix Super Markets, Inc., Plaintiffs: Anthony J. Bolognese, Joshua H. Grabar, LEAD ATTORNEYS, Bolognese& Associates, LLC, Philadelphia, PA; Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; David P. Germaine, LEAD ATTORNEY, VANEK VICKERS & MASINI PC, CHICAGO, IL; Joseph T. Lukens, LEAD ATTORNEY, Hangley, Aronchick, Segal & Pudlin, Philadelphia, PA; Joseph M. Vanek, LEAD ATTORNEY, Vanek, Vickers & Masini, P.C., Chicago, IL; Linda P. Nussbaum, LEAD ATTORNEY,  [*14] Grant & Eisenhofer P.A., New York, NY; Richard L. Coffman, LEAD ATTORNEY, The Coffman Law Firm, Beaumont, TX; Robert N. Kaplan, LEAD ATTORNEY, Kaplan Fox & Kilsheimer LLP, New York, NY; Steven D. Shadowen, LEAD ATTORNEY, Hangley Aronchick Segal & Pudlin, Harrisburg, PA; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann

Maxwell & Hippel LLP, Harrisburg, PA.

For Thomas Rode, on behalf of himself and all others similarly situated, Plaintiff: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA; Ronald J. Aranoff, Bernstein Liebhard & Lifshitz, LLP, New York, NY.

For CVS Pharmacy, Inc., Rite Aid Corporation, Rite Aid Hdqtrs. Corp., Longs Drug Stores California, Inc., Plaintiffs: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Eric L. Bloom, Steven D. Shadowen, LEAD ATTORNEYS, Hangley Aronchick Segal & Pudlin, Harrisburg, PA; Joseph T. Lukens, LEAD ATTORNEY, Hangley, Aronchick, Segal & Pudlin, Philadelphia, PA; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA.

For Donald Webster, on behalf of himself [*15] and on behalf of all others similarly situated, Plaintiff: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA; Joshua D. Snyder, Kohn Swift & Graf PC, Philadelphia, PA; Marc H. Edelson, Edelson & Associates, LLC, Doylestown, PA; Michael J. Boni, Boni & Zack LLC, Bala Cynwyd, PA.

For Giant Eagle, Inc., a Pennsylvania Corporation, Plaintiff: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Joseph T. Lukens, LEAD ATTORNEY, Hangley, Aronchick, Segal & Pudlin, Philadelphia, PA; Steven D. Shadowen, LEAD ATTORNEY, Hangley Aronchick Segal & Pudlin, Harrisburg, PA; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA; Bernard D. Marcus, Marcus & Shapira, Pittsburgh, PA; Brian C. Hill, PRO

HAC VICE, Moira Cain-Mannix, Marcus & Shapira LLP, Pittsburgh, PA.

For Debra L. Damaske, Shirley A. Dresen, Craig Stephenson, on behalf of himself and all others similarly situated, Lisa Blackwell, Linda K. Davis, Plaintiffs: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; James J. McCarthy [*16] Jr., LEAD ATTORNEY, McCarthy Weisberg Cummings, P.C., Harrisburg, PA; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA.

For Isabelle Dikland, on behalf of themselves and all others similarly situated, Plaintiff: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA; Elizabeth K. Tripodi, Finkelstein Thomspon LLP, Washington, DC; Richard M. Volin, Finkelstein Thompson LLP, Washington, DC.

For Julia Isenhower, on behalf of herself and all others similarly situated, Plaintiff: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA; Joseph C. McCorquodale, PRO HAC VICE, McCorquodale & McCorquodale, Jackson, AL.

For Ben Lee Distributors, Inc., on behalf of itself and all others similarly situated, Plaintiff: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA; David S. Stellings, New York, NY; Dean M. Harvey, [*17] Lieff Cabraser heimann & Bernstein LLP, San Francisco, CA.

For Seth E. Ellis, P.A., on behalf of itself and all others similarly situated, Plaintiff: Daniel A.

Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA; Kevin B. Love, Criden & Love, P.A., South Miami, FL.

For Cindy Elan-Mangano, on behalf of herself and all others similarly situated, Plaintiff: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA; James S. Reece, Zelle Hofmann Voelbel & Mason LLP, Minneapolis, MN; Michael E. Jacobs, Zelle, Hofmann, Voelbel, Mason & Gette LLP, Minneapolis, MN; Richard M. Hagstrom, Zelle, Hofmann, Voelbe, Mason & Gette LLP, Minneapolis, MN.

For John Candido, on behalf of himself & all others similarly situated, Plaintiff: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA; Joseph M. Patane, Law Office of Joseph M. Patane, San Francisco, CA; Lauren Clare **[\*18]** Russell, Mario N. Alioto, Trump Alioto Trump & Prescott, LLP, San Francisco, CA.

For Marcy Linder, on behalf of herself and all others similarly situated, Plaintiff: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA; Amber M. Nesbitt, Edward A. Wallace, Kenneth A. Wexler, Wexler Wallace LLP, Chicago, IL.

For NMJ Consultant Group, Inc., individually and on behalf of a class of all those similarly situated, Plaintiff: Christopher J. Cormier, LEAD ATTORNEY, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, DC; Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Hilary

K. Ratway, LEAD ATTORNEY, Hausfeld LLP, Washington, DC; Michael D. Hausfeld, LEAD ATTORNEY, Hausfeld LLC, Washington, DC; Seth R Gassman, LEAD ATTORNEY, Labaton Sucharow LLP; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA; Jayne A. Goldstein, Shepherd, Finkelman, Miller & Shah, LLP, Media, PA.

For Canteen Vending Company, individually and on behalf of a class of all those similarly situated, Plaintiff: Arthur N. Bailey, LEAD ATTORNEY, **[\*19]** Arthur N. Bailey & Associates, Jamestown, NY; Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Tanya S Chutkan, William A. Isaacson, LEAD ATTORNEYS, Boies, Schiller & Flexner LLP, Washington, DC; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA.

For Jones Vend and OCS Distributing, Inc., on behalf of itself and all others similarly situated, Plaintiff: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA; Bruce L. Simon, Pearson, Simon, Warshaw & Penny, LLP, San Francisco, CA.

For Russell Traub, individually and on behalf of all others similarly situated, Plaintiff: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA; Bonny E. Sweeney, Robbins Geller Rudman & Dowd LLP, San Diego, CA.

For C.W. Brower, Inc., on behalf of itself and all others similarly situated, Plaintiff: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Walter W. Cohen, LEAD ATTORNEY, **[\*20]** Obermayer Rebmann Maxwell & Hippel

Case 4:21-cv-00196-MWB   Document 249-1   Filed 10/07/25   Page 76 of 482

Page 8 of 18
2011 U.S. Dist. LEXIS 151516, *20

LLP, Harrisburg, PA; Clinton P Walker, Fred A Silva, Kathy L Monday, Damrell, Nelson, Schrimp, Pallios, Pacher & Silva, Modesto, CA; Roger M. Shrimp, Damrell, Nelson Schrimp, Pallios, Pacher & Silva, Modesto, CA.

For Treat America Limited, on behalf of itself and all others similarly situated, Plaintiff: Bernice Conn, LEAD ATTORNEY, Los Angeles, CA; Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Joseph B. Smith, Michael C. Maher, LEAD ATTORNEYS, Steven R. Maher, The Maher Law Firm, Winter Park, FL; K. Craig Wildfang, LEAD ATTORNEY, PRO HAC VICE, Robins, Kaplan, Miller & Ciresi LLP, Minneapolis, MN; Michael A. Geibelson, LEAD ATTORNEY, PRO HAC VICE, Robins Kaplan Miller & Ciresi LLP, Los Angeles, CA; Roman M. Silberfeld, LEAD ATTORNEY, PRO HAC VICE, Robins, Kaplan, Miller & Ciresi LLP, Los Angeles, CA; Thomas J. Undlin, LEAD ATTORNEY, PRO HAC VICE, Minneapolis, MN; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA; Christopher H. Casey, Dilworth Paxson, LLP, Philadelphia, PA; Emily A. Jarvis, PRO HAC VICE, Robins, Kaplain, Miller & Ciresi L.L.P., Los Angeles, CA; Joseph U. Metz, [*21] Dilworth Paxson LLP, Harrisburg, PA; Joshua D. Wolson, Dilworth Paxson LLP, Philadelphia, PA.

For T. Levy Associates, trading as Beautyland, on behalf of itself and all others similarly situated, Plaintiff: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA; Adam S. Levy, The Haviland Law Firm LLC, Philadelphia, PA; Donald E Haviland, Haviland Hughes, LLC, Philadelphia, PA; Michael J. Lorusso, Haviland Hughes, L.L.C., Philadelphia, PA.

For Judith Bishop, Plaintiff: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; James J. McCarthy, Jr., LEAD ATTORNEY, McCarthy Weisberg Cummings, P.C., Harrisburg, PA; Kevin J. Miller, LEAD ATTORNEY, Kellogg, Huber, Hansen, Todd, Evans & figel, PLLC, Washington, DC; Kfir B. Levy, LEAD ATTORNEY, Kellogg, Huber, Hansen, Todd, Evans & Figel PLLC, Washington, DC; Richard A. Saveri, LEAD ATTORNEY, Saveri & Saveri, Inc., San Francisco, CA; Steven F. Benz, LEAD ATTORNEY, Kellog, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, DC; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, [*22] Harrisburg, PA.

For Eric Rodman Cohen, James Miles, Frank Gerencser, Sarah Allder, Timothy Duffy, Susan Jones, Donna Siler, Robert Allder, Douglas Dillard Glenn, Monica Browne, Layna M. Rose, Marlene Smith, Mike Davis, Plaintiffs: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; James J. McCarthy, Jr., LEAD ATTORNEY, McCarthy Weisberg Cummings, P.C., Harrisburg, PA; Kevin J. Miller, LEAD ATTORNEY, Kellogg, Huber, Hansen, Todd, Evans & figel, PLLC, Washington, DC; Richard A. Saveri, LEAD ATTORNEY, Saveri & Saveri, Inc., San Francisco, CA; Steven F. Benz, LEAD ATTORNEY, Kellog, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, DC; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA.

For Timothy Emmer, Sarina Vlock, Amy K. Luminoso, Plaintiffs: Christopher P. Welsh, LEAD ATTORNEY, Welsh & Welsh, P.C., L.L.O., Omaha, NE; Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; James J. McCarthy, Jr., LEAD ATTORNEY, McCarthy Weisberg Cummings, P.C., Harrisburg, PA; Kevin J. Miller, LEAD ATTORNEY, Kellogg, Huber,

Hansen, Todd, Evans & figel, PLLC, Washington, DC; Richard A. Saveri, LEAD [*23] ATTORNEY, Saveri & Saveri, Inc., San Francisco, CA; Steven F. Benz, LEAD ATTORNEY, Kellog, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, DC; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA.

For Katherine Mary Ferlic, Plaintiff: Adam C. Belsky, Terry Gross, LEAD ATTORNEYS, Gross Belsky Alonso LLP, San Francisco, CA; Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; James J. McCarthy, Jr., LEAD ATTORNEY, McCarthy Weisberg Cummings, P.C., Harrisburg, PA; Kevin J. Miller, LEAD ATTORNEY, Kellogg, Huber, Hansen, Todd, Evans & figel, PLLC, Washington, DC; Richard A. Saveri, LEAD ATTORNEY, Saveri & Saveri, Inc., San Francisco, CA; Steven F. Benz, LEAD ATTORNEY, Kellog, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, DC; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA.

For Mark Moynahan, Plaintiff: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; James J. McCarthy, Jr., LEAD ATTORNEY, McCarthy Weisberg Cummings, P.C., Harrisburg, PA; Kevin J. Miller, LEAD ATTORNEY, Kellogg, Huber, Hansen, Todd, Evans & figel, PLLC, Washington, [*24] DC; Richard A. Saveri, LEAD ATTORNEY, Saveri & Saveri, Inc., San Francisco, CA; Steven F. Benz, LEAD ATTORNEY, Kellog, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, DC; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA; Brian J. Barry, Law Offices of Brian Barry, Los Angeles, CA.

For Food Lion, LLC, Hannaford Bros. Co., Kash N' Karry Food Stores, Inc., individually and on behalf of a class of all those similarly situated, Plaintiffs: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Joseph T. Lukens, LEAD ATTORNEY, Hangley, Aronchick, Segal & Pudlin, Philadelphia, PA; Richard L. Wyatt, Jr., Todd M. Stenerson, LEAD ATTORNEYS, Hunton & Williams, Washington, DC; Sofia Luina, Torsten M. Kracht, LEAD ATTORNEYS, Hunton & Williams, LLP, Washington, DC; Steven D. Shadowen, LEAD ATTORNEY, Hangley Aronchick Segal & Pudlin, Harrisburg, PA; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA.

For VME Distributors, Inc., Individually and on behalf of a class of all those similarly situated, Plaintiff: Allan Steyer, Jayne A. Peeters, LEAD ATTORNEYS, Steyer Lowenthal Boodrookas Alvarez [*25] & Smith LLP, San Francisco, CA; Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Michael D. Hausfeld, LEAD ATTORNEY, Hausfeld LLC, Washington, DC; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA; Hilary K. Ratway, Hausfeld LLP, Washington, DC.

For Card & Party Mart II Ltd., Plaintiff: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Michael D. Hausfeld, LEAD ATTORNEY, Hausfeld LLC, Washington, DC; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA; Steven A. Kanner, Freed Kanner London & Millen LLC, Bannockburn, IL.

For Edward S Hesano, Individually and on behalf of all other similarly situated, Plaintiff: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA; Elizabeth A. McKenna, Milberg

LLP, New York, NY; Paul F. Novak, Peter G Safirstein, Milberg LLP, New York, NY.

For Karin Jacobs, on Behalf of Herself and All Others Similarly Situated, Plaintiff: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, **[*26]** DC; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA; Michael A. McShane, Audet & Partners, LLP, San Francisco, CA.

For Weis Markets, Inc., Individually and on behalf of a class of all those similarly situated, Plaintiff: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA; Mark R. Cuker, Williams Cuker Berezofsky, Philadelphia, PA.

For Cyrus T.G., d/b/a Alta Cucina, on behalf of himself and all others similarly situated, Plaintiff: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA; Gordon Ball, Ball & Scott, Knoxville, TN.

For Superior Office Snacks, Inc., Plaintiff: Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA; Michael J. Flannery, PRO HAC VICE, Carey & Danis, LLC, St. Louis, MO.

For Kelsey French, Pernell Larsen, Plaintiffs: Adam C. Belsky, Terry Gross, LEAD ATTORNEYS, Gross Belsky Alonso **[*27]** LLP, San Francisco, CA; Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; James J. McCarthy, Jr., LEAD ATTORNEY, McCarthy Weisberg Cummings, P.C., Harrisburg, PA; Walter W. Cohen, LEAD ATTORNEY,

Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA.

For Brookshire Grocery Company, United Supermarkets, L.L.C., Plaintiffs: Daniel H. Gold, LEAD ATTORNEY, Haynes and Boone, LLP, Dallas, TX; Daniel A. Small, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Joseph T. Lukens, LEAD ATTORNEY, Hangley, Aronchick, Segal & Pudlin, Philadelphia, PA; Lawrence Andrew Gaydos, LEAD ATTORNEY, Haynes & Boone - Dallas, Dallas, TX; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA.

For A - DIRECT PURCHASERS, Plaintiff: Bernice Conn, LEAD ATTORNEY, Los Angeles, CA; H. L. Montague, Jr., LEAD ATTORNEY, Berger & Montague, P.C., Philadelphia, PA; Michael D. Hausfeld, LEAD ATTORNEY, Hausfeld LLC, Washington, DC; Steven D. Shadowen, LEAD ATTORNEY, Hangley Aronchick Segal & Pudlin, Harrisburg, PA; Walter W. Cohen, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, Harrisburg, PA; Bruce J. Wecker, Hausfeld LLP, San Francisco, **[*28]** CA; Hilary K. Ratway, Hausfeld LLP, Washington, DC; Kit A. Pierson, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Moira Cain-Mannix, Marcus & Shapira LLP, Pittsburgh, PA; Ruthanne Gordon, Berger & Montague, PC, Philadelphia, PA; Steven F. Benz, Kellog, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, DC.

For B - INDIRECT PURCHASERS FOR RESALE, Plaintiff: Bernice Conn, LEAD ATTORNEY, Los Angeles, CA; H. L. Montague, Jr., LEAD ATTORNEY, Berger & Montague, P.C., Philadelphia, PA; Joseph U. Metz, LEAD ATTORNEY, Dilworth Paxson LLP, Harrisburg, PA; Roman M. Silberfeld, LEAD ATTORNEY, PRO HAC VICE, Robins, Kaplan, Miller & Ciresi LLP, Los Angeles, CA; Steven R. Maher, LEAD ATTORNEY, PRO

HAC VICE, The Maher Law Firm, Winter Park, FL; Steven D. Shadowen, LEAD ATTORNEY, Hangley Aronchick Segal & Pudlin, Harrisburg, PA; Ruthanne Gordon, Berger & Montague, PC, Philadelphia, PA; Steven F. Benz, Kellog, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, DC.

For C - INDIRECT END USERS, Plaintiff: Bernice Conn, LEAD ATTORNEY, Los Angeles, CA; Christopher Lovell, LEAD ATTORNEY, Lovell Stewart Halebian, LLP, New York, NY; H. L. Montague, Jr., LEAD ATTORNEY, Berger & Montague, P.C., [*29] Philadelphia, PA; James J. McCarthy, Jr., LEAD ATTORNEY, McCarthy Weisberg Cummings, P.C., Harrisburg, PA; Kfir B. Levy, LEAD ATTORNEY, Kellogg, Huber, Hansen, Todd, Evans & Figel PLLC, Washington, DC; Steven F. Benz, LEAD ATTORNEY, Kellog, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, DC; Steven D. Shadowen, LEAD ATTORNEY, Hangley Aronchick Segal & Pudlin, Harrisburg, PA; Andrew M. Hetherington, Kellogg, Huber Hansen Todd Evans & Figel PLLC, Washington, DC; Ruthanne Gordon, Berger & Montague, PC, Philadelphia, PA.

For D - INDIVIDUAL PLAINTIFFS, Plaintiff: Bernice Conn, LEAD ATTORNEY, Los Angeles, CA; H. L. Montague, Jr., LEAD ATTORNEY, Berger & Montague, P.C., Philadelphia, PA; Steven D. Shadowen, LEAD ATTORNEY, Hangley Aronchick Segal & Pudlin, Harrisburg, PA; Moira Cain-Mannix, Marcus & Shapira LLP, Pittsburgh, PA; Ruthanne Gordon, Berger & Montague, PC, Philadelphia, PA; Steven F. Benz, Kellog, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, DC.

For James Bell, Plaintiff: Joseph R. Gunderson, LEAD ATTORNEY, Gunderson Sharp & Walke LLP, Des Moines, IA; Jason D. Walke, Gunderson Sharp & Walke PC, Des Moines, IA.

For Corporate Services Group, SS Distributor, LLC, [*30] d/b/a JR Foodmart, GNC Properties, Inc, d/b/a Olive View AMPM, Coborn's Inc., Greater Tricities Services, LLC, GTS Refreshment Service, Food Express, Inc., All Star Services, Inc., The Konop Companies, Plaintiffs: Joseph U. Metz, LEAD ATTORNEY, Dilworth Paxson LLP, Harrisburg, PA; Roman M. Silberfeld, LEAD ATTORNEY, PRO HAC VICE, Robins, Kaplan, Miller & Ciresi LLP, Los Angeles, CA; Steven R. Maher, LEAD ATTORNEY, PRO HAC VICE, The Maher Law Firm, Winter Park, FL.

For The Golub Corporation, Plaintiff: Eric L. Bloom, LEAD ATTORNEY, Hangley Aronchick Segal & Pudlin, Harrisburg, PA; Joseph T. Lukens, LEAD ATTORNEY, Hangley, Aronchick, Segal & Pudlin, Philadelphia, PA.

For Albertson's LLC, The Great Atlantic & Pacific Tea Company, Inc., HEB Grocery Company, LP, Plaintiffs: Joseph T. Lukens, LEAD ATTORNEY, Hangley, Aronchick, Segal & Pudlin, Philadelphia, PA.

For Supervalu Inc., Plaintiff: Joshua H. Grabar, LEAD ATTORNEY, Bolognese& Associates, LLC, Philadelphia, PA.

For Judith DePippo, Darlene Hewson, Madeline Robinson, Carl Fochf, Plaintiffs: Christopher Lovell, LEAD ATTORNEY, Lovell Stewart Halebian, LLP, New York, NY; James J. McCarthy, Jr., LEAD ATTORNEY, McCarthy Weisberg Cummings, P.C., [*31] Harrisburg, PA; Steven F. Benz, LEAD ATTORNEY, Kellog, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, DC.

For Melissa Bowie, Patricia Fast, Leslie Fuller, Plaintiffs: Christopher Lovell, LEAD ATTORNEY, Lovell Stewart Halebian, LLP, New York, NY; James J. McCarthy, Jr., LEAD ATTORNEY, McCarthy Weisberg Cummings, P.C., Harrisburg, PA; Steven F. Benz, LEAD ATTORNEY, Kellog, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, DC; Ivy

L. Frignoca, Law Offices of Joe Bornstein, Portland, ME.

For North County Vending, Inc., NVC Arizona, Inc., Plaintiffs: Bernice Conn, LEAD ATTORNEY, Los Angeles, CA; Joseph U. Metz, LEAD ATTORNEY, Dilworth Paxson LLP, Harrisburg, PA; Roman M. Silberfeld, LEAD ATTORNEY, PRO HAC VICE, Robins, Kaplan, Miller & Ciresi LLP, Los Angeles, CA; Steven R. Maher, LEAD ATTORNEY, PRO HAC VICE, The Maher Law Firm, Winter Park, FL.

For William Govostes, Plaintiff: Christopher Lovell, LEAD ATTORNEY, Lovell Stewart Halebian, LLP, New York, NY; Steven F. Benz, LEAD ATTORNEY, Kellog, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, DC.

For Diane Sandbothe, Carrie MacIntosh, Plaintiffs: Christopher Lovell, Lovell Stewart Halebian, LLP, New York, NY; Steven **[*32]** F. Benz, Kellog, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, DC.

For Carl Fochs, Rene Lafferty, Plaintiffs: Christopher Lovell, Lovell Stewart Halebian, LLP, New York, NY; James J. McCarthy, Jr., McCarthy Weisberg Cummings, P.C., Harrisburg, PA; Steven F. Benz, Kellog, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, DC.

For M.R. Williams, Inc., Movant: John H. Zollicoffer, Jr., Paul J. Stainback, Stainback, Satterwhite, Burnette & Zollicoffer, PLLC, Henderson, NC.

For The Hershey Company, Defendant: Brian M. English, LEAD ATTORNEY, Tompkins, McGuire, Wachenfeld & Barry, LLP, Newark, NJ; Jonathan D. Brightbill, LEAD ATTORNEY, Britt C. Grant, Craig S. Primis, Janakan L. Thiagarajah, Kirkland & Ellis LLP, Washington, DC; Thomas D. Yannucci, LEAD ATTORNEY, Kirkland & Ellis, Washington, DC; Alan R. Boynton, Jr., McNees, Wallace & Nurick,

Harrisburg, PA; H. L. Montague, Jr., Berger & Montague, P.C., Philadelphia, PA; James P. DeAngelo, McNees Wallace & Nurick, Harrisburg, PA; Kimberly M. Colonna, Kimberly A. Selemba, McNees Wallace & Nurick LLC, Harrisburg, PA; Ruthanne Gordon, Berger & Montague, PC, Philadelphia, PA; Steven F. Benz, Kellog, Huber, Hansen, Todd, Evans **[*33]** & Figel, P.L.L.C., Washington, DC.

For Mars, Incorporated, Defendant: Brian J. McMahon, LEAD ATTORNEY, Gibbons PC, Newark, NJ; David Marx, Jr., LEAD ATTORNEY, Rachael V. Lewis, McDermott Will & Emery LLP, Chicago, IL; Frederick E. Blakelock, LEAD ATTORNEY, Gibbons, P.C., Philadelphia, PA; Guy V. Amoresano, LEAD ATTORNEY, Gibbons, PC, Newark, NJ; Jennifer Mara, LEAD ATTORNEY, Gibbons, P.C., Newark, NJ; Michael F. Quinn, LEAD ATTORNEY, Gibbons P.C., Newark, NJ; Nicole L. Castle, Stefan M. Meisner, LEAD ATTORNEYS, McDermott Will & Emery LLP, Washington, DC; Thomas S. Brown, LEAD ATTORNEY, Gibbons P.C., Philadelphia, PA; H. L. Montague, Jr., Berger & Montague, P.C., Philadelphia, PA; Kimberly A. Selemba, McNees Wallace & Nurick LLC, Harrisburg, PA; Ruthanne Gordon, Berger & Montague, PC, Philadelphia, PA; Steven F. Benz, Kellog, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, DC.

For Nestle U.S.A., Inc., Defendant: Carmine R. Zarlenga, LEAD ATTORNEY, PRO HAC VICE, Mayer Brown, Washington, DC; Gilbert S. Keltas, LEAD ATTORNEY, PRO HAC VICE, Howrey LLP, Washington, DC; Joseph A. Ostoyich, LEAD ATTORNEY, Howrey & Simon, Washington, DC; Matthew M. Haar, LEAD ATTORNEY, Saul Ewing, **[*34]** LLP, Harrisburg, PA; Michael A. Finio, LEAD ATTORNEY, Emily H. Bensinger, Saul Ewing LLP, Harrisburg, PA; Peter E. Moll, LEAD ATTORNEY, Cadwalader, Wickersham & Taft LLP, Washington, DC; Adam L. Hudes,

Veronica N. Berger, Mayer Brown LLP, Washington, DC; H. L. Montague, Jr., Berger & Montague, P.C., Philadelphia, PA; Kimberly A. Selemba, McNees Wallace & Nurick LLC, Harrisburg, PA; Ruthanne Gordon, Berger & Montague, PC, Philadelphia, PA; Steven F. Benz, Kellog, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, DC.

For Cadbury Adams Canada, Inc., Cadbury PLC, Defendants: Bridget E. Montgomery, LEAD ATTORNEY, Eckert Seamans Cherin & Mellott, LLC, Harrisburg, PA; David J. Schertz, LEAD ATTORNEY, Harrisburg, PA; Dennis P. Orr, Jessica L. Kaufman, Thomas M Mueller, LEAD ATTORNEYS, Morrison & Foerster LLP, New York, NY; Leah A. Ramos, LEAD ATTORNEY, Morrison & Forester LLP, New York, NY; Ruthanne Gordon, Berger & Montague, PC, Philadelphia, PA; Steven F. Benz, Kellog, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, DC.

For Hershey Canada, Inc., Defendant: Alan R. Boynton, Jr., LEAD ATTORNEY, McNees, Wallace & Nurick, Harrisburg, PA; Jonathan D. Brightbill, Thomas D. Yannucci, [*35] LEAD ATTORNEYS, Craig S. Primis, Kirkland & Ellis LLP, Washington, DC; H. L. Montague, Jr., Berger & Montague, P.C., Philadelphia, PA; Kimberly A. Selemba, McNees Wallace & Nurick LLC, Harrisburg, PA; Ruthanne Gordon, Berger & Montague, PC, Philadelphia, PA; Steven F. Benz, Kellog, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, DC.

For Mars Snackfood US LLC, Defendant: David Marx, Jr., LEAD ATTORNEY, Rachael V. Lewis, McDermott Will & Emery LLP, Chicago, IL; Nicole L. Castle, Stefan M. Meisner, LEAD ATTORNEYS, McDermott Will & Emery LLP, Washington, DC; Frederick E. Blakelock, Gibbons, P.C., Philadelphia, PA; H. L. Montague, Jr., Berger & Montague, P.C., Philadelphia, PA; Kimberly A. Selemba, McNees Wallace & Nurick LLC, Harrisburg,

PA; Ruthanne Gordon, Berger & Montague, PC, Philadelphia, PA; Steven F. Benz, Kellog, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, DC; Thomas S. Brown, Gibbons P.C., Philadelphia, PA.

For Cadbury Holdings Ltd., Defendant: Bridget E. Montgomery, LEAD ATTORNEY, Eckert Seamans Cherin & Mellott, LLC, Harrisburg, PA; Dennis P. Orr, Jessica L. Kaufman, Thomas M Mueller, LEAD ATTORNEYS, Morrison & Foerster LLP, New York, NY; Leah A. Ramos, [*36] LEAD ATTORNEY, Morrison & Forester LLP, New York, NY; Ruthanne Gordon, Berger & Montague, PC, Philadelphia, PA; Steven F. Benz, Kellog, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, DC.

For Government of Canada, Intervenor Defendant: Bradley H. Blower, PRO HAC VICE, John P. Relman, LEAD ATTORNEYS, Relman & Dane, PLLC, Washington, DC; Katherine A. Gillespie, LEAD ATTORNEY, PRO HAC VICE, Relman & Dane & Colfax PLLC, Washington, DC; Joseph K. Goldberg, Law Office of Joseph K. Goldberg, Harrisburg, PA.

**Judges:** CHRISTOPHER C. CONNER, United States District Judge.

**Opinion by:** CHRISTOPHER C. CONNER

## Opinion

### FINAL JUDGMENT AND ORDER OF DISMISSAL GRANTING FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT WITH CADBURY PLC, CADBURY HOLDINGS LTD. AND CADBURY ADAMS CANADA, INC.

This Court having considered the Settlement Agreement executed on April 28, 2011, including all Exhibits thereto (the "Settlement

Agreement") between the Plaintiffs and all members of the Settlement Class certified in the above-captioned case (collectively "Plaintiffs") and Defendants Cadbury plc, Cadbury Holdings, Ltd., and Cadbury Adams Canada, Inc. (collectively, "the Cadbury Defendants"), and having held a Fairness Hearing on December 12, **[*37]** 2011, and having considered all of the submissions and arguments with respect thereto, and otherwise being fully informed and good cause appearing therefore,

IT IS HEREBY ORDERED, ADJUDGED and DECREED as follows:

1. This Final Judgment and Order of Dismissal incorporates herein and makes a part hereof, the Settlement Agreement, including the Exhibits thereto. Unless otherwise provided herein, the terms defined in the Settlement Agreement shall have the same meanings for purposes of this Final Judgment and Order of Dismissal.

2. The Court has personal jurisdiction over all Plaintiffs and the Cadbury Defendants, and has subject matter jurisdiction to approve the Settlement Agreement.

3. For purposes of the settlement with the Cadbury Defendants (and only for such purposes, without any impact upon the issues between any of the Plaintiffs and any of the non-settling Defendants), the Court finds that the requirements of *Rule 23 of the Federal Rules of Civil Procedure* have been satisfied with respect to the Settlement Class. At this settlement certification phase, and only for purposes of the settlement with the Cadbury Defendants, the Settlement Class is defined as:

All persons and entities **[*38]** who indirectly purchased Chocolate Candy for resale in, or for delivery into any state that has enacted a statute extending standing

(or standing to assert claims which could be denominated to be antitrust claims in any state), to indirect purchasers for resale asserting claims under state or local antitrust, unfair competition, consumer protection, unfair practices, trade practice, or civil conspiracy law, including but not limited to the states of Arizona, California, the District of Columbia, Florida, Guam, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nevada, New Hampshire, New Mexico, Nebraska, New York, North Dakota, North Carolina, Oregon, South Dakota, Tennessee, Utah, Vermont and Wisconsin, that was manufactured and/or distributed by or for any Defendant or any predecessor, subsidiary, affiliate or division of any Defendant, at any time from December 9, 2002 through and including December 20, 2007. The Class is composed of indirect purchasers for resale as defined in Paragraph 41 of the Indirect Purchasers for Resale Second Amended Consolidated Class Complaint. Excluded from the Settlement Class are governmental entities, Defendants, or any present **[*39]** or former parent, subsidiary or affiliate thereof.[1]

No Settlement Class Members have elected to be excluded from the Settlement Class.

4. Pursuant to *Rule 23(a)(1)*, the Court determines that the Settlement Class is so numerous that joinder of all members is impracticable.

5. For purposes of this settlement only, the commonality requirement of *Rule 23(a)(2)* is satisfied because Plaintiffs have alleged one or more questions of fact and law common to the Settlement Class, including whether the Cadbury Defendants violated state antitrust

---

[1] Neither the Cadbury Settlement nor this Order is intended to or shall limit the rights of any state attorney general.

and consumer protection laws by engaging in an unlawful conspiracy to fix, raise, maintain and/or stabilize prices of chocolate candy in the United States.

6. The Court hereby approves the following entities as Representative Plaintiffs of the Settlement Class pursuant to *Rule 23(a)(3)*, and finds that, for settlement purposes only, these Representative Plaintiffs' claims are typical of the claims of the Settlement Class: Treat America Limited, Corporate Services Group, Greater Tricities Services, LLC d/b/a GTS Refreshment Service, Food Express, **[*40]** Inc., All Star Services, Inc., The Konop Companies, North County Vending, Inc., NCV Arizona, Inc., SS Distributor, LLC d/b/a JR Foodmart, GNC Properties, Inc. d/b/a Olive View AMPM and Coborn's Inc. The claims of the Representative Plaintiffs and absent class members rely on the same legal theories and arise from the same alleged conspiratorial conduct by Defendants, namely, the agreement to fix, raise, maintain and/or stabilize prices of chocolate candy in various states.

7. The Court finds that, for purposes of this settlement with the Cadbury Defendants, the Representative Plaintiffs will fairly and adequately protect the interests of the Settlement Class in satisfaction of the requirements of *Rule 23(a)(4)* because: (1) the interests of the Representative Plaintiffs are consistent with those of the Settlement Class members; (2) there appear to be no conflicts between or among the Representative Plaintiffs and the other Settlement Class members; (3) the Representative Plaintiffs have been and appear to be capable of continuing to be active participants in both the prosecution and the settlement of this litigation; and (4) the Representative Plaintiffs and the Settlement Class members **[*41]** are represented by qualified, reputable counsel who are experienced in preparing and

prosecuting large, complicated class action cases, including those concerning violations of antitrust law.

8. The Court finds that, for purposes of his settlement only, questions of law or fact common to members of the Settlement Class predominate over questions affecting only individual members of the Settlement Class under *Rule 23(b)(3)*. Further, a class action resolution in the manner proposed in the Settlement Agreement would be superior to other available methods for a fair and efficient adjudication of the litigation with respect to the Cadbury Defendants. In making these preliminary findings, the Court has considered, *inter alia*, (1) the interest of the Settlement Class members in individually controlling the prosecution or defense of separate actions; (2) the impracticality or inefficiency of prosecuting or defending separate actions; (3) the extent and nature of any litigation concerning these claims already commenced; and (4) the desirability of concentrating the litigation of the claims in a particular forum.

9. At this juncture, the Court makes no determination regarding the manageability **[*42]** of this litigation as a class action, if this litigation were to go to trial.

10. The Court hereby also approves the following law firms as Settlement Class Counsel pursuant to *Rule 23(g)*, and finds that, for settlement purposes only, these Settlement Class Counsel have and will fairly and adequately protect the interests of the Settlement Class: Robins, Kaplan, Miller & Ciresi L.L.P. and The Maher Law Firm.

11. The Indirect Purchaser for Resale Settlement Class has received notice in the manner approved by the Court in its Order of August 12, 2011 (Docket No. 1025). The Court finds that such notice: (i) constitutes reasonable and the best practicable notice; (ii) constitutes notice that is reasonably

calculated, under the circumstances, to apprise potential Settlement Class members of the terms of the settlement, their right to object to the settlement, and their right to appear at the settlement Fairness Hearing; (iii) constitutes due, adequate and sufficient notice to all persons entitled to receive notice; and (iv) meets the requirements of due process and *Rule 23 of the Federal Rules of Civil Procedure*.

12.  **[*43]** No individuals or entities have excluded themselves from the Settlement Class.

13. Pursuant to *Rule 23 of the Federal Rules of Civil Procedure*, the Court hereby finally approves in all respects the settlement set forth in the Settlement Agreement (the "Settlement") and finds that the Settlement and the Settlement Agreement are, in all respects, fair, reasonable and adequate, and in the best interest of the Settlement Class. The Court further approves the establishment of the Settlement Fund and Notice and Administration Fund under the terms and conditions set forth in the Settlement Agreement and the Escrow Agreements. The parties are hereby directed to implement and consummate the Settlement according to the terms and provisions of the Settlement Agreement.

14. Plaintiffs may use the Settlement Fund to pay from time to time such expenses as may reasonably be incurred in the prosecution of the Class Action, subject to an accounting to the Court at the time of the final resolution of the Class Action.

15. The above-captioned case is hereby dismissed with prejudice against the Cadbury Defendants only and without costs to any party.

16. (a) The Cadbury Defendants and their past and present **[*44]** officers, directors,

employees, parents, subsidiaries, and affiliates; the past and present officers, directors, and employees of such parents, subsidiaries, and affiliates; and the predecessors, successors, heirs, executors, and assigns of each of the foregoing (the "Releasees")- shall be completely released, acquitted, and forever discharged from any and all manner of claims, demands, actions, suits, causes of action, whether class, individual, or otherwise in nature whether personal or subrogated, damages whenever incurred, damages of any kind including compensatory, punitive or other damages, including any compensation derived from *parens patriae* lawsuits, liabilities of any nature whatsoever, including interests, costs, expenses, class administration expenses, penalties, and lawyers' fees (including Settlement Class Counsel fees) that Class Representatives, the Settlement Class Members and their respective past and present parents, subsidiaries, affiliates, heirs and assigns. or each of them, ever had, now have, or hereafter can, shall, or may have against the Releasees, whether known or unknown, on account of, arising out of, relating to, or resulting from or in any way relating **[*45]** to conduct of the Releasees during the period February 1, 2001 to December 31, 2008 concerning any aspect of the pricing, selling, discounting, marketing, manufacturing, and distributing of chocolate candy purchased for resale in, or for delivery into, any state that has enacted a statute extending antitrust standing (or standing to assert claims which could be denominated to be antitrust claims in any state) to indirect purchasers for resale asserting claims under state or local antitrust, unfair competition, consumer protection, unfair practices, trade practice, or civil conspiracy law, or that permits indirect purchasers for resale to recover for such claims, including but not limited to the states of Alaska, Arkansas, Arizona, California, the District of Columbia,

Florida, Guam, Hawaii, Idaho, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nevada, New Hampshire, New Mexico, New York, North Dakota, North Carolina, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, Virginia and Wisconsin, or which are, have been or could have been asserted by Releasors, within the scope of the facts asserted in the Complaint, either of which arise under any **[\*46]** state or local antitrust, unfair competition, consumer protection, unfair practices, trade practice, or civil conspiracy law. Nothing in this Order is intended to or shall release the rights of any state attorney general.

(b) Each Releasor waives _California Civil Code Section 1542_ and similar provisions in other states. Class Plaintiffs have certified that they are aware of and have read and reviewed the following provision of _California Civil Code Section 1542_ ("_Section 1542_"): "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor." The provisions of the release set forth above shall apply, regardless of the provisions of _Section 1542_ or any equivalent, similar, or comparable present or future law or principle of law of any jurisdiction. Each Releasor may hereafter discover facts other than or different from those which he, she or it knows or believes to be true with respect to the claims that are the subject matter of this paragraph, but each Releasor hereby expressly and fully, finally and forever waives, **[\*47]** relinquishes, and forever settles and releases any and all rights and benefits existing under (i) _Section 1542_ or any equivalent, similar or comparable present or future law or principle of law of any jurisdiction and (ii) any law or principle of law of any jurisdiction that would limit or restrict the effect or scope of the provisions of the release

set forth above. Each Releasor also expressly waives and fully, finally and forever settles any claims it may have against Releasees or any of them under _California Business and Professions Code § 17200 et seq._, which claims are expressly incorporated into this paragraph.

(c) Nothing herein shall release any product defect, claims of supplier or distributor breach of contract, or similar claims between the parties relating to Chocolate Candy.

(d) Notwithstanding the foregoing, "Releasees" does not include any other Defendant currently named in the Action.

17. Upon final approval of the settlement (including, without limitation, the exhaustion of any judicial review, or requests for judicial review, from this Final Judgment and Order of Dismissal), the Cadbury Defendants fully and finally release and discharge each of the Representative Plaintiffs **[\*48]** and their counsel and experts from any Claims relating to the institution or prosecution of the Action.

18. Nothing in this Final Judgment and Order of Dismissal, the settlement, or the Settlement Agreement, is or shall be deemed or construed to be an admission or evidence of any violation of any statute or law or of any liability or wrongdoing.

19. Without affecting the finality of this Final Judgment and Order of Dismissal, the Court retains continuing and exclusive jurisdiction over any all matters relating to the administration, consummation, enforcement and interpretation of the Settlement Agreement and of this Final Judgment and Order of Dismissal, and for any other necessary purpose. The Cadbury Defendants, Plaintiffs and each member of the Settlement Class are hereby deemed to have irrevocably submitted to the exclusive jurisdiction of this Court for any suit, action, proceeding or dispute arising

out of or relating to the Settlement Agreement or the applicability of the Settlement Agreement, including the Exhibits hereto. Without limiting the generality of the foregoing, and without affecting the finality of this Final Judgment and Order of Dismissal, the Court retains jurisdiction **[*49]** over any such suit, action or proceeding. Solely for purposes of such suit, action or proceeding, to the fullest extent they may effectively do so under applicable law, the parties hereto are deemed to have irrevocably waived and agreed not to assert by way of motion, as a defense or otherwise, any claim or objection that they are not subject to the jurisdiction of this Court, or that this Court is, in any way, an improper venue or an inconvenient forum.

20. In the event that the Settlement does not become effective according to the Settlement Agreement, this Final Judgment and Order of Dismissal shall be rendered null and void as provided by the Settlement Agreement, shall be vacated, and all orders entered and releases delivered in connection herewith shall be null and void to the extent provided by and in accordance with the Settlement Agreement.

SO ORDERED this 12th day of December, 2011.

/s/ Christopher C. Conner

CHRISTOPHER C. CONNER

United States District Judge

---

Davis v. Kraft Foods North America, Inc., Not Reported in Fed. Supp. (2007)

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 87 of 482

2007 WL 9807443
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Debra DAVIS and Francenia Canion,
on behalf of themselves and all other
similarly situated persons, Plaintiffs,
v.
KRAFT FOODS NORTH AMERICA, INC., Defendant.

CIV. NO. 03-6060
|
Filed 08/10/2007

**Attorneys and Law Firms**

Robert T. Vance, Jr., Law Offices of Robert T. Vance, Jr.,
Shanon J. Carson, Berger & Montague PC, Hadley B. Perkins,
Reed Smith LLP, Stephen A. Whinston, Philadelphia, PA,
William T. Coleman, III, Law Office of William T. Coleman
III, Penn Valley, PA, for Plaintiff Debra Davis.

Hadley B. Perkins, Reed Smith LLP, Philadelphia, PA, for
Plaintiff Francenia Canion.

Allan G. King, Littler, Mendelson, Dallas, TX, Marguerite S.
Walsh, Michele Halgas Malloy, Littler Mendelson Prof Corp.,
Philadelphia, PA, for Defendant.

## ORDER

Paul S. Diamond, J.

**\*1** In this class action, named Plaintiffs Debra Davis and
Francenia Canion alleged that Kraft Foods discriminated
against African-American employees working in Kraft's
Philadelphia Bakery with respect to job discipline. On May
21, 2007, Plaintiffs filed the instant Motion for Final Approval
of Proposed Settlement with Kraft Foods North America,
Inc. and for Final Approval of Plaintiffs' Proposed Plan for
Distribution of Settlement Funds.

I may approve a class action settlement under Rule 23 where,
as here, it is "fair, reasonable and adequate." See Fed. R. Civ.
P. 23(e)(1)(c); In re Prudential Ins. Co. of Am. Sales Practices
Litig., 148 F.3d 283, 316 (3d Cir. 1998); Stoetzner v. U.S.
Steel Corp., 897 F.2d 115, 118 (3d Cir. 1990); Walsh v. Great
Atlantic & Pacific Tea Co., Inc., 726 F.2d 956, 965 (3d Cir.

1983). I have broad discretion in making this decision. Girsh
v. Jepson, 521 F.2d 153, 156 (3d Cir. 1975).

Courts in this Circuit give considerable weight and deference
to the views of experienced counsel as to the merits of
an arms-length settlement. In re Automotive Refinishing
Paint Antitrust Litig., 2004 U.S. Dist. LEXIS 29161, at *6
(E.D. Pa. September 27, 2004); see also Petruzzi's, Inc. v.
Darling-Delaware Co., 880 F. Supp. 292, 301 (M.D. Pa.
1995) ("the opinions and recommendations of ... experienced
counsel are ... entitled to considerable weight."); Lake v.
First Nationwide Bank, 156 F.R.D. 615, 628 (E.D. Pa.
1994) (giving "due regard to the recommendations of the
experienced counsel in this case, who have negotiated this
settlement at arms-length and in good faith"). "A presumption
of correctness is said to attach to a class settlement
reached in arms-length negotiations between experienced,
capable counsel after meaningful discovery." In re Linerboard
Antitrust Litig., 292 F. Supp. 2d 631, 640 (E.D. Pa. 2003).

In Girsh v. Jepson, the Third Circuit Court identified nine
factors to assist courts in determining whether a class
action settlement should be approved as "fair, adequate and
reasonable." 521 F.2d at 157. These "Girsh factors" are:

(1) the complexity, expense and likely duration of the
litigation;

(2) the reaction of the class to the settlement;

(3) the stage of the proceedings and the amount of
discovery completed;

(4) the risks of establishing liability;

(5) the risks of establishing damages;

(6) the risks of maintaining the class action through the
trial;

(7) the ability of the defendants to withstand a greater
judgment;

(8) the range of reasonableness of the settlement fund in
light of the best possible recovery; and

(9) the range of reasonableness of the settlement fund in
light of all the attendant risks of litigation.

In re Cendant Corp. Litig., 264 F.3d 201, 232 (3d Cir. 2001).

After applying the nine Girsh factors to the instant case, I conclude that the settlement is fair, adequate, and reasonable.

First, the complexity, expense, and likely duration of the litigation support the settlement. Plaintiffs alleged that job discipline was administered in a racially disparate manner at the Kraft Philadelphia Bakery. This is a complex allegation that would have been difficult to establish with common proof. The continued prosecution of the case would thus have meant significant additional expenses and a substantial delay before a recovery, if any, could have been obtained. Among other things, merits discovery, the filing of dispositive motions, and trial still remain, as well as all the attendant costs and uncertainties. Kraft is represented by extremely able counsel who vigorously and effectively defended this matter. Trial likely would have taken several weeks, "with its attendant pretrial order, laborious winnowing of proof before trial, and post-trial skirmishing." In re Gulf Oil/Cities Service Tender Offer Litig., 142 F.R.D. 588, 591 (S.D.N.Y. 1992). The settlement with Kraft will guarantee substantial benefits to the class, potentially avoiding years of delay and uncertainty. Each individual class member will receive between $1,000 and $11,000. Moreover, the settlement includes a mechanism for monitoring and preventing racially disparate personnel decisions, thus addressing a problem that has plagued the Philadelphia Bakery since it was run by Nabisco (well before Kraft's 2000 take-over of the facility). The settlement thus provides innovative and important non-monetaryu relief to present and future African-American employees of the Kraft Bakery.

 *2  The second Girsh factor supports approval of the settlement, as no class member objected.

Third, the stage-of-proceedings factor also weighs in favor of the settlement. The Parties have engaged in extensive class discovery. Class counsel had considerable information from which to make an informed judgment regarding the reasonableness of the proposed settlement. Moreover, the case has been in active litigation for over three years and there has been ample time to review and assess the issues raised in the course of discovery.

The fourth, fifth, and sixth Girsh factors – the risks of establishing liability and damages and of maintaining the class action through the trial – also favor settlement. Class action employment discrimination cases are difficult to win at trial and often involve prolonged and expensive litigation. By arriving at a fair and reasonable settlement for the class, class

counsel have averted the myriad of risks involved in litigating this case through to a verdict.

The seventh factor does not support approval of the settlement, as Kraft could withstand a greater judgment. The employee class is necessarily small, however – approximately 260 persons. In addition, there are attendant risks Plaintiffs would face if this case proceeded to trial – including the real possibility of recovering less or nothing. Accordingly, I accord this factor little weight. See, e.g., Lazy Oil Co. v. Wotco Corp., 95 F. Supp. 2d 290, 318 (W.D. Pa. 1997) (fact that a settling defendant had the financial resources to pay a larger judgment did not weigh against settlement "in light of the risks that Plaintiffs would not be able to achieve any greater recovery at trial"). Moreover, the determination, standing alone, that a defendant could withstand a greater judgment "does not carry much weight in evaluating the fairness of the Settlement." Meijer, Inc. v. 3M, 2006 WL 2382718, at *16 (E.D. Pa. Aug. 14, 2006) (citing Perry v. FleetBoston Fin. Corp., 229 F.R.D. 105, 116 (E.D. Pa. 2005)).

Finally, the eighth and ninth factors – the range of reasonableness of the settlement fund in light of the best possible recovery and in light of all the attendant risks of litigation – weighs in favor of the settlement. Once again, the class comprises of 260 persons. Moreover, employment discrimination is difficult to prove on a classwide basis, and trial court verdicts in favor of plaintiffs in Title VII actions often are overturned. See, e.g., Kevin M. Clermont & Stewart J. Schwab, "How Employment Discrimination Plaintiffs Fare in Federal Court," 1 J. Empirical Legal Stud. 429 (July 2004).

Taking into consideration all the benefits obtained for the class and the risks of litigation, the settlement is certainly reasonable. Accordingly, the Girsh factors strongly support the settlement.

I must also determine the reasonableness of the plan of allocation the settlement affords. See In re Ikon Office Solutions, Inc., 194 F.R.D. 166, 184 (E.D. Pa. 2000). "Approval of a plan of allocation of a settlement fund in a class action is 'governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable and adequate.' " Id. (quoting In re Computron Software, Inc., 6 F. Supp. 2d 313, 321 (D. N.J. 1998)). Courts generally consider plans of allocation that reimburse class members based on the type and extent of their injuries to be reasonable. Id. "As with other aspects of settlement, the opinion of experienced and

informed counsel is entitled to considerable weight." *In re American Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 430 (S.D.N.Y. 2001). In the instant case, the plan of allocation will reimburse class members based on the type of job-related discipline they received. Class counsel included a description of the proposal for distribution of the settlement in the notice to potential class members. No class member objected to the proposed distribution plan. In these circumstances, I conclude that the plan of distribution of the settlement fund is fair, reasonable, and adequate.

**\*3** AND NOW, this 9th day of August, 2007, upon consideration of the Plaintiffs' Motion for Final Approval of Class Action Settlement with Defendant Kraft Foods North America, Inc. ("Kraft"), after a duly-noticed final approval hearing held on July 27, 2007, and the Court expressly finding, pursuant to Federal Rule of Civil Procedure 54(b), that there is no just reason for delay, the Court expressly directs the entry of the following Final Judgment:

IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows:

1. The Court finds that due and adequate notice was provided of the settlement with Kraft, pursuant to Rule 23 of the Federal Rules of Civil Procedure, to all members of the class as defined in the Court's April 30, 2007 Order. The notice provided was the best notice practicable under the circumstances and included individual notice by first class mail to all members of the class who could be identified through reasonable effort. The Court finds and concludes that the notice provided fully complied in all respects with the requirements of Rule 23 of the Federal Rules of Civil Procedure and due process. Moreover, the notice allowed class members to opt out in a manner consistent with all of the requirements of Rule 23 and due process and the Court finds and concludes that it is not necessary to provide class members with an additional opportunity to opt out of the class pursuant to Rule 23(e).

2. The Court finds that the class members identified on the schedule filed with the Court in accordance with the Court's Class Notice dated May 17, 2007, and no others, have timely requested to be excluded from the Class and accordingly are not included in or bound by the Final Judgment being entered pursuant to this Order.

3. The Court finds that the Agreement of Settlement between Plaintiffs and the class, on the one hand, and Kraft on the other, is fair, reasonable and adequate. The Settlement Agreement is hereby approved pursuant to Rule 23(e).

4. All claims of Plaintiffs and the class which were asserted against Kraft in the Amended Class Action Complaint are dismissed with prejudice, with each party to bear its own costs (except as provided for in the Agreements of Settlement).

5. Plaintiffs and any and all members of the class who have not previously timely excluded themselves pursuant to the Notice of the Court dated May 17, 2007 are permanently barred and enjoined from pursuing any claim(s) for alleged racially discriminatory discipline during the class period against Kraft Foods North America, Inc. and its corporate predecessor Nabisco Biscuit Company, its direct and indirect parents, subsidiaries, affiliates, divisions, and partners, the past and present officers, directors, members of any supervisory board or board of management, employees, agents, attorneys, servants, and representatives of the aforesaid entity, and the predecessors, successors, heirs, executors, administrators, and assigns of each of the foregoing.

6. Except as provided in the Settlement Agreement, Kraft shall have no obligation for attorneys' fees, incentive awards to Plaintiffs, costs or expenses, including but not limited to expenses of administering and distributing the Settlement Fund, which expenses are to be paid out of settlement funds subject to further order of this Court.

7. Nothing in this Final Judgment Order or the Settlement Agreement and no aspect of the settlements or negotiations thereof is or shall be deemed or construed to be an admission or concession of any violation of any statute or law or of any liability or wrongdoing by Kraft or of the truth of any of the claims or allegations in any of the complaints in the Actions or any other pleading, and evidence thereof shall not be discoverable or used, directly or indirectly, in any way, whether in any of the Actions or in any other action or proceeding other than to enforce the terms of this Final Judgment Order or the Settlement Agreements.

**\*4** 8. Without affecting the finality of this judgment in any way, this Court hereby retains continuing jurisdiction for the purposes of implementing and enforcing the Settlement Agreement and any ancillary proceedings, including any future application for distribution of the settlement proceeds or awarding attorneys' fees and expenses.

IT IS SO ORDERED.

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 90 of 482

Davis v. Kraft Foods North America, Inc., Not Reported in Fed. Supp. (2007)

**All Citations**

Not Reported in Fed. Supp., 2007 WL 9807443

**End of Document**                                           © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Davis v. Kraft Foods North America, Inc., Not Reported in Fed. Supp. (2007)

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 91 of 482

2007 WL 9807445
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Debra DAVIS and Francenia Canion,
on behalf of themselves and all other
similarly situated persons, Plaintiffs,
v.
KRAFT FOODS NORTH AMERICA, INC., Defendant.

CIV. NO. 03-6060
|
Filed 08/10/2007

**Attorneys and Law Firms**

Robert T. Vance, Jr., Law Offices of Robert T. Vance, Jr., Shanon J. Carson, Berger & Montague PC, Hadley B. Perkins, Reed Smith LLP, Stephen A. Whinston, Philadelphia, PA, William T. Coleman, III, Law Office of William T. Coleman III, Penn Valley, PA, for Plaintiff Debra Davis.

Hadley B. Perkins, Reed Smith LLP, Philadelphia, PA, for Plaintiff Francenia Canion.

Allan G. King, Littler, Mendelson, Dallas, TX, Marguerite S. Walsh, Michele Halgas Malloy, Littler Mendelson Prof Corp., Philadelphia, PA, for Defendant.

**ORDER**

Paul S. Diamond, J.

**\*1** In this class action, named Plaintiffs Debra Davis and Francenia Canion alleged that Kraft Foods discriminated against African-American employees working in Kraft's Philadelphia Bakery with respect to job discipline. On this date, I granted Plaintiffs' Motion for Final Approval of Proposed Settlement with Kraft Foods North America, Inc. and for Final Approval of Plaintiffs' Proposed Plan for Distribution of Settlement Funds.

Plaintiffs have also filed the instant Application for Award of Attorneys' Fees and Reimbursement of Expenses. (Doc. No. 98.) Because this is a class action settlement, I must thoroughly review the fee petition for fairness. In re General Motors, 55 F.3d 768, 820 (3d Cir. 1995). Courts typically use either the percentage of recovery method or the lodestar

method to assess attorneys' fees. In re Rite Aid Corp., 396 F.3d 294, 300 (3d Cir. 2005).

I will apply the percentage of recovery method in the instant case as it is "generally favored in common fund cases because it allows courts to award fees from the fund 'in a manner that rewards counsel for success and penalizes it for failure.' " In re Rite Aid Corp., 396 F.3d at 300 (quoting In re Prudential Ins. Co. of Am., 148 F.3d 283, 333 (1998)). I also will use the lodestar method to cross-check the reasonableness of the percentage-of-recovery fee award, as the Third Circuit has recommended. In re AT & T Corp., 455 F.3d 160, 164 (3d Cir. 2006).

When a district court uses the percentage of recovery method, it "first calculates the percentage of the total recovery that the proposal would allocate to attorneys fees by dividing the amount of the requested fee by the total amount paid out by the defendant; it then inquires whether that percentage is appropriate based on the circumstances of the case." In re Cendant, 264 F.3d 201, 256 (3d Cir. 2001).

In Gunter v. Ridgewood Energy Corp., the Third Circuit directed district courts to consider the following seven factors when determining whether a percentage of recovery fee award is reasonable:

(1) the size of the fund created and the number of persons benefitted;

(2) the presence or absence of substantial objections by members of the class to the settlement terms and/or the fees requested by counsel;

(3) the skill and efficiency of the attorneys involved;

(4) the complexity and duration of the litigation;

(5) the risk of nonpayment;

(6) the amount of time devoted to the case by plaintiffs' counsel; and

(7) the awards in similar cases.

223 F.3d 190, 195 n. 1(3d Cir. 2000); see also In re Rite Aid, 396 F.3d at 301. In addition to the Gunter factors, the Third Circuit in In re Prudential Ins. Co. of Am. identified three other factors that may be applicable:

(1) the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to

Case: 4:21-cv-00196-MWB   Document 249-1   Filed 10/07/25   Page 92 of 482

Davis v. Kraft Foods North America, Inc., Not Reported in Fed. Supp. (2007)

the efforts of other groups, such as government agencies conducting investigations;

(2) the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained; and

**\*2** (3) any "innovative" terms of settlement.

In re AT&T Corp., 455 F.3d at 165 (citing In re Prudential Ins. Co. of Am., 148 F.3d at 338-39).

The settlement fund in this case, as of July 27, 2007, is $1,325,000. Class counsel seek $450,000 in attorneys' fees. Consequently, the percentage of recovery is 34%.

Applying the Gunther and Prudential factors to the instant case demonstrates that the fee request is reasonable and justified. A substantial settlement fund has been created for the benefit of the relatively small class of 260 members. Each class member's recovery will be between $1,000 and $11,000. This is an excellent recovery. No class members have objected to the fee request. No one has sought to opt out of the class. Class counsel – Joseph Kohn, Martin D'Urso, and Robert Vance – demonstrated consummate skill and efficiency in prosecuting this very difficult case. The total recovery of $1,325,000 they obtained, plus significant non-monetary relief, demonstrates their ability. The decision by Messrs Kohn, D'Urso, and Vance to take on this case after prior counsel's disqualification is especially admirable. Even without the added difficulty of that disqualification, this case would have been extremely demanding; its continued litigation would have been complex and time-consuming. It was exceptionally well defended by Marguerite Walsh. Moreover, a class action whose central allegation is racially disparate job-related discipline is necessarily complex and demanding. Class counsel thus faced a substantial risk of nonpayment both because of this matter's difficulty and because they undertook the action on a wholly contingent basis and advanced significant expenses that would not have been reimbursed absent a successful result. Class counsel spent a significant amount of time working on this case – time that could have been spent on other matters. The instant fee request is reasonable as compared to awards in similar cases. See, e.g., Royal v. Aramark Corp., 1999 U.S. Dist. LEXIS 22516, at *13-14 (E.D. Pa. July 29, 1999) (33 1/3%); see also In re Microcrystalline Cellulose Antitrust Litig., MDL No. 1402 (E.D. Pa. Nov. 22, 2006) (33.3%); In re FAO Inc. Sec. Litig., 2005 WL 3801469, at *2 (E.D. Pa. May 20, 2005) (awarding fees of 30 and 33%);

Godshall v. Franklin Mint Co., 2004 WL 2745890, at *5 (E.D. Pa. Dec. 1, 2004) (33 1/3%). A private contingent fee agreement could have resulted in a 40% recovery – 6% higher than that recovered by the Kohn firm. See Fanning v. Acromed Corp., 2000 WL 1622741, at *7 (E.D. Pa. Oct. 23, 2000) ("[P]laintiffs' counsel in private contingency fee cases regularly negotiate agreements providing for thirty to forty percent of any recovery."); In re Ikon Office Solutions, Inc., 194 F.R.D. 166, 194 (E.D. Pa. 2000) ("[I]n private contingency fee cases ... plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery."). The benefits accruing to the class are entirely attributable to the efforts of class counsel. The settlement agreement includes a mechanism for monitoring and preventing racially disparate personnel decisions, thus addressing a problem that has plagued the Philadelphia Bakery since it was run by Nabisco (well before Kraft's 2000 take-over of the facility). The settlement thus provides innovative and important non-monetary relief to present and future African-American employees of the Kraft Philadelphia Bakery. In these circumstances, I conclude that a fee of $450,000 is reasonable and well-justified.

**\*3** The reasonableness of the fee is further demonstrated by a lodestar cross-check. I first determine the lodestar calculation by multiplying the number of hours class counsel worked by "blended billing rates that approximate the fee structure of all the attorneys who worked on the matter." In re Rite Aid Corp., 396 F.3d at 306. I then divide the proposed fee award by the lodestar calculation, resulting in a lodestar multiplier. See In re AT & T Corp., 455 F.3d at 164. "[W]hen the multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method, with an eye toward reducing the award." In re Rite Aid Corp., 396 F.3d at 306. As the Third Circuit has stated, however,

> the percentage of common fund approach is the proper method of awarding attorneys' fees. The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting. The district courts may rely on summaries submitted by the attorneys and need not review actual billing records. Furthermore, the resulting multiplier need not fall within any pre-defined range, provided

Case: 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 93 of 482

Davis v. Kraft Foods North America, Inc., Not Reported in Fed. Supp. (2007)

that the District Court's analysis
justifies the award.

Id. at 306-07.

In the instant case, the Kohn firm worked a total of
approximately 878 hours and had a lodestar calculation of
$289,640.50. (Joseph C. Kohn Decl. at 2.) In addition, Mr.
Vance worked a total of 115.9 hours and had a lodestar
calculation of $40,565. (Robert T. Vance Affid. at 2.) Thus,
the total lodestar calculation if $330,205.50. Accordingly,
the lodestar multiplier is 1.36. Multipliers of up to 4 are
frequently awarded in common fund cases. See, e.g., Meijer,
Inc. v. 3M, 2006 WL 2382718, at *24 (E.D. Pa. Aug.
14, 2006) (4.77); Nichols v. SmithKline Beecham Corp.,
2005 WL 950616, at *24 (E.D. Pa. April 22, 2005) (3.15);
Varacallo v. Mass. Mut. Life Ins. Co., 226 F.R.D. 207, 256
(D. N.J. 2005) (2.83). In these circumstances, I conclude that
the lodestar method confirms that the instant fee request is
reasonable and justified.

In addition to attorneys' fees, class counsel seek
reimbursement of litigation expenses. "Attorneys who create
a common fund for the benefit of a class are entitled to
reimbursement of reasonable litigation expenses from the
fund." Nichols v. SmithKline Beecham Corp., 2005 WL
950616, at *24 (E.D. Pa. April 22, 2005) (quoting In re Aetna
Inc., 2001 WL 20928, at *13 (E.D. Pa. Jan. 4, 2001)). Class
counsel have requested reimbursement of $113,582.10. This
includes costs incurred in connection with the prosecution and
settlement of the litigation for items such as: depositions and
transcripts; copying, printing, and velobinding; online legal
research; postage; court costs; travel; long distance phone and

fax; witness expenses; and expert fees. The reimbursement
sought is less than the $125,000 that counsel notified the class
it would seek. Significantly, class counsel have not sought
reimbursement for the expert opinion of Professor Geoffrey
Hazard that I rejected in disqualifying prior class counsel.
No objections have been filed in response to this request for
reimbursement. Almost two-thirds of the expenses ($69,128)
are for the expert services of Dr. David L. Crawford, Ph.D.,
whose studies demonstrated the racially disparate impact of
discipline imposed at Kraft's Philadelphia Bakery. (Shanon J.
Carson Decl. at 2.) This evidence was critically important to
Plaintiffs at class certification and would have been equally
important to Plaintiffs had the matter gone to trial. In these
circumstances, I conclude that the requested expenses are
reasonable.

AND NOW, this 9th day of August, 2007, upon consideration
of Plaintiffs' Application for an Award of Attorneys' Fees and
Reimbursement of Expenses, and after conducting a hearing
on July 27, 2007, IT IS ORDERED that the Application is
**GRANTED** as follows:

> **\*4** (1) The Court awards Plaintiffs' Counsel attorneys fees
> in the amount of $450,000 pursuant to the settlement
> reached with defendant Kraft Foods North America; and

> (2) The Court approves a payment of unreimbursed
> litigation expenses in the amount of $113,582.10 from
> the settlement fund to Plaintiffs' Counsel.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2007 WL 9807445

---

**End of Document**                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: DOMESTIC DRYWALL ANTITRUST LITIGATION | MDL No. 2437 13-MD-2437 |

THIS DOCUMENT RELATES TO:

ALL DIRECT PURCHASER ACTIONS

### [PROPOSED] ORDER GRANTING PRELIMINARY APPROVAL OF DIRECT PURCHASER PLAINTIFFS' PROPOSED SETTLEMENT WITH DEFENDANT LAFARGE NORTH AMERICA INC.; CERTIFYING THE LAFARGE SETTLEMENT CLASS FOR THE PURPOSE OF PROVIDING NOTICE; AND AUTHORIZING DISSEMINATION OF NOTICE TO THE LAFARGE SETTLEMENT CLASS MEMBERS

Upon consideration of the Direct Purchaser Plaintiffs' Motion for Preliminary Approval of the Proposed Settlement with Defendant Lafarge North America Inc. and Authorization to Disseminate Notice to the Lafarge Settlement Class Members (the "Motion"),

WHEREAS, this multidistrict litigation involves allegations of a conspiracy in restraint of trade among manufacturers of gypsum wallboard, including Lafarge North America Inc. ("Lafarge"); and Defendants, including Lafarge, deny liability and deny the existence of any conspiracy in violation of the Sherman Act or any other law; and

WHEREAS, discovery has proceeded on issues relating to whether the Defendants conspired, and Direct Purchaser Plaintiffs ("Plaintiffs") have had an opportunity to review extensive document productions, numerous depositions in this matter, and the Court's summary judgment ruling as to Lafarge and other Defendants; and

WHEREAS, Lafarge denies any wrongdoing or liability relating to any of the allegations made by Plaintiffs, and it is agreed among Lafarge and Plaintiffs that the Settlement Agreement

shall not constitute, and shall not be construed as or deemed to be evidence of or an admission of any fault, wrongdoing, or liability by Lafarge or any other person or entity; and

WHEREAS, the Court has considered the Settlement Agreement, the proposed forms of Notice, and the other documents submitted in connection with Plaintiffs' request for preliminary approval of the Settlement Agreement, certification of the Settlement Class set forth in the Settlement Agreement (the "Lafarge Settlement Class") for the purposes of settlement only, and appointment of counsel for the Lafarge Settlement Class, and good cause appearing therefore;

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:**

1.      The Motion is **GRANTED**.

2.      Terms used in this Order that are defined in the Settlement Agreement are, unless otherwise defined herein, used in this Order as defined in the Settlement Agreement.

### Preliminary Approval of the Lafarge Settlement

3.      The Court finds that: (a) the proposed Settlement with Lafarge, as set forth in the Settlement Agreement, is sufficiently fair, reasonable and adequate to authorize the dissemination of notice of the Settlement to potential members of the Lafarge Settlement Class and to schedule a fairness hearing to determine whether to grant final approval of the proposed Lafarge Settlement under Fed. R. Civ. P. 23(e); (b) the Settlement Agreement was negotiated at arm's-length by experienced counsel acting in good faith; and (c) there has been adequate opportunity for discovery for experienced counsel to evaluate the claims and risks at this stage of the litigation.

4.      The Court finds that preliminary approval is appropriate and hereby grants preliminary approval of the Settlement subject to final determination following notice and hearing.

2

**Certification of the Lafarge Settlement Class, Appointment of Lafarge Settlement Class Representatives, and Appointment of Lafarge Settlement Class Counsel**

5.     For purposes of the settlement of the claims against Lafarge, and only for that purpose, and without an adjudication on the merits and without any impact upon the issues between Plaintiffs and non-settling Defendants or issues between Plaintiffs and Lafarge in the event that final approval of the Settlement does not occur, pursuant to Rule 23 of the Federal Rules of Civil Procedure, the Court finds that the requirements for a class action are met, and the Court provisionally certifies the following class solely for purposes of settlement of claims against Lafarge (the "Lafarge Settlement Class"):

> All persons or entities that purchased Wallboard in the United States directly from any of the Defendants or their respective subsidiaries from January 1, 2012 through June 16, 2016. Excluded from the Lafarge Settlement Class are Defendants, the officers, directors and employees of any Defendant, the parent companies, subsidiaries, and affiliates of any Defendant, the legal representatives and heirs or assigns of any Defendant, any federal governmental entities and instrumentalities of the federal government, any judicial officer presiding over the Action, any member of his or her immediate family and judicial staff, and any juror assigned to the Action.

6.     For purposes of preliminary approval, the Court finds that provisional certification of the Lafarge Settlement Class is warranted in light of the proposed Settlement under the prerequisites of Federal Rule of Civil Procedure 23(a) because: (1) the members of the Lafarge Settlement Class are so numerous that joinder is impracticable; (2) there are issues of law and fact common to the Lafarge Settlement Class; (3) Plaintiffs' claims are typical of the claims of the Lafarge Settlement Class Members; and (4) Plaintiffs and Interim Co-Lead Counsel will fairly and adequately represent the interests of the Lafarge Settlement Class Members.

7.     For purposes of preliminary approval, the Court finds that provisional certification of the Lafarge Settlement Class is warranted in light of the proposed Settlement under Federal Rule of Civil Procedure 23(b)(3) because common issues, including whether

3

Lafarge and other Defendants entered into any conspiracy, predominate over any questions affecting only individual members of the Lafarge Settlement Class, and settlement of this action on a class basis is superior to other means of resolving the Action as to Lafarge.

8. The Court hereby appoints Plaintiffs Sierra Drywall Systems, Inc., Janicki Drywall, Inc., New Deal Lumber & Millwork Co., and Grubb Lumber Co., Inc. as the Lafarge Settlement Class Representatives. The Court preliminarily finds that the Lafarge Settlement Class Representatives will fairly and adequately protect the interests of the Lafarge Settlement Class because: (1) the interests of the Lafarge Settlement Class Representatives are consistent with those of Lafarge Settlement Class Members; (2) there appear to be no conflicts between or among the Lafarge Settlement Class Representatives and the other Lafarge Settlement Class Members; (3) the Lafarge Settlement Class Representatives have been and appear to be capable of continuing to be active participants in both the prosecution and the settlement of this litigation; and (4) the Lafarge Settlement Class Representatives and Lafarge Settlement Class Members are represented by qualified, reputable counsel who are experienced in preparing and prosecuting large, complicated class action cases, including those concerning violation of the antitrust laws.

9. In making these preliminary findings, the Court has considered, *inter alia*, (1) the interests of the Lafarge Settlement Class Members in individually controlling the prosecution or defense of separate actions; (2) the impracticality or inefficiency of prosecuting or defending separate actions; (3) the extent and nature of any litigation concerning these claims already commenced; and (4) the desirability of concentrating the litigation of the claims in a particular forum.

4

10.     At this juncture, the Court makes no determination regarding the manageability of this litigation as a class action, if this litigation were to go to trial.

11.     The requirements of Rule 23(g) of the Federal Rules of Civil Procedure are met, and the Court hereby appoints the law firms of Berger & Montague, P.C., Cohen, Milstein, Sellers & Toll, PLLC, and Spector Roseman Kodroff & Willis, P.C. as Settlement Class Counsel for the Lafarge Settlement Class.

## CAFA Notice

12.     Pursuant to the Settlement Agreement, within ten (10) days after filing with the Court the motion papers seeking preliminary approval of the Settlement, Lafarge shall provide notice of the Settlement to the appropriate state and federal officials as provided in the Class Action Fairness Act, 28 U.S.C. § 1715.

## Notice to Potential Lafarge Settlement Class Members

13.     The Court finds that the proposed Settlement with Lafarge, as set forth in the Settlement Agreement, subject to final determination following proper notice and a fairness hearing, is sufficiently fair, reasonable, and adequate to authorize dissemination of notice to the Lafarge Settlement Class.

14.     The Court approves the form and content of the: (a) Notice of Proposed Settlement of Direct Purchaser Class Action with Lafarge North America Inc. ("Notice"), attached hereto as Exhibit A; and (b) Summary Notice of Proposed Settlement of Direct Purchaser Class Action with Lafarge North America Inc. ("Summary Notice"), attached hereto as Exhibit B.

15.     The Court finds that the dissemination of the Notice and Summary Notice in the manner set forth herein constitutes the best notice practicable under the circumstances; is valid,

due, and sufficient notice to all persons entitled to notice; and complies fully with the requirements of Federal Rule of Civil Procedure 23 and due process.

16. By _July 28_, 2016 (10 days from the date of entry of this Order), all Defendants in the Action shall provide to Lafarge Settlement Class Counsel, in a computer readable format, and, if not reasonably available in computer readable format, then in mailing label format, if available, or other similar format, the names and addresses of potential members of the Lafarge Settlement Class, to the extent they are identifiable through reasonable efforts.

17. By _August 29_, 2016 (30 days from the receipt of information needed to facilitate notice from Defendants), the Notice, in substantially the same form as Exhibit A, shall be mailed by first class mail, postage prepaid, to all potential members of the Lafarge Settlement Class identified pursuant to paragraph 16. The Notice shall also be provided to all persons who request it. In addition, copies of the Notice shall be posted on the Internet on a website dedicated to this litigation.

18. Subject to lead time required for publication, Lafarge Settlement Class Counsel shall cause the Summary Notice, in substantially the same form as Exhibit B, to be published in the LBM Journal on the first available publication date on or after 7 days from the provision of individual mailed notice.

19. By _October 3_, 2016 (75 days from the date of entry of this Order), Lafarge Settlement Class Counsel shall file with the Court their motion for final approval of the Lafarge Settlement and may file a request to utilize a portion of the Lafarge Settlement Fund to pay Plaintiffs' ongoing litigation expenses, along with proof that notice was provided to potential members of the Lafarge Settlement Class as directed by this Order.

20.     All requests for exclusion from the Lafarge Settlement Class must be in writing, postmarked no later than October 17, 2016 (90 days from the date of entry of this Order), and must otherwise comply with the requirements set forth in the Notice.

21.     Any Lafarge Settlement Class Member who objects to the proposed Settlement, or to the request to utilize a portion of the Lafarge Settlement Fund to pay Plaintiffs' ongoing litigation expenses, must do so in writing, postmarked no later than October 17, 2016 (90 days from the date of entry of this Order), and shall otherwise comply with the requirements set forth in the Notice.

22.     Lafarge Settlement Class Counsel shall file with the Court and serve on the parties their responses to any objection(s) to the Settlement and/or the request to use the Lafarge Settlement Fund for ongoing litigation expenses on or before October 31, 2016 (105 days from the date of entry of this Order).

23.     Each potential member of the Lafarge Settlement Class shall retain all rights and causes of action with respect to claims against all Defendants other than Lafarge, regardless of whether such potential member of the Lafarge Settlement Class decides to remain in the Lafarge Settlement Class or exclude itself from the Lafarge Settlement Class.

24.     The Court will hold a fairness hearing on Wed. Dec. 7, 2016 at 2:00 p.m. (at least 120 days from the date of entry of this Order), at the James A. Byrne United States Courthouse, Courtroom 3A, 601 Market Street, Philadelphia, PA, to determine the fairness, reasonableness, and adequacy of the proposed Settlement with Lafarge and to consider whether to approve the request to utilize a portion of the Lafarge Settlement Fund to pay Plaintiffs' ongoing litigation expenses. Any Lafarge Settlement Class Member who follows the procedure set forth in the Notice may appear and be heard. The fairness hearing may be

7

rescheduled, adjourned or continued without further notice to the Lafarge Settlement Class Members.

**Other Provisions**

25.     In the event that the Lafarge Settlement is validly terminated as provided for in the Settlement Agreement, all proceedings had in connection with the Settlement and any orders regarding the Settlement shall be null and void, except insofar as expressly provided to the contrary in the Settlement Agreement, and without prejudice to the status quo ante rights of the Plaintiffs, Lafarge, and Lafarge Settlement Class Members.

26.     In the event that the Lafarge Settlement does not become final and effective for any reason, nothing in the Settlement Agreement, this Order, or proceedings or orders regarding the Settlement shall be construed to prejudice any position that any of the parties may assert in any aspect of this litigation.

27.     Neither the Settlement Agreement, nor any of its terms or provisions, nor any of the negotiations or proceedings in connection with it, shall be construed as an admission or concession by Lafarge of the truth of any allegations in the litigation, or of any fault or wrongdoing of any kind, or by Plaintiffs of any lack of merit of Plaintiffs' allegations.

28.     The Court's provisional certification of the Lafarge Settlement Class is without prejudice to, or waiver of, the rights of Defendants, including Lafarge, in the event Final Approval of the Lafarge Settlement does not occur, to contest certification of any other class proposed in MDL No. 2437. The Court's findings in this Order shall have no effect on the Court's ruling on any motion to certify any other class in MDL No. 2437, and no party may cite or refer to the Court's approval of the Lafarge Settlement Class as compelling the same result with respect to a motion to certify any other class in MDL No. 2437.

8

29.     The Court approves the establishment of the Lafarge escrow account under the Settlement Agreement as a qualified settlement fund ("QSF") pursuant to Internal Revenue Code Section 468B and the Treasury Regulations promulgated thereunder and retains continuing jurisdiction as to any issue that may arise in connection with the formation and/or administration of the QSF.

30.     The Court approves the establishment of a federally insured interest-bearing bank account for the payment of expenses associated with providing notice to the Lafarge Settlement Class.  Lafarge Settlement Class Counsel are, in accordance with the Settlement Agreement, authorized to expend funds from the federally insured interest-bearing bank account for the payment of notice and notice administration costs.  If any funds remain in the federally insured interest-bearing bank account after all notice and notice administration costs are paid, such funds will be transferred to the QSF in accordance with the Settlement Agreement.

31.     Kurtzman Carson Consultants LLC is approved to serve as settlement administrator for the purpose of issuing notice to the Lafarge Settlement Class.

32.     The litigation against Lafarge is stayed except as provided for in the Settlement Agreement and to the extent necessary to obtain final approval of the Lafarge Settlement.

Date: 7/18/16

BY THE COURT:

MICHAEL M. BAYLSON, U.S.D.J.

9

Case 4:21-cv-00196-MWB  Document 249-1  Filed 10/07/25  Page 103 of 482

Ebner v. Merchants & Medical Credit Corp., Not Reported in Fed. Supp. (2017)

2017 WL 1079966
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Susan EBNER, individually and on behalf
of all others similarly situated, Plaintiff,

v.

MERCHANTS & MEDICAL
CREDIT CORP., et al., Defendant.

CIVIL ACTION NO. 14-06882
|
Filed 03/22/2017

**Attorneys and Law Firms**

Arkady Eric Rayz, Kalikhman & Rayz LLC, Huntingdon
Valley, PA, Gerald D. Wells, III, Robert J. Gray, Connolly
Wells & Gray, LLP, King of Prussia, PA, for Plaintiff.

Brendan H. Little, Lippes Mathias Wexler Friedman LLP,
Buffalo, NY, Charity A. Olson, Olson Law Group, Ann Arbor,
MI, for Defendant.

**MEMORANDUM**

GERALD J. PAPPERT, DISTRICT JUDGE

**\*1** Plaintiff Susan Ebner, through her proposed class
counsel, and Defendant Merchants & Medical Credit
Corporation ("MMCC"), have negotiated and agreed to a
settlement of this class action. On June 15, 2016 the Court
preliminarily approved that settlement. (ECF No. 21.) Class
counsel has moved for final approval of the settlement and for
attorneys' fees and costs. (ECF No. 32.) For the reasons that
follow, the Court grants the motion.

**I.**

MMCC mailed Ebner debt collection letters in June of 2014 in
glassine window envelopes. (Compl. ¶¶ 17, 24.) Her account
number was visible through the window. (*Id.* ¶¶ 20, 26.)
Ebner filed a class action lawsuit on December 4, 2014,
alleging that by disclosing her account number on the face
of the envelope, MMCC violated 15 U.S.C. § 1692f(8) of
the Fair Debt Collection Practices Act ("FDCPA"). (ECF
No. 1.) Section 1692(f)(8) provides that "using any language

or symbol, other than the debt collector's address, on any
envelope when communicating with a consumer by use of
the mails" is an "unfair or unconscionable means to collect
or attempt to collect any debt." 15 U.S.C. § 1692f(8). In
*Douglass v. Convergent Outsourcing*, 765 F.3d 299 (3d Cir.
2014), the Third Circuit Court of Appeals explained that
the "plain language of § 1692f(8) does not permit [a debt
collector's] envelope to display an account number". *Id.* at
303.

On March 21, 2016 Ebner filed a motion for approval of
a class settlement and class certification. (ECF No. 17.)
The Court held a hearing on June 14, 2016 and entered an
order the next day preliminarily approving the class action
settlement and directing notice to the class. (ECF No. 21.) The
proposed class was defined as "[a]ll persons located in (i) the
Commonwealth of Pennsylvania, (ii) the State of New Jersey,
or (iii) the State of Delaware according to their last known
address ... from December 4, 2013 through August 1, 2015 ...
who received one or more letters from MMCC seeking to
collect a consumer debt for which the ... account number was
visible through the glassine window of the envelope." (*Id.* at
2.)

On September 15, 2016 MMCC moved to continue the
final approval hearing and amend the Court's preliminary
order approving the class action settlement. (ECF No. 25.)
MMCC's motion explained that the number of settlement
class members was smaller than initially thought at the time
of the Court's preliminary order. MMCC asked for more time
to meet the deadlines in the Court's order. Plaintiffs did not
oppose this motion. The Court granted MMCC's motion on
September 30, 2016. (ECF No. 28.) On December 29, 2016
Ebner filed a motion for final approval of settlement. (ECF
No. 31.) The Court held a final approval hearing on January
12, 2017. (ECF No. 34.)

**II.**

Federal Rule of Civil Procedure 23(e) requires court approval
of class action settlements. FED. R. CIV. P. 23(e)(2).
Approval is appropriate "only after a hearing and on finding
that it is fair, reasonable, and adequate." *Id.* The Court must
(1) determine if the requirements for class certification under
Rule 23(a) and (b) are satisfied; (2) assess whether notice to
proposed class was adequate; and (3) evaluate if the proposed
settlement is fair under Rule 23(e). *See In re Nat'l Football*

*League Players Concussion Injury Litig.*, 775 F.3d 570, 581 (3d Cir. 2014).

**A: Whether Class Certification is Proper**

**\*2** Rule 23(a) requires Plaintiffs to demonstrate that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." FED R. CIV. P. 23(a). Rule 23(b)(3), under which Plaintiffs seek class certification, requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). For the reasons that follow, the proposed class may be certified because the Plaintiffs have demonstrated compliance with Rule 23(a) and 23(b)(3)'s requirements.

**i. Rule 23(a) Factors**

**1. Numerosity**

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). There is no minimum number of plaintiffs required to satisfy this requirement; a proposed class exceeding 40 members is sufficient. *Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir. 2001). Undisputed records in this case indicate that MMCC sent similar letters to approximately 4,802 individuals between December 3, 2013 and August 1, 2015. (Pl.'s Mot., at 7, ECF No. 31-1.)

**2. Commonality**

Rule 23(a)(2) mandates the showing of "questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). This element requires that plaintiffs "share at least one question of fact or law with the grievances of the prospective class." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 527–28 (3d Cir. 2004). "Generally, courts have held that the commonality requirement is satisfied in FDCPA actions when the defendants have engaged in standardized conduct towards members of the proposed class by mailing them allegedly

illegal form letters or documents." *Good v. Nationwide Credit, Inc.*, 314 F.R.D. 141, 151–52 (E.D. Pa. 2016). Here, MMC engaged in standardized conduct by sending similar letters to all members of the proposed class. (Pl.'s Mot., at 8.) The common question of fact is whether account numbers were visible through envelope windows. The common question of law is whether MMCC's conduct violates § 1692f(8).

**3. Typicality**

Rule 23(a)(3) requires the class representative's claims to be "typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). The typicality inquiry is "intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented." *Baby Neal v. Casey*, 43 F.3d 48, 57 (3d Cir. 1994). "Where claims of the representative plaintiffs arise from the same alleged wrongful conduct on the part of the defendant, the typicality prong is satisfied." *Good*, 314 F.R.D. at 152. Here, MMCC mailed proposed class members letters with the identical flaw: a visible account number through the envelope window. (Pl.'s Mot., at 9.)

**4. Adequacy of Representation**

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). The Court must inquire into the "qualifications required to represent the class," and then assess whether there are "conflicts of interest between named parties and the class they seek to represent." *In re Prudential ins. Co. of Am. Sales Practice Litig.*, 148 F.3d 283, 312 (3d Cir. 1998).

Class counsel is qualified and MMCC does not contend otherwise. Connolly Wells & Gray, LLP and Kalikhman & Rayz, LLC have substantial experience in handling not only class actions, but the specific type of claim asserted here. (Pl.'s Mot., at 10.) They have spent more than two years litigating this case. Moreover, district courts in this circuit have appointed them as class counsel for FDCPA settlement claims in the past. *See, e.g., Magness v. Walled lake Credit Bureau et al.*, No. 12-06586 (ECF No. 83) (E.D. Pa. February 18, 2015); *Ebner v. United Recovery Systems, LP et al.*, No. 14-06881 (ECF No. 40) (E.D. Pa. September 9, 2016). The

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 105 of 482

Ebner v. Merchants & Medical Credit Corp., Not Reported in Fed. Supp. (2017)

Court is unaware of any conflicts of interest between Ebner and the class she seeks to represent. As explained above, Ebner's claims and those of the proposed class are identical.

### ii. Rule 23(b)(3) Factors

**\*3** Plaintiffs seek class certification under Rule 23(b)(3) which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

### 1. Predominance

The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 594 (1997). It also assesses whether a class action "would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated." FED. R. CIV. P. 23(b)(3) advisory committee's note to 1966 amendment. Here, where MMCC sent similarly flawed "debt collection letters to all members of the putative class, common questions of law and fact predominate due to the virtually identical factual and legal predicates of each class member's claim." *Good*, 314 F.R.D. at 154.

### 2. Superiority

The superiority requirement "asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *Warfarin*, 391 F.3d at 533–34. When assessing superiority and "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, ... for the proposal is that there be no trial." *Amchem*, 521 U.S. at 620. The Third Circuit has explained that class actions are "fundamental to the statutory structure of the FDCPA." *Weiss v. Regal Collections*, 385 F.3d 337, 345 (3d Cir. 2004). Without the class action device, "meritorious FDCPA claims might go unredressed because the awards in an individual case might be too small to prosecute an individual action." *Id.*

The superiority requirement is "apparent in a case such as this one, in which thousands of individuals seek relief for violation of the FDCPA regarding a substantially identical" flaw in debt collection letters. *Good*, 314 F.R.D. at 154. MMCC mailed thousands of individuals letters that displayed their account number through the envelope window. "Even if a mere fraction of the members of the putative class were to litigate their claims individually, the courts would be significantly burdened by numerous lawsuits. It is more probable, however, that ... consumers would find it uneconomical to litigate their claims individually, thereby hindering the FDCPA's private attorney-general enforcement mechanism." *Id.* at 155.

### B. Whether Notice to the Class Members was Adequate

"In the class action context, the district court obtains personal jurisdiction over the absentee class members by providing proper notice of the impending class action and providing the absentees with the opportunity to be heard or the opportunity to exclude themselves from the class." *Prudential*, 148 F.3d at 306. Rule 23(c)(2)(B) requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." FED. R. CIV. P. 23(c)(2)(B). Moreover, the notice must "clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3). *Id.* Rule 23(e) requires notification to all members of the terms of any proposed settlement. FED. R. CIV. P. 23(e). This "notice is designed to summarize the litigation and the settlement" and "to apprise class members of the right and opportunity to inspect the complete settlement documents, papers, and pleadings filed in the litigation." *Prudential*, 148 F.3d at 327.

**\*4** The Court's order granting preliminary approval of the settlement, (ECF No. 21), directed Ebner to send notice "directly to the members of the Settlement Class." (*Id.*) Ebner also published notice on a dedicated website. (Pl.'s Mot., at 13.) Ebner represented to the Court that of 4,802 notices mailed to potential class members, only 392 were returned as undeliverable—a 91.8 percent penetration rate. (Pl.'s Mot., at 13.). In an affidavit, class counsel Arkady Rayz explained that this rate compares favorably to rates in other class actions on which he has worked. (Rayz Decl. ¶ 73.) At the final

Case 4:21-cv-00196-MWB   Document 249-1   Filed 10/07/25   Page 106 of 482

Ebner v. Merchants & Medical Credit Corp., Not Reported in Fed. Supp. (2017)

approval hearing, class counsel represented to the Court that they received calls from over 100 class members. (Tr. of Hr'g, at 15:2–5, ECF No. 35.) This notice satisfies Rule 23(c)(2) (B) and (e).

## C. Whether the Settlement is Fair

The Court must determine if the proposed settlement is "fair, adequate, and reasonable," as required by Rule 23(e) (2). *Prudential*, 148 F.3d at 316–17. "Where the parties simultaneously seek certification and settlement approval, the Third Circuit requires 'courts to be even more scrupulous than usual' when they examine the fairness of the proposed settlement." *Good*, 314 F.R.D. at 156 (quoting *Prudential*, 148 F.3d at 317). "The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." *Girsh v. Jepson*, 521 F.2d 153, 156 (3d Cir. 1975).

The Third Circuit identified nine factors for a district court to consider when determining the fairness of a proposed settlement: (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *Girsh*, 521 F.2d at 157. In this case, "the mechanical application of the *Girsh* factors is perhaps unfitting, because the settlement affords the class the maximum recovery permitted under the FDCPA's damages cap." [1] *Good*, 314 F.R.D. at 157.

### i. Complexity, Expense, & Likely Duration

This first factor aims to take into account the "probable costs, in both time and money, of continued litigation." *In re Cendant Corp. Litig.*, 264 F.3d 201, 233 (3d Cir. 2001). This case was filed over two years ago. (ECF No. 1.) Class counsel has represented to the Court that "much work has been done by counsel" including document review, written discovery and legal research. (Pl.'s Mot., at 17.) Continued litigation would entail a potential dispute over class certification, a possible summary judgment motion, and trial—not to mention the possibility for appeals from a

certification decision or verdict. This factor weighs heavily in favor of settlement.

### ii. Reaction of the Class to the Settlement

Class counsel represents that it mailed 4,802 notices to class members and that no member has objected to the settlement or asked to be excluded. (Pl.'s Mot., at 18.) "[T]hat the settlement is entirely uncontested is evidence of its fairness." *Good*, 314, F.R.D. at 157; *see also Prudential*, 148 F.3d at 318.

### iii. Stage of Proceedings and Amount of Discovery Completed

**\*5** This factor requires the Court to evaluate whether Plaintiffs had an "adequate appreciation of the merits of the case before negotiating" settlement. *Prudential*, 148 F.3d at 319. "Where, as here, the class obtains the maximum recovery permitted by law, this factor seems inapplicable." *Good*, 314 F.R.D. at 157. Regardless, class counsel represents to the Court that it has exchanged significant information with MMCC during the course of settlement negotiations in addition to engaging in significant written discovery. (Pl.'s Mot., at 19.) This settlement comes after more than two years of litigation. The Court is satisfied that the parties have sufficient information to evaluate the merits of this settlement, something that favors its approval.

### iv. Risks of Establishing Liability and Damages and Maintaining the Class Action Through Trial and the Ability of the Defendant to Withstand a Greater Judgment

*Girsh* factors four through seven require the Court to "survey the potential risks and rewards of proceeding to litigation in order to weigh the likelihood of success against the benefits of an immediate settlement." *Warfarin*, 391 F.3d at 537. Class counsel represents that "certification, liability, and establishing damages would all have been hotly contested issues." (Pl.'s Mot., at 20.) Counsel also represents that, based on their experience, MMCC was likely to vigorously oppose class certification and that the "risks associated with class certification increase the risk of maintaining the proposed class." (*Id.*) Because the FDCPA provides for a statutory cap on damages and the proposed settlement provides the maximum recovery available to the class, the ability of the defendant to withstand a greater judgment is inapplicable. Overall, these factors support settlement approval.

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 107 of 482

Ebner v. Merchants & Medical Credit Corp., Not Reported in Fed. Supp. (2017)

### v. Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and the Attendant Risks of Litigation

"The reasonableness of a proposed settlement depends in part upon a comparison of the present value of the damages the plaintiffs would recover if successful discounted by the risks of not prevailing." *Boone v. City of Philadelphia,* 668 F. Supp. 2d 693, 712 (E.D. Pa. 2009) (citation omitted)). As explained above, the proposed settlement provides the class the maximum recovery available under the FDCPA. (Pl.'s Mot., at 21.) Moreover, *experienced* class counsel endorses this settlement. Such an opinion is entitled to "significant weight." *Good,* 314 F.R.D. at 159 (quoting *Boone,* 668 F. Supp. 2d at 712).

### III.

### A.

Class counsel moves for approval of a case contribution award to Ebner of $2,500. MMCC has agreed to pay this separate and apart from the settlement fund. (Pl.'s Mot., at 2, ECF No. 31-2.) Class counsel explained that Ebner "searched her files for relevant records, obtained copies of documents concerning her debt that was the subject of the collection letter and provided information to Class Counsel to assist in [the litigation]." (Rayz Decl. ¶ 122.) The FDCPA "specifically allows a higher recovery for the claims by class representatives than for the claims asserted for the other class members." *Good,* 314 F.R.D. at 160. MMCC does not contest this motion and no class member has objected to this case contribution award.

### B.

Class counsel also moves for approval of attorneys' fees and costs in the amount of $42,500. Class counsel submitted documents showing that (1) Arkady Rayz, a partner in Kalikhman & Rayz, LLC, worked 28.4 hours at an hourly rate of $415, for a total of $11,786.00 in fees; (2) Gerald D. Wells, III, a partner in Connolly, Wells & Gray, LLP, worked 47.75 hours at an hourly rate of $550, for a total of $26,262.50 in fees; (3) Stephen E. Connolly, a partner in Connolly, Wells & Gray, LLP, worked 13.75 hours at an hourly rate of $550, for a total of $7,562.50 in fees; and (4) Robert J. Gray, a partner in Connolly, Wells & Gray, LLP, worked 3.15 hours at an hourly rate of $550, for a total of $1,732.50 in fees. (Rayz Decl. ¶¶ 89 & 91.) This is a total of $47,343.50 and does not include the time spent preparing and filing the motions for final approval of the settlement, case contribution award of plaintiff and approval of attorneys' fees and costs. (*Id.*¶ 86.)

**\*6** The Third Circuit has explained that attorneys' fees under the FDCPA are not a special or discretionary remedy but rather "the Act mandates an award of attorneys' fees as a means of fulfilling Congress's intent that the Act should be enforced by debtors acting as private attorneys general." *Graziano v. Harrison,* 950 F.2d 107, 113 (3d Cir. 1991). MMCC does not contest this motion and no class member has objected to the award of these fees and costs. [2] Moreover, the settlement agreement provides that the attorneys' fees and costs will be paid separate and apart from the settlement fund. (Pl.'s Mot., at 1.) "Even if the Court were to approve less than the [$42,000] negotiated amount, the class would not gain a greater recovery; rather, MMCC would simply keep the money. Under these circumstances, the Court concludes that the proposed attorneys' fees do not offend what is an otherwise fair settlement." *Good,* 314 F.R.D. at 161–62.

An appropriate order follows.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1079966

---

### Footnotes

1    The FDCPA provides for a statutory cap on damages. *See* 15 U.S.C. § 1692k(a)(2)(B) ("[I]n the case of a class action" damages are "not to exceed the lesser of $500,000 or 1 per centum of the net worth of the debt collector.") Here, one percent of MMCC's net worth is $29,000. (Pl.'s Mot., at 1.)

2    At the final approval hearing, defense counsel explained that she believed the fee award was fair: "I can submit to you that was an item that was negotiated after the class settlement was agreed to in principle, that's the appropriate way to do it in class litigation so there's no suggestion that one tail was wagging the dog.... I can submit to the Court that by virtue of my participation, I do feel like the amount expended was reasonable and necessary, notwithstanding the fact that we didn't blow this case up in a way that some—some of those in our profession like to do." (Tr. of Hr'g, at 32:15–33:15.)

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

IN RE: EpiPen (Epinephrine
      Injection, USP) Marketing,
      Sales Practices and Antitrust
      Litigation

(This Document Applies to Consumer
Class Cases)

MDL No:  2785

Case No. 17-md-2785-DDC-TJJ

---

## ORDER (I) PRELIMINARILY APPROVING SETTLEMENT UNDER FED. R. CIV. P. 23(e)(1), (II) APPOINTING THE SETTLEMENT ADMINISTRATOR, (III) APPROVING FORM AND MANNER OF NOTICE TO CLASS MEMBERS, (IV) SCHEDULING A FINAL FAIRNESS HEARING TO CONSIDER FINAL APPROVAL OF THE SETTLEMENT, AND (V) GRANTING RELATED RELIEF

An MDL proceeding entitled *In re EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litigation*, Civil Action No. 2:17-md-02785-DDC-TJJ (D. Kan.) (the "Action") is pending before this court.  Plaintiff Class Representatives, on behalf of the certified Class, have filed a motion under Federal Rule of Civil Procedure 23(e).  Doc. 2590. The motion asks the court to enter an order preliminarily approving the Settlement of this Action against Defendants Mylan N.V., Mylan Specialty L.P., Mylan Pharmaceuticals Inc., and Heather Bresch (collectively, "Mylan"), in accordance with a Stipulation of Class Action Settlement dated as of February 27, 2022 (the "Settlement Agreement"), which, together with the Exhibits attached to it, sets forth the terms and conditions for a proposed Settlement of the Action and Other Actions against Mylan and Viatris Inc. (collectively, the "Mylan Defendants") and for dismissal of the Action and Other Actions with prejudice against the Mylan Defendants upon the terms and conditions set forth therein.  The court has read and considered the Settlement Agreement and the Exhibits attached to it.  Also, the court held a hearing on the motion on

March 11, 2022.  Now, the court considers whether it should grant preliminary approval of that

Settlement Agreement under Rule 23(e).

Rule 23(e) permits the parties to settle the claims of a certified class action, but "only

with the court's approval."  And, the court may approve a settlement only upon finding that it is

"fair, reasonable, and adequate[.]"  Fed. R. Civ. P. 23(e)(2).  The Tenth Circuit has identified

four factors that a district court must consider when assessing whether a proposed settlement is

"fair, reasonable, and adequate":

>    (1)     whether the proposed settlement was fairly and honestly negotiated;
>    (2)     whether serious questions of law and fact exist, placing the ultimate
>            outcome of the litigation in doubt;
>    (3)     whether the value of an immediate recovery outweighs the mere possibility
>            of future relief after protracted and expensive litigation; and
>    (4)     the judgment of the parties that the settlement is fair and reasonable.

*Rutter & Willbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1188 (10th Cir. 2002).

The settlement approval process typically transpires in two phases.  *First*, the court

considers whether preliminary approval of the settlement is appropriate.  William B. Rubenstein,

*Newberg on Class Actions* § 13:10 (5th ed.); *Freebird, Inc. v. Merit Energy Co.*, No. 10-1154-

KHV, 2012 WL 6085135, at *4 (D. Kan. Dec. 6, 2012).  "If the Court grants preliminary

approval, it directs notice to class members and sets a hearing at which it will make a final

determination on the fairness of the class settlement."  *In re Motor Fuel Temperature Sales*

*Pracs. Litig.*, 286 F.R.D. 488, 492 (D. Kan. 2012); *see also Newberg on Class Actions* § 13:10

("[T]he court's primary objective [at the preliminary approval stage] is to establish whether to

direct notice of the proposed settlement to the class, invite the class's reaction, and schedule a

final fairness hearing."  *Second*, "taking account of all of the information learned during [the

preliminary approval] process, the court decides whether or not to give 'final approval' to the

settlement."  *Newberg on Class Actions* § 13:10.

Because preliminary approval is just the first step of the approval process, courts apply a "less stringent" standard than they apply at the final approval stage. *Freebird*, 2012 WL 6085135, at *5. "[D]istrict courts have developed a jurisprudence whereby they undertake some review of the settlement at preliminary approval, but perhaps just enough to ensure that sending notice to the class is not a complete waste of time." *Newberg on Class Actions* § 13:10. "The general rule [is] that a court will grant preliminary approval where the proposed settlement [is] neither illegal nor collusive and is within the range of possible approval." *Id.* (internal citation omitted). "While the Court will consider [the Tenth Circuit's] factors in depth at the final approval hearing, they are a useful guide at the preliminary approval stage as well." *In re Motor Fuel Temperature Sales Pracs. Litig.*, 286 F.R.D. at 502–03.

Applying this governing legal standard, the court grants the Motion for Preliminary Approval of Settlement (Doc. 2590), as follows:

**IT IS HEREBY ORDERED:**

1.     The court has reviewed the Settlement Agreement and preliminarily approves the Settlement between Plaintiffs and the Mylan Defendants set forth therein as fair, reasonable, and adequate, subject to further consideration at the Fairness Hearing described below.

2.     As the court previously certified in its Memorandum and Order dated February 27, 2020 (ECF No. 2018-1), the classes are defined as follows, which are collectively referred to as the "Class":

> All persons and entities in the United States who paid or provided reimbursement for some or all of the purchase price of Branded or authorized generic EpiPens for the purpose of consumption, and not resale, by themselves, their family member(s), insureds, plan participants, employees, or beneficiaries, at any time between August 24, 2011, and November 1, 2020;
>
> All persons and entities in the Antitrust States who paid or provided reimbursement for some or all of the purchase price of Branded EpiPens at any

time between January 28, 2013, and November 1, 2020, for the purpose of consumption, and not resale, by themselves, their family member(s), insureds, plan participants, employees, or beneficiaries.

The "Antitrust States" are:  Alabama, California, Florida, Hawaii, Illinois, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New York, North Carolina, Tennessee, and Utah.

The following groups are excluded from the Class:

a.    Defendants and their officers, directors, management, employees, subsidiaries, and affiliates;

b.    Government entities, other than government-funded employee benefit plans;

c.    Fully insured health plans (i.e., plans that purchased insurance that covered 100% of the plan's reimbursement obligations to its members);

d.    "Single flat co-pay" consumers who purchased EpiPens or generic EpiPens only via a fixed dollar co-payment that is the same for all covered devices, whether branded or generic (*e.g.*, $20 for all branded and generic devices);

e.    Consumers who purchased or received EpiPens or authorized generic equivalents only through a Medicaid program;

f.    All persons or entities who purchased branded or generic EpiPens directly from defendants;

g.    The judges in this case and members of their immediate families;

h.    All third-party payors who own or otherwise function as a Pharmacy Benefit Manager or control an entity who functions as a Pharmacy Benefit Manager; and

i.    Individual consumers whose only purchases of an EpiPen occurred before March 13, 2014 (the Generic Start Date).

3.    Also excluded from the Class are those persons and entities who timely and validly requested exclusion from the Class under the court's Memorandum and Order dated October 13, 2020 (Doc. 2240), and are listed on Exhibit F to Class Plaintiffs' Final Status Report

Re Implementation of Class Notice (Doc. 2323-1) as well as those persons excluded from the Class as set forth in the Pfizer Final Judgment (Doc. 2507 at 8).

4.      The court preliminarily finds that the court should approve the proposed Settlement of the Action between Plaintiff Class Representatives and Mylan because:  (i) it is the result of serious, extensive arm's-length and non-collusive negotiations; (ii) it falls within a range of reasonableness warranting final approval; (iii) it suffers no obvious deficiencies; and (iv) the proposed settlement deserves notice of the proposed Settlement to Class Members and further consideration at the Fairness Hearing described below.

5.      The court will conduct a Fairness Hearing on July 6, 2022 at 9:30 a.m., Central Time, at the United States District Court for the District of Kansas, 500 State Avenue, Kansas City, Kansas 66101, Courtroom 643, (A) to determine (i) whether the proposed Settlement of the Action on the terms and conditions provided for in the Settlement Agreement is fair, reasonable, and adequate to the Class and should be finally approved by the court; (ii) whether the proposed Final Judgment and Order of Dismissal with Prejudice as provided under the Settlement Agreement should be entered as to the Mylan Defendants; (iii) whether the proposed Plan of Allocation is fair, reasonable, and adequate and should be approved; (iv) the amount of attorneys' fees, costs, and expenses that the court should award to Class Counsel; and (v) any service award to Plaintiff Class Representatives; (B) to hear any objections by Class Members to (i) the Settlement or Plan of Allocation; (ii) the award of attorneys' fees and expenses to Class Counsel; and (iii) service awards to Plaintiff Class Representatives; and (C) to consider such other matters the court deems appropriate.  The court may adjourn the Fairness Hearing without further notice to the Class Members.

6.     The court approves the form and content of the Notice substantially in the form annexed as Exhibit B to the Settlement Agreement.

7.     The court approves the form and content of the Summary Notice and Proof of Claim forms (together, the "Notice Package"), substantially in the forms annexed as Exhibits C and D to the Settlement Agreement, respectively.

8.     The court finds that the distribution and publication of the Notice and Notice Package substantially in the manner and form set forth in ¶¶ 10, 11 of this Order:  (a) constitute the best notice to Class Members practicable under the circumstances; (b) are reasonably calculated, under the circumstances, to describe the terms and effect of the Settlement Agreement and of the Settlement and to apprise Class Members of their right to object to the proposed Settlement; (c) are reasonable and constitute due, adequate, and sufficient notice to all persons entitled to receive such notice; and (d) satisfy all applicable requirements of the Federal Rules of Civil Procedure (including Rules 23(c)–(e)), the United States Constitution (including the Due Process Clause), the Rules of this court, and other applicable law.

9.     The firm of A.B. Data, Ltd. ("Settlement Administrator") is appointed to supervise and administer the notice procedure as well as the processing of claims as more fully set forth below.

10.     Not later than five business days after entry of this order (the "Notice Date"), the Settlement Administrator shall commence distributing the Notice Package to all Class Members who it can identify with reasonable effort and post it on the case-designated website, www.EpiPenClassAction.com, according to the Notice Plan in the Declaration of Eric Schachter filed in support of Preliminary Approval.

11.     Not later than the Notice Date, the Settlement Administrator shall publish the Summary Notice, according to the Notice Plan in the Declaration of Eric Schachter filed in support of Preliminary Approval.

12.     At least seven (7) calendar days prior to the Fairness Hearing, Class Counsel shall serve on Mylan's counsel and file with the court proof, by affidavit or declaration, of such distribution and publishing.

13.     The Settlement Fund shall pay all fees and expenses incurred in identifying and notifying Class Members and in no event shall any of the Mylan Defendants' Released Parties bear any responsibility or liability for such fees or expenses.

14.     The Settlement Administrator shall submit a projected budget to Class Counsel for performing its duties and shall not make expenditures that exceed the projected budget by more than five percent without the prior approval of Class Counsel.  Consistent with the requirements of Rules 1, 23, and due process, the Settlement Administrator shall coordinate to minimize costs in effectuating its duties.

15.     All determinations and judgments in the Action concerning the Settlement, whether favorable or unfavorable to the Class, shall bind all Class Members regardless of whether such persons or entities seek or obtain by any means, including, without limitation, by submitting a Proof of Claim or any similar documentation, any distribution from the Settlement Fund or the Net Settlement Fund.

16.     Class Members who wish to participate in the Settlement shall complete and submit Proofs of Claim in accordance with the instructions contained therein.  Unless the court orders otherwise, Class Members must postmark or submit electronically all Proofs of Claim, no later than July 25, 2022.  Any Class Member who submits a Proof of Claim shall reasonably

cooperate with the Settlement Administrator, including by promptly responding to any inquiry made by the Settlement Administrator.  Any Class Member who does not timely submit a Proof of Claim within the time provided shall be barred from sharing in the distribution of the proceeds of the Settlement but shall nonetheless be bound by the Settlement Agreement, the Judgment, and the releases therein, unless otherwise ordered by the court.  Notwithstanding the foregoing, the Settlement Administrator may, in its discretion, accept late-submitted claims for processing so long as distribution of the Net Settlement Fund to Class Members is not materially delayed thereby.

17.     Each Class Member must submit the Proof of Claim that:  (a) is properly completed, signed, and submitted in a timely manner in accordance with the preceding paragraph; (b) is deemed adequate by the Settlement Administrator or Class Counsel; (c) if the person executing the Proof of Claim is acting in a representative capacity, include a certification of his or her current authority to act on behalf of the claimant; (d) is complete and contains no deletions or modifications of any of the printed matter contained therein; and (e) is signed under penalty of perjury.  As part of the Proof of Claim, each claimant shall submit to the jurisdiction of the court with respect to the claim submitted.

18.     Class Members who previously submitted a claim in connection with the settlement with the Pfizer Defendants in this Action shall not be required to submit a new claim in this Settlement, and the Distribution Amount for any Class Member's share of the Net Settlement Fund from this Settlement shall be combined with the Distribution Amount from the settlement with the Pfizer Defendants, if any, such that the Settlement Administrator may make one payment to each Class Member who submitted a timely and valid claim.  Class Members

who did not previously submit a claim in connection with the settlement with the Pfizer Defendants in this Action shall only receive a payment for this Settlement.

19.     Any Class Member may enter an appearance in the Action, at the Class Member's own expense, individually or through counsel of the Class Member's own choice.  If a Class Member does not enter an appearance, Class Counsel will continue to represent that Class Member.

20.     Any Class Member may appear at the Fairness Hearing and show cause why the court should or should not approve the proposed Settlement of the Action as fair, reasonable, and adequate, why the court should or should not enter a judgment thereon, why the court should or should not approve the Plan of Allocation, why the court should or should not award attorneys' fees and expenses to Class Counsel, or why the court should or should not award an amount of Service Awards to Plaintiff Class Representatives; provided, however, that no Class Member or any other person or entity shall be heard or entitled to contest such matters, unless that person or entity has delivered by hand or sent by First-Class Mail written objections and copies of any papers and briefs such that they are received, not simply postmarked, on or before June 8, 2022, by Rex A. Sharp, SHARP LAW, LLP, 4820 West 75th Street, Prairie Village, KS 66208, and Adam K. Levin, HOGAN LOVELLS US LLP, 555 13th Street, NW, Washington, DC 20004, and filed said objections, papers, and briefs with the Clerk of the United States District Court for the District of Kansas, 500 State Avenue, Kansas City, Kansas 66101, on or before June 8, 2022, unless otherwise ordered by the court.  Any objections must:  (i) state the name, address, and telephone number of the objector and must be signed by the objector even if represented by counsel; (ii) state that the objector is objecting to the proposed Settlement, Plan of Allocation, application for Attorneys' Fees and Expenses, and/or application for Service Awards to

9

Plaintiffs; (iii) state the objection(s) and the specific reasons for each objection, including any legal and evidentiary support the objector wishes to bring to the court's attention; (iv) state whether the objection applies only to the objector, to a subset of the Class, or to the entire Class; (v) identify all class actions to which the objector and his, her, or its counsel has previously objected; (vi) include documents sufficient to prove the objector's membership in the Class, such as the number of EpiPens purchased, acquired, or paid for during the Class Period, as well as the dates and prices of each such purchase, acquisition, or payment; (vii) state whether the objector intends to appear at the Fairness Hearing; (viii) if the objector intends to appear at the Fairness Hearing through counsel, state the identity of all attorneys who will appear on the objector's behalf at the Fairness Hearing; and (ix) state that the objector submits to the jurisdiction of the court with respect to the objection or request to be heard and the subject matter of the Settlement of the Action, including, but not limited to, enforcement of the terms of the Settlement.  Any Class Member who does not make his, her, or its objection in the manner provided shall be deemed to have waived such objection and shall forever be foreclosed from making any objection to the fairness or adequacy of the proposed Settlement as set forth in the Settlement Agreement, to the Plan of Allocation, or to the award of fees, charges, and expenses to Class Counsel or any incentive awards to Plaintiff Class Representatives, unless otherwise ordered by the court.  Class Members submitting written objections are not required to attend the Fairness Hearing, but any Class Member wishing to be heard orally in opposition to the approval of the Settlement, the Plan of Allocation, and/or the application for an award of attorneys' fees and expenses must file a written objection and indicate in the written objection their intention to appear at the hearing and to include in their written objections the identity of any witnesses they may call to testify and copies of any exhibits they intend to introduce into evidence at the

Fairness Hearing. Class Members do not need to appear at the Fairness Hearing or take any other action to indicate their approval.

21.    All funds held by the Escrow Agent shall be deemed and considered to be in *custodia legis* of the court, and shall remain subject to the jurisdiction of the court, until such time as such funds shall be distributed under the Settlement Agreement and/or further order(s) of the court.

22.    All opening briefs and supporting documents in support of the Settlement, the Plan of Allocation, and any application by Class Counsel for attorneys' fees, charges, and expenses and Service Awards to Plaintiff Class Representatives shall be filed and served by no later than May 20, 2022, and any reply papers shall be filed and served no later than June 27, 2022. The Mylan Defendants' Released Parties shall have no responsibility for the Plan of Allocation or any application for attorneys' fees, charges, or expenses submitted by Class Counsel or any Service Award to Plaintiff Class Representatives, and such matters will be considered separately from the fairness, reasonableness, and adequacy of the Settlement.

23.    At or after the Fairness Hearing, the court shall determine whether it should approve the Plan of Allocation proposed by Class Counsel, and any application for attorneys' fees, charges, expenses, or awards. The court reserves the right to enter the Final Judgment approving the Settlement regardless of whether it has approved the Plan of Allocation or awarded attorneys' fees and/or charges and expenses.

24.    All reasonable expenses incurred in identifying and notifying Class Members, as well as administering the Settlement Fund, shall be paid as set forth in the Settlement Agreement. In the event the Settlement is not approved by the court, or otherwise fails to become effective, neither Plaintiff Class Representatives nor any of their counsel shall have any

obligation to repay any amounts incurred and properly disbursed, except as set forth in the Settlement Agreement.

25.     Neither this Order, the Settlement Agreement, nor any of its terms or provisions, nor any act performed or document executed under or in furtherance of the Settlement Agreement or the Settlement:  (a) is or may be deemed to be or may be used as an admission of, or evidence of, the validity of any Plaintiffs' Released Claim, or of any wrongdoing or liability of the Mylan Defendants or Mylan Defendants' Related Parties, or (b) is or may be deemed to be or may be used as an admission of, or evidence of, any fault or omission of any of the Mylan Defendants or Mylan Defendants' Related Parties in any civil, criminal, or administrative proceeding in any court, administrative agency, or other tribunal.

26.     The court reserves the right to adjourn the date of the Fairness Hearing without further notice to the members of the Class, and retains jurisdiction to consider all further applications arising out of or connected with the proposed Settlement.  The court may approve the Settlement, with such modifications as the Settling Parties may agree to, if appropriate, without further notice to the Class.

27.     If the Settlement Agreement and the Settlement set forth therein is not approved or consummated for any reason whatsoever, the Settlement Agreement and Settlement and all proceedings had in connection therewith shall be without prejudice to the rights of the Settling Parties *status quo ante* as set forth in ¶ 7.2 of the Settlement Agreement.

28.     Pending a final determination about the approval of the settlement, the court shall stay all proceedings in the Action and Other Actions for the Mylan Defendants, other than proceedings necessary to carry out or enforce the terms and conditions of the Settlement Agreement.  Pending final determination of whether the court should approve the proposed

12

Settlement, neither Plaintiff Class Representatives nor any Class Member, directly or indirectly, representatively, or in any other capacity, nor anyone claiming through or on behalf of any such Class Members, shall commence or prosecute against any of the Mylan Defendants, any action or proceeding in any court or tribunal asserting any of the Plaintiffs' Released Claims.

29.     The court retains exclusive jurisdiction over the Action and Other Actions to consider all further matters arising out of or connected with the Settlement.

**IT IS THEREFORE ORDERED BY THE COURT THAT** the Class Plaintiffs' Motion for Preliminary Approval of Settlement With Mylan (Doc. 2590) is granted.

**IT IS SO ORDERED.**

**Dated this 11th day of March, 2022, at Kansas City, Kansas.**

<u>**s/ Daniel D. Crabtree**</u>
**Daniel D. Crabtree**
**United States District Judge**

**APPROVED SCHEDULE FOR FINAL APPROVAL PROCESS**

| DATE | EVENT |
|------|-------|
| March 10, 2022 | Mylan provides Class Action Fairness Act Notice |
| March 11, 2022 at 9:30 am | Hearing on Preliminary Approval of Settlement |
| Five business days after the entry of this Order | Settlement Notice Program Begins |
| May 20, 2022 | Plaintiffs file Motion for Final Approval of Settlement, Attorneys' Fees, Expenses, and Service Awards |
| June 8, 2022 | Deadline to file Comments/Objections |
| June 27, 2022 | Plaintiffs file Response to Objections for Final Approval of Settlement, Attorneys' Fees, Expenses, and Service Awards |
| July 6, 2022 at 9:30 am | Hearing on Final Approval of Settlement, Attorneys' Fees, Expenses, and Service Awards |

2014-1 Trade Cases P 78,657

2014 WL 285076

United States District Court,
E.D. Pennsylvania.

In re FASTENERS ANTITRUST LITIGATION.

Civil Action No. 08–md–1912.
|
Jan. 24, 2014.

**Attorneys and Law Firms**

Fasteners Antitrust Litigation, pro se.

***MEMORANDUM***

R. BARCLAY SURRICK, District Judge.

**\*1** Presently before the Court is Plaintiffs' Motion for Final Approval of Proposed Settlements with the Prym, YKK and Coats Defendants and Plaintiffs' Proposed Plan for Distribution of Settlement Funds (ECF No. 128). For the following reasons, the Motion will be granted, and the settlements will be approved.

**I. BACKGROUND** [1]

**A. Factual Background and Procedural History**

This multi-district litigation is based on allegations that four groups of corporate defendants engaged in a global "conspiracy to fix prices and allocate customers and markets in the United States and worldwide for 'Fasteners,' " " in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. (Consol. Class Action Compl. ¶ 1, ECF No. 61.) The term "Fasteners" includes zippers, snap fasteners, buttons, hooks, and other similar products used primarily in the textile, apparel, footwear, and luggage industries. (*Id.* at ¶ 35.) The instant Motion seeking final approval of the proposed settlements involve three groups of Defendants: (1) the "Prym Defendants," which include William Prym GmbH & Co. KG, Prym Consumer USA, Inc., Prym Fashion, Inc., Prym Inovan GmbH & Co., Prym Consumer GmbH, EP Group S.A., Inovan GmbH & Co. KG, Prym Fashion GmbH, Prym Consumer Europe GmbH, and William Prym Inc.; (2) the "YKK Defendants," which include YKK Corporation, YKK Corporation of America, Inc., YKK (U.S.A.) Inc., and YKK Snap Fasteners America, Inc.; and (3) the "Coats Defendants," which include Coats Holdings, Ltd., Coats

Holdings, Inc., Coats American, Inc., d.b.a. Coats North America, Coats North America de Republica Dominicana, Inc., and Coats & Clark, Inc. [2]

Plaintiffs Fishman & Tobin, Greco Apparel, Inc., Jolna Apparel Group LLC, and Norman Shatz Co., U.S.A. (collectively, "Plaintiffs") brought this consolidated class action on behalf of themselves and others who purchased fasteners in the United States from Defendants from January 1, 1991, until September 19, 2007 (the "Class Period"). (*Id.* at ¶ 2.)

On August 12, 2011, we denied Defendants' joint motion to dismiss. (ECF Nos. 92–93.) On August 6, 2012, we denied the YKK and Coats Defendants' Motion to certify the order denying the motion to dismiss for interlocutory appeal. (*See* ECF Nos. 118, 119.)

On August 12, 2013, Plaintiffs filed a motion seeking preliminary approval of proposed settlements with the Prym, YKK, and Coats Defendants, and seeking authorization to disseminate notice to the settlement class. (Mot. Prelim. Approval, ECF No. 124.) Attached as exhibits to Plaintiffs' motion for preliminary approval were the proposed settlement agreements with the Prym, YKK, and Coats Defendants. (Agreements, Mot. Prelim. Approval Exs. 1–3.)

On August 26, 2013, we granted Plaintiffs' motion. (Order Prelim. Approval, ECF No. 126.) In our Order, we stated that the "proposed settlements with Prym, YKK and Coats, as set forth in the respective Settlement Agreements, subject to final determination following proper notice and a fairness hearing, are sufficiently fair, reasonable and adequate to authorize dissemination of notice to the proposed settlement class (the "Settlement Class"). (*Id.* at ¶ 2.) We defined the Settlement Class as:

> **\*2** All persons and entities who purchased Fasteners in the United States directly from a Defendant during the period from and including January 1, 1991 to an including September 19, 2007. Excluded from the Class are Defendants and their predecessors, successors, parents,

subsidiaries, affiliates, divisions and governmental entities.

(*Id.*) The Preliminary Approval Order also appointed class representatives, appointed Co–Lead Counsel to represent the Settlement Class, approved the form and content of the Notice of Proposed Settlement of Class Action with the Prym, YKK and Coats Defendants and Hearing on Settlement Approval and Claim Form ("Notice"), and directed that the Notice be sent to all members of the settlement class, be posted on the internet, and be advertised in the Wall Street Journal. (*Id.* at ¶¶ 5–11.) Finally, the Preliminary Approval Order scheduled a fairness hearing for January 10, 2014, in order to, among other things, "determine the fairness, reasonableness, and adequacy of the proposed settlements with Prym, YKK and Coats ...." (*Id.* at ¶ 18.)

Pursuant to the Preliminary Approval Order, on October 25, 2013, counsel for the Settlement Class directed a printing company to mail, by first class mail, postage prepaid, 32,359 copies of the Notice to potential Settlement Class members. Notice of the proposed settlement was also published in the Wall Street Journal on November 7, 2013, and posted on a website, www.FastenersAntitrustLitigation.com. (Cert. of Mailing, ECF No. 131; *see also* Class Counsel's Report, ECF No. 132.)

The Notice to the Settlement Class advised that any objection to the proposed settlement, to the plan of distribution, or to Plaintiffs' counsel's application for fees, litigation costs, and incentive awards, had to be filed with the Clerk by December 15, 2013. (Class Counsel's Report 2.) There were no objections filed by any potential Settlement Class members. The Notice to the Settlement Class also advised that requests for exclusion from the Settlement Class had to be sent to Settlement Class counsel no later than December 15, 2013. (*Id.*)[3] Settlement Class Counsel received one timely request for exclusion from American Soccer Company, Inc. (d/b/a Score Sports).

On November 25, 2013, class counsel filed the instant Motion for Final Approval of Proposed Settlements with the Prym, YKK and Coats Defendants and Plaintiff's Proposed Plan for Distribution of Settlement Funds. (Pls.' Mot., ECF No. 128.)[4]

A fairness hearing was held on January 10, 2014. Arguments for approval of the proposed settlement and for the award of counsel fees were heard at that time. (Jan. 10, 2014 Hr'g Tr. (on file with Court); Min Entry, ECF No. 133.)

**B. The Proposed Settlement Agreements**

The Settlement Agreements each provide for the resolution of this multi-district litigation. Pursuant to the proposed settlements, the Prym, YKK, and Coats Defendants will make payments totaling $17.55 million. The Prym Defendants will make a payment of $1.1 million, the YKK Defendants will make a payment of $6.6 million, and the Coats Defendants will make a payment of $9.85 million. (Agreements.) Each Defendant has already made these required payments into an escrow account that has been accruing interest.

**\*3** Shortly after the Court entered a case management order in August of 2009, Plaintiffs began "protracted settlement negotiations" with Prym, which culminated in a March 2, 2010 settlement agreement. Pursuant to the agreement, Prym agreed to pay 1.1 million and to assist Plaintiffs in the prosecution of their claims against the other Defendants. The settlement agreements with the Prym, YKK, and Coats Defendants all contain cooperation provisions, which require Defendants to cooperate in the prosecution of the claims against remaining Defendants. (Pls.' Mot. 5–6.) In exchange for the settlement payments and cooperation agreements, all class members, including Plaintiffs, provide a release to Defendants of certain claims related to the purchase of fasteners.

**II. LEGAL STANDARD**

According to Federal Rule of Civil Procedure 23(e), "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval ." Fed.R.Civ.P. 23(e). To approve a class action settlement, a court must determine that the settlement is "fair, adequate, and reasonable." *Eichenholtz v. Brennan,* 52 F.3d 478, 482 (3d Cir.1995). The district court has discretion to approve a class action settlement. *In re SFBC Int'l Inc., Sec & Derivative Litig.,* 310 F. App'x 556, 557 (3d Cir.2009). A court makes this determination after holding a formal fairness hearing at which the proponents of the settlement "should explain why the proposed settlement is preferable ... to continuation of the litigation." David F. Herr, Annotated Manual for Complex Litigation (Fourth) § 13.14 (2013). Moreover, the proponents of the proposed settlement bear the burden of establishing that it is fair, adequate, and reasonable. *In re Gen. Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 785 (3d Cir.1995).

In determining whether a settlement is fair, adequate, and reasonable, district courts must consider nine factors articulated by the Third Circuit in *Girsh v. Jepson,* 521 F.2d 153 (3rd Cir.1975). The *Girsh* factors are:

(1) the complexity, expense and likely duration of the litigation;

(2) the reaction of the class to the settlement;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the risks of establishing liability;

(5) the risks of establishing damages;

(6) the risks of maintaining the class action through the trial;

(7) the ability of the defendants to withstand a greater judgment;

(8) the range of reasonableness of the settlement fund in light of the best possible recovery; and

(9) the range of reasonableness of the settlement fund in light of all the attendant risks of litigation.

*In re Cendant Corp. Litig.,* 264 F.3d 201, 231–32 (3d Cir.2001) (citing *Girsh,* 521 F.2d at 157).

"In more recent decisions, the Third Circuit has suggested an expansion of the nine-prong test when appropriate to include what are now referred to as the *Prudential* considerations." *In re Flonase Antitrust Litig.,* No. 08–3149, 2013 U.S. Dist. LEXIS 83976, at *6 (E.D. Pa. June 14, 2013). The *Prudential* considerations include:

**\*4** the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other facts that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved— or likely to be achieved—for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

*Id.* at *6–7 (quoting *In re Prudential Ins. Co. of Am. Sales Practice Litig.,* 148 F.3d 283, 323 (3d Cir.1998)); *see also In re Pet Food Prods. Liab. Litig.,* 629 F.3d 333, 350 (3d Cir.2010).

District courts are required to make findings with respect to each of the *Girsh* factors. *In re Pet Foods,* 629 F.3d at 350. Consideration of the *Prudential* factors, however, is not mandatory. *Id.* Instead, the *Prudential* factors are "illustrative of additional inquiries that in many instances will be useful for a thoroughgoing analysis of a settlement's terms." *Id.* at 350; *see also In re Baby Prods. Antitrust Litig.,* 708 F.3d 163, 174 (3d Cir.2013) (noting that the *Prudential* factors "are permissive and non-exhaustive"). The Third Circuit has cautioned that district courts should not "substitute the parties' assurances or conclusory statements for [the district court's] independent analysis of the settlement terms." *In re Pet Foods,* 629 F.3d at 350–51. However, in light of the overriding public interest in settling class actions, weight should be given to the recommendations of experienced attorneys "who have engaged in arms-length settlement negotiations." *In re Automotive Refinishing Paint Antitrust Litig.,* 617 F.Supp.2d 336, 341 (E.D.Pa.2007); *see also In re Imprelis Herbicide Mktg.,* No. 11–2284, 2013 U.S. Dist. LEXIS 149323, at *24–25 (E.D.Pa. Oct. 17, 2013) ("[B]ecause a settlement represents the result of a process by which opposing parties attempt to weigh and balance the factual and legal issues that neither side chooses to risk taking to final resolution, courts have given considerable weight to the views of experienced counsel as to the merits of a settlement."); *Lake v. First Nationwide Bank,* 900 F.Supp. 726, 732 (E.D.Pa.1995) ("Significant weight should be attributed to the belief of experienced counsel that settlement is in the best interest of the class.") (internal quotation omitted).

## III. DISCUSSION

### A. Certification of Class

Before considering whether the settlements are fair and reasonable, we must determine whether the proposed settlement satisfies the class certification requirements of Rules 23(a) and 23(b). *In re Pet Foods,* 629 F.3d at 341.

### *1. Rule 23(a)*

**\*5** Rule 23(a) contains four threshold requirements for class certification:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defense of the representative parties are typical of the claims or defense of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class

Fed.R.Civ.P. 23(a).[5] The burden to establish the requirements under Rule 23 is by preponderance of the evidence. *In re Imprelis Herbicide Mktg.,* No. 11–2284, 2013 U.S. Dist. LEXIS 149323, at \*9 (E.D.Pa. Oct. 17, 2013) (citing *Ins. Brokerage Antitrust Litig.,* 579 F.3d 241, 257–58 (3d Cir.2009)).

### (i) *Numerosity*

There is no specific number of plaintiffs required in order to maintain a class action. However, the Third Circuit has indicated that a class of more than 40 plaintiffs will generally meet the numerosity requirement. *Stewart v. Abraham,* 275 F.3d 220, 226–27 (3d Cir.2001). Moreover, whether the numerosity requirement is met is determined not only by the size of the class but also by the geographic location of the class members. *Marsden v. Select Medical Corp.,* 246 F.R.D. 480, 484 (E.D.Pa.2007). Here, Settlement Class Counsel indicate that that the proposed settlement class "is believed to include thousands of members who are geographically dispersed through the United States." (Pls.' Mot. 8 .) Under these circumstances, the numerosity requirement is clearly established since "a class of this size makes joinder of all members impracticable." *In re Pet Foods,* 629 F.3d at 343.

### (ii) *Commonality*

The second requirement to Rule 23(a) is that there are questions of law or fact common to the class. Fed.R.Civ.P. 23(a)(2). This prerequisite "is not a high bar: it does not require identical claims or facts among class members." *Chiang v. Veneman,* 385 F.3d 256, 265 (3d Cir.2004). Rather, the requirement is met when "the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Baby Neal v. Casey,* 43 F.3d 48, 56 (3d Cir.1994); *see also In re Microcrystalline Cellulose Antitrust Litig.,* 218 F.R.D. 79, 83–84 (E.D.Pa.2003) (stating that "all that is required is that the litigation involve some common questions and that plaintiffs allege harm under the same legal theory").

Cases involving "the existence, scope, and efficacy of an alleged conspiracy" generally meet the commonality requirement because the allegations "present questions adequately common to class members." *In re Flat Glass Antitrust Litig.,* 191 F.R.D. 472, 478 (W.D.Pa.1999); *see also In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516 528–29 (3d Cir.2004); *In re Ins. Brokerage Antitrust Litig.,* No. 04–5184, 2013 U.S. Dist. LEXIS 108042, at \*84 (D.N.J. Aug. 1, 2013) ("Due to the conspiratorial nature of allegations in antitrust and RICO actions, such cases often present common questions of law and fact and are frequently certified as class actions.").

**\*6** The Consolidated Class Action Complaint alleges that during the class period, Defendants engaged in a price-fixing conspiracy in the United States fasteners market. Specifically, the Complaint alleges that Defendants engaged in a "conspiracy to fix prices and allocate costumers and markets in the United States and worldwide for fasteners." (Consol. Class Action Compl. ¶ 1.) Class counsel have offered possible common questions of law or fact, specifically, whether or not Defendants entered into an agreement to fix prices and allocate customers. This is a question of fact common to all class members because it is an essential element of a conspiracy claim. (Pls.' Mot. 10.) In addition, whether the alleged agreement to fix prices amounted to a violation of the antitrust laws is also a question of law common to all class members. (*Id.*) We are satisfied that, in light of the conspiracy alleged in this antitrust action, the commonality requirement is met here.

### (iii) *Typicality*

The third prerequisite of Rule 23(a) is that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). In other words, the typicality factor asks "whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class." Beck v. Maximus, Inc., 457 F.3d 291, 295–96 (3d Cir.2006). The Third Circuit advises that "[i]f the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of factual differences." Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 183–84 (3d Cir.2001). "As with numerosity, the Third Circuit has 'set a low threshold for satisfying' typicality, holding that '[i]f the claims of the named plaintiffs and class members involve the same conduct by the defendant, typicality is established ....' " In re Ins. Brokerage Antitrust Litig., 2013 U.S. Dist. LEXIS 108042, at *86 (quoting Newton, 259 F.3d at 183–84).

The claims of each of the class members arise from the alleged conspiracy to price-fix and allocate customers and markets in the United States for fasteners. In a case like this one where "it is alleged that the defendants engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical of the absent class members." In re Linerboard Antitrust Litig., 203 F.R.D. 197, 207 (E.D.Pa.2001). The typicality requirement is met here.

(iv) Adequacy of Representation

The final prerequisite of Rule 23(a) requires that class representatives fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a)(4). This requirement has dual concerns: to ensure that class representatives do not have interests antagonistic to the class and that class counsel have the necessary skills and qualifications to adequately represent the class. In re Imprelis Herbicide Mktg., 2013 U.S. Dist. LEXIS 149323, at *14; see also Dewey v. Volkswagen Aktiengesellschaft, 681 F.3d 170, 181–82 (3d Cir.2012) (noting that the adequacy of the representative parties requirement, "has two components: (1) concerning the experience and performance of class counsel; and (2) concerning the interests and incentives of the representative plaintiffs."); Prudential, 148 F.3d at 312 (noting that the adequacy requirement services two purposes: (1) to "test[ ] the qualifications of the counsel to represent the class," and (2) "to uncover conflicts of interest between named parties and the class they seek to represent") (quoting Amchem Prods.

v. Windsor, 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)).

**\*7** The four law firms that we appointed to serve as Settlement Class Counsel are highly qualified, and have extensive expertise and experience in the area of complex litigation and antitrust disputes. Moreover, the attorneys have all worked together on similar complex cases in the past, and have had success in resolving disputes. Settlement Class Counsel clearly have the necessary skills and qualifications to represent the proposed class. With regard to the second component, the interest of the proposed class representatives are the same as the other class members in that their injury arose from the same alleged price fixing conspiracy in the United States fastener market. Class Counsel advise that Plaintiffs, just like the other class members, are direct purchasers of fasteners from Defendants in the United States. (Pls.' Mot. 12.) Class Counsel also advise that there are no conflicts of interest among Plaintiffs and the other class members. (Id.) Plaintiffs' interests appear to be completely aligned with the interests of the other class members. The adequacy of representation requirement is met.

2. Rule 23(b)(3)—Predominance and Superiority

Next, we must consider whether the proposed class fits within one of the three categories of class actions enumerated in Rule 23(b). Plaintiffs contend that the settlement class qualifies under Rule 23(b)(3), which authorizes class certification if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b) (3). [6] "Rule 23(b)(3)'s predominance requirement imposes a more rigorous obligation upon a reviewing court to ensure that issues common to the class predominate over those affecting only individual class members." Sullivan v. DB Invs., Inc., 667 F.3d 273, 297 (3d Cir.2011). Third Circuit precedent provides that "the focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." Id. In antitrust cases, the requirement of predominance is often easily met. See Amchem, 521 U.S. at 625 ("Predominance is a test readily met in certain cases alleging ... violations of antitrust laws"); In re Warfarin Sodium, 391 F.3d at 528 (noting that allegations in a consumer fraud and antitrust action "naturally raise several questions of law and fact

Case 4:21-cv-00196-MWB   Document 249-1   Filed 10/07/25   Page 128 of 482
In re Fasteners Antitrust Litigation, Not Reported in F.Supp.3d (2014)
2014-1 Trade Cases P 78,657

common to the entire class and which predominate over any issues related to individual class members, including the unlawfulness of [the defendant's] conduct under federal antitrust laws ..., the causal linkage between [the defendant's] conduct and the injury suffered by the class members, and the nature of the relief to which class members are entitled"). Here, the same operative facts and legal arguments surrounding Defendants' conduct in conspiring to fix, raise, maintain, or stabilize prices of fasteners in the United States, apply to each class member. We are satisfied that questions of law or fact common to class members predominate over any questions affecting only individual members.

**\*8** The second inquiry under Rule 23(b)(3) is whether a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). "The superiority requirement asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternate available methods of adjudication." *Prudential,* 148 F.3d at 316 (internal quotation omitted). Here, prior to consolidation, thirty-five plaintiffs filed complaints in four United States district courts alleging price-fixing conspiracies in the United States fasteners market. Absent class certification, this Court and others would be faced with numerous lawsuits, all arising out of the same alleged illegal conduct. Proceeding as a class action is the superior course not only because it will avoid unnecessarily wasting judicial resources, but also because it avoids the possibility of contradictory results.

### B. The Settlement is Fair and Reasonable—the *Girsh* Factors

The Settlement Agreements may be approved only after the Court is satisfied that the settlement terms are "fair, reasonable, and adequate." Fed.R.Civ.P. 23(e)(2). Generally, public policy favors the settlement of civil actions. "There is a 'strong presumption in favor of voluntary settlement,' particularly in 'class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation.' " *In re CertainTeed Corp. Roofing Shingle Prods. Liab. Litig.,* 269 F.R.D. 468, 484 (E.D.Pa.2010) (quoting *Ehrheart v. Verizon Wireless,* 609 F.3d 590, 595 (3d Cir.2010)). As noted above, we are guided by the nine *Girsh* factors in considering whether to approve the proposed settlements.

### *1. The Complexity, Expense and Likely Duration of the Litigation*

The first factor takes into consideration the "probable costs, in both time and money, of continued litigation." *In re Cendant Corp. Litig.,* 264 F.3d at 233 (internal quotation omitted). We previously observed that the antitrust action is "arguably the most complex action to prosecute" and that "[t]he legal and factual issues involved are always numerous and uncertain in outcome." *In re Automotive Refinishing Paint,* 617 F.Supp.2d at 341 (quoting *In re Linerboard,* 296 F.Supp.2d 568, 577 (E.D.Pa.2003)).

Plaintiffs contend that continued litigation against Prym, YKK, and Coats would require significant additional expense to the Class and substantial delay before any class member would see a recovery. Defendants challenged Plaintiffs' claims on jurisdictional grounds, and on sufficiency grounds, and when the Court denied Defendant's motions to dismiss, Defendants' sought and were denied an interlocutory appeal. Continued litigation would no doubt involve additional contested matters and likely appeals, which would in turn "become a costly and lengthy process for all parties." *In re Insurance Brokerage,* 282 F.R.D. at 103. This factor weighs in favor of approving the proposed settlements.

### *2. The Reaction of the Class to the Settlements*

**\*9** The reaction of the class to the proposed settlements has been overwhelmingly supportive. Approximately 32,359 copies of the Notice of Proposed Settlement were sent out to potential class members. Not one of the class members filed an objection either to the terms of the proposed settlements or to Class Counsel's fee application. (Class Counsel's Report 3.) In addition, only one of the class members sought exclusion from the settlement class. (*Id* .) The Third Circuit has found that "vast disparity between the number of potential class members who received notice of the Settlement and the number of objectors creates a strong presumption that this factor weighs in favor of settlement ...." *In re Cendant Corp. Litig.,* 264 F.3d at 235; *see also Cullen v. Whitman Med. Corp.,* 197 F.R.D. 136, 144 (E.D.Pa.2000) (stating that the "overwhelming positive" class response weighs in favor of approval of the settlement). We find it striking that in a potential class this large, not one class member lodged an objection to the proposed settlements. This factor weighs strongly in favor of finding the settlements fair, reasonable, and adequate.

### *3. The Stage of the Proceedings and the Amount of Discovery Completed*

This *Girsh* factor looks at whether Plaintiffs had an "adequate appreciation of the merits of the case before negotiating" settlement. *Prudential,* 148 F.3d at 319 (internal quotation omitted); *see also In re Cendant Corp. Litig.,* 264 F.3d at 235 (noting that the stage of proceedings factor "captures the degree of case development that class counsel have accomplished prior to settlement" and that "[t]hrough this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating") (quotation omitted). Courts are generally more inclined to find that this factor tilts in favor of approving settlement when discovery has been substantially completed. *See, e.g., Bell Atl. Corp. v. Bolger,* 2 F.3d 1304, 1314 (3d Cir.1993); *In re Flonase,* 2013 U.S. Dist. LEXIS 83976, at *9–10.

Here, settlement negotiations began before extensive formal discovery was conducted. However, significant information was nevertheless exchanged during the settlement process. Plaintiffs' settlement agreement with the Prym Defendants contained a cooperation provision, pursuant to which Prym provided Plaintiffs with extensive information and documents about the alleged conspiracy. Prym personnel also underwent interviews with Plaintiffs' counsel. Plaintiffs relied heavily on the information provided by Prym to draft the Consolidated Class Action Complaint. Class Counsel represents that with the information provided by Prym, they were able to "make an informed judgment regarding the reasonableness of the proposed Prym, YKK and Coats Settlements." (Pls.' Mot. 21.)

We are satisfied, based on the representations of highly qualified Class Counsel, that adequate discovery and information was provided by the Prym Defendants so that Class Counsel "were able to gain a full appreciation of the merits of the case as well as the legal theories and risks." *In re Pet Food Prods.,* 629 F.3d at 351.

### 4. The Risks of Establishing Liability and Damages

**\*10**  These two *Girsh* factors are closely related and are often addressed together. They require us to "survey the potential risks and rewards of proceeding to litigation in order to weigh the likelihood of success against the benefits of an immediate settlement." *Warfarin,* 391 F.3d at 537.

With respect to the risks associated with establishing liability if Class Counsel elected to litigate the claims, Plaintiffs point out the substantial risk that they may not be able to prove that each defendant "actually engaged in the alleged collusion or that Defendants fraudulently concealed the conspiracy." (Pls.' Mot. 22.) Plaintiffs also suggest challenges

in proving damages against Defendants, particularly when a trial would entail diametrically opposed expert testimony regarding the existence and nature of the damages. We are satisfied that the risks associated with proving liability and damages favors approving settlement at this time.

### 5. The Risk of Maintaining the Class Action Through the Trial

The Third Circuit has determined that consideration of this *Girsh* factor in "settlement-only" class actions is "perfunctory" since "the district court will always possess the authority to decertify or modify a class that proves unmanageable," and thus, "[t]here will always be a 'risk' or possibility of decertification, and consequently the court can always claim this factor weighs in factor of settlement." *In re Prudential,* 148 F.3d at 321.

In this case, the Court preliminarily certified the class for settlement purposes only. Thus, consistent with Third Circuit precedent, the inherent risks associated with bringing a class action to trial and maintaining a class action through trial weigh in favor of approving the settlements.

### 6. The Ability of the Defendants to Withstand a Greater Judgment

This *Girsh* factor requires us to consider whether Prym, YKK, and Coats could respectively withstand judgment for an amount significantly greater than the $1.1 million, $6.6 million and $9.85 million, provided for in the settlement agreements. *In re Cendant Corp. Litig.,* 264 F.3d at 240 (noting that this *Girsh* factor is "concerned with whether the defendants could withstand a judgment for an amount significantly greater than the Settlement"). However, "this factor does not require that the defendant pay the maximum it is able to pay." *Brown v. Am. Home Prods. Corp. (In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine)) Prods. Liab. Litig.,* No. 99–20593, 2000 U.S. Dist. LEXIS 12275, at *188 (E.D.Pa. Aug. 28, 2000); *see also In re Flonase,* 291 F.R.D. at 101 ("I follow my district court colleagues within the Third Circuit who regularly find a settlement to be fair even though the defendant has the practical ability to pay greater amounts.") (internal quotation omitted).

Class counsel represent that the each Defendant agreed to pay a "substantial sum" to the Settlement Class and that Prym at the time of settlement was in precarious financial shape. Class counsel represent that all three Defendants agreed to pay a

"substantial sum ... in light of the attendant risks plaintiffs would face if this case proceeds to trial." (Pls.' Mot. 24.) This factor is neutral in our consideration of the settlements proposed.

### 7. The Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and in Light of the All of the Attendant Risks of Litigation

**\*11** Under the last two *Girsh* factors, which are also typically considered together, the court must "test two sides of the same coin: the reasonableness in light of the best possible recovery and the reasonableness in light of the risks the parties would face if the case went to trial." *In re Warfarin Sodium,* 391 F.3d at 538. As set forth above, the settlement terms are reasonable in light of the risks associated with proceeding to trial. We are satisfied that a proposed settlement of $17.55 million, which each class member may benefit from immediately upon approval of the settlement, together with avoiding the uncertainties of litigation and the delay that would necessarily result if this case would proceed to trial, all outweigh the attendant risks of litigation and militate strongly in favor of settlement.

### 8. Prudential Factors

Consideration of the *Prudential* factors also supports approval of the proposed settlements. A substantial amount of information has been provided to Settlement Class Counsel such that counsel are capable of making an informed decision about the merits of the case if it were to proceed to trial, and about the fairness of the settlement terms. We are satisfied that the underlying substantive issues were well developed. In addition, class members were given the opportunity to opt out. Significantly, only one member opted out of the settlement class, and no members objected to the proposed settlement. With regard to the procedure for processing individual claims under the settlement, it appears to be fair and reasonable. Again, there have been no objections to the procedures or to the settlement amounts proposed. The *Prudential* factors, like the *Girsh* factors, counsel strongly in favor of approving the settlements. Accordingly, we find the proposed settlements to be fair, reasonable, and adequate.

### IV. CONCLUSION

After reviewing the settlement agreements with the Prym, YKK, and the Coats Defendants in light of the *Girsh* factors and the *Prudential* factors, we are satisfied that the settlements are fair, reasonable, and adequate. Accordingly,

for all of the reasons stated above, Plaintiffs' Motion for Final Approval of Proposed Settlements with the Prym, YKK and Coats Defendants and Plaintiffs' Proposed Plan for Distribution of Settlement Funds will be granted.

Appropriate Orders follow.

### FINAL JUDGMENT ORDER

**AND NOW,** this 24th day of January, 2014, upon consideration of the Plaintiffs' Motion for Final Approval of Settlements with William Prym GmbH & Co. KG, Prym Consumer USA, Inc., Prym Fashion, Inc., Prym Inovan GmbH & Co. KG, Prym Consumer GmbH, EP Group S.A., Inovan GmbH & Co. KG, Prym Fashion GmbH, Prym Consumer Europe GmbH, and William Prym Inc. (collectively, "Prym"), YKK Corporation, YKK Corporation of America, YKK (U.S.A.) Inc., and YKK Snap Fasteners America Inc., n/k/a LBK Real Estate Corporation, and Coats Holdings, Ltd., Coats Holdings, Inc., Coats American, Inc., d.b.a. Coats North America, Coats North America de Republica Dominicana, Inc., and Coats & Clark, Inc., after a duly-noticed final approval hearing held on January 10, 2014, and the Court expressly finding, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, that there is no just reason for delay, the Court expressly directs the entry of the following Final Judgment as to Prym:

**\*12  IT IS HEREBY ORDERED, ADJUDGED AND DECREED** as follows:

1. This Court has jurisdiction to enter this Judgment.

2. The Court finds, for purposes of this settlement only, that the prerequisites for a class action under Federal Rules of Civil Procedure 23(a) and (b)(3) have been satisfied. The Court certifies for purposes of this settlement only, pursuant to Rule 23 of the Federal Rules of Civil Procedure, this action as a class action on behalf of a Settlement Class of all persons and entities who purchased zippers, snap fasteners, jeans buttons, hooks and eyes, clamping locks, clip fasteners and rivets, whether made of metal or plastic, used for fastening materials together in products used primarily in the textile, apparel, footwear, and luggage industries ("Fasteners") in the United States directly from a Defendant during the period from and including January 1, 1991 to and including September 19, 2007. Excluded from the Settlement Class

are Defendants and their predecessors, successors, parents, subsidiaries, affiliates, divisions and governmental entities.

3. The Court finds that due and adequate notice was provided of the settlement with Prym, pursuant to Rule 23 of the Federal Rules of Civil Procedure, to all members of the Settlement Class. The notice provided was the best notice practicable under the circumstances and included individual notice by first class mail to all members of the Settlement Class who could be identified through reasonable effort, notice published in *The Wall Street Journal,* and notice posted on the Internet on a website dedicated to this litigation, www.FastenersAntitrustLitigation.com. The Court finds and concludes that the notice provided fully complied in all respects with the requirements of Rule 23 of the Federal Rules of Civil Procedure and due process.

4. The Court finds that due and adequate notice was provided pursuant to 28 U.S.C. § 1715(b) to the Attorney General of the United States and to the Attorneys General of the Fifty States, as well as the Attorneys General of American Samoa, Guam, Northern Mariana Islands, Puerto Rico, and the U.S. Virgin Islands.

5. The Court finds that the Settlement Agreement between the Class Representatives for the Settlement Class, on the one hand, and Prym on the other (ECF No. 124–2) (the "Settlement Agreement"), is fair, reasonable and adequate. The Settlement Agreement is hereby approved pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

6. The Court finds that American Soccer Company, Inc. (dba Score Sports), 726 E. Anaheim Street, Wilmington, CA 90744 ("Score Sports"), and no other Settlement Class member, has timely requested to be excluded from the Settlement Class and accordingly is not included in or bound by the Final Judgment being entered pursuant to this Order.

7. All claims of the Class Representatives for the Settlement Class and the Settlement Class that were asserted against Prym in the Actions included in MDL Docket No. 1912 (the "Actions") are dismissed with prejudice, with each party to bear its own costs (except as provided for in the Settlement Agreement).

**\*13** 8. The Class Representatives for the Settlement Class and each member of the Settlement Class (other than Score Sports) are permanently barred and enjoined from prosecuting against jointly and severally, individually and

collectively, Prym and its parents, subsidiaries, affiliates, divisions, predecessors and successors, and their respective past and present officers, directors and employees (but does not include any other person or entity other than Prym and does not include any current or former officer, director or employee of Prym who is determined by Settlement Class Counsel to have refused to comply with a request by Settlement Class Counsel, made under the terms of the Settlement Agreement, that the person be interviewed, provide a declaration or affidavit, or appear to testify at deposition or at trial and to testify, without invocation of his or her right against self incrimination, concerning alleged anticompetitive behavior relating to the manufacturing, marketing and sale of Fasteners) ("Releasees"), all manner of claims, demands, actions, suits, and causes of action, damages, and liabilities of any nature, including, without limitation, costs, expenses, penalties, and attorneys' fees, whether class, individual, or otherwise in nature, that jointly and severally, individually and collectively, Plaintiffs and the Settlement Class Members and their parents, subsidiaries, affiliates, divisions, predecessors and successors, or any of them, ever had, now has, or hereafter can, shall, or may have, directly, representatively, derivatively or in any other capacity against Releasees, whether known or unknown, suspected or unsuspected, in law or equity concerning sales of Fasteners to customers who purchased Fasteners in the United States prior to the end of the Class Period based in whole or in part on the facts, occurrences, transactions, or other matters alleged in, or that could have been alleged in, the Action against Prym, regarding Fasteners, which arise under any United States federal or state law, including any United States federal or state antitrust or consumer protection law, including, without limitation, the Sherman Antitrust Act, 15 U.S.C. § 1 et seq.; provided, however, that nothing herein shall release: (1) any claims based upon indirect purchases of Fasteners; (2) claims for any product defect, breach of contract, or similar claim relating to Fasteners; or (3) claims under laws other than those of the United States.

9. Each member of the Settlement Class (other than Score Sports) has expressly agreed to waive and release, and shall be deemed to have waived and released, any and all provisions, rights and benefits conferred by § 1542 of the California Civil Code, which reads:

> Section 1542. *Certain Claims Not Affected by General Release.* A general release does not extend to

claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor;

**\*14**  or by any law of any state or territory of the United States, or principle of common law, which is similar, comparable or equivalent to § 1542 of the California Civil Code. Each member of the Settlement Class (other than Score Sports) may hereafter discover facts other than or different from those which he, she or it knows or believes to be true with respect to the claims which are the subject matter of the provisions of paragraph 9, but each of those Settlement Class members has expressly waived and has fully, finally and forever settled and released, any known or unknown, suspected or unsuspected, contingent or non-contingent claim which is the subject matter of paragraph 9, without regard to the subsequent discovery or existence of such different or other facts.

10. Except as provided in the Settlement Agreement, and in this Final Judgment Order, Prym shall have no obligation for any costs, expenses, or fees of any of the Settlement Class' attorneys, experts, advisors, agents, or representatives, which expenses are to be paid out of the Settlement Fund as defined in the Settlement Agreement.

11. Nothing in this Final Judgment Order or the Settlement Agreement and no aspect of the settlement or negotiation thereof is or shall be deemed or construed to be an admission or concession of any violation of any statute or law or of any liability or wrongdoing by Prym or of the truth of any of the claims or allegations in any of the complaints in the Actions or any other pleading, and evidence thereof shall not be discoverable or used, directly or indirectly, in any way, whether in any of the Actions or in any other action or proceeding other than to enforce the terms of this Final Judgment Order or the Settlement Agreement.

12. This Final Judgment Order does not settle or compromise any claim by the Class Representatives for the Settlement Class or any Settlement Class member against any former or current Non–Settling Defendant or alleged co-conspirator or any other person or entity other than the Releasees and all rights against any Non–Settling Defendant or other person or entity are specifically reserved.

13. Without affecting the finality of this judgment in any way, this Court hereby retains continuing jurisdiction for the purposes of implementing and enforcing the Settlement Agreement.

14. Terms used in this Final Judgment Order that are defined in the Settlement Agreement are, unless otherwise defined herein, used in this Final Judgment Order as defined in the Settlement Agreement.

### *FINAL JUDGMENT ORDER*

**AND NOW,** this 24th day of January, 2014, upon consideration of the Plaintiffs' Motion for Final Approval of Settlements with YKK Corporation, YKK Corporation of America, YKK (U.S.A.) Inc., and YKK Snap Fasteners America Inc., n/k/a LBK Real Estate Corporation (collectively, "YKK"), William Prym GmbH & Co. KG, Prym Consumer USA, Inc., Prym Fashion, Inc., Prym Inovan GmbH & Co. KG, Prym Consumer GmbH, EP Group S.A., Inovan GmbH & Co. KG, Prym Fashion GmbH, Prym Consumer Europe GmbH, and William Prym Inc., and Coats Holdings, Ltd., Coats Holdings, Inc., Coats American, Inc., d.b.a. Coats North America, Coats North America de Republica Dominicana, Inc., and Coats & Clark, Inc., after a duly-noticed final approval hearing held on January 10, 2014, and the Court expressly finding, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, that there is no just reason for delay, the Court expressly directs the entry of the following Final Judgment as to YKK:

**\*15  IT IS HEREBY ORDERED, ADJUDGED AND DECREED** as follows:

1. This Court has jurisdiction to enter this Judgment.

2. The Court finds, for purposes of this settlement only, that the prerequisites for a class action under Federal Rules of Civil Procedure 23(a) and (b)(3) have been satisfied. The Court certifies for purposes of this settlement only, pursuant to Rule 23 of the Federal Rules of Civil Procedure, this action as a class action on behalf of a Settlement Class of all persons and entities who purchased zippers, snap fasteners, jeans buttons, hooks and eyes, clamping locks, clip fasteners and rivets, whether made of metal or plastic, used for fastening materials together in products used primarily in the textile, apparel, footwear, and luggage industries ("Fasteners") in

the United States directly from a Defendant during the period from and including January 1, 1991 to and including September 19, 2007. Excluded from the Settlement Class are Defendants and their predecessors, successors, parents, subsidiaries, affiliates, divisions and governmental entities.

3. The Court finds that due and adequate notice was provided of the settlement with YKK, pursuant to Rule 23 of the Federal Rules of Civil Procedure, to all members of the Settlement Class. The notice provided was the best notice practicable under the circumstances and included individual notice by first class mail to all members of the Settlement Class who could be identified through reasonable effort, notice published in *The Wall Street Journal,* and notice posted on the Internet on a website dedicated to this litigation, www.FastenersAntitrustLitigation.com. The Court finds and concludes that the notice provided fully complied in all respects with the requirements of Rule 23 of the Federal Rules of Civil Procedure and due process.

4. The Court finds that due and adequate notice was provided pursuant to 28 U.S.C. § 1715(b) to the Attorney General of the United States and to the Attorneys General of the Fifty States, as well as the Attorneys General of American Samoa, Guam, Northern Mariana Islands, Puerto Rico, and the U.S. Virgin Islands.

5. The Court finds that the Settlement Agreement between the Class Representatives for the Settlement Class, on the one hand, and YKK on the other (ECF No. 124–3) (the "Settlement Agreement"), is fair, reasonable and adequate. The Settlement Agreement is hereby approved pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

6. The Court finds that American Soccer Company, Inc. (dba Score Sports), 726 E. Anaheim Street, Wilmington, CA 90744 ("Score Sports"), and no other Settlement Class member, has timely requested to be excluded from the Settlement Class and accordingly is not included in or bound by the Final Judgment being entered pursuant to this Order.

7. All claims of the Class Representatives for the Settlement Class and the Settlement Class that were asserted against YKK in the actions included in MDL Docket No. 1912 (the "Actions") are dismissed with prejudice, with each party to bear its own costs (except as provided for in the Settlement Agreement).

**\*16** 8. The Class Representatives for the Settlement Class and each member of the Settlement Class (other than Score Sports) are permanently barred and enjoined from prosecuting against jointly and severally, individually and collectively, YKK and all of its respective past and present, direct and indirect, parents, subsidiaries, affiliates, and divisions; the predecessors, successors and assigns of YKK; and each and all of the past, present, and future principals, partners, officers, directors, supervisors, employees, representatives, contractors, insurers, attorneys, heirs, executors, administrators, and assignees of each of the foregoing (but does not include any current or former officer, director or employee of YKK or their affiliates who has refused to comply with a reasonable request by Settlement Class Counsel, properly made pursuant to Section H of the Settlement Agreement, to be interviewed, provide a declaration or affidavit, or appear to testify at deposition or at trial and to testify, without invocation of his or her right against self incrimination, concerning the matters alleged in the complaint in the Action) ("Releasees"), all manner of claims, demands, actions, suits, and causes of action, damages, and liabilities of any nature, including, without limitation, costs, expenses, penalties, and attorneys' fees, whether class, individual, or otherwise in nature, that jointly and severally, individually and collectively, Plaintiffs and the Settlement Class members on behalf of themselves and any person or entity claiming by or though them as an heir, administrator, devisee, predecessor, successor, parent, subsidiary, affiliate, division, representative of any kind, shareholder, partner, director, owner of any kind, assignee, agent, employee, contractor or insurer, on behalf of themselves and any person or entity claiming by or through them as an heir, administrator, devisee, predecessor, successor, parent, subsidiary, representative of any kind, shareholder, director, owner of any kind, affiliate, assignee, agent, employee, contractor, attorney or insurer, or any of them, ever had, now has, or hereafter can, shall, or may have, up to and including the Effective Date as defined in the Settlement Agreement, directly, representatively, derivatively or in any other capacity against the Releasees or any of them, whether known or unknown, suspected or unsuspected, in law or equity based in whole or in part on the facts, occurrences, transactions, or other matters alleged in the Action against YKK which arise under any United States federal or state law, including any United States federal, state or local statutory or common law, or any other code, rule, or regulation of any country or other jurisdiction worldwide, including, without limitation, the Sherman Antitrust Act, 15 U.S.C. § 1 et seq.; provided, however, that nothing herein shall release: (1) any

claims based upon Indirect Purchases of Fasteners; (2) claims for any product defect, non-performance of contract or similar claim relating to Fasteners; or (3) claims for purchases made outside of the United States.

**\*17** 9. Each member of the Settlement Class (other than Score Sports) has expressly agreed to waive and release, and shall be deemed to have waived and released, any and all provisions, rights and benefits conferred by § 1542 of the California Civil Code, which reads:

> Section 1542. *Certain Claims Not Affected by General Release.* A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor;

or by any law of any state or territory of the United States, or principle of common law, which is similar, comparable or equivalent to § 1542 of the California Civil Code. Each member of the Settlement Class (other than Score Sports) may hereafter discover facts other than or different from those which he, she or it knows or believes to be true with respect to the claims which are the subject matter of the provisions of paragraph 9, but each of those Settlement Class members has expressly waived and has fully, finally and forever settled and released, any known or unknown, suspected or unsuspected, contingent or non-contingent claim which is the subject matter of paragraph 9, without regard to the subsequent discovery or existence of such different or other facts.

10. Except as provided in the Settlement Agreement, and in this Final Judgment Order, YKK shall have no obligation for any costs, expenses, or fees of any of the Settlement Class' attorneys, experts, advisors, agents, or representatives, which expenses are to be paid out of the Settlement Fund as defined in the Settlement Agreement.

11. Nothing in this Final Judgment Order or the Settlement Agreement and no aspect of the settlement or negotiation thereof is or shall be deemed or construed to be an admission or concession of any violation of any statute or law or of

any liability or wrongdoing by YKK or of the truth of any of the claims or allegations in any of the complaints in the Actions or any other pleading, and evidence thereof shall not be discoverable or used, directly or indirectly, in any way, whether in any of the Actions or in any other action or proceeding other than to enforce the terms of this Final Judgment Order or the Settlement Agreement.

12. This Final Judgment Order does not settle or compromise any claim by the Class Representatives for the Settlement Class or any Settlement Class member against any former or current Non–Settling Defendant or alleged co-conspirator or any other person or entity other than the Releasees and all rights against any Non–Settling Defendant or other person or entity are specifically reserved.

13. Without affecting the finality of this judgment in any way, this Court hereby retains continuing jurisdiction for the purposes of implementing and enforcing the Settlement Agreement.

14. Terms used in this Final Judgment Order that are defined in the Settlement Agreement are, unless otherwise defined herein, used in this Final Judgment Order as defined in the Settlement Agreement.

### *FINAL JUDGMENT ORDER*

**\*18 AND NOW,** this 24th day of January, 2014, upon consideration of the Plaintiffs' Motion for Final Approval of Settlements with Coats Holdings, Ltd., Coats Holdings, Inc., Coats American, Inc., d.b.a. Coats North America, Coats North America de Republica Dominicana, Inc., and Coats & Clark, Inc. (collectively, "Coats"), YKK Corporation, YKK Corporation of America, YKK (U.S.A.) Inc., and YKK Snap Fasteners America Inc., n/k/a LBK Real Estate Corporation, and William Prym GmbH & Co. KG, Prym Consumer USA, Inc., Prym Fashion, Inc., Prym Inovan GmbH & Co. KG, Prym Consumer GmbH, EP Group S.A., Inovan GmbH & Co. KG, Prym Fashion GmbH, Prym Consumer Europe GmbH, and William Prym Inc., after a duly-noticed final approval hearing held on January 10, 2014, and the Court expressly finding, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, that there is no just reason for delay, the Court expressly directs the entry of the following Final Judgment as to Coats:

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** as follows:

1. This Court has jurisdiction to enter this Judgment.

2. The Court finds, for purposes of this settlement only, that the prerequisites for a class action under Federal Rules of Civil Procedure 23(a) and (b)(3) have been satisfied. The Court certifies for purposes of this settlement only, pursuant to Rule 23 of the Federal Rules of Civil Procedure, this action as a class action on behalf of a Settlement Class of all persons and entities who purchased zippers, snap fasteners, jeans buttons, hooks and eyes, clamping locks, clip fasteners and rivets, whether made of metal or plastic, used for fastening materials together in products used primarily in the textile, apparel, footwear, and luggage industries ("Fasteners") in the United States directly from a Defendant during the period from and including January 1, 1991 to and including September 19, 2007. Excluded from the Settlement Class are Defendants and their predecessors, successors, parents, subsidiaries, affiliates, divisions and governmental entities.

3. The Court finds that due and adequate notice was provided of the settlement with Coats, pursuant to Rule 23 of the Federal Rules of Civil Procedure, to all members of the Settlement Class. The notice provided was the best notice practicable under the circumstances and included individual notice by first class mail to all members of the Settlement Class who could be identified through reasonable effort, notice published in *The Wall Street Journal,* and notice posted on the Internet on a website dedicated to this litigation, www.FastenersAntitrustLitigation.com. The Court finds and concludes that the notice provided fully complied in all respects with the requirements of Rule 23 of the Federal Rules of Civil Procedure and due process.

4. The Court finds that due and adequate notice was provided pursuant to 28 U.S.C. § 1715(b) to the Attorney General of the United States and to the Attorneys General of the Fifty States, as well as the Attorneys General of American Samoa, Guam, Northern Mariana Islands, Puerto Rico, and the U.S. Virgin Islands.

**\*19** 5. The Court finds that the Settlement Agreement between the Class Representatives for the Settlement Class, on the one hand, and Coats on the other (ECF Nos. 124–4, 124–5) (the "Settlement Agreement"), is fair, reasonable and adequate. The Settlement Agreement is hereby approved

pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

6. The Court finds that American Soccer Company, Inc. (dba Score Sports), 726 E. Anaheim Street, Wilmington, CA 90744 ("Score Sports"), and no other Settlement Class member, has timely requested to be excluded from the Settlement Class and accordingly is not included in or bound by the Final Judgment being entered pursuant to this Order.

7. All claims of the Class Representatives for the Settlement Class and the Settlement Class that were asserted against Coats in the actions included in MDL Docket No. 1912 (the "Actions") are dismissed with prejudice, with each party to bear its own costs (except as provided for in the Settlement Agreement).

8. The Class Representatives for the Settlement Class and each member of the Settlement Class (other than Score Sports) are permanently barred and enjoined from prosecuting against jointly and severally, individually and collectively, Coats and all of its respective past and present, direct and indirect, parents, subsidiaries, affiliates, and divisions; the predecessors, successors and assigns of Coats; and each and all of the past, present, and future principals, partners, officers, directors, supervisors, employees, representatives, contractors, insurers, attorneys, heirs, executors, administrators, and assignees of each of the foregoing (but does not include any current or former officer, director or employee of Coats or their affiliates who refuses to comply with a reasonable request by Settlement Class Counsel, properly made pursuant to Section H of the Settlement Agreement, to be interviewed, provide a declaration or affidavit, or appear to testify at deposition or at trial and to testify, without invocation of his or her right against self incrimination, concerning the matters alleged in the complaint in the Action) ("Releasees"), all manner of claims, demands, actions, suits, and causes of action, damages, and liabilities of any nature, including, without limitation, costs, expenses, penalties, and attorneys' fees, whether class, individual, or otherwise in nature, that jointly and severally, individually and collectively, Plaintiffs and the Settlement Class members on behalf of themselves and any person or entity claiming by or though them as an heir, administrator, devisee, predecessor, successor, parent, subsidiary, affiliate, division, representative of any kind, shareholder, partner, director, owner of any kind, assignee, agent, employee, contractor or insurer, on behalf of themselves and any person or entity claiming by or

through them as an heir, administrator, devisee, predecessor, successor, parent, subsidiary, representative of any kind, shareholder, director, owner of any kind, affiliate, assignee, agent, employee, contractor, attorney or insurer, or any of them, ever had, now has, or hereafter can, shall, or may have, up to and including the Effective Date as defined in the Settlement Agreement, directly, representatively, derivatively or in any other capacity against the Releasees or any of them, whether known or unknown, suspected or unsuspected, in law or equity based in whole or in part on the facts, occurrences, transactions, or other matters alleged in the Action against Coats which arise under any United States federal or state law, including any United States federal, state or local statutory or common law, or any other code, rule, or regulation of any country or other jurisdiction worldwide, including, without limitation, the Sherman Antitrust Act, 15 U.S.C. § 1 et seq.; provided, however, that nothing herein shall release any: (1) claims based upon Indirect Purchases of Fasteners; (2) claims for any product defect, non-performance of contract or similar claim relating to Fasteners; or (3) claims for purchases made outside of the United States.

**\*20**  9. Each member of the Settlement Class (other than Score Sports) has expressly agreed to waive and release, and shall be deemed to have waived and released, any and all provisions, rights and benefits conferred by § 1542 of the California Civil Code, which reads:

> Section 1542. *Certain Claims Not Affected by General Release.* A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor;

or by any law of any state or territory of the United States, or principle of common law, which is similar, comparable or equivalent to § 1542 of the California Civil Code. Each member of the Settlement Class (other than Score Sports) may hereafter discover facts other than or different from those which he, she or it knows or believes to be true with respect to the claims which are the subject matter of the provisions of paragraph 9, but each of those Settlement

Class members has expressly waived and has fully, finally and forever settled and released, any known or unknown, suspected or unsuspected, contingent or non-contingent claim which is the subject matter of paragraph 9, without regard to the subsequent discovery or existence of such different or other facts.

10. Except as provided in the Settlement Agreement, and in this Final Judgment Order, Coats shall have no obligation for any costs, expenses, or fees of any of the Settlement Class' attorneys, experts, advisors, agents, or representatives, which expenses are to be paid out of the Settlement Fund as defined in the Settlement Agreement.

11. Nothing in this Final Judgment Order or the Settlement Agreement and no aspect of the settlement or negotiation thereof is or shall be deemed or construed to be an admission or concession of any violation of any statute or law or of any liability or wrongdoing by Coats or of the truth of any of the claims or allegations in any of the complaints in the Actions or any other pleading, and evidence thereof shall not be discoverable or used, directly or indirectly, in any way, whether in any of the Actions or in any other action or proceeding other than to enforce the terms of this Final Judgment Order or the Settlement Agreement.

12. This Final Judgment Order does not settle or compromise any claim by the Class Representatives for the Settlement Class or any Settlement Class member against any former or current Non–Settling Defendant or alleged co-conspirator or any other person or entity other than the Releasees and all rights against any Non–Settling Defendant or other person or entity are specifically reserved.

13. Without affecting the finality of this judgment in any way, this Court hereby retains continuing jurisdiction for the purposes of implementing and enforcing the Settlement Agreement.

14. Terms used in this Final Judgment Order that are defined in the Settlement Agreement are, unless otherwise defined herein, used in this Final Judgment Order as defined in the Settlement Agreement.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 285076, 2014-1 Trade Cases P 78,657

---

## Footnotes

1    The factual background of this multi-district litigation is more fully set forth in the Court's August 12, 2011 Memorandum denying Defendants' motions to dismiss the complaint. (ECF Nos. 92–93; *In re Fasteners Antitrust Litig.,* No. 08–1912, 2011 WL 3563989 (E.D.Pa. Aug.12, 2011).)

2    Scovill Fasteners, Inc. was originally a named Defendant in this action. On April 19, 2011, Scovill filed for Chapter 11 bankruptcy. (*See* ECF No. 91.) Subsequently, on July 30, 2013, Plaintiffs voluntarily dismissed the action against Scovill pursuant to Federal Rule 41(a)(1)(A)(i).

3    Settlement Class Counsel refers to the four law firms that were appointed by the Court to serve as Co–Lead Counsel for the Settlement Class. These firms are Barrack, Rodos & Bacine, Kaplan, Fox & Kilsheimer LLP, Kohn, Swift & Graf, P.C., and Law Offices of Bernard M. Gross, P.C. (Order Prelim. Approval ¶ 6.)

4    Class counsel also filed a joint petition for award of counsel fees, payment of costs and expenses, and award of incentive payments to the class representatives. (*See* ECF No. 129.) We will rule on this motion separately.

5    In the Court's August 26, 2013 Order granting Defendant's motion for preliminary approval of the proposed settlement, we made preliminary findings regarding the Class certification. Specifically, we determined that:

   For purposes of the proposed settlements only, the Court preliminarily finds that certification of the Settlement Class is warranted because: (a) the members of the Settlement class are so numerous that joinder is impracticable; (b) there are questions of law and fact common to the Settlement Class; (c) plaintiffs' claims present issues that are typical of the Settlement Class; and (d) the plaintiffs and the Settlement Class Counsel ... will fairly and adequately represent and protect the interests of the Settlement Class.

   (Order Prelim. Approval ¶ 4.)

6    In the Preliminary Approval Order, we made preliminary findings regarding class certification under Rule 23(b)(3):

   The Court further preliminarily finds, for the purposes of the proposed settlements only, that issues of law and fact common to the Settlement Class predominate over any issues affecting only individual members of the Settlement Class and that settlement of this action with respect to Prym, YKK and Coats is superior to other means available for fairly and efficiently adjudicating the controversy.

   (Order Prelim. Approval ¶ 4.)

---

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 296954
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

In re FASTENERS ANTITRUST LITIGATION.

Civil Action No. 08–md–1912.
|
Jan. 27, 2014.

### MEMORANDUM

SURRICK, District Judge.

**\*1** Presently before the Court is Co–Lead Counsel's Joint Petition for Award of Counsel Fees, Payment of Costs and Expenses, and Award of Incentive Payments to the Class Representatives (ECF No. 129). For the following reasons, the Motion will be granted.

## I. BACKGROUND

### A. Factual Background and Procedural History
The factual background of this multi-district litigation is more fully set forth in the Court's August 12, 2011 Memorandum denying Defendants' motions to dismiss the complaint, *In re Fasteners Antitrust Litig.,* No. 08–1912, 2011 WL 3563989 (E.D.Pa. Aug. 12, 2011), and the Court's Memorandum granting Plaintiffs' Motion for Final Approval of Proposed Settlements with the Prym, YKK, and Coats Defendants and Plaintiffs' Proposed Plan for Distribution of Settlement Funds (ECF No. 134).

Plaintiffs Fishman & Tobin, Greco Apparel, Inc., Jolna Apparel Group LLC, and Norman Shatz Co., U.S.A. (collectively, "Plaintiffs") brought this consolidated class action on behalf of themselves and others who purchased fasteners in the United States from Defendants from January 1, 1991, until September 19, 2007 (the "Class Period"). (*Id.* at ¶ 2.) [1] Plaintiffs serve as the representatives of the class. There are three groups of Defendants in this case: (1) the "Prym Defendants," which include William Prym GmbH & Co. KG, Prym Consumer USA, Inc., Prym Fashion, Inc., Prym Inovan GmbH & Co., Prym Consumer GmbH, EP Group S.A., Inovan GmbH & Co. KG, Prym Fashion GmbH, Prym Consumer Europe GmbH, and William Prym Inc.; (2)

the "YKK Defendants," which include YKK Corporation, YKK Corporation of America, Inc., YKK (U.S.A.) Inc., and YKK Snap Fasteners America, Inc.; and (3) the "Coats Defendants," which include Coats Holdings, Ltd., Coats Holdings, Inc., Coats American, Inc., d.b.a. Coats North America, Coats North America de Republica Dominicana, Inc., and Coats & Clark, Inc. [2]

On August 12, 2011, we denied Defendants' joint motion to dismiss. (ECF Nos. 92–93.) On August 6, 2012, we denied the YKK and Coats Defendants' motion to certify the order denying the motion to dismiss for interlocutory appeal. (*See* ECF Nos. 118–119.)

On August 12, 2013, Plaintiffs filed a motion seeking preliminary approval of proposed settlements with the Prym, YKK, and Coats Defendants, and seeking authorization to disseminate notice to the settlement class. (Mot. Prelim. Approval, ECF No. 124.) Attached as exhibits to Plaintiffs motion for preliminary approval were the proposed settlement agreements with the Prym, YKK, and Coats Defendants. (Agreements, Mot. Prelim. Approval Exs. 1–3.)

On August 26, 2013, we granted Plaintiffs' motion seeking preliminary approval of the proposed settlement. (Order Prelim. Approval, ECF No. 126.) In our Order, we determined that the "proposed settlements with Prym, YKK and Coats, as set forth in the respective Settlement Agreements, subject to final determination following proper notice and a fairness hearing, are sufficiently fair, reasonable and adequate to authorize dissemination of notice to the proposed settlement class (the "Settlement Class")." (*Id.* at ¶ 2.) We defined the Settlement Class as:

> **\*2** All persons and entities who purchased Fasteners in the United States directly from a Defendant during the period from and including January 1, 1991 to an including September 19, 2007. Excluded from the Class are Defendants and their predecessors, successors, parents, subsidiaries, affiliates, divisions and governmental entities.

(*Id.*) The Preliminary Approval Order also appointed class representatives, appointed Co–Lead Counsel to represent the

Settlement Class, approved the form and content of the Notice of Proposed Settlement of Class Action With the Prym, YKK and Coats Defendants and Hearing on Settlement Approval and Claim Form ("Notice"), and directed that the Notice be sent to all members of the settlement class, be posted on the internet, and be advertised in the Wall Street Journal. (*Id.* at ¶¶ 5–11.) Finally, the Preliminary Approval Order scheduled a fairness hearing for January 10, 2014, to, among other things, "determine the fairness, reasonableness, and adequacy of the proposed settlements with Prym, YKK and Coats...." (*Id.* at ¶ 18.)

Pursuant to the Preliminary Approval Order, on October 25, 2013, counsel for the Settlement Class directed a printing company to mail, by first class mail, postage prepaid, 32,359 copies of the Notice to potential Settlement Class members. Notice of the proposed settlement was also published in the Wall Street Journal on November 7, 2013, and posted on a website, www.FastenersAntitrustLitigation.com. (Cert. of Mailing, ECF No. 131; *see also* Class Counsel's Report, ECF No. 132.)

The Notice to the Settlement Class advised that any objection to the proposed settlement, to the plan of distribution, or to Plaintiffs' counsel's application for fees, litigation costs, and incentive awards, had to be filed with the Clerk by December 15, 2013. (Class Counsel's Report 2.) There were no objections filed by any potential Settlement Class members. The Notice to the Settlement Class also advised that requests for exclusion from the Settlement Class had to be sent to Settlement Class Counsel no later than December 15, 2013. (*Id.*) [3] Settlement Class Counsel received one timely request for exclusion from American Soccer Company, Inc. (d/b/a Score Sports).

On January 24, 2014, we granted Plaintiffs' motion for final approval of the settlement agreements with Defendants. (*See* ECF No. 134 ("Final Settlement Approval Memorandum"); ECF Nos. 135–137 ("Final Settlement Approval Orders").) The Settlement Agreements each provide for the resolution of this multi-district litigation. Pursuant to the proposed settlements, the Prym, YKK, and Coats Defendants will make payments totaling $17.55 million (the "Settlement Fund"). The Prym Defendants will make a payment of $1 .1 million, the YKK Defendants will make a payment of $6.6 million, and the Coats Defendants will make a payment of $9.85 million. (Agreements.) Each Defendant has already made these required payments into an escrow account that has been accruing interest.

**\*3** On November 25, 2013, Co–Lead Counsel filed the instant Petition for Award of Counsel Fees, Payment of Costs and Expenses and Award of Incentive Payments to the Class Representatives. (Pet., ECF No. 129.) A fairness hearing was held on January 10, 2014. Arguments were heard regarding the approval of the fees and costs requested in the Petition. (Jan. 10, 2014 Hr'g Tr. (on file with Court); Min Entry, ECF No. 133.)

## II. PETITION FOR ATTORNEY'S FEES AND EXPENSES

Co–Lead Counsel requests $5.85 million in attorney's fees, which represents one-third of the Settlement Fund, and $337,667.72 in litigation costs and expenses. This is the first time that Co–Lead Counsel has requested fees and expenses in this case. No interim fees were requested or awarded.

Rule 23(h) of the Federal Rules of Civil Procedure provides that "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed.R.Civ.P. 23(h). We must determine whether Co–Lead Counsel's request for these fees and expenses is fair and reasonable. *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980) ("[A] litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to reasonable attorney's fees from the fund as a whole."); *Brytus v. Spang & Co.,* 203 F.3d 238, 242 (3d Cir.2000); *In re Corel Corp. Inc.,* 293 F.Supp.2d 484, 498 (E.D.Pa.2003) ("There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of ... reasonable litigation expenses from that fund.") (internal quotation omitted).

Generally, two methods are used for assessing attorney's fees: the percentage-of-recovery method and the lodestar method. *In re Prudential Ins. Co. of Am. Sales Practice Litig.,* 148 F.3d 283, 333 (3d Cir.1998). In the Third Circuit, "[t]he percentage-of-recovery method is generally favored in cases involving a common fund, and is designed to allow courts to award fees from the fund 'in a manner that rewards counsel for success and penalizes it for failure.' " *Welch & Forbes, Inc. v. Cendant Corp. (In re Cendant Corp. Prides Litig.),* 243 F.3d 722, 732 (3d Cir.2001) (quoting *In re Prudential,* 148 F.3d at 333). Although the lodestar method is more commonly used in statutory fee-shifting cases, "it is sensible for a court to use a second method of fee approval to cross-check its initial fee calculation." *In re Rite Aid Corp. Sec. Litig,* 396

F.3d 294, 300 (3d Cir.2005). In practice, courts in the Third Circuit assess requests for attorney's fees in antitrust cases using the percentage-of-recovery method, and then cross-check the result with the lodestar method. *See, e.g., In re Flonase Antitrust Litig.,* No. 08–3149, 2013 U.S. Dist. LEXIS 83976, at * 17, 27 (E.D. Pa. June 14, 2013); *In re Auto. Refinishing Paint Antitrust Litig.,* MDL No. 1426, 2008 U.S. Dist. LEXIS 569, at *9 (E.D.Pa. Jan. 3, 2008); *Craig v. Rite Aid Corp.,* No. 08–2317, 2013 U.S. Dist. LEXIS 2658, at *47–48 (M.D.Pa. Jan. 7, 2013).

### A. Percentage–of–Recovery Approach

**\*4**  The Third Circuit has identified ten factors for district courts to consider when applying the percentage-of-recovery method and considering the reasonableness of a request for attorney's fees:

> (1) the size of the fund created and the number of beneficiaries, (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel, (3) the skill and efficiency of the attorneys involved, (4) the complexity and duration of the litigation, (5) the risk of nonpayment, (6) the amount of time devoted to the case by plaintiffs' counsel, (7) the awards in similar cases, (8) the value of the benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations, (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained, and (10) any innovative terms of settlement.

*In re Diet Drugs Prod. Liab. Litig.,* 582 F.3d 524, 541 (3d Cir.2009). The first seven (7) factors derive from the case *Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190 (3d Cir.2000), and are known as the Gunter factors. The remaining three factors come from *Prudential,* 148 F.3d at 338–340. *In re AT & T Corp. Secs. Litig.,* 455 F.3d 160, 165

(3d Cir.2006). Many of these factors overlap with the *Girsh* factors that we discussed in our Final Settlement Approval Memorandum. We will consider each *Gunter* and *Prudential* factor; however, we incorporate the analysis set forth in our Memorandum approving the final settlements.

### 1. The size of the fund and the number of beneficiaries

The settlement negotiations resulted in a settlement fund of $17.55 million. The number of settlement class members is unknown at this time. However, approximately 32,000 Notices of the proposed settlement were sent to potential settlement class members nationwide. We are satisfied that this significant settlement will provide a fair recovery for settlement class members and direct purchasers of fasteners in the United States. This factor weighs in favor of approving the attorney's fees.

### 2. Substantial objections by members of the class to the settlement terms or fees requested by counsel

As of the date of the fairness hearing, not one class member objected to the proposed settlement or to the amount of fees requested by Co–Lead Counsel. Only one class member opted out of the settlement agreements. We find it significant that, despite the large class size, there have been no objections. *See In re Diet Drugs,* 582 F.3d at 541–42 (affirming district court's approval of fee and noting that district court did not err in placing significant weight to the fact that there were only a few objections to the settlement and request for attorney's fees). This factor weighs heavily in favor of approving the fee award.

### 3. The skill and efficiency of the attorneys involved

**\*5**  As explained more fully in our Memorandum approving the settlements, the four law firms that comprise Co–Lead Counsel in this case are highly qualified, and have extensive experience and expertise in litigating complex antitrust cases like the instant one. Moreover, these attorneys have worked together on other antitrust cases and have had success resolving disputes. In addition, we have previously recognized the outstanding efforts of these attorneys in another antitrust case in this Court. *In re Auto. Refinishing Paint Antitrust Litig.,* MDL No. 1426, 2004 U.S. Dist. LEXIS 29162, at *21 n. 3 (E.D.Pa. Oct. 13, 2004).

Plaintiffs' Counsel have vigorously litigated this antitrust action over the course of the past six years. Among other things, Counsel have drafted the Complaint; interviewed

witnesses; sought, served, received, and reviewed discovery; responded to Defendants' discovery requests; met with Defendants in order to prepare a joint Rule 26(f) report; interviewed experts regarding Defendants' liability and damages; prepared motions and briefs in response to Defendants' attempts to dismiss this action and certify issues for interlocutory appeal. In addition, Plaintiffs' Counsel successfully negotiated three settlements with defendants and obtained Court approval for those settlements. This Court previously observed that the "very successful settlement negotiations demonstrate[ ] the significant skill and expertise of counsel." *In re Auto. Refinishing Paint,* 2008 U.S. Dist. LEXIS 569, at * 13; *see also In re Warfarin Sodium Antitrust Litig.,* 212 F.R.D. 231, 261 (D.Del .2002) (noting that counsel for the class "showed their effectiveness through the favorable cash settlement they were able to obtain"); *Cullen v. Whitman Med. Corp.,* 197 F.R.D. 136, 149 (E.D.Pa.2000) (stating that "[t]he single clearest factor reflecting the quality of class counsel's services to the class are the results obtained").

The skill and efficiency of the Plaintiffs' Counsel in this case weighs strongly in favor of approving the award of attorney's fees.

### 4. The complexity and duration of the litigation

Like many other antitrust cases, this case has involved complex issues and has been lengthy. The litigation has been ongoing for approximately six years. Defendants' motions to dismiss involved complicated legal and factual issues. Plaintiffs faced three motions to dismiss from Defendants, which included challenges to their claims on many grounds, including jurisdiction and sufficiency of the evidence. The briefing on these motions were extensive and included multiple complicated legal arguments. When Defendants' motions to dismiss were denied by the Court, Plaintiffs were then faced with Defendants' attempt to seek an interlocutory appeal of the Court's denial. We agree with Co–Lead Counsel that "[s]ettlement at this juncture avoids the parties engaging in protracted and expensive discovery on the merits as well as class certification." (Pet.15.) This factor also weighs in favor of approving the settlement.

### 5. The risk of nonpayment

**\*6** In our Final Settlement Approval Memorandum, we determined that the risks associated with establishing liability if litigation were to continue were substantial, and thus weighed in favor of approving the settlement. The Third Circuit has found that this risk of establishing liability

is relevant to the analysis of whether there is a risk of nonpayment. *See In re Rite Aid,* 396 F.3d at 304 (noting that the analysis supporting the risk of liability *Girsh* factor is relevant to the risk of nonpayment *Gunter* factor).

We understand that Plaintiffs' Counsel undertook this case on a purely contingent fee basis, and that this poses a significant risk of not being paid or reimbursed for the costs of litigating the case. In fact, "any contingency fee includes a risk of nonpayment." *O'Keefe v. Mercedes–Benz U.S., LLC,* 214 F.R.D. 266, 309 (E.D.Pa .2003). In addition, we realize that Co–Lead Counsel commenced this litigation without the benefit of information and support provided by the United States Department of Justice in a parallel investigation. Co–Lead Counsel state that they did rely to some degree on the investigation and decision by the European Commission, which related to the involvement of some Defendants in the operation of European and global cartels, however, there was no cooperation between Plaintiffs' counsel and the European Commission investigating body in pursuing the claims in the United States. We agree with Co–Lead Counsel that the risk of not establishing liability and nonpayment are greater when plaintiffs are without the benefit of the results of a corresponding U.S. governmental investigation. (Petition 15); *see In re Linerboard Antitrust Litig .,* 2004 U.S. Dist. LEXIS 10532, at *36 (concluding that petitioners faced significant risk of nonpayment and finding relevant to this conclusion the fact that "petitioners did not benefit from the fruits of a prior government investigation or prosecution"). This factor weighs in favor of approving the fee award.

### 6. The amount to time devoted to the case by Plaintiffs' counsel

Attached as an exhibit to Co–Lead Counsel's Petition is the Declaration of Warren Rubin, Esq., which is offered in support of the requested fees and expenses. (Rubin Decl., Pet. Ex. 1.) Attached to the Rubin Declaration are additional declarations from the other three law firms representing the class representatives, and a spreadsheet detailing the costs and fees incurred by all 48 law firms that represented Plaintiffs. These exhibits demonstrate that, in the aggregate, Co–Lead Counsel have expended approximately 11,753 hours litigating this case since its inception in early 2007. (Rubin Decl. & Ex. A & B.) The amount of hours spent by all Plaintiffs' counsel represents an aggregate lodestar of $8,540,668.80. (Pet. 16 & Rubin Decl Ex. B.) In addition, Plaintiffs' counsel have incurred $377,667.72 in expenses. (*Id.*) The amount of time spent and costs incurred by Co–Lead

Counsel "demonstrate a significant commitment of resources to this litigation."

### 7. The awards in similar cases

*7 Co–Lead Counsel's request for one third of the settlement fund is consistent with other direct purchaser antitrust actions. *See In re* Flonase, 2013 U.S. Dist. LEXIS 83976, at *22–23 (citing cases approving of one third fees in direct purchaser antitrust actions). The amount is also consistent with attorney's fees awards generally granted in this Circuit. *See Steele v. Welch,* No. 03–6596, 2005 U.S. Dist. LEXIS 16577, at *5–6 (E.D.Pa. May 20, 2005) (finding a fee of 33%, plus expenses, to be reasonable); *In re Corel Corp.,* 293 F.Supp.2d 484, 497–98 (awarding counsel one-third of the settlement fund in addition to the reimbursement of litigation expenses); *In re Gen. Instrument Sec. Litig.,* 209 F.Supp.2d 423, 433–34 (E.D.Pa.2001) (approving a fee request of one-third of the settlement fund plus nearly $ 1,800,000 in expenses). We also find it significant that the Notice of the proposed settlement advised class members that counsel would be seeking one third of the settlement fund as attorney's fees and not one class member objected. *See In re Flonase,* 2013 U.S. Dist. LEXIS 83976, at *23–24. This factor weighs in favor of approving the requested fee award.

### 8. The value of benefits attributable to the efforts of class counsel relative to the efforts of other groups

As noted above, Co–Lead Counsel commenced this litigation without the benefit of information and support provided by the United States Department of Justice in a parallel investigation. Co–Lead Counsel state that they did rely on information uncovered during the European Commission investigation, but the investigating body in the European Commission provided no support to Plaintiffs' counsel in pursuing the claims in the United States.

The fact that Co–Lead Counsel were not assisted by a United States governmental investigation weighs in favor of approving the fee award. *See In re AT & T Corp. Secs. Litig.,* 455 F.3d 160, 173 (3d Cir.2006) (affirming district court's approval of fee award in antitrust litigation and finding significant that "class counsel in this case was not aided by a government investigation"); *In re Prudential,* 148 F.3d at 338.

### 9. The percentage fee that would have been negotiated had the case been subject to private contingent fee arrangement

This factor considers "the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained." *In re Diet Drugs,* 582 F.3d at 541. Co–Class Counsel assert that counsel typically negotiate for contingency fees between 30% and 40%, and therefore, it is reasonable to assume that the one-third attorney fee award requested here would have been negotiated had the case been subject to a private contingent fee arrangement. This argument is somewhat speculative. However, we agree that a one-third contingency fee arrangement is not out of the ordinary in a complex case like this one. Even though we find that this factor weighs in favor of approving the one-third fee award, we do not assign it great weight given the uncertainty underlying our predicting how the parties would have negotiated at the outset of litigation. *See In re Flonase,* 2013 U.S. Dist. LEXIS 83976, at *25–26.

### 10. Any innovative terms of settlement

*8 Co–Lead Counsel assert that the three settlement agreements contain relatively standard settlement terms. Accordingly, this factor is neutral, neither weighing in favor of or against approval of the proposed fee award.

### B. The Lodestar Cross–Check

As stated above, the lodestar method is used to cross-check the reasonableness of the award as determined using the percentage of recovery method. *In re AT & T Corp.,* 455 F.3d at 164. Calculating the lodestar is accomplished by "dividing the proposed fee award by the lodestar calculation, resulting in a lodestar multiplier." *Id.* The purpose of the multiplier is "to account for the contingent nature or risk involved in a particular case." *Id.* at 164 n. 4. Moreover, the multiplier may be adjusted "to account for particular circumstances, such as the quality of the representation, the benefit obtained for the class, [and] the complexity and novelty of the issues presented." *Id.* The lodestar cross-check, while useful, should not displace a district court's primary reliance on the percentage-of-recovery method." *Id.* at 164.

Here, the lodestar represents a negative multiplier of 0.68. This is calculated by dividing the proposed fee award of $5.85 million by the aggregate lodestar value of all of Co–Lead Counsel's time litigating this matter, $8,540,668.80. A negative multiplier results when the aggregate lodestar value, or the amount of money spent by all the attorneys, is greater than the actual award of fees requested. Courts in this Circuit have found multipliers up to four as reasonable in light of

the risks of litigation. *See, e.g., Meijer Inc. v. 3M,* No. 04–5871, 2006 U.S. Dist. LEXIS 56744, at *82 (E.D.Pa. Aug. 14, 2006) (noting multiplier of 4.77); *In re Flonase Antitrust Litig.,* 2013 U.S. Dist. LEXIS 83976, at *30 (noting lodestar multiplier of 2.99). Since the multiplier here is less than one, which means that the requested fee is less than the amount that would be awarded using the lodestar method, we are satisfied that a lodestar cross-check confirms the reasonableness of Co–Lead Counsel's request for attorney's fees. *See In re Auto. Refinishing Paint Antitrust Litig.,* 2008 U.S. Dist. LEXIS 569, at * 12 (observing that fee awards based on negative multipliers are indicative of the reasonableness of the award).

### C. The Amount of Requested Litigation Expenses is Reasonable

Co–Lead Counsel also seek reimbursement of $337,667.72 in litigation costs and expenses incurred in the prosecution of this action. We have observed that "there is no reason to reject the request for reimbursement of [expenses] that counsel have spent out of their own pockets in litigating [an antitrust] case." *In re Auto. Refinishing Paint Antitrust Litig.,* MDL No. 1426, 2004 U.S. Dist. LEXIS 29162, at *35–36 (E.D.Pa. Oct. 13, 2004). Moreover, "attorneys who create a common fund for the benefit of a class are entitled to reimbursement of reasonable litigation expenses from the fund." *In re Aetna Inc. Sec. Litig.,* MDL No. 1219, 2001 U.S. Dist. LEXIS 68, at *40 (E.D.Pa. Jan. 4, 2001). Finally, we emphasize that no class member has objected to the request for attorney's fees or to the request for reimbursement of expenses. Accordingly, Co–Lead Counsel's request for reimbursement of litigation costs and expenses will be granted.

### IV. PETITION FOR INCENTIVE AWARDS FOR CLASS REPRESENTATIVES

**\*9** Finally, Co–Lead Counsel requests that the four Class Representatives–Fishman & Tobin, Inc., Greco Apparel, Inc., Jolna Apparel Group, LLC, and Norman Shatz Co, U.S.A.-be provided incentive awards in the amount of $5,000 each. "Incentive awards are not uncommon in class action litigation and particularly where ... a common fund has been created for the benefit of the entire class." *Sullivan v. DB Invs., Inc.,* 667 F.3d 273, 333 n. 65 (3d Cir2011) (citations omitted).

"The purpose of [incentive awards] is to compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation." *Id.; see also In re Auto. Refinishing Paint Antitrust Litig.,* 2008 U.S. Dist. LEXIS 569, at *21 ("Incentive awards are typically awarded to class representatives for their often extensive involvement with a lawsuit and courts in [the Third Circuit] have traditionally granted requests for these awards."); *In re Plastic Tableware Antitrust Litig.,* No. 94–3564, 1995 U.S. Dist. LEXIS 18166, at *5–6 (E.D.Pa. Dec. 4, 1995) ("Payments to class representatives may be considered a form of restitutionary relief within the discretion of the trial court. They may also be treated as a reward for public service and for the conferring of a benefit on the entire class."). In this case, the class representatives not only provided a benefit to the class as a whole, but also risked their existing relationships with the suppliers of fasteners. *See In re Auto. Refinishing Paint,* 2008 U.S. Dist. LEXIS 569, at *22; *Cullen,* 197 F.R.D. 136, 145 ("[C]ourts routinely approve incentive awards to compensation named plaintiffs for the services [class representatives] provided and the risks they incurred during the course of the class action litigation .").

Co–Lead Counsel assert that the class representatives provided information to counsel about the fastener industry, searched for and produced documents to counsel and were in communication with counsel with respect to all of the filings in this litigation. Moreover, counsel point out that there are attendant risks in their industry that the class representatives undertook with respect to their existing relationships with the suppliers. *See In re Flonase Litig.,* 2013 U.S. Dist. LEXIS 83976, at *32 (noting that the class representatives "launched this litigation despite the risk of retaliation inherent in suing a supplier"). Under the circumstances, we are satisfied that an award of $5,000 to each class representative is perfectly reasonable in light of the duration and complexity of this litigation. Accordingly, Co–Lead Counsel's request for incentive awards for the class representatives will be granted.

### V. CONCLUSION

For all of the reasons stated above, Co–Lead Counsel's Joint Petition for Award of Counsel Fees, Payment of Costs and Expenses and Award of Incentive Payments to the Class Representatives will be granted.

**\*10** An appropriate Order follows.

### *ORDER*

**AND NOW,** this *27th* day of *January,* 2014, upon consideration of Co–Lead Counsel's Joint Petition for Award of Counsel Fees, Payment of Costs and Expenses and Award

of Incentive Payments to the Class Representatives (ECF No. 129), and after a fairness hearing on January 10, 2014, it is ORDERED as follows:

1. The Motion is **GRANTED.**

2. Class Counsel are awarded counsel fees in the amount of $5.85 million, with accrued interest.

3. Class Counsel are awarded reimbursement of costs and expenses in the amount of $337,667.72, with accrued interest.

4. Co–Lead Counsel are responsible for allocating and distributing counsel fees and expenses to be paid to Class Counsel.

5. Incentive awards in the amount of $5,000 are each awarded to the four Class Representatives: Fishman & Tobin, Greco Apparel, Inc., Jolna Apparel Group LLC, and Norman Shatz Co., U.S.A.

6. The Court retains jurisdiction over the Settlement Agreements to include resolution of any matters which may arise related to the allocution and distribution of counsel's fees and expenses to Class Counsel.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 296954

---

## Footnotes

1    The term "Fasteners" includes zippers, snap fasteners, buttons, hooks, and other similar products used primarily in the textile, apparel, footwear, and luggage industries. (Consol. Class Action Compl. ¶ 35.)

2    Scovill Fasteners, Inc. was originally a named Defendant in this action. On April 19, 2011, Scovill filed for Chapter 11 bankruptcy. (*See* ECF No. 91.) Subsequently, on July 30, 2013, Plaintiffs voluntarily dismissed the action against Scovill pursuant to Federal Rule 41(a)(1)(A)(i).

3    Settlement Class Counsel and Co–Lead Counsel both refer to the four law firms that were appointed by the Court to serve as lead counsel for the Settlement Class. These firms include: Barrack, Rodos & Bacine; Kaplan, Fox & Kilsheimer LLP; Kohn, Swift & Graf, P.C.; and Law Offices of Bernard M. Gross, P.C. (Order Prelim. Approval ¶ 6.) The instant Petition seeks fees and expenses on behalf of 48 law firms that provided legal services and incurred costs on behalf of Plaintiffs. Co–Lead Counsel will be responsible for allocating the attorneys' fee award to all of these 48 law firms.

---

End of Document                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 Neutral

As of: October 2, 2025 12:33 AM Z

## *Fuentes v. Jiffy Lube Int'l, Inc.*

United States District Court for the Eastern District of Pennsylvania

May 28, 2024, Decided; May 28, 2024, Filed

CIVIL ACTION NO. 2:18-CV-5174

**Reporter**

2024 U.S. Dist. LEXIS 94102 *; 2024 WL 2723840

VICTOR FUENTES, individually and on behalf of all others similarly situated, PLAINTIFF, v. JIFFY LUBE INT'L, INC., DEFENDANT.

**Prior History:** *Fuentes v. Royal Dutch Shell PLC, 2019 U.S. Dist. LEXIS 224708, 2019 WL 7584654 (E.D. Pa., Nov. 25, 2019)*

## Core Terms

settlement, class member, expenses, class action, Plaintiffs', approving, settlement agreement, attorney's fees, final approval, franchisee, no-poach, antitrust, parties, factors, putative class member, discovery, weighs, negotiations, damages, notice, cases, district court, fee request, class certification, proposed settlement, reimbursement, lodestar, employees, nationwide class, litigating

**Counsel:** **[*1]** For VICTOR FUENTES, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, Plaintiff: GEORGE R. BRAND, LAURA C. FELLOWS, RICHARD M. PAUL, III, LEAD ATTORNEYS, PAUL LLP, KANSAS CITY, MO; GEORGE W. SAMPSON, JOSHUA J. BLOOMFIELD, MICHAEL L. SCHRAG, LEAD ATTORNEYS, GIBBS LAW GROUP LLP, OAKLAND, CA; JOHN A. YANCHUNIS, LEAD ATTORNEY, MORGAN & MORGAN, TAMPA, FL; KEVIN CLANCY BOYLAN, LEAD ATTORNEY, MORGAN & MORGAN, PHILADELPHIA, PA.

For JIFFY LUBE INTERNATIONAL, INC., A DELAWARE CORPORATION, Defendant:

ANNE M. RODGERS, Eliot Fielding Turner, LAYNE E. KRUSE, LEAD ATTORNEYS, NORTON ROSE FULBRIGHT US LLP, HOUSTON, TX; ANDREA L. D'AMBRA, Norton Rose Fulbright US LLP, New York, NY.

For Nathan Hernandez, Movant: YAMAN SALAHI, Edelson PC, San Francisco, CA; ZOE SEAMAN-GRANT, Edelson PC, Chicago, IL.

For ACE Lube Centers, LLC, Interested Party: ALAN C. MILSTEIN, LEAD ATTORNEY, SHERMAN SILVERSTEIN KOHL ROSE PODOLSKY, MOORESTOWN, NJ; SCOTT M. ZASLAV, LEAD ATTORNEY, MOSKOWITZ, MANDELL, SALIM & SIMOWITZ, P.A., FORT LAUDERDALE, FL; TODD A. ARMBRUSTER, LEAD ATTORNEY, MOSKOWITZ, MANDELL, SALIM & SIMOWITZ, P.C., FT LAUDERDALE, FL.

For M.C. LLC, Non-Party, Interested Party: HEATHER ZALAR STEELE, LEAD ATTORNEY, **[*2]** FISHER & PHILLIPS LLP, Philadelphia, PA.

For UNITED STATES OF AMERICA, Interested Party: Peter M. Bozzo, LEAD ATTORNEY, Atr, Antitrust Division, Washington, DC.

For Oscar Jimenez, INDIVIDUALLY AND ON BEHALF ALL OTHERS SIMILARLY SITUATED, Intervenor: RAFEY S. BALABANIAN, LEAD ATTORNEY, EDELSON PC, SAN FRANCISCO, CA; ALEXANDER G. TIEVSKY, Edelson PC, Chicago, IL; DAVID S.

SENOFF, First Law Strategy Group, LLC, Philadelphia, PA; YAMAN SALAHI, Edelson PC, San Francisco, CA; ZOE SEAMAN-GRANT, Edelson PC, Chicago, IL.

**Judges:** ANITA B. BRODY, J.

**Opinion by:** ANITA B. BRODY

## Opinion

<u>MEMORANDUM</u>

Plaintiff Victor Fuentes, on behalf of himself and the putative class members he seeks to represent, has negotiated and agreed to a Settlement Agreement with Defendant Jiffy Lube International, Inc. ("Jiffy Lube"). On September 15, 2023, I preliminarily certified the Settlement Class and preliminarily approved the Settlement Agreement. Plaintiff now moves for class certification and final approval of the Settlement. Additionally, Plaintiff moves for attorneys' fees, reimbursement of expenses, and a service award to Plaintiff Fuentes.

The Settlement Agreement proposes a $2 million all-cash settlement fund that, after subtraction of attorney **[*3]** costs and Fuentes' service award, would be distributed to approximately 1,255 class members. Pl.'s Br. in Supp. of Mot. for Final Approval of Settlement and Award of Att'y's Fees, Expenses, and Service Award ("Pl.'s Final Approval Br."), ECF No. 175-1, at 8, 8 n.2, 9. The putative class members were notified of the proposed settlement, and no individuals opted out or filed objections to the Settlement Agreement. Pl.'s Reply Br. in Supp. of Mot. for Final Approval of Settlement and Award of Attorney's Fees, Expenses, and Service Award ("Pl.'s Final Approval Reply Br."), ECF No. 177, at 1. On May 8, 2024, the Court held a final fairness hearing. For the below reasons, I

will grant Plaintiff's motion for class certification and final approval of the Settlement. I will also grant Plaintiff's motion for attorneys' fees, reimbursement of expenses, and service award to the class representative.

## I. BACKGROUND

Defendant Jiffy Lube has more than 2,000 locations across the country that provide lubrication, oil change, and light repair services for cars and light trucks. Second Amended Compl., ECF No. 91, at ¶ 2, 11. These shops are Jiffy Lube franchises, which are independently owned and operated. **[*4]** *Id.* at ¶ 11. Jiffy Lube enters into a contractual franchise agreement with the owner of each franchised shop. *Id.* These franchise agreements allow the business operator (franchisee) to operate a licensed Jiffy Lube shop in return for a fee and agreement to other terms. *Id.* at ¶ 18. From an unknown date until at least March 30, 2016, Jiffy Lube included a term in its standard franchise agreement that prohibited franchisees from soliciting or hiring existing employees of Jiffy Lube shops (the "no-poach" clause). *Id.* at ¶ 23. The "no-poach" clause read as follows:

> Franchisee covenants that during the term of this Agreement, Franchisee will not employ or seek to employ any person who is or within the preceding six months has been an employee of Franchisor or of any System franchisee of Franchisor, either directly or indirectly, for itself or through, on behalf of, or in conjunction with any person.

*Id.* If a franchisee failed to comply with this or any other term of the franchise agreement, Jiffy Lube could terminate their franchise. *Id.* at ¶ 24.

Plaintiff alleges that the "no-poach" clause had the effect of benefitting Jiffy Lube franchise shop owners at the expense of employees and

consumers. **[*5]** *Id.* at ¶¶ 27, 31. Plaintiff further alleges that the "no-poach" clause allowed Jiffy Lube locations to retain employees at below-market wages, without attractive benefits, working conditions, or opportunities for advancement. *Id.* at ¶¶ 32, 35. According to Plaintiff, Jiffy Lube's "no-poach" clause constituted unfair competition and collusion in violation of antitrust law. *Id.* at ¶¶ 40, 51, 88.

On November 29, 2018, former Jiffy Lube franchisee employee Victor Fuentes filed a complaint under the *Sherman Act* against Jiffy Lube. Compl., ECF No. 1. He sought to represent a nationwide class of former Jiffy Lube franchisee employees who allegedly had their wages depressed as a result of the "no-poach" provisions contained in Jiffy Lube's franchise agreements. *Id.* On April 15, 2019, Jiffy Lube moved to dismiss Fuentes' complaint for failure to state a claim. ECF No. 11. On May 1, 2019, Jiffy Lube moved to transfer venue to the Southern District of Texas. ECF No. 24. On November 25, 2019, I denied Jiffy Lube's motion to dismiss to the extent it argued that Plaintiff failed to state a claim under the Sherman Act. Explanation and Order, ECF No. 41, at 6. I granted the motion to dismiss as to Fuentes' claim for injunctive **[*6]** relief and his claims falling outside the four-year statute of limitations. *Id.* On December 20, 2019, I denied Jiffy Lube's motion to transfer venue. Explanation and Order, ECF No. 45, at 10.

On May 4, 2020, Plaintiffs[1] filed an amended complaint. ECF No. 53. Jiffy Lube once again moved to dismiss the complaint, which was then resolved by stipulation. ECF Nos. 54, 57. The parties engaged in discovery and requested multiple extensions of the discovery

deadlines due to COVID-19 delays and the high volume of discovery in this case. ECF Nos. 61, 72, 74. By March 15, 2021, Jiffy Lube had produced more than 920,000 pages in discovery. Notice, ECF No. 72, at 1. Plaintiffs took six depositions, including a deposition of three corporate Jiffy Lube designees, four Jiffy Lube employees, and a third party. Decl. of Joshua J. Bloomfield in Supp. of Pl.'s Mot. for Final Approval of Settlement and Award of Attorney's Fees, Expenses, and Service Award ("Bloomfield Decl."), ECF No. 175-2, at ¶ 5. Plaintiff hired an econometric expert to analyze the data received from Jiffy Lube and to create a preliminary damages model to assess the economic impact of the "no-poach" model. *Id.* at ¶ 6. The parties held **[*7]** informal settlement discussions. *Id.* at ¶ 7. On October 13, 2021 and November 5, 2021, the parties engaged in settlement negotiations before Magistrate Judge David R. Strawbridge. ECF Nos. 80, 81. On February 22, 2022, Fuentes informed the Court that the parties had agreed in principle to a settlement of class claims on behalf of certain Jiffy Lube franchisee employees. Notice, ECF No. 84.

On July 22, 2022, Fuentes moved for preliminary approval of a settlement of class claims and preliminary certification of the settlement class. Motion, ECF No. 90. The proposed settlement class was narrower than the class described by Fuentes' original complaint. Instead of a nationwide class, the proposed settlement agreement encompassed only those employees who had worked at a Jiffy Lube franchise in the greater Philadelphia metropolitan area. Second Amended Compl., ECF No. 91.

On September 2, 2022, Oscar Jimenez moved to intervene as a class representative for a nationwide class and a California subclass. Motion to Intervene, ECF No. 94, at 1-2. Jimenez is a former employee of a Jiffy Lube franchisee in California, and his claims against

---

[1] Cayla Young participated in this lawsuit as a class representative from May 4, 2020 until July 25, 2022, when she was dismissed from the case by stipulation. First Amended Compl., ECF No. 53; Stipulation of Dismissal, ECF No. 92.

2024 U.S. Dist. LEXIS 94102, *7

Jiffy Lube would not be encompassed by Fuentes' proposed settlement. **[*8]** *Id.* at 4. On March 16, 2023, I permitted Jimenez to intervene in the suit. Order, ECF No. 117. On September 14, 2023, I compelled Jimenez to arbitrate his claims based on the existence of a binding arbitration agreement between Jimenez and the Jiffy Lube franchisee where he previously worked. Memorandum, ECF No. 153, at 10; Order, ECF No. 154.

On September 15, 2023, I preliminarily approved Fuentes' settlement of class claims and scheduled a final approval hearing. Order, ECF Nos. 155, 156. On September 21, 2023, Nathan Hernandez moved to intervene to replace Oscar Jimenez as a class representative for a nationwide class and a California subclass. ECF No. 157, at 3. On December 13, 2023, I denied Hernandez's motion as untimely because of his lengthy delay in seeking intervention. Memorandum, ECF No. 170; Order, ECF No. 171. That same day, I issued a scheduling order setting forth deadlines for notice to the putative class members. ECF No. 172.

KCC Class Action Services, LLC ("KCC") is the Claims Administrator that managed the notice process. Decl. of Bernella Osterlund Re: Notice Procedures ("Osterlund Decl."), ECF No. 176-1, at ¶ 1. KCC received the names of the 1,255 identified putative **[*9]** class members and submitted court-approved notice packets to each of them. *Id.* at ¶¶ 3, 4. KCC verified and updated the address information of each putative class member. *Id.* at ¶¶ 2, 4. In five instances, notice packets were returned as undeliverable and KCC was unable to find a new address for the putative class member. *Id.* at ¶ 4. KCC established a website, email address, and toll-free telephone number to provide additional information about the settlement. *Id.* at ¶¶ 5, 6, 7. KCC did not receive any communications from putative class members seeking to dispute their

calculated total earnings, opt out from the settlement, or object to the settlement. *Id.* ¶¶ 8, 9, 10.

On January 29, 2024, Fuentes moved for final approval of the settlement, and for the awarding of attorney's fees, expenses, and a service award. ECF No. 175. In April 2024, Fuentes filed additional briefing regarding the results of the notice and opt-out procedures. ECF Nos. 176, 177. On May 8, 2024, I held a final approval hearing.

## II. PROPOSED CLASS ACTION SETTLEMENT

### A. Proposed Settlement Class

The parties define the Settlement Class as follows:

> All persons in the United States who between December 1, 2014 and December **[*10]** 31, 2018 (i) worked as hourly employees; (ii) of a Jiffy Lube Franchisee located in the Philadelphia-Camden-Wilmington MSA; and (iii) worked for a period of at least 90 days.

Settlement Agreement, ECF No. 90-3, at ¶ 1.33. Excluded from the Settlement Class are:

> (a) Jiffy Lube and its principals, affiliated entities, legal representatives, successors, and assigns; (b) any Person who files a valid, timely Request for Exclusion; (c) federal, state, and local governments (including all agencies and subdivisions thereof); and (d) any Person who settled and released claims at issue in this Action.

Pl.'s Final Approval Br. at 1.[2]

### B. Proposed Settlement

---

[2] This exclusion provision was incorporated into the Settlement Agreement orally by party stipulation on the record at the Final Approval Hearing on May 8, 2024.

The proposed Settlement is a cash settlement. Settlement Agreement at ¶ 3.1. Defendant Jiffy Lube has already deposited $2 million into the escrow account to be used for the settlement distribution. Pl.'s Final Approval Br. at 2 n.5. After payment of settlement administration expenses, taxes, fee and expense awards, and the class representative's service award, the remaining portion of the settlement would be paid to the class members. Settlement Agreement at ¶ 8.3. These payments would be allocated pro rata based on the estimated amounts that the **[*11]** class members earned at a Jiffy Lube franchisee during the Settlement Class Period. Ex. 2, Allocation Plan for Jiffy Lube Settlement, ECF No. 175-4, at 1 (referenced in Settlement Agreement at ¶ 8.5). Class members would be paid automatically, without needing to submit a claim form. *Id.* One-third of the settlement payment to each class member would be considered taxable wages, and the Settlement Administrator would withhold tax and pay payroll tax for that portion of the class member's payment. *Id.* The remaining two-thirds of the payment would not be subject to withholding. *Id.* If the pro rata settlement amount due to any class member were $50 or less, that amount would be all be considered non-wages. *Id.*

If there were unclaimed funds after the initial distribution (e.g., if some checks were returned as undeliverable), Jiffy Lube would not have a reversionary interest in the remaining amount. Settlement Agreement at ¶ 8.7. A second pro rata distribution would be sent to class members if there were sufficient funds remaining to make this economically sensible. *Id.* If not, the remaining undistributed amount would be donated on a cy-près basis to a Court-approved nonprofit organization. **[*12]** *Id.*

## III. Discussion

### A. Class Certification

Plaintiffs move for certification of the Settlement Class pursuant to *Rule 23(b)(3)*. For a class action to have preclusive effect and bind absent class members, a class must first be certified. *Federal Rule of Civil Procedure 23(a)* contains four threshold requirements for certification:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

*Fed. R. Civ. P. 23(a)*. *Rule 23(b)(3)* imposes two additional requirements: "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Fed. R. Civ. P. 23(b)(3)*. The *Rule 23(b)(3)* requirements are commonly referred to as predominance and superiority. *Sullivan v. DB Investments, Inc., 667 F.3d 273, 296 (3d Cir. 2011)* (en banc). In addition to these two explicit requirements, *Rule 23(b)(3)* also imposes an implicit ascertainability requirement. *Byrd v. Aaron's Inc., 784 F.3d 154, 161-62 (3d Cir. 2015)*.

"[T]he party proposing class-action certification bears the burden of affirmatively demonstrating by a preponderance **[*13]** of the evidence her compliance with the requirements of *Rule 23*." *Byrd, 784 F.3d at 163*. Class certification "demand[s] undiluted, even heightened, attention in the settlement context." *Amchem Prods., Inc. v. Windsor, 521*

*U.S. 591, 620, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997)*. However, the existence of a settlement means that "certain *Rule 23* considerations . . . are not applicable." *Rodriguez v. Nat'l City Bank, 726 F.3d 372, 378 (3d Cir. 2013)*. For example, because a settlement obviates the need for trial, concerns regarding the manageability of a *Rule 23(b)(3)* class disappear. *See Amchem, 521 U.S. at 620*; *see also Sullivan, 667 F.3d at 297* (noting that "concerns regarding variations in state law largely dissipate when a court is considering the certification of a settlement class"); *In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 529 (3d Cir. 2004)* ("[C]oncerns with regards to case manageability that arise with litigation classes are not present with settlement classes, and thus those variations are irrelevant to certification of a settlement class" (citing *Amchem, 521 U.S. at 620*)).

The proposed Class meets the *Rule 23(a)* and *23(b)(3)* requirements and warrants certification.

## 1. *Rule 23(a)* Requirements

### a. Numerosity

*Rule 23(a)(1)* requires that a class be "so numerous that joinder of all members is impracticable." *Fed. R. Civ. P. 23(a)(1)*. "No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of *Rule 23(a)* has been met." *Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001)*. The parties represent **[\*14]** that there are approximately 1,255 putative class members. Accordingly, Plaintiff satisfies the numerosity requirement of *Rule 23(a)*.

### b. Commonality

*Rule 23(a)(2)* requires that "there are questions of law or fact common to the class." *Fed. R. Civ. P. 23(a)(2)*. To satisfy commonality, class members' claims "must depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011)*. Commonality may be shown by "demonstrat[ing] that the class members 'have suffered the same injury.'" *Id.* (quoting *Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 157, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)*). A single common question or fact is sufficient to satisfy the commonality requirement of *Rule 23(a)(2)*. *Wal-Mart, 564 U.S. at 359*; *Kanter ex rel. Baby Neal v. Casey, 43 F.3d 48, 56 (3d Cir. 1994)*.

Here, common questions of law and fact include:

> a. Whether Jiffy Lube engaged in unlawful contracts, combinations, and/or conspiracies in restraint of trade and commerce and in violation of the *Sherman Antitrust Act, 15 U.S.C. §1, et seq.*;
> b. Whether such agreements had an antitrust impact in suppressing wages below competitive levels;
> c. Whether Plaintiff and Settlement Class Members are entitled to damages;
> d. The amount of any damages.

Pl.'s Final Approval Br. at 19-20. Effectively, Plaintiffs allege the same harm **[\*15]** from the same conduct: the suppression of wages below competitive levels because of a "no-poach" agreement between Jiffy Lube and its franchisees. All the putative class members' claims depend on common questions of law and fact: whether this agreement constituted a

violation of the Sherman Antitrust Act, and the extent of the agreement's effect on wages. The commonality requirement is satisfied.

### c. Typicality

*Rule 23(a)(3)* requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." *Fed. R. Civ. P. 23(a)(3)*. The typicality inquiry asks "whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class." *Beck v. Maximus, Inc., 457 F.3d 291, 295-96 (3d Cir. 2006)* (quoting *Baby Neal, 43 F.3d at 55*).

The Third Circuit has "set a low threshold for satisfying" the typicality requirement. *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 183 (3d Cir. 2001)*. The typicality requirement "acts as a bar to class certification only when 'the legal theories of the named representatives potentially conflict with those of the absentees.'" *Id.* (quoting *Georgine v. Amchem Prods. Inc., 83 F.3d 610, 631 (3d Cir. 1996)*, *aff'd sub nom.*, *Amchem Prods. Inc. v. Windsor, 521 U.S. 591, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997)*). "If the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of factual differences." **[*16]** *Newton, 259 F.3d at 183-84*.

Plaintiff Fuentes alleges that he and all putative class members suffered economic damages from Jiffy Lube's implementation of a "no-poach" agreement. Specifically, Fuentes alleges that the agreement artificially depressed wages by preventing Jiffy Lube franchisee employees from seeking employment at other Jiffy Lube locations. Fuentes was an employee at a Jiffy Lube franchisee store during the time the "no-poach" agreement was in effect. The putative class encompasses those, like him, who were employed during the time that this agreement existed. The typicality requirement is satisfied because the claims of the named Plaintiff and the putative class members involve the same agreement promulgated by Jiffy Lube, the same alleged injury, and the same claim for relief.

### d. Adequacy of Representation

The final prong of *Rule 23(a)* requires that "the representative parties will fairly and adequately protect the interests of the class." *Fed. R. Civ. P. 23(a)(4)*. "The adequacy inquiry under *Rule 23(a)(4)* serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem, 521 U.S. at 625*. The adequacy of representation requirement addresses two components: (1) the qualifications of class counsel; and (2) the interests and **[*17]** incentives of the class representatives." *Dewey v. Volkswagen Aktiengesellschaft, 681 F.3d 170, 181 (3d Cir. 2012)*.

### i. Adequacy of Class Counsel

When examining settlement classes, courts "have emphasized the special need to assure that class counsel: (1) possessed adequate experience; (2) vigorously prosecuted the action; and (3) acted at arm's length from the defendant."[3] *In re Gen. Motors Corp. Pick-Up*

---

[3] In 2003, Congress amended *Rule 23* to include *subdivision 23(g)*, which provides a non-exhaustive list of factors for a court to consider when scrutinizing the adequacy of class counsel's representation. *See* *Fed. R. Civ. P. 23(g)*. The addition was meant to transfer the analysis of class counsel's representation from *Rule 23(a)(4)*, where it had little textual support, to *Rule 23(g)*. *See* 1 William B. Rubenstein, Newberg on Class Actions § 3.80 (5th ed.). *Rule 23(g)* "builds on" the

2024 U.S. Dist. LEXIS 94102, *17

*Truck Fuel Tank Prod. Liab. Litig., 55 F.3d 768, 801 (3d Cir. 1995)*.

Gibbs Law Group is Class Counsel, as it is defined in the Settlement Agreement. Settlement Agreement at ¶ 1.3.[4] Joshua J. Bloomfield, the Gibbs attorney who has been the primary litigator in the later stages of this case,[5] has been involved in this litigation since its inception. Mr. Bloomfield is an experienced attorney who has previously litigated complex class action claims. *See* Ex. 3, Gibbs Law Group Firm Resume, ECF No. 175-5, at 24.

Class Counsel has vigorously prosecuted the claims of the Philadelphia-area class claimants who are encompassed by the Settlement Agreement. This case has demanded substantial time and energy from Class Counsel: there have been two motions to dismiss and significant discovery, as well as multiple settlement conferences. Developing precedent in other circuits has, at times, called into question certain aspects of the class claims. *See* Pl.'s **[*18]** Br. in Support of Uncontested Mot. for Prelim. Approval of Settlement and for Certification of the Proposed Settlement Class, ECF No. 90-1, at 6 (expressing concern about the viability of certifying a nationwide class action) (citing *Deslandes v. McDonald's USA, LLC, No 17 C 4857, 2021 U.S. Dist. LEXIS 140735, 2021 WL 3187668, at *11 (N.D. Ill. July 28, 2021)* (declining to certify nationwide Sherman Act class action case)). Since the inception of this case, Class Counsel has advanced attorney time and litigation expenses without a guaranteed recovery.

Moreover, Class Counsel has prosecuted this case at arm's length from Jiffy Lube. They have engaged in adversarial motions practice, and the negotiations that resulted in the proposed Settlement Agreement took place in formal settlement conferences before Magistrate Judge Strawbridge.

Accordingly, Mr. Bloomfield and his colleagues have adequately represented the putative class.

## ii. Adequacy of Class Representatives

"A class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Amchem, 521 U.S. at 625-26* (quoting *East Tex. Motor Freight System, Inc. v. Rodriguez, 431 U.S. 395, 403, 97 S. Ct. 1891, 52 L. Ed. 2d 453 (1977)*). "[T]he linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *Dewey, 681 F.3d at 183*. The purpose of the adequacy requirement is to identify intra-class **[*19]** conflicts that may prevent the representative plaintiff from adequately representing the entire class. *Id. at 183-4*. A court must address two questions to determine whether the representative plaintiff adequately represents the putative class: "(1) whether an intra-class conflict exists; and if so, (2) whether that conflict is 'fundamental.'" *Id. at 184*.

Plaintiff Victor Fuentes has diligently represented the Settlement Class. He has participated in discovery and made himself available during settlement conferences. Like

---

[4] Two other law firms have been involved on the plaintiff's side of this litigation: Paul LLP and Morgan & Morgan.

[5] The two other Gibbs Law Group attorneys listed on ECF, Michael L. Schrag and George W. Sampson, do not appear to still be affiliated with the firm. *See* Ex. 3, Gibbs Law Group Firm Resume, ECF No. 175-5.

existing *23(a)(4)* jurisprudence instead of "introducing an entirely new element into the class certification process." *See Fed. R. Civ. P. 23(g)* advisory committee's notes (2003 amendments). Accordingly, the Third Circuit continues to apply the factors relied on prior to the addition of *Rule 23(g)*. *See In re Cmty. Bank of N. Va., 622 F.3d 275, 304-05 (3d Cir. 2010)*; *In re Cmty. Bank of N. Va., 418 F.3d 277, 307 (3d Cir. 2005)*. Class Counsel's representation of the Class satisfies both *Rule 23(a)(4)* and *23(g)*.

the class members he seeks to represent, Fuentes is a former Philadelphia-area Jiffy Lube franchisee employee who was allegedly harmed by Jiffy Lube's "no-poach" provision. There does not appear to be any intra-class conflict between Fuentes and the other members of the Settlement Class. This conclusion is further bolstered by the lack of objections from the 1,255 individuals who were notified about their potential class membership.

## 2. *Rule 23(b)(3)* Requirements

### a. Predominance

Under *Rule 23(b)(3)*, an opt-out class may be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members." *Fed. R. Civ. P. 23(b)(3)*. Predominance "tests whether proposed classes **[*20]** are sufficiently cohesive to warrant adjudication by representation," *Amchem, 521 U.S. at 623*, and to determine whether the proposed class "would achieve economies of time, effort, and expense[.]" *Id. at 615* (internal quotation marks omitted) (quoting Advisory Committee's Notes on *Fed R. Civ. P. 23(b)(3)* (1966 amendments)). The predominance inquiry is a more stringent version of the commonality analysis; common questions must drive the litigation. *See Danvers Motor Co. v. Ford Motor Co., 543 F.3d 141, 148 (3d Cir. 2008)* ("[T]he commonality requirement 'is subsumed by the predominance requirement.'" (quoting *Georgine, 83 F.3d at 627*)); *Warfarin, 391 F.3d at 528* (noting the predominance requirement to be "far more demanding" than the commonality requirement).

"[T]he focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." *Sullivan, 667 F.3d at 298*. Although it is sometimes necessary to determine whether the elements of each claim can be proved through evidence common to the class, a settlement "obviates the difficulties inherent in proving the elements of varied claims at trial or in instructing a jury on varied state laws," *Id., 667 F.3d at 304, 306*. Additionally, because certification of a settlement class is sought, a court is "not as concerned with formulat[ing] some **[*21]** prediction as to how [an] element of a Sherman Act violation would play out at trial, for the proposal is that there be no trial." *In re Ins. Brokerage Antitrust Litig., 579 F.3d 241, 269 (3d Cir. 2009)* (citations and internal quotation marks omitted).

Here, the allegation is that Jiffy Lube engaged in a common course of conduct that pertained to all franchisees covered by the Settlement Agreement. The "no-poach" provision applied to every franchise agreement equally. The issue of whether this provision suppressed wages in violation of antitrust law is common to all putative class members. The injury to each franchisee employee is also a common question: if Jiffy Lube's use of the "no-poach" provision lowered wages at all its locations in the Philadelphia area, all the franchisee employees would claim the same injury. The same issues, requiring the same expertise and the same proof, apply to each of the putative class members, predominating over any individual differences between the individual members. Accordingly, Plaintiff satisfies the predominance requirement.

### b. Superiority

*Rule 23(b)(3)* requires "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

*Fed. R. Civ. P. 23(b)(3)*. "The superiority requirement 'asks the court to balance, in **[\*22]** terms of fairness and efficiency, the merits of a class action against those alternative available methods of adjudication.'" *Warfarin, 391 F.3d at 533-34* (quoting *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 316 (3d Cir. 1998)*). In determining whether a settlement class action is superior, a court "consider[s] the class members' interests in individually controlling litigation, the extent and nature of any litigation, the desirability or undesirability of concentrating the litigation, and the likely difficulties in managing a class action." *In re Nat'l Football League Players Concussion Injury Litig., 821 F.3d 410, 434-35 (3d Cir. 2016)* (citing *Fed. R. Civ. P. 23(b)(3)(A)-(D)*).

The parties have identified 1,255 putative class members. Individual putative class members may "have little interest in 'individually controlling the prosecution or defense of separate actions' because each [individual] has a very small claim in relation to the cost of prosecuting a lawsuit." *Warfarin, 391 F.3d at 534* (quoting *Fed. R. Civ. P. 23(b)(3)(A)*) (in the context of consumer class actions). These costs can be especially burdensome in an antitrust lawsuit. The parties have not represented that any putative class member has commenced litigation on an individual basis. This indicates a lack of interest in individually bringing claims. *See Warfarin, 391 F.3d at 534*. None of the putative class members have opted out of the settlement or objected to it. This is unsurprising: the prospect of litigating **[\*23]** an individual antitrust case for a low payout is economically unfeasible. If I credit the plaintiff's expert's assertion that a $2 million settlement represents 90% of the putative class members' damages, a successful individual claim would result in a payout of under $2,000. The mechanism of the class action allows litigation expenses to be shared among class members to avoid the time and expense of litigating hundreds of individual claims. Accordingly, Plaintiff satisfies the superiority requirement.

## c. Ascertainability

*Rule 23(b)(3)*'s implicit ascertainability requirement requires the plaintiff to show that: "1) the class is "defined with reference to objective criteria"; and (2) there is "a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Byrd v. Aaron's Inc., 784 F.3d 154 (3d Cir. 2015)* (internal quotation marks omitted). Here, the parties have identified 1,255 putative class members by reference to Jiffy Lube's employment records. These records identify the employment dates and locations of these former employees, and reliably indicate which individuals fall within the class definition. The proposed class is ascertainable.

In conclusion, I will certify the Settlement **[\*24]** Class because the Settlement Class satisfies the requirements of *Rule 23(a)* and *23(b)(3)*.

## B. Final Approval of the Settlement

Plaintiffs move for final approval of the Settlement Agreement. Under *Federal Rule of Civil Procedure 23(e)(2)*, a court may approve the settlement of a class action "only on finding that it is fair, reasonable, and adequate." *Fed. R. Civ. P. 23(e)(2)*. The Third Circuit has "identified two opposing interests a district court must weigh when reviewing motions for settlement-only class certification and approval of the settlement." *In re: Google Inc. Cookie Placement Consumer Privacy Litig., 934 F.3d 316, 326 (3d Cir. 2019)*.

The first competing interest is to "favor the parties reaching an amicable agreement and avoiding protracted litigation." *Id.* This is

because these complex actions "consume substantial judicial resources and present unusually large risks for the litigants." *In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig., 55 F.3d 768, 805 (3d Cir. 1995)*. Therefore, when evaluating a settlement, a court should be "hesitant to undo an agreement that has resolved a hard-fought, multi-year litigation." *In re Baby Prods. Antitrust Litig., 708 F.3d 163, 175 (3d Cir. 2013)* (citing *Warfarin, 391 F.3d at 535*). "Settlements are private contracts reflecting negotiated compromises. The role of a district court is not to determine whether the settlement is the fairest possible resolution—a task particularly ill-advised given that the likelihood of success at trial (on which all settlements are based) can only be estimated **[*25]** imperfectly." *Id. at 173-74* (citation omitted). A court must recognize that a settlement is a "yielding of the highest hopes in exchange for certainty and resolution" and "guard against demanding too large a settlement based on its view of the merits." *In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig., 55 F.3d at 806*.

"At the same time, a district court has an obligation as a fiduciary for absent class members to examine the proposed settlement with care." *Google, 934 F.3d at 326*. This role requires special rigor "where settlement negotiations precede class certification, and approval for settlement and certification are sought simultaneously." *Warfarin, 391 F.3d at 534*; see *Google, 934 F.3d at 326*. "[A] district court's scrupulous review of the settlement terms is designed to ensure that class counsel has demonstrated sustained advocacy throughout the course of the proceedings and has protected the interests of all class members." *Google, 934 F.3d at 326* (internal quotation marks omitted).

With these competing interests in mind, it is important to determine whether a presumption of fairness applies to the Settlement Agreement, but even more crucial to scrupulously review whether the Settlement is fair, reasonable, and adequate.

## 1. Presumption of Fairness

The Third Circuit applies an initial presumption of fairness if "'(1) the negotiations occurred at arms **[*26]** length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.'" *Google, 934 F.3d at 326* (quoting *NFL Concussion Litig., 821 F.3d at 436*).

The parties participated in multiple formal settlement negotiations that occurred at arm's length before Magistrate Judge Strawbridge. Prior to beginning formal negotiations, Class Counsel engaged in discovery, including document discovery, depositions, and consultation with experts. During their negotiations, Class Counsel assessed the relative strengths of their case and ultimately abandoned their nationwide class claim in favor of reaching a more limited settlement for the Philadelphia area. By the time the parties reached their proposed Settlement Agreement, they had litigated several issues through two motions to dismiss and had adequately assessed the strength of the class claims. Class Counsel has substantial experience in similar complex litigation, and defense counsel is similarly experienced.[6] Finally, there have been no objections lodged to the settlement, and that no individual putative class members have opted out. Therefore, the presumption of

---

[6] Jiffy Lube is represented by Andrea L. D'Ambra, Anne M. Rodgers, Eliot Fielding Turner, and Layne E. Kruse of Norton Rose Fulbright US LLP. Each of these attorneys is of counsel or a partner at the firm, with substantial experience in antitrust litigation, discovery and data, and/or class action litigation. *See* Norton Rose Fulbright People Search, available at https://www.nortonrosefulbright.com/en-us/people.

2024 U.S. Dist. LEXIS 94102, *26

fairness applies.

## 2. Factors to Consider [*27] in Evaluating the Settlement

For a class action settlement, "[d]istrict courts are to assess the fairness, reasonableness, and adequacy . . . under *Rule 23(e)(2)* . . . applying the *Girsh* factors; applying the *Prudential* factors where applicable; and considering 'the degree of direct benefit provided to the class.'" *Google, 934 F.3d at 329* (quoting *Baby Prods., 708 F.3d at 174*).[7]

---

[7] Effective December 1, 2018, *Rule 23(e)(2)* was amended to include the following considerations to guide a court's determination of the fairness, reasonableness, and adequacy of a settlement, whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

    (iv) any agreement required to be identified under *Rule 23(e)(3)*; and

    (D) the proposal treats class members equitably relative to each other.

*Fed. R. Civ. P. 23(e)(2)*. The Advisory Committee Notes recognize that prior to the addition in *Rule 23(e)(2)* of these explicit factors to consider, circuit courts had developed their own lists of factors to determine whether a settlement was fair, reasonable, and adequate. *See Fed. R. Civ. P. 23(e)(2)* advisory committee's notes (2018 amendments). Moreover, the Advisory Committee Notes explain: "The goal of this amendment is not to displace any factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." *Id.* Notwithstanding the amendment of *Rule 23(e)(2)*, the Third Circuit continues to advise district courts to assess the fairness, reasonableness, and adequacy of a settlement applying the *Girsh* factors, the relevant

Here, the *Girsh* factors, relevant *Prudential* considerations, and *Baby Products* analysis overall weigh in favor of approval of the Settlement.

### a. The *Girsh* Factors

In *Girsh v. Jepson*, The Third Circuit directed district courts to consider the following **[*28]** nine factors:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975)* (internal quotation marks and ellipses omitted).

### i. The Complexity, Expense, and Likely Duration of the Litigation

This factor "captures the probable costs, in both time and money, of continued litigation."

---

*Prudential* considerations, and the *Baby Products* direct benefit consideration. *See Google, 934 F.3d at 329*. Following this guidance from the Third Circuit, this Court will apply the *Girsh* factors, the relevant *Prudential* considerations, and the *Baby Products* direct benefit consideration to determine whether to approve the Settlement, with the understanding that these factors and considerations amply address "the core concerns and procedure and substance" listed in the amended *Rule 23(e)(2)*. *Fed. R. Civ. P. 23(e)(2)* advisory committee's notes (2018 amendments).

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 157 of 482

Page 13 of 25
2024 U.S. Dist. LEXIS 94102, *28

*Warfarin, 391 F.3d at 535-36* (quoting *In re Cendant Corp. Litig., 264 F.3d 201, 233 (3d Cir. 2001)*). Antitrust class actions are particularly complex to litigate and therefore quite expensive. *See In re Auto. Refinishing Paint Antitrust Litig., MDL No. 1426, 2008 U.S. Dist. LEXIS 569, 2008 WL 63269, at *5 (E.D. Pa. Jan. 3, 2008)* ("This litigation, *like most antitrust cases*, has been exceedingly complex, expensive, and lengthy." (emphasis added)). "An antitrust class action is arguably the most complex action to prosecute." *In re Linerboard Antitrust Litig., 296 F. Supp. 2d 568, 577 (E.D. Pa. 2003)* (internal quotation marks omitted).

If litigation [*29] continues in this antitrust class action, the parties may have to engage in additional discovery, extensive pretrial motions addressing complex factual and legal questions, and ultimately a lengthy and complicated trial involving several experts. This case has already been pending for over five years, and continued litigation could mean that any recovery for the class members would take several more years. The complexity, expense, and likely duration of this antitrust class action weigh heavily in favor of approving the Settlement.

### ii. The Reaction of the Class to the Settlement

"The second *Girsh* factor 'attempts to gauge whether members of the class support the settlement.'" *Warfarin, 391 F.3d at 536* (quoting *Prudential, 148 F.3d at 318*). In order to gauge class members' reactions, I first determine whether the class was appropriately notified of the settlement. To satisfy due process, notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *NFL Concussion*

*Litig., 821 F.3d at 435*. The notice in this case included detailed information, available in English and Spanish, that addressed each of the notice requirements in *Fed. R. Civ. P. 23(c)(2)(B)*:

> (i) the nature of the action; [*30]
> (ii) the definition of the class certified;
> (iii) the class claims, issues, or defenses;
> (iv) that a class member may enter an appearance through an attorney if the member so desires;
> (v) that the court will exclude from the class any member who requests exclusion;
> (vi) the time and manner for requesting exclusion; and
>
> (vii) the binding effect of a class judgment on members under *Rule 23(c)(3)*.

*See generally* Notice, Ex. A, ECF No. 161-1. The notice was in plain language and described the nature of the settlement and the class member's rights in a Question-and-Answer format. It also provided three means by which the class members could obtain more information: a website, an email address, and a toll-free number. ECF No. 161-1, at 6. On February 21, 2024, KCC Class Action Services, LLC mailed the notice packet to the newest available addresses of all 1,255 identified class members. Osterlund Decl. at ¶ 3. Class Counsel and the Court received no objections or opt outs from the Settlement Agreement, and there were no disputes filed as to the total estimated amount earned at a Jiffy Lube franchisee. Final Approval Hearing, ECF No. 178. Some class members inputted their Social Security numbers on the website, [*31] confirming that they did receive notice of the Settlement Agreement. *Id.*

No class member has voiced any objection or concern regarding the proposed settlement, and it appears that the notice procedures adequately advised the class members about the Settlement Agreement. The reaction of the

Class weighs in favor of approving the Settlement.

### iii. The Stage of the Proceedings and the Amount of Discovery Completed

"The third *Girsh* factor captures the degree of case development that class counsel [had] accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *NFL Concussion Litig., 821 F.3d at 438-39* (quoting *Warfarin, 391 F.3d at 537*). "[F]ormal discovery is not a requirement for the third Girsh factor. What matters is not the amount or type of discovery class counsel pursued, but whether they had developed enough information about the case to appreciate sufficiently the value of the claims." *Id. at 439*.

Here, Class Counsel engaged in sufficient discovery to adequately appreciate the merits of the case before negotiating. Class Counsel briefed two motions to dismiss and engaged in fact discovery and depositions. They also consulted with an expert regarding the effects **[*32]** that the "no-poach" provision may have had on wages. By the time the parties reached the Settlement Agreement, Class Counsel had a strong grasp of the legal hurdles that different permutations of the class could face, including the risk that a national class might not be certified. Therefore, this factor weighs in favor of approving the Settlement.

### iv. The Risks of Establishing Liability and Damages

"The fourth and fifth *Girsh* factors survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement." *NFL Concussion Litig., 821 F.3d at 439* (quoting *Prudential, 148 F.3d at 319*).

Plaintiffs face some risks if they sought to continue litigating this action. Most notably, the viability of a nationwide class has been called into question by similar cases in districts outside of the Third Circuit. Class Counsel summarized this concern in their briefing:

> District court rulings in the substantially similar no-poach cases against Jimmy Johns and McDonald's enhanced the risk of obtaining class certification and proving liability. In both cases, the district court denied class certification and relied on the Supreme Court's *Alston* decision **[*33]** to hold that rule of reason analysis applies in no-poach actions brought by franchisee employees. *Conrad v. Jimmy John's Franchise, LLC, No. 18-CV-00133-NJR, 2021 U.S. Dist. LEXIS 142272, 2021 WL 3268339, at *10*; *Deslandes v. McDonald's USA, LLC, No. 17 C 4857, 2021 U.S. Dist. LEXIS 140735, 2021 WL 3187668, at *7*. In *Deslandes*, the district court also granted judgment on the pleadings in favor of McDonalds. *Deslandes v. McDonald's USA, LLC, No. 17 C 4857, 2022 U.S. Dist. LEXIS 113524, 2022 WL 2316187, at *4-5 (N.D. Ill. June 28, 2022)*.
>
> After this Court granted preliminary approval, the Seventh Circuit reviewed the *McDonalds* decision, reversed the dismissal, and remanded the case to the district court, *Deslandes v. McDonald's USA, LLC, 81 F.4th 699, 703 (7th Cir. 2023)*, finding the nopoach restriction was alleged to be horizontal and thus the per se rule could apply. While Plaintiff believes the *Deslandes* appellate court decision is correct, the Third Circuit has not affirmatively applied the per se rule in this context and thus there remains a real risk that liability is uncertain because unlike per

se or quick look analysis, rule of reason is a more complex analysis and is far less favorable to an antitrust plaintiff.

Pl.'s Final Approval Br. at 16-17. Even if this Court established regional subclasses, as requested by the California intervenor Jimenez (and would-be intervenor Hernandez), such subclasses would likely require additional time and spending by Class Counsel to assess economic impacts in different markets.

Moreover, damages would not be guaranteed for the current class members **[*34]** or for the broader original nationwide class. Both Plaintiff and Defendant would likely call experts to dispute whether (and if so, to what extent) the "no-poach" class in Jiffy Lube's franchise agreement caused low wages in violation of antitrust law. A jury could favor either expert's narrative, and the class members encompassed by this proposed Settlement Agreement might receive little to no benefit. *See* _Cendant, 264 F.3d at 239_ (contemplating that a jury could believe either of two competing experts).

Accordingly, the Settlement avoids the many significant hurdles that the Plaintiff would have encountered in establishing liability and damages. Therefore, the fourth and fifth _Girsh_ factors weigh in favor of approving the Settlement.

## v. The Risks of Maintaining the Class Action Through the Trial

This factor "measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial." _Warfarin, 391 F.3d at 537_. Because class certification is subject to review and modification at any time during the litigation, the uncertainty of maintaining class certification favors settlement. *See* _Zenith Labs., Inc. v. Carter-Wallace, Inc., 530 F.2d 508, 512 (3d Cir. 1976)_

(affirming decision of the district court to reconsider and deny previously-approved class certification). "In a settlement **[*35]** class, this factor becomes essentially toothless because a district court need not inquire whether the case, if tried, would present intractable management problems[,] . . . for the proposal is that there be no trial." _NFL Concussion Litig., 821 F.3d at 440_ (internal quotation marks omitted). Thus, this factor "deserve[s] only minimal consideration." *Id.*

Here, the Plaintiff faces real risks to obtaining and keeping class certification, particularly if the Plaintiff sought to reinstitute litigation on behalf of a nationwide class. Therefore, this factor weighs in favor of approving the Settlement.

## vi. The Ability of Defendants to Withstand a Greater Judgment

"The seventh _Girsh_ factor considers 'whether the defendants could withstand a judgment for an amount significantly greater than the [s]ettlement.'" _Warfarin, 391 F.3d at 537-38_ (quoting _Cendant, 264 F.3d at 240_). "The seventh _Girsh_ factor is most relevant when the defendant's professed inability to pay is used to justify the amount of the settlement." _NFL Concussion Litig., 821 F.3d at 440_; *see also* _Warfarin, 391 F.3d at 538_ (finding no error with the district court's conclusion that "DuPont's ability to pay a higher amount was irrelevant to determining the fairness of the settlement"). "[I]n any class action against a large corporation, the defendant entity is likely to be able to withstand **[*36]** a more substantial judgment, and, against the weight of the remaining factors, this fact alone does not undermine the reasonableness of the . . . settlement." _NFL Concussion Litig., 821 F.3d at 440_ (internal quotation marks omitted).

Plaintiffs concede that Jiffy Lube likely could withstand a greater judgment. Pl.'s Final

Approval Br. at 17. This factor, however, does not undermine the reasonableness of the Settlement because Jiffy Lube has not tried to use any claimed inability to pay to avoid a higher settlement amount. The proposed settlement provides the class members with 90% of their damages, as estimated by Plaintiff's expert. *Id.* This factor is therefore neutral.

### vii. The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and in Light of all the Attendant Risks of Litigation

"In evaluating the eighth and ninth *Girsh* factors, we ask 'whether the settlement represents a good value for a weak case or a poor value for a strong case.'" *Id.* (quoting *Warfarin, 391 F.3d at 538*). "The factors test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." *Warfarin, 391 F.3d at 538*. "[T]he present value of the damages plaintiffs would **[*37]** likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement." *NFL Concussion Litig., 821 F.3d at 440* (quoting *Prudential, 148 F.3d at 322*).

If the Plaintiff were to succeed at trial on his antitrust claim for the Settlement Class, he might recover slightly more than this settlement amount. However, the attorney fees and expenses would continue increasing, potentially negating any additional amount gained by going to trial. If the Plaintiff sought to litigate his original nationwide class action, he might recover much more, potentially tens of millions of dollars. The Plaintiff, however, would face the risk of additional lengthy and expensive litigation to try to certify that nationwide class. The Settlement Agreement

here represents an excellent recovery for the Settlement Class, and an adequate overall recovery. Therefore, these factors weigh in favor of approving the Settlement.

### b. The *Prudential* Considerations

In *In re Prudential Insurance Co. America Sales Practice Litigation*, the Third Circuit expanded the analysis of factors to consider in evaluating a settlement to include what are now referred to as *Prudential* considerations:

> the maturity of the underlying substantive **[*38]** issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other facts that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

*Prudential, 148 F.3d at 323*. "Unlike the *Girsh* factors, each of which the district court must consider before approving a class settlement, the *Prudential* considerations are just that, prudential. They are permissive and non-exhaustive[.]" *Baby Prods., 708 F.3d at 174*.

Here, Class Counsel was able to make an informed decision about the probable outcome of a trial. All Settlement Class Members had

the opportunity to opt out of the Settlement. The procedure for processing individual **[\*39]** claims under the settlement is fair and reasonable and does not require any action by individual class members.[8] Additionally, as discussed later in this memorandum, the provisions for attorneys' fees are reasonable. Therefore, the relevant *Prudential* considerations weigh in favor of approving the Settlement.

### c. The Degree of Direct Benefit Provided to the Class

In *In re Baby Products Antitrust Litigation*, the Third Circuit articulated an additional consideration for evaluating a settlement—"the degree of direct benefit provided to the class." *Baby Prods., 708 F.3d at 174*. The Third Circuit explained:

> In making this determination, a district court may consider, among other things, the number of individual awards compared to both the number of claims and the estimated number of class members, the size of the individual awards compared to claimants' estimated damages, and the claims process used to determine individual awards.

*Id.*

Here, the Settlement Agreement created a $2 million cash fund to be distributed among 1,255 class members. In order to inform the class members about the Settlement, Class Counsel engaged in a thorough notice process. Class Counsel and the Settlement Administrator used Jiffy Lube, U.S. Postal Service, **[\*40]** and other records to ascertain the mailing addresses for the class members. Osterlund Decl. at ¶¶ 2, 4. As of April 1, 2024, addresses were still missing for only five of the

class members. *Id.* at ¶ 4. Packets were mailed (and not returned as undeliverable) to the other 1,250 class members. *Id.* Additionally, the Settlement Administrator established a website, email address, and telephone number to provide more information about the settlement and to respond to class members' inquiries. *Id.* at ¶¶ 5-7. Some class members have provided their requested (but optional) Social Security number information, as stated on the record at the final approval hearing.

After subtraction of the requested attorney's fees and expenses, the settlement administration costs, and the lead plaintiff's award, the fund totals $1,106,403. The average remaining award, if divided among all the 1,255 class members, is $881.60. The lack of objections or opt-outs to the settlement confirms that this fund represents a substantial benefit to class members, despite the sizable deduction of expenses and fees from the overall fund.

Because the *Girsh* factors and *Prudential* considerations overwhelming weigh in favor of approving the Settlement, **[\*41]** and the degree of direct benefit to the Class does not counsel against approving the Settlement, I will grant final approval of the Settlement.

## C. Attorneys' Fees and Reimbursement of Litigation Expenses

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." *Fed. R. Civ. P. 23(h)*. "[A] thorough judicial review of fee applications is required in all class action settlements." *Prudential, 148 F.3d at 333* (quoting *In re GMC, 55 F.3d at 819*); *see also Baby Prods., 708 F.3d at 178-80*.

Here, Class Counsel requests $500,000 in

---

[8] Class members may provide their Social Security numbers but are not required to do so in order to receive payments.

attorney's fees, $320,465 in litigation expenses, and $68,132 for settlement administration. Pl's Mot. for Final Approval of Settlement and Award of Attorney's Fees, Expenses, and Service Award, ECF No. 175, at ¶ 5. The Settlement Agreement provides that Class Counsel may apply to the Court for an award for the time and expenses associated with litigating this case, to be drawn from the Settlement Fund. Settlement Agreement at ¶ 9.2. Jiffy Lube itself is not directly liable for payment of attorney's fees and expenses; these amounts will be subtracted from the overall $2 million fund. *Id.* at ¶ 9.2, 9.5.

Courts generally use one of two methods for assessing attorneys' fee requests: **[*42]** the lodestar method or the percentage-of-recovery method. *In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 300 (3d Cir. 2005)*, *as amended* (Feb. 25, 2005). The lodestar method is more commonly the starting point in statutory fee-shifting cases. *Id.* The percentage-of-recovery method, on the other hand, is "generally favored in common fund cases." *Id.* This case involves a common cash fund, and therefore the percentage-of-recovery method is appropriate. Although not "necessarily determinative," the use of the lodestar method of fee approval also provides a cross-check of a court's initial fee calculation under the percentage-of-recovery method. *Baby Prods., 708 F.3d at 179-80*; *see also In re Rite Aid, 396 F.3d at 300*.

"Counsel for a class action is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the class action." *In re Suboxone (Buprenorphine, Hydrochloride and Naloxone) Antitrust Litig., 13-MD-2445, 2024 U.S. Dist. LEXIS 33018, 2024 WL 815503, at *18 (E.D. Pa. Feb. 27, 2024)* (quoting *In re Safety Components, Inc. Sec. Litig., 166 F. Supp. 2d 72, 108 (D.N.J.*

*2001)*). Class Counsel's expense request is broken down as follows:

⊞ *Go to table1*

Bloomfield Decl. at ¶ 16. Class Counsel seeks reimbursement for $320,465 of the above expenses, as well as $68,132 for Gilardi & Co. LLC to administer the settlement. ¶ **[*43]** 8. These expenses total nearly 20% of the total settlement amount.

Because the percentage-of-recovery method and the lodestar cross-check demonstrate that the attorneys' fee and expense request is reasonable, I will approve Plaintiffs' request for $500,000 as an award of attorneys' fees. Because the incurred expenses were reasonably incurred in the prosecution of this action, I will also approve $320,465 for reimbursement of expenses, and $68,132 for settlement administration expenses.

## 1. Percentage-of-Recovery Method

In deciding what amount is a reasonable fee award under the percentage-of-recovery method, a district court must consider the following ten factors known as the *Gunter/Prudential* factors:

(1) the size of the fund created and the number of beneficiaries, (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel, (3) the skill and efficiency of the attorneys involved, (4) the complexity and duration of the litigation, (5) the risk of nonpayment, (6) the amount of time devoted to the case by plaintiffs' counsel, (7) the awards in similar cases, (8) the value of benefits attributable to the efforts of **[*44]** class counsel relative to the efforts of other groups, such as government agencies conducting investigations, (9) the

percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained, and (10) any innovative terms of settlement.

*In re Diet Drugs, 582 F.3d 524, 541 (3d Cir. 2009)* (citations omitted).

Importantly, however, before reaching any single *Gunter/Prudential* factor, a court "should begin by determining with reasonable accuracy the distribution of funds that will result from the claims process." *Baby Prods., 708 F.3d at 179*. "Th[e] court should then, relying on the *Gunter/Prudential* factors and its experience, determine whether the level of distribution provided to the class by the settlement reflects a failure of class counsel to represent adequately the interests of the entire class." *Id.*

The Class consists of 1,255 current and former employees of Jiffy Lube franchisees in the Philadelphia area. The Settlement Agreement provides $2 million, less fees and expenses, to allocate to each of these former employees on a pro rata basis depending on the amount of money each employee earned during the settlement period. There is no reversion, meaning that Jiffy Lube will not be reimbursed **[*45]** any amount of the $2 million if the initial fund distribution does not fully exhaust the settlement fund. In that case, a second distribution will be made or the funds will be donated to a nonprofit organization on a cy-près basis. Plaintiff's econometrics expert's initial analysis shows that the Settlement amount is approximately 90% of the Settlement Class's damages. Bloomfield Decl. at ¶ 11. This means that, after subtraction of the 25% attorney fee amount and the expenses from the Settlement Fund, each member of the Settlement Class will likely receive approximately half of their estimated damages. Although this is not an exceptional

recovery given the size of the fee and expense amounts, an examination of the *Gunter/Prudential* factors demonstrates that this is an adequate recovery given the substantial litigation time and costs involved in this case.

### a. The Size of the Fund Created and the Number of Beneficiaries

As noted above, the Settlement Agreement creates a $2 million fund to be distributed to 1,255 class members after the subtraction of fees and expenses. The fund itself represents 90% of the damages of the class, according to Plaintiff's econometrics expert. Bloomfield Decl. **[*46]** at ¶ 11. Class Counsel reviewed hundreds of thousands of documents throughout the discovery process, took six depositions, and began preparation of expert reports. *Id.* at ¶¶ 5, 6. Class Counsel also successfully briefed two motions to dismiss. Class Counsel requests 25% of the fund as attorney's fees.

Because Class Counsel diligently prosecuted this case and adequately prioritized the direct benefit to the Class, this factor weighs in favor of approving Plaintiffs' fee request.

### b. The Presence or Absence of Substantial Objections by Members of the Class to the Settlement Terms and/or Fees Requested by Counsel

Out of 1,255 class members, no individuals opted out or objected to the Settlement. Moreover, no one objected to Class Counsel's requested attorney's fees and expense reimbursements. Because there have been no objections pertaining to attorneys' fees, this factor weighs in favor of approving Plaintiffs' fee request.

### c. The Skill and Efficiency of the Attorneys Involved

As previously discussed, Class Counsel has extensive knowledge of antitrust law and class action practice. Throughout the course of this litigation, Mr. Bloomfield, Mr. Schrag, and Mr. Sampson have identified relevant **[*47]** issues in the action and have successfully defended against two motions to dismiss. This factor weighs in favor of approving Plaintiffs' fee request.

### d. The Complexity and Duration of the Litigation

The factors which increase the complexity of a class action include: "complex and/or novel legal issues, extensive discovery, acrimonious litigation, and tens of thousands of hours spent on the case by class counsel." *In re Cendant Corp. PRIDES Litig., 243 F.3d 722, 741 (3d Cir. 2001)*. Antitrust class actions are particularly complex to litigate and therefore quite expensive. *See In re Auto. Refinishing, 2008 U.S. Dist. LEXIS 569, 2008 WL 63269, at *5* ("This litigation, *like most antitrust cases*, has been exceedingly complex, expensive, and lengthy." (emphasis added)). "An antitrust class action is arguably the most complex action to prosecute." *In re Linerboard, 296 F. Supp. 2d at 577* (internal quotation marks omitted).

This case involved complex antitrust litigation and novel issues about franchise model wage suppression. This case has been pending for over five years, during which time there has been substantial litigation within this case and developments across the country related to franchisee wage suppression issues. *See* Compl. at ¶ 6 (noting that many states' attorneys general are investigating "no-poach" provisions in franchise agreements, and that at least **[*48]** 30 national chains had entered consent decrees to cease use of such

provisions). This factor weighs in favor of approving Plaintiffs' fee request.

### e. The Risk of Nonpayment

In every class action in which class counsel brings a case on a contingency basis, there is some risk of nonpayment. There is effectively no risk of nonpayment at this point given that Jiffy Lube has already deposited the $2 million settlement payment into an escrow account. The Third Circuit has "never [directly] addressed whether courts must reconsider the risk of nonpayment as the action evolves." *In re Diet Drugs, 582 F.3d at 543*. In practice, however, it has evaluated the risk of nonpayment throughout the litigation. *See Sullivan, 667 F.3d at 332* (assessing "risk of nonpayment throughout the litigation"). Until the parties reached a settlement agreement in this case, the Plaintiff had no guarantee of recovery of damages for the class, fees and expenses for Class Counsel, or an individual award for the class representative.

Because the risk of nonpayment changed throughout the course of this litigation, this factor weighs only mildly in favor of approving Plaintiffs' fee request.

### f. The Amount of Time Devoted to the Case by Plaintiffs' Counsel

Through January 29, 2024, **[*49]** Plaintiff's counsel had devoted 3,267 hours to this case.[9] Bloomfield Decl. at ¶ 15. Class Counsel has also advanced at least $322,073 in litigation expenses. *Id.* at ¶ 16. The time and money spent by Plaintiff's counsel was necessary for the prosecution of this case and its eventual settlement. Because Plaintiff's Counsel devoted significant resources to this case, this

---

9  1,379 hours were spent by Class Counsel Gibbs Law Group, 523 hours were spent by Paul LLP, and 1,365 hours were spent by Gustafson Gluec PLLC. Bloomfield Decl. at ¶ 15.

factor weighs in favor of approving Plaintiffs' fee request.

### g. The Awards in Similar Cases

Class Counsel request a fee that is 25% of the entire fund. In this District, "fee awards generally range between nineteen and forty-five percent of the common fund." *McDonough v. Toys R Us, Inc., 80 F. Supp. 3d 626, 653 (E.D. Pa. 2015)* (collecting cases); *see also In re Suboxone Antitrust Litig., 2024 U.S. Dist. LEXIS 33018, 2024 WL 815503, at *16* (collecting cases). Moreover, "courts within this Circuit have typically awarded attorneys' fees of 30% to 35% of the recovery, plus expenses." *In re Ravisent Techs., Inc. Sec. Litig., No. 00-1014, 2005 U.S. Dist. LEXIS 6680, 2005 WL 906361, at *11 (E.D. Pa. Apr. 18, 2005)* (collecting cases). Plaintiffs' fee request falls within the range of fees that are typically approved in this district. This factor weighs in favor of approving Plaintiffs' fee request.

### h. The Value of Benefits Attributable to the Efforts of Class Counsel Relative to the Efforts of Other Groups, Such as Government Agencies Conducting Investigations

This factor contemplates whether Class Members **[*50]** benefitted from "the efforts of other groups, such as government agencies conducting investigations." *In re AT & T Corp., 455 F.3d 160, 165 (3d Cir. 2006)*. Class Members have benefitted from the actions of state attorneys general who investigated these "no-poach" provisions in franchisee agreements. *See* Katie Reilly and Natalie West, *Antitrust Enforcement Is Top of Mind for State Attorneys General*, Bloomberg Law, July 17, 2023 (noting that several companies using a franchise model settled with 14 state

attorneys general to cease use of no-poach agreements, and that the Washington Attorney General had signed 155 such agreements). The United States Department of Justice is also involved in investigating the role and impact of "no-poach" agreements. *See* Letter, ECF No. 146 (stating interest of U.S. Department of Justice Antitrust Division in this litigation). However, as noted by Plaintiff, these government actions have typically been forward-looking, seeking to eliminate "no-poach" terms from franchise agreements to prevent the damage they allegedly cause to workers. Compl. at ¶ 7. This class action litigation drew upon the work of government agencies, but the settlement addresses alleged harms not otherwise resolved by government action. **[*51]** This favor is therefore neutral.

### i. The Percentage Fee that Would have been Negotiated had the Case been Subject to a Private Contingent Fee Arrangement at the Time Counsel was Retained

Plaintiffs' percentage fee request of 25% of the $2 million fund is a slightly lower percentage than is typically negotiated in private contingency fee cases. *See In re Aetna Inc., MDL No. 1219, 2001 U.S. Dist. LEXIS 68, 2001 WL 20928, at *14 (E.D. Pa. Jan. 4, 2001)* ("[A]n award of thirty percent is in line with what is routinely privately negotiated in contingency fee tort litigation.); *In re Ikon Office Sols., Inc., Sec. Litig., 194 F.R.D. 166, 194 (E.D. Pa. 2000)* ("[I]n private contingency fee cases . . . plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery."). Class Counsel states that their customary fee in individual cases is in the range of 33%. Pl.'s Final Approval Br. at 29. The expenses of litigating this case were substantial, and their deduction from the fund results in a payment of only about 55% of the fund to the class

members. It is not clear what proportion of these expenses were necessary for litigation for this particular settlement class, or to what extent these expenses were attributable to the original litigation of the nationwide class action claim. This factor weighs slightly in favor of approving [*52] Plaintiffs' fee request.

### j. Any Innovative Terms of Settlement

In the absence of any innovative terms, this factor neither weighs in favor nor against the proposed fee request.

Overall, the *Gunter/Prudential* factors demonstrate that Plaintiffs' request for $500,000 as an award of attorneys' fees, $320,465 in litigation expenses, and $68,132 for settlement administration expenses is reasonable.

### 2. Lodestar Method

After a district court applies the percentage-of-recovery method to determine whether a fee request is reasonable, it is sensible to also apply "an abridged lodestar analysis serving as a cross check." *In re Rite Aid, 396 F.3d at 305*. But the lodestar cross-check "should not displace a district court's primary reliance on the percentage-of-recovery method." *In re AT&T Corp., 455 F.3d 160, 164 (3d Cir. 2006)*. "The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting. The district courts may rely on summaries submitted by the attorneys and need not review actual billing records." *In re Rite Aid, at 306-307* (footnote omitted).

"The lodestar award is calculated by multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services [*53] provided, and the experience of

the attorneys." *Id. at 305*. "The crosscheck is performed by dividing the proposed fee award by the lodestar calculation, resulting in a lodestar multiplier." *In re AT & T, 455 F.3d at 164*. A negative lodestar multiplier "suggests that class counsel would not be overpaid for their services if compensated as requested, but it also suggests that counsel has a significant financial incentive to cut its losses and settle the lawsuits." *Baby Prods., 708 F.3d at 180 n.14*.

Plaintiffs' counsel devoted at least 3,250 hours to this action, resulting in a lodestar award of $2,083,711 according to counsel's calculation. Pl.'s Final Approval Br. at 30. When Plaintiffs' fee request of $500,000 is divided by the lodestar award of $2,083,711, it results in a significant negative multiplier of .24. The negative multiplier suggests that Plaintiffs' fee request is reasonable.[10]

Class Counsel also requests payment of expenses and charges incurred in connection with the prosecution of this litigation in the amount of $320,465,[11] as well as payment of $68,132 for settlement administration. Together, the expenses and settlement administration costs total nearly 20% of the overall fund.

"[T]here is no reason to reject the request for reimbursement of [*54] expenses that counsel have spent out of their own pockets in litigating an antitrust case." *In re Fasteners Antitrust Litig., Civil Action No. 08-md-1912, 2014 U.S. Dist. LEXIS 9990, 2014 WL 296954, at *8 (E.D. Pa. Jan. 27, 2014)* (cleaned up) (quoting *In re Auto. Refinishing Paint Antitrust Litig., MDL No. 1426, 2004 U.S. Dist. LEXIS 29162,*

---

10  Admittedly, Class Counsel had "a significant financial incentive to cut its losses and settle the lawsuits," Baby Prods., 708 F.3d at 180 n.14. But, given that a much higher recovery would have been possible if they continued litigating on behalf of a nationwide class, I defer to the attorneys' assessment that such continued litigation was too risky to justify jeopardizing recovery for this settlement class.
11  $265,343 is attributable to experts and consultants. Bloomfield Decl. at ¶ 16. $57,730 is attributable to copying, litigation support, postage, research, transcripts, and travel. Id.

at *35-36 (E.D. Pa. Oct. 13, 2004)). Courts in this district have permitted expense reimbursements of this magnitude and for similar types of expenses in cases involving higher settlement amounts. *See, e.g.* *Fasteners, 2014 U.S. Dist. LEXIS 9990, 2014 WL 296954, at *8* (reimbursing $337,667.72 in costs in the context of a $17.55 million settlement); *In re Flonase Antitrust Litig., 951 F. Supp.2d at 751* (approving reimbursement of economic expert fees, with total reimbursed expenses of over $2 million in context of $150 million settlement). While in hindsight, an expensive econometric analysis of the nationwide impact of Jiffy Lube's "no-poach" term is unnecessary to prove a case solely for Philadelphia-area class members, this was a reasonable expense at the time that Plaintiff's counsel was litigating a nationwide case. This expert report may also have been a useful tool in convincing Jiffy Lube to agree to a settlement for the regional class. Class Counsel's expenses, while high given the size of the eventual settlement, were reasonably incurred in prosecution of this case.

Because both the percentage-of-recovery method and the lodestar cross-check indicate that Plaintiffs' fee request is reasonable, I will approve **[*55]** Plaintiffs' request for $500,000 as an award of attorneys' fees, $320,465 in litigation expenses, and $68,132 for settlement administration expenses.

## D. Incentive Awards for Class Representatives

Plaintiffs' request an incentive award of $5,000 the named class representative, Victor Fuentes, for his contributions to the case. "Incentive awards, also known as 'enhancement awards' or 'service payments,' are common in class actions that result in a common fund for distribution to the class." *Altnor v. Preferred Freezer Servs., Inc., 197 F.*

Supp. 3d 746, 769 (E.D. Pa. 2016). "The purpose of these payments is to compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation, and to reward the public service of contributing to the enforcement of mandatory laws." *Sullivan, 667 F.3d at 333 n.65* (internal quotation marks omitted).

Plaintiffs cite to several cases in which district courts in this circuit have awarded named plaintiffs $5,000 or more. Pl.'s Final Approval Br. at 32 (citing *Myers v. Jani-King of Philadelphia, No. 09-1738, 2019 U.S. Dist. LEXIS 144929, 2019 WL 4034736, at *10 (E.D. Pa. Aug. 26, 2019)* ($10,000); *Caddick v. Tasty Baking Co., No. 2:19-CV-02106-JDW, 2021 U.S. Dist. LEXIS 206991, 2021 WL 4989587, at *10 (E.D. Pa. Oct. 27, 2021)* ($5,000); *Copley v. Evolution Well Servs. Operating, LLC, No. 2:20-CV-01442-CCW, 2023 U.S. Dist. LEXIS 23452, 2023 WL 1878581, at *4 (W.D. Pa. Feb. 10, 2023)* ($10,000); *Baez-Medina v. Judge Group, Inc., No. 21 3534, 2023 U.S. Dist. LEXIS 124960, 2023 WL 4633503, at *9 (E.D. Pa. July 20, 2023)* ($5,000)). Fuentes was involved in this case since its inception in 2018. He has made himself available to participate in settlement conferences, and he has provided documentation related to his own employment at a Jiffy **[*56]** Lube franchisee. Because Victor Fuentes provided information necessary to Plaintiffs' counsel for filing the complaint and for negotiating this Settlement Agreement, I will approve Plaintiffs' request for an incentive award of $5,000 to Mr. Fuentes.

## IV. Conclusion

For the above reasons, I will grant Plaintiffs' motion for class certification and final approval of the Settlement. I will also grant Plaintiffs' motion for attorneys' fees, reimbursement of

expenses, and incentive award to the class representative. Accordingly, I will approve Plaintiffs' requests for $500,000 as an award of attorneys' fees, $320,465 in litigation expenses, and $68,132 for settlement administration expenses. I will also approve Plaintiffs' request for an incentive award of $5,000 for the named class representative.

/s/ ANITA B. BRODY, J.

ANITA B. BRODY, J.

## ORDER

**AND NOW**, this 28TH day of May, 2024, it is **ORDERED** that Plaintiff's Motion for Final Approval of Settlement and Award of Attorney's Fees, Expenses, and Service Award (ECF No. 175) is **GRANTED**. Accordingly, the Court approves an award of $500,000 in attorneys' fees, $320,465 in reimbursement of litigation expenses, and $68,132 for settlement administration **[*57]** expenses. The Court also approves a service award for Plaintiff Victor Fuentes in the amount of $5,000.

/s/ ANITA B. BRODY, J.

ANITA        B.        BRODY,        J.

2024 U.S. Dist. LEXIS 94102, *57

**Table1 (***Return to related document text***)**

| Expense Category | Expense Amount |
| --- | --- |
| Copying (Internal) | $1,017 |
| Experts/Consultants | $265,343 |
| Litigation Support | $36,189 |
| Postage/Delivery | $110 |
| Research | $3,066 |
| Transcripts | $13,440 |
| Travel | $3,908 |
| **Total** | **$322,073** |

**Table1 (***Return to related document text***)**

---

**End of Document**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION** | **MDL NO. 2724**<br><br>**16-MD-2724** |
| **THIS DOCUMENT RELATES TO:**<br><br>***Direct Purchaser Class Plaintiffs' Actions*** | **HON. CYNTHIA M. RUFE** |

## MEMORANDUM OPINION

**Rufe, J.**                                                            **March 9, 2023**

Direct Purchaser Class Plaintiffs César Castillo, LLC, FWK Holdings, LLC, Rochester

Drug Cooperative, Inc., and KPH Healthcare Services, Inc. a/k/a/ Kenney Drugs, Inc. ("DPPs")

seek final approval of settlements with Defendants Sun Pharmaceutical Industries, Inc., and its

affiliates Caraco Pharmaceutical Laboratories, Ltd., Mutual Pharmaceutical Company, Inc., and

URL Pharma, Inc. (collectively, "Sun") and with Taro Pharmaceuticals, U.S.A., Inc. ("Taro").

Under Federal Rule of Civil Procedure 23(e), the Court held a hearing on March 8, 2023, to

determine whether the proposed class-action settlements are "fair, reasonable, and adequate."[1]

The Court must: (1) determine if the requirements for class certification under Rule 23(a) and (b)

are satisfied; (2) assess whether notice to the proposed class was adequate; and (3) evaluate if the

proposed settlements are fair under Rule 23(e).[2] Preliminarily, the Court finds that Sun and Taro

caused timely notice of the settlements and related materials to be sent to the Attorney General of

---

[1] Fed. R. Civ. P. 23(e)(2).

[2] *See In re Nat'l Football League Players Concussion Inj. Litig.*, 775 F.3d 570, 581 (3d Cir. 2014).



the United States and the Attorneys General of all U.S. states, territories, and the District of Columbia pursuant to the Class Action Fairness Act of 2005 ("CAFA").[3] The Court finds that such notification complies fully with the applicable requirements of CAFA.

## I.    RULE 23(A)

To certify a class, the Court must determine that the following factors under Rule 23(a) are met: numerosity, commonality, typicality, and adequacy of representation.[4] The Court preliminarily certified the following settlement class for both settlements:

> All persons or entities, and their successors and assigns, that directly purchased one or more of the Named Generic Drugs from one or more Defendants in the United States and its territories and possessions, at any time during the period from May 1, 2009 until December 31, 2019. Excluded from the Settlement Class are Defendants and their present and former officers, directors, management, employees, subsidiaries, or affiliates, judicial officers and their personnel, and all governmental entities.[5]

Numerosity is satisfied as the settlement class includes more than 700 members geographically dispersed throughout the United States.[6] A single common issue is enough to satisfy the commonality requirement, and typicality is met where "the action can be efficiently maintained as a class and . . . the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentee's interests will be fairly represented."[7] Here, there are common issues of law and fact as to all class members: namely, that they made direct

---

[3] 28 U.S.C. § 1715. *See* MDL Doc. Nos. 2376, 2377.

[4] Fed. R. Civ. P. 23(a). The Court's determinations are based on the particular settlement class currently before the Court; no broader or more general determinations as to the suitability of class actions in the MDL generally have been made.

[5] Order of Preliminary Approval [MDL Doc. No. 2093] at 3.

[6] Am. Decl. of Eric J. Miller [MDL Doc. No. 2383-1]; Order of Preliminary Approval [MDL Doc. No. 2093] at 3. *See Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir. 2001) (more than 40 class members generally satisfies numerosity).

[7] *Baby Neal v. Casey*, 43 F.3d 48, 56–57 (3d Cir. 1994) (citation omitted).

purchases of generic pharmaceuticals that were priced higher than they should have been because of an alleged conspiracy among manufacturers, including Sun and Taro.

Plaintiffs also have demonstrated that "the representative parties will fairly and adequately protect the interests of the class."[8] The named Plaintiffs' interests align with those of other class members. The settlement agreements provide that each of the four class representatives will receive a service award of $20,000 (for a total of $80,000). In the context of the settlement award, the Court finds this a reasonable amount, as the representatives have been actively involved in the prosecution of the case, including through depositions and extensive document production. Class counsel are qualified, experienced, and fully capable of litigating the class members' claims.[9] The representative Plaintiffs, and class counsel, have protected the interests of the class in crafting an adjusted settlement amount that will be allocated on a *pro rata* basis upon the filing of a motion for distribution, which will provide an opportunity for class members to object to the proposed distribution.[10] In addition, Sun and Taro have agreed to provide cooperation to DPPs, which will facilitate the administration of the settlements and will aid the litigation against non-settling Defendants.[11]

---

[8] Fed. R. Civ. P. 23(a)(4).

[9] 391 F.3d 516, 532 (3d Cir. 2004).

[10] Mem. Supp. Mot. to Approve [Doc. No. 2344-1] at 25. The settlement amount was adjusted from $85 million to $75 million based on the aggregate dollar amount of purchases by those opting out of the settlement, but may be adjusted upward by as much as $20 million depending on the Most Favored Nations clauses in the settlement agreements, which apply to future settlements with opt-outs. *Id.* at 6–8. In addition, as discussed below, the settlement will be reduced by expenses and Plaintiffs seek to have 1/3 of the net settlement amount placed in escrow against a future motion for attorneys' fees.

[11] *Id.* at 8–9.

## II.     RULE 23(B)

The settlement class also satisfies at least one of the three requirements listed in Rule 23(b).[12] The Court finds that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."[13] The alleged collusive conduct by Sun and Taro affected all class members in the same way with regard to the cost of generic pharmaceuticals.[14] Plaintiffs have shown that for the purposes of settlement a class action is a "fair and efficient adjudication of the controversy . . . against those of alternative available methods of adjudication."[15] As directed by Rule 23(b)(3), the Court has considered "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; [and] (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum . . . . "[16]

Although some Plaintiffs are proceeding individually in the MDL, given the complexity of the litigation, 700 individual actions are not likely to be a more desirable way of proceeding, and "[a] class action is therefore superior to other methods of adjudication" in the context of the settlements.[17] The Court therefore certifies the settlement class for purposes of the final settlements.

---

[12] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011).

[13] Fed. R. Civ. P. 23(b)(3).

[14] *In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249, 262–63 (E.D. Pa. 2012) (citing *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 297 (3d Cir. 2011)).

[15] *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 533–34 (3d Cir. 2004) (citations omitted).

[16] Fed. R. Civ. P. 23(b)(3).

[17] *McDermid v. Inovio Pharms., Inc.*, No. 20-1402, 2023 WL 227355, at *3 (E.D. Pa. Jan. 18, 2023) (citations omitted).

As part of the preliminary approval, the Court directed that notice be provided.[18] The notice clearly and concisely stated in plain, easily understood language: "(i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)."[19] Notice was made through direct mail, through the use of digital banner ads on a website targeted to reach likely direct purchasers, through publication in the *Wall Street Journal*, and through a news release via Business Wire, and with the use of a case-specific toll-free telephone number, email address, and website.[20] The notice complies with the Court's Preliminary Approval Order of May 11, 2022[21] and satisfies the requirements of Rule 23.

### III.    RULE 23(E)

The Court determines that the proposed settlements are "fair, reasonable and adequate."[22] A settlement is fair where "(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected."[23] Each of these factors is met. Negotiations occurred at arm's length over more than a year of negotiations and there has been extensive

---

[18] Fed. R. Civ. P. 23(c)(2)(B).

[19] Fed. R. Civ. P. 23(c)(2)(B).

[20] Am. Decl. Eric J. Miller [MDL Doc. No. 2383-1].

[21] MDL Doc. No. 2093.

[22] *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 316 (3d Cir. 1998) (quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995)); *see also* Fed. R. Civ. P. 23(e).

[23] *In re Warfarin*, 391 F.3d at 535 (quoting *In re Cendant Corp. Litig.*, 264 F.3d 201, 232 n.18 (3d Cir. 2001)).

discovery in the MDL, enabling class counsel to "develop[ ] enough information about the [litigation] to appreciate sufficiently the value of the claims."[24] Plaintiffs' counsel is experienced and accomplished, and there have been no objections to the settlements.[25] In addition, as required by Rule 23(e)(2), the Court determines that the relief provided to the class is adequate.[26] From the settlement amount of $75 million, each of the two settlement agreements provides for up to $250,000 in reasonable expenses for the administration of the settlements, including the allocation and distribution of the payments to class members.[27] In addition, Plaintiffs' counsel seek reimbursement for past and future common expenses in the amount of $6,300,0000 (in addition to the $500,000 referenced above), and have explained that the majority of those expenses are attributable to fees to expert economists necessary to determine the amounts and the method of distribution. Finally, Plaintiffs' attorneys seek to place one-third of the net settlement fund into escrow to pay attorneys' fees at a later time as counsel do not seek an award of attorneys' fees at this time.[28] Counsel represented at the hearing that the future request for an

---

[24] *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 439 (3d Cir. 2016).

[25] DPPs have received requests for exclusion on behalf of 371 entities; however, only 33 of those entities have been identified as potential settlement class members based on data from Sun and Taro. *See* Am. Decl. Eric J. Miller at ¶¶ 16–18. As counsel explained at the hearing, many of the other entities are subsidiaries or other related entities to the 33 purchasers, who likely were excluded to avoid any potential confusion.

[26] Rule 23(e)(2) requires the Court to determine that:

(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

[27] Accordingly, $500,000 has been withdrawn from the settlement fund for such purposes. DPPs' Mem. Supp. Mot. to Approve [MDL Doc. No. 2344-1] at 11.

[28] DPPs' Mot. for Order [MDL Doc. No. 2195]; DPPs' Mem. Supp. Mot. to Approve [MDL Doc. No. 2344-1] at 12.

award will not seek fees in excess of the amount placed in escrow, and that there will be an opportunity for class members to object to the proposed fee award.

The relief the settlements are expected to provide class members is adequate when balanced against "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)."[29] In addition to the inherent risk to recovery involved in prolonged litigation, continuing through motions regarding class certification, the dismissal of claims, and the exclusion of evidence, as well as potential trials and appeals would only delay any recovery class members may receive.

Rule 23(e)(2)(iv) requires the Court to account for any agreements between the parties required to be identified under Rule 23(e)(3), referring to "any agreement made in connection with the [settlement] proposal."[30] The settlement documents set forth the relevant agreements, including that the settling parties have agreed that Sun's and Taro's sales remain in the MDL for purposes of joint and several liability as to non-settling Defendants to the extent permitted or authorized by law, and that Sun and Taro will provide cooperation, both in terms of effectuating the settlements and providing information to help in the continued litigation against the non-settling Defendants.[31] Counsel represented at the hearing that there are no other operative agreements and that all terms of the settlements are part of the record.[32]

---

[29] Fed. R. Civ. P. 23(e)(2)(C)(i)–(iv).

[30] Fed. R. Civ. P. 23(e)(3).

[31] DPPs' Mem. Supp. Mot. to Approve [MDL Doc. No. 2344-1] at 2.

[32] At the hearing, counsel represented that had been a confidential side letter but that the terms of that agreement were no longer operative and therefore all terms of the settlements are public.

The final element of Rule 23(e)(2) requires the Court to determine whether the proposal treats the class members equitably relative to each other. As discussed above, the settlement funds will be allocated on a *pro rata* basis, which treats the class members equitably.[33]

## IV.  CONCLUSION

The Court having determined that the settlements are fair and reasonable, and that all applicable requirements have been met, the Court will approve the settlements. Appropriate orders will be entered.

---

[33] In addition to satisfying the standard under Rule 23, the factors set forth by the Third Circuit in *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975), also favor settlement. The *Girsh* factors are "(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation." *Id.* (citation omitted). These factors generally have been discussed in connection with Rule 23(e). The litigation is extremely complex and, in the absence of settlement, it would likely be several years before all of the claims asserted by DPPs against Sun and Taro are resolved. No class members have objected to the settlements, and potential class members have been able to opt out. There has been extensive motion practice and discovery through which the parties have learned of the claims. Sun and Taro have denied liability, and without settlement, DPPs would be required to litigate issues of liability, damages, and class certification. There remain many other claims asserted against Sun and Taro, and settlement at this time assures a fair payment to the DPPs on their claims against these Defendants. Considering all of the attendant risks of litigation of DPPs' claims, including within the broader context of the MDL, the Court concludes that the settlements are reasonable under the *Girsh* factors.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLENDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,<br><br>Defendants. | Case No.: 1:22-cv-00125<br><br>**Hon. Matthew F. Kennelly** |

**[PROPOSED] ORDER GRANTING PRELIMINARY APPROVAL OF SETTLEMENTS WITH DEFENDANTS CALIFORNIA INSTITUTE OF TECHNOLOGY AND THE JOHNS HOPKINS UNIVERSITY, PROVISIONAL CERTIFICATION OF THE PROPOSED SETTLEMENT CLASS, APPROVAL OF THE FOURTH TRANCHE NOTICE PLAN, APPROVAL OF THE FOURTH TRANCHE ALLOCATION PLAN, AND APPROVAL OF THE SCHEDULE FOR COMPLETING THE SETTLEMENT PROCESS**

WHEREAS, on July 20, 2024, this Court granted final approval of settlements between

Plaintiffs Andrew Corzo, Sia Henry, Alexander Leo-Guerra, Michael Maerlender, Brandon

Piyevsky, Benjamin Shumate, Brittany Tatiana Weaver, and Cameron Williams (collectively,

"Plaintiffs") on behalf of themselves and a Settlement Class and Defendants Brown University

("Brown"), University of Chicago ("Chicago"), The Trustees of Columbia University in the City

of New York ("Columbia"), Trustees of Dartmouth College ("Dartmouth"), Duke University

("Duke"), Emory University ("Emory"), Northwestern University ("Northwestern"), William

Marsh Rice University ("Rice"), Vanderbilt University ("Vanderbilt"), and Yale University

("Yale") (ECF No. 726);

WHEREAS, Plaintiffs, on behalf of themselves and a proposed Settlement Class of the

same individuals have, since July 20, 2024, entered into two additional settlement agreements

("Settlement Agreements") with Defendants California Institute of Technology ("Caltech") and

the Johns Hopkins University ("Johns Hopkins") (collectively the "Fourth Tranche Settling

Universities" or "Fourth Tranche Settling Defendants") (Plaintiffs and the Fourth Tranche

Settling Universities together, the "Parties") that set forth the terms and conditions of the Parties'

proposed settlements and releases and their agreements (the "Fourth Tranche Settlements") to

dismiss with prejudice the claims of the Plaintiffs and members of the proposed Settlement Class

against both of the Fourth Tranche Settling Universities;

WHEREAS, the universities Plaintiffs sued in this Action are the "Defendants."

Defendants are Brown, Caltech, Chicago, Columbia, Cornell University, Dartmouth, Duke,

Emory, Georgetown University, Johns Hopkins, Massachusetts Institute of Technology,

Northwestern, University of Notre Dame du Lac, Trustees of the University of Pennsylvania,

Rice, Vanderbilt, and Yale.

WHEREAS, on January 17, 2025, Plaintiffs filed a Motion for Preliminary Approval of

the Fourth Tranche Settlements, Confirmation of Certification of Proposed Settlement Class,

Approval of Fourth Tranche Notice Plan, Approval of the Fourth Tranche Allocation Plan, and Approval of the Proposed Schedule for Completing the Settlement Process, requesting the entry of an Order (the "Motion"): (i) granting preliminary approval of the Fourth Tranche Settlement Agreements; (ii) confirming that the standards for certifying the proposed Settlement Class under Fed. R. Civ. P. 23 for purposes of settlement and judgment are likely satisfied; (iii) appointing Andrew Corzo, Sia Henry, Alexander Leo-Guerra, Michael Maerlender, Brandon Piyevsky, Benjamin Shumate, Brittany Tatiana Weaver, and Cameron Williams as representatives of the Settlement Class ("Class Representatives"); (iv) confirming the appointment of Freedman Normand Friedland LLP, Gilbert Litigators & Counselors PC, and Berger Montague PC as Settlement Class Counsel under Fed R. Civ. P. 23(g); (v) directing notice to the Settlement Class be provided pursuant to the Fourth Tranche Notice Plan; (vi) preliminarily approving the Fourth Tranche Allocation Plan; (vii) appointing Angeion Group as Settlement Claims Administrator; (viii) appointing The Huntington National Bank ("Huntington Bank") as Escrow Agent; and (ix) approving the proposed schedule for the Fourth Tranche Settlements, including the scheduling of a Fairness Hearing during which the Court will consider: (a) Plaintiffs' request for final approval of both Settlements and entry of a proposed order and final judgment; (b) Plaintiffs' counsel's application for attorneys' fees, reimbursement of expenses, service awards, and payment of administrative costs; and (c) Plaintiffs' request for dismissal of this action only against the Fourth Tranche Settling Universities with prejudice.

WHEREAS, the Court ordered that any oppositions to the Motion would be due on [DATE] and no oppositions were filed;

WHEREAS, the Court held a hearing on the Motion on [DATE];

WHEREAS, the Fourth Tranche Settling Universities support the Motion; and

3

WHEREAS, the Court is familiar with and has reviewed the record in this case and the Fourth Tranche Settlements, and has found good cause for entering the following Order.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

## Jurisdiction

1.      This Court has jurisdiction to enter this Order as it has jurisdiction over the subject matter of this action and over the Fourth Tranche Settling Universities and Plaintiffs, including all members of the Settlement Class (defined below).

## Settlement Class

2.      Pursuant to Rule 23(e)(1)(B)(ii) of the Federal Rules of Civil Procedure, the Court confirms that the Court will likely find that the requirements of Federal Rules of Civil Procedure 23(a) and 23(b)(3) have been satisfied for settlement and judgment purposes only. As to the requirements of Rule 23(a) for settlement purposes only, (i) the Settlement Class provisionally certified herein likely exceeds 100,000 individuals, and joinder of all would be impracticable; (ii) there are questions of law and fact common to the Settlement Class; (iii) Class Representatives' claims are typical of the claims of the Settlement Class they seek to represent for purposes of settlement; and (iv) Class Representatives are adequate representatives of the Settlement Class. As to the requirements of Rule 23(b)(3) for settlement purposes only, questions of law and fact common to the Settlement Class predominate over any questions affecting any individual Settlement Class Member, and a class action on behalf of the Settlement Class is superior to other available means of settling and disposing of this dispute.

3.      Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the Court confirms, solely for purposes of effectuating the Settlements, the following "Settlement Class," which permits potential class members to opt out, including the following persons:

a.  All persons who have during the Class Period (a) enrolled in one or more of Defendants' full-time undergraduate programs, (b) received at least some need-based financial aid from one or more Defendants, and (c) whose tuition, fees, room, or board to attend one or more of Defendants' full-time undergraduate programs was not fully covered by the combination of any types of financial aid or merit aid (not including loans) in any undergraduate year.[1] The Class Period is defined as follows:

    i.  For Chicago, Columbia, Cornell, Duke, Georgetown, MIT, Northwestern, Notre Dame, Penn, Rice, Vanderbilt, Yale—from Fall Term 2003 through February 28, 2024.

    ii.  For Brown, Dartmouth, Emory—from Fall Term 2004 through February 28, 2024.

    iii.  For Caltech—from Fall Term 2019 through February 28, 2024.

    iv.  For Johns Hopkins—from Fall Term 2021 through February 28, 2024.

b.  Excluded from the Class are:

    i.  Any Officers[2] and/or Trustees of Defendants, or any current or former employees holding any of the following positions: Assistant or Associate Vice Presidents or Vice Provosts, Executive Directors, or Directors of Defendants' Financial Aid and Admissions offices, or any Deans or Vice

---

[1] For avoidance of doubt, the Class does not include those for whom the total cost of attendance, including tuition, fees, room, and board for each undergraduate academic year, was covered by any form of financial aid or merit aid (not including loans) from one or more Defendants.

[2] For the avoidance of doubt, the Columbia University "Officers" excluded from the Class are members of the Senior Administration of Columbia University, and do not include exempt employees of Columbia University who are referred to as officers.

Deans, or any employees in Defendants' in-house legal offices;

ii.   any person who was not a U.S. citizen or permanent resident at the time
such person attended a full-time undergraduate program and received at
least some financial aid from one or more Defendants; and

iii.  the Judge presiding over this action, his or her law clerks, spouse, and any
person within the third degree of relationship living in the Judge's
household and the spouse of such a person.

4.      For settlement purposes only, the Court confirms the appointment of Plaintiffs
Andrew Corzo, Sia Henry, Alexander Leo-Guerra, Michael Maerlender, Brandon Piyevsky,
Benjamin Shumate, Brittany Tatiana Weaver, and Cameron Williams as Class Representatives.

5.      Pursuant to Rule 23(g) of the Federal Rules of Civil Procedure, the Court
confirms the appointment of Berger Montague PC, Freedman Normand Friedland LLP, and
Gilbert Litigators & Counselors PC as Settlement Class Counsel for the Settlement Class.

**Preliminary Approval of Settlements**

6.      Pursuant to Fed. R. Civ. P. 23(e)(1)(B), based on "the parties' showing that the
court will likely be able to (i) approve the proposal[s] under Rule 23(e)(2); and (ii) certify the
class for purposes of judgment on the proposal[s]," the Court hereby preliminarily approves the
Fourth Tranche Settlements, as embodied in the Fourth Tranche Settlement Agreements between
Plaintiffs and the Settling Universities.

7.      Upon review of the record, the Court finds the Fourth Tranche Settlements were
entered into after over two years of hard-fought litigation, extensive discovery, and arm's length
negotiations. Accordingly, the Court preliminarily finds that the Fourth Tranche Settlements
meet all factors under Rule 23(e)(2) and will likely be granted final approval by the Court,

subject to further consideration at the Court's final Fairness Hearing. The Court finds that the Fourth Tranche Settlements encompassed by the Settlement Agreements are preliminarily determined to be fair, reasonable, and adequate, and in the best interest of the Settlement Class, raise no obvious reasons to doubt their fairness, and that there is a reasonable basis for presuming that the Fourth Tranche Settlements and their terms satisfy the requirements of Federal Rule of Civil Procedure 23(c)(2) and 23(e) and due process so that notice of the Fourth Tranche Settlements should be given to members of the Settlement Class.

8.      The Court has reviewed and hereby preliminarily approves the Fourth Tranche Allocation Plan, including without limitation its provisions providing that if any portion of the Settlement Fund remains following disbursement of Court-approved notice expenses, the fees and expense Award, and the service awards to the class representatives, and after distribution (or redistribution) to authorized claimants pursuant to the Court-approved Revised Plan of Allocation, and is of such an amount that it is not cost effective or administratively efficient to redistribute the amount to the authorized claimants, then the Settling Parties have agreed to seek leave of Court to disburse such remaining funds, after payment of any further notice and administration costs and taxes and tax expenses, to one or more appropriate charitable non-profit organization(s) that promote access to higher education for disadvantaged students and families as agreed to by the Settling Parties and upon approval by the Court.

9.      Angeion Group is hereby appointed as Settlement Claims Administrator.

10.     Huntington Bank is hereby appointed as Escrow Agent pursuant to the Settlements.

11.     The Court approves the establishment of the Settlement Fund under the Fourth Tranche Settlement Agreements as a qualified settlement fund ("QSF") pursuant to Internal

Revenue Code Section 468B and the Treasury Regulations promulgated thereunder and retains continuing jurisdiction as to any issue that may arise in connection with the formation and/or administration of the QSF. In accordance with the Fourth Tranche Settlement Agreements, Settlement Class Counsel are authorized to withdraw funds from the QSF for the payment of the reasonable costs of notice, payment of taxes, and reasonable settlement administration costs.

12. Pending further Order of the Court, all litigation activity against the Fourth Tranche Settling Universities on behalf of the Settlement Class is hereby stayed, and all hearings, deadlines, and other proceedings related to the Plaintiffs' claims against the Fourth Tranche Settling Universities, other than those incident to the settlement process, are hereby taken off the Court's calendar. The stay shall remain in effect until such a time that (i) any Fourth Tranche Settling University or Plaintiffs exercise its/their right to terminate any of the Settlements; (ii) any of the Fourth Tranche Settlements is terminated pursuant to its terms; or (iii) the Court renders a final decision regarding approval of any of the Fourth Tranche Settlements, and if it approves the Fourth Tranche Settlements, enters final judgment and dismisses Plaintiffs' claims against the Fourth Tranche Settling Universities with prejudice.

13. In the event that any of the Fourth Tranche Settlements fail to become effective in accordance with its/their terms, or if an Order granting final approval to any of the Fourth Tranche Settlements and dismissing Plaintiffs' claims against any of the Fourth Tranche Settling Universities with prejudice is not entered or is reversed, vacated, or materially modified on appeal, this Order shall be null and void but only as to the Fourth Tranche Settlement(s) that fail to become effective.

14. In the event any of the Fourth Tranche Settlements terminate, or are not approved by the Court, or any Fourth Tranche Settlement does not become final pursuant to its terms,

litigation against that Fourth Tranche Settling University or those Fourth Tranche Settling Universities shall resume in a reasonable manner as approved by the Court upon joint application of the Plaintiffs and that Fourth Tranche Settling University or those Fourth Tranche Settling Universities.

**Approval of Notice Plan**

15.     The Court approves, in form and substance, the long-form notice and publication notice attached as Exhibits A and B to January 17, 2025 Declaration of Steven Weisbrot. The class notice plan specified by Plaintiffs and supported by the Declaration of Steven Weisbrot is: (i) the best notice practicable; (ii) is reasonably calculated, under the circumstances, to apprise members of the Settlement Class of the pendency and status of this Action and of their right to participate in, object to, or exclude themselves from the proposed Settlements; (iii) is reasonable and constitutes due, adequate, and sufficient notice to all persons entitled to receive notice of the Fairness Hearing; and (iv) fully satisfies the requirements of Fed. R. Civ. P. 23(e)(1), and constitutes due process, and is a reasonable manner of distributing notice to Settlement Class members who would be bound by the Fourth Tranche Settlements.

16.     The Settling Universities shall provide notice of the Settlements as required by 28 U.S.C. § 1715.

**Email and Mailing Addresses for Notice**

17.     Pursuant to 34 C.F.R. § 99.37(a), the Court finds that mailing addresses and email addresses in education records of current students of a Defendant constitute "directory information" and may be disclosed, without consent, to the Settlement Claims Administrator for purposes of providing class notice in this litigation if (a) the Defendant has previously provided public notice that the mailing addresses and email addresses are considered "directory

information" that may be disclosed to third parties including public notice of how students may restrict the disclosure of such information, and (b) the student has not exercised a right to block disclosure of mailing addresses or email addresses ("FERPA Block"). Defendants shall not disclose from education records mailing addresses or email addresses subject to a FERPA Block.

18.     Pursuant to 34 C.F.R. § 99.37(b), the Court further finds that mailing addresses and email addresses in education records of former students of a Defendant constitute "directory information" and may be disclosed, without consent, to the Settlement Claims Administrator for purposes of providing class notice in this litigation, provided that each Defendant continues to honor any valid and un-rescinded FERPA Block.

### Approval of Schedule

19.     Angeion Group and the Fourth Tranche Settling Defendants shall adhere to the following schedule:

    a.  No later than 30 days after the date of this Order, Angeion Group shall begin the process of providing notice to the Settlement Class, in accordance with the Plan of Notice.

    b.  No later than 60 days after the date of this Order, Settlement Class Counsel shall file a motion for attorneys' fees, unreimbursed litigation costs and expenses, and/or service awards for the Class Representatives, pursuant to the terms of the Settlement Agreements.

    c.  By no later than 75 days after the date of this Order, Settlement Class Members may request exclusion from the Settlement Class or submit any objection to the proposed Settlements or to the proposed allocation plan summarized in the notice, or to Settlement Class Counsel's request for attorneys' fees, unreimbursed litigation costs and expenses, and/or service awards to the Class Representatives. All objections must be in writing and filed with the Court, with copies sent to the Claims Administrator, and include the following information: (1) the

name of the case (*Henry, et al. v. Brown University, et al.*, Case No. 1:22-cv-00125); (2) the individual's name and address and if represented by counsel, the name, address, and telephone number of counsel; (3) proof of membership (such as, for instance, evidence of an accepted financial aid award from a Defendant University), indicating that the individual is a member of the Settlement Class; (4) a statement detailing all objections to the Settlements; and (5) a statement of whether the individual will appear at the Fairness Hearing, either with or without counsel. All requests for exclusion from the Settlement Class must be in writing, mailed to the Claims Administrator, and include the following information: (1) the name of the case (*Henry, et al. v. Brown University, et al.*, Case No. 1:22-cv-00125); (2) the individual's name and address and if represented by counsel, the name, address, and telephone number of counsel; (3) proof of membership (such as, for instance, evidence of an accepted financial aid award from a Defendant University); (4) a statement indicating that the individual is a member of the proposed Settlement Class and wishes to be excluded from the Settlement Class; and (5) an individual signature by the Settlement Class member.

      d.    No later than 90 days after the date of this Order, Settlement Class Counsel shall file all briefs and materials in support of final approval of the Fourth Tranche Settlements.

      e.    The Fairness Hearing on the Fourth Tranche Settlements shall take place on June 20, 2025 at 11:00 a.m. Central time, by video conference.

Dated: January 24, 2025                 **SO ORDERED**

                                      Matthew F. Kennelly

2007 WL 2085357

Only the Westlaw citation is currently available.

NOT FOR PUBLICATION

United States District Court, D. New Jersey.

Robert A. JONES, o/b/o himself and
all others similarly situated, Plaintiff,

v.

COMMERCE BANCORP, INC.;
Commerce Bank, N.A., Defendants.

Civil No. 05–5600 (RBK).
|
July 16, 2007.

**Attorneys and Law Firms**

Joseph A. Osefchen, The Law Firm of Philip Stephen Fuoco,
Philip Stephen Fuoco, Haddonfield, NJ, for Robert A. Jones.

Jordana Cooper, Kit Applegate, Blank Rome, LLP, Cherry
Hill, NJ, for Commerce Bancorp, Inc., Commerce Bank, N.A.

**OPINION**

KUGLER, United States District Judge.

 **\*1** This matter comes before the Court on a motion
by Plaintiff Robert A. Jones ("Plaintiff") for preliminary
approval of a proposed class action settlement. Specifically,
Plaintiff moves for an order: (1) preliminarily approving the
proposed class settlement; (2) certifying the settlement class
for purposes of the proposed settlement; (3) directing that
notice of the proposed settlement be given to members of
the settlement class; and (4) setting a date for formal hearing
on the proposed settlement. Defendants Commerce Bancorp,
Inc. and Commerce Bank (collectively "Commerce" or
"Defendant") do not oppose the motion. For the reasons set
forth below, the Court grants Plaintiff's motion.

**I. Background**

Plaintiff states in the Second Amended Class Action
Complaint (the "Complaint") that five middle and upper-
level Commerce Bank employees obtained confidential
customer account information, including account numbers
and balances, from the bank's computer database and sold
the information to Orazio Lembo ("Lembo"). (Compl.¶¶

11–14.) Lembo then sold this information to third parties,
including as many as forty debt collection entities. (Compl.¶
12.) The Hackensack Police Department arrested the involved
Commerce employees on April 27, 2005. (Compl.¶ 11.)
According to the police, the employees sold confidential
information to Lembo over a four-year period. (Compl.¶
15.) Lembo possessed confidential banking information of
over a half a million bank customers, including numerous
Commerce customers (Compl.¶ 16.)

The police told Commerce the names of its customers whose
information Lembo possessed. (Compl.¶ 17.) Commerce
then sent a form notice to affected customers, including
Plaintiff, which stated that "confidential account information"
may have been "inappropriately viewed or misused by
former bank employees." (Compl.¶ 18.) The notice did not
mention that the arrested employees were actually current
employees, that they obtained the confidential information
from Commerce records, or that they resold the information
to Lembo. (Compl.¶¶ 19–21.) Commerce did not offer to
change account numbers, provide free checks, or provide
credit monitoring services to customers with compromised
accounts; rather, Commerce suggested these customers place
a fraud alert on their credit reports. (Compl.¶¶ 22–24.)

Plaintiff alleges that Commerce had a legal duty to take
reasonable steps to protect customer account information
from unauthorized access, use, or distribution by Commerce
employees and to promptly alert customers when this
occurred. (Compl.¶ 25.) Plaintiff further alleges that
Commerce failed to take adequate precautions to safeguard
customer information. (Compl.¶ 27.)

Plaintiff alleges counts of negligence, invasion of privacy,
breach of the common law duty of bank confidentiality,
violation of the New Jersey Consumer Fraud Act, breach
of contract, breach of express warranty, and violations
of N.J.S.A. §§ 2A:38A–3 and 2A:38A–5. The proposed
settlement stipulates that Commerce provide new bank
account numbers, purchase new checks bearing the new
account numbers, and purchase credit monitoring services to
detect fraud on behalf of Plaintiff and the class he represents.

**II. Preliminary Approval of Proposed Class Action
Settlement**

 **\*2** Review of a proposed class action settlement is a two-
step process: preliminary approval and a subsequent fairness
hearing. *In re Initial Pub. Offering Sec. Litig.,* 226 F.R.D. 186,
191 (S .D.N.Y.2005). Courts make a preliminary evaluation

of the fairness of the settlement, prior to directing that notice be given to members of the settlement class. *In re Nasdaq Mkt. Makers Antitrust Litig.,* 176 F.R.D. 99, 102 (S.D.N.Y.1997). Preliminary approval is not binding, and it is granted unless a proposed settlement is obviously deficient. *Cf. Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 116 (2d Cir.2005) (quoting *Manual for Complex Litigation, Third,* § 30.42 (West, 1995)) ("A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery."); *In re Nasdaq Mkt. Makers Antitrust Litig.,* 176 F.R.D. at 102 (quoting *Manual for Complex Litigation,* Third, § 30.41 (West, 1995)) ("Where the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval, preliminary approval is granted.").

The standards for preliminary approval are met in this case. The proposed settlement appears to be the result of serious negotiation between counsel for Plaintiff and Defendant. Furthermore, Commerce agreed in the proposed settlement to provide virtually all of the relief sought in the Complaint. (Pl.'s Br. 7). The proposed settlement is thus clearly reasonable and does not present any obvious deficiency. Lastly, the proposed settlement does not appear to unreasonably favor class representatives or any segment of the class. The Court emphasizes that the reasonable amount of payments to the class representative and class counsel are subject to approval.

### III. Certification of Settlement Class

Plaintiff moves, pursuant to Federal Rule of Civil Procedure 23, to certify a settlement class of "all Commerce Bank Customers who received a form notice from Commerce Bank" informing them of a security breach of their confidential information.

#### 1. *Standard for Class Certification*

(a) One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the

representative parties will fairly and adequately protect the interests of the class.

(b) An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

...

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

**\*3**  Fed.R.Civ.P. 23.

#### 2. *Class Certification*

Plaintiff argues that the putative class in this case meets each of the four requirements of Rule 23(a) for class certification: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. In addition, Plaintiff argues, citing Rule 23(b)(3), that the action is maintainable because questions of law and fact common to the class predominate over questions affecting only individual members and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Numerosity is satisfied because there are more than 1700 putative class members. There is no threshold number necessary to satisfy the numerosity requirement, but courts in this Circuit generally hold that classes of close to one hundred members are sufficient. *See Eisenberg v. Gannon,* 766 F.2d 770, 785–86 (3d Cir.1985) ("The allegation of more than [ninety] geographically dispersed plaintiffs met the numerosity requirement...."); *Weiss v. York,* 745 F.2d 786, 809 (3d Cir.1984) (determining that a ninety-two plaintiff class was sufficiently numerous to satisfy Rule 23(a)(1)); *Id.* at 809 n. 35 (stating that numbers exceeding one hundred will, with exception, sustain the numerosity requirement). Here, the potential class is approximately seventeen times

larger than classes considered sufficiently numerous by courts in this Circuit. Due to the size of the class, and because Defendant does not challenge certification under the numerosity requirement, Plaintiff satisfies numerosity.

Plaintiff further demonstrates commonality. To demonstrate commonality, plaintiff needs to show that "at least one common question of fact or law exists among the putative class." *Stewart v. Abraham,* 275 F.3d 220, 227 (3d. Cir.2001). Class members do not need to share identical claims or claims arising from the same factual scenario. *See In re Prudential Ins. Co. of Am. Sales Practice Litig. Agent Actions,* 148 F.3d 283, 310–11 (3d Cir.1998) (stating that a finding of commonality does not require that all class members share identical claims); *Baby Neal v. Casey,* 43 F.3d 48, 57 (1994) ("[F]actual differences among the claims of the putative class members do not defeat certification."). In this case, putative class members received the same letter, sent pursuant to the same circumstances. Because there is a common issue of law arising from the same factual scenario, and due to the fact that Defendant does not challenge commonality, Plaintiff satisfies the commonality requirement.

Likewise, Plaintiff satisfies the typicality requirement. A named Plaintiff's claims are typical where each class member's claims arise from the same course of events and each class member makes similar legal arguments to prove the defendant's liability. *Robinson v. Metro–North Commuter R.R. Co.,* 267 F.3d 147, 155 (2d Cir.2001). The typicality requirement precludes certification of classes where the legal theory of the named plaintiff potentially conflicts with the legal theory of the absentees; it requires that common claims are comparably central to the named and absentee party claims. *Baby Neal,* 43 F.3d at 57. Typicality ensures that the interest of the class and class representative are aligned so that the latter works to remedy the injuries to the former. *Id.* Because Plaintiff's "essential legal claim" (that Defendant breached its legal duty to protect customer account information and to promptly alert customers when the security breach occurred) and the "factual matrix that suggests this claim" (the form letter itself) are the same as those of all plaintiffs in the proposed class, Plaintiff demonstrates typicality. *See Weiss v. York Hosp.,* 745 F.2d 786, 810 (3d Cir.1984). In addition, Defendant does not challenge typicality.

**\*4** Plaintiff further demonstrates adequacy of representation. Adequacy of representation is a two-part inquiry that applies to both Plaintiff's counsel and Plaintiff.

First, adequacy of representation asks whether plaintiff's attorney is qualified, experienced, and able to conduct the litigation. *In re Prudential,* 148 F.3d at 312 (citing *In re Gen. Motors Corp. Pick–Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F.3d 768, 800 (3d Cir.1995)). Second, "it serves to uncover conflicts of interest between the named parties and the class they seek to represent." *In re Prudential,* 148 F.3d at 312 (citing *Amchem Products v. Windsor,* 521 U.S. 591, 594 (1997)). In this case, Plaintiff shows that his attorneys are qualified, experienced, and generally able to conduct this litigation, and because Plaintiff shares the class interest in establishing that Commerce breached its legal duty, Plaintiff is an adequate class representative. As with the other prongs of the analysis, Defendant does not challenge the adequacy of representation.

Thus, Plaintiff establishes the Rule 23(a) elements of numerosity, commonality, typicality, and adequacy of representation. Rule 23(b)(3) requires the district court to make two additional findings: predominance and superiority. For class certification, common questions of law and fact must predominate over questions affecting only individual members. *In re Prudential,* 148 F.3d at 314 Furthermore, the class action device must be superior to all other available means of handling the litigation. *Id.* Class treatment is superior where individual claims are small or modest. *Id.* at 315. As to the element of predominance, Plaintiff argues that the class "was affected and treated uniformly and will be treated thus under the terms of the proposed settlement." (Pl.'s Br. 10.) Plaintiff further points out that class action is the best method for this claim because "where, as here, the claims reflect a lack of monetary damages, superiority is readily satisfied." (*Id* .) There is no evidence that any litigation concerning this controversy, other than Plaintiff's individual complaint, has already commenced; further, there is no evidence that this forum is an undesirable one for the concentration of this litigation, or that the management of this class action would present any particular difficulties. In light of Defendant's failure to challenge these assertions, this Court holds that Plaintiff has met the predominance and superiority requirements under Rule 23(b)(3).

Because the proposed class meets the requirements of Rule 23(a) and (b)(3), the class is suitable for certification. However, a court that certifies a class must appoint class counsel. Fed.R.Civ.P. 23(g)(1)(A). In appointing class counsel, the court *must* consider "the work counsel has done in identifying or investigating potential claims in the action," "counsel's experience in handling class action

and other complex litigation," "counsel's knowledge of the applicable law," and "the resources counsel will commit to representing the class." Fed.R.Civ.P. 23(g)(1)(C)(i) (emphasis added). While Plaintiff's counsel does not specifically provide evidence of any of these considerations, the Court acknowledges that counsel possesses experience handling class actions and other complex litigation, counsel investigated potential claims and developed legal theories to support those claims, and counsel appears familiar with the applicable laws. See Bristow v. Lycoming Engines, No. 06–1947, 2007 WL 1752602, at *5 (E.D. Cal. June 15, 2007). Accordingly, this Court can appoint class counsel and certify the class.

### III. Approval of Class Notice

**\*5** Plaintiff moves, pursuant to Federal Rule of Civil Procedure 23, that this Court direct notice to all class members. The Court "must direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise." Fed.R.Civ.P. 23(e)(B). Plaintiff submitted a proposed notice of class certification and settlement, with opt-out instructions, and a proposed claim form. The Court approves both documents.

The proposed class certification and settlement notice appears to give class members a fair opportunity to consider the proposed settlement and raise objections. The notice reasonably inform class members of: (1) appropriate information regarding the litigation, the class, the class representative, class counsel, and the essential terms of the settlement agreement; (2) appropriate information about counsel's forthcoming application for attorney's fees; (3) appropriate information about how to participate in the settlement; (4) appropriate information about this Court's final approval procedure; and (5) appropriate information about how to challenge or opt-out of the settlement. See Rosenburg v. IBM Corp., No. 06–00430, 2007 WL 128232, at *5 (N.D.Cal. Jan. 11, 2007). Furthermore, the objection process is spelled out in detail and the notice states with specificity that class members may object to the settlement, the class representative, the class counsel, the award of attorney's fees, and the award to the class representative. The notice is clear that class members need to complete a claim form to receive the benefits of the settlement, and the claim form adequately informs class members of the process they must follow. Lastly, the proposed distribution of notice to class members by first class mail is reasonable because no alternative method of distribution is more likely to notify class members who may not receive notice pursuant to the proposed distribution plan.

### IV. Final Approval Hearing

The Court schedules a hearing to determine whether to grant final approval of the proposed settlement for Monday, October 15, 2007 at 9:30 AM.

### IV. Conclusion

For the foregoing reasons, the Court grants Plaintiff's motion and preliminarily approves the proposed class action settlement, certifies the settlement class, directs that notice be given to members of the settlement class, and sets a date for the final settlement hearing.

### All Citations

Not Reported in F.Supp.2d, 2007 WL 2085357

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 2699390
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

In re K–DUR ANTITRUST LITIGATION.
This Document Relates To: All Actions.

Civil Action No. 01–1652 (JAG).
|
MDL Docket No. 1419.
|
April 14, 2008.

**SPECIAL MASTER'S REPORT AND RECOMMENDATION ON THE DIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

ORLOFSKY, Special Master.

### INTRODUCTION

**\*1** This consolidated antitrust action has been transferred to the District of New Jersey by the Judicial Panel on Multidistrict Litigation pursuant to 28 U.S.C. § 1407. Pursuant to Rule 53 of the Federal Rules of Civil Procedure [1] and by consent of all parties in the above-captioned action, I have been appointed by order of this Court, dated April 12, 2006, to preside as a Special Master to review and decide all currently pending and future motions directed to Judge Joseph A. Greenaway, Jr. and Magistrate Judge Madeline Cox Arleo including, but not limited to discovery disputes, class certification and summary judgment (the "Appointment Order") (Doc. No. 316). The Appointment Order provides that the decision of the Special Master on any matter before the Special Master will conclusively resolve that matter unless an appropriate objection is filed pursuant to Fed.R.Civ.P. 53(g).

This Report and Recommendation addresses the Direct Purchaser Plaintiffs' ("DP Plaintiffs") Motion for Class Certification. After consideration of the parties' voluminous memoranda of law and accompanying exhibits in support of, and in opposition to, this Motion, [2] as well as the oral argument of counsel heard on November 30, 2007, and based upon the analysis that follows, I conclude that the class, as proposed by the DP Plaintiffs and modified herein, satisfies the requirements of Fed.R.Civ.P. 23. Accordingly, the DP

Plaintiffs' Amended Motion for Class Certification will be granted.

### BACKGROUND

The factual background of this consolidated action and the underlying motions have been set forth in detail in Judge Greenaway's decision in this case, *see In re K–Dur Antitrust Litig .,* 338 F.Supp.2d 517 (D.N.J.2004), and my Report and Recommendation on: (1) Defendants Schering–Plough Corporation, Key Pharmaceuticals, Inc. and Upsher–Smith Laboratories, Inc.'s Motion for Sanctions against Plaintiff Commonwealth of Pennsylvania; (2) Plaintiff Commonwealth of Pennsylvania's Cross–Motion to Dismiss; and (3) Motion of James Morgan to Intervene as Class Representative (Docket No. 328). Familiarity with that factual background is presumed and will not be repeated in this Report and Recommendation except where necessary to resolve these motions.

### DISCUSSION

**I. THE DP PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

In the Motion before me, putative class representative Louisiana Wholesale Drug Co

> ("LWD") requests certification of the following class: All persons or entities who have purchased K–Dur 20 directly from Schering at any time during the period November 20, 1998, through September 1, 2001.

*See* DP Plaintiffs' Amended Complaint ("Am. Compl." at ¶ 11; Pl. Br. at 4–5.) Excluded from the proposed class are:

> Defendants and their officers, directors, management and employees, subsidiaries and affiliates, as well as federal government entities. Also excluded are persons or entities who have neither purchased generic versions of K–Dur 20, nor obtained increased discounts on brand name K–Dur 20, after the introduction of generic versions of K–Dur 20.

**\*2** *Id.*

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.    1

## II. *LEGAL STANDARD GOVERNING CLASS CERTIFICATION*

Federal Rule of Civil Procedure 23 prescribes the framework for determination of a motion seeking class certification. In order to certify a class, I must conclude that the Plaintiffs have satisfied all of the prerequisites of Fed.R.Civ.P. 23(a) and one of the requirements of Fed.R.Civ.P. 23(b). *See, e.g., Georgine v. Amchem Prods., Inc.,* 83 F.3d 610, 624 (3d Cir.1996), *aff'd,* 521 U.S. 591 (1997); *Baby Neal v. Casey,* 43 F.3d 48, 55 (3d Cir.1994). Plaintiffs bear the burden of showing that the putative class should be certified. *Weisfeld v. Sun Chemical Corp.,* 210 F.R.D. 136, 139 (D.N.J.2002) (citing *Morisky v. Public Serv. Elec. & Gas Co.,* 111 F.Supp.2d 493, 499 (D.N.J.2000)).

A class may be certified only if the court "is satisfied, after a rigorous analysis, that the prerequisites of [Rule 23] have been satisfied." *Gen. Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 161 (1982). As the Court in *Falcon* observed, " 'the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.' " *Id. at* 160 (quoting *Coopers & Lybrand v. Livesay,* 437 U.S. 463 (1978) (internal quotations omitted)). As a result, "it may be necessary for the court to probe beyond the pleadings before coming to rest on the certification question." *Id. at* 160. The foregoing approach is reflected in the Third Circuit's class certification jurisprudence, which recognizes that ' "[b]efore deciding whether to allow a case to proceed as a class action, ... [courts] should make whatever factual and legal inquiries are necessary under Rule 23.' " *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 166 (3d Cir.2001) (quoting *Szabo v. Bridgeport Machs., Inc.,* 249 F.3d 672, 676 (7th Cir.2001)). Thus, "a preliminary inquiry into the merits is sometimes necessary to determine whether the alleged claims can be properly resolved as a class action." *Newton,* 259 F.3d at 168.

In conducting the required rigorous analysis, however, I may not credit one party's evidence or evaluate the merits of the parties' legal or factual claims. *See, e.g., Weisfeld v. Sun Chem. Corp.,* 210 F.R.D. 136, 139 (D.N.J.2002); *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig,* 174 F.R.D. 332, 339 (D.N.J.1997); *In re Pressure Sensitive Labelstock Antitrust Litig,* MDL No. 1556, 2007 WL 4150666 (M.D.Pa. Nov. 19, 2007). Guided by these standards, I turn to the requirements of Rule 23.

## III. *APPLICATION OF RULE 23 TO THE DP PLAINTIFFS' MOTION*

### A. *Rule 23(a) Requirements*

A putative class representative seeking certification of a class must satisfy the four general prerequisites of Fed.R.Civ.P. 23(a) and establish that:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

**\*3** Fed.R.Civ.P. 23(a). "The requirements of Rule 23(a) are meant to assure both that class action treatment is necessary and efficient and that it is fair to absentees under the particular circumstances." *Baby Neal,* 43 F.3d at 55.

#### 1. *Numerosity*

Rule 23(a)(1) requires that the class be so numerous that joinder of its members is impracticable. No threshold number is required to satisfy the numerosity requirement, and the most important factor is whether joinder of all the parties would be impracticable for any reason. *See, e.g., Stewart v. Abraham,* 275 F.3d 220, 227–28 (3d Cir.2001) (noting that there is no minimum number to satisfy numerosity and observing that, generally, if the potential number of plaintiffs exceeds 40, the numerosity requirement has been met); *J.B.D.L. Corp. v. Wyeth–Ayerst Laboratories, Inc.,* 225 F.R.D. 208, 213 (S.D.Ohio 2003) ("The numerosity requirement does not impose an absolute numerical limitation."); *In re Terazosin Hydrochloride Antitrust Litig.,* 220 F.R.D. 672, 684 (S.D.Fla.2004) ("The numerosity requirement is met when it would be inconvenient or difficult to join all of the class members, and may be satisfied with as few as 25–30 class members."). Numerosity is not determined solely by the size of the class; the geographic location of class members is also considered in determining whether joinder would be impracticable.[3] *See, e.g., Mardsen v. Select Medical Corp.,*

246 F.R.D. 480, 484 (E.D.Pa.2007); *In re J.B.D.L.,* 225 F.R.D. at 213; *In re Terazosin,* 220 F.R.D. at 685.

It is undisputed that the proposed class of DP Plaintiffs consists of more than 40 members. *See, e.g.,* Def. Sur–Reply at 3–4 and n. 5 (referring to putative class of 45–47 members); Rubinfeld 8/9/07 Rep. at 10–12 and Exh. 3 (opining that class has 45 members); Leitzinger 11/2/07 Rep. at 6 and Exh. 3 (identifying class of 47 members). Indeed, Defendants Briefs do not expressly contest the numerosity requirement of Rule 23(a)(1) but, rather, refer to the size of the proposed class only in the context of their arguments regarding the superiority requirement of Rule 23(b)(3). *See* Def. Resp. at 1, 14–15; Def. Sur–Reply at 3–4. [4]

Notably, other courts have certified classes similar in size and composition to the one proposed here. *See In re Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd. ("Ovcon"),* No. 05–2195, 2007 WL 3257015, *10 (D.D.C. Oct. 22, 2007) (certifying class of approximately 30 members represented by LWD, among others) (citing *EEOC v. Printing Indus. of Metro. Washington, D.C., Inc.,* 92 F.R.D. 51, 53 (D.D.C.1996) ("as few as 25–30 class members should raise a presumption that joinder would be impracticable, and thus, the class should be certified"); *Riordan v. Smith Barney,* 113 F .R.D. 60, 62 (N.D.Ill.1986) (certifying class of 29 members and citing cases certifying classes of 10–23 members); *Town of New Castle v. Yonkers Contracting Corp.,* 131 F.R.D. 38, 40–41 (S.D.N.Y.1990); *Alvarado Partners, L.P. v. Mehta,* 130 F.R.D. 673, 675 (D.Colo.1990) (certifying class of 33 members)). *See also In re Nifedipine Antitrust Litig.,* 246 F.R.D. 365, 368–69 (D.D.C.2007); *In re Cardizem CD Antitrust Litig.,* 200 F.R.D. 297, 303 (E.D.Mich.2001); *In re Busiprone Patent Litig.,* 210 F.R.D. 43, 57 (S .D.N.Y.2002).

**\*4** In my view, the proposed DP Plaintiff class is sufficiently large and, presumably, geographically dispersed, to render joinder of all members impracticable and satisfy the numerosity requirement of Rule 23(a)(1).

### 2. *Commonality*

Rule 23(a)(2) requires plaintiffs to demonstrate that there are questions of law or fact common to the class. A single common issue will satisfy the commonality requirement. *See Johnston v. HBO Film Mgmt., Inc.,* 265 F.3d 178, 184 (3d Cir.2001). As the Third Circuit observed in *Baby Neal,*

> The commonality requirement will be satisfied if the named plaintiffs share at least one common question of fact or law with the grievances of the prospective class. [citation omitted] Because the requirement may be satisfied by a single common issue, it is easily met, as at least one treatise has noted. *See* H. Newberg & A. Conte, 1 Newberg on Class Actions § 3.10, at 3–50 (1992). *Furthermore, class members can assert such a single common complaint even if they have not all suffered actual injury; demonstrating that all class members are subject to the same harm will suffice.* [citations omitted]

*Baby Neal,* 43 F.3d at 56 (italics in original; underlining added). Courts routinely find commonality among antitrust class members alleging conspiracy to fix prices, as well as monopolization . [5] *See, e.g., Jerry Enterprises of Gloucester County, Inc. v. Allied Beverage Group, L.L.C.,* 178 F.R.D. 437, (D.N.J.1998) (Orlofsky, J.) (noting that in a price-fixing antitrust case, "the existence, scope, duration, effect, and ultimately, the illegality, of the alleged conspiracy would appear, at this point, to be the overwhelming centerpiece of this litigation"); *Ovcon,* 2007 WL 3257015, at *5 (noting that numerous courts have found commonality satisfied by allegations concerning the existence, scope and efficacy of an alleged antitrust conspiracy); *In re Terazosin Hydrochloride Antitrust Litig.,* 220 F.R.D. at 686 (in antitrust cases, courts "have consistently held that allegations of price-fixing, monopolization and conspiracy by their very nature involve common questions of law or fact"); *In re Bulk [Extruded] Graphite Prods. Antitrust Litig,* No. 02–6030, 2006 WL 891362, *5 (D.N.J. April 4, 2006) (existence, scope and efficacy of conspiracy to fix or stabilize prices satisfied requirement of Rule 23(a)(2)); *In re OSB Antitrust Litig,* No. 06–826, 2007 WL 2253418, *3 (E.D.Pa. Aug. 3, 2007) (common issues included, *inter alia,* whether defendants engaged in conspiracy, the conspiracy's duration and extent).

In this case, DP Plaintiffs' claims raise several common issues of fact and law, including, *inter alia,* (1) whether Defendants' agreements violate Section 1 of the Sherman Act, 15 U.S.C.

§ 1; (2) whether the agreements delayed the entry of generic versions of K–Dur 20; and (3) whether Defendants' alleged conduct caused the DP Plaintiffs to pay more for K–Dur 20 than they would have absent the alleged conduct. *See* Pl. Br. at 14; Pl. Reply at 12–19. Defendants have not contested the DP Plaintiffs' showing of commonality under Rule23(a), [6] and I agree that the proposed class satisfies the commonality requirement.

### 3. *Typicality*

**\*5** The Third Circuit has described the typicality requirement as "intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented." *Baby Neal*, 43 F.3d at 57 (citing 3B Moore & Kennedy, ¶ 23.06–02; 1 Newberg & Conte § 3.13. As the Court in *Baby Neal* further explained:

> The typicality criterion is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees by requiring that the common claims are comparably central to the claims of the named plaintiffs as to the claims of the absentees.

*Id.* (citing *Weiss v. York Hosp.,* 745 F.2d 786, 810 (3d Cir.1984)). Like adequacy of representation, typicality "evaluates the sufficiency of the named plaintiff." *Hassine v. Jeffes,* 846 F.2d 169, 177 n. 4 (3d Cir.1988).

To evaluate typicality, the court asks "whether the named plaintiffs' claims are typical, in common sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class." *Baby Neal,* 43 F.3d at 55. Cases alleging that the same unlawful conduct affects both the named plaintiffs and the absent class members usually satisfy the typicality requirement despite individual fact patterns underlying the individual claims. *Baby Neal,* 43 F.3d at 58 (citing 1 Newberg & Conte § 3.13). "If the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of factual differences." *Newton,* 259 F.3d at 183–84. *See also*

*Baby Neal,* 43 F.3d at 58 (" 'Factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory.' ") (quoting *Hoxworth v. Blinder, Robinson & Co.,* 980 F.2d 912, 923 (3d Cir.1992));

"To satisfy typicality, plaintiffs must show that the class representatives have legal interests such that pursuit of their own goals will benefit the entire class. Even if there are 'pronounced factual differences' among the plaintiffs, typicality is satisfied as long as there is a strong similarity of legal theories and the named plaintiff does not have any unique circumstances." *In re Microcrystalline Cellulose Antitrust Litig.,* 218 F.R.D. 79, 84 (E.D.Pa.2003). *See also In re Mercedez–Benz Antitrust Litig.,* 213 F.R.D. 180, (D.N.J.2003) ("[W]hile the Court must ensure that the interests of the plaintiffs are congruent, the Court will not reject the plaintiffs' claim of typicality on speculation regarding conflicts that may arise in the future").

The DP Plaintiffs assert that typicality is satisfied because the claims of LWD and absent Class members rely on the same legal theories and arise from the same "core pattern" of alleged conduct by the Defendants, namely, "Defendants' agreements that delayed the market entry of generic versions of K–Dur 20." *See* Pl. Br. at 15; Pl. Reply at 20. According to DP Plaintiffs, "[t]he delay in generic entry blocked *all* Class members from purchasing less expensive, generic potassium chloride 20." *See* Pl. Br. at 15 (italics in original).

**\*6** In their opposition to the DP Plaintiffs' Motion, Defendants challenge typicality as an adjunct to their argument that the adequacy requirement of Rule 23(a)(4) is not satisfied due to alleged conflicts within the proposed Class. *See* Def. Resp. at 39 n. 26 (arguing that alleged conflicts mean the proposed Class also fails the typicality requirement of Rule 23(a)(3)). Accordingly, I will address Defendants' arguments regarding alleged class conflicts in my analysis of the adequacy requirement, *infra.*

At the November 30, 2007 argument, Defendants' counsel also suggested that because Defendants intend to assert legal and factual defenses as to some Class members, typicality is defeated. *See* 11/30/07 Tr. at 68. I disagree. "[T]he 'presence of a unique defense will not ... destroy typicality [unless] it will skew the focus of the litigation and create a danger that absent class members will suffer *if their representative is preoccupied with defenses unique to it.* ' " *Ovcon,* 2007 WL

3257015, at *7 (emphasis added) (quoting *In re Cardizem*, 200 F.R.D. at 304–05 (internal quotations omitted)).

As a threshold matter, Defendants have not argued that the putative class representative, LWD, is subject to the individualized defenses alluded to by counsel at oral argument.[7] *See* 11 /30/07 Tr. at 68. Thus, there do not appear to be any unique defenses with which LWD could be preoccupied to the detriment of absent class members. Moreover, to the extent that some individualized defenses may exist as to other Class members, I conclude that they can be resolved without skewing the focus of the litigation and, thus, do not pose a barrier to class certification. *See Ovcon*, 2007 WL 3257015, at *7 (citing *In re Cardizem*, 200 F.R.D. at 305). *See also In re Busiprone*, 210 F.R.D. at 58–59 (rejecting argument that because Big Three allegedly could not establish injury, their claims were not "typical," and reasoning that "differences in the particular injuries faced by particular member of the class ... are insufficient to defeat a motion for class certification").

In sum, Defendants have not demonstrated that LWD's claims are atypical of those of the proposed Class. *See In re Bulk [Extruded] Graphite Prods. Antitrust Litig.*, No. 02–6030, 2006 WL 891362, *6 (D.N.J. April 4, 2006). On the contrary, the DP Plaintiffs allege that all putative class members suffered injury as a result of Defendants' alleged anticompetitive conduct. Although individual damages may differ, LWD's claims are based on the same legal theory as the class. *In re OSB Antitrust Litig.*, 2007 WL 2253418, at *3. Accordingly, I conclude that the DP Plaintiffs have satisfied the typicality requirement of Rule 23(a)(3).

**4. *Adequacy of Representation***
Under Rule 23(a)(4), both the class representatives and their attorneys must "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). *See also Weisfeld*, 210 F.R.D. at 140; *Bogosian v. Gulf Oil Co.*, 561 F.2d 434, 449 (3d Cir.1977). As the Third Circuit explained in *Bogosian*:

> **\*7** This prerequisite embodies concerns which fall into two categories: that the representatives and their attorneys will competently, responsibly and vigorously prosecute the suit, and that the relationship of the representative parties' interests to

> those of the class are such that there is not likely to be divergence in viewpoint or goals in the conduct of suit.

*Bogosian*, 561 F.2d at 449.

With respect to class counsel, courts typically consider counsel's experience in litigating antitrust cases to be a key factor in assessing the adequacy of class counsel. *See In re NASDAQ Market Makers Antitrust Litig*, 169 F.R.D. 493, 515 (S.D.N.Y.1996); *In re Pressure Sensitive Labelstock*, 2007 WL 4150666, at *11; *In re Microcrystalline Cellulose Antitrust Litig.*, 218 F.R.D. 79, 84 (E.D.Pa.2003).

With respect to the class representatives, the adequacy requirement essentially seeks to prevent conflicts of interest among the class, and it is generally satisfied as long as the plaintiff "posses[es] the same interest and suffer[s] the same injury as class members." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997) (internal quotation omitted). "The Supreme Court has counseled that [the adequacy] element 'serves to uncover conflicts of interest between named parties and the class they seek to represent.' " *Newton*, 259 F.3d at 185 (quoting *Amchem*, 521 U.S. at 625).

As a preliminary matter, Defendants do not dispute that counsel for the proposed DP Plaintiff Class have extensive experience and expertise in antitrust, class action and complex civil litigation, including actions similar to the one at bar. *See* Pl. Br. at 25. I am likewise amply satisfied that counsel for the proposed Class have vigorously and capably prosecuted this action, conducting appropriate discovery and presenting detailed analyses in memoranda, expert declarations and oral argument.[8] *See, e.g., In re OSB Antitrust Litig.*, 2007 WL 2253418, at *4; *In re Microcrystalline*, 218 F.R.D. at 84. Accordingly, I find that the adequacy requirement of Rule 23(a)(4) is satisfied with respect to Class counsel.

As is discussed in more detail below, the disputed issues here concern the adequacy of the Class representative, specifically, Defendants' assertion that alleged conflicts between LWD and certain other Class members preclude certification.

**a. *Class Members Who Allegedly Benefitted From Delayed Generic Entry***

Defendants assert that a conflict exists between Class members who benefit from earlier generic entry and those whose business is allegedly harmed by generic entry. *See* Def. Resp. at 39–42. According to Defendants, generic entry harms the Big Three wholesalers because: (1) they lose sales volume when some of their customers switch to buying generic drugs directly from the manufacturer (referred to as "generic bypass"); (2) to the extent they resell drugs based on a percentage of the price under "cost-plus" contracts, they make less money on lower cost generics; (3) they realize a smaller profit on repackaging less expensive generic drugs; and (4) "forward buying"—*i.e.,* buying large quantities just before a manufacturer price increase, then reselling at the higher price in effect at the time of resale—is not profitable with generic drugs, the prices of which tend to decrease after generic entry.[9] *Id.* at 41.

**\*8** Defendants' arguments against certification based on the foregoing alleged conflicts between the proposed Class and the Big Three fail for two primary reasons. First, Defendants' argument is based primarily on the reasoning of the Eleventh Circuit Court of Appeals in *Valley Drug Co. v. Geneva Pharm., Inc,* 350 F.3d 1181 (11th Cir.2003), which I previously considered and rejected.[10] *See* Jan. 2, 2007 Report.

In *Valley Drug,* the Eleventh Circuit concluded that the proposed named plaintiffs could not adequately represent the interests of a direct purchaser class that included the Big Three, because the Big Three "appear to benefit from the effects of the conduct alleged to be wrongful by the named plaintiffs because their net economic situation is better off when the branded drugs dominate the market." *Valley Drug,* 350 F.3d at 1191. According to the court in *Valley Drug,* "this economic reality would lead the national wholesalers and other similarly situated class members to have divergent interests and objectives from the named representatives with respect to the fundamental issues in controversy in this litigation." *Id.* at 1193.

In my Jan. 2, 2007 Report, I noted my disagreement with *Valley Drug,* and determined, as have other courts, that the Eleventh Circuit's conclusion in that case is inconsistent with the Supreme Court's decisions in *Hanover Shoe v. United Shoe Machinery Corp.,* 392 U.S. 481 (1968) and *Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977). *See* Jan. 2, 2007 Report. *See also Ovcon,* 2007 WL 3257015, \*8 (disagreeing with *Valley Drug* because it conflicts with *Hanover Shoe* and *Illinois Brick* ); *In re Hypodermic Product Direct Purchaser*

*Antitrust Litig,* No. 05–CV–4465, 2006 U.S. Dist. LEXIS 89353, \*17–20 (D.N.J. Sept. 7, 2006) (rejecting *Valley Drug* as inconsistent with Third Circuit precedent).

Under *Hanover Shoe* and *Illinois Brick,* "[a]ntitrust injury is considered complete when the direct purchaser pays an illegal overcharge and whether he is able to pass through the overcharge theory of damages is irrelevant to the inquiry." *J.B.D.L. Corp.,* 225 F.R.D. at 216. • Moreover, "under the *Hanover Shoe* rule, 'direct purchasers are not only spared the burden of litigating the intricacies of pass-on but are also permitted to recover *the full amount of the* overcharge.' "[11] *Ovcon,* 2007 WL 3257015, at \*8 (quoting *Illinois Brick,* 431 U.S. at 745–46).

Thus, as I concluded in the Jan. 2, 2007 Report:

> Based on the Supreme Court's decisions in *Hanover Shoe* and *Illinois Brick,* if the [DP Plaintiffs] incurred an overcharge based upon the Defendants' alleged actions, they would be deemed to have suffered an antitrust injury and would be entitled to recover the full amount of the overcharge, regardless of whether they may have benefited in other ways from Defendants' alleged actions.

\* \* \*

Because all members of the putative class in this case will be entitled to the same measure of damages if successful —the amount of the overcharge—there can be no conflict within the class on the issue of damages.

**\*9** *See* Jan. 2, 2007 Report at 21–22. The same analysis applies equally here. Defendants' arguments that the Big Three otherwise benefited from the delayed entry of a generic version of K–Dur 20 "are irrelevant as a matter of law, and cannot serve to demonstrate that a conflict exists between the Plaintiffs' interests and those of the Big Three with respect to this litigation." *Ovcon,* 2007 WL 3257015, at \*9 (rejecting argument that conflicts precluded class certification because Big Three allegedly benefited from delayed generic entry due generic bypass and cost-plus contracts). *See also J.B.D.L. Corp.,* 225 F.R.D. at 216 (certifying direct purchaser class and rejecting argument that conflict existed because some class members allegedly benefited from delayed generic entry through forward buying of brand name drug).

Second, the alleged class conflicts Defendants identify are speculative and are undermined by the record in this case. As one court in this District has noted:

[C]ourts are generally skeptical of defenses to class certification based on conflicts between the proposed class members. "The mere fact that a representative plaintiff stands in a different factual posture is not sufficient to refuse certification ... [t]he atypicality or conflict must be clear and must be such that the interests of the class are placed in significant jeopardy." Courts have "generally declined to consider conflicts, particularly as they regard damages, sufficient to defeat class action status at the outset unless the conflict is apparent, imminent, and on an issue at the very heart of the suit."

*In re Bulk [Extruded] Graphite Prods.,* 2006 WL 891362, at *8 (quoting *Hedges Enters., Inc. v. Continental Group, Inc.,* 81 F.R.D. 461, 466 (E.D.Pa.1979), and *In re NASDAQ Market–Makers Antitrust Litig.,* 169 F.R.D. 493, 514 (S.D.N.Y.1996)). *See also In re Cardizem,* 200 F.R.D. at 306 ("To defeat certification, 'the conflict must be more than merely speculative or hypothetical.' ") (quoting 5 *Moore's Federal Practice,* § 23.25(4)(b)(ii)); *In re Visa Check/Master Money Antitrust Litig.,* 280 F.3d 124, 145 (2d Cir.2001) ("The conflict that will prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite must be fundamental, and speculative conflict should be disregarded at the class certification stage.") (internal quotations and citations omitted), *overruled on other grounds by In re Initial Pub. Offering Sec. Litig.,* 471 F.3d 24 (2d Cir.2006).

Defendants' argument essentially asks me to presume that either the Big Three or the other Class members (consisting of regional wholesalers like LWD, direct purchasing retailers and other direct purchasers) will be disadvantaged by the other's presence in the class. I decline to employ such a presumption where both the named Class Plaintiff and representatives of the Big Three have expressly disavowed any Class conflict. Specifically, in their Brief in support of class certification, the DP Plaintiffs state:

    **\*10**  There are no conflicts between [LWD] and the members of the proposed class, which includes regional wholesalers like [LWD]; larger "national" wholesalers; direct purchasing retailers; and other direct purchasers. [citation omitted] All

share a common interest with [LWD] in proving Defendants' liability and recovering overcharge damages.

*See* Pl. Br. at 16–17 (citing Leitzinger 5/27/05 Decl. at 28 n. 40). Moreover, I note that authorized representatives of each of the Big Three have submitted declarations stating, *inter alia,* that each company "has decided, in its considered best judgment, that: (a) its interests are best served by this action proceeding as a Class Action with [the company] as part of the class; and (b) the Named Plaintiff and its counsel are fully capable of representing the interests of [the company] for purposes of the Class Action." *See* 11/2/07 Pearlman Decl. at Exh. 2 (3/6/07 Aff. of Brian Jones, ABC Vice President, Generic Pharmaceuticals Product Development (the "Jones Aff.") ¶ 7–8), Exh. 3 (Aff. of Saul D. Factor, McKesson Senior Vice President, Product Managment (the "Factor Aff.") ¶ 7–8), and Exh. 4 (Aff. of Michael Kauffman, Cardinal Executive Vice President Supply Chain Services (the "Kauffman Aff.") ¶ 5–6). [12]

Under these circumstances, where both the named Plaintiff and the Big Three have disavowed any potential disadvantage from participating in the same proposed Class, I find no basis to conclude that the inclusion of the Big Three will create an imminent or fundamental conflict within the class. *See Ovcon,* 2007 WL 3257015, at *9.

**b.** *Alleged Conflicts Regarding Legal Theories and Strategy*

Defendants also argue that conflicts may exist within the Class regarding which legal theory and litigation strategies to pursue. *See* Def. Resp. at 41–45. Specifically, Defendants contend that retailer Class members *may prefer* "generic bypass," "cost-plus" or "lost profits" theories rather than the overcharge theory being pursued by LWD. *See* Def. Resp. at 43–45. In addition, Defendants suggest that *potential* conflicts may exist within the proposed Class with respect to the "business interests" of Class members. *See* Def. Resp. at 41–42. Defendants then speculate that "[l]itigants who benefit from the challenged conduct *probably* will adopt different litigation strategies than litigants who suffer from the challenged practice." *Id.*

In my view, the foregoing alleged conflicts are purely hypothetical and, thus, insufficient to defeat class certification. *See, e.g., In re Bulk [Extruded] Graphite*

*Prods.,* 2006 WL 891362, at *8. *See also In re Cardizem,* 200 F.R.D. at 306 ("To defeat certification, 'the conflict must be more than merely speculative or hypothetical.' ") (quoting 5 *Moore's Federal Practice,* § 23.25(4)(b)(ii)); *In re Visa Check/Master Money Antitrust Litig.,* 280 F.3d 124, 145 (2d Cir.2001). Moreover, *if* any actual, fundamental conflict should arise, the opt-out provision of Rule 23(c)(2)(B) is available to Class members whose interests may be affected. This provision "is an important method for determining whether alleged conflicts are real or speculative. It avoids class certification denial for conflicts that are merely conjectural and, if conflicts do exist, resolves them by allowing dissident class members to exclude themselves from the action." 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 3.30 (4th ed.2002).

**\*11**  In sum, based on the foregoing analysis, I find that the proposed DP Plaintiff class satisfies the adequacy requirement of Rule 23(a) (4).

### B. *Rule 23(b)(3) Requirements*

Having met the requirements of Rule 23(a), the DP Plaintiffs must additionally show that the proposed class action is maintainable under one of the three subsections of Fed.R.Civ.P. 23(b). In this case, the DP Plaintiffs are seeking certification pursuant to Fed.R.Civ.P. 23(b)(3), which requires a finding that:

> [Q]uestions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the

difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3). [13]  At its essence, Rule 23(b)(3) requires that " '[i]ssues common to the class must predominate over individual issues, and the class action device must be superior to other means of handling the litigation.' " *Newton,* 259 F.3d at 186–87 (quoting *In re Prudential Ins. Co. Am. Sales Practice Litig .,* 148 F.3d 283, 313–14 (3d Cir.1998)).

### 1. *Predominance*

"Predominance measures whether the class is sufficiently cohesive to warrant certification." *Newton,* 259 F.3d at 187 (citing *Amchem,* 521 U.S. at 623). "Unlike commonality, predominance is significantly more demanding, requiring more than a common claim." *Id.* (citing *Amchem,* 521 U.S. at 623–24). While the commonality requirement of Rule 23(a) can be satisfied by a single issue common to the class, "[p]redominance requires that common issues be both numerically and qualitatively substantial in relation to the issues peculiar to individual class members." *In re Mercedez–Benz Antitrust Litig.,* 213 F.R.D. 180, 186 (D.N.J.2003). The existence of individual issues does not necessarily defeat certification, as long as the individualized issues have less overall significance than the issues common to the class and they are manageable in a single class action. *Weisfeld,* 210 F.R.D. at 141.

A plaintiff seeking certification of an antitrust class action must show that common or class-wide proof will predominate with respect to the three essential elements of its claim: (1) violation of the applicable antitrust law, here, Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) fact of injury or impact; [14]  and (3) the amount of damages. [15]  *See Danny Kresky Enter. Corp. v. Magid,* 716 F.2d 206, 209–210 (3d Cir.1983); *In re Linerboard Antitrust Litig.,* 305 F.3d 145, 156 (3d Cir.2002) (*"Linerboard II"* ). At the class certification stage, "[p]laintiffs need not actually prove these elements; rather, they must offer a valid and detailed method by which they will do so at trial." *In re OSB Antitrust Litig.,* 2007 WL 2253425, at *6. I address the above elements in turn.

### a. *Violation of Antitrust Law*
**\*12**  Courts routinely find that proof of a violation of the antitrust law focuses on the defendants' conduct and not on the

conduct of individual class members. *See, e.g., Bogosian,* 561 F.2d at 454 (district court correctly held that question of the existence of conspiracy was common to the class); *Weisfeld,* 210 F.R.D. at 141 (conspiracy to restrain trade subject to common proof); *In re OSB Antitrust Litig,* 2007 WL 2253425, at *6 (noting defendants' concession that proof of antitrust conspiracy was common to the class); *In re Mercedez–Benz,* 213 F.R.D. at 186–86 (common issues predominated on issue of alleged antitrust violation).

In their Briefs in opposition to class certification, Defendants do not contest the DP Plaintiffs' assertion that all of the proofs relative to Defendants' alleged antitrust violation are common to the class. *See* Pl. Br. at 27–28; Pl. Reply at 25–28; Def. Resp. at 25–38 (challenging predominance only as to LWD's theories of impact and damages). The common nature of the proof of Defendants' alleged antitrust violation has been noted above in connection with my analysis under Rule 23(a)(2), and it appears undisputed that common issues of fact and law will predominate on this element of the DP Plaintiffs' case. *See also* Pl. Proposed Trial Plan at 2–6 (attached as Exh. 12 to the 11/2/07 Pearlman Decl.) (describing common evidence of antitrust violation). Accordingly, I find that common issues predominate with respect to whether Defendants violated antitrust law.

**b.** *Fact of Injury*

The critical disputed issue here concerns whether common questions predominate with respect to antitrust impact. As noted above, "impact" or fact of injury is an essential element of an antitrust claim for damages. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n. 9 (1969). The injury-in-fact requirement exists to assure that litigants have a 'personal stake' in the litigation." *Danvers Motor Co., Inc. v. Ford Motor Co.,* 432 F.3d 286, 291 (3d Cir.2005) (quoting *The Pitt News v. Fisher,* 215 F.3d 354, 360 (3d Cir.2000)). A plaintiff seeking damages for an antitrust violation "must allege a distinct and palpable injury *to himself,* even if is an injury shared by a large class of other possible litigants." *Warth v. Seldin,* 422 U.S. 490, 500 (1975) (italics added). As the Third Circuit Court of Appeals explained in *Danvers:*

A "legally and judicially cognizable" injury-in-fact must be "distinct and palpable," not "abstract or conjectural or hypothetical." *Raines v. Byrd,* 521 U.S. 811, 819, 117 S.Ct. 2312,

138 L.Ed.2d 849 (1997); *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (internal quotations omitted) (quoting *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), and *Los Angeles v. Lyons,* 461 U.S. 95, 101–02, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)). While it is difficult to reduce injury-in-fact to a simple formula, economic injury is one of its paradigmatic forms.

**\*13** *Id.* at 291.

A plaintiff's "burden of proving the fact of damage ... is satisfied by its proof of some damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damages." *Zenith Radio Corp.,* 395 U.S. at 114, n. 9. "The fact of injury may be established by inference or circumstantial evidence." ABA Section of Antitrust Law, *Antitrust Law Developments* (5th ed.2002) at 870 (citing, *e.g., Zenith Radio Corp.,* 395 U.S. at 125; *Callahan v. A.E. V., Inc.,* 182 F.3d 237, 250–60 (3d Cir.1999)).

At the class certification stage, the Court's concern "is not whether Plaintiffs can or will establish class-wide impact, 'but whether class-wide impact may be proven by evidence common to all class members.' " *In re Pressure Sensitive Labelstock,* 2007 WL 4150666, at *13 (quoting *In re Bulk [Extruded] Graphite Prods.,* 2006 WL 891362, at *10). "Plaintiffs are not required to show that they currently possess all of the common evidence to prove impact, but need 'only make a threshold showing that the element of impact will predominantly involve generalized issues of proof, rather than questions which are particular to each member of the plaintiff class .' " *Id.* (quoting *In re Linerboard Antitrust Litig.,* 203 F.R.D. 197, 220 (E.D.Pa.2001) (*"Linerboard I"* )). "Whether or not fact of damage can be proven on a common basis therefore depends upon the circumstances of each case." *Id. See also Weisfeld,* 210 F.R.D. at 142 (citing *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 454 (3d Cir.1977)). "If the facts [of a case] are such that a court must determine antitrust injury for each plaintiff separately, this determination may overwhelm common issues in the litigation." *In re Microcrystalline,* 218 F.R.D. at 85 (citing *Windham v. Am. Brands, Inc.,* 565 F.2d 59, 68 (4th Cir.1977)).

The Third Circuit has held that "when an antitrust violation impacts upon a class of persons who do have standing, there is no reason in doctrine why proof of impact cannot be made on a common basis, so long as the common proof adequately demonstrates some damage to each individual." *Bogosian,* 561 F.2d at 454. *See also Linerboard II,* 305 F.3d at 151; *Am. Seed Co, Inc. v. Monsanto Co.,* No. 07–1265, 2008 WL 857532, *2–3 (3d Cir. April 1, 2008)* (reaffirming *Bogosian* and *Linerboard II* ). As the Court explained in *Bogosian:*

> If, in this case, a nationwide conspiracy is proven, the result of which was to increase prices to a class of plaintiffs beyond the prices which would obtain in a competitive regime, an individual plaintiff could prove fact of damage simply by proving that the free market prices would be lower than the prices paid and that he made some purchases at the higher price. If the price structure in the industry is such that nationwide the conspiratorially affected prices at the wholesale level fluctuated within a range which, though different in different regions, was higher in all regions than the range which would have existed in all regions under competitive conditions, it would be clear that all members of the class suffered some damage, notwithstanding that there would be variations among all dealers as to the extent of their damage.

**\*14** *Bogosian, 561 F.2d at 454.* "This presumption of class-wide injury through the use of common proof is now referred to as the *'Bogosian short cut.'* " *Am. Seed Co.,* 2008 WL 857532, at *2 (quoting *Linerboard II,* 305 F.3d at 151).

In *Am. Seed Co.,*[16] the Third Circuit recently explained its affirmance of class certification in *Linerboard II,* "based on [the Third Circuit's] determination that the district court had used a 'belt and suspenders rationale to support its conclusion that the putative class had met its burden of showing impact. In addition to relying on the *Bogosian* short cut, it credited the testimony of plaintiffs' experts, opinions

that were supported by charts, studies and articles from leading trade publications.' " *Id.* at 2–3 (quoting *Linerboard II,* 305 F.3d at 153). Reaffirming the belt and suspenders approach to establishing impact approved in *Linerboard II,* the Court noted in *Am. Seed Co.:*

> [W]e "found it important that plaintiffs' expert witnesses had utilized supporting data to conduct analyses that authenticated their professional opinions." For that reason, we held that "this was not a case where plaintiffs relied solely on presumed impact and damages." Thus, post-*Linerboard [II]* it is important that a putative class's presumption of impact under *Bogosian* be supported by some additional amount of empirical evidence.
>
> *Id.* (quoting *Linerboard II,* 305 F.3d at 155).

With the foregoing analytical framework in mind, I will address the parties' respective arguments regarding the impact element of the DP Plaintiffs' claim.

### (i) *Plaintiffs' Evidence of Impact*

As LWD acknowledges, its "theory of antitrust impact (and damage) is an overcharge, based primarily on the undisputed, substantial difference in price between brand name K–Dur 20, and its bioequivalent generic."[17] *See* Pl. Reply at 28. LWD contends that but for Defendants' alleged anticompetitive conduct, which Plaintiffs assert delayed the market entry of an AB-rated generic version of K–Dur until September 2001,[18] Class members would have paid less for potassium chloride 20, principally by substituting some amount of the cheaper generic for the brand. *Id* . Thus, Plaintiffs argue, "[t]o demonstrate antitrust impact at trial, Plaintiffs need prove only that class members would have purchases *some amount* of a cheaper, generic version of K–Dur 20 had it been available during the class period of November 1998 through September 2001." *See* PL Br. at 28 (citing *Bogosian,* 561 F.2d at 455) (italics in original); *See* Pl. Reply at 28.

Plaintiffs propose to prove this alleged antitrust impact through the following common proof, discussed in more detail in the declarations and report of their expert, Dr. Leitzinger: (1) governmental and academic studies relating to the effects of generic entry and competition in pharmaceutical markets and concluding that AB-rated generic drugs (a) enter the market at substantially lower prices than their brand counterparts, and (b) capture a significant share of the combined product (brand and generic) unit sales;[19]

(2) Defendants' internal analyses and projections predicting significant generic penetration and substantially lower prices for potassium chloride products after generic entry;[20] and (3) sales data from Schering, Upsher and other manufacturers of generic potassium chloride showing the class-wide substitution and pricing impact of actual generic entry.[21] Based on his analysis of the foregoing evidence, Dr. Leitzinger concludes that "the alleged delay in generic entry would give rise to antitrust injury on the part of all (or virtually all) members of the proposed class." *See* Letizinger 8/2/07 Rep. at 9, 51–53. *See also* Leitzinger 5/27/04 Decl. at 34; Leitzinger 11/2/07 Decl. at 3–4, 9–10.

**\*15**  Before addressing Defendants' arguments, I note that the types of evidence relied upon by Dr. Leitzinger "are precisely the types of evidence that have been found sufficient to satisfy the predominance requirement with respect to proof of impact in other cases alleging delayed generic entry." *Ovcon,* 2007 WL 3257015, at \*13 (citing *In re Cardizem,* 200 F.R.D. at 208; *In re Relafen Antitrust Litig.,* 218 F.R.D. 337, 343–44 (D.Mass.2003); *J.D.B.L.,* 225 F.R.D. at 217–18). Moreover, Dr. Leitzinger's report and declarations reflect that his opinions regarding classwide impact (and damages) are based on his review of extensive materials relevant to this case, including deposition testimony, pleadings, studies of the pharmaceutical industry, documents and data produced by Schering, Upsher and other drug manufacturers, sales data from IMS Health, Inc., and data from entities that are pursuing individual actions against the Defendants. *See,* Leitzinger 8/2/07 Rep. at 8 and Exh. 8; Leitzinger 5/27/04 Decl. at 5–6 and Exh. 2.

### (ii) *Defendants' Arguments Regarding Impact*

Defendants contend that impact cannot be established by class-wide evidence but, rather, requires individualized inquiries. First, Defendants argue that any assessment of brand-generic impact must consider whether and to what extent particular class members would have switched to a generic version of K–Dur 20 and whether generic bypass negates or diminishes the injury of individual class members. *See* Def. Resp. at 29–30. I respectfully disagree.

It is undisputed that the vast majority of the proposed Class purchased some quantity of the generic version of K–Dur 20 after it became available. *See, e.g.,* Rubinfeld 8/9/07 Rep. at ¶ 31–33 and Exh. 3; Leitzinger 11/2/07 Decl. at 6–7. Evidence that all (or virtually all) class members substituted a lower

priced generic for some of their K–Dur 20 purchases gives rise to the inference that they would have similarly done so in the but-for world. *See In re Cardizem,* 200 F.R.D. at 320. This fact combined with the common evidence discussed above regarding the effect of generic entry on pricing and substitution suffices to establish class-wide impact under the belt and suspenders approach approved by the Third Circuit in *Linerboard II* and reaffirmed in *Am. Seed Co.*

Moreover, because Defendants concede that 45 of the proposed Class members purchased *some* amount of generic K–Dur, they cannot contend that these Class members were entirely bypassed. Under the DP Plaintiffs brand-generic ("BG") theory of overcharge, Class members suffered antitrust injury as long as they would have purchased *some* generic K–Dur earlier in the Class period had it been available. *Ovcon,* 2007 WL 3257015, at \*14. Thus, Defendants' arguments regarding the effects of generic bypass relate to the quantum of damages, rather than the fact of injury. *See Zenith Radio Corp.,* 395 U.S. at 114, n. 9. (the "burden of proving the fact of damage ... is satisfied by its proof of some damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damages"). *See also* Leitzinger 5/27/04 Decl. at 32–34.

**\*16**  Second, Defendants argue that individual inquires are necessary to determine "whether branded and generic K–Dur are economically identical such that only their price differential matters." *See* Def. Resp. at 31–33. According to Defendants and their expert, Dr. Rubinfeld, branded drugs have unique economic value to consumers that is not shared by their AB-rated generic counterparts and, thus, the price difference between the brand and generic is, at least in part, not an overcharge. *Id. See also* Rubinfeld 8/9/07 Rep. at ¶ 45–51. This argument is meritless. As I previously concluded in the Jan. 2, 2007 Report, "the only economic differences between branded and generic K–Dur that are relevant to this case are the prices charged for the initial purchase of the products." *See* Jan. 2, 2007 Report at 25. The court in *In re Cardizem* rejected a similar argument and reasoned:

> Defendants' strained attempts to distinguish the facts of this case from other price-fixing cases are to no avail. Cardizem CD and its AB-rated generics are identical in all material respects. AB-rated generics are freely

substitutable and interchangeable with their brand name counterparts. Industry experts describe them as perfect substitutes for the brand name drug.... In the pharmaceutical industry, there is a government-assured complete interchangeability of drug products. This is why pharmacies are allowed to substitute the lower-priced generic versions of brand name drug products that have been demonstrated to the FDA to be therapeutically equivalent. Market behavior, which shows generics capturing a significant percentage of the branded drug market soon after they are introduced, likewise supports the conclusion that the brand and generic drugs are essentially fungible and interchangeable. Cardizem and its generic bioequivalents are two interchangeable versions (one less costly than the other) of the same drug product. Antitrust law requires only that the two products at issue be close substitutes for each other. Cardizem CD and its generic bioequivalents meet this requirement.

*In re Cardizem,* 200 F.R.D. at 310–11 (internal citations omitted). *See also* Leitzinger 11/2/07 Decl. at 19–20. The *Cardizem* court's reasoning applies equally to K–Dur 20 and its AB-rated generic equivalents.

Third, Defendants contend that the experience of Class members refutes class-wide impact because, according to Dr. Rubinfeld, nine putative Class members were not injured by the delay in generic entry. *See* Def. Resp. at 33; Rubinfeld 8/9/07 Rep. at ¶ 61; Def. Sur–Reply at 2–3; Rubinfeld 11/20/07 Rep. at ¶ 6–20. Plaintiffs and Dr. Leitzinger largely dispute Dr. Rubinfeld's conclusions on the ground that they are based on a misapplication of Dr. Leitzinger's aggregate damage model to individual Class members.[22] *See* Pl. Sur–Rebuttal at 5–7; Leitzinger 12/14/07 Decl. Specifically, Dr. Leitzinger states that his "model for the calculation, or quantification, of aggregate damages is not designed to calculate damages, or, for that matter, identify antitrust injury,

in the individualized manner that Dr. Rubinfeld uses it." *See* Leitzinger 12/14/07 Decl. at 8.

**\*17** Dr. Leitzinger further notes that seven of the Class members identified by Dr. Rubinfeld purchased both branded and generic K–Dur 20. *See* Leitzinger 12/14/07 Decl. at 4. As to five of those Class members, Dr. Leitzinger specifically disagrees with Dr. Rubinfeld's application of the aggregate damage model and with his conclusion that because one Class member did not purchase any generic K–Dur in March 2002 and four did not purchase generics until after March 2002, they have no injury. *Id.* at 4–7. According to Dr. Leitzinger, "[t]he issue is whether a Class member would have purchased at least some generic units in the but-for world in place of the higher priced brand. If so, that Class member was overcharged by virtue of any delay in generic entry and, at least to that extent, suffered antitrust injury." *See* Leitzinger 11/2/07 Decl. at 21–22.

According to Defendants and Dr. Rubinfeld, another proposed Class member, Prescription Solutions, may have paid more for generic K–Dur than for the branded drug. *See* Rubinfeld 8/9/07 Rep. at ¶ 61 and Exh. 2; Rubinfeld 11/20/07 Rep. at ¶ 7–8. Although Plaintiffs and Dr. Leitzinger do not expressly contest Dr. Rubinfeld's opinion regarding the brand and generic prices paid by Prescrption Solutions, neither do they concede that Prescription Solutions suffered no overcharges as a result of Defendants' alleged conduct. Moreover, Plaintiffs expressly argue that even assuming, *arguendo,* that Dr. Rubinfeld is correct that one Class member did not pay less for generic K–Dur, it does not preclude a finding that common issues of impact predominate. *See* Pl. Sur–Rebuttal at 7.

Finally, Defendants argue that Plaintiffs cannot establish fact of injury with respect to two proposed Class members, Gerould's Pharmacy and Darby Drug, who apparently were included in the Class because, according to Dr. Leitzinger, although they did not purchase generic K–Dur, they may have received "increased discounts" on branded K–Dur. *See* PL Sur–Rebuttal at 7 n. 5; Leitzinger 12/14/07 Decl. at 9; Def. Sur–Reply at 2–3; Rubinfeld 11/20/07 Rep. at ¶ 14–18. Defendants further contend that no class-wide proof of "increased discounts," or brand-brand overcharge exists, and that the price of K–Dur did not decline after generic entry. *See* Def. Resp. at 26–28; Rubinfeld 8/9/07 Report at ¶ 70–79; Rubinfeld 11/20/07 Report at ¶ 14–18. In a related argument, Defendants contend that the proposed Class definition is inadequate because it requires a detailed individual inquiry to

determine whether or not particular direct purchasers received "increased discounts."

In their Reply Brief, Plaintiffs argued that "Schering did, in fact, 'increase discounts' on K–Dur 20 after generic entry." *See* Pl. Reply at 39. *See also* Leitzinger 11/2/07 Decl. at 16–17 (opining that Schering sold branded K–Dur to direct purchasers at some percentage below its established WAC price and stating that the calculation of such discounts has been done on a class-wide basis). However, Plaintiffs appear to have conceded that the two proposed Class members whose impact, if any, arises solely by virtue of "increased discounts" were identified through an individualized analysis of the data applicable to those two entities. *See* Pl. Reply at 40; Pl. Sur–Rebuttal at 7 n. 5.

**\*18** After reviewing the parties' arguments and the opinions of their respective experts, I am satisfied that the DP Plaintiffs have satisfied their burden of adducing "sufficient evidence and a plausible theory" to convince me that impact may be proven by evidence common to all class members. *In re Mercedez–Benz,* 213 F .R.D. at 190. *See also In re Bulk [Extruded] Graphite Prods.,* 2006 WL 891362, at \*14; *In re Cardizem,* 200 F.R.D. at 320. In my view, Defendants' argument that impact is not class-wide involves merits-based disputes that should not be resolved at the class certification stage. *See, e.g, In re Cardizem,* 200 F.R.D. at 311 (at the class certification stage, "the Court should not delve into the merits of an expert's opinion or indulge 'dueling' between opposing experts"); *In re Bulk [Extruded] Graphite Prods.,* 2006 WL 891362, at \*14 ("the Court is not in a position at the class certification stage to weigh the arguments of the plaintiffs' expert and the defendants' expert").

Moreover, as several courts have held, *the possibility* that Plaintiffs ultimately may be unable to show fact of injury as to a few class members does not defeat certification where the Plaintiffs can show widespread injury to the class. *See In re Cardizem,* 200 F.R.D. at 321 (citing *In re NASDAQ Market–Makers Antitrust Litig.,* 169 F.R.D. at 523); *Ovcon,* 2007 WL 3257015, at \*14; *J.B.D.L.,* 225 F.R.D. at 218. *See also In re Pressure Sensitive Labelstock,* 2007 WL 4150666, at \*13 ("The Court's concern at this stage is not whether Plaintiffs can or will establish class-wide impact, 'but whether class-wide impact may be proven by evidence common to all class members.' ") (quoting *In re Bulk [Extruded] Graphite Prods.,* 2006 WL 891362, at \*10).

However, with respect to the Class definition and the issue of "increased discounts," Defendants' arguments have some merit. I see no difficulty with the balance of the DP Plaintiffs' proposed Class definition, as the Report and Declarations of Dr. Leitzinger adequately demonstrate a methodology to identify the proposed Class members who purchased K–Dur 20 during the Class period and also purchased generic versions of K–Dur 20.[23] *See* Leitzinger 8/2/07 Rep. at 55–56. With respect to proposed Class members who obtained "increased discounts," however, Dr. Leitzinger merely states that "[t]hose potential Class members that did not purchase any generic were included in the Class if they received increased discounts off of their brand purchases after generic entry." *Id.* at 56. Dr. Leitzinger does not provide any class-wide methodology for identifying the direct purchasers whose only basis for Class membership is the purported receipt of such discounts. In short, including the amorphous concept of "increased discounts" in the Class definition would potentially undermine both the ability to ascertain the Class and to establish fact of injury on a Class-wide basis through common proof. Accordingly, I will modify the proposed Class definition to exclude persons or entities whose claims are based solely on their alleged receipt of "increased discounts" on K–Dur 20 after generic entry. *See* Fed.R.Civ.P. 23(c)(1). *See also Chiang v. Veneman,* 385 F.3d 256, 268 (3d Cir.2004) (modifying class definition to eliminate ambiguity); *In re OSB Antitrust Litig.,* 2007 WL 2253418, at \*9 (modifying class definition to exclude plaintiff who lacked direct purchaser standing).

**\*19** In summary, based on the analysis set forth above, I find that the DP Plaintiffs have satisfied the predominance requirement with respect to impact as to Class members who purchased K–Dur 20 during the Class period and who also purchased generic versions of K–Dur 20.

### c. *Damages*

In addition to challenging predominance with respect to impact, Defendants also argue that individualized damage questions will overwhelm any common issues. *See* Def. Resp. at 37. Specifically, Defendants contend that neither LWD nor Dr. Leitzinger has offered a "single objective formula" that can be applied to each Class member's transactions. *Id* Defendants' argument, however, would require LWD to prove more than is necessary at the class certification stage. Rather, "in determining whether a feasible method exists to compute class-wide damages, '[n]o precise damage formula is needed at the certification stage of an antitrust action; the court's

inquiry is limited to whether the proposed methods are so insubstantial as to amount to no method at all.' " *In re Pressure Sensitive Labelstock,* 2007 WL 4150666, at *19 (quoting *In re Carbon Black Antitrust Litig.,* MDL No. 1543, 2005 WL 102966, *19 (D. Mass Jan. 18, 2005) (internal quotations omitted). *See also Ovcon,* 2007 WL 3257015, at *15.

The DP Plaintiffs assert that "damages here can be reliably estimated in the aggregate for the class as a whole, using the same types of common evidence that can be employed to demonstrate the fact of antitrust injury." *See* Pl. Br. at 33; Leitzinger 5/27/04 Decl. at 28–34. Under Dr. Leitzinger's methodology, the first step in estimating aggregate damages involves "development of a benchmark for market performance—the 'but–for world'—reflecting the world as it would have been had generic entry occurred sooner (as Plaintiffs allege)." *See* Leitzinger 5/27/04 Decl. at 31. Dr. Leitzinger explains that in this case, he developed the but-for world benchmark using a "before/after" method, which "uses the market experience before and/or after the alleged misconduct period to provide the basis for estimating prices and quantities that would have existed in the period but for the behavior in question." *See* Leitzinger 8/2/07 Rep. at 62–63. After determining the benchmark, "the rest is mostly arithmetic ... [and] involves a sum, in the aggregate, of: (1) the difference between the generic price and the brand price multiplied by the volume of generic substitution by the Class that was forestalled by the delay in generic entry; (2) the inflated amounts paid by the Class for the branded volumes it did purchase (and still would have purchased even if generic entry had occurred earlier) attributable to the delay in generic price competition; and (3) the inflated amounts paid by the Class for generic volumes attributable, again, to the delay in price competition." *See* Leitzinger 5/27/04 Report at 32.

Defendants do not dispute that the "before and after" methodology proposed by Dr. Leitzinger is "judicially recognized and commonly accepted." *See In re Cardizem,* 200 F.R.D. at 321. Rather, Defendants argue that the proposed aggregate damages model fails to account for individual issues concerning, *inter alia,* the extent to which each Class member would have switched to a generic in the but-for world; the extent of any generic bypass and generic upgrading; the extent to which Class members may have benefited from delayed generic entry; and whether Class members' purchases were resold under cost-plus contracts for which Defendants have a pass-on defense. *Id.*

**\*20** I have previously considered and rejected the foregoing arguments in my analysis of the adequacy requirement and will not repeat that analysis here. Moreover, I note, as did the *Ovcon* court, that "a number of courts have been satisfied that a common methodology exists in actions alleging delayed or impeded entry of generic pharmaceuticals, notwithstanding challenges similar to Defendants' arguments in the instant case." *Ovcon,* 2007 WL 3257015, at *16 (citing *In re Cardizem,* 200 F.R.D. at 321–25; *In re Busprione Patent Litig.,* 210 F.R.D. 43, 58 (S.D.N.Y.2002); *J.B.D.L.,* 225 F.R.D. at 217–219). Finally, to the extent that individual issues regarding damage amounts may arise, the Third Circuit has opined that "because separate proceedings can, if necessary, be held on individualized issues such as damages ... such individual questions do not ordinarily preclude the use of the class action device." *In re General Motors Corp. Pick–Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F.3d 768, 817 (3d Cir.1995). *See also Bogosian,* 561 F.2d at 456 ("[I]t has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate.").

Accordingly, I conclude that the DP Plaintiffs have sufficiently demonstrated that common proof exists such that LWD can establish each element of its antitrust claim on a simultaneous, class-wide basis. Thus, I find that the predominance requirement of Rule 23(b) (3) is satisfied.

### 2. *Superiority*

Finally, I turn to the superiority requirement of Rule 23(b) (3). As noted above, the factors pertinent to the superiority requirement include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action. Fed.R.Civ.P. 23(b)(3).

Defendants argue that a class action is not a superior means of adjudicating this case because, they contend, the Class is relatively small and comprised largely of sophisticated purchasers who are able to prosecute their claims independently, and the damages sought be Plaintiffs are large enough to justify individual suits. I disagree. As other courts have noted, Rule 23(b)(3) " 'does not exclude from certification cases in which individual damages run

high.' " *Ovcon,* 2007 WL 3257015, at *18 (quoting *Amchem,* 521 U.S. at 617). *See also In re Cardizem,* 200 F.R.D. at 325–26. Moreover, as in the *Ovcon* case, it is not clear in this case that individual damages actually "run high," and "Defendants do not suggest that all putative class members are large wholesalers with large claims." *Ovcon, supra.*

 **\*21** Defendants further argue that there are extensive conflicts among the Class, and they speculate that the fact that nine entities have chosen not to participate in the Class somehow indicates that the parties who remain in the proposed Class have a strong "interest in individual prosecution of claims." In my view, the fact that the opt outs have exhibited an interest in controlling their claims sheds no light on whether Class members who have *not* chosen to opt out have the same interest. Defendants' argument in this regard, and their speculation regarding Class conflict is further undermined by the declarations of representatives of the Big Three affirming that those companies wish to participate in the Class. *See Ovcon,* 2007 WL at 3257015, at *18. *See also In re Bulk [Extruded] Graphite Prods.,* 2006 WL 891362, at *16 (noting the absence of any indication that large class member preferred to prosecute its claims individually).

I likewise reject Defendants various and related arguments that a Class action will be inefficient and unduly burdensome to the parties and the Court. As I have already determined, this case presents common issues of law and fact regarding Defendants' alleged antitrust violation, fact of injury and damages. In my view, resolution of these common issues in single action is a more efficient use of the Court's and the parties' resources than the alternative of potentially numerous additional individual actions. In this regard, I note that several other courts have likewise found a class action to be efficient and superior in cases similar to this one. *See, e.g., Ovcon,* 2007 WL 3257015, at *18; *In re Nifedipine Antitrust Litig,* 246 F.R.D. 365, 372 (D.D.C.2007); *J .B.D.L.,* 225 F.R.D. at 220; *In re Cardizem,* 200 F.R.D. at 325–26; *In re Pressure Sensitive Labelstock,* 2007 WL 4150666, at *22.

## CONCLUSION

Accordingly, for the reasons set forth above, I conclude that the Direct Purchaser Plaintiffs' Motion for Class Certification should be granted, subject to modification of the proposed Class definition for the reasons discussed above. As modified, the Class to be certified shall consist of:

> All persons or entities who have purchased K–Dur 20 directly from Schering at any time during the period November 20, 1998, through September 1, 2001.

Excluded from the proposed class shall be:

> Defendants and their officers, directors, management and employees, subsidiaries and affiliates, as well as federal government entities. Also excluded are persons or entities who have not purchased generic versions of K–Dur 20 after the introduction of generic versions of K–Dur 20.

**As provided in the Order entered by Magistrate Judge Arleo in this matter, the Special Master's decision on any motion can be appealed to Judge Greenaway in the manner, and subject to the standards of review set forth in Rule 53 of the Federal Rules of Civil Procedure and applicable Local Rules.**

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 2699390

---

**Footnotes**

1    **(a) Appointment.**

**(1)** Unless a statute provides otherwise, a court may appoint a master only to:

**(A)** perform duties consented to by the parties;

* * *

**(C)** address pretrial and post-trial matters that cannot be addressed effectively and timely by an available district judge or magistrate judge of the district.

2    In support of their Motion for Class Certification, the DP Plaintiffs submitted an opening Memorandum of Law ("Pl.Br."), a Reply Memorandum of Law ("Pl.Reply"), a Reply to Defendants' Sur–Reply Regarding Class Certification ("Pl.Sur–Rebuttal"), and a Notice of Supplemental Authority (Pl.Suppl.Br."), as well as numerous exhibits, including expert reports and declarations regarding class certification issues and damages. Similarly, in opposition to the Motion, Defendants submitted a Response Brief ("Def.Resp.") and a Sur–Reply Brief ("Def.Sur–Reply"), also accompanied by voluminous exhibits and expert reports. The expert materials submitted by the parties in connection with this Motion include the following, which are cited herein as indicated: (For DP Plaintiffs) Declaration of Jeffrey J. Leitzinger, Ph.D. ("Dr.Leitzinger") dated May 27, 2005 (attached as Exh. 1 to Pl. Br .) ("Leitzinger 5/27/04 Decl."), Expert Report of Dr. Leitzinger, Ph.D. dated Aug. 2, 2007 (attached as Exh. 24 to 11/2/07 Pearlman Decl.) ("Leitzinger 8/2/07 Rep."), Class Certification Rebuttal Declaration of Dr. Leitzinger dated Nov. 2, 2007 (attached as Exh. 31 to 11/2/07 Pearlman Decl.) ("Leitzinger 11/2/07 Decl."), and Supplemental Class Declaration of Dr. Leitzinger dated Dec. 14, 2007 (attached as Exh. to Pl. Sur–Rebuttal) ("Leitzinger 12/14/07 Decl."); and (For Defendants) Expert Report of Daniel L. Rubinfeld ("Dr.Rubinfeld") Regarding Certification of Proposed Class of Direct Purchasers dated Aug. 9, 2007 (attached as Exh. 1 to 8/9/07 O'Shaughnessy Decl.) ("Rubinfeld 8/9/07 Rep.") and Sur–Rebuttal Report of Dr. Rubinfeld Regarding Certification of the Proposed Class of Direct Purchasers dated Nov. 20, 2007 (attached as Exh. 4 to Def. Sur–Reply) ("Rubinfeld 11/20/07 Rep."). Finally, on April 9, 2008, Defendants submitted a letter Brief addressing the recent decision issued by Third Circuit Court of Appeals in *Am. Seed Co., Inc. v. Monsanto Co.,* No. 07–1265, 2008 WL 857532 (3d Cir. April 1, 2008). On April 11, 2008, the DP Plaintiffs submitted a responsive letter Brief attaching a class certification order issued in the matter of *Louisiana Wholesale Drug Co, Inc. v. Sanofi–Aventis,* No. 07 CIV 7343 (S.D.N.Y. April 8, 2008).

3    Although the parties' briefs do not address the geographic location of the putative class members, the record suggests that they are likely dispersed. *See* Rubinfeld 8/9/07 Rep. at Exh. 3 (listing 45 proposed class members including, *inter alia,* numerous regional wholesalers).

4    At the November 30, 2007 oral argument, Defendants' counsel suggested, for the first time, that the proposed Class may not satisfy the numerosity requirement. *See* 11/30/07 Tr. at 63–67. According to Defendants, the proposed Class of 47 members identified by Dr. Leitzinger should be reduced by the nine members who, according to Dr. Rubinfeld, have no injury. *See* 11/30/07 Tr. at 66; Rubinfeld 11/20/07 Rep. Defendants contend that joinder of all members is not impractical as to the resulting Class of 38 members and argued: "If these people can identify 38 class members and if there are 38 who really want to participate in the litigation, they can identify them individually and then we're entitled to litigate our defenses against them." *See* 11/30/07 Tr. at 66. In my view, Defendants' arguments do not defeat numerosity. First, the question of whether nine proposed Class members suffered injury is a disputed merits issue which I decline to resolve at this time. *See* Leitzinger 12/14/07 Decl. (disputing Dr. Rubinfeld's analysis regarding the nine proposed class members and opining that it is based on a misapplication of Dr. Leitzinger's aggregate damages model). *See also In re Pressure Sensitive Labelstock Antitrust Litig.,* MDL No. 1556, 2007 WL 415066, *7 (M.D.Pa. Nov. 19, 2007) (" 'To the extent that [class certification] involves a battle of experts, it [is] not appropriate for the Court to determine which expert is more credible at this time.' ") (quoting *In re Linerboard Antitrust Litig.,* 203 F.R.D.

197, 217 n. 13 (E.D.Pa.2001)). Second, even if the proposed Class consisted of only 38 members, that fact, alone, would not defeat numerosity, particularly where the members appear to be dispersed geographically and the interests of judicial economy would be served by resolving the common issues raised in this case in a single action, rather than 38 individual ones. *See In re Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.,* No. 05–2195, 2007 WL 3257015, *10 (D.D.C. Oct. 22, 2007).

5       As a practical matter, the commonality requirement "rarely has resulted in the denial of class certification in an antitrust action ." Antitrust Law Developments 3d at 314. In fact, some courts have opined that because most class actions are brought pursuant to Rule 23(b)(3), that subsection's predominance requirement (discussed *infra* ) has rendered the commonality requirement of Rule 23(a) (2) almost superfluous. *See e.g., Martino v. McDonald's Sys.,* 81 F.R.D. 81, 85 (N.D.Ill.1979).

6       *See* Def. Resp.; Def. Sur–Reply; 11/30/07 Tr. at 22–23, 68.

7       According to Defendants' counsel, examples of the allegedly individual defenses "are the assignments and cost-plus contracts." *See* 11/30/07 Tr. at 68. These defenses appear to relate only to the big three national wholesalers, McKesson Corp. ("McKesson"), Cardinal Health, Inc. ("Cardinal") and AmeriSource Bergen Corp. ("ABC") (collectively, the "Big Three"), none of which is a representative of the proposed Class. *See* Def. Resp. at 18–22. Counsel also indicated that Defendants intend to contest injury and damages as to nine of the *absent* class members. *See* 11/30/07 Tr. at 68.

8       I further note that the District Court previously approved of the Berger & Montague and Garwin, Gerstein firms as co-lead counsel for the proposed DP Plaintiff Class. *See* Doc. Nos. 57 and 127. The District Court also granted preliminary and final approval of the DP Plaintiffs' settlement with Defendant Wyeth (f/k/a American Home Products) and, thus, necessarily determined that counsel satisfied the adequacy requirement of rule 23(a)(4). *See* Doc. Nos. 176 and 226.

9       Defendants also speculate that pharmacy benefit management ("PBM") companies that are members of the proposed DP Plaintiff class may be harmed by generic entry, to the extent that they receive rebates from Schering on brand name K–Dur 20 large enough to offset the price differential between the branded drug and the generic and do not pass all rebates on to their insurer customers. *See* Def. Resp. at 40 n. 28. Thus, according to Defendants, *"[i]t is possible* that some PBMs are financially better off with branded K–Dur...." *Id.* As is noted, *infra,* such speculative and hypothetical conflicts are insufficient to defeat adequacy. *See., e.g., In re Cardizem,* 200 F.R.D. at 306 ("To defeat certification, 'the conflict must be more than merely speculative or hypothetical.' ") (quoting 5 *Moore's Federal Practice,* § 23.25(4)(b)(ii)).

10      Defendants raised essentially identical arguments in connection with their appeal of Magistrate Judge Haneke's March 24, 2005 Order denying Defendants' Motion for downstream discovery from the DP Plaintiffs. In my Report and Recommendation dated January 2, 2007 (the "Jan. 2, 2007 Report"), I declined to follow *Valley Drug* and recommended that Judge Hanake's March 24, 2005 Order be affirmed. *See* Jan. 2, 2007 Report.

11      In *Valley Drug,* the Eleventh Circuit acknowledged that pursuant to the Supreme Court's holding in *Hanover Shoe,* an antitrust defendant generally cannot assert a "pass-on" defense against a direct purchaser. *Valley Drug,* 350 F.3d at 1192. The *Valley Drug* court also did not dispute that a "direct purchaser who passes on overcharges to his customers nevertheless suffers cognizable antitrust injury and may sue to recover damages regardless of whether he actually profited from the defendants' conduct." *Id.* The court reasoned, however, that the issues of a direct purchaser's standing and damages are distinct from "the issue of whether class certification is appropriate where a fundamental conflict exists among the named and unnamed members of the class." *Id.* Based on this analysis, the court narrowly construed *Hanover Shoe* and concluded that it directs "a court to overlook the potential net gain, or conversely the potential absence of a net loss,

that a direct purchaser may in fact have experienced for purposes of providing the direct purchaser with standing to sue and a means for calculating damages in antitrust violation litigation.," but "does not hold that this net economic gain must be ignored or overlooked ... when determining whether Rule 23 has been satisfied." *Id.* at 1193. I respectfully disagree with the reasoning of *Valley Drug* and concur in the *Ovcon* court's observation that "the Eleventh Circuit's holding fails to appreciate the true import of the *Hanover Shoe* rule that a direct purchaser may recover the full amount of the overcharge, even if he otherwise benefitted, because the antitrust 'injury occurs and is complete when the defendant sells at the illegally high price.' " *Ovcon,* 2007 WL 3257015, at *9 (quoting *In re Cardizem,* 200 F.R.D. at 313).

12    The representatives of the Big Three also have affirmatively and expressly (1) stated that there is no "antagonism or conflict" between the interests of LWD in pursuing overcharge damages and the "overall economic and legal interests" of the Big Three; and (2) waived any potential conflict between the Big Three and LWD, should the Court find that one may exist. *See* Jones Aff. at ¶ 9–10; Factor Aff. at ¶ 9–10; Kauffman Aff. at 7–9.

13    The Advisory Committee notes to Rule 23 state that the requirements of Rule 23(b)(3) were adopted to "encompass[ ] those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *See* Fed.R.Civ.P. 23, Advisory Committee Notes, 1966 Amendment, Subdivision (b)(3). *See also Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 615 (1997). Providing examples of the application of Rule 23(b) 3), the Advisory Committee explains that a case involving fraud "perpetrated on numerous persons by the use of similar representations" could be suitable for certification, even if damages had to be determined separately. *Id.* In contrast, a "mass accident" involving significant individual questions of liability, defenses and damages ordinarily would be unsuitable for class treatment. *Id.* With respect to proposed antitrust class actions, the Advisory Committee Notes state that "[p]rivate damage claims by numerous individuals arising out of concerted antitrust violations may or may not involve predominating common questions." *Id.*

14    The fact of injury element is referred to interchangeably as "injury-in-fact," "impact" and "fact of damage." *See, e.g.,* ABA Section of Antitrust Law, *Antitrust Law Developments* (5th ed.2002) at 839; *Rossi v. Standard Roofing, Inc.,* 156 F.3d 452, 483 (3d Cir.1998). Fact of injury is often analyzed in conjunction with the related concept of "antitrust injury." Fact of injury focuses on whether the plaintiff sustained injury to his business or property by reason of anything forbidden in the antitrust laws. *See Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489 (1977). The concept of "antitrust injury" focuses on whether the "injury [is] of the type the antitrust laws were intended to prevent and ... flows from that which makes the defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of the anticompetitive acts made possible by the violation." *Id. See also City of Pittsburgh v. West Penn Power Co.,* 147 F.3d 256 (3d Cir.1998) (discussing "antitrust standing" and "antitrust injury").

15    I note that once a plaintiff has established the fact of injury element of an antitrust claim, the standard of proof required with respect to the amount of damages is less stringent and is satisfied by a reasonable approximation. *See, e.g., J. Truett Payne,* 451 U.S. 557, 566–67 (1981). The relatively relaxed standard of proof for the amount of damages recognizes the principle that "it does not 'come with very good grace' for the wrongdoer to insist upon specific proof of the injury which it has itself inflicted." *Id.* at 567 (quoting *Hetzel v. Baltimore & Ohio R. Co.,* 169 U.S. 26 (1898).

16    In *Am. Seed Co.,* the Third Circuit affirmed the district court's decision denying certification of a class of purchasers of genetically engineered corn seed on the ground that the proposed class failed to satisfy the predominance requirement *See Am. Seed Co.,* 2008 WL 857532. Although I am guided by the Court's reaffirmation of *Bogosian* and *Linerboard II* in *Am. Seed Co.,* the case is factually inapposite in two fundamental respects. First, as the district court noted in *Am Seed Co.,* the " 'market for [genetically modified]

seeds is highly individualized depending on geographic location, growing conditions, consumer preference and other factors.' " *Am. Seed Co. v. Monsanto Co.,* 238 F.R.D 394, 400 (D.Del.2006) (*"Am. Seed Co. I"* ) (quoting *Sample v. Monsanto Co.,* 218 F.R.D. 644 (E.D.Mo.2003). Second, in contrast to the DP Plaintiffs' expert in this case, the plaintiffs' expert in *Am. Seed Co.* failed "to provide[ ] any actual data for the court's review as to the 'factual setting of the case' "; failed to cite any "factual authority in his declaration in support of his theory of common impact"; failed to conduct a "preliminary study of the market"; failed to independently analyze the documents produced during class discovery"; and did not "study the pricing and/or pricing variability" of the products at issued in that case. *Am. Seed Co.,* 2008 WL 857352, at *3 (quoting *Am. Seed Co. I,* 238 F.R.D. at 400–01).

17   According to the DP Plaintiffs' expert, Dr. Leitzinger, overcharges of Class members occurred in one or more of three ways: (1) brand-generic overcharge, represented by the difference between the price paid by Class members for branded K–Dur 20 and the (lower) price they would have paid for the generic; (2) generic-generic overcharge, representing the difference between the prices paid for generics and the (lower) price Class members would have paid if generic entry, and subsequent additional generic competition, had occurred earlier; and (3) brand-brand overcharge, representing the higher amounts Class members paid by reason of being deprived of discounts or price reductions on branded K–Dur they may have received had generic entry occurred earlier. *See* Leitzinger 5/27/04 Decl. at 15–17. Although Dr. Leitzinger opined in his initial class certification Declaration that each type of overcharge can be demonstrated with the common proof discussed *infra,* it is clear that his conclusions regarding class-wide impact focus on brand-generic overcharges to Class members who purchased branded K–Dur 20 during the Class period and who also purchased generic versions of K–Dur 20. *See* Leitzinger 11/2/07 Decl. at 15 (stating that "the role played by potential but-for branded K–Dur 20 price reductions in my conclusions is simply to recognize as a possibility that one mechanism through which AB-rated generic entry can create (and, in fact, has created) competitive benefits is through changes in WAC [wholesale acquisition cost] prices or increased discounts from WAC offered by the brand (either generally or to selected customers) in order to retain business in the fact of a generic option); and 17 (stating that his damages calculation does not include any generic-generic damages).

18   The DP Plaintiffs allege that but for Defendants' alleged anticompetitive conduct, an AB-rated generic would have entered the market no later than November 20, 1998, the date Defendant Upsher received final FDA approval to market its generic version of K–Dur 20. *See* Am. Compl. at ¶¶ 101–102.

19   *See* Pl. Br. at 30–31; Leitzinger 5/2704 Decl. at 17–23; Leitzinger 8/7/07 Rep. at 28–34.

20   *See* Pl. Br. at 31–32; Leitzinger 5/2704 Decl. at 23–25; Leitzinger 8/7/07 Rep. at 34–38.

21   *See* Pl. Br. at 32–33; Leitzinger 5/2704 Decl. at 25–27; Leitzinger 8/7/07 Rep. at 39.

22   Dr. Rubinfeld and Dr. Leitzinger apparently agree, after further review of data, that one proposed Class member, Longs, either did not purchase any generic or did not purchase it directly and, thus, was initially erroneously included in the proposed Class. *See* Leitzinger 12/14/07 Decl. at 7; Rubinfeld 11/20/07 Rep. at ¶ 9. Because Longs does not fall within the Class definition, any injury it may have suffered due to delayed generic entry is irrelevant to the issue of class certification.

23   Dr. Leitzinger's Report states that he identified Class members through analysis of Schering's and the generic manufacturer's transaction data. *See* Leitzinger 8/2/07 Rep. at 55–56.

---

**End of Document**                                     © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5180857
Only the Westlaw citation is currently available.
United States Court of Appeals,
Third Circuit.

In re K–DUR ANTITRUST LITIGATION.
Louisiana Wholesale Drug
Co., Inc., Appellant at 10–2077
CVS Pharmacy, Inc.; Rite Aid
Corporation, Appellants at 10–2078
Walgreen Co.; Eckerd Corporation; The Kroger
Co.; Safeway, Inc.; Albertson's, Inc; Hy–Vee,
Inc.; Maxi Drug, Inc., Appellants at 10–2079
Merk & Co., Ins.; Upshur–Smith
Laboratories, Inc., Appellants at 10–4571.

Nos. 10–2077, 10–2078, 10–2078, 10–4571.
|
Sept. 9, 2013.

(D.N.J. No. 2–01–cv–01652).

Present: SLOVITER, VANASKIE, Circuit Judges, and
STENGEL *, District Judge.

ORDER

DOLORES K. SLOVITER, Circuit Judge.

*1 The foregoing motion is Granted.

Joint Motion by Parties to Reinstate this Court's Prior Holding
on Class Certification and to Remand for Further Proceedings
Consistent with the Supreme Court's Opinion in *FTC v.
Actavis.*

**All Citations**

Not Reported in F.3d, 2013 WL 5180857

---

### Footnotes

\*      Honorable Lawrence F. Stengel, United States District Court for the Eastern District of Pennsylvania, sitting
       by designation.

---

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 213 of 482

King Drug Company of Florence, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2015)

KeyCite Yellow Flag
Distinguished by    *In re Glumetza Antitrust Litigation,*    N.D.Cal.,
February 3, 2022

2015 WL 12843830
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

KING DRUG COMPANY OF FLORENCE,

INC., et al., on behalf of themselves and

all others similarly situated, Plaintiffs,

v.

CEPHALON, INC., et al., Defendants.

Master Docket No. 2:06-cv-01797-MSG

|

Signed 10/15/2015

**Attorneys and Law Firms**

Andrew William Kelly, Stuart E. De Sroches, Odom &
Des Roches LLP, Chris Letter, Odom & Desroches, New
Orleans, LA, Dan Litvin, Joseph Opper, Noah Silverman,
Kimberly Hennings, Bruce E. Gerstein, Garwin Gerstein and
Fisher L.L.P., Linda P. Nussbaum, Nussbaum Law Group
PC, Richard J. Kilsheimer, Kaplan Fox & Kilsheimer LLP,
Archana Tamoshunas, Kevin Landau, Taus, Cebulash &
Landau, LLP, New York, NY, Dianne M. Nast, Erin C. Burns,
Nastlaw LLC, Fine, Kaplan & Black, Eric
L. Cramer, Sarah Schalman-Bergen, Andrew Coyne Curley,
Caitlin G. Coslett, Nicholas Urban, Daniel Berger, Daniel
C. Simons, David F. Sorensen, Berger & Montague, P.C.,
Barry L. Refsin, Hangley Aronchick Segal & Pudlin, Krishna
B. Narine, Meredith & Narine, Philadelphia, PA, David C.
Raphael, Jr., David P. Smith, Susan C. Segura, Brian D.
Brooks, Smith Segura & Raphael LLP, Alexandria, LA,
Douglas R. Wilson, Heim Payne & Chorush LLP, Austin,
TX, Miranda Y. Jones, Russell A. Chorush, Heim Payne
& Chorush LLP, Houston, TX, Neill Wilson Clark, Peter
R. Kohn, Faruqi & Faruqi LLP, Jenkintown, PA, Scott E.
Perwin, Richard A. Arnold, Kenny Nachwalter, P.A., Miami,
FL, David P. Germaine, John Paul Bjork, Joseph M. Vanek,
Vanek Vickers & Masini PC, Chicago, IL, Stephen Edward
Connolly, Connolly Wells & Gray LLP, King of Prussia,
PA, Michael L. Roberts, Roberts Law Firm, Little Rock,
AR, Monica L. Rebuck, Hangley Aronchick Segal Pudlin &
Schiller, Harrisburg, PA, Bernard D. Marcus, Moira E. Cain-
Mannix, Brian C. Hill, Scott D. Livingston, Marcus & Shapira
LLP, Pittsburgh, PA, Gordon Ball, Ball & Scott, Knoxville,
TN, for Plaintiffs.

Kevin Vanwart, Kirkland & Ellis LLP, Chicago, IL, Emily R.
Whelan, Gregory P. Teran, Mark A. Ford, Peter J. Kolovos,
James C. Burling, Peter A. Spaeth, Wilmer Cutler Pickering
Hale & Dorr LLP, Laurence Schoen, Mintz Levin Cohn Ferris
Glovsky & Popeo PC, Boston, MA, Frank R. Emmerich, Jr.,
Nancy J. Gellman, Conrad O'Brien, David L. Comerford,
Katherine M. Katchen, Akin Gump Strauss Hauer & Feld
LLP, Brett Alan Kratz, Neill C. Kling, Harkins Cunningham
LLP, Erin C. Dougherty, Montgomery McCracken Walker
& Rhoads, LLP, Philadelphia, PA, Gregory L. Skidmore,
Katherine R. Katz, Kirkland Ellis LLP, J. Douglas Baldridge,
Christopher K. Diamond, Danielle R. Foley, Lisa Jose Fales,
Molly T. Cusson, Vincent E. Verrocchio, Venable LLP, C.
Fairley Spillman, Catherine E. Creely, Paul B. Hewitt, Akin
Gump Strauss Hauer & Feld LLP, Washington, DC, Melinda
Meador, Winchester Sellers Foster & Steele PC, Knoxville,
TN, Robert J. Gunther, Jr., Wilmer Cutler Pickering Hale
Dorr LLP, Daniel P. Margolskee, David R. Marriott, Evan
R. Chesler, Lindsay J. Timlin, Rowan D. Wilson, Cravath
Swaine & Moore LLP, Jeffrey B. Korn, William H. Rooney,
Willkie Farr Gallagher LLP, New York, NY, Reginald D.
Steer, Akin Gump Strauss Hauer & Feld LLP, San Francisco,
CA, Joseph E. Wolfson, Stevens & Lee, King of Prussia, PA,
for Defendants.

**ORDER GRANTING FINAL JUDGMENT AND
ORDER OF DISMISSAL APPROVING DIRECT
PURCHASER CLASS SETTLEMENT AND
DISMISSING DIRECT PURCHASER CLASS
CLAIMS AGAINST THE CEPHALON DEFENDANTS**

The Honorable Mitchell S. Goldberg, United States District
Judge

**\*1** Pursuant to Rule 23(e) of the Federal Rules of
Civil Procedure, and in accordance with the terms of the
Settlement Agreement between Defendants Cephalon, Inc.,
Teva Pharmaceutical Industries Ltd., Teva Pharmaceuticals
USA, Inc., and Barr Pharmaceuticals, Inc. (collectively,
the "Cephalon Defendants"), and Direct Purchaser Class
Plaintiffs' Lead Counsel acting pursuant to the authority
provided by the Court's Order dated August 18, 2009 (ECF
No. 196), on behalf of Plaintiffs King Drug Co. of Florence,
Inc. ("King Drug"), Rochester Drug Co-operative, Inc.
("RDC"), Burlington Drug Company Inc. ("Burlington"),
J.M. Smith Corp. d/b/a Smith Drug Co. ("Smith Drug"),

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 214 of 482

King Drug Company of Florence, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2015)

Meijer, Inc. and Meijer Distribution, Inc. ("Meijer"), Stephen L. LaFrance Pharmacy d/b/a SAJ Distributors, Inc. and Stephen L. LaFrance Holdings, Inc. ("SAJ" and together with King Drug, RDC, Burlington, Smith Drug, and Meijer, the "Plaintiffs"), and on behalf of the Direct Purchaser Class, dated April 17, 2015, it is hereby ORDERED, ADJUDGED AND DECREED as follows:

1. This Final Judgment and Order of Dismissal hereby incorporates by reference the definitions in the Settlement Agreement among the Cephalon Defendants, Plaintiffs, and the Direct Purchaser Class, and all capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Settlement Agreement.

2. On, July 27, 2015, this Court certified a class for purposes of settlement ("Direct Purchaser Class"):

All persons or entities in the United States and its territories who purchased Pro vigil in any form directly from Cephalon at any time during the period from June 24, 2006 through August 31, 2012 (the "Class"). Excluded from the Class are Defendants, and their officers, directors, management, employees, subsidiaries, or affiliates, and all federal governmental entities.

Also excluded from the Class are: Rite Aid Corporation, Rite Aid HDQTRS. Corp., JCG (PJC) USA, LLC, Eckerd Corporation, Maxi Drug, Inc. d/b/a Brooks Pharmacy, and CVS Caremark Corporation, Walgreen Co., The Kroger Co., Safeway Inc., American Sales Co. Inc., HEB Grocery Company, LP, Supervalu, Inc., and Giant Eagle, Inc., and their officers, directors, management, employees, subsidiaries, or affiliates in their own right and as assignees from putative Direct Purchaser Class members as more fully described in Paragraph 10 of the Settlement Agreement ("Opt Out Plaintiffs").

3. The Court has appointed King Drug, RDC, Burlington, Smith Drug, Meijer, and SAJ as representatives of the Direct Purchaser Class (the "Class Representatives"). The Court has found that Lead Counsel, Liaison Counsel and the Executive Committee ("Class Counsel") have fairly and adequately represented the interests of the Direct Purchaser Class and satisfied the requirements of Fed. R. Civ. P. 23(g).

*2  4. The Court has jurisdiction over these actions, each of the parties, and all members of the Direct Purchaser Class for all manifestations of this case, including this Settlement.

5. The notice of settlement (substantially in the form presented to this Court as Exhibit B to the Settlement Agreement) (the "Notice") directed to the members of the Class, constituted the best notice practicable under the circumstances. In making this determination, the Court finds that the Notice provided for individual notice to all members of the Direct Purchaser Class who were identified through reasonable efforts. Pursuant to, and in accordance with, Rule 23 of the Federal Rules of Civil Procedure, the Court hereby finds that the Notice provided Direct Purchaser Class members due and adequate notice of the Settlement, the Settlement Agreement, these proceedings, and the rights of Class members to opt-out of the Direct Purchaser Class and/or object to the Settlement.

6. Due and adequate notice of the proceedings having been given to the Direct Purchaser Class and a full opportunity having been offered to the Direct Purchaser Class to participate in the October 15, 2015 Fairness Hearing, it is hereby determined that all Direct Purchaser Class members are bound by this Order and Final Judgment.

7. In determining that the Settlement should be given final approval, the Court makes the following findings of fact and conclusions of law.

8. The Court has fully considered the *Girsch* factors and the *Prudential* factors and finds that, considered together, the factors overwhelmingly favor approval of the Settlement. *See Girsch v. Jepson,* 521 F. 2d 153 (3d Cir. 1975); *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,* 148 F. 3d 283 (3d Cir. 1998).

9. No class members have opted out of the Settlement or objected to any part of it, and class members who will be collectively entitled to approximately 96% of the monetary recovery here have submitted letters to the Court explicitly and affirmatively supporting the Settlement. Four of the named plaintiffs, outside counsel for the country's three largest pharmaceutical distributors and six other class members, collectively who made approximately 96% of the purchases at issue in this case, wrote to the Court to express their support for the Settlement. These class members are business entities which have participated in other, similar cases and possess the incentive and knowledge to assess the fairness, reasonableness and adequacy of the Settlement. The overwhelming positive reaction of the class, which is a *Girsch* factor that is critical to the Court's fairness analysis, strongly

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 215 of 482

King Drug Company of Florence, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2015)

supports the Court's conclusion that the Settlement is fair, reasonable and adequate.

10. The amount of the Settlement, plus interest accrued from August 6, 2015 (the date upon which the Cephalon Defendants deposited such amount into an escrow account held in trust by Morgan Stanley Smith Barney LLC that is earning interest for the benefit of the Direct Purchaser Class) confers a monetary benefit on the Direct Purchaser Class that is substantial.

11. Every issue in this highly complex antitrust case has been vigorously litigated for almost a decade. The litigation between the Direct Purchaser Class and the Cephalon Defendants is in an advanced stage, with all discovery having been completed and the parties having completed dispositive motion briefing, and was poised for trial at the time of the Settlement. Class Counsel thus had an adequate appreciation of the merits of the case.

*3 12. Class Counsel faced significant risks in taking their claims against the Cephalon Defendants to trial, including the risk that a jury might not find in their favor on any of a number of issues and that any jury verdict could result in a lengthy post-trial motion and appellate process. By contrast, the Settlement provides the Direct Purchaser Class with immediate relief without the delay, risk and uncertainty of continued litigation.

13. The Settlement of this Direct Purchaser Class Action was not the product of collusion between the Direct Purchaser Class Plaintiffs and the Cephalon Defendants or their respective counsel, but rather was the result of *bona fide* and arm's-length negotiations conducted in good faith between Direct Purchaser Class Counsel and counsel for the Cephalon Defendants, with the assistance of a mediator.

14. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, this Court hereby approves the Settlement, and finds that the Settlement is, in all respects, fair, reasonable and adequate to Direct Purchaser Class members. Accordingly, the Settlement shall be consummated in accordance with the terms and provisions of the Settlement Agreement.

15. The Court hereby approves the Plan of Allocation of the Settlement Fund as proposed by Class Counsel (the "Plan of Allocation"), which was summarized in the Notice of Proposed Settlement and is attached to Direct Purchaser Class Plaintiffs' Motion for Final Approval of Settlement,

and directs Berdon Claims Administration LLC, the firm retained by Direct Purchaser Class Counsel as the Claims Administrator, to distribute the net Settlement Fund as provided in the Plan of Allocation.

16. All claims against the Cephalon Defendants in *King Drug Company of Florence, Inc., etal. v. Cephalon, Inc., etal,* No. 2:06-cv-1797-MSG (E.D. Pa.), including by those members of the Direct Purchaser Class who have not timely excluded themselves from the Direct Purchaser Class, are hereby dismissed with prejudice, and without costs.

17. Upon the Settlement Agreement becoming final in accordance with paragraph 7 of the Settlement Agreement, Plaintiffs and the Direct Purchaser Class unconditionally, fully and finally release and forever discharge the Cephalon Defendants, any past, present, and future [1] parents, subsidiaries, divisions, affiliates, joint ventures, stockholders, officers, directors, management, supervisory boards, insurers, general or limited partners, employees, agents, trustees, associates, attorneys and any of their legal representatives, or any other representatives thereof (and the predecessors, heirs, executors, administrators, successors and assigns of each of the foregoing) (the "Released Parties") from any and all manner of claims, rights, debts, obligations, demands, actions, suits, causes of action, damages whenever incurred, liabilities of any nature whatsoever, known or unknown, suspected or unsuspected, fixed or contingent, including costs, expenses, penalties and attorneys' fees, accrued in whole or in part, in law or equity, that Plaintiffs or any member or members of the Direct Purchaser Class (including any of their past, present or future officers, directors, insurers, general or limited partners, divisions, stockholders, agents, attorneys, employees, legal representatives, trustees, parents, associates, affiliates, joint ventures, subsidiaries, heirs, executors, administrators, predecessors, successors and assigns, acting in their capacity as such) (the "Releasors"), whether or not they object to the Settlement, ever had, now has, or hereafter can, shall or may have, directly, representatively, derivatively or in any other capacity, arising out of or relating in any way to: any claim that was alleged or could have been alleged in the Direct Purchaser Class Action prior to the date of the Settlement, including but not limited to:

*4 (1) the alleged delayed entry of generic versions of Provigil (modafinil);

(2) conduct with respect to the procurement and enforcement of United States Reissue Patent Number 37,516 or United States Patent Number 5,618,845;

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 216 of 482

King Drug Company of Florence, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2015)

(3) any conduct relating to Nuvigil that was alleged in, could fairly be characterized as being alleged in, is related to an allegation made in, or could have been alleged in the Direct Purchaser Class Action, such as intending to convert market demand from Provigil to Nuvigil;

(4) the sale, marketing or distribution of Provigil or its generic equivalent, except as provided for in paragraph 19 herein (the "Released Claims").

Releasors hereby covenant and agree that each shall not sue or otherwise seek to establish or impose liability against any Released Party based, in whole or in part, on any of the Released Claims. For the avoidance of doubt, the release provided herein applies, without limitation, to any conduct relating to the procurement, maintenance or enforcement of United States Reissue Patent Number 37,516 or United States Patent Number 5,618,845, including any commencement, maintenance, defense or other participation in litigation concerning any such patents, that was alleged in, could be fairly characterized as being alleged in, is related to an allegation made in, or could have been alleged in the Direct Purchaser Class Action.

18. In addition, Plaintiffs on behalf of themselves and all other Releasors, hereby expressly waive, release and forever discharge, upon the Settlement becoming final, any and all provisions, rights and benefits conferred by § 1542 of the California Civil Code, which reads:

> Section 1542. General Release; extent.
> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor;

or by any law of any state or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable or equivalent to § 1542 of the California Civil Code. Plaintiffs and members of the Direct Purchaser Class may hereafter discover facts other than or different from those which he, she or it knows or believes to be true with respect to the claims which are the subject matter

of this paragraph 18, but each Plaintiff and member of the Direct Purchaser Class hereby expressly waives and fully, finally and forever settles, releases and discharges, upon this Settlement becoming final, any known or unknown, suspected or unsuspected, asserted or unasserted, contingent or non-contingent claim that would otherwise fall within the definition of Released Claims, whether or not concealed or hidden, without regard to the subsequent discovery or existence of such different or additional facts. Each Plaintiff and member of the Direct Purchaser Class also hereby expressly waives and fully, finally and forever settles, releases and discharges any and all claims it may have against any Released Party under § 17200, et seq., of the California Business and Professions Code or any similar comparable or equivalent provision of the law of any other state or territory of the United States or other jurisdiction, which claims are expressly incorporated into the definition of Released Claims.

**\*5** 19. The releases set forth in paragraphs 17 and 18 of this Order shall not release claims between Plaintiffs, members of the Direct Purchaser Class, and the Released Parties unrelated to the allegations in King Drug Company of Florence, Inc., et al. v. Cephalon, Inc., et al, No. 2:06-cv-1797-MSG (E.D. Pa.), including claims under Article 2 of the Uniform Commercial Code (pertaining to Sales), the laws of negligence or product liability or implied warranty, breach of contract, breach of express warranty, or personal injury, or other claims unrelated to the allegations in King Drug Company of Florence, Inc., et al. v. Cephalon, Inc., et al, No. 2:06-cv-1797-MSG (E.D. Pa.).

20. Class Counsel for the Direct Purchaser Class have moved for an award of attorneys' fees, reimbursement of expenses and incentive awards for the class representatives. Class Counsel request an award of attorneys' fees of 27.5% of the Settlement (including the interest accrued thereon), reimbursement of the reasonable costs and expenses incurred in the prosecution of this action in the amount of $3,581,091.19.00, and incentive awards totaling $500,000.00 collectively for the six named plaintiffs, and such motion has been on the docket and otherwise publicly available since September 17, 2015.

21. In awarding attorneys' fees, reimbursement of expenses and incentive awards for the class representatives, the Court makes the following findings of fact and conclusions of law.

22. The "percentage of the fund" method is the proper method for calculating attorneys' fees in common fund class actions

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 217 of 482

King Drug Company of Florence, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2015)

in this Circuit. *See, e.g., In re Rite Aid Sec. Litig.*, 396 F. 3d 294, 305 (3d Cir. 2005).

23. The Court has fully considered the *Gunter* factors and the *Prudential* factors and finds that, considered together, the factors overwhelmingly favor granting Class Counsel's requested attorneys' fee, reimbursement of expenses and incentive awards for the class representatives. *See Gunter v. Ridgewood Energy Corp.*, 223 F. 2d 193 (2d Cir. 2000); *In re Prudential, supra.*

24. No class members have objected to any part of Class Counsel's requested 27.5% fee award, and class members who will be collectively entitled to approximately 96% of the monetary recovery here have submitted letters to the Court explicitly and affirmatively supporting Class Counsel's requested fee. Four of the named plaintiffs, outside counsel for the country's three largest pharmaceutical distributors and six other class members, collectively whom made approximately 96% of the purchases at issue in this case, wrote to the Court to express their support for Class Counsel's requested fee. These class members are business entities which have participated in other, similar cases and possess the incentive and knowledge to object to Class Counsel's requested fee. The overwhelming positive reaction of the class, which is a *Gunter* factor, strongly supports the Court's conclusion to grant Class Counsel's requested fee.

25. As noted above, the Settlement has conferred a monetary benefit on the Direct Purchaser Class that is substantial.

26. The Settlement here is directly attributable to the skill and efforts of Class Counsel, who are highly experienced in prosecuting these types of cases.

27. In prosecuting this action, Class Counsel have expended more than 59,000 hours of uncompensated time, and incurred substantial out of pocket expenses, with no guarantee of recovery. Class Counsel's hours were reasonably expended in this highly complex case that was vigorously litigated for almost a decade, and their time was expended at significant risk of non-payment.

**\*6** 28. Class Counsel's requested fee is lower than attorney fee awards in numerous other, Hatch-Waxman cases alleging delayed generic entry, where the courts in such cases have routinely granted a fee award of 33⅓%. Class Counsel's requested fee is also consistent with and/or lower than the fee

that would have been negotiated had the case been subject to a private contingent fee agreement.

29. A 27.5% fee award would equate to a lodestar multiplier of approximately 4.12. Such a multiplier is within the range of those frequently awarded in common fund cases.

30. Upon consideration of Class Counsel's petition for fees, costs and expenses, Class Counsel are hereby awarded attorneys' fees totaling $140,800,000.00 (representing 27.5% of the Settlement Fund) and costs and expenses totaling $3,581,091.19, together with a proportionate share of the interest thereon from the date the funds are deposited in the Settlement Escrow Account until payment of such attorneys' fees, costs and expenses, at the rate earned by the Settlement Fund, to be paid solely from the Settlement Fund and only if and after the Settlement becomes final in accordance with paragraph 7 of the Settlement Agreement. Upon consideration of Class counsel's petition for incentive payments for Direct Purchaser Class Representatives, each of King Drug, RDC, Burlington, and Smith Drug are hereby awarded $100,000.00, and each of Meijer and SAJ are hereby awarded $50,000.00, to be paid solely from the Settlement Fund and only if and after the Settlement becomes final in accordance with paragraph 7 of the Settlement Agreement. Garwin Gerstein & Fisher LLP shall allocate and distribute such attorneys' fees, costs and expenses among the various Class Counsel which have participated in this litigation. Garwin Gerstein & Fisher LLP shall allocate and distribute such incentive awards among the various Direct Purchaser Class Representatives which have participated in this litigation. The Released Parties (as defined in paragraph 14 of the Settlement Agreement) shall have no responsibility for, and no liability whatsoever with respect to, any payment or disbursement of attorneys' fees, expenses, costs or incentive awards among Class Counsel and/or Class Representatives, nor with respect to any allocation of attorneys' fees, expenses, costs or incentive awards to any other person or entity who may assert any claim thereto. The attorneys' fees, costs and expenses, and incentive awards authorized and approved by Final Judgment and Order shall be paid to Garwin Gerstein & Fisher LLP within five (5) business days after this Settlement becomes final pursuant to paragraph 7 of the Settlement Agreement or as soon thereafter as is practical and in accordance with the terms of the Settlement Agreement and the Escrow Agreement. The attorneys' fees, costs and expenses, and incentive award authorized and approved by this Final Judgment and Order shall constitute full and final satisfaction of any and all claims that Plaintiffs and any Direct

Case 4:21-cv-00196-MWB Document 249-1 Filed 10/07/25 Page 218 of 482

King Drug Company of Florence, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2015)

Purchaser Class member, and their respective counsel, may have or assert for reimbursement of fees, costs, and expenses, and incentive awards, and Plaintiffs and members of the Direct Purchaser Class, and their respective counsel, shall not seek or demand payment of any fees and/or costs and/or expenses and/or incentive awards from any source other than the Settlement Fund, including the Cephalon Defendants.

**\*7** 31. The Court retains exclusive jurisdiction over the Settlement and the Settlement Agreement as described therein, including the administration and consummation of the Settlement, and over this Final Judgment and Order.

32. The Court finds that this Final Judgment and Order adjudicates all of the claims, rights and liabilities of the parties to the Settlement Agreement (including the members of the Direct Purchaser Class), and is final and shall be immediately appealable. Neither this Order nor the Settlement Agreement nor any other Settlement-related document shall constitute

any evidence or admission by the Cephalon Defendants or any other Released Party on liability, any merits issue, or any class certification issue (including but not limited to whether a class can be certified for purposes of litigation or trial) in this or any other matter or proceeding, nor shall either the Settlement Agreement, this Order, or any other Settlement-related document be offered in evidence or used for any other purpose in this or any other matter or proceeding except as may be necessary to consummate or enforce the Settlement Agreement, the terms of this Order, or if offered by any released Party in responding to any action purporting to assert Released Claims.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2015 WL 12843830

---

### Footnotes

1    For the avoidance of doubt, Ranbaxy Laboratories, Ltd., Ranbaxy Pharmaceuticals, Inc., Mylan Laboratories, Inc., and/or Mylan Pharmaceuticals, Inc. are excluded from the definition of future parents, subsidiaries, divisions, affiliates, joint ventures, stockholders, officers, directors, management, supervisory boards, insurers, general or limited partners, employees, agents, trustees, associates, attorneys and any of their legal representatives, or any other representatives of the Cephalon Defendants released under this paragraph. Nothing in the Settlement Agreement dismisses or releases the claims of Plaintiffs and the Direct Purchaser Class against Ranbaxy Laboratories, Ltd., Ranbaxy Pharmaceuticals, Inc., Mylan Laboratories, Inc., and/or Mylan Pharmaceuticals, Inc.

---

End of Document                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT NEVADA

CUNG LE, NATHAN QUARRY, JON FITCH,
BRANDON VERA, LUIS JAVIER
VAZQUEZ, *and* KYLE KINGSBURY, *On
Behalf of Themselves and All Others Similarly
Situated,*

            Plaintiffs,

    v.

ZUFFA, LLC, D/B/A ULTIMATE FIGHTING
CHAMPIONSHIP *and* UFC,

            Defendant.

Case No. 2:15-cv-01045-RFB-BNW

**ORDER PRELIMINARILY APPROVING SETTLEMENT, PRELIMINARILY
APPROVING THE PLAN OF ALLOCATION,
APPROVING THE NOTICE PLAN, AND APPROVING
THE PROPOSED SCHEDULE FOR COMPLETING THE SETTLEMENT PROCESS**

WHEREAS, Plaintiffs have moved for preliminary approval under Fed. R. Civ. P. 23(c)(2) and 23(e) of the settlement ("Settlement") between the parties in the action *Le, et al. v. Zuffa, LLC d/b/a Ultimate Fighting Championship and UFC*, Case No. 2:15-cv-01045 (D. Nev.) (the "Action");[1]

WHEREAS, on September 26, 2024, Class Representatives, both individually and on behalf of the Class (defined below), and Defendant Zuffa, LLC ("Defendant" or "Zuffa") entered into a settlement agreement that sets forth the terms and conditions of the parties' proposed Settlement and the release and dismissal with prejudice of the Plaintiffs' claims against Defendant (the "Settlement Agreement");

WHEREAS, on October 7, 2024, Plaintiffs filed a Motion for Preliminary Approval of the Settlement, Preliminary Approval of the Plan of Allocation, Approval of the Notice Plan, and Approval of the Proposed Schedule for Completing the Settlement Process, requesting the entry of an Order: (i) granting preliminary approval of the Settlement Agreement; (ii) reaffirming the Court's finding that the requirements of Fed. R. Civ. P. 23(a) and 23(b)(3) are satisfied for the Class; (iii) reaffirming the appointment of Berger Montague PC, Cohen Milstein Sellers & Toll PLLC, and Joseph Saveri Law Firm, LLP as Co-Lead Class Counsel[2] for the Class under Fed. R. Civ. P. 23(g); (iv) authorizing dissemination of notice of the Settlement to the Class; (v) preliminarily approving the proposed Plan of Allocation; (vi) appointing Angeion Group LLC ("Angeion") as Settlement Claims Administrator; (vii) appointing The Huntington National Bank ("Huntington") as Escrow Agent and approving the Custodian/Escrow Agreement attached as Exhibit A to the Settlement Agreement; and (viii) approving the proposed Settlement schedule, including setting a date for a final Fairness Hearing;

---

[1] Plaintiffs Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury brought the Action against one defendant, Zuffa, LLC. On August 9, 2023, the Court certified the Class (*see* below) and appointed all the plaintiffs in the Action, other than Nathan Quarry, as the class representatives for the Class (the "Class Representatives"). *See* ECF No. 839, at 78-79 (certifying the bout class). Plaintiff Nathan Quarry was proffered as a class representative for the "Identity Rights Class," which the Court did not certify. *See generally* ECF No. 839 at 75-78. The Class Representatives together with Mr. Quarry are collectively referred to as "Plaintiffs."

[2] Co-Lead Class Counsel together with Kemp Jones, LLP, Clark Hill PLC, and other firms that worked under the direction of Co-Lead Class Counsel on behalf of the Class in the Action are collectively referred to as "Class Counsel."

WHEREAS, on August 9, 2023, the Court certified the Bout Class (defined below) in the Action (ECF No. 839, at 79);

WHEREAS, on July 30, 2024, the Court denied preliminary approval of a prior proposed settlement (dated April 24, 2024) that sought to resolve this Action together with *Johnson, et al. v. Zuffa, LLC, et al.*, No. 2:21-cv-1189 (D. Nev.) (the "*Johnson* Action"), for $335 million plus certain prospective relief (the "Denial") (ECF No. 1038);

WHEREAS, the Settlement does not resolve any claims being prosecuted in the *Johnson* Action;

WHEREAS, Defendant supports Plaintiffs' Motion; and

WHEREAS, the Court is familiar with the record in this case, and having reviewed the Settlement and supporting documents, has found good cause for entering the following Order.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

**<u>Jurisdiction</u>**

1.      This Court has jurisdiction to enter this Order as it has jurisdiction over the subject matter of the above-captioned action and over Defendant and Plaintiffs, including all members of the Class.

**<u>The Class</u>**

2.      The Court reaffirms its finding that the requirements of Fed. R. Civ. P. 23(a) and 23(b)(3) are satisfied for the Class, including for settlement and judgment purposes. *See* ECF No. 839, at 79 (defining the Bout Class).

3.      The Class includes:

All persons who competed in one or more live professional UFC-promoted mixed-martial arts ("MMA") bouts taking place or broadcast in the United States from December 16, 2010 to June 30, 2017 (the "Class Period").

Excluded from the Class are all persons who are not residents or citizens of the United States unless the UFC paid such persons for competing in a bout fought in the United States.

ECF No. 839, at 79.

4.      The Court previously appointed Plaintiffs Cung Le, Jon Fitch, Brandon Vera, Luis

Javier Vazquez, and Kyle Kingsbury as the class representatives for the Class. *See* ECF No. 839, at 79; *see also* n.1 *supra*.

5.     The Court reaffirms the appointment of Berger Montague PC, Cohen Milstein Sellers & Toll PLLC, and Joseph Saveri Law Firm, LLP as Co-Lead Class Counsel for the Class having determined that the requirements of Rule 23(g) of the Federal Rules of Civil Procedure are fully satisfied by this appointment.

<u>**Preliminary Approval of the Settlement**</u>

6.     Pursuant to Fed. R. Civ. P. 23(e)(1)(B), based on "the parties' showing that the Court will likely (i) approve the proposal[s] under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal[s]," the Court hereby preliminarily approves the Settlement, as embodied in the Settlement Agreement.

7.     Being familiar with the record, and having reviewed the settlement papers, the Court finds the Settlement was entered into after nearly ten years of hard-fought litigation in the Action, including, *inter alia*, completion of fact discovery, the exchange of expert reports and the depositions of each expert, an evidentiary hearing relating to class certification and *Daubert* featuring seven witnesses, class certification and *Daubert* briefing (and decisions on class certification and *Daubert*), three sets of summary judgment briefing (and a decision on summary judgment), briefing on motions *in limine*, submission of trial briefs, and trial preparation. The Court finds further that, both before and after the Denial, the Settlement process involved multiple mediation sessions before an experienced mediator. The parties reached the Settlement only after extensive arm's length negotiations, including negotiations that occurred after the Denial. The parties took into account the Court's stated reasons for the Denial, including by resolving this Action without also resolving the *Johnson* Action. Accordingly, the Court preliminarily finds that the Settlement meets all factors under Rule 23(e)(2) and will likely be granted final approval by the Court, subject to further consideration at the Court's final Fairness Hearing. The Court finds that the Settlement encompassed by the Settlement Agreement is preliminarily determined to be fair, reasonable, and adequate, and in the best interests of the Class, raises no obvious reasons to doubt its fairness and raises a reasonable basis for presuming that the Settlement and its terms satisfy the requirements of Federal Rule of Civil Procedure 23(c)(2) and 23(e)

3

and due process so that notice of the Settlement should be given.

8.    The Court has reviewed the Plan of Allocation and hereby preliminarily approves it.

9.    Angeion Group LLC is hereby appointed as Settlement Claims Administrator for the Class.

10.   The Huntington National Bank is hereby appointed as Escrow Agent pursuant to the Settlement.

11.   The Court approves the establishment of the *Le v. Zuffa* Settlement Fund under the Settlement Agreement as a qualified settlement fund ("QSF") pursuant to Internal Revenue Code Section 468B and the Treasury Regulations promulgated thereunder and retains continuing jurisdiction as to any issue that may arise in connection with the formation and/or administration of the QSF. In accordance with the Settlement Agreement, Co-Lead Class Counsel are authorized to withdraw funds from the QSF for the payment of reasonable costs of notice, payment of taxes, and settlement administration costs.

12.   Pending further Order of the Court, all litigation activity against Defendant on behalf of the Class is hereby stayed, and all hearings, deadlines, and other proceedings related to the Plaintiffs' claims against Defendant, other than those incident to the settlement process, are hereby taken off the Court's calendar. The stay shall remain in effect until such time that: (i) Defendant or Plaintiffs exercise their right to terminate the Settlement pursuant to its terms; (ii) the Settlement is terminated pursuant to its terms; or (iii) the Court renders a final decision regarding approval of the Settlement, and if it approves the Settlement, enters final judgment and dismisses Plaintiffs' claims against Defendant with prejudice.

13.   In the event that the Settlement fails to become effective in accordance with its terms, or if an Order granting final approval to the Settlement and dismissing Plaintiffs' claims against Defendant with prejudice is not entered or is reversed, vacated, or materially modified on appeal, this Order shall be null and void.

14.   In the event the Settlement is terminated, not approved by the Court, or the Settlement does not become final pursuant to the terms of the Settlement, litigation against Defendant shall resume in a reasonable manner as approved by the Court upon an application of Plaintiffs or Defendant.

**Approval of the Notice Plan**

15.     The Court approves in form and substance the Plaintiffs' proposed notice plan, including the long-form notice, the short-form notice, the poster notice, and the updated Settlement website as described herein. The proposed notice plan specified by Plaintiffs and as supported by the Declaration of Steven Weisbrot, Esq. of Angeion Group LLC re the Settlement Notice Plan, dated October 7, 2024 ("Weisbrot Settlement Decl.") (hereinafter, the "Notice Plan"): (i) is the best notice practicable; (ii) is reasonably calculated, under the circumstances, to apprise members of the Class of the settlement of the Action (defined in the Settlement Agreement, ¶1(a)) and of their right to participate in or object to the proposed Settlement; (iii) is reasonable and constitutes due, adequate, and sufficient notice to all persons entitled to receive notice of the Fairness Hearing; and (iv) fully satisfies the requirements of Fed. R. Civ. P. 23(e)(1) and due process and is a reasonable manner of distributing notice to Class Members who would be bound by the Settlement.

16.     Angeion may modify the form and/or content of the targeted advertisements and banner notices as it deems necessary and appropriate to maximize their impact and reach, as long as those modifications substantially comport with the notices attached to the Weisbrot Settlement Decl. as Exhibits A, B, and C.

17.     Defendant shall provide notice of the Settlement as required by 28 U.S.C. § 1715.

18.     The Court observes that, on November 17, 2023, it authorized notice to the Class relating to its certification of the Bout Class in the Action. ECF No. 921. Notice to the Class utilized four forms of notice: (i) a long-form notice that provided detailed information about the Action, the Class, and the Class Members' rights, including their right to opt-out; (ii) a short-form notice that provided critical information to Class Members in a summary form and directed them on how to obtain additional information; (iii) a press release notice to alert UFC fighters about the Class and draw media attention to the certification of the Class; and (iv) a poster notice displayed at MMA gyms. The manner of notice employed a multiplicity of methods designed to ensure notice to the largest possible number of Class Members, which included: (1) direct notice to all reasonably identifiable Class Members via email and U.S. mail; (2) a targeted first-party social media campaign; (3) the issuance of a press release; (4) posted notice in notable MMA gyms; and (5) the implementation of a dedicated website

5

ORDER PRELIMINARILY APPROVING SETTLEMENT, PRELIMINARILY APPROVING THE PLAN
OF ALLOCATION, APPROVING THE NOTICE PLAN, AND APPROVING
THE PROPOSED SCHEDULE FOR COMPLETING THE SETTLEMENT PROCESS

and tollfree hotline where Class Members could learn more about their rights and options in the Action.

19.     The Court further observes that, on February 5, 2024, Plaintiffs filed with the Court a notice concerning the implementation of the Class notice program. *See* Plaintiffs' Notice of: (1) Effectuation of Class Notice Plan, and (2) Exclusions from Bout Class, ECF No. 966, at 1 (Feb. 5, 2024). This submission, and the accompanying declaration of the Court-appointed Notice Administrator (Angeion), described in detail the process and results of effectuating notice to the Class, including that no requests for exclusion were submitted by Class Members. *See id.* at 3-4.

20.     The Court finds that notice to the Class was effectuated according to the Court approved notice plan to the Class, as described above. The Court further finds that notice to the Class was sufficient and reasonably informed Class Members of their rights to participate in or opt-out from the Class and, accordingly, no second opportunity to request exclusion from the Class is warranted in connection with notice of the Settlement. *See Low v. Trump Univ., LLC*, 881 F.3d 1111, 1121-22 (9th Cir. 2018) (holding no second opportunity to opt-out at settlement stage and that Ninth Circuit law provides no due process right for such a second opt-out choice); *Musgrove v. Jackson Nurse Pros., LLC*, No. CV 17-6565 FMO (SSX), 2022 WL 2092656, at *7 (C.D. Cal. Jan. 11, 2022) (approving preliminary approval of settlement and holding a settlement does not afford a second opportunity to opt-out when class members had earlier opportunity and did not do so); *In re Zillow Grp., Inc. Sec. Litig.*, No. 2:17-CV-1387-JCC, 2023 WL 2766264, at *4 (W.D. Wash. Apr. 3, 2023) (same); 2 MᴄLᴀᴜɢʜʟɪɴ ᴏɴ Cʟᴀss Aᴄᴛɪᴏɴs § 6:21 (20th ed. 2023) (collecting cases that "reject[ ] the suggestion that a second opt-out should be granted as a matter of course, even if the terms of the settlement change after the expiration of the initial opt-out period").

## **Approval of the Schedule**

21.     Angeion and the parties shall adhere to the following schedule:

a.     No later than 30 days of the date of this Order, Angeion shall begin the process of providing notice to the Class in accordance with the Notice Plan.

b.     No later than 60 days of the date of this Order, Co-Lead Class Counsel shall file a motion for attorneys' fees, unreimbursed litigation costs and expenses, and service awards for the Class Representatives, pursuant to the terms of the Settlement Agreement.

6

c. No later than 90 days of the date of this Order, members of the Class may submit any objection to the proposed Settlement or to the proposed Plan of Allocation, or to the request for attorneys' fees, unreimbursed litigation costs and expenses, service awards to the Class Representatives, and/or any other aspect of the Settlement.

d. All objections must be in writing and filed with the Court, with copies sent to the Claims Administrator, and include the following information: (1) the name of the case (*Le, et al. v. Zuffa, LLC*, Case No. 2:15-cv-01045 (D. Nev.)); (2) the individual's name and address and if represented by counsel, the name, address, and telephone number of counsel; (3) proof of membership (such as, for instance, evidence of participation in a UFC bout during the Class Period) indicating that the individual is a member of the Class; (4) a statement detailing all objections to the Settlement; and (5) a statement of whether the individual will appear at the Fairness Hearing, either with or without counsel. Furthermore, all objections must be signed by the objecting member of the Class.

e. No later than 21 days after the expiration of the deadline for members of the Class to object to the proposed Settlement and/or attorneys' fees, expenses and service awards, or the Plan of Allocation, Co-Lead Class Counsel shall file all briefs and materials in support of final approval of the Settlement.

f. A hearing on final approval of the Settlement shall be held before this Court on Thursday, February 6, 2025, at 9:15 a.m. PST in Las Vegas Courtroom 7C.

**DATED:** October 23, 2024                **SO ORDERED**

_____

**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**

7

ORDER PRELIMINARILY APPROVING SETTLEMENT, PRELIMINARILY APPROVING THE PLAN
OF ALLOCATION, APPROVING THE NOTICE PLAN, AND APPROVING
THE PROPOSED SCHEDULE FOR COMPLETING THE SETTLEMENT PROCESS

2025 WL 1510577
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Antoinette LEWIS-ABDULHAADI, Plaintiff,
v.
UNION SECURITY INSURANCE CO., Sun Life Assurance Company of Canada, and Merakey USA, Defendants

Case No. 21-cv-03805-WB
|
Signed March 20, 2025

**Attorneys and Law Firms**

R. Joseph Barton, The Barton Firm LLP, Washington, DC, Colin M. Downes, Barton & Downes LLP, Washington, DC, Jonathan M. Feigenbaum, Boston, MA, Melanie J. Garner, Adam Harrison Garner, The Garner Firm, Ltd., Philadelphia, PA, Robert Joseph Barton, Block & Leviton LLP, Washington, DC, for Plaintiff.

Ann-Martha Andrews, Maynard Nexsen, Phoenix, AZ, Erika Leonard, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Austin, TX, Joshua Brand, Robert C. Perryman, Ogletree Deakins Nash Smoak & Stewart PC, Philadelphia, PA, Mark E. Schmidtke, Ogletree Deakins Nash Smoak & Stewart PC, Valparaiso, IN, for Defendants Union Security Insurance Co., Sun Life Assurance Company of Canada.

**ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

Wendy Beetlestone, United States District Judge

**\*1**  This case came before the Court on Plaintiff's Unopposed Motion for Final Approval of Class Action Settlement (ECF No. 134), Class Counsel's Unopposed Motion for Approval of Attorneys' Fees & Expenses (ECF No. 129) and Plaintiff's Motion for a Class Representative Service Award (ECF No. 128). The court **GRANTS** the Motion for Final Approval, finally certify the Class, finally approve the Settlement, **GRANTS** the Motion for Approval of Attorneys' Fees & Expenses and **GRANTS** the Motion for a Class Representative Service Award and finds as follows:

**Jurisdiction**
1. The Court has personal jurisdiction over Plaintiff, members of the Class and Defendants pursuant to ERISA § 502(e), 29 U.S.C. § 1132(e) and subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1), including but not limited to jurisdiction to finally approve the proposed Settlement.

**The Class**
2. The Class that the Court previously certified by Order dated November 26, 2024, ECF No. 122, is hereby finally certified for settlement purposes as to Counts I, II, and IV-VIII pursuant to Rule 23(b)(1) and Rule 23(b)(2) of the Federal Rules of Civil Procedure on behalf of the following Class:

All participants in an ERISA-covered plan that provided or offered dependent child life insurance that is or was insured by Sun Life Assurance Company of Canada ("Sun Life" or Union Security Insurance company ("USIC")) at any time from and including August 25, 2015 until March 14, 2025 and for which a participant paid premiums (or premiums were paid) for at least one child in such dependent child life insurance coverage and either (i) had no enrolled children who met the definition of dependent child under the policy while such premiums were paid for coverage or (ii) had a claim for dependent child life insurance denied because the child's age was beyond the oldest allowable age for a dependent child under the applicable policy or based on the child's age and because the child was not a full-time student; and the beneficiaries of such persons.

Excluded from the Class are (1) any fiduciaries of the Plans with decision-making or administrative authority related to the establishment, administration, funding or interpretation of the Plan, (2) persons not eligible for benefits under Section IV of the Settlement Agreement. Additionally, any person does not meet the requirements of Section (ii) of the Class Definition and will be excluded unless (a) Defendants identify that person as a Class Member With Denied Claim or (b) the claim for dependent child life insurance was denied solely because the child's age was beyond the oldest allowable age for a dependent child under the applicable policy or a claim denied solely based on the child's age and because the child was not a full-time student.

3. No members of the Class have requested to exclude themselves from the Class.

4. Pursuant to Rule 23(a)(4) and 23(g), the Court confirms its prior appointment of Plaintiff Antoinette Lewis as Class Representative

**\*2** 5. Pursuant to Rule 23(a)(4) and 23(g), the Court confirms its prior appointment of R. Joseph Barton of The Barton Firm LLP, and Adam Harrison Garner of The Garner Firm, Ltd., and Jonathan M. Feigenbaum as Co-Lead Class Counsel.

6. The Court finds that the Class Representative and Co-Lead Class Counsel have fully and adequately represented the interests of the Class for purposes of entering into and implementing the Settlement Agreement and have satisfied the requirements of Rule 23 of the Federal Rules of Civil Procedure.

**Class Notice**

7. The Court finds that the Notice of Class Action Settlement was distributed consistent with the terms of the Settlement Agreement and the Court's Preliminary Approval Order dated November 26, 2024, ECF No. 123, and:

a. Constituted the best practicable notice to members of the Class under the circumstances of this action;

b. Was reasonably calculated, under the circumstances, to apprise members of the Class of: (i) the pendency of this class action; (ii) their right to object to any aspect of the proposed Settlement, including the fairness, reasonableness, and adequacy of the Class's representation by Class Counsel, and the award of attorneys' fees and expenses; (iii) their right to appear at the Final Approval Hearing; and (iv) the binding effect of the orders and Final Judgment as to all claims asserted in this action against Defendants, whether favorable or unfavorable, on all members of the Class;

c. Was reasonable and constituted due, adequate, and sufficient notice to all persons entitled to be provided with notice; and

d. Fully satisfied the requirements of the Federal Rules of Civil Procedure (including Rules 23(c)(2) and (e)), the United States Constitution, and any other applicable law.

**Final Approval of the Settlement**

### *Rule 23(e) Factors*

8. Federal Rule of Civil Procedure 23 requires that a class action "may be settled ... only with the court's approval." Fed. R. Civ. P. 23(e). This requires a court to "independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims will be extinguished." *In re Cendant*, 264 F.3d 201, 231 (3d Cir. 2001) (quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995)). In determining whether a proposed class action settlement is fair, reasonable, and adequate, the recently amended provisions of Federal Rule of Civil Procedure 23 require courts to consider whether:

> (A) the class representative and class counsel have adequately represented the class; (B) the proposal was negotiated at arms' length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). The factors set forth in Rule 23(e)(2) augment, rather than replace, the traditional factors developed by courts to assess the fairness of a class action settlement. Courts of the Third Circuit applying this amendment to Rule 23 have thus held that these newly enumerated factors "augment, rather than replace" the *Girsh* and *Prudential* factors. *Caddick v. Tasty Baking Co.*, No. 2:19-CV-02106-JDW, 2021 WL 4989587, at \*4 (E.D. Pa. Oct. 27, 2021); *see Somogi v. Freedom Mortg. Corp.*, 495 F.Supp.3d 337, 350 (D.N.J. 2020) (separately analyzing Rule 23(e)(2), *Girsh*,

and *Prudential* factors.). For the reasons discussed below, the Court finds that the Settlement Agreement is fair, reasonable, and adequate to the Class pursuant to Fed. R. Civ. P. 23(e).

### A. *Adequate Representation*

**\*3** 9. Federal Rule of Civil Procedure 23(g) sets forth the factors to evaluate counsel's adequacy including work done in identifying or investigating claims in the action and counsel's experience handling class actions, other complex litigation, and the types of claims in the action. *Sheinberg v. Sorenson*, 606 F.3d 130, 132 (3d Cir. 2010) (finding the Rule 23(g) factors govern adequacy of counsel). Class Counsel have significant experience litigating class action ERISA cases. ECF No. 55-2 ¶¶ 8-9; ECF No. 55-5 ¶¶ 5-6; ECF No. 55-14 ¶¶ 2-4. Plaintiff and Class Counsel have litigated vigorously on behalf of the Class since initiating the litigation more than three years ago and have spent more than 2,350 hours litigating this case. ECF No. 129-6. Plaintiff Lewis is qualified to adequately represent the Class.

### B. *Arm's Length Negotiations*

10. The Court finds the Settlement Agreement was the result of an adversarial, non-collusive, and arms-length negotiation. ECF No. 123 ¶ 3. The Settlement Agreement is the result of arm's length negotiations that extended over several months and included four separate sessions with an impartial mediator with extensive experience in ERISA class action matters. The assistance of a professional mediator reinforces that the Settlement Agreement is non-collusive. *See Alves v. Main*, No. 01-cv-789, 2012 WL 6043272, at \*22 (D.N.J. Dec. 4, 2012) ("The participation of an independent mediator in settlement negotiations virtually [e]nsures that the negotiations were conducted at arm's length and without collusion between the parties."), *aff'd*, 559 F. App'x 151 (3d Cir. 2014); *Rose v. Travelers Home and Marine Ins. Co.*, No. 19-977, 2020 WL 4059613, at \*7 (E.D. Pa. July 20, 2020) (quoting *Bellum v. Law Offices of Frederic I. Weinberg & Assocs., P.C.*, No. 15-2460, 2016 WL 4766079, at \*6 (E.D. Pa. Sept. 3, 2016)). The parties held multiple rounds of mediation with an experienced, professional mediator, Hunter Hughes. Agmt. at Recital G. The parties negotiated the settlement agreement over the course of four separate days across several months. *Id.*; ECF No. 123 ¶ 3.

### C. *Adequate Relief*

11. The Court concludes that the relief provided for the Class is adequate. The settlement provides substantial relief to the Class and falls within the range of reason. In summary:

a. For those Class Members with Denied Claims that were previously denied (Group 1), Sun Life will pay (a) 100% of dependent child life insurance benefits for claims denied because the child's age at the time of death was beyond the oldest allowable age for eligibility of a dependent child under the applicable policy, and (b) 50% of dependent child life insurance benefits provided by the group policy for claims denied based on the child's age and because the deceased child was not a full-time student (i.e. the child was of an age that if they were a full-time student their age alone would not have been disqualifying under the policy).

b. For Class Members whose child died or dies on or after August 25, 2015 and for 10 years after the end of the Class Period (i.e. after the Final Approval Hearing) and whose claims were not denied during the Class Period (Group 2), Sun Life will pay 100% of dependent child life insurance benefits under the applicable group policy for Covered Decedents without considering the child's age (so long as the child is not 40) so long as premiums have been paid for at least 6 months.

c. For Class Member(s) Without Eligible Dependent Children (Group 3), Sun Life will offer those Class Members the option to purchase an individual policy of conversion life insurance for each child who did not satisfy the definition of dependent child under the applicable policy while premiums were being paid for dependent child life insurance coverage under a USIC or Sun Life group policy, subject to certain conditions in the Settlement Agreement.

**\*4** d. As of the date of this Order, payments on the previously denied claims will be approximately $620,250, which is more than 72% of the maximum value that could be obtained. These Class Members who had a claim denied will receive either a 50% or 100% recovery. Class Members who have not yet had a claim denied but whose children have died or die during the next 10 years will receive 100% of benefits. To date, another 40 persons have submitted such Notice of Potential Claim and the period to submit such claims will not expire until mid-July 2025. Ehm Suppl. Decl. ¶ 20. Recoveries of 50% or 100% significantly exceed the results achieved in many other complex class action lawsuits approved in this jurisdiction. *Cunningham v. Wawa, Inc.*, No. CV 18-3355, 2021 WL 1626482, at

*6 (E.D. Pa. Apr. 21, 2021) (finding ERISA settlement that represents 18.0% of the best possible outcome for the Class Members and 28.1% for the Subclass Members were "in line with other approved settlements"); *Stevens v. SEI Invs. Co.*, No. CV 18-4205, 2020 WL 996418, at *6 (E.D. Pa. Feb. 28, 2020) (finding ERISA settlement that provided more than 31% of the maximum proposed loss "compare[d] favorably to other class action settlements."); *In re Ikon Off. Sols., Inc., Sec. Litig.*, 194 F.R.D. 166, 183 (E.D. Pa. 2000) (approving monetary settlement of 5.2% to 8.7% of best possible recovery for class members); *see also Alderfer v. Clemens Markets, Inc. Ret. Sav. & Profit Sharing Plan 003*, No. CIV.A. 10-4423, 2012 WL 12292160, at *7 (E.D. Pa. Apr. 19, 2012) (finding settlement providing for $642,500 to be distributed to the class, less 30% in attorneys' fees, $28,000 in expenses and $5,000 incentive award – or $416,000 net – was reasonable). [1]

e. All costs of the administration of the Settlement will be borne by Defendants rather than being deducted from a settlement fund or assessed against Class Members, which differs from some ERISA settlements and provides an added benefit. *E.g. Alderfer*, 2012 WL 12292160, at *1 (approving payment of $21,500 in settlement administration expenses out of the Fund). Instead, this constitutes an additional benefit *See Hurtado v. Rainbow Disposal Co.*, No. 817CV01605JLSDFM, 2021 WL 2327858, at *4 (C.D. Cal. May 21, 2021) (approving settlement and describing settlement term that Class Members will not bear the costs of receiving their distributions as an "additional benefit").

12. The Court also finds the expected relief for Class Members is adequate considering the four factors listed in Rule 23(e)(2)(C).

a. *Costs, risks, and delay of trial and appeal.* The Settlement Agreement provides a number of Class members with most of what they could have received if Plaintiff, on behalf of a certified Class, successfully proceeded to judgment. ECF No. 117-1 at 4; Agmt. § IV. Here, if the parties had not reached a settlement, Plaintiff would have faced risks in continuing the litigation. Because of the complex and difficult disputed issues presented in this case, continued litigation posed significant risks both in terms of the relief that could have been achieved through trial and judgment and the time spent on the litigation. ECF No. 129-2 ¶¶ 15-16.

b. *Effectiveness of proposed method of distributing relief to the Class.* The Settlement Agreement provides that Class Members who previously submitted a claim for dependent child life insurance benefits that was denied between August 25, 2015 and the Final Approval Hearing and which was denied based on the child's age do not need to take any action to receive a payment (other than to update contact information to provide beneficiary information if necessary). ECF No. 117-4. Class Members whose child passed away between August 25, 2015 and the Final Approval Hearing but did not previously submit a claim for child life insurance benefits must submit a claim to receive benefits (as all other claimants for benefits do). *Id.* Class Members who paid premiums for a child who was above the allowed age for dependent child life insurance and their child is still alive, may convert the life insurance to an individual policy for each such child by submitting a Notice of Interest in Conversion Coverage. *Id.*

**\*5** c. *Terms of proposed award of attorney's fees.* The amount of attorneys' fees and expenses will be determined by the Court. The amount sought by the requested attorneys' fee and expense award is reasonable. *See* Fed. R. Civ. P. 23(e)(2)(C)(iii). The fee award does not decrease the benefit available to the class, and no class members have objected to the proposed fee and expense award after having received notice of the amount requested.

d. *Side Agreements.* The only side agreement identified by the parties is a supplemental stipulation that clarifies and expedites the procedures for Group 2 class members to submit claims, which this Court also approved. *See* ECF No. 135

**D. The Settlement Agreement Treats Class Members Equitably**

13. Here, the Settlement Agreement contemplates differential treatment that is based on legitimate considerations. Specifically, Class Members with Denied Claims based on age will receive 100% if they exceeded the maximum age because Plaintiff claims that Defendants should have been able to readily ascertain if a child exceeded the maximum age and 50% if the denial was based on age but the child could have been eligible as a full time student because the child was still under the maximum age, it would be more difficult for Defendants to ascertain if the deceased remained a full time student. Agmt. § IV.1.

14. Class Members who did not have a child die but paid premiums for ineligible dependents will have the right to elect individual conversion life insurance. *Id.* § IV.4. The Settlement provides those Class Members with a valuable benefit that they lost the opportunity to exercise that option. McTeague Decl. ¶ 5. This benefit is beneficial considering the likely *de minimis* monetary value of any claim to a refund and the lack of medical underwriting on a conversion policy. It is particularly valuable for children with medical issues who are unlikely to be able to obtain individual life insurance on the open market. McTeague Decl. ¶ 6. To date, 63 Class Members have submitted a Notice of Interest in Conversion. Ehm Suppl. Decl. ¶ 21.

15. As these differences in treatment are rationally based on legitimate considerations and there is no indication of any collusion, they do not represent undue favor to a portion of the Class.

**Girsh Factors**

16. In the Third Circuit, courts must continue to analyze the factors propounded in *Girsh v. Jepson,* 521 F.2d 153 (3d Cir. 1975), which are (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risk of maintaining the class through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of the attendant risks of litigation. *In re Nat'l Football League Players Concussion Injury Litig.,* 821 F.3d 410, 437 (3d 2016). "A court may approve a settlement even if it does not find that each of these factors weighs in favor of approval." *In re N.J. Tax Sales Certificate Antitrust Litig.,* 750 F. App'x 73, 77 (3d Cir. 2018).

a. *Complexity, Expense, and Likely Duration of the Litigation.* Because continued litigation would likely be lengthy and expensive, settlement is reasonable. Without the Settlement, the parties would likely have faced several additional years of litigation, including appeal from any decisions on the merits. The factual and legal issues in this dispute were hard-fought and complex as illustrated by the arguments made by Sun Life in defending this case. ECF No. 56. Sun Life has vigorously denied any liability to Plaintiff or the Class. ECF No. 120. The Settlement was reached after obtaining sufficient discovery in advance of any settlement discussions and as the result of lengthy arm's length negotiations aided by a professional mediator. Agmt at Recital ¶¶ E & G. In light of the complex and difficult disputed issues, continued litigation would likely have taken years. Defendant would have likely moved for summary judgment on some or all of the issues in this case. Trial would have been complex, and the non-prevailing parties would certainly have taken an appeal.

**\*6** b. *Reaction of the Class to the Settlement.* Any member who wished to object to the Settlement or otherwise be heard concerning the Settlement had to file an objection in writing, bearing a postmark no later than March 3, 2025. ECF No. 123 ¶ 16. The Settlement Administrator received no objections to the Settlement by the deadline, no requests for exclusion from the settlement, and no notices of intention to appear at final approval hearing. Ehm Suppl. Decl. ¶ 23. The Settlement Administrator received one email styled as an objection that submitted after the deadline, but that objection has subsequently been withdrawn.

c. *Stage of the Proceedings and Amount of Discovery Completed.* This suit has been litigated for more than three years. Agmt. at Recital A. From about January 2022 to August 2023, the Parties engaged in discovery during which Plaintiff served interrogatories, requests for production of documents, and requests for admission to Defendants. Agmt. at Recital E. Plaintiff also issued subpoenas to produce documents to non-parties, including many plan administrators of ERISA-covered welfare plans insured by USIC or Sun Life. *Id.* Plaintiff also took seven depositions, including the depositions of Sun Life and USIC by four separate Rule 30(b)(6) representatives, a deposition of a Merakey benefits department representative, and two expert witnesses designated by USIC and Sun Life. *Id.* USIC and Sun Life deposed Plaintiff and an expert designated by Plaintiff. *Id.* During discovery, Defendants produced claim files (including benefit claims, claim denials, and if applicable, appeals and appeal denials) for at least 28 participants in an ERISA-covered plan that provided or offered dependent child life insurance that is or was insured by Sun Life or USIC. *Id.* at Recital H & I. The claim files produced during discovery consisted of files for those participants who submitted claims for benefits involving a dependent child insurance for which the claim for benefits was denied on or after August 25, 2015 because the child's age was beyond the oldest allowable age for a dependent child under the applicable policy. *Id.* All parties had a full appreciation

of the merits of this suit before negotiating the Settlement Agreement.

d. *The Risks of Establishing Liability and Damages.* The Settlement Agreement provides a number of Class Members with most of what they could have received if Plaintiff, on behalf of a certified Class, successfully proceeded to judgment. ECF No. 117-1 at 4; Agmt. § IV. Here, if the parties had not reached a settlement, Plaintiff would have faced risks in continuing the litigation. Because of the complex and difficult disputed issues presented in this case, continued litigation posed significant risks both in terms of the relief that could have been achieved through trial and judgment and the time spent on the litigation. ECF No. 129-2 ¶¶ 15-16

e. *The Risk of Maintaining the Class Action Through Trial.* At the time that settlement was reached, no class was certified. As such, there whether a class would be certified or whether it would include all the persons included in the settlement.

f. *The Ability of Defendants to Withstand a Greater Judgment is Neutral.* Plaintiff reached the Settlement based on the strengths and weaknesses of the case without regard to Defendants' ability to pay the full amount of a greater judgment. There does not appear to be a question that Defendants could withstand a greater judgment. This factor is neutral.

g. *The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and all Attendant Risks of Litigation.* The Settlement provides substantial relief to the Class.

**\*7** i. Class Members who had a child die and a claim denied will receive 100% of the benefits if the child was above the maximum allowable age for a dependent child under the policy or 50% if the denial was based on age, but the child was still below the maximum age if the child had been a full-time student. Agmt. § IV.1. For Class Members who have a child die in the 10 years following the Final Approval Hearing, Defendants will pay 100% of the dependent child life insurance benefits without considering the age of the child (so long as the child is under 40). *Id.* § IV.2. For Class Members who did not have any children die, but paid premiums for dependent child life insurance on ineligible children, Sun Life will offer those Class Members the option to purchase an individual policy of conversion life insurance for each such child. *Id.* § IV.3.

ii. The maximum recovery for the 99 Class Members with previously denied claims would be more $843,000.00. *See* ECF No. 136 (Barton Suppl. Decl.) ¶ 5. Those 99 Class Members with denied claims will receive 50% or 100% of the benefits to which they were entitled. Agmt. § IV.1, 2. On an aggregate basis, those Class Members will receive $620,000 or a more than 73 % aggregate recovery. ECF No. 136 (Barton Suppl. Decl.) ¶ 5. Those Class Members will not need to do anything to receive payment. Defendants will simply send them a check.

iii. To date, an additional 40 class members have submitted a notice of potential claim. ECF No. 136 (Barton Suppl. Decl.) ¶ 56. And the deadline to file such a claim is not until at least July 16, 2025. Agmt § IV.2.b.

iv. Class Members whose children die within the next ten years but whose claims would otherwise have been denied as ineligible based on exceeding the maximum age will likewise receive 100% of their benefits so long as they file a claim (just as those who previously filed claims and had them denied did). *Id.* § IV.3. Assuming that the claims rate (and the amount of benefit payment) remains the same over the next 10 years and using the average claim amount of $8,515 for the past 9.5 years and the average number of claims per year of 10.4, that would result in Defendants paying an estimated $ 88,557.57 each year for the next 10 years (after Final Approval) or an additional $ 885,575.75. ECF No. 136 (Barton Suppl. Decl.). ¶ 5. The total estimated payments for claims as a result of this settlement (i.e., considering the previously denied claims and potential future claims) will be more than $1.5 million to persons whose claims would otherwise have been denied. *Id.* That estimated amount does not include the 40 persons who have submitted a Notice of Potential Claim.

v. As to Class Members who no longer have Eligible Dependent Children, but did not have a child die, the Settlement provides them with the ability to elect conversion insurance coverage. Agmt. § IV.3. Without this Settlement, these Class Members missed their window under their policies to elect conversion coverage (likely because, among other reasons, they believed that their children were, in fact, still eligible for coverage under the policy). Restoring that ability is a valuable right for multiple reasons, including because unlike individual coverage purchased on the open market, this

conversion right will not be subject to individual medical underwriting. McTeague Decl. ¶ 6. These policies are approved by state insurance regulators. *Id.* ¶ 9. The premiums stay the same for the life of the policy, the policies have a cash value (albeit small given the small amount of the death benefit) and there is some ability to take loans on the cash value. *Id.* ¶ 8. The value of this claim is further evidenced by the 124 class members who have submitted notice of intent for conversion coverage. ECF No. 136 (Barton Suppl. Decl.) ¶ 6. And the deadline to file such a claim is not until July 12, 2025. Agmt. § IV.3.c.

**\*8** vi. The only other harm suffered by these Class Members (i.e. those who did not have a child die) is having paid premiums for non-existent coverage. But the monetary recovery for many such Class Members would be small and likely considered *de minimis* under any class action allocation plan. The Third Circuit has expressly recognized the need to establish certain "*de minimis* thresholds for payable claims" in class action settlements because those minimums "are beneficial to the class as a whole since they save the settlement fund from being depleted by the administrative costs associated with claims unlikely to exceed those costs." *Sullivan v. DB Invs. Inc.*, 667 F.3d 273, 328 (3d Cir. 2011) (approving class action settlement with a $10 or $25 minimum payment threshold for any class member to receive payment). For some settlements, including ERISA class actions, the minimum recovery amount has been higher – either $25 or $50 – due to the complexity and cost of administering the settlement. *E.g. In re Remicade Antitrust Litig.*, No. 17-CV-04326, 2022 WL 3042766, at *3 (E.D. Pa. Aug. 2, 2022) (requiring $25 minimum distribution to be paid to the class member); *Mehling v. N.Y. Life Ins. Co.*, 248 F.R.D. 455, 463 (E.D. Pa. 2008) (approving ERISA class settlement plan with $50 minimum payment). Not only did Defendants have an argument based on the terms of the policies that they should not have to refund more than 12 months of premium, but a Class Member would likely have had to pay more than one year's worth of premiums or more if the settlement was less than 100% (which is likely) to exceed an amount considered more than *de minimis* and therefore receive any payment. For Class Members who elected a smaller benefit (i.e., $1,000 or $5,000), their premiums would have been less than Plaintiff (who had $10,000 in coverage) and they would have had to have paid premiums for even longer to receive a payment that was more than *de minimis.*

17. Based on the monetary payments in this settlement alone, the percentage of recovery significantly exceeds the recoveries in other class settlements approved in this Circuit.

**Attorney's Fees and Costs.**

18. Under the Federal Rule of Civil Procedure, "[i]n an action certified as a class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). With respect to fees and costs, the Settlement Agreement required Sun Life/USIC to pay $1 million into an escrowed Fees & Expense Fund out of which any award of attorneys' fees and litigation expenses would be paid. Agmt. § VII.1.

19. The lodestar method is more typically applied in statutory fee-shifting cases because it allows courts to "reward counsel for undertaking socially beneficial litigation in cases where the expected relief has a small enough monetary value that a percentage-of-recovery method would provide inadequate compensation." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005); *Dungee v. Davison Design & Dev. Inc.*, 674 F. App'x 153, 156 (3d Cir. 2017) (finding district court did not err in applying lodestar to assessing fee in class action based on statutory fee).

20. "When a court applies the lodestar method to award fees in a class action case that involves a fee-shifting statute, there is "a 'strong presumption' that the lodestar represents the 'reasonable' fee," for class counsel's work." *Id.* at 156 (quoting *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992)). The lodestar analysis is performed by "multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d at 305. The resulting figure is the lodestar amount, which is a "presumptively reasonable fee" for counsel's services. *Planned Parenthood of Cent. N.J. v. Att'y Gen. of N.J.*, 297 F.3d 253, 265 n.5 (3d Cir. 2002).

21. A lodestar multiplier of less than one is "strong evidence that the requested fees are reasonable." *In re Valeant Pharms. Int'l, Inc. Third-Party Payor Litig.*, No. CV163087-MASLHG, 2022 WL 525807, at *7 (D.N.J. Feb. 22, 2022). When the lodestar is less than one, this "reveals that Class Counsel's fee request constitutes only a fraction of the work they billed." *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 284 (3d Cir. 2009).

### *Reasonableness of Hours Expended*

22. Class Counsel has submitted detailed time records showing that they spent a total of 2,351.20 hours on this litigation, resulting in a lodestar of $1,723,078.00. In other complex ERISA cases that have settled at similar stages of litigation and in a similar time period of litigation, courts have concluded that similar hours were reasonably expended. *Pfeifer v. Wawa, Inc.*, No. 16-497, 2018 WL 4203880, at *13 (E.D. Pa. Aug. 31, 2018) (finding 2,700 hours were reasonably expended during 2 years of litigation); *Sweda v. Univ. of Pa.*, No. 16-4329, 2021 WL 5907947, at *7 (E.D. Pa. Dec. 14, 2021) (noting that counsel in an ERISA class action expended 8,144 hours in four years of litigation); *In re Schering-Plough Corp. Enhance ERISA Litig.*, C.A. No. 08-1432 DMC JAD, 2012 WL 1964451, at *8 (D.N.J. May 31, 2012) (finding expenditure of 4,640 hours by class counsel reasonable in ERISA fiduciary breach class action). These hours include time spent investigating the claims of the Class, drafting the Complaint, engaging in significant discovery, including 7 depositions, filing motions and briefing on class certification (twice) and multiple briefs on standing, preparing for and appearing at four mediation sessions, drafting and negotiating the Settlement Agreement (twice), and drafting motions for preliminary approval (twice) and overseeing administration of the settlement. ECF No. 129-2 ¶ 10, ECF No. 129-3, ECF No. 129-4; ECF No. 129-9 ¶ 39, ECF No. 129-11; ECF No. 129-14 ¶ 60, ECF No. 129-15. In sum, the number of hours billed by Class Counsel is reasonable given the length and history of the litigation.

### *Reasonableness of Rates*

 **\*9** 23. "[I]n most cases, the relevant rate is the prevailing rate in the forum of the litigation," but there is an exception to this "forum rate rule" where "the need for the special expertise of counsel from a distant district is shown." *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 426 F.3d 694, 705 (3d Cir. 2005) (cleaned up). Complex cases arising under ERISA "demand[ ] a quality of service for which relatively expensive representation is to be expected." *In re Unisys Corp. Retiree Med. Benefits ERISA Litig.*, 886 F.Supp. 445, 478 (E.D. Pa. 1995) (awarding fees based on hourly rates "albeit expensive" are reasonable compared to the standard rates "in complex class actions"); *see Cunningham*, 2021 WL 1626482, at *8 (finding class counsel's "hourly rates are reasonable in light

of the complexity of this ERISA action and the skill and experience of counsel").

24. Class counsel's hourly billing rates are reflective of the skill and experience of the lawyers involved. These rates range from $200-285 per hour for paralegals (depending on experience) and $400-$650 per hour for associates and $700 to $995 per hour for partners and counsel. They are also supported by declarations of attorneys in the Philadelphia area.

25. Other courts, including those in this Circuit, have approved Class Counsel's customary hourly rates in complex ERISA litigation. *Cunningham*, 2021 WL 1626482, at *8 (approving customary rates of $235-875 per hour for the attorneys affiliated with Mr. Barton's firm "in light of the complexity of ERISA cases and the skill and experience of counsel"); *Campbell v. Royal Bank Suppl. Exec. Retirement Plan*, 646 F.Supp.3d 629, 643 (E.D. Pa. 2022) (approving Mr. Garner's then-hourly rate of $550 per hour);

26. The rates sought here by Class Counsel are also consistent with fee award using local hourly rates (when those rates are adjusted for inflation). *Taha v. Bucks Cnty. Pa.*, No. CV 12-6867, 2020 WL 7024238, at *9 (E.D. Pa. Nov. 30, 2020) (Beetlestone, J.) (determining that hourly billing rates ranging from $100 per hour to $775 per hour are reflective of the prevailing market rate in this District for class actions as well as the skill and experience of the lawyers involved).

27. The requested fees exceed the lodestar even using the Attorney Fee Schedule of the Community Legal Services of Philadelphia, Inc. ("CLS"), which the Third Circuit has found as "being well developed" and "a fair reflection of the prevailing market rates in Philadelphia." *Maldonado v. Houstoun*, 256 F.3d 181, 187 (3d Cir. 2001) (quotations omitted). Even using the two-year old CLS rates as the 2025 local rates, the lodestar would still be more than $1.4 million.

28. In sum, Class Counsel's hourly rates and requested fees are reasonable, especially given that counsel will be compensated for only a fraction of the time it spent pursuing these claims on behalf of the Class. Even subtracting from the lodestar – whether calculated using Class Counsel's hourly rates (i.e. $1.7 million or local rates ($1.4 million) – the $65,000 that Class Counsel received from the settlement with Merakey, the lodestar will exceed the amount of attorneys' fees to be paid under the Settlement.

**Reimbursement of Expenses.**

29. Class Counsel are entitled to reimbursement of expenses that were appropriately incurred in the prosecution of the case. *In re Healthcare Servs. Grp., Inc. Deriv. Litig.*, No. 2:20-cv-03426-WB, 2022 WL 2985634, at \*16 (E.D. Pa. July 28, 2022) (quotations and citations omitted) (Beetlestone, J.); *see In re Ikon Office Sols., Inc., Sec. Litig.*, 194 F.R.D. at 192 ("There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of ... *reasonable* litigation expenses from that fund"). Class counsel has identified expenses which total of $77,052.84 and comprise costs associated with, among other copying, attorney travel, consulting experts, process servers, court reports, deposition transcripts, and mediation fees. Payment of these costs will not decrease the benefits obtained for the class. These expenses were necessary for Class Counsel's competent handling of this case, and are reasonable. Plaintiff's proposed expense award shall be granted.

**Award of Attorneys' Fees & Expenses**

 **\*10**  30. The Court award the following amounts to Class Counsel to be paid out of the Fees & Expense Fund:

a. $ 77,052.84 to Class Counsel for litigation expenses

b. The balance of the Fund (approximately $ 1,002,888.10), *see* ECF No. 129-2 ¶ 27, after deducting the amount awarded for litigation expenses and the Class Representative Service Award, or approximately $920,835.26 is awarded as attorneys' fees.

**Class Representative Service Award.**

31. Plaintiff requests a $5,000 service award for Class Representative Lewis. The Third Circuit has expressly authorized service awards to class representatives. *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 333 n.65 (3d Cir. 2011). There is no definitive set of factors to determine whether a service award is appropriate. Courts often consider some variation of the following factors: "(1) the risk involved for the named plaintiff in pursuing the litigation; (2) any personal difficulties suffered by the named plaintiff in light of the litigation; (3) the duration of the litigation; (4) the degree of the named plaintiff's personal involvement in the litigation; and (5) the named plaintiff's personal benefit solely in his capacity as a member of the class." *Taha*, 2020 WL 7024238, at \*9 (Beetlestone, J.); *Koertge v. LG Elecs. USA, Inc.*, No. 2:12-CV-06204, 2013 WL 12156331, at \*2 (D.N.J. Dec. 3,

2013) (using a four-factor test). In this Circuit, such awards have ranged up to $30,000. *Craig v. Rite Aid Corp.*, No. 4:08-CV-2317, 2013 WL 84928, at \*13 (M.D. Pa. Jan. 7, 2013) (citing cases); *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 285 (3d Cir. 2009) (finding no error in approving a settlement that included a $10,000.00 incentive award for each class representative). Here, these factors support a service award of $5,000 for Ms. Lewis.

32. As Ms. Lewis is the *only plaintiff,* "there would be no benefit to the Settlement Class Members if Plaintiff had not stepped forward and prosecuted this matter to the current resolution." *Stevens v. SEI Invs. Co.*, No. CV 18-4205, 2020 WL 996418, at \*14 (E.D. Pa. Feb. 28, 2020). Ms. Lewis's efforts unquestionably have benefited the class. Only as a result of her efforts and that of her counsel, the Class will share in a settlement of substantial value (and one that will <u>not</u> be reduced by attorneys' fees and litigation expenses). Settlement Agreement (ECF No. 117-3) § VII. No class member has objected to Lewis' proposed service award. As a result, Plaintiff will be awarded a $5,000 service award to be paid out of the Attorneys' Fees & Expense Fund.

**Releases.**

33. The Releases contained in the Settlement Agreement are expressly incorporated herein as follows:

a. The Plaintiff and the Class will be deemed conclusively to have released and waived any and all Settled Class Claims against Defendants as provided in the Settlement Agreement.

b. The Defendants will be deemed conclusively to have released and waived any and all Claims against Plaintiffs and the Class as provided in the Settlement Agreement.

c. Consistent with Paragraph XIII.1 of the Agreement, Plaintiff and the Class will be barred from asserting claims released by Paragraph XIII.1 against any non-Defendant fiduciary of the applicable Plans conditioned on that fiduciary (including for example Plan Administrators) not asserting any claims or challenges against a Class Member, including any claim or challenge regarding any Class Member's eligibility or entitlement to benefits that are provided in the Settlement, including the Plan Administrator(s) providing the Class Notice to Class Members.

 **\*11**  d. Consistent with Paragraph XIII.3 of the Agreement, Defendants will be barred from asserting any

claims described in Paragraph XIII.3 against any non-Defendant fiduciary of the applicable plans conditioned on that fiduciary (including for example Plan Administrators) not asserting any claims or challenges against Defendants arising out of or relating to or based on the same factual predicate of the Amended Complaint and providing the Class Notice to Class Members.

e. The Parties and the Class are barred and permanently enjoined from prosecuting any and all Settled Claims, as provided in the Settlement Agreement, against any Party for whom they have released claims.

34. **Non-Released Claims.** Neither this Order nor the Settlement releases Claims to enforce the Settlement Agreement.

35. The Parties and the Class are barred and permanently enjoined from prosecuting any and all Settled Claims, as provided in this Settlement Agreement, against any Party from whom they have released claims.

**CAFA Notice**

36. Defendants have timely complied with CAFA and provided CAFA Notice consistent with the Settlement Agreement, that notice to the appropriate state and federal officials has been provided as required by CAFA, and that Defendant has satisfied its obligations pursuant to 28 U.S.C. § 1715.

**Approval of Post-Final Approval Notices Required By the Settlement Agreement**

37. Along with the Motion for Final Approval, the Parties have submitted the following Notices that are to be disseminated after the hearing on Final Approval as required by the Settlement Agreement § IV.4: (a) Reminder Notice to Class Members; (b) Notice to Persons Handling Claim Decisions & Appeals at Defendants; (c) Reminder Notice to Policyholders and (d) Notice by Class Counsel to Certain Attorney Groups. Upon review of those Notices, they are approved and the Parties are directed to issue those Notices at times and manner as required in the Settlement Agreement.

**ACCORDINGLY, IT IS ORDERED** this 20th day of March, 2025 as follows:

38. Plaintiff's Motion for Final Approval of Class Action Settlement (ECF No. 134) is **GRANTED** and the settling parties are ordered to carry out the Settlement as provided in the Settlement Agreement, except that Court will not retain continuing jurisdiction as contemplated by Sections IX.2.k or XV.12 of the Settlement Agreement. Pursuant to Local Rule 41.1, any Party may seek to seek to re-open this case within 90 days of the date that Judgment is entered.

39. Plaintiff's Motion for Class Representative Service Awards (ECF No. 128) is **GRANTED** and the Court awards a service award of $ 5,000.00 to Plaintiff Lewis to be paid out of the Fees & Expense Fund.

40. Class Counsel's Motion for Award of Attorneys' Fees and Costs (ECF No. 129) is **GRANTED** and Class Counsel is awarded $ 77,052.84 in expenses to be paid out of the Fees & Expense Fund and the remaining amount of the Fees & Expense Fund as attorneys' fees.

41. There is no just reason to delay entry of this Order and Final Judgment, and immediate entry by the Clerk of Court is directed pursuant to Rule 54 of the Federal Rules of Civil Procedure. The Clerk of Court **SHALL ENTER** Judgment dismissing this action with prejudice.

**All Citations**

Slip Copy, 2025 WL 1510577

---

**Footnotes**

1    Numerous courts have approved settlements in ERISA cases recovering far less. *E.g., Sims v. BB&T Corp.,* No. 1:15-CV-732, 2019 WL 1995314, at *5 (M.D.N.C. May 6, 2019) (19% of estimated losses); *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.,* No. 8:15-cv-01614-JLS-JCG, 2018 WL 8334858, at *7 (C.D. Cal. July 30, 2018) (25% of estimated losses); *Johnson v. Fujitsu Tech. & Bus. of Am., Inc.,* No. 16-cv-03698-NC, 2018 WL 2183253, at *6–7 (N.D. Cal. May 11, 2018) (approximately 10% of losses under Plaintiffs' highest model).

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 238 of 482

In re Lithium Ion Batteries Antitrust Litigation, Not Reported in Fed. Supp. (2020)

2020-2 Trade Cases P 81,483

2020 WL 7264559

United States District Court, N.D. California.

IN RE LITHIUM ION BATTERIES
ANTITRUST LITIGATION

This Documents Relates to:

All Indirect Purchaser Actions

Case No. 13-MD-02420 YGR (DMR)

|

MDL No. 2420

|

Signed 12/10/2020

**ORDER GRANTING INDIRECT PURCHASER
PLAINTIFFS' MOTION FOR FINAL
APPROVAL OF SETTLEMENTS WITH
HITACHI, LG CHEM, AND NEC AND *REVISED*
PLAN OF ALLOCATION (DKT. NO. 2613);**

**GRANTING IN PART IPPS' RENEWED
MOTION FOR ATTORNEYS' FEES,
EXPENSES, AND SERVICE AWARDS;
OVERRULING OBJECTIONS (DKT. NO. 2588);**

**DENYING ADMINISTRATIVE MOTION
TO FILE MOTION TO STRIKE LATE
FILINGS (DKT. NO. 2637); AND**

**GRANTING MOTION OF SHIYANG
HUANG RE: LATE CLAIM (DKT. NO. 2645)**

**SETTING COMPLIANCE DEADLINE
RE: DISTRIBUTION STATUS REPORT**

YVONNE GONZALEZ ROGERS, UNITED STATES
DISTRICT JUDGE

**TABLE OF CONTENTS**

**\*1** I. BACKGROUND AND PROCEDURAL
HISTORY .......................................................2
A. Round 2 Settlements and their
Approval..........................................................2 B.
Denial of Motion for Class Certification and Choice-of-Law

Guidance................3 C. Motion for Final Approval of Round
2 Settlement Agreements............................4 D. Round 3
Settlements..........................................................................6
E. Court's Approval of Round 3 and 90/10 Distribution
Formula...............................7 F. Vacatur and Remand of Final
Approval Order of Round 2 Settlements...............8

II. SUMMARY OF THE ROUND 2
SETTLEMENTS.......................................................9
A. Settlement
Terms..........................................................................10
B. The Settlement
Fund.........................................................................10
C. Release of
Claims.........................................................................10
D. Plan of
Allocation.......................................................................10

III. MOTION FOR FINAL APPROVAL OF ROUND
2 SETTLEMENTS...............................................11
A. The Court Certifies the Settlement Classes
for the Round 2 Settlements.............11

1. The Settlement Class Meets the Requirements of Rule
23(a)......................12
2. Common Issues Predominate Under Rule 23(b)
(3).....................................14 a. Predominance is readily
shown in antitrust cases...........................14

b. Predominance is met despite variations in state
law......................15

3. The Settlement Class Satisfies Superiority
Under Rule 23(b)(3)...............18 B. Plan of
Distribution.......................................................................19
C. Appointment of Class Counsel Under
Rule 23(g)..................................................21
D. The Proposed Settlements Are Fair,
Adequate, and Reasonable..........................21

1. Representation of the
Class..........................................................................22

2. Arm's Length
Negotiation.......................................................................23
3. Adequacy of Relief to the
Class.............................................................24 a. Risks and
Costs of the Litigation....................................................24

2020-2 Trade Cases P 81,483

b. Effectiveness of Distribution..............................................25

c. Terms of Proposed Attorney's Fees..............................................26

d. Other Agreements..............................................26
4. Equitable Treatment of Class Members..............................................26 a. Plan of Allocation..............................................27

b. Late Claims..............................................27

E. Additional Approval Factors..............................................28
1. Notice..............................................28
2. Reaction of Class Members and Objections..............................................29

IV. IPPS' REQUEST FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS ..................31
A. Reasonableness of Attorneys' Fees Sought..............................................31
B. Objections to Attorneys' Fees..............................................34

1. Bednarz's Objection to Fees..............................................34

2. Morgan's Objection to Attorneys' Fees..............................................37

3. Andrews' Objection to Attorneys' Fees..............................................37 C. Attorneys' Fee Award..............................................38
D. Expenses..............................................39
E. Service Awards..............................................40
F. Settlement Administrator Fees..............................................41

V. PLAN OF DISTRIBUTION AS TO SONY SETTLEMENT (ROUND 1)..............................................41

## VI.

CONCLUSION ..................................................................................

This matter comes before the Court on motions of indirect purchaser plaintiffs ("IPPs") for Final Approval of Class Action Settlements with defendants Hitachi Maxell, Ltd., and Maxell Corporation of America, LG Chem, Ltd. and LG Chem America, Inc., and NEC Corporation ("Round 2 Settlements") (Dkt. No. 2613) and for attorneys' fees, reimbursement of expenses, and service awards (Dkt. No. 2588). As explained more fully herein, these motions followed the Ninth Circuit's decision vacating the Court's prior approval of the Round 2 Settlements and remanding for further proceedings. (Dkt. No. 2531.) A hearing on these motions was held May 20, 2020, at which counsel for IPPs, for class members, for defendants, for objectors, and objectors *in pro se* appeared via a videoconference platform. Thereafter, and at the direction of the Court, the Hagens Berman firm submitted a copy of the sealed portions of a bid submitted in connection with the contested proceedings regarding appointment of interim class counsel (Dkt. No. 2630) and IPPs and objectors submitted supplemental briefing addressing the effect of the sealed bid on the pending motions.

**\*2** On August 14, 2020, this Court issued an Order to Show Cause Re: further notice to the class concerning a revised/clarified allocation and distribution plan for all settlement funds in this matter including the settlement the Court had previously approved in connection with the Sony Defendants. (Dkt. No. 2648.)

After considering responses filed thereto, the Court issued its Order Directing Further Notice Regarding Settlement Distribution Plan and an Order Approving the form of notice of the revised settlement distribution plan. (Dkt. Nos. 2651, 2654.) After dissemination of the approved class notice and an opportunity for class members to submit objections to the revised distribution plan, the Court held a hearing via videoconference on December 8, 2020, to consider final approval of that revised distribution plan. IPPs and objectors Michael Frank Bednarz, Steven Helfand, Edwin Orr, and Gordon Morgan appeared via videoconference.

The Court has carefully reviewed and considered the record in this matter, including: the memoranda and supporting declarations; the proposed settlement agreements between IPPs and Hitachi, LG Chem, and NEC (collectively, "the Settlements"); the objections submitted by Christopher Andrews (Dkt No. 2604), Edward W. Orr (Dkt. No. 2605); Michael Frank Bednarz (Dkt. No. 2606), and Gordan Morgan

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 240 of 482

In re Lithium Ion Batteries Antitrust Litigation, Not Reported in Fed. Supp. (2020)

2020-2 Trade Cases P 81,483

(Dkt. No. 2607); IPPs' responses to those objections (Dkt. No. 2614); the supplemental filings of IPPs and objectors (Dkt. Nos. 2636, 2643, 2644, 2646); the responses to the August 14, 2020 OSC and additional objections and responses thereto filed with respect to the revised distribution plan (Dkt. Nos. 2649, 2650, 2653, 2659, 2662, 2663, 2666, 2668, 2669, 2671); and the previously sealed bid information from Hagens Berman. The Court has also reviewed prior proceedings bearing on the issues, including the hearing transcripts.

Good cause appearing, the Court ORDERS that the motion for final approval is GRANTED and the motion for attorneys' fees, expenses, and service awards is **GRANTED IN PART**, on the terms and for the reasons stated herein. Further, the revised settlement distribution plan is APPROVED.

## I. BACKGROUND AND PROCEDURAL HISTORY

### A. Round 2 Settlements and their Approval

IPPs reached settlement agreements with defendants LG Chem, Hitachi, and NEC in November 2016, December 2016, and January 2017, respectively (hereinafter, "Round 2 Settlements"). Those settlement agreements included provisions that the distribution of the settlement funds therein, net of attorneys' fees, costs, and taxes, would be distributed to authorized claimants according to a distribution plan approved by the Court. (*See* LG Chem, Hitachi and NEC Settlement Agreements at ¶¶ 19(e), 20(c).) The Round 2 Settlement Agreements specifically stated that a plan of distribution to claimants was not part of the settlement agreement, like the Round 1 Sony Settlement before it, and left a determination of the appropriate distribution plan to the Court at a later date after final approval. (*See, e.g.*, LG Chem, Hitachi and NEC Settlements at ¶¶ 23 and A(1)(h) [" 'Distribution Plan' means any plan or formula of allocation of the Gross Settlement Fund, to be approved by the Court, whereby the Net Settlement Fund shall in the future be distributed to Authorized Claimants. ***Any Distribution Plan is not part of this Agreement***."] (emphasis supplied); *see also* Sony Settlement Agreement, Dkt. No. 1505-1 at ¶¶ E.20 [funds to be distributed after final approval and "the Distribution Plan and such further approval and further order(s) of the Court as may be necessary or as circumstances require"], A.1(h) [" 'Distribution Plan' means any plan or formula of allocation of the Gross Settlement Fund, to be approved by the Court, whereby the Net Settlement Fund shall in the future be distributed to Authorized Claimants. ***Any Distribution Plan is not part of this Agreement***."].) At the

time the agreements were executed, IPPs' original motion for class certification had been fully briefed but not yet decided.[1]

**\*3** IPPs filed motions for preliminary approval of the settlements on December 6, 2016 (Dkt. No. 1652 [LG Chem]); and January 24, 2017 (Dkt. No. 1672 [Hitachi and NEC]). The Court heard argument on the motions for preliminary approval on February 28, 2017.[2] On March 20, 2017, with the IPPs' motion for class certification still under submission, the Court granted the motions for preliminary approval of the Round 2 Settlements and directed notice to the Settlement Classes and a schedule for filing of objections and a hearing on final approval. (Dkt. No. 1714.)

### B. Denial of Motion for Class Certification and Choice-of-Law Guidance

On April 12, 2017, the Court issued its order denying without prejudice IPPs' motion for class certification as to the non-settling defendants which, at the time, were Samsung, Sanyo, Toshiba and Panasonic. (Dkt. No. 1735 at 1 fn.1.) In denying class certification, the Court found that the numerosity, adequacy, typicality and commonality requirements of Rule 23(a) were met with respect to the claims against the non-settling defendants, but that IPPs had failed to offer a reliable method of common proof for class-wide impact and damages, specifically because the expert report of Dr. Edward Leamer was insufficient to that task. (*Id.* at 10-11, 14, 19.) The Court also offered, as guidance for IPPs' renewed motion for class certification, a choice of law analysis based upon the then-available evidence proffered by IPPs concerning defendants' significant contacts with California versus New Jersey. (*See id.* at 21:19-22:2.) Based on evidence of defendants' substantial contacts with California, the Court considered the choice-of-law question under the California test, finding:

> the interests of *Illinois Brick*[3] non-repealer states in precluding indirect purchaser claims would be impaired more significantly by applying the Cartwright Act than California's interests would be impaired by limiting its application to *Illinois Brick* repealer states, the Court finds that a nationwide class under the Cartwright Act would not be appropriate. However, as to the *Illinois Brick*

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 241 of 482

In re Lithium Ion Batteries Antitrust Litigation, Not Reported in Fed. Supp. (2020)

2020-2 Trade Cases P 81,483

repealer states, California's interests would prevail over less significant issues of whether a state follows some or all of the standing factors in *Associated General Contractors of California v. California State Council of Carpenters*, 459 U.S. 519 (1983), statute of limitations differences, and the like. Any renewed motion for class certification should take this determination into account.

(*Id.* at 24:1-9.) [4]

**C. Motion for Final Approval of Round 2 Settlement Agreements**

IPPs filed their motion for final approval of the Round 2 settlements on August 28, 2017. (Dkt. No. 1921.) Mssrs. Andrews, Morgan, and Bednarz filed objections to the final approval motion. (Dkt. Nos. 1753, 1787, 1833, 1834, 1900 [Andrews' objections]; 1902, 1907 [Bednarz objections]; 1906, 1915 [Morgan objections].) [5]

**\*4** On October 3, 2017, the Court heard arguments on the original motion for final approval of the Round 2 Settlements. (*See* Dkt. No. 1984.) [6] Objector Frank Bednarz argued that the pro rata distribution plan that was part of the settlements therein was unfair. The Court noted at oral argument that Bednarz's objections to the distribution plan were not actually ripe, given that the Court had not yet considered or approved a distribution plan. (*Id.* at 4:16-20, 22-23 [Court stating "each of the agreements gives [the Court] the ability to distribute the gross settlement fund" and "given that we aren't distributing yet and there isn't a very specific plan in front of me that I can approve...I can take the objections under advisement"].) Mr. Bednarz's counsel acknowledged that the distribution plan had only been suggested at that point, but nevertheless believed that it raised an issue of adequacy of representation under Rule 23(a)(4), meaning that there needed to be separate representation of those class members. (*Id.* at 5:22-6:2; 6:10-15.) He argued that the adequacy issue was one that the *Sullivan* court did not specifically address. (*Id.* at 6:10-15.)

IPPs' counsel confirmed that the Court had the discretion to determine the final distribution plan, arguing that the Court did not need to determine the final plan in order to

approve the settlements with the Round 2 defendants. (*Id.* at 5:6-12.) IPPs' counsel argued that the Third Circuit's decision in *Sullivan* [7] addressed the practical problem underlying Bednarz's objection to the certification of a nationwide class before deciding the merits of non-repealer state residents' claims: "if you aren't going to allow settlements of claims...before the legitimacy of those claims is resolved as a practical matter, there are never going to be settlements." (*Id.* at 7:13-16.) The settlements had been negotiated based on a nationwide class and a nationwide damages number at a time when the Court had not yet given any indication on the choice of law issue. (*Id.* at 9:14-10:5.) Indeed, he argued, the Court had not resolved the issue finally even at the time of final approval, begging the question of when such a settlement would be permissible under objector's logic. (*Id.* at 9:25-10:5.) After hearing the arguments, the Court took the matter under submission.

On October 27, 2017, the Court issued its order granting final approval of the Round 2 Settlement Agreements. (Dkt. No. 2003.) The Court specifically noted that "a pro rata plan of distribution, *the specifics of which the Court shall approve at a later date*" was approved. (*Id.* at 1, 3, emphasis supplied.) The Court certified a single nationwide settlement class, citing *Sullivan* as well as *In re Transpacific Passenger Air Transportation Antitrust Litigation*, No. 15-16280, 2017 WL 2772177 (9th Cir. June 20, 2017); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 3:07-CV-5944 JST, 2016 WL 721680, at \*15 (N.D. Cal. Jan. 28, 2016). The Court acknowledged the objections regarding "intraclass conflicts between consumers that reside in *Illinois Brick* repealer states and those that reside in other states, which the allocation plan must take into account" but found that, for purposes of settlement, common issues predominated despite variations in state law might have affected some settlement class members' right to recover had the case proceeded to trial. (*Id.* at 4:4-5, 13-20, citing *Sullivan*, 667 F.3d at 302-303 ("in the settlement context, variations in state antitrust, consumer protection and unjust enrichment laws did not present 'the types of insuperable obstacles' that could render class litigation unmanageable").) The Court concluded that the settlements, and the general plan of a pro rata distribution among the members of the settlement classes therein, were fair and adequate despite intragroup differences. (*Id.* at 4:19-20.) Finally, the Court stated that,

**\*5** Without affecting the finality of the order and Judgment in any way,

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 242 of 482

In re Lithium Ion Batteries Antitrust Litigation, Not Reported in Fed. Supp. (2020)

2020-2 Trade Cases P 81,483

the Court **ORDERS** that <u>IPPs submit a proposed distribution plan</u> at the close of the claims period and that it submit quarterly reports directly to the Court on the progress and status of the claims program. The proposed distribution plan and first quarterly claims report shall be lodged with the Court no later than **14 days prior to the close of the claims period**.

(*Id*. at 5:4-8, emphasis in original and supplied.)

### D. Round 3 Settlements

On November 20, 2017, Mr. Bednarz filed an appeal of the final approval order for the Round 2 Settlement Agreements. (Dkt. No. 2034.) Subsequent to Mr. Bednarz's appeal, on January 5, 2018, IPPs notified the Court that they had reached settlements in principle with the Tokin and Toshiba defendants. (Dkt. No. 2124.)

IPPs were denied class certification on their renewed motion by Order issued March 5, 2018. (Dkt. No. 2197.) The Ninth Circuit denied IPPs' request to file a direct appeal of the denial of the renewed class certification motion on June 27, 2018. (Dkt. No. 2347.) Thereafter, IPPs entered into a settlement with the Samsung defendants. (*See* Dkt. No. 2312.) They requested that the Court delay any motion for preliminary approval of the Tokin, Toshiba, and Samsung settlements while the Ninth Circuit considered whether it would grant rehearing *en banc* in *In re Hyundai & Kia Fuel Economy Litigation*, 881 F.3d 679 (9th Cir. 2018). (*Id*.; *see also* Dkt. No. 2365 [noting that *en banc* review was granted].)

Finally, after the Court ordered IPPs' unauthorized third motion for class certification stricken (Dkt. No. 2407), on November 20, 2018, IPPs reported that they had reached a settlement in principle with the Panasonic defendants, the only defendants remaining in the IPP case. (Dkt. No. 2444.)

### E. Court's Approval of Round 3 and 90/10 Distribution Formula

With the appeals of the Round 2 Settlements still pending before the Ninth Circuit, on January 24, 2019, IPPs filed their motion to direct notice to the class regarding the settlements with defendants SDI, Tokin, Toshiba, and Panasonic ("the Round 3 Settlements"). (Dkt. No. 2459.) In the context of

that motion, IPPs also first proposed an allocation plan they asserted "meaningfully reflects the greater settlement value of claims by residents of states that have passed laws allowing recovery by indirect purchasers (so-called '*Illinois Brick* repealer states') versus residents of states that have not done so ('non-repealer states')." (*Id*. at 1:16-19.) The proposed distribution plan was to allocate 90% of the settlement fund to class members in *Illinois Brick* repealer states and the remaining 10% of settlement funds to class members in non-repealer states. IPPs made this recommendation based upon the parties' stipulated adversarial process before the Honorable Rebecca J. Westerfield (Ret.), in which Judge Westerfield considered extensive analysis and rendered findings and recommendations concerning an appropriate allocation as between the two groups of putative class members. With that recommendation in hand, IPPs argued the Court should allocate the 10% nominal amount to non-repealer state residents in recognition of the value of their releases of claims, even if nominal. (*Id*. at 18.) The Court heard arguments on March 5, 2019, and entered its Order Directing Notice to the class regarding the Round 3 Settlements and proposed distribution plan on March 11, 2019. (Dkt. No. 2475.) Therein, the Court found, based upon its review of the proposed distribution plan, that it was likely to approve the distribution plan as fair, reasonable, and adequate. The Court found the plan appeared appropriate given that non-repealer state class members had claims that had not been finally resolved on their merits and the Court's guidance regarding the application of California choice-of-law rules would have been subject to appeal. (*Id*. at 3.) The Court set a final approval hearing for July 16, 2019. (*Id*. at 6.)

**\*6** The motion for final approval of the Round 3 Settlement and the proposed distribution plan was filed June 11, 2019 (Dkt. No. 2501) and set for hearing along with IPPs' motion for attorneys' fees (Dkt. No. 2487). Objections were filed by Mssrs. Bednarz, Morgan, and Andrews. (Dkt. Nos. 2495, 2496, 2497.)

On August 16, 2019, after carefully considering the parties' request, Judge Westerfield's analysis, and the objectors' briefing and arguments, the Court granted final approval of the Round 3 Settlements and approval of the 90/10 distribution plan. (Dkt. No. 2516.) At that same time, the Court ordered that IPPs were entitled to attorneys' fees in the amount of $29,334,176.00 which, together with a prior Interim Award of $4,495,000.00, totaled $33,829,176.00 or just under 30% of the total fund. The Court also ordered reimbursement of expenses in the amount of $5,891,547.34

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 243 of 482

In re Lithium Ion Batteries Antitrust Litigation, Not Reported in Fed. Supp. (2020)
2020-2 Trade Cases P 81,483

($6,751,735.84 minus the $860,188.50 already awarded by the Court in the Interim Award), and additional service awards of $225,500.00 ($8,500 for each of the twenty-one individual class representatives and $23,500 for each of two governmental entity class representatives) beyond those awarded in the Interim Award. Thereafter, objectors Christopher Andrews and Gordon Morgan appealed the attorney fee award. (*See* Dkt. No. 2527, 2534.)

### F. Vacatur and Remand of Final Approval Order of Round 2 Settlements

On September 16, 2019, the Ninth Circuit vacated this Court's final approval order of the Round 2 Settlements. (Dkt. No. 2531.) The Ninth Circuit's memorandum stated that the Court "did not explain why a nationwide class should be certified and a pro rata distribution plan approved despite substantial differences in state law between repealer and non-repealer states," and had summarily overruled Mr. Bednarz's objections in finding the pro rata allocation fair and adequate. (*Id*. at 3.) The Ninth Circuit noted this Court's "suggestion in a previous order denying certification of a nationwide class that California's *Illinois Brick* repealer law likely would not apply to class members from non-repealer states." (*Id*. at 4.) The memorandum went on to express that the Circuit's "concerns are also magnified by the district court's recent approval of another set of settlement agreements whose [*sic*] distribution plans specifically account for the difference between repealer and non-repealer states." (*Id*. at 4.)

Upon remand, IPPs moved to direct a new notice to the classes in the Round 2 Settlements regarding the 90/10 plan of allocation, giving them a new opportunity to object or to request exclusion. (Dkt. No. 2566.) [8] On January 10, 2020, this Court provisionally approved that plan of allocation for the purposes of the Round 2 Settlements, and directed a new notice be provided to the Settlement Class regarding the settlement and distribution plan. (Dkt. No. 2571.) In so doing, the Court again carefully considered Judge Westerfield's recommendation and the assurances of fairness related to the proceedings before her, and found that it was likely to grant final approval of the distribution plan since it treated class members equitably relative to one another based on the relative strength of the subgroups' claims. (*Id*. at 1-2.) The Court further found that it was likely to certify these Round 2 Settlement classes as meeting Rule 23(a)'s requirements and establishing that common questions of law and fact predominate regardless of interclass distinctions in the distribution formula. (*Id*. at 4.)

## II. SUMMARY OF THE ROUND 2 SETTLEMENTS

**\*7** IPPs now move again for final approval of their Round 2 Settlements, attached hereto as **Exhibits 1 through 3**. In the Court's January 10, 2020 Order, IPPs were directed to provide additional notice to the class regarding the Settlements and the distribution plan. (Dkt. No. 2571.) Epiq, the Court-appointed class administrator, provided notice in accordance with this Court's order. Only 21 class members requested exclusion from the class, and a total of four objections were filed. A list of those persons or entities who validly requested exclusion from the Settlement Class is attached hereto as **Exhibit 4**. Such persons or entities are not entitled to any recovery of the settlement proceeds obtained in connection with the Settlements.

### A. Settlement Terms

The proposed Settlements resolve all claims against the Round 2 Settling Defendants stemming from the alleged conspiracy to restrain competition for lithium-ion batteries. The Settlement Class in each of the settlements is substantially similar and is defined as follows:

> All persons and entities who, as residents of the United States and during the period from January 1, 2000 through May 31, 2011, indirectly purchased new for their own use and not for resale one of the following products which contained a lithium-ion cylindrical battery manufactured by one or more defendants or their coconspirators: (i) a portable computer; (ii) a power tool; (iii) a camcorder; or (iv) a replacement battery for any of these products.

### B. The Settlement Fund

Under the proposed Round 2 Settlements, the Round 2 Settling Defendants will pay a total of $44.95 million in cash: LG Chem will pay $39 million, Hitachi will pay $3.45 million, and NEC will pay $2.5 million. The settlement funds are non-reversionary to the defendants. Inclusive of the settlements previously approved between IPPs and other

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 244 of 482

In re Lithium Ion Batteries Antitrust Litigation, Not Reported in Fed. Supp. (2020)
2020-2 Trade Cases P 81,483

defendants in this case, IPPs have secured settlements of $113.45 million for the IPP class.

### C. Release of Claims

Each Settlement Agreement provides that upon final approval and entry of judgment, Class Members will release state and federal law claims against the Round 2 Settling Defendants relating to purchases of lithium-ion batteries or products containing lithium-ion batteries up through May 31, 2011. The proposed Settlement Class includes only purchasers of portable computers, power tools, camcorders, and replacement batteries, consistent with the class for which IPPs originally sought certification. As to these settlement class members, the Settlements will release all antitrust claims based on all lithium-ion battery types (*i.e.*, cylindrical, prismatic, and polymer batteries) and additional products (*e.g.*, mobile phones, smart phones, cameras, digital video cameras, and digital audio players), consistent with the scope of claims originally pleaded.

### D. Plan of Allocation

IPPs propose to distribute the settlement funds in two steps. *First*, 90 percent of the settlement funds will be allocated toward Class Members who made purchases in *Illinois Brick* repealer jurisdictions, and the remaining 10 percent will be allocated toward Class Members who made purchases in non-repealer states. *Second*, within each allocation, the funds will be distributed *pro rata* to claimants based on the total number of covered products purchased from January 1, 2000 through May 31, 2011. Should a balance remain after distribution to the class (whether by reason of tax refunds, uncashed checks, or otherwise), those funds shall escheat to federal or state governments. Accordingly, no settlement funds will revert to the Round 2 Settling Defendants.

## III. MOTION FOR FINAL APPROVAL OF ROUND 2 SETTLEMENTS

At final approval, this Court must decide whether: (1) the proposed settlement class meets Rule 23's requirements; (2) the settlements are fair, reasonable, and adequate; and (3) appropriate notice and other procedural requirements are met. The new amendments to Rule 23 provide that in determining whether a proposed settlement is fair, reasonable, and adequate, the Court must consider whether:

>  **\*8** (A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

### A. The Court Certifies the Settlement Classes for the Round 2 Settlements.

At final approval, this Court must decide whether the proposed Settlement Class meets Rule 23's requirements. To certify this proposed settlement class, IPPs must show that the requirements of Rule 23(a) and 23(b)(3) are met. The Ninth Circuit Court has confirmed that "[t]he criteria for class certification are applied differently in litigation and settlement classes." *Hyundai*, 926 F.3d at 556. In *Hyundai*, the Ninth Circuit clarified the application of the Rule 23 criteria in the settlement class action context, which informs the analysis here. As discussed below, the Court certifies the proposed settlement class for settlement purposes under Rule 23(b)(3) and (e).

#### 1. The Settlement Class Meets the Requirements of *Rule 23(a)*

Under Rule 23(a), the proponent of class certification must show that the proposed class meets the requirements of (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy. Those requirements are met here.

As the Court found in connection with IPPs' original motion for class certification (Dkt. No. 1735), those same classes (now Settlement Classes herein), satisfy Rule 23(a)'s requirements. (*Id*. at 10-12.) As to numerosity, the class numbers in the million, which would make

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 245 of 482

In re Lithium Ion Batteries Antitrust Litigation, Not Reported in Fed. Supp. (2020)

2020-2 Trade Cases P 81,483

joinder impracticable, if not impossible. With respect to commonality, a common question "must be of such a nature that it is capable of class[-]wide resolution – which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350. "[F]or purposes of Rule 23(a)(2), even a single common question will do." *Id.* at 359. Here, a central, common question underlying each of the Settlement Classes' claims is whether defendants participated in a conspiracy to raise, fix, stabilize or maintain the prices of lithium ion batteries sold in the United States. Thus, Rule 23(a)(2) is satisfied.

Rule 23(a)(3) requires a showing that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality means that the named plaintiffs "suffer the same injury as the class members." *Dukes*, 564 U.S. at 348. "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (*quoting Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). The requirement is "permissive" and the representatives' claims need only be "reasonably co-extensive with those of absent class members." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)). Here, IPPs alleged that the defendants engaged in a common price-fixing scheme affecting all members of the Settlement Classes in the same way. The Court finds, as it did in considering IPPs' motion for class certification (Dkt. No. 1735 at 10-12), that the IPP named plaintiffs' claims here are reasonably co-extensive with the claims of members of the Settlement Classes. *Cf. In re Transpacific Passenger Air Transportation*, 2015 WL 3396829, at *3 (finding antitrust settlement fair and adequate despite potential differences in application of *Illinois Brick*, since court had not reached the merits of those issues and court's role was not to "differentiat[e] within a class based on the strength or weakness of the theories of recovery." (citing *Sullivan*, 667 F.3d at 328 and *Lane v. Facebook, Inc.*, 696 F.3d 811, 824 (9th Cir. 2012)).

**\*9** Finally, Rule 23(a)(4)'s adequacy requirement considers whether a class representative will "fairly and adequately protect the interests of the class," meaning that the representative does not have any conflicts of interest with other class members and will prosecute the action vigorously on their behalf. Fed. R. Civ. P. 23(a)(4); *see Ellis v.*

*Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011). "To determine legal adequacy, [courts must] resolve two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hyundai*, 926 F.3d at 566.

Here, the Court does not believe the potential state law variations applicable to some class members create a conflict of interest, or that the class representatives cannot fairly represent all class members. As in *Hyundai*, for purposes of certification of a settlement class, class representatives can adequately represent the absent class members if their claims "revolved around a 'common nucleus of facts'...[and a] common course of conduct," even if state law variations might affect the relative viability of certain absent class members' claims. *Hyundai*, 926 F.3d at 563–64; *see also In re Transpacific Passenger Air Transportation*, 2015 WL 3396829, at *3 (N.D. Cal. May 26, 2015) (rejecting claim of intraclass conflict and finding that the court need not "wade into the *Illinois Brick* issue" or make distinctions in the strength or value of some members claims in order to approve settlement). In this case, the nature of the claims alleged and relief sought— that *all* class members could bring claims under California's Cartwright Act—were the predominant issues in this case and identical as to *all* class members. As such, for purposes of settlement, the class representatives and counsel could represent *all* those class members' interests fairly and adequately. The question of whether class members could bring claims under California's Cartwright Act had not been finally resolved at the time of settlement or subsequently. Further, the Class Counsel and the Class Representatives have litigated this action competently and vigorously since 2013 and have achieved an excellent result for *all* class members. These factors, along with the structural assurances of fairness inherent in the proposed distribution plan, satisfy the Court that class counsel and class representatives have no conflict with the class and have represented all members' interests fairly.

## 2. Common Issues Predominate Under Rule 23(b)(3)

The Settlement Class satisfies Rule 23(b)(3) because common questions predominate over questions affecting individual class members. "The predominance inquiry under Rule 23(b)(3) 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.' " *Hyundai*, 926 F.3d at 557 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). The Ninth Circuit in *Hyundai* emphasized that Rule 23(b)(3) does not require that all elements of a

Case 4:21-cv-00196-MWB Document 249-1 Filed 10/07/25 Page 246 of 482

In re Lithium Ion Batteries Antitrust Litigation, Not Reported in Fed. Supp. (2020)

2020-2 Trade Cases P 81,483

claim is susceptible to class-wide proof; rather, "even if just one common question predominates, 'the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately.' " *Id.* (quoting *Tyson Foods, Inc. v. Bouaphakeo*, _U.S._, 136 S.Ct. 1036, 1045 (2016)).

*a. Predominance is readily shown in antitrust cases.*
In horizontal price-fixing cases, questions as to the existence of the alleged conspiracy and as to the occurrence of price-fixing are readily found to predominate. *See, e.g.*, *Sullivan*, 667 F.3d at 300; *see also Amchem*, 521 U.S. at 625 (predominance under Rule 23(b)(3), "is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."). The court in *In re TFT-LCD (Flat Panel) Antitrust Litigation*, 267 F.R.D. 291, 310 (N.D. Cal. 2010) collected cases and explained: "Courts have frequently found that whether a price-fixing conspiracy exists is a common question that predominates over other issues because proof of an alleged conspiracy will focus on defendants' conduct and not on the conduct of individual class members."

**\*10** This price-fixing case is no different. Resolution of IPPs' claims depends principally on whether defendants participated in a price-fixing conspiracy, and whether the conspiracy caused an artificial increase to the market price of lithium ion batteries. If IPPs were to prove these elements based on common evidence, a jury could reasonably infer that every class member suffered some injury as a result. Antitrust cases, like consumer fraud cases, are ones in which predominance is "readily met" because the class is comprised a "cohesive group of individuals [who] suffered the same harm in the same way because of the [defendants'] alleged conduct." *Hyundai*, 926 F.3d at 559 ("We have held that these types of common issues, which turn on a common course of conduct by the defendant, can establish predominance in nationwide class actions."). Had the Settlement Class members brought their claims individually, each would have had to rely on the same evidence of cartel behavior, and prove damages using the same economic modeling on which IPPs relied.[9]

*b. Predominance is met despite variations in state law*
IPPs move to certify a nationwide Settlement Class of consumers—including residents of both *Illinois Brick* repealer states and non-repealer states. The Court finds that, for purposes of certifying a settlement class, the variations in state law with respect to *Illinois Brick*'s repeal or non-repeal do not foreclose a finding that common issues predominate.

In its April 12, 2017 order denying that motion without prejudice (Dkt. No. 1735), the Court denied certification on the grounds that IPPs had not presented a sufficient model of class-wide proof of pass-through liability and damages. The Court provided plaintiffs with "guidance...should [they] elect to renew their motion" in the form of an analysis, based on the evidence then-presented, of the applicability of California's Cartwright Act to a nationwide class.[10] (*Id.* at 20-24.) The Court did not provide a final resolution of the *Illinois Brick* issue, nor did it resolve the parties' dispute over which states qualified as *Illinois Brick* repealers. (*Id.* at 24 and fn. 11.)

The settlements herein originally were reached and preliminarily approved ***prior*** to the Court's ruling on IPPs' first motion for class certification. Moreover, this Court's analysis in its order denying without prejudice IPPs' first attempt to certify a nationwide litigation class does not foreclose certification of a nationwide ***settlement*** class.

Mr. Bednarz, in connection with the *original* fairness hearing on these settlements, argued that intraclass conflicts between those who purchased in *Illinois Brick* repealer states and those who did not precluded certification of the settlement classes. Although Mr. Bednarz does not raise that objection to the present motion, Mr. Orr raises the argument for him as an objection here. Essentially, the objection is that claims with "vastly different litigation value" (Dkt. No. 1902 at 6:7-8)— or as Mr. Orr contends, zero value—cannot be unified fairly in a single class for settlement purposes.

To the extent *Illinois Brick* variations in state law might weigh against predominance, the Court finds they are counterbalanced by the common issues here: the price-fixing conspiracy and cartel, and whether that resulted in increased market price of lithium ion batteries, based on a cohesive set of facts causing harm to all class members. On this point, the Court finds persuasive the Third Circuit's analysis in *Sullivan*, 667 F.3d 273. There the circuit court observed that, even in a nationwide litigation class, variations in state law would not necessarily defeat predominance and certification where a constellation of common issues binds the class together and state law variations can be sorted into groups with similar legal doctrines. *Id.* at 302 (citing *Klay v. Humana, Inc.*, 382 F.3d 1241, 1262 (11th Cir.2004); *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1017 (D.C.Cir.1986).) Such concerns were greatly diminished when presented with

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 247 of 482

In re Lithium Ion Batteries Antitrust Litigation, Not Reported in Fed. Supp. (2020)

2020-2 Trade Cases P 81,483

certification of a *settlement* class where state law variations are rendered irrelevant "since a settlement would eliminate the principal burden of establishing the elements of liability under disparate laws." *Id.* at 303. [11] Further, the court in *Sullivan* held that certification for settlement purposes did not require plaintiffs to demonstrate that they possessed viable claims despite *Illinois Brick* in order to establish predominance:

> **\*11** The question is not what valid claims can plaintiffs assert; rather, it is simply whether common issues of fact or law predominate. Contrary to what the dissent and objectors principally contend, there is no "claims" or "merits" litmus test incorporated into the predominance inquiry beyond what is necessary to determine preliminarily whether certain elements will necessitate individual or common proof. Such a view misreads Rule 23 and our jurisprudence as to the inquiry a district court must conduct at the class certification stage. An analysis into the legal viability of asserted claims is properly considered through a motion to dismiss under Rule 12(b) or summary judgment pursuant to Rule 56, not as part of a Rule 23 certification process.

*Sullivan,* 667 F.3d at 305 (internal citation omitted).

As the Ninth Circuit has held, the choice of law issue in the context of class certification for purposes of litigation bears largely on trial management concerns rather than predominance of common questions *per se. Hyundai,* 926 F.3d at 562; *Jabbari v. Farmer,* 965 F.3d 1001, 1007 (9th Cir. 2020) (9th Cir. July 20, 2020) ("*Hyundai* made clear that it generally is not legal error to forego a choice-of-law analysis in a settlement-class predominance inquiry"). While "[t]he prospect of having to apply the separate laws of dozens of jurisdictions present[s] a significant issue for trial manageability, weighing against a predominance finding [in litigation]....[i]n settlement cases, such as the one at hand, the district court need not consider trial manageability issues." *Hyundai,* 926 F.3d at 563 (citing *Amchem,* 521

U.S. at 620); *see also Zinser v. Accufix Research Inst., Inc.,* 253 F.3d 1180, 1190 (9th Cir.), *opinion amended on denial of reh'g,* 273 F.3d 1266 (9th Cir. 2001) (choice of law analysis in nationwide class affected question of manageability at trial). [12] Moreover, courts have recognized that individualized damages determinations, particularly when they are based upon a common formula, do not defeat predominance. *See Pulaski & Middleman, LLC v. Google, Inc.,* 802 F.3d 979, 988 (9th Cir. 2015) (reaffirming "the proposition that differences in damage calculations do not defeat class certification").

Thus, the Court finds, like others before it, that state law variations between members of a nationwide class do not defeat a finding of predominance of common issues for purposes of settlement. *In re Transpacific Passenger Air Transportation,* 2015 WL 3396829, at *3 (finding antitrust settlement fair and adequate despite potential differences in application of *Illinois Brick,* since court had not reached the merits of those issues and court's role was not to "differentiat[e] within a class based on the strength or weakness of the theories of recovery") (citing *Sullivan,* 667 F.3d at 328; *Lane,* 696 F.3d at 824); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,* No. C 06-4333 PJH, 2013 WL 12333442, at *79 (N.D. Cal. Jan. 8, 2013), *report and recommendation adopted sub nom. In re Dynamic Random Access Memory Antitrust Litig.,* No. C 06-4333 PJH, 2014 WL 12879520 (N.D. Cal. June 27, 2014) (approving settlement with pro rata distribution plan regardless of *Illinois Brick* differences based upon *Sullivan* court's analysis).

### 3. The Settlement Class Satisfies Superiority Under Rule 23(b)(3)

**\*12** Resolution of IPPs' claims through a class action is superior to alternative methods. Litigating every class member's claims separately would waste both judicial and party resources, given that the vast majority of evidence of liability would be identical. *See Hanlon,* 150 F.3d at 1023.

### B. Plan of Distribution

"Approval of a plan of allocation of settlement proceeds in a class action is governed by the same standards of review applicable to approval of the settlement as a whole: the plan must be fair, reasonable and adequate." *In re Omnivision Techs., Inc.,* 559 F.Supp.2d 1036, 1045 (N.D. Cal. 2008); *Class Plaintiffs v. City of Seattle,* 955 F.2d 1268, 1285 (9th Cir. 1992). Allocation of the settlement funds based on the extent of class members' injuries or the strength of their claims

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 248 of 482

In re Lithium Ion Batteries Antitrust Litigation, Not Reported in Fed. Supp. (2020)

2020-2 Trade Cases P 81,483

on the merits represents a fair, reasonable, and adequate allocation. *Omnivision,* 599 F.Supp.2d at 1045; *see also, In re Oracle Sec. Litig.,* No. 90–cv–00931–VRW, 1994 WL 502054, at *1 (N.D. Cal. June 18, 1994) ("A plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable."). A proposed allocation "need only have a reasonable, rational basis, particularly if recommended by experienced and competent counsel." *In re: Cathode Ray Tube (CRT) Antitrust Litig.,* No. C-07-5944-JST, 2016 WL 3763382, at *6 (N.D. Cal. Feb. 29, 2016), *report and recommendation adopted in part,* No. C-07-5944 JST, 2016 WL 3648478 (N.D. Cal. July 7, 2016), *dismissed sub nom. In re CRT,* 2017 WL 3468376 (9th Cir. Mar. 2, 2017) (quoting *Rieckbom v. Velti PLC,* No. 13-cv-03889, 2015 WL 468329, at *8 (N.D. Cal. Feb. 3, 2015)).

Consistent with the settlements approved in Round 3, IPPs here recommend that the Court allocate 10 percent of the settlement funds for distribution to Class Members in non-repealer states, based on considerations of the risk-discounted value of the claims those class members release under the terms of the Settlement Agreements. Mssrs. Andrews and Orr object to the distribution plan on the same basis that they object to certification of the Settlement Classes—that permitting class members in non-repealer states to receive a portion of the funds, even if only a nominal 10% of the fund, unfairly dilutes the claims of those in repealer states.

The Court has considered the distribution plan here, which takes account of the relative strength of class members' claims depending upon the *Illinois Brick* repealer issue. The settlements do not require individualized damage determinations, but simply prescribe a formula for allocating proceeds as between two sub-groups within the settlement class. The proposed 90/10 allocation in this case is appropriate in light of the fact that both residents of repealer and non-repealer jurisdictions released claims as part of this settlement, albeit with a risk-discounted value as to the non-repealer state class members. While the Court had ruled that only class members in repealer states could be part of a class alleging violation of the Cartwright Act, non-repealer state class members retained rights to appeal that decision.

A plan which "fairly treats class members by awarding a pro rata share to every Authorized Claimant, [even as it] sensibly makes interclass distinctions based upon, *inter alia,* the relative strengths and weaknesses of class members' individual claims" should be approved as fair and reasonable. *In re MicroStrategy, Inc., Sec. Litig.,* 148 F.Supp.2d 654,

669 (E.D. Va. 2001) (citation omitted). Indeed, distribution models that acknowledge the relative strengths and values of the various claims within the Settlement Class and distribute smaller relative awards certain subgroups have been approved within this Circuit. *See, e.g., Jenson, v. First Tr. Corp.,* No. CV 05-3124 ABC (CTX), 2008 WL 11338161, at *10 (C.D. Cal. June 9, 2008) (approving distinctions in plan of allocation as reasonably reflecting likelihood of recovery of subgroups within the class); *In re Biolase, Inc. Sec. Litig.,* No. SA-CV-13-1300-JLS-FFMX, 2015 WL 12720318, at *5 (C.D. Cal. Oct. 13, 2015) (variable pro rata distribution plan based upon relative injuries of class members approved); *In re Oracle Sec. Litig.,* 1994 WL 502054, at *2 (approving plan "reasonably calculated to allow class members with more meritorious claims to recover a correspondingly larger portion of the settlement" based upon class counsel's appraisal of relative merits of subgroups).

**\*13** As the Court found in connection with the Round 3 settlements, it is appropriate for class members from non-repealer states to receive a limited share of the total recovery given that their claims had not been dismissed nor amended out of the pleadings ***before*** the settlements agreeing to release those claims were reached. Indeed, the settlements reached with these three sets of defendants were executed ***prior*** to the Court's orders denying class certification and its choice-of-law analysis. That analysis was subject to further litigation and appeal had the case not settled.

Thus, in recognition of the fact that such releases themselves have some value, even if nominal, the Court finds the 90/10 allocation plan is fair and reasonable and does not preclude certification of a settlement class. To infer that those claims have ***no*** value would be to ignore the practical realities of litigation including the right to appeal. The parties and lawyers here are sophisticated. They are entitled to continue to pursue litigation. They are also entitled to "buy peace," even where some claims are not as strong as others. *Cf. Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of San Francisco,* 688 F.2d 615, 625 (9th Cir. 1982) ("voluntary conciliation and settlement are the preferred means of dispute resolution."); *Van Bronkhorst v. Safeco Corp.,* 529 F.2d 943, 950 (9th Cir. 1976) ("[T]here is an overriding public interest in settling and quieting litigation" and this is "particularly true in class action suits."); *see also Sullivan,* 667 F.3d at 311 ("achieving global peace is a valid, and valuable, incentive to class action settlements" and making proof of validity of all claims a prerequisite would prevent "the

Case 4:21-cv-00196-MWB Document 249-1 Filed 10/07/25 Page 249 of 482
In re Lithium Ion Batteries Antitrust Litigation, Not Reported in Fed. Supp. (2020)
2020-2 Trade Cases P 81,483

parties from seriously getting to, and engaging in, settlement negotiations").

**C. Appointment of Class Counsel Under Rule 23(g)**

Pursuant to Rule 23(g), this Court appoints Cotchett, Pitre & McCarthy, LLP, Hagens Berman Sobol Shapiro LLP, and Lieff Cabraser Heimann & Bernstein, LLP, as Class Counsel to represent the certified Settlement Class. At the outset of this action, the Court appointed these firms as Interim Co-Lead Counsel for IPPs after a competitive application process. (Order Appointing Interim Co-Lead Counsel & Liaison Counsel for Indirect Purchaser Plaintiffs, Dkt. No. 194.) Considering counsel's work in this action, their collective expertise and experience in handling similar actions, and the resources they have committed to representing the class, they are appointed as class counsel for the settlement class under Rule 23(g)(1).

**D. The Proposed Settlements Are Fair, Adequate, and Reasonable**

Rule 23 provides that, in determining whether a proposed settlement is fair, reasonable, and adequate, a court must consider whether:

> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
> (i) the costs, risks, and delay of trial and appeal;
>
> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>
> (iv) any agreement required to be identified under Rule 23(e)(3); and
>
> (D) the proposal treats class members equitably relative to each other.

Rule 23(e)(2). [13] Recognizing that "[c]ourts have generated lists of factors," the Advisory Committee emphasizes that these new provisions are intended to "focus" the inquiry on "the primary considerations that should always matter to the

decision whether to approve the proposal." Fed. R. Civ. P. 23(e)(2), 2018 Advisory Committee Notes.

**\*14** Taking these factors into consideration, and as set forth below, the Court finds that the proposed Settlement Agreements are fair, reasonable, and adequate under the Rule 23(e) factors and other relevant considerations identified by the Ninth Circuit.

*1. Representation of the Class*

The Court finds that the class representatives and class counsel have more than adequately represented the Class. The Advisory Committee Notes explain that this subsection, in conjunction with subsection (B), "identify matters that might be described as 'procedural' concerns, looking to the conduct of the litigation and of the negotiations leading up to the proposed settlement." *See* Fed. R. Civ. P. 23, Notes of Advisory Comm., Subdivision (e)(2), Paragraphs (A) and (B) (2018).

As an "example, the nature and amount of discovery in this or other cases, or the actual outcomes of other cases, may indicate whether counsel negotiating on behalf of the class had an adequate information base." *Id.* Ninth Circuit law, too, instructs court to consider the "extent of discovery completed and the stage of the proceedings." *See* Bluetooth, 654 F.3d at 946 (factor five). The extent of the discovery conducted to date and the stage of the litigation are both indicators of counsel's familiarity with the case and of IPPs having enough information to make informed decisions. *See, e.g.*, In re Mego Fin. Corp. Secs. Litig., 213 F.3d 454, 459 (9th Cir. 2000).

IPPs here, during nearly seven years of hard-fought litigation, survived multiple rounds of dispositive motions and conducted extensive discovery, thoroughly testing the claims and defenses in this case. During fact discovery, IPPs took and defended over eighty depositions, served voluminous discovery, reviewed millions of pages of documents (mostly in Japanese, Korean, and Chinese), and analyzed enormous electronic data files produced by defendants and third parties. To obtain this discovery, IPPs brought and prevailed, at least in part, on fourteen contested motions to compel, including orders compelling defendants to produce worldwide transactional sales and cost data for battery cells and packs, detailed interrogatory responses, recalcitrant LG Chem witness Seok Hwan Kwak to appear for deposition. IPPs also engaged in extensive expert discovery and motion practice, and with the help of expert analyses, synthesized large amounts of evidence to show the

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 250 of 482

In re Lithium Ion Batteries Antitrust Litigation, Not Reported in Fed. Supp. (2020)

2020-2 Trade Cases P 81,483

conspiracy's substantial and universal impact on consumers. As a result of their work, IPPs obtained substantial recoveries for the Settlement Class from all but one of the Defendant families prior to the Court's final denial of class certification. These facts make clear that the Class Representatives and Class Counsel had the information they needed to negotiate intelligently on behalf of the class.

### 2. Arm's Length Negotiation

Rule 23(e)(2)(B) instructs courts to consider whether "the proposal was negotiated at arm's length." The Settlements were negotiated at arm's length among experienced and sophisticated counsel. The Advisory Committee Notes state that "the involvement of a neutral or court-affiliated mediator or facilitator in those negotiations may bear on whether they were conducted in a manner that would protect and further the class interests." Here, the Settlements resulted from iterative negotiations directly between counsel and with the assistance of retired Chief Judge Vaughn Walker.

**\*15** As a final procedural consideration, the Advisory Committee Notes to the federal rules directs courts to consider the "treatment of any award of attorney's fees, with respect to both the manner of negotiating the fee award and its terms." The Ninth Circuit has identified three related signs as troubling and potentially indicative that a proposed settlement is not in the class's interests: (a) when class counsel receive a disproportionate distribution of the settlement; (b) when the parties negotiate a "clear sailing" arrangement that provides for the payment of attorneys' fees separate and apart from class funds; or (c) when the parties arrange for fees not awarded to plaintiffs' counsel to revert to the defendants rather than the class. *Hyundai*, 926 F.3d at 569; *Bluetooth*, 654 F.3d at 946. Here, none of these typical signs of collusive behavior are present. Specifically, (a) the funds will be used to cover costs and fees and compensate the class based on a *pro rata* formula, (b) there is no "clear sailing" provision, no payment of fees separate and apart from the class funds, and (c) the proposed settlement is a common fund, all-in settlement with no possibility of reversion, and no "kicker" provision which would allow unawarded fees to revert to the defendants. The class notice informed class members that class counsel would make a request for attorneys' fees up to 30 percent of the settlement fund. In sum, all procedural considerations support a conclusion that negotiations occurred at arm's length.

### 3. Adequacy of Relief to the Class

Rule 23(e)(2)(C) asks the court to consider whether "the relief provided for the class is adequate" taking into account four enumerated factors.

*a. Risks and Costs of the Litigation* The first factor – "the costs, risks, and delay of trial and appeal," Fed. R. Civ. P. 23(e)(2)(C)(i) – is analogous to the Ninth Circuit's consideration of the risk, expense, complexity, and likely duration of further litigation, while also examining the strength of plaintiffs' case, the risk of maintaining class action status throughout the trial, and the amount offered in settlement. *Bluetooth*, 654 F.3d at 947-48 (identifying these factors).

Antitrust cases are particularly risky, challenging, and widely acknowledge to be among the most complex actions to prosecute. *See, e.g.*, *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 118 (2d Cir. 2005) (" "Indeed, the history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal.' " (quoting *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 475 (S.D.N.Y. 1998))); *see also In re Super. Beverage/Glass Container Consol. Pretrial*, 133 F.R.D. 119, 127 (N.D. Ill. 1990) ("The 'best' case can be lost and the 'worst' case can be won, and juries may find liability but no damages. None of these risks should be underestimated."); *In re Linerboard Antitrust Litig.*, MDL No. 1261, 2004 WL 1221350, at \*10 (E.D. Pa. June 2, 2004) (quoting *In re Motorsports Merch. Antitrust Litig.*, 112 F. Supp. 2d 1329, 1337 (N.D. Ga. 2000)) (internal quotation marks omitted); *In re Auto. Refinishing Paint Antitrust Litig.*, 617 F. Supp. 2d 336, 341 (E.D. Pa. 2007) (the "antitrust class action is arguably the most complex action to prosecute[;] [t]he legal and factual issues involved are always numerous and uncertain in outcome") (internal quotation marks and citation omitted). This case in particular was intrinsically difficult to litigate due to the scope and length of the conspiracy alleged, the complexity associated with proving the existence of overcharges, and the measure of the pass-through overcharge to the end-consumer. The sheer scale of this litigation required extensive coordination among Class Counsel and the supporting firms in developing pleadings, engaging in motion practice, conducting discovery, and creating economic models to demonstrate damages.

Recovery of $44.95 million in settlements for the indirect purchaser class from these Round 2 Settling Defendants represents a strong result given the sizeable risks, challenges,

Case 4:21-cv-00196-MWB Document 249-1 Filed 10/07/25 Page 251 of 482

In re Lithium Ion Batteries Antitrust Litigation, Not Reported in Fed. Supp. (2020)

2020-2 Trade Cases P 81,483

and costs faced. These Settlements, while compromises, represent a robust result for the Settlement Class, particularly given the risk of nominal or no recovery by the Settlement Class. Indeed, subsequent to reaching these settlement agreements, the Court denied IPPs' initial and renewed motions for class certification, potentially limiting IPPs' recovery to the damages of the Class Representatives only. Recovery of $44.95 million is a significant result given the risks the Settlement Class faced.

### b. Effectiveness of Distribution

**\*16** Rule 23(e)(2)(C) also instructs the Court to take into account the "effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." IPPs' proposed distribution plan will maximize the effectiveness of the distribution of the settlement proceeds. After any outreach requested by the parties to review the validity of claims is complete, and the Court approves the Settlements and enters final judgment (which may take several months, pending appeals and Court availability), settlement administrators will send an email to all valid claimants. The email will provide instructions on how to receive payments electronically via PayPal, Google Wallet, Amazon Balance, and other popular methods. Epiq also will mail physical checks to Settlement Class Members who have requested to receive compensation in that manner. The Court has worked actively with Class Counsel to ensure that electronic means can be used to increase participation rates.

### c. Terms of Proposed Attorney's Fees

The third factor to be considered under Rule 23(e)(2)(C) is "the terms of any proposed award of attorney's fees, including timing of payment." Here, the Settlement Agreements do not contemplate a specific award of attorney's fees but provide that any Court-awarded fees will be paid from the Gross Settlement Fund. IPPs requested a total award of $33,829,176 in attorneys' fees plus interest, just under 30% percent of the total recovery in this case, subject to this Court's approval.

### d. Other Agreements

The final factor of Rule 23(e)(2)(C) instructs courts to consider "any agreement required to be identified under Rule 23(e)(3)." This provision is aimed at "related undertakings that, although seemingly separate, may have influenced the terms of the settlement by trading away possible advantages for the class in return for advantages for others." Fed. R. Civ.

P. 23(e) 2003 Advisory Committee Notes. IPPs have entered into no such agreements.

### *4. Equitable Treatment of Class Members*

The Court finds that the settlements treat class members equitably relative to each other, consistent with Rule 23(e)(2)(D). Rule 23(e)(2)(D) requires a court to consider whether members of the settlement class are treated equitably relative to one another, including "whether apportionment of relief among class member takes appropriate account of differences among their claims." Fed. R. Civ. P. 23(e)(2) 2018 Advisory Committee Notes. The proposed Settlement Agreements do not contemplate any unwarranted preferential treatment of class representatives or segments of the class, a consideration identified by Rule 23(e)(2)(D). While the distribution plan treats the repealer and non-repealer subgroups differently, it does so on reasonable and equitable grounds.

### a. Plan of Allocation

Under the terms of the Settlements, the plan of allocation is left for determination by the Court. After remand, IPPs recommend allocating ninety percent of the settlement funds to Class Members making purchases in repealer states, and the remaining ten percent to Class Members making purchases in non-repealer states, and the plan of allocation as to settlements with other defendants to the litigation.

As previously stated, the Court agrees with this recommendation. It is appropriate for class members from non-repealer states to receive a limited recovery because, although their claims were relatively weak compared to repealer state class members, they were still active litigants in the case, and their claims were not finally foreclosed. Thus, in recognition of the fact that such releases themselves have some risk-discounted value, the Court finds the distribution plan allocating 90 percent of the settlement funds to purchases made by Class Members in repealer states and ten percent of the settlement funds to purchases made by Class Members in non-repealer state to be proper.

### b. Late Claims

In their motion for approval, IPPs' argued that the 1,289 paper claims that the Class Administrator received after the claims filing deadline, should not be allowed because they would dilute the existing timely claims. Counsel appearing on behalf of 228 members of the Settlement Class who submitted late claims argued that class members were not aware of their

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 252 of 482

In re Lithium Ion Batteries Antitrust Litigation, Not Reported in Fed. Supp. (2020)
2020-2 Trade Cases P 81,483

eligibility to participate prior to the July 19, 2019 claims deadline, but diligently pursued their claims once they were aware. (Dkt. No. 2623.) [14]

**\*17**  Here, the history of the case has been convoluted, including the necessity of renoticing the settlement and distribution plan for the settlements post-remand. These claimants would be subject to the release in the settlement without any compensation. Moreover, including these late claims will not delay the claims and distribution process in any substantial way. Thus, the Court finds that principles of equity and fairness support allowing the 1,289 claims identified in Class Counsel's motion for final approval.

The Court **ORDERS** that the 1,289 claims identified in Class Counsel's motion for final approval shall be deemed timely submitted. Further, **all claims submitted prior to December 15, 2020** shall be deemed timely submitted.

### E. Additional Approval Factors

#### 1. Notice

Class actions brought under Rule 23(b)(3) must satisfy the notice provisions of Rule 23(c)(2), and upon settlement, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal[.]" Fed. R. Civ. P. 23(e)(l)(B). Rule 23(c)(2) prescribes the "best notice that is practicable under the circumstances, including individual notice [of particular information] to all members who can be identified through reasonable effort[.]" Fed. R. Civ. P. 23(c)(2)(B) (enumerating notice requirements for classes certified under Rule 23(b)(3)).

The proposed notice plan was undertaken and carried out pursuant to this Court's preliminary approval order prior to remand, and a second notice campaign thereafter. (See Dkt. No. 2571.) The class received direct and indirect notice through several methods – email notice, mailed notice upon request, an informative settlement website, a telephone support line, and a vigorous online campaign. Digital banner advertisements were targeted specifically to settlement class members, including on Google and Yahoo's ad networks, as well as Facebook and Instagram, with over 396 million impressions delivered. Sponsored search listings were employed on Google, Yahoo and Bing, resulting in 216,477 results, with 1,845 clicks through to the settlement website. An informational released was distributed to 495 media contacts in the consumer electronics industry. The case

website [15] has continued to be maintained as a channel for communications with class members. Between February 11, 2020 and April 23, 2020, there were 207,205 unique visitors to the website. In the same period, the toll-free telephone number available to class members received 515 calls.

#### 2. Reaction of Class Members and Objections

The Northern District Procedural Guidance, as well of the law of this Circuit, provide that the reaction of class members to the proposed settlement should be considered. IPPs' notice program reached millions of consumers who purchased the consumer products involved in this case. Over one million class members filed claims. Only four objections were received out of millions of class members, and only twenty-one class members requested exclusion [16] from the class. The reaction of the class favors approval of the settlement.

Four objections to the settlements and/or attorneys' fees were filed by objectors Michael Frank Bednarz and Gordon Morgan, Christopher Andrews, and Edward Orr. The bulk of their objections (and the entirety of those filed by Bednarz and Morgan) concerned the request for attorneys' fees and will be addressed in connection with the ruling on the renewed motion for attorneys' fees, below. (See section IV(B), *infra*.)

**\*18  Andrews:** On the merits of settlement approval itself, Mr. Andrews contends that the settlements should be rejected in their entirety because IPPs' counsel failed in their fiduciary duties to class members in the 30 repealer states. Mr. Andrews asserts that non-repealers' claims were never viable and they should recover nothing, since their recovery would dilute the claims of repealer state class members. In addition, Mr. Andrews argues that class representative incentive awards amount to "selling out" unnamed class members, particularly with respect to the higher incentive awards to the City Entity plaintiff representatives. Finally, Mr. Andrews contends that the settlement agreements are defective in that they do not detail the rights, duties, and obligations of the Class Settlement Administrator, including handling of personal identifying information, and that there are discrepancies in the signature dates by defendants' representatives. [17]

**Orr:** Objector Mr. Orr asserts that a single settlement class is unlawful where there are substantial material differences in state law. More specifically, he objects that recovery by non-repealer class members under the 90/10 distribution plan makes the settlement unjust and improper.

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 253 of 482

In re Lithium Ion Batteries Antitrust Litigation, Not Reported in Fed. Supp. (2020)
2020-2 Trade Cases P 81,483

First, as set forth more fully above, the Court does not find merit in Mssrs. Andrews' and Orr's objections to class certification or to the distribution plan based upon intraclass differences as to *Illinois Brick*. The objections appear to be directed to the typicality, adequacy, and predominance factors discussed by the Court above and are overruled for the reasons stated herein. Non-repealers' claims were subject to continued litigation, including on appeal, regardless of their relative weakness or value. Certification of a class encompassing those claims for purposes of settlement is permissible, and a distribution plan taking those relative strengths and risks into account is fair and adequate.

Mr. Andrews' objection to the service awards for named plaintiffs is without merit. Such awards are a typical feature of class action settlements, granted at the discretion of the court as compensation for the special role played by class representatives, to make up for the additional work and responsibilities of the role and the financial or reputational risks it might involve. *See Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009) (citing multiple authorities).

Finally, the Court rejects Mr. Andrews' objections that the Settlement Agreements are otherwise defective. The Court does not find the Settlement Agreements suspect due to the signature dates, nor are they deficient for failure to include a more detailed statement of the Class Administrator's claims and data-handling procedures. However, for purposes of clarification, the Court **ORDERS** that the Class Administrator shall ensure that personal identifying information of all class members is destroyed within 30 days after the IPPs' submission of its final accounting on the distribution of settlement funds and shall file a certification with the Court to that effect.

In summary, the Court finds that the proposed Round 2 Settlements are fair, reasonable, and adequate, and they are **APPROVED**.

Likewise, the distribution plan as set forth above as to the Round 2 Settlements is **APPROVED** and claims submitted by **December 15, 2020**, are **DEEMED TIMELY**.

## IV. IPPS' REQUEST FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS

**\*19** IPPs have submitted a renewed motion for an award of attorneys' fees, expenses, and class representative awards from the total $113.45 million dollar settlement fund as follows:

(1) a total of $33,829,176 in attorneys' fees—just under 30 percent of the settlement fund;

(2) reimbursement of expenses incurred in connection with this litigation totaling $6,751,735.84; and

(3) service awards for each of the class representatives —$10,000 for each of the twenty-one individual class representatives and $25,000 for each of two governmental entity class representatives.

These amounts are identical to what the Court previously awarded in its original decision on fees for IPP Class Counsel. [18] (*See* Dkt. 2516.) No additional costs or fees incurred in the course of the appeals are sought. Objectors submitted arguments against the attorneys' fees sought here, as detailed below.

### A. Reasonableness of Attorneys' Fees Sought

"While attorneys' fees and costs may be awarded in a certified class action where so authorized by law or the parties' agreement, Fed. R. Civ. P. 23(h), courts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011). A district court must adequately explain its reasoning in reaching a fee award determination such that a reviewing court can conduct a meaningful review of the award's reasonableness. *See Stanger v. China Elec. Motor, Inc.*, 812 F.3d 734, 741 (9th Cir. 2016) (per curiam); *McCown v. City of Fontana*, 565 F.3d 1097, 1102 (9th Cir. 2009).

"Where a settlement produces a common fund for the benefit of the entire class," as here, "courts have discretion to employ either the lodestar method or the percentage-of-recovery method" in determining an award of attorneys' fees. *In re Bluetooth*, 654 F.3d at 942. "Because the benefit to the class is easily quantified in common-fund settlements," courts in the Ninth Circuit typically employ the percentage of the common fund method and a benchmark rate of 25%. *Id.*; *see also Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 & n.5 (9th Cir. 2002) ("the primary basis of the fee award remains the percentage method," with the lodestar used "as a cross-check on the reasonableness of a percentage figure.").

However, that 25% benchmark may not be reasonable if it would result an award "either too small or too large in light

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 254 of 482

In re Lithium Ion Batteries Antitrust Litigation, Not Reported in Fed. Supp. (2020)
2020-2 Trade Cases P 81,483

of the hours devoted to the case or other relevant factors." *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990). Particularly "where awarding 25% of a 'megafund' would yield windfall profits for class counsel in light of the [low] hours spent on the case, courts should adjust the benchmark percentage or employ the lodestar method instead." *In re Bluetooth*, 654 F.3d at 942 (citing *Six (6) Mexican Workers*, 904 F.2d at 1311). The preliminary question, however, is whether a given percentage of the fund would constitute an unreasonable multiplier of counsel's lodestar. *See Vizcaino*, 290 F.3d at 1052-54 (citing survey of "megafund" cases finding that 83% of fee awards in such cases amounted to multipliers on top of counsel's lodestar ranging from 1.0-4.0). Here, the concerns that class counsel will receive a windfall if awarded fees at or near the normal benchmark do not arise. Counsel's request for an award just under 30% of the fund amounts to a negative multiplier (approximately 0.82) of Class Counsel's $41,458,223.50 total lodestar request for the case; a 25% benchmark would result in an even greater negative multiplier. Further, as noted, the Court has already ordered Class Counsel not to submit fees for certain actions taken.

 **\*20**  In determining the reasonableness of a fee request, the Ninth Circuit has directed courts to consider these additional factors: (1) the market rate for the particular field of law; (2) whether counsel achieved exceptional results for the class; (3) whether the case was risky for class counsel; (4) whether the case was handled on a contingency basis; and (5) the burdens class counsel experienced while litigating the case. *Online DVD*, 779 F.3d at 955. The Ninth Circuit has held that a fair fee award must include consideration of the contingent nature of the fee and the risk counsel assumed. *See, e.g., id.* at 954-55 & n. 14; *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1299 (9th Cir. 1994).

The Court has conducted a review of the declarations, summaries, and records submitted and finds that the lodestar calculation is reasonable. IPPs' lodestar calculation was made using a blended rate of $467.10 per hour for attorneys, well below the average blended billing rate of $528.11 per hour for forty approved class action settlements in the Northern District of California in 2016 and 2017. (*See* Joint Decl. [Dkt. No. 2487-2] at Exh. 2, William B. Rubenstein Declaration, at 16-18.) The total hours among the 40 firms was 101,048, with the three lead counsel's hours comprising over 70% of those hours and the next largest portion incurred by the group of firms primarily engaged in managing class

representative discovery, high-level document translation and foreign-language document analysis. (*Id.* at ¶ 71, Exh. 1.)

Here, in light of the circumstances of the case, the results achieved for the class are excellent. Based upon IPPs' estimates, the common fund of the settlement equates to 11.7 percent of the single damages a nationwide class would have sustained during the eleven-and-a-half-year class period. Further, the litigation entailed a great deal of risk and cost shouldered by counsel on a contingency basis for seven years. The Court, concerned with the role of litigation funders, met with Class Counsel to ensure that no such funders were involved in the litigation and that Class Counsel themselves were financing the litigation. The record before the Court demonstrates that Class Counsel devoted substantial time to the litigation, foregoing other work. These factors all weigh in favor of finding IPP Class Counsel's fee request to be reasonable. [19]

## B. Objections to Attorneys' Fees

### 1. Bednarz's Objection to Fees

First, Mr. Bednarz argues that an award of 30% of the settlement fund is unreasonable as a general matter and particularly due to the megafund nature of the settlement fund here which should lead to economies of scale and a lower percentage award of fees. However, for the reasons set forth above, the concerns about awarding an amount that would constitute a windfall to counsel here are removed by the fact that the amount sought would be less than counsel's reasonable lodestar.

Second, Mr. Bednarz contends that IPP Class Counsel's baseline fee award should be limited in accordance with the fee bid submitted by Hagens Berman in connection with its motion to be appointed sole interim class counsel at the start of this litigation. Mr. Bednarz contends that IPP counsel, or at a minimum Hagens Berman, should be held to the bid it submitted at the beginning of the case and, from this baseline, the Court should make deductions to account for class counsel's failed Round 2 settlement proposals. Bednarz further contends that the bid represents an appropriate market rate for calculating the fees here.

 **\*21**  As stated in the Court's previous order of November 18, 2019, the fee bid information was redacted from the declaration submitted by Steve W. Berman to the Court in support of the Hagens Berman motion (Dkt. No. 108-1) and, despite an order granting a motion to seal, no unredacted

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 255 of 482

In re Lithium Ion Batteries Antitrust Litigation, Not Reported in Fed. Supp. (2020)
2020-2 Trade Cases P 81,483

version of the declaration was docketed as part of the Court's records. (*See* Dkt. No. 2560 [Order Denying Motion for Clarification re: Unredacted Bid]; *see also* Dkt. No. 216.) In connection with the current motion, the Court ordered Hagens Berman to submit the unredacted version of the declaration and has permitted objectors to respond to that new information. They have done so.

Where "class counsel secures appointment as interim lead counsel by proposing a fee structure in a competitive bidding process, that bid becomes the starting point for determining a reasonable fee." *In re Optical Disk Drive Prod. Antitrust Litig.*, 959 F.3d 922, 934–35 (9th Cir. 2020). Here, however, class counsel did not secure appointment based upon a competitive fee bidding process. Rather, the Court determined that a tripartite leadership structure was the more reasonable approach for this litigation given its size and complexity. The Court further ordered that all counsel abide by specified guidelines to "balance[e] efficiency with the need to maintain quality and thoroughness in prosecuting this case." (Dkt. No. 202, Exh. A at 2; *see also* Dkt. Nos. 145, 148, 194.) As the Court previously clarified, it did not consider the redacted portion of the Berman declaration in reaching its decision to appoint interim lead counsel. Rather, the Court engaged in a lengthy and robust proceeding, hearing from counsel from across the United States with respect to the appropriate nature and membership of the leadership structure. (*See* Transcript of Proceedings April 3, 2013, Dkt. No. 148, at 50:4-85:16.) By the end of the proceeding, Mr. Berman himself withdrew his request to proceed alone and agreed to the tripartite leadership. (*Id.* at 78:13-80:14.) Likewise, as previously indicated, the Court does not consider the bid to be relevant to the present motion to determine the reasonableness of the request for attorneys' fees now before it.

Third, Mr. Bednarz argues that fees should be reduced based upon IPPs' counsel's continued advocacy for an equal pro rata distribution to all class members which he contends was unfair to those in the repealer states and created a representational conflict of interest. Mr. Bednarz contends that this conflict supports a reduction, if not outright denial of fees, citing *Rodriguez v. Disner*, 688 F.3d 645, 653, 655 (9th Cir. 2012) ("*Rodriguez* II") ("The representation of clients with conflicting interests and without informed consent is a particularly egregious ethical violation that may be a proper basis for complete denial of fees," and the court has the power to deny or reduce fees based thereon). Mr. Bednarz contends class counsel pressed the proposed pro rata distribution, contrary to a majority of similar, state-law

antitrust settlements in this district. [20] Further, IPPs' counsel continued to press that position in opposition to his appeal of the Round 2 settlements, even though they were proposing a 90/10 split to the Court in connection with the Round 3 settlements before this Court. Bednarz argues that this resulted in the entire class paying increased notice costs after remand, which reduced and delayed their recovery.

**\*22**  The Court finds this objection without merit. Counsel acted as zealous advocates in opposing to Mr. Bednarz's appeal seeking to vacate the Round 2 settlements. As the Court specifically noted in its original order granting final approval of the Round 2 settlements, *no distribution order had yet been approved nor details of a plan provided.* Indeed, the order specified when such details were to be provided to the Court for its determination of what plan would be fair, reasonable, and adequate. To the extent Bednarz rested his appeal on a premature objection to the not-yet determined distribution plan, it was he, not class counsel that occasioned delay. Moreover, class counsel does not seek attorneys' fees for its time defending Bednarz's appeal, nor for the additional hours incurred upon remand to provide additional notice to the class of the specifics of the allocation plan, but only a reinstatement of the fee award the Court previously entered. (*See* Motion for Attorneys' Fees, Dkt. No. 2588, at 1:9-11; 2:25-26.) Further, as stated above, the Court finds no intraclass conflict and thus no breach of Counsel's fiduciary duties to represent all members of the class, in contrast to *Rodriguez.* [21] Even if counsel argued for simple pro-rata distribution in opposition to Bednarz's appeal, the Court had not entertained or decided the details of such a proposal.

### 2. Morgan's Objection to Attorneys' Fees

Mr. Morgan also objects that the Hagens Berman bid should be taken into account as a measure of the market rate, at a minimum with respect to any award to that firm. He also asserts an objection to the percentage of the fund sought here on the grounds that it is a megafund and that it is out of step with the empirical data on other similar class settlements. For the reasons set forth above, the Court finds these objections without merit.

In addition, Mr. Morgan objects that class counsel's declarations do not clearly address whether they have taken interest on the prior fee award or refunded that interest after the award was vacated. The Court finds Class Counsel's verification on the record during the May 20, 2020 hearing sufficient. (Dkt. No. 2632 at 18.) Nevertheless, Class Counsel

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 256 of 482

In re Lithium Ion Batteries Antitrust Litigation, Not Reported in Fed. Supp. (2020)

2020-2 Trade Cases P 81,483

is directed to account for any interest as part of the final accounting of distribution of funds required by the Court, *infra*.

### 3. Andrews' Objection to Attorneys' Fees

In addition to his objections to elements of the settlement, Mr. Andrews lodged objections to class counsel's attorneys' fee request. Andrews echoes the objections of Bednarz regarding the megafund nature of the case and the impropriety of such a large percentage of the fund as fees. [22] He objects that hours are inflated or insufficiently accounted for, including excessive rates, block billing, vague entries, improper rounding, clerical work, excessive time spent (which in some cases Andrews characterizes as "mathematically impossible"), inefficiency, and overstaffing. He further objects to the demand for interest. The Court further rejects Mr. Andrews' objection that Steve W. Berman should be disqualified as incompetent as lacking in a substantial factual or legal basis. [23] Finally, Andrews objects that numerous attorneys billed for time who were "never given permission to join the litigation and bill the class in the first place," and any firms representing the non-repealers should not be paid.

**\*23** The objections are without merit. The Court has already addressed most. The Court notes also that a protocol was implemented from the outset to manage billings and Class Counsel provided quarterly reports regarding billings to the Court. This allowed a mechanism for Class Counsel themselves to challenge any firm seeking ultimate payment for inefficient or unauthorized work on an ongoing basis. Further, the Court's appointment of interim lead counsel in this multi-district litigation does not preclude payment of attorneys' fees to counsel for the classes alleged in the member cases in this multi-district litigation. (*See* Dkt. No. 194, Order Appointing Interim Co-Lead Counsel and Liaison Counsel.)

### C. Attorneys' Fee Award

Based upon the foregoing, the Court finds that a total attorneys' fee award of $33,829,176.00, is fair and reasonable. The award amounts to just under 30 percent of the settlement fund. Courts in this district in similar antitrust litigation have awarded attorneys' fees constituting similar percentages of the total fund as sought here. *See, e.g.*, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944 JST, 2016 WL 4126533 (N.D. Cal. Aug. 3, 2016) (30 percent for

IPP settlement); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) (28.6 percent for IPP settlement); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07-md-1819-CW (N.D. Cal. Oct. 14, 2011), Dkt. No. 1407 (33 percent for IPP settlement).

The Court therefore awards Class Counsel the amount of **$33,829,176.00** (less the $4,495,000.00 from the Interim Award), together with a proportional share of interest earned on the Settlement Fund for the time period until dispersed. Co-Lead Class Counsel shall allocate the fees and reimbursement of expenses among themselves and supporting counsel in a fair and equitable manner that, in Co-Lead Class Counsel's good-faith judgment, reflects each firm's contribution to the institution, prosecution, and resolution of the litigation.

### D. Expenses

IPP Class Counsel request reimbursement of $6,751,735.84 in unreimbursed expenses (less the $860,188.50 the Court previously ordered as an interim award). The bulk of the total consists of three types of expenses – economic experts and consultants ($4,857,677.85), online document database services ($951,168.46), and payment for translations and interpreters ($239,037.66). (*See* summaries at Dkt. No. 2487-4 [Berman Decl.] at Exh. 5; Dkt. No. 2487-5 [Glackin Decl.] at Exh. 6; Dkt. No. 2487-6 [Zapala Decl.] at Exh. F; Dkt. No. 2487-2 [Joint Decl.] at Exhs. 4, 15, summarizing expenses paid from the litigation fund and directly by Class Counsel.)

An attorney is entitled to "recover as part of the award of attorney's fees those out-of-pocket expenses that would normally be charged to a fee paying client." *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (citation omitted). A request for such expenses should be supported by an itemized list of expenses by category and the amount advanced for each. *See* *Wren v. RGIS Inventory Specialists*, No. 06-cv-05778-JCS, 2011 WL 1230826, at *30 (N.D. Cal. Apr. 1, 2011), supplemented, No. 06-cv-05778-JCS, 2011 WL 1838562 (N.D. Cal. May 13, 2011).

Here, with respect to the request for expenses, Mr. Andrews objected that Class Counsel improperly sought the following: large amounts not covered by receipts; non-taxable costs; double billing for experts; and recovery of *pro hac vice* application fees. The Court rejects these arguments. The claimed expenses are documented sufficiently and are reasonable. While there is a split of authority concerning

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 257 of 482

In re Lithium Ion Batteries Antitrust Litigation, Not Reported in Fed. Supp. (2020)

2020-2 Trade Cases P 81,483

whether such fees are taxable costs under 28 U.S.C. section 1920, class counsel are not limited to recovery of only taxable costs. *See* Fed. R. Civ. P. 23(h) ("In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."); *Competitive Techs. v. Fujitsu Ltd.*, No. C-02-1673 JCS, 2006 WL 6338914, at *4 (N.D. Cal. Aug. 23, 2006) (describing split of authority and noting that the Ninth Circuit has not addressed question but agreeing with other district courts that such costs are not taxable); *see also* 5 NEWBERG ON CLASS ACTIONS § 16:10 (5th ed.) (class counsel can recover reasonable nontaxable costs including counsel's out-of-pocket expenses).

**\*24** The Court finds that the expenses sought here are fair and reasonable. The Court further notes that it required Class Counsel to explain and confirm that it negotiated with experts to obtain the discounts and other reductions on behalf of the class. Class Counsel shall be reimbursed for their out-of-pocket expenditures as requested.

### E. Service Awards

IPPs also request that the Court approve service awards for each of the class representatives--$10,000 for each of the twenty-one individual class representatives and $25,000 for each of two governmental entity class representatives, to be deducted from the common settlement fund. The class representatives have spent a significant amount of time assisting in the litigation of this case, including time spent in depositions and responding to discovery. Named plaintiffs are eligible for reasonable incentive payments to compensate them for their participation in the litigation, including discovery, and the personal financial or reputational risk they may suffer in bringing the action on behalf of the unnamed class members. *See* Staton v. Boeing Co., 327 F.3d 938, 977 (9th Cir. 2003).

Here, the named class members invested a substantial amount of time and effort in the litigation, continuing to pursue the litigation through adverse determinations to settlement and declining incentives to settle individually. The Court finds the service awards appropriate in the circumstances of this long-running litigation. The class representatives were awarded $1,500.00 in the Interim Award. Therefore, an additional $225,500.00 ($8,500 for each of the twenty-one individual class representatives and $23,500 for each of two governmental entity class representatives) shall be distributed from the common settlement fund. [24]

### F. Settlement Administrator Fees

This Court previously approved payment of taxes, tax expenses, notice, and administrative costs as set forth in the Settlement Agreements. (Order Directing Notice to the Class, Dkt. No. 2475, ¶ 9.) The Administrator has estimated that there will be a need for up to an additional $10,000.00 to pay for future costs of distribution, including issuance of checks. The Court **GRANTS** IPPs' request to pay up to $10,000.00 in additional costs from the settlement fund.

## V. PLAN OF DISTRIBUTION AS TO SONY SETTLEMENT (ROUND 1)

As set forth in this Court's Order of August 27, 2020, directing further notice to all class members regarding the plan of distribution for the settlements in this action (Dkt. No. 2651), the Court has conducted a searching review of the record herein and Court finds that allocation and distribution for all settlement funds in this matter should be consistent with its August 16, 2019 Order, that is the 90/10 proportionate pro rata distribution plan distinguishing between class members in *Illinois Brick* repealer vs. non-repealer states. As stated therein, the Court previously expressed concerns regarding approval of generalized distribution plans in the context of early settlements in these complicated, multi-defendant cases litigated over the span of many years. While a general plan of distribution—pro rata based on the number of claimed devices—supported a finding of fairness of the settlement itself, consideration of a more specific plan at the time of distribution was contemplated in each of the settlement agreements and final fairness orders approving those agreements. (*See, e.g.,* Dkt. No. 1712, Sony Final Approval Order, at ¶ 15 [expressly retaining jurisdiction over the plan of allocation].)

**\*25** Class members were given notice of the Court's intention to order such a distribution plan and to submit objections. Six individuals submitted objections regarding the plan of distribution: Matthew Erickson, Steven F. Helfand, Christopher Andrews, Aryeh Katz, Michael Frank Bednarz, and Edward Orr. (Dkt. Nos. 2659, 2662, 2663, 2666, 2668, 2669.) All are self-represented save for Mr. Bednarz. The Court summarizes the objections as follows:

(1) Mssrs. Erickson and Katz, as residents of non-repealer states, object that the 90/10 proportionate pro rata distribution plan treats them unfairly and an equal pro rata distribution should be ordered. Mr. Katz specifically

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 258 of 482

In re Lithium Ion Batteries Antitrust Litigation, Not Reported in Fed. Supp. (2020)

2020-2 Trade Cases P 81,483

requests the option to opt out of the class absent an equal pro rata distribution plan.

(2) Mr. Andrews contends that those in non-repealer states had no right to recover, that no changes to the distribution plan should be made on their behalf, and that residents of repealer states should not have their recovery diluted by the non-repealer state class members. He, too, indicates that class members should be permitted opt-out if the 90/10 distribution plan is approved.

(3) With respect to the class notice regarding the distribution plan, Mssrs. Helfand and Andrews each raise arguments that the notice concerning the Court's revision to the distribution plan was misleading because it focused only on that distribution plan and did not provide an opportunity to object to other terms of, or request exclusion from, the settlement agreements.

(4) Mr. Bednarz raises the additional objection that the Court has no authority to revise the distribution plan absent an order voiding the judgments entered in connection with the final fairness approvals of the prior settlements.

(5) Both Mssrs. Bednarz and Orr object that class counsel should bear the expense of the additional, Court-directed notice concerning the distribution plan.

The Court has considered the objections and concludes that they do not overcome the reasons, as stated herein, for finding a 90/10 proportionate distribution represents the fairest allocation among class members for all settlement funds in this matter, including the Round 1 Settlement with the Sony Defendants. The Court has discretion to determine an appropriate plan of allocation without setting aside its orders or judgments granting final approval of the settlements themselves, both by the terms of the settlement agreements and under relevant authorities. *See Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1275 (9th Cir. 1992) (affirming final approval of class action settlement entered one year prior to final approval of plan of allocation); *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 641 (5th Cir. 2012) (where settlement terms made approval of settlement terms separate from determination of distribution plan "[a] change in the plan...gives no reason to reject the settlement"); *In re Agent Orange Prod. Liab. Litig. MDL No. 381*, 818 F.2d 145, 170 (2d Cir. 1987) *cert. denied*, 484 U.S. 1004 (1988) (approval of settlement fund can be granted prior to adoption of a distribution scheme "so long as the distribution scheme does not affect the obligations of the defendants

under the settlement agreement" and to require otherwise "would immensely complicate settlement negotiations and might so overburden the parties and the district court as to prevent either task from being accomplished."); *see also* 2 MCLAUGHLIN ON CLASS ACTIONS (16th ed.) § 6:23 ("court approval of a settlement as fair, reasonable and adequate is conceptually distinct from the approval of a proposed plan of allocation...courts frequently approve them separately"); MANUAL COMPLEX LIT. (4th ed.) § 21.312 ("Often...the details of allocation and distribution are not established until after the settlement is approved."); *In re Washington Pub. Power Supply Sys. Sec. Litig.*, No. MDL 551, 1988 WL 158947, at *3–4 (W.D. Wash. July 28, 1988)* ("deferral of allocation decisions is routinely followed in partial settlements where the appropriate allocation among class members can best be determined when further settlements have been achieved or the litigation is completely resolved."); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 480 (S.D.N.Y. 1998) ("it is appropriate, and often prudent, in massive class actions to follow a two-stage procedure, deferring the Plan of Allocation until after final settlement approval, as here."). Thus, Mr. Bednarz's argument that the Court must void the prior settlement approval in order to revise the allocation plan as to the Sony settlement is without merit.

**\*26** Further, prior to final approval of all of the settlements herein, all class members were given notice that the amount they would receive from the settlement distribution was unknown, that the Court had authority to determine the details of the claims and distribution plan at a later time, and that they must request to exclude themselves from the settlements by a date certain before that distribution. Alterations to the distribution plan do not alter the finality of the certification decision nor the finality of a class member's decision not to request exclusion. No new opportunity to opt-out, years later, was required. *Cf. Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 635 (9th Cir. 1982) ("we have found no authority of any kind suggesting that due process requires that members of a Rule 23(b)(3) class be given a second chance to opt out" after learning what individual remedy they would obtain); *Denney v. Deutsche Bank AG*, 443 F.3d 253, 271 (2d Cir. 2006) ("Neither due process nor Rule 23(e)(3) requires, however, a second opt-out period whenever the final terms change after the initial opt-out period. Requiring a second opt-out period as a blanket rule would disrupt settlement proceedings because no certification would be final until after the final settlement terms had been reached").

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 259 of 482

In re Lithium Ion Batteries Antitrust Litigation, Not Reported in Fed. Supp. (2020)
2020-2 Trade Cases P 81,483

Finally, no objector offers any authority indicating that class counsel should bear the expense of the notice plan directed by the Court with respect to the revised distribution plan and the Court finds no reason to so order.

## VI. CONCLUSION

Based upon the foregoing, the Court **ORDERS**:

> (1) The proposed Round 2 Settlements are fair, reasonable, and adequate and are approved.

(2) The Court finds the distribution plan to allocate 90% of settlement funds to class members from repealer states and 10% of settlement funds to class members from non-repealer states as to all settlement funds contributed by *all* defendants in this matter to be fair and equitable.

(3) All late claims submitted prior to **December 15, 2020** shall be deemed timely.

(4) IPPs' counsel are awarded a total of **$33,829,176.00**, less the $4,495,000.00 from the Interim Award, together with a proportional share of interest earned on the Settlement Fund for the time period until dispersed.

(5) IPPs shall be reimbursed their out-of-pocket expenditures in the amount of $**6,751,735.84**, less the $860,188.50 interim award;

(6) the class representatives shall be paid total service awards of $260,000, less the prior interim awards, which constitutes a service of award of $10,000 for each of 21 individual class representatives and $25,000 for each of two governmental entity class representatives.

(7) the class administrator shall be paid additional administrative costs up to $10,000.00 from the settlement fund.

(8) The Court **SETS** a compliance deadline of **January 29, 2021**, at which time IPPs are directed to submit a status update on the distribution process and guidelines to be provided to the class concerning contesting ineligibility, and a proposed form of final distribution order.

(9) Within 60 days of the final distribution, IPPs shall submit an accounting of the distribution, including distribution of interest on the settlement fund. Within 30 days thereafter, IPPs shall certify that they have destroyed personal identifying information of all class members.

(10) IPPs' administrative motion (Dkt. No. 2637) to strike the late, duplicative filings of Mr. Orr in at Docket No. 2631, filed May 19, 2020, is **DENIED AS MOOT**. The Court reviewed Mr. Orr's filings in reaching the decision herein.

(11) the unopposed motion of Shiyang Huang to file a late claim (Dkt. No. 2645) is **GRANTED**. The claim shall be considered to have been submitted timely.

> This terminates Docket Nos. 2588, 2613, 2637, 2645. **IT IS SO ORDERED.**

December 10, 2020

Dated: _____

_____

**YVONNE GONZALEZ ROGERS UNITED STATES DISTRICT JUDGE**

**All Citations**

Not Reported in Fed. Supp., 2020 WL 7264559, 2020-2 Trade Cases P 81,483

---

**Footnotes**

1    The Court held oral argument on IPPs' original motion for class certification on November 15, 2016. Defendant LG Chem executed its settlement agreement on November 14, 2016, the day before the Court held oral argument. (*See* LG Chem Settlement Agreement at p. 33, 34.)

2    Supplemental post-hearing briefing on the motions for preliminary approval, concerning electronic payments on claims and updated versions of the class notices, was filed on March 9, 2017 (Dkt. No. 1700).

3    *Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977) (prohibiting claims that consumer was injured by defendant's unlawful overcharge passed on to the consumer by an intermediary purchaser). Following *Illinois Brick,* certain state courts or legislatures have changed their state law to permit such claims, *i.e.* "repealer" states.

4    IPPs filed their renewed motion for class certification against the non-settling defendants on September 26, 2017. (Dkt. No. 1960.)

5    The additional objection of William H. Yoes was withdrawn. (*See* Dkt. Nos. 1843, 1886.)

6    The Court initially set a fairness hearing for final approval of the Round 2 Settlements for August 1, 2017, but modified the schedule to set the fairness hearing for October 3, 2017, pursuant to an unopposed motion of IPPs due to an error in processing and delivering notice to the class. The time to request exclusion and file objections was extended to August 11, 2017. (Dkt. No. 1835.)

7    *Sullivan v. DB Invs., Inc.,* 667 F.3d 273, 300 (3d Cir. 2011).

8    On December 12, 2019, the Court granted the motion of objector Michael Frank Bednarz for an indicative ruling concerning his pending appeal, Ninth Circuit Case No. 19-16855, such that this Court could consider whether the attorneys' fee award, issued at the same time as the Round 3 final approvals should be modified. (Dkt. No. 2567.) By order issued January 30, 2020, the Ninth Circuit agreed that it was "appropriate to vacate the district court's fee award" and therefore vacated the portion of the Court's August 16, 2019 Order on the Round 3 settlements awarding attorneys' fees. (Dkt. No. 2579.) Thus, the issue of attorneys' fees for IPPs' counsel is properly before the Court.

9    Although this Court denied IPPs' renewed motion for class certification, courts "will certify settlement classes although they had previously denied certification of the same class for litigation purposes." 3 NEWBERG ON CLASS ACTIONS § 7:35 (5th ed.); *see also In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,* No. M-02-1486-PJH, 2013 WL 12333442, at *56 (N.D. Cal. Jan. 8, 2013); *In re New Motor Vehicles Canadian Export Antitrust Litig.,* 269 F.R.D. 80, 81- 82 (D. Me. 2010).

10   IPPs' subsequent renewed motion for class certification limited the proposed class to states they identified as repealer states. That motion, too, was denied, but not for reasons having to do with whether variations in state law applicable to the class members' claims or any choice of law question.

11   As Judge Scirica noted in his concurrence:

     Objectors view the indirect purchaser class as composed of members who either have valid claims under the laws of states with *Illinois Brick* repealers or members who have invalid claims under the laws of non-repealer states. But a claim cannot be declared invalid without proper analysis, which would require a choice-of-law examination for each class member's claim. Such analyses may pose difficulties in cases where the residence of the class member is not the sole consideration; modern choice-of-law standards often consider an array of factors particular to individual plaintiffs. Consequently, individual 12(b)(6) inquiries for settlement class certification could present serious difficulties in administration and greatly increase costs and fees, and may deplete rather than increase the recovery of even successful plaintiffs.

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 261 of 482

In re Lithium Ion Batteries Antitrust Litigation, Not Reported in Fed. Supp. (2020)

2020-2 Trade Cases P 81,483

*Sullivan*, 667 F.3d at 337 (Scirica, J., concurring).

12    Further, no objector here offers contrary evidence or analysis regarding the appropriate choice of law analysis, such that the Court is not obligated to perform such an analysis in order to approve settlement. *Hyundai*, 926 F.3d at 562 (where objectors offered no choice-of-law analysis, "neither the district court nor class counsel were obligated to address choice-of-law issues beyond those raised by the objectors, and we will not decertify a class action for lack of such analysis").

13    Prior to the recent Rule 23 amendments, the Ninth Circuit instructed courts to weigh some or all of the following factors: "(1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement." *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011).

14    At the December 8, 2020 hearing, IPPs' objections to the late claims were withdrawn.

15    The case website is found at www.ReverseTheCharge.com.

16    The Court notes that, on March 26, 2020, Paul Schultz filed a letter requesting to rescind his February 14, 2020 request for exclusion and to rejoin the class so that his claims would be considered. (Dkt. No. 2593.) Mr. Schultz's name does not appear on the exclusion list provided by IPPs, and the Court presumes his claims have not been excluded.

17    Mr. Andrews offered additional objections in a supplemental filing after the hearing on this matter. (Dkt. No. 2644.) Objectors were given leave to respond to the information in the previously sealed Hagens Berman bid. Mr. Andrews' new objections fall out the scope of the supplemental briefing permitted by the Court. Moreover, Mr. Andrews' claims that the Settlement Administrator and Class Counsel have permitted the class website to include tracking "cookies" that illegally "spy" on class members and violate their privacy lack evidentiary support. These new objections are **OVERRULED**.

18    These total amounts sought include the $4,495,000.00 this Court already awarded as interim attorneys' fees and the $860,188.50 awarded as interim costs. *See* October 27, 2017 Order Granting In Part And Denying In Part, Without Prejudice, Motion For An Award Of Attorneys' Fees, Reimbursement Of Expenses, and Service Awards ("Interim Award"). (Dkt. No. 2005.) Likewise, the total amount sought in this motion reduced the request by the $205,824.00 in fees for the unauthorized third motion for class certification as previously disallowed by the Court. (*See* Dkt. Nos. 2513 at ¶ 1 and 2516.)

19    Courts in this district in similar antitrust litigation have awarded attorneys' fees constituting similar percentages of the total fund as sought here. *See, e.g.*, *In re CRT*, 2016 WL 4126533 (N.D. Cal. Aug. 3, 2016) (30 percent for IPP settlement); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) (28.6 percent for IPP settlement); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07-md-1819- CW (N.D. Cal. Oct. 14, 2011), Dkt. No. 1407 (33 percent for IPP settlement).

20    Bednarz cites three decisions from this district, all of which are arguably distinguishable. In *ODD*, the settlement class was limited to the class previously certified by the court. *In re ODD*, 2016 WL 7364803, at *2 (N.D. Cal. Dec. 19, 2016), *vacated and remanded*, 959 F.3d 922 (9th Cir. 2020), and *aff'd*, 804 F.App'x 445 (9th Cir. 2020). Similarly, the TFT-LCD approval order cited by Bednarz concerned settlement approval after the court granted class certification. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2013 WL 1365900, at *2 (N.D. Cal. Apr. 3, 2013). In the *CRT* litigation, plaintiffs contended the complaint alleged only injunctive relief for non- repealer state class members, which they contended was valueless at the time of settlement due to the "unlikelihood of future violations" as to a nearly obsolete product. *In re: CRT Antitrust*

In re Lithium Ion Batteries Antitrust Litigation, Not Reported in Fed. Supp. (2020)

2020-2 Trade Cases P 81,483

*Litig.*, 2016 WL 721680, at *5, 23-25 (N.D. Cal. Jan. 28, 2016) (concluding that, regardless of ambiguity in the prayer, a reasonable reading of the operative complaint limited non-repealer class members to valueless claims that could be released without compensation).

21      In *Rodriguez*, the Ninth Circuit held that a conflict in representation arose from counsel's agreements with individual class representatives at the outset of the litigation, establishing progressively increasing incentive payments tied to settlement. The Ninth Circuit found that these agreements incentivized settlement of the case over further litigation, putting class representatives' interests at odds with those of unnamed class members and creating a conflict in counsel's representation and duty of loyalty to unnamed class members. *See Rodriguez v. West Publ'g Corp*, 563 F.3d 948, 959, 968 (9th Cir. 2009) ("*Rodriguez* I").

22      Andrews contends that he, not Bednarz, raised this issue first, and therefore he is entitled to attorneys' fees for his objection benefitting the class. Even if that were the case, Mr. Andrews is self-represented and therefore not entitled to attorneys' fees.

23      Mr. Berman appeared and was granted *pro hac vice* status in this action well over seven years ago. Mr. Andrews' objection that his *pro hac vice* status should now be revoked because he has appeared *pro hac vice* an excessive number of times in this district is **OVERRULED**. Not only is the case nearly complete, but MDL courts routinely allow *pro hac vice* status for the efficient management of these nationwide cases.

24      The Court notes that the objections of Christopher Andrews, filed October 13, 2020 (Dkt. No. 2663) with respect to class representative service awards are both untimely and wholly without merit. Reasonable service awards have long been approved in the Ninth Circuit. *See Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1057 (9th Cir. 2019) (reasonable incentive awards are permitted to compensate class representatives for work on behalf of the class, financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general) (citing cases). The Court declines to follow the recent holding of the Eleventh Circuit suggesting such awards are unlawful. *See Johnson v. NPAS Sols., LLC*, 975 F.3d 1244, 1260 (11th Cir. 2020).

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.   25

Case 4:21-cv-00196-MWB   Document 249-1   Filed 10/07/25   Page 263 of 482

In re Lithium Ion Batteries Antitrust Litigation, Not Reported in Fed. Rptr. (2022)

2022 WL 16959377
Only the Westlaw citation is currently available.
United States Court of Appeals, Ninth Circuit.

IN RE: LITHIUM ION BATTERIES
ANTITRUST LITIGATION,

Indirect Purchaser Plaintiffs, Plaintiff-Appellee,
v.
Michael Frank Bednarz, Objector-Appellant,
v.

Panasonic Corporation; Panasonic Corporation of
North America; Sanyo Electric Co., Ltd.; Sanyo
North America Corporation; Hitachi, Ltd.; Hitachi
Maxwell, Ltd.; Maxwell Corporation of America;
Toshiba Corporation; Toshiba America Electronic
Components, Inc.; NEC Corporation; Samsung
SDI Co. Ltd.; Samsung Sdi America, Inc.; Sony
Corporation; Sony Energy Devices Corporation; Sony
Electronics, Inc.; NEC Tokin Corporation; LG Chem,
Ltd.; LG Chem America, Inc., Defendants-Appellees.
In re: Lithium Ion Batteries Antitrust Litigation,
Indirect Purchaser Plaintiffs, Plaintiff-Appellant,
v.
Steven Franklyn Helfand; Michael Frank Bednarz;
Christopher Andrews, Objectors-Appellees,
v.
Panasonic Corporation; Panasonic Corporation of
North America; Sanyo Electric Co., Ltd.; Sanyo
North America Corporation; Hitachi, Ltd.; Hitachi
Maxwell, Ltd.; Maxwell Corporation of America;
Toshiba Corporation; Toshiba America Electronic
Components, Inc.; NEC Corporation; Samsung
SDI Co. Ltd.; Samsung Sdi America, Inc.; Sony
Corporation; Sony Energy Devices Corporation;
Sony Electronics, Inc.; NEC Tokin Corporation; LG
Chem, Ltd.; LG Chem America, Inc., Defendants.

No. 21-15120, No. 21-15200
|
Argued and Submitted October
17, 2022 San Francisco, California
|
FILED NOVEMBER 16, 2022

Appeal from the United States District Court for the Northern
District of California, Yvonne Gonzalez Rogers, District
Judge, Presiding, D.C. No. 4:13-md-02420-YGR

**Attorneys and Law Firms**

Steve Berman, Hagens Berman, Seattle, WA, Elizabeth
J. Cabraser, Eric B. Fastiff, Brendan P. Glackin, Richard
M. Heimann, Lieff Cabraser Heimann & Bernstein, LLP,
San Francisco, CA, Joseph W. Cotchett, Adam J. Zapala,
Cotchett, Pitre & McCarthy, LLP, Burlingame, CA, Jeff D.
Friedman, Shana E. Scarlett, Hagens Berman Sobol Shapiro,
LLP, Berkeley, CA, for Plaintiff-Appellee Indirect Purchaser
Plaintiffs.

Steve Berman, Hagens Berman, Seattle, WA, Elizabeth J.
Cabraser, Eric B. Fastiff, Brendan P. Glackin, Richard M.
Heimann, Lieff Cabraser Heimann & Bernstein, LLP, San
Francisco, CA, Joseph W. Cotchett, Adam J. Zapala, Cotchett,
Pitre & McCarthy, LLP, Burlingame, CA, Jeff D. Friedman,
Shana E. Scarlett, Hagens Berman Sobol Shapiro, LLP,
Berkeley, CA, Kevin Kamuf Green, Hagens Berman Sobol
Shapiro LLP, San Diego, CA, for Plaintiff-Appellant Indirect
Purchaser Plaintiffs.

Christopher Andrews, Livonia, MI, Pro Se.

Theodore H. Frank, Adam Ezra Schulman, Hamilton Lincoln
Law Institute, Washington, DC, for Objector-Appellant/
Objectors-Appellees Michael Frank Bednarz.

Jeffrey J. Amato, Eva W. Cole, Jeffrey L. Kessler, Winston
& Strawn, LLP, New York, NY, for Defendants-Appellees/
Defendants Panasonic Corporation, Panasonic Corporation
of North America, Sanyo Electric Co., Ltd., Sanyo North
America Corporation.

Craig Philip Seebald, Partner, Lindsey R. Vaala, Vinson &
Elkins, LLP, Washington, DC, for Defendants-Appellees/
Defendants Hitachi, Ltd., Hitachi Maxwell, Ltd.

Christopher Walter James, Vinson & Elkins, LLP, San
Francisco, CA, Craig Philip Seebald, Partner, Lindsey
R. Vaala, Vinson & Elkins, LLP, Washington, DC,
for Defendant-Appellee/Defendant Maxwell Corporation of
America.

Christopher M. Curran, Jerry Frank Hogue, White &
Case, LLP, Washington, DC, for Defendants-Appellees/
Defendants Toshiba Corporation, Toshiba America
Electronic Components, Inc.

Dana Lynn Cook-Milligan, Jeanifer E. Parsigian, Winston & Strawn, LLP, San Francisco, CA, for Defendant-Appellee/ Defendant NEC Corporation.

Andrew Rhys Davies, Allen & Overy LLP, New York, NY, John Roberti, Cohen & Gresser, LLP, Washington, DC, for Defendants-Appellees/Defendants Samsung SDI Co. Ltd., Samsung SDI America, Inc.

Beatriz Mejia, Cooley, LLP, San Francisco, CA, for Defendants-Appellees/Defendants Sony Corporation, Sony Energy Devices Corporation, Sony Electronics, Inc.

Rachel Susan Brass, Gibson, Dunn & Crutcher, LLP, San Francisco, CA, for Defendant-Appellee/Defendant NEC Tokin Corporation.

Nathan P. Eimer, Eimer Stahl, LLP, Chicago, IL, for Defendants-Appellees/Defendants LG Chem, Ltd., LG Chem America, Inc.

Before: HAWKINS, McKEOWN, and BYBEE, Circuit Judges.

## MEMORANDUM [*]

**\*1** On December 10, 2020, the district court granted Indirect Purchaser Plaintiffs' ("IPPs") motions for final approval of the class-action settlement and for attorney's fees ("Settlement Order"). The court also partially granted objector Frank Bednarz's motion for attorney's fees ("Fee Order"). Bednarz appeals the Settlement Order, arguing that the district court abused its discretion in awarding attorney's fees in two respects: (1) by failing to consider a bid submitted by Hagens Berman Sobol Shapiro LLP ("Hagens Berman") to be lead class counsel as a baseline and (2) by not reducing class counsel's fee award based on the conflict of interest present in representing plaintiffs from both *Illinois Brick* [1] repealer and non-repeater states. Bednarz also appeals the Fee Order, arguing that the district court erred by not granting his fee request in full. IPPs cross-appeal the Fee Order, arguing that the district court erred in awarding Bednarz fees at all. We have jurisdiction under 28 U.S.C. § 1291, and we review a district court's award of attorney's fees and its chosen method of calculation for abuse of discretion. *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 940 (9th Cir. 2011). We affirm.

1. The district court properly declined to use the Hagens Berman bid as a baseline in awarding attorney's fees to class counsel. We have previously held that "when class counsel secures appointment as interim lead counsel by proposing a fee structure in a competitive bidding process, that bid becomes the starting point for determining a reasonable fee." *In re Optical Disk Drive Prods. Antitrust Litig.*, 959 F.3d 922, 934 (9th Cir. 2020). Here, however, the district court determined that a three-firm co-lead interim counsel structure was preferable to a sole lead counsel structure. Consequently, Hagens Berman's bid to be sole interim counsel was not relevant to the district court's assessment of the reasonableness of class counsel's fee request because the firm did not "secure[ ] appointment as interim lead counsel by proposing a fee structure in a competitive bidding process." *Id.* Importantly, when interim counsel is selected in the manner it was in this case—as opposed to through a competitive bidding process—the risk that a firm will deliberately submit a low bid to secure the position as lead counsel only to make a substantially higher fee request when the case resolves is mitigated. And, when the counsel structure differs from that conceived of in the singular competitive bid submitted, that bid offers little insight into market rates. The district court did not abuse its discretion by excluding the bid from its calculations.

**\*2** 2. The district court did not abuse its discretion in rejecting Bednarz's objection based on the potential representational conflict faced by class counsel in representing both repealer-state class members and non-repealer-state class members. Although Bednarz argues that the district court concluded that there was no conflict simply on the grounds that "class counsel 'achieved an excellent result for *all* class members,' " the district court did more. After questions as to class certification and choice-of-law became more settled, the district court approved the third round of settlements subject to a 90/10 distribution plan. The plan allocated 90% of the settlement fund to repealer-state class members and 10% of the settlement fund to non-repealer-state class members to account for the differing strength of their claims. [2] In the Settlement Order, the district court approved the same 90/10 distribution plan for the first two rounds of settlements as well. The district court concluded that, among other things, "the structural assurances of fairness inherent in the proposed distribution plan" satisfied the court that "class counsel ... have no conflict with the class and have represented all members' interests fairly." In addition to finding that the 90/10 distribution plan mitigated intraclass conflict concerns, the district court

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 265 of 482

In re Lithium Ion Batteries Antitrust Litigation, Not Reported in Fed. Rptr. (2022)

explicitly considered the primary case Bednarz relies on in his argument, *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948 (9th Cir. 2009), and concluded that it was inapposite because there was no similar conflict in the case at hand. The district court also noted that class counsel did not seek fees associated with Bednarz's earlier appeal, which involved issues relating to the potential conflict among class members, or the related hours incurred on remand. As such, the district did not abuse its discretion in declining to reduce class counsel's award because of an alleged representational conflict.

3. The district court did not err in partially granting Bednarz's motion for attorney's fees. Because Bednarz generated an extra $10 million benefit for repealer-state class members by successfully objecting to the original distribution plan for the second round settlements, he is entitled to attorney's fees for conferring a material benefit to a portion of the class. *See Rodriguez v. Disner*, 688 F.3d 645, 658–59 (9th Cir. 2012) (objectors "may claim entitlement to" attorneys' fees when they confer a substantial benefit on the class); *Rodriguez v. West Publ'g Corp.*, 563 F.3d at 963 (finding it

"clearly erroneous" to deny fees to objectors who augmented the class's net fund); *In re Southwest Airlines Voucher Litig.*, 898 F.3d 740, 746 (7th Cir. 2018) (reversing denial of fees to objector who conferred benefit on the class). However, because the benefit represented a transfer from non-repealer-state class members to repealer-state class members, it is difficult to quantify the benefit to the class as a whole. We have held that the district court has "discretion to award fees based on how much time counsel spent and the value of that time" in situations where it is difficult to quantify the benefit to the class. *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1126 (9th Cir. 2020) (citing *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 571 (9th Cir. 2019)). Here, the district court did precisely that.

**AFFIRMED.**

**All Citations**

Not Reported in Fed. Rptr., 2022 WL 16959377

---

## Footnotes

\*    This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

1    *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 735 (1977) (holding that indirect purchasers cannot recover damages under federal antitrust law). About thirty states (repealer states) have authorized indirect purchasers of goods to bring state antitrust claims, while the remaining states (non-repealer states) follow federal antitrust law and restrict such claims.

2    IPPs made the 90/10 third round settlement distribution "recommendation based upon the parties' stipulated adversarial process before the Honorable Rebecca J. Westerfield (Ret.), in which Judge Westerfield considered extensive analysis and rendered findings and recommendations concerning an appropriate allocation as between the two groups of putative class members." Bednarz does not challenge the allocation.

---

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 266 of 482
Mylan Pharmaceuticals, Inc. v. Warner Chilcott Public Ltd. Co., Not Reported in...
2014 WL 631031, 2014-1 Trade Cases P 78,690

2014 WL 631031
United States District Court,
E.D. Pennsylvania.

MYLAN PHARMACEUTICALS, INC., et al., Plaintiff,
v.
WARNER CHILCOTT PUBLIC
LIMITED COMPANY, et al., Defendants.

Civ. No. 12–3824.
|
Feb. 18, 2014.

**Attorneys and Law Firms**

Christopher A. Williams, Jonathan R. Lutinski, Seth C. Silber, Courtney Armour, Shaun N. Snader, Wilson Sonsini Goodrich & Rosati, PC, Washington, DC, Daniel P. Weick, Jonathan M. Jacobson, Jeffrey C. Bank, Michael S. Sommer, Wilson Sonsini Goodrich & Rosati PC, New York, Archana Tamoshunas, Taus Cebulash & Landau LLP, Sarah Westby, Faruqi & Faruqi LLP, Adam Steinfeld, Linda P. Nussbaum, Grant & Eisenhofer PA, Joseph P. Guglielmo, Scott & Scott LLP, New York, NY, Joseph M. Donley, Jonathan W. Hugg, Nolan Ganguli Shenai, Clark Hill Thorp Reed, Wayne C. Stansfield, Reed Smith LLP, David F. Sorensen, Eric L. Cramer, Andrew Coyne Curley, Caitlin G. Coslett, Nicholas Urban, Berger & Montague, P.C., Anthony J. Bolognese, Joshua H. Grabar, Bolognese & Associates, LLC, Jeffrey L. Kodroff, Spector Roseman Kodroff & Willis, P.C., Ira Neil Richards, Schnader Harrison Segal & Lewis LLP, Philadelphia, PA, Anne K. Fornecker, Hilliard & Shadowen LLC, Austin, TX, David P. Germaine, John Paul Bjork, Joseph M. Vanek, Vanek Vickers & Masini PC, Chicago, IL, Peter R. Kohn, A. Luke Smith, Joseph T. Lukens, Neill Wilson Clark, Faruqi & Faruqi, LLP, Jenkintown, PA, Thomas M. Sobol, David S. Nalven, Hagens Berman Sobol Shapiro LLP, Cambridge, MA, Steve D. Shadowen, Hilliard & Shadowen LLC, Mechanicsburg, PA, John D. Radice, Radice Law Firm, Long Beach, NJ, Patrick E. Cafferty, Cafferty Clobes Meriwether & Sprengel LLP, Ann Arbor, MI, Anne L. Box, Christopher M. Burke, David Hale Goldberger, Jennifer J. Scott, Luis E. Lorenzana, Walter W. Noss, Scott & Scott LLP, San Diego, CA, Scott E. Perwin, Kenny Nachwalter, P.A., Miami, FL, for Plaintiff.

Bryn Resser Pallesen, Derrick F. Moore, Jack E. Pace, III, Kevin Charles Adam, Lindsay E. Leonard, Michael J. Gallagher, Robert A. Milne, White & Case LLP, New York, NY, Christel Green, Eileen Marie Cole, Holly Smith Letourneau, J. Mark Gidley, Jaime M. Crowe, Peter J. Carney, Stephen A. Fraser, White & Case LLP, Washington, DC, Jeremy K. Ostrander, White & Case LLP, Palo Alto, CA, Leonard A. Gail, Massey & Gail LLP, Chicago, IL, Matthew J. Reedy, Mauro, Savo, Camerino & Grant, Somerville, NJ, David H. Pittinsky, Edward D. Rogers, Jonathan S. Satinsky, M. Norman Goldberger, Ballard, Spahr, Andrews and Ingersoll, Philadelphia, PA, John E. Flaherty, Matthew Sklar, Richard Hernandez, Jonathan Short, Mark D. Villanueva, William J. O'Shaughnessy, Sr., McCarter & English LLP, Newark, NJ, for Defendants.

## ORDER

PAUL S. DIAMOND, District Judge.

**\*1** In this putative class action, direct purchasers of Doryx, the branded version of doxycycline hyclate, allege that Defendant brand name pharmaceutical companies for illegally thwarted generic competition. The Parties now ask me to certify conditionally a Rule 23(b)(3) settlement class and approve preliminarily their proposed Settlement. Because I conclude preliminarily that the proposed settlement classes meet the requirements of Rule 23, the proposed settlement is within the range of reasonableness, and the notice provisions are consistent with the requirements of due process and Rule 23, I will grant their Motion.

## *BACKGROUND*

Plaintiffs are generic drug manufacturers, pharmaceutical wholesalers, and retail pharmacies. Defendants are pharmaceutical companies that produce and sell Doryx, the branded version of an antibiotic prescription drug (doxycycline hyclate) used primarily to treat severe acne. Plaintiffs allege that Defendants conspired to protect their monopoly by implementing a series of product changes that —while providing no real benefit to patients—exempted Doryx from state laws that would otherwise have allowed pharmacists to substitute generic drugs for prescriptions for Doryx.

Plaintiffs filed the instant action on July 6, 2012. (Doc. No. 1 .) Defendants moved to dismiss the Complaint. (Doc. Nos.82, 83, 101, 102, 135, 138, 172, 174.) In denying Defendants' Motion, I deferred until summary judgment ruling on the dispositive question of whether product hopping

Case 4:21-cv-00196-MWB   Document 249-1   Filed 10/07/25   Page 267 of 482

Mylan Pharmaceuticals, Inc. v. Warner Chilcott Public Ltd. Co., Not Reported in...

2014 WL 631031, 2014-1 Trade Cases P 78,690

is anticompetitive. (Doc. No. 280.) Direct Purchaser Plaintiffs filed a Motion for Class Certification on April 1, 2013. (Doc. No. 151.) Defendants opposed Certification. (Doc. Nos.228, 247.) While the certification motion was pending, the Parties began settlement discussions and, after lengthy negotiations, reached a proposed settlement on December 24, 2013. (Doc. No. 452.)

Plaintiffs filed the instant unopposed Motion on January 14, 2014, asking me to: (1) certify conditionally a Rule 23(b)(3) class for settlement purposes; (2) approve preliminarily the Settlement; (3) direct notice of the Settlement to the Class; and (4) schedule a Final Approval Hearing. (Doc. No. 452.) I held a hearing on the Parties' Motion on February 6, 2014. Doc. No. 452; *see Gates v. Rohm and Haas Co.,* 248 F.R.D. 434, 439 (E.D.Pa.2008) ("Judicial review of a proposed class settlement generally requires two hearings: one preliminary approval hearing and one final 'fairness' hearing.").

### LEGAL STANDARDS

Rule 23(e) provides that "[t]he claims, issues, or defenses of a certified class may be settled ... only with the court's approval." Fed.R.Civ.P. 23(e). At the preliminary approval stage, I must determine whether there are any obvious deficiencies and the "settlement falls within the range of reason." *Gates v. Rohm and Haas Co.,* 248 F.R.D. 434, 438 (E.D.Pa.2008) (quotations omitted); *see also* Manual for Complex Litigation, § 21.632 (4th ed.2009).

**\*2** Where, as here, a class has not already been certified, I must also independently determine that the proposed settlement class satisfies the requirements of Rule 23. *See Am chem v. Windsor,* 521 U.S. 591, 620, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *In re Prudential Ins. Co. of Amer. Sales Practices Litig.,* 148 F.3d 283, 308 (3d Cir.1998) ("[A] district court must ... find [that] a class satisfies the requirements of Rule 23, regardless of whether it certifies the class for trial or settlement."); *Manual for Complex Litigation,* § 21.632 (4th ed.2009) (same).

Preliminary approval is not binding; it is granted unless a proposed settlement is obviously deficient. *Gates,* 248 F.R.D. at 438. I must consider: (1) whether the negotiations were at arm's length, (2) whether there was adequate discovery, (3) whether the litigants are experienced in similar litigation, and (4) the proportion of the class objected. *In re General Motors*

*Corp. Pick–Up Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 785–86 (3d Cir.1995).

### DISCUSSION

#### I. *Rule 23*

Here, the Parties ask me to certify the following settlement class:

> All persons and entities in the United States who purchased Doryx directly from one or more of the Defendants at any time from July 18, 2008 through December 31, 2013 (the "Class Period"). Excluded from the class are Defendants, their parents, employees, subsidiaries and affiliates, and federal government entities (the "Class").

The Class has at least 23 members spread throughout the United States. This is sufficient to satisfy the impracticality of joinder requirement of Rule 23(a)(1). "[W]hen the court finds that the class members are widely dispersed geographically, then their joinder may be deemed impracticable." 7A Charles A. Wright, et al., Federal Practice and Procedure § 1762. Courts have repeatedly deemed joinder impracticable when class members' dispersion was similar to that presented here. *Am. Sales Co. v. SmithKline Beecham Corp.,* 274 F.R.D. 127, 132–33 (E.D.Pa.2010) (class members spread across 14 states rendered joinder impracticable); *In re Wellbutrin, XL Antitrust Litig.,* No. 08–2431, 2011 WL 3563385, at *3 (E.D.Pa. Aug.11, 2011) (class members across 15 states rendered joinder impracticable).

Rule 23(a) requires that there be questions of law or fact common to the class. To satisfy the commonality requirement, the purported class's claims must depend upon a common contention. *Wal–Mart Stores, Inc. v. Dukes,* ——U.S. ——, ——, 131 S.Ct. 2541, 2550, 180 L.Ed.2d 374 (2011). The common contention must be capable of classwide resolution. *Id.* at 2551. Here, the following issues relating to claims or defenses present common, class-wide questions under Rule 23(a)(2):

Mylan Pharmaceuticals, Inc. v. Warner Chilcott Public Ltd. Co., Not Reported in...

2014 WL 631031, 2014-1 Trade Cases P 78,690

a. Whether the conduct challenged by the Class as anticompetitive in the Consolidated Amended Class Action Complaint filed August 13, 2012 (the "Complaint") (ECF No. 62) constitutes a restraint of trade in violation of Section 1 of the Sherman Act 15 U.S.C. § 1 or constitutes monopolization or attempted monopolization in violation Section 2 of the Sherman Act, 15 U.S.C. § 2;

**\*3** b. Whether Defendants' challenged conduct substantially affected interstate commerce and caused antitrust injury-in-fact to the Class through overcharges paid as a result of the higher prices direct purchasers paid for Doryx; and

c. The amount of overcharge damages, if any, owed to the Class in the aggregate under Section 4 of the Clayton Act, 15 U.S.C. § 4.

Rule 23 also requires me to evaluate whether the Named Plaintiffs' claims are typical of the class. *See Beck v. Maximus, Inc.,* 457, F.3d 291, 295–96 (3d Cir.2006) (citations omitted). The named Plaintiffs—Meijer Inc., Meijer Distribution, Inc., Rochester Drug Co-operative, Inc., and American Sales Company, LLC—are hereby appointed as Class representatives. They allege on behalf of the Class and themselves the same manner of injury from the same course of conduct and assert on their own behalf the same legal theory that they assert for the Class. Any probable factual differences relate to damages rather than to liability. *Gates,* 248 F.R.D. at 441. Accordingly, I conclude that the Named Plaintiffs' claims meet Rule 23(a)(3)'s typicality requirement.

Finally, the Named Plaintiffs will fairly and adequately protect the interests of the Class; their interests do not conflict with the interests of absent members of the Class. Fed.R.Civ.P. 23(a)(4). All Class Members seek to prove Defendants' alleged anticompetitive conduct, and to recover overcharge damages. Moreover, all Class Members will be given an opportunity to opt out. Furthermore, the Named Plaintiffs are well-qualified to represent the Class, given their experience in prior cases, and the vigor with which they have acted thus far. (Doc. No. 452.)

For settlement purposes, I conclude that common questions of law and fact predominate over questions affecting only individual members. Fed.R.Civ.P. 23(b)(3). "[T]he task for plaintiffs at class certification is to demonstrate that [each] element ... is capable of proof at trial through evidence that is common to the class rather than individual to its members." *In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305, 310–312 (3d Cir.2008). Here, the three elements of Plaintiffs' claims are (1) violation of antitrust laws, (2) antitrust impact, and (3) measurable damages. Because these issues are subject to generalized proof, they apply Classwide and predominate over issues that require individualized proof. *Id.*

Finally, I must consider whether a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). This requirement requires me to determine whether a class action is fairer and more efficient than alternative methods of adjudication. *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,* 148 F.3d 283, 316 (3d Cir.1998). Plainly, it would be fairer and more efficient to resolve the claims of the Class in a single action. There are few manageability problems presented by a case such as this, particularly in light of the Settlement approved in this Order.

**II. *Class Counsel***

**\*4** Pursuant to Fed.R.Civ.P. 23(c)(1)(B) and 23(g), having considered the factors provided in Rule 23(g)(1)(A), I hereby appoint the following counsel as Co–Lead Counsel for the Class, and direct them to ensure that any remaining work in this litigation that is performed by any counsel listed on the Complaint is performed efficiently and without duplication of effort:

Peter Kohn

Joseph T. Lukens

Neill W. Clark

**FARUQI & FARUQI, LLP**

101 Greenwood Ave., Ste. 600

Jenkintown, PA 19046

Thomas M. Sobol

David Nalven

**HAGENS BERMAN SOBOL SHAPIRO LLP**

55 Cambridge Parkway, Ste. 301

Cambridge, MA 02142

Mylan Pharmaceuticals, Inc. v. Warner Chilcott Public Ltd. Co., Not Reported in...
2014 WL 631031, 2014-1 Trade Cases P 78,690

Tel: (215) 277–5770

David F. Sorensen

Andrew C. Curley

Caitlin Coslett

**BERGER & MONTAGUE, P.C.**

1622 Locust Street

Philadelphia, PA 19103

Tel: (215) 875–3000

Tel: (617) 482–3700

Linda P. Nussbaum

Adam Steinfeld

**GRANT & EISENHOFER, P.A.**

485 Lexington Avenue

New York, N.Y. 10017

Tel: (646) 722–8504

### III. *Reasonableness of the Proposed Settlement*

The final approval of a class action settlement requires a finding that the settlement is fair, adequate, and reasonable. *Walsh v. Great Atl. & Pac. Tea Co.,* 726 F.2d 956, 965 (3d Cir.1983). In evaluating a proposed settlement for preliminary approval, however, I am required to determine only whether "the proposed settlement disclose grounds to doubt its fairness or other obvious deficiencies such as unduly preferential treatment of class representatives or segments of the class, or excessive compensation of attorneys, and whether it appears to fall within the range of possible approval." *Mehling v. New York Life Ins. Co.,* 246 F.R.D. 467, 472 (E.D.Pa.2007) (internal quotation marks omitted). The proposed Settlement satisfies this standard.

Upon review of the record and the Settlement Documents, I find that the proposed settlement—which includes a cash payment of $15 million by Defendants into an escrow account for the benefit of the Class in exchange for, *inter alia,* dismissal of the litigation with prejudice and certain releases of claims by Plaintiffs and the Class as set forth in the Settlement Agreement is the product of arm's-length negotiations by highly experienced counsel after years of litigation, falls within the range of possibly approvable settlements, and so is preliminarily approved, subject to further consideration at the Fairness Hearing provided for below.

### IV. *Approval of the Plan of Notice to the Class*

The proposed form of Notice to Class Members of the pendency of this Class Action and the proposed Settlement (annexed as Exhibit "C" to the Settlement Documents) and the proposed method of notice satisfy the requirements of Rule 23(e) and due process, are otherwise fair and reasonable, and so are approved. Class Counsel shall cause the Notice substantially in the form attached to the Settlement Agreement to be disseminated by no later than March 4, 2014, or 15 days following the entry of this Order, by first-class mail to the last known address of each entity that purchased Doryx directly from one or more Defendants during the Class Period.

**\*5** Potential Class members may request exclusion from the Class or object to the Settlement no later than 30 days from the date on the Notice. Class Counsel or their designee shall monitor and record any and all opt-out requests that are received.

Pursuant to the Class Action Fairness Act of 2005 ("CAFA") Defendants shall serve notices as required under CAFA within ten (10) days from the date Plaintiffs filed the Settlement Documents.

I appoint Rust Consulting, Inc. to serve as Claims Administrator and to assist Class Counsel in disseminating the Notice. Robin Niemiec of Rust has submitted a declaration setting forth Rust's qualifications (Exhibit "F" to the Settlement Documents). All expenses incurred by the Claims Administrator must be reasonable, are subject to Court approval, and shall be payable solely from the Settlement Fund.

I appoint The Huntington National Bank to serve as Escrow Agent to administer the escrow account holding the settlement sum. All expenses incurred by the Escrow Agent must be reasonable, are subject to Court approval, and shall be payable from the settlement fund. A copy of the Escrow

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 270 of 482
Mylan Pharmaceuticals, Inc. v. Warner Chilcott Public Ltd. Co., Not Reported in...
2014 WL 631031, 2014-1 Trade Cases P 78,690

Agreement executed by the Huntington National Bank and Counsel for the parties is annexed as Exhibit "G" to the Settlement Documents.

### V. *Final Fairness Hearing*

A hearing on final approval shall be held before me on June 9, 2014, at 10:00 a.m. in Courtroom 6B at the United States District Court for the Eastern District of Pennsylvania, James A. Byrne United States Courthouse, 601 Market Street, Philadelphia PA 19106. At the Fairness Hearing, I will consider, *inter alia:* (a) the fairness, reasonableness and adequacy of the Settlement and whether the Settlement should be finally approved; (b) whether the Court should approve the proposed plan of distribution of the Settlement Fund among Class members; (c) whether the Court should approve awards of attorneys' fees and reimbursement of expenses to Class Counsel; (d) whether and in what amount incentive awards should be awarded to the Named Plaintiffs; and (e) whether entry of a final judgment terminating this litigation should be entered. If the Fairness Hearing is rescheduled or continued, I will notify all counsel. Class Counsel shall be responsible

for communicating any such notice promptly to the Class by posting conspicuous notice on the following website of Class Counsel: www.faruqilaw.com.

All briefs and materials in support of the application for an award of attorneys' fees and reimbursement of expenses and incentive awards for the named Plaintiffs shall be filed with the Court no later than thirty (30) days from the date of this Order, March 19, 2014.

Class Members who wish to (a) object with respect to the proposed Settlement or (b) otherwise wish to appear in person at the Fairness Hearing must first send an Objection and, if intending to appear, a Notice of Intention to Appear, along with a Summary Statement outlining the position(s) to be asserted and the supporting grounds together with copies of any papers or briefs, via first class mail, postage prepaid, to the Clerk of the United States District Court for the Eastern District of Pennsylvania, James A. Byrne United States Courthouse, 601 Market Street, Philadelphia PA 19106, with copies to the following counsel:

### On behalf of Plaintiffs and the Class:

| | |
|---|---|
| Peter Kohn | Thomas M. Sobol |
| Joseph T. Lukens | David Nalven |
| Neill W. Clark | **HAGENS BERMAN SOBOL SHAPIRO** |
| **FARUQI & FARUQI, LLP** | **LLP** |
| 101 Greenwood Ave., Suite 600 | 55 Cambridge Parkway, Suite 301 |
| Jenkintown, PA 19046 | Cambridge, MA 02142 |
| Tel: (215) 277–5770 | Tel. (617) 482–3700 |
| | |
| David F. Sorensen | Linda P. Nussbaum |
| Andrew C. Curley | Adam Steinfeld |
| Caitlin Coslett | **GRANT & EISENHOFER, P.A.** |
| **BERGER & MONTAGUE, P.C.** | 485 Lexington Avenue |
| 1622 Locust Street | New York, N.Y. 10017 |
| Philadelphia, PA 19103 | Tel: (646) 722–8504 |
| Tel: (215) 875–3000 | |

Mylan Pharmaceuticals, Inc. v. Warner Chilcott Public Ltd. Co., Not Reported in...
2014 WL 631031, 2014-1 Trade Cases P 78,690

**On behalf of Defendants:**

J. Mark Gidley

WHITE & CASE LLP

701 Thirteenth Street, NW

Washington, DC 20005–3807

(202) 626–3600

*Counsel for Warner Chilcott Public Limited Company, Warner Chilcott Company, LLC, Warner Chilcott (US), LLC, Warner Chilcott Holding Company III, Limited, and Warner Chilcott Laboratories Ireland Limited.*

Jonathan Short

McCARTER & ENGLISH LLP

Four Gateway Center

100 Mulberry Street

Newark, NJ

(973) 622–4444

*Attorneys for Mayne Pharma Group Limited and Mayne Pharma International Pty. Ltd.*

**\*6** To be valid, any such Objection or Notice of Intention to Appear and Summary statement must be postmarked no later than thirty (30) days from the date of the Notice. Except as provided here, no person or entity shall be entitled to contest the terms of the proposed Settlement. All persons and entities who fail to file an Objection or Notice of Intention to Appear as well as a Summary Statement as provided above shall be deemed to have waived any such objections by appeal, collateral attack or otherwise and will not be heard at the Fairness Hearing.

All briefs and materials in support of the final approval of the settlement and the entry of final judgment proposed by the parties to the Settlement Agreement shall be filed with the Court within fifty one (51) days from the date of the Notice.

All proceedings in the direct purchaser class action are hereby stayed until such time as the Court renders a final decision regarding the approval of the Settlement and, if it approves the Settlement, enters final judgment and dismisses these actions with prejudice.

In the event that the Settlement does not become final, litigation of the direct purchaser Class Action will resume in a reasonable manner to be approved by the Court.

In the event the Settlement Agreement and the Settlement are terminated or rescinded in accordance with the applicable provisions of the Settlement Agreement, the Settlement Agreement, the Settlement, and all related proceedings shall,

except as expressly provided to the contrary in the Settlement Agreement, become null and void, shall have no further force and effect, and Plaintiffs shall retain full rights to assert any and all causes of action against Defendant(s) and any other released party, and Defendant(s) and any other released parties shall retain any and all defenses and counterclaims. These actions shall revert forthwith to their procedural and substantive status before the date of execution of the Settlement Agreement and shall proceed as if the Settlement Agreement and all other related orders and papers had not been executed by Plaintiffs and Defendant(s).

Neither this Order nor the Settlement Agreement nor any other Settlement-related document, nor any proceedings undertaken in accordance with the terms set forth in the Settlement Agreement or in any other Settlement-related document, shall constitute, be construed as or be deemed to be evidence of or an admission or concession by Defendants as to the validity of any claim that has been or could have been asserted against Defendants or as to any liability by Defendants as to any matter set forth in this Order, or to whether any class may certified for purposes of litigation and trial.

**AND IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 631031, 2014-1 Trade Cases P 78,690

**Mylan Pharmaceuticals, Inc. v. Warner Chilcott Public Ltd. Co., Not Reported in...**
2014 WL 631031, 2014-1 Trade Cases P 78,690

---

**End of Document**                                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 273 of 482
Mylan Pharmaceuticals, Inc. v. Warner Chilcott Public..., Not Reported in Fed....

2014 WL 12778314

2014 WL 12778314
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

MYLAN PHARMACEUTICALS, INC., et al., Plaintiffs,
v.
WARNER CHILCOTT PUBLIC
LIMITED COMPANY, et al., Defendants.

Civ. No. 12-3824
|
Signed 09/15/2014

**Attorneys and Law Firms**

Christopher A. Williams, Jonathan R. Lutinski, Courtney Armour, Seth C. Silber, Shaun R. Snader, Wilson Sonsini Goodrich & Rosati PC, Washington, DC, Daniel P. Weick, Jonathan M. Jacobson, Michael S. Sommer, Jeffrey C. Bank, Wilson Sonsini Goodrich & Rosati PC, New York, NY, Joseph M. Donley, Nolan Ganguli Shenai, Jonathan W. Hugg, Clark Hill Thorp Reed, Wayne C. Stansfield, Reed Smith LLP, Philadelphia, PA, for Plaintiffs.

Bryn Resser Pallesen, Derrick F. Moore, Jack E. Pace, III, Kevin Charles Adam, Michael J. Gallagher, Robert A. Milne, White & Case LLP, New York, NY, Kimberly Man Yin Wong, Baker & Hostetler LLP, New York, NY, Christel Green, Eileen Marie Cole, Holly Smith Letourneau, J. Mark Gidley, Jaime M. Crowe, Peter J. Carney, Stephen A. Fraser, White & Case LLP, Washington, DC, Jeremy K. Ostrander, White & Case LLP, Palo Alto, CA, Leonard A. Gail, Matthew J. Reedy, Massey & Gail LLP, Chicago, IL, David H. Pittinsky, Edward D. Rogers, M. Norman Goldberger, Jonathan S. Satinsky, Evan Krick, Ballard, Spahr, Andrews and Ingersoll, Mark D. Villanueva, Stradley Ronon Stevens & Young, LLP, David A. Schumacher, Buchanan Ingersoll & Rooney PC, Philadelphia, PA, John E. Flaherty, Matthew Sklar, Richard Hernandez, Jonathan Short, William J. O'Shaughnessy, Sr., McCarter & English LLP, Newark, NJ, Steven H. Winick, Sheppard Mullin Richter & Hampton LLP, San Francisco, CA, for Defendants.

## ORDER

Paul S. Diamond, District Judge

**\*1** In this putative class action, Direct Purchasers of Doryx, the branded version of doxycycline hyclate, allege that Defendant brand name pharmaceutical companies illegally thwarted generic competition. The Parties now ask me to certify a Rule 23(b)(3) Settlement Class, grant final approval of their proposed Settlement, and approve an award of attorneys' fees and incentive awards. (Doc. Nos. 571, 572.) Because I conclude that: (1) the proposed Settlement Classes meet the requirements of Rule 23(a) and 23(b)(3); (2) the Notice to Class Members was sufficient; (3) the terms of the Settlement are fair, reasonable and adequate; and (4) the requested fees and awards are reasonable, I will grant their Motions.

## BACKGROUND

Plaintiffs are generic drug manufacturers, pharmaceutical wholesalers, and retail pharmacies. Defendants are pharmaceutical companies that produce and sell Doryx, the branded version of an antibiotic prescription drug (doxycycline hyclate) used primarily to treat severe acne. Plaintiffs allege that Defendants conspired to protect their monopoly by implementing a series of product changes that, while providing no real benefit to patients, exempted Doryx from state laws that would otherwise have allowed pharmacists to fill prescriptions doctors had written for Doryx with generics.

Plaintiffs filed the instant action on July 6, 2012. (Doc. No. 1.) Defendants moved to dismiss the Complaint. (Doc. Nos. 82, 83, 101, 102, 135, 138, 172, 174.) In denying Defendants' Motion, I deferred until summary judgment ruling on the dispositive question of whether "product hopping" is anticompetitive. (Doc. No. 280.) Direct Purchaser Plaintiffs filed a Motion for Class Certification on April 1, 2013. (Doc. No. 151.) Defendants opposed certification. (Doc. Nos. 228, 247.) While the certification motion was pending, the Parties began settlement discussions and, after lengthy negotiations, reached a proposed Settlement on December 24, 2013. (Doc. No. 452.)

I provisionally certified the Settlement Class on February 18, 2014 after a preliminary approval hearing. (Doc. No. 484.) Plaintiffs filed the instant unopposed Motion on April 24, 2014, asking me to: (1) grant final certification for settlement purposes; (2) approve the proposed Settlement; (3) approve the proposed distribution plan; (4) approve the proof of claim and release; and (5) dismiss all Direct Purchaser Plaintiff's

Mylan Pharmaceuticals, Inc. v. Warner Chilcott Public..., Not Reported in Fed....
2014 WL 12778314

claims against Defendants. (Doc. No. 571-72.) I held a final fairness hearing on June 9, 2014. (Doc. No. 653); see Gates v. Rohm and Haas Co., 248 F.R.D. 434, 439 (E.D. Pa. 2008) ("Judicial review of a proposed class settlement generally requires two hearings: one preliminary approval hearing and one final 'fairness' hearing.").

## LEGAL STANDARDS

Rule 23(e) provides that "[t]he claims, issues, or defenses of a certified class may be settled ... only with the court's approval." Fed. R. Civ. P. 23(e). "While the law generally favors settlement in complex or class action cases for its conservation of judicial resources, the court has an obligation to ensure that any settlement reached protects the interests of the class members." In re Aetna Inc. Sec. Litig., MDL No. 1219, 2001 WL 20928, at *4 (E.D. Pa. Jan 4, 2001) (citing In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig., 55 F.3d 768, 784 (3d Cir. 1995)).

**\*2** Consequently, before approving the Settlement, I must determine whether the Notice provided to Class Members was adequate. Id. I must also "scrutinize the terms of the settlement to ensure that it is 'fair, adequate and reasonable.' " Id. "[C]ases such as this, where the parties simultaneously seek certification and settlement approval, require 'courts to be even more scrupulous than usual' when they examine the fairness of the proposed settlement." In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 316 (3d Cir. 1998) (citations omitted).

Where, as here, the Class has not already been finally certified, I must also independently determine that the proposed Settlement Class satisfies the requirements of Rule 23. See Amchem v. Windsor, 521 U.S. 591, 620 (1997); In re Prudential Ins., 148 F.3d at 308 ("[A] district court must ... find [that] a class satisfies the requirements of Rule 23, regardless of whether it certifies the class for trial or settlement.").

## DISCUSSION

### I. Rule 23(a) & (b)(3)

In my February 18, 2014 Order granting Plaintiffs' Motion for Preliminary Approval (Doc. No. 484), I preliminarily certified and ordered that Notice of the Settlement be directed by Rust Consulting Inc., to the following Class:

> All persons and entities in the United States who purchased Doryx directly from one or more of the Defendants at any time from July 18, 2008 through December 31, 2013 (the "Class Period"). Excluded from the Class are Defendants, their parents, employees, subsidiaries and affiliates, and federal government entities (the "Class").

Rule 23(a)(1) requires that joinder of the parties be impracticable. Fed. R. Civ. P. 23(a)(1). The Class I preliminarily certified has 23 Members across the United States, which is sufficient to satisfy the impracticality of joinder requirement. "[W]hen the court finds that the class members are widely dispersed geographically, their joinder may be deemed impracticable." 7A Charles A. Wright, et al., Federal Practice and Procedure § 1762. Courts have repeatedly deemed joinder impracticable when class members' dispersion was similar to that presented here. Am. Sales Co. v. SmithKline Beecham Corp., 274 F.R.D. 127, 132-33 (E.D. Pa. 2010) (class members spread across 14 states rendered joinder impracticable); In re Wellbutrin, XL Antitrust Litig., No. 08-2431, 2011 WL 3563385, at *3 (E.D. Pa. Aug. 11, 2011) (class members across 15 states rendered joinder impracticable).

Rule 23(a)(2) requires that the Class share common questions of law or fact. To satisfy the commonality requirement, the purported class's claims must depend upon a common contention susceptible to class-wide resolution. Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2550-51 (2011). Here, the following issues present common, class-wide questions under Rule 23(a)(2):

a. Whether the conduct challenged by the Class as anticompetitive in the Consolidated Amended Class Action Complaint filed August 13, 2012 (Doc. No. 62) constitutes a restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, or constitutes monopolization or attempted monopolization in violation Section 2 of the Sherman Act, 15 U.S.C. § 2;

b. Whether Defendants' challenged conduct substantially affected interstate commerce and caused antitrust injury-

Mylan Pharmaceuticals, Inc. v. Warner Chilcott Public..., Not Reported in Fed....

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 275 of 482

2014 WL 12778314

in-fact to the Class through overcharges paid as a result of the higher prices direct purchasers paid for Doryx; and

   c. The amount of overcharge damages, if any, owed to the Class in the aggregate under Section 4 of the Clayton Act, 15 U.S.C. § 4.

**\*3** Rule 23(a)(3) requires me to evaluate whether the Named Plaintiffs' claims are typical of the Class. See Beck v. Maximus, Inc., 457 F.3d 291, 295-96 (3d Cir. 2006). The named Plaintiffs—Meijer Inc., Meijer Distribution, Inc., Rochester Drug Co-operative, Inc., and American Sales Company, LLC—allege on behalf of the Class and themselves the same manner of injury from the same course of conduct and assert on their own behalf the same legal theory that they assert for the Class. Any probable factual differences relate to damages not liability. Gates, 248 F.R.D. at 441. Accordingly, I conclude that the Named Plaintiffs' claims meet Rule 23(a)(3)'s typicality requirement.

Finally, Rule 23(a)(4) requires me to decide whether the Named Plaintiffs will fairly and adequately protect the interests of the Class. Fed. R. Civ. P. 23(a)(4). I find that they will. All Class Members sought to prove Defendants' alleged anticompetitive conduct, and to recover overcharge damages. Moreover, all Class Members were given an opportunity to opt out. Furthermore, the Named Plaintiffs are well-qualified to represent the Class, given their experience in prior cases, and the vigor with which they have acted thus far. (Doc. No. 452.)

Turning to the requirements of Rule 23(b)(3), I conclude, for settlement purposes, that common questions of law and fact predominate over questions affecting only individual Members. Fed. R. Civ. P. 23(b)(3). "[T]he task for plaintiffs at class certification is to demonstrate that [each] element ... is capable of proof at trial through evidence that is common to the class rather than individual to its members." In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 310-11 (3d Cir. 2008). Here, the elements of Plaintiffs' claims are (1) violation of antitrust laws, (2) antitrust impact, and (3) measurable damages. Because these issues are subject to generalized proof, they apply class-wide and predominate over issues that require individualized proof. Id.

Finally, I must consider whether a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This requires me to determine whether a class action is fairer and more efficient than alternative methods of adjudication. In re Prudential Ins.,

148 F.3d at 316. Plainly, it would be fairer and more efficient to resolve the claims of the Class in a single action. There are few manageability problems presented by a case such as this, particularly in light of the Settlement approved in this Order.

**II. Notice**

As required in my Preliminary Approval Order, timely Notice of the proposed Settlement was mailed by first-class mail to the last known address of all Class Members found in Warner Chilcott's sales database and verified by Rust. The Notice was also posted, along with relevant litigation and Settlement documents, on Faruqi & Faruqi, LLPs website —www.faruqilaw.com—to further advise Members of the Class of the Settlement. I find that this Notice complies with the requirements of Fed. R. Civ. P. 23(e) and due process. Moreover, it is the best notice practicable in the circumstances. Accordingly, all Class Members are bound by this Order and Final Judgment.

**III. Reasonableness of the Proposed Settlement**

In determining whether the Settlement is fair, adequate, and reasonable, I must consider the Girsh factors: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the Class to the Settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the Class action through the trial; (7) the ability of the Defendants to withstand a greater judgment; (8) the range of reasonableness of the Settlement Fund in light of the best possible recovery; and (9) the range of reasonableness of the Settlement Fund in light of all the attendant risks of litigation. In re Cendant Corp. Litig., 264 F.3d 201, 231–32 (3d Cir. 2001) (citing Girsh v. Jepson, 521 F.2d 153, 157 (3rd Cir. 1975)).

**\*4** Additionally, "[i]n more recent decisions, the Third Circuit has suggested an expansion of the nine-prong test when appropriate to include what are now referred to as the Prudential considerations." In re Flonase Antitrust Litig., 951 F. Supp. 2d 739, 742 (E.D. Pa. 2013). These include: (1) the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other facts that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; (2) the existence and probable outcome of claims by other classes and subclasses; (3) the comparison between the results achieved by the

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 276 of 482
Mylan Pharmaceuticals, Inc. v. Warner Chilcott Public..., Not Reported in Fed....
2014 WL 12778314

Settlement for individual Class or subclass Members and the results achieved—or likely to be achieved—for other claimants; (4) whether Class or subclass Members are accorded the right to opt out of the Settlement; (5) whether any provisions for attorneys' fees are reasonable; and (6) whether the procedure for processing individual claims under the Settlement is fair and reasonable. Id. (quoting In re Prudential Ins., 148 F.3d at 323).

The Third Circuit has determined that a court should accord a presumption of fairness to settlements if the court finds that: "(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the Settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." In re Cendant Corp. Litig., 264 F.3d at 233 n.18. Here, the Settlement is entitled to a presumption of fairness because: (1) it is the result of intense, *bona fide*, arm's length negotiations, (2) the Parties engaged in exhaustive discovery, (3) the attorneys are extremely experienced in similar litigation, and (4) there were no objections from the Class. Id.

*The Girsh Factors*

These weigh heavily in favor of approving the Settlement. This was a complex and expensive case with 23 experts and dozens of fact witnesses. Lengthy dispositive motions and a protracted trial and appeal were nearly certain (first factor). The time and resources saved by the avoidance of these costs benefits all Parties. Fleisher v. Fiber Composites, LLC, No. 12-1326, 2014 WL 866441, at *11 (E.D. Pa. Mar. 5, 2014).

There have been no opt-outs or objections from the Class (second factor). At the time the Parties settled, they had concluded fact discovery and were midway through expert discovery. A reasonable amount of discovery has thus been completed—enough to give both sides an accurate view of the risks of continued litigation (third factor).

The risks of litigation and establishing damages (fourth and fifth factors) weigh heavily in favor of approving the Settlement. Plaintiffs faced the risk that I would rule that: (1) product hopping was not anticompetitive; (2) Defendants had legitimate business justifications for the product changes; or (3) Plaintiffs suffered no damages. Defendants faced a potential treble damages award.

The Settlement amount—$15 million—is reasonable in light of the damages estimates, which were between $23 million and $1 billion, the risks of litigation that I have described,

and was recommended by the mediator. (Id. at 6-7) (eighth and ninth factors). The remaining factors—the risks of maintaining the Class through trial and Defendants' abilities to withstand a greater verdict—are neutral.

*The Prudential Factors*

These also weigh in favor of approving the Settlement. First, as I have discussed, the case was well developed, and extensive discovery had already been taken. Second, Indirect Purchaser and opt-out Retailers have both also settled. Only a single Plaintiff—Mylan—remains; the outcome of that case is unclear. Third, no Plaintiff has chosen to opt out. Fourth, the attorney fee provisions are reasonable, as discussed below. Fifth, the claim handling mechanism (to which no Party has objected) is fair and reasonable, allowing for the distribution of funds based on the nature and extent of the injuries. Similar mechanisms have been approved and implemented successfully and efficiently in other cases. (Doc. No. 571, at 23.) Accordingly, applying the Prudential and Girsch factors, I conclude that the Settlement is fair, adequate, and reasonable.

### IV. Approval of Proposed Settlement Plan

**\*5** I also approve the Plan of Distribution of the Settlement Proceeds, net of attorneys' fees, reimbursed expenses and incentive awards proposed by Plaintiffs. "Approval of a plan of allocation of a settlement fund in a class action is governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable and adequate." In re Ikon Office Solutions, Inc. Sec. Litig., 194 F.R.D. 166, 179 (E.D. Pa. 2000). Generally, a distribution plan is reasonable if it reimburses the class members based on the type and extent of their injuries. Id. Here, the Plan will authorize Rust to make fair and efficient distribution of the Net Settlement Fund proceeds *pro rata*, with the assistance of Class Counsel's expert economist, based on Class Members' purchases of Doryx during the Class Period. (The Net Settlement Fund is the amount remaining after attorneys' fees, reimbursement of litigation expenses, Class Representative incentive awards, and Settlement administration costs approved by the Court are deducted.)

### V. Approval of the Proposed Claim Form

I also approve the proposed Doryx Direct Purchaser Proof of Claim and Release Form, (Doc. No. 452-5), Rust will use to notify each Class Member of the Class Member's estimated

Mylan Pharmaceuticals, Inc. v. Warner Chilcott Public..., Not Reported in Fed....

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 277 of 482

2014 WL 12778314

purchases of Doryx during the Class Period. Each estimate will be formulated with the assistance of Class Counsel's expert economist, based on data produced by Warner Chilcott and Retailer Plaintiffs, as well as Rust's estimate of the Class Member's *pro rata* share of the Net Settlement Fund.

**VI. Release of Claims**

All Direct Purchaser Plaintiffs' claims in the above-captioned action against Defendants will be dismissed with prejudice and without costs. In accordance with Paragraph 11 the Settlement Agreement, upon the Settlement becoming final, I will find that:

> Plaintiffs and all Class Members, on behalf of themselves and their respective past and present parents, subsidiaries, affiliates, officers, directors, employees, agents, attorneys, servants, representatives (and the parents' subsidiaries' and affiliates' past and present officers, directors, employees, agents, attorneys servants, and representatives), and their predecessors, successors, heirs, executors, administrators, and representatives (the "Releasors"), hereby release and forever discharge, and covenant not to sue Defendants and their past and present parents, subsidiaries, affiliates, officers, directors, employees, agents, attorneys, servants, representatives (and the parents', subsidiaries', and affiliates' past and present officers, directors, employees, agents, attorneys, servants, and representatives), and the predecessors, successors, heirs, executors, administrators and representatives of each of the foregoing (the "Releasees"), with respect to, in connection with, or relating to any and all past, present, or future liabilities, claims, demands, obligations, suits, injuries, damages, levies, executions, judgments, debts, charges, actions, or causes of action, at law or in equity,

> whether class, individual, or otherwise in nature, and whether known or unknown, foreseen or unforeseen, suspected or unsuspected, contingent or non-contingent, arising out of or relating to purchases of Doryx at any time prior to the Effective Date and arising under the Sherman Act, 15 U.S.C. §§ 1 & 2, *et seq.*, or any other federal or state statute or common law relating to antitrust or unfair competition (the "Released Claims"). The Released Claims include, but are not limited to, any and all claims relating to or arising out of the facts, occurrences, transactions, or other matters alleged or asserted in this Action, or that could have been alleged or asserted in this Action. However, this Settlement Agreement is not intended to release anyone other than the Releasees, is not on behalf of anyone other than the Releasors, and does not affect the claims of the proposed end-payor Class, the claims of the Retailer Plaintiffs who filed their own complaints in this matter, or the claims of Mylan Pharmaceuticals, Inc. or its affiliates, nor is it intended to release any actual or potential claims described in Paragraph 13 of the Settlement Agreement.

**\*6** In addition, in accordance with Paragraph 12 of the Settlement Agreement, upon the Settlement becoming final, I will find that each Class Member has expressly waived and released any and all provisions, rights, and/or benefits conferred by § 1542 of the California Civil Code, which reads:

> Section 1542. General Release; extent. A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor; or

Case 4:21-cv-00196-MWB   Document 249-1   Filed 10/07/25   Page 278 of 482

Mylan Pharmaceuticals, Inc. v. Warner Chilcott Public..., Not Reported in Fed....

2014 WL 12778314

by any law of any state or territory of the United States, or principle of common law, which is similar, comparable or equivalent to § 1542 of the California Civil Code. Each Releasor may hereafter discover facts other than or different from those which he, she, or it knows or believes to be true with respect to the claims that are the subject matter of Paragraph 10. Nonetheless, upon the Settlement becoming final each Releasor hereby expressly waives and fully, finally and forever settles and releases any known or unknown, foreseen or unforeseen, suspected or unsuspected, contingent or non-contingent claim that is the subject matter of Paragraph 10 of the Settlement Agreement, whether or not concealed or hidden, without regard to the subsequent discovery or existence of such different or additional facts.

## VII. Attorney's Fees & Incentive Awards

Finally, Class Counsel have moved for an award of attorneys' fees of $5,000,000; reimbursement of expenses totaling $1,111,284.11; and incentive awards of $50,000 to each Class Representative. Under Fed. R. Civ. P. 23(h)(3) and 54(d), and the factors for assessing the reasonableness of a class action fee request set forth in Gunter and In re Prudential, I find that Counsel is entitled to the requested fees and costs. Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000); In re Prudential, 148 F.3d at 340.

Here, the proposed fees represent approximately one-third of the Settlement Fund. This Settlement confers a monetary benefit on the Class that is substantial both in absolute terms and when assessed in light of the risks of establishing liability and damages. The Fund will benefit all Class Members. There were no objections by Class Members to the requested fee award of one-third of the Settlement Fund. Class Counsel have efficiently prosecuted this difficult and complex action on behalf of the Members of the Class for over two years, with no guarantee they would be compensated, undertaking numerous and significant risks of nonpayment. Further, Class Counsel have reasonably expended thousands of hours, and incurred over a million dollars in out-of-pocket

expenses, in prosecuting this action, with no guarantee of recovery. Fee awards similar to the fee requested by Class Counsel here have been awarded in similar cases, including numerous Hatch-Waxman antitrust class actions similarly alleging impaired generic competition. Gunter, 223 F.3d 195 n.1; (Doc. No. 572-12, at 20 (collecting cases).)

The Third Circuit has advised that a court should also consider the Prudential factors in approving the fee award. In re Prudential, 148 F.3d at 340. Here, the Settlement achieved for the benefit of the Class was obtained as a direct and exclusive result of Class Counsel's skillful advocacy. Moreover, the Settlement was reached following negotiations conducted by an experienced mediator and after good-faith discussions.

**\*7** The "percentage-of-the-fund" method is an appropriate method for calculating attorneys' fees in complex, common-fund class actions. See, e.g., In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 305 (3d Cir. 2005). In the notice of Proposed Settlement, Class Members were advised that Class Counsel intended to move for up to 33⅓% of the gross Settlement Fund in attorney's fees, in addition to reimbursement of reasonable costs and expenses. Class Counsel then moved for an award in that amount, plus reimbursement. This Motion has been publicly available since March 19, 2014 on this docket and on Faruqi & Faruqi's website. (Doc. No. 566.)

A lodestar cross-check, which confirms the reasonableness of the fee request, ensures that application of the percentage method results in a recovery that is "sensible." Rite Aid, 396 F.3d at 305-06. Class Counsel's lodestar is in excess of $11,296,550. The requested fee is thus 44 percent less than the lodestar and below the range normally approved in comparable cases. See, e.g., Meijer, Inc. v. 3M, No. 04-5871, 2006 WL 2382718, at *24 (E.D. Pa. Aug. 14, 2006) (approving a percentage fee award that translated to a 4.77 multiplier in case that settled after one year); In re Remeron Direct Purchaser Antitrust Litig., No. 03-85, 2005 WL 3008808, at *47-48 (D.N.J. Nov. 9, 2005) (multiplier of 1.8 is on the "low end of the spectrum").

Class Counsel substantially developed this case through their investigation and efforts. Although other Plaintiffs pursued claims against Defendants, Class Counsel took a primary role in leading the joint litigation efforts, including serving as lead questioner during most of Defendants' employee depositions; taking the lead in third party discovery; overseeing the work of numerous experts in dermatology, gastroenterology, pharmaceutics, pharmaceutical manufacturing and supply,

Mylan Pharmaceuticals, Inc. v. Warner Chilcott Public..., Not Reported in Fed....

2014 WL 12778314

pharmacoeconomics, and economics. Further, a one-third contingency is standard in individual litigation; in antitrust litigation, a higher contingency would be reasonable, given the complexities and risks involved. In these circumstances, the requested 33⅓% fee award is fair and reasonable. Accordingly, Class Counsel will be awarded attorneys' fees in the amount of $5,000,000 from the Settlement Fund plus interest, if any. Co-Lead Counsel shall allocate the fees among Class Counsel.

Class Counsel also will be awarded $1,111,284.11 for reimbursement of out of pocket expenses that were fairly and reasonably incurred. The awarded fees and expenses shall be paid to Class Counsel from the Settlement Fund in accordance with the terms of the Settlement Agreement. Co-Lead Counsel shall allocate the expenses among Class Counsel.

Without affecting the finality of this judgment, I will retain exclusive jurisdiction over the Settlement Agreement to oversee its administration, distribution to the Class, and issues relating to attorneys' fees. In addition, Defendants and each Class Member irrevocably submit to the exclusive jurisdiction of this Court for any suit, action, proceeding or dispute arising out of or relating to the Settlement Agreement.

RDC, American Sales and Meijer each will be awarded $50,000 from the Settlement Fund. These payments are in recognition of the work these Plaintiffs undertook in representing the Class. This amount is in addition to whatever monies these Plaintiffs will receive from the Settlement Fund pursuant to the Plan. These awards are fair and reasonable.

## VIII. Claims

Finally, I find that under Rule 54(b), there is no just reason to delay the entry of dismissal with prejudice as to Defendants. Accordingly, I will direct the Clerk to enter final judgment. The entry of final judgment is appropriate because this Order fully and finally adjudicates the Class's claims against all Defendants, allows execution of the Settlement, and will expedite the distribution of the Settlement proceeds to Class Members.

**\*8  AND IT IS SO ORDERED.**

## All Citations

Not Reported in Fed. Supp., 2014 WL 12778314

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 286118
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

In re NEURONTIN ANTITRUST LITIGATION.

This Document Relates to:

Louisiana Wholesale Drug Company, Inc., Meijer
Inc. and Meijer Distribution, Inc., on behalf of
themselves and all others similarly situated, Plaintiffs,
v.
Pfizer, Inc. and Warner–Lambert Co., Defendants.

MDL No. 1479.
|
Master File No. 02–1390.
|
Civil Action Nos. 02–1830 (FSH), 02–2731(FSH).
|
Jan. 25, 2011.

**Attorneys and Law Firms**

Jonathan D. Clemente, Esq., Clemente Mueller, P.A., Cedar
Knolls, NJ, for Direct Purchaser Class Plaintiffs.

Robert N. Kaplan, Esq., Richard Kilsheimer, Esq., Kaplan,
Fox & Kilsheimer LLP, Bruce Gerstein, Esq., Garwin,
Gerstein & Fisher, LLP, New York, NY, for Direct Purchaser
Class Plaintiffs.

John J. Francis, Jr., Esq., Michael C. Zogby, Esq., Drinker
Biddle & Reath LLP, Florham Park, NJ, Clifford H. Aronson,
James A. Keyte, Karen Hoffman Lent, Skadden, Arps, Slate,
Meagher & Flom LLP,New York, NY, for Defendants Pfizer,
Inc. and Warner–Lambert Company LLC.

### *OPINION*

HOCHBERG, District Judge.

**\*1** This matter comes before the Court upon the Motion
for Class Certification [Docket # 226] filed by Louisiana
Wholesale Drug Company, Inc., Meijer, Inc., and Meijer
Distribution, Inc., et al. (collectively, "Plaintiffs") pursuant
to Federal Rule of Civil Procedure 23. The Court has
considered the submissions of the parties, including their
memoranda of law and the exhibits attached thereto; all
expert reports submitted by the parties, including the merits

report of Plaintiffs' expert, Dr. French; [1] Plaintiffs' Trial Plan
and Defendants' response thereto; and the parties' proposed
findings of fact and conclusions of law. The Court heard oral
argument on the motion on April 13, 2010 and September 13,
2010.

### I. *BACKGROUND* [2]

Plaintiffs in the instant action each directly purchased
Neurontin, a brand-name version of the drug compound
gabapentin anhydrous ("gabapentin"), from Defendants
Pfizer, Inc. and Warner–Lambert Company, LLC
(collectively, "Warner–Lambert"). [3] In their Amended
Complaint, Plaintiffs allege that Warner–Lambert engaged
in an overarching anticompetitive scheme to acquire and
maintain monopoly power in the market for gabapentin
products in violation of Section 2 of the Sherman Act, 15
U.S.C. § 2. Warner–Lambert is alleged to have carried out this
scheme by:

(1) procuring two additional patents that it improperly
listed in the Orange Book; (2) manipulating the patent
approval process so that a third patent with claims so
limited that they are impossible to accurately measure or
distinguish from the prior art enabling the patent to be
used to delay generic entry; (3) filing and prosecuting
multiple sham lawsuits on these patents that no reasonable
litigant could have expected to succeed; and (4) engaging
in fraudulent off-label promotion to convince doctors to
prescribe Neurontin for uses for which it was not approved.
DPNC Complaint ¶ 29. Plaintiffs claim that these actions
were designed to, and did in fact, delay the entry of generic
gabapentin into the market until late 2004. Plaintiffs allege
that but for Warner–Lambert's anticompetitive scheme,
generic manufacturers would have entered the market
at lower prices as early as 2000. As a result of this
delayed entry, Plaintiffs contend that they and other
direct purchasers of Neurontin were foreclosed from the
opportunity of purchasing lower-priced generic versions
of the drug for years, and were accordingly compelled to
pay noncompetitive prices for gabapentin. Plaintiffs seek
damages for this overcharge pursuant to Sections 4 and 16
of the Clayton Act, 15 U.S.C. §§ 15 and 26.

Plaintiffs now move for certification of a class of similarly
situated entities (the "Class") under Federal Rule of Civil
Procedure 23(a) and (b)(3) defined as follows:

All persons or entities in the United States that purchased Neurontin from [Warner–Lambert] at any time during the period of December 11, 2002 through August 31, 2008. Excluded from the Class are Defendants, and each of their respective parents, employees, subsidiaries, affiliates, and franchisees, and all governmental entities. [4]

**\*2** Plaintiffs also request that this Court designate the Plaintiffs as Class Representatives, and that proposed Class Counsel be appointed pursuant to Federal Rule of Civil Procedure 23(g). [5]

## II. *DISCUSSION*

### A. *Standard Governing Class Certification*

To obtain certification, Plaintiffs must demonstrate that the proposed class satisfies all four prerequisites of Federal Rule of Civil Procedure 23(a), as well as one of the three sets of criteria set out in Rule 23(b). *See, e.g., Georgine v. Amchem Prods., Inc.,* 83 F.3d 610, 624 (3d Cir.1996); *Baby Neal v. Casey,* 43 F.3d 48, 55 (3d Cir.1994). Class certification cannot be presumed and must only be entered after a "rigorous analysis" that the requirements of Rule 23 are met. *Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). As part of this rigorous analysis, the Court "must make whatever factual and legal inquiries are necessary and must consider all relevant arguments and evidence presented by the parties." *In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305, 307 (3d Cir.2008). In making these inquiries, "the Court must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits —including disputes touching on elements of the cause of action." *Id.* Any "[f]actual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence." *Id.* at 320. "In other words, to certify a class the district court must find that the evidence more likely than not establishes each fact necessary to meet the requirements of Rule 23." *Id.*

### B. *Rule 23(a) Requirements*

Rule 23(a) requires Plaintiffs to show that:

(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a); *Amchem,* 521 U.S. at 613. These prerequisites are commonly known as numerosity, commonality, typicality, and adequacy. *Baby Neal,* 43 F.3d at 55. They are "meant to assure both that class action treatment is necessary and efficient and that it is fair to absentees under the particular circumstances." *Id.*

Warner–Lambert does not contest that that these prerequisites are satisfied here. [9/13/10 Tr. 23.] Nonetheless, consistent with its own duty to conduct a rigorous analysis of the Rule 23 requirements, the Court will consider each in turn.

#### 1. Numerosity

"Satisfaction of the first prerequisite, numerosity, does not require evidence of the exact number or identification of the members of the proposed class, but rather that the proposed class is so 'numerous that joinder of all members is impracticable.' " *In re Linerboard Antitrust Litig.,* 203 F.R.D. 197, 205 (E.D.Pa.2001) (citing Fed.R.Civ.P. 23(a)(1)). Although "[n]o minimum number of plaintiffs is required ... generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Stewart v. Abraham,* 275 F.3d 220, 226–27 (3d Cir.2001). Numerosity is not, however, determined solely by the size of the class; the geographic location of class members is also considered in determining whether joinder would be impracticable. *See, e.g., Mardsen v. Select Med. Corp.,* 246 F.R.D. 480, 484 (E.D.Pa.2007); *Marian Bank v. Elec. Payment Servs., Inc.,* Civ. No. 95–614, 1997 WL 811552, at \*15 (D.Del. Dec. 30, 1997).

Case 4:21-cv-00196-MWB Document 249-1 Filed 10/07/25 Page 282 of 482
In re Neurontin Antitrust Litigation, Not Reported in F.Supp.2d (2011)
2011 WL 286118

**\*3** Here, it is undisputed that the proposed Class consists of more than 40 geographically dispersed members. Plaintiffs' expert estimates that the Class consists of more than 100 geographically dispersed entities; Warner–Lambert's expert puts the number at between 100 and 130. Given the number of potential Class Members throughout the United States, the Court finds that joinder of all members is impracticable. *See, e.g., Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir.1985) ("The allegation of more than 90 geographically dispersed plaintiffs met the numerosity requirement of Fed.R.Civ.P. 23(a)(1)."). [6] The proposed Class therefore satisfies the numerosity requirement.

### 2. Commonality

Rule 23(a)'s second prerequisite, commonality, requires Plaintiffs to demonstrate that there are questions of law or fact common to the class. Fed.R.Civ.P. 23(a)(2). This test is "satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Stewart,* 275 F.3d at 227. Because only one issue must be in common, "the burden for meeting this requirement is low," *In re Wellbutrin SR Direct Purchaser Antitrust Litig.,* No. 04–5525, 2008 WL 1946848, at \*2 (E.D.Pa. Mar.2, 2008) (citing *Baby Neal,* 43 F.3d at 56), and is routinely found to be satisfied in antitrust cases alleging monopolization. *See, e.g., K–Dur,* 2008 WL 2699390, at \*4; *see generally* Antitrust Law Developments, 3d at 314 (the commonality requirement "rarely has resulted in the denial of class certification in an antitrust action").

In this case, Plaintiffs allege a common course of conduct by Warner–Lambert which, they contend, had the general effect of delaying the entry of generic gabapentin to the market, thereby allowing Warner–Lambert to maintain its monopoly. Warner–Lambert does not dispute that Plaintiffs' antitrust claims raise numerous common questions of law and fact, including, inter alia, (i) whether Warner–Lambert engaged in an anticompetitive scheme to delay generic entry, and if so, whether the scheme as a whole or portions of it constitute antitrust violations; (ii) whether Warner–Lambert maintained monopoly power by delaying generic entry; (iii) whether direct proof of monopoly power is available, and if available, whether it is sufficient to prove Warner–Lambert's monopoly power without the need to define a relevant market; (iv) to the extent a relevant market must be defined, what that definition is; and (v) whether, and to what extent, Warner–Lambert's conduct caused antitrust injury to the business or property of Plaintiffs and Class Members, and if so, the appropriate measure of damages. *See* DPNC Compl. 28(a)-(e). Given these numerous common questions, the Court finds that the commonality requirement is satisfied. [7]

### 3. Typicality

The third prerequisite, typicality, requires that "the claims ... of the representative parties are typical of the claims ... of the class." Fed.R.Civ.P. 23(a)(3). The typicality inquiry "evaluates the sufficiency of the named plaintiff." *Hassine v. Jeffes,* 846 F.2d 169, 177 n. 4 (3d Cir.1988). It is intended to assess "whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented." *Baby Neal,* 43 F.3d at 57. It does so by "requiring that the common claims are comparably central to the claims of the named plaintiffs as to the claims of the absentees." *Id.* Named plaintiffs' claims are generally found to be typical if they "arise from the same alleged wrongful conduct" and are based upon the "same general legal theories" of those of the class. *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 5332 (3d Cir.2004); *see also Newton v. Merrill Lynch,* 259 F.3d 154 183–84 n. 28 (3d Cir.2001) ("[c]ases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement"). This is the case even where there are factual differences among plaintiffs. *Baby Neal,* 43 F.3d at 58.

**\*4** Here, the claims of the Named Plaintiffs and absent Class Members rely on the same legal theories and arise from the same alleged course of conduct by Warner–Lambert; namely, Warner–Lambert's alleged misuse of the patent process and filing of frivolous lawsuits in order to delay generic entry and maintain its monopoly of the gabapentin market. This conduct affected Named Plaintiffs and Class Members in the same way, as all direct purchasers allegedly paid higher prices for gabapentin because generic manufacturers were prevented from competing with Warner–Lambert for years. While individual damages may differ, the Court finds that Named Plaintiffs' claims are typical of the claims of the Class. [8] *See Linerboard,* 203 F.R.D. at 207 ("in instances it is alleged that the defendants engaged in a common scheme relative to all members of the class," typicality is generally satisfied).

### 4. Adequacy

Under Rule 23(a)'s fourth prerequisite, both the class representatives and their attorneys must "fairly and

adequately protect the interests of the class." Rule 23(a)(4). Adequacy is, therefore, a two-part inquiry "designed to ensure that absentees' interests are fully pursued." *Warfarin,* 391 F.3d at 532. First, "the court must determine whether the representatives' interests conflict with those of the class." *Johnston v. HBO Film Mgmt., Inc.,* 265 F.3d 178, 185 (3d Cir.2001). Second, the Court must assess the qualifications of class counsel to determine "whether the class attorney is capable of representing the class." *Id.* at 185.

Here, Warner–Lambert does not dispute that both prongs of the adequacy inquiry are satisfied. First, each Named Plaintiff has the same interest as each Class Member in establishing that Warner–Lambert's conduct violated the antitrust laws, and that but for the violation, Warner–Lambert would not have been able to sustain its monopoly of the gabapentin market. Further, each seeks to recover for the same type of injury-the overcharges it paid for Neurontin. Accordingly, "because all class members have the right to pursue overcharge damages, they have the same incentive to do so, and there is no conflict among class members allegedly harmed by the same antitrust violation." *Wellbutrin,* 2008 WL 1946848, at *6. [9]

Second, proposed Class Counsel are highly qualified to represent the Class. Counsel have submitted resumes demonstrating that they have extensive experience and expertise in antitrust, class action, and complex civil litigation, including actions similar to the instant case involving delayed generic entry. *See In re NASDAQ Market Makers Antitrust Litig.,* 169 F.R.D. 493, 515 (S.D.N.Y.1996) (noting that counsel's experience in litigating similar matters is a key factor in assessing adequacy). Further, there is "no indication that Plaintiffs' counsel is incapable of litigating vigorously on behalf of the putative class." *In re Rubber Chems. Antitrust Litig.,* 232 F.R.D. 346, 351 (C.D.Cal.2005). Rather, to date, counsel have zealously and capably prosecuted this action, conducting appropriate discovery and presenting comprehensive and intelligent analyses in their briefs and oral argument. Accordingly, the Court finds that the adequacy requirement is satisfied with respect to both Named Plaintiffs and proposed Class Counsel. [10]

### C. *Rule 23(b)(3) Requirements*

**\*5** Having satisfied the requirements of Federal Rule of Civil Procedure 23(a), Plaintiffs must next demonstrate that the proposed class is maintainable under one of the three subsections of Federal Rule of Civil Procedure 23(b). In the instant case, Plaintiffs seek certification under Rule 23(b)(3), and, as such, must show that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and that (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). These twin requirements are known as predominance and superiority. The Court will consider each in turn.

### 1. Predominance

Predominance demands that "[i]ssues common to the class [ ] predominate over individual issues." *In re Prudential Ins. Co. Am. Sales Practice Litig.,* 148 F.3d 283, 313–14 (3d Cir.1998). This inquiry "measures whether the class is sufficiently cohesive to warrant certification." *Newton,* 259 F.3d at 187. It is a standard "far more demanding" than the commonality requirement of Rule 23(a), because it requires more than a single common claim. *Hydrogen Peroxide,* 552 F.3d at 311 (quoting *Amchem,* 521 U.S. at 623). Instead, "[p]redominance requires that common issues be both numerically and qualitatively substantial in relation to issues peculiar to individual class members." *In re Mercedes–Benz Antitrust Litig.,* 213 F.R.D. 180, 186 (D.N.J.2003). While "[i]ndividual issues do[ ] not necessarily defeat certification," they must "have less overall significance than the issues common to the class." *K–Dur,* 2008 WL 2699390, at *11.

"Because the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual, a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *Hydrogen Peroxide,* 552 F.3d at 311 (internal quotations and citations omitted); *see also Sandwich Chef, Inc. v. Reliance Nat'l Indem. Ins. Co.,* 319 F.3d 205, 218 (5th Cir.2003) (Rule 23(b)(3) requires the court to "consider how a trial on the merits would be conducted if a class were certified"). This inquiry requires an examination of the elements of a plaintiff's claim "through the prism of Rule 23." *Hydrogen Peroxide,* 552 F.3d at 311. That is, the court must consider the substantive elements of a plaintiff's claims and the type of proof that plaintiff plans to proffer to establish those elements in order to determine whether common issues predominate. In doing so, "[t]he relevant question is not whether each element can be proved but whether such proof will require evidence individual to class members." *McDonough v. Toys R Us, Inc.,* No. 06–0242,

2011 WL 286118

2009 U.S. Dist. LEXIS 60684, at *58–59, 2009 WL 2055168 (E.D.Pa. July 15, 2009) (citing *Hydrogen Peroxide,* 552 F.3d at 311–12).

**\*6** In the instant case, the elements of Plaintiffs' claim are: (i) a violation of the applicable antitrust law-here, Section 2 of the Sherman Act; (ii) individual injury to Class Members as a result of that violation (also known as "impact," "fact of damage," or "injury-in-fact"); and (iii) measurable damages. *See Hydrogen Peroxide,* 552 F.3d at 311. To be certified as a class under Rule 23(b)(3), Plaintiffs must show that common or generalized proof will predominate at trial with respect to each of these essential elements. *Linerboard,* 203 F.R.D. at 214; *see also Meijer,* 246 F.R.D. at 369 (predominance satisfied "when there exists generalized evidence which proves or disproves an element [of plaintiff's claim] on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position"). The Court will assess the nature of the proposed proofs with respect to each of these elements in turn.

### a. Violation of Antitrust Law

To prove a violation of Section 2 of the Sherman Act, Plaintiffs must establish that: (i) Warner–Lambert possessed monopoly power in the relevant market; and (ii) Warner–Lambert willfully acquired or maintained that power. *U.S. v. Grinnell Corp.,* 384 U.S. 564, 570–71 (1966). Courts have routinely found that proof of this violation focuses on the defendant's conduct, not on the conduct of individual class members, and is therefore well suited for class treatment. *See, e.g., Warfarin,* 391 F.3d at 528 (allegations of violations of Section 2 "naturally raise several questions of law and fact common to the entire class and which predominate over any issues related to individual class members"); *Tricor,* 252 F.R.D. at 227 (same); *see also* 6 Newberg on Class Actions § 18.25 ("common liability issues such ... monopolization have, almost invariably, been held to predominate over individual issues").

Here, Warner–Lambert has "never contested that common proof would apply to these elements of [Plaintiffs'] claim." Defs. Response to Trial Plan 3. As in other monopolization cases, Class Members' claims focus only on the allegedly anticompetitive conduct of Warner–Lambert. Had they pursued their claims individually, each Class Member would have been required to prove identical facts, such as Warner–Lambert's monopoly power [11] and its alleged misuse of the patent process and initiation of sham litigation to perpetuate

its exclusivity scheme, without resort to evidence regarding Class Members' individual behaviors. Indeed, Warner–Lambert's own expert conceded that proving "whether or not [Warner–Lambert] engaged in various efforts to delay generic entry would not vary by class member." Hughes Dep. 55–57. Accordingly, the Court finds that common evidence will predominate with respect to whether Warner–Lambert violated antitrust law.

### b. Antitrust Impact

The critical disputed issue here concerns whether common questions predominate with respect to antitrust impact. As noted above, "impact" or "fact of damage" is an essential element of Plaintiffs' claim, and requires proof that Plaintiffs suffered some injury that was caused by Warner–Lambert's antitrust violation. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). At the class certification stage, the Court's concern is only whether Plaintiffs could prove impact through predominately class-wide evidence; not whether, in fact, they have. *Hydrogen Peroxide,* 522 F.3d at 311; *Linerboard,* 305 F.3d at 152.

**\*7** In the instant case, Plaintiffs assert that Warner–Lambert's scheme delayed the market entry of generic gabapentin, in turn delaying the ability of Class Members to substitute purchases of Neurontin with purchases of a generic alternative. Plaintiffs contend that their injury stems from the higher prices they paid for Neurontin as a result of being foreclosed from buying lower-priced generics (the "overcharge"). [12] To show this injury, Plaintiffs plan to demonstrate that, absent Warner–Lambert's anticompetitive conduct, Class Members would have purchased the lower-priced generic in place of Neurontin. Warner–Lambert has conceded that this is a cognizable theory of injury, recognizing that "class members suffered damages to the extent that each entity would have substituted generic gabapentin for its purchases of Neurontin." Defs. Proposed Findings 37.

There are two components to proving this injury, each of which Plaintiffs argue they can establish with class-wide proof. First, Plaintiffs must show that the price of generic gabapentin would have been lower than Neurontin absent Warner–Lambert's anticompetitive conduct (e.g., that Class Members would have paid less for generic gabapentin). Second, Plaintiffs must show that all or nearly all Class Members would have substituted at least some generic

gabapentin for Neurontin (e.g., that they would have paid the overcharge on at least one purchase).

With respect to the first component of this theory of injury, Plaintiffs have offered the expert opinion of Dr. French, an economist who has studied the structure of the pharmaceutical industry and the price effects of generic drugs on brand drug markets. French Aff. 5. Based on his research, as well as his review of materials relevant to this case—including deposition testimony, pleadings, and documents and data produced by the parties—Dr. French has opined that proving that generic prices would have been lower absent Warner–Lambert's alleged conduct can be accomplished with class-wide evidence. This common evidence includes: (1) government studies, scholarly economic literature, and empirical evidence analyzing the market-wide effects of unfettered generic competition on the prices of brand and generic drugs, which generally conclude that where there is unfettered generic competition, prices for a drug product are lower;[13] (2) Warner–Lambert's and generic manufacturers' analyses of the effect of generic competition for Neurontin forecasting that the generic would be sold at significantly reduced prices relative to Neurontin;[14] and (3) transactional data reflecting that the generics' actual market entry did in fact reduce the cost of gabapentin dramatically.[15] See Pl. Trial Plan 3–6. Warner–Lambert does not appear to challenge Plaintiffs' ability to make use of this common evidence. The use of this type of evidence is well established,[16] and it is reasonable to proffer it here. Importantly, this evidence will not vary by Class Member. The Court finds that Plaintiffs have shown generalized evidence exists that will prove the first component of their injury.

**\*8** With respect to the second component, Plaintiffs again offer the expert report of Dr. French, opining that common evidence is available to show that Class Members would have purchased generic gabapentin in the "but for" world. This common evidence includes: (1) economic literature and governmental studies of empirical evidence analyzing the market-wide effects of unfettered generic competition on market shares of both brand and generic drugs, which generally conclude that when less expensive generics are introduced, they are rapidly substituted for their branded counterparts;[17] (2) Warner–Lambert's and generic manufacturers' analyses forecasting that generics would be aggressively substituted for Neurontin upon entry;[18] (3) transactional data reflecting that after the generics entered the market in 2004, they were, in fact, rapidly substituted

for Neurontin;[19] and (4) Dr. French's analysis of the nature and economic function of the pharmaceutical wholesaler business, which concludes that wholesalers must stock and sell some generics to fulfill customer needs.[20] As noted above, precisely this type of generalized evidence has been found sufficient to satisfy the predominance requirement with respect to proof of impact in analogous cases alleging delayed generic entry.[21]

Warner–Lambert does not appear to contest the availability or import of this common evidence, but argues that it cannot show that *each and every* Class Member would have made the requisite substitution on a generalized basis. Warner–Lambert emphasizes that because of "generic bypass" some Class Members would not have purchased *any* generic gabapentin after generic entry and therefore could not have been injured. Generic bypass refers to the phenomenon in which retail pharmacies buy their brand drugs from wholesalers (like Class Members here), but purchase some or all of their generic drugs directly from generic manufacturers, thereby "bypassing" the wholesaler. In such a situation, the wholesalers lose sales volume, and thus do not need to stock the generic drug at the same inventory level as the brand. At its most extreme, generic bypass may result in a wholesaler not making any purchases of the generic. According to Warner–Lambert's expert, individualized inquiry into the customer base and purchasing practices of each Class Member will be necessary to determine which Class Members were not completely bypassed, and instead made the requisite substitution, thereby suffering an injury.

In response to Warner–Lambert's concern regarding generic bypass, Plaintiffs have proposed narrowing their Class Definition to include only those entities that purchased Neurontin directly from Warner–Lambert during the class period *and* that purchased generic gabapentin after it became available.[22] Pls. Second Motion to Supplement Class Definition 5 [Docket # 239]. This definitional change moots Warner–Lambert's argument that Plaintiffs cannot show with common proof that *every* Class Member was injured[23] as Warner–Lambert has effectively conceded that any Class Member who bought both the brand and the generic suffered an antitrust injury. *See* Defs. Proposed Findings 37 ("class members suffered damages to the extent that each entity would have substituted generic gabapentin for its purchases of Neurontin"); *see also* Hughes Dep. at 179–81 ("[i]f they [would have] bought one unit [of generic] in a properly

specified but-for world, yes, they would have suffered injury").

**\*9** Under the modified class definition, each Class Member substituted at least some purchases of Neurontin with that of a generic alternative after generics entered the market. As Warner–Lambert recognizes, "[w]hether an individual entity actually purchased a generic drug when it became available is recognized as a proxy for whether it would have substituted the generic drug for the branded version in the 'but for' world." Defs. Proposed Findings 28. A post-entry generic purchase is a reasonable "proxy" because it is well supported by the common evidence Dr. French cites in his expert report; namely, academic studies as well as documents and data from this case indicating that when generics are introduced, they are rapidly substituted for their branded counterparts. In this way, evidence that a Class Member substituted a generic product for some of its Neurontin purchases after generic entry gives rise to a reasonable inference that it similarly would have done so in the but-for world, and therefore suffered an injury. *Accord Cardizem,* 200 F.R.D. at 320; *K– Dur,* 2008 WL 2699390, at *15.* [24]

In light of the modified Class Definition, the Court finds that Plaintiffs have met their burden of showing that impact is susceptible to class-wide proof. That is, Plaintiffs have demonstrated that common evidence is available to show that, but for Warner–Lambert's alleged anticompetitive conduct, (1) generic gabapentin would have been priced less than Neurontin; and (2) Class Members would have purchased at least some of the lower-priced generic in place of Neurontin. Together, this common evidence supports Plaintiffs' theory that generic entry caused Class Members to overpay for at least some units of gabapentin, and thereby suffered injury.

### c. Damages

The final element of Plaintiffs' antitrust claim is proof of damages; to wit, the extent to which Class Members have been overcharged for their purchases of gabapentin. At the class certification stage, plaintiffs are not required to prove damages by calculating specific damages figures for each member of the class. Instead, they need only show that a "viable method" is available to prove damages on a class-wide basis. *In re Vitamins Antitrust Litig.,* 209 F.R.D. 251, 268 (D.D.C.2002); *see also Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.,* 100 Fed. App'x 296, 299–300 (5th Cir.2004) (plaintiffs must have a "reliable method" capable of measuring antitrust damages).

Here, Plaintiff's expert, Dr. French, has identified and employed a "before-during-after" method to calculate damages attributable to Warner–Lambert's alleged anticompetitive scheme. First, Dr. French determined the rate at which generics were substituted for Neurontin by month after generic entry. He then shifted that rate back in time to August 2000 (the date Plaintiffs contend generics would have entered the market absent Warner–Lambert's challenged conduct) to determine the total units of Neurontin that would have been sold as generic in a "but for" world. Next, to assess price, Dr. French subtracted the price of gabapentin that would have prevailed "but for" Warner–Lambert's anticompetitive conduct from the price of gabapentin that actually was charged. Finally, Dr. French multiplied the total units that would have been generic by the differential between the actual and "but for" price to arrive at the total class overcharge. To make these calculations, Dr. French relied on the pricing and sales data produced by Warner–Lambert and the generic manufacturers as well as industry-wide market share data—evidence that is common to the class.

**\*10** As noted by Plaintiffs, Dr. French's proposed methodology is "judicially recognized" and "commonly accepted." *K–Dur,* 2008 WL 2699390, at *19–20.* Indeed, it has been found to satisfy the predominance requirement in numerous analogous delayed generic entry cases. *See Wellbutrin,* 2008 U.S. Dist. LEXIS 36719, at *37–38 (finding that Dr. French's "before-andafter" damages methodology satisfied the predominance requirement); *Relafen,* 218 F.R.D. at 344 (same); *Cardizem,* 200 F.R.D. at 323 (same); *see also Meijer,* 246 F.R.D. at 307–12 (approving use of benchmark method); *Buspirone,* 210 F.R.D. at 58 (same).

Nonetheless, Warner–Lambert argues that this damages model is inappropriate because it aggregates damages and fails to account for individual issues concerning, *inter alia,* the extent to which each Class Member would have switched to a generic in the but-for world; the extent to which Warner–Lambert's off-label promotional activities inflated demand for Neurontin, and thereby affected substitution rates; the extent of any generic bypass; and the extent to which Class Members may have benefitted from delayed generic entry. Warner–Lambert presses that a proper damages model would "pair" each Class Member's purchases of Neurontin with its purchases of generic gabapentin, and demonstrate damages for each Class Member individually.

Warner–Lambert is, in essence, arguing for a level of individualized damages calculation that is not required at this stage of the litigation. As noted above, at class certification, Plaintiffs need only demonstrate that they have a "viable method" for calculating damages that is common to the class, not that their method is the best or most accurate. *Tricor,* 252 F.R.D. at 231; *Nifedipine,* 246 F.R.D. at 369. Plaintiffs have met this burden: they have offered a reasonable, judicially recognized methodology for calculating damages and have shown that the data needed to make these calculations is available and common to the class. Moreover, despite Warner–Lambert's claims to the contrary, the use of an aggregate approach to measure class-wide damages may be appropriate. *See* 2 Newberg on Class Actions, Chapter 10, § 10.05 (3d ed.1992) (noting that "[a]ggregate computation of class monetary relief is lawful and proper"); *NASDAQ,* 169 F.R.D. at 525 (observing that "aggregate judgments have been widely used in antitrust, securities, and other class actions"); *Nifedipine,* 246 F.R.D. at 312 (approving aggregate damages methodology); *Cardizem,* 200 F.R.D. at 324 (same). Further, to the extent individual issues need to be accounted for, it is well-established that such individualized issues with respect to damages calculations do not defeat Rule 23(b)(3) certification if the predominance requirement is otherwise met. *Bogosian,* 561 F.2d at 456; *see also In re General Motors,* 55 F.3d 768, 817 (3d Cir.1995) ("because separate proceedings can, if necessary be held on individualized issues such as damages ... such individual questions do not ordinarily preclude the use of the class action device"); *Chiang v. Veneman,* 385 F.3d 256, 273 (3d Cir.2004) (same). [25]

**\*11** Finally, Warner–Lambert's "pairing" formulation of damages [26] raises a question best left for the merits stage of the litigation. While the parties agree that overcharges are an appropriate measure of damages here, the parties disagree as to the volume of purchases on which the Class can properly claim to have paid overcharges. Plaintiffs seek to compute overcharges on all units of Neurontin actually purchased at monopoly prices—damages they argue reflect the societal harm of the alleged antitrust violation, rather than the net loss to claimants. Warner–Lambert would calculate overcharges only on purchases that Class Members would have made absent its challenged conduct. Warner–Lambert argues that Plaintiffs' method inflates Class Members' damages, while Plaintiffs argue that Warner–Lambert's method improperly allows Warner–Lambert to keep a portion of its ill-gotten gains. This dispute implicates broader legal theories and principles of recovery, deterrence, and equity, and does not need to be resolved at this stage of the litigation.

*See NASDAQ,* 169 F.R.D. at 521. It does not defeat class certification because Plaintiffs have offered a viable common method for calculating damages, and that is all that is required at this stage.

In summary, the Court concludes that Plaintiffs have successfully demonstrated that generalized evidence exists on which Plaintiffs could prove each element of their antitrust claim on a simultaneous, class-wide basis. The Court therefore finds that common questions predominate over individual ones.

### 2. Superiority

Finally, the Court must consider whether the class action device is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). This "requirement asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative methods of adjudication." *Prudential,* 148 F.3d at 316. It is meant to ensure that resolution by class action will "achieve economies of time, effort, and expense, and promote ... uniformity of decision without sacrificing procedural fairness or bringing about other undesirable results." *Amchem,* 521 U.S. at 615 (quoting Advisory Committee's Note on Fed.R.Civ.P. 23).

The Court finds that the superiority requirement is satisfied here. This action involves the resolution of numerous complex issues of law and fact common to all putative class members. Denying certification would require each direct purchaser to file suit individually to prove the same operative facts in scores of separate trials at the expense of judicial economy and litigation costs for all parties. *See, e.g., In re Carbon Black Antitrust Litig.,* No. 03–10191, 2005 U.S. Dist. LEXIS 660 (D.Mass. Jan. 18, 2005) ("[a]ntitrust class actions are expensive endeavors and joining forces with other similarly situated plaintiffs is often the only way to effectuate a case"). Moreover, litigating all claims together avoids the risk of inconsistent rulings regarding, for example, Warner–Lambert's liability or the appropriate benchmark for direct purchasers' damages. "Resolution by class action would instead promote uniform treatment of class members—similarly situated direct purchasers who allege similar injuries resulting from the same conduct." *Relafen,* 218 F.R.D. at 347; *accord Meijer,* 246 F.R.D. at 313 ("The class action mechanism ... avoids the specter of inconsistent adjudications."). As class certification provides an opportunity for the efficient resolution of the entire class

in a single forum, the Court finds that the class action mechanism is a superior litigation approach.[27]

### III. CONCLUSION

**\*12** For the reasons discussed above, the Court finds that all of the requirements of Rule 23(a) and Rule 23(b)(3) are satisfied. Accordingly, the Court will grant Plaintiffs' motion for class certification. An appropriate Order will issue.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 286118

---

### Footnotes

1    Warner–Lambert does not oppose the Court's consideration of Dr. French's merits report, (9/13/10 Hearing Tr. 34), and, in light of the Third Circuit's directives in *In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305 (3d Cir.2008), the Court has determined that it is appropriate to consider the report at this stage, only as it related to the certification of a class.

2    The facts and allegations underlying this consolidated action were discussed extensively in this Court's Opinion dated August 27, 2009 denying Warner–Lambert's motion to dismiss. *In re Neurontin Antitrust Litig.,* No. 02–1390, 2009 U.S. Dist. LEXIS 77475, 2009 WL 2751029 (D.N.J. Aug. 27, 2009). The Court presumes familiarity with that Opinion, as well as with the abbreviations and acronyms used therein.

3    Warner–Lambert Company LLC, formerly Warner–Lambert Company, became a wholly-owned subsidiary of Pfizer Inc. on or about June 19, 2000.

4    After briefing on their Motion for Class Certification was complete, Plaintiffs requested the right to amend the class definition proposed therein. [Docket # 301]. Specifically, Plaintiffs proposed that the starting date for the class period be revised from July 16, 2000 to December 11, 2002, and the ending date be revised from September 25, 2009 to August 31, 2008, so to conform to the record evidence as it developed after briefing was complete. Warner–Lambert does not oppose this request. [9/13/10 Hearing Tr. 24.] Because "Plaintiffs are entitled to define the class period as broadly as their evidence supports," *In re Hydrogen Peroxide Antitrust Litig.,* 240 F.R.D. 163, 177 (E.D.Pa.2007), *rev'd on other grounds,* 552 F.3d 305 (3d Cir.2008), for purposes of this Motion, the Court will consider Plaintiffs' amended class definition. *See also* 7 Newberg on Class Actions § 22:76 (4th ed.) ("Courts have either redefined the classes themselves or permitted the plaintiffs to redefine the classes.").

5    By Order dated March 14, 2003 [Docket # 27], this Court appointed interim Liaison Counsel, Co–Lead Counsel, and an Executive Committee ("Interim Class Counsel"). Plaintiffs are seeking to have these same firms, in the same leadership structure, appointed as Class Counsel under Federal Rule of Civil Procedure 23(g). Plaintiffs also seek the appointment of Berger & Montague, P.C. as additional Class Counsel.

6    Notably, courts in analogous cases-similarly alleging that a drug manufacturer engaged in anticompetitive conduct to prevent generic drugs from entering the market-certified classes similar in size and composition to the one proposed here. *See In re Buspirone Patent & Antitrust Litig.,* 210 F.R.D. 43, 57 (S.D.N.Y.2002) (certifying class of approximately 100 direct purchasers in delayed generic entry case); *In re Nifedipine Antitrust Litig.,* 246 F.R.D. 365, 368–69 (D.D.C.2007) (certifying class of approximately 85 direct purchasers in delayed generic entry case); *In re K–Dur Antitrust Litig.,* No. 01–1652, 2008 WL 2699390, at \*4 (D.N.J. Apr.14, 2008) (certifying class of approximately 45 direct purchasers in delayed generic entry case); *Meijer,*

*Inc. v. Warner Chilcott Holdings Co. III,* 246 F.R.D. 293, 300 (D.D.C.2007) (certifying class of approximately 30 direct purchasers in delayed generic entry case).

Warner–Lambert has argued that the decisions in these similar delayed generic entry cases have limited precedential value, as they precede the Third Circuit's decision in Hydrogen Peroxide. The Court has conducted a thorough, independent analysis of the facts and holdings of these analogous cases. While many recite standards that Hydrogen Peroxide has since clarified, the courts nonetheless conducted the "rigorous analysis" of the proofs that *Hydrogen Peroxide* demands. In this way, these cases remain persuasive authority, and the Court has considered them as such.

7   This conclusion is consistent with the findings of other courts in analogous delayed generic entry cases. *See Meijer,* 246 F.R.D. at 300 ("[Plaintiffs'] claims raise numerous common issues of fact and law, including ... whether Defendants' activities have substantially affected interstate commerce ... whether, and to what extent, Defendants' conduct caused direct purchasers to pay more for Ovcon 35 Products than they would have absent Defendants' conduct; and ... the appropriate measure of damages."); *In re Relafen Antitrust Litig.,* 218 F.R.D. 337, 342 (D.Mass.2003) ("The factual questions common to the class members' claims include whether SmithKline engaged in the alleged anticompetitive conduct and whether and to what extent this conduct resulted in overcharges.... The legal questions common to the class members' claims include whether SmithKline's conduct violated Section 2 of the Sherman Act."); *Buspirone,* 210 F.R.D. at 57 ("There are also numerous common questions of fact and law at issue among the members of the proposed class concerning whether BMS engaged in the anticompetitive conduct alleged, the scope of this conduct, and whether this conduct resulted in any overcharges in the market for buspirone.").

8   This determination is consistent with courts' findings in analogous delayed generic entry cases. *See Buspirone,* 210 F.R.D. at 57 (finding that the typicality requirment was satisfied. where plaintiff "alleges that it was injured in the same general way and by the same general course of conduct that allegedly injured other members of the class."); *Meijer,* 246 F.R.D. at 300 ("Each plaintiff made some purchases of [the drug] during the class period," thus, "the Court concludes that Plaintiffs claims arise from the same course of events that led to, and rely on the same legal arguments as, the claims of absent class members."); *Nifedipine,* 246 F.R.D. at 369 (finding the typicality requirement satisfied where "[e]ach potential class member's claim arises from the same alleged conspiracy ..."); *Relafen,* 218 F.R.D. at 343 (finding the typicality requirement satisfied where plaintiff bases claims on the same "core pattern of alleged anti-competitive conduct" giving rise to all class members' claims.").

9   Additionally, the Named Plaintiffs—Louisiana Wholesale and Meijer—have been found to be adequate class representatives in multiple prior analogous delayed entry cases. *See Ovcon,* 246 F.R.D. at 302–05 (finding Meijer and Louisiana Wholesale are adequate class representatives); *In re Tricor Antitrust Litig.,* 252 F.R.D. 213, 226–27 (D.Del.2008) (same); *Relafen,* 218 F.R.D. at 343 (same); *Nifedipine,* 246 F.R.D. at 369 (finding Meijer adequate); *Wellbutrin,* 2008 WL 1946848, at *3–7 (same); *K–Dur,* 2008 WL 2699390, at *6–11 (finding Louisiana Wholesale adequate); *Buspirone,* 210 F.R.D. at 57–58 (same); *Cardizem,* 200 F.R.D. at 305–06 (same).

10  In light of Interim Class Counsel's experience in these types of cases and capable prosecution of this action to date, and there being no opposition to their request for appointment as counsel, the Court will appoint the same firms, in the same leadership structure, as Class Counsel under Federal Rule of Civil Procedure 23(g). The Court will also appoint Berger & Montague, P.C. as additional Class Counsel.

11  As set forth in their Trial Plan, Plaintiffs' common evidence of Warner–Lambert's monopoly power will consist of, *inter alia,* Warner–Lambert's pricing records for Neurontin; the pricing records of Warner–Lambert's generic subsidiary for generic gabapentin; pricing data from generic competitors; academic studies regarding the market effects of generic competition; government studies regarding the same; and facts regarding what

happened to prices and sales after the generic gabapentin entered the market. Plaintiffs will also rely on the expert testimony of Dr. Keith Leffler, who will testify that Warner–Lambert possessed market power in a well-defined relevant market consisting of Neurontin and its generic equivalents.

12    Warner–Lambert makes much of the fact that the price of Neurontin increased after the entry of generic gabapentin to the market. However, as Plaintiffs argue, this fact is irrelevant to Plaintiffs' theory of injury: the overcharge pursued by Plaintiffs is the difference in price between Neurontin and the generics that dominated the market soon after generic entry, not the difference between the prices of Neurontin pre- and post-generic entry. In other words, Plaintiffs' overcharge analysis does not depend on a finding that brand prices decreased after generic entry. *Accord Meijer,* 246 F.R.D. at 310 ("the effect of generic entry on the price of [the brand] appears to be irrelevant to Plaintiffs' ability to demonstrate proof of impact through common evidence").

13    For example, government research shows that generic equivalents are initially priced between 20 and 30% lower than their branded counterparts, and that the generic price falls substantially as additional generic competitors enter. Pls. Proposed Findings of Fact B(1)(a) (citing French Aff. 27 (collecting sources)) [Docket # 348].

14    For example, John Marion, Pfizer's Neurontin World Wide Team Leader, stated in a Declaration that the price of gabapentin subsequent to generic entry would be "significantly reduced over time ... and that the price would continue to decrease with the entry of each new generic manufacturer." Pls. Proposed Findings of Fact B(1)(c) (citing Decl. of John Marino) [Docket # 348].

15    For example, in October 2004, generic gabapentin sold, on average, at a 37% discount off of the price of Neurontin 300 mg capsules. By December 2008, the generic 300 mg capsule price had fallen to a 95% discount off of Neurontin's pre-generic entry price. Pls. Proposed Findings of Fact B(1)(d) (citing French Aff. 45) [Docket No. 348].

16    *See, e.g., Relafen,* 346 F.Supp.2d at 343 (finding predominance requirement met where direct purchasers relied on "governmental and academic studies, projections and analyses described in [defendant's] and its competitors' internal documents, and price and sales data for Relafen and its generic equivalents"); *Wellbutrin,* 2008 WL 1946848, at *8 (approving Dr. French's use of literature examining impact of generic entry into pharmaceutical market and analysis of public data collected on dispensation and purchases of prescription drugs to prove common impact); *Cardizem,* 200 F.R.D. at 308 (approving the use of academic studies, defendants' internal sales documents, and marketplace sales data, to prove common impact); *Nifedipine,* 246 F.R.D. at 370 (noting that plaintiffs' expert explained that common impact could be proved by studies of generic entry on the pharmaceutical industry, evidence obtained from defendants, and publicly available sales data, and concluding that "plaintiffs have offered a sufficient colorable method of proving class-wide impact with common evidence as to the issue of causation"); *Tricor,* 252 F.R.D. at 229 (same); *Meijer,* 246 F.R.D. at 308 (same); *K–Dur,* 2008 WL 2669390, at *15 (same).

17    For example, government and academic research shows that, due to institutional features of the pharmaceutical marketplace—including state generic substitution laws and third-party payor requirements—when less expensive generic equivalents are sold, they are rapidly substituted for their branded counterparts. Pls. Proposed Findings of Fact B(2)(b)-(c) (citing French Aff. 27 (collecting sources)) [Docket # 348].

18    For example, one of Warner–Lambert's documents notes that the generic would "make an immediate and substantial incursion into Warner–Lambert's exclusive market share." Pl. Proposed Findings of Fact B(2)(d) (citing Marino Decl. 17) [Docket # 348].

19    For example, by December 2004, branded Neurontin sales accounted for only 20% of the total sales for gabapentin 300 mg capsules, while generic gabapentin accounted for 80%. By December 2008, branded

Neurontin sales accounted for only 2% of 300 mg sales by volume. Pl. Proposed Findings of Fact B(2)(e) (citing French Aff. 44) [Docket # 348].

20    Pl. Proposed Findings of Fact B(3)(a)-(b) (citing French Reb. 12 and Hughes Report 33) [Docket # 348].

21    *See* cases cited *supra* note 16.

22    This revision of the Class Definition follows analogous precedent. *See K–Dur,* 2008 WL 2699390, at *1, *18 ("excluded are persons or entities who have neither purchased generic versions of [the branded product], nor obtained increased discounts on [the branded product], after the introduction of generic versions"); *Meijer,* 246 F.R.D. at 310 n. 17 ("if the evidence ultimately suggests that a putative class member has neither purchased a generic version of [the drug] nor received a discount on [the] branded [product] since the entry of [the] generic [product], the Court can accommodate by amending the class definition to exclude such putative class members"); *see also Wellbutrin,* 2008 U.S. Dist. LEXIS 36719, at *41–43 (referring to court's ability to remove any possible uninjured class members who did not buy generic prior to trial).

23    The parties dispute whether Plaintiffs must, at this stage, show that their adduced common proof will demonstrate injury to "every" Class Member. Plaintiffs highlight cases indicating that common proof of "widespread injury" to the Class is sufficient. *See, e.g., Meijer,* 246 F.R.D. at 309–10 ("courts have routinely observed that the inability to show injury to a few does not defeat class certification where the plaintiffs can show widespread injury to the class"); *K–Dur,* 2008 WL 2699390, at *18 (same); *Cardizem,* 200 F.R.D. at 307 ("Plaintiffs are not required to show that fact of injury actually exists for each class member"); *see also Kohen v. Pac. Inv. Mgmt. Co.,* 571 F.3d 672, 677 (7th Cir.2009) ("a class will often include persons who have not been injured by the defendant's conduct.... Such a possibility or indeed inevitability does not preclude class certification.") Warner–Lambert argues that *Hydrogen Peroxide* changed this legal landscape, and requires Plaintiffs to show that impact can be established for every class member through common proof. The Court notes, however, that the passage from *Hydrogen Peroxide* that Warner–Lambert cites for this proposition relates to Plaintiffs' burden at the merits stage of the litigation: "to prevail on the merits, every class member must prove at least some antitrust impact resulting from the alleged violation." 552 F.3d at 311 (emphasis added). Regardless, the definitional change proposed by Plaintiffs obviates the need to resolve this question. *See Flast v. Cohen,* 392 U.S. 83, 96, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) (courts should not decide questions that have been mooted by subsequent developments).

24    Any arguments regarding the variable rates at which Class Members substituted generic gabapentin for Neurontin relate to the quantum of injury, rather than the fact of injury, and therefore do not defeat predominance with respect to the impact element. *See Zenith Radio Corp.,* 395 U.S. at 114 n. 9 (the "burden of proving the fact of damage ... is satisfied by its proof of some damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damages").

Likewise, Warner–Lambert's argument that Dr. French's damages model must account for Warner–Lambert's alleged off-labeling marketing conduct also goes to quantum of damages, not fact of damages. This argument relates to the volume of purchases on which the Class could properly claim to have paid overcharges, not to whether the Class in fact suffered injury. It therefore does not defeat predominance with respect to the impact element of Plaintiffs' claim.

25    In any event, Dr. French has proposed reasonable methods for accounting for generic bypass and off-label marketing.

26    Warner–Lambert suggests that a proper damages model would "pair" each Class Member's purchases of Neurontin with its purchases of generic gabapentin, resulting in an individual damages determination.

2011 WL 286118

27    This finding of superiority is consistent with the findings of other courts in analogous delayed generic entry cases. *See In re Nifedipine,* 246 F.R.D. 371–72; *Meijer,* 246 F.R.D. at 313; *Relafen,* 218 F.R.D. at 346; *Wellbutrin,* 2008 WL 1946848, at *9–10.

---

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 293 of 482

In re Neurontin Antitrust Litigation, Not Reported in Fed. Supp. (2014)

2014 WL 12962880
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

IN RE NEURONTIN ANTITRUST LITIGATION
This Document Relates to:
Louisiana Wholesale Drug Company, Inc., Meijer,
Inc. and Meijer Distribution, Inc., on behalf of
themselves and all others similarly situated, Plaintiffs,
v.
Pfizer, Inc. and Warner-Lambert Co., Defendants.

Civil Action No. 02-1830, Civil Action No. 02-2731
|
Signed 08/06/2014

**FINAL JUDGMENT AND ORDER OF
DISMISSAL APPROVING PROPOSED CLASS
SETTLEMENT AND DISMISSING ACTIONS**

Faith S. Hochberg, U.S.D.J.

**\*1** Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, and in accordance with the terms of the Settlement Agreement dated April 17, 2014, it is hereby ORDERED as follows:

1. This Final Judgment and Order of Dismissal hereby incorporates by reference the definitions in the Settlement Agreement among the parties to these actions on file with this Court, and all capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Settlement Agreement.

2. The Court has jurisdiction over these actions and over each of the parties and over all members of the Class.

3. The notice of settlement (in the forms presented to this Court as Exhibits B-1 and B-2 to the Settlement Agreement) (the "Notice") directed to the members of the Class, constituted the best notice practicable under the circumstances. In making this determination, the Court finds that the Notice provided for individual notice to all Class members who were identified through reasonable efforts. Pursuant to, and in accordance with, Rule 23 of the Federal Rules of Civil Procedure, the Court hereby finds that the Notice provided Class members due and adequate notice of

the Settlement, the Settlement Agreement, these proceedings and the rights of Class members to object to the Settlement.

4. The Court held a preliminary fairness hearing on May 1, 2014 and a final fairness hearing on July 31, 2014, regarding the reasonableness of the parties' settlement. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, this Court hereby approves the Settlement, and finds that the Settlement is, in all respects, fair, reasonable and adequate to Class members. Accordingly, the Settlement shall be consummated in accordance with the terms and provisions of the Settlement Agreement. [1]

5. The Court hereby approves the Plan of Allocation of the Settlement Fund as proposed by Class Counsel (the "Plan"), which was summarized in the Notice of Proposed Settlement. The Claims Administrator is directed to distribute the net Settlement Fund as provided in the Plan.

**\*2** 6. The Court has certified a Class consisting of "[a]ll persons or entities in the United States that purchased Neurontin from Pfizer at any time during the period of December 11, 2002 through August 31, 2008 and who have purchased generic gabapentin. Excluded from the Class are Defendants and each of their respective parents, employees, subsidiaries, affiliates, and franchisees, and all government entities."

7. Also excluded from the Class are CVS Pharmacy Inc., Caremark, L.L.C., Rite Aid Corporation, Rite Aid HDQTRS Corp., Walgreen Co., American Sales Co, Inc., HEB Grocery Co. LP, Safeway Inc., SuperValu Inc., and The Kroger Co., in their own right as direct purchasers of Neurontin from Pfizer and as assignees limited to their purchases of Neurontin from Class members.

8. The Court has found that the Class meets all the requirements of Fed. R. Civ. P. 23. The Class, made up of sophisticated business entities, had a full and fair opportunity to request exclusion at the time of class certification and, therefore, there is no reason for the Court to afford a new opportunity to individual Class members to request exclusion who had an earlier opportunity to request exclusion but did not do so.

9. The Court has appointed Louisiana Wholesale Drag company, Inc., Meijer, Inc., and Meijer Distribution, Inc. as class representatives (the "Class Representatives").

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 294 of 482

In re Neurontin Antitrust Litigation, Not Reported in Fed. Supp. (2014)

10. The Court has found that Co-Lead Counsel, listed below, along with other Class Counsel, have fairly and adequately represented the interests of the Class and satisfied the requirements of Fed. R. Civ. P. 23(g):

Bruce E. Gerstein, Esq.
GARWIN GERSTEIN & FISHER LLP

88 Pine Street, 10 th Floor
New York, NY 10005

Richard J. Kilsheimer, Esq.
KAPLAN FOX & KILSHEIMER LLP

850 Third Avenue, 14 th Floor
New York, NY 10022

11. The following actions are hereby dismissed with prejudice, as provided in the Settlement Agreement, and without costs, except as provided for herein and in the Settlement Agreement:

- *Louisiana Wholesale Drug Company, Inc., et al. v. Pfizer, Inc. and Warner-Lambert*, No. 2:02-cv-01830-FSH (D.N.J.)

- *Meijer, Inc., et al. v. Pfizer, Inc. and Warner-Lambert*, No. 2:02-cv-02731 (D.N.J.)

12. Each of the foregoing dismissals shall become effective upon the date the Settlement becomes final in accordance with paragraph 4 of the Settlement Agreement.

13. Upon this Settlement becoming final in accordance with paragraph 4 of the Settlement Agreement, Defendants and their past, present and future parents, subsidiaries, divisions, affiliates, joint ventures, stockholders, officers, directors, management, supervisory boards, insurers, general or limited partners, employees, agents, trustees, associates, attorneys and any of their legal representatives (and the predecessors, heirs, executors, administrators, successors and assigns of each of the foregoing) (the "Released Parties") are and shall be unconditionally, fully and finally released and forever discharged from all manner of claims, debts, obligations, demands, actions, suits, causes of action, damages whenever incurred, liabilities of any nature whatsoever, including costs, expenses, penalties and attorneys' fees, known or unknown, suspected or unsuspected, accrued in whole or in part, in law or equity, that Plaintiffs or any member or members of the Class (including any of their past, present or future officers, directors, insurers, general or limited partners, divisions, stockholders, agents, attorneys,

employees, legal representatives, trustees, parents, associates, affiliates, joint ventures, subsidiaries, heirs, executors, administrators, predecessors, successors and assigns, acting in their capacity as such) (the "Releasors"), whether or not they object to the Settlement and whether or not they make a claim upon or participate in the Settlement Fund, ever had, now has, or hereafter can, shall or may have, directly, representatively, derivatively or in any other capacity, arising out of or relating in any way to any conduct alleged or asserted in any of Plaintiffs' complaints filed in this Class Action, relating to any alleged delay in the marketing, sale, manufacture, pricing, or purchase of, or the enforcement of intellectual property related to Neurontin or its generic equivalents, prior to the date hereof, except the Settlement does not release any claims between Plaintiffs, members of the Class and the Released Parties concerning product liability, breach of contract, breach of warranty or personal injury (the "Released Claims").

**\*3** 14. In addition, Plaintiffs and each Class member, on behalf of themselves and all other Releasors, hereby expressly waive, release and forever discharge, upon the Settlement becoming final, any and all provisions, rights and benefits conferred by § 1542 of the California Civil Code, which reads:

> Section 1542. General Release; extent.
> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor;

or by any law of any state or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable or equivalent to § 1542 of the California Civil Code. Each Class member may hereafter discover facts other than or different from those which he, she or it knows or believes to be true with respect to the claims which are the subject matter of this paragraph 13, but each Class member hereby expressly waives and fully, finally and forever settles, releases and discharges, upon this Settlement becoming final, any known or unknown, suspected or unsuspected, asserted or un-asserted, contingent or non-contingent claim that would otherwise fall within the definition of Released Claims, whether or not concealed

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 295 of 482

In re Neurontin Antitrust Litigation, Not Reported in Fed. Supp. (2014)

or hidden, without regard to the subsequent discovery or existence of such different or additional facts. Each Class member also hereby expressly waives and fully, finally and forever settles, releases and discharges any and all claims it may have against any Released Party under § 17200, *et seq*, of the California Business and Professions Code or any similar, comparable or equivalent provision of the law of any other state or territory of the United States or other jurisdiction, which claims are expressly incorporated into the definition of Released Claims.

15. The releases set forth in paragraphs 13 and 14 of this Order shall not release any claims between Plaintiffs, Class members and the Released Parties concerning product liability, breach of contract, breach of warranty, or personal injury.

16. Upon consideration of Class Counsel's petition for fees, costs and expenses, Co-Lead Counsel, on behalf of all counsel for the Class, are hereby awarded attorneys' fees in the amount of 33⅓% of the Settlement Fund and costs and expenses totaling $2,213,537.35, together with a proportionate share of the interest thereon from the date the funds are deposited in the Escrow Account until payment of such attorneys' fees, costs and expenses, at the rate earned by the Settlement Fund, to be paid solely from the Settlement Fund and only if and after the Settlement becomes final in accordance with paragraph 4 of the Settlement Agreement. Upon consideration of Class Counsel's petition for incentive payments for Plaintiffs in these actions, LWD and Meijer are each hereby awarded an incentive award in the amount of $100,000.00, to be paid solely from the Settlement Fund, and only if and after the Settlement becomes final in accordance with paragraph 4 of the Settlement Agreement. Co-Lead Counsel shall allocate and distribute such attorneys' fees, costs and expenses among the various Class Counsel that have participated in this litigation. Co-Lead Counsel shall distribute such incentive awards to the Plaintiffs as provided herein. The Released Parties (as defined in paragraph 10 of the Settlement Agreement) shall have no responsibility for, and no liability whatsoever with respect to, any payment or disbursement of attorneys' fees, expenses, costs or incentive awards among Class Counsel and/or Plaintiffs, or with respect to any allocation of attorneys' fees, expenses, costs or incentive awards to any other person or entity who may assert any claim thereto. The attorneys' fees, costs and expenses, and incentive award authorized and approved by this Final Judgment and Order shall be paid to Co-Lead Counsel within five (5) business days after this Settlement becomes final

pursuant to paragraph 4 of the Settlement Agreement and in accordance with the terms of the Settlement Agreement and the Escrow Agreement. The attorneys' fees, costs and expenses, and incentive awards authorized and approved by this Final Judgment and Order shall constitute full and final satisfaction of any and all claims that Plaintiffs and any Class member, and their respective counsel, may have or assert for reimbursement of fees, costs, and expenses, and incentive awards, and Plaintiffs and members of the Class, and their respective counsel, shall not seek or demand payment of any fees and/or costs and/or expenses and/or incentive awards from any source other than the Settlement Fund. The Court retains exclusive jurisdiction over the Settlement and the Settlement Agreement as described therein, including the award of attorneys' fees to Plaintiffs' Counsel, the reimbursement of expenses, the award of incentive payments to Plaintiffs, and the administration and consummation of the Settlement, and over this Final Judgment and Order.

**\*4** 17. The Court finds that this Final Judgment and order adjudicates all of the claims, rights and liabilities of the parties to the Settlement Agreement (including the members of the Class), and is final and shall be immediately appealable. Neither this Order nor the Settlement Agreement nor any other Settlement-related document shall constitute any evidence or admission of liability by Defendants or any other Released Party, nor shall either the Settlement Agreement or this Order or any other Settlement-related document be offered in evidence or used for any other purpose in this or any other matter or proceeding except as may be necessary to consummate or enforce the Settlement Agreement of the terms of this Order or if offered by any Released Party in responding to any action purporting to assert Released Claims.

18. Class Counsel for the Direct Purchaser Class Plaintiffs have moved for an award of attorneys' fees, reimbursement of expenses, and incentive awards for class representatives. (Doc. No. 749). Pursuant to Rule 23(h) of the Federal Rules of Civil Procedure, and pursuant to the factors for assessing the reasonableness of a class action fee request as set forth in *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000), this Court makes the following findings of fact and conclusions of law with respect to Class Counsel's request for an award of attorneys' fees, reimbursement of expenses, and incentive awards for Class Representatives:

19. The Settlement of $190,416,438.36 million (the "Settlement Fund"), representing the agreed-upon $190

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 296 of 482

In re Neurontin Antitrust Litigation, Not Reported in Fed. Supp. (2014)

million plus 1% per annum interest that had accrued from March 14, 2014 (the date that the parties first orally agreed to the Settlement's terms) to June 2, 2014 (the date that defendants deposited such amount into an escrow account held in trust by UBS AG that is earning interest for the benefit of the Class), plus interest on the Settlement Fund from June 2, 2014, confers a monetary benefit on the Direct Purchaser Class that is substantial, both in absolute terms and when assessed in light of the risks of establishing liability and damages in this case. The Settlement was reached following negotiations held in good-faith and in the absence of collusion, with the aid of a highly-renowned mediator, over the course of three mediation sessions, covering six days.

20. The Court-approved Notice of Proposed Settlement of Class Action (Doc. No. 727) advised Class Members that Class Counsel intended to move for an award of attorneys' fees in an amount up to 33-1/3% of the gross Settlement Fund (including the interest accrued thereon), plus reimbursement of reasonable costs and expenses incurred in the prosecution of this action.

21. Class Counsel have moved for an award of attorneys' fees in the amount of 33-1/3% of the gross Settlement Fund (including the interest accrued thereon), plus reimbursement of reasonable costs and expenses incurred in the prosecution of this action, which such motion has been on the docket and publicly available since July 1, 2014.

22. In prosecuting this action, Class Counsel expended over 60,570 hours of uncompensated time, and incurred substantial out of pocket expenses, with no guarantee of recovery. Class Counsel's hours were reasonably expended in this complex case that was vigorously litigated for over twelve years, and their time was expended at significant risk of nonpayment.

23. No Class Members objected to Class Counsel's fee request. In fact, as described below, the reaction of the Class has been entirely positive and supportive of the Settlement generally and Class Counsel's requested fee award specifically.

24. The Settlement achieved for the benefit of the Direct Purchaser Class was obtained as a direct result of Class Counsel's skillful advocacy. This is confirmed by the entirely positive reaction of the Class Members to the Settlement and Class Counsel's request for a fee award of 33-1/3% of the Settlement. Outside antitrust counsel for the country's three largest pharmaceutical distributors,

who made in excess of 70% of the branded and generic Neurontin purchases at issue in this case, wrote to the Court on behalf of their clients to express their clients' support for the Settlement and Class Counsel's request for an award of one-third of the Settlement amount. *See* Exhibits 2-4 to the Joint Declaration of Bruce E. Gerstein and Richard J. Kilsheimer in Support of Direct Purchaser Class Plaintiffs* Motions for Final Approval of Settlement and for an Award of Attorneys' Fees, Reimbursement of Expenses and Incentive Awards to Class Representatives (the "Joint Declaration" or "Joint Decl.," Doc. No. 748-5) (Doc. Nos. 748-7 – 748-9) (letters to the Court from outside counsel to AmerisourceBergen Corporation, Cardinal Health, Inc., and McKesson Corporation). In addition, a number of other Class Members wrote directly to the Court stating their belief that Class Counsel's requested fees are justified in light of the time and expense that Class Counsel expended prosecuting and favorably resolving this complex litigation. *See* Exhibits 5-12 to the Joint Declaration (Doc. Nos. 748-9 – 748-17) (letters from Class Members Burlington Drag Company, Inc., Dakota Drug, Inc., Drogueria Betances, Inc., King Drug Company of Florence, Inc., Miami-Luken, Inc., Prescription Supply, Inc., J M Smith Corporation d/b/a Smith Drug Co., and Value Drug Co.). All of the above-mentioned Class Members who have written to the Court to express their support for the Settlement and Class Counsel's fee request account for approximately 93% of the purchases at issue in this litigation.

**\*5** 25. The "percentage-of-the-fund" method is the proper method for calculating attorneys' fees in common fund class actions in this Circuit. *See, e.g., In re Rite Aid Sec. Litig.,* 396 F.3d 294, 305 (3d Cir. 2005). The Court concludes that that the fees requested by Class Counsel are comparable to recent awards in similar cases in the Third Circuit and elsewhere, including direct purchaser class actions similarly alleging anticompetitive practices in the pharmaceutical industry.

26. The Court finds that Class Counsel's request for a 33-1/3% fee is consistent with what would have been negotiated for a contingent-fee case of this complexity. For example, the current and former presidents of class representative Louisiana Wholesale Drag Co., Inc. ("LWD") attested that "had LWD retained the law firms and/or attorneys ... to represent it in an individual action in this complex litigation, LWD would have retained these same attorneys based on a 33 1/3% contingency fee in the event of settlement or compromise without trial and/or based on a 40% contingency fee in the event of trial, with any applicable contingency fee percentage computed in addition to out-of-pocket expenses."

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 297 of 482

In re Neurontin Antitrust Litigation, Not Reported in Fed. Supp. (2014)

Exhibit 13 to the Joint Decl, Declaration of Chad Gielen, President/Chief Executive Office of LWD, at ¶ 6, and Exhibit 14 to the Joint Decl, Declaration of Gayle White, former President and General Manager of LWD, at ¶ 3. Furthermore, the letters from the Class Members supporting Class Counsel's fee award is further evidence that the 33-1/3% fee award is consistent with what those entities would have assented to had they retained Class Counsel in private litigation.

27. As detailed in Class Counsel's affidavits, a one-third fee award would equate to a lodestar multiplier of approximately 1.99. The Court concludes that, based on recently-approved multipliers in other Third Circuit antitrust class actions alleging similar anticompetitive practices in the pharmaceutical market, the multiplier requested here is well within the acceptable range. *See, e.g., In re Flonase Antitrust Litigation*, 951 F. Supp. 2d 739, 750 (E.D. Pa. 2013) (approving 33 1/3% fee award of $150 million settlement that amounted to multiplier of 2.99).

28. In light of the factors and findings described above, the Court finds that the requested 33-1/3% fee award is within the applicable range of reasonable percentage fund awards.

29. The Court finds this fee award is reasonable pursuant to Federal Rule of Civil Procedure 23(h). The Court orders that Class Counsel request for attorneys' fees of 33-1/3% of the Settlement Fund, which equates to $63,472,146.12, plus one-third of the interest earned on the Settlement Fund from June 2, 2014 (the date of funding of the Settlement Fund) to the date of payment, at the same net interest rate earned by the Settlement Fund, is granted.

30. Further, the Court orders that Class Counsel is awarded $2,213,537.35 out of the Settlement Fund to reimburse them for the expenses incurred in prosecution of this case, which such expenses the Court finds to be fair and reasonably incurred to achieve the benefits to the Direct Purchaser Class obtained by the Settlement.

31. Further, the Court orders payment of two incentive awards of $100,000 each for each of the Class Representatives – one incentive award of $100,000 to LWD and one incentive award to "Meijer", which consists of Meijer, Inc. and Meijer Distribution, Inc. (together, "Meyer") – for their active participation and assistance in the prosecution of this case, including responding to document requests and interrogatories, appearing for deposition and keeping apprised of the progress of the case, including settlement efforts. The Class Representatives' efforts contributed to the benefits conferred upon the Class through the Settlement. In addition, no Class Member has objected to the awarding of these incentive awards. Moreover, the three largest pharmaceutical distributors have specifically supported granting incentive awards in the requested amounts. *See* Exhibits 2-4 to the Joint Decl. (Doc. Nos. 748-7 – 748-9) (letters to the Court from outside counsel to AmerisourceBergen Corporation, Cardinal Health, Inc., and McKesson Corporation).

**\*6** IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2014 WL 12962880

---

## Footnotes

1    The Court has fully considered the *Girsh* factors and finds that, considered together, the factors overwhelming favor approval of the Class settlement. *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975); *see also In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 323 (3d Cir. 1998). As the Court indicated at the fairness hearing, every issue in this complex antitrust case has been vigorously litigated by both sides for over twelve years. Class Plaintiffs faced significant risks in taking the case to trial, which this Court has discussed in its opinions on dispositive motions and recent status conferences. This Court agrees with counsel's position, as discussed in the extensive briefing and supporting affidavits, that the Settlement Agreement is fair and reasonable for all Class members. The value of the settlement to the Class is confirmed by the fact that no members of the Class of identifiable, sophisticated business entities have objected, rather many have explicitly approved of the Settlement.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.    5

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| IN RE: OPANA ER ANTITRUST LITIGATION | MDL DOCKET NO. 2580 |
| | Lead Case No. 14-cv-10150 |
| This document relates to: | |
| END-PAYOR ACTIONS | Hon. Harry D. Leinenweber |

## ORDER PRELIMINARILY APPROVING END-PAYOR CLASS PLAINTIFFS' SETTLEMENT WITH DEFENDANT IMPAX LABORATORIES, INC.

WHEREAS, on July 19, 2022, Plaintiffs Plumbers and Pipefitters Local 178 Health & Welfare Trust Fund; Louisiana Health Service & Indemnity Company, d/b/a Blue Cross and Blue Shield of Louisiana; Fraternal Order of Police, Miami Lodge 20, Insurance Trust Fund; Wisconsin Masons' Health Care Fund; Pennsylvania Employees Benefit Trust Fund; and International Union of Operating Engineers, Local 138 Welfare Fund (collectively, "End-Payor Plaintiffs"), on behalf of themselves and on behalf of the certified End-Payor Plaintiff Classes (the "End-Payor Classes"), and Defendant Impax Laboratories, Inc. ("Impax") entered into a settlement agreement, which sets forth the terms and conditions of the parties' proposed settlement and the release and dismissal with prejudice of the End-Payor Classes' claims against Impax (the "Impax Settlement").

WHEREAS, on August 12, 2022, End-Payor Plaintiffs filed a Motion for Preliminary Approval of the Proposed Class Action Settlement with Impax, requesting the entry of an Order (i) preliminarily approving the Impax Settlement; (ii) staying End-Payor Plaintiffs' litigation against Impax; (iii) approving the Notice Plans and Long and Short Form Notices; (iv)

appointing A.B. Data, Ltd. as Claims and Notice Administrator; (v) appointing The Huntington National Bank to serve as Escrow Agent; (vi) approving the plan of allocation; and (vii) setting a schedule for final approval of the Impax Settlement;

WHEREAS, Impax does not oppose the End-Payor Plaintiffs' Motion; and

WHEREAS, the Court is familiar with and has reviewed the record in this case and the Impax Settlement, and has found good cause for entering the following Order.

### NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

### JURISDICTION

1.  This Court has jurisdiction to enter this Order. The Court has jurisdiction over the subject matter of this action and over Impax and End-Payor Plaintiffs, including all members of the Classes.

### THE PREVIOUSLY CERTIFIED CLASSES

2.  Given the Court's previous order dated June 4, 2021, certifying the Classes (ECF No. 741) pursuant to Fed. R. Civ. P. 23(a) and (b)(3), as amended by orders dated August 11, 2021, and September 23, 2021 (ECF Nos. 746, 752), the Classes in the Impax Settlement are defined as follows:

> **Antitrust/Consumer Protection Class:** All persons or entities who indirectly purchased, paid for, and/or provided reimbursement for some or all of the purchase price for brand or generic Opana ER 5 mg, 10 mg, 20 mg, 30 mg, and/or 40 mg sold by Defendants, other than for resale, in the states and commonwealths of Arizona, California, Florida, Hawaii, Iowa, Maine, Michigan, Minnesota, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Vermont, West Virginia, Wisconsin, and the District of Columbia from April 2011 through September 2018; and

> **Unjust Enrichment Subclasses:** All persons or entities who from April 2011 through September 2018 indirectly purchased, paid for, and/or provided reimbursement for some or all of the purchase price for brand or generic Opana ER 5 mg, 10 mg, 20 mg, 30 mg, and/or

2

40 mg sold by Defendants, other than for resale, in the following states and commonwealths:

**Subclass 1**: Iowa, Michigan, Oregon, West Virginia

**Subclass 2**: Maine, New Mexico, Wisconsin

**Subclass 3**: Hawaii, Massachusetts*, Mississippi*, Nebraska, Vermont

**Subclass 4**: Florida, Minnesota, Missouri, Nevada, Pennsylvania, South Dakota, Utah

**Subclass 5**: Arizona*, North Dakota

*\* With respect to Arizona, Massachusetts, and Mississippi unjust enrichment claims, Class Members must have purchased, paid for, and/or provided reimbursement for some or all the purchase price of brand or generic Opana ER from June 4, 2011 through September 2018.*

3. The following persons or entities are excluded from the End-Payor Classes:

(a) Defendants and their counsel, officers, directors, management, employees, subsidiaries, or affiliates;

(b) Persons or entities whose only purchases of or reimbursements or payments for brand or generic Opana ER were of or for the generic Opana ER product sold by Actavis South Atlantic LLC or its successors;

(c) All governmental entities and Medicare Part D plans and beneficiaries, except for non-Medicare Part D government-funded employee benefit plans;

(d) All persons or entities who purchased Opana ER for purposes of resale or directly from Defendants or their affiliates;

(e) Fully-insured health plans (plans that purchased insurance from another third-party payor covering 100 percent of the plan's reimbursement obligations to its members);

(f) Flat co-payers (consumers who paid the same co-payment amount for brand and generic drugs);

(g) Any consumer who purchased only Endo's brand version of Opana ER after the AB-rated generic version became available in January 2013 (i.e., "brand loyalists");

(h) Consumers with copay insurance plans who purchased only generic versions of Opana ER (i.e., "generic-only copay consumers");

(i) Pharmacy Benefit Managers;

(j) All Counsel of Record; and

(k) The Court, Court personnel and any member of their immediate families.

In addition, people who or entities that submitted a valid exclusion request before the December 6, 2021 exclusion deadline described in the previous notice of this Lawsuit sent to all Class Members are also excluded.

## PRELIMINARY APPROVAL OF SETTLEMENT

4.      The terms of the Impax Settlement, dated July 19, 2022, are hereby preliminarily approved. This Order incorporates the Impax Settlement and terms used in this Order that are defined in the Impax Settlement have the same meanings. The Impax Settlement was entered into after full fact and expert discovery, class certification (including a Rule 23(f) petition), summary judgment and Daubert motions, and five (5) days of trial. The Court finds that the Impax Settlement was concluded after arm's-length negotiations by experienced counsel on behalf of the End-Payor Classes. Accordingly, the Court preliminarily finds that the Impax Settlement is fair, reasonable, and adequate, and in the best interests of the End-Payor Classes, and that preliminary approval under Federal Rule of Civil Procedure 23 is warranted.

5.      Huntington Bank is hereby appointed as Escrow Agent pursuant to the Impax Settlement.

6.       The Court approves the establishment of the Settlement Fund under the Settlement Agreement as a qualified settlement fund ("QSF") pursuant to Internal Revenue Code Section 468B and the Treasury Regulations promulgated thereunder, and retains continuing jurisdiction as to any issue that may arise in connection with the formation and/or administration

of the QSF. In accordance with the Settlement Agreement, counsel are authorized to expend funds from the QSF for the payment of the costs of notice, payment of taxes, and settlement administration costs.

7.      A.B. Data is hereby appointed as Claims and Notice administrator.

8.      Pending further Order of the Court, all litigation activity against Impax on behalf of the Classes is hereby stayed, and all hearings, deadlines, and other proceedings related to the End-Payor Plaintiffs' claims against Impax, other than those incident to the settlement process, are hereby taken off the Court's calendar. The stay shall remain in effect until such time that (i) the Impax or End-Payor Plaintiffs exercise their right to terminate the Impax Settlement pursuant to its terms; (ii) the Impax Settlement is terminated pursuant to its terms; or (iii) the Court renders a final decision regarding approval of the Impax Settlement, and if it approves the Impax Settlement, enters final judgment and dismisses End-Payor Plaintiffs' claims against Impax with prejudice. Impax shall not be party to the ongoing proceedings in this case, and Impax is neither bound nor estopped by any findings made hereafter.

9.      In the event that the Impax Settlement fails to become effective in accordance with its terms, or if an Order granting final approval to the Impax Settlement and dismissing End-Payor Plaintiffs' claims against Impax with prejudice is not entered or is reversed, vacated, or materially modified on appeal, this Order shall be null and void.

10.     In the event the Impax Settlement is terminated, not approved by the Court, or the Impax Settlement does not become final pursuant to the terms of the Impax Settlement, litigation against Impax shall resume in a reasonable manner as approved by the Court upon joint application of the End-Payor Plaintiffs and Impax.

## APPROVAL OF NOTICE, CLAIMS, AND ALLOCATION PLAN

11.    The Court finds that the plan for distributing notice of the Impax Settlement to the End-Payor Classes satisfies the requirements of Fed. R. Civ. P. 23(e)(1) and due process and is a reasonable manner of distributing notice to class members who would be bound by the Impax Settlement.

12.    The Court approves the Long- and Short-Form Notices (as well as the Third-Party Payor Postcard Notice, which will contain the same text as the Short-Form Notice) attached as Exhibit B to the Impax Settlement and as Exhibits C and D to the Declaration of Linda V. Young filed concurrently with End-Payor Plaintiffs' Motion. A.B. Data may modify the form and/or content of the targeted advertisements and banner notices as it deems necessary and appropriate to maximize their impact and reach, as long as those modifications substantially comport with the Notices attached to the Declaration of Linda V. Young.

13.    The Court approves the claim forms attached as Exhibits E and F to the Declaration of Linda V. Young as fair, reasonable, and adequate.

14.    Defendant shall provide notice of the Impax Settlement as required by 28 U.S.C. § 1715.

15.    The Court finds that the Plan of Allocation is fair, reasonable, and adequate.

## APPROVAL OF SCHEDULE

16.    A.B. Data and End-Payor Plaintiffs shall adhere to the following schedule:

    a.    Within five (5) days of the date of this Order, A.B. Data shall update the Class website (www.opanaerantitrustlitigation.com) to announce the Impax Settlement.

6

      b.     No later than fourteen (14) days of the date of this Order, or **September 7, 2022**, A.B. Data shall begin the process of providing notice to the End-Payor Classes of the Impax Settlement, in accordance with the Plan of Notice.

      c.     Members of the End-Payor Classes may object to the Impax Settlement not later than **November 7, 2022**.

      d.     Class Members who wish to object to the proposed Impax Settlement and/or appear by video or audio (access information provided in Paragraph f. below) at the hearing on final approval of the settlement (the "Fairness Hearing") must first send an objection and, if intending to appear, a notice of intention to appear, along with a summary statement outlining the position(s) to be asserted and the grounds therefore, together with copies of any supporting papers or briefs, via first class mail, postage prepaid, to the Clerk of the U.S. District Court for the Northern District of Illinois, Everett McKinley Dirksen United States Courthouse, 219 South Dearborn Street, Chicago, Illinois 60604, with copies to the following counsel:

<u>Co-Lead Counsel for the End-Payor Classes:</u>

Gregory S. Asciolla
DICELLO LEVITT GUTZLER LLC
One Grand Central Place
60 East 42nd Street, Suite 2400
New York, NY 10165
Tel: (646) 933-1000
gasciolla@dicellolevitt.com

Robert Wozniak
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Tel: (224) 632-4500
Fax: (224) 632-4521
rwozniak@fklmlaw.com

<u>For Settling Defendant</u>:

Devora W. Allon, P.C.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel: (212) 446-4800
devora.allon@kirkland.com

The objection and/or notice of intention to appear shall include reference to *In re Opana ER Antitrust Litigation*, 14-cv-10150 (N.D. Ill.). To be valid, any such objection to the Impax Settlement and/or notice of intention to appear must be postmarked no later than **November 7, 2022**, and it must include the class member's name, address, telephone number, and signature. Except as herein provided, no person or entity shall be entitled to contest the terms of the proposed Impax Settlement. All persons and entities who fail to file a notice of intention to appear or a letter stating reasons for objecting as provided above shall be deemed to have waived any objections by appeal, collateral attack, or otherwise and will not be heard at the Fairness Hearing.

e.      All briefs and materials in support of final approval of the Impax Settlement and entry of final judgment proposed by the parties to the Impax Settlement shall be filed with the Court no later than thirty (30) days before the date of the Fairness Hearing.

f.      A hearing on final approval of the Impax Settlement shall be held before this Court on **December 15, 2022 at 10:00 a.m. Central Time** by video conference via the following link that can be accessed from a computer, mobile telephone, or tablet:

https://meet.uc.uscourts.gov/meeting/971179555?secret=axs_OtIs0SDNZx4qFKoc7g

Meeting ID:  971179555.  For audio access only, participants can dial 517-353-2301.

17.      Neither this Order nor the Impax Settlement nor any other Settlement-related document or anything contained herein or therein or contemplated hereby or thereby nor any

proceedings undertaken in accordance with the terms set forth in the Impax Settlement or herein or in any other Settlement-related document shall constitute, be construed as or be deemed to be evidence of or an admission or concession by Impax as to the validity of any claim that has been or could have been asserted against Impax or as to any liability of Impax or as to any matter set forth in this Order.

**SO ORDERED**

Dated: August 24, 2022

Harry D. Leinenweber
United States District Judge

No *Shepard's* Signal™
As of: October 2, 2025 8:27 PM Z

## *In re Papa John's Emp. & Franchise Emp. Antitrust Litig.*

United States District Court for the Western District of Kentucky, Louisville Division

August 7, 2025, Decided; August 7, 2025, Filed

Case No. 3:18-cv-825-BJB

**Reporter**
2025 U.S. Dist. LEXIS 152012 *; 2025 LX 316197

In Re: Papa John's Employee and Franchisee Employee Antitrust Litigation

## Core Terms

settlement, class member, arbitrate, class representative, proposed settlement, adequacy, predominate, antitrust, preliminary approval, no-poach, classwide, notice, email, subject to arbitration, arbitration agreement, final approval, calculate, discount, opt out, vigorously, subclass, suppress, absent class members, common question, preliminarily, certificate, putative, seal

**Counsel:** [*1] For Jamiah Greer, on behalf of herself and all others similarly situated, Plaintiff: Christian Levis, Claire Noelle Forde, Roland R. St. Louis, III, Vincent Briganti, LEAD ATTORNEYS, PRO HAC VICE, Lowey Dannenberg P.C., White Plains, NY; Connor P. Lemire, LEAD ATTORNEY, McCune Wright Arevalo, LLP - Edwardsville, Edwardsville, IL; Dean M. Harvey, LEAD ATTORNEY, PRO HAC VICE, Lin Y. Chan, Lieff, Cabraser, Heimann & Bernstein, LLP- San Francisco, San Francisco, CA; Jennifer A. Moore, LEAD ATTORNEY, Moore Law Group, PLLC, Louisville, KY; Walter W. Noss, San Diego, CA.

For Ashley Page, individually and on behalf of all others similarly situated, Plaintiff: Anne B. Shaver, Dean M. Harvey, Lin Y. Chan, LEAD ATTORNEYS, PRO HAC VICE, Lieff, Cabraser, Heimann & Bernstein, LLP- San Francisco, San Francisco, CA; April Lambert, Daniel E. Rubenstein, John Radice, LEAD ATTORNEYS, Radice Law Firm, PC, Princeton, NJ; Ashton R. Smith, Jennifer A. Moore, LEAD ATTORNEYS, Moore Law Group, PLLC, Louisville, KY; Bradley Robert Palmer, Edward L. Lasley, Kenneth A. Bohnert, LEAD ATTORNEYS, Conliffe, Sandmann & Sullivan - Louisville, Louisville, KY; Christian Levis, Claire Noelle Forde, Vincent Briganti, LEAD [*2] ATTORNEYS, PRO HAC VICE, Lowey Dannenberg P.C., White Plains, NY; Connor P. Lemire, LEAD ATTORNEY, McCune Wright Arevalo, LLP - Edwardsville, Edwardsville, IL; Jessica A. Moldovan, LEAD ATTORNEY, PRO HAC VICE, Lieff, Cabraser, Heimann & Bernstein, LLP - New York, New York, NY; Michele M. Vercoski, Richard D. McCune, Jr., LEAD ATTORNEYS, PRO HAC VICE, McCune Wright Arevalo, LLP - Ontario, Ontario, CA; Michelle E. Conston, LEAD ATTORNEY, PRO HAC VICE, Scott+Scott, Attorneys at Law, LLP - New York, New York, NY; Paul V. Shehadi, LEAD ATTORNEY, McEldrew Young, Philadelphia, PA; Walter W. Noss, San Diego, CA.

For Papa John's International, Inc., a Delaware Corporation, Papa John's USA, Inc., a Kentucky Corporation, Defendants: Buddy J. VanCleave, Donald L. Miller, II, LEAD ATTORNEYS, Quintairos, Prieto, Wood & Boyer, PA, Louisville, KY; Gerald L. Maatman, Jr., LEAD ATTORNEY, Duane Morris LLP, Chicago, IL; Michael L. DeMarino, LEAD

ATTORNEY, Laner Muchin, Ltd, Chicago, IL.

**Judges:** Benjamin Beaton, United States District Judge.

**Opinion by:** Benjamin Beaton

# Opinion

**OPINION & ORDER PRELIMINARILY APPROVING SETTLEMENT CLASS & AUTHORIZING NOTICE**

Ashley Page is the sole representative of a putative antitrust class of pizza-chain **[*3]** employees subject to franchise-wide no-poach provisions. She has filed an amended motion for preliminary approval of a classwide settlement with Papa John's International and Papa John's USA.[1] DN 239. The Court previously issued an opinion (DN 227) denying Page's initial motion (DN 202) for preliminary approval of this settlement. A fuller account of the allegations in this case and the reasons why preliminary approval was premature can be found in that opinion. It explains why the Court could likely approve the proposed settlement under _Rule 23(e)(2)_, but not necessarily certify the class under _Rule 23(a)_ and _(b)(3)_—at least not based on the record then before the Court. Opinion at 3, 4-8. That order requested additional information on whether Page's claims were typical of the class, whether her representation was adequate, and whether common questions of law or fact predominated. _Id._ at 5-7.

Under _Rule 23(e)(1)(B)_, a court should preliminarily approve a classwide settlement

and direct notice to class members if "the court will likely be able to ... approve the proposal under _Rule 23(e)(2)_ and certify the class for purposes of judgment on the proposal." Page's amended motion—boosted by a later-filed supplement (DN 253) and information provided **[*4]** during a hearing (DN 245)— clears these hurdles, though without tremendous room to spare. Whether the Court ultimately approves the proposed settlement— after hearing from potential objectors—is of course a different question. So for now the Court preliminarily approves the request for a classwide settlement, approves the process for notifying potential class members, and sets a schedule for interested parties to object or comment before a fairness hearing and ultimate determination regarding class-settlement approval.

**A.** _Rule 23(e)(2)_. The Court previously held that it would "likely be able to ... approve the proposal under _Rule 23(e)(2)_," Opinion at 4, and this order will not disturb that holding. Upon further review of the Settlement Agreement and supplemental filings, however, two potential issues may merit attention at or before the final fairness hearing.

**1**. The Settlement Agreement imposes more onerous requirements on putative class members to opt out or object than to receive notice of the settlement. Under the Agreement, email is the primary method for notifying absent class members of the proposed settlement: "Class Counsel and Defendants' Counsel shall work together to develop the content of an email **[*5]** notice that the Claims Administrator will distribute ...." Settlement Agreement (DN 202-2) ¶ 6.2. Notice is mailed to class members only if "the Claims Administrator is unable to locate working email addresses ...." ¶ 6.3. And class members can submit claims through a website. ¶ 6.6. But those wishing to object or opt out must send snail mail to the Claims Administrator. ¶¶ 6.10,

---

[1] The complaint explains that the two corporate entities "operate as a single entity" "out of the same location" with "the same directors and executives." Amended Complaint (DN 54) ¶¶ 22-23. For purposes of this motion, the parties identify no relevant difference between the two Defendants and the remainder of the opinion refers to them collectively as Papa John's.

7.2.

Why would email work for some but not all purposes? Needless to say, Americans use email for all manner of legal and business dealings in 2024—now three decades out from the launch of AOL and the founding of Prodigy. Perhaps good reasons exist for this delay and asymmetry. But none are apparent from the face of the settlement and court filings. At least one other district court has rejected a similarly skewed proposed settlement: "requiring ... class members to opt out by mailing a hard copy letter ... serves little purpose but to burden those who wish to opt out. In a world where [the Defendants] can ... administer settlement claims electronically ... [Defendants] can assuredly process opt outs electronically." *Arena v. Intuit, Inc., No. 19-cv-2546, 2021 U.S. Dist. LEXIS 41994, 2021 WL 834253, at *10 (N.D. Cal. March 5, 2021)* (denying preliminary approval of classwide settlement).

**2**. The Settlement Agreement grants **[*6]** Page a $5,000 service award. ¶ 9.1. The Sixth Circuit has warned that courts "should be most dubious of incentive payments when they make the class representatives whole, or ... even more than whole; for in that case the class representatives have no reason to care whether the mechanisms available to unnamed class members can provide adequate relief." *In re Dry Max Pampers Litigation, 724 F.3d 713, 722 (6th Cir. 2013)*. Under that rejected settlement, the class representatives received a service award of $1000 per child, while absent class members received no monetary relief. *Id. at 716*. Here, Page would receive five times that amount, though absent class members should at least receive *something*: plaintiffs' counsel estimates that "gross recovery will average $165.22," assuming a 20% claims rate. First Motion for Preliminary Approval (DN 202) at 12. And the initial request for preliminary approval explains

that some or all of Page's proposed service award compensates her for time devoted to this litigation—not simply her recovery as a former Papa John's employee. First Motion for Preliminary Approval at 17.

These issues are not so troubling as to cause the Court to revisit its earlier holding at this juncture. And other courts have approved service fees under **[*7]** similar circumstances. *See Daoust v. Maru Rest., LLC, No. 17-cv-13879, 2019 U.S. Dist. LEXIS 111222, 2019 WL 2866490, at *6 (E.D. Mich. July 3, 2019)* (approving $5,000 service award for named plaintiff against former employer who produced documents, collaborated with class counsel, and participated in mediation); *Shane Group v. Blue Cross Blue Shield of Mich., 833 F. App'x 430, 431 (6th Cir. 2021)* (approving $10,000 service award for plaintiffs who searched for and produced records for discovery and traveled for depositions). Despite general suspicion of service awards, therefore, this particular settlement still appears to fall "within the range of possible approval," which is all that is required at this preliminary stage. *In re High-Tech Emple. Antitrust Litig., No. 11-cv-2509, 2014 U.S. Dist. LEXIS 110064, 2014 WL 3917126, at *3 (N.D. Cal. Aug, 8, 2014)*. But given the caselaw and considerations noted above, these issues may deserve consideration before or during the final fairness hearing.

**B.** **Rule 23(a)** & **(b)**. "Before a court may certify a class, it must ensure that the class satisfies each of *Rule 23(a)*'s requirements and that it falls within one of three categories permitted by *Rule 23(b)*." *Int'l Union, United Auto., Aerospace, & Agricultural Implement Workers of America v. General Motors Corp., 497 F.3d 615, 625 (6th Cir. 2007)*. This Court already held that Page has likely established numerosity, adequacy of class counsel, and superiority. Opinion at 4. And commonality "is subsumed under, or superseded by, the more

stringent ... requirement that questions common to the class predominate over other questions." *Amchem Products, Inc. v. Windsor, 521 U.S. 591, 609, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997)*. So (as indicated by the Court's prior order) the only remaining questions **[*8]** are typicality, adequacy, and predominance.

**1. Typicality.** A class representative's claims must be "typical of the claims ... of the class." *FED. R. CIV. P. 23(a)(3)*. "A claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and [the] claims are based on the same legal theory." *Beattie v. CenturyTel, Inc., 511 F.3d 554, 561 (6th Cir. 2007)*. This ensures that "the representative['s] interests are aligned with the interests of the represented class members so that, by pursuing [her] own interests, the class representativ[e] also advocate[s] the interests of the class members." *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litigation, 722 F.3d 838, 852-53 (6th Cir. 2013)*.

Page's claim is typical of those of the class. It arises from the same course of conduct: the inclusion of no-poach clauses in franchise agreements. *See* Amended Complaint (DN 54) ¶¶ 1, 6, 17. And it rests on the same legal theory: those clauses are (from the employees' perspective) an unreasonable restraint of trade because competitors effectively agreed to suppress employees' wages. ¶¶ 1, 11.

The prior opinion identified two typicality concerns: (1) Page's failure to change locations in search of better wages and (2) the half of the proposed class—not including Page—that has signed arbitration agreements. Opinion at **[*9]** 6. The new filings mitigate those concerns.

Page's failure to change locations in search of better wages, *see* Opinion at 6, does not necessarily defeat typicality. The putative class's theory of the case is that no-poach

agreements suppressed competition for Papa John's employees as a group and in so doing depressed their wages as a group. *E.g.*, Amended Motion for Preliminary Approval at 2-3. Without endorsing this theory as an economic or legal matter, it suffices to note that if the plaintiffs are right, that would mean the wages of employees like Page would've been suppressed regardless of whether they sought a job at another Papa John's location.

This is consistent with the standard for typicality. A class-representative's claims "need not be identical" to those of all other class members so long as they "share the same essential characteristics as the claims of the class at large." NEWBERG & RUBENSTEIN ON CLASS ACTIONS (6th ed. 2023) § 3:29. Page's claims do.

Nor does the uneven distribution of arbitration clauses defeat typicality.[2] The Court's prior opinion expressed concern that Page's lack of an arbitration obligation might render her an atypical representative of class members **[*10]** bound by them. Opinion at 6. About half the proposed class—but not Page—signed employment agreements with arbitration provisions. Even according to Plaintiffs' counsel, this affects the value of arbitrable employee claims, which the settlement discounts in value by 75%. But differences in the defenses available against a class representative and other class members

---

[2] The arbitration agreements are relevant to both typicality and adequacy. To some extent, the concerns overlap: "The adequate representation requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members." *In re American Medical Systems, Inc., 75 F.3d 1069, 1083 (6th Cir. 1996)*. But the inquiries remain distinct: "[T]ypicality focuses on the similarities between the proposed class representative's claims and those of the class while adequacy focuses on whether the proposed representative has incentives that generate disabling conflicts of interest." NEWBERG & RUBENSTEIN § 3:32.

don't necessarily defeat typicality. "[A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *Young v. Nationwide Mut. Ins. Co., 693 F.3d 532, 543 (6th Cir. 2012)* (quoting *In re Am. Med. Sys., 75 F.3d at 1082*)).

True, defenses may affect typicality when a defendant has "unique defenses against the proposed class representatives compared to its defenses against the rest of the class." NEWBERG & RUBENSTEIN § 3:33. Litigating a unique defense, the thinking goes, may "distract the named plaintiff to such an extent that its representation of the interests of the rest of the class will suffer." *Norfolk County Retirement System v. Community Health Systems, Inc., 332 F.R.D. 556, 568 (M.D. Tenn. 2019)* (collecting cases); *see also Doster v. Kendall, 54 F.4th 398, 438 (6th Cir. 2022)* (rejecting "unique defenses" argument based on the issues' relative insignificance and citing RUBENSTEIN § 3:45) (vacated and remanded, **[*11]** *see 144. S. Ct. 481, 217 L. Ed. 2d 248 (2023)*, under *United States v. Munsingwear, 340 U.S. 36, 71 S. Ct. 104, 95 L. Ed. 36 (1950)*). That isn't a concern here, however: Papa John's doesn't have a unique (much less uniquely distracting) defense against Page's claim. Rather, it has a defense that potentially runs against many thousands—though not all—putative class members. Page's situation relative to these employees is hardly one of a kind, since thousands of others likewise faced a no-poach agreement but no arbitration provision. So her claim is at least typical of the class's claims—it arises from the same event, practice, and legal theory, *Beattie, 511 F.3d at 561*—and even the potential Papa John's defense doesn't isolate her within the class.

Even if it did, typicality still likely exists

because the arbitration "defense" is a procedural one unrelated to the underlying claim. The Sixth Circuit has followed this distinction in a related context: a release from liability agreed to by some class members but not others. *Bittinger v. Tecumseh Products Co., 123 F.3d 877, 884 (6th Cir. 1997)*. That the defense was not uniformly held across the class was "not enough to justify rejection of class certification" on typicality grounds. *Id.* Arbitration agreements provide a procedural defense but don't bear on the underlying claim. *See id.* (citing with approval *Finnan v. L.F. Rothschild, 726 F. Supp. 460 (S.D.N.Y. 1989)* (certifying class "despite the fact that **[*12]** some but not all class members had signed arbitration agreements").[3] The same principle applies here to the "procedural defense" of an arbitration agreement.

**2. Adequacy**. A class representative must also "fairly and adequately protect the interests of the class." *Fed. R. Civ. P. 23(a)(4)*. The Sixth Circuit applies a two-pronged test for adequacy: "1) The representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Vassalle v. Midland Funding LLC, 708 F.3d 747, 757 (6th Cir. 2013)*. If class members' interests "are not aligned" "in significant respects," one party cannot serve as the representative for all. *Gooch v. Life Investors Ins. Co. of Am., 672 F.3d 402, 429 (6th Cir. 2012)*. When a settlement class is at issue, courts must scrutinize adequacy "more closely, not less" because "the need for the adequacy of representation finding is

---

[3] For instance, "unique defenses that are unlikely to play a substantial role in litigation usually will not defeat typicality." NEWBERG & RUBENSTEIN § 3:45. So "typicality will generally not be defeated by allegations that the proposed class representative has released the defendants from the claims asserted, may face a statute of limitation defense, or owes prior unsettled debt to the defendant." *Id.*

particularly acute ...." *In re Dry Max Pampers Litigation, 724 F.3d at 721*.

The Court's prior opinion raised two adequacy concerns: Page's status as a manager (not a line employee) and the arbitration agreements (which applied to about half the putative class, but not to her). Opinion at 5-6.

The managerial position appeared potentially significant given caselaw rejecting managers as class representatives **[*13]** when they had been "charged with enforcing the allegedly anticompetitive No-Poach [policy]." *See Conrad v. Jimmy Johns, No. 18-cv-133, 2021 U.S. Dist. LEXIS 142272, 2021 WL 3268339, at *6-7 (S.D. Ill. July 30, 2021)*. Page responded by attaching to her amended motion exhibits that indicate her managerial role does not render her inadequate to represent a class that includes cooks and drivers in addition to store managers. The sealed record indicates that franchise owners (rather than store managers like Page) enforced the no-poach agreements, which applied to managers and non-managers alike. *See* DNs 240-5 to 240-7. And, according to Page's interpretation, the agreements suppressed wages for both managers and non-managers. Amended Motion at 14-15. So store managers like Page and non-manager class members apparently share a "common interest" in proving that Papa John's suppressed wages in violation of the antitrust laws. Supplement at 5. And nothing in the record appears to overcome the presumption that Page has "handled [her] responsibilities with the independent vigor that the adversarial process demands" based on her managerial position. *Int'l Union, 497 F.3d at 628*.

The second adequacy concern—Page's lack of an arbitration agreement—poses a greater challenge. Page must demonstrate that her incentives align sufficiently with **[*14]** those of class members in different positions. Unlike the analysis above of Page's typicality, a requirement that "focuses on the similarities between the proposed class representative's claims and those of the class," the adequacy requirement "focuses on whether the proposed representative has incentives that generate disabling conflicts of interest." NEWBERG & RUBENSTEIN § 3:32.

At first glance, every class member—whether potentially subject to arbitration or not—shares the same interest: proving that Papa John's no-poach agreements unlawfully suppressed wages. *See* Supplement at 5. And, as Page puts it, she has "vigorously prosecute[d]" the interests of class members subject to arbitration agreements. Absent a classwide settlement, "those Class Members would recover not simply less—they would recover nothing" because classwide arbitration is apparently unavailable and individual arbitrations are presumably uneconomic to pursue. *Id.* at 7.

The concern here, however, is the amount rather than the fact of recovery. Under the proposed settlement, employees subject to an arbitration agreement would recover only a quarter for every dollar recovered by an employee (like Page) not subject to **[*15]** such an agreement. As discussed at the hearing, a rational actor in Page's situation would not necessarily have a reason to "vigorously prosecute" the interests of absent class members subject to arbitration agreements. Transcript (DN 247) at 44. After all, she is subject to a different damages calculation. If anything, her self-interest could push her toward sacrificing other class members' recovery to maximize that of herself and other class members not subject to arbitration agreements.

Notably, this action originally proposed two class representatives: Page and Jamiah Greer. Page was not subject to an arbitration

agreement; Greer was. But Papa John's successfully knocked out Greer as a class representative by moving to dismiss her claims in favor of arbitration under her agreement with Papa John's. Order to Compel Arbitration (DN 90) at 9. Now, Page claims to adequately represent those like her without any risk of arbitration *and* those like Greer who are potentially susceptible to arbitration. Potentially, not definitely, because Papa John's has chosen not to exercise arbitration clauses in other employee contracts and instead to settle those claims in litigation. It of course raises **[*16]** no objection to Page's adequacy and doesn't *have to* compel arbitration against any and all class members with arbitration agreements. Amended Motion for Preliminary Approval at 15-16.

The implication: Papa John's is willing to settle, but not litigate, arbitrable claims on a classwide basis. Yet the classwide agreement values the arbitrable claims at a steep discount. Page's role, at least in part, is to ensure the adequacy of representation and recovery for putative class members. The whole premise of class-action litigation presupposes that she, through counsel, can and will protect and maximize the legal interests of others who are similarly situated but absent. Who should represent the interest and maximize recovery for those absent class members with different interests, however?

The proposed settlement significantly discounts the value of claims held by employees bound by arbitration agreements. In support, counsel cite caselaw addressing claims valued differently because of the strength of the claims. Supplement at 6-7. But they don't cite authority for assessing the adequacy of representation and recovery when a subset of plaintiffs' claims are discounted without an independent **[*17]** representation or reason to justify the size and fairness of that discount. When a class

contains claims of vastly different values, holders of the "more valuable" claims have "disparate interests" from the holders of the "less valuable" claims. *In re Literary Works in Electronic Databases Copyright Litigation, 654 F.3d 242, 251 (2d Cir. 2011)*. And the owners of the more valuable claims may have an interest in "selling out" the owners of the less valuable claims. *Id. at 252*. "Only the creation of subclasses, and the advocacy of an attorney representing each subclass," some courts have held, "can ensure that the interests of that particular subgroup are in fact adequately represented." *Id.*; *see also Bittinger, 123 F.3d at 884* ("It may be that the best remedy to both the purportedly atypical claims and defenses would be to create subclasses.").

For reasons unclear to the Court, the proposed settlement isn't structured around separately represented subclasses; surely it would be easier if it had been. This failure would appear to doom the settlement in, for example, the Second Circuit, which has held that "*[o]nly* the creation of subclasses ... can ensure that the interests of [a] particular subgroup are in fact adequately represented." *In re Literary Works in Elec. Databases Copyright Litig., 654 F.3d 242, 252 (2d Cir. 2011)*.

But the Sixth Circuit hasn't adopted such a strict position on subclasses and (in)adequacy. **[*18]** To the contrary, precedent in this Circuit appears to presume a level of good faith from class representatives and counsel. It explains that when, as here, the class representative and class members have "suffered the same injury ... there is every reason to believe that the [class representative] will vigorously prosecute the interests of the class." *Beattie v. CenturyTel, Inc., 511 F.3d 554, 563 (6th Cir. 2007)*. And the Sixth Circuit "demand[s] evidence of improper incentives for the class representatives" "before abandoning the

presumption that the class representatives ... handled their responsibilities with the independent vigor that the adversarial process demands." _Int'l Union, 497 F.3d at 628 (6th Cir. 2007)_.

On the other hand, risks of collusion call for "a more probing inquiry" in the class-settlement context "than may normally be required under _Rule 23(e)._" _Saucillo v. Peck, 25 F.4th 1118, 1130 (9th Cir. 2022)_. And that scrutiny increases when disparate recovery aligns with divergent incentives that distinguish a group of plaintiffs represented by the named plaintiff from another group that doesn't enjoy such representation and is nevertheless bound. _See Amchem, 521 U.S. at 625-28_ ("The settling parties, in sum, achieved a global compromise with no structural assurance of fair and adequate representation for the diverse groups and individuals affected.").

At this **[*19]** stage, the Court can confidently assess the claims subject to arbitration as less valuable than those, like Page's, that are not subject to this procedural defense. Therefore the fact of a discounted recovery calculation seems reasonable—certainly reasonable enough not to call into question the adequacy of Page's representation of employees who otherwise might've recovered nothing in litigation _or_ arbitration. But the amount of that discount is harder to assess absent any qualitative monitor (in the form of a subclass rep) or quantitative measurement (which doesn't appear to be included in the record before the Court). With these caveats, the Court preliminarily approves, dubitante, the adequacy of Page's representation and remains open to additional or contrary evidence or argument at the time of a final ruling.

**3.  Predominance**.  "The  _Rule 23(b)(3)_ predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." _Amchem, 521 U.S. at 623_. It "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." _Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 453, 136 S. Ct. 1036, 194 L. Ed. 2d 124 (2016)_. "_Rule 23(b)(3)_ requires a showing that questions common to the class predominate, **[*20]** not that those questions will be answered, on the merits, in favor of the class." _Amgen, Inc. v. Connecticut Retirement Plans & Trust Funds, 568 U.S. 455, 459, 133 S. Ct. 1184, 185 L. Ed. 2d 308 (2013)_.

Assessing whether such questions predominate "begins, of course, with the elements of the underlying cause of action." _Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 809, 131 S. Ct. 2179, 180 L. Ed. 2d 24 (2011)_. Page asserts that Papa John's has unreasonably restrained trade in violation of _§ 1 of the Sherman Act_. Amended Complaint ¶¶ 123-134. "To establish an antitrust claim, plaintiffs typically must prove (1) a violation of the antitrust laws, (2) an injury they suffered as a result of that violation, and (3) an estimated measure of damages." _Nitsch v. Dreamworks Animation SKG Inc., 315 F.R.D. 270, 288 (N.D. Cal. 2016)_.

**a**. As for the first element, Page asserts that Papa John's no-poach agreements were the sort of naked non-solicitation agreements that are considered per se unlawful. Amended Motion at 19. This is a common question. And Page has demonstrated—through citations to the sealed portion of the record—that this question could be resolved through evidence common to the class. Page attached the franchise agreement as a sealed exhibit to her motion. DN 240-1. That agreement supports allegations that Papa John's restaurants (both corporate and franchises) viewed each other as competitors. Other sealed evidence supports allegations that the restaurants

actually competed for employees. **[\*21]** Amended Complaint at 3-4. So "virtually all class members would be relying on the same evidence that [Page] ha[s] submitted in support of class certification—namely the documents, emails, ... and other indirect evidence necessary to prove that Defendants conspired in violation of antitrust laws." *Kleen Products LLC v. Int'l Paper, 306 F.R.D. 585, 594 (N.D. Ill. 2015)*.

Several related predominance concerns discussed in the prior opinion stemmed from uncertainty about what form of antitrust scrutiny—per se analysis or rule of reason—would apply based on Page's theory of the case. Opinion at 6. Page's new filings have clarified things. This evidence of inter-store competition for labor—and horizontal agreements amongst such competitors—supports (without necessarily proving) Page's argument for per se unlawfulness. Areeda & Hovenkamp § 1910. And while this case was pending, the Seventh Circuit decided (in a similar fast-food no-poach case) that the per-se rule applied. *See Deslandes v. McDonald's USA, LLC, 81 F.4th 699, 702 (7th Cir. 2023)* ("[N]aked restraints ... are unlawful per se."). Given this evidence, Page's per-se theory—rather than the rule of reason—appears sufficiently likely to apply that the Court may assess the parties' compromise on the basis of the evidence they would use to contest that theory of the case. Correspondingly, they would **[\*22]** *not* have to rely on the commonality and predominance of evidence Page submitted regarding monopsony power, which would not be relevant absent a rule-of-reason theory. That evidence of "market power is not essential to antitrust claims involving naked agreements among competitors." *Deslandes, 81 F.4th at 703*.

Papa John's of course disagrees that Page's evidence would carry the day, and earlier in the case pointed to countervailing evidence that it would rely on to rebut these citations if the case went to trial. Motion to Dismiss (DN 59) at 7-12 (arguing that the restraints are not subject to the *per se* rule because they are vertical and ancillary). But the relevant questions at this stage are certification and common proof, not summary judgment and material factual disagreement. Courts in other no-poach cases have held that similar evidence demonstrates that antitrust violation is a common question that would be answered using common proof. *E.g., Nitsch, 315 F.R.D. at 289-90, 292* (emails between CEOs agreeing not to poach employees show that "common legal and factual issues will predominate as to whether Defendants maintained a conspiracy..."); *Seaman v. Duke Univ., No. 1:15-cv-462, 2018 U.S. Dist. LEXIS 16136, 2018 WL 671239, at \*4 (M.D.N.C. Feb. 1, 2018)* ("internal and external correspondence discussing recruitment" demonstrates that "the issue of antitrust **[\*23]** violation is a common question that will be addressed with common proof for all proposed class members").

Commentators have remarked that "whether a conspiracy exists is a common question that is thought to predominate over the other issues in the case and has the effect of satisfying the first prerequisite in *Rule 23(b)(3)*." 7AA CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1781 (3d ed. 2024). And "*Rule 23(b)(3)* ... does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." *Amgen, 568 U.S. at 469* (cleaned up). But Page has also identified common evidence for the remaining two elements of her claim.

**b**. Antitrust injury asks simply "whether the plaintiffs were harmed," not "by how much"—which is the scope of the damages calculation. *Kleen Prods., 306 F.R.D. at 594*. To establish antitrust injury, Page primarily relies upon

economic theory and evidence that Papa John's linked pay for all employees. Amended Motion at 24-26. This evidence appears identical across the class, and Page asserts that it answers the common question whether the no-poach agreements class members were harmed. Amended Motion at 24. Whether this evidence would persuade a jury is beside the point: **[\*24]** "[N]amed plaintiffs must show that *they will be able* to prove injury through common evidence, not that they have in fact proved that common injury." *Rikos v. P&G, 799 F.3d 497, 521 (6th Cir. 2015)*.

**c.** That leaves damages. "Although individual damages calculations do not preclude class certification under *Rule 23(b)(3)*, a court must ensure at the class-certification stage that plaintiffs' formula calculates damages based only on their theory of liability." *Hicks v. State Farm Fire & Casualty Co., 965 F.3d 452, 460 (6th Cir. 2020)*. On this point, Page submitted a sealed declaration for her retained expert, Hal Singer. DN 254-1. Though Singer did not prepare an export report, his declaration describes a damages calculation based on a multiple-regression analysis of payroll data provided by Papa John's. ¶¶ 10-11. This analysis purportedly quantifies the effect of the no-poach agreements on employee compensation. ¶ 12. And Singer uses it to estimate aggregate damages. ¶¶ 19-20. So Page's model purports "to measure damages resulting from the particular antitrust injury on which [Papa John's] liability in this action is premised." *Comcast Corp v. Behrend, 569 U.S. 27, 36, 133 S. Ct. 1426, 185 L. Ed. 2d 515 (2013)*. Regardless of whether that measurement would ultimately survive a challenge and persuade a jury, this amounts to common evidence that would likely predominate over individualized damages questions. **[\*25]**

\*\*\*

The additional information and arguments offered by Page in her briefs and at the hearing—while not overwhelming—suffice to allow the Court at this preliminary stage to hold that it "will likely be able to ... certify the class for purposes of judgment on the proposal." *Fed. R. Civ. P. 23(e)(1)(B)(ii)*.

## ORDER

1. Unless otherwise defined, all terms that are capitalized shall have the meanings ascribed to those terms in the Settlement Agreement.

2. The Court finds on a preliminary basis pursuant to *Rule 23 of the Federal Rules of Civil Procedure* that the settlement ("Settlement") memorialized in the "Settlement Agreement" is fair, reasonable, and adequate.

3. The Court has considered the pleadings and arguments made by Plaintiff in support of the motion for preliminary approval and finds that the proposed Settlement Class described in the Settlement Agreement is proper and should be provisionally certified for settlement purposes. Solely for the purposes of the proposed Settlement, the following Settlement Class is hereby provisionally certified pursuant to *Rule 23 of the Federal Rules of Civil Procedure*:

> All individuals who were employed at a Papa John's branded restaurant located in the United States, whether owned by Defendants or a Papa John's franchisee, at any time between December 18, 2014 and December **[\*26]** 31, 2021 and who received more than $200 in compensation during that time period.

4. Solely for the purposes of the proposed Settlement, the Court finds that: (1) the

Settlement Class is so numerous (approximately 401,000 members) that joinder is impracticable; (2) questions of law and fact are common to the Settlement Class; (3) the claims of the Class Representative are typical of the claims of the Settlement Class; and (4) the Class Representative will fairly and adequately protect the interests of the Settlement Class. Further, for purposes of settlement only, the Court finds that the proposed Settlement Class meets the predominance and superiority requirements of *Rule 23(b)(3) of the Federal Rules of Civil Procedure*. The Court finds that certification of the Settlement Class for settlement purposes is the best means of protecting the interests of all of the Class Members.

5. Solely for the purposes of the proposed Settlement, the Court preliminarily approves Lin Y. Chan of Lieff Cabraser Heimann & Bernstein, LLP; Christian Levis of Lowey Dannenberg, P.C.; Richard McCune of McCune Wright Arevalo, LLP; and Michelle E. Conston of Scott+Scott Attorneys at Law LLP to be appointed as Class Counsel. The Court also hereby preliminarily approves **[*27]** Page as the Class Representative.

6. Per the request of the Parties, the Court appoints A.B. Data, Ltd., as the Claims Administrator.

7. The Court approves, as to form and content, the proposed Claim Form and Notice of Class Action Settlement with the following modifications: (1) the procedure must specify that the 100-day deadline for response will be calculated from the date emails and postcards are sent, and (2) once the content of the email notice is developed by Class Counsel and

Defendants' Counsel, it must receive final approval from the Court. The Court finds that the procedures for notifying the Settlement Class about the Settlement as described in the Settlement Agreement provide the best notice practicable under the circumstances and therefore meet the requirements of the United States Constitution and specifically its *Due Process Clause*, *Rule 23 of the Federal Rules of Civil Procedure*, and any other applicable laws and rules mentioned in the parties' filings. The Court therefore directs distribution of the Notice Packet to Class Members as set forth in the Settlement Agreement.

8. A hearing, for purposes of determining whether the Settlement should be finally approved, shall be held before this Court on **January 7, 2026 at 9:30 a.m.** at the **[*28]** U.S. District Court for the Western District of Kentucky, Gene Snyder United States Courthouse, 601 West Broadway, Louisville, KY 40202. At the hearing, the Court will hear arguments concerning whether the proposed Settlement of the Action on the terms and conditions provided for in the Settlement Agreement is fair, reasonable, and adequate and should be approved by the Court. The Court will consider any objections that may be filed, as well as Class Counsel's request for an award of attorneys' fees and costs and for a Service Award to be made to Plaintiff.

9. No later than thirty days after the Court enters the Preliminary Approval Order, Defendants shall transmit fifty percent (50%) of the payment required by the Settlement Agreement by wire transfer (or other appropriate means) to the Settlement Account. If the Court decides not to enter a Final Approval Order for any reason, then the entire amount in the Settlement

Account, including any interest earned on that amount, will be returned to Defendants, less any Administrative Costs and taxes paid or reasonably incurred up to that point. No other funds shall be added to or comingled with the Settlement Account except as provided for **[*29]** by the Settlement Agreement. In no event shall the Claims Administrator withdraw, transfer, pledge, impair, or otherwise make use of the funds in the Settlement Account except as expressly provided in the Settlement Agreement.

10. With respect to the Settlement Account, the Claims Administrator shall comply with all of the duties and requirements set forth in the Settlement Agreement and all applicable federal, state, and local law.

11. The Settlement Account, including all interest or other income generated therein, shall be in *custodia legis* and immune from attachment, execution, assignment, hypothecation, transfer, or similar process by any third party, including any Class Member.

12. Pending the Court's decision on final approval of the Settlement and entry of the Court's Final Approval Order, Plaintiff and all Class Members who do not timely submit valid Requests for Exclusion, and anyone acting on any of their behalf, shall be barred and enjoined from: (a) further litigation in this case; and (b) filing or taking any action directly or indirectly to commence, prosecute, pursue, or participate on an individual or class or collective action basis of any action, claim, or proceeding **[*30]** against any Defendant in any forum in which any of the claims released in the Settlement Agreement are asserted, or which in any way would prevent any such claims from being

extinguished.

13. As of the Effective Date, each and every claim released in the Settlement Agreement by Plaintiff and Class Members who have not timely submitted valid Requests for Exclusion shall be deemed to be conclusively and forever released as against Defendants. As of the Effective Date, all Class Members who have not timely submitted valid Requests for Exclusion are hereby forever barred and enjoined from prosecuting the claims released in the Settlement Agreement against Defendants.

14. All Class Members who do not opt out of the Settlement by submitting a timely Request for Exclusion shall be bound by all determinations and judgments in the Action concerning the Settlement, whether favorable or unfavorable to the Settlement Class or Class Member.

15. To receive a Settlement Payment under the Settlement, Class Members must materially complete, execute, and submit the Claim Form to the Claims Administrator no later than the Claims Deadline as specified in the Settlement Agreement. Any Class Member who does **[*31]** not submit a timely and materially complete and executed Claim Form may not receive a Settlement Payment. Notwithstanding the foregoing, Class Counsel shall have the discretion, but not the obligation, to accept late-submitted claims for processing by the Claims Administrator so long as distribution of the proceeds of the Gross Settlement Fund is not materially delayed.

16. All Class Members objecting to the terms of the Settlement must do so no later than 100 days following the entry of this order ("the Claims Deadline") and subject to the terms and conditions set forth in the

Settlement Agreement. The written objection must be postmarked to the Claims Administrator on or before this date.

17. Any Class Member who wishes to be excluded ("Opt Out") from the Settlement Class and not participate in the proposed Settlement must complete and submit a Request for Exclusion to the Claims Administrator postmarked no later than the Claim Deadline, as specified in the Settlement Agreement.

18. Any Class Member may enter an appearance in the Action, at his or her own expense, individually or through counsel of his or her own choice. Any Class Member who neither enters an appearance nor opts out **[*32]** of the Settlement Class will be represented by Class Counsel.

19. Any Class Member may appear at the Final Approval Hearing and show cause, if he or she has any, why the proposed Settlement of the Action should or should not be approved as fair, reasonable, and adequate, or why a judgment should or should not be entered thereon. No Class Member or any other person, however, shall be heard or entitled to contest the approval of the terms and conditions of the proposed Settlement, or, if approved, the Final Approval Order to be entered thereon approving the same, unless that Class Member has submitted a timely and valid Request for Exclusion to the Claims Administrator. All timely filed and served objections shall be considered and ruled upon by the Court at the Final Approval Hearing. Any Class Member who does not timely file and serve his or her objection in the manner provided in the Settlement Agreement shall be deemed to have waived such objection and shall forever be foreclosed from making any objection to

the fairness or adequacy of the proposed Settlement as incorporated in the Settlement Agreement.

20. In the event that the Effective Date (as provided for in the Settlement Agreement) **[*33]** does not occur, the Settlement and the Settlement Agreement shall be deemed null and void and shall have no effect whatsoever.

21. The Parties must carry out the Settlement according to the terms of the Settlement Agreement.

22. The Court imposes the following schedule:

📊 *Go to table1*

August 7, 2025

/s/ Benjamin Beaton

Benjamin Beaton, District Judge

United    States    District    Court

2025 U.S. Dist. LEXIS 152012, *33

**Table1 (***Return to related document text***)**

| Event | Date |
| --- | --- |
| Papa John's to Provide Database of Class Members' Identities and Corresponding Information to Claims Administrator | August 21, 2025 |
| Claims Administrator Shall Engage Credit Reporting Agency or Similar Service to Locate Class Members' Email Addresses | September 4, 2025 |
| Claims Administrator Will Email Notice Package, Publish Settlement Website, and Mail Postcards to Class Members Whose Email Addresses Cannot be Located | Following receipt of tracing Class Member Contact Information |
| Claims Administrator will Alert Parties if Direct Notice Unlikely to Reach More than 80% of Class Members | Following additional email and postcard notice to Class Members |
| Motion for Fees, Costs, and Plaintiff's Service Award | October 21, 2025 |
| Deadline for Claims, Objections, and Requests for Exclusion | November 15, 2025 |
| Motion for Final Approval and Claims Administrator Affidavit of Compliance with Notice Requirements | December 17, 2025 |
| Final Approval Hearing (Minimum of 130 days after Preliminary Approval) | January **[*34]** 7, 2026 |

**Table1 (***Return to related document text***)**

---

**End of Document**

 Neutral
As of: October 3, 2025 8:26 PM Z

## *In re Ry. Indus. Emple. No-Poach Antitrust Litig.*

United States District Court for the Western District of Pennsylvania

August 26, 2020, Decided; August 26, 2020, Filed

Master Docket Misc. No. 18-798; MDL No. 2850

**Reporter**
2020 U.S. Dist. LEXIS 249904 *; 2020 WL 13852931

IN RE: RAILWAY INDUSTRY EMPLOYEE NO-POACH ANTITRUST LITIGATION. This Document Relates to: ALL ACTIONS

## Core Terms

Senior, Settlement, Compliance, Notice, final approval, class member, Weigh, class action

**Counsel: [*1]** For DAVID B. WHITE, Special Master: David B. White, LEAD ATTORNEY, Burns White LLC, Burns White Center, Pittsburgh, PA.

For DANIEL LIENEMANN, Plaintiff: Paul A. Lagnese, LEAD ATTORNEY, Berger & Lagnese, Pittsburgh, PA; Robert N. Kaplan, LEAD ATTORNEY, PRO HAC VICE, Kaplan, Kilsheimer & Fox, New York, NY.

For JASON T. ROOZEMOND, Plaintiff: Alexandra S. Bernay, LEAD ATTORNEY, PRO HAC VICE, Robbins Geller Rudman & Dowd LLP, San Diego, CA; Jessica H Meeder, Nicholas Adam Szokoly, LEAD ATTORNEYS, Murphy Falcon and Murphy, Baltimore, MD; William H Murphy, III, LEAD ATTORNEY, PRO HAC VICE, Murphy Falcon and Murphy, Baltimore, MD.

For DAVID ESCALERA, Plaintiff: Adam J. Pessin, LEAD ATTORNEY, PRO HAC VICE, Fine, Kaplan and Black, RPC, Philadelphia, PA; Joseph Goldberg, LEAD ATTORNEY, PRO HAC VICE, Freedman, Boyd, Hollander, Goldberg & Ives, P.A., Albuquerque, NM; Richard E. Donahoo, LEAD ATTORNEY, PRO HAC VICE, Donahoo & Associates, Pc, Tustin, CA; Yaman Salahi, LEAD ATTORNEY, PRO HAC VICE, Lieff Cabraser Heimann & Bernstein LLP, San Francisco, CA; Dean M. Harvey, Kelly M. Dermody, Lin Y. Chan, PRO HAC VICE, Lieff Cabraser Heimann & Bernstein, LLP, San Francisco, CA; Frank T. Davis, Jr., PRO HAC **[*2]** VICE, Freedman Boyd Hollander Goldberg Urias & Ward P.A., Albuquerque, NM; Gerard A. Dever, Roberta D Liebenberg, PRO HAC VICE, Fine, Kaplan and Black, Rpc, Philadelphia, PA; Kathleen M. Konopka, PRO HAC VICE, Lieff Cabraser Heimann & Bernstein, New York, NY; Kelly K. Iverson, Carlson Lynch, LLP, Pittsburgh, PA; Linda Nussbaum, PRO HAC VICE, Nussbaum Law Group PC, New York, NY; Michael Sheen, PRO HAC VICE, Lieff, Cabraser, Hiemann & Bernstein, LLP, San Francisco, CA; Vincent J. Ward, PRO HAC VICE, Freedman Boyd Hollander Goldberg Urias & Ward P.A., Albuquerque, NM.

For SONNY FRICIA, Plaintiff: Benjamin Howard Carney, LEAD ATTORNEY, Gordon, Wolf & Carney, Chtd, Towson, MD; Richard E. Donahoo, LEAD ATTORNEY, PRO HAC VICE, Donahoo & Associates, Pc, Tustin, CA; Yaman Salahi, LEAD ATTORNEY, PRO HAC VICE, Lieff Cabraser Heimann & Bernstein LLP, San Francisco, CA; Dean M. Harvey, PRO HAC VICE, Kelly M. Dermody, Lin Y. Chan, Lieff Cabraser Heimann & Bernstein, LLP, San Francisco, CA; Kathleen M. Konopka, PRO HAC VICE, Lieff Cabraser Heimann & Bernstein, New York, NY; Michael Sheen, Lieff, Cabraser, Hiemann & Bernstein, LLP, San Francisco, CA.

For DEREK JOHNSON, Plaintiff: Anne B Shaver, Yaman **[*3]** Salahi, LEAD ATTORNEYS, PRO HAC VICE, Lieff Cabraser Heimann and Bernstein LLP, San Francisco, CA; Benjamin Howard Carney, LEAD ATTORNEY, Gordon, Wolf & Carney, Chtd, Towson, MD; Brendan P. Glackin, Kelly M. Dermody, Lin Y. Chan, Richard M. Heimann, LEAD ATTORNEYS, Dean M. Harvey, Lieff Cabraser Heimann & Bernstein, LLP, San Francisco, CA; Judith Camilleri, Richard E. Donahoo, Sarah L Kokonas, LEAD ATTORNEYS, PRO HAC VICE, Donahoo and Associates PC, Tustin, CA; Michael Sheen, LEAD ATTORNEY, Lieff, Cabraser, Hiemann & Bernstein, LLP, San Francisco, CA; Kathleen M. Konopka, PRO HAC VICE, Lieff Cabraser Heimann & Bernstein, New York, NY.

For SHAWN SHEPHERD, Plaintiff: Benjamin Howard Carney, LEAD ATTORNEY, Gordon, Wolf & Carney, Chtd, Towson, MD; Joseph Goldberg, LEAD ATTORNEY, PRO HAC VICE, Freedman, Boyd, Hollander, Goldberg & Ives, P.A., Albuquerque, NM;

Richard E. Donahoo, LEAD ATTORNEY, PRO HAC VICE, Donahoo & Associates, Pc, Tustin, CA; Yaman Salahi, LEAD ATTORNEY, PRO HAC VICE, Lieff Cabraser Heimann & Bernstein LLP, San Francisco, CA; Dean M. Harvey, PRO HAC VICE, Kelly M. Dermody, Lin Y. Chan, Lieff Cabraser Heimann & Bernstein, LLP, San Francisco, CA; Frank T. Davis, Jr., Vincent **[*4]** J. Ward, PRO HAC VICE, Freedman Boyd Hollander Goldberg Urias & Ward P.A., Albuquerque, NM; Gerard A. Dever, PRO HAC VICE, Fine, Kaplan and Black, Rpc, Philadelphia, PA; Kathleen M. Konopka, PRO HAC VICE, Lieff Cabraser Heimann & Bernstein, New York, NY; Michael Sheen, Lieff, Cabraser, Hiemann & Bernstein, LLP, San Francisco, CA; Roberta D Liebenberg, PRO HAC VICE, Fine, Kaplan and Black, R.P.C., Philadelphia, PA.

For LUIS TARIN, Plaintiff: Elizabeth A. Chiappetta, LEAD ATTORNEY, D. Aaron Rihn, Robert Peirce & Associates, P.C., Pittsburgh, PA; Joseph Goldberg, LEAD ATTORNEY, PRO HAC VICE, Freedman, Boyd, Hollander, Goldberg & Ives, P.A., Albuquerque, NM; Richard E. Donahoo, LEAD ATTORNEY, PRO HAC VICE, Donahoo & Associates, Pc, Tustin, CA; Shana E. Scarlett, LEAD ATTORNEY, PRO HAC VICE, Hagens Berman Sobol Shapiro LLP, Berkeley, CA; Steve W. Berman, LEAD ATTORNEY, PRO HAC VICE, Hagens Berman Sobol Shapiro LLP, Seattle, WA; Yaman Salahi, LEAD ATTORNEY, PRO HAC VICE, Lieff Cabraser Heimann & Bernstein LLP, San Francisco, CA; Dean M. Harvey, PRO HAC VICE, Kelly M. Dermody, Lin Y. Chan, Lieff Cabraser Heimann & Bernstein, LLP, San Francisco, CA; Frank T. Davis, Jr., Gerard A. Dever, PRO **[*5]** HAC VICE, Freedman Boyd Hollander Goldberg Urias & Ward P.A., Albuquerque, NM; Kathleen M. Konopka, PRO HAC VICE, Lieff Cabraser Heimann & Bernstein, New York, NY; Michael Sheen, Lieff, Cabraser, Hiemann & Bernstein, LLP, San Francisco, CA; Roberta D Liebenberg, Vincent J. Ward, PRO HAC VICE, Fine, Kaplan and Black, R.P.C., Philadelphia, PA.

For JOHN BRAND, Plaintiff: Nicholas S. Cheolas, PRO HAC VICE, Jennifer Duncan Hackett, LEAD ATTORNEY, Zelle LLP, Washington, DC; Christopher T. Micheletti, Qianwei Fu, PRO HAC VICE, Zelle LLP, San Francisco, CA; Kelly K. Iverson, Carlson Lynch, LLP, Pittsburgh, PA.

For OMAR SEY, Plaintiff: Andrew David Freeman, LEAD ATTORNEY, Brown Goldstein and Levy LLP, Baltimore, MD; Christopher J. McDonald, Jay L. Himes, LEAD ATTORNEYS, PRO HAC VICE, Labaton Sucharow LLP, New York, NY; Gary F. Lynch, Kelly K.

Iverson, LEAD ATTORNEYS, Carlson Lynch, LLP, Pittsburgh, PA; Gregory S. Asciolla, LEAD ATTORNEY, PRO HAC VICE, Labaton Sucharow LLP, Brooklyn, NY; Neel Lalchandani, LEAD ATTORNEY, Brown, Goldstein & Levy, Baltimore, MD; Steven J Durham, LEAD ATTORNEY, PRO HAC VICE, Labaton Sucharow LLP, Washington, DC; Brian Morrison, Jonathan S. Crevier, Karin E. Garvey, **[*6]** PRO HAC VICE, Labaton Sucharow LLP, New York, NY.

For DUSTIN THEOBALD, Plaintiff: Hollis L. Salzman, LEAD ATTORNEY, Robins Kaplan LLP, New York, NY; John C. Evans, LEAD ATTORNEY, Specter Specter Evans & Manogue, Pittsburgh, PA.

For KORY MARIETTA, Plaintiff: Hollis L. Salzman, LEAD ATTORNEY, Robins Kaplan LLP, New York, NY; Joel R. Hurt, LEAD ATTORNEY, Feinstein Doyle Payne & Kravec, LLC, Pittsburgh, PA.

For SLOAN STEWART, JOHN W. LUCAS, Plaintiffs: Daniel J. Walker, LEAD ATTORNEY, Berger Montague PC, Washington, DC; Eric R Harlan, Paul Mark Sandler, LEAD ATTORNEYS, Shapiro Sher Guinot and Sandler, Baltimore, MD; Jiamin Chen, Joseph Richard Saveri, Kyla J Gibboney, LEAD ATTORNEYS, PRO HAC VICE, Joseph Saveri Law Firm Inc., San Francisco, CA; Karissa Sauder, LEAD ATTORNEY, Berger Montague P.C., Philadelphia, PA; Michael C Dell Angelo, LEAD ATTORNEY, PRO HAC VICE, Berger Montague PC, Philadelphia, PA; Steven N. Williams, LEAD ATTORNEY, Joseph Saveri Law Firm, Inc., San Francisco, CA; Eric L. Cramer, PRO HAC VICE, Berger Montague PC, Philadelphia, PA.

For BYRON E. WELLS, Plaintiff: Nicholas A. Migliaccio, LEAD ATTORNEY, Migliaccio Law Firm PLLC, Washington, DC; Daniel C. Hedlund, PRO HAC VICE, **[*7]** Gustafson Gluek PLLC, Minneapolis, MN.

For PATRICIA LONERGAN, Plaintiff: Eric R Harlan, Paul Mark Sandler, LEAD ATTORNEYS, Shapiro Sher Guinot and Sandler, Baltimore, MD; Jiamin Chen, Joseph Richard Saveri, V Prentice, LEAD ATTORNEYS, PRO HAC VICE, Joseph Saveri Law Firm Inc., San Francisco, CA; Steven N. Williams, LEAD ATTORNEY, Joseph Saveri Law Firm, Inc., San Francisco, CA; Jason S. Hartley, Hartley LLP, San Diego, CA; Kelly K. Iverson, Carlson Lynch, LLP, Pittsburgh, PA.

For JANIS McNEAL, Plaintiff: Joseph H. Meltzer, Kimberly Justice, Zachary Arbitman, LEAD ATTORNEYS, PRO HAC VICE, Kessler Topaz Meltzer & Check, LLP, Radnor, PA.

2020 U.S. Dist. LEXIS 249904, *7

For PAUL ARCURI, ASHLEY KERR, Plaintiffs: Adam E. Polk, Daniel C. Girard, LEAD ATTORNEYS, Girard Sharp LLP, San Francisco, CA; James P Ulwick, LEAD ATTORNEY, Kramon and Graham PA, Baltimore, MD.

For JOANN AGOSTINI, Plaintiff: Gary F. Lynch, LEAD ATTORNEY, Kelly K. Iverson, Carlson Lynch, LLP, Pittsburgh, PA.

For DANIEL CRAVER, TIMOTHY BACCO, Plaintiffs: Joel R. Hurt, Ruairi McDonnell, LEAD ATTORNEYS, Feinstein Doyle Payne & Kravec, LLC, Pittsburgh, PA.

For STEPHEN BALDASSANO, BRIAN LARA, Plaintiffs: Joel R. Hurt, Ruairi McDonnell, LEAD ATTORNEYS, Feinstein [*8] Doyle Payne & Kravec, LLC, Pittsburgh, PA; Kelly K. Iverson, Carlson Lynch, LLP, Pittsburgh, PA.

For JEFFREY J. OCHOA, Plaintiff: A. Patricia Diulus-Myers, LEAD ATTORNEY, A. Patricia Diulus-Myers, Attorney at Law, Rivertech Center, Pittsburgh, PA; Elizabeth R. Odette, Heidi M. Silton, LEAD ATTORNEYS, PRO HAC VICE, Lockridge Grindal Nauen P.L.L.P., Minneapolis, MN; W. Joseph Bruckner, LEAD ATTORNEY, PRO HAC VICE, Lockridge, Grindal, Nauen & Holstein, Minneapolis, MN.

For JASON CARON, Plaintiff: Arthur N. Bailey, LEAD ATTORNEY, PRO HAC VICE, Rupp Baase Pfalzgraf Cunningham, LLC, Jamestown, NY; Bruce C. Fox, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, BNY Mellon Center, Pittsburgh, PA; John E. Sindoni, Joshua D. Snyder, LEAD ATTORNEYS, PRO HAC VICE, Boni, Zack & Snyder LLC, Bala Cynwyd, PA; Michael J. Boni, LEAD ATTORNEY, PRO HAC VICE, Boni & Zack, Bala Cynwyd, PA.

For TRAVIS CARRUTH, Plaintiff: David B. Spear, LEAD ATTORNEY, Minto Law Group, LLC, Pittsburgh, PA; Jeanette M. Bayoumi, LEAD ATTORNEY, Hausfeld LLP, New York, NY; Joshua Grabar, LEAD ATTORNEY, Grabar Law Office, Philadelphia, PA; Sathya S. Gosselin, LEAD ATTORNEY, PRO HAC VICE, Hausfeld LLP, Washington, DC.

For EDWARD [*9] KUBIK, DEONDRA RANDLE, ALLYN BASORE, Plaintiffs: Chad A McGowan, LEAD ATTORNEY, McGowan Hood Felder and Johnson, Rock Hill, SC; Jason Scott Hartley, LEAD ATTORNEY, PRO HAC VICE, Hartley LLP, San Diego, CA; Russell Thomas Burke, LEAD ATTORNEY, McGowan Hood and Felder LLC, Columbia, SC; Vincent J. Esades, LEAD ATTORNEY, PRO HAC VICE, Heins Mills & Olson, P.L.C., Minneapolis, MN.

For JOSEPH CASTAGNO, Plaintiff: David B. Spear,

LEAD ATTORNEY, Minto Law Group, LLC, Pittsburgh, PA.

For WESTINGHOUSE AIR BRAKE CO., Defendant: Amanda R. Cashman, Melissa J. Tea, Thomas E. Birsic, K&L Gates, LLP, K&L Gates Center, Pittsburgh, PA.

For FAIVELEY TRANSPORT NORTH AMERICA INC., FAIVELEY TRANSPORT, S.A., Defendants: Jennifer Hess Thiem, LEAD ATTORNEY, K&L Gates LLP (Chas), Charleston, SC; Amanda R. Cashman, Melissa J. Tea, Thomas E. Birsic, K&L Gates, LLP, K&L Gates Center, Pittsburgh, PA; Brian J. Smith, Lauren N. Donahue, Michael E. Martinez, PRO HAC VICE, K&L Gates LLP, Chicago, IL; David C. Kiernan, PRO HAC VICE, Jones Day, San Francisco, CA; Peter Julian, PRO HAC VICE, Jones Day, San Francisco, CA.

For KNORR-BREMSE AG, Defendant: Mark H. Hamer, LEAD ATTORNEY, PRO HAC VICE, Baker McKenzie, Washington, [*10] DC; Steven Michael Chasin, LEAD ATTORNEY, Baker and McKenzie LLP, Washington, DC; Catherine Y. Stillman, PRO HAC VICE, Baker & McKenzie LLP, New York, NY; Graham R. Cronogue, PRO HAC VICE, Arlington, VA; Mark H. Hamer, Baker McKenzie LLP, Washington, DC.

For RICHARD BOWIE, Defendant: Mark H. Hamer, LEAD ATTORNEY, PRO HAC VICE, Baker McKenzie, Washington, DC; Steven Michael Chasin, LEAD ATTORNEY, Baker and McKenzie LLP, Washington, DC; Catherine Y. Stillman, PRO HAC VICE, Baker & McKenzie LLP, New York, NY; Graham R. Cronogue, PRO HAC VICE, Arlington, VA.

For WESTINGHOUSE AIR BRAKE TECHNOLOGIES CORPORATION, Defendant: Jennifer Hess Thiem, LEAD ATTORNEY, K&L Gates LLP (Chas), Charleston, SC; Brian J. Smith, Lauren N. Donahue, Michael E. Martinez, PRO HAC VICE, K&L Gates LLP, Chicago, IL; David C. Kiernan, Peter Julian, PRO HAC VICE, Jones Day, San Francisco, CA; Thomas E. Birsic, K&L Gates LLP, K&L Gates Center, Pittsburgh, PA.

For KNORR BRAKE COMPANY, Defendant: Catherine Y. Stillman, PRO HAC VICE, Baker & McKenzie LLP, New York, NY; Graham R. Cronogue, PRO HAC VICE, Arlington, VA.

**Judges:** Honorable Joy Flowers Conti, Senior United States District Judge.

**Opinion by:** Joy Flowers Conti

# Opinion

## ORDER GRANTING FINAL APPROVAL [*11] OF CLASS ACTION SETTLEMENTS AND FINAL JUDGMENT AND ORDER OF DISMISSAL

WHEREAS, Plaintiffs Stephen Baldassano, John Brand, David Escalera, Brian Lara, and Patricia Lonergan brought claims on behalf of themselves and all similarly situated persons and have entered into Settlement Agreements with the Defendants;

WHEREAS, the Knorr Defendants and Wabtec Defendants have entered into Settlement Agreements dated October 16, 2019 and February 24, 2020, respectively;

WHEREAS, after a hearing held on March 18, 2020, the Court issued an Order on March 19, 2020 granting preliminary approval of the Settlement Agreements. Dkt. 262. In so doing, the Court, *inter alia*,
  i. Found that the Settlements were within the range of reasonableness meriting possible final approval;
  ii. Approved the retention of KCC LLC ("KCC") as Notice Administrator to handle any and all aspects of Settlement Administration and Notice of the Settlements;

  iii. Approved the forms of Notice to Class Members and the Notice Plan for disseminating those Notices as reasonable, constituting the best notice practicable under the circumstances, and consistent with the requirements of due process and *Fed. R. Civ. P. 23(e)*;

  iv. Conditionally certified a Settlement [*12] Class and found that, for settlement purposes only, the Settlement Class meets all prerequisites for class certification under *Rule 23(a)* and *(b) of the Federal Rules of Civil Procedure*, including that: (a) the Settlement Class is ascertainable; (b) the Settlement Class is so numerous that joinder of all members is impracticable; (c) there are questions of law and fact common to the Settlement Class; (d) Plaintiffs and their counsel are capable of fairly and adequately protecting the interests of the Settlement Class; (e) common questions of law and fact predominate over questions affecting only individual Settlement Class Members; and (f) certification of the Settlement Class is superior to other available methods for the fair and efficient resolution of the claims of Settlement Class Members;
  v. Preliminarily approved the plan of allocation

proposed by Plaintiffs; and,
  vi. Set procedures and schedules for Class Members to assert objections, request exclusion, or file claims.

WHEREAS, on July 17, 2020, Plaintiffs filed a Motion for Final Approval of Proposed Class Action Settlements and brief in support of same, seeking final approval of the Settlements pursuant to *Rule 23(e) of the Federal Rules of Civil Procedure*;

WHEREAS, on August 26, 2020, the Court held a final fairness hearing (the [*13] "Fairness Hearing" or "Final Approval Hearing") to adjudicate the fairness, reasonableness and adequacy of the Settlements;

WHEREAS, unless otherwise defined herein, all capitalized terms have the same meanings as set forth in the Settlement Agreements.

NOW, THEREFORE, THIS 26th DAY OF August, 2020, IT IS HEREBY ORDERED AS FOLLOWS:

1. The Court has reviewed the terms and conditions set forth in the two Settlement Agreements, including all exhibits thereto, and finds that they are fair, reasonable, and adequate under *Rule 23(e)(2) of the Federal Rules of Civil Procedure*. The Court finds that the Settlements are in full compliance with all requirements of the Federal Rules of Civil Procedure, the Class Action Fairness Act, the United States Constitution (including the *Due Process Clause*), and any other applicable law.

2. Pursuant to *In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 535 (3d Cir. 2004)*, the Court finds that a presumption of fairness applies because the Settlements were negotiated at arm's length; the Parties were represented by reputable counsel with substantial class action, antitrust, and complex litigation experience; there was sufficient formal and informal discovery and the Parties and counsel were knowledgeable about the facts of the case and potential risks of continued litigation; and no Class Member [*14] objected and only four Class Members opted out.

3. The Court also specifically considered the *Girsh* factors, including the complexity, expense, and likely duration of litigation; the favorable reaction of the Settlement Class; the stage of proceedings; the risks of establishing liability, damages, and class status; and the range of reasonableness of the Settlements in light of the best possible recovery and attendant risks of litigation. *Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975)*. The Court finds that these factors weigh in favor

of approving the Settlements.

4. The Court finds that the distribution of Notice as set forth in the Declaration of Derek Smith of KCC was in compliance with the Court's March 19, 2020 Order approving proposed notices and the notice plan, and that notice has been given in an adequate and sufficient manner; constitutes the best notice practicable under the circumstances; and satisfies *Federal Rule of Civil Procedure 23(e)* and due process.

5. Defendants properly and timely notified the appropriate government officials of the Settlements pursuant to the *Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715*. Further, more than ninety (90) days have elapsed since Defendants provided notice of the Settlements pursuant to CAFA. Dkt. 251.

6. The Court has jurisdiction **[*15]** over the subject matter of this Action and over all parties to the Settlements, including all absent members of the Settlement Class certified for purposes of the Settlements.

7. Pursuant to *Rule 23 of the Federal Rules of Civil Procedure*, the Court grants final class certification, for settlement purposes only, of the Settlement Class that it preliminarily certified in paragraph 12 of its March 19, 2020 Order.

8. Pursuant to *Rule 23 of the Federal Rules of Civil Procedure*, the Court certifies, for settlement purposes only, the following Settlement Class: All natural persons who worked in job families in which railway industry experience or skills were valuable and were employed in the United States by one or more of the following: (a) from January 1, 2009 through April 3, 2018, Westinghouse Air Brake Technologies Corporation or its subsidiaries, including Wabtec Railway Electronics, Inc., Railroad Controls, L.P., and Xorail Inc.; (b) from January 1, 2009 through April 3, 2018, Knorr Brake Company LLC or New York Air Brake LLC; or (c) from June 1, 2010 through April 3, 2018, Faiveley Transport, S.A. or Faiveley Transport North America Inc. Excluded from the Settlement Class are senior executives and personnel in the human resources, recruiting, and legal departments of the Defendants. **[*16]** Attached hereto as Appendix A is the list of job titles in the Settlement Class.

9. For avoidance of doubt, the Settlement Class does not include employees of entities that are not specifically named in paragraph 8, even if they held job titles listed in Appendix A.

10. The Court confirms the appointment of Stephen Baldassano, John Brand, David Escalera, Brian Lara, and Patricia Lonergan as Settlement Class representatives.

11. The Court confirms the appointment of Dean M. Harvey of Lieff Cabraser Heimann & Bernstein, LLP and Roberta D. Liebenberg of Fine, Kaplan and Black, R.P.C. as Co-Lead Counsel for the Settlement Class.

12. The Court grants final approval of the plan of allocation as being fair, reasonable, adequate, and in the best interest of the Settlement Class. The Court further finds that the plan of allocation "treats class members equitably relative to each other" as required by *Federal Rule of Civil Procedure 23(e)(2)(D)*.

13. Accordingly, the Court hereby grants Plaintiffs' Motion for Final Approval of Proposed Class Action Settlements. The Settlements are hereby approved in all respects, and the Parties are hereby directed to implement the Settlements.

14. Plaintiffs have notified the Court that four Class Members **[*17]** timely opted out of the Settlement Class. As set forth in Exhibit D to the Declaration of Derek Smith, they are David Corbin, Kyle S. Hagan, Richard Pecone, and Connie Cella. The releases and other provisions of the Settlement Agreements shall not apply to them. This listing satisfies the requirement for Class Counsel to set forth an opt-out list within seven (7) days of the Final Approval Hearing. Dkt. 262 at ¶ 22.

15. The Court hereby dismisses the Action as to all Defendants on the merits, with prejudice, and without taxation of fees or costs except as provided for in the Agreements.

16. This is the Final Judgment as defined in the Settlement Agreements. In the event that this Final Judgment is not otherwise final and appealable, pursuant to *Federal Rule of Civil Procedure 54(b)*, the Court finds and directs that there is no just reason for delaying enforcement or appeal and judgment should be entered.

17. Without affecting the finality of this Order and Final Judgment in any way, this Court hereby retains exclusive and continuing jurisdiction as to all matters relating to administration, consummation, implementation, enforcement and interpretation of the Settlements and this Order and Final Judgment, and for

all matters **[*18]** ancillary thereto.

IT IS SO ORDERED.

BY THE COURT:

/s/ Joy Flowers Conti

The Honorable Joy Flowers Conti

Senior United States District Judge

**Appendix A**

**Wabtec Railroad Employees Class Titles List**

1 - Assembly

1 - Clean

1 - Inspection

1 - Line Leader

1 - Seal/Test

1 - Specialty Welder/Subarc

1 - Subarc/Lathe

1 - Subarc/Teardown

1 - Supervisor

1 - Teardown

1 - Technical Advisor

1 - Welder

2 - Buff & Clean

2 - Clean

2 - Supervisor

2 - Teardown

2nd Shift - Subarc/Lathe

ASCTD Manager

ASCTD Technician

ASCTD/G & B Install Technician

Account Receivables Manager

Accountant

Accountant, Cost

Accounting Analyst

Accounting Clerk

Accounting Manager

Accounting Payable

Accounting Specialist

Accounting Specialist/Hourly

Accounts Payable

Accounts Payable Clerk

Accounts Payable Specialist

Accounts Payable, Receivable

Accounts Receivable

Accounts Receivable Clerk

Accounts Receivable Coordinator

Accounts Receivable Specialist

Accounts Receivables Manager

Administrative Manager, RS

Administrator, PTC Field Service

After Market Sales Representative

Aftermarket Bid Estimator

Aftermarket Sales Representative

Air Compressor Technician

Air Compressor Technician Line Leader

Air Dryer TBCA

Airbrake - BC

Airbrake Foreman

Airbrake/Airdryer - Teardown

Airdryer - TD

Altoona, **[*19]** PA - FST

Analyst

Analyst, Servicenow

Application Developer II

Application Engineer

Application Engineer - SFRTA

Application Engineering - Group Lead

Application Engineering Technician

Area Coordinator

Assembly

Assembly & Test Operator

Assembly - Material Handler Kitter

Assembly I

Assembly II

Assembly III

Assembly Lead

Assembly Specialist

Assembly Technician

Assembly Technician I

Assembly Technician II

Assembly Technician Lead

Assembly/Clean/TD/Test

Assembly/TD/Clean/Initial Inspection

Assembly/Tester

Assistant Controller

Assistant Corporate Controller

Assistant Manager, Sourcing

Assistant Program Manager

Assistant Project Manager

Assistant Signalman

Assistant Team Lead

Assistant Treasurer & Director, Finance

Assistant Treasurer & Director, Tax

Assistant Vice President, Construction

Assistant Vice President, Engineering

Assistant Vice President, IT & App Development

Assistant Vice President, Information Service

Assistant Vice President, Validation

Assistant Wireman

Associate Program Manager

Audit Manager

Audit Manager - Projects

Bid Engineer

Bids & Estimation Manager

Bms Engineer

Bore Operator

Boring Foreman

Boring Operator

Broing Operator

Budget Analyst

Budget Analyst Part Time

Buff

Buff Or Piston

Building Service Worker

Business Analyst [*20]

Business Analyst II

Business Analyst III

Business Intelligence Developer

Buyer

Buyer/Expeditor

CAD Designer III

2020 U.S. Dist. LEXIS 249904, *20

CAD Engineer

CAD Support Specialist

CAD Technician

CAD Technician I

CAD Technician I - As In Service

CAD Technician II

CAD Technician II - As In Service

CAD Technician III

CAD/Draftsperson

CDL Truck Driver

CNC Machine Operator

CNC Machine Operator I

CNC Machine Operator II

CNC Machine Operator III

CNC Machine Operator/Assembly

CNC Machine Operator/Programer

CNC Machine Programmer

CNC Machinist

CNC Machnist Operator I

CNC Operator

CNC Operator Programmer

CS Account Manager

CS Inside Sales Rep I

Cable Locator

Cable Locator Foreman

Calibration Technician

Cash Application Manager

Cash Application Specialist

Category Manager

Cell Leader

Cell Operator

Certified Crane Operator

Chemist

Clean

Client Support Specialist

Client Support Specialist I

Client Support Specialist II

Client Support Specialist III

Commodity Buyer

Commodity Purchasing Manager

Communications Engineer

Composite Technician

Compressor Design Engineer

Compressor Line

Compressor Line Lead

Compressor Mechanic

Compressor Teardown

Compressor Teardown & Sub Assembly

Compressor Teardown Line Leader

Compressor Technician

Compressor Technician Line Leader

Compressor Technician Trainer **[*21]**

Compressor Technician, Head Assembly

Compressor Technician, Teardown

Compressor Technician/Special Projects

Compressor/Assembly

Computer Systems Analyst

Contract Administrator

Contracts Manager

Controller

| | |
|---|---|
| Controller & Manager, Material | Crewman |
| Controller, Wabtec Global Service | Crewman (Lead Man) |
| Coordinator, Accounting | Customer Sales & Service Representative |
| Coordinator, Data Documentation | Customer Service Account Manager |
| Coordinator, Facility | Customer Service Administrator |
| Coordinator, Maintenance | Customer Service Representative |
| Coordinator, Material | Cycle Counter III |
| Coordinator, Operations & Planning | Data Entry Clerk |
| Coordinator, PTC | Database Engineer |
| Coordinator, Process Engineering | Demand Management Analyst |
| Coordinator, Production | Deputy Project Manager |
| Coordinator, Purchasing | Deputy Supply **[*22]** Chain Director |
| Coordinator, QA & QPS | Design Drafter |
| Coordinator, QPS | Design Engineer |
| Coordinator, QPS & Quality | Design Engineer, Couplers |
| Coordinator, Quality | Designer |
| Coordinator, Remanufacturing | Director |
| Coordinator, Safety | Director - Construction |
| Coordinator, Sales & Marketing | Director Contracts Administration |
| Coordinator, Ship | Director Finance, Freight Service |
| Coordinator, Ship, Receive | Director Of Contracts |
| Coordinator, Ship, Receive & Traffic | Director Of Fleet |
| Coordinator, Warranty Returns | Director Of In Service Testing |
| Corporate EHS Compliance Manager | Director Of NPR & I Sourcing |
| Corporate EHS Training Manager | Director Of Sourcing |
| Cost Accountant | Director Of Sourcing Electronics Group |
| Cost Accounting Manager | Director Quality - Freight |
| Cost Estimator | Director Quality — Elastomers, Heat Exchangers & Turbochargers |
| Coupler Production & Overhaul Lead | |
| Crane Operator | Director Quality — Freight Service & Mexico |

2020 U.S. Dist. LEXIS 249904, *22

Director, Aftermarket Operations

Director, Application Service

Director, Business Development

Director, Business Systems

Director, Construction

Director, Continuous Improvement

Director, Corporate Development

Director, Customer Support

Director, Electronics & PTC Aftermarket

Director, Engineering

Director, Engineering Process & Quality

Director, Engineering Quality

Director, Freight Wep/Lean

Director, Global Logistics

Director, Global Supply Chain

Director, In Service Testing

Director, Information Service

Director, Infrastructure & Operations

Director, International Business Development & Operations

Director, Locomotive OEM Sales

Director, Locomotive Service

Director, Marketing

Director, Marketing & Customer Service

Director, Material

Director, Material Management **[*23]**

Director, OE Sales

Director, Operations

Director, Operations & Support

Director, Product Evaluation

Director, Program Management

Director, Project Development

Director, Project Engineering

Director, Project Management

Director, Purchasing

Director, Purchasing & Supply Chain

Director, Quality

Director, Quality Control

Director, Quality, Training & Safety

Director, Safety

Director, Sales

Director, Sales & Marketing

Director, Sales & Marketing For Engine Cooling

Director, Software Development

Director, Software Engineering

Director, Spares & Trading Business Unit

Director, Supply Chain & Customer Service

Director, Supply Chain Logistics

Director, System Engineering

Director, Systems Engineering

Director, Systems Testing

Director, Tax

Director, Train Control & Communications

Director, Transit Marketing

Director, WGS Service Centers

Document Control/Planning Clerk

Drafter

Drafter II

Dynamometer Technician

EHS Coordinator

EHS Technician

EHS/QPS Coordinator

EOCC - LAithe

EOCC - Shift 1

EOCC - Shift 2

EOCC Production Manager

EOCC Welder - Shift 1

EOT Technician

EPIC/FB Lead Technician

Electrical & Software Engineering - Group Lead

Electrical Designer

Electrical Engineer

Electronic Assembly I

Electronic Assembly II

Electronics Engineer

Electronics **[*24]** Hardware Engineer

Electronics Supervisor

Electronics Technician

Electronics Technician I

Electronics Technician/Passenger Transit

Electronics Technician/TD - BC - Assembly - Test

Embedded Software Engineer

Employee

Engineer

Engineer - Hourly

Engineer, Rams

Engineering Aide

Engineering Analyst

Engineering Assistant

Engineering Assistant I

Engineering Assistant II

Engineering Assistant III

Engineering Change Support

Engineering Clerk

Engineering Designer

Engineering Project Admin I

Engineering Project Manager

Engineering Service Technician

Engineering Specialist

Engineering Support Associate

Engineering Support Coordinator

Engineering Support Specialist

Engineering Technician

Enterprise Architect

Estimator

Expediter

Expeditor

Fabricator

Facilities Manager/ME/Quality

Facilities Technician

Fellow Engineer

Field Sales Representative

Field Service - Salary

Field Service Engineer

Field Service Representative

Field Service Supervisor

Field Service Technician

Field Service Technician - Amtrak - Chicago

Field Service Technician - Amtrak - LA

Field Service Technician - Denver Eagle

| | |
|---|---|
| Field Service Technician - MARC | GW |
| Field Service Technician - Metrolink | GW/TBAT |
| Field Signal Electronics Engineer I | GW/TBC |
| Field Signal Test Engineer | GW/TD - BC - Assembly |
| Field Signal Test Engineer III [*25] | GW/TD - BC - Assembly - Test |
| Field Technician | GW/TD - Buff & Clean |
| Field Test Engineer | General Accountant |
| Field Test Technician | General Supervisor |
| Finance Director, Global Treasury | Global Category Manager |
| Finance Director, Tax | Global Commodity Leader |
| Financial Analyst | Global Commodity Leader — Indirect Sourcing |
| Floater, Ship, Rec. | Global Project Manager |
| Foreman | Global Treasury Analyst |
| Foreman (Craftworker) | Group Controller |
| Foreman (Laborer) | Group Controller - Electronics Group |
| Foreman, Composite Technicians | Group Controller - Frieght Group |
| Foreman, Construction | Group Controller - Shared Service |
| Foundation Brake Lead | Group Leader |
| Freight & Locomotive Teardown | Group Leader, Operative |
| Freight Assembly | Group Leader, QPS |
| Freight CNC Machine Operator | HSE Supervisor |
| Freight CNC Machine Operator/Teardown | HVAC Lead Technician |
| Freight Line Manager | HVAC Mechanical Engineer III |
| Freight Teardown | HVAC Technician |
| Freight Teardown & Assembly | HVAC Technician III |
| Freight Teardown Line Leader | HW/SW Lead Engineer |
| Freight Teardown, Assembly & Test | Head Assembly |
| Freight Test Rack Operator | Head TD/Clean Head Assy |
| Freight Test Rack Operator Line Leader | Heat Exchanger Shop Foreman [*26] |
| Freight Test Rack Operator/Quality Assurance | Hoses |

| | |
|---|---|
| Hydraulic Manufacturing Director | Lead Assembly |
| Hydraulics Design Engineer | Lead Assembly Technician |
| Hydraulics Lead Engineer | Lead Buyer |
| Hydraulics Lead Technician | Lead Composite Technician |
| Incoming Inspector | Lead Construction Inspector |
| Industrial Customer Service Manager | Lead Controls Engineer |
| Industrial Engineer | Lead Crewman |
| IngéNieur SystèMe | Lead Data Analyst |
| Inside Sales Account Manager | Lead Engineer |
| Inspector | Lead Engineer - Foundation Brakes |
| Inspector (Technicians) | Lead Engineer — Couplers |
| Inspector A | Lead Engineer — Pneumatic Controls |
| Inspector B | Lead Engineer, Advance Engineering |
| Integration Test Manager | Lead Engineer, Bogie Brakes |
| Internal Auditor | Lead Engineer, Test Lab |
| Inventory & Warehouse Clerk | Lead Engineering |
| Inventory Control Analyst | Lead Field Engineer |
| Inventory Control Clerk | Lead Field Service Technical Representative |
| Inventory Control Specialist | Lead Man |
| Inventory Coordinator | Lead Manufacturing Technician |
| Inventory Cost Manager | Lead Material Handler (Craft Workers) |
| Inventory Specialist | Lead Material Technician |
| Inventory Technician | Lead Mechanical Engineer |
| Junior Designer I | Lead PTC Installer - Shortline |
| LSTR Project Technician | Lead PTC [*27] Product Support Analyst |
| Laboratory Specialist A | Lead PTC Technician |
| Laboratory Technician | Lead Painter |
| Lathe | Lead Pneumatics Engineer |
| Lathe/Test | Lead Production Associate |
| Lead AGTU Engineer | Lead Project Coordinator |

| | |
|---|---|
| Lead Proposal Engineer | Logistics Coordinator |
| Lead Senior Systems Engineer | Logistics Coordinator/Supervisor |
| Lead Ship & Receive | Logistics Specialist |
| Lead Signal Test Engineer | MRR Coordinator |
| Lead Systems Analyst | Machine Operator |
| Lead Systems Engineer | Machine Programmer |
| Lead Systems Trainer | Machining Operations Manager |
| Lead Technician | Machining Performance Engineer |
| Lead Test Engineer | Machinist |
| Lead Tool & Die Technician | Machinist (Craft Workers) |
| Lead Wireman | Machinist (Operatives) |
| Lead, Engineering | Maintenance |
| Leadbuyer | Maintenance Assistant |
| Leader, Planner/Expediter A | Maintenance Associate |
| Line Lead | Maintenance Manager |
| Line Lead, Assembly | Maintenance Mechanic |
| Line Lead, Test Rack | Maintenance Operator |
| Line Lead, Test/Fail Analysis | Maintenance Supervisor |
| Line Leader Parts/Material Handler | Maintenance Technician |
| Loco/Buff & Clean | Maintenance Technician (Craft Workers) |
| Loco/Buff Or Piston | Maintenance Technician **[*28]**  (Technicians) |
| Loco/TD - Buff & Clean | Maintenance Technician II |
| Locomotive Assembly | Maintenance Technician Leader |
| Locomotive Line Leader | Maintenance Worker (Craft Worker) |
| Locomotive Line Manager | Maintenance Worker (Operatives) |
| Locomotive Operator | Manager |
| Locomotive Teardown | Manager - Billing, Construction |
| Locomotive Teardown & Assembly | Manager - Hourly |
| Locomotive Test | Manager Of Accounting |
| Locomotive Test Rack Operator | Manager Of Construction Operations |

2020 U.S. Dist. LEXIS 249904, *28

| | |
|---|---|
| Manager Tool Design | Manager, Design Engineering |
| Manager, Accounting | Manager, Drafting |
| Manager, Advanced Engineering | Manager, EHS |
| Manager, After Market Business | Manager, Electronic Product Service |
| Manager, After Market Engineering | Manager, Embedded Systems |
| Manager, Aftermarket Service | Manager, **[*29]** Embedded Systems Engineering |
| Manager, Assembly Operations | Manager, Engineering |
| Manager, Assembly Production | Manager, Engineering & Fields Service |
| Manager, Billing & Accounts Receivable | Manager, Engineering & Production |
| Manager, Brake Product Engineering | Manager, Engineering & QPS |
| Manager, Business Analyst | Manager, Engineering & Quality Assurance |
| Manager, Business Development | Manager, Engineering Service |
| Manager, Business Operations | Manager, Engineering Support |
| Manager, Business Planning & SC | Manager, Environmental, Health & Safety |
| Manager, CAD | Manager, Field Service |
| Manager, CS Inside Sales | Manager, Field Service & Training |
| Manager, CS Regional | Manager, Field Service Engineering |
| Manager, Communications | Manager, Financial Compliance |
| Manager, Communications Systems | Manager, Global Category |
| Manager, Construction | Manager, Global Enterprise Architecture |
| Manager, Contracts | Manager, Global Trade |
| Manager, Corporate Accounting | Manager, Health, Safety & Environmental |
| Manager, Corporate Communications | Manager, Hydraulics |
| Manager, Corporate Quality | Manager, Infrastructure - Americas |
| Manager, Coupler Product Engineering | Manager, Lab |
| Manager, Credit, Cost Estimator, Senior | Manager, Logistics |
| Manager, Customer Service | Manager, Logistics & Production |
| Manager, Customer Service & Pricing | Manager, Machine, Fabrication & Welding |
| Manager, Customer Service & Project Manager | Manager, Machining |
| Manager, Deputy Project | Manager, Machining Operations |

2020 U.S. Dist. LEXIS 249904, *29

Manager, Maintenance

Manager, Manufacturing

Manager, Manufacturing Engineering

Manager, Manufacturing Engineering & Maintenance

Manager, Marketing

Manager, Marketing Communication

Manager, Marketing/Sales Application

Manager, Material

Manager, Material Control

Manager, Material Lab

Manager, Mechanical Engineering

Manager, Mfg. Engineering & Facilities

Manager, New Product Development

Manager, OEM Marketing

Manager, Operation

Manager, Operations

Manager, Operations & Production

Manager, Operations **[*30]** & Support - West

Manager, PTC Operations

Manager, Parts

Manager, Planning

Manager, Plant Engineering

Manager, Pricing, Proposal & Customer Service

Manager, Process Improvement

Manager, Procurement

Manager, Product Design

Manager, Product Line

Manager, Production

Manager, Production - VBI

Manager, Production Machining, Fabrication & Welding

Manager, Production Planning

Manager, Production Shop

Manager, Project Controlling

Manager, Project Engineering

Manager, Project Quality

Manager, Purchasing

Manager, Purchasing - Hourly

Manager, QPS

Manager, QPS & Safety

Manager, Quality

Manager, Quality Assurance

Manager, Quality Assurance/QPS

Manager, Quality Performance Systems

Manager, Rams/LCC

Manager, Regional Field Service

Manager, Regional Sales

Manager, Reject

Manager, Safety

Manager, Safety & IP

Manager, Safety Assurance

Manager, Sales

Manager, Sales & Service

Manager, Sales Central Region

Manager, Sales Eastern Region

Manager, Sales Western Region

Manager, Senior Project Manager

Manager, Senior Supplier Quality

Manager, Service Center

Manager, Service Desk - Americas

Manager, Shop Operations

2020 U.S. Dist. LEXIS 249904, *30

Manager, Signal Construction

Manager, Software Engineering

Manager, Software Test Engineering

Manager, Sourcing

Manager, Southeast Regional

Manager, [*31] Special Projects

Manager, Standards & Special Projects

Manager, Supplier Quality

Manager, Supply Chain

Manager, Supply Chain - Vapor Bus International & Ricon Corporation

Manager, System Engineering

Manager, Systems Engineering

Manager, Systems Infrastructure

Manager, Systems Safety Engineering

Manager, Systems Testing

Manager, Tax

Manager, Technical

Manager, Technical Documentation

Manager, Technical Project

Manager, Technical Sales & Marketing

Manager, Technical Sales & Service

Manager, Technical Service

Manager, Technical Support

Manager, Technical Training

Manager, Technician Pubs

Manager, Test Engineering

Manager, Transit PTC Operations

Manager, Transit Sales & Service

Manager, Transit Sales - North America

Manager, WGS Compressor Product Lines

Manager, WGS Transit Service

Manager, Wabtec Performance Systems

Manager, Warehouse

Manufacturing - Hourly Direct

Manufacturing Analyst

Manufacturing Engineer

Manufacturing Engineer/Coordinator, QPS

Manufacturing Engineering Analyst

Manufacturing Engineering Specialist

Manufacturing Engineering Technician

Manufacturing Supervisor

Manufacturing Technician

Manufacturing Technician - Lead

Manufacturing Tool Crib Technician

Marketing Analyst

Marketing Assistant

Marketing Specialist [*32]

Master Planner

Master Scheduler

Material & Planning Supervisor

Material Associate II

Material Clerk

Material Clerk II

Material Coordinator

Material Expediter

Material Expeditor

Material Handler

Material Handler (Craft Workers)

Material Handler (Laborer)

2020 U.S. Dist. LEXIS 249904, *32

| | |
|---|---|
| Material Handler (Operatives) | Midwest/Southwest Sales & Service Manager |
| Material Handler III | Mill Room Assistant |
| Material Handler Lead | Mill Room Operator |
| Material Handler Rec I | Mixer Operator |
| Material Handler Rec II | Mixer/Prep Operator Assistant (Punch, Flashcut Weigh - Up) |
| Material Handler Ship I | |
| Material Handler Ship II | Mixer/Prep Operator Assistant (Punch, Flashcut Weigh - Up, Std. Build) |
| Material Handler/Oiler | Mixer/Prep Operator Assistant (Punch, Flashcut, Standard Build, Weigh - Up) |
| Material Handler/Parts/Inventory | |
| Material Inventory Specialist | Mixer/Prep **[*33]** Operator Assistant (Punch, Flashcut, Weigh - Up) |
| Material Lead | Mixer/Prep Operator Assistant (Punch, Flashcut, Weigh - Up, Standard Build) |
| Material Manager I | |
| Material Planner | Mixer/Prep Operator Assistant (Punch, Flashcut, Weigh - Up, Std. Build) |
| Material Planning Specialist | Mixer/Prep Operator Assistant Punch, Flashcut Weigh - Up) |
| Material Technician | |
| Material Technicians | Mold Design Technician |
| Mechanic | Motor Pull/Paint |
| Mechanic (Craft Worker) | Multi Service Operator |
| Mechanic (Operatives) | NPR & I Buyer |
| Mechanic Fabricator | NPR Buyer |
| Mechanical Assembly I | Network Application Developer |
| Mechanical Assembly II | Network Engineer |
| Mechanical Assembly Senior | OBS |
| Mechanical Design Engineer | OBS - NICTD |
| Mechanical Designer | OBS - SFRTA |
| Mechanical Engineer | OBS - Sunrail |
| Mechanical Engineer II | OBS Technician - MARC |
| Mechanical Technician | Onboard Support Technician - Ace |
| Methods & Industrialization Manager | Onboard Support Technician - Caltrain |
| Methods Engineer | Onboard Support Technician - Regional PTC |

| | |
|---|---|
| Onboard Support Technician - SFRTA | PTC Installer - SFRTA |
| Operations & Maintenance Manager | PTC Installer - Shortline |
| Operations & Planning Coordinator | PTC Installer - Sunrail |
| Operator | PTC Intaller |
| Operator (Craft Workers) | PTC Intaller - Shortline |
| Oracle Application Developer II | PTC Integration Engineer |
| Oracle Application Developer III | PTC Integration Engineer - Brazil |
| Oracle Application Lead Developer | PTC Integration Engineer - Hourly |
| Oracle Developer | PTC Integration Trainer |
| Oracle Development Project Lead | PTC Lead Installer |
| Oracle Service Specialist | PTC Lead Installer - Shortline |
| Order Correspondent A | PTC Lead Installer - Sunrail |
| PCB Design Lead | PTC Manager |
| PTC Application Engineer | PTC Onboard Support Technician |
| PTC Application Engineer Technician | PTC Operations Manager |
| PTC Application Engineer Technician - SFRTA | PTC Product Support Analyst |
| PTC FST - (Trainer) | PTC Project Manager |
| PTC FST - Kansas City | PTC Repair Technician |
| PTC FST - Selkrik, Ny | PTC Support Technician - NS Support |
| PTC Field Service - CSX - TN | PTC System Integration Engineer |
| PTC Field Service Technician | PTC Systems Instructor |
| PTC Help Desk Analyst | PTC Technical Trainer |
| PTC Installation Manager | PTC Technician |
| PTC Installation Manager - LA | PTC Technician - Regional PTC |
| PTC Installer | PTC Technician - Shortline |
| PTC Installer [*34]  - Fort Worth | PTS & Freight DB Supervisor |
| PTC Installer - LA | Packer |
| PTC Installer - LAJ | Paint/Final Inspection |
| PTC Installer - MARC | Paint/Final Inspection/Clean |
| PTC Installer - Regional PTC | Painter |

2020 U.S. Dist. LEXIS 249904, *34

| | |
|---|---|
| Painter & Test | Plate Prep Operator |
| Painter (Craft Workers) | Portal/Web Developer III |
| Painter I | Power & Information Systems Leader |
| Painter II | Prep Operator (Calender, Extrude, Mixer, Mills) |
| Parts Coordinator - Compressor Line | Prep Operator (Calender, Extrude, Mixer, Mixer Mills) |
| Passenge Transit Teardown & Assembly | Press Brake Operator II |
| Passenger Test Rack Operator | Press Brake Operator III |
| Passenger Transit Assembly | Press Operator (1000T, 1650T, Stretch |
| Passenger Transit Teardown | Press Operator - (McNeil, Rdfl) |
| Passenger Transit Teardown & Assembly | Press Operator - (McNeil, Small Desma, Pentaject) |
| Passenger Transit Teardown Technician | Press Operator - 1000T, 1650T, Stretch |
| Passenger Transit Teardown/Assembly | Press Operator - 4 - Press, 5 - Press, Platen |
| Passenger Transit Technician | Press Operator - LArge Desma |
| Passenger Transit Test Rack Operator | Press Operator - McNeil, Small Desma, Pentaject |
| Piston TB | Press Operator - Rubber Demand Flow Line |
| Piston TBAT | Press Operator Check Valve |
| Piston Teardown [*35] Operator | Press Operator Hinge Press |
| Piston Test | Press Operator Large Injection |
| Piston/All | Press Operator Large Platen |
| Piston/Buff | Press Operator McNeil Small Desma Pentaject |
| Piston/TD - BC - Assembly | Press Operator Ring Lathe |
| Piston/TD - BC - Assembly - Test | Press Operator Rubber Demand Flow Line |
| Planner | Press Operator Small Injection |
| Planner/Expediter A | Press Operator Small Platen |
| Planner/Expediter B | Press Opertor Small Platen |
| Planner/Expeditor | Pricing Manager |
| Planner/Scheduler | Principal Architect |
| Planning Assistant | Principal Data Scientist |
| Plant Manager | Principal Engineer |
| Plant Performance Director | Principal Field Test Engineer |

2020 U.S. Dist. LEXIS 249904, *35

| | |
|---|---|
| Principal Mechanical Engineer **[*36]** | Production Line Leader |
| Principal Product Engineer Crb | Production Line Leader - 1st Shift |
| Principal Quality Engineer | Production Line Leader - MARC |
| Principal Safety Engineer | Production Line Supervisor/TD - BC - Assembly - Test |
| Principal Software Architect | Production Planner |
| Principal Software Engineer | Production Technician |
| Principal Software Test Engineer | Production Worker |
| Principal Systems Engineer | Production Worker (Operatives) |
| Principal Systems Safety Engineer | Production Worker A |
| Principal Test Engineer | Production Worker B |
| Process Engineer | Production/Planning Clerk |
| Process Quality Supervisor | Program Assistant |
| Procurement Agent | Program Manager |
| Product Application Specialist | Program Manager (Mid - Level Manager) |
| Product Data Analyst | Program Manager (Professional) |
| Product Engineer | Project Accountant |
| Product Engineering Technician | Project Administrator |
| Product Line Engineer | Project Administrator I |
| Product Line Manager | Project Analyst |
| Product Line Systems Engineer | Project Assistant |
| Product Manager | Project Buyer |
| Product Manager, HVAC | Project Controller |
| Product Support Manager | Project Controlling **[*37]**  Manager |
| Production & Electronics Technician | Project Coordinator |
| Production Assembly | Project Engineer |
| Production Associate | Project Engineer - Ace |
| Production Clerk | Project Engineer - NICTD |
| Production Coordinator | Project Management |
| Production Lead | Project Management - Hourly Direct |
| Production Line Lead | Project Manager |

| | |
|---|---|
| Project Manager (Mid - Level Manager) | Quality Analyst |
| Project Manager (Professional) | Quality Assurance Analyst |
| Project Manager - MARC | Quality Assurance Engineer |
| Project Manager - SFRTA | Quality Assurance Inspector |
| Project Manager - Sunrail | Quality Assurance Inspector - Caltrain |
| Project Manager - Track Service | Quality Assurance Inspector - MARC |
| Project Manager I | Quality Assurance Inspector - NICTD |
| Project Manager II | Quality Assurance Inspector - Sunrail |
| Project Manager III | Quality Assurance Specialist II |
| Project Manager Of In Service Testing | Quality Assurance Technician |
| Project Manufacturing Engineer | Quality Assurance Technician - MARC |
| Project Quality Engineer | Quality Assurance Technician(Operatives) |
| Project Scheduler | Quality Control Inspector/Auditor |
| Project Service | Quality [*38]  Control Specialist |
| Project Specialist | Quality Engineer |
| Proposal Manager | Quality Manager |
| Proposal Specialist | Quality Specialist |
| Prototype Specialist/Product Development Eng Support | Quality Technician |
| Purchasing Agent | Quality Test Engineer |
| Purchasing Agent II | Quotes & Proposals Lead |
| Purchasing Specialist | Quotes & Proposals Manager |
| QA Analyst II | Quotes & Proposals Specialist |
| QA Manager | RMA Coordinator |
| QA Manager, WGS | Rams Engineer |
| QAI - SFRTA | Rams/LCC System Engineer |
| QPS Coordinator | Receive Clerk |
| QPS Engineer | Receive Clerk (Administrative Support) |
| QPS Technician | Receive Lead |
| Qualified Crewman | Receive, Airbrake |
| Qualified Crewman Foreman | Receive, UP |

| | |
|---|---|
| Recor - Teardown | Senior Assembly, Wiring |
| Regional Vice President, International Sales | Senior Bonder |
| Relief Foreman | Senior Business Analyst |
| Report Developer | Senior Buyer |
| Research & Development Engineer | Senior CAD Design |
| Responsable Bureau D'Etude Cvs | Senior Communications Engineer |
| Rover/Paint | Senior Contract Administrator |
| SCM Engineer | Senior Cost Accountant |
| Safety & QAI - Sunrail | Senior Customer Service Administrator |
| Safety Engineer | Senior Design Engineer [*39] |
| Safety Manager | Senior Designer |
| Safety Manager Of AAF | Senior Director, Business Development |
| Safety/QPS Supervisor | Senior Director, Engineering |
| Sales & Service Representative | Senior Director, Office Product Line |
| Sales & Service Specialist | Senior Director, Operations & Customer Support |
| Sales Administrator | Senior Director, Program Management |
| Sales Director Freight Car | Senior Director, Systems Development |
| Sales Director Infrastructure | Senior Electrical Engineer |
| Sales Director Locomotive | Senior Electro Mechanical Assembly |
| Sales Director Train Control | Senior Electronic Assembly |
| Sales Engineer | Senior Electronics Engineer |
| Sales Regional Manager | Senior Electronics Engineer I |
| Sales Representative | Senior Electronics Engineer II |
| Scheduler | Senior Electronics Technician |
| Senior Accountant | Senior Engineer |
| Senior Accountant/Analysis | Senior Engineer, Coupler Design |
| Senior Advisory Engineer | Senior Engineer, Couplers |
| Senior Analyst | Senior Engineer, Pneumatics |
| Senior Analyst, Treasury | Senior Engineering Application Specialist |
| Senior Application Engineer | Senior Engineering Designer |

2020 U.S. Dist. LEXIS 249904, *39

Senior Engineering Manager

Senior Engineering Support Specialist

Senior Field Service Representative

Senior Finance Director - Electronics Group

Senior Finance Director - Freight Group

Senior Finance Director - Freight Service Group

Senior Finance Director - Industrial Group

Senior Finance Director, Financial Planning & Analysis

Senior Finance Director, Treasury

Senior Financial Analyst

Senior Global Treasury Analyst

Senior Group Leader

Senior Internal Auditor

Senior Maintenance Technician

Senior Maintenance Test Rack Technician

Senior Manager, Accounting

Senior Manager, Corporate Accounting

Senior Manager, Corporate **[*40]**  Tax

Senior Manager, Electronics Design

Senior Manager, Engineering

Senior Manager, Global Trade

Senior Manager, International Marketing

Senior Manager, Service Desk - Americas

Senior Manager, Software Engineering

Senior Manager, Tax

Senior Manager, Technical Project

Senior Manager, Treasury

Senior Manufacturing Engineer

Senior Manufacturing Engineering Analyst

Senior Manufacturing Engineering Specialist

Senior Material Clerk

Senior Material Estimator

Senior Material Planner

Senior Mechanical Assembly

Senior Mechanical Design Engineer

Senior Mechanical Engineer

Senior Network Engineer

Senior Planner

Senior Principal Engineer

Senior Product Line Engineer

Senior Production Planner

Senior Program Coordinator

Senior Program Manager

Senior Project Accountant

Senior Project Administrator

Senior Project Coordinator

Senior Project Manager (Professional)

Senior Project Manager, Communications

Senior Project Scheduler

Senior Purchasing Specialist

Senior Quality Engineer

Senior Signal Designer

Senior Signal Engineer

Senior Software Architect

Senior Software Design Engineer

Senior Software Engineer

Senior Software Engineer - Group Leader

Senior Software Specialist

Senior Software Test Engineer

Senior Software Test/Verification Engineer **[*41]**

| | |
|---|---|
| Senior System Integration Test Engineer | Ship Clerk |
| Senior System Safety Engineer | Ship Clerk (Administrative Support) |
| Senior Systems & Communications Engineer | Ship Clerk (EEO - Administrative Support) |
| Senior Systems Architect | Ship Department Line Leader |
| Senior Systems Engineer | Ship Lead |
| Senior Systems Integration Engineer | Ship Lead - First Shift |
| Senior Systems Safety Engineer | Ship, Packer |
| Senior Tax Accountant | Ship, Receive |
| Senior Tax Analyst | Ship, Receive (Laborer) |
| Senior Technical Advisor | Ship, Receive (Operatives) |
| Senior Technical Project Manager | Ship, Receive Clerk |
| Senior Technician | Ship, Receive Manager |
| Senior Test Engineer | Ship, Receive, Kit, Final Pack |
| Senior Test Technician | Shop Foreman |
| Senior Web Application Engineer | Shop Painter |
| Senior Wiring Assembly | Shop Painter/Freight Teardown |
| Service Desk Lead | Shop Painter/Freight Test Rack Operator |
| Service Desk Specialist | Signal Construction Inspector |
| Service Director | Signal Designer |
| Service Manager | Signal Designer I |
| Service Manager - CSX | Signal Designer II |
| Service Manager - NS Support | Signal Engineer |
| Service Test Engineer | Signal Engineer I |
| Set Up Operator | Signal Engineer II **[*42]** |
| Set Up Technician | Signal Engineer III |
| Ship & Receive Clerk | Signal Inspector |
| Ship & Receive Clerk I | Signal Inspector II |
| Ship & Receive II | Signal Test Engineer |
| Ship & Receive III | Signal Test Technician |
| Ship Associate | Signalman |

2020 U.S. Dist. LEXIS 249904, *42

| | |
|---|---|
| Single Car Test, Teardown & Assembly | Sub Components |
| Site Accounting Lead | Sub Components Assy/Test |
| Small Parcel Ship | Subarc/Lathe |
| Software & Electrical Engineer | Subarc/Lathe - Shift 1 |
| Software Developer | Subarc/Test/Paint/Final Inspection |
| Software Engineer | Supervisor |
| Software QA Analyst I | Supervisor - 1st Shift |
| Software Quality Analyst | Supervisor - 2nd Shift |
| Software Quality Assurance Analyst II | Supervisor - BNSF |
| Software Technical Associate | Supervisor - Compressor Dept |
| Software Test Analyst | Supervisor - Electronics Dept |
| Software Test Engineer | Supervisor - Hourly |
| Solutions Engineer | Supervisor - Locomotive |
| Sourcing Specialist | Supervisor - PTC Support |
| Special Products Assembly | Supervisor - Passenger [*43]  Transit |
| Special Products TBA | Supervisor - Small Freight, Piston & Slack Adjuster Line |
| Special Products TBC | Supervisor Cooler Lines |
| Special Products TD - BC - Assembly | Supervisor Parts/Inventory Dept |
| Special Products Teardown | Supervisor QA/Safety & Operations |
| Special Products Test | Supervisor Radiator Lines |
| Special Products/TD - Buff & Clean | Supervisor Ship & Receive |
| Special Projects Coordinator | Supervisor, Administration |
| Special Projects/Compressor Technician | Supervisor, CNC |
| Specialty Welder/Subarc 1st Shift | Supervisor, Compressor Line |
| Staff Accountant/AP Manager | Supervisor, Construction |
| Strategic Lead For Production & Test Engineering | Supervisor, Customer Service |
| Sub - Assembly Technician | Supervisor, DO/HVAC/APS |
| Sub - Contractor Technical Representative | Supervisor, EPIC |
| Sub Arc | Supervisor, Engineering |
| Sub Arc/TD/Final Inspection | Supervisor, Engineering Service |

2020 U.S. Dist. LEXIS 249904, *43

| | |
|---|---|
| Supervisor, Fabrication | Supplier Quality Engineer |
| Supervisor, Field Service | Supplier Quality **[*44]** Lead |
| Supervisor, Freight | Supply Chain - Salary |
| Supervisor, Lead | Supply Chain Admin |
| Supervisor, Locomotive & Transit | Supply Chain Engineer |
| Supervisor, Locomotive Service | Supply Chain Specialist |
| Supervisor, Mainenance | Support Engineer |
| Supervisor, Maintenance | Suprvisor, Durox |
| Supervisor, Operations | Surveyor I |
| Supervisor, PTC | Surveyor II |
| Supervisor, PTC Product Support Help Desk | System Integration Test Engineer |
| Supervisor, Piston/Slack Adjuster/SCTD | System Safety Engineer |
| Supervisor, Plant | System Test Engineer |
| Supervisor, Production | Systems Analyst II |
| Supervisor, Production Lead | Systems Engineer |
| Supervisor, Quality | Systems Engineering Manager |
| Supervisor, Quality Assurance | Systems Engineering Technician |
| Supervisor, Quality Test Engineering | Systems Field Inspector 1 |
| Supervisor, Receive | Systems Field Inspector I |
| Supervisor, Relays & Contactors | Systems Integration Engineer |
| Supervisor, Sash | Systems Integration Manager |
| Supervisor, Service Desk America | TBA & Test |
| Supervisor, Ship | TBA, Weld & Test |
| Supervisor, Ship & Receive | TD |
| Supervisor, Ship, Customer Service | TD - Assembly |
| Supervisor, Shop | TD - Assembly - Test |
| Supervisor, Shop - Hourly | TD - BC - Assembly - Test |
| Supervisor, Supplier Quality | TD - BC - Assembly - Test/Weld |
| Supervisor, Test Engineering | TD - Test |
| Supervisor, Warehouse | TD/Initial Inspection/Clean |

2020 U.S. Dist. LEXIS 249904, *44

| | |
|---|---|
| TDW Operator | Technical Writer **[*45]**  - Hourly |
| Tax Senior | Technician |
| Team Lead - Ship | Technician - HVAC |
| Team Lead Business Analyst | Technician I |
| Team Lead Software Engineer | Technician II |
| Team Lead Systems Engineer | Technician Service Rep |
| Team Leader | Tender Analyst |
| Team Leader (Craft Workers) | Test |
| Team Leader (Operatives) | Test Engineer |
| Team Leader I | Test Engineering Technician |
| Team Leader II | Test Rack Operator |
| Team Leader III | Test Rack Operator (Craft Workers) |
| Team Leader, Service Parts | Test Rack Operator - Special Projects |
| Tear Down/Cleaning Operator | Test Rack Operator Line Leader |
| Teardown | Test Technician |
| Teardown, Assembly & Test | Test/Final Inspection |
| Teardown/Initial Inspection | Test/TD/Clean/Paint/Final Inspection |
| Teardown/Lathe | Tester - Airbrake |
| Technical Advisor | Testing |
| Technical Analyst Service Delivery | Threader |
| Technical Director | Tool & Die Machinist |
| Technical Project Manager | Tool & Die Technician |
| Technical Sales Advisor | Tool & Model Maker III |
| Technical Service Manager | Tool & Mold Maker II |
| Technical Service Representative | Tool Room Technician |
| Technical Specialist | Trade Compliance Analyst |
| Technical Specialist B | Traffic & Material Control Operator |
| Technical Support Analyst | Trainer, Engineering |
| Technical Trainer | Treasurer & Vice President, Tax |
| Technical Writer | Treasury Analyst |

2020 U.S. Dist. LEXIS 249904, *45

Triangle TBA

Triangle/Locomotive Teardown

Triangle/TD - BC - Assembly

Trim (Hand Punch, Cryogenic, Paint Line)

Trim (Hand, Punch, Cryogenic, Paint Line)

Trim (Hand, Punch, Cryogenic, Paint Line) Operator

Trim Operator (Hand, Punch, Cryogenic, Paint Line)

Truck Driver

UX Account Coordinator

Utility Engineer

Utility Operator

Vice President

Vice President - Corporate Initiatives

Vice President - Marketing & Product Planning

Vice President Customer Service, Freight Segment

Vice President Electronics Coe

Vice President Government Relations & Public Affairs

Vice President Line Management/Sales Freight Car

Vice President Locomotive **[*46]** Serv

Vice President Of Compensation & Benefits

Vice President Of Finance, Finance Processes & Systems

Vice President Of Operations

Vice President, CS & Freight Sales

Vice President, Claims Management & Bid Governance

Vice President, Construction

Vice President, Controller

Vice President, Corporate & Freight Quality

Vice President, Corporate Quality

Vice President, Corporate Safety & Environmental Compliance

Vice President, Corporate Strategy

Vice President, Engineering

Vice President, Finance & Global Treasury

Vice President, Finance & Group Controller

Vice President, Financial Planning & Analysis

Vice President, Freight Customer Service

Vice President, Freight Marketing & Sales

Vice President, Integration & Strategy

Vice President, Internal Audit

Vice President, International Business Development

Vice President, Investor Relations

Vice President, Marketing

Vice President, Marketing & Sales Freight Car

Vice President, Marketing & Sales Industrial

Vice President, Marketing & Sales Infrastructure

Vice President, Marketing & Sales Locomotive

Vice President, Marketing & Sales Train Control - Signaling - Analytics

Vice President, Marketing Freight Segment

Vice President, Operations & Business Development

Vice President, **[*47]** Product Development

Vice President, Program Management

Vice President, Project Management & Bid Governance

Vice President, Quality & Training

Vice President, Quotes & Proposals

Vice President, Rail Service

Vice President, Regional Sales

Vice President, Safety, Environment & Sustainability

Vice President, Sales

Vice President, Sales & Marketing

Vice President, Sales & Marketing, Freight Segment

Vice President, Sales Motivepower

Vice President, Sales North America

Vice President, Train Control

Wabtrax Tester/Support

Warehouse & Distribution Supervisor

Warehouse Clerk

Warehouse Coordinator

Warehouse Lead

Warehouse Worker (Craft Worker)

Warehouse Worker (Laborer)

Warranty & Reliability Engineer

Warranty & Repair Manager

Warranty Administrator

Warranty Manager

Warranty Technician

Warranty Technician, Lead

Web Portal Developer Level II

Welder

Welder (Craft Workers)

Welder (Operatives)

Welder - 1st Shift

Welder - SFRTA

Welder I

Welder II

Welder/Assembly

West Coast Regional Manager

Wireman

Wiring Assembly II

Yard Controller

**Knorr Railroad Employees Class Titles List**

2nd Shift Supervisor

ABS Controller

ABS Sales & Site Manager

AM, Automation & Controlling Engineer 4

APO Bus Expert/SAP Prod Data Specialist

APU

APU Labor (Genset Builder)

 [*48] APU Lead

Account Coordinator

Account Manager

Accountant Clerk

Accounting & Tax Specialist

Accounting Clerk

Accounting Clerk 2

Accounting Clerk Sr

Accounts Payable & Receivable Manager

Accounts Payable Clerk

Accounts Payable Clerk 1

Accounts Payable Clerk 2

Accounts Payable Clerk I

Accounts Payable Lead

Accounts Payable Supervisor

Acting Director, Quality (KBC)

Acting Director, Rail Services

Acting Engineering Admin

Acting Program Manager

Adv Calibration

Adv Calibration (HS)

| | |
|---|---|
| Advanced Manufacturing Engineer | Assy III |
| Advanced Manufacturing Engineer 3 | Assy III **[*49]** |
| Advanced Manufacturing Engr | BU Controller |
| Advanced Manufacturing Engr Jr | BU Manager IFE/HVAC |
| Advanced Manufacturing Manager | Batch System Operator |
| Aftermarket Sales Rep | Briquette System Operator |
| Aftermarket Sales Representative | Bus Proc Exp-Customs & Trade Compliance |
| Air Compressor | Business Process Expert - Materials Mgmt |
| Air Compressor Lead | Business Process Expert - Warehouse Mgmt |
| Air Compressor Sandblaster | Business Stream Manager |
| Air Compressor Tear Down Labor | Buyer |
| Air Compressor/Machine Shop Lead | Buyer 1 |
| Air Dryer | Buyer 2 |
| Air Dryer Lead | Buyer I |
| Applications Engineer | Buyer III |
| Applications Engineer 3 | Buyer Planner 2 |
| Applications Engineer/Dyno Dept. Manager | Buyer Std Commodities |
| Applications Engr | Buyer/Materials Planner |
| Assembly III | Buyer/Planner 1 |
| Assembly Test Technician | Buyer/Planner 1 (KC) |
| Assembly Test Technician - Cell Leader | Buyer/Planner 1 (Premtec) |
| Assistant Controller | Buyer/Planner 2 |
| Assistant Controller - Premtec | Buyer/Planner 3 |
| Assistant Controller SBU | Buyer/Simulator Support |
| Assistant Facility Manager | CAD Drafter 1 |
| Assistant Shop Coordinator | CAD Drafter 2 |
| Assistant Western Regional Manager | CAD Drafter 3 |
| Associate Manufacturing Engineer | CCB Loco A&T |
| Assy I | CCC Paid Repair Customer Srv |
| Assy II | CCC Warranty Administration |

Cad Drafter

Cell Expert

Cell Leader

Certified Welder

Chief Engineer

CoC Manager - Doors

CoC-Engineering Team Lead

Commodity Manager

Commodity Manager 1

Commodity Manager 2

Commodity Manager 3

Commodity Manager 3 - Electronics

Commodity Manager Jr

Commodity Manager, Jr.

Configuration Management Spvr

Configuration Management Supervisor

Contract Administrator

Controller

Controller NYAB

Corporate Customs Compliance Supervisor

Corporate Trans Customs Compliance Mgr

Cost Accountant/Financial Analyst

Cost Analyst

Cost Engineer

Cost Engineer 2

Costing

Credit & Collections Lead

Credit & Collections Manager

Customer SCM Manager

Customer Service /Sales Administrator

Customer Service Administrator

Customer **[*50]** Service Rep

Customer Service Rep 1

Customer Service Rep 2

Customer Service Rep 2, International

Customer Service Rep 2, OE

Customer Service Rep 3

Customer Service Rep 3, OE

Customer Service Representative

Customer Service Representative 1

Customer Service, Lead

Customer Service/Shipping Clerk

Customer Srv Manager

Cyl Machining

Cylinder Machining

DB60 A&T

DB60 Machining

Data Coordinator

Demand Planner Analyst

Dep Director of PUR & Demand Planning

Deputy Director of OE Project Management

Deputy Director of OE Sales

Deputy Director of Purchasing

Deputy Director of Supply Chain

Deputy Project Director, NYCT

Design Engr

Design Validation Manager

Designer/Checker

Director CoC Brakes

Director Engr Electrical Software

Director Engr Mechanical

Director Engr Product Owners

Director Engr RAMS

Director Engr Sales Systems

Director Engr Services

Director Engr Systems Dev

Director Engr TDS

Director Freight OE Sales

Director International & Loco OE Sales

Director International Sales

Director Marketing & Sales

Director OE Locomotive Sales

Director Of Engineering, TDS Division

Director Operations/Program Management

Director PMO

Director Project Managing & Operations

Director Rail Services

Director Sourcing

Director TDS

Director of Agile Practice

 **[*51]** Director of Agile Program Management

Director of Business Unit

Director of Continuous Improvement

Director of Controlling

Director of Controlling and Finance

Director of Doors Business Unit

Director of Finance

Director of Logistics

Director of Manufacturing

Director of Marketing

Director of Meta-Scrum Product Ownership

Director of Operational Excellence

Director of Operations

Director of Operations and Engineering

Director of Purchasing

Director of Quality

Director of Quality Systems

Director of Rail Services

Director of Sales

Director of Supply Chain Management

Director, Brakes Business Unit

Director, Business Development

Director, Customer Service

Director, Engineering

Director, Engineering Brakes

Director, Engr Systems Dev

Director, Finance

Director, HVAC Business Unit

Director, Programs

Director, Project Management

Director, Quality

Director, Rail Services

Director, Sales & Marketing

Director, Sales & Systems

Director, Sales & Systems - Engineering

Director, Sales & Systems - Sales

Director, Supply Chain

Document Control Specialist

Documentation Clerk

Domestic & Intl Transportation Clerk

2020 U.S. Dist. LEXIS 249904, *51

| | |
|---|---|
| Domestic & Intl Transportation Spec | Engineer, General |
| EP60 A&T | Engineer, General (PT) |
| Elec Technician (HS) | Engineering Manager |
| Electical Engineer 2 | Engineering Support Specialist |
| Electrical | Engr Logistics Coord |
| Electrical Engineer 2 | Engr Prod Data Mgt Supervisor |
| Electrical Engineer [*52] 3 | Engr Production Services Senior Spec |
| Electrical Engineer 4 | Engr Tools and Configuration Specialist |
| Electrical Engr 1 | Expediter |
| Electrical Engr 2 | Expediter / Buyer |
| Electrical Engr 3 | Fabrication Lead |
| Electrical Engr 4 | Facilities Maint Tech & Electrician |
| Electrical Engr 5 | Facilities Maintenance Technician |
| Electrical Lead | Facilities Manager |
| Electrical Technician | Facilities and Logistics Specialist |
| Electrician (HS) | Facilities and Warehouse Manager |
| Electro-Mechanical Engineer | Facilities and Warehouse Specialist |
| Electronic HW Engr 2 | Facility & HSE Lead |
| Electronic System Engineer | Facility Maintenance Electrician |
| Electronic Systems Engineer | Field Service Applications Specialist |
| Electronic Systems Engineer Team Leader | Field Service Applications Supervisor |
| Electronic Technician | Field Service Engineer |
| Electronics Systems Engineer | Field Service Engineer I |
| Electronics Systems Engineering Manager | Field Service Mechanic |
| Electronics Test Technician | Field Service Rep - Site [*53] Supervisor |
| Electronics Test Technician (PT) | Field Service Representative |
| Embedded Software Engineer Associate | Field Service Site Supervisor |
| Embedded Systems Developer | Field Service Specialist |
| Embedded Systyms Developer | Field Service Specialist 1 |
| Engineer | Field Service Specialist 2 |

2020 U.S. Dist. LEXIS 249904, *53

| | |
|---|---|
| Field Service Specialist Sr | Freight Control Valve A&T - Section Lead |
| Field Service Specialist, Senior | Freight OE Sales Manager |
| Field Service Supervisor | Freight OE Sales Manager, Sr |
| Field Service Technician | Fuel Crane |
| Field Service Technician I | Fuel Cranes Lead |
| Field Service Technician II | GIS Analyst 1 |
| Field Service and Sales Manager | GIS Analyst 2 |
| Field Service and Sales Specialist | GIS Analyst I |
| Field Services Specialist 2 | GIS Anaylst 1 |
| Field Srv Application Engr | General Maintenance (HS) |
| Field Srv Engr | General Maintenance 1 (HS) |
| Field Srv Project Mgr | General Maintenance Dyno |
| Field Srv Rep | General Maintenance Leadman |
| Field Srv Spec | General Maintenance Mechanic |
| Field Srv Spec/Inside Sales | General Maintenance-1 |
| Field Srv Technician | General Maintenance-2 |
| Field Support Coordinator | General Maintenance-Tooling **[*54]** Coord |
| Final Inspector | General Shop Labor Nixa |
| Finance Admin Generalist/Bookkeeper | Global Client Services Lead |
| Finance Admin Generalist/Bookkeeper 3 | Global Transportation Specialist |
| Financial Accountant | Graphic Designer 2 |
| Financial Analyst | Group Leader |
| Financial Analyst / IFE | HSE Manager |
| Financial Analyst 1 | HVAC Assembly Technician |
| Financial Analyst I | HVAC Assembly Test Technician |
| Fixed Asset & Cost Analyst | HVAC CoC Manager |
| Fixture Mechanic | HVAC Electrical System Engineer |
| Flex Production | HVAC Electrical Systems Engineer |
| Freight Control Valve | HVAC Electronics Repair Electrician (PT) |
| Freight Control Valve A&T | HVAC Engineering Coordinator |

HVAC Engineering Support Specialist

HVAC General Assembler

HVAC Mechanical Assembler

HVAC Mechanical Designer

HVAC Mechanical Engineer

HVAC Power and Controls Engineer

HVAC Rail Services Manager

HVAC Repair Tech

HVAC Repair Technician

HVAC Strategic Purchasing Specialist

HVAC Supplier Development Specialist

HVAC System Validation Engineer

HVAC Systems Engineer

HVAC Tech - Assembler

HVAC Technician (HS)

HVAC Test Technician

HVAC Test Technician - Cell Leader

Hand Brake

Health Safety & Environmental Manager

Health Safety Environmental Specialist

Health and Safety Specialist - PREMTEC

Health and Safety Specialist - Watertown

Hose Lead

Hose Product Development

Hose Products Sales Manager

Hose Technician 1

Hose Technician 1B

Hose Technician 1C

Hose Technician 2

Hose Technician 2A

Hose Technician 2B

Hose Technician 3

Hose Technician 3A

Hose and Specialty Products Manager

IC Supply Chain Manager

IFE Sales [*55] and Systems Manager

IS Manager

Improvement Specialist

In Supply Analyst

In Supply Coordinator Sr

Indirect Buyer

Industrial Engineer

Inside Sales Manager

Inside Sales Representative

Inside Sales/Field Service Technician

Inspection

Interim Manager — Sales and Systems

International Sales & Support Supervisor

International Sales Account Manager

International Sales Representative

Inventory Control - Customer Srv Spec

Inventory Control Clerk

Inventory Control Specialist

Inventory Control Specialist 2

Inventory Spec/Material Coord

Inventory Specialist/Material Coord

Jr Quality Engineer/KPI Specialist

Junior Manufacturing Engineer

Junior Quality Engineer

Junior Technical Illustrator

2020 U.S. Dist. LEXIS 249904, *55

| | |
|---|---|
| Junior Technical Writer | Logistics Specialist |
| KC/KBL Assistant Controller | Logistics Specialist 2 |
| KPS Champion | Logistics Specialist I |
| KPS Leader | Logistics Specialist II |
| KPS Manager | Logistics and Material Analyst |
| Kitting Assembler | Logistics and Warehouse Supervisor |
| Lab Technician | Lube Mechanic |
| Lab Technician 1 | MRP Controller |
| Lab Technician 2 | Machine Repair |
| Lead HVAC Mechanical Engineer | Machine Repair (HS) |
| Lead HVAC Systems Engineer | Machine Shop |
| Lead Inspection | Machine Shop Lead |
| Lead Person | Machining (HS) |
| Lead Software Engr | Machinist |
| Lead System Engineer | Machinist II |
| Lead Systems Engineer | Machinist-Short Cycle |
| Leader, HVAC Mechanical Engineer | Maint Mech A-Electrician |
| Leader, Mechanical Design | Maint Mech A-Pipe/Plumb |
| Line Feeder | Maintenance |
| Line Worker | Maintenance Electrical Technician |
| Loco A&T | Maintenance Electrical Technician - 2nd |
| Locomotive | Maintenance Helper |
| Locomotive A&T | Maintenance Specialist |
| Locomotive OE Sales Rep | Maintenance Technician |
| Logistics & Trade Compliance Specialist | Maintenance Technician 2 |
| Logistics & Warehouse Manager | Maintenance and Reliability Engineer |
| Logistics Coordinator | Manager Aftermarket Sales |
| Logistics Manager | Manager Business Development |
| Logistics Order [*56] Administrator | Manager Corporate Trans Customs Complian |
| Logistics Spec | Manager Customer Service |

| | |
|---|---|
| Manager Electronic Engr | Manager of Business Dev/Tech Transfer |
| Manager Engineering Services | Manager of Electronics Engineering |
| Manager Engineering Test | Manager of PMO |
| Manager Engr ABS | Manager of Quality Assurance |
| Manager Engr Hardware | Manager of Sales and Project Management |
| Manager Engr Loco Sys Dev | Manager of Software Engineering |
| Manager Engr Mechanical | Manager, Accounting |
| Manager Engr Product Data Mgmt | Manager, Accounting and Reporting |
| Manager Engr Shared Services | Manager, Aftermarket Bus. Development |
| Manager Engr Software | Manager, Business Unit Controller-Brakes |
| Manager Engr Sustaining | Manager, Contracts & Logistics |
| Manager Engr Systems | Manager, Cost Accounting |
| Manager Engr Systems Quality | Manager, Document Control |
| Manager Engr Systems Verification | Manager, Engineering Services |
| Manager Engr TCS Dev | Manager, FS North America |
| Manager Engr Tech Pubs | Manager, FS Northeast |
| Manager Engr Test | Manager, FS Northeast & Central |
| Manager Facilities and Equip Maintenance | Manager, Facilities |
| Manager Field Service | Manager, Maintenance Services |
| Manager Freight Systems Engr | Manager, Manuals & Training |
| Manager In-Supply **[*57]** | Manager, Material Control |
| Manager Locomotive Sales | Manager, Mechanical Engineering |
| Manager NPI Programs | Manager, Merak Finance & IT Services |
| Manager OEM Freight Sales | Manager, Operations Brakes & Doors |
| Manager Quality HSE Systems | Manager, Planning & Logistics |
| Manager Sales OE Brakes | Manager, Project & Systems Eng. HVAC |
| Manager Sales and Systems Engr | Manager, Purchasing |
| Manager Systems Engr | Manager, Rail Services Sales Logistics |
| Manager of Accounting | Manager, Sales & Business Development |
| Manager of Adv Manuf Engr | Manager, Sales Logistics |

2020 U.S. Dist. LEXIS 249904, *57

Manager, Sales and Systems Engineering

Manager, Service

Manager, Shop Operations

Manager, Software & Electr. **[*58]** Engineering

Manager, Supplier Quality

Manager, Supply Chain

Manager, Systems Engineering

Manager, Systems Engineering Doors

Manager, Systems Integration Verificatio

Manager, Tech Pubs & Document Control

Manager, Warehouse

Managing Team Leader

Manufacturing Electronics Engineer

Manufacturing Engineer

Manufacturing Engr

Manufacturing Engr Manager

Manufacturing Master Production Schedule

Manufacturing Services Manager

Marketing Analyst

Marketing Analyst, Senior

Marketing Coord

Marketing Coord 3

Master Scheduler

Material Acquisition Specialist

Material Coord

Material Coord Team Leader

Material Coordinator

Material Expediter

Material Expeditor

Material Handler

Material Handler (PT)

Material Handler 1

Material Handler 2

Material Handling

Material Hnd A

Material Planner

Material Planner Team Lead

Material Planning Team Lead

Material Requirements Planner 1

Material Requirements Planner 2

Material Requirements Planner 3

Materials & Planning Prod Supervisor

Materials Coord

Materials Coord 2

Materials Coord A

Materials Handler 1

Materials Handler 2

Materials Manager

Mechanical Design Engineer

Mechanical Designer

Mechanical Designer, HVAC

Mechanical Development Engr

Mechanical Engineer

Mechanical Engineer 1

Mechanical Engineer 2

Mechanical Engineer **[*59]** Jr.

Mechanical Engineering Team Leader

Mechanical Engr 1

Mechanical Engr 2

Mechanical Engr 3

2020 U.S. Dist. LEXIS 249904, *59

| | |
|---|---|
| Mechanical Engr 4 | Owner |
| Mechanical Engr 5 | Paid Repair CSR |
| Mechanical Engr 5S | Paint |
| Mechanical Systems Engineering Manager | Painter |
| Mgr International Sales and Market Deve | Painter - Cell Leader |
| Mgr RAMS | Peripheral A&T |
| Mgr, Engineering & Strategic Purchasing | Peripheral A&T - Shift Lead |
| Mgr. Indust. Manufacturing Engineering | Peripheral A&T 1 |
| Mgr. Manufacturing Engineering | Peripheral A&T 2 |
| Mgr., HVAC Engineer & Strategic Planning | Peripherals A&T 2 |
| Millwright Maintenance | Physical Inventory Audit |
| Mold Press Oper A | Planner |
| Mold Press Operator | Planner & Production Supervisor |
| NC/PC Machinist (HS) | Planner/Buyer |
| Nozzle | Plant Manager |
| Nozzle Lead | Pneumatic Systems Engineering Team Lead |
| OE Customer Srv Rep | Preventative Maintenance Coordinator |
| OE Sales & PM Manager, LRV/Hydraulics | Pricing Analyst |
| OE Sales & PM Manager, Mainline | Principal Engr [*60] |
| OE Sales & PM Manager, Met/E&DMU/Com/HSR | Principal Systems Safety Engineer |
| OE/Spare Customer Service | Process Engineer |
| OE/Spare Customer Srv | Process Engineer - PREMTEC |
| Off Shift Supervisor | Process Engineer - Warehouse Operations |
| Oil Free Compressor (HS) | Process Engineer 2 |
| On-Board Systems PM Manager | Process Engineer 3 |
| On-Board Systems Production Manager | Process Engr |
| Operations Manager | Process Improvement Manager |
| Operations Manager - Brakes, KPS Manager | Process Quality Engr |
| Operations Services Supervisor & Planner | Procurement Project Manager |
| Operations Specialist | Procurement Specialist |

2020 U.S. Dist. LEXIS 249904, *60

| | |
|---|---|
| Product & Quality Systems Leader | Project Manager |
| Product Data Analyst | Project Manager - HVAC |
| Product Data Analyst 1 | Project Manager - NYCT |
| Product Designer | Project Manager - Selectron |
| Product Line Manager | Project Manager 1 |
| Product Line Manager Sr | Project Manager 2 |
| Product Line Mgr Sr | Project Manager Jr |
| Product Quality Engr | Project Manager Sr |
| Product Quality Engr Sr | Project Manager, Ops Planning & Dev |
| Product Quality Manager Sr | Project Manager/Planner |
| Product Quality Manager, Sr. | Project Mgr |
| Production Coordinator | Project Portfolio Coordinator |
| Production Line Manager, Jr. | Project [*61] Quality Engineer |
| Production Manager | Project Quality Engineering Supervisor |
| Production Manager, Freight | Project Quality Manager |
| Production Requirements Scheduler | Proposal Manager |
| Production Specialist | Purchasing |
| Production Supervisor | Purchasing Manager |
| Production Supervisor, Locomotive | QA Administrator |
| Production Technician 2 | QA Improvement Associate |
| Production Technician 3 | QA Inspector/Warehouse Clerk |
| Program Coordinator | Quality Assistant |
| Program Manager | Quality Assurance Lead Auditor |
| Program Manager Sr | Quality Control |
| Program Manager, Ideas @ Work | Quality Coordinator |
| Project Administrator | Quality Coordinator 2 |
| Project Controller | Quality Data Analyst |
| Project Controller I | Quality Data Analyst 2 |
| Project Coordinator | Quality Engineer |
| Project Coordinator - NYCT | Quality Engineer - Brakes |

2020 U.S. Dist. LEXIS 249904, *61

| | |
|---|---|
| Quality Engineer - Doors & Brakes | RS Field Service Manager |
| Quality Engineer - HVAC | RS Field Support Engineer |
| Quality Engineer 2 | RS Material Coordinator |
| Quality Engineer 3 | RS Project Coordinator |
| Quality Engineer 4 | RS Project Manager |
| Quality Inspection Supervisor | RS Proposal Specialist |
| Quality Inspector | RS Regional Sales Manager |
| Quality Lab Technician | RS Sales Administration Coordinator |
| Quality Lab Technician 2 | RS Sales Engineer |
| Quality Lab Technician 3 | RS Sales Logistics Coordinator **[*62]** |
| Quality Manager | RS Sales Logistics Expeditor |
| Quality Support Specialist | RS Sales Representative |
| Quality Technician | RS Service Center Manager |
| RAMS Engineer 3 | RS Sr. Project Manager |
| RAMS Engr 1 | RS Technical Sales Specialist |
| RAMS Engr 2 | RS Technical Services Manager |
| RAMS Engr 3 | Rail Service Expeditor |
| RAMS Engr 4 | Rail Service Technician |
| RAMS LCC Electrical Engr | Rail Services Material Coordinator |
| RMA / NCR | Rail Services Sales Manager |
| RMA Coordinator | Receiving Inspection Team Lead |
| RMA Technician | Receiving Inspector |
| RMSH Eng Team Leader | Regional Manager SC FIT Americas |
| RMSH Engineering Manager | Regional Planning Specialist |
| RS Account Coordinator | Regional Quality Mgr Rail Srv |
| RS Account Manager | Regional Sales Manager |
| RS Bids & Proposals Manager | Regional Sales Manager Sr |
| RS Business Analyst | Regional Sales Manager, Senior |
| RS Business Development Manager | Reliability & Quality Manager |
| RS Engineering Manager | Reliability Engineer |

| | |
|---|---|
| Repair Cost & Inventory Analyst | Sales Manager |
| Repair Shop Administrator | Sales Manager N. America - Sigma MID |
| Repair Shop Cell Leader | Sandblaster |
| Repair Shop Coordinator | Scrum Business Analyst |
| Repair Shop Supervisor | Secondary Ops |
| Repair Shop Technician | Section Lead - Freight Control Valve A&T |
| Repair Shop Technician - Cell Leader | Section Leader Freight Control Valve A&T |
| Repair Shop Test Technician | Section Leader Locomotive A&T |
| Repair Tech/Warehouse Worker | Section Leader Secondary Ops |
| Repair Technician | Section Leader Warehousing |
| Repair Technician 1 | Segment Leader |
| Repair Technician 2 | Semi Metalic Hot Forming Operator |
| Repair Technician 3 | Semi Metalic Laborer / Operator |
| Repair Technician, Brakes | Semi Metalic Operator |
| SAP Business Process & Innovation Mgr | Semi Metallic Laborer / Operator |
| SBU Business Process Manager | Semi-Metallic Hot Forming Operator |
| SBU Planning Manager | Senior Advanced Manufacturing Engineer |
| SBU Production Scheduling Manager | Senior Cost & Business Analyst |
| SBU Supply Chain Manager | Senior Cost Analyst |
| SC Team Leader | Senior Customer Srv Accts Payable Spec |
| SCE Manager | Senior Design Engr |
| SCM Administrator | Senior Designer |
| SCM Team Leader/Manager | Senior Director of Quality & HSE |
| Safety Manager | Senior Electro Mech Packaging Engr |
| Sales & Marketing Coordinator | Senior Electronic Hardware Dev Engr |
| Sales Administration Coordinator | Senior Field Srv Spec |
| Sales Coordinator - Aftermarket | Senior Manager Planning & Logistics |
| Sales Coordinator, OEM Brakes [*63] | Senior Manufacturing Engineer |
| Sales Engr | Senior Process Engr |
| Sales Logistics Coordinator | Senior Project Manager |

2020 U.S. Dist. LEXIS 249904, *63

| | |
|---|---|
| Senior Project Manager - HVAC | Software Engineer 1 |
| Senior Quality & HSE Specialist - TDS | Software Engineer 2 |
| Senior Quality & HSE Systems Specialist | Software Engineer 3 |
| Senior Quality Engineer | Software Engineer 4 |
| Senior Quality Technician | Software Engineer 5 |
| Senior Software Engr | Software Engir 3 |
| Senior Staff Engineer | Software Engr |
| Senior Supplier Quality Assur Engr | Software Engr 1 |
| Senior Supply Chain Manager | Software Engr 2 |
| Senior Systems Engr | Software Engr 3 |
| Senior Tax Analyst | Software Engr 4 |
| Senior Techncial Writer | Software Engr 5 |
| Senior Technical Illustrator | Software Engr 6 |
| Senior Technical [*64] Writer | Software QA Engineer |
| Senior Technical Writer, Team Leader | Software Quality Assurance, Team Leader |
| Senior Test Engr | Software Safety Assurance Engr |
| Senior Test Technician | Sourcing Engineer |
| Senior Tool Engr | Sourcing Specialist |
| Service | Spares/Sales Administrator |
| Service Shop | Specialist 1, Quality Technician |
| Shift Supervisor | Specialist 2, Quality Technician |
| Shipping & Receiving Clerk | Specialist Buyer |
| Shipping Clerk | Specialist Lean |
| Shipping Coordinator | Specialist Maintenance |
| Shipping Coordinator, Team Lead | Specialist Quality Technician |
| Shipping Labor | Specialist, Quality Technician |
| Shipping Lead | Specialist; Shipping & Receiving |
| Shop Labor Nixa | Sr In Supply Coord |
| Six Sigma Black Belt Business Process Im | Sr Product Quality Engr |
| Software Engineer | Sr Project Manager |

2020 U.S. Dist. LEXIS 249904, *64

Sr Quality Manager

Sr Reliability & Quality Engr

Sr. Accountant

Sr. Buyer

Sr. Field Service Technician

Sr. Field Specialist

Sr. Manager, Locomotive OE Sales

Sr. Project Manager

Sr. Project Mgr

Sr. Quality & Reliability Engr

Sr. Regional Sales Manager

Sr. Supplier **[*65]**  Quality Engr

Sr. Supply Chain Engineer

Staff Accountant

Staff Accountant - Merak & IFE

Staff Accountant / HVAC

Staff Accountant 1

Staff Accountant 2

Strategic Purchasing Manager

Sub-Project Manager

Sub-Project Manager/Mechanical Engineer

Supervisor

Supervisor Aftermarket Sales

Supervisor Srv Rep

Supervisor, Customer Service

Supervisor, Graphics & Documentation

Supervisor, Materials

Supervisor, Production

Supervisor, Repair Shop

Supervisor, Warehouse

Supplier Quality

Supplier Quality Assur Engr Sr

Supplier Quality Engineer

Supplier Quality Engineer 1

Supplier Quality Engineer 2

Supplier Quality Engineer Sr

Supplier Quality Engr

Supplier Quality Manager

Supply Chain Analyst

Supply Chain Business Process Manager

Supply Chain Business Process Spc

Supply Chain Business Process Spc-PTEC

Supply Chain Coordinator

Supply Chain Engineer

Supply Chain Engineer 2

Supply Chain Manager

Supply Chain Manager-PREMTEC

Supply Chain Material Planner

Supply Chain Supervisor

Supply Chain Tools & Processes Manager

Sustaining Engr

Sys Engr 3

System Test Engr 1

System Test Engr 2

System Test Engr 3

System Test and Commissioning Engineer

Systems Engineer

Systems Engineer 1

Systems Engineer 2

Systems Engineer 3

2020 U.S. Dist. LEXIS 249904, *65

| | |
|---|---|
| Systems Engineer 4 | Team Lead - Goods Receiving |
| Systems Engineer 5 | Team Lead - High Rack Storage |
| Systems Engineer **[*66]** Doors | Team Lead - Kardex |
| Systems Engineer II | Team Lead - Material Handling |
| Systems Engineer Jr | Team Lead - Shipping |
| Systems Engr | Team Leader - Repair and Warranty CSR |
| Systems Engr 1 | Team Leader - Repair and Warrenty CSR |
| Systems Engr 2 | Team Leader CCB Systems Engr |
| Systems Engr 3 | Team Leader CCC |
| Systems Engr 4 | Team Leader Complaint Management |
| Systems Engr 4 Validation | Team Leader Enger IT Infrstructr Dev-Ops |
| Systems Engr 5 | Team Leader Engr |
| Systems Engr 6 | Team Leader Engr Air Supply |
| Systems Engr Manager | Team Leader Engr Mechanical |
| Systems Safety Assurance Engr | Team Leader Engr Services |
| Systems Team Mgr | Team Leader Engr Software |
| Systems Test Engineer 1 | Team Leader Engr Systems |
| Systems Test Engineer 2 | Team Leader Engr Test |
| Systems Test Engineer 3 | Team Leader PMO |
| Systems Test Engineer 4 | Team Leader Process Engr |
| Systems Test Engr 1 | Team Leader Sales Project Manager |
| Systems Test Engr 2 | Team Leader Test Engr |
| Systems Test Engr 3 | Team Leader, Brake Control Sys Test Eng |
| Systems Test Engr 4 | Team Leader, Mechanical Systems Engineer |
| Systems Test Lab Lead | Team Leader, **[*67]** Paint Cell |
| TDS Assistant Controller | Team Leader, Test Engineering |
| TDS Asst Controller | Team Leader, Warehouse |
| TDS Site Lead & Sr. Product Line Manager | Team Leaders Engr Mechanical |
| Tactical Purchasing Manager | Tech-Electronic |
| Tax Manager | Technical Documentation Spec |

| | |
|---|---|
| Technical Documentation Spec 3 | Test Tech 2 |
| Technical Illustrator | Test Technician |
| Technical Publications Team Lead | Test Technician 1 |
| Technical Trainer | Testing Commissioning Manager |
| Technical Writer | Tool/Model Maker - Cell Leader |
| Technical Writer 2 | Toolmaker (HS) |
| Technical Writer 3 | Toolmaker/Model Maker |
| Technical Writer/Trainer | Toolmaker/Model Maker - Cell Leader |
| Technician 1 | Tools & Processes Manager |
| Technician 2 | Tools&Configuration Engineer Specialist |
| Technician 3 | Trans Export Clerk |
| Technician 4 | Trans/Customs Compliance Business Lead |
| Technician, Service | Transportation Compliance Specialist |
| Territory Manager, Mexico | Transportation Manager |
| Test & Commissioning Manager | Truck Driver/Material Handler |
| Test Engineer | VP Engineering |
| Test Engineer 1 | VP Finance & Controlling |
| Test Engineer 2 | VP Marketing and Sales |
| Test Engineer 3 | VP Operations |
| Test Engineer 4 | VP Quality & Program Mgt |
| Test Engineer 5 | VP of Operations |
| Test Engineer IV | Validation & Test Manager |
| Test Engr | Vice President, CoC Brakes |
| Test Engr 1 | Vice President, Contracts |
| Test Engr 2 | Vice President, [*68] Finance |
| Test Engr 3 | Vice President, On-Board Systems |
| Test Engr 4 | Warehouse & Shipping Specialist |
| Test Engr 5 | Warehouse Clerk 1 |
| Test Engr 5S | Warehouse Clerk 2 |
| Test Tech 1 | Warehouse Clerk Lead |

Warehouse Labor

Warehouse Lead

Warehouse Logistics Spec

Warehouse Manager

Warehouse SAP Coord

Warehouse Shipping Lead

Warehouse Supervisor

Warehouse Supervisor II

Warehouse Supervisor, Alt Shift

Warehousing

Warehousing - 1st Shift

Warehousing - 2nd Shift

Warehousing - 3rd Shift

Warehousing - Shift Lead

Warehousing Lead (B-Core)

Warehousing Section Leader

Warranty Data Analyst

Warranty Data Analyst 2

Warranty Data Analyst 3

Watertown/Premtec Assistant Controller

Welder / Brazer

Western Regional Sales Manager

Wheatland Labor

Wheatland Shop Labor

---

**End of Document**

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 370 of 482

In re Remicade Antitrust Litigation, Not Reported in Fed. Supp. (2022)

2022 WL 3042766
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

IN RE REMICADE ANTITRUST LITIGATION

CIVIL ACTION No. 17-cv-04326
|
Filed August 2, 2022

## MEMORANDUM

MARSTON, District Judge

**\*1**  This is a consolidated, putative class indirect-purchaser antitrust action in which Named Plaintiffs Local 295 Employer Group Welfare Fund and National Employees Health Plan allege that Defendants Johnson & Johnson and Janssen Biotech, Inc. engaged in anticompetitive conduct related to their infliximab biologic, Remicade, in violation of federal and state antitrust laws and state consumer protection laws. Presently before the Court is Plaintiffs' Uncontested Motion for an Order Certifying a Settlement Class; Granting Preliminary Approval of the Settlement Agreement; Appointing Class Counsel; Appointing a Settlement Administrator and Escrow Agent; and Approving the Form and Manner of Notice to the Settlement Class (the "Motion"). (Doc. No. 172.) For the reasons below, the Motion is granted, and the Court will schedule a Final Approval Hearing.

## I. Background

### A. Background Litigation

In 2017, three putative class indirect-purchaser antitrust actions were filed against Defendants, alleging that Defendants had violated an array of state and federal antitrust and state consumer protection laws and engaged in anticompetitive conduct in connection with the sale and marketing of Remicade.[1] (Doc. No. 172-4 at 3.) On November 21, 2017, the actions were consolidated under the caption *In re Remicade Antitrust Litigation*, No. 2:17-cv-04326.[2]

On January 23, 2018, the Court appointed Robbins Geller Rudman & Dowd LLP as Interim Class Counsel and Jayne A. Goldstein of Shepherd, Finkelman, Miller & Shah LLP

as Interim Liaison Counsel. (Doc. No. 50.) On February 21, 2018, Plaintiffs filed a Consolidated Amended Complaint ("CAC") on behalf of the class. (Doc. No. 53.) In the CAC, Plaintiffs alleged that Defendants "worked to suppress competition and raise prices to purchases of [Remicade] by imposing a web of exclusionary contracts on both health insurers and healthcare providers" and "engaged in other anticompetitive conduct." (*Id.* at ¶ 1; *see also* Doc. No. 172-4 at 4 ("Plaintiffs' central allegation is that Remicade had a dominant market position and that Defendants abused that dominant position to suppress competition in the infliximab market through exclusionary contracts with health insurers and healthcare providers, alongside additional alleged anticompetitive conduct.").) Plaintiffs asserted causes of action for violations of § 2 of the Sherman Antitrust Act, 15 U.S.C. § 2 (monopolization and attempted monopolization of the relevant product market) (Counts I and II); violation of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (unreasonable restraint of trade) (Count III); violation of § 1 of the Clayton Act, 15 U.S.C. § 14 (unlawful exclusive dealing) (Count IV); violation of state antitrust statutes (Count V); violation of state law for *Walker Process* fraud (Count VI); and violation of state consumer protection statutes (Count VII). (Doc. No. 53 at 42–95.) On April 9, 2018, Defendants filed a motion to dismiss (Doc. No. 67), which the Court granted in part and denied in part on December 7, 2018 (Doc. Nos. 90, 91).[3]

**\*2**  Following over four years of litigation, including extensive fact and expert discovery[4] and several weeks' worth of arms-length settlement negotiations, the parties entered into a Stipulation of Class Action Settlement on April 15, 2022 (the "Settlement Agreement"). (Doc. No. 172-4 at 3–5.) Plaintiffs filed this unopposed Motion that same day. (*Id.*) The Court held a hearing on the Motion on July 28, 2022.

### B. The Settlement Agreement

The Settlement Agreement contains the following provisions.

#### 1. Payments to Class Members

The Settlement Class[5] consists of "[a]ll persons and entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of Defendants' infliximab between April 5, 2016 and February 28, 2022." (Doc. 172-4 at ¶ 1.6.) However, certain groups are excluded from the Class:

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 371 of 482

In re Remicade Antitrust Litigation, Not Reported in Fed. Supp. (2022)

(a) Defendants, their officers, directors, management, employees, subsidiaries and affiliates;

(b) all federal and state governmental entities except for cities, towns or municipalities with self-funded prescription drug plans;

(c) all persons or entities who purchased Defendants' infliximab for purposes of resale or who purchased infliximab directly from Defendants;

(d) fully insured health plans (i.e., health plans that purchased insurance covering 100% of their reimbursement obligation to members);

(e) any "flat co-pay" consumers whose purchases of Defendants' infliximab were paid in part by a third-party payor and whose co-payment was the same regardless of the retail purchase price;

(f) pharmacy benefit managers;

(g) any judges or justices involved in this action and any members of their immediate families; and

(h) any providers (including but not limited to hospitals, clinics, and physicians) who purchase Remicade and are later reimbursed for the provision of Remicade.

(*Id.*)

Defendants will deposit $25 million into a Settlement Fund for the benefit of the Class.[6] (*See* Doc. No. 172-4 at 5 & ¶ 1.35; Doc. No. 172-8 at 3.) The Net Settlement Fund amount will be determined by "subtracting any court-approved award of attorneys' fees and expenses, service awards, settlement administrators' costs, taxes and tax expenses, and any other Court-approved deduction from the total Settlement Fund of $25 million." (Doc. No. 172-8 at 3; *see also* Doc. No. 172-4 at ¶ 1.20 (" 'Net Settlement Fund' means the Settlement Fund less: (a) Attorneys' Fees and Expenses, including Service Awards, as awarded by the Court; (b) Notice and Administration Expenses; (c) Taxes and Tax Expenses; and (d) other Court-approved deductions.").)[7] The Net Settlement Fund will be distributed to Class Members pursuant to the Plan of Allocation and Distribution. (*See* Doc. No. 172-4 at 5 & ¶¶ 5.4, 5.5, 5.8; *see also* Doc. No. 172-5 at ¶ 8 ("The Net Settlement Fund will be distributed to Authorized Claimants on a pro rata basis based on the relative size of their Recognized Claims."); Doc. No. 172-7 at

3 ("[T]he remainder of the Settlement Fund will be distributed to Class Members who file a valid Claim Form, with the amount that each Class Member might receive [will] vary[ ] based on where that Class Member purchased and/or paid for Remicade. The precise amount that you might receive from the Net Settlement Fund will depend on how much you (and other Class Members) paid for Remicade.").)[8]

**\*3** To be eligible for a distribution, a Class Member must submit a Claim Form. (Doc. No. 172-5 at ¶ 3.) Claim Forms will be due 120 days after entry of the Preliminary Approval Order. (Doc. No. 172-1 at 33.) If an Authorized Claimant's Distribution Amount is less than $25.00, no distribution will be made to that claimant. (Doc. No. 172-5 at ¶ 9.)

After the Net Settlement Fund is distributed among the Class in accordance with the Plan of Allocation and Distribution,[9] any remaining balance will be reallocated among the Class Members and, afterwards, any *de minimis* balance of the Net Settlement Fund will be donated to the Crohn's & Colitis Foundation or another approved non-profit organization. (*See* Doc. No. 172-4 at ¶ 5.8 ("If there is any balance remaining in the Settlement Fund after a reasonable period of time after the date of the initial Distribution ..., Class Counsel shall, if feasible, reallocate ... such balance among those Class Members, who cash their initial Distribution Check and who would receive a Distribution of at least $10.00, in an equitable and economic fashion. Thereafter, any *de minimis* balance which still remains in the Net Settlement Fund shall be donated to the Crohn's & Colitis Foundation, or one or more other non-sectarian, non-profit, 501(c)(3) organization(s) to be determined by Class Counsel and approved by the Court.").)

### 2. Notice to the Class

The parties have chosen Gilardi & Co., LLC ("Gilardi") to serve as the Settlement Administrator and Huntington Bank to serve as the Escrow Agent. (Doc. No. 172-4 at ¶¶ 1.14, 1.34.) Gilardi will establish a website and a toll-free number to allow Class Members to obtain information about the Settlement. (Doc. No. 172-11 at ¶¶ 25–26.) Notice shall be completed within 60 days after entry of the Preliminary Approval Order. (Doc. No. 172-1 at 33; Doc. No. 172-6 at ¶ 14.)

Gilardi has outlined plans for notice to third-party payors ("TPPs") and to consumers. (*See* Doc. No. 172-11 at 5–9.) As for notice to TPPs, Gilardi will send notice via email to all

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 372 of 482

In re Remicade Antitrust Litigation, Not Reported in Fed. Supp. (2022)

TPPs in its database, which is approximately 26,000 contacts. (*Id.* at ¶ 11.) The email will contain the notice in the body of the email and will also contain a link to the settlement website. (*Id.*) "If an email bounces back or is known not to have successfully been delivered, Gilardi will send a single postcard notice via [the] United States Postal Service (USPS) to the TPP's corresponding postal address." (*Id.*) Further, Gilardi will send one postcard notice via USPS to all TPP entities for which it possesses a postal address (approximately 24,000 contacts). (*Id.* at ¶ 12.) The addresses will be checked against the National Change of Address database, and notices returned as undeliverable will be re-mailed to any address available through USPS's information. (*Id.* at ¶¶ 13–14.) Gilardi will also advertise digital notices on trade websites and in digital trade e-newsletters. (*Id.* at ¶¶ 15–16.) As for notice to consumers, a summary notice will appear in the national edition of *People* magazine, both online and print editions, which reaches 11.6% of the target audience. (*Id.* at ¶ 20.) Moreover, "over 67.2 million internet impressions will be purchased programmatically and distributed over various websites," including Facebook. (*Id.* at ¶ 21.) Gilardi's digital specialists will routinely monitor these digital media campaigns. (*Id.* at ¶ 22.)

**\*4** In addition to these TPP and consumer notice plans, Gilardi will also contact various organizations—including clinical and healthcare systems, the Chron's & Colitis Foundation, The Arthritis Foundation, the American Juvenile Arthritis Foundation, and the Rheumatoid Arthritis Foundation—and provide them with information regarding the settlement and ask them to share the information with their audiences. (*Id.* at ¶ 23.) Gilardi will also research support groups (e.g., the REMICADE (infliximab) Users and Support Group on Facebook) and post messages to their respective pages. (*Id.*) Further, Gilardi will issue a national press release. (*Id.* at ¶ 24.)

Class Members will have an opportunity to either opt out [10] of the Settlement or to object and/or intervene by following the procedures set forth in the Settlement Agreement and Notice. (Doc. No. 172-4 at ¶¶ 8.1–8.2; Doc. No. 172-6 at ¶¶ 15–16; Doc. No. 172-8 at 5–6; Doc. No. 172-7 at 3–4.) Objections and opt-outs are due 120 days after entry of the Preliminary Approval Order. (Doc. No. 172-1 at 33.)

### 3. Release

After the Settlement is finally approved, the Settlement Class will release Defendants from claims and causes of action arising before February 28, 2022 related to "any antitrust, unfair competition, consumer protection, Lanham Act or similar common law cause of action regarding Remicade, Inflectra, or any other infliximab product." (Doc. No. 172-4 at ¶¶ 1.25, 4.1.) Claims to enforce the terms of the Settlement Agreement are not released. (*Id.* at ¶ 4.1.)

## II. Provisional Certification of the Settlement Class

### A. Legal Standard

"The Court may certify class actions for the purpose of settlement." *In re CertainTeed Corp. Roofing Shingle Prods. Liab. Litig.*, 269 F.R.D. 468, 476 (E.D. Pa. 2010) (citing *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 786 (3d Cir. 1995)). In these situations, the court "approves preliminary certification of the class," but reserves "[f]inal certification" until it "rules on whether the final settlement agreement is to be approved." *Id.* When a court certifies a class for settlement, "it must first find that the class satisfies all the requirements of Rule 23." *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 300 (3d Cir. 2005).

Rule 23(a) and 23(b) of the Federal Rules of Civil Procedure give the requirements for certifying a class. Under Rule 23(a), a class action is allowable only if:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *see also Reyes v. Netdeposit, LLC*, 802 F.3d 469, 482 (3d Cir. 2015) ("All potential classes must initially satisfy four prerequisites to be certified: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of the representation.").

If the Rule 23(a) conditions are met, then a case may proceed as a class action if one of the conditions of Rule 23(b) is also satisfied. Here, Plaintiffs seek certification for a class under Rule 23(b)(3), which requires that "the court finds that the questions of law or fact common to

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 373 of 482

In re Remicade Antitrust Litigation, Not Reported in Fed. Supp. (2022)

class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see also Reyes*, 802 F.3d at 482 (explaining that plaintiff must demonstrate "predominance and superiority" for certification under Rule 23(b)(3)).

### B. Analysis

**\*5** Plaintiffs propose that the Settlement Class consist of "[a]ll persons and entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of Defendants' infliximab between April 5, 2016 and February 28, 2022."[11] (Doc. No. 172-4 at ¶ 1.6). This class meets all six requirements of Rules 23(a) and 23(b). The Court address each requirement in turn.

### 1. Rule 23(a) Requirements

*Numerosity.* While "[t]here is no magic number of class members needed for a suit to proceed as a class action," the Third Circuit has held that "numerosity is generally satisfied if there are more than 40 class members." *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 426 (3d Cir. 2016); *see also In re Modafinil Antitrust Litig.*, 837 F.3d 238, 249–50 (3d Cir. 2016). Here, Plaintiffs say that the class includes thousands of people. (Doc. No. 172-1 at 15 ("The Settlement Class includes thousands of consumer and [third-party payor] TPP members who are geographically dispersed across the country.").) Accordingly, the Court finds that the Settlement Class is sufficiently large to satisfy Rule 23(a)'s numerosity requirement.

*Commonality.* "A putative class satisfies Rule 23(a)'s commonality requirement if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *In re Nat'l Football League Players*, 821 F.3d at 426–27 (quoting *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013)). It is "easy enough" to meet the requirement, provided all members of the class have claims that are capable of class-wide resolution. *Id.* Commonality is met in this case because each Class Member's claim depends on whether Defendants unlawfully engaged in anticompetitive behavior. (*See* Doc. No. 172-1 at 16 (explaining that there are "numerous issues" common to the class, including "whether Defendants unlawfully excluded

competition for biosimilar infliximab"; "whether the alleged conduct violated the Sherman Antitrust Act"; "whether the alleged scheme violated various state and federal antitrust and state consumer protection statutes"; and "the effect of the alleged scheme on the prices of infliximab in the United States during the Class Period").) *See In re Wellbutrin XL Antitrust Litig.*, 282 F.R.D. 126, 137 (E.D. Pa. 2011) ("The Court finds that commonality is met here. The plaintiffs allege that the defendants engaged in a scheme to delay the entry of less expensive generic versions of Wellbutrin XL into the market ... Each class member's claims depends on whether or not the defendants unlawfully engaged in anticompetitive behavior to limit the entry of generic competitors in violation of each state's respective antitrust and/or consumer protection laws."); *see also In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 217 (E.D. Pa. 2012) ("Resolving the allegations surrounding GSK's alleged conduct in delaying generic entry will resolve issues that are central to the validity of each one of the claims in one stroke. Therefore, I find the commonality requirement satisfied here."). Thus, this case presents a sufficient degree of commonality, even if the distribution amount from the Net Settlement Fund that each Class Member will receive varies.

*Typicality.* "To evaluate typicality, we ask whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class." *Beck v. Maximus*, 457 F.3d 291, 295–96 (3d Cir. 2006) (cleaned up); *see also In re Flonase Antitrust Litig.*, 284 F.R.D. at 217 ("The typicality requirement is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees. This inquiry assesses whether the named plaintiffs have incentives that align with those of the absent class members so that the absentees' interests will be fairly represented." (quoting *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 631 (3d Cir. 1996))). There is a " 'low threshold' for typicality"; provided "the interests of the class and the class representative are aligned," courts will find typicality even when class members' claims are only legally similar, and not factually similar. *In re Nat'l Football League Players*, 821 F.3d at 427–28 (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 182–83 (3d Cir. 2001)); *see also Beck*, 457 F.3d at 296 ("Factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." (cleaned up)).

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 374 of 482

In re Remicade Antitrust Litigation, Not Reported in Fed. Supp. (2022)

**\*6** Here, because the Named Plaintiffs' and Class Members' claims arise out of the same conduct and are based on the same legal theories—i.e., Defendants' alleged anticompetitive behavior related to Remicade and whether Defendants violated antitrust and consumer protection laws, resulting in suppressed competition and artificially inflated prices—the Court concludes the typicality factor is satisfied. *See In re Wellbutrin XL Antitrust Litig.*, 282 F.R.D. at 138 ("The Court finds that the typicality requirement is met here because the representatives' claims arise from the same course of conduct and are based on the same legal theories."); *see also In re Fasteners Antitrust Litig.*, Civil Action No. 08-md-1912, 2014 WL 285076, at *6 (E.D. Pa. Jan. 24, 2014) ("The claims of each of the class members arise from the alleged conspiracy to price-fix and allocate customers and markets in the United States for fasteners. In a case like this one where it is alleged that the defendants engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical of the absent class members. The typicality requirement is met here." (cleaned up)); *In re Flonase Antitrust Litig.*, 284 F.R.D. at 218 (finding the typicality requirement satisfied because the class representatives' and class members' claims arose from an "identical course of conduct—GSK's allegedly monopolistic 'brand maturation strategy,' " which GSK implemented across the board and without reference to individual purchasers, meaning that all members of the proposed class sought recovery for the same resulting injury).

*Adequacy of the Representation.* Courts considering adequacy of representation examine both "the qualifications of class counsel and the class representatives." *In re Nat'l Football League Players*, 821 F.3d at 428; *see also In re Fasteners Antitrust Litig.*, 2014 WL 285076, at *6 ("The requirement has dual concerns: to ensure that class representatives do not have interests antagonistic to the class and that class counsel have the necessary skills and qualifications to adequately represent the class."); *In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 207 (E.D. Pa. 2001) ("The adequacy of the class representative is dependent on satisfying two factors: 1) that the plaintiffs' attorney is competent to conduct a class action; and 2) the class representatives do not have interests antagonistic to the interests of the class."). "[T]he linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *In re Cmty. Bank of N. Va.*, 795 F.3d at 393 (quoting

*Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 183 (3d Cir. 2012)).

As to the class representatives, the Court finds that Named Plaintiffs have standing and do not have interests antagonistic to the Settlement Class. *See In re Fasteners Antitrust Litig.*, 2014 WL 285076, at *7 ("The interest of the proposed class representatives are the same as the other class members in that their injury arose from the same alleged price fixing conspiracy in the United States fastener market ... Plaintiffs' interests appear to be completely aligned with the interests of the other class members."); *In re Flonase Antitrust Litig.*, 284 F.R.D. at 218 (" 'A class representative must be part of the class and possess the same interest and suffer the same injury as the class members.' Each class member purchased and/or reimbursed for FP at some point during the Class Period at a supracompetitive price. Each class member holds a strong common interest in establishing GSK's liability for these alleged overcharges." (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 625–26 (1997))). Named Plaintiffs, like the other Class Members, indirectly purchased, paid, and/or provided reimbursement for some or all of the purchase price of Remicade during the Class Period and have a common interest in establishing Defendants' liability for alleged anticompetitive conduct that resulted in inflated pricing of Remicade. (*See, e.g.*, Doc. No. 53 at ¶¶ 18–19 (alleging that Named Plaintiffs are both employee welfare benefit plans under ERISA and that their Plan participants in various states were dispensed Remicade and paid or had paid on their behalf the required copayment).)

Named Plaintiffs have represented the class capably and diligently. In addition to retaining competent counsel, Named Plaintiffs actively participated in extensive discovery and routinely communicated with counsel regarding the status of the action, and they were reportedly involved in important litigation decisions. (Doc. No. 172-1 at 18.) *See Wood v. Saroj & Manju Inves. Phila. LLC*, Civil Action No. 19-2820-KSM, 2020 WL 7711409, at *5 (E.D. Pa. Dec. 28, 2020) (finding that the class representative adequately represented the interests of his fellow members where he "provided counsel with the paperwork and information they needed to initiate [the] case and substantiate his claims" and was " 'instrumental' in the mediation sessions that led to the settlement agreement").

**\*7** With respect to class counsel, the important factors are whether the attorneys "(1) possessed adequate experience; (2) vigorously prosecuted the action; and (3) acted at arm's

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 375 of 482

In re Remicade Antitrust Litigation, Not Reported in Fed. Supp. (2022)

length from the defendant." *In re Gen. Motors Corp.*, 55 F.3d at 801. The Third Circuit has indicated that courts should consider the non-exhaustive list of factors in Rule 23(g) for appointing counsel in determining the adequacy of representation. *See In re Nat'l Football League Players*, 821 F.3d at 429; *see also Sheinberg v. Sorensen*, 606 F.3d 130, 132 (3d Cir. 2010) ("Although questions concerning the adequacy of class counsel were traditionally analyzed under the aegis of the adequate representation requirement of Rule 23(a) (4) of the Federal Rules of Civil Procedure, those questions have, since 2003, been governed by Rule 23(g)."). Those factors include counsel's work in the instant class action, experience in handling class actions or other kinds of complex litigation, knowledge of the applicable laws, and resources available for representing the class. Fed. R. Civ. P. 23(g)(1) (A). Additionally, the court "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

Under each of the Rule 23(g)(1)(A) factors, the proposed Class Counsel—Robbins Geller Rudman & Dowd LLP—is qualified to "fairly and adequately represent the interests of the class." Robbins Geller has extensive experience handling complex class action litigation generally, and cases in the antitrust class action context specifically. (*See* Doc. No. 178-1 at 22; Doc. No. 172-3 at ¶ 3 ("Counsel for Plaintiffs ... have decades of experience litigating antitrust class actions[.]"); *see also* Doc. No. 172-10 (the firm's Global Antitrust and Unfair Competition Practice Resume); *id.* at 4 (stating that the "Firm's record of success includes some of the largest recoveries in history, including the largest antitrust class action settlement: $5.5 billion"); *id.* at 5 ("Robbins Geller has been appointed lead counsel in numerous federal antitrust class actions, and has achieved some of the largest recoveries on behalf of antitrust plaintiffs.").)

Not only is Robbins Geller well qualified to pursue this suit, but the firm has done so with vigor. Following their initial investigation and commencement of the action, proposed class counsel engaged in extensive discovery, took part in over 30 depositions, and reviewed "millions of pages of documents." (Doc. No. 172-3 at ¶ 6.) Throughout the various phases of the suit, proposed class counsel "researched, analyzed, and evaluated many contested legal and factual issues." (*Id.* at ¶ 7.) Proposed class counsel also engaged in "numerous rounds of [settlement] discussions," which were "conducted at arm's-length and in good faith, and were informed and approved by Plaintiffs." (*Id.* at ¶ 6.)

In sum, the proposed class's interests have been advanced by experienced, dedicated counsel, working at arm's length from Defendants. The Court finds Rule 23(a)(4) is satisfied.

### 2. Rule 23(b) Requirements

In addition to meeting the requirements of Rule 23(a), a named plaintiff must also satisfy Rule 23(b)(3), which requires the Court find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

*Predominance.* The key issue under the predominance factor is "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Windsor*, 521 U.S. at 623. Third Circuit "precedent provides that the focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 298 (3d Cir. 2011) (en banc). The Third Circuit has counseled that courts should be "more inclined to find the predominance test met in the settlement context."[12] *In re Nat'l Football League Players*, 821 F.3d at 434 (quoting *Sullivan*, 667 F.3d at 304 n.29). Further, the Supreme Court has stated that "predominance is a test readily met in certain cases alleging ... violations of the antitrust laws." *Windsor*, 521 U.S. at 625; *see also In re Fasteners Antitrust Litig*, 2014 WL 285076, at *7 ("In antitrust cases, the requirement of predominance is often easily met."); *In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249, 263 (E.D. Pa. 2012) ("Predominance is a test readily met in certain cases alleging ... violations of the antitrust laws. This is because these types of claims typically arise from an alleged common course of conduct on the part of the defendant, and depend upon common proof of liability, such as evidence of the defendants' conduct." (cleaned up)).

**\*8** Here, the predominance requirement is satisfied. Each Class Member's claim raises similar operative facts and legal arguments surrounding Defendants' alleged anticompetitive conduct. Named Plaintiffs allege that Defendants took advantage of Remicade's dominant market position and suppressed competition, resulting in a common injury to all Class Members—the inflated price of Remicade—in violation of federal and state antitrust laws and state consumer protection laws. *See Sullivan*, 667 F.3d at 300 (finding

Case 4:21-cv-00196-MWB   Document 249-1   Filed 10/07/25   Page 376 of 482

In re Remicade Antitrust Litigation, Not Reported in Fed. Supp. (2022)

predominance factor met where the plaintiffs alleged that "De Beers engaged in anticompetitive conduct by exploiting its" dominant position in the diamond market to "impose rigid constraints on the sale and resale of [ ] diamonds," "result[ing] in a common injury as to all class members—inflated diamond prices—in violation of federal antitrust, consumer protection, or unjust enrichment laws of every state"); *see also In re Comcast Corp. Set-Top Cable Television Box Antitrust Litig.*, 333 F.R.D. 364, 377 (E.D. Pa. 2019) ("Here, the allegation is that Comcast engaged in a common course of conduct—it unlawfully tied the sale of its Premium Cable to the rental of a Comcast Set-Top Box—and putative Class Members suffered the same injury—the payment of supracompetitive prices for their Set-Top Boxes. Accordingly, Plaintiffs satisfy the predominance requirement."); *In re Fasteners Antitrust Litig.*, 2014 WL 285076, at *7 ("Here, the same operative facts and legal arguments surrounding Defendants' conduct in conspiring to fix, raise, maintain, or stabilize prices of fasteners in the United States, apply to each class member. We are satisfied that questions of law or fact common to class members predominate over any questions affecting only individual members."). These common issues of law and fact predominate over any individual differences, such as the amount of compensation that each member will be entitled to under the settlement's distribution plan.

*Superiority.* The last requirement for certifying a class is that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). When evaluating this requirement, courts consider "the class members' interests in individually controlling litigation, the extent and nature of any litigation, the desirability or undesirability of concentrating the litigation, and the likely difficulties in managing a class action." *In re Nat'l Football League Players,* 821 F.3d at 435 (citing Rule 23(b)(3)(A)–(D)). Superiority can be satisfied where the settlement prevents "duplicative lawsuits and enables fast processing of a multitude of claims." *Id.* (quoting *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 382 (E.D. Pa. 2015)); *see also Sullivan,* 667 F.3d at 312).

In this case, an analysis of superiority weighs towards granting the provisional class certification. At this stage, it is somewhat difficult to assess the extent to which individual Class Members' interest in controlling litigation would be harmed by class certification. Pre-notice, we are unable to evaluate whether individual members care strongly enough

about the suit to, for instance, opt out of it. *See In re Nat'l Football League Players,* 307 F.R.D. at 382 (finding superiority in part because relatively few class members had opted out of the class).

Plaintiffs represent that the Settlement Class is composed of potentially thousands of consumer and TPP members. Class-wide adjudication is superior because individual consumer class members are likely to have small claims in relation to the cost of litigating the lawsuit. (*See* Doc. No. 172-1 at 21 ("Without the Settlement these consumers and small plans would very likely get nothing.").) *See In re Wafarin Sodium Antitrust Litig.*, 391 F.3d 516, 534 (3d Cir. 2004) (finding superiority requirement satisfied in antitrust class action where there were a "potentially large number of class members [ ], including some 2 million consumers and potentially thousands of TPPs" and reasoning in part that "individual consumer members have little interest in individually controlling the prosecution or defense of separate actions because each consumer has a very small claim in relation to the cost of prosecuting a lawsuit"); *In re Comcast Corp. Set-Top Cable Television Box Antitrust Litig.*, 333 F.R.D. at 378 (finding superiority requirement met in antitrust class action for similar reasons, i.e., that there were millions of class members with low-dollar-value claims). Moreover, "[i]ndividual treatment of each class members' claims would require duplicative, expensive litigation, which would come at enormous expense to the parties and judicial economy. Class resolution would also avoid problems of inconsistent resolution." *In re Wellbutrin XL Antitrust Litig.*, 282 F.R.D. at 145; *see also In re Fasteners Antitrust Litig.*, 2014 WL 285076, at *8 ("Proceeding as a class action is the superior course not only because it will avoid unnecessarily wasting judicial resources, but also because it avoids the possibility of contradictory results.").

**\*9** Accordingly, superiority is met in this case.

\* \* \*

For these reasons, the Court finds that the requirements of Rules 23(a) and 23(b)(3) are satisfied, and the Court will conditionally certify the class.

## III. Appointing Class Representatives

Appointment of class representatives is governed by Rule 23(a) of the Federal Rules of Civil Procedure, which requires that their claims be "typical of the claims ... of the class" and that they "will fairly and adequately protect the interests of

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 377 of 482

In re Remicade Antitrust Litigation, Not Reported in Fed. Supp. (2022)

the class." For the reasons previously discussed in Part II.B.1, those requirements are met here, and the Court will appoint Local 295 Employer Group Welfare Fund and National Employees Health Plan as representatives of the Settlement Class.

## IV. Appointing Class Counsel

Rule 23(g) of the Federal Rules of Civil Procedure provides the standard for the appointment of class counsel. Class counsel are responsible not only for representing the interests of the class representative, but also for "fairly and adequately represent[ing] the interests of the class." Fed. R. Civ. P. 23(g)(4). As discussed above in Part II.B.1, Rule 23(g) provides a non-exclusive list of factors courts should consider when appointing class counsel. For the reasons previously discussed, the Court finds that Robbins Geller has the ability and resources to "fairly and adequately represent the interests of the class." Accordingly, Robbins Geller will be appointed as Class Counsel.

## V. Appointing Settlement Administrator

Parties may use class notice experts or professional claims administrators to provide a class notice and otherwise administer a settlement. Fed. R. Civ. P. 23 note(c)(2) (2018). Gilardi, the proposed Settlement Administrator, has experience administering large class action settlements, such as this one. [13] (Doc. No. 172-11 at ¶ 3 ("Since 1984, Gilardi has been retained to administer more than 6,000 class actions and distributed settlement payments totaling well over $20 billion in assets.").) The Court appoints Gilardi to serve as the Settlement Administrator and administer the settlement in good faith in accordance with the terms of the Settlement Agreement.

## VI. Preliminary Approval of the Class Settlement

*10  Preliminary approval of a proposed class action settlement is left to the discretion of the trial court and is based on an examination of whether the proposed settlement is "likely" to be approved under Rule 23(e)(2). Fed. R. Civ. P. 23(e)(1)(B)(i); see In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 299 (3d Cir. 1998); see also In re Traffic Exec. Ass'n-E. R.R.s, 627 F.2d 631, 634 (2d Cir. 1980) ("[Preliminary approval] is at most a determination that there is what might be termed 'probable cause' to submit the proposal to class members and hold a full-scale hearing as to its fairness."). Preliminary approval is not a commitment to approve the final settlement. "[R]ather,

it is a determination that 'there are no obvious deficiencies and the settlement falls within the range of reason.' " Gates v. Rohm & Haas Co., 248 F.R.D. 434, 438 (E.D. Pa. 2008) (quoting Smith v. Prof'l Billing & Mgmt. Servs., Inc., Civil No. 06-4453 (JEI), 2007 WL 4191749, at *1 (D.N.J. Nov. 21, 2007)). The settlement is entitled to "an initial presumption of fairness" if "the court finds that: (1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." In re Gen. Motors Corp., 55 F.3d at 785.

Despite the relatively low bar for preliminary approval, the court does not act as a mere rubber stamp for the parties' proposed agreement. This is particularly true when a proposed settlement will impact the legal rights of individuals who are not yet represented in the litigation and likely are unaware the litigation exists. In that situation, unscrupulous counsel, and, to some extent, representative plaintiffs, may seek disproportionately high fees by settling a case quickly, on terms unfavorable to absent class members and without having done much work on the case. For these reasons, courts evaluating a settlement have a "fiduciary responsibility, as the guardian[s] of the rights of the absentee class members." Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975); see also In re Pet Food Prods. Liab. Litig., 629 F.3d 333, 349 (3d Cir. 2010) ("[T]rial judges bear the important responsibility of protecting absent class members.").

After review of the proposed Settlement Agreement and the proposed Notice, the Court is satisfied that the proposed settlement meets the criteria for preliminary approval. In the preliminary approval phase, the Court is tasked only with determining whether "the proposed settlement discloses grounds to doubt its fairness or other obvious deficiencies such as unduly preferential treatment of class representatives or segments of the class, or excessive compensation of attorneys, and whether it appears to fall within the range of possible approval." In re Nat'l Football League Players' Concussion Injury Litig., 301 F.R.D. 191, 198 (E.D. Pa. 2014) (quoting Mehling v. N.Y. Life Ins. Co., 246 F.R.D. 467, 472 (E.D. Pa. 2007)). The proposed settlement at issue here does not raise any doubts as to fairness or otherwise reveal any deficiencies.

### A. Benefits to the Settlement Class

Class Members will substantially benefit from the proposed settlement terms. Defendants will pay out $25 million to the overall Settlement Fund. This amount is within the

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 378 of 482

In re Remicade Antitrust Litigation, Not Reported in Fed. Supp. (2022)

range of other similar settlements. (*See generally* Doc. No. 172-2.) Given the risks (and costs) associated with litigating through class certification, trial, and appeal, and the monetary and nonmonetary relief afforded the Class Members, the settlement amount represents a substantial recovery.

### B. Notice

The Court is also satisfied that the form and content of the notice to the settlement class is adequate. For class notice to be adequate in this case, it must meet two requirements. First, Rule 23(c)(2)(B) requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Additionally, principles of due process "require[ ] that notice be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.' " *In re Nat'l Football League Players*, 821 F.3d at 435 (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)). The notice documents must provide a detailed description of the settlement, the circumstances leading to it, and the consequences of objecting or opting out. *See In re Diet Drugs Prods. Liab. Litig.*, 369 F.3d 293, 310–12 (3d Cir. 2004).

**\*11** Here, the Court finds that the requirements of Rule 23 and due process are satisfied by the parties' proposed notice plan. To notify the TPPs, Gilardi will send notice via email to all TPPs in its database, and if an email bounces back, Gilardi will send a postcard notice to the TPP's postal address. (Doc. No. 172-11 at ¶ 11.) Gilardi will also send a postcard notice to all TPP entities for which it possesses a postal address, and the addresses will be checked against the National Change of Address database. (*Id.* at ¶¶ 12–14.) Gilardi will also advertise digital notices on trade websites and in trade e-newsletters. (*Id.* at ¶¶ 15–16.) And to notify consumers, Gilardi will publish a notice in *People* magazine and purchase and distribute 67.2 million Internet impressions over various websites and Facebook. (*Id.* at ¶¶ 20–21.) Gilardi will also publish a national press release and reach out to organizations and support groups with information regarding the settlement. (*Id.* at ¶¶ 23–24.) Gilardi will also set up a toll-free number and a website that will include information on the Settlement. (*Id.* at ¶¶ 25–26.)

The Court finds that the proposed Notice Program meets the Rule 23 and due process requirements. *See In re Flonase Antitrust Litig.*, 291 F.R.D. 93, 99 (E.D. Pa. 2013) (finding notice was sufficient where "a notice was published in a

variety of national publications" and appeared in newspapers and periodicals, targeted Internet banner ads were published; and a TPP notice appeared in an industry trade journal); *see also Demmick v. Cellco Partnership*, Civil Action No. 06-2163 (JLL), 2015 WL 13643682, at \*4–5 (D.N.J. May 1, 2015) (finding notice plan adequate where it used a combination of individual notice (i.e., email and postcards) to reach identifiable class members and publication notice (i.e., advertisements in *People* magazine and on Facebook) to reach unknown class members). *Cf. Boone v. City of Philadelphia*, 668 F. Supp. 2d 693, 702–03, 709 (E.D. Pa. 2009) (finding notice program adequate where notice forms were mailed to identified class members, notice was provided in local publications and through televisions advertisements, and there was a toll-free number and settlement website that provided information to the class).

Moreover, the Court is satisfied that the content of the short-form and long-form notices (Doc. Nos. 172-7, 172-8) satisfy Rule 23 and due process. The notices explain, in plain language, who the interested parties are, how the suit came to be settled, how Class Members' claims will be calculated, the process for making a claim, the process for opting out of the settlement, the process for objecting to the settlement, and how to obtain additional information. (*See generally* Doc. Nos. 172-7, 172-8.) *See Stechert v. Travelers Home & Marine Ins. Co.*, CIVIL ACTION NO. 17-0784-KSM, 2021 WL 5235221, at \*10 (E.D. Pa. Nov. 9, 2021); *Wood*, 2020 WL 7711409, at \*12. As written, the proposed notice forms will ensure that "interested parties [are apprised] of the pendency of the action and afford them an opportunity to present their objections." *In re Nat'l Football League Players*, 821 F.3d at 435 (quoting *Mullane*, 339 U.S. at 314).

### C. Plan of Allocation and Distribution

When assessing proposed plans of allocation, courts consider whether the proposed plan is "fair, reasonable, and adequate." *See In re Flonase Antitrust Litig.*, 951 F. Supp. 2d 739, 752 (E.D. Pa. 2013) (citing *In re Cendant Corp. Litig.*, 264 F.3d 201, 248 (3d Cir. 2001)); *see also Sullivan*, 667 F.3d at 326 ("A district court's 'principal obligation' in approving a plan of allocation 'is simply to ensure that the fund distribution is fair and reasonable as to all participants in the fund.' " (citation omitted)); *Bradburn Parent Teacher Store, Inc. v. 3M (Minn. Mining & Mfg. Co.)*, 513 F. Supp. 2d 322, 335 (E.D. Pa. 2007) ("Approval of a plan of allocation of a settlement fund in a class action is governed by the same standards of review applicable to approval of a settlement as a whole: the distribution must be fair, reasonable and

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 379 of 482

In re Remicade Antitrust Litigation, Not Reported in Fed. Supp. (2022)

adequate." (cleaned up)). "In general, a plan of allocation that reimburses class members based on the type and extent of their injuries is reasonable." *In re Flonase Antitrust Litig.*, 951 F. Supp. 2d at 752 (quoting *In re Ikon Office Sols. Inc. Sec. Litig.*, 194 F.R.D. 166, 184 (E.D. Pa. 2000)).

**\*12** Under the proposed Plan of Allocation and Distribution, a Class Member's recognized claim will be determined in part by where the Class Members reside or maintain a principal place of business is located and/or where the Class Member purchased or reimbursed for Remicade. [14] (*See* Doc. No. 172-8 at 3–4; Doc. No. 172-1 at 29–30.) The proposed Plan allocates the Settlement Fund, less attorneys' fees and expenses, service awards, notice and administration expenses, and tax-related expenses, among Class Members on a pro rata basis based on the relative size of their recognized claims. (*See* Doc. No. 172-5 at ¶ 8; Doc. No. 172-1 at 29; *see also* Doc. No. 172-1 at 29–30 (noting that a Class Member's claims will be determined, in part, by the total dollars spent by that member to purchase or provide reimbursement for Remicade).) The Court finds this to be fair, adequate, and reasonable. *See Mylan Pharma., Inc. v. Warner Chilcott Pub. Ltd. Co.*, Civ. No. 12-3824, 2015 WL 12791433, at \*6 (E.D. Pa. Jan. 28, 2015) (approving the allocation plan where the plan "authorize[d] GCG to make fair and efficient distribution of the Net Settlement Fund proceeds *pro rata*, based on Class Members' aggregate share of the total Class' [sic] indirect purchases of Doryx during the Class Period").

\* \* \*

For these reasons, the Court preliminarily approves the parties' proposed settlement agreement.

### VII. Conclusion

The Court is satisfied that preliminary approval is appropriate. Accordingly, Plaintiffs' Motion is granted. The Final Settlement Hearing is scheduled for **Monday, February 27, 2023 at 2:00 p.m.**

An appropriate Order follows.

### All Citations

Not Reported in Fed. Supp., 2022 WL 3042766

---

## Footnotes

1    In 1998, the FDA approved Remicade to treat Crohn's disease. (Doc. No. 172-4 at 3.) Since then, Remicade has been approved to treat other autoimmune disorders, including ulcerative colitis and rheumatoid arthritis, among others. (*Id.*; *see also* Doc. No. 172-1 at 11.) For almost two decades, Remicade was patent-protected and the only infliximab product available in the United States. (Doc. No. 172-1 at 11.)

2    In July 2021, this case was reassigned from the calendar of the Honorable J. Curtis Joyner to the calendar of the Honorable Karen Spencer Marston. (Doc. No. 150.)

3    The Court dismissed Plaintiffs' sham litigation and *Walker Process* claims and their claims under the consumer protection statutes of Rhode Island and New York. (Doc. No. 91.) With respect to all other claims, the Court denied the motion to dismiss. (*Id.*)

4    Discovery was consolidated with two related actions, *Pfizer Inc. v. Johnson & Johnson*, No. 2:17-cv-04180 (E.D. Pa.) (the "*Pfizer* Action"), and *Walgreen Co. v. Johnson & Jonson*, No. 2:18-cv-02357 (E.D. Pa.) (the "*Retailer* Action"). Both actions have been resolved. (*See Pfizer* Action, Doc. No. 167 and *Retailer* Action, Doc. No. 103 (Stipulations of Dismissal).)

5    Capitalized terms not defined herein have the same meaning as ascribed in the Settlement Agreement.

6    $25 million is the gross settlement amount. (*See* Doc. No. 172-4 at ¶ 2.2 ("The Settlement Amount paid by Defendants is their sole monetary responsibility under this Settlement Agreement ... The Defendants are not responsible for payment of Attorneys' Fees and Expenses, Notice and Administration Expenses, or any out-

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 380 of 482

In re Remicade Antitrust Litigation, Not Reported in Fed. Supp. (2022)

of-pocket expenses, other than out of the Settlement Amount."); *id.* at ¶ 5.2 ("The Settlement Fund shall be applied as follows: (a) to pay all Notice and Administration Expenses; (b) to pay the Taxes and Tax Expenses [ ]; (c) to pay Attorneys' Fees and Expenses to Class Counsel, including to pay Service Awards to Named Plaintiffs, to the extent allowed by the Court; and (d) after the Effective Date, to distribute the Net Settlement Fund to Class Members[.]").)

7    Class Counsel will request attorneys' fees in an amount not to exceed one-third of the Settlement Fund, plus interest, litigation expenses, and Service Award payments to the Named Plaintiffs. (Doc. No. 172-7 at 3.)

8    "Each Class Member's claim on the Settlement Fund will be determined under ... one of ... three categories below, based on whether the Class Member resides or has a principal place of business in a Selected State and whether the Class Member made purchases of, or reimbursements for, Remicade in a Selected State":

(1) "Class Members who reside or have their principal place of business in a Selected State will have a claim on the Net Settlement Fund equal to that Class Member's total Remicade purchases and reimbursements";

(2) "Class Members who do not reside or have their principal place of business in a Selected State, but who did purchase or reimburse for Remicade in one or more of the Selected States, will have a claim on the Net Settlement Fund equal to the sum of that Class Members total Remicade purchases and reimbursements in the Selected States, plus 1% of that Class Member's total Remicade purchases and reimbursements outside of those states";

(3) "Class Members who do not reside or have their principal place of business in a Selected State and who did not purchase or reimburse for Remicade in any of the Selected States, will have a claim on the Net Settlement Fund equal to 1% of that Class Member's total Remicade purchases and reimbursements."

(Doc. No. 172-8 at 3–4; *see also* Doc. No. 172-1 at 29–30.)

"Selected States" include Arizona, Arkansas, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin. (Doc. No. 172-4 at ¶ 1.31.) "The allocation method recognizes that some class members reside in or made reimbursements in the Selected States, which permit recovery of damages for indirect purchases in a manner that is precluded under the Sherman Antitrust Act under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977)." (Doc. No. 172-1 at 29.)

9    At bottom, this is a "non-recapture" Settlement Agreement, meaning that it is not a claims-based settlement; once the Settlement is finalized, Defendants "shall have no ability to get back any of the Settlement Amount," including any amount remaining after all distributions are made pursuant to the Plan of Allocation and Distribution. (*Id.* at ¶ 1.39.)

10   Defendants may withdraw and terminate the Settlement in the event certain identified members of the Class opt out during the opt out period; the Court has reviewed this list *in camera.* (*See* Doc. No. 172-4 at ¶ 7.2 ("Defendants have the right and option, in their sole discretion, to withdraw from and terminate the Settlement on or before the Opt-Out Deadline. Named Plaintiffs must notify Defendants of any such opt-outs within 5 business days of receiving the opt-out request. Defendants must exercise this optional termination right within 60 days following the Opt-Out Deadline.").)

11   As noted above, certain identified groups are excluded from the Settlement Class.

12   To be clear, the fact that all members of the proposed class have an interest in the settlement itself does not help establish predominance. *See Windsor*, 521 U.S. at 622–23. Nonetheless, the fact that Defendants

have agreed to settle not just with the Named Plaintiffs, but with thousands of similarly situated indirect purchasers/third-party payors and consumers, is a strong signal of the predominance of common factual and legal questions among the policyholders' claims.

13    Gilardi has served as administrator in several other cases in this Circuit. *See, e.g., Rescigno v. Statoil USA Onshore Props. Inc.*, Civil Action No. 3:16-85, 2020 WL 3833030, at *6 (M.D. Pa. July 8, 2020) ("Lastly, the court will preliminarily approve Gilardi as the settlement administrator to proceed with the settlement process agreed to by the parties and as set forth in their proposed schedule for completing settlement."); *In re N.J. Tax Sales Certificates Antitrust Litig.*, Master Dkt. No. 2:12-CV-01893-MAS-TJB, 2015 WL 12910923, at *3 (D.N.J. Jan. 29, 2015) ("The Court appoints Gilardi & Co. LLC as the Class Administrator to assist Class Counsel in effectuating and administering notice to the class of all 14 Settlements, as well as to administer the exclusion process for those Settlement Class members who wish to opt-out of the Settlement Class."); *W. Pa. Elec. Emps. Pension Fund v. Alter*, Civil Action No. 2:09-cv-04730-CMR, 2014 WL 12608966, at *2 (E.D. Pa. Apr. 22, 2014) ("The Court appoints the firm of Gilardi & Co. LLC ... to supervise and administer the notice procedure as well as the processing of claims[.]").

14    "In *Illinois Brick*, the Supreme Court prohibited federal antitrust suits by indirect purchasers. Following *Illinois Brick*, a number of statutes passed '*Illinois Brick* repealers,' which established the right of an indirect purchaser to bring an antitrust claim under state law." *In re Wellbutrin XL Antitrust Litig.*, 282 F.R.D. at 132 n.2 (cleaned up). "As the ability of members of the Class to recover is tied primarily to the laws of the Selected States, this Plan of Allocation and Distribution appropriately recognizes and reflects each Class Members' likely ability to recover should the case have been litigated to resolution." (Doc. No. 172-1 at 30; *see also id.* at 29 ("The allocation method recognizes that some class members reside in or made reimbursements in the Selected States, which permit recovery of damages for indirect purchases in a manner that is precluded under the Sherman Antitrust Act under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). To the extent a Class Member resides outside of the Selected States, its remedies for purchases made outside of the Selected States would likely be limited to equitable relief.").)

---

**End of Document**                                   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 382 of 482

In re: Shop-Vac Marketing and Sales Practices Litigation, Not Reported in Fed. Supp....

2016 WL 3315219
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

IN RE: SHOP-VAC MARKETING AND
SALES PRACTICES LITIGATION.
This Document Relates to: All Cases.

MDL No. 2380
|
No. 4:12-md-2380
|
Filed 05/26/2016

### MEMORANDUM

Kane, Judge

**\*1** Before the Court is the parties' joint motion for preliminary approval of their proposed settlement agreement, preliminary certification of a nationwide settlement class, and approval of proposed form of notice. (Doc. No. 160.) For the reasons that follow, the Court will grant the motion and schedule a fairness hearing.

### I. BACKGROUND

Pursuant to 28 U.S.C. § 1407, the Judicial Panel on Multidistrict Litigation transferred multiple cases involving the marketing of Shop-Vac brand wet/dry vacuums to this Court for the coordination of pretrial proceedings. (Doc. Nos. 1, 9, 22.) Plaintiffs Andrew Harbut, Alan McMichael, and Kris Reid filed the first consolidated amended complaint in the above-captioned multidistrict litigation on February 19, 2013 (Doc. No. 62), and the second consolidated amended complaint ("SCAC") on September 12, 2013 (Doc. No. 97). In the SCAC, Plaintiffs Harbut, McMichael, and Reid allege, inter alia, that Defendants Shop-Vac Corporation, Lowe's Home Centers, Inc., and Lowe's HIW, Inc. made fraudulent and misleading representations about the peak horsepower and tank capacity of Shop-Vac brand wet/dry vacuums.[1] (Doc. No. 97; see Doc. No. 162-2 at 2.)

On October 25, 2013, Defendants Shop-Vac Corporation, Lowe's Home Centers, Inc., and Lowe's HIW, Inc. moved to dismiss the SCAC pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Doc. No. 102.) This Court granted in part and denied in part Defendants' motion to dismiss. (Doc. Nos. 115, 116.) Thereafter, on August 13, 2015, the parties entered into mediation with the Honorable Edward A. Infante, retired Chief Magistrate Judge of the United States District Court for the Northern District of California. (Doc. No. 140 ¶ 2.) In September 2015, the parties reached an agreement in principle to settle, (Doc. Nos. 140 ¶ 3; 161 at 16; 162-1 at 11, 43), and continued negotiating until March 2016 with the assistance of Judge Infante (Doc. No. 156).

On April 1, 2016, Plaintiffs Andrew Harbut, Alan McMichael, Kris Reid, David Palomino, and Scott Giannetti and Defendants Shop-Vac Corporation and Lowe's Home Centers, LLC jointly filed the present motion, requesting that the Court: (1) preliminarily approve their proposed settlement agreement; (2) "preliminarily" certify the proposed settlement class; (3) appoint representatives of the settlement class, liaison counsel, and class counsel for the settlement class; (4) approve the proposed form of notice; and (5) schedule a fairness hearing.[2] (Doc. No. 160.) In support thereof, the parties submitted a supporting brief (Doc. No. 161), and attached a copy of the class action settlement agreement (Doc. No. 162-1). The Court addresses the parties' requests in turn.

### II. DISCUSSION

**\*2** Federal Rule of Civil Procedure 23(e) governs the settlement of class actions and the procedures that apply for review of a class settlement. Fed. R. Civ. P. 23(e); see In re Nat. Football League Players Concussion Injury Litig., 775 F.3d 570, 581 (3d Cir. 2014) (interior quotations omitted). The Court first undertakes a review of the proposed class settlement for preliminary approval.

#### A. Preliminary approval of class settlement

The parties jointly move this Court to grant preliminary approval of their proposed settlement agreement. (Doc. No. 160.)

Preliminary approval of a proposed class action settlement "establishes an initial presumption of fairness," In re Gen. Motors Corp., 55 F.3d 768, 785 (3d Cir. 1995) (citing Newberg on Class Actions § 11.41 (3rd ed.)), and guides "whether notice of the proposed settlement should be sent to the class." Newberg on Class Actions § 13:13 (5th ed.). The purpose of this preliminary determination is "not to make a final determination of the settlement's fairness," id., or simply to issue a "judicial rubber stamp of the parties' agreement." In re Nat'l Football League Players' Concussion Injury

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 383 of 482

In re: Shop-Vac Marketing and Sales Practices Litigation, Not Reported in Fed. Supp....

Litig., 961 F. Supp. 2d 708, 714 (E.D. Pa. 2014). As such, district courts examine whether the proposed agreement arose out of "serious, informed non-collusive negotiations," has any "obvious deficiencies," "improperly grant[s] preferential treatment to class representatives or segments of the class," and "falls within the range of possible approval." E.g., In re Nasdaq Market–Makers Antitrust Litig., 176 F.R.D. 99, 102 (S.D.N.Y. 1997) (citing Manual for Complex Litigation § 30.41 (3rd ed.)); see In re Gen. Motors Corp., 55 F.3d at 785.

Here, the Court is satisfied that the proposed settlement agreement arose out of "serious, informed, non-collusive negotiations." In re Nasdaq, 176 F.R.D. at 102. The parties engaged in three years of discovery (Doc. No. 161 at 22), pursued significant motion practice prior to agreeing to mediation (Doc. Nos. 68, 77, 102, 107), entered into settlement discussions with a third-party mediator, Judge Infante (Doc. No. 161 at 23), and spent seven months negotiating the terms of the settlement agreement (id. at 24). The parties also emphasize, in their supporting brief, the scope of the discovery conducted. (Doc. No. 161 at 22-23.) Plaintiffs' counsel describes having reviewed 22,000 pages of Defendants' documents, taking and defending multiple depositions, and consulting with several experts. (Id.) Thus, the Court is persuaded that the proposed settlement agreement arose out of "serious, informed, non-collusive negotiations." In re Nasdaq, 176 F.R.D. at 102; see In re Gen. Motors Corp., 55 F.3d at 785 (discussing the factors to consider at the preliminary approval stage).

Similarly, as to the terms of the agreement, the Court is satisfied that the agreement has no "obvious deficiencies" and "falls within the range of possible approval." In re Nasdaq, 176 F.R.D. at 102. "To determine whether a settlement falls within the range of possible approval, a court must consider plaintiffs' expected recovery balanced against the value of the settlement offer." In re Nat'l Football League Players' Concussion Injury Litig., 961 F. Supp. 2d 708, 714 (E.D. Pa. 2014) (internal quotations and citations omitted). The proposed settlement amount does not have to be "dollar-for-dollar the equivalent of the claim," In re Ionosphere Clubs, Inc., 156 B.R. 414, 427 (S.D.N.Y. 1993), and a "satisfactory settlement" may only "amount to a hundredth or even a thousandth part of a single percent of the potential recovery." City of Detroit v. Grinnell Corp., 495 F.2d 448, 455 (2d Cir. 1974).

**\*3** The proposed settlement agreement provides, inter alia, for an extension of the manufacturer's warranty on the motors of the Shop-Vac brand wet/dry vacuums by twenty-four months, requires Shop-Vac to change how it refers to "peak horsepower" on its marketing materials, and "alters the existing tank gallon legend" of the vacuums. (Doc. No. 162-1 at 12-13.) Defendants agree not to oppose Faruqi & Faruqi, LLP, Lax LLP, Lite DePalma Greenberg, LLC, and Milberg LLP's request for $4,250,000 in attorneys' fees and expenses. (Doc. No. 162-1 at 5, 18.) In exchange thereof, the proposed class settlement would release, inter alia, all claims that any member of the settlement class has or may have in the future against Defendants:

> (a) has alleged in the Lawsuits or (b) could have been alleged in the Lawsuits or in another action and relates (i) to any of the alleged inadequacies, misstatements, or issues of with the Vacuums alleged in the Lawsuits or (ii) to any act, omission, matter, cause, or event whatsoever arising out of or related to the initiation, or settlement of the Lawsuits or the claims or defenses asserted or that could been asserted in the Lawsuits.

(Id. at 7-8, 19-20.) The settlement agreement also provides that counsel may submit to the Court an application "seeking awards to Plaintiffs not to exceed $5,000 each." (Id. at 18.)

In light of the risks faced by Plaintiffs in continuing litigation and the benefits provided under the proposed settlement agreement, the Court finds that the proposed settlement agreement falls within the range of possible approval for purposes of preliminary approval. The parties estimate the retail value of the extended warranties amount "well into the millions of dollars." (Doc. No. 161 at 26.) The proposed payment of $4,250,000 in attorneys' fees and expenses is "separate from and in addition to the relief afforded" to the settlement class. (Id. at 27.) Furthermore, proposed monetary awards to Plaintiffs represent incentive awards, which are permissible in class action litigation and appear reasonable at this stage. Sullivan v. DB Inv., Inc., 667 F.3d 273, 333 n.65 (3d Cir. 2011). Accordingly, the Court will preliminarily approve the proposed settlement agreement.

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 384 of 482

In re: Shop-Vac Marketing and Sales Practices Litigation, Not Reported in Fed. Supp....

**B. Preliminary certification of a nationwide settlement class**

The parties also jointly move the Court to preliminarily certify a nationwide settlement class pursuant to Federal Rule of Civil Procedure 23(b)(3). (Doc. No. 161 at 7; see Doc. No. 162-1 at 10, 43.) In support thereof, the parties represent that the proposed settlement class satisfies the requirements under Federal Rules of Civil Procedure 23(a) and 23(b)(3). (Doc. No. 161 at 27.)

At the preliminary approval stage of a class action settlement, a court may preliminarily certify the class for purposes of providing "notice to absent class members." See In re NFL Players Litig., 775 F.3d at 584; In re: Amtrak Train Derailment in Phila., Pa., No. 15-2654, 2016 WL 1359725, at *4 (E.D. Pa. Apr. 6, 2016). In making this preliminary determination, district courts examine whether "the proposed class satisfies the criteria set out in Rule 23(a) and at least one of the subsections of Rule 23(b)." E.g., Smith v. Prof'l Billing & Mgmt. Servs., Inc., No. 06-4453, 2007 WL 4191749, at *2 (D.N.J. Nov. 21, 2007) (citing Manual for Complex Litigation § 21.632 (4th ed.)). This preliminary determination employs a "less rigorous analysis than that necessary for final certification" because courts conduct a "fairness hearing in order to issue a final class certification and approve the settlement." See In re: Amtrak Train Derailment, 2016 WL 1359725, at **2, 4 (E.D. Pa. Apr. 6, 2016).

The Court addresses, in turn, Federal Rules of Civil Procedure 23(a) and 23(b)(3)'s requirements for maintaining a class action. Fed. R. Civ. P. 23(a), (b)(3).

**1. Proposed Settlement Class Definition**

**\*4** The proposed settlement class corresponds to "each person in the United States and its territories who, from January 1, 2006 to the date of entry of the Preliminary Approval Order, either (1) purchased a Vacuum [3], or (2) received a Vacuum as a gift, or (3) acquired possession of a Vacuum through other lawful means." (Doc. No. 162-1 at 9; see Doc. No. 161 at 17.) The proposed class definition excludes, inter alia, persons or entities who acquired a vacuum for the purpose of resale, Defendants' employees, and putative settlement class members who properly and timely opt-out of the proposed settlement. (Doc. No. 162-1 at 9.) The Court considers this proposed class definition sufficiently "precise, objective and presently ascertainable"

for purposes of this preliminary determination. Manual for Complex Litigation § 21.222 (4th ed.)

**2. Numerosity**

Federal Rule of Civil Procedure 23(a) provides four prerequisites to maintaining a class action: numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a). The numerosity requirement is satisfied if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001). Here, the parties claim that millions of Shop-Vac vacuums were sold during the class period (Doc. Nos. 161 at 28, 37; see Doc. No. 162-1 at 40), and submit testimony that "known Class Members will exceed 1 million" (Doc. No. 162-1 at 80). [4] Therefore, Rule 23(a)'s numerosity requirement is met.

**3. Commonality**

The second Rule 23(a) prerequisite requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "A putative class satisfies Rule 23(a)'s commonality requirement if 'the named plaintiffs share at least one question of fact or law with the grievances of the prospective class.' " Rodriguez v. Nat'l City Bank, 726 F.3d 372, 382 (3d Cir. 2013) (quoting Baby Neal v. Casey, 43 F.3d 48, 56 (3d Cir. 1994)). "Their claims must depend upon a common contention ... that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." In re Nat'l Football League Players Concussion Injury Litig., No. 15-2206, 2016 WL 1552205, at *7 (3d Cir. Apr. 18, 2016) (quoting Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011)).

Here, the parties argue that a "common question that cuts across every claim of every Settlement Class Member is whether Defendants misrepresented the peak horsepower and tank capacity" of Shop-Vac vacuums. (Doc. No. 161 at 28.) The Court agrees. See Rodriguez v. Nat'l City Bank, 726 F.3d 372, 383 (3d Cir. 2013) ("[T]here may be many legal and factual differences among the members of a class, as long

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 385 of 482

In re: Shop-Vac Marketing and Sales Practices Litigation, Not Reported in Fed. Supp....

as all were subjected to the same harmful conduct by the defendant."). For purposes of preliminary certification, the commonality requirement is satisfied.

### 4. Typicality

Rule 23(a)(3)'s typicality requirement demands that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The Third Circuit has "set a 'low threshold' for typicality. Even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories' or where the claim arises from the same practice or course of conduct." In re NFL Players Litig., 2016 WL 1552205, at *8 (internal citations omitted).

**\*5** Here, the parties contend in their supporting brief that named "Plaintiffs' claims and the claims of all other Settlement Class Members arise from the same conduct, Defendants' pattern of overstating the 'peak horsepower' and tank capacity of the Vacuums." (Doc. No. 161 at 30; see Doc. No. 12-5 at 5.) The Court finds that the typicality requirement is tentatively satisfied for purposes of providing "notice to absent class members." See In re NFL Players Litig., 775 F.3d at 584.

### 5. Adequacy of representation

The fourth Rule 23(a) prerequisite provides that "representative parties [must] fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "This requires a determination of (1) whether the representatives' interests conflict with those of the class and (2) whether the class attorney is capable of representing the class." Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 185 (3d Cir. 2001). Upon review of the record, the Court is persuaded that the competence and experience evidenced by Plaintiffs' interim counsel in this MDL satisfies Rule 23(a)'s adequacy requirement.

### 6. Rule 23(b)(3): Common questions of law and fact predominate

In addition to satisfying the four Rule 23(a) prerequisites, the parties must also demonstrate that the proposed class "satisf[ies] at least one of the three requirements listed in Rule

23(b)." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 345 (2011). Here, the parties rely on Rule 23(b)(3), which applies when (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) when "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); see Dukes, 564 U.S. at 345.

The first inquiry – the "predominance inquiry" – tests "whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." Sullivan v. DB Investments, Inc., 667 F.3d 273, 298 (3d Cir. 2011). The parties stress that "predominance is satisfied" for two reasons. First, the issues relevant to the settlement class center on Defendants' conduct, rather than Plaintiff's actions. (Doc. No. 161 at 33.) Second, questions such as whether the Shop-Vac vacuums "reach their advertised 'peak horsepower' " or tank capacity is an issue susceptible to generalized proof. (Id.) For purposes of preliminary certification, the Court is satisfied that common questions surrounding Defendants' alleged misrepresentation and fraud appear to predominate over individual questions of law or fact. See Sullivan, 667 F.3d at 297-98; In re Linerboard Antitrust Litig., 305 F.3d 145, 163 (3d Cir. 2002).

The second inquiry – the superiority inquiry – "asks a district court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." In re Cmty. Bank of N. Virginia Mortgage Lending Practices Litig., 795 F.3d 380, 409 (3d Cir. 2015) (interior citation omitted). The parties argue that class treatment is superior because the "size of each Settlement Class Member's alleged loss is too small to be economically litigated outside of a class action." (Doc. No. 161 at 34.) The Court agrees. Considering the amount of the alleged loss, settlement appears to be "a more desirable outcome for the class than individualized litigation." In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig., 55 F.3d 768, 796 (3d Cir. 1995).

**\*6** Thus, having found preliminarily that predominance and superiority are satisfied, the Court will preliminarily certify the proposed class for purposes of providing "notice to absent class members." See In re NFL Players Litig., 775 F.3d at 584.

### C. Proposed notice to class

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 386 of 482

In re: Shop-Vac Marketing and Sales Practices Litigation, Not Reported in Fed. Supp....

The parties also move the Court to approve the proposed means of notifying class members. (Doc. Nos. 161 at 36; 162-1 at 15). In doing so, the parties ask the Court to approve Epiq Systems Class Action and Claims Solutions ("Epiq Systems") as the settlement administrator. (Doc. No. 162-1 at 9, 13, 48.) The parties submitted a proposed settlement notice (id. at 10, 56), posted notice (id. at 7, 58-68), publication notice (id. at 8, 70), and a proposed plan for disseminating the notice (id. at 72).

Federal Rule of Civil Procedure 23(c)(2)(B) requires the "best notice that is practicable under the circumstances" to be given to potential members of a Rule 23(b)(3) class, "including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2).[5] Here, the parties seek to certify a settlement class pursuant to Federal Rule 23(b)(3). Therefore, under Rule 23(c)(2)(B), "[t]he notice must clearly and concisely state in plain, easily understood language" the following:

> (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B). "In addition to the requirements of Rule 23, due process further requires that notice be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.' " In re NFL Players Litig., 2016 WL 1552205, at *16 (quoting Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950)).

The parties propose, in relevant part, that Epiq Systems would disseminate a copy of the settlement notice (Doc. No. 162-1 at 56), within twenty-one days to every member of the settlement class who "reasonably can be identified in Defendants' records" by email address or mailing address (Doc. No. 162-1 at 15-17, 81-82). Defendants

or Epiq Systems would further disseminate notices in People Magazine, Family Handyman, Facebook, and the Conversant Ad Network within twenty-one days. (See id.) The parties' proposed notice plan also includes sponsoring search listings on Internet search engines, including Google, Yahoo! and Bing, establishing an informational website, www.ShopVacPHPSettlement.com, and providing a toll-free number for additional information. (Doc. No. 162-1 at 82-84.) The parties submitted expert input that the proposed notice targets "adults 18 years and older who shop at Lowes" and would "reach at least 70.2% of Settlement Class Members an average of 2.5 times each." (Doc. No. 162-1 at 80.) Defendants propose to pay for the costs of preparing and disseminating the notices. (Doc. No. 162-1 at 17.)

**\*7** Having reviewed the proposed notices and the proposed notice plan, the Court is satisfied that the parties' proposed notices and notice plan satisfy Federal Rules of Civil Procedure 23(c)(2)(B) and 23(e)(1) as well as due process. The proposed settlement notice is individualized in nature (Doc. No. 162-1 at 47, 77, 80), describes the nature of the action, defines the proposed settlement class, identifies the class claims, provides that class members may appear through an attorney, permits members to opt-out of the settlement, and addresses the binding effect of the judgment. Fed. R. Civ. P. 23(c)(2)(B) (id. at 56). The proposed "posted notice" further apprises class members of the opportunity to inspect settlement documents and pleadings filed in the above-captioned MDL. (Doc. No. 162-1 at 60, 68.) The proposed notices are altogether informative and easy to read; the notice plan appears designed to reach the class efficiently.

Accordingly, the Court will approve the proposed settlement notice, publication notice, and proposed notice plan. The Court will also approve the proposed "posted notice," (Doc. No. 162-1 at 7, 58-68), excepting Section 13's discussion of class counsel (id. at 64) for reasons discussed below,[6] and approve "Epiq Systems" to serve as the settlement administrator.

### D. Appointment of class counsel and class representatives

On January 17, 2013, this Court appointed Milberg LLP, Lax LLP and Faruqi & Faruqi LLP as Plaintiffs' interim class counsel, and Dilworth Paxson LLP as Plaintiffs' interim liaison counsel. (Doc. No. 56.) The parties move the Court to appoint class counsel for the settlement class and representatives of the settlement class.[7]

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 387 of 482

In re: Shop-Vac Marketing and Sales Practices Litigation, Not Reported in Fed. Supp....

The application for class counsel "is generally submitted as part of the certification motion." Manual Complex Lit. § 21.273 (4th ed.). In fact, the Third Circuit has stated that "a district court's decision to certify a class must precede the appointment of class counsel." Sheinberg v. Sorensen, 606 F.3d 130, 132 (3d Cir. 2010) (emphasis added); see Newberg on Class Actions § 3:84 (5th ed.) ("[I]t is clear that a court must appoint class counsel at the same time it certifies the class."). Here, only the parties' motion for preliminary certification is before the Court. (Doc. No. 160.) Therefore, the Court will decline to appoint class counsel, liaison counsel, or class representatives at this preliminary stage. See Sheinberg, 606 F.3d at 132.

## III. CONCLUSION

For the reasons stated above, the Court will grant the parties' joint motion for preliminary approval of class settlement and for preliminary certification of a nationwide settlement class. (Doc. No. 160.) The Court will also approve the proposed settlement notice, publication notice, proposed notice plan, and amended posted notice. An order consistent with this memorandum follows.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 3015219

---

## Footnotes

1    Plaintiffs David Palomino and Scott Giannetti brought a parallel, class action lawsuit against Defendant Shop-Vac for breach of the New Jersey Consumer Fraud Act and for breach of warranty in the Superior Court of New Jersey, Law Division, Bergen County, Docket No. BER-L-1399-12 (the "New Jersey Action"). (Doc. No. 162-1 at 1-3; see Doc. No. 12-5 at 3-15.) On February 6, 2015, the New Jersey "state court certified a class of consumers who are New Jersey citizens who purchased Shop-Vac brand wet/dry vacuums in New Jersey between February 1, 2006 and May 8, 2015." (Doc. No. 161 at 13.) The New Jersey Action is currently stayed pending the "completion of federal proceedings." (Id.) The proposed settlement agreement would release claims against Defendant Shop-Vac in the New Jersey Action. (Doc No. 162-1 at 1.)

2    The Court will refer to Plaintiffs Andrew Harbut, Alan McMichael, Kris Reid, David Palomino, and Scott Giannetti and Defendants Shop-Vac Corporation and Lowe's Home Centers, LLC collectively as "the parties."

3    The proposed settlement agreement defines "Vacuums" as "Shop-Vac brand wet/dry vacuums sold in the United States and its territories during the Class Period." (Doc. No. 162-1 at 10.)

4    In the proposed order, the parties also agree that "persons and entities throughout the nation purchased thousands of [Shop-Vac] Vacuums." (Doc. No. 162-1 at 40.)

5    Similarly, Federal Rule of Civil Procedure 23(e)(1) requires the court to "direct notice in a reasonable manner to all class members" of a proposed settlement agreement. Fed. R. Civ. P. 23(e)(1); see In re Prudential Ins., 148 F.3d at 326. "The Rule 23(e) notice is designed to summarize the litigation and the settlement and 'to apprise class members of the right and opportunity to inspect the complete settlement documents, papers, and pleadings filed in the litigation.' " In re Prudential Ins., 148 F.3d at 327 (quoting 2 Newberg on Class Actions § 8.32).

6    Section 13 of the proposed "posted notice," (Doc. No. 162-1 at 64) should be amended in accordance with the Court's decision declining to appoint class counsel at this preliminary stage. See Sheinberg v. Sorensen, 606 F.3d 130, 132 (3d Cir. 2010).

In re: Shop-Vac Marketing and Sales Practices Litigation, Not Reported in Fed. Supp....

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 388 of 482

7       The parties request the additional appointment of Lite DePalma Greenberg, LLC, which was appointed as class counsel along with Milberg LLP and Lax LLP in the New Jersey Action. (Doc. No. 161 at 35 n.8.)

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

In re Suboxone (Buprenorphine Hydrochloride and..., Not Reported in Fed....

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 389 of 482

2024 WL 815503
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

IN RE SUBOXONE (BUPRENORPHINE
HYDROCHLORIDE AND NALOXONE)
ANTITRUST LITIGATION
This Document Relates to: Direct Purchaser Actions

MDL NO. 2445
|
13-MD-2445
|
Filed February 27, 2024

**MEMORANDUM OPINION**

Goldberg, District Judge

 **\*1**  Currently before me in this multi-district antitrust case is the Direct Purchaser Plaintiffs' ("DPPs") Motion for Final Approval of the Settlement. Upon review of the parties' briefing and considering the arguments at the final fairness hearing on February 27, 2024, I will certify a settlement class, grant final approval of the class action settlement, and award attorneys' fees, costs, and incentive payments as set forth in the accompanying Order.

**I. FACTUAL AND PROCEDURAL HISTORY**
Defendant Indivior, Inc. ("Defendant") manufactures Suboxone, a drug commonly used to combat opioid addiction. Suboxone previously came in tablet form, but in 2010, citing safety concerns, Defendant effectuated a change in the administration of this drug, switching from tablet to sublingual film. Various purchasers/consumers of Suboxone claimed that this switch was anticompetitive and solely designed to maintain Defendant's market exclusivity—a scheme known as a "product hop." These claims resulted in multi-district, antitrust litigation before this Court. [1]

Class Counsel for the DPPs ("Class Counsel") originally began investigating this case in August 2012. [2] On December 12, 2012, certain Class Counsel firms, representing named Plaintiff Burlington Drug Company ("BDC"), filed the first antitrust lawsuit on behalf of a putative class of direct purchasers challenging Defendant's conduct with respect to

its Suboxone product. See Burlington Drug Co., Inc. v. Reckitt Benckiser Group plc, et al. Civ. A. No. 12-2828 (D. Vt.). That suit was quickly followed by other, similar direct purchaser complaints on behalf of named Plaintiffs Rochester Drug Cooperative ("RDC") and Meijer, Inc. and Meijer Distribution, Inc. (collectively, "Meijer"). On June 6, 2013, following referral of all of these cases to the United States Judicial Panel on Multidistrict Litigation, the cases were centralized in the United States District Court for the Eastern District of Pennsylvania. Notably, at the time these actions were instituted, no governmental entities were involved.

On August 15, 2013, Class Counsel filed a Consolidated Amended Complaint alleging that Defendant engaged in various acts and practices as a part of an overall scheme to coerce a switch of the Suboxone market from Suboxone tablets to Suboxone film and to delay the market entry of less-expensive versions of Suboxone tablets, in violation of Section 2 of the Sherman Act.

 **\*2**  Defendant filed a motion to dismiss the DPPs' claims in September 2013. While a portion of the motion was granted, most of that motion was denied. Thereafter, the parties began discovery and the DPPs again amended their Complaint. Full discovery commenced in March 2015, and proceeded for several years, during which numerous discovery disputes were litigated and resolved. Class Counsel obtained approximately 6.7 million pages in discovery, deposed thirty-three fact witnesses, and defended multiple other depositions. The parties also exchanged fifteen expert reports (not including rebuttal reports) on multiple issues pertinent to the antitrust claims and damages posed by the operative Complaint, and the DPPs took seven depositions of Defendant's experts and defended eight depositions of their own experts.

On September 18, 2018, Class Counsel moved for class certification of the DPP class. Defendant opposed this motion and also moved, pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), to exclude the DPPs' class certification expert. Following extensive briefing and oral argument, I issued a Memorandum Opinion, dated September 27, 2019, granting the motion for class certification and denying Indivior's Daubert motion. Defendant appealed this decision to the United States Court of Appeals for the Third Circuit, thus staying the case pending appeal. On July 28, 2020, the Third Circuit issued a unanimous, precedential opinion affirming the class certification. See In re Suboxone, 967 F.3d 264 (3d Cir. 2020).

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 390 of 482

In re Suboxone (Buprenorphine Hydrochloride and..., Not Reported in Fed....

While the appeal was pending, the parties briefed "Phase I" _Daubert_ motions—*i.e.*, motions to exclude non-economic expert opinions that would not be impacted by the Third Circuit's pending decision. On November 23, 2020, I issued an extensive Opinion regarding the Phase I _Daubert_ motions. Subsequent to the Third Circuit's affirmance of class certification, I then considered the "Phase II _Daubert_ motions—*i.e.*, motions to exclude economic experts. I ruled on those Phase II motions on February 19, 2021. Additionally, I rejected Defendant's two-time effort to disqualify named Plaintiff RDC as a class representative.

In March 2021, the parties filed extensive motions for summary judgment, including two separate motions by Defendant and a partial motion for summary judgment by the DPPs. Ultimately, on August 22, 2022, I denied both of Defendant's motions in their entirety. I reserved ruling on the DPPs' motion for summary judgment as to the relevant market, but ultimately denied it on August 30, 2023.

The parties also had ongoing disputes regarding the deposition of nine witnesses, who had previously invoked the Fifth Amendment in May 2018 while the Department of Justice ("DOJ") was engaged in a criminal investigation of Defendant. After the closure of the DOJ's criminal charges against Defendant, the DPPs sought, in December 2022, to subpoena and depose these witnesses. Several of the witnesses continued to invoke the Fifth Amendment, and the DPPs moved for an adverse inference as to their testimony. That motion was ultimately mooted by the settlement of the case.

On December 16, 2022, following a conference with the parties, I set a trial date of September 18, 2023. That date was later pushed to October 30, 2023, as a result of the settlement by the End-Payor Class. The DPPs and Defendant began active trial preparation and filed forty-two motions *in limine*, as well as numerous motions relating to the other issues arising during pre-trial period.

In January 2023, upon all counsel's request, I engaged in mediation with the DPPs and Defendant. Following several months of mediation, the DPPs and Defendant reached a settlement in the amount of $385 million, in exchange for a release of all antitrust, consumer protection, and unjust enrichment claims asserted on behalf of the certified class (the "Settlement").

**\*3**  On October 30, 2023, I entered an order for preliminary approval of the proposed Settlement, for preliminary certification of the settlement classes, for approval of an escrow agent and proposed escrow agreement, for appointment of a claims administrator, for permission to disseminate notice of the proposed settlement to members of the Class, and for a schedule up through the Fairness Hearing ("Preliminary Approval Order").

Following entry of the Preliminary Approval Order, Defendant deposited the settlement fund into the approved interest-bearing escrow account, and Co-Lead Counsel posted all relevant documents on their websites, including notice to the class, which was mailed by the claims administrator on November 20, 2023. Pursuant to the Preliminary Approval Order, members of the DPP Class had until January 12, 2024 to object to either the Settlement and/or Class Counsel's request for attorneys' fees, reimbursement of expenses and service awards to the Class representatives. As of the date of the filing of the Motion for Final Approval on February 2, 2024, no objections were filed, and several class members have submitted letters to the Court in affirmative support of the Settlement and/or Class Counsel's Revised Fee Submission.

I held a Final Fairness Hearing on February 27, 2024.

## II. LEGAL STANDARDS

Class actions settlements are distinguished from those in most normal suits because Federal Rule of Civil Procedure 23(e) mandates that "[a] class action shall not be dismissed or compromised without the approval of the court." Fed. R. Civ. P. 23(e); see also In re GMC Pick–Up Truck Fuel Tank Prods. Liab. Litig. ("G.M. Trucks"), 55 F.3d 768, 785 (3d Cir. 1995). This rule "imposes on the trial judge the duty of protecting absentees, which is executed by the court's assuring the settlement represents adequate compensation for the release of the class claims." In re Prudential Ins. Co. Am. Sales Litig., 148 F.3d 283, 316 (3d Cir. 1998) (quoting G.M. Trucks, 55 F.3d at 805). A district court may approve a settlement agreement only "after a hearing and on finding that it is fair, reasonable, and adequate." In re Nat'l Football League Players Concussion Injury Litig. ("In re NFL"), 775 F.3d 570, 581 (3d Cir. 2014) (quoting Fed. R. Civ. P. 23(e) (2)). The factual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence. In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 320 (3d Cir. 2008).

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 391 of 482

In re Suboxone (Buprenorphine Hydrochloride and..., Not Reported in Fed....

In order to fulfill this duty, the court is required to "independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims would be extinguished." In re Cendant, 264 F.3d 201, 231 (3d Cir. 2001) (quotations omitted). "The court cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate." G.M. Trucks, 55 F.3d at 785 (quotations omitted). While the court is to employ a vigorous analysis in fulfilling its fiduciary duty to protect the rights of absent class members, it must also "guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." In re Prudential, 148 F.3d at 317 (quoting G.M. Trucks, 55 F.3d at 806). "The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." Id. at 299 (quoting Girsh v. Jepson, 521 F.2d 153, 156 (3d Cir. 1975)).

**\*4** Where the court has not already certified the class prior to evaluating the settlement, the court must determine whether the proposed settlement class satisfies the requirements of Rule 23(a) and (b), and then separately determine whether the settlement is fair to the class under Rule 23(e). In re NFL, 775 F.3d at 581; In re Pet Food Prods. Liab. Litig., 629 F.3d 333, 341 (3d Cir. 2010).

Under Rule 23(h), at the conclusion of a successful class action, class counsel may apply to a court for an award of attorney's fees. The amount of an attorney's fee award "is within the district court's discretion so long as it employs correct standards and procedures and makes finding of fact not clearly erroneous[.]" Sullivan v. DB Invs., Inc., 667 F.3d 273, 329 (3d Cir. 2011) (en banc) (internal quotation marks omitted).

### III. CERTIFICATION OF A SETTLEMENT CLASS

Prior to inquiring into the fairness of the Settlement, I must first ensure that the certification requirements set forth in Federal Rule of Civil Procedure 23(a) and (b) have been satisfied. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 619 (1997); In re NFL, 775 F.3d at 581. The Supreme Court has made clear that "[s]ettlement is relevant to a class certification." Amchem Prods., 521 U.S. at 619. Consequently, a district court "may take the proposed settlement into consideration when examining the question of certification." In re Prudential Ins. Co., 148 F.3d at 308.

I already engaged in an extensive analysis of the certification requirements when certifying the DPPs as a litigation class under Federal Rule of Civil Procedure 23(b). In re Suboxone, 421 F. Supp. 3d 12, 45-65 (E.D. Pa. 2019). I need not re-engaged in that analysis for purposes of certifying a settlement class.

### IV. FAIRNESS OF THE SETTLEMENT

After determining that a proposed settlement class may properly be certified under Rule 23, the court must evaluate the fairness of a proposed class action settlement under Rule 23(e). See In re Ins. Brokerage Antitrust Litig., 579 F.3d 241, 258 (3d Cir. 2009) (" 'Even if it has satisfied the requirements for certification under Rule 23, a class action cannot be settled without the approval of the court and a determination that the proposed settlement is fair, reasonable and adequate.' ") (quoting In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 316 (3d Cir. 1998)). The Third Circuit, in In re Cendant Corp. Litigation, 264 F.3d 201 (3d Cir. 2001), directed a district court to apply an initial presumption of fairness when reviewing a proposed settlement where: "(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." Id. at 232 n.18; see also In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 535 (3d Cir. 2004)

In Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975), the Third Circuit "identified certain factors which district courts may employ in informing their discretion before granting final approval to the class action settlement." Schwartz v. Dallas Cowboys Football Club, Ltd., 157 F. Supp. 2d 561, 571 (E.D. Pa. 2001) (citing Girsh). "[T]he district court must make findings as to each of the nine Girsh factors in order to approve a settlement as fair, reasonable, and adequate, as required by Rule 23(e)." In re Pet Food Prods., 629 F.3d at 350. The Girsh factors include:

> **\*5** (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class

Case 4:21-cv-00196-MWB   Document 249-1   Filed 10/07/25   Page 392 of 482

In re Suboxone (Buprenorphine Hydrochloride and..., Not Reported in Fed....

action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Girsh*, 521 F.2d at 157.

Subsequently, in In re Prudential Insurance Company America Sales Practice Litigation Agent Actions, 148 F.3d 283 (3d Cir. 1999), the Third Circuit cited a "sea-change in the nature of class actions" and advised that "it may be useful to expand the traditional Girsh factors" when appropriate. Id. at 323. The additional factors for consideration cited by the Prudential Court include:

[T]he maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

Id. These Prudential factors are "illustrative of additional inquiries that in many instances will be useful for a thoroughgoing analysis of a settlement's terms." In re Pet Food Prods., 629 F.3d at 350.

Finally, in In re Baby Products Antitrust Litigation, 708 F.3d 163 (3d Cir. 2013), the Third Circuit added that "one of the additional inquiries for a thorough analysis of settlement terms is the degree of direct benefit provided to the class." Id. at 174. "In making this determination, a district court may consider, among other things, the number of individual awards compared to both the number of claims and the estimated number of class members, the size of the individual awards compared to claimants' estimated damages, and the claims process used to determine individual awards." Id.

Ultimately, the "decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court," and the appellate court gives great deference to the district court's factual findings. *Girsh*, 521 F.2d at 156. There is an overriding public interest in settling class action litigation, and it should therefore be encouraged. See G.M. Trucks, 55 F.3d at 784 ("The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation"); In re Sch. Asbestos Litig., 921 F.2d 1330, 1333 (3d Cir. 1990) (noting that the court encourages settlement of complex litigation "that otherwise could linger for years"). As a result, "when evaluating a settlement, a court should be 'hesitant to undo an agreement that has resolved a hard-fought, multi-year litigation." In re Comcast Corp. Set-Top Cable TV Box Antitrust Litig., 333 F.R.D. 364, 378 (E.D. Pa. Sept. 24, 2019) (quoting In re Baby Prods., 708 F.3d at 175).

**\*6** With these standards in mind, my review of the Settlement here entails several steps. I will first address whether the Settlement is entitled to a presumption of fairness as described in the Cendant case. I will then individually address the Girsh, Prudential and Baby Products factors.

**A. Presumption of Fairness**

As set forth above, a proposed settlement is entitled to an initial presumption of fairness where: "(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." In re Cendant, 264 F.3d at 232 n.18; see also In re NFL, 821 F.3d at 436.

In re Suboxone (Buprenorphine Hydrochloride and..., Not Reported in Fed....

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 393 of 482

All of these factors are satisfied here. First, it is undisputed that the settlement negotiations occurred at arm's length. The parties began settlement negotiations in January 2023, and then engaged in intensive mediation starting in August 2023. During numerous mediation sessions, in which I was personally involved, the parties maintained adversarial positions requiring intensive advocacy and negotiation.

Second, as detailed above, the parties engaged in sufficient discovery, which took place over the course of approximately ten years and involved the review and analysis of thousands of documents and deposition transcript pages. The parties exchanged a total of fifteen expert reports and had the opportunity to test their legal theories via numerous motions.

Third, Class Counsel, who are the proponents of the Settlement, are highly experienced in similar class litigation. As I found in my Opinion certifying the DPP Class, Class Counsel have extensive experience handling complex class action litigation, particularly in the antitrust context. In re Suboxone, 421 F. Supp. 3d 12, 50 (E.D. Pa. 2019).

Finally, as will be discussed in more detail below, the response to the Class Settlement has been overwhelmingly favorable. No class member has filed an objection.

In light of these factors, I find that the proposed Settlement is entitled to a presumption of fairness. While this presumption does not obviate the need for scrupulous analysis under the Girsh, Prudential, and Baby Product factors, it does skew the analysis in favor of approving the Settlement.

**B. Application of the *Girsh* Factors**

1. Complexity, Expense, and Likely
Duration of the Litigation (Factor 1)

"The first factor 'captures the probable costs, in both time and money, of continued litigation.' " In re Warfarin, 391 F.3d 535–36 (quoting In re Cendant, 264 F.3d at 233); see also In re NFL, 821 F.3d at 437.

This suit involves complicated antitrust issues in the realm of pharmaceutical manufacturing. "An antitrust class action is arguably the most complex action to prosecute ..." In re Linerboard Antitrust Litig., 296 F. Supp. 2d 568, 577 (E.D. Pa. 2003) (quotations omitted); see also In re Flonase Antitrust Litig., 951 F. Supp. 2d 739, 743 (E.D. Pa. 2013)

("Antitrust class actions are particularly complex to litigate and therefore quite expensive."). Continued prosecution of the claims would have required complicated pretrial proceedings, litigation of multiple motions *in limine*, weeks of fact witness testimony, and costly expert witnesses, all without guarantee of any recovery. Ultimately, the settlement eliminated these risks and provided immediate and guaranteed recovery. Because such private resolution of the conflict "reduces expenses and avoids delay," this factor weighs heavily in favor of approving the Settlement. McDonough v. Toys R Us, Inc., 80 F. Supp. 3d 626, 640 (E.D. Pa. 2015).

2. Reaction of the Potential Class
Members to the Settlements (Factor 2)

**\*7** The second Girsh factor—the reaction of the classes to the settlement—"attempts to gauge whether members of the class support the settlement." In re Warfarin Sodium Antitrust Litig., 212 F.R.D. 231, 254 (D. Del. 2002) (quoting In re Prudential, 148 F.3d at 318).

Here, in response to widespread notice, no objections have been received, and during the hearing itself, there were no objectors. Indeed, in connection with the DPPs' Motion for Final Approval, eight class members sent letters in affirmative support of the settlement and attorneys' fees. (ECF No. 996-2, Decl. of Bruce Gerstein at Exs. 2–9.) Accordingly, this factor favors approval of the Settlement.

3. Stage of Proceedings and Amount
of Discovery Completed (Factor 3)

Through the "lens" of the third Girsh factor—the stage of the proceedings and the amount of discovery competed—courts can determine whether counsel had an "adequate appreciation of the merits of the case before negotiating." In re Prudential, 148 F.3d at 319 (quoting G.M. Trucks, 55 F.3d at 813). "[P]ost discovery settlements are more likely to reflect the true value of the claim and be fair." Lazy Oil Co. v. Witco Corp., 166 F.3d 581, 588 (3d Cir. 1999) (citing Bell Atl. v. Bolger, 2 F.3d 1304, 1314 (3d Cir. 1993)).

Here, ten years of active litigation transpired during which extensive discovery was exchanged, depositions were taken, expert reports were obtained and exchanged, and vigorous motion practice was pursued. The parties reached a settlement

In re Suboxone (Buprenorphine Hydrochloride and..., Not Reported in Fed....

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 394 of 482

only after the grant of class certification, the issuance of rulings on Daubert motions, the denial of Defendant's motions for summary judgment, and extensive pretrial preparation. Given this record, I find that the parties had a well-developed appreciation of the merits of the case prior to negotiation.

### 4. Risks of Establishing Liability & Damages (Factors 4 and 5)

The fourth and fifth Girsh factors "survey the potential risks and rewards of proceeding to litigation in order to weigh the likelihood of success against the benefits of an immediate settlement." In re Warfarin, 391 F.3d at 537.

Given Defendant's numerous defenses both as to liability and damages, a favorable outcome was not guaranteed to the DPPs. At the time of the Settlement, trial was merely three and a half weeks away, with numerous legal motions remaining to be decided, many of which could have significantly undermined the DPPs' case.

By the same token, I note "there is no indication this case was brought in bad faith simply to generate attorneys' fees, or that the case [was] too weak to succeed under most circumstances." Reibstein v. Rite Aid Corp., 761 F. Supp. 2d 241, 253 (E.D. Pa. 2011). Indeed, the DPPs successfully thwarted Defendant's extensive motion for summary judgment. Ultimately, the Settlement provided the certainty of a $385 million immediate recovery without subjecting the DPPs to the rigors of a difficult trial. As such, I find these factors weigh in favor of the Settlement.

### 5. Likelihood of Obtaining and Keeping Class Certification Through Trial (Factor 6)

The sixth Girsh factor "measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial" in light of the fact that "the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the class action." In re Warfarin, 391 F. 3d at 537 (internal quotations & citation omitted). Class certification is tenuous, as a "district court retains the authority to decertify or modify a class at any time during the litigation if it proves to be unmanageable." Id. (citation omitted).

**\*8** Here, the DPPs were certified as a class, and that decision was unanimously affirmed by the Third Circuit. See In re Suboxone, 967 F.3d 264 (3d Cir. 2020). There was no reason to believe that this case would not sustain its class certification through trial. As such, this factor does not weigh either for or against the Settlement.

### 6. Ability of Defendants to Withstand a Greater Judgment (Factor 7)

The ability of the Defendants to withstand a greater judgment generally only comes into play when "a settlement in a given case is less than would ordinarily be awarded but the defendant's financial circumstances do not permit a greater settlement." Reibstein, 761 F. Supp. 2d at 254. The Third Circuit has noted that simply because a defendant "could afford to pay more does not mean that it is obligated to pay any more than what the [class members] are entitled to under the theories of liability that existed at the time the settlement was reached." In re Warfarin, 391 F.3d at 538.

Here, although the DPPs did not know precisely what Defendant's financial situation was, it was nonetheless a factor for consideration in the settlement negotiations. Defendant already had a $600 million judgment against it by the Department of Justice and had recently reached settlements of $102.5 million with forty-two States' Attorneys General and $30 million with a class of end payors. In addition, Defendant was facing other litigation in the state courts. The DPPs negotiated a settlement that provided for immediate financial recovery, which eliminated the risk that they would not be able to collect on a judgment following a trial.

### 7. Range of Reasonableness of Settlement Fund in Light of Best Possible Recovery and to a Possible Recovery in Light of All Attendant Risks of Litigation (Factors 8 & 9)

"The last two Girsh factors evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case. The factors test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." In re Warfarin, 391 F.3d at 538 (citations omitted). In order to assess the reasonableness of a settlement in cases seeking primarily monetary relief, "the present value of the damages plaintiffs would likely

Case 4:21-cv-00196-MWB   Document 249-1   Filed 10/07/25   Page 395 of 482

In re Suboxone (Buprenorphine Hydrochloride and..., Not Reported in Fed....

recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement." In re Prudential, 148 F.3d at 322 (quoting G.M. Trucks, 55 F.3d at 806 (further quotations omitted)). In conducting this evaluation, courts recognize "that settlement represents a compromise in which the highest hopes for recovery are yielded in exchange for certainty and resolution and [courts should] guard against demanding too large a settlement based on the court's view of the merits of the litigation." In re Aetna Sec. Litig., No. MDL 1219, 2001 WL 20928, at *11 (E.D. Pa. Jan. 4, 2001). "The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved. The percentage recovery, rather must represent a material percentage recovery to plaintiff in light of all the risks considered under Girsh." In re Cendant Corp. Sec. Litig., 109 F. Supp. 2d 235, 263 (D.N.J. 2000) (citations omitted) (internal quotations marks omitted), aff'd, 264 F.3d 201 (3d Cir. 2001).

**\*9** The settlement here is reasonable in light of the best possible recovery. The DPPs' expert, Dr. Russell L. Lamb, estimated the DPPs damages in two scenarios: (1) if the DPPs proved that Defendant had delayed the entry of generics, the damages were $3,157,444,422, and (2) if the DPPs lost on their generic delay theory, the damages were $2,643,264,162. The total DPP settlement of $385 million is approximately twelve to fourteen percent of these potential recovery situations. Courts have approved settlements in and around this range. See In re Linerboard Antitrust Litigation, 321 F. Supp. 2d 619, 633 (E.D. Pa 2004) (citing in part In re Domestic Air Transp. Antitrust Litig., 148 F.R.D. 297, 325 (N.D. Ga. 1993) (approving a settlement in the appropriate amount of 12.7 to 15.3 percent of the estimated $2 billion minimum possible trebled recovery); Erie Forge and Steel, Inc. v. Cyprus Minerals Co., No. 94-cv-404, 1994 WL 485803 (W.D. Pa. Dec. 23, 1996) (approving settlement of $3.6 million where plaintiffs' expert estimated damages of $44.4 million); Fox v. Integra Financial Corp., No. 90-cv-1504 (W.D. Pa. July 9, 1996) (approving a settlement of $6.5 million where plaintiffs' best estimate of provable damages was $33 million); In re Four Seasons Sec. Litig., 58 F.R.D. 19, 36–37 (W.D. Okla. 1972) ($8 million settlement approved although claims exceeded $100 million)).

The settlement becomes even more favorable when considered against the attendant risks of litigation. The settlement was achieved after ten years of litigation.

Defendant had competing economic experts who would have challenged the DPPs' damages calculations on multiple potentially viable theories. "After considering the present-day-value of money, the likelihood that the class would recover less than its maximum actual damages, all of the attendant risks of litigation, and the interests in resolution, such a recovery is well within the range of reasonableness." Jackson v. Wells Fargo Bank, N.A., 136 F. Supp. 3d 687, 706 (W.D. Pa. 2015); see also In re NFL, 821 F.3d 410, 440 (3d Cir. 2016) (holding that, in considering the eighth and ninth Girsh factors, "we must take seriously the litigation risks inherent in pressing forward with the case" including the possibility that litigation could leave class members with "no recovery at all").

Taking all of this into consideration, I find that the eighth and ninth Girsh factors weigh in favor of approval of the Settlement.

### 8. Summary of the *Girsh* Factors

In sum, all of the Girsh factors favor approval of the DPP Settlement. Although the Girsh factors are simply a guide, I find that, under these considerations, the Settlement is fair and reasonable.

### C. The *Prudential* Factors

The Prudential factors involve multiple additional considerations, including: (1) "the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages"; (2) "the existence and probable outcome of claims by other classes and subclasses"; (3) "the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved— for other claimants"; (4) "whether class or subclass members are accorded the right to opt out of the settlement"; (5) "whether any provisions for attorneys' fees are reasonable"; and (6) "whether the procedure for processing individual claims under the settlement is fair and reasonable." In re Prudential, 148 F.3d at 323. Only the Prudential factors relevant to the litigation in question need be addressed. Id. 323–24; In re Cigna-American Specialty Health Admin. Fee

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 396 of 482

In re Suboxone (Buprenorphine Hydrochloride and..., Not Reported in Fed....

Litig., No. 16-cv-3967, 2019 WL 4082946, at *3 (E.D. Pa. Aug. 29, 2019).

The first factor—maturity of the underlying substantive issues—substantially mirrors Girsh factor three, the stage of the proceedings. Under this factor, the advanced development of the record weighs in favor of approval. See Chakejian v. Equifax Info. Servs., LLC, 275 F.R.D. 201, 215 (E.D. Pa. 2011) (finding settlement reasonable where underlying substantive issues were "mature in light of the experience of the attorneys, extent of discovery, posture of case, and mediation efforts undertaken."). As oft-repeated, the Settlement here came on the heels of ten years of active litigation during which extensive discovery was exchanged, expert reports were obtained, and vigorous motion practice was pursued. Class Counsel had the benefit of assessing the strength and weaknesses of the case based on this discovery and the Defendants' motions. Moreover, the Settlement resulted from extensive negotiations in which I acted as the mediator. Accordingly, I find that the Settlement was premised on a significantly mature record.

 *10 Factors two and three look at the outcomes of claims by other classes and other claimants. The DOJ had already obtained a $600 million judgment against Defendant based on similar conduct and accompanied by the threat of criminal liability. As part of the consolidated litigation before me, a group of forty-two States' Attorneys General obtained a settlement of $102.5 million and the End Payor Class obtained a settlement of $30 million, leaving the DPPs the sole remaining group. The Settlement here involves an immediate payout of $385 million, more than three times that of the States and more than ten times that of the EPPs. Thus, there do not appear to be any disparities in the success of the settlements obtained by the various claimants.

Factor four considers whether class or subclass members are accorded the right to opt out of the settlement. After the initial certification of the class, class members were provided an opt-out period. Although a second opt-out period was not provided following the Settlement, I find that that class members still retained the right to object to the Settlement and did not do so.

Pursuant to the fifth factor—the reasonableness of attorneys' fees—the Notice Program specifically advised potential Class Members that:

> If the Court gives Final Approval to the settlement, then the Court will be asked to approve reasonable fees and

expenses for the lawyers wo worked on the case and for reimbursement of the litigation expenses they have advanced on behalf of the Class. Class Counsel intend to seek attorneys' fees of up to 33 1/3 % of the Settlement Fund plus court-approved expenses and service awards, including a proportionate share of any accrued interest. If the Court grants Class Counsel's requests, fees and expenses would be deducted from the Settlement Fund. Class Members will not have to pay any attorneys' fees or expenses out of their own pockets.

> Any application by Class Counsel for an award of attorneys' fees, reimbursement of expenses and service awards to Class Representatives will be filed with the Court and made available for download and/or viewing ...

(ECF No. 996-10, p. 8–9.) While the reasonableness of these requested fees is discussed in more detail below, I find—for purposes of approving the fairness of the Settlement—that the notice to the Class Members about the requested fees was reasonable.

Under the fifth factor—the procedure for processing individual claims under the settlement—I find that the process is both fair and reasonable. The Claims Administrator will provide a separate, individualized claim form (the "Claim Form") for each class member. The Claim Form will expressly set forth the Class member's (a) purchases of Suboxone Tablets during the period of June 1, 2012 through March 14, 2013, and (b) purchases of Suboxone Film during the period of September 1, 2012 through July 31, 2015, all calculated based on sales data produced by Defendant during discovery. The Claim Form will also request that the Class member verify the accuracy of the information contained therein and will provide instructions for challenging any figures or computations. If a Class member disputes the information, it may submit its own purchase data pursuant to certain procedures. If it agrees that the information is accurate, it can sign and return the Claim Form. Once the Settlement Administrator completes the processing and calculation of the settlement awards for all timely-filed claims, final recommendations will be submitted to the Court for approval. The Net Settlement Fund will be paid pursuant to the plan of allocation and divided according among all the Direct Purchaser Class members whose claims are approved, based on their purchases. (ECF No. 982-4.)

Overall, the Prudential factors raise no concerns regarding the fairness of the Settlement. The Settlement was reached at mature stage of the litigation, and the Settlement's terms

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 397 of 482

In re Suboxone (Buprenorphine Hydrochloride and..., Not Reported in Fed....

appropriately set forth how to file a claim, how the monies will be distributed, how to object to the Settlement, and what the potential attorneys' fees and costs awards could be. Ultimately, the Settlement is consistent with those obtained by the other claimants in the related actions. As such, I find that the Prudential factors favor approval of the Settlement.

### D. *Baby Products* Direct Benefit Factor

**\*11** The final factor I must consider in my analysis of the Settlement's fairness is "the degree of direct benefit provided to the class." In re Baby Products Antitrust Litig., 708 F.3d 163, 174 (3d Cir. 2013). As noted above, "[i]n making this determination, a district court may consider, among other things, the number of individual awards compared to both the number of claims and the estimated number of class members, the size of the individual awards compared to claimants' estimated damages, and the claims process used to determine individual awards." Id.; see also In re Google Inc. Cookie Placement Consumer Privacy Litig., 934 F.3d 316, 329 (3d Cir. 2019).

Here, the number of individual awards is not relevant where, as here, "each class member who submit[s] a valid claim is eligible to receive an individual award." Ward v. Flagship Credit Acceptance LLC, 17-cv-2069, 2020 WL 7599389, at \*22 (E.D. Pa. Feb. 13, 2020). As to the size of the individual awards compared to claimants' damages, the Settlement represents a compromise but still awards each class member a substantial direct benefit that is immediate and guaranteed. Finally, as set forth above, the claims process used to determine individual words is directly based on each Class member's purchases from Defendant.

### E. Conclusion as to Fairness of the Settlement

In light of the foregoing, I find that the Settlement is fair, reasonable, and adequate. Lending the Settlement the requisite presumption of fairness, I note that all the Girsh factors, the Prudential factors, and the Baby Products direct benefit consideration weigh in favor of approval. Accordingly, I will grant final approval to Settlement.

## V. APPROVAL OF THE PLAN OF ALLOCATION

When assessing proposed plans of allocation, courts use the same standard for determining whether to approve the settlement itself. McDonough v. Toys R Us, Inc., 80 F. Supp. 3d 626, 648 (E.D. Pa. 2015). "Therefore, the proposed plan needs to be fair, reasonable and adequate." Id. (citing In re

Baby Prods., 708 F.3d at 174). "A district court's 'principal obligation' in approving a plan of allocation 'is simply to ensure that the fund distribution is fair and reasonable as to all participants in the fund.' " Sullivan v. DB Investments, Inc., 667 F.3d 273, 326 (3d Cir. 2011) (quoting Walsh v. Great Atl. & Pac. Tea Co., Inc., 726 F.2d 956, 964 (3d Cir. 1983)).

"In general, a plan of allocation that reimburses class members based on the type and extent of their injuries is reasonable." In re Ikon Office Solutions, Inc., Secs. Litig., 194 F.R.D. 166, 184 (E.D. Pa. 2000). Repeatedly, courts have approved of similar plans of allocation. See, e.g., In re Flonase Antitrust Litig., 951 F. Supp. 2d 739, 752 (E.D. Pa. 2013) (approving plan of allocation as fair, reasonable, and adequate where, in antitrust action against brand name drug manufacturer, each class member receives their *pro rata* share of the net settlement fund, based on their share of qualifying purchases of the brand name drug); Bradburn Parent Teacher Store, Inc. v. 3M (Minnesota Mining and Manufacturing Company), 513 F. Supp. 2d 322, 335 (E.D. Pa. 2007) (approving as reasonable a distribution plan that allocated settlement funds to class members based upon their *pro rata* share of the class's total transparent tape purchases during the damage period, net of invoice adjustments and rebates paid as of the date of the settlement); In re Remeron Direct Purchaser Antitrust Litig., No. 03-cv-0085, 2005 WL 3008808, at \*11 (D.N.J. Nov. 9, 2005) ("Plaintiffs propose to allocate the Settlement funds, net of Court approved attorneys' fees, incentive award, and expenses ... in proportion to the overcharge damages incurred by each Class member due to Defendants' alleged conduct in restraint of trade. Such a method of allocating the Net Settlement Fund is inherently reasonable."); see also In re Corel Corp. Inc. Secs. Litig., 293 F. Supp. 2d 484, 493 (E.D. Pa. Jan. 4, 2001) (noting that courts "generally consider plans of allocation that reimburse class members based on the type and extent of their injuries to be reasonable.").

**\*12** Here, the proposed Plan of Allocation is fair, reasonable, and adequate as it provides a straightforward method for determining each Class Member's *pro rata* share of the Net Settlement Fund based upon purchases of branded Suboxone Tablets and Film. As set forth in more detail above, Direct Purchaser Class members need only complete a form with information about their purchases of Suboxone Tablets and Film for specific periods of time. Based upon Dr. Lamb's damages calculations, the Allocation Plan allocates 4.78% of the Net Settlement Fund to the Class's purchases of Suboxone

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 398 of 482

In re Suboxone (Buprenorphine Hydrochloride and..., Not Reported in Fed....

Tablets and 95.22% of the Net Settlement Fund to the Class's purchases of Suboxone Film. (ECF No. 982-4 at 5–6.)

To calculate the *pro rata* share for each claimant, the Claims Administrator, working with Dr. Lamb, will take (a) each Claimant's weighted combined total net purchases of Suboxone Tablets from Defendant from January 1, 2012 through March 13, 2013, and Suboxone Film from Defendant from September 1, 2012 through July 31, 2015; (b) remove any purchases for which the rights to damages in this litigation have been assigned by agreement; and divide it by (c) the weighted combined total purchases by all Claimants who timely submit valid, accepted Claim Forms of Suboxone Tablets from Defendant from January 1, 2012 through March 14, 2013 and Suboxone Film from Defendant from September 1, 2012 through July 31, 2015. Using data produced in discovery, Dr. Lamb has already performed a preliminary computation of the percentage shares of the Net Settlement Fund due to each Class member. Should any Class member fail to submit a claim or should any Claimant document and submit an alternative amount of purchases that is approved by the Claims Administrator, the Claimant's shares will be recalculated accordingly. (Id. at 7.)

Upon Court approval of the final report and declaration of the Claims Administrator, the Claims Administrator shall issue, a check or wire payable to each Claimant who has submitted a complete and valid Claim Form, including to each Claimant that filed a late but approved claim. Subject to further Court order, any monies that remain unclaimed form the Net Settlement Fund after the initial distribution shall be distributed to Claimants in an additional distribution on the basis of the same calculations of the Claimants' *pro rata* weighted combined total of Suboxone Tablets and Suboxone Film Purchases. To the extent residual funds cannot be feasibly paid out, Plaintiffs' Counsel shall seek *cy pres* distributions, although that scenario is unlikely. (Id. at 11.)

As no Class Member has objected to the proposed Plan of Allocation, and as the Plan seeks to distribute the entire amount of the Net Settlement Fund to Class Members, I will approve. It.

## VI. MOTION FOR ATTORNEYS' FEES, LITIGATION EXPENSES, AND INCENTIVE AWARDS

The final portion of my review of the Settlement requires consideration of the DPPs' Motion for (1) an award of attorneys' fees, (2) reimbursement of litigation expenses, and (3) incentive awards for the class representatives.

### A. **Attorneys' Fees**

The DPPs seek an award of attorneys' fees in the amount of $120,645,687.56 plus accrued interest—approximately thirty-two percent of the Class Settlement Fund minus reimbursed expenses and service awards to class representatives—on behalf of Class Counsel.

Under Federal Rule of Civil Procedure 23(h), at the conclusion of a successful class action, class counsel may apply to a court for an award of attorneys' fees. The amount of an attorneys' fee award "is within the district court's discretion so long as it employs correct standards and procedures and makes finding of fact not clearly erroneous[.]" Sullivan v. DB Invs., Inc., 667 F.3d 273, 329 (3d Cir. 2011) (en banc) (internal quotation marks omitted). " '[A] private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation, including attorneys' fees.' " In re Cendant, 404 F.3d at 187 (quoting G.M. Trucks, 55 F.3d 768, 820 n.39).

**\*13** In assessing attorneys' fees, courts typically apply either the percentage-of-recovery method or the lodestar method. The percentage-of-recovery method is generally favored in common fund cases, such as the one here, because it allows courts to award fees from the fund "in a manner that rewards counsel for success and penalizes it for its failure." In re Prudential, 148 F.3d at 333 (internal quotations omitted); see also In re Rite Aid Sec. Litig., 396 F.3d 294, 300 (3d Cir. 2005) (finding that the "percentage of the fund" method is the proper method for calculating attorneys' fees in common fund class actions in this Circuit.); Kirsch v. Delta Dental of New Jersey, 534 F. App'x 113, 115 (3d Cir. 2013) ("The percentage of recovery method is generally favored in common fund cases ...") (quotations omitted).

In Gunter v. Ridgewood Energy Corp., 223 F.3d 190 (3d Cir. 1990), the Third Circuit directed that, when analyzing a fee award in a common fund case, a district court must consider several factors, including:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 399 of 482

In re Suboxone (Buprenorphine Hydrochloride and..., Not Reported in Fed....

requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

Id. at 195 n. 1. This list was not intended to be exhaustive. Id.

In In re Prudential, the Third Circuit identified three other factors that may be relevant and important to consider: (1) the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to the efforts of other groups, such as government agencies conducting investigations, (2) the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained, and (3) any "innovative" terms of settlement. 148 F.3d at 336–40.

Ultimately, in reviewing an attorneys' fees award in a class action settlement, a district court should consider the Gunter factors, the Prudential factors, and any other factors that are useful and relevant with respect to the particular facts of the case. The fee award reasonableness factors "need not be applied in a formulaic way" because each case is different, "and in certain cases, one factor may outweigh the rest." In re Rite Aid, 396 F.3d at 301 (quoting Gunter, 223 F.3d at 195 n.1). In cases involving extremely large settlement awards, district courts may give some of these factors less weight in evaluating a fee award. See In re Cendant Corp. Litig., 264 F.3d 201, 283–84 (3d Cir. 2001); In re Prudential, 148 F.3d at 339. What remains important is that, in all cases, the district court "engage in robust assessments of the fee award reasonableness factors," In re Rite Aid, 396 F.3d at 302, recognizing "an especially acute need for close judicial scrutiny of fee arrangements in class action settlements." In re Cendant Corp. PRIDES Litig., 243 F.3d 722, 730 (3d Cir. 2001) (internal quotations omitted); see also In re AT&T Corp., 455 F.3d 160, 165–66 (3d Cir. 2006).

Once all of the Gunter and Prudential factors have been considered, the Third Circuit has suggested that it is "sensible" for district courts to "cross-check" the percentage fee award against the "lodestar" method. In re Prudential, 148 F.3d at 333. More specifically, the district court should apply the percentage-of-recovery method and then do "an abridged lodestar analysis"—multiplying the number of

hours reasonably worked on a case by a reasonable billing rate —and compare it against the percentage-of-recovery method. In re Rite Aid, 396 F.3d at 305–06. In doing so, the court can ensure that the percentage-of-recovery method does not yield too high or low of an award. Id. at 306.

**\*14** With these standards in mind, I consider each of the Gunter and Prudential factors and then cross-check the percentage-of-recovery amount against a lodestar analysis to provide an overall assessment of the reasonableness of the requested attorneys' fees.

### 1. Gunter/Prudential Factors

*a. Size of the Fund Created & Number of Persons Benefitted*

The Settlement Agreement establishes a total recovery of $385 million, from which administrative expenses, attorneys' fees, and costs must be paid. See Jackson v. Wells Fargo Bank, N.A., 136 F. Supp. 3d 687, 713 (W.D. Pa. 2015) (noting that "size of the fund" should include attorneys' fees, and administration expenses); Lake Forest Partners, L.P. v. Sprint Commc'ns Co. L.P., No. 12-cv-00999, 2013 WL 3048919, at *2 (W.D. Pa. June 17, 2013) (the size of the fund should include the "separate payment of attorney's fees and expenses, and the expenses of administration") (citing Boeing Co. v. Van Gemert, 444 U.S. 472, 479 (1980)).

Class Counsels' requested fees in this case represent thirty-two percent [3] of the total recovery—a percentage which is well within the range of reasonable fees, on a percentage basis, in the Third Circuit. See, e.g., Esslinger v. HSBC Bank Nevada, No. 10-cv-3213, 2012 WL 5866074, at *12 (thirty percent fee award reasonable considering size of the fund); In re Processed Egg Prods. Antitrust Litig., No. 08–md-2002, 2012 WL 5467530, at *6 (E.D. Pa. Nov. 9, 2012) (approving a thirty percent fee award for $25,000,00.00 settlement); In re Flonase Antitrust Litig., 291 F.R.D. 93, 104 (E.D. Pa. 2013) (citing cases and remarking that "[a] one-third fee award is standard in complex antitrust cases of this kind" and "is consistent with awards in other complex antitrust actions involving the pharmaceutical industry") (quotations omitted). Accordingly, this factor weighs in favor of finding the fee request reasonable.

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 400 of 482

In re Suboxone (Buprehorphine Hydrochloride and..., Not Reported in Fed....

### b. Presence or Absence of Substantial Objections

The Notice, mailed on November 20, 2023, specifically advised Class Members that Class Counsel would request an award of attorneys' fees of up to one-third of the total amount of the Settlement funds, plus costs, all of which would be paid from the Settlement funds. Despite this Notice, no class member filed an objection prior to the deadline of January 12, 2024.

### c. Skill and Efficiency of Attorneys' Involved

The Third Circuit has explained that the goal of the percentage fee-award device is to ensure "that competent counsel continue to undertake risky, complex, and novel litigation." Gunter, 223 F.3d at 198 (quotations omitted). "The single clearest factor reflecting the quality of class counsels' services to the class are the results obtained." Cullen v. Whitman Med. Corp., 197 F.R.D. 136, 149 (E.D. Pa. 2000) (quotations omitted).

As repeatedly discussed above, both in regard to class certification and with respect to the fairness of the Settlement, Class Counsel are skilled and effective class action litigators that have obtained a highly favorable settlement in an extremely complex case litigated over the course of ten years. I need not reiterate those same considerations again here. This factor therefore supports a thirty-two percent attorney fee award.

### d. Complexity and Duration of the Litigation

**\*15** "[C]omplex and/or novel legal issues, extensive discovery, acrimonious litigation, and tens of thousands of hours spent on the class by class counsel" are factors which "increase the complexity of class litigation." In re Cendant Corp. PRIDES, 243 F.3d at 741. All of those factors favor the requested fee award here.

The legal issues involved here were complex, implicating a novel theory of a product hop antitrust scheme. Various groups of plaintiffs proceeded against Defendant. Discovery was extensive and far-reaching, involving certification, fact, and expert discovery. The case was hard-fought on both sides, with multiple, highly-contested motions, including motions to dismiss, discovery motions, certification motions, Daubert

motions, and motions for summary judgment. Finally, after more than ten years of litigation, and many months of intensive mediation, the case reached a settlement.

In short, the litigation has been more than sufficiently lengthy and complex to justify the requested attorneys' fees.

### e. Risk of Nonpayment

The risk of nonpayment in this matter was not negligible. Class Counsel began this litigation in 2013 on a contingent fee basis with no up front retainer fees or allowance of expenses. See In re Flonase, 291 F.R.D. at 104 ("[A]s a contingent fee case, counsel faced a risk of nonpayment in the event of an unsuccessful trial. Throughout this lengthy litigation, Class Counsel have not received any payment. This factor supports approval of the requested fee."). Over the next ten years, Class Counsel devoted extensive amounts of time and resources to litigating this case, all while pursuing complex legal theories which brought with them no guarantee of recovery at trial. Even in the event of recovery, the DPPs faced the substantial likelihood of challenge on appeal and a potential bankruptcy filing by Defendant. Given Class Counsels' diligent pursuit of this case for more than a decade with significant risk and no immediate financial reward in sight, I find that this factor weighs in favor of the requested fee award.

### f. Amount of Time Devoted to the Case by Counsel

According to the Declarations submitted in support of the Motion for Attorneys' Fees, Class Counsel has spent approximately 112,000 hours prosecuting of this case and advanced approximately $7.5 million, all without any guarantee of payment. (Gerstein Decl., ECF No. 992-2, ¶ 83.) Such expenditure of time at such great risk warrants the requested thirty-two percent fee award. See In re Ikon Office Solutions, Inc., Secs. Litig., 194 F.R.D. 166, 194 (E.D. Pa. 2000) (granting a thirty fee request because "[c]ounsel expended more than 45,000 hours on this case and paid out expenses of more than $3 million with no guarantee of recovery" and the case presented "the legal obstacles of establishing scienter, damages, causation, and the like."); Cullen, 197 F.R.D. at 149–50 (finding that counsel's expenditure of 3,899.84 hours on litigation represented a "substantial commitment to this litigation" that warranted a counsel fee of thirty-three and a third percent of the settlement fund); Wallace v. Powell, 288 F.R.D. 347, 375 (M.D. Pa.

2012) (finding that counsel's expenditure of 34,900.48 hours on prosecuting the matter reflected a "substantial commitment to this litigation" and "the complexity of Plaintiffs' claims").

### g. Awards in Similar Cases

**\*16** "While there is no benchmark for the percentage of fees to be awarded in common fund cases, the Third Circuit has noted that reasonable fee awards in percentage-of-recovery cases generally range from nineteen to forty-five percent of the common fund." Stevens v. SEI Invs. Co., No. 18-cv-4205, 2020 WL 996418, at \*12 (E.D. Pa. Feb. 26, 2020) (citing G.M. Trucks, 55 F.3d at 822). Courts have consistently approved such awards. See, e.g., Myers v. Jani-King of Philadelphia, Inc., No. 09-cv-1738, 2019 WL 4034736, at \*11 (E.D. Pa. Aug. 26, 2019) (citing cases and noting that "the requested fee of one-third (1/3) of the settlement amount is reasonable in comparison to awards in other cases."); In re Fasteners Antitrust Litig., No. 08-md-1912, 2014 WL 296954, at \*7 (E.D. Pa. Jan. 27, 2014) ("Co-Lead Counsel's request for one third of the settlement fund is consistent with other direct purchaser antitrust actions") (citing cases); Stagi v. Nat'l R.R. Passenger Corp., 880 F. Supp. 2d 564, 571 (E.D. Pa. 2012) (noting that this District's fee awards generally range between nineteen and forty-five percent of the common fund); In re Merck & Co., Inc. Vytorin Erisa Litig., No. 08-cv-285, 2010 WL 547613, at \*11 (D.N.J. Feb. 9, 2010) ("review of 289 settlements demonstrates "average attorney's fee percentage [of] 31.71% with a median value that turns out to be one-third") (quoting In re Remeron Direct Purchaser Antitrust Litig., No. 03-cv-0085, 2005 WL 3008808, at \*15 (D.N.J. Nov. 9, 2005)); Nichols v. SmithKline Beecham Corp., No. 00-cv-6222. 2005 WL 950616, at \*24 (E.D. Pa. Apr. 22, 2005) (approving thirty percent fee of the $65 million settlement in pharmaceutical antitrust class action); In re Linerboard Antitrust Litig., No. MDL 1261, 2004 WL 1221350, at \*16 (E.D. Pa. June 2, 2004) (approving thirty percent fee of a $202 million settlement in an antitrust class action).

Given the magnitude of this case, the efforts of Class Counsel, the risks borne, and the positive outcome, I find that the requested fee of thirty-two percent recovery remains consistent with the awarded fees in other, similar cases.

### h. Value of Benefits Accruing to Class Members Attributable to the Efforts of Class Counsel as Opposed to the Efforts of Other Groups, Such as Government Agencies

A significant factor to consider is whether Class Counsel was aided by a government investigation. In re AT&T Corp., 455 F.3d 160, 173 (3d Cir. 2005). "Allowing private counsel to receive fees based on the benefits created by public agencies would undermine the equitable principles which underline the concept of the common fund, and would create an incentive for plaintiffs[s] attorneys to 'minimize the costs of failure ... by free riding on the monitoring efforts of others.' " In re Prudential, 148 F.3d at 337 (further quotations omitted).

Here, the DPPs filed suit in December 2012, which significantly preceded the FDA's referral of Defendant's conduct to the Federal Trade Commission, subsequent FTC investigation, and criminal prosecutions by the Department of Justice. Prior to these governmental suits, the DPPs had already engaged in their own investigation and developed their own antitrust theories regarding Defendant's actions. Class Counsel were subsequently able to coordinate discovery and the exchange of information with the End Payor Class and the States' Attorneys General.

Moreover, the involvement of the federal government and its subsequent settlements with Defendant put the financial viability of Defendant, and thus the ability of the Direct Purchaser Class to recover anything, in question. Nonetheless, Class Counsel pushed forwarded and litigated Daubert and summary judgment motions. Any benefit gained from government agency involvement paled in comparison to the efforts of Class Counsel.

### i. The Percentage Fee that Would Have Been Negotiated Had the Case Been Subject to a Private Contingent Fee Agreement at the Time Counsel Was Retained

"In making a common benefit award, we must try to ascertain what the market would pay for the attorneys' efforts. That is, we must consider 'the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained.' " In re Diet Drugs Prods. Liab. Litig., 553 F. Supp. 2d 442, 482 (E.D. Pa. 2008) (quoting In re AT & T Corp., 455 F.3d 160, 165(3d Cir. 2006)). While not an easy calculation, it is an important exercise because "the goal of the fee setting process [is] to

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 402 of 482

In re Suboxone (Buprenorphine Hydrochloride and..., Not Reported in Fed....

'determine what the lawyer would receive if he were selling his services in the market rather than being paid by Court Order.' " In re Linerboard Antitrust Litig. ("Linerboard II"), 333 F. Supp. 2d 343, 351 (E.D. Pa. 2004) (quoting In re Continental Ill. Sec. Litig., 962 F.2d 566, 568 (7th Cir. 1992)). "[I]n private contingency fee cases ... plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery. In re Ikon Office Solutions, 194 F.R.D. at 194 (E.D. Pa. 2000); see also In re Remeron Direct Purchaser Antitrust Litig., No. 03-cv-0085, 2005 WL 3008808, at *16 (D.N.J. 2005) ("Attorneys regularly contract for contingent fees between 30% and 40% with their clients in non-class commercial litigation.")

 **\*17** The requested fees here fall squarely within that range, as Class Counsel seeks an award of thirty-two percent of the Settlement Fund. Therefore, this factor supports the requested fees.

### j. Innovative Terms of Settlement

In certain cases, a district court may find that "class counsels' representation and the results achieved [by the settlement agreement] were 'nothing short of remarkable.' " In re Prudential, 148 F.3d at 339 (quotations omitted). Such a finding may be warranted where a settlement involved "innovative" or unique terms. Id. (describing the findings of the lower court regarding plaintiffs' counsels' work on the settlement, including "the availability of full compensatory relief, the extensive and comprehensive outreach, and the multi-tiered review process designed to ensure fair scoring of claims," among other characteristics).

Nothing in the Settlement here is particularly remarkable or innovative. Accordingly, there is no indication that this factor should bear on an attorney fee award.

### k. Overall Review of the Gunter and Prudential Factors

All of the Gunter and Prudential factors—except one that weighs neither for nor against approval—supports the award of an attorneys' fees in the amount of thirty-two percent of the Settlement. Taking them as a whole, I find that the scale is heavily tipped in favor of the requested attorneys' fee award.

### 2. Cross-Check Against Class Counsels' Lodestar

The Third Circuit has suggested that it is "sensible" for district courts to cross check the percentage fee award against the "lodestar" method. In re Rite Aid, 396 F.3d at 305. The lodestar award is calculated by multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys. Id. The court must then use a multiplier, which is a device that "attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work." Id. at 305–06. "The lodestar cross-check serves the purpose of alerting the trial judge that when the multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method, with an eye toward reducing the award." Id. at 306. Even when used as a cross-check, courts should "explain how the application of a multiplier is justified by the facts of a particular case." In re Prudential, 148 F.3d at 340–41.

Here, as noted above, Class Counsel spent approximately 112,000 working on this case, which hours included preparing the initial Complaint and the Consolidated Amended Class Action Complaint, conducting legal research, engaging in extensive discovery, briefing multiple motions or responses to motions for summary judgment, pursuing class certification, engaging and working with experts, preparing for trial, and pursuing settlement negotiations and settlement document drafting. In addition, Class Counsel will undoubtedly need to spend additional hours in order to monitor and administer the Settlement and final closing of this case.

Rates for counsel appear to be well within the reasonable range for Class Counsels' experience and for the region. The current hourly rates charged by class counsel take into account position, experience, level, and location, with the highest rate at somewhere between $1550 per hour for co-lead counsel Bruce Gerstein and progressively working downward. Courts have considered similar rates reasonable in the past. Fulton-Green v. Accolade, Inc., No. 18-cv-274, 2019 WL 4677954, at *12 (E.D. Pa. Sept. 23, 2019) (approving class counsel's rates that ranged from $202 to $975 per hour); In re Viropharma Inc., Sec. Litig., No. 12-cv-2714, 2016 WL 312108, at *18 (E.D. Pa. Jan. 25, 2016) ("The hourly billing rates of all of Plaintiff's Counsel range from $610 to $925 for partners, $475 to $750 for of counsels, and $350 to $700 for other attorneys.")a.

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 403 of 482

In re Suboxone (Buprenorphine Hydrochloride and..., Not Reported in Fed....

**\*18**  According to counsel, taking the lodestar yields a number of $80,094,400.22. Where there has been a class settlement, this lodestar "is usually multiplied by a factor to reflect the degree of success, the risk of non-payment the attorneys faced and perhaps the delay in payment that they encountered." Brown v. Esmor Corr. Servs., No. 98-cv-1282, 2005 WL 1917869, at \*13 (D.N.J. Aug. 10, 2005); see also In re Prudential, 148 F.3d 283, 340 (3d Cir. 1998) ("Multipliers may reflect the risks of nonrecovery facing counsel, may serve as an incentive for counsel to undertake socially beneficial litigation, or may reward counsel for an extraordinary result."). The Third Circuit has recognized that lodestar multipliers from one to four "are frequently awarded" in class cases. In re Prudential, 148 F.3d at 341 (citing 3 Herbert Newberg & Albert Conte, Newberg on Class Actions § 14.03 at 14-5 (3d ed. 1992)).

Here, Class Counsel's requested fees equate to a lodestar multiplier of 1.5, which is well within the accepted range in the Third Circuit.

### 3. Conclusion as to Attorneys' Fees

Having thoroughly considered all of the Gunter and Prudential factors and having cross-checked the requested fee against the lodestar amount, I find nothing that would warrant denying or reducing the fee requested by Class Counsel. Indeed, by all measures, the requested fee is fair, reasonable, and commensurate with the skill of the attorneys, the amount of work they expended on this complicated litigation, and the results they achieved. Accordingly, I will grant attorneys' fees in the amount of $120,645,687.56 plus accrued interest.

### B. Reasonable Litigation Expenses

"Counsel for a class action is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the class action." In re Safety Components, Inc. Sec. Litig., 166 F. Supp. 2d 72, 108 (D.N.J. 2001). The court must consider whether the expenses were adequately documented and reasonably and appropriately incurred in the prosecution of the case. Demmick v. Cellco P'ship, No. 06-cv-2163, 2015 WL 13646311, at \*4 (D.N.J. Apr. 30, 2015).

According to the Declarations submitted by Class Counsel, the EPPs have incurred $7,532,226.36 for expenses advanced

to prosecute the litigation since December 2012. These expenses included local counsel fees, deposition and hearing vendors, document databases and review platforms, process servers/subpoena costs, experts, data, mediation, trial support, and costs of notice of class certification. (Gerstein Decl., ECF No. 992-2, ¶¶ 83–84.) Class Counsel has broken down the fees both by category and by which law firm incurred them. Finding that these expenses were appropriately incurred in the prosecution of the class action, I award Class Counsel the requested costs in the amount of $7,532,226.36.

### C. Class Representative Incentive Awards

Incentive awards are "not uncommon in class action litigation and particularly where, as here, a common fund has been created for the benefit of the entire class." McDonough v. Toys R Us, Inc., 80 F. Supp. 3d 626, 665 (E.D. Pa. 2015) (quotations omitted). Generally, "[c]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." Cullen v. Whitman Med. Corp., 197 F.R.D. 136, 145 (E.D. Pa. 2000) (quotation omitted); see also First State Orthopaedics v. Concentra, Inc., 534 F. Supp. 2d 500, 524–25 (E.D. Pa. 2007) (citing Nichols v. SmithKline Beecham Corp., No. 00-cv-6222, 2005 WL 950616, at \*24 (E.D. Pa. Apr. 22, 2005); Godshall v. Franklin Mint Co., No. 01-cv-5639, 2004 WL 2745890 (E.D. Pa. Dec. 1, 2004)). Factors to be considered when deciding to give incentive awards include "the risk to the plaintiff in commencing litigation, both financially and otherwise; the notoriety and/or personal difficulties encountered by the representative plaintiff; the extent of the plaintiff's personal involvement in the lawsuit in terms of discovery responsibilities and/or testimony at depositions or trial; the duration of the litigation; and the plaintiff's personal benefit (or lack thereof) purely in her capacity as a member of the class." McGee v. Ann's Choice, Inc., No. 12-cv-2664, 2014 WL 2514582, at \*3 (E.D. Pa. June 4, 2014) (citing In re Plastic Tableware Antitrust Litig., No. 94-cv-3564, 1995 WL 723175, at \*2 (E.D. Pa. Dec. 4, 1995)).

**\*19**  Here, Class Counsel requests incentive awards in the amount of $100,000 for each of the three DPP representatives for their efforts to date. According to Class Counsel, each of these representatives—Burlington Drug Company ("BDC"), Rochester Drug Co-Operative ("RDC"), and Meijer, inc. and Meijer Distribution, Inc. ("Meijer")— assisted greatly in the prosecution of this case by filing suit on behalf of the DPP Class and undertaking all responsibilities involved in being a named plaintiff, including monitoring the progress of the

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 404 of 482

In re Suboxone (Buprenorphine Hydrochloride and..., Not Reported in Fed....

case and responding to discovery requests. According to Class Counsel, each class representative executed broad document searches and collections that required time and effort by their employees. Each of the class representatives was also deposed, and they continued to expend time and effort over more than a decade.

As noted by the DPPs, these requested incentive awards fall in line with those that have been approved in other cases. See, e.g., King Drug Co. of Florence, Inc. v. Cephalon, Inc., No. 06-cv-1797, 2015 WL 12843830, at *6 (E.D. Pa. Oct. 15, 2015) (approving $100,000 incentive award for four class representatives, and $50,000 incentive awards for two other class representatives); In re Domestic Drywall Antitrust Litig., No. 13-md-2437, 2018 WL 3439454, at *20 (E.D. July 17, 2018) (approving incentive awards to the four named Plaintiffs in the amount of $50,000); Marchbanks Truck Serv. v. Comdata Network, Inc., No. 07-cv-1078, 2014 WL 12738907, at *3–4 (E.D. Pa. July 14, 2014) (awarding incentives in the amount of $150,000 to one class representative, $75,000 each to two others, and $15,000 to the fourth); In re Opana ER Antitrust Litig., No. 14-cv-10150, ECF No. 1085 (N.D. Ill. Nov. 3, 2022) at ¶ 16 (awarding $150,000 each to two class representatives).

For these reasons, I will grant the requested incentive awards of $100,000 to each of the Direct Purchaser Plaintiffs, including BDC, RDC, and Meijer, for a total of $300,000 in incentive payments.

**VII. CONCLUSION**

In light of the foregoing, I will approve the Direct Purchaser Class Settlement and Plan of Allocation. In addition, I will: (a) award Direct Purchaser Class Counsel attorneys' fees in the amount of $120,645,687.56, plus accumulated interest; (b) reimburse Class Counsel $7,532,226.36 in litigation costs and expenses; and (c) award each of the Direct Purchaser Plaintiffs $100,000 (for a total of $300,000) to be paid from the Class Settlement Fund.

An appropriate Order follows.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 815503

---

**Footnotes**

1    The alleged antitrust scheme at issue is multi-faceted and explained at length in my Opinion regarding the denial of Defendant's Motion for Summary Judgment on liability in In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litigation, 622 F. Supp. 3d 22, 35–45 (E.D. Pa. 2022). I incorporate these facts by reference here.

2    Class Counsel includes attorneys from nine firms including Gerwin Gerstein & Fisher LLP, Faruqi & Faruqi LLP, Hagens Berman Sobol & Shapiro LLP, Berger Montague PC, Odom & Des Roches, LLC, Smith Segura Raphael & Leger LLP, Taus Cebulash & Landau LLP, the Radice Law Firm PC, and Sperling & Slater LLC (hereinafter, "Class Counsel").

3    Class Counsel's initial Motion for Attorneys' Fees sought 33 1/3 % of the Net Settlement Fund. By way of a supplemental submission, Class Counsel lowered their request to 32% of the Net Settlement Fund.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2002 WL 1773035
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Carolyn THOMAS

v.

NCO FINANCIAL SYSTEMS, INC.

No. CIV.A. 00–5118.
|
July 31, 2002.

## Synopsis

Debtor brought action against debt collector alleging violation of Fair Debt Collection Practices Act (FDCPA). Parties filed a joint motion for class certification of settlement class and preliminary approval of settlement and notice to class. The District Court, Waldman, J., held that: (1) prospective class of 2.2 million persons was sufficiently numerous to satisfy numerosity requirement; (2) commonality requirement was satisfied; (3) typicality requirement was satisfied; (4) attorneys did not satisfy adequacy of representation requirement; (5) predomination requirement was satisfied; (6) superiority requirement was not satisfied; and (7) proposed settlement was within range of possible approval.

Motion denied.

## MEMORANDUM

WALDMAN, J.

### I. Introduction

*1 Plaintiff has asserted claims under the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692 et seq. ("FDCPA"). Presently before the court is the parties' Joint Motion for Class Certification of a Settlement Class and Preliminary Approval of the Settlement and Notice to Class. The parties seek provisional certification of a settlement class, conditional certification of plaintiff as class representative and his counsel as class counsel, preliminary approval of a proposed settlement, and approval of their proffered notice of the class action and proposed settlement.

The parties seek to certify a settlement class defined as "all persons in the United States who incurred a debt primarily for personal, family, or household purposes (other than officers, directors and employees of NCO) which was previously owned or serviced by Commercial Financial Services ("CFS"), and which was reported by NCO to one or more credit reporting agencies" at any time "between October 10, 1999 and the date of entry of the Preliminary Approval Order."

Plaintiff alleges that during the class period defendant routinely and deliberately changed the actual charge-off date or date of last activity to a later date or failed to report any date of last activity when reporting information to credit bureaus for the purpose of collecting debts. Plaintiff alleges that defendant reported the debt in its own name rather than the name of the original creditor, thereby causing confusion as to the source of the debt and its date of origin. By so doing, defendant caused the debt to continue to appear on the credit reports for plaintiff and class members beyond the seven-year period permitted law. See 15 U.S.C. § 1681c. Plaintiff asserts that the practices employed by defendant were false, deceptive and misleading in violation of the FDCPA. See 15 U.S.C. § 1692e.

NCO is a Pennsylvania corporation with its principal place of business in Fort Washington. It is the world's largest provider of accounts receivable collection services and serves clients throughout the United States. Most of the company's accounts receivable services have focused on recovery of delinquent and bad debt accounts, primarily in the financial services, health care, education and telecommunication sectors. The parties represent that approximately 2.2 million persons qualify as members of the proposed class. For purposes of the class action damage cap in 15 U.S.C. § 1692k(a)(2)(B), defendant's net worth does not exceed $8,000,000.

### II. Certification of Settlement Class

Certification of class actions is governed by Fed.R.Civ.P. 23(a) which requires that the following factors be satisfied:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and,

(4) the representative parties will fairly and adequately protect the interests of the class.

**\*2** A plaintiff must also satisfy one of the requirements of subsection (b) of Rule 23. The parties have moved for certification under Rule 23(b)(3) which requires the court to find that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

The fact of settlement, of course, is also relevant to a class certification. When a court is asked to certify only a settlement class, it logically follows that considerations pertinent to the conduct of trial are less significant. See *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 619–20, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

The burden is ordinarily on the plaintiff to demonstrate that a class should be certified. See *Davis v. Romney,* 490 F.2d 1360, 1366 (3d Cir.1974). When deciding a motion for class certification, however, the court does not pass upon the ultimate merits of the plaintiff's claims. See *Eisen v. Carlisle & Jacqueline,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

*Numerosity*

Rule 23(a)(1) permits class action treatment only when "the class is so numerous that joinder of all class members is impracticable." There is not a minimum number which automatically satisfies the numerosity requirement and plaintiff does not have to allege the exact identity or number of the proposed class members. See *Williams v. Empire Funding Corp.,* 183 F.R.D. 428, 437–38 (E.D.Pa.1998); *Dirks v. Clayton Brokerage Co. of St. Louis,* 105 F.R.D. 125, 131 (D.Minn.1985). Classes of more than a hundred persons are generally sufficient to satisfy the numerosity requirement. See *Weiss v. York Hospital,* 745 F.2d 786, 809 n. 35 (3d Cir.1984), *cert. denied,* 470 U.S. 1060 (1985); *Williams,* 183 F.R.D. at 437–38. The parties agree that the actions complained of during the class period involve approximately 2.2 million persons. Joinder of all members of the class would clearly be impracticable.

*Commonality*

The court must next determine whether common questions of law and fact exist in the putative class. The commonality requirement is subsumed by the more stringent Rule 23(b)(3) requirement that questions common to the class "predominate over" other questions. See *Amchem Products,* 521 U.S. at 610; *Ralston v. Zats,* 2000 WL 1781590, \*4 (E.D.Pa. Nov.7, 2000); *Strain v. Nutri/System, Inc.,* 1990 WL 209325, \*3 (E.D.Pa. Dec.12, 1990) ("The threshold for commonality under Rule 23(a)(2) is significantly less rigorous than the Rule 23(b)(3) requirement that common questions of law or fact predominate over questions affecting only individual class members").

The named plaintiff need only share one question of law or fact with the prospective class. See *Williams,* 183 F.R.D. at 438. The alleged existence of a common unlawful practice generally satisfies the commonality requirement. See *Ralston,* 2000 WL 1781590, at \*5; *Anderson v. Dep't. of Public Welfare,* 1 F.Supp.2d 456, 461 (E.D.Pa.1998). Plaintiff relies on essentially the same legal predicate and the same practices as would the proposed class. This is sufficient to show commonality.

*Typicality*

**\*3** Under Rule 23(a)(3), the claims of the representative parties must be typical of those of the class they seek to represent. The typicality requirement is satisfied if the plaintiff's claim arises from the same event or course of conduct that gives rise to the claims of other class members and is based on the same legal theory. See *Barnes v. American Tobacco Co.,* 161 F.3d 127, 141 (3d Cir.1998); *Baby Neal v. Casey,* 43 F.3d 48, 57 (3d Cir.1994).

The threshold for establishing typicality is low. See *Zlotnick v. Tie Communications, Inc.,* 123 F.R.D. 189, 193 (E.D.Pa.1988). The term "typical" does not mean "identical." *Eisenberg v. Gagnon,* 766 F.2d 770, 786 (3d Cir.1984). The court must focus on whether the plaintiff's individual circumstances are markedly different or whether the legal theory upon which the claims are based differs from that upon which the claims of the other class members will be based. *Id.* at 786.

Generally, the typicality requirement is satisfied where all claims arise from the same alleged fraudulent scheme. See *In re Prudential Ins. Co. v. America Sales Litig.,* 148 F.3d 283, 312 (3d Cir.1998); *Baby Neal,* 43 F.3d 48, 57 ("cases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy

the typicality requirement irrespective of the varying fact patterns underlying the individual claims"). Like the other class members, plaintiff's claim is predicated on defendant's practice of altering or failing to provide the charge off date and naming itself as the original creditor.

*Adequacy*

The adequacy requirement of Rule 23(a)(4) involves a two-step inquiry. *See In re Prudential,* 148 F.3d 283, 312; *Lewis v. Curtis,* 671 F.2d 779, 788 (3d Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982). First, the court must be satisfied that plaintiff's counsel is qualified, experienced and capable of conducting the proposed class litigation. The court must then determine that there is no conflict of interest between the claims of the class representative and the other members of the proposed class. This requirement overlaps with typicality. *See General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *Torres v. Careercom Corp.,* 1992 WL 245923, *3 (E.D.Pa. Sept.18, 1992).

As discussed above, plaintiff's claim appears to be typical. There is no apparent conflict of interest. No specific information, however, has been provided as to the qualifications and experience of counsel. The entire discussion of this factor consists of a single conclusory statement which reads "Said attorneys have substantial experience in consumer class action litigation." Counsel have not identified any such class action or provided the results thereof, and the court is unable to make the requisite finding from the limited information publicly available. [1]

*Predominance*

**\*4** To certify a class under Rule 23(b)(3), the court must find that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members" and that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

The existence of individual questions of fact does not *per se* preclude class certification. *See Eisenberg,* 766 F.2d at 787. Rather, predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.,* 521 U.S. at 623.

Class certification is generally appropriate where a defendant has engaged in a pattern of uniform activity. *See id.* at 624

(predominance test readily met in cases alleging consumer fraud); *In re Prudential,* 148 F.3d at 314–15 (predominance requirement is satisfied where class member claims arise from a common scheme by defendant). A common question of law predominates, that is whether defendant's practice of changing the charge off date or date of last activity, or not providing a date of last activity, and reporting the debt in its own name violates the FDCPA. Each class member would also have to prove many, if not all, of the same essential facts about defendant's practices with respect to reporting information to credit bureaus for purposes of debt collection.

*Superiority*

This requirement "asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *In re Prudential Ins. Co.,* 148 F.3d at 316 (internal citations omitted). Rule 23(b)(3) identifies four considerations pertinent to this determination: the interest of class members in bringing separate actions; any litigation already commenced by or against class members; the desirability of litigating the claims in the forum; and, the likely difficulties in managing the class action. In cases of this type, the amount of actual damages will rarely be substantial. *See Lake v. First Nationwide Bank,* 156 F.R.D. 615, 626 (E.D.Pa.1994). As there is also a relatively modest cap on statutory damages, class members would have little incentive to prosecute actions individually. *See id.* at 616.[2] Moreover, most prospective class members are likely unaware that their rights have been violated. *See Sledge v. Sands,* 182 F.R.D. 255, 259 (N.D.Ill.1998).

The parties have not addressed the question of whether any other actions have been commenced by prospective class members against defendant. It would seem that this is something which could be determined by NCO's general counsel without undue effort. Since the presumption that even those aware of a viable cause of action would be unlikely to pursue it individually is a significant consideration, this is information which should be presented to the court.

**\*5** The putative class is nationwide. There is no suggestion that the members are disproportionately located in any other forum or region. Defendant maintains its principal office in the Philadelphia suburbs and litigation in this district would clearly be less burdensome for it than litigation elsewhere. Moreover, as certification is sought only for a settlement

class, the only further proceedings contemplated would be in connection with a fairness hearing.

No difficulty in managing the class action is apparent with one significant exception. The number of class members is substantial and they are located throughout the country. It is not clear that appropriate notice could be provided in a manner sufficiently economical to proceed on a class basis. See *Six(6) Mexican Workers v. Arizona Citrus Growers,* 904 F.2d 1301, 1304 (9th Cir.1990) (the " 'manageability' requirement includes consideration of the potential difficulties in notifying class members of the suit").

III. *Preliminary Approval of Settlement and Notice to Class*

The touchstone for approval of a class action settlement is a determination that it is fair, adequate and reasonable. See *Eichenholtz v. Brennan,* 52 F.3d 478, 482 (3d Cir.1995); *In re General Motors Corp. Pick–Up Truck Fuel Tank Prods. Liability Litig.,* 55 F.3d 768, 785 (3d Cir.1994); *Stoetzner v. United States Steel Corp.,* 897 F.2d 115, 118 (3d Cir.1990); *Walsh v. Great Atlantic & Pacific Tea Co.,* 726 F.2d 956, 965 (3d Cir.1983); *Girsh v. Jepson,* 521 F.2d 153, 157 (3d Cir.1975).

In evaluating a settlement for preliminary approval, the court need not reach any ultimate conclusions on the issues of fact and law that underlie the merits of the dispute. See *Detroit v. Grinnell Corp.,* 495 F.2d 448, 456 (2d Cir.1974). The court determines whether the proposed settlement discloses grounds to doubt its fairness or other obvious deficiencies such as unduly preferential treatment of class representatives or segments of the class, or excessive compensation of attorneys, and whether it appears to fall within the range of possible approval. See *In re Prudential Securities Incorporated Limited Partnerships Litigation,* 163 F.R.D. 200, 209 (S.D.N.Y.1995) (citing *Manual for Complex Litigation* § 30.41 at 237 (3d ed. 1995)).

The parties represent that the settlement agreement is the product of lengthy arms-length negotiations conducted over the course of several face-to-face meetings and numerous telephone conferences. While there is no reference to any formal discovery, it appears that putative class counsel have all of the information necessary as a practical matter to sustain a FDCPA claim. The settlement funds available to claimants would constitute 150% of the maximum recovery under the FDCPA and would be distributed *pro rata* in an amount up

to $100 per claimant. Up to $15,000 of any unclaimed funds would be distributed to the National Consumer Law Center. Any unclaimed funds in excess of $15,000 would revert to NCO.

**\*6** The agreement also provides for a permanent injunction to ensure that defendant does not knowingly report, excepting any bona fide error, any CFS accounts that are the subject of this lawsuit to any credit reporting agency or like entity unless it has first independently verified the accuracy of such credit information and determined that reporting the information is legally permissible. While not expressly so stated, it appears and the court assumes that the "accuracy" and "legally permissible" language encompasses any repetition of the practices complained of.

While resolution by trial is rarely risk free, the one specific defense maintained by defendant of "bona fide error," *see* 15 U.S.C. § 1692k(c), would not appear to be a particularly promising one. The conduct complained of was systemic, continuing and widespread. The bona fide error defense generally encompasses clerical mistakes or instances where, despite procedures employed to avoid a particular type of error, such an error is inadvertently made. See *Patzka v. Viterbo College,* 917 F.Supp. 654, 659 (W.D.Wisc.1996). In the instant case, the offending conduct appears to result from procedures intentionally adopted and employed to produce the type of error complained of. [3]

The proposed attorney fees represent 41% of the portion of the fund dedicated to payment of claims and fees. [4] The proposed incentive bonus for the class representative is modest and appears reasonable. There is no preferential treatment of the class representative or any segment of the class.

While the settlement fund would exceed defendant's maximum liability in a class action by virtue of the 1% cap, it is considerably less than the exposure defendant would face from individual suits by even a small percentage of putative class members. Each claiming class member would receive the maximum $100 provided only if the percentage of claimants were .0545% or less. With a claim rate of 5%, each claimant would receive $1.09. Nevertheless, given the unlikelihood of individual suits, the 1% statutory cap on damages in class actions, the inability to project the claim rate and the provision of some meaningful injunctive relief, the court cannot say that the proposed settlement falls outside the range of possible approval.

The proposed notice sets forth in understandable language all pertinent information, including a summary of the proposed settlement terms and an explanation of opt-out rights. It provides a toll free number that class members can call to obtain a claim form. The agreement provides for notice by publication of a ⅛ page notice in the national edition of USA Today once in each of two consecutive weeks.

**\*7** Rule 23(c)(2) requires that members of a class certified under Rule 23(b)(3) be provided with "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort," of the pendency of the action, their right to opt-out, the effect of their failure to do so and their right to appear through counsel. Rule 23(e) provides for notice to class members of a proposed settlement "in such manner as the court directs."

In a case where a settlement class has been provisionally certified and a proposed settlement tentatively approved, notice of certification and of the proposed settlement are properly combined but must satisfy the requirement of Rule 23(c)(2). *See Fry v. Hayt,* 198 F.R.D. 461, 474 (E.D.Pa.2000); *In re Ikon Office Solutions,* 194 F.R.D. 166, 174 (E.D.Pa.2000); *Collier v. Montgomery Housing Authority,* 192 F.R.D. 176, 186 (E.D.Pa.2000). *See also Silber v. Mabon,* 18 F.3d 1449, 1454 (9th Cir.1994) (applying Rule 23(c)(2) standard to settlement class). This is entirely reasonable since such will be the first notice of the pendency of the action and their critical right to opt-out which is directed to class members.

The requirement that individual notice be sent to all class members whose names and addresses may be ascertained with reasonable effort is mandatory. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 175–76, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (rejecting notice by publication to class of 2,250,000 despite prohibitive cost of providing individual notice to ascertainable class members); *Zimmer Paper Products, Inc. v. Berger & Montague, P.C.,* 758 F.2d 86, 90 (3d Cir.), *cert. denied,* 474 U.S. 902, 106 S.Ct. 228, 88 L.Ed.2d 227 (1985); *Carlough v. Amchem Products, Inc.,* 158 F.R.D. 314, 325 (E.D.Pa.1993) (notice by publication inadequate where putative class member's name and address is known or ascertainable with reasonable effort).

While a court may direct the defendant to effectuate notice where it can do so with less difficulty or expense than the representative plaintiffs, the cost of notice is borne by the plaintiffs unless the cost to the defendant would be insubstantial such as where it routinely directs mail to putative class members in the ordinary course of business. *See Oppenheimer Fund Inc. v. Sanders,* 437 U.S. 340, 356, 359, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978); *Eisen,* 417 U.S. at 178; *Barahona–Gomez v. Reno,* 167 F.3d 1228, 1236 (9th Cir.1999); *Silber,* 18 F.3d at 1452; *Southern Ute Indian Tribe v. Amoco Production Co.,* 2 F.3d 1023, 1029 (10th Cir.1993); *Miles v. America Online,* 202 F.R.D. 297, 305 (M.D.Fla.2001); *In re Playmobil Antitrust Litigation,* 35 F.Supp.2d 231, 249 (E.D.N.Y.1998). [5]

The parties have provided no information regarding the availability of the names and addresses of putative class members or otherwise to show that the proposed notice is the best practicable. Even as to the proposed publication, the parties do not explain how two notices in a single publication is reasonably calculated to provide actual notice to the millions of putative class members. *See Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 317–18, 70 S.Ct. 652, 94 L.Ed. 865 (1950); *Peters v. National R.R. Passenger Corp.,* 966 F.2d 1483, 1486 (D.C.Cir.1992).

## IV. *Conclusion*

**\*8** Plaintiff has satisfied the numerosity, commonality and typicality requirements of Rule 23(a), as well as the criteria of Rule 23(b)(3) that common issues of fact or law predominate. In the absence of any specific information about the professional experience of proposed class counsel, the court cannot conscientiously determine the adequacy of representation. The court also cannot conscientiously conclude that a class action is a superior method of litigating the controversy in the absence of information about the pendency of other overlapping lawsuits and about potential difficulties in providing adequate notice insofar as this affects manageability.

The proposed settlement appears to be within the range of possible approval. In the absence of any information about the possibility of individual notice, however, the court cannot conclude that the notice proposed is the best notice practicable. Moreover, even as to publication, the court has reservations about the adequacy of two notices in a two-week period in a single publication.

Accordingly, the parties' motion will be denied without prejudice to renew with additional pertinent information

regarding proposed class counsel, the pendency of other individual or class actions, the provision of the best notice practicable and the effect of the requirement of such notice on the manageability of the case as a class action. An appropriate order will be entered.

### ORDER

AND NOW, this day of July, 2002, upon consideration of the parties' Joint Motion for Certification of Settlement Class and Preliminary Approval of Settlement and Notice to Class (Doc. # 47), consistent with the accompanying memorandum, IT IS HEREBY ORDERED that said Motion is DENIED without prejudice to renew within fifteen days with additional pertinent information regarding proposed class counsel, the pendency of other individual or class actions, the provision of the best notice practicable and the effect of the requirement of such notice on the manageability of the case as a class action.

### All Citations

Not Reported in F.Supp.2d, 2002 WL 1773035

---

## Footnotes

1    One of plaintiff's attorneys lists his practice areas in Martindale–Hubbell as general practice, personal injury law and probate. He appears as counsel in no class action with a reported disposition, either by publication or on a database. Plaintiff's other attorney does list consumer litigation as a practice area and appears as co-counsel in three class actions with dispositions reported or available on the Westlaw or LEXIS database. In the most recent of these, a motion to dismiss her client's class action securities fraud complaint was granted. In another, she filed a class action RICO complaint which was never pursued as the defendant shortly thereafter filed for bankruptcy and the Bankruptcy Court denied a request for relief from the automatic stay. In the third class action, she appeared for an objector to object to the proposed settlement and to the adequacy of representation by class counsel.

2    Under the FDCPA, each class member may recover actual damages, attorneys fees and statutory damages of up to $1000. *See* 15 U.S.C. § 1692k(a)(2)(A).

3    The bona fide error defense does not encompass a mistake of law regarding the requirements or applicability of the Act. *See Pipiles v. Credit Bureau of Lockport, Inc.,* 886 F.2d 22, 27 (2d Cir.1989); *Hulshizer v. Global Credit Services, Inc.,* 728 F.2d 1037, 1038 (8th Cir.1984); *Baker v. G.C. Services Corp.,* 677 F.2d 775, 779 (9th Cir.1982).

4    This is not excessive per se. *See In re Smithkline Beckman Corp. Sec. Lit.,* 751 F.Supp. 525, 544 (E.D.Pa.1990) (noting general range of attorney fees in common fund cases is 19% to 45%). The circumstances of each case, however, must be examined and a cross-check against the lodestar conducted in ultimately resolving fee requests. This is one function of the final fairness hearing.

5    In the context of a settlement, of course, the parties are free to agree that the defendant shall absorb the cost of notification. Indeed, NCO has agreed to pay the cost of the limited notification presently proposed.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 411 of 482

In re Tricor Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2009)

2009 WL 10744518

2009 WL 10744518
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.

IN RE TRICOR DIRECT PURCHASER
ANTITRUST LITIGATION
This Document Relates To: Louisiana
Wholesale Drug Co., Inc. Rochester Drug
Co-Operative, Inc. Meijer, Inc., et al.

Case No. 05-340 (SLR)
(consolidated), 05-340, 05-351, 05-358
|
Signed 04/23/2009

[PROPOSED] ORDER AND FINAL JUDGMENT
APPROVING SETTLEMENT, AWARDING
ATTORNEYS' FEES AND EXPENSES,
AWARDING REPRESENTATIVE PLAINTIFF
INCENTIVE AWARDS, APPROVING PLAN
OF ALLOCATION, AND ORDERING
DISMISSAL AS TO ALL DEFENDANTS

Sue L. Robinson, United States District Judge

**\*1** The Court, having considered (a) the Direct Purchaser Class's Motion for Final Settlement Approval; (b) the Brief in Support of the Direct Purchaser Class's Motion for Final Settlement Approval; (c) the Plan Of Allocation For Direct Purchaser Class; (d) the Declaration Of Jeffrey J. Leitzinger, Ph.D. Regarding Classwide Damages and the Proposed Plan Of Allocation ("Leitzinger Declaration"); (d) the Direct Purchaser Class's Motion for an Award Of Attorneys' Fees, Reimbursement of Expenses and Incentive Awards to the Class Representatives; (e) the Brief in Support of the Direct Purchaser Class's Motion For An Award Of Attorneys' Fees, Reimbursement of Expenses and Incentive Awards To The Class Representatives; (f) the Affidavit of Lead Counsel Barry S. Taus, Esq.; (g) the Corrected Supplemental Affidavit of Lead Counsel Barry S. Taus, Esq.; and (h) the Affidavit of Adam M. Steinfeld dated March 9, 2009; and having held a hearing on April 23, 2009; and having considered all of the submissions and arguments with respect thereto; pursuant to Rules 23 and 54 of the Federal Rules of Civil Procedure, and in accordance with the terms of the settlement agreement between Direct Purchaser Class Plaintiffs ("Plaintiffs") and Abbott Laboratories ("Abbott")

and Fournier Industrie et Santé and Laboratories Fournier S.A. (together, "Fournier") (collectively, "Defendants") dated January 6, 2009 (the "Settlement Agreement"), it is hereby **ORDERED, ADJUDGED and DECREED that:**

1. This Order and Final Judgment incorporates by reference the definitions in the Settlement Agreement, and all terms used herein shall have the same meanings set forth in the Settlement Agreement. As set forth in the Preliminary Approval Order (D.I. No. 529), dated January 8, 2009, the previously certified Class is defined as follows:

The Direct Purchaser Class includes all persons or entities in the United States who purchased TRICOR® in any form directly from Abbott Laboratories ("Abbott"), Fournier Industrie et Sante, or Laboratories Fournier S.A. ("Fournier") (Abbott and Fournier collectively are "Defendants") at any time during the period April 9, 2002 through August 18, 2008. Excluded from the Class are Defendants and their officers, directors, management, employees, subsidiaries, or affiliates, all federal governmental entities, and the following entities that opted out of the Class: Ahold a/k/a American Sales Corp., Albertson's Inc., CVS Pharmacy, Inc., CVS Corporation, Eckerd Corporation, Maxi Drug, Inc. d/b/a Brooks Pharmacy, Hy-Vee, Inc., Kroger Co., Rite Aid Corporation, Rite Aid Hdqtrs. Corp., Safeway, Inc., Walgreen Co., State of Oregon (all government entities), State of Washington (all government entities), Maryland State Employee and Retiree Health and Welfare Benefits Program and the Maryland Pharmacy Program, Connecticut Department of Social Services, State of New York (all government entities), State of Texas Heath and Human Services Commission, Commonwealth of Massachusetts Executive Office of Health and Human Services Office of

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 412 of 482

In re Tricor Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2009)

2009 WL 10744518

Medicaid (MassHealth), Pennsylvania Department of Public Works and Department of Aging, and Overman & Stevenson Pharmacists.

**\*2** 2. The Court has jurisdiction over these actions and over each of the parties and over all members of the Class.

3. As required by this Court in the Preliminary Approval Order, notice of the proposed Settlement was mailed by first-class mail to all members of the Class. Such notice to members of the Class is hereby determined to be fully in compliance with requirements of Fed. R. Civ. P. 23(e) and due process of law and is found to be the best notice practicable under the circumstances and to constitute due and sufficient notice to all entities entitled thereto.

4. Due and adequate notice of the proceedings having been given to the Class and a full opportunity having been offered to the Class to participate in the fairness hearing, it is hereby determined that all Class members are bound by this Final Order and Judgment.

5. The Settlement of this Direct Purchaser Class Action was not the product of collusion between Plaintiffs and Defendants or their respective counsel, but rather was the result of *bona fide* and arm's-length negotiations conducted in good faith between Class Counsel [1] and Defendants' counsel.

6. The Court has held a hearing to consider the fairness, reasonableness and adequacy of the proposed Settlement, and has been advised that there have been no objections to the Settlement from any members of the Class, and also that several members of the Class have explicitly indicated their support for the Settlement and Class Counsel's requested attorneys' fees.

7. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, this Court hereby approves the Settlement, and finds that the Settlement is, in all respects, fair, reasonable and adequate to Class members. Accordingly, the Settlement shall be consummated in accordance with the terms and provisions of the Settlement Agreement. The Settlement is fair, reasonable and adequate in light of the factors set forth in *Girsh v. Jepson*, 521 F.2d 153 (3d Cir 1975), as follows:

(a) this case was highly complex, expensive and time consuming, and would have continued to be so if the case had not settled;

(b) there were no objections to the Settlement by Class members, and several Class members expressed affirmative support for the Settlement;

(c) because the case settled after the parties had completed discovery and commenced trial, Class Counsel had a full appreciation of the strengths and weaknesses of their case before negotiating the Settlement;

(d) Class Counsel and the Class would have faced numerous and substantial risks in establishing both liability and damages if they had decided to continue to litigate rather than settle;

**\*3** (e) the Settlement amount is well within the range of reasonableness in light of the best possible recovery and the risks the parties would have faced if the case had continued to verdicts as to both liability and damages; and,

(f) the Settlement also satisfies the additional factors set forth in *In re Prudential Ins. Co. of America Sales Practices Litigation*, 148 F.3d 283 (3d. Cir 1998), *cert. denied*, 525 U.S. 1114 (1999).

8. The Court approves the Plan of Allocation of the Settlement proceeds (net of attorneys' fees, reimbursed expenses and incentive awards) as proposed by Class Counsel in the Plan of Allocation (the "Plan") (attached hereto as Ex. A), and supported by the Leitzinger Declaration. The Plan, which had previously been summarized in the Notice of Proposed Settlement, proposes to distribute the net Settlement proceeds *pro rata* based on Class member purchases of Tricor, and does so fairly and efficiently. It directs Epiq Systems, Inc., the firm retained by Class Counsel as the claims administrator, to distribute the net Settlement proceeds in the manner provided in the Plan.

9. All claims in the above-captioned action against Defendants are hereby dismissed with prejudice, and without costs.

10. In accordance with the Settlement Agreement, upon the Settlement's becoming final in accordance with its terms:

(a) Defendants and their past, present and future parents, subsidiaries, divisions, affiliates, stockholders, officers,

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 413 of 482

In re Tricor Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2009)

2009 WL 10744518

directors, insurers, general or limited partners, employees, agents, attorneys and any of their legal representatives (and the predecessors, heirs, executors, administrators, successors and assigns of each of the foregoing) (the "Released Parties") are and shall be released and forever discharged from all manner of claims, demands, actions, suits, causes of action, damages, and liabilities, of any nature whatsoever (whether such claims, demands, actions, suits, causes of action, damages, or liabilities arise or are incurred before, during or after the date hereof), including costs, expenses, penalties and attorneys' fees, known or unknown, suspected or unsuspected, in law or equity, that Plaintiffs or any member or members of the Class who has (have) not timely excluded itself (themselves) from the Class (including any past, present or future officers, directors, insurers, general or limited partners, divisions, stockholders, agents, attorneys, employees, legal representatives, trustees, parents, associates, affiliates, subsidiaries, partners, heirs, executors, administrators, purchasers, predecessors, successors and assigns, acting in their capacity as such), whether or not they object to the Settlement and whether or not they make a claim upon or participate in the Settlement Fund, ever had, now has, or hereafter can, shall or may have, directly, representatively, derivatively or in any other capacity, to the extent arising out of or relating to any conduct:

(1) alleged in the Actions,

(2) alleged in any other complaint filed in any action currently consolidated or coordinated, or subject to a pending request for consolidation or coordination with the Actions, or

(3) relating to any alleged change in formulation or withdrawal of TRICOR 200 or TRICOR 160 or any conduct relating to the change to TRICOR 160 or the change to TRICOR 145, or any generic equivalents of TRICOR 200 or TRICOR 160 (reference to any formulation of TRICOR or any generic equivalent shall in each instance include any associated lower doses),

**\*4** provided only that such conduct occurred or allegedly occurred prior to the date hereof, except as expressly provided for in paragraph 12 of the Settlement Agreement (the "Released Claims"). Plaintiffs and each member of the Class shall not sue or otherwise seek to establish or impose liability against any Released Party based, in whole or in part, on any of the Released Claims.

(b) In addition, the Court finds that each class member has expressly waived and released, upon the Settlement Agreement becoming final, any and all provisions, rights, benefits conferred by § 1542 of the California Civil Code, which reads:

> **Section 1542. General Release—Claims Extinguished. A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.**

or by any law of any state or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable or equivalent to § 1542 of the California Civil Code. Each Class member may hereafter discover facts other than or different from those which he, she or it knows or believes to be true with respect to the claims which are the subject matter of this Paragraph 10, but each Class member hereby expressly waives and fully, finally and forever settles and releases, upon the Settlement Agreement's becoming final, any known or unknown, suspected or unsuspected, contingent or non-contingent claim that would otherwise fall within the definition of Released Claims, whether or not concealed or hidden, without regard to the subsequent discovery or existence of such different or additional facts. For the avoidance of doubt, the Court finds that each Class member has expressly waived and fully, finally and forever settled and released any and all claims it may have against any Released Party under § 17200, et seq., of the California Business and Professions Code or any similar, comparable or equivalent provision of the law of any other state or territory of the United States or other jurisdiction, which claims are hereby expressly incorporated into the definition of Released Claims.

11. Class Counsel have moved for an award of attorneys' fees and reimbursement of expenses. Pursuant to Rules 23(h)(3) and 54(d) of the Federal Rules of Civil Procedure, and pursuant to the factors for assessing the reasonableness of a class action fee request as set forth in Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000), this Court makes the following findings of fact and conclusions of law:

(a) the Settlement confers a monetary benefit on the Class that is substantial, both in absolute terms and when assessed

in light of the risks of establishing liability and damages in this case;

(b) there were no objections by Class members to the requested fee award of one-third of the Settlement Fund, and in fact, numerous Class members, with purchases of Tricor during the relevant period in excess of 70% of the aggregate Class purchases, have affirmatively expressed their support for and/or lack of objection to the requested fee;

(c) Class Counsel have effectively and efficiently prosecuted this difficult and complex action on behalf of the members of the Class for over three and one-half years, with no guarantee they would be compensated;

 **\*5** (d) Class Counsel undertook numerous and significant risks of nonpayment in connection with the prosecution of this action;

(e) Class Counsel have reasonably expended tens of thousands of hours, and incurred millions of dollars in out of pocket expenses, in prosecuting this action, with no guarantee of recovery;

(f) fee awards similar to the fee requested by Class Counsel here have been awarded in similar cases, including numerous Hatch-Waxman antitrust class actions similarly alleging impeded entry of generic drugs;

(g) the Settlement achieved for the benefit of the Class was obtained as a direct result of Class Counsel's skillful advocacy;

(h) the Settlement was reached following negotiations held in good-faith and in the absence of collusion;

(i) the "percentage-of-the-fund" method is the proper method for calculating attorneys' fees in common fund class actions in this Circuit (*see, e.g., In re Rite Aid Sec. Litig.*, 396 F.3d 294, 305 (3d Cir. 2005));

(j) Class members were advised in the Notice of Proposed Settlement of Class Action, which notice was approved by this Court, that Class Counsel intended to move for an award of attorneys' fees in an amount up to 33-1/3% of the gross Settlement Fund (including the interest accrued thereon), plus reimbursement of reasonable costs and expenses incurred in the prosecution of this action;

(k) Class Counsel did, in fact, move for an award of attorneys' fees in the amount of 33-1/3% of the gross Settlement Fund (including the interest accrued thereon), plus reimbursement of reasonable costs and expenses incurred in the prosecution of this action, which motion has been on the docket and publicly available since March 9, 2009;

(l) As detailed in Class Counsel's affidavits, a one-third fee award would equate to a lodestar multiplier of approximately 3.93. An examination of recently approved multipliers in other Hatch-Waxman class actions similarly alleging impeded generic competition reveals that the multiplier requested here is well within the acceptable range;

(m) in light of the factors and findings described above, the requested 33-1/3% fee award is within the applicable range of reasonable percentage fund awards.

Accordingly, Class Counsel are hereby awarded attorneys' fees in the amount of $83,333,333.33 from the Settlement Fund, plus one-third of the interest earned on the Settlement proceeds from January 27, 2009 (the date of funding of the Settlement Fund) to the date of payment, at the same net interest rate earned by the Settlement Fund. The Court finds this award to be fair and reasonable.

Further, Class Counsel are hereby awarded $3,590,415.82 out of the Settlement Fund to reimburse them for the expenses they incurred in the prosecution of this lawsuit, which expenses the Court finds to be fair, and reasonably incurred to achieve the benefits to the Class obtained in the Settlement to the Class.

The awarded fees and expenses shall be paid to Class Counsel from the Settlement Fund in accordance with the terms of the Settlement Agreement. Lead Counsel shall allocate the fees and expenses among all of the Class Counsel.

12. Neither this Final Order and Judgment, the Settlement Agreement, nor any and all negotiations, documents and discussions associated with it shall be deemed or construed to be an admission or evidence of any violation of any statute or law, of any liability or wrongdoing by Defendants, or of the truth of any of the claims or allegations contained in any complaint or any other pleading or document, and evidence thereof shall not be discoverable, admissible or otherwise used directly or indirectly, in any way by or against Plaintiffs or Defendants, whether in this Direct Purchaser Class Action or in any other action or proceeding.

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 415 of 482

In re Tricor Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2009)

2009 WL 10744518

**\*6** 13. Without affecting the finality of this judgment, the Court retains exclusive jurisdiction over the Settlement, and the Settlement Agreement, including the administration and consummation of the Settlement Agreement, the Plan of Allocation, and in order to determine any issues relating to attorneys' fees and expenses and any distribution to members of the Class. In addition, without affecting the finality of this judgment, Defendants and each member of the Class hereby irrevocably submit to the exclusive jurisdiction of the Court for any suit, action, proceeding or dispute arising out of or relating to the Settlement Agreement or the applicability of the Settlement Agreement, including, without limitation any suit, action, proceeding or dispute relating to the release provisions herein, except that this submission to the Court's jurisdiction shall not prohibit (a) the assertion of the forum in which a claim is brought that the release included in the Settlement Agreement is a defense, in whole or in part, to such claim or, (b) in the event that such a defense is asserted in that forum, the determination of its merits in that forum.

14. The three Class Representatives are each hereby awarded $50,000 out of the Settlement Fund, for representing the Class, which amount is in addition to whatever monies these plaintiffs will receive from the Settlement Fund pursuant to the Plan of Allocation. The Court finds these awards to be fair and reasonable.

15. In the event the Settlement does not become final in accordance with paragraph 5 of the Settlement Agreement, this Order and Final Judgment shall be rendered null and void as provided by the Settlement Agreement, shall be vacated, and all orders entered and releases delivered in connection herewith shall be null and void to the extent provided by and in accordance with the Settlement Agreement.

16. The Court hereby directs that this judgment be entered by the clerk forthwith pursuant to Federal Rule of Civil Procedure 54(b). The direction of the entry of final judgment pursuant to Rule 54(b) is appropriate and proper because this judgment fully and finally adjudicates the claims of the Plaintiffs and the Class against all Defendants in this action, allows consummation of the Settlement, and will expedite the distribution of the Settlement proceeds to the Class members.

**All Citations**

Not Reported in Fed. Supp., 2009 WL 10744518

---

## Footnotes

1    The Court appointed Garwin Gerstein & Fisher, L.L.P., as Lead Counsel and as a member of the Executive Committee, along with the firms of Berger & Montague, P.C., Odom & Des Roches, L.L.P., The Smith Foote Law Firm (formerly Percy, Smith & Foote), and Cohen, Milstein, Hausfeld & Toll (which is now known as Cohen Milstein Sellers & Toll). Kaplan, Fox & Kilsheimer, L.L.P., was substituted for Cohen Milstein midway through the litigation. Additional class counsel that actively participated in the case include Heim Payne & Chorush, L.L.P. (formerly Conley, Rose & Tayon), Vanek, Vickers & Masini, L.L.P., and Delaware counsel Rosenthal, Monhait & Goddess, P.A.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

2020 WL 1922902
United States District Court, E.D. Pennsylvania.

VISTA HEALTHPLAN, INC., et al., Plaintiffs,
v.
CEPHALON, INC., et al., Defendants.

CIVIL ACTION No. 2:06-cv-1833
|
Signed 04/20/2020
|
Filed 04/21/2020

**Attorneys and Law Firms**

Joseph H. Meltzer, Terence S. Ziegler, Donna Siegel Moffa, Kessler Topaz Meltzer & Check, LLP, Radnor, PA, Kevin B. Love, Hanzman Criden & Love, P.A., South Miami, FL, Lawrence Kendall Satterfield, Michael G. McLellan, Finkelstein Thompson LLP, Washington, DC, Theodore M. Lieverman, Jeffrey L. Kodroff, John A. Macoretta, Spector Roseman Kodroff & Willis, P.C., Philadelphia, PA, Robert W. Sink, Law Offices of Robert W. Sink, Fort Washington, PA, for Plaintiff Vista Healthplan, Inc.

Joseph H. Meltzer, Terence S. Ziegler, Donna Siegel Moffa, Kessler Topaz Meltzer & Check, LLP, Radnor, PA, Kevin B. Love, Hanzman Criden & Love, P.A., South Miami, FL, Theodore M. Lieverman, John A. Macoretta, Spector Roseman Kodroff & Willis, P.C., Philadelphia, PA, Lawrence Kendall Satterfield, Finkelstein Thompson LLP, Washington, DC, Robert W. Sink, Law Offices of Robert W. Sink, Fort Washington, PA, for Plaintiff Pennsylvania Turnpike Commission.

Jeffrey L. Kodroff, John A. Macoretta, Mary Ann Geppert, Spector Roseman & Kodroff PC, Philadelphia, PA, Kevin B. Love, Hanzman Criden & Love, P.A., South Miami, FL, Terence S. Ziegler, Donna Siegel Moffa, Joseph H. Meltzer, Kessler Topaz Meltzer & Check, LLP, Radnor, PA, Lawrence Kendall Satterfield, Finkelstein Thompson LLP, Washington, DC, Robert W. Sink, Law Offices of Robert W. Sink, Fort Washington, PA, for Plaintiffs Pennsylvania Employees Benefit Trust Fund, District Council 37 Health & Security Plan.

Donna Siegel Moffa, Joseph H. Meltzer, Terence S. Ziegler, Kessler Topaz Meltzer & Check, LLP, Radnor, PA, John A. Macoretta, Spector Roseman & Kodroff, P.C., Philadelphia, PA, for Plaintiff Shirley Panebianco.

William Richard Restis, Finkelstein and Krinsk, San Diego, CA, for Plaintiff Jeffrey R. Krinsk.

Gregory P. Teran, Peter J. Kolovos, Mark A. Ford, Michelle D. Miller, Emily R. Whelan, Peter A. Spaeth, Wilmer Cutler Pickering Hale & Dorr LLP, Boston, MA, Robert J. Gunther, Jr., Wilmer Cutler Pickering Hale Dorr LLP, New York, NY, James Douglas Baldridge, Venable LLP, Washington, DC, Kevin T. Vanwart, Kirkland & Ellis LLP, Chicago, IL, Nancy J. Gellman, Conrad O'Brien, PC, Philadelphia, PA, for Defendant Cephalon, Inc.

Jay P. Lefkowitz, Kirkland & Ellis, New York, NY, John C. O'Quinn, Karen N. Walker, Kirkland Ellis LLP, James Douglas Baldridge, Venable LLP, Washington, DC, Lathrop B. Nelson, III, Montgomery McCracken Walker and Rhoads, L.L.P., Richard L. Scheff, Armstrong Teasdale, LLP, Philadelphia, PA, for Defendant Barr Laboratories, Inc.

C. Fairley Spillman, Catherine E. Creely, Paul B. Hewitt, Akin Gump Strauss Hauer & Feld LLP, James Douglas Baldridge, Venable LLP, Washington, DC, David L. Comerford, Jeffery A. Dailey, Katherine M. Katchen, Akin Gump Strauss Hauer & Feld LLP, Philadelphia, PA, David R. Marriott, Evan R. Chesler, Daniel P. Margolskee, Lindsay J. Timlin, Cravath Swaine & Moore LLP, New York, NY, Reginald D. Steer, Akin Gump Strauss Hauer & Feld LLP, San Francisco, CA, for Defendant Mylan Laboratories, Inc.

Jeffrey B. Korn, William H. Rooney, Willkie Farr Gallagher LLP, New York, NY, Joseph E. Wolfson, Stevens & Lee, Philadelphia, PA, James Douglas Baldridge, Venable LLP, Washington, DC, Laurence Schoen, Mintz Levin Cohn Ferris Glovsky & Popeo PC, Boston, MA, for Defendants Teva Pharmaceutical Industries, Ltd., Teva Pharmaceuticals USA, Inc.

Danielle R. Foley, James Douglas Baldridge, Lisa Jose Fales, Vincent E. Verrocchio, Venable LLP, Washington, DC, Brett Alan Kratz, Neill C. Kling, Harkins Cunningham LLP, Philadelphia, PA, for Defendants Ranbaxy Laboratories, Ltd., Ranbaxy Pharmaceuticals, Inc.

Catherine E. Creely, C. Fairley Spillman, Akin Gump Strauss Hauer & Feld LLP, James Douglas Baldridge, Venable LLP, Washington, DC, David R. Marriott, Evan R. Chesler, Daniel P. Margolskee, Lindsay J. Timlin, Cravath Swaine & Moore LLP, New York, NY, Katherine M. Katchen, Akin Gump Strauss Hauer & Feld, LLP, Philadelphia, PA, Reginald D.

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)
2020-1 Trade Cases P 81,190

Steer, Akin Gump Strauss Hauer & Feld LLP, San Francisco, CA, for Defendant Mylan Pharmaceuticals, Inc.

Monica L. Kiley, Hangley Aronchick Segal Pudlin & Schiller, Harrisburg, PA, Steve D. Shadowen, Hilliard & Shadowen LLP, Austin, TX, for Defendant Eckerd Corporation.

## MEMORANDUM

Goldberg, J.

**\*1** This case arises out of a set of antitrust actions which involve reverse settlement payments involving the drug Provigil®. The parties included a brand-name drug manufacturer, numerous generic drug companies, retail drug distributors, the Federal Trade Commission, States Attorneys General, direct purchasers, and end-payors. The End-Payor Plaintiff ("EPP") action, captioned under Vista Healthplan et al. v. Cephalon, et al., Civ. A. No. 06-1833, culminated in a settlement for which the EPPs now seek approval. On August 8, 2019, I granted preliminary approval of the settlement and preliminarily certified two classes for settlement purposes.

The EPPs now move for final approval of the settlement. Upon review of the parties' briefing and considering the arguments at the final fairness hearing on February 26, 2020, I will certify a settlement class, grant final approval of the class action settlement, and award attorneys' fees, costs, and incentive payments as requested.

## I. FACTUAL HISTORY

### A. Background of the EPPs' Claims

In May and June 2006, several now-consolidated cases were filed on behalf all persons who paid for Provigil and/or generic modafinil in twenty-seven states and the District of Columbia, against Defendants Cephalon, Inc., Barr Laboratories, Inc., Teva Pharmaceutical Industries Ltd., Teva Pharmaceuticals USA, Inc. (collectively, "the Cephalon Parties"),[1] Mylan Inc., Mylan Pharmaceuticals Inc. (collectively "Mylan"), and Sun Pharmaceutical Industries, Ltd. as successor-in-interest to Ranbaxy Laboratories, Ltd. and Ranbaxy Pharmaceuticals, Inc. ("Ranbaxy") (all of the foregoing collectively referenced as "Defendants").

The lawsuit alleged that, in April 1997, the Patent and Trademark Office issued U.S. Patent No. 5,618,845 ("the '845 patent") to Cephalon, Inc., which patented a specific

formulation of modafinil known as Provigil, a wakefulness-promoting drug. In 2002, Cephalon, Inc. was granted a reissue patent on Provigil, U.S. Patent No. RE 37,516 ("the RE '516 patent"), which was scheduled to expire October 6, 2014. As a result of studying the drug's effects on children, Cephalon, Inc. received an additional six months of pediatric exclusivity on Provigil, extending Cephalon, Inc.'s exclusivity period through April 6, 2015.

On December 24, 2002, four generic drug manufacturers —Barr Laboratories, Inc., Teva Pharmaceutical Industries Ltd./Teva Pharmaceuticals USA, Inc., Mylan Inc./Mylan Pharmaceuticals Inc., and Ranbaxy Pharmaceuticals, Inc. (collectively, the "Generics")— filed Abbreviated New Drug Applications ("ANDAs") for generic Provigil, each certifying that Cephalon Inc.'s patent was either invalid or would not be infringed by their generic modafinil product. As first-filers, all of the Generics, upon FDA approval, were entitled to share in 180 days of exclusive marketing, a characteristic of the Hatch-Waxman Act, Pub. L. No. 98-417. On March 28, 2003, following the Generics' ANDA filings, Cephalon, Inc. sued the Generics for patent infringement.

**\*2** All of the litigation between Cephalon, Inc. and the Generics was settled between December 2005 and February 2006, while motions for summary judgment were pending. The settlements each permitted the Generics to launch their generic Provigil product on April 6, 2012, prior to the expiration of the RE '516 patent. The agreements further contained "contingent-launch provisions," which permitted each Generic to market generic Provigil prior to that date if any other company marketed generic Provigil, whether through a license or at-risk, or if the RE '516 patent was declared invalid, unenforceable, or not infringed by generic Provigil. Each of these settlement agreements contained provisions for and/or were signed alongside licenses for intellectual property, active pharmaceutical ingredient supply agreements, and pharmaceutical development agreements. Cephalon, Inc. agreed to pay a total of approximately $300 million to the Generics as a result of these agreements.

In subsequently-filed litigation, various groups—including direct purchasers, end-payors, a generic drug companies, retail drug distributors, the Federal Trade Commission, and States Attorneys General—alleged that these settlement transactions between Cephalon, Inc. and the Generics were anticompetitive "reverse-settlement" payments that violated antitrust laws. Specifically, they contended that but for these payments, the Generics would have launched generic Provigil

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

at risk, and thus lower-cost generic competition would have been brought to the relevant market by June 2006.

### B. Brief Procedural History of the Litigation

Multiple end-payor plaintiffs, or EPPs—including both consumers and large Third-Party payors ("TPPs") who paid for Provigil and/or modafinil in twenty-seven states and the District of Columbia—filed antitrust complaints against Defendants. By way of an August 8, 2006 Court Order, all actions that had been filed alleging claims against Defendants and seeking damages and other relief for injuries allegedly sustained as a result of Defendants' anti-competitive conduct were consolidated for pre-trial purposes.

On April 6, 2009, the consolidated cases were transferred from the Honorable R. Barclay Surrick to my docket for all further proceedings. The same day I entered an order vacating the previous case management orders, and consolidating all EPP actions for all purposes under the caption of Vista Healthplan Inc. v. Cephalon, Inc. et al., Civ. A. No. 06-1833.

An Amended Consolidated Class Action Complaint was filed in August 2009 on behalf of all of the EPPs. On August 18, 2009, I entered an order formally appointing Kessler Topaz Meltzer & Check, LLP, Spector Roseman & Kodroff, P.C. and Criden & Love, P.A. as Interim Co-Lead Class Counsel to act on behalf of all plaintiffs in the EPP putative class action.

At the end of August 2009, Defendants filed renewed motions to dismiss. Following oral argument, I substantially denied the motions to dismiss. Thereafter, over the next several years, the parties engaged in extensive discovery involving written discovery, more than 180 depositions, significant expert discovery, and extensive motion practice.

In 2013, the parties filed summary judgment motions. In March and June 2014, I granted in part and denied in part the EPPs' motion, and granted Defendants' motions on the EPPs' allegations of an overall conspiracy.

In the interim, the United States Supreme Court issued a decision in F.T.C. v. Actavis, Inc., 570 U.S. 136 (2013), which recognized that settlements in which a holder of a pharmaceutical patent makes a payment to an alleged patent infringer to resolve a challenge to the patent—i.e., a reverse payment settlement—"can sometimes violate the antitrust laws." Id. at 141. In light of the guidance provided by Actavis, Defendants filed motions for summary judgment on the EPPs' claims, which I denied.

The EPPs moved for class certification on May 12, 2014. Following extensive briefing and a certification hearing, I denied class certification on June 10, 2015. Vista Healthplan, Inc. v. Cephalon, Inc., No. 06-1833, 2015 WL 3623005 (E.D. Pa. June 10, 2015). Specifically, I found that the EPPs had not met their burden of proving ascertainability for any class, predominance as to antitrust impact for the proposed antitrust class, or predominance and superiority as to the proposed unjust enrichment/consumer protection class. Id. Class Counsel sought immediate review of this decision under Federal Rule of Civil Procedure 23(f), but the United States Court of Appeals for the Third Circuit denied the petition.

### C. Preliminary Negotiations and Settlement

**\*3** In January 2014, settlement discussions among the EPPs and Defendants began before United States Magistrate Judge David R. Strawbridge and two Special Masters, Robert Heim and Constantine Canon. Following two full days of mediation, Class Counsel continued to engage in settlement negotiations with Defendants.

The EPPs first reached a settlement with Mylan, which was announced at the class certification hearing on March 24, 2015. Mylan agreed to pay the EPPs a total of $14,377,600 to fully resolve all claims against it ("Mylan Settlement Agreement").

In October 2015, following the Cephalon Defendants' $1.2 billion settlement with the Federal Trade Commission ("FTC"), the Cephalon Defendants orally agreed to a settlement with the EPPS and a separate group of over forty health plans (the "Settling Health Plans" or "SHPs"), who opted to proceed separately from the class proceedings following the denial of class certification. The EPPs, SHPs, and the Cephalon Defendants entered a Memorandum of Understanding ("MOU") in December 2015, providing for Cephalon to pay $125 million—$48 million to the EPPs and $77 million to the SHPs—in exchange for releases ("Cephalon Settlement Agreement").

The Cephalon Settlement Agreement was delayed when United Health Care ("United"), one of the SHPs that signed the MOU, renounced its agreement to settle and initiated its own litigation against the Cephalon Defendants, Ranbaxy, and Mylan under Civil Action No. 17-555. The Cephalon Defendants then sued United, under Civil Action No. 16-4870, to enforce the MOU. Following summary judgment briefing and a non-jury trial, I determined, on

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 419 of 482

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

September 19, 2018, that United was bound by the terms of the MOU. While that litigation was pending, however, the EPPs, SHPs, and the Cephalon Defendants executed a May 2018 settlement agreement, which created a carve-out for United, while acknowledging the existence and lack of impact of the MOU litigation.

The EPPs and Ranbaxy reached a settlement on the eve of trial in September 2018. The settlement with Ranbaxy is for $3.5 million ("Ranbaxy Settlement Agreement").

### D. Preliminary Approval of the Settlement and Notice

On August 8, 2019, I entered an order for preliminary approval of the proposed settlements (collectively, the "Settlement"), for preliminary certification of the Settlement Classes, and for permission to disseminate notice of the proposed Settlement to members of the Settlement Classes ("Preliminary Approval Order"). The Preliminary Approval Order certified the following classes:

#### State Antitrust/Consumer Protection Class

All persons or entities in Arizona, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin who purchased Provigil and/or its generic equivalent intended for consumption by themselves, their families or their members, employees, plan participants beneficiaries or insureds between June 24, 2006 and August 8, 2019.

#### State Unjust Enrichment Class

All persons or entities in Alabama, Arizona, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin who purchased Provigil and/or its generic equivalent modafinil, intended for consumption by themselves, their families or their members, employees, plan participants, beneficiaries or insureds between June 24, 2006 and August 8, 2019.

**\*4**  (ECF No. 592.)

The following persons or entities were excluded from the proposed Settlement Classes: (i) the Defendants and their respective subsidiaries, affiliates and employees; (ii) all governmental entities (except for government funded employee benefit plans); (iii) insured individuals covered by plans imposing a flat dollar co-pay that was the same dollar amount for generic as for brand generic purchases; (iv) insured individuals who purchased only generic modafinil (not branded Provigil) pursuant to a fixed co-pay applicable to generic drugs; (v) United Healthcare Services, Inc. ("United Healthcare"), including its subsidiaries; and (v) fully-insured health plans, *i.e.* plans that purchased insurance from another third-party payor covering 100% of the plan's reimbursement obligations to its members. In addition, the Settling Health Plans ("SHPs"), identified in Schedule A to the Cephalon Settlement, are excluded from the Cephalon Settlement.

Following entry of the Preliminary Approval Order, Class Counsel worked with Settlement Administrator A.B. Data, Ltd. ("A.B. Data") to implement the approved notice program ("Notice Program"). The EPPs coordinated notice with the California State Attorney General, who filed a separate action in this Court for approval of its own settlement with Cephalon under Civil Action No. 19-3281 (the "California Settlement"). As described by the EPPs, the Notice Program consisted of:

- Direct notice to potential Class Members identified through subpoenas to twenty-five providers of retail pharmacy services and pharmacy benefits managers, including mail-order pharmacies;

- Direct notice to potential members of the Settlement Class identified through the States' Attorneys General Provigil Settlement;

- Publication notice in national consumer magazines;

- Internet banner and newsfeed ads on multiple networks, including social media and targeted websites;

- Distributing notice via PR Newswire's US1 Newsline;

- Developing and launching a dedicated information website for the Settlement at ProvigilSettlement.com; and

- Establishing a dedicated toll-free telephone number with an interactive voice response system and live operators.

(Decl. of Joseph Meltzer ("Meltzer Decl."), Ex. 4, ¶¶ 3, 6–19.)

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 420 of 482

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

As described in the Notice, in order to submit claims, Class Members need only provide information regarding the total amount they paid for Provigil or modafinil from June 24, 2006 through August 8, 2019, with only one proof of purchase, which can take any number of forms including pharmacy records, an insurance EOB (explanation of benefits) form, or letter from the claimant's doctor. (Decl. of Eric Miller ("Miller Decl."), Ex. C.) Absent a proof of purchase, a Class Member can seek help from the Settlement Administrator to file a valid claim. (Id.) As then explained in the End-Payors' Plan of Allocation, the Settlement Administrator will review and process all submitted claims to determine whether there are any deficiencies and, if so, to notify the Claimant how to cure the deficiency. (Meltzer Decl., Ex. 5.) Once all non-deficient claims are collected, the Settlement Administrator will review the claims to determine which claims are authorized for approval or are ineligible. (Id.)

**\*5** The proposed Plan of Allocation then calls for payment of any approved attorneys' fees, litigation costs, settlement administration costs, escrow administration costs, and incentive payments from the settlement funds received from each of the three Defendants. Following those disbursements, the net settlement funds ("Net Class Settlement Fund") will be used to pay class claims that have been approved and authorized. The Net Class Settlement Fund will be disbursed to "Authorized Consumer Claimants" (who will receive 14% of the net Class Settlement Fund) and "Authorized Third Party Payor (TPP) Claimants" (who will receive 86% of the Net Class Settlement Fund) by the Settlement Administrator, under the supervision of Class Counsel and upon Court approval. If there are sufficient funds, each Authorized Consumer Claimant shall receive 100% of their Authorized Consumer Claim (reduced by money that the Authorized Consumer Claimant has received in any other modafinil settlement). If there are insufficient funds to pay each Authorized Consumer Claimant 100% of their Authorized Consumer Claim, then each Authorized Consumer Claimant shall receive a *pro rata* share of the fund. If, after all Authorized Consumer Claimants are paid 100% of their claims, funds remain in the Consumer Distribution Fund, those remaining funds shall be added to the TPP Settlement Fund and paid out to Authorized TPP Claimants.

As of February 2020, there were a total of eighteen potential Class Members who sought exclusion from the Class. (Supp. Decl. of Eric Miller (Supp. Miller Decl.) ¶¶ 5–6.) Nearly 40,000 Settlement Class Members had responded by filing

claims to participate in the Settlement. (Id. ¶ 7.) Finally, there were objections from three potential Class Members—Barry Balach, Carlton Davis, and Daniel Dunham—each of whom submitted a one to two page letter.

### E. Motion for Final Approval

In December 2019, Class Counsel filed the present Motion for Approval of Proposed Settlements with All Defendants, for Certification of Settlement Classes, and for Final Approval of the Plan of Allocation. Class Counsel also filed a Motion for an Award of Attorneys' Fees, for Reimbursement of Litigation Expenses, and for Incentive Awards for the Class Representatives.

I held a final fairness hearing on February 26, 2020 on both this $65,877,600 Settlement and the $25.25 million California Settlement.

## II. LEGAL STANDARDS

Class actions settlements are distinguished from those in most normal suits because Federal Rule of Civil Procedure 23(e) mandates that "[a] class action shall not be dismissed or compromised without the approval of the court." Fed. R. Civ. P. 23(e); see also In re GMC Pick–Up Truck Fuel Tank Prods. Liab. Litig. ("G.M. Trucks"), 55 F.3d 768, 785 (3d Cir. 1995). This rule "imposes on the trial judge the duty of protecting absentees, which is executed by the court's assuring the settlement represents adequate compensation for the release of the class claims." In re Prudential Ins. Co. Am. Sales Litig., 148 F.3d 283, 316 (3d Cir. 1998) (quoting G.M. Trucks, 55 F.3d at 805). A district court may approve a settlement agreement only "after a hearing and on finding that it is fair, reasonable, and adequate." In re Nat'l Football League Players Concussion Injury Litig. ("In re NFL"), 775 F.3d 570, 581 (3d Cir. 2014) (quoting Fed. R. Civ. P. 23(e) (2)). The factual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence. In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 320 (3d Cir. 2008).

In order to fulfill this duty, the court is required to "independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims would be extinguished." In re Cendant, 264 F.3d 201, 231 (3d Cir. 2001). "The court cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate." G.M. Trucks, 55 F.3d at 785 (quotations omitted).

While the court is to employ a vigorous analysis in fulfilling its fiduciary duty to protect the rights of absent class members, it must also "guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." In re Prudential, 148 F.3d at 317 (quoting G.M. Trucks, 55 F.3d at 806). "The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." Id. at 299 (quoting Girsh v. Jepson, 521 F.2d 153, 156 (3d Cir. 1975)).

**\*6** Where, as here, the court has not already certified the class prior to evaluating the settlement, the court must determine whether the proposed settlement class satisfies the requirements of Rule 23(a) and (b), and then separately determine whether the settlement is fair to the class under Rule 23(e). In re NFL, 775 F.3d at 581; In re Pet Food Prods. Liab. Litig., 629 F.3d 333, 341 (3d Cir. 2010).

Under Rule 23(h), at the conclusion of a successful class action, class counsel may apply to a court for an award of attorney's fees. The amount of an attorney's fee award "is within the district court's discretion so long as it employs correct standards and procedures and makes finding of fact not clearly erroneous[.]" Sullivan v. DB Invs., Inc., 667 F.3d 273, 329 (3d Cir. 2011) (en banc) (internal quotation marks omitted).

## III. CERTIFICATION OF A SETTLEMENT CLASS

Prior to inquiring into the fairness of the Settlement, I must first ensure that the certification requirements set forth in Federal Rule of Civil Procedure 23(a) and (b) have been satisfied. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 619 (1997); In re NFL, 775 F.3d at 581. The Supreme Court has made clear that "[s]ettlement is relevant to a class certification." Amchem Prods., 521 U.S. at 619. Consequently, a district court "may take the proposed settlement into consideration when examining the question of certification." In re Prudential Ins. Co., 148 F.3d at 308. Specifically, the Supreme Court has explained:

> Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for

the proposal is that there be no trial. But other specifications of [Rule 23] —those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context. Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold.

Amchem, 521 U.S. at 620 (citations omitted). The court should put particular emphasis on the Rule 23(a)(4) requirement that the representative will fairly and adequately protect the interests of the class. In re Pet Food Prods., 629 F.3d at 341–42.

To obtain certification, a class must satisfy the requirements of Federal Rule of Civil Procedure 23(a), which sets forth four prerequisites to class certification:

(1) the class is so numerous that joinder is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Following consideration of these four prerequisites—often referred to as numerosity, commonality, typicality, and adequacy of representation—the court must examine whether the class falls within one of the three categories of class actions set forth in Federal Rule of Civil Procedure 23(b). In re Cmty. Bank of N. Va., 418 F.3d 277, 302 (3d Cir. 2005). The EPPs move for class certification under Rule 23(b)(3), which provides for certification when:

**\*7** [T]he court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 422 of 482

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). Stated differently, to satisfy Rule 23(b)(3), the court must find "predominance" and "superiority." In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 527 (3d Cir. 2004).

Finally, the Third Circuit has recognized that Rule 23(b)(3) carries with it an "ascertainability" requirement. Byrd v. Aaron's Inc., 784 F.3d 154, 161–62 (3d Cir. 2015). "The ascertainability requirement as to a Rule 23(b)(3) class is consistent with the general understanding that the class-action deviates from the normal course of litigation in large part to achieve judicial economy." Id. at 162. It "ensures that a proposed class will actually function as a class." Id. The Third Circuit has explained that "[t]he ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is defined with reference to objective criteria, and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." Id. at 163 (internal quotation marks omitted).

Ultimately, a court's class certification analysis must be "rigorous." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350–51 (2011). "[T]he decision to certify a class calls for findings by the court, not merely a 'threshold showing' by a party, that each requirement of Rule 23 is met," and that "[f]actual determinations supporting Rule 23 findings must be made by a preponderance of the evidence." Hydrogen Peroxide, 552 F.3d at 307. Thus, "to certify a class the district court must find that the evidence more likely than not establishes each fact necessary to meet the requirements of Rule 23." Id. at 320.

**A. Rule 23(a) Requirements**

1. Numerosity

A plaintiff seeking certification must first demonstrate that the class is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). "In recent years, the numerosity requirement has been given 'real teeth.' " Mielo v. Steak 'n Shake Operations, Inc., 897 F.3d 467, 484 (3d Cir. 2018). Third Circuit precedent demands that a court "make a factual determination, based on the preponderance of the evidence, that Rule 23's requirements have been met." Id. (quoting Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 596 (3d Cir. 2012)).

The first part of the numerosity inquiry is the size of the class. "No magic number exists satisfying the numerosity requirement, nor must plaintiff allege the exact number or identity of class members." Moskowitz v. Lopp, 128 F.R.D. 624, 628 (E.D. Pa. 1989); see also Chakejian v. Equifax Info. Servs., LLC, 256 F.R.D. 492, 497 (E.D. Pa. 2009). As a general rule, "if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." Stewart v. Abraham, 275 F.3d 220, 226–27 (3d Cir. 2001). On the other hand, a class of fifteen to twenty is likely too small to meet the numerosity requirement. In re Modafinil Antitrust Litig., 837 F.3d 238, 250 (3d Cir. 2016). Classes with between twenty-one and forty members are given varying treatment, depending on the circumstances of each case. Id.

*8 The second half of the numerosity inquiry looks at the impracticability of joinder. Whether joinder of all of the class members would be impracticable depends on the circumstances surrounding the case and not merely on the number of class members. In re Modafinil, 837 F.3d at 249. The Third Circuit has enumerated a non-exhaustive list of factors to consider, including: judicial economy, the claimants' ability and motivation to litigate as joined plaintiffs, the financial resources of class members, the geographic dispersion of class members, the ability to identify future claimants, and whether the claims are for injunctive relief or for damages. Id. at 253. Of those factors, both judicial economy and the ability to litigate as joined parties are of primary importance. Id.

Where, as here, plaintiffs seek a to certify a class of thousands of Consumer Class Members and TPP Class Members, numerosity is easily satisfied. See In re Wellbutrin XL Antitrust Litig., 282 F.R.D. 126, 137 (E.D. Pa. 2011) (finding numerosity met where plaintiff class involved hundreds of thousands of consumer class members and thousands of TPP class members). In my prior Opinion denying certification of

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 423 of 482

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

a litigation class, I noted that the EPPs' expert had identified in excess of five million total Provigil prescriptions filled in the relevant jurisdictions from 2006 through January 2011. Vista Healthplan, Inc. v. Cephalon, Inc., 06-1833, 2015 WL 3623005, at *13 (E.D. Pa. June 10, 2015) ("Prior Certification Opinion"). Consistent with that prior decision, I again find numerosity satisfied.

### 2. Commonality

Rule 23(a)(2) next requires Plaintiffs to demonstrate that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "[C]ommonality does not require perfect identity of questions of law or fact among all class members. Rather, 'even a single common question will do.' " Reyes v. Netdeposit, LLC, 802 F.3d 469, 486 (3d Cir. 2015) (quoting Dukes, 564 U.S. at 359). "The focus of the commonality inquiry is not on the strength of each plaintiff's claim, but instead is on whether the defendant[s'] conduct was common as to all of the class members." Rodriguez v. Nat'l City Bank, 726 F.3d 372, 382 (3d Cir. 2013) (internal quotation and citations omitted). All plaintiffs need not suffer the same injury. The fact that the plaintiffs were subjected to the injury or faced the immediate threat of these injuries suffices for Rule 23. Baby Neal for and by Kanter v. Casey, 43 F.3d 48, 57 (3d Cir. 1994); see also Rodriguez, 726 F.3d at 383 ("[T]here may be many legal and factual differences among the members of a class, as long as all were subjected to the same harmful conduct by the defendant."). "Even where individual facts and circumstances do become important to the resolution, class treatment is not precluded." Baby Neal, 43 F.3d at 57.

Ultimately, the commonality bar is not a high one. Rodriguez, 726 F.3d at 382. To satisfy Rule 23(a)(2), the resolution of the common question of law or fact must "resolve an issue that is central to the validity of each one of the claims in one stroke." Dukes, 564 U.S. at 350. Commonality exists in cases where "[e]ach putative class member alleges that Defendants caused overcharges by engaging in an anticompetitive scheme to delay and suppress generic competition." In re Loestrin 24 Fe Antitrust Litig., No. 13-2472, 2019 WL 3214257, at *11 (D.R.I. July 2, 2019); see also In re Flonase Antitrust Litig., 284 F.R.D. 207, 217 (E.D. Pa. 2012) ("Resolving the allegations surrounding [defendant's] alleged conduct in delaying generic entry will resolve issues that are 'central to the validity of each one of the claims in one stroke.' ")

In my Prior Certification Decision, I noted that the Class Members' claims here depend on common evidence of whether or not Defendants engaged in anticompetitive behavior to limit the entry of generic competitors. Vista Healthplan, 2015 WL 3623005, at *14. At this stage, that common question remains. Accordingly, I find that commonality has been satisfied.

### 3. Typicality

**\*9** The third Rule 23(a) factor considers typicality. "Typicality" aids a court in determining whether "maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Marcus, 687 F.3d at 597–98 (citing Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 158 n.13 (1982)). Typicality "screen[s] out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present." Id. at 598. To determine whether a named plaintiff is markedly different from the class as a whole, the court must address three distinct concerns: "(1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class." Id. at 598 (quoting In re Schering Plough Corp. ERISA Litig., 589 F.3d 585, 599 (3d Cir. 2009)).

The Third Circuit has set a "low threshold" for typicality, such that "[e]ven relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarityf of legal theories or where the claim arises from the same practice or course of conduct." In re NFL, 821 F.3d at 428 (internal quotation marks omitted). "[I]n instances wherein it is alleged that the defendants engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical of the absent class members." In re Linerboard Antitrust Litig., 203 F.R.D. 197, 207 (E.D. Pa. 2001) (quotations omitted).

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 424 of 482

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

In my Prior Certification Opinion, I noted that typicality was established because both the named and absent Class Members maintained the same claims and legal theories —that the allegedly anticompetitive conduct of Cephalon and the Generic Defendants constituted a violation of state antitrust, consumer protection and unjust enrichment laws. Vista Healthplan, 2015 WL 3623005, at \*14. I also found that there were no potential conflicts of interest. Nothing in the record before me suggests anything to undermine these findings. As such, I deem typicality satisfied.

#### 4. Adequacy of Representation

The last Rule 23(a) factor considers adequacy of representation. "The principal purpose of the adequacy requirement is to determine whether the named plaintiffs have the ability and the incentive to vigorously represent the claims of the class." In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig., 795 F.3d 380, 393 (3d Cir. 2015). The adequacy requirement has two components: (1) the interests and incentives of the representative plaintiffs; and (2) the experience and performance of class counsel. Dewey v. Volkswagen Aktiengesellschaft, 681 F.3d 170, 181 (3d Cir. 2012) (citation omitted).

Questions concerning the adequacy of class counsel are governed by Federal Rule of Civil Procedure 23(g), which requires a court to consider the following: (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources counsel will commit to representing the class. Fed. R. Civ. P. 23(g); see also Dewey, 681 F.3d at 181 n.13 (noting that adequacy of class counsel must be considered under factors in Fed. R. Civ. P. 12(g)).

As I found in my Prior Certification Opinion, there is no valid challenge to the adequacy of Class Counsel, all of whom have extensive experience handling complex class action litigation, particularly in the antitrust context. Vista Healthplan, 2015 WL 3623005, at \*15. Class Counsel was appointed as Interim Class Counsel in August 2009, and has managed the case with efficiency and professionalism ever since.

**\*10** As to the adequacy of the class representatives, I likewise harbor no doubts. Again, as I found in my Prior Certification Opinion, there is no real probability

of a conflict of interest among Class Members and "[a]ll [C]lass [M]embers have a common interest in maximizing classwide damages." Id. at \*16. Any speculative concerns about damages allocation that presented during the litigation class certification proceedings are no longer a concern at this settlement stage of the case.

**B. Rule 23(b)(3) Requirements**

#### 1. Predominance

The predominance requirement is similar to commonality and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997). While commonality and predominance present similar considerations, the predominance standard is "far more demanding." In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 311 (3d Cir. 2008), as amended (Jan. 16, 2009) (quotations omitted). The plaintiff need not prove his claims for purposes of the predominance inquiry. He must only show that he can establish the elements of his claim at trial by common, and not individualized, proof. Sullivan v. DB Invs., Inc., 667 F.3d 273, 305 (3d Cir. 2011).

"Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those *questions* will be answered, on the merits, in favor of the class." Amgen, Inc. v. Connecticut Retirement Plans and Trust Funds, 568 U.S. 455, 459 (2013) (emphasis in original). The merits underlying the cause of action need be considered only to the extent that they are "enmeshed" with the certification inquiry. Comcast Corp. v. Behrend, 569 U.S. 27, 34 (2013) (citations omitted). "Put another way, what matters for purposes of the predominance determination is whether there are common questions, not common answers." In re Mushroom Direct Purchaser Antitrust Litig., 319 F.R.D. 158, 187–88 (E.D. Pa. 2016). As such, to decide whether class-action treatment is appropriate, the court must "give careful scrutiny to the relation between common and individual questions." Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1045 (2016). Common questions are those "where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." Id. (quotation and alterations omitted). Individual questions are those "where members of a proposed class will need to present evidence that varies from member to member ..." Id. (quotation omitted).

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

To assess predominance at the certification stage, a court must examine each element of the asserted legal claim "through the prism" of Rule 23(b)(3). Marcus, 687 F.3d at 600 (quoting In re DVI, Inc. Sec. Litig., 639 F.3d 623, 630 (3d Cir. 2011)). The plaintiff must "demonstrate that the element of [the legal claim] is capable of proof at trial through evidence that is common to the class rather than individual to its members." Id. (quoting Hydrogen Peroxide, 552 F.3d at 311). Thus, a court must predict how specific issues will play out at trial "in order to determine whether common or individual issues predominate in a given case." Malack v. BDO Seidman, LLP, 617 F.3d 743, 746 (3d Cir. 2010) (quoting Hydrogen Peroxide, 552 F.3d at 311).

Here, the EPPs set forth antitrust violations and state consumer protection claims. I address each individually.

### a. Antitrust Class

For the antitrust class, the EPPs must show that common issues predominate with respect to their ability to prove: (1) a violation of the antitrust laws; (2) antitrust impact from the violation, *i.e.* causation; and (3) measurable damages. See Hydrogen Peroxide, 552 F.3d at 311.

 **\*11** With respect to the first element—antitrust violation—my Prior Certification Opinion found that predominance clearly existed. Vista Healthplan, 2015 WL 3623005, at \*16. This finding continues to hold true at the settlement stage. The United States Supreme Court has noted that "[p]redominance is a test readily met in certain cases alleging consumer [ ] fraud or violations of antitrust laws." Amchem, 521 U.S. at 625; see also In re Warfarin, 391 F.3d 516, 528 (3d Cir. 2004). As a general rule, liability for anticompetitive conduct focuses on the defendants' actions, not the conduct of individual class members. In re Warfarin, 391 F.3d at 528. "The issues of relevant market, monopoly power, and exclusionary conduct can be proven using common, class-wide evidence because such issues focus on the defendants' conduct rather than individual class members." In re Wellbutrin, 282 F.R.D. at 140. Accordingly, I deem predominance satisfied on this element.

With respect to the third element of damages, the EPPs need to demonstrate that common issues predominate as to the element of "measurable damages" on a classwide basis. Hydrogen Peroxide, 552 F.3d at 311–12 (citing 15

U.S.C. § 15). "[T]he plaintiffs are not required to prove damages by calculating specific damages figures for each member of the class, but rather they must show that a reliable method is available to prove damages on a class-wide basis." In re Wellbutrin, 282 F.R.D. at 144. Variation of damages between and among class members does not necessarily defeat predominance. In re Processed Egg Prods. Antitrust Litig., 312 F.R.D. 171, 203 (E.D. Pa. 2015).

In my Prior Certification Opinion, I found that the EPPs had demonstrated predominance with respect to antitrust damages. Vista Healthplan, 2015 WL 3623005, at \*22–25. I noted that Plaintiff's economist, Dr. Hartman, presented a formulaic and well-established methodology by which to calculate damages on a class-wide basis. Id. at \*25. As that is the same measure of damages to be used with the Settlement Class, I find that predominance is satisfied.

Finally, with respect to the second element of antitrust impact, the EPPs must demonstrate that they can prove by common evidence that the Class Members suffered an injury, or antitrust impact, from the antitrust violation. In re Processed Egg Prods., 312 F.R.D. at 183. As to this element —unlike with the previous elements—my Prior Certification Opinion declined to find that the EPPs had established predominance. Vista Healthplan, 2015 WL 3623005, at \*21. Specifically, I credited the testimony of Defendants' expert that numerous groups of uninjured persons remained within the class definition, including, for example: TPPs that were uninjured due to capitation agreements [2] between the TPPs and pharmacies; TPPs that paid more for the generic than branded Provigil because they aggressively promoted generic substitution through their copayment structure; consumers with no out-of-pocket payment; and consumers who received no cost-benefit from switching to the generic. Id. at \*19–20. I further noted that the EPPs had put forth no methodology using common evidence to identify these uninjured persons, meaning that every Class Member would need to be reviewed on an individualized basis to see if they were impacted by Defendants' anticompetitive actions. Id. at \*19.

These concerns are no longer at issue for several reasons.

First, the EPPs have redefined the Settlement Classes to specifically exclude: (1) insured individuals covered by plans imposing a flat dollar co-pay that was the same dollar amount for generic as for brand drug prices, and (2) insured individuals who purchased only generic modafinil pursuant to a fixed co-pay applicable to generic drugs. These exclusions

are specified on the Consumer Claim form, and in order to participate in the Settlement, Class Members must swear in their claim forms, under penalty of perjury, that they do not fall within such exclusions. (Meltzer Decl., Ex. 4, at exhs. C and D.) This process carves out the uninjured individuals and eliminates some of my prior concerns about the inclusion of uninjured persons or entities.

**\*12** Second, as defined, the Settlement Classes condition class membership on a Provigil or modafinil "purchase," which requires claiming Class Members to verify that they paid for such a purchase or purchases. (Id.) This refined definition excludes consumers with no out-of-pocket payment for Provigil or modafinil.

Finally, the EPPs have produced the report of W. Paul DeBree, an expert in the Pharmacy Benefit Manager ("PBM") Industry, to address my previous concerns that the proposed litigation class included uninjured TPPs, such as (a) those with capitation agreements with pharmacies and (b) those that pay more for the generic than branded Provigil because they aggressively promote generic substitution through their co-payment structure. At the time of the prior certification proceedings, the EPPs had no information about or response to the inclusion of these TPPs. Mr. DeBree now explains that, with respect the first possible category of uninjured TPPs, capitation agreements have not existed in the TPP marketplace for over a decade and were not in place "in any meaningful way" during any part of the class period, making the existence of TPP Class Members with such plans very unlikely. (Expert Report of W. Paul DeBree ("DeBree Report"), ECF No. 586-11, ¶ 35.) As to second proposed category of uninjured TPPs, Mr. DeBree opines that "the theoretical possibility that a TPP would pay more for the generic modafinil than for the branded Provigil version of modafinil due to a co-pay structure is virtually non-existent. As a practical matter the differential between branded and generic prices for expensive drugs, like Provigil, so substantially exceed the differential between the co-pays for each that the amount paid by the TPP for the branded drug will always be greater." (Id. ¶ 47.)

Given this enhanced record with a new expert opinion, together with refined class definitions, I find that the EPPs have cured the problems of predominance found within the proposed litigation class. Indeed, unlike previously "where the certification inquiry was set against the backdrop of an impending trial, here we are not as concerned with 'formulat[ing] some prediction' as to how this element of [an

antitrust] violation would 'play out' at trial ... 'for the proposal is that there be no trial,' ... and instead our inquiry into the element of antitrust injury is solely for the purpose of ensuring that issues common to the class predominate over individual ones." In re Ins. Brokerage Antitrust Litig., 579 F.3d 241, 269 (3d Cir. 2009) (internal quotations omitted). Accordingly, for purposes of certifying a settlement class, I find that the element of predominance is satisfied.

### b. State Unjust Enrichment/Consumer Protection Class

With respect to the state unjust enrichment/consumer protection claims, I previously found that predominance could not be satisfied due to material differences in state law. Vista Healthplan, 2015 WL 3623005, at \*33–34. Specifically, I remarked that because of the variations in state law, combined with the EPPs' inability to account for those differences during trial, common issues did not predominate. Id.

This concern is no longer relevant at the settlement class stage. "Confronted with a request for settlement-only class certification, a district need not inquire whether the case, if tried, would present intractable management problems." Amchem Prods., 521 U.S. at 620. "[V]ariations [in state laws] are irrelevant to certification of a settlement class since a settlement would eliminate the principal burden of establishing the elements of liability under disparate laws." Sullivan, 667 F.3d at 303 (internal quotations omitted) (alterations in original). Accordingly, I find that the state law variations do not defeat predominance as to the state unjust enrichment/consumer protection class.

### 2. Superiority

**\*13** In addition to predominance, plaintiffs seeking certification under Rule 23(b)(3) must show that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). To determine whether plaintiffs have met their burden on superiority, courts consider "class members' interests in pursuing separate actions, the extent of any independent litigation already begun by class members, the desirability of concentrating the litigation in this forum, and the difficulties likely to be encountered in the management of a class action." In re Mushroom, 319 F.R.D. at 208 (quotations omitted). "In settlement situations, the superiority requirement arguably

Case 4:21-cv-00196-MWB     Document 249-1     Filed 10/07/25     Page 427 of 482

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

translates into the question whether the settlement is a more desirable outcome for the class than individualized litigation, and may assure that the settlement has not grossly undervalued plaintiffs' interests." Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 192 (3d Cir. 2001) (citing G.M. Trucks, 55 F.3d at 796).

In my Prior Certification Opinion, I found that superiority was not met because the EPPs had failed to offer a manageable and efficient way to instruct the jury on the important substantive differences in the various states' laws. As noted above, however, that litigation manageability concern is no longer an issue as the Settlement resolves the case without trial. Moreover, and perhaps more importantly, I note that many of the individual Class Members have smaller damage awards, which they would likely not individually litigate against the behemoth pharmaceutical companies that comprise the Defendants. See In re Namenda Direct Purchaser Antitrust Litig., 331 F. Supp. 3d 152, 220 (S.D.N.Y. 2018) ("Class treatment is appropriate in such 'negative value cases,' in which each class members' interest in the litigation is less than the cost to maintain an individual action."). The Settlement therefore provides monetary remuneration for individuals and small health plans who would likely otherwise have no recovery. Accordingly, I deem the superiority element satisfied.

### C. Ascertainability

The final element that I must consider regarding certification of the Settlement Classes is whether the classes are ascertainable.

"[A]scertainability" is closely tied to the requirement that plaintiffs provide a proper class definition. Byrd v. Aaron's, Inc., 784 F.3d 154, 164 (3d Cir. 2015). "A trial court ... needs a class to be 'defined with reference to objective criteria' and some assurance that there can be 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition,' in order to rigorously analyze the explicit Rule 23(a) and (b) certification requirements." Id. at 164–65 (internal citations omitted). The separate ascertainability requirement ensures that class members can be identified after certification and, therefore, "prepares a district court to direct to class members the best notice that is practicable under the circumstances." Id. at 165 (internal quotation marks omitted). "If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." Marcus, 687 F.3d at 593.

The Third Circuit has clarified that the ascertainability inquiry is "narrow." Byrd, 784 F.3d at 165. "If defendants intend to challenge ascertainability, they must be exacting in their analysis and not infuse the ascertainability inquiry with other class-certification requirements." Id. "[A]scertainability only requires the plaintiff to show that class members can be identified." Carrera v. Bayer Corp., 727 F.3d 300, 308 n.2 (3d Cir. 2013). The proposed method for identifying class members must be "administratively feasible," meaning that "identifying class members is a manageable process that does not require much, if any individual factual inquiry." Carrera, 727 F.3d at 307–08 (quotations omitted).

**\*14** In my Prior Certification Opinion, I found that the EPPs had failed to present a clear methodology to identify Class Members and distinguish Class Members from persons that fell within an exclusion. Vista Healthplan, 2015 WL 3623005, at \*10. I further found that the EPPs had not established any administratively feasible approach that would be effective without extensive individualized inquiry and mini-trials. Id.

Here, the revised class definitions and Notice Program obviate all of my previous ascertainability concerns. As detailed above, the Classes were re-defined to exclude (1) insured individuals covered by plans imposing a flat dollar co-pay that was the same dollar amount for generic as for brand drug prices, and (2) insured individuals who purchased only generic modafinil pursuant to a fixed co-pay applicable to generic drugs. These exclusions are specified on the Consumer Claim Form and, in order to participate in the Settlement, Class Members must swear in their claim forms, under penalty of perjury, that they do not fall within such exclusions. (Miller Decl., Exs. C & D.) The proposed Settlement Classes specifically condition class membership on a Provigil or modafinil "purchase" and require claiming Class Members to verify that they paid for such a purchase. (Id.)

Moreover, the Notice Program has borne out the desired results of identifying Class Members. As set forth above, the Notice Program consisted of (a) direct notice to potential Class Members identified through subpoenas to twenty-five providers of retail pharmacy services and pharmacy benefits managers, including mail-order pharmacies; (b) direct notice to potential members of the Settlement Class identified through the A.G. Provigil Settlement; (c) publication notice in national magazines; (d) internet banner and newsfeed ads on multiple networks; (e) distributing notice via PR

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 428 of 482

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

Newswire's US1 Newsline; (f) developing and launching a dedicated informational website for the Settlement at ProvigilSettlement.com; and (g) establishing a dedicated toll-free telephone number. As a result of this Notice Program, over 40,000 eligible claimants have been identified. As represented by the EPPs' Class Counsel, all money obtained from the Settlement will be distributed, leaving no surplus.

Ultimately, I find that the EPPs have met their burden of setting forth objective criteria by which the Settlement Classes are defined and providing reasonable assurance of a reliable and administratively feasible mechanism for determining whether putative Class Members fall within the class definition. My previous concerns about the need for individualized fact-finding or mini-trial to identify Class Members has been adequately addressed by the EPPs.

#### D. Conclusion as to Class Certification

Following a "rigorous analysis," I find that the EPPs have proven that class certification is warranted and proper. The EPPs have established all of the Rule 23(a) elements of numerosity, commonality, typicality, and adequacy of class representation. Moreover, common, class-wide issues will predominate, and the EPPs have adduced sufficient classwide evidence to prove anticompetitive conduct, antitrust impact, and damages. Finally, I conclude that a class action is a superior method to fairly and efficiently adjudicate this controversy, and that the class is ascertainable. Accordingly, the EPPs' Motion for Class Certification of the Settlement Classes will be granted.

#### E. Appointment of Interim Class Counsel as Class Counsel

**\*15** Having certified the Settlement Class, I must now appoint Class Counsel.

Questions concerning the adequacy of class counsel are governed by Federal Rule of Civil Procedure 23(g), which requires a court to consider the following: (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources counsel will commit to representing the class. Fed. R. Civ. P. 23(g); see also Dewey v. Volkswagen Aktiengesellschaft, 681 F.3d 170, 181 n.13 (3d Cir. 2012) (noting that adequacy of class counsel must be considered under factors in Fed. R. Civ. P. 23(g)).

I have already twice determined that the three firms that were appointed as Interim Class Counsel—Spector Roseman & Kodroff, Kessler Topaz Meltzer & Check, and Criden & Love—are qualified under Rule 23(g) factors. I have again reviewed these factors in the course of the adequacy of representation factor of Rule 23 and found that these firms have actively, efficiently, and competently litigated this case for over twelve years. They have applied their past experience in handling antitrust class actions and their extensive knowledge of the applicable law, and they have committed extraordinary resources to this matter. Having no reason to doubt the collective experience of Interim Class Counsel, I appoint these firms as Class Counsel.

#### IV. FAIRNESS OF THE SETTLEMENT

After determining that a proposed settlement class may properly be certified under Rule 23, the court must evaluate the fairness of a proposed class action settlement under Rule 23(e). See In re Ins. Brokerage Antitrust Litig., 579 F.3d 241, 258 (3d Cir. 2009) (" 'Even if it has satisfied the requirements for certification under Rule 23, a class action cannot be settled without the approval of the court and a determination that the proposed settlement is fair, reasonable and adequate.' ") (quoting In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 316 (3d Cir. 1998)).

Where, as here, "settlement negotiations precede class certification, and approval for settlement and certification are sought simultaneously," the court must protect absentee class members by applying an "even more rigorous, heightened standard." In re Pet Food Prods. Liab. Litig., 629 F.3d 333, 350 (3d Cir. 2010) (internal quotation marks omitted) (In re Warfarin, 391 F.3d 516, 534 (3d Cir. 2004)). However, the Third Circuit, in In re Cendant Corp. Litigation, 264 F.3d 201 (3d Cir. 2001), has directed a district court to apply an initial presumption of fairness when reviewing a proposed settlement where: "(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." Id., at 232 n.18; see also In re Warfarin, 391 F.3d at 535.

In Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975), the Third Circuit "identified certain factors which district courts may employ in informing their discretion before granting final approval to the class action settlement." Schwartz v. Dallas Cowboys Football Club, Ltd., 157 F. Supp. 2d 561, 571 (E.D. Pa. 2001) (citing Girsh). "[T]he district court must

2020-1 Trade Cases P 81,190

make findings as to each of the nine Girsh factors in order to approve a settlement as fair, reasonable, and adequate, as required by Rule 23(e)." In re Pet Food Prods., 629 F.3d at 350. The Girsh factors include:

> **\*16** (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

Girsh, 521 F.2d at 157.

Subsequently, in In re Prudential Insurance Company America Sales Practice Litigation Agent Actions, 148 F.3d 283 (3d Cir. 1999), the Third Circuit cited a "sea-change in the nature of class actions" and advised that "it may be useful to expand the traditional Girsh factors" when appropriate. Id. at 323. The additional factors for consideration cited by the Prudential Court include:

> [T]he maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement

> for individual class or subclass members and the results achieved— or likely to be achieved—for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

Id. These Prudential factors are "illustrative of additional inquiries that in many instances will be useful for a thoroughgoing analysis of a settlement's terms." In re Pet Food Prods., 629 F.3d at 350.

Finally, in In re Baby Products Antitrust Litigation, 708 F.3d 163 (3d Cir. 2013), the Third Circuit added that "one of the additional inquiries for a thorough analysis of settlement terms is the degree of direct benefit provided to the class." [3] Id. at 174. "In making this determination, a district court may consider, among other things, the number of individual awards compared to both the number of claims and the estimated number of class members, the size of the individual awards compared to claimants' estimated damages, and the claims process used to determine individual awards." Id.

Ultimately, the "decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court," and the appellate court gives great deference to the district court's factual findings. Girsh, 521 F.2d at 156. There is an overriding public interest in settling class action litigation, and it should therefore be encouraged. See G.M. Trucks, 55 F.3d at 784 ("The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation"); In re Sch. Asbestos Litig., 921 F.2d 1330, 1333 (3d Cir. 1990) (noting that the court encourages settlement of complex litigation "that otherwise could linger for years"). As a result, "when evaluating a settlement, a court should be 'hesitant to undo an agreement that has resolved a hard-fought, multi-year litigation.' " In re Comcast Corp. Set-Top Cable TV Box Antitrust Litig., No. 09-md-2034, 2019 WL 4645331, at \*10 (E.D. Pa. Sept. 24, 2019) (quoting In re Baby Prods., 708 F.3d at 175).

**\*17** With these standards in mind, my review of the Settlement here entails several steps. I will first address

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 430 of 482

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

whether the Settlement is entitled to a presumption of fairness as described in the <u>Cendant</u> case. I will then individually address the <u>Girsh</u>, <u>Prudential</u> and <u>Baby Products</u> factors.

## A. **Presumption of Fairness**

As set forth above, a proposed settlement is entitled to an initial presumption of fairness where: "(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." <u>In re Cendant, 264 F.3d at 232 n.18</u>; see also <u>In re NFL, 821 F.3d at 436</u>.

All of these factors are satisfied here. First, it is undisputed that the settlement negotiations occurred at arm's length. The parties began settlement negotiations through two full days of mediation conducted by United States Magistrate Judge David R. Strawbridge and the two Special Masters he selected. (Meltzer Decl. ¶ 28.) Over the ensuing pendency of the litigation, settlement discussions occurred intermittently, ultimately culminating in the Settlement after the denial of class certification. (<u>Id.</u> ¶¶ 29–32.)

Second, sufficient discovery unequivocally occurred here. Discovery took place over the course of over twelve years and involved the review and analysis of more than five million pages of documents, over 180 depositions including those of all five named Plaintiffs, court hearings on discovery, and extensive motion practice. (<u>Id.</u> ¶¶ 22–24.)

Third, as noted above, Class Counsel, who are the proponents of the Settlement, are highly experienced in similar class litigation. As I found in my Prior Certification Opinion, Class Counsel has extensive experience handling complex class action litigation, particularly in the antitrust context. <u>Vista Healthplan, 2015 WL 3623005, at *15</u>.

Finally, as will be discussed in more detail below, the response to the Class Settlement has been overwhelmingly favorable. Nearly 40,000 Settlement Class Members have filed claims to participate in the Settlement, only eighteen potential Class Members have sought exclusion from the Class, and only three individuals have filed generalized objections.

In light of these factors, I find that the proposed Settlement is entitled to a presumption of fairness. While this presumption does not obviate the need for scrupulous analysis under the <u>Girsh</u>, <u>Prudential</u>, and <u>Baby Product</u> factors, it does skew the analysis in favor of approving the Settlement.

## B. **Application of the *Girsh* Factors**

### 1. Complexity, Expense, and Likely Duration of the Litigation (Factor 1)

"The first factor 'captures the probable costs, in both time and money, of continued litigation.' " <u>In re Warfarin</u>, 391 F.3d 535–36 (quoting <u>In re Cendant, 264 F.3d at 233</u>); see also <u>In re NFL, 821 F.3d at 437</u>.

This suit involves complicated antitrust and patent issues in the realm of pharmaceutical manufacturing. "An antitrust class action is arguably the most complex action to prosecute ..." <u>In re Linerboard Antitrust Litig., 296 F. Supp. 2d 568, 577 (E.D. Pa. 2003)</u> (quotations omitted); see also <u>In re Flonase Antitrust Litig., 951 F. Supp. 2d 739, 743 (E.D. Pa. 2013)</u> ("Antitrust class actions are particularly complex to litigate and therefore quite expensive."). The Settlement therefore avoided the need for a difficult and expensive multi-week trial involving numerous <u>Daubert</u> motions, multiple motions *in limine*, fact witness testimony, and costly expert witness testimony in scientific and regulatory areas. Moreover, given the significant amount of money at stake, the likelihood of appeal by either side was high, further multiplying the projected expenditures. Because such private resolution of the conflict "reduces expenses and avoids delay," this factor weighs heavily in favor of approving the Settlement. <u>McDonough v. Toys R Us, Inc., 80 F. Supp. 3d 626, 640 (E.D. Pa. 2015)</u>.

### 2. Reaction of the Potential Class Members to the Settlements (Factor 2)

**\*18** The second <u>Girsh</u> factor—the reaction of the classes to the settlement—"attempts to gauge whether members of the class support the settlement." <u>In re Warfarin Sodium Antitrust Litig., 212 F.R.D. 231, 254 (D. Del. 2002)</u> (quoting <u>In re Prudential, 148 F.3d at 318</u>).

Here, the Notice to potential Class Members stated that Requests for Exclusions had to be mailed to the Settlement Administrator so that they were received by December 6, 2019. (Miller Decl., ECF 600-4, ¶ 21 & Ex. C, ¶ 15.) The Settlement Administrator received a total of eighteen Requests for Exclusion. (Supp. Miller Decl. ¶ 6.) By contrast,

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 431 of 482

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

nearly 40,000 Settlement Class Members have filed claims to participate in the Settlement.

Three objections to the proposed Settlement were filed, none of which I find warrants non-approval of the Settlement.

First, Mr. Barry Balach challenges the Cephalon Settlement because it does not include Nuvigil purchases in those for which Class Members may recover. He asserts that any settlement that does not take into account his out-of-pocket costs for Nuvigil is inadequate. He also believes the amount of the Settlement is insufficient. (Barry Balach Obj., ECF No. 601.)

I note that the EPPs' Amended Complaint originally alleged that Cephalon's launch of Nuvigil was part of an illegal "product hop" and that Nuvigil purchases should be recoverable damages. The EPPs' Class Counsel, however, averred that evidence received during discovery revealed the weakness of the product hop allegations, and that damages related to Nuvigil purchases "would be low if not impossible to prove." (EPPs' Suppl. Br. 4.) Indeed, Nuvigil purchases were not recoverable in either the Direct Purchaser Settlement or the States' Attorneys General Settlement. As I find the decision to exclude Nuvigil purchases from the Settlement to be reasonable, I will overrule Mr. Balach's objection.

The second objection comes from Mr. Carlton Davis, who contends that the Cephalon Settlement will be an insufficient deterrent because he understood that Cephalon "accrued as much as $47.25 billion in overcharges" and that the Settlement amount will not impede the illicit conduct because it is a "mild slap on the wrist to a greed-addicted company." He also believes that the Settlement "does nothing to address the real cost inflicted" on society and is "woefully inadequate to compensate consumers" because only $20 million is going to be paid out to the class. He urges that he should be compensated for his time and expenses in pursuing his claim, in the amount of $8,000. (Carlton Davis Obj. ECF No. 602.)

I find no basis to sustain the objection for several reasons. First, Mr. Davis's objection relies on an overly-inflated overcharge number. As noted by the EPPs, the overcharge damages were not calculated to be $47.25 billion, as Mr. Davis believes, but rather were calculated, by the EPPs' expert, to be approximately $1.244 billion. (Meltzer Decl. for Preliminary Approval, ECF No. 586, Ex. 18.) Moreover, the Settlement amount itself is substantial. It gives approximately $66 million to the EPP class, which, combined with $77

million obtained from the separate group of Settling Health Plans ("SHP's"), results in a total settlement of $143 million to the entire group of end-payors for whom the litigation was originally commenced. The amount of the Settlement is even more substantial when viewed in light of the fact that the EPPs were denied class certification, meaning that a collective recovery through litigation would have been impossible. Finally, Mr. Davis's concerns as to the amount of attorneys' fees are unfounded, as I will discuss later in this Opinion.

**\*19** Mr. Davis's request for $8,000 in personal attorneys' fees—unaccompanied by any documentation—has no legal basis. "Absent a showing that the objector substantially enhanced the benefits to the class under the settlement, the objector is not entitled to a fee." In Rent-Way Secs. Litig., 305 F. Supp. 2d 491, 520 (W.D. Pa. 2003). As Mr. Davis has not demonstrated that his participation has enhanced the benefits to the class under the settlement, he is not entitled to any fees. Accordingly, I will overrule Mr. Davis's objection as well.

Finally, Mr. Daniel Dunham [4] generally objects that "[t]he actions alleged, if true, would require penalties in excess of profit to have any deterring effect" and suggests that "the fund to be distributed be much larger, since victims can obtain nothing more than what was lost due to the alleged behavior, and the total judgment has a finite limit." He believes that "there is no reason a company should retain any of the profit that is earning using unlawful methods." (Daniel Dunham Obj., ECF No. 607-4.)

This objection is meritless for the same reasons applied to Mr. Davis's objection. Moreover, Mr. Dunham has, contrary to his objection, filed a claim form to participate in the Settlement. Accordingly, I will overrule this objection as well.

While I appreciate and carefully consider the objections of those who take the time to participate in what is generally a lawyer-driven settlement, I do not find that any of the three objections before me raise valid concerns to the fairness and adequacy of the EPP Settlement. By contrast, the fact that approximately 40,000 individuals have filed forms to participate in the Settlement reflects significant support for the Settlement. As a "small proportion of objectors does not favor derailing [the] settlement," Bell Atl. v. Bolger, 2 F.3d 1304, 1314 (3d Cir. 1993), I find that this factor weighs in favor of approval.

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 432 of 482

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

### 3. Stage of Proceedings and Amount of Discovery Completed (Factor 3)

Through the "lens" of the third Girsh factor—the stage of the proceedings and the amount of discovery completed—"courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." In re Prudential, 148 F.3d at 319 (quoting G.M. Trucks, 55 F.3d at 813). "[P]ost discovery settlements are more likely to reflect the true value of the claim and be fair." Lazy Oil Co. v. Witco Corp., 166 F.3d 581, 588 (3d Cir. 1999) (citing Bell Atl. v. Bolger, 2 F.3d 1304, 1314 (3d Cir. 1993)).

Here, twelve years of active litigation transpired during which extensive discovery was exchanged, over 180 depositions were taken, expert reports were obtained and exchanged, and vigorous motion practice was pursued. Only after the denial of class certification and rulings on summary judgment were issued did the parties reach the Settlement. Moreover, the parties had the benefit of rulings in the related cases by the States' Attorneys General and the Direct Purchasers, as well as my ruling in the patent infringement case brought by Apotex. Given this record, I find that the parties had a well-developed appreciation of the merits of the case prior to negotiation.

### 4. Risks of Establishing Liability & Damages (Factors 4 and 5)

"These factors survey the potential risks and rewards of proceeding to litigation in order to weigh the likelihood of success against the benefits of an immediate settlement." In re Warfarin, 391 F.3d at 537.

**\*20** As I have repeatedly noted over the twelve-year litigation period, a favorable outcome was far from guaranteed to the EPPs. The EPPs put forth novel theories of antitrust liability in an ever-changing legal landscape. Defendants—three large pharmaceutical companies—had immeasurable resources to proceed to and through trial. Even if the EPPs were successful in establishing an unlawful reverse-settlement payment Actavis scheme with respect to Provigil, they faced an uncertain battle in establishing causation and damages. "The dispute over damages would likely have resulted in an expensive battle of the experts and there was no way to anticipate a jury's response to intricate economic data." McDonough, 80 F. Supp. 3d at 644.

By the same token, I note that while the EPPs' likelihood of prevailing was far from certain, "there is no indication that this case was brought in bad faith simply to generate attorneys' fees, or that the case [was] too weak to succeed under most circumstances." Reibstein v. Rite Aid Corp., 761 F. Supp. 2d 241, 253 (E.D. Pa. 2011). Ultimately, the Settlement provided the certainty of a $66 million immediate recovery without subjecting the EPPs to the rigors of a difficult trial. As such, I find these factors weigh in favor of the Settlement.

### 5. Likelihood of Obtaining and Keeping Class Certification Through Trial (Factor 6)

The sixth Girsh factor "measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial" in light of the fact that "the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the class action." In re Warfarin, 391 F.3d at 537 (internal quotations & citation omitted). Class certification is tenuous, as a "district court retains the authority to decertify or modify a class at any time during the litigation if it proves to be unmanageable." Id. (citation omitted).

This factor weighs heavily in favor of approval. As noted above, I had already denied class certification to the EPPs, meaning that any trial in this case would have been only on behalf of the five individual EPPs and any recovery would have been limited to their individual damages. Depending on the outcome of that trial, either the named Plaintiffs would have had to appeal my class certification decision, or the non-named potential Class Members would have had to decide whether to pursue their own costly individual cases against the Defendants. Given the relatively small amounts of damages that these individual plaintiffs each sustained, individual litigation would not likely be feasible.

By contrast, the Settlement here guarantees some recovery to all of the potential Class Members, both named and unnamed. As such, this factor weighs in favor of approving the Settlement.

### 6. Ability of Defendants to Withstand a Greater Judgment (Factor 7)

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 433 of 482

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

The ability of the Defendants to withstand a greater judgment generally only comes into play when "a settlement in a given case is less than would ordinarily be awarded but the defendant's financial circumstances do not permit a greater settlement." Reibstein, 761 F. Supp. 2d at 254. The Third Circuit has noted that simply because a defendant "could afford to pay more does not mean that it is obligated to pay any more than what the Consumer and TPP Class Members are entitled to under the theories of liability that existed at the time the settlement was reached." In re Warfarin, 391 F.3d at 538.

Here, there is no question that the Defendants' total resources far exceed the Settlement amount, and Defendants did not profess any inability to pay during settlement negotiations. That factor does not appear to have come into play during the settlement negotiations. Defendants' ability to pay is therefore irrelevant in determining the fairness of the Settlement and I decline to give it any weight.

7. Range of Reasonableness of Settlement Fund in Light of Best Possible Recovery and to a Possible Recovery in Light of All Attendant Risks of Litigation (Factors 8 & 9)

**\*21** "The last two Girsh factors evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case. The factors test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." In re Warfarin, 391 F.3d at 538 (citations omitted). In order to assess the reasonableness of a settlement in cases seeking primarily monetary relief, "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement." In re Prudential, 148 F.3d at 322 (quoting G.M. Trucks, 55 F.3d at 806). In conducting this evaluation, it is recognized "that settlement represents a compromise in which the highest hopes for recovery are yielded in exchange for certainty and resolution and [courts should] guard against demanding too large a settlement based on the court's view of the merits of the litigation." In re Aetna Sec. Litig., No. MDL 1219, 2001 WL 20928, at \*11 (E.D. Pa. Jan. 4, 2001). "The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved. The percentage recovery, rather must represent a material percentage recovery to plaintiff in light of all the risks considered under Girsh." In re Cendant Corp. Sec. Litig., 109 F. Supp. 2d 235, 263 (D.N.J. 2000) (citations omitted) (internal quotations marks omitted), aff'd, 264 F.3d 201 (3d Cir. 2001).

The Settlement here is reasonable in light of the best possible recovery. As set forth above, the Settlement provides $65,877,600 for Class Members, which amount was negotiated simultaneously with the $77 million settlement from the Cephalon Parties for the Settling Health Plans. The EPPs' expert, Dr. Hartman, calculated the total overcharge damages as $1.244 billion. (Meltzer Decl., ECF No. 586, Ex. 18 ¶ 44.) The total EPP Settlement of $142,877,300 is approximately 11.5% of that best possible recovery situation. Courts have approved settlements in and around this range. See In re Linerboard Antitrust Litigation, 321 F. Supp. 2d 619, 633 (E.D. Pa. 2004) (citing in part In re Domestic Air Transp. Antitrust Litig., 148 F.R.D. 297, 325 (N.D. Ga. 1993) (approving a settlement in the appropriate amount of 12.7 to 15.3 percent of the estimated $2 billion minimum possible trebled recovery); Erie Forge and Steel, Inc. v. Cyprus Minerals Co., No. 94-404, 1994 WL 485803 (W.D. Pa. Dec. 23, 1996) (approving settlement of $3.6 million where plaintiffs' expert estimated damages of $44.4 million); Fox v. Integra Financial Corp., No. 90-1504 (W.D. Pa. July 9, 1996) (approving a settlement of $6.5 million where plaintiffs' best estimate of provable damages was $33 million); In re Four Seasons Sec. Litig., 58 F.R.D. 19, 36–37 (W.D. Okla. 1972) ($8 million settlement approved although claims exceeded $100 million)).

**\*22** The Settlement becomes even more reasonable when considered in light of the attendant risks of litigation. The combined Settlement of almost $143 million (EPP Class plus SHPs) was achieved after twelve years of litigation. As noted above, class certification had been denied, meaning that the best case recovery scenario—which accounted for damages to an entire class—could not be obtained through a singular trial. And Defendants had their own competing economic experts who would have challenged the EPPs' damages calculation at every angle, potentially lowering the amount of recoverable damages. "After considering the present-day-value of money, the likelihood that the class would recover less than its maximum actual damages, all of the attendant risks of litigation, and the interests in resolution, such a recovery is well within the range of reasonableness." Jackson v. Wells Fargo Bank, N.A., 136 F. Supp. 3d 687, 706 (W.D. Pa. 2015); see also In re NFL, 821 F.3d 410, 440 (3d Cir. 2016) (holding that, in considering the eighth and ninth Girsh

Case 4:21-cv-00196-MWB   Document 249-1   Filed 10/07/25   Page 434 of 482

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

factors, "we must take seriously the litigation risks inherent in pressing forward with the case" including the possibility that litigation could leave class members with "no recovery at all").

Taking all of this into consideration, I find that the eighth and ninth <u>Girsh</u> factors weigh in favor of approval of the Settlement.

8. Summary of the <i>Girsh</i> Factors

In sum, <u>Girsh</u> factors one through six, eight, and nine favor approval of the EPP Settlement. Factor seven—the ability of the Defendants to withstand a greater settlement—is neutral and does not persuade me either way. Although the <u>Girsh</u> factors are simply a guide, I find that, under these considerations, the Settlement is fair and reasonable.

**C. The <i>Prudential</i> Factors**

The <u>Prudential</u> factors involve multiple additional considerations, including: (1) "the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages"; (2) "the existence and probable outcome of claims by other classes and subclasses"; (3) "the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants"; (4) "whether class or subclass members are accorded the right to opt out of the settlement"; (5) "whether any provisions for attorneys' fees are reasonable"; and (6) "whether the procedure for processing individual claims under the settlement is fair and reasonable." In re Prudential, 148 F.3d at 323. Only the <u>Prudential</u> factors relevant to the litigation in question need be addressed. Id. 323–24; In re Cigna-American Specialty Health Admin. Fee Litig., No. 16-3967, 2019 WL 4082946, at *3 (E.D. Pa. Aug. 29, 2019).

The first factor—maturity of the underlying substantive issues—substantially mirrors <u>Girsh</u> factor three, the stage of the proceedings. Under this factor, the advanced development of the record weighs in favor of approval. See Chakejian v. Equifax Info. Servs., LLC, 275 F.R.D. 201, 215 (E.D. Pa. 2011) (finding settlement reasonable where underlying

substantive issues were "mature in light of the experience of the attorneys, extent of discovery, posture of case, and mediation efforts undertaken."). The Settlement here came on the heels of twelve years of active litigation during which extensive discovery was exchanged, over 180 depositions were taken, expert reports were obtained and exchanged, and vigorous motion practice was pursued. Class Counsel had the benefit of assessing the strength and weaknesses of the case based on this discovery, the Defendants' motions, and the Supreme Court ruling in Actavis. Moreover, the Settlement resulted from extensive negotiations with multiple mediators who had the benefit of an expansive overview of the case. Accordingly, I find that the Settlement was premised on a significantly mature record.

**\*23** Factors two and three look at the outcomes of claims by other classes and other claimants. Defendants here faced antitrust claims from multiple other claimants and classes including the Federal Trade Commission, generic manufacturer Apotex, a group of retailer pharmacy chains, a class of direct purchaser plaintiffs, and several States' attorneys general, all of whom reached settlements allowing for the recovery of overcharge damages. In addition, the State of California has a pending settlement that allows its claimants to recover full reimbursement for their purchases of Provigil and/or modafinil. Consistent with these settlements, the Settlement here likewise permits Class Members to potentially recover the full amount of overcharge damages they suffered as a result of the alleged anticompetitive conduct. Thus, there do not appear to be any disparities in the success of the settlements obtained by the various claimants.

Factor four considers whether class or subclass members are accorded the right to opt out of the settlement. The Settlement here specifically advised potential class members that they had the option to be excluded from the class. (Miller Decl., Exs. C & D.) As of the date of the Final Fairness Hearing, only eighteen class members had opted out of the Settlement. (Supp. Miller Decl. ¶¶ 5–6.) The release of claims against Defendants does not apply to those Plaintiffs who opt out.

Pursuant to the fifth factor—the reasonableness of attorneys' fees—the Notice Program specifically advised potential Class Members that:

> Class Counsel will request an award
> from the Court for attorneys' fees of
> up to one-third of the total amount of

the Settlement funds plus any accrued interest, plus reimbursement for the costs and expenses they advanced in litigating the case. All awards for attorneys' fees and expenses shall be paid from the Settlement Funds after the Court approves them. In addition, pursuant to an agreement between Class Counsel and the lawyers for the Settling Health Plans or SHPs (a group of TPPs who separately settled with the Cephalon Defendants), Class Counsel received 40% of the fees paid to the SHP's lawyers from their separate agreement with the Cephalon Defendants. The fees paid pursuant to this agreement are separate from any attorney fees the Court awards to Class Counsel from the Settlement Funds in this case. Further, also pursuant to the agreement between the SHPs' lawyers and Class Counsel, Class Counsel will pay the SHPs' lawyers approximately 32.2% of any fees awarded by the Court in connection with the settlement with the Cephalon Defendants.

(Miller Decl., Exs. C & D.) While the reasonableness of these requested fees is discussed in more detail below, I find—for purposes of approving the fairness of the Settlement—that the notice to the Class Members about the requested fees was reasonable.

Finally, under the sixth factor, I find that the procedure for processing individual claims is both fair and reasonable. In order to submit claims, Class Members need only provide information regarding the total amount they paid for Provigil or modafinil from June 24, 2006 through August 8, 2019, with only one proof of purchase, which can take any number of forms including pharmacy records, an insurance EOB (explanation of benefits) form, or letter from the claimant's doctor. (Miller Decl., Ex. C.) Absent a proof of purchase, a Class Member can seek help from the Settlement Administrator to file a valid claim. (Id.) The Settlement Administrator will then process all submitted claims to determine whether there are any deficiencies and, if so, to notify the Claimant how to cure the deficiency.

(Meltzer Decl., Ex. 5.) Once all non-deficient claims are collected, the Settlement Administrator will review the claims to determine which ones are authorized for approval and which ones are ineligible. (Id.) Upon final approval of the Settlement, the approved Settlement Notice Costs, Settlement Administration Costs, Escrow Administration Costs, taxes, approved attorneys' fees and costs, and lead plaintiff incentives shall be paid from the settlement funds. The Settlement Administrator shall then pay all authorized Consumer Claims from the final Consumer Distribution Fund allowing claimants to receive up to 100% of their authorized Consumer Claim, depending on the sufficiency of the funds available and whether the claimant has received reimbursements from either the State Attorney General settlement or the California Attorney General settlement.

**\*24** Overall, the Prudential factors raise no concerns regarding the fairness of the Settlement. The Settlement was reached at mature stage of the litigation, and the Settlement's terms appropriately set forth how to file a claim, how the monies will be distributed, how to opt out of the Settlement, and what the potential attorneys' fees and costs awards could be. Ultimately, the Settlement is consistent with those obtained by the other claimants in the related actions. As such, I find that the Prudential factors favor approval of the Settlement.

### D. *Baby Products* Direct Benefit Factor

The final factor I must consider in my analysis of the Settlement's fairness is "the degree of direct benefit provided to the class." In re Baby Products Antitrust Litig., 708 F.3d 163, 174 (3d Cir. 2013). As noted above, "[i]n making this determination, a district court may consider, among other things, the number of individual awards compared to both the number of claims and the estimated number of class members, the size of the individual awards compared to claimants' estimated damages, and the claims process used to determine individual awards." Id.; see also In re Google Inc. Cookie Placement Consumer Privacy Litig., 934 F.3d 316, 329 (3d Cir. 2019).

Here, the Plan of Allocation provides that:

- The separate settlement funds provided by each of the Cephalon Settlement, the Mylan Settlement, and the Ranbaxy Settlement shall be deposited into three separate accounts.

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 436 of 482

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

- From those accounts, there will be several deductions made on a *pro rata* basis:

  − Any and all allowed costs (including Settlement Notice costs, Settlement Administration costs, Escrow Administration costs, and taxes).

  − Any allowed class attorneys' fees and costs.

  − Court-authorized incentive awards to the named Plaintiffs.

  − Any future Settlement Administration Costs, Escrow Administration costs, and taxes likely to be incurred through completion of the claims process.

- Following these disbursements, the Settlement Administrator shall combine the remaining funds in the three accounts (the "Net Class Settlement Fund"), which will be used to pay Consumer and TPP claims that have been processed and authorized by the Settlement Administrator in accordance with the Plan of Allocation.

- The Net Class Settlement Fund will be so allocated and disbursed to "Authorized Consumer Claimants" (who will receive 14% of the net Class Settlement Fund) and "Authorized TPP Claimants" (who will receive 86% of the Net Class Settlement Fund) by the Settlement Administrator, under the supervision of Class Counsel and upon Court approval.

- If there are sufficient funds, each Authorized Consumer Claimant shall receive 100% of their Authorized Consumer Claim (reduced by money that Authorized Consumer Claimant has received in any other modafinil settlement).

- If there are insufficient funds to pay each Authorized Consumer Claimant 100% of their Authorized Consumer Claim, then each Authorized Consumer Claimant shall receive a *pro rata* share of the fund.

- If, after all Authorized Consumer Claimants are paid 100% of their claims, funds remain in the Consumer Distribution Fund, those remaining funds shall be added to the TPP Settlement fund and paid out to Authorized TPP Claimants.

As discussed above, Class Members will be entitled to recover up to 100% of their purchase price if sufficient funds are available. Potential Class Members have already received sufficient notice with detailed information and an easy-to-complete claim form. Ultimately, this Settlement prioritizes the maximum number of potential Class Members receiving a direct benefit from the litigation. In re Comcast Corp. Set-Top Cable Television Box Antitrust Litig., 333 F.R.D. 364, 385 (E.D. Pa. 2019) (approving class settlement where, "[d]espite a weak case, Class Counsel continued to prioritize obtaining a direct benefit for potential Class Members and ultimately achieved a Settlement with the potential to directly benefit an estimated 3.5 million consumers.").

### E. Conclusion as to Fairness of the Settlement

**\*25**  In light of the foregoing, I find that the EPP Settlement is fair, reasonable, and adequate. Lending the Settlement the requisite presumption of fairness, I note that all but one of the Girsh factors, all of the Prudential factors, and the Baby Products direct benefit consideration weigh in favor of approval. Accordingly, I will grant final approval to Settlement.

### V. APPROVAL OF THE PLAN OF ALLOCATION

When assessing proposed plans of allocation, courts use the same standard for determining whether to approve the settlement itself. McDonough v. Toys R Us, Inc., 80 F. Supp. 3d 626, 648 (E.D. Pa. 2015). "Therefore, the proposed plan needs to be fair, reasonable and adequate." Id. (citing In re Baby Prods., 708 F.3d at 174). "A district court's 'principal obligation' in approving a plan of allocation 'is simply to ensure that the fund distribution is fair and reasonable as to all participants in the fund.' " Sullivan v. DB Investments, Inc., 667 F.3d 273, 326 (3d Cir. 2011) (quoting Walsh v. Great Atl. & Pac. Tea Co., Inc., 726 F.2d 956, 964 (3d Cir. 1983)).

"In general, a plan of allocation that reimburses class members based on the type and extent of their injuries is reasonable." In re Ikon Office Solutions, Inc., Secs. Litig., 194 F.R.D. 166, 184 (E.D. Pa. 2000). Repeatedly, courts have approved of similar plans of allocation. See, e.g., In re Flonase Antitrust Litig., 951 F. Supp. 2d 739, 752 (E.D. Pa. 2013) (approving plan of allocation as fair, reasonable, and adequate where, in antitrust action against brand name drug manufacturer, each class member receives their *pro rata* share of the net settlement fund, based on their share of qualifying purchases of the brand name drug); Bradburn Parent Teacher Store, Inc. v. 3M (Minnesota Mining and Manufacturing Company), 513 F. Supp. 2d 322, 335 (E.D. Pa. 2007) (approving as reasonable a distribution plan that allocated settlement funds to class members based upon their *pro rata*

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 437 of 482

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

share of the class's total transparent tape purchases during the damage period, net of invoice adjustments and rebates paid as of the date of the settlement); In re Remeron Direct Purchaser Antitrust Litig., No. 03-0085, 2005 WL 3008808, at *11 (D.N.J. Nov. 9, 2005) ("Plaintiffs propose to allocate the Settlement funds, net of Court approved attorneys' fees, incentive award, and expenses ... in proportion to the overcharge damages incurred by each Class member due to Defendants' alleged conduct in restraint of trade. Such a method of allocating the Net Settlement Fund is inherently reasonable."); see also In re Corel Corp. Inc. Secs. Litig., 293 F. Supp. 2d 484, 493 (E.D. Pa. Jan. 4, 2001) (noting that courts "generally consider plans of allocation that reimburse class members based on the type and extent of their injuries to be reasonable.").

Here, the proposed Plan of Allocation is fair, reasonable, and adequate as it provides a straightforward method for determining each Class Member's *pro rata* share of the Net Settlement Fund and then reimburses Class Members based on the type and extent of their injuries. As set forth in more detail above, the process for submission of claims is simple as Class Members need only provide information regarding the total amount they paid for Provigil or modafinil from June 24, 2006 through August 8, 2019, with only one proof of purchase, which can take any number of forms. Once all non-deficient claims are collected, the Settlement Administrator will review the claims to determine which claims are authorized for approval or are deemed ineligible.

 **\*26**  The Settlement funds from each of the three Defendants will be subject to deductions for approved attorneys' fees, administrative costs, litigation costs, and incentive payments. The net amounts will then be combined into a single Class Settlement Fund. Authorized Consumer Claimants will receive 14% of Net Settlement Fund and Authorized TPP Claimants will receive 86% of the Net Settlement Fund. The amounts will be allocated on a *pro rata* basis and all Class Members will receive a proportionate award based on the amounts they paid for Provigil and modafinil during the class period, up to 100% depending on the number of claims. All of the net settlement amounts will be reimbursed to Class Members.

I will therefore approve the proposed Plan of Allocation.

## VI. MOTION FOR ATTORNEYS' FEES, LITIGATION EXPENSES, AND INCENTIVE AWARDS

The final portion of my review of the Settlement requires consideration of the EPPs' Motion for (1) an award of attorneys' fees, (2) reimbursement of litigation expenses, and (3) incentive awards for the class representatives.

### A. Attorneys' Fees

The EPPs first seek an award of attorneys' fees in the amount of $21,959,200 plus accrued interest—approximately one-third of the Class Settlement Fund—on behalf of Class Counsel and two other participating firms (Finkelstein Thompson and the Law Offices of Robert Sink). [5]

Under Federal Rule of Civil Procedure 23(h), at the conclusion of a successful class action, class counsel may apply to a court for an award of attorneys' fees. The amount of an attorneys' fee award "is within the district court's discretion so long as it employs correct standards and procedures and makes finding of fact not clearly erroneous[.]" Sullivan v. DB Invs., Inc., 667 F.3d 273, 329 (3d Cir. 2011) (en banc) (internal quotation marks omitted). " '[A] private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation, including attorneys' fees.' " In re Cendant, 404 F.3d at 187 (quoting G.M. Trucks, 55 F.3d 768, 820 n.39).

In assessing attorneys' fees, courts typically apply either the percentage-of-recovery method or the lodestar method. The percentage-of-recovery method is generally favored in common fund cases, such as the one here, because it allows courts to award fees from the fund "in a matter that rewards counsel for success and penalizes it for its failure." Prudential, 148 F.3d at 333 (internal quotations omitted); see also In re Rite Aid Sec. Litig., 396 F.3d 294, 300 (3d Cir. 2005) (finding that the "percentage of the fund" method is the proper method for calculating attorneys' fees in common fund class actions in this Circuit.); Kirsch v. Delta Dental of New Jersey, 534 F. App'x 113, 115 (3d Cir. 2013) ("The percentage of recovery method is generally favored in common fund cases ...") (quotations omitted).

In Gunter v. Ridgewood Energy Corp., 223 F.3d 190 (3d Cir. 1990), the Third Circuit directed that, when analyzing a fee award in a common fund case, a district court must consider several factors, including:

2020-1 Trade Cases P 81,190

**\*27**  (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

Id. at 195 n. 1. This list was not intended to be exhaustive. Id.

In In re Prudential, the Third Circuit identified three other factors that may be relevant and important to consider: (1) the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to the efforts of other groups, such as government agencies conducting investigations, (2) the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained, and (3) any "innovative" terms of settlement. Id. at 336–40.

Ultimately, in reviewing an attorneys' fees award in a class action settlement, a district court should consider the Gunter factors, the Prudential factors, and any other factors that are useful and relevant with respect to the particular facts of the case. The fee award reasonableness factors "need not be applied in a formulaic way" because each case is different, "and in certain cases, one factor may outweigh the rest." In re Rite Aid, 396 F.3d at 301 (quoting Gunter, 223 F.3d at 195 n.1). In cases involving extremely large settlement awards, district courts may give some of these factors less weight in evaluating a fee award. See In re Cendant Corp. Litig., 264 F.3d 201, 283–84 (3d Cir. 2001); In re Prudential, 148 F.3d at 339. What remains important is that, in all cases, the district court "engage in robust assessments of the fee award reasonableness factors," In re Rite Aid, 396 F.3d at 302, recognizing "an especially acute need for close judicial scrutiny of fee arrangements in class action settlements." In re Cendant Corp. PRIDES Litig., 243 F.3d 722, 730 (3d Cir. 2001) (internal quotations omitted); see also In re AT&T Corp., 455 F.3d 160, 165–66 (3d Cir. 2006).

Once all of the Gunter and Prudential factors have been considered, the Third Circuit has suggested that it is "sensible" for district courts to "cross-check" the percentage fee award against the "lodestar" method. In re Prudential, 148 F.3d at 333. More specifically, the district court should apply the percentage-of-recovery method and then do "an abridged lodestar analysis"— multiplying the number of hours reasonably worked on a case by a reasonable billing rate —and compare it against the percentage-of-recovery method. In re Rite Aid, 396 F.3d at 305–06. In doing so, the court can ensure that the percentage-of-recovery method does not yield too high or low of an award. Id. at 306.

With these standards in mind, I consider each of the Gunter and Prudential factors and then cross-check the percentage-of-recovery amount against a lodestar analysis to provide an overall assessment of the reasonableness of the requested attorneys' fees.

### 1. Gunter/Prudential Factors

*a. Size of the Fund Created & Number of Persons Benefitted*

**\*28**  The Settlement Agreement establishes a total recovery of \$65,877,600, from which administrative expenses, attorneys' fees, and costs must be paid. See Jackson v. Wells Fargo Bank, N.A., 136 F. Supp. 3d 687, 713 (W.D. Pa. 2015) (noting that "size of the fund" should include attorneys' fees, and administration expenses); Lake Forest Partners, L.P. v. Sprint Commc'ns Co. L.P., No. 12-00999, 2013 WL 3048919, at \*2 (W.D. Pa. June 17, 2013) (the size of the fund should include the "separate payment of attorney's fees and expenses, and the expenses of administration") (citing Boeing Co. v. Van Gemert, 444 U.S. 472, 479 (1980)). Notice has been disseminated to thousands of potential Class Members through the Notice Program as described above, and nearly 40,000 Class Members have filed claims to date.

Class Counsels' requested fees in this case represent 33 1/3 % of the total recovery, which is well within the range of reasonable fees, on a percentage basis, in the Third Circuit. See, e.g., Esslinger v. HSBC Bank Nevada, No. 10-3213, 2012 WL 5866074, at \*12 (thirty percent fee award reasonable considering size of the fund); In re Processed Egg Prods. Antitrust Litig., No. 08–2002, 2012 WL 5467530, at \*7 (E.D. Pa. Nov. 9, 2012) (approving a thirty percent (30%) fee award for \$25,000,000.00 settlement); In

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 439 of 482

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

re Flonase Antitrust Litig., 291 F.R.D. 93, 104 (E.D. Pa. 2013) (citing cases and remarking that "[a] one-third fee award is standard in complex antitrust cases of this kind" and "is consistent with awards in other complex antitrust actions involving the pharmaceutical industry") (quotations omitted). Accordingly, this factor weighs in favor of finding the fee request reasonable.

### b. Presence or Absence of Substantial Objections

The Notice Program specifically advised potential Class Members that Class Counsel would request an award of attorneys' fees of up to one-third of the total amount of the Settlement funds, plus costs, all of which would be paid from the Settlement funds. Despite this widespread notice, only three individuals filed objections. Of those, only one objector —Carlton Davis—challenged the amount of the requested attorneys' fees. Specifically, he stated that the Settlement was inequitable because "[o]ver 50% of [the settlement funds] is allocated to the state and private litigators to compensate for replenishing funds, for time spent, and expenses incurred." He believed that "[f]unds need to be provided to us consumers for our time and expenses researching our cost, calculating our time, and our damages." (Carlton Davis Obj., ECF No. 602.)

This singular objection, standing alone, would not be sufficient for me to deny the requested fees. Moreover, I note that, in their Supplemental Filing, the EPPs represented that a member of Class Counsel spoke with Mr. Davis by phone on January 27, 2000, to further explain the details of the Settlement. During that phone call, Class Counsel addressed some of Mr. Davis's concerns. Mr. Davis expressed appreciation for the call and advised that he had no objection to a one-third attorneys' fee award, indicating that he was aware that such amount was common in contingent fee cases. (EPPs' Supp. Br., ECF No. 607, p. 6 n.6.) Finally, I remain cognizant that nearly 40,000 individuals have submitted claims, thus tacitly indicating their approval for the Settlement and requested attorneys' fees.

### c. Skill and Efficiency of Attorneys' Involved

The Third Circuit has explained that the goal of the percentage fee-award device is to ensure "that competent counsel continue to undertake risky, complex, and novel litigation." Gunter, 223 F.3d at 198 (quotations omitted). "The single clearest factor reflecting the quality of class counsels' services to the class are the results obtained." Cullen v. Whitman Med. Corp., 197 F.R.D. 136, 149 (E.D. Pa. 2000) (quotations omitted).

**\*29** As repeatedly discussed above, both in regard to class certification and with respect to the fairness of the Settlement, Class Counsel are skilled and effective class action litigators that have obtained a highly favorable settlement in an extremely complex case despite the fact that an end-payor litigation class was not certified. I need not reiterate those same considerations again here. This factor therefore supports a 33 1/3% attorney fee award.

### d. Complexity and Duration of the Litigation

"[C]omplex and/or novel legal issues, extensive discovery, acrimonious litigation, and tens of thousands of hours spent on the class by class counsel" are factors which "increase the complexity of class litigation." In re Cendant Corp. PRIDES, 243 F.3d at 741. All of those factors favor the requested fee award here.

First, the legal issues involved here were novel and complex, implicating both patent and antitrust issues. Various groups of plaintiffs proceeded against Defendants under a reverse-payment settlement antitrust theory. Several years into the litigation, that theory was significantly altered and shaped in the wake of the Supreme Court decision in FTC v. Actavis, Inc., 570 U.S. 136 (2013). To further complicate matters, the case against Defendants involved complex patent issues under the Supreme Court case of Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172 (1965).

Second, discovery was extensive and far-reaching. The parties proceeded through years of certification, fact, and expert discovery involving approximately five million pages of documents, over 180 depositions, and depositions of numerous experts.

Third, the case was hard-fought on both sides. The parties briefed multiple, highly-contested motions, including motions to dismiss, discovery motions, certification motions, and motions for summary judgment. Counsel spent approximately 41,000 hours on the litigation.

Finally, the case was subject to numerous delays that were out of the EPPs' control. I first delayed the matter to conduct a patent infringement trial and resolve the underlying patent

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 440 of 482

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

issues before reaching the antitrust issues. Thereafter, the matter was delayed by the Supreme Court's impending ruling in Actavis. Finally, after the Settlement was reached, one of the members of the SHPs group—United Healthcare Corporation—attempted to withdraw from the Settlement, resulting in additional litigation and further delay of the resolution of this case.

In short, the litigation has been more than sufficiently lengthy and complex to justify the requested amount of attorneys' fees.

### e. Risk of Nonpayment

The risk of nonpayment in this matter was not negligible. Counsel began this litigation in 2006 on a contingent fee basis. See In re Flonase, 291 F.R.D. at 104 ("[A]s a contingent fee case, counsel faced a risk of nonpayment in the event of an unsuccessful trial. Throughout this lengthy litigation, Class Counsel have not received any payment. This factor supports approval of the requested fee."). Over the next twelve years, Class Counsel devoted extensive amounts of time and resources to litigating this case, all while pursuing complex legal theories which brought with them no guarantee of recovery at trial. Even in the event of recovery, the EPPs faced the substantial likelihood of challenge on appeal. The risk of nonpayment was then significantly heightened by the denial of class certification. Given Class Counsels' diligent pursuit of this case for more than a decade with significant risk and no immediate financial reward in sight, I find that this factor weighs in favor of the requested fee award.

### f. Amount of Time Devoted to the Case by Counsel

**\*30** According to the Declaration submitted in support of Class Counsels' Motion for Attorneys' Fees, Class Counsel has spent 41,000 hours prosecuting of this case, all without any guarantee of payment. (Meltzer Decl. ¶¶ 46–52 & Exs. 6, 7, 8 & 10.) Such expenditure of time at such great risk warrants the requested 33 1/3 % fee award. See In re Ikon Office Solutions, Inc., Secs. Litig., 194 F.R.D. 166, 194 (E.D. Pa. 2000) (granting a 30% fee request because "[c]ounsel expended more than 45,000 hours on this case and paid out expenses of more than $4 million with no guarantee of recovery" and the case presented "the legal obstacles of establishing scienter, damages, causation, and the like."); Cullen, 197 F.R.D. at 149–50 (finding that counsel's

expenditure of 3,899.84 hours on litigation represented a "substantial commitment to this litigation" that warranted a counsel fee of 33 1/3 % of the settlement fund); Wallace v. Powell, 288 F.R.D. 347, 375 (finding that counsel's expenditure of 34,900.48 hours on prosecuting the matter reflected a "substantial commitment to this litigation" and "the complexity of Plaintiffs' claims").

### g. Awards in Similar Cases

"While there is no benchmark for the percentage of fees to be awarded in common fund cases, the Third Circuit has noted that reasonable fee awards in percentage-of-recovery cases generally range from nineteen to forty-five percent of the common fund." Stevens v. SEI Invs. Co., No. 18-4205, 2020 WL 996418, at *12 (E.D. Pa. Feb. 26, 2020) (citing G.M. Trucks, 55 F.3d at 822). Courts have consistently approved such awards. See, e.g., Myers v. Jani-King of Philadelphia, Inc., No. 09-1738, 2019 WL 4034736, at *11 (E.D. Pa. Aug. 26, 2019) (citing cases and noting that "the requested fee of one-third (1/3) of the settlement amount is reasonable in comparison to awards in other cases."); In re Fasteners Antitrust Litig., No. 08-md-1912, 2014 WL 296954, at *7 (E.D. Pa. Jan. 27, 2014) ("Co-Lead Counsel's request for one third of the settlement fund is consistent with other direct purchaser antitrust actions") (citing cases); Stagi v. Nat'l R.R. Passenger Corp., 880 F. Supp. 2d 564, 571 (E.D. Pa. 2012) (noting that this District's fee awards generally range between nineteen and forty-five percent of the common fund); In re Merck & Co., Inc. Vytorin Erisa Litig., No. 08-285, 2010 WL 547613, at *11 (D.N.J. Feb. 9, 2010) ("review of 289 settlements demonstrates "average attorney's fee percentage [of] 31.71% with a median value that turns out to be one-third") (quoting In re Remeron Direct Purchaser Antitrust Litig., No. 03-0085, 2005 WL 3008808, at *15 (D.N.J. Nov. 9, 2005)); SmithKline Beecham Corp., No. 00-6222. 2005 WL 950616, at *24 (E.D. Pa. Apr. 22, 2005) (approving 30% fee of the $65 million settlement in pharmaceutical antitrust class action); In re Linerboard Antitrust Litig., No. MDL 1261, 2004 WL 1221350, at *16 (E.D. Pa. June 2, 2004) (approving 30% fee of a $202 million settlement in an antitrust class action).

Given the magnitude of this case, the efforts of Class Counsel, the risks borne, and the positive outcome, I find that the requested fee of 33 1/3 % recovery remains consistent with the awarded fee in other, similar cases.

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 441 of 482

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

*h. Value of Benefits Accruing to Class Members Attributable to the Efforts of Class Counsel as Opposed to the Efforts of Other Groups, Such as Government Agencies*

A significant factor to consider is whether Class Counsel was aided by a government investigation. In re AT&T Corp., 455 F.3d 160, 173 (3d Cir. 2005). "Allowing private counsel to receive fees based on the benefits created by public agencies would undermine the equitable principles which underline the concept of the common fund, and would create an incentive for plaintiff[s] attorneys to 'minimize the costs of failure ... by free riding on the monitoring efforts of others.' " In re Prudential, 148 F.3d at 337 (further quotations omitted).

Here, the EPPs filed suit almost two years before the Federal Trade Commissions ("FTC") initiated suit in FTC v. Cephalon, Inc., Civ. A. No. 08-2141 (Feb. 13, 2008). Prior to the FTC suit, the EPPs had already engaged in their own investigation of the Provigil market and developed their own antitrust theories regarding the reverse-payment settlements between Cephalon and the generic modafinil manufacturers. Class Counsel were subsequently able to coordinate discovery and the exchange of information with other classes and claimants, including the FTC, generic manufacturer Apotex, a group of large pharmacy chains, a direct purchaser class, and a group of state attorneys general. Such cooperation, however, does not detract from the exorbitant time and effort expended by Class Counsel on this matter and does not impact the percentage fee to which they are entitled.

*i. The Percentage Fee that Would Have Been Negotiated Had the Case Been Subject to a Private Contingent Fee Agreement at the Time Counsel Was Retained*

**\*31** "In making a common benefit award, we must try to ascertain what the market would pay for the attorneys' efforts. That is, we must consider 'the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained.' " In re Diet Drugs Prods. Liab. Litig., 553 F. Supp. 2d 442, 482 (E.D. Pa. 2008) (quoting AT & T, 455 F.3d at 165). While not an easy calculation, it is an important exercise because "the goal of the fee setting process [is] to 'determine what the lawyer would receive if he were selling his services in the market rather than being paid by Court Order.' " In re Linerboard Antitrust Litig. ("Linerboard II"),

333 F. Supp. 2d 343, 351 (E.D. Pa. 2004) (quoting In re Continental Ill. Sec. Litig., 962 F.2d 566, 568 (7th Cir. 1992)). "[I]n private contingency fee cases ... plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery. In re Ikon Office Solutions, 194 F.R.D. at 194 (E.D. Pa. 2000); see also In re Remeron Direct Purchaser Antitrust Litig., No. 03-0085, 2005 WL 3008808, at \*16 (D.N.J. 2005) ("Attorneys regularly contract for contingent fees between 30% and 40% with their clients in non-class commercial litigation.")

The requested fees here fall squarely within that range, as Class Counsel seeks an award of 33 1/3% of the Settlement Fund. Therefore, this factor supports the requested fees.

*j. Innovative Terms of Settlement*

In certain cases, a district court may find that "class counsels' representation and the results achieved [by the settlement agreement] were 'nothing short of remarkable.' " In re Prudential, 148 F.3d at 339 (quotations omitted). Such a finding may be warranted where a settlement involved "innovative" or unique terms. Id. (describing the findings of the lower court regarding plaintiffs' counsels' work on the settlement, including "the availability of full compensatory relief, the extensive and comprehensive outreach, and the multi-tiered review process designed to ensure fair scoring of claims," among other characteristics).

Nothing in the Settlement here is particularly remarkable or innovative. Accordingly, there is no indication that this factor should bear on an attorney fee award.

*k. Overall Review of the Gunter and Prudential Factors*

All of the Gunter and Prudential factors—except one, which weighs neither for nor against approval—supports the award of an attorneys' fees in the amount of 33 1/3 % of the Settlement. Taking them as a whole, I find that the scale is heavily tipped in favor of the requested attorneys' fee award.

2. Cross-Check Against Class Counsels' Lodestar

The Third Circuit has suggested that it is "sensible" for district courts to cross check the percentage fee award against the "lodestar" method. In re Rite Aid, 396 F.3d at 305. The

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 442 of 482

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

lodestar award is calculated by multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys. Id. The court must then use a multiplier, which is a device that "attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work." Id. at 305–06. "The lodestar cross-check serves the purpose of alerting the trial judge that when the multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method, with an eye toward reducing the award." Id. at 306. Even when used as a cross-check, courts should "explain how the application of a multiplier is justified by the facts of a particular case." In re Prudential, 148 F.3d at 340–41.

Here, as noted above, Class Counsel spent 41,000 working on this case on behalf of the class, which hours included preparing the initial Complaint and the Consolidated Amended Class Action Complaint, conducting legal research, engaging in extensive discovery, briefing multiple motions or responses to motions for summary judgment, pursuing class certification, engaging and working with experts, preparing for trial, and pursuing settlement negotiations and settlement document drafting. (Meltzer Decl. ¶¶ 50, 52 & Exs. 6–8.) In addition, Class Counsel will undoubtedly need to spend additional hours in order to monitor and administer the Settlement and final closing of this case.

**\*32** Rates for counsel appear to be well within the reasonable range for Counsels' experience and for the region. At the firm of Spector Roseman and Kodroff, rates ranged from $140 per hour for a paralegal to $880 per hour for the most senior partner, with a great deal of the work being done at the contract attorney level. (Meltzer Decl., Ex. 6.) At the firm of Criden & Love, rates ranged from $425 per hour for an associate to $800 for a partner. (Meltzer Decl., Ex. 7.) Finally, at the firm of Finkelstein Thompson LLP, rates ranged from $150 for a law clerk, and $220 for a paralegal, to $850 for a partner. (Meltzer Decl., Ex. 8.) The rates of the lawyers from the two assisting firms are consistent. (Meltzer Decl., Exs. 9 & 10.)

Courts have considered similar rates reasonable in the past. Fulton-Green v. Accolade, Inc., No. 18-274, 2019 WL 4677954, at *12 (E.D. Pa. Sept. 23, 2019) (approving class counsel's rates that ranged from $202 to $975 per hour); In re Viropharma Inc., Sec. Litig., No. 12-2714, 2016 WL 312108, at *18 (E.D. Pa. Jan. 25, 2016) ("The hourly billing rates of all

of Plaintiff's Counsel range from $610 to $925 for partners, $475 to $750 for of counsels, and $350 to $700 for other attorneys."); In re Avandia Mktg., Sales Practices and Prods. Liab. Litig., No. 07-1871, 2012 WL 6923367, at * 10 (E.D. Pa. Oct. 19, 2012) (concluding a top hourly rate of $595 was "particularly reasonable in comparison" to the hourly rates of top Philadelphia firms).

Multiplying the reasonable hours by the reasonable hourly rates yields a total lodestar of $22,823,274. Where there has been a class settlement, this lodestar "is usually multiplied by a factor to reflect the degree of success, the risk of non-payment the attorneys faced and perhaps the delay in payment that they encountered." Brown v. Esmor Corr. Servs., No. 98-1282, 2005 WL 1917869, at *13 (D.N.J. Aug. 10, 2005); see also In re Prudential, 148 F.3d 283, 340 (3d Cir. 1998) ("Multipliers may reflect the risks of nonrecovery facing counsel, may serve as an incentive for counsel to undertake socially beneficial litigation, or may reward counsel for an extraordinary result."). The Third Circuit has recognized that lodestar multipliers from one to four "are frequently awarded" in class cases. In re Prudential Ins. Co., 148 F.3d at 341 (citing 4 Herbert Newberg & Albert Conte, Newberg on Class Actions § 14.03 at 14-5 (3d ed. 1992)).

Here, no such multiplier is necessary as the lodestar amount is even higher than the $21,959,200 percentage-of-recovery amount sought here. In other words, Class Counsel is requesting less than their total lodestar, making it within the accepted range in the Third Circuit.

### 3. Conclusion as to Attorneys' Fees

Having thoroughly considered all of the Gunter and Prudential factors and having cross-checked the requested fee against the lodestar amount, I find nothing that would warrant denying or reducing the fee requested by Class Counsel. Indeed, by all measures, the requested fee is fair, reasonable, and commensurate with the skill of the attorneys, the amount of work they expended on this complicated litigation, and the results they achieved. Accordingly, I will grant attorneys' fees in the amount of $21,959,200.

### B. Reasonable Litigation Expenses

"Counsel for a class action is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the class

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 443 of 482

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

action." In re Safety Components, Inc. Sec. Litig., 166 F. Supp. 2d 72, 108 (D.N.J. 2001); Careccio v. BMW of N. Am. LLC, No. 08-2619, 2010 WL 1752347, at *7 (D.N.J. Apr. 29, 2010). The court must consider whether the expenses were adequately documented and reasonably and appropriately incurred in the prosecution of the case. Demmick v. Cellco P'ship, No. 06-2163, 2015 WL 13646311, at *4 (D.N.J. Apr. 30, 2015)

**\*33** Class Counsel here has adequately documented their expenses, which include, among other things, litigation fund, professional fees (expert, investigator, accountant, etc.), computer research, copying, travel, court fees, and phone and messenger services. (Meltzer Decl., Exs. 6–10.) During the Final Fairness Hearing, I questioned counsel on the nature of the "litigation fund" expense, and Class Counsel adequately explained that it was a fund of money donated by each participating Class Counsel firm from which day-to-day expenses were drawn. Finding that these expenses were appropriately incurred in the prosecution of the class action, I award Class Counsel the requested fees in the amount of $2,663,468.

### C. Class Representative Incentive Awards

Incentive awards are "not uncommon in class action litigation and particularly where, as here, a common fund has been created for the benefit of the entire class." McDonough v. Toys R Us, Inc., 80 F. Supp. 3d 626, 665 (E.D. Pa. 2015) (quotations omitted). Generally, "[c]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." Cullen v. Whitman Med. Corp., 197 F.R.D. 136, 145 (E.D. Pa. 2000) (quotation omitted); see also First State Orthopaedics v. Concentra, Inc., 534 F. Supp. 2d 500, 524–25 (E.D. Pa. 2007) (citing Nichols v. SmithKline Beecham Corp., No. 00-6222. 2005 WL 950616, at *24 (E.D. Pa. Apr. 22, 2005); Godshall v. Franklin Mint Co., No. 01-6539, 2004 WL 2745890 (E.D. Pa. Dec. 1, 2004)). Factors to be considered when deciding to give incentive awards include "the risk to the plaintiff in commencing litigation, both financially and otherwise; the notoriety and/or personal difficulties encountered by the representative plaintiff; the extent of the plaintiff's personal involvement in the lawsuit in terms of discovery responsibilities and/or testimony at depositions or trial; the duration of the litigation; and the plaintiff's personal benefit (or lack thereof) purely in her capacity as a member of the class." McGee v. Ann's Choice, Inc., No. 12-2664, 2014 WL 2514582, at *3 (E.D. Pa. June 4, 2014) (citing In re Plastic

Tableware Antitrust Litig., No. 94-3564, 1995 WL 723175, at *2 (E.D. Pa. Dec. 4, 1995)).

Here, Class Counsel requests incentive awards in the amount of $15,000 for Consumer Plaintiff Shirley Paneianco, and $50,000 for each of the four TPP Plaintiffs, Vista Healthplan, Inc. (n/k/a Coventry Health Care of Florida, Inc.), District Council 37 Health & Security Plan, Pennsylvania Employees Benefit Trust Fund, and Pennsylvania Turnpike Commission, all of which are to be paid from the Class Settlement Fund. Class Counsel note that each of the five named Plaintiffs provided significant assistance to the case, including responding to written discovery, producing documents, and sitting for a deposition by Defendants. In addition, each named Plaintiff actively monitored the litigation and reviewed the Complaint and other substantive pleadings. Finally, the named Plaintiffs participated in mediation talks and were responsible for reviewing and approving the Settlement.

As noted by the EPPs, these requested incentive awards fall in line with those that have been approved in other cases. See, e.g., King Drug Co. of Florence, Inc. v. Cephalon, Inc., No. 06-1797, 2015 WL 12843830, at *6 (E.D. Pa. Oct. 15, 2015) (approving $100,000 incentive award for four class representatives, and $50,000 incentive awards for two other class representatives); Drywall, No. 13-md-2437, 2018 WL 3439454, at *20 (E.D. July 17, 2018) (approving incentive awards to the four named Plaintiffs in the amount of $50,000); Marchbanks Truck Serv. v. Comdata Network, Inc., No. 07-1078, 2014 WL 12738907, at *3–4 (E.D. Pa. July 14, 2014) (awarding incentives in the amount of $150,000 to one class representative, $75,000 each to two others, and $15,000 to the fourth).

**\*34** For these reasons, I will grant the requested incentive awards of $15,000 to Shirley Panebianco, and $50,000 to the three TPP Class Representatives.

### VII. CONCLUSION

In light of the foregoing, I will certify the Settlement Classes set forth above and grant Final Approval to the Settlement. I will further appoint interim Class Counsel as Class Counsel, and approve the Plan of Allocation. In addition, I will (a) award End-Payor Co-Lead Counsel for the Settlement Classes attorneys' fees in the amount of $21,959,200, plus one-third of the accumulated interest on the Class Settlement Fund; (b) reimburse Class Counsel $2,663,468 in litigation costs and expenses; and (c) award Consumer Plaintiff Shirley

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 444 of 482

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

Panebianco an incentive award of $15,000, and each TPP Plaintiff—Vista Healthplan, Inc. (n/k/a Coventry Health Care of Florida, Inc.), District Counsel 37 Health & Security Plan, Pennsylvania Employees Benefit Trust Fund, and Pennsylvania Turnpike Commission—an incentive award of $50,000 to be paid from the Class Settlement Fund.

An appropriate Order follows.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 1922902, 2020-1 Trade Cases P 81,190

---

## Footnotes

1    During the pendency of this litigation, Barr Laboratories, Inc. Teva Pharmaceutical Industries Ltd., and Teva Pharmaceuticals USA, Inc. merged with Cephalon, Inc. making them all one entity, which, for purposes of this Opinion, I collectively refer to as "the Cephalon Parties."

2    According to the EPPs' expert, W. Paul DeBree, a "capitation contract" is an agreement that provides for the payment of a flat fee for each covered individual. (Expert Report of W. Paul DeBree ("DeBree Report"), ECF No. 586-11, ¶ 35.)

3    In In re Baby Products, the Third Circuit was addressing a proposed settlement with a *cy pres* distribution. It is not entirely clear whether this factor applies only to those settlements that include *cy pres* distributions or whether it should be considered in all class settlements. Although the Settlement here does not include a *cy pres* component, for the sake of comprehensiveness, I will address the Baby Products direct benefit consideration here.

4    Mr. Dunham filed an objection on the docket of the related case brought by the California Attorney General, but clearly intended to address the EPP Settlement.

5    I note that Class Counsel has an agreement with the SHPs to share fees related to the Cephalon Settlement. Specifically, under the agreement, Class Counsel has already received forty percent of the SHP Counsels' fee from that settlement, for a total of $4,960,000. In exchange for this advanced payment, Class Counsel is obligated to provide SHP's Counsel 32.21% of the fees awarded in this matter related solely to the Teva portion of the settlement. This private agreement has no impact on my decision here.

---

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:21-cv-00196-MWB Document 249-1 Filed 10/07/25 Page 445 of 482

In re Wawa, Inc. Data Security Litigation, Not Reported in Fed. Supp. (2021)

2021 WL 3276148

2021 WL 3276148
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

IN RE WAWA, INC. DATA SECURITY LITIGATION
This document applies to the Consumer Track.

CIVIL ACTION No. 19-6019 and all related cases.
|
Filed 07/30/2021

### MEMORANDUM

Pratter, United States District Judge

**\*1** Hackers accessed Wawa Inc.'s point-of-sale systems and installed malware targeting in-store payment terminals and gas station fuel dispensers in March 2019. Over the next several months, the hackers obtained customer payment card information, which they later offered for purchase on the "dark web." Wawa, which operates a chain of convenience stores and gas stations throughout the eastern United States, disclosed the data breach in December 2019 and litigation followed. This case is proceeding with three distinct tracks for the class action litigation: the Consumer Track, the Employee Track, and the Financial Institution Track. This Memorandum addresses the Consumer Track Plaintiffs' motion for preliminary approval of the class action settlement and provisional certification of the settlement class.

The Consumer Track Plaintiffs have negotiated a settlement. In the settlement, Wawa agrees to three tiers of possible compensation for consumers in the form of Wawa gift cards and cash payments. Additionally, Wawa agrees to strengthen its payment processing systems and enhance its data security practices. The terms of the settlement are set out in a settlement agreement dated February 9, 2021, executed by the parties and their counsel, and later amended on April 27, 2021.

The Consumer Plaintiffs filed their Motion for an Order Preliminarily Approving the Class Action Settlement, Provisionally Certifying the Settlement Class, and Directing Notice on February 19, 2021. The Employee Track Plaintiffs filed an opposition to the Consumer Plaintiffs' Motion; several generations of briefing followed. The Consumer Plaintiffs filed a Notice of an Amended Settlement Agreement, noting that the scope of the release had been

clarified. The Court held a preliminary approval hearing on May 5, 2021 during which the Court urged various changes leading to the parties filing a joint status report informing the Court that language will be added to the notice to the class regarding the limited use of personal information and also agreeing that an email reminder will be sent nine months after the gift cards have been issued to claimants who had not by then used the full value of their gift cards.

With these changes, the Court provisionally certifies the class for settlement purposes and preliminarily approves the Settlement Agreement, subject to a final approval hearing.

### LEGAL STANDARDS

A proposed class must satisfy the requirements of Rule 23(a) and at least one provision of Rule 23(b). *Fulton-Green v. Accolade, Inc.*, No. 18-cv-274, 2019 WL 316722, at \*2 (E.D. Pa. Jan. 24, 2019). Rule 23(a) requires that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims ... of the representative parties are typical of the [class] claims ...; and (4) the representative parties will fairly and adequately protect the interests of the class." Even after satisfying the requirements of Rule 23(a), the parties must also show that the action can be maintained under at least one of Rule 23(b)'s subsections. *Fulton-Green*, 2019 WL 316722, at \*2.

**\*2** Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members," and that a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The Court must also receive sufficient information to allow it to "determine whether to give notice of the proposal to the class." Fed. R. Civ. P. 23(e)(1)(A). As to notice, the parties must demonstrate that "the court will likely be able to: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for the purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B). A court may provisionally certify a class at the preliminary stage while "leaving the final certification decision for the subsequent fairness hearing." *Hall v. Accolade, Inc.*, No. 17-cv-3423, 2019 WL 3996621, at \*2 (E.D. Pa. Aug. 23, 2019).

If a court determines that it likely will be able to approve the settlement and certify the class, it should direct notice in a "reasonable manner to all class members who would

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 446 of 482

In re Wawa, Inc. Data Security Litigation, Not Reported in Fed. Supp. (2021)

2021 WL 3276148

be bound by the proposal." Fed. R. Civ. P. 23(e)(1)(B). *See* *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002, 2014 WL 1261451, at *2-4 (E.D. Pa. Dec. 19, 2014) (conditionally certifying class, preliminarily approving settlement, and directing notice to proposed class). Pursuant to Rule 23(c)(2)(B), the notice must be the "best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."

Rule 23(e)(2) requires that a settlement be "fair, reasonable, and adequate," and sets forth several factors a court must consider in determining the fairness of a settlement. These factors include whether adequate representation was provided, a proposal was negotiated at arm's length, adequate relief is given that takes into account the costs, risks, and possible delay of trial and appeal, the effectiveness of any proposed method of distributing relief to the class, terms of proposed attorneys' fees, and that the proposal treats class members equitably relative to each other. Fed. R. Civ. P. 23(e)(2).

### DISCUSSION

### I. Motion for Preliminary Certification of the Class for Settlement Purposes

The parties negotiated a settlement concerning all of the Consumer Plaintiffs' claims asserted in this litigation. The Settlement Agreement provides for monetary relief to proposed class members via a three-tier system, explained in greater detail below, that includes the distribution of Wawa gift cards or cash payments to those who experienced out-of-pocket losses as a result of the data breach. The Settlement Agreement also provides injunctive relief designed to strengthen Wawa's data security systems.

The proposed Settlement Class is defined as:

> All residents of the United States who used a credit or debit card at a Wawa location at any time during the Period of the Data Security Incident of March 4, 2019 through December 12, 2019. Excluded from the Settlement Class

> are Wawa's executive officers and the Judge to whom this case is assigned.

*See* Doc. 201-1, Exhibit A, Amended Settlement Agreement ("S.A.") ¶ 28. The Consumer Plaintiffs assert that the proposed Settlement Class meets the requirements of Rules 23(a) and 23(b)(3), so they ask the Court to certify the proposed class for settlement purposes only.

### A. Rule 23(a)

A court may certify a settlement class that satisfies the requirements of Rule 23(a) and at least one provision of Rule 23(b). *See* *Fulton-Green*, 2019 WL 316722, at *2. The Consumer Plaintiffs must satisfy the four prerequisites of Rule 23(a)—numerosity, commonality, typicality, and adequacy—and show that the class falls into one of the categories identified in Rule 23(b).

**\*3** The Consumer Plaintiffs contend that their proposed class satisfies Rule 23(a). They also contend that their proposed class complies with Rule 23(b)(3) because "questions of law or fact common to class members predominate over any questions affecting only individual members," and that a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Accordingly, they ask that the proposed class be provisionally certified for settlement purposes, pending a final certification decision after a final fairness hearing.

### *i. Numerosity*

Wawa estimates that there are over 22 million potential class members. Doc. No. 181 (Jt. Decl.) at ¶ 23. This is more than enough to meet Rule 23(a)(1)'s numerosity requirement that the class be "so numerous that joinder of all members is impracticable."

### *ii. Commonality*

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." The threshold for commonality is not a high one. Here, the facts surrounding the data security incident are the key issues in this case. These common questions include how the data breach happened, whether Wawa had a duty to protect its customers' payment card

Case 4:21-cv-00196-MWB Document 249-1 Filed 10/07/25 Page 447 of 482

In re Wawa, Inc. Data Security Litigation, Not Reported in Fed. Supp. (2021)

2021 WL 3276148

information, and whether Wawa's customers were harmed by the breach. *See Fulton-Green*, 2019 WL 316722, at *3. Therefore, for purposes of conditional class certification, this factor is satisfied.

### iii. Typicality

Rule 23(a)(3) requires that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." This requirement is designed "to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interest will be fairly represented.' " *Hall*, 2019 WL 3996621, at *7 (quoting *Baby Neal v. Casey*, 43 F.3d 48, 57 (3d Cir. 1994)).

Here, the class representatives, all of whom were Wawa customers while the data security breach was ongoing, seek to hold Wawa "liable for damages related to the breach and share common questions of law and fact with all other class members. [T]heir claims are typical of the class delineated for the proposed settlement." *Fulton-Green*, 2019 WL 316722, at *4.

### iv. Adequacy

Lastly, under Rule 23(a)(4), Plaintiffs must "fairly and adequately protect the interests of the class." This requirement is designed to "uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

The named plaintiffs here have been actively involved in this litigation and, as represented by counsel, each plaintiff has produced numerous documents and reviewed and approved the proposed settlement. Jt. Decl. ¶ 39. Plaintiffs also state that their interests and the interests of the other class members are aligned because they all seek to prove the factual averments in the complaint, to establish Wawa's liability, and to obtain compensation from Wawa. Doc. No. 180 at 31.

Adequacy also examines the "qualifications of the counsel to represent the class." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 532 (3d Cir. 2004) (quoting *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 313 (3d Cir. 1998)). The class representatives maintain that they

have retained knowledgeable counsel who have successfully prosecuted many class actions, including those involving data breaches. Interim Co-Lead Counsel also represent that they have "vigorously" prosecuted this action even before being appointed co-lead counsel, and that they have devoted substantial time, effort, and resources on behalf of the class. *See* Jt. Decl. *passim*.

**\*4** Based on the submitted information, the Court is satisfied that the named plaintiffs and their counsel will adequately represent the interests of the proposed class here. The Court will allow the named plaintiffs to be appointed as class representatives and Interim Co-Lead Counsel to be appointed as class counsel.

### B. Rule 23(b)(3)

After meeting all four prerequisites set forth in Rule 23(a), the Consumer Plaintiffs must still satisfy at least one subsection of Rule 23(b). They seek class certification under Rule 23(b)(3) because, they argue, the proposed class meets both of Rule 23(b)(3)'s requirements, namely, that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

### i. Common Issues

When examining whether certain issues predominate, a court looks to see if "common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation and internal quotation marks omitted). An action can properly be considered under Rule 23(b)(3), if "one or more of the central issues in the action are common to the class and can be said to predominate ... even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Id.*

In this case, there is a myriad of questions of law and fact that predominate. These include: whether Wawa owed a duty to class members to safeguard their payment card information; whether Wawa breached that duty; whether Wawa violated state consumer protection laws; whether Wawa knew or should have known that its payment processing systems were susceptible to attack; whether Wawa complied with industry

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 448 of 482

In re Wawa, Inc. Data Security Litigation, Not Reported in Fed. Supp. (2021)

2021 WL 3276148

standards (i.e., the Payment Card Industry Data Security Standard—PCI DSS); whether Wawa's conduct or failure to act was the proximate cause of the breach; and whether plaintiffs and the class members are entitled to recovery.

Given the nature of the data security incident, Wawa's liability depends upon the duties it owed to its customers and the actions it took or did not take; it does not depend on the "particularized conduct of individual class members." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 300 (3d Cir. 2011). The Consumer Plaintiffs represent that class members would rely on "common documentary, testimonial, and expert evidence" to show both Wawa's action and inaction and to establish liability. Doc. No. 180 at 33. The Court finds that common issues predominate in this case. *See In re NFL Players Concussion Inj. Litig.*, 821 F.3d 410, 427 (3d Cir. 2016) (finding commonality existed even if plaintiffs' "particular injuries are unique [because] their negligence and fraud claims still depend on the same common questions regarding [defendant's] conduct").

### ii. Means of Adjudication

Rule 23(b)(3) includes several non-exhaustive factors for a court to consider, including: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."

**\*5** Here, after considering these factors, the Court finds that they weigh in favor of granting preliminary class certification for settlement purposes. Nothing before the Court even suggests that the class members would be interested in litigating their claims individually or that this litigation should proceed in a non-class forum. [1] The many cases filed against Wawa in state and federal court were brought as class actions, and the federal actions have been consolidated in this Court, while the single state-court action in New Jersey has been stayed pending the outcome of the negotiated settlement. Jt. Decl. ¶¶ 4, 38. Furthermore, the cost and complexity of the litigation here would likely preclude most class members from filing suit individually. "Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable

management problems ... for the proposal is that there be no trial." *In re Processed Egg Prod. Antitrust Litig.*, 284 F.R.D. 249, 264 (E.D. Pa. 2012) (internal citation omitted) (quoting *Amchem*, 521 U.S. at 620).

The proposed settlement here provides class members with an immediate tangible benefit in the form of a Wawa gift card or cash payment in addition to improved security when using a payment card at Wawa. *See Fulton-Green*, 2019 WL 316722, at \*4 (preliminarily certifying Rule 23(b)(3) class in data breach case where "all of the claims [were] almost identical," "the damages should be easily provable and quantifiable," and "the value of the individual claims may be modest and thus impractical to litigate" individually).

The Court concludes that the Consumer Plaintiffs have established that their proposed class warrants preliminary class certification for the purposes of settlement having met the requirements of Rules 23(a) and 23(b)(3).

## II. Motion for Preliminary Approval of the Settlement Agreement

The parties also ask the Court to preliminarily approve their settlement in accordance with Rule 23(e). The Consumer Plaintiffs' Amended Complaint alleges that Wawa breached its duties by failing to secure its point-of-sale systems which resulted in the compromise of customers' payment card data. A few months after filing the Amended Complaint and after a day-long mediation, the parties reached an agreement in principle to settle. The terms of the settlement are set out in a settlement agreement, executed by the parties and their counsel, and later amended.

### A. Background

#### i. Settlement Agreement and Claims Process

The Settlement Agreement provides for three tiers of relief among the class members as well as injunctive relief by way of enhancements to Wawa's payment processing procedures and terminals. *See* Doc. 201-1, Exhibit A, Amended Settlement Agreement ("S.A."). All class members who do not opt out of the settlement then release any claims against Wawa arising from the data breach.

Tier One provides a $5 Wawa Gift Card for customers who used a debit or credit card to make a purchase at Wawa between March 4, 2019 to December 12, 2019 and who attest

In re Wawa, Inc. Data Security Litigation, Not Reported in Fed. Supp. (2021)

2021 WL 3276148

that they spent at least some time monitoring their payment card as a result. Total Tier One compensation is subject to a $6 million cap and a $1 million floor. S.A. ¶ 36.

Tier Two provides a $15 Wawa Gift Card to customers who used a payment card at Wawa during the relevant time period, had a subsequent fraudulent charge on their card, and spent at least some time addressing the fraudulent transaction or otherwise monitoring their account. Total Tier Two compensation is subject to a $2 million cap and no floor. *Id.*

Gift cards under both Tiers One and Two will be fully transferable, valid for one year, and usable toward the purchase of any item sold in a Wawa convenience store (except tobacco products), including fuel if payment is completed inside the store.

Tier Three provides cash payments up to $500 for customers who can demonstrate certain expenditures they made or other out-of-pocket losses resulting from the data breach. The maximum total payments for Wawa for claims in this Tier is $1 million in aggregate. *Id.*

**\*6** The Settlement Agreement also provides for injunctive relief. These provisions will require Wawa to strengthen its data security systems, and its in-store and fuel dispenser payment terminals, to help prevent future data breaches. Other enhancements will include an annual compliance assessment/audit and vulnerability testing. The upgraded systems and other security measures are estimated to cost at least $35 million. *Id.* ¶¶ 38-40.

As to the claims process, class members will be able to fill out a claim form online and select under which tier they are filing their claim. *Id.* ¶ 36. Wawa will be responsible for generating and distributing the Wawa gift cards to claimants. *Id.* ¶ 81.

### ii. Attorneys' Fees, Class Representative Awards, and Administrative Fees

Aside from class member compensation, Wawa has agreed to pay a lump sum of $3.2 million to cover attorneys' fees and expenses, class representative awards, and the costs of settlement administration. *Id.* ¶¶ 77-79. The named plaintiffs (and one additional state court plaintiff) are also applying for $1,000 service awards to recognize their time, effort, and commitment on behalf of the Settlement Class, including

the production of documents and information throughout litigation. *Id.* ¶ 76. Plaintiffs request that the Court appoint KCC, LCC to serve as the Settlement Administrator to oversee notice and to administer the claims process. *Id.* ¶ 42.

### iii. Notice

The proposed notice program includes posting signs at Wawa's payment terminals inside stores and at fuel pumps, information posted on Wawa's website, a comprehensive settlement website, a press release, and resulting media coverage. *Id.* ¶ 55. The settlement website will include detailed information about the litigation, class members' rights, how to file a claim, how to object to the settlement, and how to opt out of the settling class. When the notice period begins, the signs will be posted for four consecutive weeks in Wawa stores and at Wawa fuel pumps.

These signs will include a QR code that customers can scan with their smartphones, which will then take them directly to the settlement website. Plaintiffs cite to Wawa's high store traffic as evidence that the signs will be seen by many of its customers. For example, in January 2021, Wawa's in-store customer transaction count was 46 million and its fuel customer transaction count was 18 million. Doc. No. 180-5, Exhibit E (O'Brien Decl.) ¶ 2.

### B. Employee Plaintiffs' Opposition

The Employee Plaintiffs, who currently are represented by Shawn McGlade, a former Wawa assistant general manager and general manager, and his wife, Karen McGlade, oppose the proposed Settlement Agreement, arguing that it will extinguish employees' rights who are also themselves consumers and, as a result, they ask the Court to order the parties "back to the bargaining table." Doc. No. 188 at 9. They argue that they are not challenging whether the settlement terms offered to consumers are "fair, reasonable and adequate" but rather whether the settlement is appropriate for the Employee Plaintiffs. Doc. No. 196 at 5. They assert that their "objections are limited to their interests in achieving the best result possible through litigation or settlement of their claims." Doc. No. 196 at 5. They also argue that Wawa employees have stronger claims under Pennsylvania law and, accordingly, a separate tier should be established for them. They contend that the Settlement Agreement does not represent their best interests because no Employee Plaintiff representative was invited to participate in the mediation

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 450 of 482

In re Wawa, Inc. Data Security Litigation, Not Reported in Fed. Supp. (2021)

2021 WL 3276148

or the underlying negotiations which led to the current Settlement Agreement. Doc. No. 188 at 5. They also argue that counsel for the Consumer Plaintiffs cannot adequately represent the Employee Plaintiffs because they are adverse to their interests, noting that the Consumer Plaintiffs joined Wawa in seeking a dismissal or stay of the Employee Plaintiffs' payment card data claims. *Id.* at 20, 22.

**\*7** In response, the Consumer Plaintiffs argue that the Employee Plaintiffs have essentially jumped the gun because they will be able to raise their "objections" once the settlement notices go out and the process for filing objections begins. And, at such a time, if the Employee Plaintiffs are unsatisfied with the settlement's terms, they will be able to opt out. Doc. No. 193 at 8. The Consumer Plaintiffs also emphasize that counsel for the Employee Plaintiffs "never once asked to participate in the mediation." *Id.* at 10. Wawa adds that any redress the Employee Plaintiffs seek for using a payment card while "walking and talking like a consumer" is appropriately resolved through the Consumer Track settlement. Doc. No. 194 at 6. Wawa contends that it always expected Wawa employees who were allegedly injured as consumers would be included in any Consumer Track settlement. *Id.* at 6-7.

### *i. Gift Cards*

The Employee Plaintiffs argue that the proposed Wawa gift cards—which they refer to as "coupons"—do not pass muster under the Class Action Fairness Act regarding non-cash class action settlements and that Wawa is not committed to paying the full, expressed settlement amount because it will only issue compensation on a claims-made basis. Although Wawa has committed to paying up to $9 million, the Employee Plaintiffs argue that this will only occur if there is a sufficient number of eligible class members who actually submit a claim. Doc. No. 188 at 19. They argue that the issuance of gift cards provides little value to proposed class members who no longer live near a Wawa store or who choose not to shop at Wawa and that the rationale behind the effectiveness of the gift cards—Wawa's loyal customer base—is inapplicable to employees. They argue that Mr. McGlade, a former Wawa assistant general manager and general manager, has no desire to return to a Wawa store to redeem a gift card.

The Consumer Plaintiffs argue that the Wawa gift cards are not "coupons" within the meaning of CAFA but are actually the functional equivalent of cash. Doc. No. 193 at 7-8. Moreover, the Consumer Plaintiffs contend that Wawa gift cards are not the exclusive settlement consideration because those who suffered documentable, out-of-pocket losses can submit a claim for reimbursement of up to $500. *Id.* at 14. They also assert that "the fact that there may be a few class members who may not want to shop at Wawa anymore, or live far away from Wawa stores, does not dictate that the Settlement is fatally flawed." *Id.*

Wawa argues that the Class Action Fairness Act does not prohibit settlements that involve gift cards and that while CAFA does apply to coupon settlements, a gift card is not a coupon. Wawa explains that the gift cards in this case, under Tier One and Tier Two, can be used for virtually any item Wawa sells and customers do not need to spend any of their own money to redeem the full value of the cards. *Id.* at 13. Wawa also notes that it sells many everyday items at its stores, 78% of which cost less than $5, and that 97.2% of Wawa gift cards issued in the last year have been redeemed. *Id.* Wawa argues that even if the Court were to find that these gift cards are coupons under CAFA, this settlement warrants approval so long as the Court determines that it is "fair, reasonable, and adequate for class members." 28 U.S.C. § 1712(e). This is the same standard as that in Rule 23, and Wawa argues that the terms of the settlement meet this standard.

### *ii. Notice*

The Employee Plaintiffs also argue that the proposed notice plan is insufficient because it does not include notice via first-class mail. They argue that Wawa should mail settlement notices to all current and former Wawa employees and that publication notice also should be required because an in-store placard—at a time when store foot store traffic has decreased due to the pandemic—is not the best method for reaching class members. Doc. No. 188 at 27-28. As support, they cite statistics showing a decrease in store visits between March 2020 to August 2020.[2] *Id.* at 31-33. They also contend that former employees, like Mr. McGlade, would never see in-store placards, nor would "transient customers" who only visited a Wawa store on their way through one of the six states in which Wawa operates. *Id.* at 34. Therefore, the Employee Plaintiffs ask the Court to deny preliminary approval until Wawa agrees to mail first-class notices to its employees and to provide publication notice for all consumers.

**\*8** In response, the Consumer Plaintiffs contend that the proposed notice plan—which includes not only in-store notices that will be posted for four consecutive weeks but also

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 451 of 482

In re Wawa, Inc. Data Security Litigation, Not Reported in Fed. Supp. (2021)

2021 WL 3276148

a settlement website, a press release, and an announcement on Wawa's website—will ensure that class members are notified of their options vis-à-vis the settlement. The Consumer Plaintiffs argue that the Employee Plaintiffs do not account for the 2018 changes to Rule 23 which now states that notice may accomplished via "United States mail, electronic means, or other appropriate means." Fed. R. Civ. P. 23(c)(2)(B). They argue that whether a proposed notice plan is adequate depends on an objective determination of whether the notice efforts will reach a high percentage of the class. Doc. No. 193 at 26. Accordingly, the Consumer Plaintiffs contend that the in-store notices will effectively notify Wawa's loyal customer base because, based on Wawa's estimates, more than 64 million customers would see the in-store notices over a four-week period. *Id.* at 28. They also assert that the Employee Plaintiffs cite outdated Wawa foot traffic statistics, which only reflected a 10 percent decrease in brand visits whereas one of Wawa's primary competitors, 7-Eleven, experienced a 31 percent decline in brand visits over the same period. *Id.*

Lastly, as to mail notice, the Consumer Plaintiffs argue that because Wawa employs roughly 34,000 employees, and assuming all those employees were members of the class, they would comprise approximately less than one half of a percent of the estimated 22 million people affected by the data breach. Additionally, they argue (without any obvious evidence) that current employees will almost certainly see the in-store notices and that former employees are likely to maintain contact with current employees. *Id.* at 30.

Wawa argues that the settlement fully complies with Rule 23's requirements. Wawa contends that foot traffic statistics from the height of a global pandemic are clearly outdated and that millions of visitors to Wawa's stores and gas pumps would see the notices over a four-week span. Wawa also emphasizes that the other means of proposed notice in this case, namely the settlement website, press release, and resulting media coverage, will notify former employees of the settlement. As to mail notice, Wawa contends that it is unnecessary and impracticable. Wawa maintains that it does not regularly collect email addresses for employees and that any mailing addresses for former employees are likely outdated. Doc. No. 194 at 11. Wawa also claims it has no knowledge of which employees made purchases at Wawa during the class period, "let alone whether they did so with payment cards." *Id.* Wawa contends that former employees will have many opportunities to learn about the settlement via the proposed notice structure as outlined in the parties' settlement agreement.

## C. Rule 23(e)

In determining whether to grant preliminary approval, a court should consider whether the proposed settlement has any "obvious deficiencies" as to its fairness and where it "appears to fall within the range of possible approval." *Mehling v. New York Life Ins. Co.*, 246 F.R.D. 467, 472 (E.D. Pa. 2007).

Rule 23(e)(2) requires that a settlement be "fair, reasonable, and adequate," and sets forth several factors a court must consider in determining the fairness of a settlement, including whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

### i. Arm's-Length Negotiations

The parties represent that the settlement here was the result of arms-length negotiations that took place between experienced counsel in this type of litigation, who were themselves assisted by a highly-experienced mediator—the Honorable Diane M. Welsh (Ret.) of JAMS. Doc. No. 181-2 (Welsh. Decl.). The parties participated in several rounds of offers and counteroffers, eventually reaching a settlement in principle. Welsh Decl. ¶¶ 8-11. The mediator stated in her declaration that the "proposed settlement was the result of fair, thorough, and fully-informed arm's-length negotiations between highly capable, experienced, and informed parties and counsel,"

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 452 of 482

In re Wawa, Inc. Data Security Litigation, Not Reported in Fed. Supp. (2021)

2021 WL 3276148

and that the settlement was a "comprehensive resolution that will benefit class members through meaningful relief." *Id.* ¶¶ 16-17.

**\*9** Afterwards, the parties spent a significant amount of time revising several drafts and negotiating the final details of the written Settlement Agreement that is now before the Court. Jt. Decl. ¶¶ 19, 20. At this time, the Court is satisfied that the settlement negotiations between the parties indeed took place at an arm's length. [3] *See In re NFL Players' Concussion Inj. Litig.*, 301 F.R.D. 191, 198 (E.D. Pa. 2014) ("noting that a presumption of fairness exists where parties negotiate at arm's length, assisted by a mediator" (citing *In re CIGNA Corp. Sec. Litig.*, No. 02-cv-8088, 2007 WL 2071898, at \*2 (E.D. Pa. July 13, 2007))).

### ii. Adequate Relief

Interim Co-Lead Counsel represent that they thoroughly investigated the claims in this case by conducting extensive interviews of plaintiffs and other class members, reviewing documents produced by plaintiffs and by Wawa regarding the data security incident, consulting with a data security expert and private investigator, and analyzing the applicable law. Jt. Decl. ¶ 6. Wawa produced thousands of pages of documents prior to the mediation, which included a preliminary report on the data security incident (a final report was sent to Consumer Plaintiffs' counsel after the mediation), emails regarding the incident, and other pertinent documents. [4] *Id.* ¶ 11. Consumer Plaintiffs' counsel analyzed these documents prior to the mediation and consulted with their data security expert who had conducted her own preliminary investigation into the incident. *Id.*

Judge Welsh presided over the full-day mediation in September 2020. Welsh Decl. ¶ 8. Each side presented additional information concerning damages and other details surrounding the incident, including a relative lack of widespread credit and debit card fraud after the data breach. Jt. Decl. ¶ 16. Interim Co-Lead Counsel, based on their prior experience in these types of cases and their investigation of the facts and applicable law in this case, determined that the negotiated settlement was fair, reasonable, and adequate, and in the best interests of the proposed settlement class. *Id.* ¶ 22.

Interim Co-Lead Counsel also represent that the settlement takes into account the costs, risks, and delay of trial and appeal, and that counsel assessed these contingencies when

analyzing the terms of the settlement. *Id.*; Welsh Decl. ¶¶ 16, 17. Counsel also pose that plaintiffs and the proposed settlement class would face a number of challenges absent settlement, including, among other things, opposing a motion to dismiss, obtaining class certification, and briefing motions for summary judgment.

### a. Form of Relief

**\*10** Here, the Settlement Agreement provides both monetary and injunctive relief. First, it offers relief via Wawa gift cards or direct cash compensation for those who can document out-of-pocket losses. Second, it offers injunctive relief by way of enhanced payment system terminals and bolstered data security practices. [5]

The crux of the Employee Plaintiffs' criticism is that they should be able to assert their own claims related to the payment card data breach and obtain their own relief. However, such an argument is premature. The Employee Plaintiffs will be able to voice their objections prior to, and during, the final approval hearing. The Court will not now entertain the prospect of forcing the parties back to the bargaining table. Wawa currently has approximately 34,000 employees—and it is estimated that there were over 50,000 current and former employees during the class period. The proposed class is estimated to be over 22 million customers. If, after preliminary approval, the Employee Plaintiffs are dissatisfied with the terms of the Settlement Agreement, they will be able to object or opt out of the settlement entirely. This is an entirely plausible scenario, especially given the fact that the Court previously denied Wawa's motion to dismiss the Employee Plaintiffs' payment card data claims, which will allow the Employee Plaintiffs to litigate these issues on their own—should they choose to do so. *See In re Wawa, Inc. Data Sec. Litig.*, No. 19-cv-6019, 2021 WL 1910887, at \*7 (E.D. Pa. May 12, 2021).

The Employee Plaintiffs have failed to demonstrate at this stage that the gift cards and cash compensation for certain individuals is not adequate or fair. The form of relief was discussed in depth at the preliminary approval hearing. Counsel for the Consumer Plaintiffs, and counsel for Wawa, stated that around 97.5 percent of Wawa gift cards are redeemed, demonstrating that the gift cards will provide value to class members. May 5, 2021 Hearing Tr. 12:14,78:16-17. Wawa's counsel also stated during the hearing that Wawa sells more than 3,000 products that cost less than $5. *Id.*

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 453 of 482

In re Wawa, Inc. Data Security Litigation, Not Reported in Fed. Supp. (2021)

2021 WL 3276148

at 95:13. In a dialogue with the Court, counsel for Wawa acknowledged that it is less expensive for Wawa to distribute gift cards, especially digital ones via email. *Id.* at 96:2-8. Wawa's counsel then explained that Wawa likely would not have been able to provide the same $5 and $15 amounts if it had accepted a cash or check settlement. *Id.* at 101:14-17.

Given the increased value presented by the gift cards, the Court finds them to be a fair and adequate form of relief, in addition to cash compensation for those who may qualify. Additionally, after the Court questioned whether gift card recipients would get a reminder to "actually use their benefit" if they had not already done so, *id.* at 67:1-5, the parties later informed the Court that the settlement administrator will send an email reminder to claimants who have not yet used the full value of their Wawa gift cards as of nine months after the gift cards have been issued. *See* Doc. No. 209 at 1.

**\*11** The Court disagrees that this is somehow a "coupon settlement." Indeed, "gift cards are a fundamentally distinct concept in American life from coupons." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 952 (9th Cir. 2015). Furthermore, "[d]istrict courts that have considered the issue have not classified gift cards as coupon settlements falling under CAFA." *Id.* (listing cases). In one such case from this district, where plaintiffs brought claims under the Fair and Accurate Credit Transactions Act, the court approved $20 Rite Aid gift cards, finding they were "more like cash than coupons" because they were mailed directly to class members, did not expire, could be freely transferred, and could be used to purchase one of the many items sold at Rite Aid. *Reibstein v. Rite Aid Corp.*, 761 F. Supp. 2d 241, 255-56 (E.D. Pa. Jan. 18, 2011). In another case, the court found that the non-cash compensation there, which involved non-transferable discount vouchers that required the purchase of a product so the consumer could obtain the voucher's benefit, was "not a gift card." *Rougvie v. Ascena Retail Grp., Inc.*, No. 15-cv-724, 2016 WL 4111320, at \*29 (E.D. Pa. July 29, 2016).

Here, the gift cards are more in line with those in *Reibstein* because they can be used to purchase virtually any item Wawa sells (excluding tobacco products) and there is no minimum purchase to obtain the value on the card. This is unlike *Rougvie* where those customers had to spend a certain amount before they received any value from the vouchers. Additionally, the Wawa gift cards here are fully transferable. [6] At this time, the Court sees no reason to doubt that the settlement will provide a tangible benefit to

plaintiffs and proposed class members while avoiding the costs and risks associated with continued litigation. *See In re CertainTeed Fiber Cement Siding Litig.*, 303 F.R.D. 199, 216 (E.D. Pa. 2014) (noting that continued litigation would be "complex, expensive and lengthy," and that a "settlement would eliminate delay and expenses and provide immediate benefit to the class").

### b. Claims Process

The Settlement Agreement also includes a claims process for class members to submit a claim for a Wawa gift card or cash reimbursement for any out-of-pocket expenses or losses they incurred as a result of the data security incident. This Court has previously recognized that a claim filing procedure is appropriate and acceptable in the context of a data breach settlement. *Fulton-Green v. Accolade, Inc.*, No. 18-cv-274, 2019 WL 4677954, at \*8 (E.D. Pa. Sept. 24, 2019). Here, the proposed claims process is "straight-forward" due to the use of "easy to understand claims forms." *Id.* At the hearing, the Court asked how any "Luddites," i.e., non-electronics users, who visited Wawa during the class period and used a payment card would go about filing an online claim. May 5, 2021 Hearing Tr. 22:11. Counsel for Wawa maintained that these class members could have a friend or family member submit a claim form for them, or the claims administrator could print out a paper version of the claim form and mail it to those class members who are technology-averse. *Id.* at 22:13-18. The Court is satisfied that there are multiple pathways through which a class member could successfully file his or her claim, either online through the website or via a mailed paper form.

The Court also noted during the preliminary hearing that it had concerns that a claimant who provided his or her email address to obtain their gift card might later receive "unsolicited promotional information." *Id.* at 49:25-50:1-2. Wawa's counsel assured the Court that Wawa would not utilize the claims process to then send additional, non-claims related communications. *Id.* at 81:3-14. The Court suggested that the parties include a clear provision that any email address or contact information a claimant provides will only be used by Wawa for the purpose of processing their claim. *Id.* at 81:20-25-82:1-4. The parties have since agreed to add such language to the notices. *See* Doc. No. 209.

### c. Notice

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 454 of 482

In re Wawa, Inc. Data Security Litigation, Not Reported in Fed. Supp. (2021)

2021 WL 3276148

**\*12**  As to notice, the settlement includes several methods by which class members will be notified of the settlement, including store signage, a press release, the settlement website, and Wawa's website. These methods were chosen during the parties' negotiations to remedy the fact that Wawa has no other available means to identify or contact potential class members who used a credit or debit card during the class period. Jt. Decl. ¶ 31; Welsh Decl. ¶ 14. The signs announcing the settlement will be posted for four consecutive weeks inside Wawa stores and at Wawa gas pumps. S.A. ¶ 55.b. To reduce the potential for any fraudulent claims, class members must submit reasonable documentary proof of their Wawa purchase and, if necessary, any resulting fraudulent charges or out-of-pocket expenses. S.A. ¶¶ 36.b.iii, 36.c.v.

The Court finds that the proposed notice plan set forth by the settlement is reasonable. The Employee Plaintiffs argue that Wawa should also send notices via first-class mail to all former and current employees who worked at Wawa during the class period. However, the post-2018 amendments to Rule 23 provide that other forms of notice besides first-class mail can be reasonable. Pursuant to Rule 23(c)(2)(B), notice to class members must be the "best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."

Here, Wawa will be displaying signs for four consecutive weeks inside Wawa stores—near the registers—and at all Wawa fuel pumps. The estimated number of class members is over 22 million customers. Based on foot traffic data, Wawa estimates that over 64 million people would see these signs over the four-week period (albeit that part of this number will represent customers making more than a single stop in the four-week period). *See In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Inj. Litig.*, 314 F.R.D. 580, 603 (N.D. Ill. 2016) (citing the Federal Judicial Center standard which states that a notice plan that can reach 70% to 95% of the settlement class is reasonable).

Aside from the in-store signage, Wawa will also be placing a notice on the Wawa website and the full details of the settlement will be available on the settlement website. Thus, mailing first-class notices to all former and current employees appears to be overinclusive, especially because there is no data on the number of employees who used a payment card at Wawa during the class period. Of course, it goes without saying that current employees are the most likely of potential class members to see the in-store signage because it will be placed next to Wawa store registers and at Wawa fuel

pumps. The Court must strike a balance "between protecting the rights of absent class members and making Rule 23 workable." *Carlough v. Amchem Prod., Inc.*, 158 F.R.D. 314, 327 (E.D. Pa. 1993). To that end, "courts have held that it is not necessary to send individual notices to an overinclusive group of people simply because that group contains some additional class members whose identities are unknown." *Id.* Accordingly, the Court does not find that the lack of first-class mailed notices would impede class members, including former and current employees, from learning about the settlement.

Furthermore, Wawa will also be issuing a press release. As stated during the preliminary hearing, Wawa's initial disclosure of the data breach in December 2019 resulted in millions of media impressions, which, as represented by Wawa's counsel, is "every time someone sees a particular article." May 5, 2021 Hearing Tr. 88:18-25-89:1-15. The Court anticipates that the preliminary approval of the settlement will also garner media attention. Other courts have found that media coverage of a settlement is a positive factor as to notice. *See In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 327 (3d Cir. 1998) (noting that the "unsolicited news coverage the settlement received" was a factor that "greatly increased the possibility" that more class members would be compensated); *see also Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1115, 1128 (9th Cir. 2020) (affirming district court's final approval of settlement where notice was provided on class counsel's websites and based on publicly available information, "primarily through news coverage").

**\*13**  Thus, the Court finds that the notice program set forth by the settlement represents suitable and practicable notice under the circumstances. Through signage that will be displayed at Wawa registers and at Wawa fuel pumps for four consecutive weeks, an announcement on Wawa's website, a dedicated settlement website, and a press release, the Court is satisfied that potential class members will properly receive notice of the settlement and their options for filing a claim or otherwise participating in the settlement process.

### *iii. Attorneys' Fees*

Interim Co-Lead Counsel represent that they have "devoted significant time and financial resources to the litigation despite the uncertainty of prevailing as to class certification and the merits and establishing damages." Doc. No. 180

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 455 of 482

In re Wawa, Inc. Data Security Litigation, Not Reported in Fed. Supp. (2021)

2021 WL 3276148

at 27. They maintain that the topic of attorneys' fees was not discussed with Wawa until substantive settlement terms had already been reached. Jt. Decl. ¶ 38; Welsh Decl. ¶ 15. Counsel states that they will apply for attorneys' fees that constitute a negative multiplier of their aggregate lodestar. Jt. Decl. ¶ 41. Additionally, the parties have agreed that any attorneys' fees approved by the Court would be paid out of a separate $3.2 million dollar fund for litigation expenses, settlement administration fees, and individual service awards to the class representatives, none of which will negatively impact the settlement funds available for the class members. *Id.* ¶ 44.

The Employee Plaintiffs argue that the proposed attorneys' fees are improper because class counsel will be paid in cash— $3.2 million—while the class members will be paid in some other way. Doc. No. 188 at 36. They contend that such a fee request deserves greater scrutiny than the parties represent in their moving papers. *Id.* at 8. The Consumer Plaintiffs retort that such an objection is premature because a motion for attorneys' fees, including supporting documentation, has not yet been filed. Doc. No. 193 at 7. Nevertheless, counsel for the Consumer Plaintiffs maintain that the attorneys' fees agreed to by the parties are reasonable given counsel's intention to "move for fees reflecting a negative multiplier of counsel's aggregate lodestar." *Id.* at 20.

At this time, the Court declines to further address attorneys' fees issues because a formal motion will be filed at a later date, at which time the Court can fully analyze the request and any opposition to it. *See In re NFL Players Concussion Injury Litig.*, 821 F.3d 410, 444 (3d Cir. 2016) ("The petition for a fee award will be submitted to the Court at a later date. Objectors will then be able to present arguments as to why the requested award is improper, and the Court will have discretion to modify the award in whatever way it sees fit.").

### *iv. Additional Requirements*

Rule 23(e)(2)(C)(iv) requires a court to consider any agreement among the parties that exists outside of the settlement agreement as identified in Rule 23(e)(3). Rule 23(e)(3) provides that "parties seeking approval must file a statement identifying any agreement made in connection with the proposal." Fed. R. Civ. P. 23(e)(3). In this case, as represented by the parties, no such agreement exists outside of the Settlement Agreement. Jt. Decl. ¶ 30.

### *v. Equitable Treatment of Class Members Relative to Each Other*

The Consumer Plaintiffs contend that the settlement treats all class members equitably and provides them with the same available means by which to recover under the Settlement Agreement. At this time, the Court is satisfied that the three tiers of direct relief and the additional injunctive relief meet this standard. The three tiers delineate between class members who experienced fraud or attempted fraud and provides cash compensation to those class members who can demonstrate out-of-pocket expenses; it also provides injunctive relief to all. *See Sullivan*, 667 F.3d at 326 ("A district court's 'principal obligation' in approving a plan of allocation 'is simply to ensure that the fund distribution is fair and reasonable as to all participants in the fund.' " (quoting *Walsh v. Great Atl. & Pac. Tea Co., Inc.*, 726 F.2d 956, 964 (3d Cir. 1983))).

### CONCLUSION

 **\*14**  For the foregoing reasons, the Court preliminarily certifies the class for settlement purposes and preliminarily approves the parties' Settlement Agreement. An appropriate order follows.

### All Citations

Not Reported in Fed. Supp., 2021 WL 3276148

---

### Footnotes

1    The Court will address the Employee Plaintiffs' opposition to the proposed class Settlement Agreement below.

2     The most recent statistics before the Court are from January 2021. During that month, Wawa's in-store customer transaction count was 46 million and its fuel customer transaction count was 18 million. O'Brien Decl. ¶ 2. Since that time, it is logical to presume that, given the availability of vaccines, the lifting of COVID-19 restrictions, and the resumption of regular in-person activities, foot traffic in Wawa stores has increased as compared to the height of the pandemic.

3     While the Court acknowledges Employee Plaintiffs' counsel's argument that he "didn't know there was a September mediation," May 5, 2021 Hearing Tr. 43:15-16, the Court ultimately finds that protestation unavailing. As the Court highlighted during the hearing, "It's not as though there was some barrier in terms of reaching out" to opposing counsel regarding participation in the mediation. *Id.* at 44:1-2. As counsel for the Consumer Plaintiffs pointed out, there were several status reports that were filed which stated that a mediation was upcoming. *Id.* at 50:21-25. Thus, it can hardly be said that the mediation was somehow hidden or a surprise.

4     Although the Consumer Plaintiffs and Wawa did not engage in "formal" discovery, that is not necessarily an obstacle for preliminary approval of a class action settlement, especially where, as here, the parties have exchanged important informal discovery. *See Fulton-Green,* 2019 WL 316722, at *3 (granting preliminary approval of class action settlement where despite "formal discovery" having not yet started, "the parties exchanged a substantial amount of information regarding the discrete issues in [the] case").

5     The Court noted during the preliminary hearing that the settlement's injunctive relief was a type of "derivative protection for the customers," but that the "major motivation" for such improvements "should be for Wawa itself." May 5, 2021 Hearing Tr. 26:17-19. Nevertheless, class members will benefit from these improvements.

6     Given this transferability, the Consumer Plaintiffs argue that "a class member could stand inside a Wawa location and give or sell his Wawa Gift Card to the next person who approaches the counter." Doc. No. 193 at 19. Although the Court has its doubts as to whether such a practice is likely to occur, it nevertheless appears to be one option a claimant would have in getting value from his or her gift card.

---

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 1946848

United States District Court,
E.D. Pennsylvania.

In re WELLBUTRIN SR DIRECT
PURCHASER ANTITRUST LITIGATION.

Civil Action No. 04-5525.
|
May 2, 2008.

***MEMORANDUM AND ORDER***

KAUFFMAN, District Judge.

**\*1** Now before the Court is the Direct Purchaser Plaintiffs'
Motion for Class Certification. For the reasons discussed
below, the Motion will be granted.

## I. BACKGROUND

Defendant SmithKline Beecham Corporation d/b/a
GlaxoSmithKline ("Defendant" or "GSK") manufactures and
sells Wellbutrin SR, a drug used to treat depression. [1]
SAJ Distributors, Inc., Stephen L. LaFrance Holdings, Inc.,
Meijer, Inc., and Meijer Distribution, Inc. (the "Named
Plaintiffs") seek to represent a class of plaintiffs (the
"Direct Purchaser Plaintiffs") that purchased Wellbutrin SR
directly from GSK after Wellbutrin SR was introduced in
1997. On behalf of the Direct Purchaser Plaintiffs, it is
alleged: (1) Defendant unlawfully extended its monopoly
over Wellbutrin SR by making fraudulent assertions to the
United States Patent and Trademark Office and by engaging
in "sham" litigation against generic drug manufacturers
seeking to market less expensive versions of the drug [2]; (2)
Because the litigation delayed the market entry of generic
versions of Wellbutrin SR, the class members were forced
to pay unnecessarily high prices for the drug because no
generic alternatives were available for nearly two years after
Defendant's patent monopoly would have expired [3]; and (3)
Defendant filed the baseless infringement suits against the
generic manufacturers solely to preserve its monopoly during
the pendency of the infringement litigation. [4] The Named
Plaintiffs have filed for certification of the Direct Purchaser
Plaintiff class. [5]

## II. LEGAL STANDARD

Before certifying a class pursuant to Federal Rule of Civil
Procedure 23, the Court must undertake a "rigorous analysis"
to ensure that all requirements are met. *Gen. Tel. Co. v.
Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740
(1982). The Court may certify a class action only if the Direct
Purchaser Plaintiffs satisfy all four provisions of Rule 23(a)
and at least one provision of Rule 23(b). *See, e.g., Amchem
Prods. v. Windsor,* 521 U.S. 591, 613-14, 117 S.Ct. 2231, 138
L.Ed.2d 689 (1997). Rule 23(a) provides:

> One or more members of a class may sue or be sued as
> representative parties on behalf of all members only if:

> (1) the class is so numerous that joinder of all members is
> impracticable;

> (2) there are questions of law or fact common to the class;

> (3) the claims or defenses of the representative parties are
> typical of the claims or defenses of the class; and

> (4) the representative parties will fairly and adequately
> protect the interests of the class.

To satisfy Rule 23(b)(3), [6] the Direct Purchaser Plaintiffs
must demonstrate that "the questions of law or fact common
to class members predominate over any questions affecting
only individual members, and that a class action is superior to
other available methods for fairly and efficiently adjudicating
the controversy."

Although the Court generally should avoid delving into
the merits of the action at the class certification stage,
the Third Circuit has recognized that in some instances,
a minimal inquiry into the merits may be necessary to
determine whether the Rule 23 requirements have been met.
*See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
259 F.3d 154,168 (3d Cir.2001) ( "In reviewing a motion for
class certification, a preliminary inquiry into the merits is
sometimes necessary to determine whether the alleged claims
can be properly resolved as a class action."); *see also In
re Hydrogen Peroxide Antitrust Litig.,* 240 F.R.D. 163, 170
(E.D.Pa.2007) (explaining that although an inquiry into the
merits may be necessary to certify a class, the court must
not "make judgments about whether plaintiffs have adduced
enough evidence or whether their evidence is more or less
credible than defendants' [evidence]"). "When doubt exists
concerning certification of the class, the court should err in
favor of allowing the case to proceed as a class action."

*Williams v. Empire Funding Corp.,* 227 F.R.D. 362, 372 (E.D.Pa.2005); *see also Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir.1985).

## III. THE CLASS CERTIFICATION MOTION

**\*2** The Direct Purchaser Plaintiffs allege that Defendant violated Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, causing them to pay inflated prices for bupropion from the time Defendant's monopoly was extended until the time the price of bupropion reached competitive levels. [7] They seek to certify a class defined as "all persons or entities in the United States, excluding governmental entities, that purchased the 100mg or 150mg dosage of Wellbutrin SR directly from GSK during the period from January 24, 2002 to June 30, 2006." [8]

### A. Rule 23(a)

#### 1. Numerosity
The Direct Purchaser Plaintiffs estimate that the class is comprised of approximately 100 direct purchasers of Wellbutrin SR dispersed throughout the United States. While "[n]o magic number exists satisfying the numerosity requirement," *Moskowitz v. Lopp,* 128 F.R.D. 624, 628 (E.D.Pa.1989), the number of class members present in this case easily satisfies the numerosity requirement. *See, e.g., Stewart v. Abraham,* 275 F.3d 220, 226-27 (3d Cir.2001) ("[G]enerally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met."). The fact that the Direct Purchaser Plaintiffs have not specified the precise number and location of class members does not defeat a finding of numerosity. *See, e.g., Hanrahan v. Britt,* 174 F.R.D. 356, 362 (E.D.Pa.1997) ("The exact number or identity of the members of the plaintiff class is not required."). Given the number of potential class members throughout the United States, the Court finds that joinder of all members is impracticable. *See, e.g., Eisenberg,* 766 F.2d at 785-86 ("The allegation of more than 90 geographically dispersed plaintiffs met the numerosity requirement of Fed.R.Civ.P. 23(a)(1).").

#### 2. Commonality
"The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Baby Neal for & by Kanter v. Casey,* 43 F.3d 48, 56 (3d Cir.1994) (citing *In re "Agent Orange" Prod. Liab. Litig.,* 818 F.2d 145, 166-67 (2d Cir.1987); *Weiss v. York Hosp.,* 745 F.2d 786, 808 (3d

Cir.1984)). "A finding of commonality does not require that all class members share identical claims, and indeed 'factual differences among the claims of the putative class members do not defeat certification.' " *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,* 148 F.3d 283, 310 (3d Cir.1998) (quoting *Baby Neal,* 43 F.3d at 56). Because only one issue must be common to the class, the burden for meeting this requirement is low. *See Baby Neal,* 43 F.3d at 56.

In the instant case, the Direct Purchaser Plaintiffs point to a series of common questions, including, *inter alia:* (1) whether Defendant made misrepresentations to the United States Patent and Trademark Office; (2) whether Defendant initiated sham litigation against potential generic manufacturers; (3) whether this litigation was designed to maintain Defendant's monopoly; (4) whether this conduct delayed entry of a generic version of Wellbutrin SR; and (5) whether this conduct resulted in artificially high prices for the drug. The Court finds that given these numerous common questions, the commonality requirement is satisfied. This conclusion is consistent with the findings of other courts in cases where a drug manufacturer allegedly engaged in anticompetitive conduct in order to prevent generic drugs from entering the market. *See Meijer, Inc. v. Warner Chilcott Holdings Co. III,* 246 F.R.D. 293, 300 (D.D.C.2007) ("Plaintiffs correctly assert that their claims raise numerous common issues of fact and law, including ... whether Defendants' activities have substantially affected interstate commerce ... whether, and to what extent, Defendants' conduct caused direct purchasers to pay more for Ovcon 35 Products than they would have absent Defendants' conduct; and ... the appropriate measure of damages."); *In re Relafen Antitrust Litig.,* 218 F.R.D. 337, 342 (D.Mass.2003) ("The factual questions common to the class members' claims include whether SmithKline engaged in the alleged anticompetitive conduct and whether and to what extent this conduct resulted in overcharges.... The legal questions common to the class members' claims include whether SmithKline's conduct violated Section 2 of the Sherman Act." (citation omitted)); *In re Buspirone Patent & Antitrust Litig.,* 210 F.R.D. 43, 57 (S.D.N.Y.2002) ("There are also numerous common questions of fact and law at issue among the members of the proposed class concerning whether BMS engaged in the anticompetitive conduct alleged, the scope of this conduct, and whether this conduct resulted in any overcharges in the market for buspirone.").

#### 3. Typicality
**\*3** "[T]ypicality entails an inquiry whether 'the named plaintiff's individual circumstances are markedly different

or ... the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based.' " *Eisenberg,* 766 F.2d at 786 (quoting *Weiss,* 745 F.2d at 809 n. 36). As with the commonality requirement, "[t]he threshold for establishing typicality is low." *Zlotnick v. Tie Commc'ns, Inc.,* 123 F.R.D. 189, 193 (E.D.Pa.1988). The Third Circuit has noted that "cases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims." *Baby Neal,* 43 F.3d at 58.

In the instant case, the Named Plaintiffs are challenging the same alleged conduct that affects all other members of the putative class: Defendant's alleged fraud and filing of frivolous lawsuits in order to maintain its monopoly. [9] This conduct affected all class members in precisely the same way, as all direct purchasers allegedly paid higher prices for bupropion because generic manufacturers were prevented from competing with Defendant for approximately two years. Accordingly, the Court finds that the typicality requirement is met. *See, e.g., Meijer, Inc.,* 246 F.R.D. at 301-02 (finding that direct purchaser class representatives, including the lead plaintiffs in the instant action, had claims typical of the class where the defendants allegedly delayed entry of generic drugs into the market); *In re Relafen,* 218 F.R.D. at 343 ("Louisiana Wholesale, lead direct purchaser plaintiff, bases its claims on the same 'core pattern of alleged anti-competitive conduct' that gives rise to all class members' claims. Accordingly, the claims of Louisiana Wholesale are typical of those asserted by other members of the class." (citation omitted)); *In re Buspirone,* 210 F.R.D. at 57 ("Louisiana Wholesale alleges that it was injured in the same general way and by the same general course of conduct that allegedly injured the other members of the class; it asserts liability based on legal theories that are common to the class; and it clearly has adequate individual incentives to prove all of the elements of the causes of action that individual members of the class would bring individually. Louisiana Wholesale's claims are thus typical of most of the other members of the purported class .").

### 4. Adequacy of Representation

"The adequacy of representation inquiry has two components intended to assure that the absentees' interests are fully pursued: it considers whether the named plaintiffs' interests are sufficiently aligned with the absentees', and it tests the qualifications of the counsel to represent the class." *In re*

*Gen. Motors Corp. Pick-Up Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 800 (3d Cir.1995) (citing *Weiss,* 745 F.2d at 811). With respect to the qualifications of counsel, the Direct Purchaser Plaintiffs have selected Dianne M. Nast, RodaNast, P.C., as lead counsel. The Direct Purchaser Plaintiffs have submitted documentation reflecting the experience of lead counsel and her co-counsel in managing class action litigation, including numerous antitrust and pharmaceutical actions. *See* Decl. of Dianne M. Nast, attached to the Mot. at Ex. B; Curriculum Vitae of Daniel E. Gustafson, attached to the Mot. at Ex. G; Curriculum Vitae of Arnold Levin, attached to the Mot. at Ex. H; Curriculum Vitae of Michael L. Roberts, attached to the Mot. at Ex. I. Counsel represent that they have expended time and resources researching the history of the case, consulting with economists, and developing legal theories to support their claims. After reviewing the documentation submitted by the Direct Purchaser Plaintiffs, the Court concludes that class counsel are qualified to represent the class.

**\*4** With respect to the interests of the Named Plaintiffs in relation to the remaining class members, Defendant raises three challenges to the adequacy of their representation: (1) Because the named plaintiffs are assignees rather than direct purchasers, they cannot represent a class of direct purchasers. (2) SAJ, one of the named plaintiffs, is subject to a unique defense, rendering it inadequate to represent the class. (3) There are significant conflicts among members of the proposed class. In challenging the adequacy of the named plaintiffs as class representatives, Defendant bears the burden. *See, e.g., Piper v. Portnoff Law Assocs.,* 215 F.R.D. 495, 502 (E.D.Pa.2003).

#### a. Assignees

Defendant asserts that the Named Plaintiffs are not direct purchasers of Wellbutrin SR and may not represent a class of which they are not members. This circuit has long recognized that antitrust claims can be assigned, *see, e.g., In re K-Dur Antitrust Litig.,* 338 F.Supp.2d 517, 539 (D.N.J.2004) ( "[E]xpress assignments of antitrust claims from a direct purchaser to an indirect purchaser are permissible and do not run afoul of ... standing requirements." (citing *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.,* 995 F.2d 425, 438-39 (3d Cir.1993))), and Defendant provides no persuasive authority for the proposition that an assignee cannot represent a class. [10] Indeed, numerous courts have certified litigation classes in which the named plaintiffs were operating under an assignment. *See, e.g., Meijer, Inc.,*

246 F.R.D. at 301 ("[W]hile Meijer, SAJ, and LaFrance were in fact indirect purchasers, they sue as assignees of, and thus stand in the shoes of, direct purchaser drug wholesalers."); *In re Urethane Antitrust Litig.,* 237 F.R.D. 440, 448 (D.Kan.2006) ("Skypark is the assignee of Burtin's 'right, title and interest' in claims arising out of Burtin's purchases of urethane and urethane chemicals, 'specifically including antitrust claims against the vendors of urethane and urethane chemicals.' Thus, Skypark is asserting its claims as the real party in interest as the assignee of Burtin. As such, it is immaterial that Skypark has not produced any evidence showing that it (as opposed to Burtin) purchased the relevant chemicals during the class period."); *In re Cardizem CD Antitrust Litig.,* 200 F.R.D. 297, 304-06 (E.D.Mich.2001) (rejecting the argument that an assignee of a direct purchaser was an inadequate class representative in an action alleging that the defendants agreed to delay the entry of lower-priced generic drugs). [11]

**b. Unique Defense Against SAJ**

Defendant next argues that SAJ Distributors, Inc.'s assignment is invalid and that, because it lacks standing to assert claims based on the invalid assignment, it cannot serve as a class representative . [12] Defendant further contends that because SAJ is subject to this unique defense, SAJ may spend most of the litigation attempting to preserve its claim in the face of the defense rather than representing the interests of the class as a whole. *See Beck v. Maximus, Inc.,* 457 F.3d 291, 297 (3d Cir.2006) ("Other courts of appeals emphasize, as do we, the challenge presented by a defense unique to a class representative-the representative's interests might not be aligned with those of the class, and the representative might devote time and effort to the defense at the expense of issues that are common and controlling for the class."). [13] Defendant's argument, however, is persuasive only if the challenge to SAJ's assignment threatens to consume the litigation itself. As the Third Circuit has explained,

**\*5** A proposed class representative is neither typical nor adequate if the representative is subject to a unique defense that is likely to become a major focus of the litigation. We believe this standard strikes the proper balance between protecting class members from a representative who is not focused on common concerns of the class, and protecting a class representative from a defendant seeking to disqualify the representative based on a speculative defense.

*Id.* at 301. As numerous courts have found, the alleged invalidity of an assignment "presents a question of law that can readily be resolved by the Court without skewing the focus of the litigation or creating a significant danger of distracting [SAJ's] ability to pursue the interests of the absent class members." *In re Cardizem,* 200 F.R.D. at 305; *see also Meijer, Inc.,* 246 F.R.D. at 302 (declining to reach the question of whether a named plaintiff's assignment was valid, but noting that the question did not threaten to derail the class litigation because it could be resolved easily by the court at a later date). Accordingly, the Court concludes that whatever the merits of the defense, it is not an issue that will distract SAJ to the detriment of the class itself.

**c. Conflicts Among Class Members**

Finally, Defendant argues that the interests of the Named Plaintiffs and other class members are in conflict, precluding class certification. [14] Defendant explains that when a drug faces no competition from generic equivalents, the three major national drug wholesalers purchase the majority of the product for resale to other parties in the distribution chain. However, entry of a generic drug into the market generally hurts the national wholesalers because generic drug manufacturers often sell directly to the other parties in the distribution chain, bypassing the national wholesalers altogether. Defendant claims that this "generic bypass" phenomenon creates a conflict among the class members because the national wholesalers benefit from anticompetitive activity that prevents entry of generic drugs into the market, allowing them to retain higher sales volumes, whereas other direct purchasers are harmed by the same anticompetitive activity in the form of higher prices.

In support of its argument, Defendant relies on *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.,* 350 F.3d 1181 (11th Cir.2003). In *Valley Drug,* the Eleventh Circuit reversed a district court's certification of a direct purchaser class alleging antitrust injury due to delayed generic entry, finding that potential conflicts among class members prevented certification without further "downstream discovery." *Id.* at 1195. The Eleventh Circuit found that the putative class-which included the three major national wholesalers and other direct purchasers-likely had differing interests because the national wholesalers may have benefitted from the alleged anticompetitive activity. *See id.* at 1191. The court further noted that due to the "generic bypass" phenomenon, the national wholesalers may have been harmed economically by generic competition. *See id.* ("[T]he record indicates that some of the national wholesalers are further injured

rather than benefitted by generic competition because the wholesalers, who play a central role in the distribution of branded drugs, are often bypassed in the distribution chain for many generic sales, causing them to lose sales."). Because the national wholesalers "appear to benefit from the effects of the conduct alleged to be wrongful by the named plaintiffs," the Eleventh Circuit found that certification of a class including the national wholesalers "would be inappropriate" without a showing that no classwide conflict actually existed. *Id.*

 **\*6** Defendant maintains that *Valley Drug* is persuasive in the instant case and that the Court should not certify the class absent a showing that no such conflict exists. However, Defendant does not explain clearly what conflict actually exists between the national wholesalers and the other class members. Even assuming that the national wholesalers in this case were harmed by the introduction of generic drugs, generic versions of Wellbutrin SR have been on the market since 2004. Therefore, the national wholesalers are no longer reaping the alleged benefits of delayed generic entry, and their interests are not "harmed" by recovery of any illegal overcharge from Defendant. Indeed, any economic benefits the wholesalers experienced in the past are legally irrelevant because the overcharge itself-not any economic effect of the overcharge-is the proper measure of recovery in this antitrust case. As the Supreme Court has explained, a party may recover for an antitrust overcharge whether or not the party experienced a net loss or a net gain (*i.e.,* by passing on the overcharge to other parties). *See Illinois Brick,* 431 U.S. at 724-25; *Hanover Shoe v. United Shoe Machinery Corp.,* 392 U.S. 481, 489, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) ("We hold that the buyer is equally entitled to [overcharge] damages if he raises the price for his own product. As long as the seller continues to charge the illegal price, he takes from the buyer more than the law allows. At whatever price the buyer sells, the price he pays the seller remains illegally high, and his profits would be greater were his costs lower."). [15] Regardless of whether some class members profited from the alleged activity in this case, the controlling question is whether the class members suffered an overcharge: if an overcharge occurred, *all* class members are entitled to recover, whether or not some plaintiffs experienced a net benefit while others experienced a past loss. Thus, the Direct Purchaser Plaintiffs, including the national wholesalers, seek exactly the same result: they urge the Court to conclude that Defendant committed an antitrust violation, thereby allowing all Direct Purchasers to recover the overcharges.

Courts in this circuit and elsewhere have rejected the "conflict" rationale adopted in *Valley Drug* and espoused by Defendant here. *See, e.g., Meijer, Inc.,* 246 F.R.D. at 304 ("Defendants' arguments that the [three major national wholesalers] actually benefitted from the delayed entry of Balziva into the market due to the generic bypass phenomenon are irrelevant as a matter of law, and cannot serve to demonstrate that a conflict exists between Plaintiffs' interests and those of the [three national wholesalers] with respect to this litigation."); *In re Hypodermic Prod. Direct Purchaser Antitrust Litig.,* 2006 U.S. Dist. LEXIS 89353, at *19 (D.N.J. Sept. 6, 2007) ("For purposes of class certification, direct purchasers that have suffered overcharges have an antitrust injury and would be entitled to recover the full amount of the overcharge they paid; it is irrelevant if they may have also benefitted from the higher prices because their profits were a percentage of their acquisition costs."). These cases recognize that because all class members have the right to pursue overcharge damages, they have the same incentive to do so, and there is no conflict among class members allegedly harmed by the same antitrust violation. [16] Accordingly, the Court declines to follow *Valley Drug* and will adhere instead to the principles announced in *Hanover Shoe* and *Illinois Brick.*

 **\*7** Moreover, even if the Court were to find *Valley Drug* persuasive, Defendant's speculation as to the alleged "conflict" is undermined by the fact that in this case, the national wholesalers have represented to the Court that their interests are aligned with those of the class members, that they support this litigation, and that they wish to participate in the litigation as part of the class. *See* Aff. of Saul D. Factor, attached to the Direct Purchaser Plaintiffs' Reply at Ex. 2; Aff. of Michael Kaufmann, attached to the Direct Purchaser Plaintiffs' Reply at Ex. 3; Aff. of Brian Jones, attached to the Direct Purchaser Plaintiffs' Reply at Ex. 4. [17] Accordingly, the Court need not rely on speculation as to what conflicts may exist between the national wholesalers and the remainder of the class because the national wholesalers fully support this litigation and explain that they perceive no conflict of interest with the remainder of the class. Defendant's challenge, therefore, is contrary to the facts of this case, and the Court concludes that the Direct Purchasers have met their burden under Rule 23(a)(4). [18]

### B. Rule 23(b)(3)

"To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites:

Common questions must 'predominate over any questions affecting only individual members'; and class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.' " *Amchem,* 521 U.S. at 615 (quoting Fed.R.Civ.P. 23(b)(3)). Rule 23(b) (3) provides a nonexhaustive list of factors relevant to the superiority analysis:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; [and] (D) the difficulties likely to be encountered in the management of a class action.

**1. Predominance of Common Questions**

"The predominance inquiry tests whether the proposed class is sufficiently cohesive to warrant adjudication by representation." *In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortgage Loan Litig.,* 418 F.3d 277, 308-09 (3d Cir.2005) (citing *Amchem,* 521 U.S. at 623-24). "Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem,* 521 U.S. at 625. The presence of individualized questions does not render 23(b)(3) certification inappropriate in all cases. *See In re Cmty. Bank,* 418 F.3d at 306 ("The existence of an individual inquiry does not preclude class action treatment where all class members face the necessity of proving the same fraudulent scheme."). Further, the necessity of an individualized calculation of damages will not defeat Rule 23(b)(3) certification if the predominance requirement otherwise is met. *See id.* at 305-06 ("Although the calculation of individual damages is necessarily an individual inquiry, the courts have consistently held that the necessity of this inquiry does not preclude class action treatment where class issues predominate."); *In re Chiang,* 385 F.3d 256, 273 (3d Cir.2004) ("[I]t is settled law that the necessity for proving damages individually does not defeat class predominance or class certification.").

**\*8**  "At the class certification stage, plaintiffs need only demonstrate that they intend to use generalized evidence which is common to the class and will predominate over individualized issues with respect to proving impact." *In re Vitamins Antitrust Litig.,* 209 F.R.D. 251, 266 (D.D.C.2002). In the instant case, liability depends solely on whether Defendant's conduct violated federal antitrust law and caused

injury to the class. The Direct Purchaser Plaintiffs maintain that the impact of Defendant's alleged conduct can be established by common proof and methodology based on publicly available data as well as information obtained through discovery. The Direct Purchaser Plaintiffs have retained Dr. Gary French, an economist with experience in class action pharmaceutical litigation, who has reviewed the available data and, based on his experience and findings in this case, concludes that "common evidence is available to show that all class members were adversely impacted on their purchases of both Wellbutrin SR and generic bupropion because of the delay in generic entry." Am. Aff. of Gary L. French ("French Aff.") ¶ 41, attached to the Direct Purchaser Plaintiffs' Supplemental Mem. of Law at Ex. 1. [19] Specifically, Dr. French believes that the common impact of the anticompetitive conduct can be explained based, *inter alia,* on literature examining the impact of generic entry into the pharmaceutical market and analysis of public data collected on dispensation and purchases of prescription drugs. *Id.* ¶ 31.

Whether or not the Direct Purchaser Plaintiffs will be able to establish common impact, they have presented a colorable method for doing so, thus satisfying the predominance inquiry as to classwide impact. *See, e.g., In re Nifedipine Antitrust Litig.,* 246 F.R.D. 365, 370 (D.D.C.2007) (noting that the plaintiffs' expert explained that common impact could be proved by studies of generic entry on the pharmaceutical industry, evidence obtained from the defendants, and publicly available sales data, and concluding that "plaintiffs have offered a sufficient colorable method of proving class-wide impact with common evidence as to the issue of causation"); *In re Linerboard Antitrust Litig.,* 203 F.R.D. 197, 220 (E.D.Pa.2001) ("For purposes of class certification, the Court concludes that plaintiffs have presented a viable method for proving class-wide impact. At this point of the litigation, it would be improper to make a determination as to the likely success of using one of the identified methods."); *Lumco Indus., Inc. v. Jeld-Wen, Inc.,* 171 F.R.D. 168, 173-74 (E.D.Pa.1997) ("At this stage of litigation ... the Court need not concern itself with whether Plaintiffs can prove their allegations regarding common impact; the Court need only assure itself that Plaintiffs' attempt to prove their allegations will predominantly involve common issues of fact and law."). [20]

Dr. French also explains that damages can be estimated using two generally accepted methods. *See* French Aff. ¶ 43. The first method, the "before-and-after" method, compares prices

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 463 of 482

In re Wellbutrin SR Direct Purchaser Antitrust Litigation, Not Reported in F.Supp.2d (2008)
2008-1 Trade Cases P 76,140, 70 Fed.R.Serv.3d 664

during a period affected by the anticompetitive behavior with competitive prices from either before or after this period to approximate the percentage overcharge resulting from the anticompetitive conduct. *Id.* The second method, the "yardstick approach," identifies either another geographic market not affected by the anticompetitive conduct, or another product that is comparable to the product and market affected by the anticompetitive conduct. *Id.* Comparing the two price levels provides an estimate of the overcharge resulting from the anticompetitive conduct. *Id.*

**\*9** As one district court has explained, "Antitrust plaintiffs have a limited burden with respect to showing that individual damages issues do not predominate. Plaintiffs do not need to supply a precise damage formula at the certification stage of an antitrust action. Instead, in assessing whether to certify a class, the Court's inquiry is limited to whether or not the proposed methods are so insubstantial as to amount to no method at all." *In re Potash Antitrust Litig.,* 159 F.R.D. 682, 697 (D.Minn.1995); *see also In re Vitamins,* 209 F.R.D. at 268 ("At the certification stage, the preliminary inquiry in assessing the proposed methods of proving damages in limited: The inquiry is not whether the methods are valid, but is only to assess whether the methods are available to prove damages on a class-wide basis."). Numerous courts in this district have found the predominance requirement met when a putative antitrust class has proposed using the "before-and-after" and "yardstick" methodologies to estimate damages. *See, e.g., In re Linerboard,* 203 F.R.D. at 218-20; *In re Plastic Cutlery Antitrust Litig.,* 1998 U.S. Dist. LEXIS 3628, at \*22-23, 1998 WL 135703 (E.D.Pa. Mar. 20,1998); *Lumco Indus.,* 171 F.R.D. at 174. After reviewing the Direct Purchaser Plaintiffs' proposed methodologies, the Court finds that the class satisfies the predominance requirement of Rule 23(b)(3). [21]

**2. Superiority**

"The superiority requirement asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *In re Prudential,* 148 F.3d at 316 (internal quotation marks omitted). In the instant case, denying certification would require each direct purchaser to file suit individually at the expense of judicial economy and litigation costs for each party. *See, e.g., In re Nifedipine,* 246 F.R.D. at 371-72 ("[P]laintiffs argue that it would be inefficient to force each class member to prove the same nucleus of operative facts in dozens of separate trials. Moreover, plaintiffs argue[ ]

that some claims may be so small as to make litigation unfeasible. I agree as to both."); *Meijer, Inc.,* 246 F.R.D. at 313 ("This action involves the resolution of numerous complex issues of law and fact common to all putative class members. As class certification provides the opportunity for an efficient resolution of these substantial issues for the entire class in a single forum, the Court concludes that the class action mechanism is a superior litigation approach in this case." (citation omitted)); *In re Relafen,* 218 F.R.D. at 346 ("[A] class action here appears to be the superior method of resolving the direct purchaser plaintiffs' claims. Given the predominance of common questions and evidence, it appears that resolution by class action would provide substantial savings in time, effort, and expense."); *In re Potash,* 159 F.R.D. at 699 ("[T]he cost associated with individual claims may require claimants with potentially small claim amounts to abandon otherwise valid claims simply because pursuing those claims would not be economical. This in turn would result in unjustly enriching the Defendants; precisely the result antitrust laws are designed to remedy.").

**\*10** Moreover, litigating all claims together avoids the risk of inconsistent results for Defendant and for all direct purchasers. *See, e.g., Meijer, Inc.,* 246 F.R.D. at 313 ("The class action mechanism not only benefits the interest of judicial economy by avoiding a significant number of individual lawsuits, but also avoids the specter of inconsistent adjudications."); *Relafen,* 218 F.R.D. at 347 ("Resolving the direct purchaser plaintiffs' claims in a single forum limits the possibility of inconsistent rulings regarding, for example, SmithKline's liability or the appropriate yardstick for its customers' damages. Resolution by class action would instead promote uniform treatment of class members-similarly situated direct purchasers who allege similar injuries resulting from the same conduct."). Accordingly, the Court concludes that the Direct Purchaser Plaintiffs have demonstrated that the requirements of Rule 23(b)(3) have been met.

**C. Overbreadth**

In its final challenge to class certification, Defendant argues that as defined, the class is overbroad because it includes purchases of Wellbutrin SR that would not have been converted to generic purchases. According to Defendant's expert, the price of Wellbutrin SR did not decrease when lower-priced generic competitors entered the market, and therefore, there can be no overcharge for those purchases of Wellbutrin SR that would not have been converted to generic purchases because the price of Wellbutrin SR was not artificially high. The Direct Purchaser Plaintiffs' expert,

In re Wellbutrin SR Direct Purchaser Antitrust Litigation, Not Reported in F.Supp.2d (2008)
2008-1 Trade Cases P 76,140, 70 Fed.R.Serv.3d 664

in contrast, contends that based on the data he has reviewed, the price of Wellbutrin SR did decrease after generic entry, demonstrating that the price of Wellbutrin SR was artificially high during the relevant class period. Therefore, Plaintiff's expert contends, even purchases of Wellbutrin SR that would not have been converted to a generic equivalent were subject to an overcharge.

This dispute is, at its core, a dispute between Plaintiff's expert and Defendant's expert. "[A]t the certification stage, it would be both 'unwise and unfair' for the Court to decide this 'material factual dispute.' " *In re Relafen,* 218 F.R.D. at 344 (quoting *In re Buspirone,* 210 F.R.D. at 56)); *see also In re Cardizem,* 200 F.R.D. at 311 (explaining that when considering a motion for class certification, "the Court should not delve into the merits of an expert's opinion or indulge 'dueling' between opposing experts").

"Even if it could be shown that some individual class members were not injured, class certification, nevertheless, is appropriate where the antitrust violation has caused widespread injury to the class." *In re NASDAQ Market-Makers Antitrust Litig.,* 169 F.R.D. 493, 523 (S.D.N.Y.1996); *see also In re Nifedipine,* 246 F.R.D. at 369 ("In order to demonstrate that common evidence exists to prove class-wide impact or injury, plaintiffs do not need to prove that every class member was actually injured."); *In re Hydrogen Peroxide,* 240 F.R.D. at 173 n. 14 ("Defendants are correct that plaintiffs 'must establish that each class member has, in fact, been injured by the alleged conduct.' They do not, however, have to prove it prior to class certification. All they need demonstrate now is that antitrust impact on each member is susceptible to proof by predominantly common evidence." (quoting *Weisfeld v. Sun Chem. Corp.,* 210 F.R.D. 136, 144 (D.N.J.2002))). If, at some later stage in the proceedings, it becomes apparent that certain Direct Purchasers were not injured (*i.e.,* because it can be shown that they were not overcharged for purchases of Wellbutrin SR that would not have been converted to generic equivalents), the Court retains the authority to remove those members from the class. *See* Fed.R.Civ.P. 23(c)(1)(C); *In re Relafen,* 218 F.R.D. at 345 (declining to resolve a dispute as to whether prices for the branded drug increased after generic entry and explaining that "at this early stage, the Court considered it appropriate to certify the class as currently defined while maintaining its authority later to amend the definition to exclude members who have not suffered injury").

## IV. CONCLUSION

*\*11* For the reasons discussed above, the Court finds that the Direct Purchaser Plaintiffs have satisfied their burden under Rule 23. Accordingly, the Court will grant the Motion. An appropriate Order follows.

### ORDER

**AND NOW,** this 2nd day of May, 2008, upon consideration of the Direct Purchaser Plaintiffs' Motion for Class Certification (docket no. 8), the Direct Purchaser Plaintiffs' Supplemental Memorandum of Law in Support of Class Certification (docket no. 58), Defendant's Response in Opposition (docket no. 74), and the Direct Purchaser Plaintiffs' Reply (docket no. 77), and for the reasons stated in the accompanying Memorandum, it is ORDERED that the Motion is **GRANTED.** It is **FURTHER ORDERED** that:

1. The following direct purchaser litigation class is hereby certified pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3): "all persons or entities in the United States, excluding governmental entities, that purchased the 100mg or 150mg dosage of Wellbutrin SR directly from GSK during the period from January 24, 2002 to June 30, 2006."

2. The following class claims are included: Claims by direct purchasers of the 100mg or 150mg dosage strengths of Wellbutrin SR for damages under Section 2 of the Sherman Antitrust Act. These claims are premised on Defendant's alleged defrauding of the United States Patent and Trademark Office and attempting to enforce invalid patents through sham litigation designed to prevent low-cost generic versions of the 100mg and 150mg dosages of Wellbutrin SR from entering the market.

3. The following class issues and defenses are included:

a. Whether Defendant made fraudulent misrepresentations or omissions to the United States Patent and Trademark Office during the patent prosecution of the '798 patent;

b. Whether Defendant made fraudulent misrepresentations or omissions to the United States Patent and Trademark Office during the original patent prosecution of the patent later reissued as the '994 patent;

c. Whether Defendant made fraudulent misrepresentations or omissions to the United States Patent and Trademark Office

during the prosecution of the reissue application leading to the ′994 patent;

d. Whether Defendant obtained the ′798 or ′994 patents because of fraudulent misrepresentations to the United States Patent and Trademark Office;

e. Whether Defendant initiated sham litigation against potential generic manufacturers of the 100mg or 150mg dosage strengths of Wellbutrin SR;

f. Whether Defendant's conduct constitutes a willful acquisition or maintenance of monopoly power with respect to the 100mg or 150mg dosage strengths of Wellbutrin SR;

g. Whether Defendant's conduct caused a delay in the market entry of the 100mg or 150mg dosage strengths of generic Wellbutrin SR;

h. Whether Defendant's conduct caused prices of the 100mg or 150mg dosage strengths of sustained-release bupropion to be at artificially high levels;

i. Whether the conduct of Defendant injured the Plaintiffs and members of the Class;

 **\*12**  j. Whether there are classwide damages, and if so, the amount of such damages;

k. Whether Defendant's conduct is protected under the *Noerr-Pennington* doctrine and/or otherwise under the United States Constitution; and

l. Whether Plaintiff's claims are precluded, in whole or in part, by the Federal Food, Drug, and Cosmetic Act's Drug Price Competition and Patent Team Restoration Act of 1984 (the "Hatch-Waxman Act").

4. SAJ Distributors, Inc, Stephen L. LaFrance Holdings, Inc., Meijer, Inc., and Meijer Distribution, Inc. are appointed Class Representatives of the Direct Purchaser Class.

5. Dianne M. Nast, Esq. and RodaNast, P.C. are appointed as Lead Class Counsel for the Direct Purchaser Class.

6. Within 30 days of the date of this Order, the parties shall submit an agreed upon proposed notice program and forms of notice to class members. If the parties are unable to agree as to the proposed notice program and/or forms of notice, they shall submit separate proposals accompanied by brief memoranda setting forth their competing positions.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 1946848, 2008-1 Trade Cases P 76,140, 70 Fed.R.Serv.3d 664

---

## Footnotes

1    Wellbutrin SR is a sustained release drug using the active ingredient bupropion hydrochloride. Defendant marks Wellbutrin SR in 100mg, 150mg, and 200mg dosage strengths. The 200mg dosage strength is not at issue in this case.

2    This Memorandum contains only an abbreviated version of the facts relevant to the instant Motion. For a more detailed recitation of the background facts and allegations against Defendant, *see In re Wellbutrin SR Antitrust Litigation,* 2006 U.S. Dist. LEXIS 9687, 2006 WL 616292 (E.D.Pa. Mar. 9, 2006).

3    In a related action (civil no. 04-5898), the "end-payor plaintiffs" make the same allegations against Defendant. The end-payor plaintiffs are the persons last in the chain of distribution and include consumers, health care benefit plans, health maintenance organizations, health insurers, hospitals, nursing homes, and self-insured employers. The end-payor plaintiffs have also filed a motion for class certification, which will be addressed in a separate memorandum and order. A third action (civil no. 05-396) involves a "third-party payor" making the same allegations against Defendant. That action has not been brought on behalf of a class.

4    Earlier in this litigation, Defendant moved to dismiss claims in the various complaints. On March 9, 2006, the Court issued a Memorandum and Order dismissing without prejudice the claims of fraudulent prosecution of a patent and the claims seeking injunctive relief pursuant to the Clayton Antitrust Act. The Court denied Defendant's motions to dismiss in all other respects.

5    As explained *infra,* the Named Plaintiffs are assignees of direct purchasers and seek to represent the Direct Purchaser Plaintiff class. For the purposes of this Memorandum and Order, the "Named Plaintiffs" shall be referred to as the "Direct Purchaser Plaintiffs," and the Motion for Class Certification shall be referred to as the "Direct Purchaser Plaintiffs' Motion" or the "Motion."

6    Because the Direct Purchaser Plaintiffs seek certification under Rule 23(b)(3), the Court will confine its analysis to that standard and will not consider whether the proposed class meets the requirements of Rule 23(b)(1) or (b)(2).

7    As explained in the Consolidated Amended Class Action Complaint, generic bupropion entered the market in January 2004. The Direct Purchaser Plaintiffs allege that the class period begins on January 24, 2002, the date on which generic entry would have occurred but for Defendant's allegedly anticompetitive conduct. They allege that the class period ends on June 30, 2006, the date on which prices stabilized at competitive levels.

8    Defendant also manufactures Zyban, which is the chemical equivalent of Wellbutrin SR. Defendant assigned the drug two different names for marketing purposes: Wellbutrin SR is marketed to treat depression, whereas Zyban is marketed to aid in smoking cessation. Although the Direct Purchaser Plaintiffs' Original Complaint and Consolidated Amended Class Action Complaint refer to both Zyban and Wellbutrin SR, they seek class certification only for direct purchasers of Wellbutrin SR.

9    Although Defendant does not argue that the typicality requirement is not met, several of its challenges to the adequacy of representation factor also relate to typicality. To the extent that the issues overlap, the Court will consider Defendant's arguments together in Section III.A.4, *infra.*

10    Defendant cites a number of cases to support the unremarkable proposition that a named plaintiff must be a member of the class which it purports to represent. The only case supporting the specific theory it articulates here-that an assignee is, by definition, unable to represent a class-has, after Defendant filed its response to the Motion, been rejected by the Second Circuit. *In re Pub. Offering Fee Antitrust Litig.,* 2006 U.S. Dist. LEXIS 21076, 2006 WL 1026653 (S.D.N.Y. Apr. 18, 2006), *rev'd sub nom. Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.,* 502 F.3d 91, 103 (2d Cir.2007) ("We conclude that Cordes and Creditors Trust, pursuing their claims and interests as assignees of the claims brought by, and interests in this litigation of, purported members of the class seeking to act as class representatives, are not excluded, for that reason alone."). While the Second Circuit did not hold that an assignee will be an adequate representative in all instances, it did reject the *per se* rule Defendant articulates here.

11    While some of the above-cited cases discuss the assignee issue under the typicality prong of the Rule 23 analysis, the point is the same: an assignee steps into the shoes of the assignor and may assert any legal claim assigned to it. Whether framed as a question of the typicality of the right being litigated or the adequacy of the assignee to litigate the right on behalf of others, courts consistently have rejected the notion that an assignee is categorically inadequate as a lead plaintiff.

12    Under *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1971), an indirect purchaser cannot bring a damages claim under federal law based on an alleged antitrust violation. Accordingly, if the assignment is invalid, SAJ cannot bring the current federal claim. Absent the assignment, it is an indirect purchaser without standing to pursue the claim.

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 467 of 482

In re Wellbutrin Sr Direct Purchaser Antitrust Litigation, Not Reported in F.Supp.2d (2008)
2008-1 Trade Cases P 76,140, 70 Fed.R.Serv.3d 664

13    This particular argument also relates to the "typicality" prong of the Rule 23 analysis. The Third Circuit has recognized that the "unique defense" challenge goes to both the typicality and the adequacy prongs, and the Court will consider both aspects of the argument here. *See Beck*, 457 F.3d at 296.

14    As a rule, "courts are generally skeptical of defenses to class certification based on conflicts between the proposed class members." *In re Bulk [Extruded] Graphite Prods. Antitrust Litig.,* 2006 U.S. Dist. LEXIS 16619, at *24 (D.N.J. Apr. 4, 2006). Courts maintain this skepticism because a defendant makes the "conflicts" argument in the guise of ensuring adequate representation for the class, where in reality, the defendant seeks to avoid class certification altogether. *See, e.g., Umbrac v. Am. Snacks, Inc.,* 388 F.Supp. 265, 275 (E.D.Pa.1975) ("It is in the nature of the motion practice on class determination issues that defendants, who naturally have no interest in the successful prosecution of the class suit against them, are called upon to interpose arguments in opposition to class determination motions verbally grounded upon a concern for the 'best' representation for the class while the implicit, but nonetheless real, objective of their vigorous legal assaults is to insure 'no' representation for the class.").

15    In *Valley Drug,* the Eleventh Circuit recognized that *Hanover Shoe* and *Illinois Brick* "stand for the proposition that a direct purchaser who passes on overcharges to his own customers nevertheless suffers cognizable antitrust injury and may sue to recover damages regardless of whether he actually profited from the defendants' conduct." 350 F.3d at 1192. The Eleventh Circuit distinguished these cases, explaining that "the question [they] address is a distinctly separate question from the issue of whether class certification is appropriate where a fundamental conflict exists among the named and unnamed members of a class." *Id.* As explained above, however, *Hanover Shoe* and *Illinois Brick* eliminate any "fundamental conflict" between the class members.

16    In a case that predates *Valley Drug,* the court in *J.B.D.L. Corp. v. Wyeth-Ayerst Laboratories, Inc.,* 225 F.R.D. 208, 216 (S.D.Ohio 2003), rejected the argument that downstream economic effects of antitrust injury can create a fundamental class conflict. In *J.B.D.L.,* the defendant argued that "there is a conflict between the class representatives and some class members because some class members purchased large quantities of Premarin and were able to resell it at a greater profit after price increases ." The court found this "conflict" argument meritless because "[a]ntitrust injury is considered complete when the direct purchaser pays an illegal overcharge and whether he was able to pass through the overcharge to indirect purchasers is irrelevant to the inquiry." *Id.* As the court explained, "as long as the price paid by the class members for Premarin was higher than it would have been absent the alleged anticompetitive conduct, there is no conflict created if indeed some of the direct purchasers were able to recoup the overcharge through price increases passed on to other purchasers." *Id.*

17    With no comparable evidence before it, the *Valley Drug* court suggested that the national wholesalers may have been reluctant to oppose the alleged anticompetitive conduct out of economic self-interest. *See* 350 F.3d at 1193 ("[T]he profits received by some class members from selling branded Hytrin in the absence of generic competition, and the greater volume of Hytrin sold by these parties in the absence of generic competition, may suggest a tradeoff the national wholesalers were content to make in order to experience greater profits."). Because the national wholesalers have represented that they support this litigation, the Court need not engage in the same speculation.

18    If, at any point during the litigation, an actual conflict between class members does arise, the Court retains the ability to divide the class into subclasses pursuant to Federal Rule of Civil Procedure 23(c)(5). Moreover, class members who do not wish to participate in the class litigation may opt out of the class altogether. *See* Fed.R.Civ.P. 23(c)(2)(B); *see also Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.,* 247 F.R.D. 253, 268-69 (D.Mass.2008) ("[S]hould *any* fundamental conflict arise, a ready mechanism exists to protect

2008-1 Trade Cases P 76,140, 70 Fed.R.Serv.3d 664

it-the opt-out provision.... Sophisticated players such as distributors and large hospitals can determine for themselves whether a fundamental conflict exists within the class.").

19    Dr. French explains that as the result of Defendant's monopoly, the entire class was injured because class members were (a) unable to purchase lower-price generic alternatives and/or (b) forced to pay artificially high prices for brand name Wellbutrin SR. *See* French Aff. ¶ 40.

20    In a number of other delayed generic entry cases, courts have approved the use of the same types of evidence the Direct Purchaser Plaintiffs rely on here to show common impact. *See, e.g., Relafen,* 218 F.R.D. at 343 (finding predominance met where the direct purchasers relied on "governmental and academic studies, projections and analyses described in SmithKline's and its competitors' internal documents, and price and sales data for Relafen and its generic equivalents"); *In re Cardizem,* 200 F.R.D. at 308 (approving the use of generalized evidence, including academic studies, the defendants' internal sales documents, and marketplace sales data, to prove common impact).

21    This finding of predominance is consistent with the findings of other courts in which plaintiffs have alleged antitrust injuries resulting from the delayed entry of generic drug competitors. *See, e.g., In re Nifedipine,* 246 F.R.D. at 369-71; *Meijer, Inc.,* 246 F.R.D. at 307-12; *In re Relafen,* 218 F.R.D. at 343-46; *In re Buspirone,* 210 F.R.D. at 58; *In re Cardizem,* 200 F.R.D. at 307-25.

---

End of Document                                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 4206696
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Scott WHITELEY and Harry Berer, individually and
on behalf of all others similarly situated, Plaintiffs

v.

ZYNERBA PHARMACEUTICALS,
INC., et al., Defendants

CIVIL ACTION NO. 19-4959
|
Filed 09/16/2021

**Attorneys and Law Firms**

Michael S. Doluisio, Jeffrey J. Masters, Tiffany Ellen Engsell, Dechert LLP, Philadelphia, PA, David H. Kistenbroker, Dechert LLP, Chicago, IL, for Defendants.

**MEMORANDUM OPINION**

NITZA I. QUIÑONES ALEJANDRO, District Judge

**INTRODUCTION**

 **\*1** Before this Court is a *motion for final approval of class action settlement and final determination that class certification for settlement purposes is appropriate*, [ECF 45], and a *motion for an award of attorneys' fees, reimbursement of expenses, and compensatory awards to lead plaintiffs*, [ECF 46], both filed by Plaintiffs Scott Whiteley and Harry Berger pursuant to Federal Rule of Civil Procedure ("Rule") 23. Previously, this Court granted preliminary approval to the underlying class action settlement agreement (the "Settlement Agreement"). [ECF 44]. A hearing was held on August 31, 2021 (the "Fairness Hearing"), at which the Court heard oral argument on Plaintiffs' unopposed motion for final approval of the Settlement Agreement. Counsel for all parties appeared. For the reasons stated herein, the motion for final approval of the class action settlement and motion for attorneys' fees and expenses are both granted.

**BACKGROUND**

Plaintiffs Scott Whiteley and Harry Berger, on behalf of themselves and all others similarly situated, brought this class action against Defendants Zynerba Pharmaceuticals, Inc. ("Zynerba"), Armando Anido, and James E. Fickenscher

(collectively, "Defendants"), asserting various claims for alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b), and 78t(a), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission. Specifically, Plaintiffs alleged that during the Settlement Class Period, Zynerba conducted Phase II clinical testing of Zygel to assess its efficacy and safety for treatment of child and adolescent patients with developmental and epileptic encephalopathies via a clinical trial called the "BELIEVE 1" trial. Zygel is a transdermal cannabinoid-based treatment, and Zynerba's only product in development. In the amended complaint, Plaintiffs alleged that Defendants knew about but failed to timely disclose adverse events experienced by participants during the BELIEVE 1 trial. When this material information was reported on September 18, 2019, Zynerba's stock price fell $2.46 per share (21.77%).

From the outset of this litigation, Defendants have denied any wrongdoing and vigorously defended this action. Initially, Defendants filed a motion to dismiss, which this Court granted, in part, and denied, in part. Defendants filed a motion for reconsideration, which this Court denied. After Defendants file an answer to the amended complaint, the parties participated in a full-day mediation with a private mediator. The parties reached an agreement in principle, which was eventually memorialized in a settlement agreement on April 30, 2021.

**The Terms of the Settlement**

The Settlement, the full terms of which are set forth in the Settlement Agreement, provides substantial economic benefits to the certified class (the "Class"). [1] The Settlement creates a total settlement fund of $4.0 million (the "Settlement Fund"), to be reduced by any amount approved by this Court for attorneys' fees and costs, and for the class representative service awards.

**Preliminary Approval and Class Notice**

 **\*2** By Order dated May 12, 2021, this Court granted preliminary approval to the proposed Settlement and provisionally certified the proposed class. Pursuant to this Court's Preliminary Approval Order, Strategic Claims Services ("SCS") was appointed to serve as the Settlement Administrator. As part of its responsibilities, SCS sent notice to the relevant governmental officials under the Class Action

Case 4:21-cv-00196-MWB   Document 249-1   Filed 10/07/25   Page 470 of 482

Whiteley v. Zynerba Pharmaceuticals, Inc., Not Reported in Fed. Supp. (2021)

Fairness Act ("CAFA"), 28 U.S.C. § 1715, et seq., effected publication notice, and sent direct notice to Class Members in accordance with the plan for notice, which this Court found to be the best notice practicable under the circumstances and consistent with the requirements of due process. SCS mailed notices to thirty-seven (37) individuals and organizations identified in the transfer agent records. SCS also mailed a letter to 1,224 nominees contained in its proprietary master mailing list, which notified the recipients of the settlement and requested that within ten (10) calendar days that they either: (a) send a postcard notice to their customers who may be beneficial purchasers/owners; (b) email either an electronic version of the Summary Notice of Pendency and Proposed Settlement of Action and Final Approval Hearing ("Publication Notice") or a direct link to the Notice of Proposed Settlement of Class Action, Motion for Attorneys' Fees and Expenses, and Settlement Fairness Hearing ("Long Notice") and Proof of Claim and Release Form ("Claim Form") supplied by SCS to their beneficial purchasers/owners; or (c) provide SCS with a list of the names, mailing addresses, and email addresses, to the extent email addresses were available, of such beneficial owners so that SCS could promptly mail the Postcard Notice or email the links to the Long Notice and Claim Form directly to them. As a result of this notice procedure, SCS mailed 24,807 Postcard Notices. In addition, Certain Nominee Account Holders notified SCS that they collectively emailed 15,805 potential Settlement Class Members to notify them of the Settlement and provide either the Publication notice or direct links to the Long Notice and Claim form on the Settlement webpage. SCS also sent the Depository Trust Company a Long Notice and Claim Form to post on its Legal Notice system and arranged for the Publication Notice to be published electronically once on the *GlobeNewswire* and in print in the *Investor's Business Daily.*

The deadline for filing objections and requests for exclusion was August 10, 2021. As of the date of the Fairness Hearing, there were no objections, and only two (one invalid) requests for exclusion.

## DISCUSSION

When granting final approval of a class action settlement, a district court must hold a hearing and conclude that the proposed settlement is fair, reasonable, and adequate. *See* Fed. R. Civ. P. 23(e)(2); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 295 (3d Cir. 2011); *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 258 (3d Cir. 2009). Although there is a strong judicial policy in favor of voluntary settlement agreements, *Pennwalt Corp. v. Plough*, 676 F.2d 77, 79-80

(3d Cir. 1982), courts are generally afforded broad discretion in determining whether to approve a proposed class action settlement. *Eichenholtz v. Brennan*, 52 F.3d 478, 482 (3d Cir. 1995). "The law favors settlement particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab.*, 55 F.3d 768, 784 (3d Cir. 1995). In addition to conservation of judicial resources, "[t]he parties may also gain significantly from avoiding the costs and risks of a lengthy and complex trial." *Id.*

In *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975), the United States Court of Appeals for the Third Circuit (the "Third Circuit") set forth factors (often called the "*Girsh* factors") that a district court should consider when reviewing a proposed class action settlement. The *Girsh* factors are the following:

(1) the complexity, expense and likely duration of the litigation;

(2) the reaction of the class to the settlement;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the risks of establishing liability;

(5) the risks of establishing damages;

(6) the risks of maintaining the class action through the trial;

(7) the ability of the defendant to withstand a greater judgment;

(8) the range of reasonableness of the settlement fund in light of the best possible recovery; and

(9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*In re Ins. Brokerage Antitrust Litig.*, 579 F.3d at 258 (citing *Girsh*, 521 F.2d at 157). No one factor is dispositive. *Hall v. Best Buy Co.*, 274 F.R.D. 154, 169 (E.D. Pa. 2011). Further, a "court may approve a settlement even if it does not find that each of [the *Girsh*] factors weighs in favor of approval." *In re N.J. Tax Sales Certificate Antitrust Litig.*, 750 F. App'x 73, 77 (3d Cir. 2018).

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 471 of 482

Whiteley v. Zynerba Pharmaceuticals, Inc., Not Reported in Fed. Supp. (2021)

In *Krell v. Prudential Ins. Co. of Am. (In re Prudential)*, 148 F.3d 283 (3d Cir. 1998), the Third Circuit identified additional nonexclusive factors (the "*Prudential* factors") for courts to consider for a "thorough going analysis of settlement terms." *See also In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 350 (3d Cir. 2010). The *Prudential* factors often overlap with the *Girsh* factors, and include:

> **\*3** (1) the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages;
>
> (2) the existence and probable outcome of claims by other classes and subclasses;
>
> (3) the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved or likely to be achieved for other claimants;
>
> (4) whether class or subclass members are accorded the right to opt-out of the settlement;
>
> (5) whether any provisions for attorneys' fees are reasonable; and
>
> (6) whether the procedure for processing individual claims under the settlement is fair and reasonable.

*In re Pet Food*, 629 F.3d at 350. Only the *Prudential* factors relevant to the litigation in question need be addressed. *In re Prudential*, 148 F.3d at 323-24.

With these principals in mind, this Court will consider each of the *Girsh* factors and the relevant *Prudential* factors in its review of the proposed class action settlement.

### *Girsh* Factors

#### 1. The complexity, expense, and likely duration of the litigation

This case raised significant and complex factual and legal questions regarding Defendants' purported omissions and/or misrepresentations in SEC filings regarding a pharmaceutical product in development. Needless to say, had the Settlement not been reached, this matter would likely have proceeded to trial on the issues of liability and determination of damages. The continued prosecution of Plaintiffs' claims against Defendants would have required significant additional expense to the Class, including additional discovery and the employment of experts, resulting in a substantial delay before any potential recovery. Further, no matter the outcome of dispositive motions or a trial, it is likely that one or all of the parties would have appealed, leading to further litigation costs and delay in any realized recovery. Thus, the avoidance of unnecessary expenditure of time and resources benefits all parties and weighs in favor of approving the settlement. *See In re Gen. Motors*, 55 F.3d at 812 (concluding that lengthy discovery and potential opposition by the defendant were factors weighing in favor of settlement).

#### 2. The reaction of the class to the settlement

"The Third Circuit has looked to the number of objectors from the class as an indication of the reaction of the class." *In re Certainteed Corp. Roofing Shingle Prods. Liab. Litig.*, 269 F.R.D. 468, 485 (E.D. Pa. 2010) (citing *In re Cendant Corp. Litig.*, 264 F.3d 201, 234-35 (3d Cir. 2001)). "Courts have generally assumed that 'silence constitutes tacit consent to the agreement.' " *In re Gen. Motors*, 55 F.3d at 812 (quoting *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1313 n.15 (3d Cir. 1993)). A low number of objectors or opt-outs is persuasive evidence that the proposed settlement is fair and adequate. *Serrano v. Sterling Testing Sys., Inc.*, 711 F. Supp. 2d 402, 415 (E.D. Pa. 2010) (citing *In re Cendant*, 264 F.3d at 234-35).

Here, Defendants identified more than 24,000 individuals who meet the Class definition. Those individuals identified as potential Class members were mailed and/or emailed notices and Class forms. As of the date of the final approval hearing, no Class Member had objected to the terms of the proposed settlement or the request for attorneys' fees, and only two persons requested exclusion. This factor is persuasive evidence of the fairness and adequacy of the proposed settlement, and weighs in favor of a final approval. *See In re Cendant*, 264 F.3d at 234-35.

#### 3. The stage of the proceedings and the amount of discovery completed

**\*4** The third *Girsh* factor "captures the degree of case development that class counsel [had] accomplished prior to settlement. Through this lens, courts can determine whether

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 472 of 482

Whiteley v. Zynerba Pharmaceuticals, Inc., Not Reported in Fed. Supp. (2021)

counsel had an adequate appreciation of the merits of the case before negotiating." *In re Cendant*, 264 F.3d at 235. When evaluating this third *Girsh* factor, courts must evaluate the procedural stage of the case at the time of the proposed settlement to assess whether counsel adequately appreciated the merits of the case while negotiating. *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 537 (3d Cir. 2004). "[C]ourts generally recognize that a proposed class settlement is presumptively valid where ... the parties engaged in arm's length negotiations after meaningful discovery." *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 144-45 (E.D. Pa. 2000). Settlements reached following discovery "are more likely to reflect the true value of the claim." *Boone v. City of Phila.*, 668 F. Supp. 2d 693, 712 (E.D. Pa. 2009) (citing *Bell Atl. Corp.*, 2 F.3d at 1314).

As set forth above, this case has been actively litigated from its commencement. Although the parties had not completed discovery, Plaintiffs' counsel had ample information to evaluate the prospects for the Class and to assess the fairness of the settlement. By the time the settlement was reached, Plaintiffs' counsel had: (1) reviewed and analyzed Class Period and pre-Class Period public filings, annual reports, press releases, quarterly-earnings-call and industry-conference transcripts, and other public statements; (2) reviewed and analyzed stock trading data relating to the Company as well as analyst reports and major financial news service reports; (3) consulted with experts; (4) drafted the initial complaint and an amended complaint to comply with the Private Securities Litigation Reform Act of 1995 (the "PSLRA"); (5) researched and drafted an opposition to Defendants' motion to dismiss and subsequent motion for reconsideration; (6) prepared for and engaged in a mediation; and (7) negotiated the final terms of the settlement. As a result of these pre-settlement efforts, the parties had ample opportunity to identify and grasp the strengths and weaknesses of each party's case. Consequently, this Court finds that this factor weighs in favor of approval.

### 4. The risks of establishing liability

This *Girsh* factor weighs the likelihood of ultimate success against the benefits of an immediate settlement. The existence of obstacles, if any, to the plaintiff's success at trial weighs in favor of settlement. *In re Warfarin*, 391 F.3d at 537; *In re Prudential*, 148 F.3d at 319. This factor should be considered to "examine what potential rewards (or downside) of litigation might have been had class counsel decided to

litigate the claims rather than settle them." *In re Cendant*, 264 F.3d at 237 (quoting *GM Trucks*, 55 F.3d at 814). "The inquiry requires a balancing of the likelihood of success if 'the case were taken to trial against the benefits of immediate settlement.' " *Wallace v. Powell*, 288 F.R.D. 347, 369 (M.D. Pa. 2012) (quoting *Prudential II*, 148 F.3d at 319).

In this case, the outcome of this matter with respect to liability is far from certain. Defendants have denied any liability throughout this litigation. The proposed settlement avoids the risk that Defendants be found not liable. Thus, this Court finds that this factor weighs in favor of approval.

### 5. The risks of establishing damages

This factor "attempts to measure the expected value of litigating the action rather than settling it at the current time." *In re Cendant*, 264 F.3d at 238-39. The Court looks at the potential damage award if the case were taken to trial against the benefits of immediate settlement. *Prudential II*, 148 F.3d at 319. In *Warfarin Sodium I*, the trial court found that the risk of establishing damages strongly favored settlement, observing that "[d]amages would likely be established at trial through a 'battle of experts,' with each side presenting its figures to the jury and with no guarantee whom the jury would believe." *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 256 (D. Del. 2002), *aff'd* 391 F.3d 516, 537 (3d Cir. 2004). Similarly, in *In re Cendant*, the Third Circuit reasoned that there was no compelling reason to think that "a jury confronted with competing expert opinions" would accept the plaintiff's damages theory rather than that of the defendant and, thus, the risk in establishing damages weighed in favor of approval of the settlement. 264 F.3d at 239. The same is likely true here. Accordingly, this factor weighs in favor of approval.

### 6. The risks of maintaining the class action through trial

**\*5** Because "the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the [class] action," *In re Gen. Motors*, 55 F.3d at 817, this factor measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial. As noted above, this action has been vigorously litigated by both sides from the outset. As such, it is likely that the issue of class certification would have been the subject of vigorous dispute. Further, even if class certification were granted in

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 473 of 482

Whiteley v. Zynerba Pharmaceuticals, Inc., Not Reported in Fed. Supp. (2021)

this matter, class certification can always be reviewed or modified before trial, so "the specter of decertification makes settlement an appealing alternative." *Skeen v. BMW of N. Am., Ltd. Liab. Co.*, 2016 WL 4033969, at *15 (D. N.J. July 26, 2016). Accordingly, this factor weighs in favor of approval.

### 7. The ability of defendants to withstand a greater judgment

This factor considers "whether the defendants could withstand a judgment for an amount significantly greater than the settlement." *In re Cendant*, 264 F.3d at 240. Here, a significant source of the settlement proceeds is Zynerba's directors' and officers' liability insurance policies, which continued litigation would have dissipated. Zynerba has no FDA approved products generating revenue, and Zygel is the only product in Zynerba's pipeline. Zygel has not been approved by the FDA and, therefore, has not been commercialized. The Company has no revenue. Accordingly, there is significant risk that Zynerba could not have withstood a greater judgment. This factor favors approval.

### 8-9. The range of reasonableness of settlement in light of best possible recovery and all attendant risks of litigation

The last two *Girsh* factors, often considered together, evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case. *In re Warfarin*, 391 F.3d at 538. In order to assess the reasonableness of a settlement in cases seeking monetary relief, "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement." *In re Prudential*, 148 F.3d at 322.

In light of the questions of fact and law present in this litigation, the value of the proposed settlement substantially outweighs the mere possibility of future relief. Here, the Class is receiving a significant settlement amount that offers real and immediate economic benefits to Class Members. The $4,000,000 cash settlement represents approximately 10.4% of estimated damages and is well above similar average settlements in securities litigation. *See, e.g., In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 715 (E.D. Pa. 2001) (noting that since 1995, class action settlements have typically "recovered between 5.5% and 6.2% of the class members' estimated losses"); *In re PNC*, 440 F. Supp. At 435-36 (approving settlement amount that represented 12%

of estimated losses because it "constitute[d] a very reasonable range of settlement when compared to the best possible recovery discounted by the attendant risks of proceeding to trial"). As previously noted, the expense of a trial and use of the parties' resources would have been substantial, especially in conjunction with the post-trial motions and appeals that would have likely followed a trial on the merits. Thus, a settlement is advantageous to all parties. Therefore, these factors weigh in favor of approval.

### Relevant *Prudential* Factors

#### 1. Factors that bear on the maturity of the underlying substantive issues

**\*6** This case was settled at a relatively mature point in the proceedings. As discussed above, Class Counsel obtained and reviewed substantial documentation prior to commencing this action and the parties fully litigated Defendants' motion to dismiss and motion for reconsideration. In addition, the parties participated in a successful private mediation. As such, the litigants were in a position to fully evaluate the strengths, weaknesses, and merits of their case. The advanced development of the record weighs in favor of approval. *See Chakejian v. Equifax Info. Servs., LLC*, 275 F.R.D. 201, 215 (E.D. Pa. 2011) (finding settlement reasonable where underlying substantive issues were "mature in light of the experience of the attorneys, extent of discovery, posture of case, and mediation efforts undertaken.").

#### 2. Results achieved by settlement for individual class members versus the results achieved— or likely to be achieved—for other claimants

This factor weighs in favor of approval since only two class members elected to be excluded and most Settlement Class Members will receive Settlement benefits automatically without having to take any further action.

#### 3. Whether class or subclass members are afforded the right to opt out of the settlement

As part of the Class notice process approved by this Court, Settlement Class Members were provided robust notice and the opportunity to file objections to the Settlement and/or

requests for exclusion. No members filed any objections, and only two members filed requests for exclusion. Thus, this factor weighs in favor of approval.

### 4. Whether any provisions for attorneys' fees are reasonable

As part of the Class notice process approved by this Court, Class members were advised that Plaintiffs would seek an award of attorneys' fees of up to one-third of the settlement amount. For the reasons discussed in greater detail below, the attorneys' fees and expenses sought and agreed to in this case are reasonable. Thus, this factor weighs in favor of approval.

### 5. Whether the procedure for processing individual claims under the class action settlement is fair and reasonable

The claims processing procedures put in place by the Settlement are fair and reasonable. The Plan of Allocation provides for distribution of the Net Settlement Fund among Authorized Claimants on a *pro rata* basis based upon each Authorized Claimant's Recognized Loss attributable to the alleged fraud. Such *pro rata* distributions are consistently utilized and upheld. *Sullivan v. DB Invs., Inc.,* 667 F.3d 273, 326 (3d Cir. 2011). This factor supports approval of the settlement.

In summary, in light of the presumption of fairness that attaches to the Settlement, *see In re Warfarin,* 391 F.3d at 539, and upon consideration of each of the *Girsh* factors and the relevant *Prudential* factors, this Court finds that the proposed class action settlement is fair and reasonable.

### Class Certification

As noted, by Order dated May 12, 2021, this Court provisionally certified the following proposed class:

> all Persons (including, without limitation, their beneficiaries) who purchased or otherwise acquired Zynerba securities from March 11, 2019 through September 17, 2019, both dates inclusive. Excluded from the Class are (i) the Defendants; (ii) the officers and directors of

Zynerba during the Class Period; (iii) the immediate family members, legal representatives, heirs, successors or assigns of such excluded persons; (iv) any entity in which any Defendant has or had a controlling interest during the Settlement Class Period; and (v) all putative members of the Settlement Class who exclude themselves by filing a valid and timely request for exclusion.

Although this Court previously certified the Class, it must again determine whether class certification is appropriate under Rule 23. *In re Prudential,* 148 F.3d at 308.

**\*7** A plaintiff seeking class certification must satisfy all requirements of Rule 23(a) and at least one of the requirements of Rule 23(b). *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* 568 U.S. 455, 465 (2013); *see also Marcus v. BMW of North America,* 687 F.3d 583, 590 (3d Cir. 2012). "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule." *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350 (2011). A district court's analysis of a motion for class certification "must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim.' " *Amgen Inc.,* 568 U.S. at 465-66 (quoting *Wal-Mart,* 564 U.S. at 351). However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether Rule 23 prerequisites for class certification are satisfied." *Id.* "Factual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence." *In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305, 320 (3d Cir. 2008).

To satisfy the Rule 23(a) requirements:

> (1) the class must be "so numerous that joinder of all members is impracticable" (numerosity); (2) there must be "questions of law or fact common to the class" (commonality); (3) "the claims or defenses of the representative parties" must be "typical of the claims or defenses of the class" (typicality); and (4) the named plaintiffs must "fairly and adequately protect the interests

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 475 of 482

Whiteley v. Zynerba Pharmaceuticals, Inc., Not Reported in Fed. Supp. (2021)

of the class" (adequacy of representation, or simply adequacy).

*Marcus*, 687 F.3d at 590-91 (citations omitted).

Here, Plaintiffs seek certification of the proposed class, as provisionally certified, pursuant to Rule 23(b)(3). This Rule permits certification when the court finds that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### *Rule 23(a)* Requirements

### 1. Numerosity

Under Rule 23(a)(1), the court must determine whether the potential class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001). Although "Rule 23(a)(1) does not require a plaintiff to offer direct evidence of the exact number and identities of the class members ... in the absence of direct evidence, a plaintiff must show sufficient circumstantial evidence specific to the products, problems, parties, and geographic areas actually covered by the class definition to allow a district court to make a factual finding." *Hayes*, 725 F.3d at 357. "Only then may the court rely on 'common sense' to forgo precise calculations and exact numbers." *Id.*

Here, Zynerba's common stock was listed on the NASDAQ with an average of over 21 million shares of common stock outstanding. Courts generally presume that the numerosity requirement has been satisfied "when a class action involves a nationally traded security." *In re Cigna Corp. Sec. Litig.*, 2006 WL 2433779, at *2 (E.D. Pa. Aug. 18, 2006). In addition, more than 24,000 potential class members have been identified. Given the number and likely geographic distribution of the Settlement Class Members, joinder of all Settlement Class Members would be impracticable. Thus, the proposed Settlement Class satisfies Rule 23's numerosity requirement for settlement purposes. *Liberty Lincoln Mercury*

*Inc. v. Ford Marketing Corp.*, 149 F.R.D. 65, 73 (D.N.J. 1993).

### *2-3. Commonality and Typicality*

**\*8** Pursuant to Rule 23(a)(2), a court must determine whether "there are questions of law or fact common to the class," ordinarily known as "commonality." Fed. R. Civ. P. 23(a)(2). Under the Rule, commonality "requires the plaintiff to demonstrate that the class members 'have suffered the same injury.' " *Wal-Mart*, 564 U.S. at 350. It "does not require identical claims or facts among class member[s]." *Marcus*, 687 F.3d at 597 (citations omitted). "For purposes of Rule 23(a)(2), even a single common question will do." *Id.* Claims common to the entire class "must depend on a common contention ... [that is] of such a nature that it is capable of classwide resolution ... [and] that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 131 S. Ct. at 2551.

Under Rule 23(a)(3), a court must also determine whether "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality and commonality are closely related and often merge. *Marcus*, 687 F.3d at 597. Typicality, however, "derives its independent legal significance from its ability to 'screen out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present.' " *Id.* at 598. "If a plaintiff's claim arises from the same event, practice, or course of conduct that gives rise[ ] to the claims of the class members, factual differences will not render that claim atypical if it is based on the same legal theory as the claims of the class." *Id.*

Typicality ensures that the putative class members' and the representative's interests "are aligned 'so that the latter will work to benefit the entire class through the pursuit of [his or her] own goals.' " *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183 (3d Cir. 2001) (citations omitted). Typicality is met "when the named plaintiffs and the proposed class members 'challenge [ ] the same unlawful conduct." *Thomas v. SmithKline Beecham Corp.*, 201 F.R.D. 386, 394 (E.D. Pa. 2001) (quoting *Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994)). Complete "factual similarity is not required; just enough factual similarity so that maintaining the class action

Case 4:21-cv-00196-MWB   Document 249-1   Filed 10/07/25   Page 476 of 482

Whiteley v. Zynerba Pharmaceuticals, Inc., Not Reported in Fed. Supp. (2021)

is reasonably economical and the interests of other class members will be fairly and adequately protected in their absence." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 598 (3d Cir. 2009).

Here, a single overarching common question—whether Defendants omitted material information and/or made misrepresentations that inflated the price of Zynerba's stock—cuts across every claim of every Settlement Class Member. *Rodriquez v. Nat'l City Bank*, 726 F.3d 372, 832 (3d Cir. 2013) ("[T]here may be many legal and factual differences among the members of a class, as long as all were subjected to the same harmful conduct by the defendant."). As such Rule 23(a)(2) and (3)'s requirements of common question of law or fact and typicality are satisfied.

### *4. Adequacy*

Under Rule 23(a)(4), a court must determine whether the proposed class representative "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To meet the adequacy requirement, a finding must be made that (1) plaintiff's interests do not "conflict with those of the class" and (2) the proposed class counsel are "capable of representing the class." *Newton*, 259 F.3d at 185. The Third Circuit has "recognized that the linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class," *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 183 (3d Cir. 2012), and "not proof of vigorous pursuit of the claim." *In re Cmty. Bank of N. Virginia*, 418 F.3d 277, 307 (3d Cir. 2005). This requirement serves "to ensure that the putative named plaintiff has the incentive to represent the claims of the class vigorously." *Dewey*, 681 F.3d at 184.

**\*9** Here, there is no conflict between the proposed Class Representatives and the Class because, as with all members of the Class, Plaintiffs seek compensation for the same claims from the same Defendants. Plaintiffs have no interests that are antagonistic to or in conflict with the Class they seek to represent and their alleged injuries are identical to those suffered by Settlement Class Members. In addition, Class Counsel have substantial experience prosecuting large-scale class actions, including class actions involving securities claims. Accordingly, both prongs of the adequacy inquiry are met.

### *Rule 23(b)(3) Requirements*

Having found that Plaintiffs have satisfied each of the Rule 23(a) prerequisites, this Court must determine pursuant to Rule 23(b) whether "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). These two requirements are generally referred to as the "predominance and superiority" factors.

### *1. Predominance*

The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Issues common to the class must "predominate" over individual issues. *In re Prudential Ins. Co. Am. Sales Practice Litig.*, 148 F.3d 283, 313-14 (3d Cir. 1998). "Because the 'nature of the evidence that will suffice to resolve a question determines whether the question is common or individual,' 'a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case.' " *In re Hydrogen Peroxide*, 552 F.3d at 311 (quoting *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005)).

The predominance requirement is met here. Plaintiffs allege that each Settlement Class member purchased Zynerba stock in reliance on the same alleged misrepresentations and/or omissions in Zynerba's SEC filings. As such, common questions of law and fact predominate over individual issues.

### *2. Superiority*

Under the second criterion of Rule 23(b), this Court must find that a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b). The superiority element requires courts "to balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods of adjudication.' " *Community Bank of Northern Virginia*, 418 F.3d at 309 (citations omitted). A "nonexhaustive list of factors pertinent to a court's 'close look' " at the superiority

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 477 of 482

Whiteley v. Zynerba Pharmaceuticals, Inc., Not Reported in Fed. Supp. (2021)

requirement is found in the text itself. *Amchem*, 521 U.S. at 615-16. The list includes:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D). The superiority inquiry is simplified in the settlement context, because when certifying a settlement only class, the Court need not inquire whether the case, if tried, would pose intractable management problems, for the purpose of the settlement is to not have a trial. *Amchem*, 521 U.S. at 620. In making this analysis, the district court may take the proposed settlement into consideration. *Prudential II*, 148 F.3d at 308; *Warfarin Sodium II*, 391 F.3d at 529 ("When dealing with variations in state laws, the same concerns with regards to case manageability that arise with litigation classes are not present with settlement classes, and thus those variations are irrelevant to certification of a settlement class.").

**\*10** Here, a class action is the superior method of resolving the Settlement Class Members' claims. All of the Settlement Class Members' claims are based upon the same basic operative facts and legal standards. It would be a far better use of judicial resources to adjudicate all of these identical issues once, on a common basis. In addition, the Settlement provides Settlement Class Members the ability to obtain predictable, certain, and definite compensatory relief promptly. By contrast, individualized litigation carries with it great uncertainty, risk, and costs, and provides no guarantee that injured Settlement Class Members will obtain timely compensatory relief at the conclusion of the litigation. Accordingly, this Court finds that consideration of the Rule 23(b) factors weighs favorably for certification. Because of the number and nature of potential class plaintiffs and the fact that each member's potential recovery is likely to be small compared to the cost of litigating an individual case,

maintaining this matter as a class action is judicially advisable and superior to other available methods.

After carefully concluding the requisite "vigorous analysis" of the factors in Rules 23(a) and (b), this Court finds that the requirements of Rule 23 have been met and that certification of Plaintiffs' proposed class is proper.

## Request for Attorneys' Fees and Expenses

As compensation for their legal services and efforts, Class Counsel have requested that this Court approve the portion of the settlement that provides for reimbursement of attorneys' fees in an amount equal to one-third of the total settlement amount, or $1,333,333.00, and litigation expenses in the amount of $37,259.11. This amount was contemplated and agreed to in the Settlement Agreement and disclosed to Class Members. The notice provided to potential Class Members expressly informed them that Class Counsel would apply for an award of attorneys' fees in an amount not to exceed one-third of the total settlement amount, reimbursement of costs, and a $7,500.00 service award for each of the two Class Representatives in recognition of their services as class representatives. To date, no Class Member has objected to the terms of the Settlement, including the provisions for attorneys' fees and costs and class representative awards. In support of their request for fees and reimbursement of costs and expenses, counsel rely upon two declarations of counsel summarizing their time and the expenses incurred on behalf of the Class. (*See* Decls. of Tamar A. Weinrib and Jacob Goldberg.)

Rule 23(h) provides that "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." "[A] thorough judicial review of fee applications is required in all class action settlements. *Gen. Motors*, 55 F.3d at 819. Awarding fees is within the discretion of the court, so long as the court employs the proper legal standards, follows the proper procedures, and makes findings of fact that are not clearly erroneous. *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 727 (3d Cir. 2001).

### *Attorneys' Fees*

There are two methods of calculating attorneys' fees in class actions—the percentage-of-recovery method and the lodestar

method. *In re Prudential*, 148 F.3d at 332-33. The percentage-of-recovery approach "applies a certain percentage to the settlement fund," while the lodestar method "multiplies the number of hours class counsel worked on a case by a reasonable hourly billing rate for such services." *Sullivan v. DB Inv. Inc.*, 667 F.3d 273, 330 (3d Cir. 2011). The percentage-of-recovery approach is more appropriate where, as here, there is a common fund. *In re AT&T Corp. Sec. Litig.*, 455 F.3d 160, 164 (3d Cir. 2006) (finding that the percentage method is "generally favored" in common fund cases because "it allows courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure."); *Harshbarger v. Penn Mut. Life Ins. Co.*, 2017 WL 6525783, at *2 (E.D. Pa. Dec. 20, 2017) ("The reasonableness of attorneys' fee awards in common fund cases ... is generally evaluated using a [percentage of recovery] approach followed by a lodestar cross-check.").

**\*11** In determining what constitutes a reasonable award under the percentage-of-recovery approach, the Third Circuit has directed district courts to consider the ten factors identified in *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190 (3d Cir. 2000) and *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998) (the "*Gunter/Prudential* factors"); *to wit*:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiff's counsel; (7) the awards in similar cases; (8) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations; (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time

counsel was retained; and (10) any innovative terms of settlement.

*Gunter*, 223 F.3d at 195 n.1; *see also Prudential*, 148 F.3d at 336-40; *Diet Drugs*, 582 F.3d at 541. Although district courts should "engage in robust assessments of the [*Gunter/Prudential* factors] when evaluating a fee request," these factors are not exhaustive and should not be applied in a formulaic way. *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 301-02 (3d Cir. 2005). This Court will apply each factor to determine the reasonableness of the attorneys' fees request.

### *1. The size of the fund created and the number of persons benefitted*

The first *Gunter* factor "consider[s] the fee request in comparison to the size of the fund created and the number of class members to be benefitted." *In re Ocean Power Techs., Inc.*, 2016 WL 6778218, at *26 (D.N.J. Nov. 15, 2016) (quoting *Rowe v. E.I. DuPont de Nemours & Co.*, 2011 WL 3837106, at *18 (D.N.J. Aug. 26, 2011)). Here, the parties negotiated a settlement with a common fund of $4 million, which represents a 10.4% recovery of estimated, alleged damages. This percentage recovery exceeds the median recovery for similar securities class actions in 2020. *See* Laarni T. Bulan and Laura E. Simmons, *Securities Class action Settlements: 2020 Review and Analysis* (Cornerstone Research 2021); *see also In re Cendant Corp. Litig.*, 264 F.3d 201, 241 (3d Cir. 2001) (noting that typical recoveries in securities class actions range from 1.6% to 14% of total losses); *In re AT&T Corp.*, 455 F.3d 160, 169 (3d Cir. 2006) (affirming settlement for 4% of total damages). This factor supports approval of the requested fees.

### *2. The presence or absence of substantial objections by members of the class*

*Gunter* advises that a court should consider "the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel." *Gunter*, 223 F.3d at 195 n.1. More than 24,000 potential Class members were provided notice of the settlement, which included notice of the agreed upon attorneys' fees, expenses, and class representative service awards. No objections to the Settlement were filed. The lack of any objections is strongly

indicative of approval by the Class. Accordingly, this factor weighs in favor of approved of the requested fees.

### 3. The skill and efficiency of the attorneys involved

**\*12** Class Counsel's skill and efficiency is "measured by the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel." *In re Viropharma Inc. Secur. Litig.*, 2016 WL 312108, at *16 (E.D. Pa. Jan. 25, 2016) (quoting *In re Computron Software, Inc.*, 6 F. Supp. 2d 313, 323 (D.N.J. 1998)). Here, Class Counsel have substantial experience prosecuting large-scale class actions, including securities class actions like the case *sub judice.* This experience undoubtedly contributed to the favorable outcome negotiated with equally experienced opposing counsel. Therefore, this factor also weighs in favor of approval.

### 4. The complexity, expense, and likely duration of the litigation

The fourth *Gunter* factor is intended to capture "the probable costs, in both time and money, of continued litigation." *In re Gen. Motors*, 55 F.3d at 812 (quoting *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 801 (3d Cir. 1974)). Securities litigation is regularly acknowledged to be particularly complex and expensive litigation, often requiring expert testimony on questions of causation and damages. *See, e.g., In re Par Pharm. Sec. Litig.*, 2013 WL 3930091, at 84 (D. N.J. July 29, 2013) ("Securities fraud class actions are notably complex, lengthy, and expensive cases to litigate.").

As noted, the claims in this action have been the subject of hard-fought litigation since its commencement. Notwithstanding the parties' progress in this matter prior to reaching settlement, if this case were to go to trial, it would involve substantial additional discovery and motion practice at great expense to the parties. Moreover, even if Plaintiffs would have recovered a larger judgment at trial on behalf of the Settlement Class Members, their actual recovery would have likely been postponed for years. There is also the possibility that Plaintiffs would not have recovered anything. The Settlement Agreement secures a recovery for the Settlement Class now, rather than the "speculative promise of a larger payment years from now." *In re Viropharma Inc.*, 2016 WL 312108, at *16. This factor, therefore, weighs in favor of approval.

### 5. The risk of non-payment

Class Counsel undertook this action on an entirely contingency fee basis. "Courts routinely recognize that the risk created by undertaking an action on a contingency fee basis militates in favor of approval." *In re Schering-Plough Corp. Enhance ERISA Litig.*, 2012 WL 1964451, at *7 (D.N.J. 2012); *see also In re Ocean Power Techs, Inc.*, 2016 WL 677218, at *28. Class Counsel has litigated this case without pay from the inception and has shouldered the risk that the litigation would yield little-to-no recovery. Accordingly, the fifth *Gunter/Prudential* factor weighs in favor of approving the attorneys' fees request.

### 6. The amount of time devoted to the case by plaintiff's counsel

The sixth *Gunter/Prudential* factor considers the amount of time Class Counsel devoted to the litigation. *Gunter*, 223 F.3d at 199. Class Counsel estimates that over 800 hours of attorney and other professional and paraprofessional time were expended on this case. These hours are reasonable for a complex class case such as this.[2] Thus, the sixth *Gunter/Prudential* factor weighs in favor of approving the attorneys' fees request.

### 7. The awards in similar cases

While there is no benchmark for the percentage of fees to be awarded in common fund cases, the Third Circuit has noted that reasonable fee awards in percentage-of-recovery cases generally range from nineteen to forty-five percent of the common fund. *In re Gen. Motors*, 55 F.3d at 822. The requested fee here falls in the middle of the range of fees that have been granted in comparable securities class actions in the Third Circuit. *See, e.g., Milliron v. T-Mobile USA, Inc.*, 2009 WL 3345762 (D. N.J. Sept. 14, 2009) (awarding 33% of $13.5 million settlement). Accordingly, this factor weighs in favor of approval.

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 480 of 482

Whiteley v. Zynerba Pharmaceuticals, Inc., Not Reported in Fed. Supp. (2021)

#### 8. Value of benefits attributable to the efforts of class counsel relative to the efforts of others

**\*13**  Class Counsel were the only ones investigating the claims at issue in this case, and they alone initiated and actively litigated this federal action. Because Class Counsel were the only attorneys pursuing the claims at issue in this case, this factor weighs in favor of approval.

#### 9. Percentage fee that would have been negotiated

Class Counsel agreed to litigate this case on a contingency fee basis and successfully negotiated a settlement. Were this case brought on behalf of an individual, the customary contingency fee would likely range between thirty and forty percent of the recovery. *Wallace v. Powell*, 288 F.R.D. 347, 375 (M.D. Pa. 2012) ("In private contingency fee cases, attorneys routinely negotiate agreements for between thirty percent and forty percent of the recovery."); *In re Ikon Ofc. Sols., Inc. Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000) ("[I]n private contingency fee cases, particularly in tort matters, plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery."). Here, Class Counsel's requested percentage is commensurate with customary percentages in private contingency fee agreements. Thus, this factor supports approval.

#### 10. Innovative terms of the settlement

The Settlement Agreement does not contain any innovative terms. This factor is neutral as it neither weighs in favor of, nor against, approval.

#### *Lodestar Cross-Check*

In common fund cases such as this one, the lodestar method is sometimes used to "cross-check the reasonableness of a percentage-of-recovery fee award." *Sullivan*, 667 F.3d at 330. The purpose of the cross-check is to ensure that the percentage approach does not result in an "extraordinary" lodestar multiple or a windfall. *See In re Cendant*, 264 F.3d at 285. The Third Circuit has stated that a lodestar cross-check entails an abridged lodestar analysis that requires neither "mathematical precision nor bean counting." *In re Rite Aid,*

396 F.3d at 305. The Court need not receive or review actual billing records when conducting this analysis. *Id.* at 307.

Under the lodestar method, a court begins the process of determining the reasonable fee by calculating the "lodestar," *i.e.*, the "number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *see also McKenna v. City of Phila.*, 582 F.3d 447, 455 (3d Cir. 2009). Once the lodestar is determined, the court must then decide whether additional adjustments are appropriate. *McKenna*, 582 F.3d at 455. A reasonable hourly rate in the lodestar calculation is "[g]enerally ... calculated according to the prevailing market rates in the relevant community," taking into account "the experience and skill of the ... attorney and compar[ing] their rates to the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Maldonado v. Houstoun*, 256 F.3d 181, 184 (3d Cir. 2001). The prevailing market rate is usually deemed reasonable. *Pub. Interest Research Grp. v. Windall*, 51 F.3d 1179, 1185 (3d Cir. 1995).

"In calculating the second part of the lodestar determination," *i.e.*, the time reasonably expended, a district court should "review the time charged, decide whether the hours set out were reasonably expended for each of the particular purposes described and then exclude those that are excessive, redundant, or otherwise unnecessary." *Pa. Envtl. Def. Found. v. Canon-McMillan Sch. Dist.*, 152 F.3d 228, 232 (3d Cir. 1998). As noted in *Hensley*, lawyers are required to use judgment when billing their clients so as not to bill clients for "excessive, redundant, or otherwise unnecessary" hours. *Id.* at 434. "Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority." *Id.* at 434 (citations omitted). Ultimately, district courts have "substantial discretion in determining what constitutes ... reasonable hours." *Lanni v. New Jersey*, 259 F.3d 146, 149 (3d Cir. 2001).

**\*14**  Attached to the Weinrib and Goldberg Declarations, Class Counsel included a summary of the hours worked by the partners, associates, and professional support staff involved in this litigation. These summaries were prepared from contemporaneous, daily time records that are regularly prepared and maintained by the respective firms. Class Counsel and support staff are claiming 862.99 hours for work done at hourly rates ranging from $110 to $1,100. After reviewing the Attorney Declarations, it appears that Class Counsel is not requesting compensation for any time that was

"excessive, redundant, or otherwise unnecessary." *Hensley, 461 U.S. at 434*. These hourly rates are also well within the range of what is reasonable and appropriate in this market. That is, the hourly charged rates for the attorneys are the same as the regular current rates charged for their services in standard non-class matters, including contingent and non-contingent matters. The attorneys have substantial experience in complex class action litigation, and their hourly rates are within the range charged by attorneys with comparable experience levels for litigation of a similar nature.

Having found the hourly rates and hours expended to be reasonable, the aggregate lodestar calculation, as of July 27, 2021, is $679,844 for the 862.99 hours of attorney and support staff work. Class Counsel's request for $1,333,333 (one-third of the settlement amount) will result in Class Counsel receiving approximately 1.96 times the lodestar. Courts frequently approve attorneys' fees awards for amounts in excess of the calculated lodestar. Indeed, multiples ranging from 1 to 8 are often used in common fund cases. *See In re Rite Aid Sec. Litig.*, 362 F. Supp. 587, 590 (E.D. Pa. 2005) (approving a 6.96 multiplier); *Steiner v. Am. Broadcasting Co.*, 248 F. App'x 780, 783 (9th Cir. 2007) (holding a 6.85 multiplier "falls well within the range of multipliers that courts have allowed"); *Viafara v. MCIZ Corp.*, 2014 WL 1777438, at *14 (S.D.N.Y. May 1, 2014) ("Courts award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers."). Such multipliers are necessary to compensate counsel for the risk of assuming the representation on a contingency fee basis. *City of Detroit v. Grinnell*, 495 F.2d 448, 470 (2d Cir. 1974). Moreover, Class Counsel is expected to perform additional work in connection with this case following this Court's approval. As such, the multiplier will likely be lower by the time this matter is closed and Class Counsel's work is completed.

Therefore, having considered the relevant *Gunter/Prudential* factors and performed the lodestar cross-check, this Court approves the reasonable amount of attorneys' fees requested.

### Reimbursed Litigation Expenses

Class Counsel also seeks approval of the portion of the Settlement Agreement which entitles them to reimbursement of their litigation expenses. Courts recognize that " '[t]here is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of ... reasonable litigation expenses from that fund.' " *In re Corel*

*Corp. Inc. Sec. Litig.*, 293 F. Supp. 2d 484, 498 (E.D. Pa. 2003) (quoting *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 179 (E.D. Pa. 2000)).

Class Counsel claims that they incurred $37,259.11 in such expenses during the pendency of this litigation. This amount includes filing fees and fees for the mediation, legal and factual research, an investigator, and other incidental expenses incurred in the course of the litigation. After carefully reviewing the documentation supporting the reimbursement request, this Court finds that the litigation and administrative expenses listed by Class Counsel are reasonable and expected in this type of case. In addition, the Notice to Class Members advised that Plaintiffs' Counsel may seek reimbursement of expenses not to exceed $125,000. Accordingly, this Court finds the request for reimbursement of $37,259.11 reasonable.

### Service Award

Class Counsel also seek this Court's approval of a service award, in the amount of $7,500, to each of the two Class Representatives, for their willingness to undertake the risks and the burden as a class representative in this litigation. "Incentive awards are not uncommon in class action litigation[.]" *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 145 (E.D. Pa. 2000). These payments "compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation[.]" *Bredbenner v. Liberty Travel, Inc.*, 2011 WL 1344745, at *22 (D.N.J. Apr. 8, 2011) (internal citations and quotations omitted). Incentive awards also " 'reward the public service' of contributing to the enforcement of mandatory laws." *Id.* (quoting *In re Cendant*, 232 F. Supp. 2d at 344).

 **\*15** This Court recognizes that there would be no benefit to the Settlement Class Members if Plaintiffs had not stepped forward and prosecuted this matter to the current resolution. In doing so, Mr. Whiteley and Mr. Berger devoted time and energy to the litigation, including assisting Class Counsel with discovery and mediation. The requested award is well within the range of awards made in similar cases. *See, e.g., Barel v. Bank of America*, 255 F.R.D. 393, 402-03 (E.D. Pa. Jan. 16, 2009) (awarding $10,000.00 incentive award); *Brown v. Progressions Behavioral Health Servs., Inc.*, 2017 WL 2986300, at *7 (E.D. Pa. July 13, 2017) (awarding $10,000 to each named plaintiff because they "were actively involved in the litigation since before it was commenced,

Case 4:21-cv-00196-MWB    Document 249-1    Filed 10/07/25    Page 482 of 482

**Whiteley v. Zynerba Pharmaceuticals, Inc., Not Reported in Fed. Supp. (2021)**

they provided the information and documents that formed the basis for the lawsuit" and "the service award payments represent a small fraction of the $452,586 Settlement Fund."). Settlement Class Members were also notified that Class Counsel would request these individual awards for each of the Class Representatives. Notably, no Settlement Class Member objected to the proposed service awards. Accordingly, this Court approves the requested award of $7,500.00 to each of the Class Representatives.

**CONCLUSION**

For the reasons stated herein, this Court: (1) grants final approval of the proposed class action settlement; (2) awards Class Counsel reasonable attorneys' fees in the amount of $1,333,333.00 and the reimbursement of litigation and administrative expenses in the amount of $37,259.11; and (3) awards the sum of $7,500.00 to each of the Class Representatives. An Order consistent with this Memorandum Opinion follows.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 4206696

---

### Footnotes

1    Unless otherwise defined herein, all capitalized terms shall have the meanings provided in the Settlement Agreement.

2    The hours expended in this case are further discussed in the lodestar crosscheck below.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.