# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

IN RE GEISINGER SYSTEM
SERVICES AND EVANGELICAL
COMMUNITY HOSPITAL
HEALTHCARE WORKERS
ANTITRUST LITIGATION

No.: 4:21–cv–00196

Chief Judge Matthew J. Brann

## APPENDIX OF UNPUBLISHED OPINIONS

Pursuant to Local Rule 7.8, Plaintiffs attach the following unpublished opinions cited in Plaintiffs' Memorandum of Law in Support of Motion for an Award of Attorneys' Fees, for Reimbursement of Expenses, and for Service Awards to the Class Representatives filed on January 20, 2026:

1. *Binotti v. Duke Univ.*,
   No. 20-cv-00470, 2021 WL 5366877 (M.D.N.C. Aug. 30, 2021);

2. *Fuentes v. Jiffy Lube Int'l, Inc.*,
   No. 18-cv-5174, 2024 WL 2723840 (E.D. Pa. May 28, 2024);

3. *Glaberson v. Comcast Corp.*,
   No. 03-cv-6604, 2015 WL 5582251 (E.D. Pa. Sept. 22, 2015);

4. *In re Cigna-Am. Specialty Health Admin. Fee Litig.*,
   No. 16-cv-03967, 2019 WL 4082946 (E.D. Pa. Aug. 29, 2019);

5. *In re Fasteners Antitrust Litig.*,
   No. 08-md-1912, 2014 WL 296954 (E.D. Pa. Jan. 27, 2014);

6. *In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
   No. 17-cv-0341, 2022 WL 16533571 (E.D. Pa. Oct. 28, 2022);

7. *In re Linerboard Antitrust Litig.*,
   No. 98-cv-5055, 2004 WL 1221350 (E.D. Pa. June 2, 2004);

8.  *In re Linerboard Antitrust Litig.*,
    No. 98-cv-5055, 2004 WL 1240775 (E.D. Pa. June 4, 2004);

9.  *In re Papa John's Emp. and Franchisee Emp. Antitrust Litig.*,
    No. 18-cv-0825, 2025 WL 2255624 (W.D. Ky. Aug. 7, 2025);

10. *In re Processed Egg Prods. Antitrust Litig.*,
    No. 08-md-2002, 2012 WL 5467530 (E.D. Pa. Nov. 9, 2012);

11. *In re Railway Indus. Emp. No-Poach Antitrust Litig.*,
    No. 18-cv-0798, 2020 U.S. Dist. LEXIS 249904
    (W.D. Pa. Aug. 26, 2020);

12. *In re Remeron Direct Purchaser Antitrust Litig.*,
    No. 03-cv-00085, 2005 WL 3008808 (D.N.J. Nov. 9, 2005);

13. *In re Remicade Antitrust Litig.*,
    No. 17-cv-04326, 2023 WL 2530418 (E.D. Pa. Mar. 15, 2023);

14. *In re Residential Doors Antitrust Litig.*,
    No. 94-cv-3744, 1998 WL 151804 (E.D. Pa. Apr. 2, 1998);

15. *Johnson v. Cmty. Bank, N.A.*,
    No. 12-cv-01405, 2013 WL 6185607 (M.D. Pa. Nov. 25, 2013);

16. *Kanefsky v. Honeywell Int'l Inc.*,
    No. 18-cv-15536, 2022 WL 1320827 (D.N.J. May 3, 2022);

17. *Martin v. Foster Wheeler Energy Corp.*,
    No. 06-cv-0878, 2008 WL 906472 (M.D. Pa. Mar. 31, 2008);

18. *O'Hern v. Vida Longevity Fund, LP*,
    No. 21-cv-402, 2023 WL 3204044 (D. Del. May 2, 2023);

19. *Vista Healthplan, Inc. v. Cephalon, Inc.,*
    No. 06-cv-1833, 2020 WL 1922902 (E.D. Pa. Apr. 21, 2020); and

20. *Whiteley v. Zynerba Pharm., Inc.*,
    No. 19-4959, 2021 WL 4206696 (E.D. Pa. Sept. 16, 2021).

Binotti v. Duke University, Not Reported in Fed. Supp. (2021)

2021 WL 5366877

---

2021 WL 5366877
Only the Westlaw citation is currently available.
United States District Court, M.D. North Carolina.

Lucia BINOTTI, individually and on behalf
of all others similarly situated, Plaintiff.

v.

DUKE UNIVERSITY, Defendant.

1:20-CV-470
|
Signed 08/30/2021

**Attorneys and Law Firms**

Anne B. Shaver, Jalle H. Dafa, Lin Y. Chan, Yaman Salahi, Dean M. Harvey, Lieff Cabraser Heimann & Bernstein, LLP, San Francisco, CA, Daniel C. Lyon, Elliot Morgan Parsonage, PLLC, Charlotte, NC, M. Travis Payne, Edelstein And Payne, Raleigh, NC, for Plaintiff.

James P. Cooney, III, Sarah Motley Stone, Womble Bond Dickinson (US), LLP, Charlotte, NC, Ashley Bass, Derek Ludwin, Covington & Burling LLP, Washington, DC, Brent F. Powell, Womble Bond Dickinson (US) LLP, Winston-Salem, NC, for Defendant.

**ORDER GRANTING PLAINTIFF'S UNOPPOSED MOTION FOR ATTORNEY'S FEES, COSTS, AND SERVICE AWARD**

Catherine C. Eagles, UNITED STATES DISTRICT JUDGE

 **\*1** This matter comes before the Court on motion of Plaintiff Dr. Lucia Binotti seeking (1) 25% of the $19 million common fund created by the Settlement with Duke University ("Duke") as attorney's fees; (2) reimbursement to Class Counsel of $125,201.41 in costs; and (3) a service award of $65,000 for Dr. Binotti. Duke takes no position on this request. The Court has reviewed the request and supporting evidence and all other papers filed in relation to that request, has considered the arguments of counsel, and has reviewed attorney's fees and class representative service awards from similar cases. For the reasons stated herein, the Court **GRANTS** the motion.

## I. BACKGROUND

The *Binotti* case built upon the work performed by the same attorneys in *Seaman v. Duke Univ.*, No. 1:15-CV-462, 2018 WL 671239, at \*1 (M.D.N.C. Feb. 1, 2018), and challenged the same conduct alleged in *Seaman*.

### 1. *Seaman*

Dr. Seaman filed her complaint against Duke and UNC on June 9, 2015. *Seaman*, No. 1:15-cv-00462-CCE-JLW (M.D.N.C.), Doc. 1. She alleged that Defendants agreed to eliminate competition for each other's medical faculty in violation of Federal and State antitrust laws. *Id.* In 2017, UNC settled the allegations against it by entering into a consent decree prohibiting UNC from further enforcing the no-poach agreement or participating in anything like it in the future. *Id.*; *Seaman*, No. 1:15-cv-00462, Doc. 83-1 at 59. The injunctive relief Dr. Seaman secured benefited the classes of both *Seaman* and *Binotti*, since it was University-wide. *Id.* The UNC settlement also contained discovery cooperation, including requiring document production from many senior administrators outside of the UNC medical school. *Id.* at 65.

After nearly four years of litigation, Plaintiff Dr. Seaman in 2019 entered into a proposed settlement with Duke to resolve the medical faculty class claims. Duke agreed to pay $54.5 million and agreed to significant injunctive relief providing powerful protections to all faculty going forward. *Seaman*, No. 1:15-cv-00462, Doc. 361 at 7, 42, 47. The *Seaman* settlement also gave the United States Department of Justice a role in monitoring and enforcing compliance with the settlement's injunctive relief provisions. *Id.* at 24, 47, 59. Just as with the UNC settlement, the injunctive relief provisions were University-wide, and thus benefited the classes at issue in both *Seaman* and *Binotti*.

Although *Seaman* focused on the alleged no-poach agreement between the Duke and UNC medical schools, evidence developed during the *Seaman* litigation indicated that the alleged no-poach agreement applied generally to all faculty. Doc. 44 at ¶ 13. While *Seaman* resolved the damages claims of medical faculty and provided injunctive relief to the benefit of all faculty, the damages claims of non-medical faculty remained unaddressed.

2021 WL 5366877

**2.** *Binotti*

To seek damages for non-medical faculty, Dr. Binotti filed her complaint against Duke on May 27, 2020. Doc. 1. She alleged a University-wide understanding between Duke and UNC to suppress competition for each other's faculty (the "No-Poach Understanding"). *Id.* Before filing that complaint, Dr. Binotti and Class Counsel made extensive efforts with Duke over five months to reach a settlement, in negotiations facilitated by mediator Jonathan Harkavy, the same mediator who facilitated the Duke settlement in *Seaman*. Those pre-filing negotiations were ultimately unsuccessful. On July 27, 2020, Duke answered the complaint and filed a Motion for Judgment on the Pleadings, arguing that (1) Dr. Binotti's claims are barred by the statute of limitations, and (2) Dr. Binotti failed to make factual allegations sufficient to toll the statute of limitations based on fraudulent concealment. Docs. 16, 17. On November 9, 2020, the Court denied the motion based on the statute of limitations. Doc. 33. The Court held it was plausible that the alleged multi-decade conspiracy continued beyond 2011 and that Duke continued to commit overt acts within the statute of limitations. *Id.* The Court, however, limited damages claims to those sustained after 2016, concluding that Dr. Binotti had not plausibly alleged an active act of concealment, the first prong of the fraudulent concealment test. *Id.*

**\*2** The parties then renewed efforts to resolve the matter, culminating in an arm's length, full-day mediation on December 16, 2020. Doc. 38 at ¶ 4. That mediation resulted in a settlement agreement, which the Court preliminarily approved on April 22, 2021, Doc. 55, as amended on June 14, 2021. Doc. 58.

**II. ANALYSIS**

**A. Fees**

In a class action, the court may award reasonable attorney's fees and nontaxable costs as authorized by law or by agreement. Fed. R. Civ. P. 23(h). In a common-fund case such as this, "a reasonable fee is based on a percentage of the fund bestowed on the class." *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984). District courts in the Fourth Circuit "overwhelmingly" prefer the percentage method in common-fund cases, *Phillips v. Triad Guaranty Inc.*, No. 1:09CV71, 2016 WL 2636289, at *2 (M.D.N.C. May 9, 2016) (collecting authorities), and "the vast majority of courts of appeals now permit or direct district courts to use" this method. *Ann.*

*Manual for Complex Lit.* § 14.121 (4th ed. 2021); *id.* at nn. 483-85 (listing cases by circuit).

To determine the reasonableness of the fee award, the Court begins by considering the twelve factors identified in *Barber v. Kimbrell's, Inc.*: "(1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorney's fees awards in similar cases." 577 F.2d 216, 226 n.28 (4th Cir. 1978) (adopting factors from *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), abrogated on other grounds by *Blanchard v. Bergeron*, 489 U.S. 87, 92-93 (1989)).

While it may not be necessary, it is generally a good idea to "conduct a lodestar cross-check that compares the requested contingent fee award against a fee calculated based on hours spent at prevailing market rates." *Sims v. BB&T Corp.*, Nos. 1:15-CV-732, 1:15-CV-841, 2019 WL 1993519, at *2 (M.D.N.C. May 6, 2019) (citing *Boyd v. Coventry Health Care, Inc.*, 299 F.R.D. 451, 462 (D. Md. 2014)). When using the lodestar method as a "cross-check," the Court needs not apply the "exhaustive scrutiny" typically mandated, and the Court may accept the hours estimates provided by counsel. *Jones v. Dominion Res. Servs., Inc.*, 601 F.Supp.2d 756, 765–766 (S.D. W.Va. 2009).

**1.** *Barber* **Factors**

Class Counsel request attorney's fees of 25% of the common fund, or $4,750,000. For a number of reasons, this is a reasonable request.

Class Counsel secured a result very favorable to their clients: a $19 million cash settlement with an average net recovery of approximately $2,341.19 per regular rank faculty class member. *In re Abrams & Abrams, P.A.*, 605 F.3d 238, 247 (4th Cir. 2010) (the result obtained is "the most critical factor

2021 WL 5366877

in determining the reasonableness of a fee award" (citation omitted)).

**\*3** A fee approaching one third of recovery is customary in antitrust class actions. *See, e.g.*, *In re Titanium Dioxide Antitrust Litig.*, No. 10-CV-00318(RDB), 2013 WL 6577029, at \*1 (D. Md. Dec. 13, 2013) (one-third of $163.5 million settlement); *In re: Urethane Antitrust Litig.*, MDL No. 1616, 2016 WL 4060156, at \*8 (D. Kan. July 29, 2016) (one-third of $835 million settlement); *In re Vitamins Antitrust Litig.*, No. MISC. 99-197(TFH), 2001 WL 34312839, at \*9 (D.D.C. July 16, 2001) (over one-third of $365 million settlement); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07-md-1819-CW, (N.D. Cal. Oct. 14, 2011), Doc. 1407 (one-third of $77 million settlement). The instant request is lower than the one-third figure found in non-antitrust cases of similar complexity in this circuit. *See Phillips*, 2016 WL 2636289, at \*6; *Krakauer v. Dish Network, L.L.C.*, No. 1:14-cv-333, 2018 WL 6305785, at \*2 (M.D.N.C. Dec. 3, 2018) (one-third of fund granted); *Sims*, 2019 WL 1993519, at \*2 (same). Class Counsel here only seek an award of 25% of the fund, as is appropriate given the relatively early stage at which settlement occurred.

Class Counsel have specialized experience and expertise in employment, antitrust, and class action cases, and are particularly experienced in such hybrid cases. Class Counsel began to bring cases of this kind as early as 2011, *In re High-Tech Employee Antitrust Litigation*, No. 11-cv-2509-LHK (N.D. Cal.), and also initiated the case that preceded this one, *Seaman v. Duke University*, No. 1:15-cv-00462-CCE-JLW (M.D.N.C.). Further, Class Counsel have been appointed to leadership roles in other similar antitrust employment cases. *See, e.g.*, *In re: Ry. Indus. Emp. No-Poach Antitrust Litig.*, MDL No. 2850, No. 2:18-mc-798 (W.D. Pa.); *Houston v. Papa John's Int'l., Inc., et al.*, No. 3:18-cv-00825-JHM-RSE (W.D. Ky.); *Deslandes v. McDonald's, LLC, et al.*, No. 1:17-cv-04857 (N.D. Ill.); *Butler v. Jimmy John's Franchise, LLC, et al.*, No. 18-cv-133-MJR-RJD (S.D. Ill.); *Blanton v. Domino's Pizza Franchising, LLC, et al.*, No. 18-cv-13207-VAR-DRG (E.D. Mich.); and *Ogden v. Little Caesar Enters., Inc.*, No. 18-cv-12792-DML-RSW (E.D. Mich.).

Class Counsel navigated significant obstacles to recovery, including a statute of limitations defense. Finally, Class Counsel devoted significant time and resources to this case. In doing so, Class Counsel had to forego other litigation opportunities. This opportunity cost, too, supports a request for 25% of the common fund.

In short, the Court finds that attorney's fees equal to 25% of the common fund ($4,750,000) are reasonable, based on the resources Class Counsel advanced, the quality of Class Counsel's work and the results obtained, the risks and obstacles Class Counsel faced and overcame, and fees awarded in similar antitrust cases.

## 2. Lodestar Cross-Check

Where a settlement is the result of successive cases or successive settlements within the same case, the proper method of performing a lodestar cross-check is to divide the total lodestar for the entire litigation campaign by the aggregate fees requested, including fees previously awarded. *See Ferris v. Sprint Commc'ns Co. L.P.*, Civ. A. No. 5:11-cv-0067-H, 2012 WL 12914716, at \*3 (E.D.N.C. Dec. 13, 2012) (noting that litigation across the country for more than a decade resulted in settlements of similar cases, which prevent class counsel from "segregating their fees"); *Payne v. Sprint Commc'ns Co. L.P.*, Civ. A. No. 1:11-cv-3434-CCB, 2012 WL 13006270, at \*3 (D. Md. Nov. 30, 2012) (same); *Loretz v. Regal Stone, Ltd.*, 756 F. Supp. 2d 1203, 1214 (N.D. Cal. 2010) (holding that time from separate, previous cases against the same defendant may count toward class action lodestar where "the work performed advanced [the pending] class action").

**\*4** When the circumstances warrant, "[c]ourts have found that lodestar multipliers ranging from 2 to 4.5 demonstrate the reasonableness of a requested percentage fee." *Phillips*, 2016 WL 2636289, at \*8; *see also Singleton v. Domino's Pizza, LLC*, 976 F.Supp.2d 665, 689 (D. Md. 2013) (noting that the lodestar multipliers "on large and complicated class actions have ranged from at least 2.26 to 4.5" but finding a multiplier of 3.8 to be unreasonable "in light of the lesser complexity and risk" of that action); *Krakauer*, 2018 WL 6305785, at \*5 (approving attorney's fee award with a lodestar multiplier of 4.39).

Here, Class Counsel provided evidence of an hourly market rate of between $560 and $700 for the primary partners on the case; between $395 and $535 for the primary associates, staff attorneys, and contract attorneys on the case; and $370-$420 for paralegals and other support staff. Docs. 60 at ¶ 10, 60-2, 63 at 5. These rates are in line with hourly rates approved by courts as reasonable. *See, e.g.*, *Kelly v. Johns Hopkins Univ., No. 1:16-CV-2835-GLR, 2020 WL 434473, at \*7 (D. Md.*

Binotti v. Duke University, Not Reported in Fed. Supp. (2021)

2021 WL 5366877

*Jan. 28, 2020)*; *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 2672 CRB (JSC), 2017 WL 1047834, at *5 (N.D. Cal. Mar. 17, 2017)*; *In re High-Tech Emp. Antitrust Litig.*, No. 11-CV-02509-LHK, 2015 WL 5158730, at *9 (N.D. Cal. Sept. 2, 2015)*; *Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766, 793-94 (N.D. Ohio 2010)*; *Pelletz v. Weyerhaeuser Co.*, 592 F. Supp. 2d 1322, 1326-27 (W.D. Wash. 2009)*; *Fleming v. Kemper Nat'l Servs., Inc.*, 373 F. Supp. 2d 1000, 1012 (N.D. Cal. 2005)*.

The Court has also reviewed Class Counsel's time summaries, which cover more than 13,400 hours over the course of six years. Class Counsel expended more than 12,500 hours litigating the *Seaman* case and 883.2 hours litigating the *Binotti* case for a total lodestar of approximately $6.8 million. Docs. 60 at ¶ 8, 63 at ¶ 16, 61 at ¶ 19. The Court previously held that the time spent in *Seaman* was reasonable, *Seaman v. Duke University*, No. 1:15-cv-00462-CCE-JLW, 2019 WL 4674758, at *4 (M.D.N.C. Sept. 25, 2019)*, and the additional 883.2 hours spent in *Binotti* were efficient and necessary to obtain the settlement here. Further, Class Counsel expended time efficiently by careful case management and avoiding duplication of efforts. Doc. 60 at ¶ 8. The Court finds that the time Class Counsel spent on the case is reasonable considering the complexity and number of issues addressed.

An award of 25% of the common fund, or $4,750,000, together with the attorney's fee award in the *Seaman* case ($18.16 million), represents a lodestar multiplier of 3.35. This does not take into account time that Class Counsel will spend in support of final approval of the Settlement and supervision of the distribution. Thus, the lodestar multiplier will ultimately be slightly smaller. Class Counsel's zealous advocacy, the resources required, and the risks involved support the multiplier. A 3.35 multiplier is reasonable and appropriate here.

**3. The Objection**

One class member has objected to the settlement and to the attorneys' fee. *See* Doc. 70 at 4-5. The Court has considered the objection, but it does not undermine the Court's view that the fee requested is appropriate. The basis for the objection is that the class counsel should not be rewarded for bringing what is, in the class member's view, a lawsuit without merit. This objection merely highlights the risks class counsel undertook and the good result obtained.

**B. Expenses**

 **\*5** Under Rule 23(h), a trial court may award nontaxable costs that are authorized by law or the parties' agreement. Fed. R.Civ. P. 23(h). "The prevailing view is that expenses are awarded in addition to the fee percentage." *Smith v. Krispy Kreme Doughnut Corp.*, No. 1:05CV00187, 2007 WL 119157, at *3 (M.D.N.C. Jan. 10, 2007)* (citation omitted).

Here, Class Counsel request reimbursement of expenses in the amount of $125,201.41. The most significant expense —over $118,082.16—went to expert fees. Doc. 60-3 at 2. The amount is reasonable in light of the critical role expert economic analysis plays in class action antitrust litigation, where experts establish class-wide impact and measure damages. Here, Dr. Binotti hired economists to create a regression model to estimate damages. Doc. 41 at ¶ 5. Without this expert analysis, Dr. Binotti would not have been able to engage in informed settlement negotiations, nor would Dr. Binotti have met her burden at class certification or at trial. The expert opinions clearly benefited the Class.

The Court finds that Class Counsel's cost reimbursement request is fair and reasonable.

**C. Service Award**

It is common for courts to compensate class representatives "for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Berry v. Schulman*, 807 F.3d 600, 613 (4th Cir. 2015)* (citation omitted). Such awards are "common ... in recognition of the time and effort [class representatives] have invested for the benefit of the class." *Temp. Servs., Inc. v. Am. Int'l Grp., Inc.*, No. 3:08-CV-00271-JFA, 2012 WL 13008138, at *6 (D.S.C. July 31, 2012)*. Courts consider numerous factors in determining the appropriate size of a service award, including, for example, the actions taken by the class representative to protect the class, the degree to which the class has benefited, the amount of time and effort expended by the class representative, the financial or professional risk assumed by the class representative, the notoriety and personal difficulties encountered by the class representative, the duration of the litigation, the personal benefit or lack thereof enjoyed by the class representative from litigation, the ultimate recovery to the class, and the sums awarded in similar cases. *See* William B. Rubinstein et al., 5 *Newberg on Class Actions* § 17:13 (5th ed.).

2021 WL 5366877

Having considered these factors, the Court concludes that Dr. Binotti's request for a $65,000 service award is fair and reasonable. Dr. Binotti has devoted over 70 hours of her time to advancing this litigation, resulting in a $19 million benefit to the Class. Doc. 64 at ¶ 8. She participated in litigation strategy, settlement negotiations, and mediation. Although the Class includes over 10,000 faculty members, no others came forward as named plaintiffs, and Dr. Binotti sought out contingent representation to investigate and prosecute claims on behalf of the non-medical faculty that were not covered by the *Seaman* settlement.

Just as importantly, Dr. Binotti put her professional career on the line when she came forward. Courts recognize that employees face unique pressures and a risk of retaliation by current or prospective employers when they sue their employers. *See, e.g., In re High-Tech,* 2015 WL 5158730, at *17 (approving $100,000 service awards where named plaintiffs received media coverage and were likely to be viewed as "troublemakers" by future employers); *Roberts v. Texaco, Inc.,* 979 F. Supp. 185, 201 (S.D.N.Y. 1997) (recognizing that in an employment case, "the plaintiff is frequently a present or past employee whose present position or employment credentials or recommendation may be at risk by reason of having prosecuted the suit, who therefore lends his or her name and efforts to the prosecution of litigation at some personal peril"). Dr. Binotti attests that her relationships with other professors have been difficult as a result of her leadership role in this case. Others in the community of romance scholars nationwide and internationally are aware of her role here. Doc. 64 at ¶¶ 10-12. Indeed, there has been publicity about Dr. Binotti's role in this case, and the case has been covered in the local press. Dr. Binotti's exposure and the risk she faces weigh in favor of an appropriate service award here.

 **\*6** The Court also concludes that the amount of the service award, $65,000, is proportionate to the other Class Members' recoveries. Dr. Binotti's service award is approximately 20 times larger than each regular faculty class member's recovery, and the size of the award is comparable to that approved in other cases. *See In re High-Tech,* 2015 WL 5158730, at *18 (approving $100,000 service awards 14-21 times greater than average class member award); *In re Titanium Dioxide Antitrust Litig.,* No. 10-CV-00318(RDB), 2013 WL 6577029, at *1 (D. Md. Dec. 13, 2013) (approving $125,000 service award); *Velez v. Novartis Pharm. Corp.,* No. 04 Civ. 09194(CM), 2010 WL 4877852, at *4, *8, *28 (S.D.N.Y. Nov. 30, 2010) (awarding $125,000 to class

representative); *Sullivan v. DB Invs., Inc.,* 667 F.3d 273, 333 n.65 (3d Cir. 2011) (en banc) (affirming antitrust class action settlement providing for service awards of $85,000 to two class representatives), *cert. denied,* 132 S. Ct. 1876 (2012); *see also Ingram v. The Coca-Cola Co.,* 200 F.R.D. 685, 694 (N.D. Ga. 2001) (awarding $300,000 service payments to each of four representative plaintiffs); *Been v. O.K. Indus., Inc.,* No. CIV-02-285-RAW, 2011 WL 4478766, at *12-13 (E.D. Okla. Aug. 16, 2011) (awarding $100,000 service awards to employee class representatives for assuming risk of retaliation), *report and recommendation adopted,* 2011 WL 4475291 (E.D. Okla. Sept. 26, 2011).

Finally, neither of the "red flags" identified by the Fourth Circuit pertaining to service awards arise here: first, the relief to the rest of the class is not "perfunctory," as each class member's net recovery averages approximately $2,341.19; second, Dr. Binotti's service award is not conditioned on her support for the settlement. *Berry,* 807 F.3d at 613-14. Nor do any other red flags appear.

By filing this case and diligently performing her duties as the Class representative, Dr. Binotti has performed a valuable public service that will benefit thousands of faculty at Duke and UNC. In light of Dr. Binotti's contributions to the case, the fact that she was the only Class Member willing to come forward, the risks she faced and will continue to face, the reasonable ratio between her service award and other Class Members' recovery, and comparable service awards in similar cases, the Court concludes that the $65,000 request is fair and reasonable.

It is hereby **ORDERED** that:

1. The Motion for attorneys' Fees, Costs, and Service Award, Doc. 59, is **GRANTED** as follows:

   a. Class Counsel's request for 25% of the common fund in attorney's fees, or $4,750,000, is **GRANTED**.

   b. Class Counsel's request for reimbursement of $125,201.41 in costs is **GRANTED**.

   c. Dr. Binotti's request for a service award of $65,000 is **GRANTED**.

2. The Notice Administrator shall remit payments in these amounts to Class Counsel and Dr. Binotti pursuant to the Settlement Agreement.

**Binotti v. Duke University, Not Reported in Fed. Supp. (2021)**

2021 WL 5366877

This the 30th day of August, 2021.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 5366877

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S.
                                                       Government Works.

Fuentes v. Jiffy Lube Int'l, Inc., Not Reported in Fed. Supp. (2024)

2024 WL 2723840

2024 WL 2723840
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Victor FUENTES, individually and on behalf
of all others similarly situated, Plaintiff,

v.

JIFFY LUBE INT'L, INC., Defendant.

CIVIL ACTION NO. 2:18-CV-5174
|
Signed May 28, 2024

**Attorneys and Law Firms**

George R. Brand, Laura C. Fellows, Richard M. Paul, III, Paul LLP, Kansas City, MO, George W. Sampson, Gibbs Law Group LLP, Oakland, CA, John A. Yanchunis, Morgan & Morgan, Tampa, FL, Joshua J. Bloomfield, Michael L. Schrag, Gibbs Law Group LLP, Oakland, CA, Kevin Clancy Boylan, Morgan & Morgan, Philadelphia, PA, for Plaintiff.

Anne M. Rodgers, Layne E. Kruse, Eliot Fielding Turner, Norton Rose Fulbright U.S. LLP, Houston, TX, Andrea L. D'Ambra, Norton Rose Fulbright U.S. LLP, New York, NY, for Defendant.

Rafey S. Balabanian, Edelson PC, San Francisco, CA, Alexander G. Tievsky, Zoe Seaman-Grant, Edelson PC, Chicago, IL, David S. Senoff, First Law Strategy Group, LLC, Philadelphia, PA, Yaman Salahi, Edelson PC, San Francisco, CA, for Defendant Oscar Jimenez.

**Memorandum**

Anita B. Brody, District Judge

**\*1** Plaintiff Victor Fuentes, on behalf of himself and the putative class members he seeks to represent, has negotiated and agreed to a Settlement Agreement with Defendant Jiffy Lube International, Inc. ("Jiffy Lube"). On September 15, 2023, I preliminarily certified the Settlement Class and preliminarily approved the Settlement Agreement. Plaintiff now moves for class certification and final approval of the Settlement. Additionally, Plaintiff moves for attorneys' fees, reimbursement of expenses, and a service award to Plaintiff Fuentes.

The Settlement Agreement proposes a $2 million all-cash settlement fund that, after subtraction of attorney costs and Fuentes' service award, would be distributed to approximately 1,255 class members. Pl.'s Br. in Supp. of Mot. for Final Approval of Settlement and Award of Att'y's Fees, Expenses, and Service Award ("Pl.'s Final Approval Br."), ECF No. 175-1, at 8, 8 n.2, 9. The putative class members were notified of the proposed settlement, and no individuals opted out or filed objections to the Settlement Agreement. Pl.'s Reply Br. in Supp. of Mot. for Final Approval of Settlement and Award of Attorney's Fees, Expenses, and Service Award ("Pl.'s Final Approval Reply Br."), ECF No. 177, at 1. On May 8, 2024, the Court held a final fairness hearing. For the below reasons, I will grant Plaintiff's motion for class certification and final approval of the Settlement. I will also grant Plaintiff's motion for attorneys' fees, reimbursement of expenses, and service award to the class representative.

**I. Background**

Defendant Jiffy Lube has more than 2,000 locations across the country that provide lubrication, oil change, and light repair services for cars and light trucks. Second Amended Compl., ECF No. 91, at ¶ 2, 11. These shops are Jiffy Lube franchises, which are independently owned and operated. *Id.* at ¶ 11. Jiffy Lube enters into a contractual franchise agreement with the owner of each franchised shop. *Id.* These franchise agreements allow the business operator (franchisee) to operate a licensed Jiffy Lube shop in return for a fee and agreement to other terms. *Id.* at ¶ 18. From an unknown date until at least March 30, 2016, Jiffy Lube included a term in its standard franchise agreement that prohibited franchisees from soliciting or hiring existing employees of Jiffy Lube shops (the "no-poach" clause). *Id.* at ¶ 23. The "no-poach" clause read as follows:

> Franchisee covenants that during the term of this Agreement, Franchisee will not employ or seek to employ any person who is or within the preceding six months has been an employee of Franchisor or of any System franchisee of Franchisor, either directly or indirectly, for itself or through, on behalf of, or in conjunction with any person.

*Id.* If a franchisee failed to comply with this or any other term of the franchise agreement, Jiffy Lube could terminate their franchise. *Id.* at ¶ 24.

Fuentes v. Jiffy Lube Int'l, Inc., Not Reported in Fed. Supp. (2024)

2024 WL 2723840

Plaintiff alleges that the "no-poach" clause had the effect of benefitting Jiffy Lube franchise shop owners at the expense of employees and consumers. *Id.* at ¶¶ 27, 31. Plaintiff further alleges that the "no-poach" clause allowed Jiffy Lube locations to retain employees at below-market wages, without attractive benefits, working conditions, or opportunities for advancement. *Id.* at ¶¶ 32, 35. According to Plaintiff, Jiffy Lube's "no-poach" clause constituted unfair competition and collusion in violation of antitrust law. *Id.* at ¶¶ 40, 51, 88.

**\*2**  On November 29, 2018, former Jiffy Lube franchisee employee Victor Fuentes filed a complaint under the Sherman Act against Jiffy Lube. Compl., ECF No. 1. He sought to represent a nationwide class of former Jiffy Lube franchisee employees who allegedly had their wages depressed as a result of the "no-poach" provisions contained in Jiffy Lube's franchise agreements. *Id.* On April 15, 2019, Jiffy Lube moved to dismiss Fuentes' complaint for failure to state a claim. ECF No. 11. On May 1, 2019, Jiffy Lube moved to transfer venue to the Southern District of Texas. ECF No. 24. On November 25, 2019, I denied Jiffy Lube's motion to dismiss to the extent it argued that Plaintiff failed to state a claim under the Sherman Act. Explanation and Order, ECF No. 41, at 6. I granted the motion to dismiss as to Fuentes' claim for injunctive relief and his claims falling outside the four-year statute of limitations. *Id.* On December 20, 2019, I denied Jiffy Lube's motion to transfer venue. Explanation and Order, ECF No. 45, at 10.

On May 4, 2020, Plaintiffs[1] filed an amended complaint. ECF No. 53. Jiffy Lube once again moved to dismiss the complaint, which was then resolved by stipulation. ECF Nos. 54, 57. The parties engaged in discovery and requested multiple extensions of the discovery deadlines due to COVID-19 delays and the high volume of discovery in this case. ECF Nos. 61, 72, 74. By March 15, 2021, Jiffy Lube had produced more than 920,000 pages in discovery. Notice, ECF No. 72, at 1. Plaintiffs took six depositions, including a deposition of three corporate Jiffy Lube designees, four Jiffy Lube employees, and a third party. Decl. of Joshua J. Bloomfield in Supp. of Pl.'s Mot. for Final Approval of Settlement and Award of Attorney's Fees, Expenses, and Service Award ("Bloomfield Decl."), ECF No. 175-2, at ¶ 5. Plaintiff hired an econometric expert to analyze the data received from Jiffy Lube and to create a preliminary damages model to assess the economic impact of the "no-poach" clause. *Id.* at ¶ 6. The parties held informal settlement discussions. *Id.* at ¶ 7. On October 13, 2021 and November 5, 2021, the parties engaged in settlement negotiations before Magistrate Judge David R.

Strawbridge. ECF Nos. 80, 81. On February 22, 2022, Fuentes informed the Court that the parties had agreed in principle to a settlement of class claims on behalf of certain Jiffy Lube franchisee employees. Notice, ECF No. 84.

On July 22, 2022, Fuentes moved for preliminary approval of a settlement of class claims and preliminary certification of the settlement class. Motion, ECF No. 90. The proposed settlement class was narrower than the class described by Fuentes' original complaint. Instead of a nationwide class, the proposed settlement agreement encompassed only those employees who had worked at a Jiffy Lube franchise in the greater Philadelphia metropolitan area. Second Amended Compl., ECF No. 91.

On September 2, 2022, Oscar Jimenez moved to intervene as a class representative for a nationwide class and a California subclass. Motion to Intervene, ECF No. 94, at 1–2. Jimenez is a former employee of a Jiffy Lube franchisee in California, and his claims against Jiffy Lube would not be encompassed by Fuentes' proposed settlement. *Id.* at 4. On March 16, 2023, I permitted Jimenez to intervene in the suit. Order, ECF No. 117. On September 14, 2023, I compelled Jimenez to arbitrate his claims based on the existence of a binding arbitration agreement between Jimenez and the Jiffy Lube franchisee where he previously worked. Memorandum, ECF No. 153, at 10; Order, ECF No. 154.

On September 15, 2023, I preliminarily approved Fuentes' settlement of class claims and scheduled a final approval hearing. Order, ECF Nos. 155, 156. On September 21, 2023, Nathan Hernandez moved to intervene to replace Oscar Jimenez as a class representative for a nationwide class and a California subclass. ECF No. 157, at 3. On December 13, 2023, I denied Hernandez's motion as untimely because of his lengthy delay in seeking intervention. Memorandum, ECF No. 170; Order, ECF No. 171. That same day, I issued a scheduling order setting forth deadlines for notice to the putative class members. Order, ECF No. 172.

**\*3**  KCC Class Action Services, LLC ("KCC") is the Claims Administrator that managed the notice process. Decl. of Bernella Osterlund Re: Notice Procedures ("Osterlund Decl."), ECF No. 176-1, at ¶ 1. KCC received the names of the 1,255 identified putative class members and submitted court-approved notice packets to each of them. *Id.* at ¶¶ 3, 4. KCC verified and updated the address information of each putative class member. *Id.* at ¶¶ 2, 4. In five instances, notice packets were returned as undeliverable and KCC was

Fuentes v. Jiffy Lube Int'l, Inc., Not Reported in Fed. Supp. (2024)

2024 WL 2723840

unable to find a new address for the putative class member. *Id.* at ¶ 4. KCC established a website, email address, and toll-free telephone number to provide additional information about the settlement. *Id.* at ¶¶ 5, 6, 7. KCC did not receive any communications from putative class members seeking to dispute their calculated total earnings, opt out from the settlement, or object to the settlement. *Id.* ¶¶ 8, 9, 10.

On January 29, 2024, Fuentes moved for final approval of the settlement, and for the awarding of attorney's fees, expenses, and a service award. ECF No. 175. In April 2024, Fuentes filed additional briefing regarding the results of the notice and opt-out procedures. ECF Nos. 176, 177. On May 8, 2024, I held a final approval hearing.

## II. Proposed Class Action Settlement

### A. Proposed Settlement Class

The parties define the Settlement Class as follows:

All persons in the United States who between December 1, 2014 and December 31, 2018 (i) worked as hourly employees; (ii) of a Jiffy Lube Franchisee located in the Philadelphia-Camden-Wilmington MSA; and (iii) worked for a period of at least 90 days.

Settlement Agreement, ECF No. 90-3, at ¶ 1.33. Excluded from the Settlement Class are:

(a) Jiffy Lube and its principals, affiliated entities, legal representatives, successors, and assigns; (b) any Person who files a valid, timely Request for Exclusion; (c) federal, state, and local governments (including all agencies and subdivisions thereof); and (d) any Person who settled and released claims at issue in this Action.

Pl.'s Final Approval Br. at 1.[2]

### B. Proposed Settlement

The proposed Settlement is a cash settlement. Settlement Agreement at ¶ 3.1. Defendant Jiffy Lube has already deposited $2 million into the escrow account to be used for the settlement distribution. Pl.'s Final Approval Br. at 2 n.5. After payment of settlement administration expenses, taxes, fee and expense awards, and the class representative's service award, the remaining portion of the settlement would be paid to the class members. Settlement Agreement at ¶ 8.3. These payments would be allocated pro rata based on the estimated amounts that the class members earned at a Jiffy Lube franchisee during the Settlement Class Period. Ex. 2,

Allocation Plan for Jiffy Lube Settlement, ECF No. 175-4, at 1 (referenced in Settlement Agreement at ¶ 8.5). Class members would be paid automatically, without needing to submit a claim form. *Id.* One-third of the settlement payment to each class member would be considered taxable wages, and the Settlement Administrator would withhold tax and pay payroll tax for that portion of the class member's payment. *Id.* The remaining two-thirds of the payment would not be subject to withholding. *Id.* If the pro rata settlement amount due to any class member were $50 or less, that amount would be all be considered non-wages. *Id.*

If there were unclaimed funds after the initial distribution (e.g., if some checks were returned as undeliverable), Jiffy Lube would not have a reversionary interest in the remaining amount. Settlement Agreement at ¶ 8.7. A second pro rata distribution would be sent to class members if there were sufficient funds remaining to make this economically sensible. *Id.* If not, the remaining undistributed amount would be donated on a cy-près basis to a Court-approved nonprofit organization. *Id.*

## III. Discussion

### A. Class Certification

**\*4** Plaintiffs move for certification of the Settlement Class pursuant to Rule 23(b)(3). For a class action to have preclusive effect and bind absent class members, a class must first be certified. Federal Rule of Civil Procedure 23(a) contains four threshold requirements for certification:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Rule 23(b)(3) imposes two additional requirements: "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Rule 23(b)(3) requirements are commonly referred to as predominance and superiority. *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 296 (3d Cir. 2011) (en banc). In addition to these two

Fuentes v. Jiffy Lube Int'l, Inc., Not Reported in Fed. Supp. (2024)

2024 WL 2723840

explicit requirements, Rule 23(b)(3) also imposes an implicit ascertainability requirement. *Byrd v. Aaron's Inc.*, 784 F.3d 154, 161–62 (3d Cir. 2015).

"[T]he party proposing class-action certification bears the burden of affirmatively demonstrating by a preponderance of the evidence her compliance with the requirements of Rule 23." *Byrd*, 784 F.3d at 163. Class certification "demand[s] undiluted, even heightened, attention in the settlement context." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). However, the existence of a settlement means that "certain Rule 23 considerations ... are not applicable." *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 378 (3d Cir. 2013). For example, because a settlement obviates the need for trial, concerns regarding the manageability of a Rule 23(b)(3) class disappear. *See Amchem*, 521 U.S. at 620, 117 S.Ct. 2231; *see also Sullivan*, 667 F.3d at 297 (noting that "concerns regarding variations in state law largely dissipate when a court is considering the certification of a settlement class"); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 529 (3d Cir. 2004) ("[C]oncerns with regards to case manageability that arise with litigation classes are not present with settlement classes, and thus those variations are irrelevant to certification of a settlement class" (citing *Amchem*, 521 U.S. at 620, 117 S.Ct. 2231)).

The proposed Class meets the Rule 23(a) and 23(b)(3) requirements and warrants certification.

**1. Rule 23(a) Requirements**

**a. Numerosity**

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir. 2001). The parties represent that there are approximately 1,255 putative class members. Accordingly, Plaintiff satisfies the numerosity requirement of Rule 23(a).

**b. Commonality**

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To satisfy commonality, class members' claims "must depend upon a common contention ... of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011). Commonality may be shown by "demonstrat[ing] that the class members 'have suffered the same injury.' " *Id.* (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)). A single common question or fact is sufficient to satisfy the commonality requirement of Rule 23(a)(2). *Wal-Mart*, 564 U.S. at 359, 131 S.Ct. 2541; *Kanter ex rel. Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994).

**\*5** Here, common questions of law and fact include:

a. Whether Jiffy Lube engaged in unlawful contracts, combinations, and/or conspiracies in restraint of trade and commerce and in violation of the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq.*;

b. Whether such agreements had an antitrust impact in suppressing wages below competitive levels;

c. Whether Plaintiff and Settlement Class Members are entitled to damages;

d. The amount of any damages.

Pl.'s Final Approval Br. at 19–20. Effectively, Plaintiffs allege the same harm from the same conduct: the suppression of wages below competitive levels because of a "no-poach" agreement between Jiffy Lube and its franchisees. All the putative class members' claims depend on common questions of law and fact: whether this agreement constituted a violation of the Sherman Antitrust Act, and the extent of the agreement's effect on wages. The commonality requirement is satisfied.

**c. Typicality**

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality inquiry asks

Fuentes v. Jiffy Lube Int'l, Inc., Not Reported in Fed. Supp. (2024)

2024 WL 2723840

"whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class." *Beck v. Maximus, Inc.*, 457 F.3d 291, 295–96 (3d Cir. 2006) (quoting *Baby Neal*, 43 F.3d at 55).

The Third Circuit has "set a low threshold for satisfying" the typicality requirement. *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183 (3d Cir. 2001). The typicality requirement "acts as a bar to class certification only when 'the legal theories of the named representatives potentially conflict with those of the absentees.' " *Id.* (quoting *Georgine v. Amchem Prod., Inc.*, 83 F.3d 610, 631 (3d Cir. 1996), *aff'd sub nom., Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). "If the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of factual differences." *Newton*, 259 F.3d at 183–84.

Plaintiff Fuentes alleges that he and all putative class members suffered economic damages from Jiffy Lube's implementation of a "no-poach" agreement. Specifically, Fuentes alleges that the agreement artificially depressed wages by preventing Jiffy Lube franchisee employees from seeking employment at other Jiffy Lube locations. Fuentes was an employee at a Jiffy Lube franchisee store during the time the "no-poach" agreement was in effect. The putative class encompasses those, like him, who were employed during the time that this agreement existed. The typicality requirement is satisfied because the claims of the named Plaintiff and the putative class members involve the same agreement promulgated by Jiffy Lube, the same alleged injury, and the same claim for relief.

**d. Adequacy of Representation**

The final prong of Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625, 117 S.Ct. 2231. The adequacy of representation requirement addresses two components: (1) the qualifications of class counsel; and (2) the interests and incentives of the class representatives. *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 181 (3d Cir. 2012).

**i. Adequacy of Class Counsel**

**\*6**  When examining settlement classes, courts "have emphasized the special need to assure that class counsel: (1) possessed adequate experience; (2) vigorously prosecuted the action; and (3) acted at arm's length from the defendant."[3] *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 801 (3d Cir. 1995).

Gibbs Law Group is Class Counsel, as it is defined in the Settlement Agreement. Settlement Agreement at ¶ 1.3.[4] Joshua J. Bloomfield, the Gibbs attorney who has been the primary litigator in the later stages of this case,[5] has been involved in this litigation since its inception. Mr. Bloomfield is an experienced attorney who has previously litigated complex class action claims. *See* Ex. 3, Gibbs Law Group Firm Resume, ECF No. 175-5, at 24.

Class Counsel has vigorously prosecuted the claims of the Philadelphia-area class claimants who are encompassed by the Settlement Agreement. This case has demanded substantial time and energy from Class Counsel: there have been two motions to dismiss and significant discovery, as well as multiple settlement conferences. Developing precedent in other circuits has, at times, called into question certain aspects of the class claims. *See* Pl.'s Br. in Support of Uncontested Mot. for Prelim. Approval of Settlement and for Certification of the Proposed Settlement Class, ECF No. 90-1, at 6 (expressing concern about the viability of certifying a nationwide class action) (citing *Deslandes v. McDonald's USA, LLC*, No 17 C 4857, 2021 WL 3187668, at \*11 (N.D. Ill. July 28, 2021) (declining to certify nationwide Sherman Act class action case)). Since the inception of this case, Class Counsel has advanced attorney time and litigation expenses without a guaranteed recovery.

Moreover, Class Counsel has prosecuted this case at arm's length from Jiffy Lube. They have engaged in adversarial motions practice, and the negotiations that resulted in the proposed Settlement Agreement took place in formal settlement conferences before Magistrate Judge Strawbridge.

**\*7**  Accordingly, Mr. Bloomfield and his colleagues have adequately represented the putative class.

Fuentes v. Jiffy Lube Int'l, Inc., Not Reported in Fed. Supp. (2024)

2024 WL 2723840

**ii. Adequacy of Class Representatives**

"A class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Amcham, 521 U.S. at 625–26, 117 S.Ct. 2231* (quoting *East Tex. Motor Freight System, Inc. v. Rodriguez, 431 U.S. 395, 403, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977)*). "[T]he linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *Dewey, 681 F.3d at 183*. The purpose of the adequacy requirement is to identify intra-class conflicts that may prevent the representative plaintiff from adequately representing the entire class. *Id. at 183–4*. A court must address two questions to determine whether the representative plaintiff adequately represents the putative class: "(1) whether an intra-class conflict exists; and if so, (2) whether that conflict is 'fundamental.' " *Id. at 184*.

Plaintiff Victor Fuentes has diligently represented the Settlement Class. He has participated in discovery and made himself available during settlement conferences. Like the class members he seeks to represent, Fuentes is a former Philadelphia-area Jiffy Lube franchisee employee who was allegedly harmed by Jiffy Lube's "no-poach" provision. There does not appear to be any intra-class conflict between Fuentes and the other members of the Settlement Class. This conclusion is further bolstered by the lack of objections from the 1,255 individuals who were notified about their potential class membership.

**2. Rule 23(b)(3) Requirements**

**a. Predominance**

Under Rule 23(b)(3), an opt-out class may be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," *Amcham, 521 U.S. at 623, 117 S.Ct. 2231*, and to determine whether the proposed class "would achieve economies of time, effort, and expense[.]" *Id. at 615, 117 S.Ct. 2231* (internal quotation marks omitted) (quoting Advisory Committee's Notes on Fed R. Civ. P. 23(b)(3) (1966 amendments)). The predominance

inquiry is a more stringent version of the commonality analysis; common questions must drive the litigation. *See Danvers Motor Co. v. Ford Motor Co., 543 F.3d 141, 148 (3d Cir. 2008)* ("[T]he commonality requirement 'is subsumed by the predominance requirement.' " (quoting *Georgine, 83 F.3d at 627*)); *Warfarin, 391 F.3d at 528* (noting the predominance requirement to be "far more demanding" than the commonality requirement).

"[T]he focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." *Sullivan, 667 F.3d at 298*. Although it is sometimes necessary to determine whether the elements of each claim can be proved through evidence common to the class, a settlement "obviates the difficulties inherent in proving the elements of varied claims at trial or in instructing a jury on varied state laws," *Id., 667 F.3d at 304, 306*. Additionally, because certification of a settlement class is sought, a court is "not as concerned with formulat[ing] some prediction as to how [an] element of a Sherman Act violation would play out at trial, for the proposal is that there be no trial." *In re Ins. Brokerage Antitrust Litig., 579 F.3d 241, 269 (3d Cir. 2009)* (citations and internal quotation marks omitted).

 **\*8** Here, the allegation is that Jiffy Lube engaged in a common course of conduct that pertained to all franchisees covered by the Settlement Agreement. The "no-poach" provision applied to every franchise agreement equally. The issue of whether this provision suppressed wages in violation of antitrust law is common to all putative class members. The injury to each franchisee employee is also a common question: if Jiffy Lube's use of the "no-poach" provision lowered wages at all its locations in the Philadelphia area, all the franchisee employees would claim the same injury. The same issues, requiring the same expertise and the same proof, apply to each of the putative class members, predominating over any individual differences between the individual members. Accordingly, Plaintiff satisfies the predominance requirement.

**b. Superiority**

Rule 23(b)(3) requires "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "The superiority requirement 'asks the court to balance, in terms of fairness

Fuentes v. Jiffy Lube Int'l, Inc., Not Reported in Fed. Supp. (2024)

2024 WL 2723840

and efficiency, the merits of a class action against those alternative available methods of adjudication.' " *Warfarin*, 391 F.3d at 533–34 (quoting *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 316 (3d Cir. 1998)). In determining whether a settlement class action is superior, a court "consider[s] the class members' interests in individually controlling litigation, the extent and nature of any litigation, the desirability or undesirability of concentrating the litigation, and the likely difficulties in managing a class action." *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 434–35 (3d Cir. 2016) (citing Fed. R. Civ. P. 23(b)(3)(A)–(D)).

The parties have identified 1,255 putative class members. Individual putative class members may "have little interest in 'individually controlling the prosecution or defense of separate actions' because each [individual] has a very small claim in relation to the cost of prosecuting a lawsuit." *Warfarin*, 391 F.3d at 534 (quoting Fed. R. Civ. P. 23(b)(3)(A)) (in the context of consumer class actions). These costs can be especially burdensome in an antitrust lawsuit. The parties have not represented that any putative class member has commenced litigation on an individual basis. This indicates a lack of interest in individually bringing claims. *See Warfarin*, 391 F.3d at 534. None of the putative class members have opted out of the settlement or objected to it. This is unsurprising: the prospect of litigating an individual antitrust case for a low payout is economically unfeasible. If I credit the plaintiff's expert's assertion that a $2 million settlement represents 90% of the putative class members' damages, a successful individual claim would result in a payout of under $2,000. The mechanism of the class action allows litigation expenses to be shared among class members to avoid the time and expense of litigating hundreds of individual claims. Accordingly, Plaintiff satisfies the superiority requirement.

**c. Ascertainability**

Rule 23(b)(3)'s implicit ascertainability requirement requires the plaintiff to show that: "1) the class is "defined with reference to objective criteria"; and (2) there is "a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Byrd v. Aaron's Inc.*, 784 F.3d 154 (3d Cir. 2015) (internal quotation marks omitted). Here, the parties have identified 1,255 putative class members by reference to Jiffy Lube's employment records. These records identify the employment

dates and locations of these former employees, and reliably indicate which individuals fall within the class definition. The proposed class is ascertainable.

**\*9** In conclusion, I will certify the Settlement Class because the Settlement Class satisfies the requirements of Rule 23(a) and 23(b)(3).

**B. Final Approval of the Settlement**

Plaintiffs move for final approval of the Settlement Agreement. Under Federal Rule of Civil Procedure 23(e)(2), a court may approve the settlement of a class action "only on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The Third Circuit has "identified two opposing interests a district court must weigh when reviewing motions for settlement-only class certification and approval of the settlement." *In re: Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 326 (3d Cir. 2019).

The first competing interest is to "favor the parties reaching an amicable agreement and avoiding protracted litigation." *Id.* This is because these complex actions "consume substantial judicial resources and present unusually large risks for the litigants." *In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 805 (3d Cir. 1995). Therefore, when evaluating a settlement, a court should be "hesitant to undo an agreement that has resolved a hard-fought, multi-year litigation." *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 175 (3d Cir. 2013) (citing *Warfarin*, 391 F.3d at 535). "Settlements are private contracts reflecting negotiated compromises. The role of a district court is not to determine whether the settlement is the fairest possible resolution—a task particularly ill-advised given that the likelihood of success at trial (on which all settlements are based) can only be estimated imperfectly." *Id.* at 173–74 (citation omitted). A court must recognize that a settlement is a "yielding of the highest hopes in exchange for certainty and resolution" and "guard against demanding too large a settlement based on its view of the merits." *In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d at 806.

"At the same time, a district court has an obligation as a fiduciary for absent class members to examine the proposed settlement with care." *Google*, 934 F.3d at 326. This role requires special rigor "where settlement negotiations precede class certification, and approval for settlement and certification are sought simultaneously." *Warfarin*, 391 F.3d at 534; *see Google*, 934 F.3d at 326. "[A] district court's

2024 WL 2723840

scrupulous review of the settlement terms is designed to ensure that class counsel has demonstrated sustained advocacy throughout the course of the proceedings and has protected the interests of all class members." *Google*, 934 F.3d at 326 (internal quotation marks omitted).

With these competing interests in mind, it is important to determine whether a presumption of fairness applies to the Settlement Agreement, but even more crucial to scrupulously review whether the Settlement is fair, reasonable, and adequate.

### 1. Presumption of Fairness

The Third Circuit applies an initial presumption of fairness if " '(1) the negotiations occurred at arms length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.' " *Google*, 934 F.3d at 326 (quoting *NFL Concussion Litig.*, 821 F.3d at 436).

**\*10** The parties participated in multiple formal settlement negotiations that occurred at arm's length before Magistrate Judge Strawbridge. Prior to beginning formal negotiations, Class Counsel engaged in discovery, including document discovery, depositions, and consultation with experts. During their negotiations, Class Counsel assessed the relative strengths of their case and ultimately abandoned their nationwide class claim in favor of reaching a more limited settlement for the Philadelphia area. By the time the parties reached their proposed Settlement Agreement, they had litigated several issues through two motions to dismiss and had adequately assessed the strength of the class claims. Class Counsel has substantial experience in similar complex litigation, and defense counsel is similarly experienced.[6] Finally, there have been no objections lodged to the settlement, and that no individual putative class members have opted out. Therefore, the presumption of fairness applies.

### 2. Factors to Consider in Evaluating the Settlement

For a class action settlement, "[d]istrict courts are to assess the fairness, reasonableness, and adequacy ... under Rule 23(e)(2) ... applying the *Girsh* factors; applying the *Prudential* factors where applicable; and considering 'the degree of direct benefit provided to the class.' " *Google*, 934 F.3d

at 329 (quoting *Baby Prods.*, 708 F.3d at 174).[7] Here, the *Girsh* factors, relevant *Prudential* considerations, and *Baby Products* analysis overall weigh in favor of approval of the Settlement.

#### a. The *Girsh* Factors

**\*11** In *Girsh v. Jepson*, The Third Circuit directed district courts to consider the following nine factors:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975) (internal quotation marks and ellipses omitted).

#### i. The Complexity, Expense, and Likely Duration of the Litigation

This factor "captures the probable costs, in both time and money, of continued litigation." *Warfarin*, 391 F.3d at 535–36 (quoting *In re Cendant Corp. Litig.*, 264 F.3d 201, 233 (3d Cir. 2001)). Antitrust class actions are particularly complex to litigate and therefore quite expensive. *See In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2008 WL 63269, at \*5 (E.D. Pa. Jan. 3, 2008) ("This litigation, *like most antitrust cases*, has been exceedingly complex, expensive, and lengthy." (emphasis added)). "An antitrust class action is arguably the most complex action to prosecute." *In re Linerboard Antitrust Litig.*, 296 F. Supp. 2d 568, 577 (E.D. Pa. 2003) (internal quotation marks omitted).

If litigation continues in this antitrust class action, the parties may have to engage in additional discovery, extensive pretrial motions addressing complex factual and legal questions, and ultimately a lengthy and complicated trial involving several experts. This case has already been pending for over five years, and continued litigation could mean that any recovery for the class members would take several more years. The

2024 WL 2723840

complexity, expense, and likely duration of this antitrust class action weigh heavily in favor of approving the Settlement.

#### ii. The Reaction of the Class to the Settlement

"The second *Girsh* factor 'attempts to gauge whether members of the class support the settlement.' " *Warfarin,* 391 F.3d at 536 (quoting *Prudential,* 148 F.3d at 318). In order to gauge class members' reactions, I first determine whether the class was appropriately notified of the settlement. To satisfy due process, notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *NFL Concussion Litig.,* 821 F.3d at 435. The notice in this case included detailed information, available in English and Spanish, that addressed each of the notice requirements in Fed. R. Civ. P. 23(c)(2)(B):

> (i) the nature of the action;

> (ii) the definition of the class certified;

> (iii) the class claims, issues, or defenses;

> (iv) that a class member may enter an appearance through an attorney if the member so desires;

> **\*12** (v) that the court will exclude from the class any member who requests exclusion;

> (vi) the time and manner for requesting exclusion; and

> (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

*See generally* Notice, Ex. A, ECF No. 161-1. The notice was in plain language and described the nature of the settlement and the class member's rights in a Question-and-Answer format. It also provided three means by which the class members could obtain more information: a website, an email address, and a toll-free number. ECF No. 161-1, at 6. On February 21, 2024, KCC Class Action Services, LLC mailed the notice packet to the newest available addresses of all 1,255 identified class members. Osterlund Decl. at ¶ 3. Class Counsel and the Court received no objections or opt outs from the Settlement Agreement, and there were no disputes filed as to the total estimated amount earned at a Jiffy Lube franchisee. Final Approval Hearing, ECF No. 178. Some class members inputted their Social Security numbers on the website, confirming that they did receive notice of the Settlement Agreement. *Id.*

No class member has voiced any objection or concern regarding the proposed settlement, and it appears that the notice procedures adequately advised the class members about the Settlement Agreement. The reaction of the Class weighs in favor of approving the Settlement.

#### iii. The Stage of the Proceedings and the Amount of Discovery Completed

"The third *Girsh* factor captures the degree of case development that class counsel [had] accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *NFL Concussion Litig.,* 821 F.3d at 438–39 (quoting *Warfarin,* 391 F.3d at 537). "[F]ormal discovery is not a requirement for the third Girsh factor. What matters is not the amount or type of discovery class counsel pursued, but whether they had developed enough information about the case to appreciate sufficiently the value of the claims." *Id.* at 439.

Here, Class Counsel engaged in sufficient discovery to adequately appreciate the merits of the case before negotiating. Class Counsel briefed two motions to dismiss and engaged in fact discovery and depositions. They also consulted with an expert regarding the effects that the "no-poach" provision may have had on wages. By the time the parties reached the Settlement Agreement, Class Counsel had a strong grasp of the legal hurdles that different permutations of the class could face, including the risk that a national class might not be certified. Therefore, this factor weighs in favor of approving the Settlement.

#### iv. The Risks of Establishing Liability and Damages

"The fourth and fifth *Girsh* factors survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement." *NFL Concussion Litig.,* 821 F.3d at 439 (quoting *Prudential,* 148 F.3d at 319).

Plaintiffs face some risks if they sought to continue litigating this action. Most notably, the viability of a nationwide class has been called into question by similar cases in districts outside of the Third Circuit. Class Counsel summarized this concern in their briefing:

Fuentes v. Jiffy Lube Int'l, Inc., Not Reported in Fed. Supp. (2024)

2024 WL 2723840

**\*13** District court rulings in the substantially similar no-poach cases against Jimmy Johns and McDonald's enhanced the risk of obtaining class certification and proving liability. In both cases, the district court denied class certification and relied on the Supreme Court's *Alston* decision to hold that rule of reason analysis applies in no-poach actions brought by franchisee employees. *Conrad v. Jimmy John's Franchise, LLC*, No. 18-CV-00133-NJR, 2021 WL 3268339, at \*10; *Deslandes v. McDonald's USA, LLC*, No. 17 C 4857, 2021 WL 3187668, at \*7. In *Deslandes*, the district court also granted judgment on the pleadings in favor of McDonalds. *Deslandes v. McDonald's USA, LLC*, No. 17 C 4857, 2022 WL 2316187, at \*4–5 (N.D. Ill. June 28, 2022).

After this Court granted preliminary approval, the Seventh Circuit reviewed the *McDonalds* decision, reversed the dismissal, and remanded the case to the district court, *Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 703 (7th Cir. 2023), finding the nopoach restriction was alleged to be horizontal and thus the per se rule could apply. While Plaintiff believes the *Deslandes* appellate court decision is correct, the Third Circuit has not affirmatively applied the per se rule in this context and thus there remains a real risk that liability is uncertain because unlike per se or quick look analysis, rule of reason is a more complex analysis and is far less favorable to an antitrust plaintiff.

Pl.'s Final Approval Br. at 16–17. Even if this Court established regional subclasses, as requested by the California intervenor Jimenez (and would-be intervenor Hernandez), such subclasses would likely require additional time and spending by Class Counsel to assess economic impacts in different markets.

Moreover, damages would not be guaranteed for the current class members or for the broader original nationwide class. Both Plaintiff and Defendant would likely call experts to dispute whether (and if so, to what extent) the "no-poach" class in Jiffy Lube's franchise agreement caused low wages in violation of antitrust law. A jury could favor either expert's narrative, and the class members encompassed by this proposed Settlement Agreement might receive little to no benefit. *See Cendant*, 264 F.3d at 239 (contemplating that a jury could believe either of two competing experts).

Accordingly, the Settlement avoids the many significant hurdles that the Plaintiff would have encountered in establishing liability and damages. Therefore, the fourth and fifth *Girsh* factors weigh in favor of approving the Settlement.

### v. The Risks of Maintaining the Class Action Through the Trial

This factor "measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial." *Warfarin*, 391 F.3d at 537. Because class certification is subject to review and modification at any time during the litigation, the uncertainty of maintaining class certification favors settlement. *See Zenith Labs., Inc. v. Carter-Wallace, Inc.*, 530 F.2d 508, 512 (3d Cir. 1976) (affirming decision of the district court to reconsider and deny previously-approved class certification). "In a settlement class, this factor becomes essentially toothless because a district court need not inquire whether the case, if tried, would present intractable management problems[,] ... for the proposal is that there be no trial." *NFL Concussion Litig.*, 821 F.3d at 440 (internal quotation marks omitted). Thus, this factor "deserve[s] only minimal consideration." *Id.*

**\*14** Here, the Plaintiff faces real risks to obtaining and keeping class certification, particularly if the Plaintiff sought to reinstitute litigation on behalf of a nationwide class. Therefore, this factor weighs in favor of approving the Settlement.

### vi. The Ability of Defendants to Withstand a Greater Judgment

"The seventh *Girsh* factor considers 'whether the defendants could withstand a judgment for an amount significantly greater than the [s]ettlement.' " *Warfarin*, 391 F.3d at 537–38 (quoting *Cendant*, 264 F.3d at 240). "The seventh *Girsh* factor is most relevant when the defendant's professed inability to pay is used to justify the amount of the settlement." *NFL Concussion Litig.*, 821 F.3d at 440; *see also Warfarin*, 391 F.3d at 538 (finding no error with the district court's conclusion that "DuPont's ability to pay a higher amount was irrelevant to determining the fairness of the settlement"). "[I]n any class action against a large corporation, the defendant entity is likely to be able to withstand a more substantial judgment, and, against the weight of the remaining factors, this fact alone does not undermine the reasonableness of the ... settlement." *NFL Concussion Litig.*, 821 F.3d at 440 (internal quotation marks omitted).

Fuentes v. Jiffy Lube Int'l, Inc., Not Reported in Fed. Supp. (2024)

2024 WL 2723840

Plaintiffs concede that Jiffy Lube likely could withstand a greater judgment. Pl.'s Final Approval Br. at 17. This factor, however, does not undermine the reasonableness of the Settlement because Jiffy Lube has not tried to use any claimed inability to pay to avoid a higher settlement amount. The proposed settlement provides the class members with 90% of their damages, as estimated by Plaintiff's expert. *Id.* This factor is therefore neutral.

### vii. The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and in Light of all the Attendant Risks of Litigation

"In evaluating the eighth and ninth *Girsh* factors, we ask 'whether the settlement represents a good value for a weak case or a poor value for a strong case.' " *Id.* (quoting *Warfarin, 391 F.3d at 538*). "The factors test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." *Warfarin, 391 F.3d at 538.* "[T]he present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement." *NFL Concussion Litig., 821 F.3d at 440* (quoting *Prudential, 148 F.3d at 322*).

If the Plaintiff were to succeed at trial on his antitrust claim for the Settlement Class, he might recover slightly more than this settlement amount. However, the attorney fees and expenses would continue increasing, potentially negating any additional amount gained by going to trial. If the Plaintiff sought to litigate his original nationwide class action, he might recover much more, potentially tens of millions of dollars. The Plaintiff, however, would face the risk of additional lengthy and expensive litigation to try to certify that nationwide class. The Settlement Agreement here represents an excellent recovery for the Settlement Class, and an adequate overall recovery. Therefore, these factors weigh in favor of approving the Settlement.

### b. The *Prudential* Considerations

**\*15** In *In re Prudential Insurance Co. America Sales Practice Litigation*, the Third Circuit expanded the analysis of factors to consider in evaluating a settlement to include what are now referred to as *Prudential* considerations:

the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other facts that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

*Prudential, 148 F.3d at 323.* "Unlike the *Girsh* factors, each of which the district court must consider before approving a class settlement, the *Prudential* considerations are just that, prudential. They are permissive and non-exhaustive[.]" *Baby Prods., 708 F.3d at 174.*

Here, Class Counsel was able to make an informed decision about the probable outcome of a trial. All Settlement Class Members had the opportunity to opt out of the Settlement. The procedure for processing individual claims under the settlement is fair and reasonable and does not require any action by individual class members.[8] Additionally, as discussed later in this memorandum, the provisions for attorneys' fees are reasonable. Therefore, the relevant *Prudential* considerations weigh in favor of approving the Settlement.

### c. The Degree of Direct Benefit Provided to the Class

In *In re Baby Products Antitrust Litigation*, the Third Circuit articulated an additional consideration for evaluating a settlement—"the degree of direct benefit provided to the class." *Baby Prods., 708 F.3d at 174.* The Third Circuit explained:

In making this determination, a district court may consider, among other things, the number of individual awards compared to both the number of claims and the estimated number of class members, the size of the individual awards compared to claimants' estimated damages, and the claims process used to determine individual awards. *Id.*

Fuentes v. Jiffy Lube Int'l, Inc., Not Reported in Fed. Supp. (2024)

2024 WL 2723840

Here, the Settlement Agreement created a $2 million cash fund to be distributed among 1,255 class members. In order to inform the class members about the Settlement, Class Counsel engaged in a thorough notice process. Class Counsel and the Settlement Administrator used Jiffy Lube, U.S. Postal Service, and other records to ascertain the mailing addresses for the class members. Osterlund Decl. at ¶¶ 2, 4. As of April 1, 2024, addresses were still missing for only five of the class members. *Id.* at ¶ 4. Packets were mailed (and not returned as undeliverable) to the other 1,250 class members. *Id.* Additionally, the Settlement Administrator established a website, email address, and telephone number to provide more information about the settlement and to respond to class members' inquiries. *Id.* at ¶¶ 5–7. Some class members have provided their requested (but optional) Social Security number information, as stated on the record at the final approval hearing.

 **\*16** After subtraction of the requested attorney's fees and expenses, the settlement administration costs, and the lead plaintiff's award, the fund totals $1,106,403. The average remaining award, if divided among all the 1,255 class members, is $881.60. The lack of objections or opt-outs to the settlement confirms that this fund represents a substantial benefit to class members, despite the sizable deduction of expenses and fees from the overall fund.

Because the *Girsh* factors and *Prudential* considerations overwhelming weigh in favor of approving the Settlement, and the degree of direct benefit to the Class does not counsel against approving the Settlement, I will grant final approval of the Settlement.

### C. Attorneys' Fees and Reimbursement of Litigation Expenses

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). "[A] thorough judicial review of fee applications is required in all class action settlements." *Prudential*, 148 F.3d at 333 (quoting *In re G.M.*, 55 F.3d at 819); *see also Baby Prods.*, 708 F.3d at 178–80.

Here, Class Counsel requests $500,000 in attorney's fees, $320,465 in litigation expenses, and $68,132 for settlement administration. Pl.'s Mot. for Final Approval of Settlement and Award of Attorney's Fees, Expenses, and Service Award, ECF No. 175, at ¶ 5. The Settlement Agreement provides that Class Counsel may apply to the Court for an award for the time and expenses associated with litigating this case, to be drawn from the Settlement Fund. Settlement Agreement at ¶ 9.2. Jiffy Lube itself is not directly liable for payment of attorney's fees and expenses; these amounts will be subtracted from the overall $2 million fund. *Id.* at ¶ 9.2, 9.5.

Courts generally use one of two methods for assessing attorneys' fee requests: the lodestar method or the percentage-of-recovery method. *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005), *as amended* (Feb. 25, 2005). The lodestar method is more commonly the starting point in statutory fee-shifting cases. *Id.* The percentage-of-recovery method, on the other hand, is "generally favored in common fund cases." *Id.* This case involves a common cash fund, and therefore the percentage-of-recovery method is appropriate. Although not "necessarily determinative," the use of the lodestar method of fee approval also provides a cross-check of a court's initial fee calculation under the percentage-of-recovery method. *Baby Prods.*, 708 F.3d at 179–80; *see also In re Rite Aid*, 396 F.3d at 300.

"Counsel for a class action is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the class action." *In re Suboxone (Buprenorphine, Hydrochloride and Naloxone) Antitrust Litig.*, 13-MD-2445, 2024 WL 815503, at \*18 (E.D. Pa. Feb. 27, 2024) (quoting *In re Safety Components, Inc. Sec. Litig.*, 166 F. Supp. 2d 72, 108 (D.N.J. 2001)). Class Counsel's expense request is broken down as follows:

| *Expense Category* | *Expense Amount* |
| --- | --- |
| Copying (Internal) | $1,017 |
| Experts/Consultants | $265,343 |
| Litigation Support | $36,189 |
| Postage/Delivery | $110 |

2024 WL 2723840

| Research | $3,066 |
| Transcripts | $13,440 |
| Travel | $3,908 |
| **Total** | **$322,073** |

Bloomfield Decl. at ¶ 16. Class Counsel seeks reimbursement for $320,465 of the above expenses, as well as $68,132 for Gilardi & Co. LLC to administer the settlement. ¶ 8. These expenses total nearly 20% of the total settlement amount.

 *17 Because the percentage-of-recovery method and the lodestar cross-check demonstrate that the attorneys' fee and expense request is reasonable, I will approve Plaintiffs' request for $500,000 as an award of attorneys' fees. Because the incurred expenses were reasonably incurred in the prosecution of this action, I will also approve $320,465 for reimbursement of expenses, and $68,132 for settlement administration expenses.

**1. Percentage-of-Recovery Method**

In deciding what amount is a reasonable fee award under the percentage-of-recovery method, a district court must consider the following ten factors known as the *Gunter/Prudential* factors:

(1) the size of the fund created and the number of beneficiaries, (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel, (3) the skill and efficiency of the attorneys involved, (4) the complexity and duration of the litigation, (5) the risk of nonpayment, (6) the amount of time devoted to the case by plaintiffs' counsel, (7) the awards in similar cases, (8) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations, (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained, and (10) any innovative terms of settlement.

*In re Diet Drugs*, 582 F.3d 524, 541 (3d Cir. 2009) (citations omitted).

Importantly, however, before reaching any single *Gunter/Prudential* factor, a court "should begin by determining with reasonable accuracy the distribution of funds that will result

from the claims process." *Baby Prods.*, 708 F.3d at 179. "Th[e] court should then, relying on the *Gunter/Prudential* factors and its experience, determine whether the level of distribution provided to the class by the settlement reflects a failure of class counsel to represent adequately the interests of the entire class." *Id.*

The Class consists of 1,255 current and former employees of Jiffy Lube franchisees in the Philadelphia area. The Settlement Agreement provides $2 million, less fees and expenses, to allocate to each of these former employees on a pro rata basis depending on the amount of money each employee earned during the settlement period. There is no reversion, meaning that Jiffy Lube will not be reimbursed any amount of the $2 million if the initial fund distribution does not fully exhaust the settlement fund. In that case, a second distribution will be made or the funds will be donated to a nonprofit organization on a cy-près basis. Plaintiff's econometrics expert's initial analysis shows that the Settlement amount is approximately 90% of the Settlement Class's damages. Bloomfield Decl. at ¶ 11. This means that, after subtraction of the 25% attorney fee amount and the expenses from the Settlement Fund, each member of the Settlement Class will likely receive approximately half of their estimated damages. Although this is not an exceptional recovery given the size of the fee and expense amounts, an examination of the *Gunter/Prudential* factors demonstrates that this is an adequate recovery given the substantial litigation time and costs involved in this case.

**a. The Size of the Fund Created and the Number of Beneficiaries**

As noted above, the Settlement Agreement creates a $2 million fund to be distributed to 1,255 class members after the subtraction of fees and expenses. The fund itself represents 90% of the damages of the class, according to Plaintiff's econometrics expert. Bloomfield Decl. at ¶ 11. Class Counsel reviewed hundreds of thousands of documents throughout the discovery process, took six depositions, and began preparation of expert reports. *Id.* at ¶¶ 5, 6. Class

Class Counsel also successfully briefed two motions to dismiss. Class Counsel requests 25% of the fund as attorney's fees.

**\*18** Because Class Counsel diligently prosecuted this case and adequately prioritized the direct benefit to the Class, this factor weighs in favor of approving Plaintiffs' fee request.

**b. The Presence or Absence of Substantial Objections by Members of the Class to the Settlement Terms and/or Fees Requested by Counsel**

Out of 1,255 class members, no individuals opted out or objected to the Settlement. Moreover, no one objected to Class Counsel's requested attorney's fees and expense reimbursements. Because there have been no objections pertaining to attorneys' fees, this factor weighs in favor of approving Plaintiffs' fee request.

**c. The Skill and Efficiency of the Attorneys Involved**

As previously discussed, Class Counsel has extensive knowledge of antitrust law and class action practice. Throughout the course of this litigation, Mr. Bloomfield, Mr. Schrag, and Mr. Sampson have identified relevant issues in the action and have successfully defended against two motions to dismiss. This factor weighs in favor of approving Plaintiffs' fee request.

**d. The Complexity and Duration of the Litigation**

The factors which increase the complexity of a class action include: "complex and/or novel legal issues, extensive discovery, acrimonious litigation, and tens of thousands of hours spent on the case by class counsel." *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 741 (3d Cir. 2001). Antitrust class actions are particularly complex to litigate and therefore quite expensive. *See In re Auto. Refinishing*, 2008 WL 63269, at *5 ("This litigation, *like most antitrust cases*, has been exceedingly complex, expensive, and lengthy." (emphasis added)). "An antitrust class action is arguably the most complex action to prosecute." *In re Linerboard*, 296 F. Supp. 2d at 577 (internal quotation marks omitted).

This case involved complex antitrust litigation and novel issues about franchise model wage suppression. This case has been pending for over five years, during which time there has been substantial litigation within this case and developments across the country related to franchisee wage suppression issues. *See* Compl. at ¶ 6 (noting that many states' attorneys general are investigating "no-poach" provisions in franchise agreements, and that at least 30 national chains had entered consent decrees to cease use of such provisions). This factor weighs in favor of approving Plaintiffs' fee request.

**e. The Risk of Nonpayment**

In every class action in which class counsel brings a case on a contingency basis, there is some risk of nonpayment. There is effectively no risk of nonpayment at this point given that Jiffy Lube has already deposited the $2 million settlement payment into an escrow account. The Third Circuit has "never [directly] addressed whether courts must reconsider the risk of nonpayment as the action evolves." *In re Diet Drugs*, 582 F.3d at 543. In practice, however, it has evaluated the risk of nonpayment throughout the litigation. *See Sullivan*, 667 F.3d at 332 (assessing "risk of nonpayment throughout the litigation"). Until the parties reached a settlement agreement in this case, the Plaintiff had no guarantee of recovery of damages for the class, fees and expenses for Class Counsel, or an individual award for the class representative.

**\*19** Because the risk of nonpayment changed throughout the course of this litigation, this factor weighs only mildly in favor of approving Plaintiffs' fee request.

**f. The Amount of Time Devoted to the Case by Plaintiffs' Counsel**

Through January 29, 2024, Plaintiff's counsel had devoted 3,267 hours to this case.[9] Bloomfield Decl. at ¶ 15. Class Counsel has also advanced at least $322,073 in litigation expenses. *Id.* at ¶ 16. The time and money spent by Plaintiff's counsel was necessary for the prosecution of this case and its eventual settlement. Because Plaintiff's Counsel devoted significant resources to this case, this factor weighs in favor of approving Plaintiffs' fee request.

**g. The Awards in Similar Cases**

Class Counsel request a fee that is 25% of the entire fund. In this District, "fee awards generally range between nineteen

2024 WL 2723840

and forty-five percent of the common fund." *McDonough v. Toys R Us, Inc.*, 80 F. Supp. 3d 626, 653 (E.D. Pa. 2015) (collecting cases); *see also In re Suboxone Antitrust Litig.*, 2024 WL 815503, at *16 (collecting cases). Moreover, "courts within this Circuit have typically awarded attorneys' fees of 30% to 35% of the recovery, plus expenses." *In re Ravisent Techs., Inc. Sec. Litig.*, No. 00-1014, 2005 WL 906361, at *11 (E.D. Pa. Apr. 18, 2005) (collecting cases). Plaintiffs' fee request falls within the range of fees that are typically approved in this district. This factor weighs in favor of approving Plaintiffs' fee request.

### h. The Value of Benefits Attributable to the Efforts of Class Counsel Relative to the Efforts of Other Groups, Such as Government Agencies Conducting Investigations

This factor contemplates whether Class Members benefitted from "the efforts of other groups, such as government agencies conducting investigations." *In re AT & T Corp.*, 455 F.3d 160, 165 (3d Cir. 2006). Class Members have benefitted from the actions of state attorneys general who investigated these "no-poach" provisions in franchisee agreements. *See* Katie Reilly and Natalie West, *Antitrust Enforcement Is Top of Mind for State Attorneys General*, Bloomberg Law, July 17, 2023 (noting that several companies using a franchise model settled with 14 state attorneys general to cease use of no-poach agreements, and that the Washington Attorney General had signed 155 such agreements). The United States Department of Justice is also involved in investigating the role and impact of "no-poach" agreements. *See* Letter, ECF No. 146 (stating interest of U.S. Department of Justice Antitrust Division in this litigation). However, as noted by Plaintiff, these government actions have typically been forward-looking, seeking to eliminate "no-poach" terms from franchise agreements to prevent the damage they allegedly cause to workers. Compl. at ¶ 7. This class action litigation drew upon the work of government agencies, but the settlement addresses alleged harms not otherwise resolved by government action. This favor is therefore neutral.

### i. The Percentage Fee that Would have been Negotiated had the Case been Subject to a Private Contingent Fee Arrangement at the Time Counsel was Retained

**\*20** Plaintiffs' percentage fee request of 25% of the $2 million fund is a slightly lower percentage than is typically negotiated in private contingency fee cases. *See In re Aetna Inc.*, MDL No. 1219, 2001 WL 20928, at *14 (E.D. Pa. Jan. 4, 2001) ("[A]n award of thirty percent is in line with what is routinely privately negotiated in contingency fee tort litigation.); *In re Ikon Office Sols., Inc., Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000) ("[I]n private contingency fee cases ... plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery."). Class Counsel states that their customary fee in individual cases is in the range of 33%. Pl.'s Final Approval Br. at 29. The expenses of litigating this case were substantial, and their deduction from the fund results in a payment of only about 55% of the fund to the class members. It is not clear what proportion of these expenses were necessary for litigation for this particular settlement class, or to what extent these expenses were attributable to the original litigation of the nationwide class action claim. This factor weighs slightly in favor of approving Plaintiffs' fee request.

### j. Any Innovative Terms of Settlement

In the absence of any innovative terms, this factor neither weighs in favor nor against the proposed fee request.

Overall, the *Gunter*/*Prudential* factors demonstrate that Plaintiffs' request for $500,000 as an award of attorneys' fees, $320,465 in litigation expenses, and $68,132 for settlement administration expenses is reasonable.

### 2. Lodestar Method

After a district court applies the percentage-of-recovery method to determine whether a fee request is reasonable, it is sensible to also apply "an abridged lodestar analysis serving as a cross-check." *In re Rite Aid*, 396 F.3d at 305. But the lodestar cross-check "should not displace a district court's primary reliance on the percentage-of-recovery method." *In re AT&T Corp.*, 455 F.3d 160, 164 (3d Cir. 2006). "The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting. The district courts may rely on summaries submitted by the attorneys and need not review actual billing records." *In re Rite Aid*, at 306–307, (footnote omitted).

"The lodestar award is calculated by multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the

Fuentes v. Jiffy Lube Int'l, Inc., Not Reported in Fed. Supp. (2024)

2024 WL 2723840

experience of the attorneys." *Id.* at 305. "The crosscheck is performed by dividing the proposed fee award by the lodestar calculation, resulting in a lodestar multiplier." *In re AT & T*, 455 F.3d at 164. A negative lodestar multiplier "suggests that class counsel would not be overpaid for their services if compensated as requested, but it also suggests that counsel has a significant financial incentive to cut its losses and settle the lawsuits." *Baby Prods.*, 708 F.3d at 180 n.14.

Plaintiffs' counsel devoted at least 3,250 hours to this action, resulting in a lodestar award of $2,083,711 according to counsel's calculation. Pl.'s Final Approval Br. at 30. When Plaintiffs' fee request of $500,000 is divided by the lodestar award of $2,083,711, it results in a significant negative multiplier of .24. The negative multiplier suggests that Plaintiffs' fee request is reasonable.[10]

Class Counsel also requests payment of expenses and charges incurred in connection with the prosecution of this litigation in the amount of $320,465,[11] as well as payment of $68,132 for settlement administration. Together, the expenses and settlement administration costs total nearly 20% of the overall fund.

**\*21** "[T]here is no reason to reject the request for reimbursement of expenses that counsel have spent out of their own pockets in litigating an antitrust case." *In re Fasteners Antitrust Litig.*, Civil Action No. 08-md-1912, 2014 WL 296954, at \*8 (E.D. Pa. Jan. 27, 2014) (cleaned up) (quoting *In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2004 U.S. Dist. LEXIS 29162, at \*35–36 (E.D. Pa. Oct. 13, 2004)). Courts in this district have permitted expense reimbursements of this magnitude and for similar types of expenses in cases involving higher settlement amounts. *See, e.g. Fasteners*, 2014 WL 296954, at \*8 (reimbursing $337,667.72 in costs in the context of a $17.55 million settlement); *In re Flonase Antitrust Litig.*, 951 F. Supp.2d at 751 (approving reimbursement of economic expert fees, with total reimbursed expenses of over $2 million in context of $150 million settlement). While in hindsight, an expensive econometric analysis of the nationwide impact of Jiffy Lube's "no-poach" term is unnecessary to prove a case solely for Philadelphia-area class members, this was a reasonable expense at the time that Plaintiff's counsel was litigating a nationwide case. This expert report may also have been a useful tool in convincing Jiffy Lube to agree to a settlement for the regional class. Class Counsel's expenses, while high given the size of the eventual settlement, were reasonably incurred in prosecution of this case.

Because both the percentage-of-recovery method and the lodestar cross-check indicate that Plaintiffs' fee request is reasonable, I will approve Plaintiffs' request for $500,000 as an award of attorneys' fees, $320,465 in litigation expenses, and $68,132 for settlement administration expenses.

**D. Incentive Awards for Class Representatives**

Plaintiffs' request an incentive award of $5,000 the named class representative, Victor Fuentes, for his contributions to the case. "Incentive awards, also known as 'enhancement awards' or 'service payments,' are common in class actions that result in a common fund for distribution to the class." *Altnor v. Preferred Freezer Servs., Inc.*, 197 F. Supp. 3d 746, 769 (E.D. Pa. 2016). "The purpose of these payments is to compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation, and to reward the public service of contributing to the enforcement of mandatory laws." *Sullivan*, 667 F.3d at 333 n.65 (internal quotation marks omitted).

Plaintiffs cite to several cases in which district courts in this circuit have awarded named plaintiffs $5,000 or more. Pl.'s Final Approval Br. at 32 (citing *Myers v. Jani-King of Philadelphia*, No. 09-1738, 2019 WL 4034736, at \*10 (E.D. Pa. Aug. 26, 2019) ($10,000); *Caddick v. Tasty Baking Co.*, No. 2:19-CV-02106-JDW, 2021 WL 4989587, at \*10 (E.D. Pa. Oct. 27, 2021) ($5,000); *Copley v. Evolution Well Services Operating, LLC*, No. 2:20-CV-01442-CCW, 2023 WL 1878581, at \*4 (W.D. Pa. Feb. 10, 2023) ($10,000); *Baez-Medina v. Judge Group, Inc.*, No. 21-3534, 2023 WL 4633503, at \*9 (E.D. Pa. July 20, 2023) ($5,000)). Fuentes was involved in this case since its inception in 2018. He has made himself available to participate in settlement conferences, and he has provided documentation related to his own employment at a Jiffy Lube franchisee. Because Victor Fuentes provided information necessary to Plaintiffs' counsel for filing the complaint and for negotiating this Settlement Agreement, I will approve Plaintiffs' request for an incentive award of $5,000 to Mr. Fuentes.

**IV. Conclusion**

For the above reasons, I will grant Plaintiffs' motion for class certification and final approval of the Settlement. I will also grant Plaintiffs' motion for attorneys' fees, reimbursement of expenses, and incentive award to the class representative. Accordingly, I will approve Plaintiffs' requests for $500,000 as an award of attorneys' fees,

Fuentes v. Jiffy Lube Int'l, Inc., Not Reported in Fed. Supp. (2024)

2024 WL 2723840

$320,465 in litigation expenses, and $68,132 for settlement administration expenses. I will also approve Plaintiffs' request for an incentive award of $5,000 for the named class representative.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 2723840

Footnotes

1   Cayla Young participated in this lawsuit as a class representative from May 4, 2020 until July 25, 2022, when she was dismissed from the case by stipulation. First Amended Compl., ECF No. 53; Stipulation of Dismissal, ECF No. 92.

2   This exclusion provision was incorporated into the Settlement Agreement orally by party stipulation on the record at the Final Approval Hearing on May 8, 2024.

3   In 2003, Congress amended Rule 23 to include subdivision 23(g), which provides a non-exhaustive list of factors for a court to consider when scrutinizing the adequacy of class counsel's representation. *See* Fed R. Civ. P. 23(g). The addition was meant to transfer the analysis of class counsel's representation from Rule 23(a)(4), where it had little textual support, to Rule 23(g). *See* 1 William B. Rubenstein, Newberg on Class Actions § 3.80 (5th ed.). Rule 23(g) "builds on" the existing 23(a)(4) jurisprudence instead of "introducing an entirely new element into the class certification process." *See* Fed. R. Civ. P. 23(g) advisory committee's notes (2003 amendments). Accordingly, the Third Circuit continues to apply the factors relied on prior to the addition of Rule 23(g). *See In re Cmty. Bank of N. Va.*, 622 F.3d 275, 304-05 (3d Cir. 2010); *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 307 (3d Cir. 2005). Class Counsel's representation of the Class satisfies both Rule 23(a)(4) and 23(g).

4   Two other law firms have been involved on the plaintiff's side of this litigation: Paul LLP and Morgan & Morgan.

5   The two other Gibbs Law Group attorneys listed on ECF, Michael L. Schrag and George W. Sampson, do not appear to still be affiliated with the firm. *See* Ex. 3, Gibbs Law Group Firm Resume, ECF No. 175-5.

6   Jiffy Lube is represented by Andrea L. D'Ambra, Anne M. Rodgers, Eliot Fielding Turner, and Layne E. Kruse of Norton Rose Fulbright US LLP. Each of these attorneys is of counsel or a partner at the firm, with substantial experience in antitrust litigation, discovery and data, and/or class action litigation. *See* Norton Rose Fulbright People Search, available at https://www.nortonrosefulbright.com/en-us/people.

7   Effective December 1, 2018, Rule 23(e)(2) was amended to include the following considerations to guide a court's determination of the fairness, reasonableness, and adequacy of a settlement, whether:

> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
>> (i) the costs, risks, and delay of trial and appeal;
>>
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>>
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>>
>> (iv) any agreement required to be identified under Rule 23(e)(3); and
>
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). The Advisory Committee Notes recognize that prior to the addition in Rule 23(e)(2) of these explicit factors to consider, circuit courts had developed their own lists of factors to determine whether a settlement was fair, reasonable, and adequate. Fed. R. Civ. P. 23(e)(2) advisory committee's notes (2018 amendments). Moreover,

**Fuentes v. Jiffy Lube Int'l, Inc., Not Reported in Fed. Supp. (2024)**

2024 WL 2723840

the Advisory Committee Notes explain: "The goal of this amendment is not to displace any factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." *Id.* Notwithstanding the amendment of Rule 23(e)(2), the Third Circuit continues to advise district courts to assess the fairness, reasonableness, and adequacy of a settlement applying the *Girsh* factors, the relevant *Prudential* considerations, and the *Baby Products* direct benefit consideration. *See Google,* 934 F.3d at 329. Following this guidance from the Third Circuit, this Court will apply the *Girsh* factors, the relevant *Prudential* considerations, and the *Baby Products* direct benefit consideration to determine whether to approve the Settlement, with the understanding that these factors and considerations amply address "the core concerns and procedure and substance" listed in the amended Rule 23(e)(2). Fed. R. Civ. P. 23(e)(2) advisory committee's notes (2018 amendments).

8    Class members may provide their Social Security numbers but are not required to do so in order to receive payments.

9    1,379 hours were spent by Class Counsel Gibbs Law Group, 523 hours were spent by Paul LLP, and 1,365 hours were spent by Gustafson Gluec PLLC. Bloomfield Decl. at ¶ 15.

10   Admittedly, Class Counsel had "a significant financial incentive to cut its losses and settle the lawsuits," *Baby Prods.,* 708 F.3d at 180 n.14. But, given that a much higher recovery would have been possible if they continued litigating on behalf of a nationwide class, I defer to the attorneys' assessment that such continued litigation was too risky to justify jeopardizing recovery for this settlement class.

11   $265,343 is attributable to experts and consultants. Bloomfield Decl. at ¶ 16. $57,730 is attributable to copying, litigation support, postage, research, transcripts, and travel. *Id.*

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 5582251
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Stanford GLABERSON, et al.

v.

COMCAST CORPORATION, et al.

CIVIL ACTION NO. 03-6604
|
September 22, 2015

**Attorneys and Law Firms**

Alycia Regan Benenati, Ayana Rivers, Dana M. Seshens, David M. Max, Dorit Ungar, James T. Cain, Megan K. Zwiebel, Michael E. Hagenson, Michael S. Shuster, Sheron Korpus, Kasowitz Benson Torres & Friedman LLP, New York, NY, Christopher B. Hockett, Davis Polk & Wardwell LLP, Menlo Park, CA, Darryl J. May, Burt M. Rublin, Jason A. Leckerman, M. Norman Goldberger, Paul J. Koob, Ballard Spahr Andrews & Ingersoll, LLP, Philadelphia, PA, Arthur J. Burke, David B. Toscano, Jessica K. Foschi, Michael P. Carroll, Davis Polk & Wardwell, New York, NY, for Comcast Corporation, et al.

**MEMORANDUM**

Padova, District Judge

**\*1** Presently pending before the Court are Plaintiffs' Motion for Final Approval of Class Action Settlement (Docket Entry 621) and Plaintiffs' Motion for Award of Attorneys' Fees (Docket Entry 615).[1] Neither Motion is opposed by Defendants, and the Court has received only three objections from class members. A final fairness hearing was conducted on September 9, 2015, at which time no persons appeared to object to the settlement or the award of counsel fees. For the following reasons, the Motions are granted.

**I. The Class**
On December 12, 2014, the Court certified a settlement class consisting of:

All cable television customers who 1) currently subscribe or 2) previously subscribed at any time from

January 1, 2003 to December 31, 2008, to video programming services (other than solely to basic cable services) from Comcast, or any of its subsidiaries or affiliates, in the counties of Bucks, Chester, Delaware, Montgomery and Philadelphia, Pennsylvania. The Class excludes governmental entities, Defendants, Defendants' subsidiaries and affiliates and this Court.

(Docket Entry 614.) That same order appointed Stanford Glaberson as representative of the class, David Woodward, Esq. of Heins, Mills & Olson and Barry Barnett, Esq. of Susman Godfrey as co-lead class counsel, and Rust Consulting, Inc. as claims administrator.

**II. The Terms of the Settlement**
The settlement is valued at $50 million, comprising a cash component valued at $16,670,000, and a services component valued at $33,330,000. It provides different options for current and former subscribers. The essential terms include:

- Current subscribers could choose either (1) a one-time credit of $15 off their bill or (2) credits from a selection of Comcast services including six pay-per-view movies (valued at $35.94), four months of upgraded internet service (valued at either $40 or $38 depending on the subscriber's current level of service), or a two-month subscription to The Movie Channel (valued at $43.90).[2] Current subscribers who returned a claim form but made no choice, or who did not return a claim form, automatically receive a two month subscription to The Movie Channel.[3]

- **\*2** • Class members who no longer subscribe to Comcast services receive a cash payment of $15.

- The settlement provides that Class Counsel will seek up to $15 million for attorneys' fees, costs and expenses to be paid from the cash component of the settlement fund. (Id. ¶¶ 8.2.-8.3.)

- If the cash obligations exceed the value of the cash component, Comcast agrees to contribute additional cash to the settlement fund, with the amount of settlement credits for services to current subscribers correspondingly reduced.[4]

- If the cash obligations are less than the value of the cash component, Comcast shall pay the remaining cash pro rata to current subscriber members of the Class by issuing a one-time credit off their bills. (Id. ¶ 8.7.)

• There is no reverter of cash or services to Comcast. (Id. ¶ 8.1.)

## III. MOTION FOR APPROVAL OF FINAL SETTLEMENT

a. Standard for final approval.

Class action settlements must be approved by the Court. See Fed. R. Civ. P. 23(e) ("The claims, issues, or defenses of a certified class may be settled...only with the court's approval."). We consider whether the Settlement Agreement is fair, reasonable and adequate. In re Ins. Brokerage Antitrust Litig., 579 F.3d 241, 258 (3d Cir. 2009) (" 'Even if it has satisfied the requirements for certification under Rule 23, a class action cannot be settled without the approval of the court and a determination that the proposed settlement is fair, reasonable and adequate.' " (quoting In re Prudential Ins. Co. Am. Sales Practice Litig., 148 F.3d 283, 316 (3d Cir. 1998))). Where, as here, " 'settlement negotiations precede class certification, and approval for settlement and certification are sought simultaneously,' " the Court must protect absentee class members by applying an "even more rigorous, heightened standard." In re Pet Food Prods. Liab. Litig., 629 F.3d 333, 350 (3d Cir. 2010) (quoting In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 534 (3d Cir. 2004)) (internal quotation marks omitted). The purpose of this inquiry is "to protect the unnamed members of the class from unjust or unfair settlements." Ehrheart v. Verizon Wireless, 609 F.3d 590, 593 (3d Cir.2010). In making this determination, the Court acts as a "fiduciary, guarding the claims and rights of the absent class members." Id.

In determining whether the Settlement Agreement is fair, reasonable, and adequate, we consider the following nine factors ("the Girsh factors"):

(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

**\*3** Prudential, 148 F.3d at 317 (quoting Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975) (internal quotation and editorial marks omitted)). Whether a settlement is fair under these factors is a discretionary determination committed to the district judge. See, e.g., Eichenholtz v. Brennan, 52 F.3d 478, 482 (3d Cir. 1995).

In addition to the Girsh factors, we may also consider the following non-exclusive factors ("the Prudential factors"):

[T]he maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

Prudential, 148 F.3d at 323 (stating that because of a "sea-change in the nature of class actions" after Girsh was decided thirty-five years ago, it may be helpful to expand the Girsh factors).

b. Application

1. The Girsh Factors

A. Complexity, expense and likely duration of the litigation.

The initial Girsh factor considers "the probable costs, in both time and money, of continued litigation." In re Cendant Corp. Litig., 264 F.3d 201, 233 (3d Cir. 2001) (citation and internal quotation marks omitted). In applying this factor, courts recognize that antitrust class actions are " 'arguably the most complex action[s] to prosecute' " as " '[t]he legal and factual issues involved are always numerous and uncertain in outcome.' " In re Auto. Refinishing Paint Antitrust Litig., 617 F. Supp. 2d 336, 341 (E.D. Pa. 2007) (quoting In re Linerboard Antitrust Litig., 296 F. Supp. 2d 568, 577 (E.D. Pa. 2003)); see also In re Fasteners Antitrust Litig., Civ. A. No. 08-1912, 2014 WL 296954, at \*5 (E.D. Pa. Jan. 27, 2014) (observing

that "[l]ike many other antitrust cases, this case has involved complex issues and has been lengthy").

The Class argues that this case is a "paradigm example of a complex antitrust action." (Pl. Att'y Fee Mem. at 7.) It has extended over a decade, and required extensive briefing of complex legal and factual issues, exhaustive discovery efforts and extensive motion practice. Counsel undertook eleven years of work and advanced millions of dollars without any assurance of compensation. If the parties had not settled, significant additional work would have been required, including briefing and arguing Comcast's motion to strike Plaintiff's supplemental expert reports filed in support of Settlement Class certification. Trial would have involved extensive pretrial briefing and preparation and the marshalling, presentation and consideration of a very substantial evidentiary record. The Class argues that the prospect of a lengthy, complicated trial and the inevitable subsequent appeals underscore the appropriateness of the settlement. See In re Processed Eggs Prods. Antitrust Litig., 284 F.R.D. 249, 269 (E.D. Pa. 2012) (approving settlement where "considerable expenditures of financial resources and hours of attorney time relating to discovery for liability and damages" would be required for trial); In re Ikon Office Solutions, Inc. Sec. Litig., 194 F.R.D. 166, 179 (E.D. Pa. 2000) (noting that "the extremely large sums of money at issue almost guarantee that any outcome, whether by summary judgment or trial, would be appealed" and that "[t]his factor thus weighs in favor of the proposed settlement"). Finally, given Comcast's ability to fund the litigation, the Class asserts that, absent a settlement, the case would undoubtedly have continued for several more years and required extensive pretrial motion practice, a complicated trial, numerous post-trial motions and highly likely appeals, while the Settlement provides all members of the Settlement Class relief that is both significant and avoids further delay. See Sullivan v. DB Invs., Inc., 667 F.3d 273, 321 (3d Cir. 2011) (noting that "[w]e agree with the District Court's conclusion that litigation of the numerous legal and factual issues discussed would have inevitably contributed to the expense and duration of the proceedings" and that "the settlement provided substantial and immediate relief to the class without further expense"); In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 536 (3d Cir. 2004) (finding first Girsh factor favors settlement "because continuing litigation through trial would have required additional discovery, extensive pretrial motions addressing complex factual and legal questions, and ultimately a complicated, lengthy trial" and "it was inevitable that post-trial motions and appeals

would not only further prolong the litigation but also reduce the value of any recovery to the class").

**\*4** We agree that this factor weighs in favor of approval of the settlement. This litigation has been notably complex, lengthy and expensive. It has engendered three appeals to the United States Court of Appeals for the Third Circuit and consideration by the United States Supreme Court. The result before the Supreme Court essentially placed the Class back to square one in terms of the certification issue, significantly extending the duration of the litigation had a settlement not been reached.

## B. The reaction of the class to the settlement.

The deadline for requesting exclusion from the Settlement Class or objecting to the Settlement was June 10, 2015. Of an estimated class size of over 800,000 persons, the Settlement Administrator received only three requests for exclusion and the Court received only three objections. (Botzet Decl. ¶ 13-14.) Counsel contend that the number of claims submitted to date, the absence of significant numbers of objections and the small number of opt-outs requests "reflect positive support by Class members." (Pl. Att'y Fee Mem. at 9.) They contend that the $50 million Settlement Fund "is more than sufficient to pay all claims submitted by any and all Class Members." (Id.) Counsel submit that the strong positive response from Settlement Class Members, evidenced by the lack of substantial numbers of objections, favors a finding that the settlement is fair, reasonable and adequate. See Bell Atl. Corp. v. Bolger, 2 F.3d 1304, 1313-14 (3d Cir. 1993) (noting that "[l]ess than 30 of approximately 1.1 million class members objected" representing an "infinitesimal" fraction of the class); Stoetzner v. U.S. Steel Corp., 897 F.2d 115, 118-119 (3d Cir. 1990) (noting that "only" 29 objections from a 281 member class "strongly favors settlement"); Prudential, 148 F.3d at 318 (affirming determination that class response was favorable in light of facts that 19,000 policyholders out of 8 million opted out and 300 class members objected); Warfarin, 391 F.3d at 536 (noting that "[o]f the 1.8 million potential class members, 136 consumers and ten TPP claimants opted out...and two TPP claimants objected," and "[t]he District Court concluded that the insignificant number of objections filed weighed in favor of approving the settlement"); Sutton v. Med. Serv. Ass'n, Civ. A. No. 92-4787, 1994 WL 246166, at *9 (E.D. Pa. June 8, 1994) (stating that "[i]n litigation involving a large class, it would be extremely unusual not to encounter objections").

Of the three objections received by the Court and forwarded to Counsel, one is from a current subscriber, one is from a former subscriber, and the third does not specifically state her subscriber status. The current subscriber Objector is Carrie Chandler, who purchases services at two addresses within the Class area, one in Philadelphia and the other in Chester, Pennsylvania. She states:

> I am objecting to the Settlement offers because I believe that I'm entitled to money offer. During that time frame indicated where I had two accounts with Comcast (and still do) I have given them a lot of money for both accounts. I feel as though Comcast package that their offering is definitely not acceptable for the money given for both accounts and years of dedicated service.

(May 20, 2015 Obj. of Carrie Chandler.) The former subscriber Objector is Mark Rhoades of Medford, New Jersey.[5] He states:

> First, the value of the "Settlement Credits" is over-stated given that the actual value of the Settlement Credits depends on the settlement option selected by the consumer.... As such, inclusion of "Settlement Credits" as part of the "Settlement Fund" misrepresents the true value of the "Settlement Fund."...[T]he use of the misrepresented value...as a benchmark to determine the adequacy of counsel fees is improper.

> **\*5**  Second, given that the "Settlement Cash Amount" to be paid by Comcast under the settlement totals only $16,670,000, awarding counsel fees in the amount of $15,000,000 is unreasonable.

> Third, with only $16,700,000 to be provided for cash rebates to Former Subscribers, and given that the Class Counsel Fees of $15,000,000 are to be paid from the Settlement Fund, there is the possibility of insufficient funds to pay the Former Subscribers under the settlement.

> Fourth, given that the Settlement Agreement requires class counsel to provide notice to the Former Subscribers..., and given that the attorneys' fees to be paid to class counsel are also to be paid from the Settlement Cash Amount portion of the Settlement Fund, there is the possibility of a conflict of interest between class counsel and Former Subscribers possibly resulting in deficient notice to Former Subscribers.

(June 10, 2015 Obj. of Mark Rhoades.) The Objector whose subscriber status is not stated is Donna Recupito of Honeybrook, Chester County, Pennsylvania. She states:

> Comcast owes me a lot more than $15 or whatever they are proposing! I'm sure I'll never see it but it should be known that every month they promised 1 price + came up with much more pricing + of course they always made excuses + were ALWAYS right. It's ashamed that we even have to pay for TV.

(April 2015 Obj. of Donna Recupito.)

We overrule these objections. The Court is informed by Class Counsel that Objector Chandler opted for the cash benefit. Accordingly, the primary basis for her objection has no merit. We find that the factual assertions underlying the argument posed by Objector Rhodes are untrue. The record belies the assertion that the "Settlement Credits" misrepresent the true value of the Settlement Fund. Comcast has committed to provide those services, and the retail cost of those services has been used to value them as credits against the services portion of the Settlement Fund. His assertion that the "Settlement Cash Amount" will be insufficient to pay counsel fees and the cash settlements, rendering the award of counsel fees unreasonable and raising the possibility of a conflict of interest between counsel and the Class, is also inaccurate. The cash fund is sufficient to pay all cash claims received by the Settlement Administrator, even if the full amount of attorneys' fees and expenses is awarded by the Court. Finally, Objector Recupito appears to be dissatisfied with the amount of the cash benefit she will receive. We overrule this objection based on our overall consideration of the Girsh and Prudential factors as they apply to the amount of the settlement and find that the reaction of the class to the settlement weighs in favor of approving the settlement.

C. The stage of the proceedings and the amount of discovery completed.

The procedural stage of a case at the time of settlement provides a means to examine the question of "whether counsel had an adequately appreciation of the merits of the case before negotiating" the settlement. Warfarin, 391 F.3d at 537 (citations omitted). "[C]ourts generally recognize that a proposed class action settlement is presumptively valid where...the parties engaged in arm's length negotiations after meaningful discovery." Cullen v. Whitman Med. Corp., 197 F.R.D. 136, 144-45 (E.D. Pa. 2000). Settlements arrived at

following discovery "are more likely to reflect the true value of the claim." Boone v. City of Phila., 668 F. Supp. 2d 693, 712 (E.D. Pa. 2009) (citing Bell Atl. Corp., 2 F.3d at 1314).

*6 Class Counsel note that this litigation is of long duration, involved extensive discovery, motion practice, multiple trips through appellate courts, a decision by the United States Supreme Court on class certification issues, forty-seven depositions, the review of millions of pages of party and third-party documents, and the retention of multiple experts by the parties, who issued reports and almost all of whom were deposed. Based upon the voluminous record, the Court previously found "that the level to which this case was litigated supports a conclusion that the settlement was reached with full appreciation by counsel of the merits of the case." (Preliminary Approval Order at 9.) Class Counsel assert that they "unquestionably had a full 'appreciation of the merits of the case as well as the legal theories and risks.' " (Pl. Att'y Fee Mem. at 10 (quoting Pet Food Prods., 629 F.3d at 351).) They conclude that the third Girsh factor weighs strongly in favor of final approval. See Warfarin, 391 F.3d at 537 ("Based on the type and amount of discovery undertaken by the parties, the District Court concluded that class counsel adequately appreciated the merits of the case before negotiating, and we agree that this factor strongly favors approval of the settlement."). We agree that Class Counsel have a full appreciation of the strengths and weaknesses of their litigation position and find that this factor weighs in favor of approving the settlement.

D. The risks of establishing liability and damages.

Class Counsel argue that the fourth and fifth Girsh factors further support a finding that the settlement is fair, reasonable and adequate. The fourth factor, the risks of establishing liability, "examine[s] what the potential rewards (or downside) of litigation might have been had class counsel elected to litigate the claims rather than settle them." In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 814 (3d Cir. 1995). The fifth factor similarly " 'attempts to measure the expected value of litigating the action rather than settling it at the current time.' " Cendant, 264 F.3d at 238-39 (quoting GMC, 55 F.3d at 816). In applying these factors, "the Court need not delve into the intricacies of the merits of each side's arguments, but rather may 'give credence to the estimation of the probability of success proffered by [Class Counsel], who are experienced with the underlying case, and the possible defenses which may be raised to their

causes of action.' " Perry v. FleetBoston Fin. Corp., 229 F.R.D. 105, 115 (E.D. Pa. 2005) (citation omitted). Class Counsel assert that the Class would have prevailed at trial, including in establishing Comcast's liability, based on the extensive evidentiary record; however, "they also recognize that class action antitrust cases, like all complex litigation against companies ably represented by teams of talented defense counsel, carry inherent risks." (Pl. Att'y Fee Mem. at 11 (citing Lazy Oil, Co. v. Witco Corp., 95 F. Supp. 2d 290, 337 (W.D. Pa. 1997) (noting that "[h]ere, as in every case, Plaintiffs face the general risk that they may lose at trial, since no one can predict the way in which a jury will resolve disputed issues").) They assert that District Courts within the Third Circuit have granted final approval to settlements of antitrust class actions where, " '[a]s in any antitrust case, [there are] substantial risks of non-recovery, even after preliminary victories were achieved.' " (Id. (quoting In re Elec. Carbon Prods. Antitrust Litig., 447 F. Supp. 2d 389, 400 (D.N.J. 2006)).)

Class Counsel also assert that the Class would be able to prove damages at trial, while recognizing "the risks of a limited recovery or no recovery given the significant differences among the parties' competing experts on the issue of overcharge damages." (Id. at 12 (citing In re Remeron Direct Purchaser Antitrust Litig., Civ. A. No. 03-85, 2005 WL 3008808, at *8 (D.N.J. Nov. 9, 2005) (stating that "[t]he determination of damages is a complicated and uncertain process" and noting that given the conflicting damages expert reports, "[i]t is by no means certain that Plaintiffs would have succeeded in recovering the maximum measure of damages estimated by Plaintiffs' expert") (citations omitted); Elec. Carbon Prods., 447 F. Supp. 2d at 401 (discussing risks in proving antitrust damages at trial involving "a battle of experts addressing the measurement of...overcharges, which can become an esoteric exercise with unpredictable results"); In re Aetna Inc. Sec. Litig., Civ. A. No. MDL 1219, 2001 WL 20928, at *10 (E.D. Pa. Jan. 4, 2001) (noting that plaintiffs' damages theories were based primarily on testimony and reports of experts, so that plaintiffs risked rejection of its experts by either the court on a Daubert challenge or by the jury); and In re Prudential Ins. Co. of Am. Sales Practices Litig., 962 F. Supp. 450, 539 (D.N.J. 1997) (observing that "a jury's acceptance of expert testimony is far from certain, regardless of the expert's credentials")).)

*7 Counsel note that, in the Preliminary Approval Order, we pointed to the vigorous dispute between the parties' experts and Comcast's motion to strike the most recent reports of Dr.

McClave and Dr. Williams, underscoring the risks inherent in continued litigation. (Preliminary Approval Order, at 9 ("The parties' recent expert reports continue to reflect both the ongoing core litigation disputes of the parties and the inherent risks of continued litigation, reinforcing the fact that the Settlement falls within the range of reasonableness").) They argue that the Settlement, on the other hand, provides all Settlement Class Members with significant, certain benefits without further delay, and contend that the fourth and fifth Girsh factors support final approval of the Settlement. We agree that these factor weighs in favor of approval of the settlement.

E. The risk of obtaining and maintaining class certification through trial.

Counsel contend that the sixth Girsh factor also provides additional support for final approval. They note that Plaintiff's motion to certify the narrowed Philadelphia Settlement Class was pending at the time the Settlement Agreement was reached. While they believe "that the extensive evidentiary record before the Court fully supports class certification and would warrant continued certification through trial... [and anticipate] that a class would have been certified for litigation purposes," they also recognize that a court may decertify or modify a class action at any time, as we in fact did following the Third Circuit's decision in In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305 (3d Cir. 2008). (Pl. Att'y Fee Mem. at 13.) Because of this ever-present risk, courts have found the sixth Girsh factor to favor final approval of settlements. See Processed Egg Prods., 284 F.R.D. at 273 (stating that "[t]he Court of Appeals for the Third Circuit has recognized: There will always be a 'risk' or possibility of decertification, and consequently the court can always claim this factor weighs in favor of settlement") (citation and internal quotation marks omitted). Counsel note that the fact that our previous order re-certifying the class was reversed by the United States Supreme Court further underscores this inherent risk. (Pl. Att'y Fee Mem. at 13-14 (citing Remeron Direct Purchaser Antitrust Litig., 2005 WL 3008808, at *8 (noting that the parties' briefing "indicates that this is a hotly contested issue, with Defendants raising multiple and factual legal arguments in opposition to certification" and that "the risks faced by Plaintiffs with regard to class certification weigh in favor of approving the Settlement")).) We agree that this factor weighs in favor of approval of the settlement.

F. The ability of Defendant to withstand a greater judgment.

Counsel contend that the seventh Girsh factor neither favors nor disfavors the settlement, noting that "many settlements have been approved where a settling defendant has had the ability to pay greater amounts." (Pl. Att'y Fee Mem. at 14 (quoting In re Remeron End-Payor Antitrust Litig., Civ. A. Nos. 02-2007, 04-5126, 2005 WL 2230314, at *23 (D.N.J. Sept. 13, 2005)); see also Warfarin, 391 F.3d at 538 (noting, in affirming certification of a nationwide settlement class and final approval of a settlement, that "[a]lthough the plaintiffs do not dispute that DuPont's total resources far exceed the settlement amount, the fact that DuPont could afford to pay more does not mean it is obligated to pay any more than what the consumer and TPP class members are entitled to under the theories of liability that existed at the time a settlement was reached").) While the ability of a defendant to withstand a greater judgment is appropriately considered in cases where the settlement amount is less than what plaintiffs might ordinarily agree to because of a defendant's limited financial circumstances, see Reibstein v. Rite Aid Corp., 761 F. Supp. 2d 241, 254 (E.D. Pa. 2011), Counsel contend that such circumstances do not exist here as there is no record evidence that Comcast is financially unstable. They also argue that courts have recognized that "whether a defendant could pay more in settlement is not relevant when considered in a pure vacuum, divorced from considerations of whether the settlement is fair, reasonable and adequate when viewed in the light of the legal issues and facts involved in the case." (Pl. Att'y Fee Mem. at 14 (citing Warfarin, 391 F.3d at 538).) They assert that this case presented difficult legal issues and substantial risks, the Class would have necessarily spent substantial additional time and expenses in pursuing the case through trial and on appeal, and the settlement provides significant benefits to the Class. They conclude that, given this context, any ability of Comcast to pay more is not relevant in determining the reasonableness of the settlement. See id. (finding no error in district court's conclusion "that DuPont's ability to pay a higher amount was irrelevant to determining the fairness of the settlement"); Lazy Oil, Co., 95 F. Supp. 2d at 318 (stating that "[t]he Court presumes that Defendants have the financial resources to pay a larger judgment" but that "in light of the risks that Plaintiffs would not be able to achieve any greater recovery at trial, the Court accords this factor little weight in deciding whether to approve the proposed Settlement"); Perry, 229 F.R.D. at 116 (observing that defendant "could certainly withstand a much larger judgment" and that "[w]hile that fact weighs against

approving the settlement, this factor's importance is lessened by the obstacles the class would face in establishing liability and damages"); and Sullivan, 667 F.3d at 323 ("At bottom, we agree that, 'in any class action against a large corporation, the defendant entity is likely to be able to withstand a more substantial judgment, and, against the weight of the remaining factors, this fact alone does not undermine the reasonableness of the settlement.' ") (citation omitted). Cf. Dryer v. Nat'l Football League, Civ. A. No. 09-2182, 2013 WL 5888231, at *4 (D. Minn. Nov. 1, 2013) (reasoning that "there is no issue with the NFL's financial condition," that defendant is "fully able to pay what it has committed to pay" and "is also fully able to continue to litigate this matter vigorously and defend itself against the class's claims should it be necessary," and concluding that "[t]his factor [defendant's ability to pay] is neutral in the Court's analysis"). Thus, Counsel conclude, the seventh Girsh factor is neutral here, neither favoring nor disfavoring settlement.

**\*8** We agree that this is a neutral factor, neither favoring nor disfavoring approval of the settlement. Comcast's financial ability to withstand a larger judgment is offset by the relative strengths and weaknesses of the parties' litigation positions and the uncertainty of a more positive result for the Class had the litigation continued to conclusion.

G. The range of reasonableness of the settlement fund in light of the best possible recovery and all of the attendant risks of litigation.

The final pair of Girsh factor focuses on "whether the settlement represents a good value for a weak case or a poor value for a strong case." Warfarin, 391 F.3d at 538. These factors "test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." Id. (citing Prudential, 148 F.3d at 322). The Third Circuit has noted that " 'after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution.' " Prudential, 148 F.3d at 317 (quoting GMC, 55 F.3d at 806). Under Rule 23(e), a court "must determine whether the settlement is within a range that responsible and experienced attorneys could accept considering all relevant risks and factors of litigation." Remeron Direct Purchaser Antitrust Litig., 2005 WL 3008808, at *4.

Counsel contend that the settlement falls squarely within the range of settlements worthy of final approval as fair,

reasonable and adequate. They note that we previously determined the settlement to be "within the range of settlements worthy of final approval as fair, reasonable and adequate," stating that "[t]he Settlement Fund amount reflects a sound recovery in relation to the estimated single damages reflected in Dr. McClave's new report." (Preliminary Approval Order at 9.)

In the Preliminary Approval Order we stated:

> We find that Plaintiffs have shown that the relief available under the Settlement falls within the range of reasonableness, and there is a conceivable basis for presuming that the standard applied for final approval—fairness, adequacy, and reasonableness—will be satisfied. The stated \$50 million value of the Fund represents approximately 25% of the amount that Dr. McClave now opines is attributable to Comcast's deterrence of overbuilding in the five counties. This is a significant result given the uncertainty whether, absent the Settlement we would accept Dr. McClave's opinion as common proof, and the substantial risk that Plaintiffs would face in persuading a jury to accept Dr. Williams' liability theory and Dr. McClave's damages theory.

(Id. at 10.) We find no cause to change our opinion given that the Class has now received notice of the settlement terms and there has been so little opposition expressed to the reasonableness of the settlement. We also find that the result is eminently reasonable given the clear uncertainty of the Class enjoying a more positive result had the case been litigated to conclusion. Accord Sullivan, 667 F.3d at 324, 326 (noting that the class's expert estimated that the indirect purchaser plaintiff settlement fund represented an estimated 10.9% of such plaintiffs' single damages and the direct purchaser fund amounted to approximately 20% of their single damages and finding no abuse of discretion in "the District Court's conclusion that the proposed settlement offered a reasonable recovery"); Warfarin, 391 F.3d at 538 (stating that according to plaintiffs' expert's figures, "the \$44.5 million settlement fund is approximately 33% of available damages and well within a reasonable settlement range when compared with recovery percentages in other class actions") (citing Cendant, 264 F.3d at 241 (approving settlement providing 36%-37% recovery and noting typical recoveries in securities class actions range from 1.6% to 14%)); and Remeron End-Payor Antitrust Litig., 2005 WL 2230314, at *24 (noting that "an antitrust class action settlement may be approved even if the settlement amounts to a small percentage of the single damages sought, if the settlement was reasonable relative to other factors, such as the risk of no recovery" and concluding

that "[t]he Court is satisfied that the settlement agreement accounts for the risks inherent in this complex litigation and provides appropriate relief in light of these risks") (citation omitted).

**\*9** Accordingly, we find that all relevant Girsh factors favor final approval of the Settlement.

2. The Prudential Factors

A. Maturity of the underlying substantive issues.

This case settled long after completion of discovery and after more than a decade of vigorously contested litigation. The stage at which settlement occurs reflects "whether counsel had an adequate appreciation of the merits of the case before negotiating." In re GMC, 55 F.3d at 813. "Where [the] negotiation process follows meaningful discovery, the maturity and correctness of the settlement become all the more apparent." In re Elec. Carbon Prods. Antitrust Litig., 447 F. Supp. 2d at 400 (citing In re Linerboard Antitrust Litig., 292 F. Supp. 2d 631, 640 (E.D. Pa. 2003)). The fact that the underlying substantive issues were well-developed and well-known further supports approval of this settlement. See Chakejian v. Equifax Info. Servs., 275 F.R.D. 201, 215 (E.D. Pa. 2011) (finding that where the underlying substantive issues were "mature in light of the experience of the attorneys, extent of discovery, posture of the case, and mediation efforts undertaken," this factor supported settlement approval); In re Fasteners Antitrust Litig., Civ. A. No. 08-1921, 2014 WL 285076, at \*11 (E.D. Pa. Jan. 24, 2014) (noting that "[a] substantial amount of information has been provided to Settlement Class Counsel such that counsel are capable of making an informed decision about the merits of the case if it were to proceed to trial, and about the fairness of the settlement terms" and concluding that "[w]e are satisfied that the underlying substantive issues were well developed"). We find that this factor weighs in favor of approval of the settlement.

B. The right to opt-out of the settlement.

All members of the Philadelphia Settlement Class have been provided the opportunity to opt-out. Counsel assert that, of a class consisting of at least 800,000 members, only three requests for exclusion were received by the Settlement

Administrator. (Botzet Decl. ¶ 13.) Counsel assert that this response is further reflected in the small number of objections to date (id. ¶ 14), and favors final approval. We agree that this factor weighs in favor of approval of the settlement.

C. Reasonableness of attorneys' fees provisions.

Class Counsel seek an award of attorneys' fees and expenses of \$15 million. As detailed in Plaintiff's fee Motion, discussed *infra*, the requested fee and expense award of \$15 million (in combination representing 30% of the \$50 million settlement fund) consists of \$8,574,896.16 in expenses (approximately 17.15% of the settlement fund) and \$6,425,103.84 in attorneys' fees (approximately 12.85% of the settlement fund). (See Plaintiff's Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Payment of Service Award to Class Representative, Declaration of David Woodward with Exhibits A-T). Plaintiff's motion for fees and expenses and request for approval of a \$10,000 service award to Class Representative Stanford Glaberson, and the supporting memorandum and Declaration of David Woodward, have been posted on the dedicated settlement website and available to Class Members since January 15, 2015. (Botzet Decl. ¶ 4.) Counsel submit that these requests are fair and reasonable under the applicable legal standards and precedent discussed in their motion papers and supporting declarations and exhibits. As detailed in our discussion *infra*, we find that this factor weighs in favor of approval of the settlement.

**\*10** D. Reasonableness of the procedure for processing claims.

Counsel assert that the Settlement Administrator, Rust Consulting, Inc., is a highly experienced claims administrator who implemented the settlement pursuant to the Court's Preliminary Approval Order. (See id. ¶ 2.) The Settlement Agreement provided a simple method for class members to receive benefits under the settlement. Class members who are current Comcast subscribers were able to submit a claim form providing their name, address and Comcast account number. (See Settlement Agreement ¶ 8.8.1 and Ex. A.) Former subscribers who are class members were entitled to submit an equally simple claim form providing their name, the address where they formerly received Comcast service during the class period, their former Comcast account number, if known, and affirming, under penalty of perjury, that they subscribed to video programming services (other than solely to basic

cable services) from Comcast at any time between January 1, 2003 and December 31, 2008 in any one of the counties of Bucks, Chester, Delaware, Montgomery and Philadelphia, Pennsylvania. (Id. ¶ 8.8.2 and Ex. B.) Claims were submitted electronically or by mail. (Id. ¶ 8.8.3.)

Current subscribers who did not elect on their claim form either a $15 bill credit or from the free services automatically receive two free months of The Movie Channel (an estimated $43.90 value). (Id. ¶ 8.2.1.) The same is true of current subscribers who do not file a claim form. (Id.) Because there will be no reverter of any portion of the Settlement Fund to Comcast (id. ¶ 8.1), all cash and service benefits will be provided to class members pursuant to the settlement.

Counsel assert that the nature and fairness of the claims process support final approval. We agree that this factor weighs in favor of approval of the settlement.

c. Conclusion

In conclusion, it must be remembered that a settlement is, by its nature, a compromise. Neither party can expect to receive a perfect outcome. Rather, each must consider the strengths and weaknesses of their litigation position, and determine what is an optimal outcome. Applying the Girsh and Prudential factors, we conclude that the settlement is fair and reasonable and represents an optimal outcome for the Class. Accordingly, we grant final approval.

IV. MOTION FOR ATTORNEYS' FEES, COSTS, AND SERVICE AWARD

Class Counsel seek an award of attorneys' fees and reimbursement of litigation expenses in the total amount of $15 million. They assert that the total expenses necessarily and reasonably incurred to date by Lead Class Counsel and other Class Counsel in this litigation and for the benefit of the Class are $8,574,896.16.[6] Class Counsel request partial reimbursement of attorneys' fees reasonably incurred in this matter in the amount representing the difference between $15 million and the amount of total expenses. Thus, the attorneys' fees component of the $15 million requested fees and expenses request is $6,425,103.84 ($15,000,000 less current expenses). Counsel have provided billing records showing the hours expended by Class Counsel and corresponding lodestars. (See Pls.' Mot for an Award of Attorneys' Fees, Woodward Declaration, Ex. A.) The requested fee represents 12.85% of the gross Settlement Fund and 15.51% of the net Settlement Fund ($50 million less

expenses and requested service award, if approved). Class Counsel's collective lodestar in this case is $24,927,677.55, representing 61,511.58 hours expended in prosecuting this complex litigation for the benefit of the Class. The requested fee, if granted in full, would amount to a "negative" multiplier of approximately .26 of the total lodestar.

a. Attorneys' Fees

**11** The Supreme Court has "recognized consistently that...a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980). See also Boone, 668 F. Supp. 2d at 713; and In re Ikon Office Solutions, Inc. Sec. Litig., 194 F.R.D. at 192 (noting that "there is no doubt that attorneys may properly be given a portion of the settlement fund in recognition of the benefit they have bestowed on class members"). The common fund doctrine is anchored in the inherent powers of federal courts to "prevent...inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit." Boeing Co., 444 U.S. at 478; see also Fickinger v. C.I. Planning Corp., 646 F. Supp. 622, 632 (E.D. Pa. 1986) (noting that fees in common fund cases "are not assessed against the unsuccessful litigant (fee shifting), but rather are taken from the fund or damage recovery (fee spreading), thereby avoiding the unjust enrichment of those who otherwise would be benefited by the fund without sharing in the expenses incurred by the successful litigant").

The Third Circuit favors the percentage-of-recovery method of calculating fee awards in common fund cases. See In re AT&T Corp., Sec. Litig., 455 F.3d 160, 164 (3d Cir. 2006); In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 300 (3d Cir. 2005) (citing Prudential, 148 F.3d at 333. Courts within the Third Circuit and elsewhere routinely use this method in antitrust class actions. See, e.g., In re Fasteners Antitrust Litig., 2014 WL 296954, at *3 (stating that "[i]n practice, courts in the Third Circuit assess requests for attorney's fees in antitrust cases using the percentage-of-recovery method, and then cross-check the result with the lodestar method"); In re Flonase Antitrust Litig., 951 F. Supp. 2d 739, 746 (E.D. Pa. 2013) (noting that "[t]he latter method [percentage-of-recovery], is 'generally favored in cases involving a common fund....' ") (quoting Prudential, 148 F.3d at 333); Remeron Direct Purchaser Antitrust Litig., 2005 WL 3008808, at *12 (finding that "the percentage of fund method is the proper method for compensating Plaintiffs' Counsel in this common fund case"). The Third Circuit recommends that district courts

perform a lodestar cross-check to ensure that application of the percentage method results in an appropriate recovery. In re Rite Aid Corp. Sec. Litig., 396 F.3d at 305.

The Third Circuit has articulated factors for courts to consider in evaluating the reasonableness of a fee request under the percentage-of-recovery method:

(1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000). We need not find that all of the Gunter factors are satisfied in order to grant the fee request. See, e.g., Meijer, Inc. v. 3M, Civ. A. No. 04-5871, 2006 WL 2382718, at *21-22 (E.D. Pa. Aug. 14, 2006) (noting that although time spent litigating the case was relatively low when the case settled after one year, other Gunter factors outweighed that fact). The Third Circuit has also indicated that other factors from In re Prudential Insurance Co. America Sales Practices Litigation may be considered:

(1) the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to the efforts of other groups, such as government agencies conducting investigations; (2) the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained; and (3) any "innovative" terms of settlement.

**\*12** In re AT&T Corp. Sec. Litig., 455 F.3d at 165-66 (citing Prudential, 148 F.3d at 338, 340, 339). Counsel assert that the application of all relevant factors provides support for their requested fee.

### 1. Application of the Gunter Factors

#### A. Size of the Fund; Number of Persons Benefited

As noted earlier, the Settlement Fund is $50 million and the parties estimate that the Class consists of at least 800,000 persons. (Settlement ¶ 8.1; Woodward Decl. ¶ 55.) Counsel argue that the Settlement provides significant, certain benefits to the Class in the form of cash payments or bill credits for

services. For the reasons already discussed, we find that this factor weighs in favor of granting the Motion.

#### B. Objections

Also as noted earlier, the Court received only three objections from class members, which we have overruled. We find this factor weighs in favor of granting the Motion.

#### C. Skill and Efficiency of the Attorneys

In appointing Lead Class Counsel for the Settlement Class pursuant to Fed. R. Civ. P. 23(a)(4), we noted that Lead Class Counsel "have extensive experience and expertise in antitrust, class action and complex litigation, and have successfully prosecuted antitrust class actions and similar cases in courts in this district and throughout the United States, including, for the last decade, this Action." (Preliminary Approval Order at 4.) Lead Class Counsel assert that they have:

deep experience prosecuting and trying complex antitrust actions. Lead Class Counsel and other Class Counsel devoted substantial time and resources to this case to perform services including developing the factual basis of the claims, working closely with experts, filing numerous pleadings, defeating multiple challenges to those pleadings, engaging in extensive motion practice, conducting significant discovery and litigating all contested issues before this Court, as well as class certification issues before the Third Circuit and the Supreme Court.

(Pl. Att'y Fee Mem. at 12; Woodward Decl. ¶ 59.) They note that they faced formidable opposition from nationally recognized law firms with extensive antitrust and class action experience who rigorously defended the case, and argue that this factor further supports Class Counsel's motion. We find that skill, efficiency, expertise, and professionalism of all counsel involved in this litigation have been exemplary and that this factor weighs in favor of granting the Motion.

#### D. Complexity and Duration of the Litigation

The complexity and duration of the litigation is "the first factor a district court can and should consider in awarding fees." Gunter, 223 F.3d at 197. Counsel note that courts have recognized that an "antitrust class action [is] perhaps

the most complex case[ ] to litigate," Bradburn Parent Teacher Store, Inc. v. 3M, 513 F. Supp. 2d 322, 338-39 (E.D. Pa. 2007); see also In re Linerboard Antitrust Litig., 296 F. Supp. 2d 568, 577 (E.D. Pa. 2003), and assert that they have diligently prosecuted this litigation on behalf of the Class for almost eleven years in the face of vigorous opposition from Defendants' highly skilled counsel. (Pl. Att'y Fee Mem. at 10.) Counsel assert their work involved "careful, thorough research, crafting pleadings that would advance Plaintiff's case through the crucible of extensive litigation of Comcast's several pleading challenges, contested arbitration proceedings at the district and appellate court levels, briefing and arguing Comcast's motion for summary judgment, review of over five million pages of documents, depositions of 47 witnesses, submission by the parties of 37 expert reports and testimony, and highly contested class certification proceedings before this Court, the Third Circuit and the Supreme Court." (Id.) They also note that they filed their Motion prior to the completion of their work on the case; that they do not seek additional reimbursement for the time devoted to implementing the Court-approved Class notice program, working with the claims administrator in the settlement administration process, responding to inquiries from Class members, drafting papers in support of final approval of the Settlement, and preparing for and appearing at the final approval hearing. We find that this factor weighs in favor of granting the Motion.

### E. Risk of Nonpayment

**\*13** "A determination of a fair fee must include consideration of the sometimes undesirable characteristics of a contingent antitrust action[ ], including the uncertain nature of the fee, the wholly contingent outlay of large out-of-pocket sums by plaintiffs, and the fact that the risk of failure and nonpayment in an antitrust case are extremely high." Remeron Direct Purchaser Antitrust Litig., 2005 WL 3008188, at \*14; see also Gunter, 223 F.3d at 195 n.1, 199 (explaining that the risk counsel takes in prosecuting a client's case should also be considered in assessing a fee award). Lead Class Counsel note that they "undertook this litigation on a wholly contingent basis, understanding from the outset that they were embarking on a long and costly litigation through a shifting legal landscape, all the while confronting highly skilled lawyers who would vigorously advocate Defendants' cause and facing uncertainty about whether they would ever receive any compensation for their enormous investment of time and money in advancing the

interests of the Class." (Woodward Decl. ¶ 63.) They contend that this case presented a host of risks and uncertainties that could have precluded any recovery. (Id. ¶ 65.) Although they continued to believe that the record evidence would establish Defendants' liability and prove damages on a class-wide basis at trial, Lead Class Counsel assert that they "agreed to the Settlement on behalf of the Class after considering a variety of factors, primarily the significant benefits of the $50 million recovery to the Class. A variety of factors made the outcome at trial uncertain, including the difficulty a jury might have in grasping the economic testimony and deciding highly complex issues, as well as decisions by the Court that impacted Plaintiff's case." (Id. ¶ 67.) They note that we have observed that the Settlement represents "a significant result given the uncertainty whether, absent the Settlement we would accept Dr. McClave's opinion as common proof, and the substantial trial risks that Plaintiffs would face in persuading a jury to accept Dr. Williams' liability theory and Dr. McClave's damages theory." (Preliminary Approval Order at 10.) Finally, they note that, even if Class Counsel successfully tried the case, Plaintiff still would have faced likely and lengthy appeals. They assert that this factor further supports approval of the requested award.[7] We agree that this factor weighs in favor of granting the Motion.

### F. Amount of Time Devoted

Class Counsels' collective lodestar is $24,927,677.55, representing 61,511.58 hours expended in prosecuting this case over nearly eleven years. (Woodward Decl. ¶ 70.) Counsel note that this amount does not include any amount for ongoing and anticipated future work in responding to Class member inquiries, managing implementation of components of the Class notice program, assisting and monitoring the claims administrator, drafting Plaintiff's memorandum in support of final approval of the Settlement, and participating in the final approval hearing. As we discuss below, the total lodestar when compared to the amount requested weighs in favor of granting the Motion.

### G. Awards in Similar Cases

Counsel assert that their requested fee award is well below the level of awards made in similar antitrust cases. They note that courts within the Third Circuit frequently award fees of one-third of the value of class action settlements. (Pl. Att'y Fee Mem. at 16 (citing In re Tricor Direct Purchaser

Antitrust Litig., Civ. A. No. 05-340, slip op. at 9-10 (ECF No. 543) (D. Del. April 23, 2009) (awarding one-third fee on settlement of $250 million); In re Flonase Antitrust Litig., 951 F. Supp. 2d 739, 751 (E.D. Pa. 2013) (awarding one-third fee on settlement of $150 million); Remeron Direct Purchaser Antitrust Litig., 2005 WL 3008808, at *17 (awarding one-third fee on settlement of $75 million); In re Wellbutrin SR Antitrust Litig., C.A. No. 04-5525, slip op. at 14 (ECF No. 413) (E.D. Pa. Nov. 21, 2011) (awarding one-third fee on settlement of $49 million); In re Wellbutrin XL Antitrust Litig., Civ. A. No. 08-2431, slip op. at 8 (ECF No. 485) (E.D. Pa. Nov. 7, 2012) (awarding one-third fee on settlement of $37.5 million); In re Metoprolol Succinate Antitrust Litig., Civ. A. No. 06-52, slip op. at 9 (ECF No. 194) (D. Del. Feb. 21, 2012) (awarding one-third fee on settlement of $20 million); In re Fasteners Antitrust Litig., 2014 WL 296954, at *7 (awarding one-third fee on settlement of $17.55 million); and Rochester Drug Coop., Inc. v. Braintree Labs., Inc., Civ. A. No. 07-142, slip op at 9 (ECF No. 243) (D. Del. May 31, 2012) (awarding one-third fee on settlement of $17.5 million)).)

**\*14** Counsel note that, in contrast to that benchmark, their requested award represents only 15.51% of the net common fund ($50 million less expenses). We find that this factor weighs in favor of granting the Motion.

## 2. Application of the Prudential Factors

### A. Value of Benefits

The value of benefits accruing to class members that is attributable to the efforts of class counsel, as opposed to the efforts of others is also a factor to be considered. See Prudential, 148 F.3d at 339-40. Counsel assert that the development and prosecution of this case was based entirely on the investigation and efforts of Class Counsel, and, unlike some antitrust class actions, did not follow on the heels of any government lawsuit or investigation. See AT&T Corp., Sec. Litig., 455 F.3d at 173 (noting that where class counsel was not aided by the efforts of any government group, this strengthened the district court's conclusion that the fee award was fair and reasonable). They assert that the Settlement's substantial benefits to the Class are attributable solely to the efforts of Lead Class Counsel and other Class Counsel. (Woodward Decl. ¶¶ 12 and 72.) We agree that this factor weighs in favor of granting the Motion.

### B. Privately Negotiated Percentage Fee

Counsel argue that the requested fee award is further supported by considerations of the considerably higher fee that would be expected to be privately negotiated in contingency fee litigation. See, e.g., In re Aetna Inc. Sec. Litig., 2001 WL 20928, at *14 (Padova, J.) (stating that "the Court concludes that an award of thirty percent is in line with what is routinely privately negotiated in contingency fee tort litigation") (citations omitted). We agree that this factor weighs in favor of granting the Motion.

### 3. Lodestar Cross-Check

The Third Circuit has embraced the use of a lodestar cross-check to ensure that application of the percentage-of-recovery method does not result in too large a fee recovery. Rite Aid, 396 F.3d at 305-06; see also In re Aetna Inc. Sec. Litig., 2001 WL 20928, at *14. Once the lodestar is calculated by multiplying the number of hours counsel reasonably expended by a reasonable billing rate for such services (see Hensley v. Eckerhart, 461 U.S. 424, 433 (1983)), "[t]he total lodestar estimate is then divided into the proposed fee calculated under the percentage method" and "[t]he resulting figure represents the lodestar multiplier to compare to multipliers in other cases." Manual for Complex Litigation (Fourth) § 14.122 (2014). Where the lodestar is greater than the requested fee award, however, the court may dispense with a cross-check. See Fleisher v. Fiber Composites, LLC, Civ. A. No. 12-1326, 2014 WL 866441, at *15 (E.D. Pa. March 5, 2014) ("Where, as here, counsel requests a fee that represents less than their lodestar, 'there is no need to discuss multipliers and the appropriateness of an increase to the lodestar.'") (citing Chakejian v. Equifax Info. Servs., LLC, 275 F.R.D. 201, 217 (E.D. Pa. 2011) (finding that the provision of attorneys' fees and costs contained in the settlement agreement was "eminently reasonable, judging from the lodestar")).

That is the case here. Class Counsel's collective lodestar total, $24,927,677.55, exceeds the requested fee award, yielding a multiplier of only 0.26. (Woodward Decl. ¶ 53.) Counsel assert that, although a lodestar cross-check "may not be necessary in this case, it is still instructive to note that the 0.26 multiplier here is far less than the multiplier of 1 to 4 or higher commonly approved in other similar class actions." (Pl. Att'y Fee Mem. at 20 (citing Bradburn, 513 F. Supp. 2d

at 341 (stating that "[t]he Third Circuit has recognized that multipliers 'ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied' " (citations omitted)); Segen v. OptionsXpress Holdings Inc., 631 F. Supp. 2d 465, 477 (D. Del. 2009) (multiplier of 2.06); In re Tricor Direct Purchaser Antitrust Litig., Civ. A. No. 05-340, slip op. at 9 (ECF No. 543) (D. Del. April 23, 2009) (multiplier of 3.93); In re Warfarin Sodium Antitrust Litig., 212 F.R.D. 231, 263 (D.Del. 2002) (multiplier of 1.33); Remeron Direct Purchaser Antitrust Litig, 2005 WL 3008808, at *17 (noting that awarded multiplier of 1.86 is on the "low end of the spectrum" (citation omitted)); Nichols v. SmithKline Beecham Corp., Civ. A. No. 00-6222, 2005 WL 950616, *24 (E.D. Pa. Apr. 22, 2005) (approving multiplier

of 3.15); In re Linerboard Antitrust Litig., No. MDL 1261, Civ. A. Nos. 98-5055, 99-1000, 99-1341, 2004 WL 1221350, at *16 (E.D. Pa. June 2, 2004) (approving a 2.66 multiplier)).

**\*15** Class Counsel have submitted to Lead Class Counsel reports itemizing for each attorney and paralegal (1) their historical hourly rate; (2) a description of the services rendered; (3) the number of hours spent performing the services; and (4) the resulting lodestar—i.e., the product of the hourly rate times the total number of hours. These reports also itemize all expenses incurred by the firms in prosecuting this litigation.[8] The following chart summarizes each law firms' lodestar declarations:

| FIRM | HOURS | LODESTAR |
|---|---|---|
| Berger & Montage, P.C. | 445.00 | $153,853.50 |
| Bolognese & Assoc., LLC | 2,564.50 | $1,027,357.50 |
| Cohen & Malad, LLP | 831.40 | $273,245.50 |
| Donner & Co. Law Offices LLC | 80.00 | $17,998.75 |
| Fine, Kaplan and Black, RPC | 907.20 | $302,546.50 |
| Freed Kanner London & Millen LLC | 1,491.10 | $750,576.00 |
| Freedman Boyd Hollander Goldberg Urias & Ward, P.A. | 3,453.27 | $929,997.50 |
| Heins Mills & Olson, P.L.C. | 33,145.50 | $13,086,595.00 |
| Hoffman & Edelson, LLC | 1,573.80 | $707,189.00 |
| Kaplan Fox & Kilsheimer LLP | 2,446.25 | $884,111.25 |
| Keller Rohrback L.L.P. | 1,476.10 | $619,273.55 |
| Lieff Cabraser Heimann & Bernstein, LLP | 274.10 | $128,467.00 |
| Mager & Goldstein, LLP | 422.25 | $174,707.50 |
| Mager White & Goldstein, LLP | 48.50 | $21,862.50 |
| Pomerantz, LLP | 7.30 | $5,621.00 |
| Shepherd, Finkleman, Miller & Shah, LLP | 27.90 | $13,361.00 |
| Susman Godfrey, L.L.P. | 11,807.16 | $5,642,067.00 |
| **TOTAL** | **61,511.58** | **$24,927,677.55** |

We find that the lodestar cross-check confirms the reasonableness of Class Counsel's fee request.

### b. Reimbursement of Expenses

The Third Circuit recognizes that attorneys who create a common fund for the benefit of a class are entitled to reimbursement from the fund of the reasonable litigation expenses advanced on behalf of the class. See, e.g., In re Cendant Corp. PRIDES Litig., 243 F.3d 722, 732 n.12 (3d Cir. 2001) (quoting the 1985 Task Force Report for the conclusion that the "common-fund doctrine...allows a person who maintains a lawsuit that results in the creation, preservation, or increase of a fund in which others have a common interest, to be reimbursed from that fund for litigation expenses incurred"); see also AT&T Corp., Sec. Litig., 455 F.3d at 172 n.8 ("[e]xpenses are generally considered and reimbursed separately from attorneys' fees"); Warfarin, 212 F.R.D. at 263 (approving costs and expenses reimbursements out of litigation fund as reasonable). Courts routinely approve such expenses incurred in the prosecution of complex cases. See, e.g. In re OSB Antitrust Litig., Civ. A. No. 06-826, slip op at 9 (ECF No. 947) (E.D. Pa. Dec. 9, 2008) (approving class counsel's fee request because "[t]his complex lengthy matter involved some eighty depositions, the creation and maintenance of a huge case database, and the preparation and review of expert economic analyses and reports"); Remeron Direct Purchaser Antitrust Litig., 2005 WL 3008808, at *17 (finding the following expenses to be reasonable: " '(1) travel and lodging, (2) local meetings and transportation, (3) depositions, (4) photocopies, (5) messengers and express services, (6) telephone and fax, (7) Lexis/Westlaw legal research, (8) filing, court and witness fees, (9) overtime and temp work, (10) postage, (11) the cost of hiring a mediator, and (12) NJ Client Protection Fund—pro hac vice' " (quoting Oh v. AT&T Corp., 225 F.R.D. 142, 154 (D.N.J. 2004))).

 *16  Class Counsel have requested reimbursement of $8,574,896.16 for out-of-pocket expenses incurred to date in this litigation. Class Counsel assert that they have "incurred these reasonable and necessary expenses over the course of more than a decade, all the while having no assurance of repayment." (Woodward Decl. ¶ 51-52.) The largest component of these expenses comprises payments to economic experts retained by the Class. Plaintiff's expert witness fees total $6,703,918.74. (Pl. Att'y Fee Mem. at 21.) Other significant expenses include the costs associated with storing millions of pages of documents on secure databases; travel to depositions, court hearings and mediation across the country; court reporting expenses; photo and data copying and computerized legal research. (See Woodward Decl., Exs. C-T.)

We find that the requested reimbursement is reasonable.

### c. Service Award for Class Representative

Class Counsel also request that the Court approve a service award of $10,000 to Plaintiff Stanford Glaberson, who has served as Class representative since the inception of this litigation. The Court-approved class notice informed the Class that Plaintiff would seek this award.

Courts recognize the purpose and appropriateness of service awards to class representatives. See, e.g., In re CertainTeed Fiber Cement Siding Litig., 303 F.R.D. 199, 225 (E.D. Pa. 2014) (noting that '[t]he purpose of these payments is to compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation, and to reward the public service of contributing to the enforcement of mandatory laws" (citing Sullivan, 667 F.3d at 333 n.65); In re Residential Doors Antitrust Litig., Civ A. Nos. 94-3744, 96-2125, MDL 1039, 1998 WL 151804, at *9 (E.D. Pa. Apr. 2, 1998) (approving awards of $10,000 each to four class representatives); In re Linerboard Antitrust Litig., 2004 WL 1221350, at *19 (approving awards of $25,000 for each of five class representatives); and Mayer v. Driver Solutions, Inc., Civ. A. No. 10-1939, 2012 WL 3578856, at *5 (E.D. Pa. Aug. 17, 2012) (approving $15,000 service award for class representative).

Class Counsel assert that Plaintiff has performed a " ' 'public service of contributing to the enforcement of mandatory laws.' ' " (Pl. Att'y Fee Mem. at 23 (quoting Chakejian, 275 F.R.D. at 220).) They note that Plaintiff has actively participated in the litigation, has provided Class Counsel with documents and information concerning his subscription to non-basic services from Comcast, was deposed twice (on January 26, 2006 and October 18, 2006), has monitored the litigation through contact with counsel, and has attended a hearing before this Court. (Woodward Decl. ¶¶ 78-79.) Counsel assert that the requested service award is appropriate in light of the risk and sacrifices made by Plaintiff during the more than 10 years this litigation was prosecuted.

We find that a service award of $10,000 to Stanford Glaberson for his service as Class representative is reasonable.

## V. CONCLUSION

For the reasons stated, the Court finds that the settlement of this highly contested litigation is fair and reasonable, and we grant final approval. We also (1) approve Class Counsels' attorneys' fee and expense application and enter an order awarding counsel fees and expenses in the amount of $15 million, consisting of $6,425,103.84 in attorneys' fees and $8,574,896.16 in expenses, and (2) approve a service award in the amount of $10,000 for Class Representative Stanford Glaberson.

An appropriate Order and a Final Judgment will be entered.

### All Citations

Not Reported in Fed. Supp., 2015 WL 5582251

Footnotes

1    By Order dated December 12, 2014 (Docket Entry 614), the Court granted Plaintiffs' unopposed Motion for Certification of a Settlement Class and Preliminary Approval of Class Action Settlement (the "Preliminary Approval Order").

2    Class Counsel advised the Court in their submission that, while the Settlement Agreement provides the choice of the receipt of pay-per-view movies, Comcast has advised them that preexisting contractual provisions prevent offering this alternative to commercial subscribers. Comcast was unable to include this information in the notices that its billing vender mailed to its commercial subscribers. On March 20, 2015, the Claims Administrator mailed those subscribers a supplemental postcard notice, advising of this limitation of their choices. Our consideration of the fairness of the settlement includes this change.

3    At the hearing, the Court expressed concern that current subscribers who never returned a claim form would not be aware of their entitlement to a two month subscription to The Movie Channel without some form of supplemental notice advising them of the subscription's commencement. The parties agreed that Comcast would provide a bill insert to those subscribers containing that information. Our consideration of the fairness of the settlement includes this change.

4    All counsel concur that, in granting Plaintiffs' counsel the full amount of the fees and expenses they request, totaling $15 million, the cash fund would have sufficient resources to satisfy all cash claims that have been made by class members.

5    We note that Medford, New Jersey is not part of the Class area, and Mr. Rhoades does not state whether he received Comcast services at an address within the Class area. We nonetheless consider the merits of his objection.

6    Not included in Class Counsels' lodestar submission are the fees and expenses incurred by the law firm of Adkins, Kelson & Zavez, P.C., which has submitted its own fee petition (Docket Entry 618). The Zavez firm has expended 879.15 hours on behalf of the Class and submitted a total lodestar of $354,494.50. (May 8, 2015 Decl. of John Peter Zavez ¶ 4.) Lead Class Counsel inform the Court that the Zavez firm's fee will be apportioned from the total amount awarded as fees by the Court, in the same manner as for all other law firms that have performed services for the Class. Accordingly, we will separately grant the Zavez firm's Motion, subject to the provisions contained in the Final Judgment for the apportioning of fees amongst law firms that have performed services for the Class. Our discussion of the attorneys' fee issues addresses all applications that have been made to the Court.

7    The Class has also appended a Declaration from Professor Eric Green, who mediated the settlement, discussing the substantial risks both sides faced in this litigation. (See Decl. of Eric Green, Docket Entry No. 608-4 at 6 (noting that Defendants "could not be sure of a favorable jury verdict" and faced the risk that "if the Class proved liability at trial, a jury could award damages far in excess of the settlement" and that "the Class faced serious obstacles to establish liability and certifying a class" and faced the risk that "the jury could have awarded damages much less than those sought by the Class or the amount of the settlement.").) Professor Green appropriately observed that "[b]oth sides also faced the risk that a jury could react unfavorably to the evidence presented" and that "continued litigation posed great risk for both sides.". (Id.)

8    Those individual attorney Declarations are attached as Exhibits C-T to the Woodward Declaration: David Woodward, Heins Mills & Olson, P.L.C. (Ex. C); Barry Barnett, Susman Godfrey, L.L.P. (Ex. D); Joseph Goldberg, Freedman Boyd Hollander Goldberg Urias & Ward, P.A. (Ex. E); Martin I. Twersky, Berger & Montague, P.C. (Ex. F); Anthony J. Bolognese, Bolognese & Associates, LLC (Ex. G); Scott D. Gilchrist, Cohen & Malad, LLP (Ex. H); Benjamin J. Brown, Cohen Milstein Sellers & Toll, PLLC (Ex. I); Ted A. Donner, Donner & Company Law Offices LLC (Ex. J); Roberta D. Liebenberg, Fine,

Kaplan and Black, R.P.C. (Ex. K); Douglas A. Millen, Freed Kanner London & Millen LLC (Ex. L); Marc H. Edelson, Hoffman & Edelson, LLC (Ex. M); Richard J. Kilsheimer, Kaplan Fox & Kilsheimer, LLP (Ex. N); Mark A. Griffin, Keller Rohrback L.L.P. (Ex. O); Annika K. Martin, Lieff Cabraser Heimann & Bernstein, LLP (Ex. P); three Declarations of Jayne A. Goldstein, for time and expenses incurred while at the law firms of Mager & Goldstein, LLP (Ex. Q), Mager White & Goldstein, LLP (Ex. R), and Pomerantz, LLP (Ex. S); and Natalie Finkelman Bennett, Shepherd, Finkelman, Miller & Shah, LLP (Ex. T).

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

In re Cigna-American Specialty Health Administrative Fee..., Not Reported in Fed....

2019 Employee Benefits Cas. 323,995

2019 WL 4082946
United States District Court, E.D. Pennsylvania.

IN RE CIGNA-AMERICAN
SPECIALTY HEALTH
ADMINISTRATIVE FEE LITIGATION

This Document Relates to: All Actions
Carol Lietz, et al., on behalf of themselves
and all others similarly situated, Plaintiffs,

v.

Cigna Corporation; Connecticut General
Life Insurance Company; Cigna Health
and Life Insurance Company; American
Specialty Health Incorporated; and American
Specialty Health Group, Inc., Defendants.

Case No. 2:16-cv-03967-NIQA
|
Filed 08/29/2019

## MEMORANDUM OPINION

NITZA I. QUIÑONES ALEJANDRO, Judge

## INTRODUCTION

 *1  Before this Court is a *motion for final approval of the settlement agreement* filed by Plaintiffs Carol Lietz, Kathleen Kilroy, Jianliang Zhu and Joyce Allen (collectively, "Plaintiffs") pursuant to Federal Rule of Civil Procedure ("Rule") 23, [ECF 93], and a *motion for an award of attorneys' fees to class counsel, reimbursement of class counsel's expenses, and service award to plaintiffs.* [ECF 96]. Previously, this Court granted preliminary approval to the Class Action Settlement Agreement. [ECF 90]. A hearing was scheduled and held on August 16, 2019, to entertain oral argument on Plaintiffs' unopposed motion for final approval. Counsel for all parties appeared. For the reasons stated herein, the motion for final approval of the class action settlement and motion for attorneys' fees and expenses are both granted.

## BACKGROUND

Plaintiff Carol Lietz ("Ms. Lietz") initially brought her claims against Defendants Cigna Corporation, Connecticut General Life Insurance Company, and Cigna Health and Life Insurance Company (collectively, "Cigna"), and American Specialty Health Incorporated and American Specialty Health Group, Inc. (collectively, "ASH," and together with Cigna, "Defendants") in the Eastern District of Pennsylvania as part of *High Street Rehabilitation, LLC, et al. v. American Specialty Health Inc., et al.,* Civ. A. No. 12-7243. This Court dismissed the claims, but the Court of Appeals for the Third Circuit ("Third Circuit") affirmed in part and reversed and remanded in part. *Am. Chiropractic Ass'n v. Am. Specialty Health Inc.,* 625 F. App'x 169 (3d Cir. 2015). Following the remand, Ms. Lietz dismissed her claims and brought them as part of a separate case filed in November 2015 related to Cigna's administrative fees claims in the District of Colorado: *Fayuell v. Cigna Corp.,* Civ. A. No. 15-1581. Defendants filed motions to dismiss in the Colorado action, which the court granted in part and denied in part, leaving only Ms. Lietz's claims. In July 2016, the *Lietz* Action was transferred to this Court and coordinated with *High Street* for discovery purposes.

The related actions, *Kilroy v. Cigna Corporation, et al.,* Civ. A. No. 18-1557, and *Zhu v. Cigna Corporation, et al.,* Civ. A. No. 18-2927, were filed on April 13, 2018, and May 23, 2018, respectively. Defendants moved to dismiss both of those cases, and Plaintiffs opposed the motions. Defendants' motions to dismiss the *Kilroy* and *Zhu* actions remained pending at the time the parties entered into the underlying settlement (the "Settlement"). As part of the Settlement, Class Counsel filed an Amended Complaint consolidating *Lietz, Kilroy,* and *Zhu* under the *Lietz* docket number and restyling the caption as *In re Cigna-American Specialty Health Administration Fee Litigation.*

The parties engaged in extensive document and data discovery in the *Lietz* and *High Street* Actions for nearly two years, which included the following:

- Responses to extensive sets of document requests and interrogatories;

- Negotiation of a Protective Order (including special provisions to protect class members' medical information to ensure compliance with HIPAA);

 *2 - Negotiation of ESI and Claims Sampling Protocols approved by the Court;

- Production of over 200,000 documents representing over 1.5 million pages;

In re Cigna-American Specialty Health Administrative Fee..., Not Reported in Fed....

2019 Employee Benefits Cas. 323,995

- Production of multiple databases and claims samples from Cigna and ASH representing over 500 gigabytes of data;

- Intensive negotiations over various document, data production, and other discovery issues, including numerous telephone conferences and email exchanges; exchange of over 100 letters; and numerous meet and confers regarding various disputes;

- Extensive work by database experts to sync the various Cigna and ASH databases in order to evaluate liability and damages issues;

- The preparation of a comprehensive deposition and "trial map" synthesizing the analysis of all documents and information produced by the parties and obtained via Class Counsel's continuing investigation; and

- Preparation for depositions.

On November 13, 2018, the parties participated in a mediation session before David Geronemus, Esquire, of JAMS. In connection with the mediation, the parties exchanged extensive mediation briefs that set forth the legal and factual bases related to the parties' respective claims and defenses. After extensive negotiations, the parties reached an agreement to settle Settlement Class Members' claims for $8.25 million, plus a commitment from Defendants to take reasonable steps to implement certain business reforms.

**The Terms of the Settlement**

The Settlement, the full terms of which are set forth in the Settlement Agreement, provides substantial economic benefits to the Class. The Settlement creates a total settlement fund of $8.25 million. Based on Lead Counsel's analysis of Defendants' existing data production, under the proposed *pro rata* plan of allocation, even after deduction of attorneys' fees and administrative expenses, Settlement Class Members who made out-of-pocket payments towards Administrative Fees will automatically be mailed checks that, on average, represent a full or near-full recovery of the actual amounts they paid. The Settlement also requires Cigna to make reasonable efforts to enact certain business reforms related to the conduct challenged by Plaintiffs. These business reforms are designed such that Cigna will provide more disclosure about how it calculates benefits and plan member cost-sharing responsibility for entities such as ASH. As consideration for

these settlement benefits, Defendants will receive a mutual release of all claims between the parties.

Notably, Defendants will be required to pay the Settlement Class benefits automatically. The Settlement Class Members who made out-of-pocket payments towards Administrative Fees will not need to file a claim or take any other steps to receive the payments due to them under the Settlement.

**Preliminary Approval and Class Notice**

On March 26, 2019, Plaintiffs filed a *motion for preliminary approval of class action settlement, provisionally certifying settlement class, directing notice to the settlement class, and scheduling final approval hearing.* [ECF 86]. By Order dated April 8, 2019, this Court granted preliminary approval to the proposed Settlement and provisionally certified the proposed class. Pursuant to this Court's preliminary approval order, AB Data sent notice to the relevant governmental officials under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715, *et seq.,* effected publication notice, and sent direct postcard notice to Settlement Class members in accordance with the plan for notice, which this Court found to be the best notice practicable under the circumstances and consistent with the requirements of due process. Notice was mailed to over 1.5 million Settlement Class members. No objections were filed and only eleven (11) Settlement Class Members opted-out of the Settlement. Both Class Counsel and AB Data followed up with all Settlement Class members who made inquiries or had questions.

**DISCUSSION**

**\*3** When granting final approval of a class action settlement, a district court must hold a hearing and conclude that the proposed settlement is fair, reasonable and adequate. *See* Fed. R. Civ. P. 23(e)(2); *Sullivan v. DB Invs., Inc.,* 667 F.3d 273, 295 (3d Cir. 2011); *In re Ins. Brokerage Antitrust Litig.,* 579 F.3d 241, 258 (3d Cir. 2009). Although there is a strong judicial policy in favor of voluntary settlement agreements, *Pennwalt Corp. v. Plough,* 676 F.2d 77, 79-80 (3d Cir. 1982), courts are generally afforded broad discretion in determining whether to approve a proposed class action settlement. *Eichenholtz v. Brennan,* 52 F.3d 478, 482 (3d Cir. 1995). "The law favors settlement particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab.,*

In re Cigna-American Specialty Health Administrative Fee..., Not Reported in Fed....

2019 Employee Benefits Cas. 323,995

55 F.3d 768, 784 (3d Cir. 1995). In addition to conservation of judicial resources, "[t]he parties may also gain significantly from avoiding the costs and risks of a lengthy and complex trial." *Id.*

In *Girsh v. Jepson,* 521 F.2d 153 (3d Cir. 1975), the Third Circuit set forth factors (often called the "*Girsh* factors") a district court should consider when reviewing a proposed class action settlement. The *Girsh* factors are:

(1) the complexity, expense and likely duration of the litigation;

(2) the reaction of the class to the settlement;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the risks of establishing liability;

(5) the risks of establishing damages;

(6) the risks of maintaining the class action through the trial;

(7) the ability of the defendant to withstand a greater judgment;

(8) the range of reasonableness of the settlement fund in light of the best possible recovery; and

(9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*In re Ins. Brokerage Antitrust Litig.,* 579 F.3d at 258 (citing *Girsh,* 521 F.2d at 157). However, no one factor is dispositive. *Hall v. Best Buy Co.,* 274 F.R.D. 154, 169 (E.D. Pa. 2011). Further, a "court may approve a settlement even if it does not find that each of [the *Girsh*] factors weighs in favor of approval." *In re N.J. Tax Sales Certificate Antitrust Litig., 750 F. App'x 73, 77 (3d Cir. 2018).*

In *Krell v. Prudential Ins. Co. of Am. (In re Prudential),* 148 F.3d 283 (3d Cir. 1998), the Third Circuit identified additional nonexclusive factors (the "*Prudential* factors") for courts to consider for a "thorough going analysis of settlement terms." *See also In re Pet Food Prods. Liab. Litig.,* 629 F.3d 333, 350 (3d Cir. 2010). These *Prudential* factors often overlap with the *Girsh* factors, and include:

(1) the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions,

the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages;

(2) the existence and probable outcome of claims by other classes and subclasses;

(3) the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved or likely to be achieved for other claimants;

(4) whether class or subclass members are accorded the right to opt-out of the settlement;

(5) whether any provisions for attorneys' fees are reasonable; and

(6) whether the procedure for processing individual claims under the settlement is fair and reasonable.

*In re Pet Food,* 629 F.3d at 350. Only the *Prudential* factors relevant to the litigation in question need be addressed. *In re Prudential,* 148 F.3d at 323-24.

**\*4** With these principals in mind, this Court will consider each of the *Girsh* factors and the relevant *Prudential* factors in its review of the proposed class action settlement.

### *Girsh* Factors

*1. The complexity, expense and likely duration of the litigation*

Needless to say, had the Settlement not been reached, this matter would likely have proceeded to trial on the issues of liability and a determination of damages, if any. The continued prosecution of Plaintiffs' claims against Defendants would have required significant additional expense to the Class and a substantial delay before any potential recovery. Though at the time the parties reached the Settlement, the parties had vigorously litigated this case for more than seven years and engaged in extensive fact discovery, much work remained, including fact depositions, expert discovery, and motion practices with respect to class certification and summary judgment. Further, no matter the outcome of a trial, it is likely that one or all of the parties would have appealed, leading to further litigation costs and delay in any realized recovery. Thus, the avoidance of unnecessary expenditure of time and resources benefits all parties, and weighs in

favor of approving the settlement. *See In re Gen. Motors,* 55 F.3d at 812 (concluding that lengthy discovery and potential opposition by the defendant were factors weighing in favor of settlement).

*2. The reaction of the class to the settlement*

"The Third Circuit has looked to the number of objectors from the class as an indication of the reaction of the class." *In re Certainteed Corp. Roofing Shingle Prods. Liab. Litig.,* 269 F.R.D. 468, 485 (E.D. Pa. 2010) (citing *In re Cendant Corp. Litig.,* 264 F.3d 201, 234-35 (3d Cir. 2001)). "Courts have generally assumed that 'silence constitutes tacit consent to the agreement.' " *In re Gen. Motors,* 55 F.3d at 812 (quoting *Bell Atl. Corp. v. Bolger,* 2 F.3d 1304, 1313 n.15 (3d Cir. 1993)). A low number of objectors or opt-outs is persuasive evidence of the proposed settlement's fairness and adequacy. *Serrano v. Sterling Testing Sys., Inc.,* 711 F. Supp. 2d 402, 415 (E.D. Pa. 2010) (citing *In re Cendant,* 264 F.3d at 234-35).

Here, Defendants identified more than 1.5 million individuals who meet the Class definition. Those individuals identified as potential Class members were mailed notices and Class forms. As of the date of the final approval hearing held on August 16, 2019, no Class Member had objected to the proposed settlement and only eleven (11) members had opted out. This factor is persuasive evidence of the fairness and adequacy of the proposed settlement, and weighs in favor of a final approval. *See In re Cendant,* 264 F.3d at 234-35 (finding that a low number of objectors and opt-outs strongly favors approval of the settlement).

*3. The stage of the proceedings and the amount of discovery completed*

The third *Girsh* factor "captures the degree of case development that class counsel [had] accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *In re Cendant,* 264 F.3d at 235. When evaluating this third *Girsh* factor, courts must evaluate the procedural stage of the case at the time of the proposed settlement to assess whether counsel adequately appreciated the merits of the case while negotiating. *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 537 (3d Cir. 2004). "[C]ourts generally recognize that a proposed class settlement is presumptively valid where ... the parties engaged in arm's

length negotiations after meaningful discovery." *Cullen v. Whitman Med. Corp.,* 197 F.R.D. 136, 144-45 (E.D. Pa. 2000). Settlements reached following discovery "are more likely to reflect the true value of the claim." *Boone v. City of Phila.,* 668 F. Supp. 2d 693, 712 (E.D. Pa. 2009) (citing *Bell Atl. Corp.,* 2 F.3d at 1314).

**\*5**  As set forth above, this case has been actively litigated from its commencement. Prior to reaching a settlement, the parties briefed multiple motions to dismiss, engaged in extensive discovery and negotiations over discovery issues, and participated in a successful private mediation. As a result of the extensive proceedings that preceded the parties' settlement, the parties had ample opportunity to identify and grasp the strengths and weaknesses of each party's case. Consequently, this Court finds that this factor weighs in favor of approval.

*4. The risks of establishing liability*

This *Girsh* factor weighs the likelihood of ultimate success against the benefits of an immediate settlement. The existence of obstacles, if any, to the plaintiff's success at trial weighs in favor of settlement. *In re Warfarin,* 391 F.3d at 537; *In re Prudential,* 148 F.3d at 319. This factor should be considered to "examine what potential rewards (or downside) of litigation might have been had class counsel decided to litigate the claims rather than settle them." *In re Cendant,* 264 F.3d at 237 (quoting *GM Trucks,* 55 F.3d at 814). "The inquiry requires a balancing of the likelihood of success if 'the case were taken to trial against the benefits of immediate settlement.' " *Wallace v. Powell,* 288 F.R.D. 347, 369 (M.D. Pa. 2012) (quoting *Prudential II,* 148 F.3d at 319).

In this case, after considering the parties' various substantive filings, the outcome of this matter with respect to liability is far from certain. Defendants have denied any liability throughout this litigation. The proposed settlement, of course, avoids the risk that Defendants be found not liable. Thus, this Court finds that this factor weighs in favor of approval.

*5. The risks of establishing damages*

This factor "attempts to measure the expected value of litigating the action rather than settling it at the current time." *In re Cendant,* 264 F.3d at 238-39. The Court looks at the potential damage award if the case were taken to trial against

the benefits of immediate settlement. *Prudential II,* 148 F.3d at 319. In *Warfarin Sodium I,* the trial court found that the risk of establishing damages strongly favored settlement, observing that "[d]amages would likely be established at trial through a 'battle of experts,' with each side presenting its figures to the jury and with no guarantee whom the jury would believe." *In re Warfarin Sodium Antitrust Litig.,* 212 F.R.D. 231, 256 (D. Del. 2002), *aff'd* 391 F.3d 516, 537 (3d Cir. 2004). Similarly, in *In re Cendant,* the Third Circuit reasoned that there was no compelling reason to think that "a jury confronted with competing expert opinions" would accept the plaintiff's damages theory rather than that of the defendant, and thus the risk in establishing damages weighed in favor of approval of the settlement. 264 F.3d at 239. The same is likely true here. Accordingly, this factor weighs in favor of approval.

### 6. The risks of maintaining the class action through trial

Because "the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the [class] action," *In re Gen. Motors,* 55 F.3d at 817, this factor measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial. As noted above, this action has been vigorously litigated by both sides from the outset. As such, it is likely that the issue of class certification would have been the subject of vigorous dispute. Further, even if class certification were granted in this matter, class certification can always be reviewed or modified before trial, so "the specter of decertification makes settlement an appealing alternative." *Skeen v. BMW of N. Am., Ltd. Liab. Co.,* 2016 WL 4033969, at * 15 (D. N.J. July 26, 2016). Accordingly, this factor weighs in favor of approval.

### 7. The ability of defendants to withstand a greater judgment

 **\*6**  This factor considers "whether the defendants could withstand a judgment for an amount significantly greater than the settlement." *In re Cendant,* 264 F.3d at 240. Though the parties acknowledge that Defendants have the ability to withstand a judgment greater than the settlement amount, where the defendants' ability to pay greatly exceeds the potential liability, this factor is generally neutral. *In re CertainTeed Corp. Roofing Shingle Prods. Liab. Litig.,* 269 F.R.D. 468, 489 (E.D. Pa. 2010). This Court finds that this factor is neutral.

### 8-9. The range of reasonableness of settlement in light of best and possible recovery and all attendant risks of litigation

The last two *Girsh* factors, often considered together, evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case. *In re Warfarin,* 391 F.3d at 538. In order to assess the reasonableness of a settlement in cases seeking monetary relief, "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement." *In re Prudential,* 148 F.3d at 322.

In light of the questions of fact and law present in this litigation, the value of the proposed settlement substantially outweighs the mere possibility of future relief. Here, the Class is receiving a significant settlement amount which offers real economic benefits to Class Members. Class Members do not have to submit claims, but instead those who made out-of-pocket payments towards Administrative Fees will be automatically mailed checks to offset the financial responsibility they incurred for services from an ASH-contracted provider. The Settlement also requires Cigna to make reasonable efforts to make changes to its policy templates for summary plan descriptions to add additional disclosure regarding the manner in which it calculates Plan benefits and Plan Member cost-sharing responsibility for entities such as ASH. As previously noted, the expense of a trial and use of the parties' resources would have been substantial, especially in conjunction with the post-trial motions and appeals that would have likely followed any trial on the merits. Thus, a settlement is advantageous to all parties. Therefore, these factors weigh in favor of approval.

### Relevant *Prudential* Factors

### 1. Factors that bear on the maturity of the underlying substantive issues

This case was settled at a mature point in the proceedings. As discussed above, there has been significant discovery on the merits and Class Counsel is aware of the complexity and risk inherent in a trial on the merits. In addition, the parties participated in a meaningful and successful private mediation. As such, the litigants were in a position to fully evaluate the strengths, weaknesses, and merits of their case. The advanced

development of the record weighs in favor of approval. *See Chakejian v. Equifax Info. Servs., LLC,* 275 F.R.D. 201, 215 (E.D. Pa. 2011) (finding settlement reasonable where underlying substantive issues were "mature in light of the experience of the attorneys, extent of discovery, posture of case, and mediation efforts undertaken.").

*2. Results achieved by settlement for individual Class Members versus the results achieved - or likely to be achieved - for other claimants*

This factor weighs in favor of approval since very few class members opted out and all Settlement Class Members will receive Settlement benefits automatically without having to take any action.

*3. Whether Class or Subclass Members are afforded the right to opt out of the settlement*

**\*7**  As part of the Class notice process approved by this Court, Settlement Class members were provided robust notice and the opportunity to opt-out. Only a very small number of members in relation to the overall class size chose to opt-out.

*4. Whether any provisions for attorneys' fees are reasonable*

As part of the Class notice process approved by this Court, Class members were advised that Plaintiff would seek an award of attorneys' fees of no more than one-third of the settlement amount. No potential member of the Class objected to such an award. Moreover, for the reasons discussed in greater detail below, the attorneys' fees and expenses sought and agreed to in this case are reasonable. Thus, this factor weighs in favor of approval.

*5. Whether the procedure for processing individual claims under the class action settlement is fair and reasonable*

The claims processing procedures put in place by the Settlement are fair and reasonable. Indeed, Settlement Class Members who made out-of-pocket payments towards Administrative Fees will receive checks automatically without the need to fill out and submit claim forms. This factor supports approval of the settlement.

In summary, in light of the presumption of fairness that attaches to the settlement, *see In re Warfarin,* 391 F.3d at 539, and upon consideration of each of the *Girsh* factors and the relevant *Prudential* factors, this Court finds that the proposed class action settlement is fair and reasonable.

**Class Certification**

As noted, by Order dated April 8, 2019, this Court provisionally certified the following proposed class:

> Collectively, any Plan Member whose Plan benefits and/or cost share under a Plan were determined based on ASH's charges to Cigna through the Final Approval Date for the following types of services: chiropractic, acupuncture, massage therapy, naturopathy, physical therapy, or occupational therapy.

Notwithstanding, this Court must again determine whether class certification is appropriate under Rule 23. *In re Prudential,* 148 F.3d at 308.

A plaintiff seeking class certification must satisfy all requirements of Rule 23(a) and at least one of the requirements of Rule 23(b). *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* 568 U.S. 455, 465 (2013); *see also Marcus v. BMW of North America,* 687 F.3d 583, 590 (3d Cir. 2012). "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule." *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350 (2011). A district court's analysis of a motion for class certification "must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim.' " *Amgen Inc.,* 568 U.S. at 465-66 (quoting *Dukes,* 131 S. Ct. at 2551). However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent - but only to the extent - that they are relevant to determining whether Rule 23 prerequisites for class certification are satisfied." *Id.* "Factual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence." *In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305, 320 (3d Cir. 2008).

**\*8**  To satisfy the Rule 23(a) requirements:

(1) the class must be "so numerous that joinder of all members is impracticable" (numerosity); (2) there must be "questions of law or fact common to the class" (commonality); (3) "the claims or defenses of the

representative parties" must be "typical of the claims or defenses of the class" (typicality); and (4) the named plaintiffs must "fairly and adequately protect the interests of the class" (adequacy of representation, or simply adequacy).

*Marcus,* 687 F.3d at 590-91 (citations omitted).

Here, Plaintiffs seek certification of the proposed class, as provisionally certified, pursuant to Rule 23(b)(3). This Rule permits certification when the court finds that "questions of law or fact common to class members predominate over any questions affecting only individual members" and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

*Rule 23(a)* Requirements

*1. Numerosity*

Under Rule 23(a)(1), the court must determine whether the potential class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Stewart v. Abraham,* 275 F.3d 220, 226-27 (3d Cir. 2001). Although "Rule 23(a)(1) does not require a plaintiff to offer direct evidence of the exact number and identities of the class members ... in the absence of direct evidence, a plaintiff must show sufficient circumstantial evidence specific to the products, problems, parties, and geographic areas actually covered by the class definition to allow a district court to make a factual finding." *Hayes,* 725 F.3d at 357. "Only then may the court rely on 'common sense' to forgo precise calculations and exact numbers." *Id.*

Here, the Settlement Class includes more than 1.5 million Settlement Class Members. Given the number and geographic distribution of the Settlement Class Members, joinder of all Settlement Class Members would be impracticable, and the proposed Settlement Class satisfies Rule 23's numerosity requirement for settlement purposes. *Liberty,* 149 F.R.D. at 73.

*2. Commonality and Typicality*

Pursuant to Rule 23(a)(2), a court must determine whether "there are questions of law or fact common to the class," ordinarily known as "commonality." Fed. R. Civ. P. 23(a)(2). Under the Rule, commonality "requires the plaintiff to demonstrate that the class members 'have suffered the same injury.' " *Wal-Mart,* 131 S.Ct. at 2551. It "does not require identical claims or facts among class member[s]." *Marcus v. BMW of North America, LLC,* 687 F.3d 583, 597 (2012) (citations omitted). "For purposes of Rule 23(a)(2), even a single common question will do." *Id.* Claims common to the entire class "must depend on a common contention ... [that is] of such a nature that it is capable of classwide resolution ... [and] that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart,* 131 S.Ct. at 2551.

**\*9** Under Rule 23(a)(3), a court must also determine whether "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality and commonality are closely related and often merge. *Marcus,* 687 F.3d at 597. Typicality, however, "derives its independent legal significance from its ability to 'screen out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present.' " *Id.* at 598. "If a plaintiff's claim arises from the same event, practice, or course of conduct that gives rise[ ] to the claims of the class members, factual differences will not render that claim atypical if it is based on the same legal theory as the claims of the class." *Id.*

Typicality ensures that the putative class members' and representative's interests "are aligned 'so that the latter will work to benefit the entire class through the pursuit of [their] own goals.' " *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 183 (3d Cir. 2001) (citations omitted). Typicality is met "when the named plaintiffs and the proposed class members 'challenge [ ] the same unlawful conduct.' " *Thomas v. SmithKline Beecham Corp.,* 201 F.R.D. 386, 394 (E.D. Pa. 2001) (quoting *Baby Neal for and by Kanter v. Casey,* 43 F.3d 48, 58 (3d Cir. 1994)). Complete "factual similarity is not required; just enough factual similarity so that maintaining the class action is reasonably economical and the interests of other class members will be fairly and adequately protected in their

In re Cigna-American Specialty Health Administrative Fee..., Not Reported in Fed....

2019 Employee Benefits Cas. 323,995

absence." *In re Sobering Plough Corp. ERISA Litig.,* 589 F.3d 585, 598 (3d Cir. 2009).

Here, a single overarching common question—whether Defendants' Administrative Fee practice to in-network services provided through ASH violated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*—cuts across every claim of every Settlement Class Member. *Rodriquez v. Nat'l City Bank,* 726 F.3d 372, 832 (3d Cir. 2013) ("[T]here may be many legal and factual differences among the members of a class, as long as all were subjected to the same harmful conduct by the defendant."). In addition, Plaintiffs assert the same ERISA claim, under the same legal theories for the same wrongful conduct as the other Settlement Class Members. As such Rule 23(a)(2) and (3)'s requirements of common question of law or fact and typicality are satisfied.

*3. Adequacy*

Under Rule 23(a)(4), a court must determine whether the proposed class representative "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To meet the adequacy requirement, a finding must be made that (1) plaintiff's interests do not "conflict with those of the class" and (2) the proposed class counsel are "capable of representing the class." *Newton,* 259 F.3d at 185. The Third Circuit has "recognized that the linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class," *Dewey v. Volkswagen Aktiengesellschaft,* 681 F.3d 170, 183 (3d Cir. 2012), and "not proof of vigorous pursuit of the claim." *In re Community Bank of Northern Virginia,* 418 F.3d 277, 307 (3d Cir. 2005). This requirement serves "to ensure that the putative named plaintiff has the incentive to represent the claims of the class vigorously." *Dewey,* 681 F.3d at 184.

Here, there is no conflict between the proposed Class Representatives and the Class because, as with all members of the Class, Plaintiffs seek compensation for the same claims from the same Defendants. Plaintiffs have no interests that are antagonistic to or in conflict with the Class they seek to represent and their alleged injuries are identical to those suffered by Settlement Class Members. In addition, Class Counsel have substantial experience prosecuting large-scale class actions, including ERISA class actions against health insurers. Accordingly, both prongs of the adequacy inquiry are met.

*Rule 23(b)(3) Requirements*

**\*10** Having found that Plaintiffs have satisfied each of the Rule 23(a) prerequisites, this Court must determine pursuant to Rule 23(b) whether "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). These two requirements are generally referred to as the "predominance and superiority" factors.

*1. Predominance*

The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623 (1997). Issues common to the class must "predominate" over individual issues. *In re Prudential Ins. Co. Am. Sales Practice Litig.,* 148 F.3d 283, 313-14 (3d Cir. 1998). "Because the 'nature of the evidence that will suffice to resolve a question determines whether the question is common or individual,' 'a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case.' " *In re Hydrogen Peroxide,* 552 F.3d at 311 (quoting *Blades v. Monsanto Co.,* 400 F.3d 562, 566 (8th Cir. 2005)).

The predominance requirement is met here. Plaintiffs allege that each Settlement Class member was subject to the Administrative Fee practice for in-network services provided through ASH. As such, the claims of each similarly situated Settlement Class Member address the same issues of law and fact. Accordingly, this Court finds that the questions of law or fact common to class members that involve liability predominate over questions involving only individual members.

*2. Superiority*

Under the second criterion of Rule 23(b), this Court must find that a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b). The superiority element requires courts "to

Case 4:21-cv-00196-MWB    Document 261-1    Filed 01/20/26    Page 51 of 287

In re Cigna-American Specialty Health Administrative Fee..., Not Reported in Fed....
2019 Employee Benefits Cas. 323,995

balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods of adjudication.' " *Community Bank of Northern Virginia,* 418 F.3d at 309 (citations omitted). A "nonexhaustive list of factors pertinent to a court's 'close look' " at the superiority requirement is found in the text itself. *Amchem,* 521 U.S. at 615-16. The list includes:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D). The superiority inquiry is simplified in the settlement context, because when certifying a settlement only class, the Court need not inquire whether the case, if tried, would pose intractable management problems, for the purpose of the settlement is to not have a trial. *Amchem,* 521 U.S. at 620. In making this analysis, the district court may take the proposed settlement into consideration. *Prudential II,* 148 F.3d at 308; *Warfarin Sodium II,* 391 F.3d at 529 ("When dealing with variations in state laws, the same concerns with regards to case manageability that arise with litigation classes are not present with settlement classes, and thus those variations are irrelevant to certification of a settlement class.").

 **\*11**  Here, a class action is the superior method of resolving the Settlement Class Members' claims. All of the Settlement Class Members' claims are based upon the same basic operative facts and legal standards. It would be a far better use of judicial resources to adjudicate all of these identical issues once, on a common basis. In addition, the Settlement provides Settlement Class Members the ability to obtain predictable, certain, and definite compensatory relief promptly. By contrast, individualized litigation carries with it great uncertainty, risk, and costs, and provides no guarantee that injured Settlement Class Members will obtain timely compensatory relief at the conclusion of the litigation. Accordingly, this Court finds that consideration of the Rule 23(b) factors weighs favorably for certification. Because of the number and nature of potential class plaintiffs and the fact that each member's potential recovery is likely to be small compared to the cost of litigating an individual case, maintaining this matter as a class action is judicially advisable and superior to other available methods.

After carefully concluding the requisite "vigorous analysis" of the factors in Rules 23(a) and (b), this Court finds that the requirements of Rule 23 have been met and that certification of Plaintiffs' proposed class is proper.

## Request for Attorneys' Fees and Expenses

As compensation for their legal services and efforts, Class Counsel have requested this Court to approve the portion of the settlement which provides for reimbursement of attorneys' fees in an amount equal to 33.3% of the total settlement amount, or $2,750,000.00, and expenses in the amount of $133,211.80. This is an amount contemplated and agreed to in the settlement agreement and disclosed to Class members. As noted above, the notice provided to potential Class members expressly informed them that Class Counsel would apply for an award of attorneys' fees in an amount not to exceed one-third of the total settlement amount and up to $175,000.00 in reimbursed litigation expenses and a $10,000.00 service award to each of the Plaintiffs in recognition of their services as class representatives. To date, no Class member has objected to the settlement or to the requested fee, which evidences both a satisfactory result and a reasonable fee. In support of their request for fees and reimbursement of costs and expenses, counsel rely upon two declarations of counsel summarizing their time and the expenses incurred on behalf of the Class. (*See* Decls. of Steven A. Schwartz and Jason M. Knott.)

Federal Rule of Civil Procedure 23(h) provides that "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." "[A] thourough judicial review of fee applications is required in all class action settlements." *In re Gen. Motors Corp Pick-Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 819 (3d Cir. 1995). The awarding of fees is within the discretion of the court, so long as the court employs the proper legal standards, follows the proper procedures, and makes findings of fact that are not clearly erroneous. *In re Cendant Corp. PRIDES Litig.,* 243 F.3d 722, 727 (3d Cir. 2001). Plaintiffs and Class Counsel seek approval of an award of attorneys' fees and reimbursement of litigation expenses in accordance with the terms of the Class Action Settlement Agreement.

### *Attorneys' Fees*

Case 4:21-cv-00196-MWB   Document 261-1   Filed 01/20/26   Page 52 of 287

In re Cigna-American Specialty Health Administrative Fee..., Not Reported in Fed....

2019 Employee Benefits Cas. 323,995

There are two methods of calculating attorneys' fees in class actions - the percentage of recovery method and the lodestar method. *In re Prudential, 148 F.3d at 332-33.* The percentage-of-recovery approach "applies a certain percentage to the settlement fund," while the lodestar method "multiplies the number of hours class counsel worked on a case by a reasonable hourly billing rate for such services." *Sullivan v. DB Inv. Inc., 667 F.3d 273, 330 (3d Cir. 2011).* The percentage-of-recovery approach is more appropriate where, as here, there is a common fund. *In re AT&T Corp. Sec. Litig., 455 F.3d 160 164 (3d Cir. 2006)* (finding that the percentage method is "generally favored" in common fund cases because "it allows courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure."); *Harshbarger v. Penn Mut. Life Ins. Co., 2017 WL 6525783, at \*2 (E.D. Pa. Dec. 20, 2017)* ("The reasonableness of attorneys' fee awards in common fund cases ... is generally evaluated using a [percentage of recovery] approach followed by a lodestar cross-check.").

 **\*12**  In determining what constitutes a reasonable percentage fee award under the percentage-of-recovery approach, the Third Circuit has directed district courts to consider ten factors identified in *Gunter v. Ridgewood Energy Corp., 223 F.3d 190 (3d Cir. 2000),* and *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions, 148 F.3d 283 (3d Cir. 1998)* (the "*Gunter/Prudential* factors"); *to wit:*

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiff's counsel; (7) the awards in similar cases; (8) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations; (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained; and (10) any innovative terms of settlement.

*Gunter, 223 F.3d at 195 n.1; see also Prudential, 148 F.3d at 336-40; Diet Drugs, 582 F.3d at 541.* Although district courts should "engage in robust assessments of the *[Gunter/Prudential* factors] when evaluating a fee request," these factors are not exhaustive, and should not be applied in a formulaic way. *In re Rite Aid, 396 F.3d at 301-02.* This Court will apply each of these factors to determine the reasonableness of the attorneys' fees request.

*1. The size of the fund created and the number of persons benefited*

The first *Gunter* factor "consider[s] the fee request in comparison to the size of the fund created and the number of class members to be benefitted." *In re Ocean Power Techs., Inc., 2016 WL 6778218, at \*26 (D.N.J. Nov. 15, 2016)* (quoting *Rowe v. E.I. DuPont de Nemours & Co., 2011 WL 3837106, at \*18 (D.N.J. Aug. 26, 2011)).* Here, the parties negotiated a settlement with a common fund of $8.25 million that confers a benefit upon approximately 1.5 million Settlement Class Members. This fund will provide monetary benefit to all members of the Settlement Class who paid a co-insurance or deductible amount for a health benefit claim for services from an ASH contracted provider based on ASH's charges to Cigna, rather than the ASH contracted provider's charges to ASH. Even after deduction of the requested attorneys' fees and expenses and notice and administrative expenses, the $8.25 million fund is large enough to provide Settlement Class Members with checks that, based on Plaintiffs' estimates, would nearly fully compensate those Settlement Class Members who made out-of-pocket payments towards administrative fees. The Settlement also confers a non-monetary benefit upon all Settlement Class Members because it requires Cigna to make reasonable efforts to enact certain business practice reforms that will provide more disclosure about how it calculates benefits and plan member cost-sharing responsibility for entities such as ASH.

*2. The presence or absence of substantial objections by members of the class*

 **\*13**  *Gunter* advises that a court should consider "the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel." *Gunter, 223 F.3d at 195 n.1.* More than 1.5 million Class Notices were sent to Settlement Class Members notifying them that Defendants had agreed to pay attorneys' fees in an amount not to exceed one-third of the total settlement amount, to reimburse expenses in an amount not to exceed $175,000.00, and to pay Plaintiffs incentive awards in the amount of $10,000.00 each as recognition of their service as Class Representatives. No objections were filed. This absence of objections supports the approval of Plaintiffs' fee petition. *See, e.g., In re Lucent Techs., Inc., Sec. Litig.,*

Case 4:21-cv-00196-MWB    Document 261-1    Filed 01/20/26    Page 53 of 287

In re Cigna-American Specialty Health Administrative Fee..., Not Reported in Fed....
2019 Employee Benefits Cas. 323,995

327 F. Supp. 2d 426, 455-56 (D.N.J. 2004) (citing *Gunter,* 223 F.3d at 195 n.1); *In re Gen. Motors,* 55 F.3d at 812.

### 3. The skill and efficiency of the attorneys involved

Class counsel's skill and efficiency is "measured by the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel." *In re Viropharma Inc. Secur. Litig.,* 2016 WL 312108, at *16 (E.D. Pa. Jan. 25, 2016) (quoting *In re Computron Software, Inc.,* 6 F. Supp. 2d 313, 323 (D.N.J. 1998)). Here, Class Counsel have substantial experience prosecuting large-scale class actions, including ERISA class actions against health insurers. This experience undoubtedly contributed to the favorable outcome negotiated with equally experienced opposing counsel. Therefore, this factor also weighs in favor of approval.

### 4. The complexity, expense, and likely duration of the litigation

The fourth *Gunter* factor is intended to capture "the probable costs, in both time and money, of continued litigation." *In re Gen. Motors,* 55 F.3d at 812 (quoting *Bryan v. Pittsburgh Plate Glass Co.,* 494 F.2d 799, 801 (3d Cir. 1974)). As noted, the claims in this action have been the subject of hard-fought litigation for over six years. Notwithstanding its duration and progress, if this case were to go to trial, it would have involved substantial additional discovery and motion practice at great expense to the parties. Moreover, even if Plaintiffs would have recovered a large judgment at trial on behalf of the Settlement Class Members, their actual recovery would likely be postponed for years. There is also the possibility that Plaintiffs would recover nothing. The Settlement Agreement secures a recovery for the Settlement Class now, rather than the "speculative promise of a larger payment years from now." *In re Viropharma Inc.,* 2016 WL 312108, at *16. This factor, therefore, weighs in favor of approval.

### 5. The risk of non-payment

Class Counsel undertook this action on an entirely contingent fee basis. "Courts routinely recognize that the risk created by undertaking an action on a contingency fee basis militates

in favor of approval." *In re Schering-Plough Corp. Enhance ERISA Litig.,* 2012 WL 1964451, at *7 (D.N.J. 2012); *see also In re Ocean Power Techs., Inc.,* 2016 WL 677218, at *28. Class Counsel has litigated this case for more than six years without pay and has shouldered the risk that the litigation would yield little to no recovery. Accordingly, the fifth *Gunter/Prudential* factor weighs in favor of approving the attorneys' fees request.

### 6. The amount of time devoted to the case by plaintiffs' counsel

The sixth *Gunter/Prudential* factor considers the amount of time Class Counsel devoted to the litigation. *Gunter,* 223 F.3d at 199. Class Counsel estimates that over 5,500 hours of attorney and other professional and paraprofessional time were expended on this case. These hours are reasonable for a complex class case like this one. Thus, the sixth *Gunter/Prudential* factor weighs in favor of approving the attorneys' fees request.

### 7. The awards in similar cases

**\*14** While there is no benchmark for the percentage of fees to be awarded in common fund cases, the Third Circuit has noted that reasonable fee awards in percentage-of-recovery cases generally range from nineteen to forty-five percent of the common fund. *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F.3d 768, 822 (3d Cir. 1995). In complex ERISA cases, courts in this Circuit and others also routinely award attorneys' fees in the amount of one-third of the total settlement fund. *See In re Merck & Co., Inc. Vytorin Erisa Litig.,* 2010 WL 547613, at *9 (D. N.J. Feb. 9, 2010); *Krueger v. Ameriprise Fin., Inc.,* 2015 WL 4246879, at *4 (D. Minn. July 13, 2015). Accordingly, this factor weighs in favor of approval.

### 8. Value of benefits attributable to the efforts of class counsel relative to the efforts of others

Class Counsel were the only ones investigating the claims at issue in this case, and they alone initiated this federal action and actively litigated it. Because Class Counsel were the only ones pursuing the claims at issue in this case, this factor weighs in favor of approval.

In re Cigna-American Specialty Health Administrative Fee..., Not Reported in Fed....

2019 Employee Benefits Cas. 323,995

*9. Percentage fee that would have been negotiated*

Class Counsel agreed to litigate this case on a contingent fee basis, and successfully negotiated a settlement. Were this case an individual action, the customary contingent fee would likely range between thirty and forty percent of the recovery. *Wallace v. Powell,* 288 F.R.D. 347, 375 (M.D. Pa. 2012) ("In private contingency fee cases, attorneys routinely negotiate agreements for between thirty percent and forty percent of the recovery."); *In re Ikon Ofc. Sols., Inc. Sec. Litig.,* 194 F.R.D. 166, 194 (E.D. Pa. 2000) ("[I]n private contingency fee cases, particularly in tort matters, plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery."). Here, Class Counsel's requested percentage of 33.3% is commensurate with customary percentages in private contingent fee agreements. Thus, this factor supports approval.

*10. Innovative terms of the settlement*

The Settlement Agreement does not contain any innovative terms. This factor is neutral as it neither weighs in favor of nor against approval.

**Lodestar Cross-Check**

In common fund cases such as this one, the lodestar method is sometimes used to "cross-check the reasonableness of a percentage-of-recovery fee award." *Sullivan,* 667 F.3d at 330. The purpose of the cross-check is to ensure that the percentage approach does not result in an "extraordinary" lodestar multiple or a windfall. *See In re Cendant Corp. Sec. Litig.,* 264 F.3d 201, 285 (3d Cir. 2001). The Third Circuit has stated that a lodestar cross-check entails an abridged lodestar analysis that requires neither "mathematical precision nor bean counting." *In re Rite Aid Corp. Sec. Litig.,* 396 F.3d 294, 305 (3d Cir. 2005). The Court need not receive or review actual billing records when conducting this analysis. *Id.* at 307.

Under the lodestar method, a court begins the process of determining the reasonable fee by calculating the "lodestar;" *i.e.,* the "number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart,* 461 U.S. 424, 433, (1983); *see also McKenna v. City of Phila.,* 582 F.3d 447, 455 (3d Cir. 2009). Once the

lodestar is determined, the court must then determine whether additional adjustments are appropriate. *McKenna,* 582 F.3d at 455. A reasonable hourly rate in the lodestar calculation is "[g]enerally ... calculated according to the prevailing market rates in the relevant community," taking into account "the experience and skill of the ... attorney and compar[ing] their rates to the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Maldonado v. Houstoun,* 256 F.3d 181, 184 (3d Cir. 2001). The prevailing market rate is usually deemed reasonable. *Pub. Interest Research Grp. v. Windall,* 51 F.3d 1179, 1185 (3d Cir. 1995).

**\*15** "In calculating the second part of the lodestar determination," *i.e.,* the time reasonably expended, a district court should "review the time charged, decide whether the hours set out were reasonably expended for each of the particular purposes described and then exclude those that are excessive, redundant, or otherwise unnecessary." *Pa. Envtl. Def. Found. v. Canon-McMillan Sch. Dist.,* 152 F.3d 228, 232 (3d Cir. 1998). As noted in *Hensley,* lawyers are required to use judgment when billing their clients so as not to bill clients for "excessive, redundant, or otherwise unnecessary" hours. *Id.* at 434. Likewise, "[h]ours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority." *Id.* at 434 (citations omitted). Ultimately, district courts have "substantial discretion in determining what constitutes ... reasonable hours." *Lanni v. New Jersey,* 259 F.3d 146, 149 (3d Cir. 2001).

Attached to the Schwartz and Knott Declarations, Class Counsel included a summary of the hours worked by the partners, associates, and professional support staff involved in this litigation. These summaries were prepared from contemporaneous, daily time records regularly prepared and maintained by the respective firms. Class Counsel and support staff are claiming 5,587.8 hours for work done at hourly rates between $175 and $995. After reviewing the Attorney Declarations, it appears that Class Counsel is not requesting compensation for any time that was "excessive, redundant, or otherwise unnecessary." *Hensley,* 461 U.S. at 434. These hourly rates are also well within the range of what is reasonable and appropriate in this market. That is, the hourly charged rates for the attorneys are the same as the regular current rates charged for their services in standard non-class matters, including contingent and non-contingent matters. The attorneys have substantial experience in complex class action litigation, and their hourly rates are also within the range charged by attorneys with comparable experience levels

for litigation of a similar nature. *See, e.g., Barel v. Bank of Am.,* 255 F.R.D. 393, 403-04 (E.D. Pa. 2009).

Having found the hourly rates and hours expended reasonable, as of June 10, 2019, the aggregate lodestar calculation is $3,105,494.44, for the 5,587.8 hours of attorney and support staff work. Class Counsel's request for $2,750,000.00 (one-third of the settlement amount) will result in Class Counsel receiving considerably less than the lodestar. This Court notes that courts frequently approve attorneys' fees awards for amounts in excess of the calculated lodestar. Indeed, multiples ranging from 1 to 4 are often used in common fund cases. *In re Prudential,* 148 F.3d at 341; *see also Keller v. TD Bank, N.A.,* 2014 WL 5591033, at *16 (E.D. Pa. Nov. 4, 2014) (approving multiplier of "slightly above 3" in FLSA collective action). In addition, this Court has considered that Class Counsel took the case on a contingent basis, *see Lindy Bros. Builders, Inc. of Phila. v. Am. Radiator & Standard Sanitary Corp.,* 487 F.2d 161 (3d Cir. 1973); there were no objections filed by Settlement Class Members to the amounts requested, *see Perry v. FleetBoston Fin. Corp.,* 229 F.R.D. 105, 124 (E.D. Pa. 2005); and Class Counsel has obtained a significant recovery for the Settlement Class Members.

Therefore, having considered the relevant *Gunter/Prudential* factors and performed the lodestar cross-check, this Court approves the reasonable amount of attorneys' fees requested.

### Reimbursed Litigation Expenses

Class Counsel also seeks approval of the portion of the Fee Agreement which entitles them to a reimbursement of expenses not to exceed $175,000.00. Class Counsel claims that they incurred $133,211.80 in actual expenses during the pendency of this litigation. This includes costs incurred in connection with the prosecution and settlement of the litigation for items such as: expert fees, filing fees, postage, transportation, working meals, printing, and consultant fees. Counsel in "common fund cases is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the case." *In re Cendant Corp. Deriv. Action Litig.,* 232 F. Supp. 2d 327, 343 (D.N.J. 2002). After carefully reviewing the documentation supporting the reimbursement request, including the Attorney Declarations, this Court finds that the litigation expenses listed by Class Counsel are reasonable and expected in this type of case. Therefore, Class Counsel's request to be reimbursed $133,211.80 in litigation expenses is granted.

### Service Awards

**\*16** Class Counsel also seek this Court's approval of Service Awards to Plaintiffs Carol Lietz, Kathleen Kilroy, Jianliang Zhu, and Joyce Allen, in the amount of $10,000.00 each, for their willingness to undertake the risks and the burden of this litigation. "Incentive awards are not uncommon in class action litigation...." *Cullen v. Whitman Med. Corp.,* 197 F.R.D. 136, 145 (E.D. Pa. 2000). These payments "compensate named plaintiffs for 'the services they provided and the risks they incurred during the course of class action litigation.' " *Bredbenner v. Liberty Travel, Inc.,* 2011 WL 1344745, at *22 (D.N.J. Apr. 8, 2011). Incentive awards also " 'reward the public service' of contributing to the enforcement of mandatory laws." *Id.* (quoting *In re Cendant,* 232 F. Supp. 2d at 344).

This Court recognizes that there would be no benefit to the Settlement Class Members if Plaintiffs had not stepped forward and prosecuted this matter to the current resolution. In doing so, these individuals devoted time and energy to the litigation, including assisting Class Counsel with discovery and the mediation. The requested awards are well within the range of awards made in similar cases. *See Barel,* 255 F.R.D. at 402-03 (awarding $10,000.00 incentive award); *Brown,* 2017 WL 2986300, at *7 (awarding $10,000 to each named plaintiff because they "were actively involved in the litigation since before it was commenced, they provided the information and documents that formed the basis for the lawsuit" and "the service award payments represent a small fraction of the $452,586 Settlement Fund."). Settlement Class Members were also notified that Class Counsel would request these individual awards for Plaintiffs. No Settlement Class Members objected to the Service Awards. Accordingly, this Court approves the requested awards of $10,000.00 each to Plaintiffs Carol Lietz, Kathleen Kilroy, Jianliang Zhu, and Joyce Allen.

### CONCLUSION

For the reasons stated herein, this Court grants final approval of the proposed class action settlement, awards Class Counsel reasonable attorneys' fees in the amount of $2,750,000.00 and the reimbursement of expenses in the amount of $133,211.80, and awards the sum of $10,000.00 to each of the Class

2019 Employee Benefits Cas. 323,995

Representatives, Carol Lietz, Kathleen Kilroy, Jianliang Zhu, and Joyce Allen. An Order consistent with this Memorandum Opinion follows.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4082946, 2019 Employee Benefits Cas. 323,995

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 296954
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

In re FASTENERS
ANTITRUST LITIGATION.

Civil Action No. 08–md–1912.
|
Jan. 27, 2014.

**MEMORANDUM**

SURRICK, District Judge.

**\*1** Presently before the Court is Co–Lead Counsel's Joint Petition for Award of Counsel Fees, Payment of Costs and Expenses, and Award of Incentive Payments to the Class Representatives (ECF No. 129). For the following reasons, the Motion will be granted.

**I. BACKGROUND**

**A. Factual Background and Procedural History**
The factual background of this multi-district litigation is more fully set forth in the Court's August 12, 2011 Memorandum denying Defendants' motions to dismiss the complaint, *In re Fasteners Antitrust Litig.,* No. 08–1912, 2011 WL 3563989 (E.D.Pa. Aug. 12, 2011), and the Court's Memorandum granting Plaintiffs' Motion for Final Approval of Proposed Settlements with the Prym, YKK, and Coats Defendants and Plaintiffs' Proposed Plan for Distribution of Settlement Funds (ECF No. 134).

Plaintiffs Fishman & Tobin, Greco Apparel, Inc., Jolna Apparel Group LLC, and Norman Shatz Co., U.S.A. (collectively, "Plaintiffs") brought this consolidated class action on behalf of themselves and others who purchased fasteners in the United States from Defendants from January 1, 1991, until September 19, 2007 (the "Class Period"). (*Id.* at ¶ 2.)[1] Plaintiffs serve as the representatives of the class. There are three groups of Defendants in this case: (1) the "Prym Defendants," which include William Prym GmbH & Co. KG, Prym Consumer USA, Inc., Prym Fashion, Inc., Prym Inovan GmbH & Co., Prym Consumer GmbH, EP

Group S.A., Inovan GmbH & Co. KG, Prym Fashion GmbH, Prym Consumer Europe GmbH, and William Prym Inc.; (2) the "YKK Defendants," which include YKK Corporation, YKK Corporation of America, Inc., YKK (U.S.A.) Inc., and YKK Snap Fasteners America, Inc.; and (3) the "Coats Defendants," which include Coats Holdings, Ltd., Coats Holdings, Inc., Coats American, Inc., d.b.a. Coats North America, Coats North America de Republica Dominicana, Inc., and Coats & Clark, Inc.[2]

On August 12, 2011, we denied Defendants' joint motion to dismiss. (ECF Nos. 92–93.) On August 6, 2012, we denied the YKK and Coats Defendants' motion to certify the order denying the motion to dismiss for interlocutory appeal. (*See* ECF Nos. 118–119.)

On August 12, 2013, Plaintiffs filed a motion seeking preliminary approval of proposed settlements with the Prym, YKK, and Coats Defendants, and seeking authorization to disseminate notice to the settlement class. (Mot. Prelim. Approval, ECF No. 124.) Attached as exhibits to Plaintiffs' motion for preliminary approval were the proposed settlement agreements with the Prym, YKK, and Coats Defendants. (Agreements, Mot. Prelim. Approval Exs. 1–3.)

On August 26, 2013, we granted Plaintiffs' motion seeking preliminary approval of the proposed settlement. (Order Prelim. Approval, ECF No. 126.) In our Order, we determined that the "proposed settlements with Prym, YKK and Coats, as set forth in the respective Settlement Agreements, subject to final determination following proper notice and a fairness hearing, are sufficiently fair, reasonable and adequate to authorize dissemination of notice to the proposed settlement class (the "Settlement Class")." (*Id.* at ¶ 2.) We defined the Settlement Class as:

> **\*2** All persons and entities who purchased Fasteners in the United States directly from a Defendant during the period from and including January 1, 1991 to an including September 19, 2007. Excluded from the Class are Defendants and their predecessors, successors, parents, subsidiaries, affiliates, divisions and governmental entities.

(*Id.*) The Preliminary Approval Order also appointed class representatives, appointed Co–Lead Counsel to represent the Settlement Class, approved the form and content of the Notice of Proposed Settlement of Class Action With the Prym, YKK and Coats Defendants and Hearing on Settlement Approval and Claim Form ("Notice"), and directed that the Notice be sent to all members of the settlement class, be posted on the

In re Fasteners Antitrust Litigation, Not Reported in F.Supp.3d (2014)

2014 WL 296954

internet, and be advertised in the Wall Street Journal. (*Id.* at ¶¶ 5–11.) Finally, the Preliminary Approval Order scheduled a fairness hearing for January 10, 2014, to, among other things, "determine the fairness, reasonableness, and adequacy of the proposed settlements with Prym, YKK and Coats...." (*Id.* at ¶ 18.)

Pursuant to the Preliminary Approval Order, on October 25, 2013, counsel for the Settlement Class directed a printing company to mail, by first class mail, postage prepaid, 32,359 copies of the Notice to potential Settlement Class members. Notice of the proposed settlement was also published in the Wall Street Journal on November 7, 2013, and posted on a website, www.FastenersAntitrustLitigation.com. (Cert. of Mailing, ECF No. 131; *see also* Class Counsel's Report, ECF No. 132.)

The Notice to the Settlement Class advised that any objection to the proposed settlement, to the plan of distribution, or to Plaintiffs' counsel's application for fees, litigation costs, and incentive awards, had to be filed with the Clerk by December 15, 2013. (Class Counsel's Report 2.) There were no objections filed by any potential Settlement Class members. The Notice to the Settlement Class also advised that requests for exclusion from the Settlement Class had to be sent to Settlement Class Counsel no later than December 15, 2013. (*Id.*)[3] Settlement Class Counsel received one timely request for exclusion from American Soccer Company, Inc. (d/b/a Score Sports).

On January 24, 2014, we granted Plaintiffs' motion for final approval of the settlement agreements with Defendants. (*See* ECF No. 134 ("Final Settlement Approval Memorandum"); ECF Nos. 135–137 ("Final Settlement Approval Orders").) The Settlement Agreements each provide for the resolution of this multi-district litigation. Pursuant to the proposed settlements, the Prym, YKK, and Coats Defendants will make payments totaling $17.55 million (the "Settlement Fund"). The Prym Defendants will make a payment of $1 .1 million, the YKK Defendants will make a payment of $6.6 million, and the Coats Defendants will make a payment of $9.85 million. (Agreements.) Each Defendant has already made these required payments into an escrow account that are accruing interest.

**\*3** On November 25, 2013, Co–Lead Counsel filed the instant Petition for Award of Counsel Fees, Payment of Costs and Expenses and Award of Incentive Payments to the Class Representatives. (Pet., ECF No. 129.) A fairness hearing was held on January 10, 2014. Arguments were heard regarding the approval of the fees and costs requested in the Petition. (Jan. 10, 2014 Hr'g Tr. (on file with Court); Min Entry, ECF No. 133.)

## II. PETITION FOR ATTORNEY'S FEES AND EXPENSES

Co–Lead Counsel requests $5.85 million in attorney's fees, which represents one-third of the Settlement Fund, and $337,667.72 in litigation costs and expenses. This is the first time that Co–Lead Counsel has requested fees and expenses in this case. No interim fees were requested or awarded.

Rule 23(h) of the Federal Rules of Civil Procedure provides that "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed.R.Civ.P. 23(h). We must determine whether Co–Lead Counsel's request for these fees and expenses is fair and reasonable. *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980) ("[A] litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to reasonable attorney's fees from the fund as a whole."); *Brytus v. Spang & Co.,* 203 F.3d 238, 242 (3d Cir.2000); *In re Corel Corp. Inc.,* 293 F.Supp.2d 484, 498 (E.D.Pa.2003) ("There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of ... reasonable litigation expenses from that fund.") (internal quotation omitted).

Generally, two methods are used for assessing attorney's fees: the percentage-of-recovery method and the lodestar method. *In re Prudential Ins. Co. of Am. Sales Practice Litig.,* 148 F.3d 283, 333 (3d Cir.1998). In the Third Circuit, "[t]he percentage-of-recovery method is generally favored in cases involving a common fund, and is designed to allow courts to award fees from the fund 'in a manner that rewards counsel for success and penalizes it for failure.' " *Welch & Forbes, Inc. v. Cendant Corp. (In re Cendant Corp. Prides Litig.),* 243 F.3d 722, 732 (3d Cir.2001) (quoting *In re Prudential,* 148 F.3d at 333). Although the lodestar method is more commonly used in statutory fee-shifting cases, "it is sensible for a court to use a second method of fee approval to cross-check its initial fee calculation." *In re Rite Aid Corp. Sec. Litig,* 396 F.3d 294, 300 (3d Cir.2005). In practice, courts in the Third Circuit assess requests for attorney's fees in antitrust cases using the percentage-of-recovery method, and then cross-check the result with the lodestar method. *See, e.g., In re Flonase Antitrust Litig.,* No. 08–3149, 2013 U.S. Dist. LEXIS

In re Fasteners Antitrust Litigation, Not Reported in F.Supp.3d (2014)

2014 WL 296954

83976, at * 17, 27 (E.D. Pa. June 14, 2013); *In re Auto. Refinishing Paint Antitrust Litig.,* MDL No. 1426, 2008 U.S. Dist. LEXIS 569, at *9 (E.D.Pa. Jan. 3, 2008); *Craig v. Rite Aid Corp.,* No. 08–2317, 2013 U.S. Dist. LEXIS 2658, at *47–48 (M.D.Pa. Jan. 7, 2013).

**A. Percentage–of–Recovery Approach**

**\*4** The Third Circuit has identified ten factors for district courts to consider when applying the percentage-of-recovery method and considering the reasonableness of a request for attorney's fees:

> (1) the size of the fund created and the number of beneficiaries, (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel, (3) the skill and efficiency of the attorneys involved, (4) the complexity and duration of the litigation, (5) the risk of nonpayment, (6) the amount of time devoted to the case by plaintiffs' counsel, (7) the awards in similar cases, (8) the value of the benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations, (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained, and (10) any innovative terms of settlement.

*In re Diet Drugs Prod. Liab. Litig.,* 582 F.3d 524, 541 (3d Cir.2009). The first seven (7) factors derive from the case *Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190 (3d Cir.2000), and are known as the Gunter factors. The remaining three factors come from *Prudential,* 148 F.3d at 338–340. *In re AT & T Corp. Secs. Litig.,* 455 F.3d 160, 165 (3d Cir.2006). Many of these factors overlap with the *Girsh* factors that we discussed in our Final Settlement Approval Memorandum. We will consider each *Gunter* and *Prudential* factor; however, we incorporate the analysis set forth in our Memorandum approving the final settlements.

*1. The size of the fund and the number of beneficiaries*
The settlement negotiations resulted in a settlement fund of $17.55 million. The number of settlement class members is unknown at this time. However, approximately 32,000 Notices of the proposed settlement were sent to potential settlement class members nationwide. We are satisfied that this significant settlement will provide a fair recovery for settlement class members and direct purchasers of fasteners in the United States. This factor weighs in favor of approving the attorney's fees.

*2. Substantial objections by members of the class to the settlement terms or fees requested by counsel*
As of the date of the fairness hearing, not one class member objected to the proposed settlement or to the amount of fees requested by Co–Lead Counsel. Only one class member opted out of the settlement agreements. We find it significant that, despite the large class size, there have been no objections. *See In re Diet Drugs,* 582 F.3d at 541–42 (affirming district court's approval of fee and noting that district court did not err in placing significant weight to the fact that there were only a few objections to the settlement and request for attorney's fees). This factor weighs heavily in favor of approving the fee award.

*3. The skill and efficiency of the attorneys involved*
**\*5** As explained more fully in our Memorandum approving the settlements, the four law firms that comprise Co–Lead Counsel in this case are highly qualified, and have extensive experience and expertise in litigating complex antitrust cases like the instant one. Moreover, these attorneys have worked together on other antitrust cases and have had success resolving disputes. In addition, we have previously recognized the outstanding efforts of these attorneys in another antitrust case in this Court. *In re Auto. Refinishing Paint Antitrust Litig.,* MDL No. 1426, 2004 U.S. Dist. LEXIS 29162, at *21 n. 3 (E.D.Pa. Oct. 13, 2004).

Plaintiffs' Counsel have vigorously litigated this antitrust action over the course of the past six years. Among other things, Counsel have drafted the Complaint; interviewed witnesses; sought, served, received, and reviewed discovery; responded to Defendants' discovery requests; met with Defendants in order to prepare a joint Rule 26(f) report; interviewed experts regarding Defendants' liability and damages; prepared motions and briefs in response to Defendants' attempts to dismiss this action and certify issues for interlocutory appeal. In addition, Plaintiffs' Counsel successfully negotiated three settlements with defendants and obtained Court approval for those settlements. This Court previously observed that the "very successful settlement negotiations demonstrate[ ] the significant skill and expertise of counsel." *In re Auto. Refinishing Paint,* 2008 U.S. Dist. LEXIS 569, at * 13; *see also In re Warfarin Sodium Antitrust Litig.,* 212 F.R.D. 231, 261 (D.Del .2002) (noting that counsel for the class "showed their effectiveness through the favorable cash settlement they were able to obtain"); *Cullen v. Whitman Med. Corp.,* 197 F.R.D. 136, 149 (E.D.Pa.2000) (stating that

"[t]he single clearest factor reflecting the quality of class counsel's services to the class are the results obtained").

The skill and efficiency of the Plaintiffs' Counsel in this case weighs strongly in favor of approving the award of attorney's fees.

### 4. The complexity and duration of the litigation

Like many other antitrust cases, this case has involved complex issues and has been lengthy. The litigation has been ongoing for approximately six years. Defendants' motions to dismiss involved complicated legal and factual issues. Plaintiffs faced three motions to dismiss from Defendants, which included challenges to their claims on many grounds, including jurisdiction and sufficiency of the evidence. The briefing on these motions were extensive and included multiple complicated legal arguments. When Defendants' motions to dismiss were denied by the Court, Plaintiffs were then faced with Defendants' attempt to seek an interlocutory appeal of the Court's denial. We agree with Co–Lead Counsel that "[s]ettlement at this juncture avoids the parties engaging in protracted and expensive discovery on the merits as well as class certification." (Pet.15.) This factor also weighs in favor of approving the settlement.

### 5. The risk of nonpayment

**\*6** In our Final Settlement Approval Memorandum, we determined that the risks associated with establishing liability if litigation were to continue were substantial, and thus weighed in favor of approving the settlement. The Third Circuit has found that this risk of establishing liability is relevant to the analysis of whether there is a risk of nonpayment. *See In re Rite Aid,* 396 F.3d at 304 (noting that the analysis supporting the risk of liability *Girsh* factor is relevant to the risk of nonpayment *Gunter* factor).

We understand that Plaintiffs' Counsel undertook this case on a purely contingent fee basis, and that this poses a significant risk of not being paid or reimbursed for the costs of litigating the case. In fact, "any contingency fee includes a risk of nonpayment." *O'Keefe v. Mercedes–Benz U.S., LLC,* 214 F.R.D. 266, 309 (E.D.Pa .2003). In addition, we realize that Co–Lead Counsel commenced this litigation without the benefit of information and support provided by the United States Department of Justice in a parallel investigation. Co–Lead Counsel state that they did rely to some degree on the investigation and decision by the European Commission, which related to the involvement of some Defendants in the

operation of European and global cartels, however, there was no cooperation between Plaintiffs' counsel and the European Commission investigating body in pursuing the claims in the United States. We agree with Co–Lead Counsel that the risk of not establishing liability and nonpayment are greater when plaintiffs are without the benefit of the results of a corresponding U.S. governmental investigation. (Petition 15); *see In re Linerboard Antitrust Litig .,* 2004 U.S. Dist. LEXIS 10532, at *36 (concluding that petitioners faced significant risk of nonpayment and finding relevant to this conclusion the fact that "petitioners did not benefit from the fruits of a prior government investigation or prosecution"). This factor weighs in favor of approving the fee award.

### 6. The amount to time devoted to the case by Plaintiffs' counsel

Attached as an exhibit to Co–Lead Counsel's Petition is the Declaration of Warren Rubin, Esq., which is offered in support of the requested fees and expenses. (Rubin Decl., Pet. Ex. 1.) Attached to the Rubin Declaration are additional declarations from the other three law firms representing the class representatives, and a spreadsheet detailing the costs and fees incurred by all 48 law firms that represented Plaintiffs. These exhibits demonstrate that, in the aggregate, Co–Lead Counsel have expended approximately 11,753 hours litigating this case since its inception in early 2007. (Rubin Decl. & Ex. A & B.) The amount of hours spent by all Plaintiffs' counsel represents an aggregate lodestar of $8,540,668.80. (Pet. 16 & Rubin Decl Ex. B.) In addition, Plaintiffs' counsel have incurred $377,667.72 in expenses. (*Id.*) The amount of time spent and costs incurred by Co–Lead Counsel "demonstrate a significant commitment of resources to this litigation."

### 7. The awards in similar cases

**\*7** Co–Lead Counsel's request for one third of the settlement fund is consistent with other direct purchaser antitrust actions. *See In re Flonase,* 2013 U.S. Dist. LEXIS 83976, at *22–23 (citing cases approving of one third fees in direct purchaser antitrust actions). The amount is also consistent with attorney's fees awards generally granted in this Circuit. *See Steele v. Welch,* No. 03–6596, 2005 U.S. Dist. LEXIS 16577, at *5–6 (E.D.Pa. May 20, 2005) (finding a fee of 33%, plus expenses, to be reasonable); *In re Corel Corp.,* 293 F.Supp.2d 484, 497–98 (awarding counsel one-third of the settlement fund in addition to the reimbursement of litigation expenses); *In re Gen. Instrument Sec. Litig.,* 209 F.Supp.2d 423, 433–34 (E.D.Pa.2001) (approving a fee request of one-

third of the settlement fund plus nearly $ 1,800,000 in expenses). We also find it significant that the Notice of the proposed settlement advised class members that counsel would be seeking one third of the settlement fund as attorney's fees and not one class member objected. *See In re Flonase,* 2013 U.S. Dist. LEXIS 83976, at *23–24. This factor weighs in favor of approving the requested fee award.

### 8. The value of benefits attributable to the efforts of class counsel relative to the efforts of other groups

As noted above, Co–Lead Counsel commenced this litigation without the benefit of information and support provided by the United States Department of Justice in a parallel investigation. Co–Lead Counsel state that they did rely to information uncovered during the European Commission investigation, but the investigating body in the European Commission provided no support to Plaintiffs' counsel in pursuing the claims in the United States.

The fact that Co–Lead Counsel were not assisted by a United States governmental investigation weighs in favor of approving the fee award. *See In re AT & T Corp. Secs. Litig.,* 455 F.3d 160, 173 (3d Cir.2006) (affirming district court's approval of fee award in antitrust litigation and finding significant that "class counsel in this case was not aided by a government investigation"); *In re Prudential,* 148 F.3d at 338.

### 9. The percentage fee that would have been negotiated had the case been subject to private contingent fee arrangement

This factor considers "the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained." *In re Diet Drugs,* 582 F.3d at 541. Co–Class Counsel assert that counsel typically negotiate for contingency fees between 30% and 40%, and therefore, it is reasonable to assume that the one-third attorney fee award requested here would have been negotiated had the case been subject to a private contingent fee arrangement. This argument is somewhat speculative. However, we agree that a one-third contingency fee arrangement is not out of the ordinary in a complex case like this one. Even though we find that this factor weighs in favor of approving the one-third fee award, we do not assign it great weight given the uncertainty underlying our predicting how the parties would have negotiated at the outset of litigation. *See In re Flonase,* 2013 U.S. Dist. LEXIS 83976, at *25–26.

### 10. Any innovative terms of settlement

**\*8** Co–Lead Counsel assert that the three settlement agreements contain relatively standard settlement terms. Accordingly, this factor is neutral, neither weighing in favor of or against approval of the proposed fee award.

### B. The Lodestar Cross–Check

As stated above, the lodestar method is used to cross-check the reasonableness of the award as determined using the percentage of recovery method. *In re AT & T Corp.,* 455 F.3d at 164. Calculating the lodestar is accomplished by "dividing the proposed fee award by the lodestar calculation, resulting in a lodestar multiplier." *Id.* The purpose of the multiplier is "to account for the contingent nature or risk involved in a particular case." *Id.* at 164 n. 4. Moreover, the multiplier may be adjusted "to account for particular circumstances, such as the quality of the representation, the benefit obtained for the class, [and] the complexity and novelty of the issues presented." *Id.* The lodestar cross-check, while useful, should not displace a district court's primary reliance on the percentage-of-recovery method." *Id.* at 164.

Here, the lodestar represents a negative multiplier of 0.68. This is calculated by dividing the proposed fee award of $5.85 million by the aggregate lodestar value of all of Co–Lead Counsel's time litigating this matter, $8,540,668.80. A negative multiplier results when the aggregate lodestar value, or the amount of money spent by all the attorneys, is greater than the actual award of fees requested. Courts in this Circuit have found multipliers up to four as reasonable in light of the risks of litigation. *See, e.g., Meijer Inc. v. 3M,* No. 04–5871, 2006 U.S. Dist. LEXIS 56744, at *82 (E.D.Pa. Aug. 14, 2006) (noting multiplier of 4.77); *In re Flonase Antitrust Litig.,* 2013 U.S. Dist. LEXIS 83976, at *30 (noting lodestar multiplier of 2.99). Since the multiplier here is less than one, which means that the requested fee is less than the amount that would be awarded using the lodestar method, we are satisfied that a lodestar cross-check confirms the reasonableness of Co–Lead Counsel's request for attorney's fees. *See In re Auto. Refinishing Paint Antitrust Litig.,* 2008 U.S. Dist. LEXIS 569, at * 12 (observing that fee awards based on negative multipliers are indicative of the reasonableness of the award).

### C. The Amount of Requested Litigation Expenses is Reasonable

Co–Lead Counsel also seek reimbursement of $337,667.72 in litigation costs and expenses incurred in the prosecution of

this action. We have observed that "there is no reason to reject the request for reimbursement of [expenses] that counsel have spent out of their own pockets in litigating [an antitrust] case." *In re Auto. Refinishing Paint Antitrust Litig.,* MDL No. 1426, 2004 U.S. Dist. LEXIS 29162, at \*35–36 (E.D.Pa. Oct. 13, 2004). Moreover, "attorneys who create a common fund for the benefit of a class are entitled to reimbursement of reasonable litigation expenses from the fund." *In re Aetna Inc. Sec. Litig.,* MDL No. 1219, 2001 U.S. Dist. LEXIS 68, at \*40 (E.D.Pa. Jan. 4, 2001). Finally, we emphasize that no class member has objected to the request for attorney's fees or to the request for reimbursement of expenses. Accordingly, Co–Lead Counsel's request for reimbursement of litigation costs and expenses will be granted.

## IV. PETITION FOR INCENTIVE AWARDS FOR CLASS REPRESENTATIVES

**\*9** Finally, Co–Lead Counsel requests that the four Class Representatives–Fishman & Tobin, Inc., Greco Apparel, Inc., Jolna Apparel Group, LLC, and Norman Shatz Co, U.S.A.- be provided incentive awards in the amount of $5,000 each. "Incentive awards are not uncommon in class action litigation and particularly where ... a common fund has been created for the benefit of the entire class." *Sullivan v. DB Invs., Inc.,* 667 F.3d 273, 333 n. 65 (3d Cir2011) (citations omitted).

"The purpose of [incentive awards] is to compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation." *Id.; see also In re Auto. Refinishing Paint Antitrust Litig.,* 2008 U.S. Dist. LEXIS 569, at \*21 ("Incentive awards are typically awarded to class representatives for their often extensive involvement with a lawsuit and courts in [the Third Circuit] have traditionally granted requests for these awards."); *In re Plastic Tableware Antitrust Litig.,* No. 94–3564, 1995 U.S. Dist. LEXIS 18166, at \*5–6 (E.D.Pa. Dec. 4, 1995) ("Payments to class representatives may be considered a form of restitutionary relief within the discretion of the trial court. They may also be treated as a reward for public service and for the conferring of a benefit on the entire class."). In this case, the class representatives not only provided a benefit to the class as a whole, but also risked their existing relationships with the suppliers of fasteners. *See In re Auto. Refinishing Paint,* 2008 U.S. Dist. LEXIS 569, at \*22; *Cullen,* 197 F.R.D. 136, 145 ("[C]ourts routinely approve incentive awards to compensation named plaintiffs for the services [class representatives] provided and the risks they incurred during the course of the class action litigation .").

Co–Lead Counsel assert that the class representatives provided information to counsel about the fastener industry, searched for and produced documents to counsel and were in communication with counsel with respect to all of the filings in this litigation. Moreover, counsel point out that there are attendant risks in their industry that the class representatives undertook with respect to their existing relationships with the suppliers. *See In re Flonase Litig.,* 2013 U.S. Dist. LEXIS 83976, at \*32 (noting that the class representatives "launched this litigation despite the risk of retaliation inherent in suing a supplier"). Under the circumstances, we are satisfied that an award of $5,000 to each class representative is perfectly reasonable in light of the duration and complexity of this litigation. Accordingly, Co–Lead Counsel's request for incentive awards for the class representatives will be granted.

## V. CONCLUSION
For all of the reasons stated above, Co–Lead Counsel's Joint Petition for Award of Counsel Fees, Payment of Costs and Expenses and Award of Incentive Payments to the Class Representatives will be granted.

**\*10** An appropriate Order follows.

## *ORDER*

**AND NOW,** this *27th* day of *January,* 2014, upon consideration of Co–Lead Counsel's Joint Petition for Award of Counsel Fees, Payment of Costs and Expenses and Award of Incentive Payments to the Class Representatives (ECF No. 129), and after a fairness hearing on January 10, 2014, it is ORDERED as follows:

1. The Motion is **GRANTED.**

2. Class Counsel are awarded counsel fees in the amount of $5.85 million, with accrued interest.

3. Class Counsel are awarded reimbursement of costs and expenses in the amount of $337,667.72, with accrued interest.

4. Co–Lead Counsel are responsible for allocating and distributing counsel fees and expenses to be paid to Class Counsel.

5. Incentive awards in the amount of $5,000 are each awarded to the four Class Representatives: Fishman & Tobin, Greco

In re Fasteners Antitrust Litigation, Not Reported in F.Supp.3d (2014)

2014 WL 296954

Apparel, Inc., Jolna Apparel Group LLC, and Norman Shatz Co., U.S.A.

6. The Court retains jurisdiction over the Settlement Agreements to include resolution of any matters which may arise related to the allocution and distribution of counsel's fees and expenses to Class Counsel.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 296954

Footnotes

1    The term "Fasteners" includes zippers, snap fasteners, buttons, hooks, and other similar products used primarily in the textile, apparel, footwear, and luggage industries. (Consol. Class Action Compl. ¶ 35.)

2    Scovill Fasteners, Inc. was originally a named Defendant in this action. On April 19, 2011, Scovill filed for Chapter 11 bankruptcy. (*See* ECF No. 91.) Subsequently, on July 30, 2013, Plaintiffs voluntarily dismissed the action against Scovill pursuant to Federal Rule 41(a)(1)(A)(i).

3    Settlement Class Counsel and Co–Lead Counsel both refer to the four law firms that were appointed by the Court to serve as lead counsel for the Settlement Class. These firms include: Barrack, Rodos & Bacine; Kaplan, Fox & Kilsheimer LLP; Kohn, Swift & Graf, P.C.; and Law Offices of Bernard M. Gross, P.C. (Order Prelim. Approval ¶ 6.) The instant Petition seeks fees and expenses on behalf of 48 law firms that provided legal services and incurred costs on behalf of Plaintiffs. Co–Lead Counsel will be responsible for allocating the attorneys' fee award to all of these 48 law firms.

---

End of Document                                        © 2026 Thomson Reuters. No claim to original U.S. Government Works.

In re Innocoll Holdings Public Ltd. Co. Sec. Litig., Not Reported in Fed. Supp. (2022)

2022 WL 16533571

2022 WL 16533571
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

IN RE INNOCOLL HOLDINGS
PUBLIC LTD. CO. SEC. LITIG.

CIVIL ACTION No. 17-341
|
Signed October 28, 2022

## MEMORANDUM

Pratter, United States District Judge

**\*1** Over the course of its five-year lifetime, this class
action litigation has absorbed thousands of attorney hours
and likely demanded considerable litigation costs, but, finally,
a conclusion is in sight. Shareholders sued pharmaceutical
company Innocoll Holdings Public Limited Company in
2017, claiming that Innocoll had misrepresented a new
product's chances of success in the Food and Drug
Administration's approval process. Over four years later, the
parties reached a settlement agreement in principle. This
Court preliminarily approved the settlement on March 10,
2022, pending a final approval hearing that took place on July
6, 2022. Russel Bleiler and Carl Bayney, the Court-appointed
lead plaintiffs in this securities action, have submitted an
unopposed motion for final approval of the class action
settlement and plan of allocation under Federal Rule of
Civil Procedure 23(e), along with an unopposed motion
for an award of attorneys' fees, reimbursement of litigation
expenses, and compensatory awards to lead plaintiffs. For the
reasons set forth below, the Court grants both motions.

## Background

Innocoll is a pharmaceutical company that specializes in
collagen technologies, making its initial public offering
("IPO") in July 2014. In its amended registration statement
for its IPO, Innocoll described the progress of clinical trials
for XaraColl, a collagen sponge implant that contains pain
medicine and is placed in surgical sites to relieve post-surgery
pain. In May 2016, Innocoll announced the results of Phase
3 clinical trials for XaraColl via press release and said on
a conference call with securities analysts that there were

no gating factors to filing a new drug application ("NDA")
for XaraColl with the FDA. In November 2016, Innocoll
announced that it had submitted the NDA for XaraColl.
On December 29, 2016, Innocoll issued a press release
explaining that the FDA had issued a "Refusal to File" letter
for XaraColl. Although Innocoll had tested and submitted
XaraColl as a drug, the FDA determined that XaraColl should
have been tested and submitted as a drug/device combination.
On the day following the press release, Innocoll's share price
fell over 61%.

In early 2017, shareholders sued Innocoll and individual
defendants, including Chief Executive Officer Anthony Zook
and Chief Medical Officer Lesley Russell, for violations of
the Securities Exchange Act of 1934, claiming that they
had misled investors who relied on the company's positive
statements about XaraColl and its chances of FDA approval.
The first complaint was dismissed because the plaintiffs
failed to meet the Private Securities Litigation Reform Act's
("PLSRA's") heightened pleading standard relating to the
element of scienter. After the filing of an amended complaint
and a stay of the action while the parties unsuccessfully
pursued mediation, the parties proceeded to discovery in
April 2020. The extensive discovery included review and
categorization of over 400,000 pages of documents and
depositions of two experts as well as of lead plaintiffs Mr.
Bleiler and Mr. Bayney. While discovery was still underway,
the shareholders filed a renewed motion for class certification.
Just before oral argument on the motion for certification was
to be held on July 6, 2021, the parties announced that they
had reached a settlement in principle: Innocoll would pay
$2,755 million to the shareholders, and, in exchange, the
shareholders would release all claims against Innocoll relating
to the alleged misrepresentations (the "Settlement").

**\*2** Under the Settlement notice program, claims
administrator Strategic Claims Services ("SCS") established a
webpage, accessible at all times, which provided information
relevant to the Settlement, including the current status of
the Settlement, case deadlines, the online claim filing link,
and the exclusion request form. SCS also maintained a toll-
free telephone number through which potential settlement
class members could seek further information or request the
notice and claim form. SCS mailed or emailed 2,190
nominee account holders or institutional groups (including
banks, brokerages, mutual funds, insurance companies,
pension funds, and money managers), notifying them of
the Settlement and requesting that they send the postcard
notice, email the summary notice, or email a link to the

In re Innocoll Holdings Public Ltd. Co. Sec. Litig., Not Reported in Fed. Supp. (2022)

2022 WL 16533571

online notice and claim form to any customers who might be beneficial purchasers or owners of Innocoll shares. The nominee account holders or institutional groups also had the option of providing SCS with a list of the names and mailing addresses of potential beneficial owners to SCS. Some 3,540 postcard notices were mailed by either SCS or the nominees, of which 105 were returned as undeliverable. A total of 4,465 potential settlement class members were notified of the Settlement via mailed postcard notices or via email containing a direct link to the notice and claim form. The publication notice was also disseminated twice electronically via *GlobeNewswire* and twice in print in *Investor's Business Daily.* The deadlines for settlement class members to submit claims, request exclusion from the Settlement, and object to the Settlement were June 6, 2022, June 15, 2022, and June 22, 2022 respectively. Potential Settlement class members submitted 682 claim forms, of which 123 claims were valid. July 6, 2022 Tr. 3:13–14. No member of the settlement class objected to final approval, attorneys' fees, reimbursement of out-of-pocket expenses, or compensatory awards to the lead plaintiffs.

Under the Settlement's plan of allocation, which was formulated by lead counsel with the assistance of an experienced financial consultant, SCS will calculate class members' recognized loss based on the time the Innocoll securities were purchased and sold, the purchase and sale price of the securities, and the estimated inflation of the price of the securities at the of purchase and sale. The Settlement amount will then be allocated to approved claimants on a *pro rata* basis, accounting for each class member's recognized loss.

The lead plaintiffs, Mr. Bleiler and Mr. Bayney, filed a motion for an award of attorneys' fees, reimbursement of litigation expenses, and compensatory awards. Lead counsel seek an award of one third of the Settlement, or $918,333. Lead counsel also seek reimbursement of $296,111.74 in litigation expenses, most of which was incurred in retaining an expert who provided evidence in support of the plaintiffs' motion for class certification. Finally, Mr. Bleiler and Mr. Bayney seek compensatory awards of $10,000 each for their dedication to pursuing this claim on behalf of the class.

## Legal Standards

Class actions may only be settled with court approval. Fed. R. Civ. P. 23(e). A district court may approve a settlement agreement "only after a hearing and only on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The Third Circuit Court of Appeals has stated its policy in favor of voluntary settlement agreements, especially in class actions and other complex litigations. *Ehrheart v. Verizon Wireless,* 609 F.3d 590, 594–95 (3d Cir. 2010). Nevertheless, "[t]he decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." *Girsh v. Jepson,* 521 F.2d 153, 156 (3d Cir. 1975).

## Discussion

### I. Motion for Final Approval of Class Action Settlement and Plan of Allocation

#### A. Final Settlement Class Certification

The Court conducted an analysis regarding settlement class certification under Rule 23 at the preliminary certification stage. *See In re Innocoll Holdings Public Ltd. Co. Sec. Litig.,* No. 17-cv-341, 2022 WL 717254, at *2–4 (E.D. Pa. Mar. 10, 2022). No material facts have changed since the preliminary certification, and so neither does this Court's Rule 23 analysis. The proposed class—all investors, excluding Innocoll directors and officers, who purchased or acquired Innocoll stock between July 25, 2014 (the date of Innocoll's IPO), and December 29, 2016 (the date it announced it had received the Refusal to File letter)—is ascertainable because "objective" and "administratively feasible" criteria are used to determine membership.

The settlement class also satisfies the four prerequisites of Rule 23(a): numerosity, commonality, typicality, and adequacy, Fed. R. Civ. P. 23(a). Innocoll, a nationally traded company, had thousands of shareholders during the relevant time period. The plaintiffs in the settlement class share common questions of law or fact, including whether Innocoll's statements around possible FDA approval of XaraColl were misleading, whether Mr. Zook and Dr. Russell knew, or should have known, that the statements were misleading, and whether the statements affected the stock price. Mr. Bleiler and Mr. Bayney, the lead plaintiffs, present claims that are typical of the class because they rely on the same legal theories and alleged misrepresentations as the other shareholders in this suit.

**\*3** The plaintiffs also fit into one of the subcategories of class actions listed in Rule 23(b). Fed. R. Civ. P.

2022 WL 16532571

23(b). Certification is warranted where the class meets the prerequisites of Rule 23(a), "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b), 23(b)(3). The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Anchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

The Court found at the preliminary certification stage that the resolution of these disputes via a class action was superior to multiple individual suits, and common issues predominated over individual issues. *See In re Innocoll*, 2022 WL 717254, at *2–4. Where there are potentially thousands of shareholders within the proposed class, class resolution is preferable to multiple relitigations that would drain both the parties and the courts of their resources. And, as the Court previously noted, common issues predominate because the shareholders must show that Innocoll made a material misrepresentation, that Innocoll knew or should have known was a misrepresentation, that the individual shareholder relied on that statement, and that misrepresentation resulted in a loss of the shareholder's money. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011). Because the plaintiffs invoked the fraud-on-the-market theory, this Court found that the shareholders had established a showing of class-wide reliance on Innocoll's misrepresentations. *See Basic Inc. v. Levinson*, 485 U.S. 224, 241–47 (1988) (holding that under the fraud-on-the-market theory, applying a rebuttable presumption of class-wide reliance is not improper).

Therefore, the Court finds that final class certification for settlement is appropriate.

**B. Adequacy of Notice**

Rule 23(e) provides that a court must "direct notice in a reasonable manner to all class members who would be bound by the [Settlement] proposal." Fed. R. Civ. P. 23(e)(1)(B). Rule 23(c) additionally provides that notice, written in "plain, easily understood language," must be sent "to all members who can be identified through reasonable effort" and contain the following information:

(i) the nature of the action;

(ii) the definition of the class certified;

(iii) the class claims, issues or defenses;

(iv) that a class member may enter an appearance through an attorney if the member so desires;

(v) that the court will exclude from the class any member who requests exclusion;

(vi) the time and manner for requesting exclusion; and

(vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B). Under the PSLRA, notices to settlement class members must also include statements on plaintiff recovery, the potential outcome of the case, attorneys' fees or costs sought, identification of counsel representatives available to answer queries, and reasons for the settlement. 15 U.S.C. § 78u-4(a)(7).

Here, the notice provided to settlement class members comports with the requirements of Rule 23 and the PSLRA. SCS, a third-party claims administrator acting under the supervision of lead counsel, sent out notices via mail and email that included, *inter alia*, the nature of the class action, the progress and current status of the litigation, the settlement class definition, that a class member may be represented by his or her own lawyer, the process for exclusion, the binding effect of the judgment absent a request for exclusion, attorney's fees and costs sought, the estimated distribution per damaged share, and the time and place of the fairness hearing. The Court finds that the contents of the notices sent to the settlement class members were "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).

**\*4** Moreover, the notice complied with the proposed notice program. Notices were sent in a combination of individual first-class mail or email to all settlement class members who could be identified. Those mailings were supplemented by copies of the notice and claim forms posted to the SCS Settlement website and a publication notice was published in *Investor's Business Daily* and electronically published on *GlobeNewswire*. The Court concludes that the notice program provided Settlement class members "the best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2) (B).

In re Innocoll Holdings Public Ltd. Co. Sec. Litig., Not Reported in Fed. Supp. (2022)

2022 WL 16533571

## C. Final Settlement Approval

Courts may approve of class settlements upon finding that a proposal is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The Federal Rules of Civil Procedure require that the Court consider "whether: (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate ...;and (D) the proposal treats class members equitably relative to each other." *Id.* Within the Third Circuit, courts employ a more expansive fairness inquiry, which includes the following nine *Girsh* factors:

(1) the complexity, expense and likely duration of the litigation;

(2) the reaction of the class to the settlement;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the risks of establishing liability;

(5) the risks of establishing damages;

(6) the risks of maintaining the class action through the trial;

(7) the ability of the defendants to withstand a greater judgment;

(8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and]

(9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975) (internal quotations and ellipses omitted). Courts may also consider, when appropriate, the six additional *Prudential* factors:

(1) the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages;

(2) the existence and probable outcome of claims by other classes and subclasses;

(3) the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants;

(4) whether class or subclass members are accorded the right to opt out of the settlement;

(5) whether any provisions for attorneys' fees are reasonable; and

(6) whether the procedure for processing individual claims under the settlement is fair and reasonable.

*In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 323 (3d Cir. 1998). While a district court is required to make findings as to the *Girsh* factors, the *Prudential* factors illustrate additional queries a court *may* pose "for a thoroughgoing analysis of a settlement's terms." *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 350 (3d Cir. 2010).[1] "The proponents of the settlement bear the burden of proving that [the *Girsh*] factors weigh in favor of approval." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995).

### 1. Initial Presumption of Fairness

**\*5** District courts in the Third Circuit also apply an initial presumption of fairness for proposed settlements if: "(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *In re Prudential*, 148 F.3d at 535 (quoting *In re Cendant Corp. Litig.*, 264 F.3d 201, 232 n.18 (3d Cir. 2001)). Each prong of this analysis is satisfied here. The negotiations around settlement appear to be at arm's length given the failure of the mediation process that took place in August 2019 and the failures of subsequent negotiations between parties. As discussed in more detail below, the plaintiffs had the opportunity to conduct extensive discovery since this case was filed in early 2017. The lead plaintiff's counsel have demonstrated their experience in prosecuting similar securities class actions for nearly 20 years. Finally, no class members objected to the Settlement. The Court therefore applies an initial presumption of fairness to this Settlement.

In re Innocoll Holdings Public Ltd. Co. Sec. Litig., Not Reported in Fed. Supp. (2022)

2022 WL 16533571

## 2. The *Girsh* Factors

The Court now considers each *Girsh* factor in turn and finds that they weigh heavily in favor of approving the Settlement.

### i. *The Complexity, Expense and Likely Duration of the Litigation*

"Securities fraud class actions are notably complex, lengthy, and expensive cases to litigate." *In re Par Pharm. Sec. Litig.*, No. 06-cv-3226, 2013 WL 3930091, at *4 (D.N.J. July 29, 2013). The degree of complexity, high cost, and probable significant duration of this matter, should it continue to be litigated, weigh in favor of settlement. Further, there are multiple issues that would either complicate the litigation of this matter or add substantial expense. First, the plaintiff class's claims are complicated where the plaintiffs must establish the requisite mental state of Innocoll, Mr. Zook, and its Dr. Russell, particularly where neither individual defendant sold their own personally-held stock. Second, because Innocoll stock was relatively thinly traded, the plaintiff class could face difficulty establishing that the shares were trading on an efficient market, which would require class members to show their individual reliance on the allegedly misleading statements of Innocoll and its officers. Third, both parties would incur expenses relating to experts, some of whom would describe the underlying issue of the FDA's categorization of drugs, devices, and drug/device combinations and some of whom would model the damages and loss causation based on market and industry conditions at the time of the allegedly false statements made by Innocoll, Mr. Zook, and Dr. Russell. Fourth, the plaintiffs may have difficulty maintaining a class of shareholders who purchased or acquired Innocoll stock between Innocoll's IPO in July 2014 and December 2016, when the first allegedly misleading statement about XaraColl's NDA was made in March of 2016. Fifth, because Innocoll's principal offices are located in Ireland, additional costs would be incurred in the prosecution of letters rogatory in Ireland, the hiring of a qualified Irish barrister to oversee depositions in Ireland, and the costs of preparing for and attending depositions in a foreign country.

Finally, even though the initial complaint in this action was filed in early 2017, if litigation continued, the plaintiff class would still have to succeed in certifying the class, survive summary judgment, survive Innocoll's pre-trial motions, prevail at trial, survive post-trial motions, and prevail on appeal. The lead plaintiffs estimate that, even assuming the plaintiff class's success at each of these steps, class members would be delayed in recovering their damages by at least five years if this action did not settle. While the Court's timing estimate is more optimistic, there is no question that a settlement now will bring recovery and conclusion considerably sooner and with more certainty than full-blown litigation through trial.

### ii. *The Reaction of the Class to the Settlement*

**\*6** The second *Girsh* factor "attempts to gauge whether members of the class support the settlement." *In re Prudential*, 148 F.3d at 318. Here, there were no objections or exclusion requests in response to the notices mailed or emailed to potential class members, nor were there any objections made to the Settlement at the final approval hearing. The significant disparity between the number of class members who received the Settlement notice and the number of objections weighs in favor of Settlement approval. *See In re Cendant*, 264 F.3d at 235.

### iii. *The Stage of the Proceedings and the Amount of Discovery Completed*

The third *Girsh* factor "captures the degree of case development that class counsel have accomplished prior to settlement," from which courts should determine whether counsel had an opportunity to assess the merits of the action before negotiations began. *In re Gen. Motors*, 55 F.3d at 813. As noted, this action began over five years ago. In the years since, the plaintiff class has conducted two investigations —involving reviewing public records, speaking with former Innocoll employees, and consulting a regulatory expert— prior to discovery. The plaintiff class also argued twice against Innocoll's motions to dismiss the First Amended Complaint and the Second Amended Complaint. *See generally* Pls.' Resp. in Opp. to Mot. to Dismiss, Doc. No. 29; Pls.' Mem. of Law in Opp. to Mot. to Dismiss, Doc. No. 52. Once the parties proceeded to discovery in April 2020, the plaintiff class reviewed over 400,000 pages of documents, served requests for admissions and interrogatories, prepared for depositions in Ireland near Innocoll's principal offices, deposed two experts on class certification, and deposed both Mr. Bleiler and Mr. Bayney. The parties had ample opportunity to consider the strengths and weaknesses of the action, and the third *Girsh* factor weighs in favor of Settlement approval.

In re Innocoll Holdings Public Ltd. Co. Sec. Litig., Not Reported in Fed. Supp. (2022)

2022 WL 16533571

#### iv. *The Risks of Establishing Liability and Damages*

The fourth and fifth *Girsh* factors together "survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement." *In re Prudential*, 148 F.3d at 319. As discussed above, should this case continue to be litigated, several complicating factors would need to be addressed. The plaintiff class would need to present expert testimony on the complex technicalities of the FDA categorization of drugs and medical devices as well as the intricacies of market modeling. Additional risk would be incurred on the question of the scienter of the defendants, particularly where Mr. Zook and Dr. Russell did not sell off any of their personally held stock during the period when the price of Innocoll stock was allegedly artificially inflated. Even assuming the plaintiff class could overcome these sizable challenges, it would likely be several years before any of the plaintiff class could receive compensation, particularly if Innocoll appealed a trial outcome favorable to the plaintiff class. Given these risks, this factor, too, weighs in favor of Settlement approval.

#### v. *The Risks of Maintaining the Class Action Through the Trial*

"The value of a class action depends largely on the certification of the class because, not only does the aggregation of the claims enlarge the value of the suit, but often the combination of the individual cases also pools litigation resources and may facilitate proof on the merits." *In re Gen. Motors*, 55 F.3d at 817. As described above, a motion for class certification would face challenges because Innocoll stock was thinly traded, did not receive coverage by many analysts, and had substantial bid-ask spreads, particularly in the time between Innocoll's IPO and December 10, 2015. These are relevant factors that may indicate the absence of an efficient market. *See Hayes v. Gross*, 982 F.2d 104, 107 n.1 (3d Cir. 1992) (noting that factors supporting an inference of an efficient market included: "(1) allegations of a large average trading volume; (2) allegations that a significant number of securities analysts followed and reported on the security; (3) allegations that the security had numerous market makers; (4) allegations that the company was entitled to file an SEC Form S-3 Registration Statement; and (5) allegations of facts showing a causal connection between

unexpected corporate events or financial releases and an immediate response in the stock price," (citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1286–87 (D.N.J. 1989)))". The degree of risk around maintaining the class action supports approval of the Settlement.

#### vi. *The Ability of the Defendants to Withstand a Greater Judgment*

**\*7** There is no evidence presented that would suggest Innocoll or its parent could not pay a more substantial judgment amount. But the same can generally be said "in any class action against a larger corporation ... and ... this fact alone does not undermine the reasonableness of the instant settlement." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 323 (3d Cir. 2011). Because the parties have not submitted more specific details on this factor, the Court will consider the factor as neutral in its analysis, neither favoring nor disfavoring Settlement.

#### vii. *The Range of Reasonableness of the Settlement Fund*

"The last two *Girsh* factors ask whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial." *In re Prudential*, 148 F.3d at 322; *see also In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 538 (3d Cir. 2004). The Settlement provides for a fund of $2,755,000, which is about 12% of the plaintiffs' estimated maximum damages of $22,900,000. Horne Decl. ¶ 20, Doc. No. 131. If the certified class were limited to investors who purchased or acquired Innocoll stock between December 10, 2015, and December 29, 2016, the Settlement would represent a 26% recovery of approximately $10,800,000 in damages. The more modest 12% recovery is not unreasonable, given the "costs, risks, and delay of trial and appeal" for both the settlement class and Innocoll, Mr. Zook, and Dr. Russell. Fed. R. Civ. P. 23(e)(2) (C)(i); *see* Laarni T. Bulan & Laura E. Simmons, Cornerstone Research, *Securities Class Action Settlements – 2021 Review and Analysis*, at 6 (2021) (finding that the median settlement between 2012 and 2020 for cases where damages were estimated as less than $25,000,000 was 18.2% of the estimated damages, while in 2021, the median settlement was 12.5%). Because of the considerable risks the plaintiff class would have undertaken if they had proceeded with more litigation and the guaranteed compensation provided by

In re Innocoll Holdings Public Ltd. Co. Sec. Litig., Not Reported in Fed. Supp. (2022)

2022 WL 16533571

the Settlement fund, these final two factors also support the Court's approval of the Settlement.

### 3. Relevant *Prudential* Factors

With the *Girsh* factors weighing in favor of Settlement approval, the Court next turns to the relevant additional *Prudential* factors.[2]

Courts may consider "the maturity of the underlying substantive issues, as measured by ... the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages." *In re Prudential*, 148 F.3d at 323. As discussed in the *Girsh* analysis, the parties in this five-year-old case have had ample time for investigation and discovery and are well-informed of the strengths and weaknesses of the case should it proceed through litigation. Moreover, plaintiffs' lead counsel has almost two decades' worth of experience in prosecuting securities class actions and has secured significant settlements for clients in cases against large technology, automobile, and biotech companies. The expertise of its counsel bears on the plaintiffs' ability to assess the potential risks and benefits if this case were to proceed to trial.

 **\*8** Settlement class members have the right to opt out of the Settlement, which is yet another consideration supporting the Court's approval of the Settlement.

As further analyzed below, the attorneys' fees requested by lead counsel are reasonable. The fees requested constitute one third of the Settlement fund, which is within a reasonable range given both lead counsel's efforts in a challenging action made more complex by certain adverse facts and a comparison with fee awards in other Third Circuit class action settlements. *See, e.g., Kanefsky*, 2022 WL 1320827, at \*11 (approving as reasonable a requested award of 29.2% of the settlement amount and collecting several Third Circuit cases where fees of 33.3% of the settlement funds were approved).

Finally, both Rule 23(e)(2)(c)(ii) and the last *Prudential* factor ask whether the procedure for processing claims is fair. To make a claim, a Settlement class member must submit a "Proof of Claim and Release Form." *See* Stip., Ex. E, Doc. No. 121-7. That form requires that the potential class member provide a list of transactions and documentary proof to confirm class membership and ascertain the loss. This

process is reasonable, fair, and typical. *See, e.g., Kanefsky*, 2022 WL 1320827, at \*6; *In re Ocean Power Techs., Inc.*, No. 3:14-CV-3799, 2016 WL 6778218, at \*3, \*24 (D.N.J. Nov. 15, 2016).

Having conducted an analysis under both the *Girsh* factors, as required, and the relevant *Prudential* factors, the Court approves the settlement as fair, reasonable, and adequate.[3]

### D. Plan of Allocation

Under Rule 23, the Court must consider whether "the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). In the Third Circuit, "[a]pproval of a plan of allocation of a settlement fund in a class action is governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable and adequate." *In re Ikon Office Sols., Inc., Sec. Litig.*, 194 F.R.D. 166, 184 (E.D. Pa. 2000) (internal quotations omitted). Plans of allocation that reimburse a member of a class based on the type and extent of his injury are generally reasonable. *Sullivan*, 667 F.3d at 328.

Here, under the plan of allocation, a calculation of each Settlement class member's recognized loss is based on when the securities were purchased and sold, the purchase and sale price of the Innocoll securities, and the estimated artificial inflation of the purchase and sale price at the relevant time, as determined by the plaintiffs' damages expert. The recognized losses are reduced by 90% for claims related to purchases of Innocoll shares during the company's IPO. This adjustment reflects the difficulty of proving that securities purchased in an IPO are purchased in an efficient market, absent unusual circumstances. Recognized losses are similarly reduced by 50% for claims related to purchases in the period between June 25, 2014, and March 16, 2016. This adjustment reflects the relative weakness of claims for purchases of Innocoll stock made before the allegedly misleading statements on the XaraColl NDA, the first of which occurred on March 17, 2016. The Settlement fund is then allocated *pro rata* based on the adjusted recognized loss. The plan of allocation is therefore fair, reasonable, and adequate. *See, e.g., Careccio v. BMW of N. Am. LLC*, No. 08-cv-2619, 2010 WL 1752347, at \*6 (D.N.J. Apr. 29, 2010) (finding that plan of allocation with tiered relief did not foreclose a finding that a Settlement is fair).

In re Innocoll Holdings Public Ltd. Co. Sec. Litig., Not Reported in Fed. Supp. (2022)

2022 WL 16533571

## II. Attorneys' Fees, Reimbursement of Expenses, and Compensatory Awards

**\*9** Lead counsel seek an award of attorneys' fees equal to one third of the Settlement, or $918,333, as well as reimbursement of $296,111.74 in out-of-pocket litigation expenses. Lead plaintiffs Mr. Bleiler and Mr. Bayney seek compensatory awards of $10,000 each.

### A. Attorneys' Fees

The Third Circuit Court of Appeals has approved of "the long line of common fund cases that hold that attorneys whose efforts create, discover, increase, or preserve a [common] fund ... are entitled to compensation" out of that fund. *In re Cendant*, 404 F.3d at 205. When a court assesses attorneys' fees, it typically applies one of two methods: the percentage-of-recovery method or the lodestar method. *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005). However, courts favor the percentage-of-recovery method in common fund cases because this method "rewards counsel for success and penalizes it for failure." *In re Prudential*, 248 F.3d at 333 (quoting *In re Gen. Motors*, 55 F.3d at 821).

District courts in the Third Circuit applying the percentage-of-recovery method must consider ten factors when determining whether a percentage fee award is reasonable. *In re Diet Drugs*, 582 F.3d 524, 541 (3d Cir. 2009). The so-called *Gunter* factors include:

(1) the size of the fund created and the number of persons benefitted;

(2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel;

(3) the skill and efficiency of the attorneys involved;

(4) the complexity and duration of the litigation;

(5) the risk of nonpayment;

(6) the amount of time devoted to the case by plaintiffs' counsel; and

(7) the awards in similar cases.

*Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000). Additionally, district courts weigh "[8] the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to the efforts of other groups, such as government agencies conducting investigations ...; [9] the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained ...; and [10] any 'innovative' terms of settlement." *In re AT&T Corp.*, 455 F.3d 160, 165 (3d Cir. 2006) (citing *In re Prudential*, 148 F.3d at 338–40, 342). The reasonableness factors "need not be applied in a formulaic way" because "[e]ach case is different, and in certain cases, one factor may outweigh the rest." *Gunter*, 223 F.3d at 195 n.1.

### 1. The *Gunter & Prudential* Factors

Turning to the analysis set forth under *Gunter* and *Prudential* and applying the factors to this unique case, the Court finds that the attorneys' fees proposed by lead counsel are reasonable.

### i. *Size of the Fund and Number of Persons Benefitted*

This case is relatively modest for a securities class action, with a Settlement fund of $2,755,000. At the final approval hearing, lead counsel indicated that there are approximately 123 claimants with valid claims.

Fee awards "involve a sliding scale dependent upon the ultimate recovery, the expectation being that, absent unusual circumstances, the percentage [of attorneys' fees] will decrease as the size of the fund increases." *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 736 (3d Cir. 2001). Underlying this inverse relationship between the size of the fund and the percentage of awards is the theory that an increase in recovery correlates more to the size of the class than to the effectiveness of counsel. *In re Prudential*, 148 F.3d at 339. Given the relatively small size of the fund here, the Court does not find that an attorney fee recovery of 33.33% of the Settlement fund is unreasonable.

### ii. *Objections*

**\*10** "[T]he absence of substantial objections by class members to the fee requests weigh[s] in favor of approving the fee request." *In re Rite Aid*, 396 F.3d at 305. Here, the notices sent to potential Settlement class members informed them that lead counsel would apply for attorneys' fees of

In re Innocoll Holdings Public Ltd. Co. Sec. Litig., Not Reported in Fed. Supp. (2022)

2022 WL 16533571

up to one third of the Settlement amount and advised them on how to object to the attorneys' fees. No Settlement class member objected to the attorneys' fees or any out-of-pocket reimbursements sought, and, indeed, no person sought exclusion from the Settlement class. This weighs in favor of approving the attorneys' fees in the amount requested.

### iii. *Counsel's Skill and Efficiency*

Applying the third *Gunter* factor regarding the performance of counsel, courts consider "the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case, and the performance and quality of opposing counsel." *In re Computron Software, Inc.*, 6 F. Supp. 2d 313, 323 (D.N. J. 1998). Here, lead counsel have achieved a 12% guaranteed recovery of the maximum possible damages claimed by the plaintiffs. Although the case presented significant factual difficulties for plaintiffs to overcome, lead counsel skillfully opposed two motions to dismiss, underwent significant discovery, prepared for depositions, and fully briefed a motion for class certification that prompted Innocoll to revisit settlement discussions. Lead counsel is experienced in securities class actions, regularly obtaining settlements for clients in excess of $20,000,000. *See* Ex. 2 to Horne Decl., Doc. No. 131-2, at 9–52. The Court finds that lead counsel's skillful performance over the past five years merits approval of the requested attorneys' fees.

### iv. *Complexity and Duration of Litigation*

As discussed in the *Girsh* factor analysis, "[s]ecurities fraud class actions are notably complex, lengthy, and expensive cases to litigate." *In re Par Pharm.*, 2013 WL 3930091, at *4. Certain adverse facts presented additional complexity for the plaintiffs' case. In the five years since the first complaint was filed, lead counsel has reportedly spent 4,451.28 hours drafting three complaints, opposing two motions to dismiss, undertaking discovery, taking or defending five depositions, briefing motions for class certification, negotiating settlement, and now, filing motions for preliminary and final approval. This lends additional weight in support of granting the fee request.

### v. *Risk of Nonpayment*

"Courts routinely recognize that the risk created by undertaking an action on a contingency fee basis militates in favor of approval" of attorneys' fees awards. *In re Schering-Plough Corp. Enhance ERISA Litig.*, No. 08-cv-1432, 2012 WL 1964451, at *7 (D.N.J. May 31, 2012). Lead counsel undertook this case entirely on contingency. Given the difficulties presented by the facts of the case, including a question of whether plaintiffs could rely on a fraud-on-the-market theory in certifying the class, there was significant risk that over five years of effort would result in no compensation. This factor, too, militates in favor of granting the requested attorneys' fees.

### vi. *Amount of Time Devoted to the Case*

Lead counsel aver via affidavit that they have expended 4,451.28 hours on this case. Horne Decl. ¶ 23, Doc. No. 131. This figure accounts for hours billed through June 1, 2022, and presumably does not account for subsequent work relating to final approval of the Settlement and any post-Settlement work. This amount of time appears reasonable to the Court.

### vii. *Awards in Similar Cases*

 **\*11**  The Third Circuit Court of Appeals has previously noted that fee awards tend to range between 19% and 45% of a settlement fund. *In re Gen. Motors*, 55 F.3d at 822. For smaller securities fraud settlements, like this one, that range is typically narrowed to "30% to 35% of the recovery, plus expenses." *In re Ravisent Techs., Inc. Sec. Litig.*, No. 00-cv-1014, 2005 WL 906361, at *11 (E.D. Pa. Apr. 18, 2005); *see e.g., P. Van Hove BVBA v. Universal Travel Grp., Inc.*, No. 11-cv-2164, 2017 WL 2734714, at *12 (D.N.J. June 26, 2017) (finding a one-third fee appropriate where settlement fund was $4.5 million, before adjudication of the motion to dismiss); *Schuler v. Meds. Co.*, No. 14-cv-1149, 2016 WL 3457218, at *10 (D.N.J. June 24, 2016) (approving a 33% award for attorneys' fee where the common fund held $4.25 million and the case settled at the motion to dismiss stage); *Yedlowski v. Roka Bioscience, Inc.*, No. 14-cv-8020, 2016 WL 6661336, at *22 (finding 30% attorneys' fee appropriate where settlement fund amount was $3,275 million and case settled before adjudication of the motion to dismiss). Lead

In re Innocoll Holdings Public Ltd. Co. Sec. Litig., Not Reported in Fed. Supp. (2022)

2022 WL 16533571

counsel's request sits comfortably within the typical range of recovery for class action settlements of this size.

#### viii. *Value Attributable to Class Counsel*

Lead counsel did not ride on anyone's coattails in this action. No government or third-party action or investigation preceded the filing of the plaintiffs' claims. Therefore, all resulting benefits that accrue to the Settlement class members are attributable to the work of lead counsel, strengthening a conclusion that this Court should approve the requested fee award.

#### ix. *Negotiated Percentage Fee*

The ninth factor in the fee reasonableness inquiry requires the Court to consider the percentage fee that would have been negotiated if the case had been subject to a private contingent fee agreement at the time counsel was retained. Courts in the Third Circuit have found that a one-third contingency fee would fit within the customary range. *See, e.g., Dartell v. Tibet Pharm., Inc.*, No. 14-cv-3620, 2017 WL 2815073, at *8, *11 (D.N.J. June 29, 2017); *Yedlowski*, 2016 WL 6661336, at *23. This weighs in favor of granting the requested attorneys' fees of one-third the amount of the Settlement Fund.

#### x. *Innovative Terms*

Lead counsel has not suggested that the Settlement has any non-standard terms, so this factor does not support approval of the requested fees. Nevertheless, the clear weight of the *Gunter* and *Prudential* factors suggests that the requested fees are reasonable.

#### 2. Lodestar Comparison

The Third Circuit Court of Appeals has encouraged district courts to cross-check a percentage fee award against a lodestar calculation to confirm its reasonableness. *In re Rite Aid*, 396 F.3d at 305–06. "The lodestar award is calculated by multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys." *Id.* at 305. The lodestar multiplier, in turn, is calculated by

dividing the requested attorneys' fees by the lodestar award amount. *Stagi v. Nat'l R.R. Passenger Corp.*, 880 F. Supp. 2d 564, 572 (E.D. Pa. 2012). A fractional multiplier is within the acceptable range in the Third Circuit "and provides strong additional support for approving the attorneys' fee request." *Id.*

The lodestar award calculated by lead counsel through June 1, 2022 is $2,423,348.25. Horne Decl. ¶ 23, Doc. No. 131. Counsel's hourly rates, per this calculation, are relatively high, ranging from $550 to $1,250 per hour. Nevertheless, lead counsel avers that these rates are equivalent to peer firm current rates and take into account the partnership status, education, experience, and reputation of the billing lawyer. Courts in the Third Circuit have found that hourly rates ranging between $295 to $1,250 are reasonable in the context of securities class actions. *See In re Wilmington Trust Sec. Litig.*, No. 10-cv-0990, 2018 WL 6046452, at *10 n.4 (D. Del. Nov. 19, 2018). When compared to the requested attorneys' fee of $918,333, the lodestar multiplier is 0.38. Moreover, counsel's actual hourly rate, calculated by dividing the $918,333 requested by 4,451.28 hours, is a more modest $206.31 per hour. The lodestar cross-check therefore confirms the Court's conclusion that the requested fee award is reasonable.

### B. Litigation Expenses

**\*12**  In addition to an attorneys' fee award, lead counsel request reimbursement of out-of-pocket litigation expenses of $296,111.74. "In the Third Circuit, it is standard practice to reimburse litigation expenses in addition to granting fee awards." *McDonough v. Toys R Us, Inc.*, 80 F. Supp. 3d 626, 658 (E.D. Pa. 2015). A summary of expenses may be adequate to show that the expenses incurred were reasonable. *Chemi v. Champion Mortg.*, No. 2:05-cv-1238, 2009 WL 1470429, at *13 (D.N.J. May 26, 2009).

Lead counsel has produced a categorized list of expenditures. Horne Decl. ¶ 27, Doc. No. 131. Counsel also provided, at the Court's request, invoices substantiating the significant expense incurred relating to the plaintiffs' financial expert, which constituted $188,207 of the $296, 11.74 requested. The expenses included: court fees, copying and printing costs, document hosting and analysis, FDA expert fees, financial expert fees, investigator fees, legal research, mediation fees, overnight and hand delivery, service of process, travel, and costs related to press releases and notice to class members.

Courts generally permit reimbursement of expenses within these categories. *See, e.g., Kanefsky,* 2022 WL 1320827, at *12 (approving reimbursement of expenditures for experts, consultants, computer research, and travel); *W. Palm Beach Police Pension Fund v. DFC Global Corp.,* No. 13-cv-6731, 2017 WL 4167440, at *9 (E.D. Pa. Sept. 20, 2017) (finding photocopying and postage expenses, *inter alia,* to be reimbursable); *Katz v. China Century Dragon Media, Inc.,* No. CV11-02769, 2013 WL 11237202, at *8 (C.D. Cal. Oct. 10, 2013) (approving the reimbursement of mediation, private investigation, service of process, press release, and notice fees). Moreover, although the notice provided to potential Settlement class members stated that lead counsel would seek reimbursement of expenses up to $325,000, no Settlement class members objected to the reimbursement. The Court therefore approves lead counsel's request for reimbursement of $296, 111.74 in out-of-pocket litigation expenses.

### C. Compensatory Awards for Lead Plaintiffs

Mr. Bleiler and Mr. Bayney, the lead plaintiffs, seek an award of $10,000. "[C]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *In re Flonase Antitrust Litig.,* 291 F.R.D. 93, 106 (E.D. Pa. 2013). The PSLRA contemplates "the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class." 15 U.S.C. § 78u-4(a)(4). Unlike the attorneys' fee analysis, a district court need not employ factors to determine the amount of class representative awards. *See Brady v. Air Line Pilots Ass'n,* 627 F. App'x 142, 146 (3d Cir. 2015).

Both Mr. Bleiler and Mr. Bayney have adequately and diligently attended to this litigation since it began over five years ago. They both prepared and sat for depositions, searched for and produced documents, reviewed pleadings,

and oversaw the adequacy of lead counsel's representation. Mr. Bleiler and Mr. Bayney devoted 90 hours and 73 hours, respectively, to this case, with Mr. Bleiler communicating with lead counsel over 150 times during the litigation and Mr. Bayney spending two vacation days to prepare for his deposition.[4] The notices sent to potential Settlement class members informed them that the lead plaintiffs could seek compensatory awards up to $10,000 each, and no class members objected to that information. Finally, a compensatory aggregate award of $20,000 is relatively modest at less than one percent of the Settlement fund and is not unreasonable when compared to compensatory awards granted by other courts in the Third Circuit. *See Elkin v. Walter Inv. Mgmt. Corp.,* 17-cv-02025, 2018 WL 8951073, at *2 (E.D. Pa. Dec. 18, 2018) (awarding lead plaintiff $10,000 from settlement fund of $2.95 million); *In re Par Pharm.,* 2013 WL 3930091, at * 11 (approving an award of $18,000 from a settlement fund of $8.1 million after finding that the lead plaintiff had reviewed and approved pleadings and regularly communicated with lead counsel, and no objections had been raised by class members in receipt of notice that the award was sought).

**\*13**  The Court therefore grants Mr. Bleiler and Mr. Bayney compensatory awards of $10,000 each.

### Conclusion

For the reasons set forth above, the Court finally approves the Settlement and plan of allocation and awards attorneys' fees of one-third of the Settlement, reimbursement of litigation expenses of $296,111.74, and compensatory awards of $10,000 to both lead plaintiffs. An appropriate order follows.

### All Citations

Not Reported in Fed. Supp., 2022 WL 16533571

Footnotes

1    Despite the 2018 amendment to Federal Rule of Civil Procedure 23(e)(2), which added a list of factors for a court to consider in evaluating class action settlements, courts within the Third Circuit have continued to analyze such actions under the *Girsh* and *Prudential* factors. *Kanefsky v. Honeywell Int'l Inc.,* No. 18-cv-15536, 2022 WL 1320827, at *4 n.3 (D.N.J. May 3, 2022). This Court will therefore focus its analysis on the more expensive *Girsh* and *Prudential* factors rather than the Rule 23 factors.

2    Several of the *Prudential* factors are inapplicable here because no individual lawsuits were filed, nor were claims made by other classes or subclasses. *See In re Prudential,* 148 F.3d at 323 (listing as possible considerations "the existence

2022 WL 16533571

and probable outcome of claims by other classes and subclasses" and "the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants").

3    However, the Court's Final Order and Judgment does not incorporate the proposed release with its unbridled breadth of all "Unknown Claims" as proposed in § 1.42 of the Stipulation of Settlement. Stipulation of Settlement ¶ 1.42, Doc. No. 121-2. The Court approves and incorporates a release by plaintiff class members of all claims, known or unknown, arising out of any securities transaction, representation, or value change that occurred or should have occurred, or otherwise existing as of the date of this Order against Innocoll by or on behalf of any and all other members not opting out of the Settlement.

4    Mr. Bleiler disclosed via affidavit that following his approval of the Settlement and attorneys' fee requests, he began an internship with the Schall Law Firm, co-counsel to plaintiffs in this case. Mr. Bleiler received no compensation in connection with this internship, which ran from January to May of 2022, and the Schall Law Firm will not receive any portion of the attorneys' fees in this action. Given this additional information, the Court finds no ethical concerns in awarding Mr. Bleiler a compensatory award for his work as a lead plaintiff.

---

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

In re Linerboard Antitrust Litigation, Not Reported in F.Supp.2d (2004)

2004-1 Trade Cases P 74,458

KeyCite Yellow Flag

Order Amended by In re Linerboard Antitrust Litigation, E.D.Pa., June 4, 2004

2004 WL 1221350

United States District Court,
E.D. Pennsylvania.

In re LINERBOARD
ANTITRUST LITIGATION

No. MDL 1261, Civ.A. 98–5055,
Civ.A. 99–1000, Civ.A. 99–1341.
|
June 2, 2004.

**Attorneys and Law Firms**

Howard I. Langer, Golomb Honik & Langer, Philadelphia, PA, for Box plaintiffs and Liaison counsel for all plaintiffs.

Eugene A. Spector, Jeffrey J. Corrigan, Spector Roseman & Kodroff, Philadelphia, PA, Michael J. Freed, Steven A. Kanner, William London, Much Shelist Freed Denenberg Ament & Rubenstein, P.C., Chicago, IL, for General Refractories Co. and Co-Lead counsel for Corrugated Sheet plaintiffs.

Robert J. LaRocca, Kohn, Swift & Graf, P.C., Philadelphia, PA, H. Laddie Montague, Martin I. Twersky, Berger & Montague, P.C., Philadelphia, PA, Roberta D. Liebenberg, Donald L. Perelman, Fine Kaplan & Black, Philadelphia, PA, W. Joseph Bruckner, Lockridge Grindal Nauen PLLP, Minneapolis, MN, for Box plaintiffs, Oak Valley Farms, Inc., Garrett Paper Inc., Local Baking Products, Inc.

Mark Reinhardt, Mark Wendorf, Reinhardt & Anderson, St. Paul, MN, for Alber I Halper Corrugated Box Co.

James J. Rodgers, Dilworth Paxson, LLP, Philadelphia, PA, Richard J. Leveridge, Elaine Metlin, Sarbina Nelson, Dickstein Shapiro Morin & Oshinsky, LLP, Washington, DC, for Tag-a-long plaintiffs.

Sherry Swirsky, Schnaeder, Harrison, Segal & Lewis, LLP, Philadelphia, PA, for defendants.

Douglas J. Kurdenbach, Kirkland & Ellis, Chicago, IL, for Tenneco, Inc., Tenneco Packaging and Packaging Corp. of America.

Steven J. Harper, Steven C. Seeger, Kirkland & Ellis, Chicago, IL, Daniel B. Huyett, Matthew W. Rappleye, Stevens & Lee, Reading, PA, for International Paper Co., Union Camp Corp.

James H. Schink, Kirkland & Ellis, Chicago, IL, for Weyerhaeuser Co.

R. Mark McCareins, Dane A. Drobny, Michael J. Mayer, Andrew D. Shapiro, Winston & Strawn, Chicago, IL, for Jefferson-Smurfit Corp., Stone Container Corp., Smurfit-Stone Container Corp.

Edward M. Posner, Paul H. Saint-Antoine, Drinker, Biddle & Reath, Thomas F. Slater, Jr., Hunton & Williams, Richmond, VA, for Georgia-Pacific Corp.

*MEMORANDUM*

DUBOIS, J.

**\*1** THIS DOCUMENT RELATES TO: All Actions (Civil Action Numbers 98–5055 and 99–1341)

I. *INTRODUCTION*

Presently before the Court is Class Counsels' Revised Memorandum of Law in Support of Petition for Award of Attorneys' Fees and Reimbursement of Expenses (Document No. 320, filed March 18, 2003) ("Fee Petition"),[1] Declarations in Support of Class Settlements with the Stone and PCA Defendants and in Support of Class Counsels' Petition for Attorneys' Fees and Costs (docket no. 302, filed February 2, 2004), Declaration of Stephen A. Saltzburg in Support of Plaintiffs' Petition for an Award of Attorneys Fees (docket no. 304, filed February 2, 2004), Appendix of Declarations by Counsel for the Class in Support of Petition for Counsel Fees and Reimbursement of Cost Disbursements (docket no. 305, filed February 2, 2004) and Supplemental Affidavit of David J. White, CPA, Regarding Attorneys' Time and Expense Summaries for and Through December 2003, and Litigation Fund Expenses From February 1, 2004 through March 17, 2004 (docket no. 321, filed March 18, 2004). In the Fee Petition, petitioners requests a fee of 30 percent of $202,572,489, the total of the settlements with all defendants in the class action (the "Settlement Fund") and reimbursement of costs totaling $1,391,203.36. A hearing on the Fee Petition was held on March 26, 2004. For the reasons that follow, the Court grants the Fee Petition, and awards petitioners 30

percent of the Settlement Fund and reimbursement of costs in the amount requested.

The Court also writes at this time in ruling on class counsel's unopposed Petition for Payment of Incentive Fees to the Five Class Representatives (Docket No. 301, filed February 2, 2004) ("Incentive Fee Petition").[2] Petitioners have requested $25,000 for each of the five representatives of the classes and the Court concludes that amount is appropriate.

## II. BACKGROUND

The Court sets forth only an abbreviated factual and procedural history as pertinent to the Fee Petition. The factual background of the case is described at length in this Court's Memorandum dated October 4, 2000 denying defendants' Motion to Dismiss, its Memorandum dated September 4, 2001 certifying classes of direct purchasers of corrugated boxes and corrugated sheets, and the Opinion of the Court of Appeals for the Third Circuit affirming the September 4, 2001 Memorandum and Order. *See In re Linerboard Antitrust Litig.,* MDL No. 1261, 2000 WL 1475559, at *1–3 (E.D.Pa. Oct.4, 2000) (*"Linerboard I"* ); *In re Linerboard Antitrust Litig.,* 203 F.R.D. 197, 201–04 (E.D.Pa.2001) (*"Linerboard II"* ); *In re Linerboard Antitrust Litig.,* 305 F.3d 145, 147–49 (3d Cir.2002) (*"Linerboard III"* ).

This is an antitrust action involving allegations that a number of U.S. manufacturers of linerboard[3] engaged in a continuing combination and conspiracy in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The seven lawsuits transferred to this Court for all pretrial proceedings by the Judicial Panel on Multidistrict Litigation on February 12, 1999 were instituted after an administrative complaint filed by the Federal Trade Commission ("FTC") against Stone Container Corporation ("Stone") was resolved by a consent decree. *Linerboard I,* 2000 WL 1475559, at *1 (setting forth allegations in FTC complaint and details of consent decree). Class plaintiffs named the following defendants in their Complaints—Stone Container Corporation, Jefferson Smurfit Corporation, Smurfit–Stone Container Corp., International Paper Company, Georgia–Pacific Corporation, Temple–Inland, Inc., Gaylord Container Corporation, Tenneco, Inc., Tenneco Packaging, Inc., Union Camp Corporation, Packing Corporation of America and Weyerhaeuser Paper Company —and alleged that they conspired to raise the price of corrugated containers and corrugated sheets throughout the United States by restricting production and/or curtailing inventories in violation of federal antitrust laws.

**\*2** By Memorandum and Order dated September 4, 2001, this Court certified the following two plaintiff classes:

Class 1—Sheet Class

All individuals and entities which purchased corrugated sheets in the United States directly from any of the defendants during the class period from October 1, 1993 through November 30, 1995, excluding the defendants, their co-conspirators, and their respective parents, subsidiaries and affiliates, as well as any government entities, and excluding those individuals and entities which purchased corrugated sheets pursuant to contracts in which the purchase price was not tied to the price of linerboard.

Class 2—Box Class

All individuals and entities which purchased corrugated containers in the United States directly from any of the defendants during the class period from October 1, 1993 through November 30, 1995, excluding the defendants, their co-conspirators, and their respective parents, subsidiaries and affiliates, as well as any government entities, and excluding those individuals and entities which purchased corrugated containers pursuant to contracts in which the purchase price was not tied to the price of linerboard or containerboard.

*Linerboard II,* 203 F.R.D. at 224. On September 25, 2001, defendants filed a Petition for Leave to Appeal pursuant to Federal Rule of Civil Procedure 23(f)[4] in the Court of Appeals. By Order dated December 18, 2001, the Court of Appeals granted that petition. Thereafter, on September 5, 2002, the Court of Appeals affirmed the ruling of this Court. By Order dated October 16, 2002, the Court of Appeals denied defendants' petition for *en banc* review. On January 14, 2003, defendants filed a Petition for Writ of Certiorari to the United States Supreme Court. The petition was denied on April 21, 2003. *See Gaylord Container Corp. v. Garrett Paper, Inc.,*—U.S.—, 538 U.S. 977, 123 S.Ct. 1786, 155 L.Ed.2d 666 (2003) (No. 02–1070).

By Order dated August 26, 2003, this Court approved a partial settlement in the amount of $8 million between plaintiff classes and Temple–Inland, Inc. and Gaylord Container Corp. The $8 million settlement was reduced to $7.2 million in accordance with the terms of the settlement agreement based

on the number of parties that subsequently opted-out of the classes. This first partial settlement was described by petitioners as an "ice-breaker-a settlement that would lead to further settlements. Within a month of Court approval of the ice-breaker settlement, on September 22, 2003, the plaintiff classes and defendants International Paper Company and Union Camp Corporation, Georgia Pacific Corporation, and Weyerhauser Company announced they had reached a settlement agreement in the total amount of $68 million. The Court granted final approval of that settlement on December 8, 2003. Prior to that date, in October and November 2003, the parties announced the two additional partial settlements with defendants Packaging Corporation of America, Tenneco, Inc., and Tenneco Packaging, Inc. (The "PCA settlement") in the amount of $43 million and with defendants Stone Container Corporation, Jefferson Smurfit Corporation, and Smurfit Stone Container Corporation (the "Stone settlement") in the amount of $92.5 million. As a result of a "most favored nation's clause" in the PCA settlement agreement, the terms of the Stone settlement triggered a reduction in the amount owed by PCA from $43 million to $34 million. The Court granted final approval of both the PCA settlement and the Stone settlement in a Memorandum and Order dated March 21, 2004. With the Court's approval of these last two partial settlements, all claims in the class action were resolved for a total of $202,572,489.

 **\*3** Petitioners submitted the Fee Petition on February 2, 2004, and a revised Fee Petition, that made only minor clerical changes on March 18, 2004. Petitioners also submitted a series of declarations from experts on class actions, a volume of declarations from all plaintiff counsel detailing their work, and two affidavits from an accountant that managed petitioners' time and expense records. A hearing was held on the Fee Petition on March 26, 2004 (the same hearing at which the PCA and Stone settlements were considered). There were no objections to the Fee Petition.

In the Memorandum the Court will refer to the attorneys involved in three ways: "petitioners" (all counsel representing members of the class), "designated counsel" (lead counsel, liaison counsel and the executive committees appointed by Third Case Management Order dated November 9, 2000) and "liaison counsel" (Howard Langer Esq.).

II. *LEGAL STANDARD*

A.  METHODS  OF  DETERMINING REASONABLENESS OF FEE PETITIONS IN CLASS

ACTIONS:  LODESTAR  AND  PERCENTAGE  OF RECOVERY

"Ordinarily, a court making or approving a fee award should determine what sort of action the court is adjudicating and then primarily rely on the corresponding method of awarding fees (though there is, as we have noted, an advantage to using the alternative method to double check the fee)." *In re GM Trucks,* 55 F.3d 768, 821 (3d Cir.1995). As the Third Court explained in *In re Cendant Corp. Prides Litig.,* 243 F.3d 722 (3d Cir.2001), there are two primary methods for calculating attorneys' fees: the percentage-of-recovery method and the lodestar method.[5] "The percentage-of-recovery method is generally favored in cases involving a common fund,[6] and is designed to allow courts to award fees from the fund 'in a manner that rewards counsel for success and penalizes it for failure' ' by aligning counsel's interests with those of the class.[7] *Id.* at 732; *see also, Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190, 195 n. 1 (3d Cir.2000); *Brytus v. Spang & Co.,* 203 F.3d 238, 243 (3d Cir.2000); *In re Prudential,* 148 F.3d 283, 333–34 (3d Cir.1998); *In re GM Trucks,* 55 F.3d at 821. "The lodestar method is more commonly applied in statutory fee-shifting cases, and is designed to reward counsel for undertaking socially beneficial litigation in cases where the expected relief has a small enough monetary value that a percentage-ofrecovery method would provide inadequate compensation."[8] *Cendant Prides,* 243 F.3d at 732.

B.  REASONABLENESS  OF  FEE  AWARD: PERCENTAGE OF RECOVERY METHOD

This is a common fund case. Therefore, the percentage of recovery method is the proper one to calculate attorneys' fees.

The Supreme Court has held that the standard for evaluating fee awards is reasonableness. *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). In determining whether a particular percentage of recovery is reasonable, the Court first calculates the percentage of the total recovery that the requested fee represents. The Court then evaluates that figure in light of the circumstances of the case. *In re Cendant Corporation Litigation,* 264 F.3d at 256. In making that decision, the Third Circuit has directed district courts to consider seven (7) factors as follows:

 **\*4** (1) the size of the fund created and the number of persons benefitted;

In re Linerboard Antitrust Litigation, Not Reported in F.Supp.2d (2004)

2004-1 Trade Cases P 74,458

(2) the presence or absence of substantial objections by members of the class to the settlement terms and/or the fees requested by counsel;

(3) the skill and efficiency of the attorneys involved;

(4) the complexity and duration of the litigation;

(5) the risk of nonpayment;

(6) the amount of time devoted to the case by plaintiffs' counsel; and

(7) the awards in similar cases.

*Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190, 195 n. 1 (3d Cir.2000) (the "Gunter" factors). The Third Circuit also recommended in *Cendant* that district courts employ a lodestar cross-check in common fund cases using the percentage of recovery method.

III. *DISCUSSION*

In the Fee Petition, petitioners have requested a fee of 30 percent of the Settlement Fund, or approximately $60 million. In determining the reasonableness of that request, the Court addresses each of the *Gunter* factors. The Court will also utilize the lodestar cross-check.

A. *Counsel's Requested 30 Percent Fee is Reasonable Under the Gunter Factors*

1. The Size of the Fund Created and the Number of Persons Benefitted.

a. *Size of the Fund*

The settlements are highly favorable to the class when analyzed as a percentage of total damages. Plaintiff classes' expert, Dr. John C. Beyer, constructed an econometric model and determined that over the class period prices for boxes and sheets were 2.7 percent higher than they would have been absent the alleged conspiracy. *See* Affidavit of John C. Beyer, Ph.D. in Support of Settlement Agreement [with defendants International Paper and Union Camp Corp., Georgia Pacific and Weyerhauser Co.] (docket no. 273, filed November 18, 2003) ("Beyer Aff.") ¶ 46. When this figure was multiplied by all defendants' sales, the result was total damages in the amount of $478 million over the full class period. *Id.* at ¶ 50. The settlements represent approximately 55 percent of the claimed damages, as calculated by plaintiffs' expert for the

statute of limitations period, and approximately 42 percent of the damages for the full period. Fee Petition at 20.

The fact that numerous courts have approved settlements where the percent of damages was substantially lower than in this case provides objective evidence that the settlements are highly favorable. *Lazy Oil Co. v. Witco,* 95 F.Supp.2d 290, 339 (W.D.Pa.1997) (court approved settlement amounting to 5.35 percent of damages for the entire class period and 25.5 percent of the of the damages falling within the limitations period); *In re Anthracite Coal Antitrust Litigation,* 79 F.R.D. 707, 714 (M.D.Pa.1978) (approving settlement of 28 percent of estimated damages for four years); *In re Domestic Air Transp. Antitrust Litig.,* 148 F.R.D. 297, 325 (N.D.Ga.1993) (court approved a combined settlement of approximately 12.7 to 15.3 percent of the estimated $2 billion minimum possible trebled recovery); *Erie Forge and Steel, Inc. v. Cyprus Minerals Co.,* Civil No. 94–404 (W.D.Pa. Dec.23, 1996) (approving settlement of $3.6 million where plaintiffs' expert estimated damages of $44.4 million); *Fox v. Integra Financial Corp .,* Civil Action No. 90–1504 (W.D.Pa. July 9, 1996) (settlement of $6.5 million approved where plaintiffs' best estimate of provable damages was $33 million); *In re Four Seasons Sec. Litig.,* 58 F.R.D. 19, 36–37 (W.D.Okla.1972) ($8 million settlement approved although claims exceeded $100 million); *Cagan v. Anchor Sav. Bank FSB,* [1990 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 95,324 at 96,559, 1990 WL 73423 at *12–13 (E.D.N.Y. May 22, 1990) (approving $2.3 million settlement over objections that "best possible recovery would be approximately $121 million"); *Behrens v. Wotemco Enterprises, Inc.,* 118 F.R.D. 534, 542 (S.D.Fla.1988) ("The mere fact that the proposed settlement of $0.20 a share is a small fraction of the desired recovery of $3.50 a share is not indicative of an inadequate compromise"), *aff'd* 899 F.2d 21 (11th Cir.1990).

*5 In absolute terms, all claims in the class action have been resolved for a total of $202.5 million. According to a recent survey of all class actions between 1972 and 2003, the total settlements in the *Linerboard* litigation make this the sixth largest reported antitrust settlement. 24 Class Action Rep. 157, 169–170 (2003). The settlements are remarkable given the fact that there was no prior government action to establish liability and the case covered a relatively short conspiracy period of 26 months. Dec. in Support of Class Settlements with Stone and PCA Def. and in Support of Class Counsel's Pet. For Attorney's Fees and Costs, Exhibit 1 (Dec. of Howard Langer) at 4. Further, the settlements are to be paid entirely in cash. *Id.*

In re Linerboard Antitrust Litigation, Not Reported in F.Supp.2d (2004)

2004-1 Trade Cases P 74,458

b. *Number of Persons Benefitted*

The number of persons benefitted is large, and includes all entities that purchased corrugated containers and sheets during the class period. Fee Petition at 20. The size of that population is best estimated by the number of entities that were sent the notice describing the final partial settlements-approximately 80,000 companies. *Id.*

Based on the foregoing, the Court concludes that consideration of the first *Gunter* factor-the size of the fund created and the number of persons benefitted-counsels in favor of granting the Fee Petition.

2. The Presence or Absence of Substantial Objections by Members of the Class to the Settlement Terms and/or the Fees Requested by Counsel.

Class members were advised that petitioners would apply for a fee award of up to 30 percent of the Settlement Fund and that class members had a right to object. Fee Petition at 21–22. No objections were filed. *Id.* The absence of objections supports approval of the Fee Petition. *See, e.g., In re Cell Pathways, Inc. Sec. Litig.,* II, 2002 U.S. Dist. LEXIS 18359 at *24 (E .D.Pa. September 23, 2003) (existence of only one objection shows that class does not object to thirty percent requested by attorneys and supports approval of fee petition); *In re Aetna Inc., Sec. Litig.,* 2001 U .S. Dist. LEXIS 68, at *48 (E. D.Pa. Jan. 4, 2001) ("the Class Members's view of the attorneys' performance, inferred from the lack of objections to the fee petition, supports the fee award"). While in some cases a lack of objections may reflect the absence of counsel or unfamiliarity with the legal system, in this case class members are represented by counsel. Further, the classes in these cases include many of the largest corporations in America-entities that are hardly unfamiliar with civil litigation.

Based on the foregoing, the Court concludes that consideration of the second *Gunter* factor-the presence or absence of substantial objections by members of the class to the settlements and/or the fees requested by counsel-supports granting the Fee Petition.

3. The Skill and Efficiency of the Attorneys Involved.

The result achieved is the clearest reflection of petitioners' skill and expertise. *See In re Warfarin Sodium Antitrust Litig. .,* 212 F.R.D. 231, 261 (D.Del.2002) (Class Counsel "showed their effectiveness through the favorable cash settlement they were able to obtain"); *see also, Ikon,* 194 F.R.D. at 194. The size of the settlements in absolute terms and expressed as a percentage of total damages evidences a high level of skill by petitioners.

**\*6** The Court's Memorandum of September 5, 2003 describes in detail designated counsel's work before the largest settlements-the PCA and Stone settlements-were reached. *In re Linerboard Antitrust Litigation,* 292 F.Supp.2d 644 (E.D.Pa.2003). The Court incorporates that section of the September 5, 2003 Memorandum by reference. The Court has repeatedly stated that the lawyering in the case at every stage was superb, and does so again.

Petitioners' skill and efficiency in managing this litigation was revealed in several discrete stages: pre-filing investigation; proceedings before the Judicial Panel on Multidistrict Litigation ("JPML"); investigation leading up to the filing of the Amended Complaint and the joining of additional defendants; class certification and the discovery leading thereto; Rule 23(f) proceedings before the Third Circuit; deposition and other discovery following the Third Circuit's affirmance of this Court's class certification decision; and settlement negotiations between February and October 2003 with all defendants. Dec. in Support of Class Settlements with Stone and PCA Def. and in Support of Class Counsel's Pet. For Attorney's Fees and Costs, Exhibit 1 (Dec. of Howard Langer) at 3.

In the first phase-pre-filing investigation-liaison counsel participated in a working group of attorneys investigating the possibility of private civil actions against Stone Container Corporation following the FTC's publication for public comment of a consent decree with Stone. *Id.* at 4. That group ultimately disbanded without taking action. In June and July 1998, three suits were filed as class actions in the Northern District of Illinois on behalf of a limited group of purchasers of corrugated sheets from Stone. *Id.* According to liaison counsel, these suits were limited to purchasers of sheets because counsel filing those cases was concerned with the indirect purchaser issues raised by *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). *Id.* That same summer, liaison counsel was approached by an attorney representing a purchaser of boxes from Stone who asked if liaison counsel would research the possibility of bringing an action on behalf of purchasers of corrugated boxes from Stone. *Id.* at 5. That lawyer, John Peoples, had approached other antitrust lawyers with his client's claim but they all had declined to pursue the matter. *Id.* Liaison counsel

concluded that *In re Sugar Industry Antitrust Litigation,* 570 F.2d 13, 19 (3d Cir.1978) provided a viable, if unused (in the class action context), exception to *Illinois Brick* under which suit could be instituted against Stone. *Id.*

In the second phase-early proceedings against Stone and proceedings before the JPML-the attorneys that would ultimately become the group of designated counsel filed suit against Stone on September 23, 1998, *Winoff Industries v. Stone Container Corp.,* in the Eastern District of Pennsylvania. *Id.* at 7. Petitioners in Philadelphia immediately undertook to coordinate their activities with petitioners in Chicago. *Id.* at 8. On October 13, 1998, Stone moved before the JPML for transfer and consolidation of all suits to the Northern District of Illinois. Petitioners in Philadelphia opposed the motion to transfer to Chicago and cross-moved for transfer to, and consolidation before, this Court. *Id.* Argument was held before the JPML on January 29, 1999 in Fort Myers, Florida. *Id.* at 9. On February 12, 1999, the JPML issued its order transferring all actions to this Court for all pretrial proceedings. *Id.*

**\*7** In the third phase-investigation leading up to the filing of the Amended Complaint and the naming of additional defendants-petitioners, prior to the transfer order issued by the JPML, organized themselves into committees and undertook different assignments related to the preparation of the Amended Complaint. *Id.* at 9. Attorneys were assigned to review Stone's FTC documents, research public sources, pursue third party discovery, review prior proceedings against the corrugated industry and to work with expert economists. *Id.*

Petitioners' handling of subpoenas at this stage serves as a simple example of the efficiency with which petitioners managed this litigation. Subpoenas were served on Stone and eleven other companies, each of which objected to the subpoena. *Id.* Petitioners took advantage of the geographic dispersal of counsel in moving to enforce the subpoenas. To the extent counsel in the case was located in the jurisdiction in which a subpoena was issued, that firm was assigned enforcement of the subpoena. *Id.*

As to other possible defendants, petitioners prepared matrices based on such facts as whether Stone documents and independent research established that a specific company had been contacted by Stone as described generally by the FTC; whether they had taken downtime; the nature of the downtime and whether the companies announced price increases at

the times they were allegedly colluding. *Id.* As a result of that research and analysis, petitioners determined that a number of other companies should be named as defendants: Jefferson Smurfit, International Paper, Union Camp, Gaylord Container Corp., Temple Inland, Weyerhauser, Packaging Corp. of America, Tenneco, Inc., and Tenneco Packaging (as a single entity) Georgia Pacific and Simpson Tacoma Kraft Co. *Id.* at 10–11.

In the fourth phase-class certification and class-related discovery-petitioners established a document depository to organize and facilitate the review of the more than one million documents produced to plaintiffs. *Id.* at 16. According to liaison counsel, the goal of the document review was to identify from the initial production those documents that would prove most useful in establishing the criteria for class certification. *Id.* at 17. After several briefing sessions with selected petitioners to apprise them of the facts and theories of the case, lawyers from among petitioners were assigned to review designated categories of documents. *Id.* Telephone conferences and meetings were held among the petitioners reviewing the documents to assure that there was appropriate cross-communication regarding their respective research. *Id.* Summary memoranda were prepared and circulated. *Id.* Separate and apart from the review itself, Donald Perelman was assigned to incorporate all of the relevant information provided in a detailed annotated chronology that was supplemented through the course of the litigation as documents were produced. *Id.* This detailed chronology allowed petitioners to correlate all the information obtained from defendants in a single document so that patterns could be observed, correspondence among different defendants could be analyzed, and an overview of each defendant's role in the conspiracy could be established. *Id.* Prior to the class certification hearing, petitioners received and reviewed tens of thousands of documents for the purpose of adducing evidence in support of class certification. *Id.* at 18. There was also significant deposition discovery related to class certification. *Id.*

**\*8** The filings related to class certification were extensive, involving hundreds of pages of briefs and many hundreds of pages of exhibits. *Id.* at 19. Argument on plaintiff classes' certification motion took place on August 8, 2001. *Id.* at 20. It extended over six hours and the transcript was 221 pages in length. *Id.* The Court in its Memorandum of September 4, 2001, approving class certification, cited many of the documents petitioners found in defendant's files, confirming

In re Linerboard Antitrust Litigation, Not Reported in F.Supp.2d (2004)

2004-1 Trade Cases P 74,458

the importance of petitioners' intense early document review. *Id.*

In the fifth phase-Rule 23(f) proceedings before the Third Circuit-petitioners extensively briefed the issue of class certification and ultimately secured the Third Circuit's imprimatur on plaintiff classes' theories of liability and of class-wide impact and damages. *Id.* at 24.

Prior to the Third Circuit's decision in this case no class certification had been affirmed by the Third Circuit on Rule 23(f) appeal. *Id.* The defendants retained Kenneth Starr, a former Solicitor General of the United States and a former Judge of the United States Court of Appeals for the D.C. Circuit to oversee and argue the appeal. This fact is significant because the quality and vigor of opposing counsel is relevant in evaluating the quality of plaintiffs' counsel. *See, e.g., Ikon,* 194 F.R.D. at 194; *In re Warner Communications Sec. Litig.,* 618 F.Supp. 735, 749 (S.D.N.Y.1985); *Arenson v. Board of Trade,* 372 F.Supp. 1349, 1354 (N.D.Ill.1974). On September 5, 2003, the Third Circuit issued its decision affirming this Court's class certification ruling. *Id.*

In the sixth phase-deposition discovery after the Third Circuit's affirmance-petitioners deposed 70 employees and former employees of defendants and third parties. *Id.* at 30. A small group of 18 senior lawyers from among petitioners was chosen to take the depositions. *Id.* All these attorneys were required to attend a day long seminar presented by Martin Twersky, Esquire. *Id.* The seminar utilized files produced by defendants and obtained from third parties to provide the attendees with a virtual tour of box plants and mills. *Id.* Procedures were put into place to assure that information gained at one deposition was shared with all those petitioners taking depositions. *Id.* This was done by circulating memoranda and having regular conference calls among petitioners. Efforts were also made to take less important depositions first in order to allow counsel to develop expertise in deposing defendants' witnesses. *Id.* In addition, this procedure provided an added benefit-by the time key senior officials' depositions were taken a record existed against which their testimony could be tested. *Id.* Counsel also took the depositions of less important witnesses by video conference and telephone to reduce the cost of litigation. *Id.* at 31.

In the seventh phase of the litigation-settlement negotiations between February and October 2003–petitioners reached a series of partial settlements with groups of defendants that

ultimately resolved all claims in the class case. Efforts at settlement began at the outset of the case but were unsuccessful. *Id.* at 49. During the period between the Court's decision certifying the classes and the Third Circuit's order granted interlocutory review, petitioners established a target for global settlement. *Id.*

**\*9** Following the Third Circuit decision, liaison counsel recommended discussions with Temple Inland/Gaylord. Petitioners believed that Temple Inland/Gaylord was a natural partner for an initial "ice breaker" settlement that would include a commitment from the settling defendant(s) to cooperate with plaintiff classes as they prosecuted their case against the other defendants. *Id.* at 51. Temple Inland/Gaylord was independently represented by Philadelphia counsel. *Id.* It was viewed as a second tier producer. Further, there was considerable ambiguity regarding its potential liability. *Id.* Temple Inland had acquired Gaylord during the course of the litigation and the evidence against Gaylord was stronger than against Temple Inland but its market share was much smaller. According to petitioners, their strategy was to offer a settlement low enough to entice Temple Inland/Gaylord to break ranks with the other defendants but high enough to represent a genuine threat to the other defendants. *Id.* at 53. Ultimately the parties agreed on $8 million and the Court approved the Temple Inland/Gaylord settlement on August 26, 2003. *Id.*

After notice of the class certification and the Temple Inland/ Gaylord settlement was sent to potential class members, entities representing approximately 25 percent of the sales to the classes opted-out. *Id.* at 54. As the Court noted in its Memorandum of September 5, 2003, the large number of opt-outs at such a late stage was unusual. *Id.* None of the major corporations included in the classes opted out at or near the outset of the case. *Id.* at 54–55. Petitioners argue that this was due to the high risk of nonpayment in the early stages of the litigation that was significantly ameliorated by petitioners' stewardship of the case through the Third Circuit's decision affirming this Court's class certification order. *Id.* at 55.

After a mediation session before the Honorable Lowell A. Reed on June 17, 2003, counsel for International Paper and Union Camp asked petitioners about further settlement discussions. *Id.* They proposed that the class negotiate with them and two other defendants, Georgia Pacific and Weyerhauser. *Id.* Counsel for these companies believed their clients formed a natural group because the liability case against them developed through discovery was materially

In re Linerboard Antitrust Litigation, Not Reported in F.Supp.2d (2004)

2004-1 Trade Cases P 74,458

weaker than that against the remaining defendants. *Id.* After several fruitless rounds of negotiations in which defendants pursued a settlement that was only slightly larger than the Temple Inland/Gaylord settlement, petitioners and counsel for International Paper, Union Camp, Georgia Pacific and Weyerhauser reached a settlement of $68 million that was approved by the Court on December 8, 2003.

Two groups of defendants remained in the case at that stage of the litigation, Packaging Corporation of America, Tenneco, Inc., and Tenneco Packaging, Inc. ("PCA defendants") and Stone Container Corporation, Jefferson Smurfit Corporation, and Smurfit Stone Container Corporation ("Stone defendants"). *Id.* at 57. The sales of these defendants represented 44 percent of the total sales of all defendants in the case. *Id.* Stone and Jefferson Smurfit merged in 1998 so any settlement with them would have to include both companies-a fact that complicated petitioners' task because the liability case against Stone and Jefferson Smurfit was not of equal strength. *Id.* Settlement negotiations with the PCA defendants began shortly after the settlements with International Paper, Union Camp, Georgia Pacific and Weyerhauser became public. *Id.* at 58. While these negotiations were proceeding, special settlement counsel for the Stone defendants contacted petitioners. Settlements with both groups of defendants, the PCA defendants and the Stone defendants, were reached on October 28 and 29 respectively. *Id.* The Court approved those settlements on March 21, 2004.

**\*10** Throughout every phase of the litigation petitioners managed a major discovery effort, managed on a day-to-day basis by Martin Twersky and Robert LaRocca. *Id.* at 25. In terms of document discovery alone, defendants produced more than 430 boxes of documents containing more than one (1) million pages of records. *Id.* This effort required the single largest expenditure of petitioners' time and resources and provides further evidence of their skill in managing this litigation. *Id.* As an example of what was accomplished, on November 15, 2002, a day long meeting of senior counsel for all parties occurred where the parties agreed on a basic framework for document discovery such as: (1) the discovery period; (2) production by defendants of electronic records of transactions at their mills and box plants, instead of hard copy invoices and purchase/sales records; (3) defendants agreement to search headquarters, regional offices and elsewhere for documents; (4) defendants agreement not to rely on categories of discovery they declined to produce; and (5) issues related to interrogatories and document requests.

*Id.* at 27. According to liaison counsel, following this meeting discovery began in earnest. *Id.*

Petitioners management of discovery disputes provides further evidence of their skill and efficiency in managing this litigation. Throughout the litigation, the Court urged counsel to seek informal resolution of discovery disputes whenever possible and petitioners expended a great deal of time and effort to this end. *Id.* at 44. For example, more than 750 letters and e-mails were exchanged between petitioners and defense counsel seeking to resolve discovery issues. *Id.* Most of these informal efforts at resolution have proved successful and the Court's involvement has only been required on a few occasions. *Id.*

Based on the foregoing, the Court concludes that consideration of the third *Gunter* factor-the skill and efficiency of the attorneys involved -counsels in favor of granting the Fee Petition.

4. The Complexity and Duration of the Litigation.
As to the complexity of the case, "[a]n antitrust class action is arguably the most complex action to prosecute." *In re Motorsports Merchandise Antitrust Litig.,* 112 F.Supp.2d 1329, 1337 (N.D.Ga.2000); *see also In re Shopping Carts Antitrust Litig.,* MDL No. 451, 1983 WL 1950, at \*7 (S.D.N.Y. Nov.18, 1983) (noting that "... antitrust price fixing actions are generally complex, expensive and lengthy" (citing *Grinnell,* 495 F.2d at 467–68)). "The legal and factual issues involved are always numerous and uncertain in outcome." *In re Motorsports,* 112 F.Supp.2d at 1337. This litigation was no exception.

As to the duration of the litigation, the case is now in its sixth year and were it to go to trial it could continue for any number of years. The Court notes that there is authority for approving a 30 percent fee in litigation that concluded much earlier in the proceeding. *E.g., In re Ikon Office Solutions Inc. Securities Litigation,* 194 F.R.D. 166, 194 (E.D.Pa.2000) (awarded attorneys 30 percent of $111 million settlement after one and a half years of litigation).

**\*11** Based on the foregoing, the Court concludes that consideration of the fourth *Gunter* factor-the complexity and duration of the litigation-counsels in favor of granting the Fee Petition.

5. The Risk of Nonpayment.

Petitioners faced significant risks of nonpayment. First, the FTC investigation into Stone had been, according to Professor Lawrence Sullivan, an antitrust expert whose declaration petitioners offered in support of the Fee Petition, "at the cutting edge of single firm antitrust liability." Dec. in Support of Class Settlements with the Stone and PCA Defendants and in Support of Class Counsels' Petition for Attorneys' Fees and Costs, Certification of Professor Lawrence Sullivan ¶ 5. As Professor Sullivan explains

> To my knowledge there has never been a successfully litigated antitrust claim of a single firm attempt to conspire to raise prices or reduce out-put based solely, or even primarily, on market conduct by the defendant firm. Indeed, except for FTC's ... Stone Container Corporation investigation (In the Matter of Stone Container Corp., Docket No. C–3806 (FTC, May 1998) there never appears to have been an *allegation* of an attempt so to conspire based solely on market conduct evidence ... In Stone Container, the dissenting statement of Commissioner Swindle serves to emphasize that the Commission's market conduct allegations were far afield from conventional antitrust theories of liability.

*Id.*

Second, petitioners did not benefit from the fruits of a prior government investigation or prosecution. The Second Circuit has held that to assess risk in antitrust class actions: "[T]he only truly objective measurement of the strength of plaintiffs' case is found by asking: 'Was defendants' liability *prima facie* established by the government's successful action?' ' *Grinnell,* 495 F.2d at 455. In this case the answer to that question is no. The FTC did not file an action against, or even identify, any market participant other than Stone. Further, the FTC investigation went no further than Stone's alleged invitation to conspire. *Id.* at ¶ 6.

Third, prior to this case no court had ever certified a class based entirely on the exception to *Illinois Brick v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) announced by the Third Circuit in *In re Sugar Industry Antitrust Litigation,* 579 F.2d 13 (3d Cir.1978). This Court addressed this issue at length in its Memorandum of September 4, 2001 certifying the classes. In *Illinois Brick,* the Supreme Court ruled that only a direct purchaser, and not others in chain of manufacturing or distribution, is a party "injured in his business or property" within meaning of the Clayton Act. 431 U.S. at 736. The Third Circuit, in *Sugar* ruled that if plaintiffs purchased items which incorporated a price-fixed item obtained directly from the producer, suit was not barred

by the *Illinois Brick* decision. *Sugar,* 579 F.2d at 17. *Sugar,* however, addressed only the issue of individual standing, and not class standing, under *Illinois Brick.* Playing off that distinction, defendants argued that the tracing of damages from one level to another complicated proof of impact and damages such that class proceedings were impracticable. Defendants arguments were rejected both by this Court and the Third Circuit.

**\*12** Fourth, defendants stated their intention to exploit at trial several perceived weaknesses in plaintiff classes' evidence of liability. There is no direct evidence of any meeting at which defendants agreed to take downtime or to raise prices and there was no direct evidence of conversations in which one conspirator agreed with another to take reciprocal downtime. In addition, as the Court discussed in its Memorandum of December 8, 2003, the reduction in production caused by the alleged conspiratorial downtime accounted for a small quantity of linerboard. During the class period, October 1, 1993 through November 30, 1995 linerboard production by all defendants totaled 20,000,000 tons per year. Therefore, the alleged conspiratorial downtime during that period produced a decease in production of 385,000 to 435,000 tons, or approximately 1 percent of production.

Moreover, in the period of alleged conspirational activity, the cost of pulp and old corrugated containers-the primary input costs of containerboard-rose at unprecedented rates. Demand also rose during the period in question and defendants' production was unable to meet this increase. The latter fact is explained in part by low prices in the 1980s and early 1990s that led to low returns on investment in additional capacity and thus reduced investment in additional capacity. Defendants could have argued that it was this lack of capacity, not collusion, that prevented defendants from meeting this increased demand. In sum, defendants would have been able to argue that these two economic forces-sharply rising costs and increased demand-led to the steep price increases not the allegedly collusive downtime in 1993.

Based on the foregoing, the Court concludes that consideration of the fifth *Gunter* factor-the risk of nonpayment-counsels in favor of granting the Fee Petition.

6. The Amount of Time Devoted to the Case by Plaintiff's Counsel

Petitioners expended 51,268 hours on this litigation. See, Langer Summary Declaration, at ¶¶ 6–11 and Declaration

of David White, CPA. They reported that more than 200 lawyers worked on the case over the six years of litigation. This group can be subdivided according to number of hours spent: (1) thirty-six lawyers reported between 100 and 500 hours; (2) seventeen lawyers reported between 500 and 1,000 hours; (3) six lawyers reported between 1,000 and 2,000 hours-this included members of the core team of lawyers that managed the litigation; (4) Liaison counsel and Robert LaRocca expended over 2,500 hours-they are the only lawyers on the case who reported more than 2,000 hours of recorded time.

The Court makes several observations about this distribution of attorneys' time expended in the case. First, the number of lawyers with less than 1,000 hours reflects the fact that the defendants were assigned to teams of junior lawyers to review documents and senior lawyers to take depositions. Second, the small group of lawyers with the most hours are the lawyers who managed the litigation.

**\*13** While the total number reported–51,268 hours-is obviously substantial, through effective management petitioners held down the number of hours and other resources required to effectively prosecute the case. Fee Petition at 22. Fewer hours of attorney time were expended in this case than in comparable litigation. For instance, *In re Flat Glass* involved fewer defendants and more firms and the fee petition covered 83,067 hours. *In re Commercial Tissue Antitrust Litigation* involved a comparable number of defendants, a similar industry, a conspiracy covering a similar time period and was resolved at a comparable stage but the fee petition covered 87,849 hours excluding time expended by the Attorney General of Florida in a separate action which was consolidated with the class action. *Id.* This development should be rewarded when it reflects, as in this case, the efficiency of counsel in maximizing total recovery to the class by minimizing attorneys' fees expenses.

Based on the foregoing, the Court concludes that consideration of the sixth *Gunter* factor-the amount of time devoted to the case by petitioners-counsels in favor of granting the Fee Petition.

7. The Awards in Similar Cases

The 30 percent fee is comparable to fees approved in the four most recent horizontal price fixing cases. *In re Busiprone Patent Antitrust Litigation,* 01–MD–1410 (S.D.N.Y. April 11, 2003) in which the court awarded class counsel in an early settlement one-third of a class action settlement of

$200 million; *In re Vitamins Antitrust Litigation,* 2001 WL 34312839 (D.D.C. July 16, 2001) in which the court awarded counsel 34.6 percent of $365 million in an early settlement of a case in which there had been a prior government criminal investigation and prosecution; *In re Cardizem CD Antitrust Litigation,* MDL 1278 (E.D.Mi. November 26, 2002) in which the court awarded 30 percent of a settlement fund of $110 million; and *In re Lease Oil Antitrust Litigation,* 186 F.R.D. 403 (S.D.Tex.1999) in which the court awarded 25 percent of $190 million settlement.

The Third Circuit in *Cendant Prides,* a securities case, looked to cases of similar size, not necessarily similar subject matter, when it analyzed the "awards in similar cases" prong of the *Gunter* analysis. 243 F.3d at 737. Many of the decisions cited by the Third Circuit involved settlements similar in size to the settlement in this litigation and the courts awarded fees in those cases comparable to the 30 percent fee requested by petitioners. *In re Ikon Office Solutions Inc. Securities Litigation,* 194 F.R.D. 166 (E.D.Pa.2000) (30 percent of $111 million); *In re Rite Aid Corporation Securities Litigation,* 146 F.Supp.2d 706 (E.D.Pa.2001) and 269 F.Supp.2d 603 (E.D.Pa.2003) (25 percent of $193 million); *In re Prison Realty Securities Litigation,* C/A No. 3:99–0458 (M.D.Tenn. February 9, 2001) (30 percent of $111 million); *In re Prudential Securities, Inc. Ltd. Partnership Litigation,* 912 F.Supp. 97 (S.D.N.Y.1996) (27 percent of $110 million); *Kurzwell v. Philip Morris, Co.,* 1999 WL 1076105 (S.D.N.Y.1999) (30 percent of $123.8 million); *In re Sumitomo Copper Litigation,* 74 F.Supp.2d 393 (S.D.N.Y.1999) (27 .5 percent of $116 million); *In re Combustion, Inc.,* 968 F.Supp. 1116 (W.D.La.1997) (36 percent of $127 million); *see generally,* 24 Class Action Rep. 169–170 (2003) (survey of all class action fee awards from 1973–2003).

**\*14** The above figures are in accord with a recent Federal Judicial Center study that found that in federal class actions generally median attorney fee awards were in the range of 27 to 30 percent. See Dec. of Prof. Stephen Saltzburg at ¶ 26 (quoting Dunbar, et al ., Recent Trends IV: What Explains Filings and Settlements in Shareholder and Class Actions (NERA, 1996) at 12–13). More specifically, recent empirical data analyzing fee awards in securities cases indicates that "regardless of size, fees average 32 percent of the settlement. See Dec. of Prof. Stephen Saltzburg at ¶ 26 (quoting Dunbar, et.al., Recent Trends IV: What Explains Filings and Settlements in Shareholder and Class Actions (NERA, 1996) at 12–13).

In *Cendant Prides,* the Third Circuit, after engaging in a review of common fund cases that produced a range of fee awards from 2.8 to 36 percent of the total settlement, noted the following common factors in those cases: "complex and/or novel legal issues, extensive discovery, acrimonious litigation, and tens of thousands of hours spent on the case by class counsel." 243 F.3d at 741. There are two recent cases that exhibit these characteristics and many of the same characteristics of the present litigation, and produced fee awards at the high end of this range-*Lease Oil* and *Ikon Office Solutions. In Lease Oil,* where the district court awarded a 25 percent fee, the court explained:

> As well as being novel, this litigation was highly complex and thus required a great deal of lawyering skill. As just explained, the task of simply compiling the evidence was an unusually difficult task, requiring the assistance of experts and the investment of many hours. Also, being novel, the legal issues raised in the litigation required skilled attorneys to handle them.

*Cendant Prides,* 243 F.3d at 738 (citing *Lease Oil,* 186 F.R.D. at 445). In *In re Ikon Office Solutions,* the district court granted a 30 percent fee request because, *inter alia,* "[c]ounsel expended more than 45,000 hours on this case and paid out expenses of more than $3 million with no guarantee of recovery," the case presented "the legal obstacles of establishing scienter, damages, causation and like" and "derivative counsel fees will be taken from this amount." *Cendant Prides,* 243 F.3d at 738 *citing In re Ikon Office Solutions,* 194 F.R.D. at 194). Notwithstanding those legal obstacles, *Ikon Office Solutions* lacked a number of the risks present in this case. For example, in *Ikon Office Solutions,* the parties stipulated to class certification. 194 F.R.D. at 171. Moreover, the result in *Ikon Office Solutions* was not nearly as favorable as the result in this case-the settlement in that case represented between 5.2 percent and 8.7 percent of the out of pocket damages. In comparison, as discussed above, the settlements in this case represent 55 percent of the claimed damages, as calculated by plaintiffs' expert for the statute of limitations period, and approximately 42 percent of the damages for the full class period. Fee Petition at 20. Lastly, by the time of final approval of the settlement, the case in *Ikon Office Solutions* had only been pending for one and half years.

**\*15** Petitioners' requested fee is similar to fees awarded for cases like *Linerboard* in the private market. The three expert declarations, that of Professor Saltzburg, who undertook a study of these mattes as co-chair of the Third Circuit Task Force on the Selection of Class Counsel; that of Jerome J.

Shestack, a former president of the American Bar Association who has specialized in representing clients in major litigation; and that of Richard Arnold, the co-liaison counsel for the direct action plaintiffs in this litigation, who has specialized in representing large corporations in major antitrust litigation, all confirm that the 30 percent sought is at or below the market rate. Fee Petition at 55. These declarations are consistent with the conclusion reached by the special master appointed by Judge Dalzell in *U.S Bioscience* to determine the market rate for fees in a complex litigation posing less risk of nonpayment than the current case:

> After reviewing all the materials outlined above, it is the considered view of the Special Master that in light of the contingency fee practices in the district, the type of class action litigation at issue here; the nature of this case, including the facts known at the outset of the litigation (that is, at the point when advance "negotiating" might have occurred); and the outstanding performance of plaintiffs' counsel, a contingency fee of 30 percent of the settlement fund, plus all expenses, should be awarded.

*In re U.S. Bioscience Securities Litig.,* 1994 WL 485935, at *15 (E.D.Pa.1994).

What the market would pay is significant because, as the Seventh Circuit has explained, the goal of the fee setting process it to "determine what the lawyer would receive if he were selling his services in the market rather than being paid by Court Order." *In re Continental Ill. Sec. Litig.,* 962 F.2d 566, 568 (7th Cir.1992); *see also, In re RJR Nabisco Sec. Litig.,* MDL No. 818, 1992 U.S. Dist. LEXIS 12702 at *20 (S.D.N.Y. Aug.24, 1992) ("What should govern such [fee] awards is not the essentially whimsical view of a judge, or even a panel of judges, as to how much is enough in a particular case, but what the market pays in similar cases).

Based on the foregoing, the Court concludes that consideration of the seventh *Gunter* factor-the awards in similar cases-counsels in favor of granting the Fee Petition.

### B. THE REQUESTED FEE IS REASONABLE UNDER A LODESTAR CROSS–CHECK

While the Court adopts the percentage of recovery method, the Court will also subject petitioners' proposed fee to a cross-check using the lodestar method. *Cendant Prides,* 243 F.3d at 742 ("we have suggested that district courts cross-check the percentage award at which they arrive against the lodestar method"); 2002 Task Force Report at Fn. 313. The Court emphasizes that this is only a cross-check and not a full

lodestar analysis. *see, e.g., DiGiacomo v. Plains All American Pipeline,* Civ. No. H–99–4137, at 23 (S.D.Tex.2001) (Court conducts a lodestar cross-check but notes that it "will not conduct a detailed analysis of charged hours and hourly rates" because to do so "would undermine the utility of the percentage method").

**\*16** To apply the lodestar method, the Court must examine the number of hours petitioners worked and the rate for these lawyers' services, and multiply the number of hours worked by the hourly rate. The Court may also multiply the hourly rate by a factor (a lodestar "multiplier") to reflect the risks of nonpayment facing counsel, to serve as an incentive for counsel to undertake socially beneficial litigation, or as a reward to counsel for an extraordinary result. *In re Prudential,* 148 F.3d at 340–341.

Petitioners have reported to the Court spending 51,268 hours on the litigation. Fee Petition at 62. Petitioners have also reported an average mixed hourly rate of senior counsel of $440.00. Based on these two figures, the lodestar under the formula adopted by the Third Circuit in In *re Cendant Corporation Prides Litigation,* 243 F.3d 722 (3d Cir.2001)-taking the hourly rates of the most senior lawyers in the case and multiplying them by the total hours incurred by attorneys who worked the case-would be $22,557,920.[9] Given the fee petitioners have requested, the multiplier under the *Cendant Prides* formula is 2.66.

In *Cendant Prides,* the Third Circuit ruled that a multiplier of 3 was the appropriate ceiling using the average rate of senior counsel method based. 243 F.3d at 742. In *Prudential,* the Third Circuit noted, based on a similar review of common fund cases, "[m]ultipliers ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied. *In re Prudential,* 148 F.3d 283, 341 (3d Cir.1998) (quoting 3 Herbert Newberg & Alba Conte, Newberg on Class Actions, S 14.03 at 14–5 (3d ed.1992). Clearly, 2.66 falls below the ceiling set by the Court in *Cendant Prides* and falls within the range the Court identified in *In re Prudential.* The Court also notes that during 2001–2003, the average multiplier approved in common fund class actions was 4.35 and during 30 year period from 1973–2003, average multiplier approved in common fund class actions was 3.89. Stuart J. Logan, et al., *Attorney Fee Awards in Common Fund Class Actions,* 24 Class Action Reports 167 (2003).

For all of the foregoing reasons, the Court concludes that the requested fee of 30 percent is reasonable when measured by the lodestar cross-check

### C. THE COURT DOES NOT DEEM IT APPROPRIATE TO REDUCE THE 30 PERCENT FEE REQUEST BY UTILIZING A SLIDING SCALE FORMULA

Some courts have applied a "sliding scale" approach to fee awards, granting smaller fee awards as the size of the common fund increases. The Third Circuit in *In re Prudential* presented one argument for such an approach: "[t]he basis for this inverse relationship is the belief that [i]n many instances the increase [in recovery] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel." 148 F.3d at 339.

One might argue that a fee award of 30 percent of settlements in excess of $200 is excessive given the absolute figure, approximately $60 million, that such an award produces. The Court rejects that thinking in this case because the highly favorable settlement was attributable to the petitioners' skill and it is inappropriate to penalize them for their success.

**\*17** Moreover, the sliding scale approach is economically unsound. This Court agrees with Judge Easterbrook's conclusion in *Synthroid Marketing Litig.,* a case in which the Seventh Circuit overruled a district court's application of a declining fee structure, that reducing fees for large awards is economically irrational:

> The district judge defined megafunds as settlements of $75 million and up. Fees in "megafund" cases should be capped at 10% of the recovery, the judge held, although she recognized that fees of 30% are more common and proper in smaller cases. This means that counsel for the consumer class could have received $22 million in fees had they settled for $74 million but were limited to $8.2 million because they obtained an extra $14 million for their clients (the consumer fund, recall, is $88 million). Why there should be such a notch is a mystery. Markets would not tolerate that effect.

*Id.* The Court also agrees with the *Ikon Office Solutions* court that:

> It is difficult to discern any consistent principle in reducing large awards other than an inchoate feeling that it is simply inappropriate to award attorneys' fees above some unspecified dollar amount, even if all the other facts ordinarily considered relevant in determining

the percentage would support a higher percentage. Such an approach also fails to appreciate the immense risks undertaken by attorneys in prosecuting complex cases in which there is a great risk of no recovery. Nor does it give sufficient weight to the fact that large attorneys fees serve to motivate capable counsel to undertake these actions.

194 F.R.D. at 197 (cited with approval in *In re Cendant Corp. Sec. Litig.,* 109 F.Supp.2d at 294–295).

The latter point quoted from *Ikon Office Solutions*-providing sufficient incentive to attorneys to undertake class actions-is particularly important in antitrust cases. As the Second Circuit has explained, the incentive for "the private attorney general" is particularly important in the area of antitrust enforcement because public policy relies so heavily on such private action for enforcement of the antitrust laws. *Alpine Pharmacy, Inc. v. Chas. Pfizer & Co., Inc.,* 481 F.2d 1045, 1050 (2d Cir.) *cert denied sub nom., Patlogan v. Dickstein, Shapiro and Galligan,* 414 U.S. 1092, 94 S.Ct. 722, 38 L.Ed.2d 549 (1973) (citations omitted).

### D. THE COURT APPROVES THE AGGREGATE FEE AMOUNT WITH ALLOCATIONS TO SPECIFIC FIRMS TO BE DETERMINED BY LIAISON COUNSEL

The Court approves the joint fee petition for all petitioners with specific allocations to firms to be determined by liaison counsel. The Court notes that all petitioners have been advised of and have agreed to this procedure. Since the procedure was first utilized in *In re Magic Market Securities Litigation,* 1979 U.S. Dist. LEXIS 9777 (E.D.Pa.1979), submission of a combined fee application with actual allocation to be made by lead counsel has generally been adopted by the courts. *See, e.g., In re Diet Drugs Products Liability Litig.,* 2002 U.S. Dist. LEXIS 19396, at *10 (E.D.Pa. Oct. 3, 2002); *see also, In re Flat Glass Antitrust Litig.,* MDL No. 1200 (W.D.Pa. May 28, 2002).

 **\*18**  Liaison counsel has led the case from its inception and is the attorney "better able to describe the weight and merit of each [counsel's] contribution, *In re Diet Drug Litig.,* 2002 U.S. Dist. LEXIS 19396 (E.D.Pa. Oct. 3, 2002). Likewise, from the standpoint of judicial economy, leaving allocation to such counsel makes sense because it relieves the Court of the "difficult task of assessing counsel's relative contributions."

*In re Prudential,* 148 F.3d at 329 n. 96.[10]

### E. PETITIONERS ARE ENTITLED TO REIMBURSEMENT OF LITIGATION AND

### SETTLEMENT EXPENSES FROM THE SETTLEMENT FUND

The Court has reviewed the expenses advanced by counsel and concludes they were reasonable and necessary to the prosecution of the case. Therefore, the Court will order that petitioners be reimbursed for these expenses from the Settlement Fund. *See, e.g., Danny Kresky Enter. v. Magid,* 716 F.2d 215, 219–220 (3d Cir.1983); *In re Chambers Dev. Secs. Litig.,* 912 F.Supp. 852, 863 (W.D.Pa.1995) ("Plaintiffs' counsel also are entitled to be reimbursed for all reasonable expenses necessary for the successful prosecution of this litigation).

### F. PETITION FOR PAYMENT OF INCENTIVE FEES TO THE FIVE CLASS REPRESENTATIVES

The Court also writes at this time in ruling on class counsel's unopposed Petition for Payment of Incentive Fees to the Five Class Representatives (Docket No. 301, filed February 2, 2004) ("Incentive Fee Petition").[11] Petitioner have requested $25,000 for each of the five representatives of the classes and the Court concludes that such an award is appropriate.

The Court finds ample authority in this district and in other circuits for such an incentive award. *Tenuto v. Transworld Systems, Inc.,* No. Civ. A 99–4228. 2002 WL 188569 (E.D.Pa. Jan.31, 2002); *In re Residential Doors Antitrust Litigation,* Nos. 93–3744, Civ. A. 96–2125, 1998 WL 151804, *8 (E.D.Pa. April 2, 1998); *Cook v. Niedert,* 142 F.3d 1004, 1016 (7th Cir.1999); *In re Lease Oil Antitrust Litigation,* 186 F.R.D. 402, 229 (S.D.Tex.1999); *In re Domestic Air Transp. Antitrust Litigation,* 148 F.R.D. 297, 357 (N.D.Ga.1993).

Like the attorneys in this case, the class representatives have conferred benefits on all other class members and they deserve to be compensated accordingly. *In re Plastic Tableware Antitrust Litigation,* No. 94–CV–3564, 2002 WL 188569 (E.D.Pa. Dec. 4, 1998) ("Payments to class representatives may be considered a form of restitutionary relief within the discretion of the trial court ... They may also be treated as a reward for public service and for the conferring of a benefit on the entire class"). Such awards are particularly appropriate in this case because there was no preceding governmental action alleging a conspiracy and taking a high-profile role threatened to jeopardize class representatives relationships with their suppliers. *Cullen v. Whiteman Medical Corp.,* 197 F.R.D. 1236 (E.D.Pa.2000) ("[c]ourts routinely approve incentive awards for the services

they provide and the risks they incurred during the course of the class action litigation").

 **\*19**  The five class representatives performed considerable work advancing the litigation. Each of the class representatives provided verified answers to interrogatories and produced documents in response to document requests. Incentive Fee Petition 5. Each of them also expended time in preparing for depositions and gave testimony at depositions. *Id.* Finally, Judge Reed required that representatives of each class be present at the initial mediation sessions. *Id.*

Lastly, the Court notes that the amount requested, $25,000, is comparable to incentive awards granted by courts in this district and in other circuits. *See, e.g., In re Graphite Electrodes Antitrust Litigation,* MDL No. 1244 (E.D.Pa. Order of September 8, 2003) ($80,000); *Bogosian v. Gulf Oil Corp.,* 621 F.Supp. 27 (E.D.Pa.1985) ($20,000); *In First Jersey Securities, Inc.,* MDL No. 681 (E.D.Pa.1989) ($24,000); *In re Revco Securities Litigation,* Nos. 851 & 89 CV 593, 1992 WL 118800 (N.D.Ohio May 6, 1992) ($90,000); *In re Busirone Antitrust Litigation,* MDL No. 1413 (S.D.N.Y. Order of April 7, 2003) ($25,000); *Brotherton v. Cleavland,* 141 F.Supp.2d 907 (S.D.Ohio 2001) ($50,000);

*In re Cardizem CD Antitrust Litigation,* MDL No. 1278 (S.D. Mich., Order of Nov. 26, 2002) ($20,000).

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that consideration of the seven *Gunter* factors counsels in favor of awarding petitioners their requested fee. Accordingly, the Court grants Plaintiff Counsel's Petition for Award of Attorneys' Fees and Reimbursement of Expenses and awards petitioners 30 percent of the Settlement Fund and reimbursement of expenses totaling $1,391,203.36.

In addition, the Court concludes that petitioners' request for payment of $25,000 to each of five named plaintiffs is appropriate. Accordingly, the Court grants class counsel's unopposed Petition for Payment of Incentive Fees to the Five Class Representatives.

An appropriate Order follows.

## All Citations

Not Reported in F.Supp.2d, 2004 WL 1221350, 2004-1 Trade Cases P 74,458

## Footnotes

1    Class counsel did not file a separate fee petition but began the Revised Memorandum of Law with the statement, "[c]lass counsel move for an award of attorneys' fees and for reimbursement of costs." Accordingly, the Court will treat the Revised Memorandum of Law in Support of Petition for Award of Attorneys' Fees and Reimbursement of Expenses as a fee petition.

2    The three Class Representatives on behalf of the Box Class are Garrett Paper, Inc., Local Baking Products, Inc., and Oak Valley Farms, Inc. General Refractories Co. And I. Halper Corrugated Box Company are the representatives for the sheet class. Two other plaintiffs, one a box purchaser, Winoff Industries, and on a sheet purchaser, Crest Meat Co. dismissed their complaints.

3    Linerboard includes any grade of paperboard suitable for use in the production of corrugated sheets, which are in turn used in the manufacture of corrugated boxes and for a variety of industrial and commercial applications. Corrugated sheets are made by gluing a fluted sheet which is not made of linerboard, known as the corrugating medium, between facing sheets of linerboard; corrugated sheets are also referred to as containerboard. The defendants named in the lawsuits are major integrated manufacturers and sellers of linerboard, corrugated sheets and corrugated boxes.

4    Appellate review of an order of a district court granting or denying class action certification requires the permission of the Court of Appeals. Federal Rule of Civil Procedure 23(f) provides, in relevant part, as follows: "A court of appeals may in its discretion permit an appeal from an order of a district court granting or denying class action certification under this rule if application is made to it within ten days after entry of the order."

5    The advantages and disadvantages of the two methods are described by the Third Circuit in *In re Cendant Corporation Litigation,* 264 F.3d 201, 255–56 (3d Cir.2001), and in the reports of two task forces convened by the Third Circuit to study the issue of counsel fees, Report of the Third Circuit Task Force, Court Awarded Attorneys Fee, 108 F.R.D. 237,

2004-1 Trade Cases P 74,458

247–248 (1985) ("1985 Task Force Report") and Report of Third Circuit Task Force on the Selection of Class Counsel (Final Report January 2002) ("Second Task Force Report"); *see also,* 1 Alba Conte, Attorney Fee Awards, § 2.02, at 31–32 (2d ed.1993).

6    "[T]he common-fund doctrine ... allows a person who maintains a lawsuit that results in the creation, preservation, or increase of a fund in which others have a common interest, to be reimbursed from that fund for litigation expenses incurred." Court Awarded Attorney Fees, Report of the Third Circuit Task Force, 108 F.R.D. 237, 241 (1985).

7    "The percentage of recovery method resembles a contingent fee in that it awards counsel a variable percentage of the amount recovered for the class." *In re GM Trucks,* 55 F.3d 768, 819 n. 38 (3d Cir.1995).

8    "A court determines an attorney's lodestar by multiplying the number of hours he or she reasonably worked on a client's case by a reasonable hourly billing rate for such services given the geographical area, the nature of the services provided, and the experience of the lawyer." *Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190, 195 n. 1 (3d Cir.2000). After the lodestar is calculated, "[t]he lodestar then could be increased or decreased based upon the contingent nature or risk involved and the quality of the attorney's work. An increase or decrease of the lodestar amount is referred to as a 'multiplier.' " *Cendant Prides,* 243 F.3d at 732 n. 14 (quoting Task Force Report, 108 F.R.D. 237, 243).

9    In addition to the *Cendant Prides* formula, courts use a "historic lodestar method", by which hours expended by each attorney are grouped into historical time periods and multiplied by that attorney's hourly rate for that time period, and the "current lodestar method", by which total hours expended by each attorney are multiplied by that attorney's hourly rate at the conclusion of the case. *See, e.g. Missouri v. Jenkins,* 491 U.S. 274, 283–84, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1980); *New York State Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1153 (2d Cir.1983). Petitioner's requested fee produces a multiplier of 4.08 using the historic rate calculation and 3.67 using the current rate calculation. Fee Petition at 63.

10    The Court notes that a Pennsylvania state court action has been filed against designated counsel and removed to this Court, *Richard Golomb, Ruben Honik and Golomb & Honik, P.C. v. Howard Langer and Langer & Grogan,* P.C., No. 04–2321, filed May 27, 2004. The parties in that litigation have raised no objections to the issuance of this Memorandum at this time.

11    The three Class Representatives on behalf of the Box Class are Garrett Paper, Inc., Local Baking Products, Inc., and Oak Valley Farms, Inc. General Refractories Co. and Albert I. Halper Corrugated Box Company are the representatives for the sheet class. Two other plaintiffs, a box purchaser, Winoff Industries, and a sheet purchaser, Crest Meat Co., voluntarily dismissed their complaints.

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2004 WL 1240775
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

In re LINERBOARD
ANTITRUST LITIGATION

No. MDL NO. 1261, Civ.A.98–5055, Civ.A.99–1341.
|
June 4, 2004.

**Attorneys and Law Firms**

Anthony J. Bolognese, Bolognese & Associates, LLC, Howard Langer, Langer & Grogan P.C., Robert J. Larocca, Kohn Swift & Graf, P.C., Philadelphia, PA, Carol V. Gilden, Michael Jerry Freed, Much Shelist Freed Denenberg Ament & Rubenstein, Steven A. Kanner, Much Shelist Freed Denenberg & Ament, P.C., Chicago, IL, for Plaintiff.

Andrew G. Klevorn, Bruce Michael Zessar, Kathleen M. Mulligan, Nathan P. Eimer, Sidley & Austin, R. Mark Mc Careins, Winston & Strawn, Chicago, IL, Barbara W. Mather, Pepper Hamilton LLP, Philadelphia, PA, Eric F. Gladbach, John P. Hooper, New York, NY, for Defendant.

Douglas J. Kurtenbach, Ram Padmanabhan, Kirkland & Ellis, Chicago, IL, Scott L. Fast, Sherry A. Swirsky, Schnader Harrison Segal & Lewis LLP, Philadelphia, PA, for Respondents.

William J. Blechman, Kenny, Nachwalter, Seymour, Arnold, Critchlow and Spector, Miami, FL, for Respondent/Movants.

Warren Rubin, Law Offices of B.M.Gross PC, James J. Rodgers, Dilworth Paxson L.L.P., Philadelphia, PA, Joseph

M. Donley, Kittredge, Donley, Elson, Fullem & Embick, Phila, PA, for Movants.

*ORDER*

DUBOIS, J.

**\*1** THIS DOCUMENT RELATES TO: All Actions (Civil Action Numbers 98–5055 and 99–1341)

AND NOW, this 4th day of June, 2004, upon consideration of the Order of June 2, 2004, granting Class Counsels' Petition for Award of Attorneys' Fees and Reimbursement of Expenses, and Petition for Payment of Incentive Fees to Five Class Representatives, IT IS ORDERED that the June 2, 2004 Order is AMENDED so as to ADD the following:

IT IS FURTHER ORDERED that PNC Bank is AUTHORIZED to TRANSFER the Temple Inland Settlement Fund and related accounts to Republic First Bank. Republic First Bank is AUTHORIZED to MAKE the PAYMENTS provided in the Order of June 2, 2004, upon receiving from Liaison Counsel for the class (a) certified copies of this Order and the June 2, 2004 Order, authorizing distribution, and (b) direction for distribution by Liaison Counsel for the class.

IT IS FURTHER ORDERED that the Court RETAINS jurisdiction over this case including jurisdiction over the Settlement Fund and its distribution, as well as all issues relating to the fees and costs of counsel in this action.

IT IS FURTHER ORDERED that the Order of June 2, 2004, CONTINUES IN EFFECT.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 1240775

---

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 2255624
Only the Westlaw citation is currently available.
United States District Court, W.D. Kentucky,
Louisville Division.

IN RE: PAPA JOHN'S EMPLOYEE
AND FRANCHISEE EMPLOYEE
ANTITRUST LITIGATION

Case No. 3:18-cv-825-BJB
|
Signed August 7, 2025

**Opinion & Order Preliminarily Approving Settlement Class & Authorizing Notice**

Benjamin Beaton, District Judge

**\*1** Ashley Page is the sole representative of a putative antitrust class of pizza-chain employees subject to franchise-wide no-poach provisions. She has filed an amended motion for preliminary approval of a classwide settlement with Papa John's International and Papa John's USA.[1] DN 239. The Court previously issued an opinion (DN 227) denying Page's initial motion (DN 202) for preliminary approval of this settlement. A fuller account of the allegations in this case and the reasons why preliminary approval was premature can be found in that opinion. It explains why the Court could likely approve the proposed settlement under Rule 23(e)(2), but not necessarily certify the class under Rule 23(a) and (b)(3)—at least not based on the record then before the Court. Opinion at 3, 4–8. That order requested additional information on whether Page's claims were typical of the class, whether her representation was adequate, and whether common questions of law or fact predominated. *Id.* at 5–7.

Under Rule 23(e)(1)(B), a court should preliminarily approve a classwide settlement and direct notice to class members if "the court will likely be able to ... approve the proposal under Rule 23(e)(2) and certify the class for purposes of judgment on the proposal." Page's amended motion—boosted by a later-filed supplement (DN 253) and information provided during a hearing (DN 245)—clears these hurdles, though without tremendous room to spare. Whether the Court ultimately approves the proposed settlement—after hearing from potential objectors—is of course a different question.

So for now the Court preliminarily approves the request for a classwide settlement, approves the process for notifying potential class members, and sets a schedule for interested parties to object or comment before a fairness hearing and ultimate determination regarding class-settlement approval.

**A. Rule 23(e)(2).** The Court previously held that it would "likely be able to ... approve the proposal under Rule 23(e)(2)," Opinion at 4, and this order will not disturb that holding. Upon further review of the Settlement Agreement and supplemental filings, however, two potential issues may merit attention at or before the final fairness hearing.

**1.** The Settlement Agreement imposes more onerous requirements on putative class members to opt out or object than to receive notice of the settlement. Under the Agreement, email is the primary method for notifying absent class members of the proposed settlement: "Class Counsel and Defendants' Counsel shall work together to develop the content of an email notice that the Claims Administrator will distribute ...." Settlement Agreement (DN 202-2) ¶ 6.2. Notice is mailed to class members only if "the Claims Administrator is unable to locate working email addresses ...." ¶ 6.3. And class members can submit claims through a website. ¶ 6.6. But those wishing to object or opt out must send snail mail to the Claims Administrator. ¶¶ 6.10, 7.2.

**\*2** Why would email work for some but not all purposes? Needless to say, Americans use email for all manner of legal and business dealings in 2024—now three decades out from the launch of AOL and the founding of Prodigy. Perhaps good reasons exist for this delay and asymmetry. But none are apparent from the face of the settlement and court filings. At least one other district court has rejected a similarly skewed proposed settlement: "requiring ... class members to opt out by mailing a hard copy letter ... serves little purpose but to burden those who wish to opt out. In a world where [the Defendants] can ... administer settlement claims electronically ... [Defendants] can assuredly process opt outs electronically." *Arena v. Intuit*, Inc., No. 19-cv-2546, 2021 WL 834253, at \*10 (N.D. Cal. March 5, 2021) (denying preliminary approval of classwide settlement).

**2.** The Settlement Agreement grants Page a $5,000 service award. ¶ 9.1. The Sixth Circuit has warned that courts "should be most dubious of incentive payments when they make the class representatives whole, or ... even more than whole; for in that case the class representatives have no reason to care whether the mechanisms available to unnamed

class members can provide adequate relief." *In re Dry Max Pampers Litigation*, 724 F.3d 713, 722 (6th Cir. 2013). Under that rejected settlement, the class representatives received a service award of $1000 per child, while absent class members received no monetary relief. *Id.* at 716. Here, Page would receive five times that amount, though absent class members should at least receive *something*: plaintiffs' counsel estimates that "gross recovery will average $165.22," assuming a 20% claims rate. First Motion for Preliminary Approval (DN 202) at 12. And the initial request for preliminary approval explains that some or all of Page's proposed service award compensates her for time devoted to this litigation—not simply her recovery as a former Papa John's employee. First Motion for Preliminary Approval at 17.

These issues are not so troubling as to cause the Court to revisit its earlier holding at this juncture. And other courts have approved service fees under similar circumstances. *See Daoust v. Maru Rest., LLC*, No. 17-cv-13879, 2019 WL 2866490, at *6 (E.D. Mich. July 3, 2019) (approving $5,000 service award for named plaintiff against former employer who produced documents, collaborated with class counsel, and participated in mediation); *Shane Group v. Blue Cross Blue Shield of Mich.*, 833 F. App'x 430, 431 (6th Cir. 2021) (approving $10,000 service award for plaintiffs who searched for and produced records for discovery and traveled for depositions). Despite general suspicion of service awards, therefore, this particular settlement still appears to fall "within the range of possible approval," which is all that is required at this preliminary stage. *In re High-Tech Employee Antitrust Litigation*, No. 11-cv-2509, 2014 WL 3917126, at *3 (N.D. Cal. Aug, 8, 2014). But given the caselaw and considerations noted above, these issues may deserve consideration before or during the final fairness hearing.

**B. Rule 23(a) & (b).** "Before a court may certify a class, it must ensure that the class satisfies each of Rule 23(a)'s requirements and that it falls within one of three categories permitted by Rule 23(b)." *Int'l Union, United Auto., Aerospace, & Agricultural Implement Workers of America v. General Motors Corp.*, 497 F.3d 615, 625 (6th Cir. 2007). This Court already held that Page has likely established numerosity, adequacy of class counsel, and superiority. Opinion at 4. And commonality "is subsumed under, or superseded by, the more stringent ... requirement that questions common to the class predominate over other questions." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 609 (1997). So (as indicated by the Court's prior order)

the only remaining questions are typicality, adequacy, and predominance.

**\*3  1. Typicality.** A class representative's claims must be "typical of the claims ... of the class." FED. R. CIV. P. 23(a)(3). "A claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and [the] claims are based on the same legal theory." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 561 (6th Cir. 2007). This ensures that "the representative['s] interests are aligned with the interests of the represented class members so that, by pursuing [her] own interests, the class representativ[e] also advocate[s] the interests of the class members." *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litigation*, 722 F.3d 838, 852–53 (6th Cir. 2013).

Page's claim is typical of those of the class. It arises from the same course of conduct: the inclusion of no-poach clauses in franchise agreements. *See* Amended Complaint (DN 54) ¶¶ 1, 6, 17. And it rests on the same legal theory: those clauses are (from the employees' perspective) an unreasonable restraint of trade because competitors effectively agreed to suppress employees' wages. ¶¶ 1, 11.

The prior opinion identified two typicality concerns: (1) Page's failure to change locations in search of better wages and (2) the half of the proposed class—not including Page—that has signed arbitration agreements. Opinion at 6. The new filings mitigate those concerns.

Page's failure to change locations in search of better wages, *see* Opinion at 6, does not necessarily defeat typicality. The putative class's theory of the case is that no-poach agreements suppressed competition for Papa John's employees as a group and in so doing depressed their wages as a group. *E.g.*, Amended Motion for Preliminary Approval at 2–3. Without endorsing this theory as an economic or legal matter, it suffices to note that if the plaintiffs are right, that would mean the wages of employees like Page would've been suppressed regardless of whether they sought a job at another Papa John's location.

This is consistent with the standard for typicality. A class-representative's claims "need not be identical" to those of all other class members so long as they "share the same essential characteristics as the claims of the class at large." NEWBERG & RUBENSTEIN ON CLASS ACTIONS (6th ed. 2023) § 3:29. Page's claims do.

Nor does the uneven distribution of arbitration clauses defeat typicality.[2] The Court's prior opinion expressed concern that Page's lack of an arbitration obligation might render her an atypical representative of class members bound by them. Opinion at 6. About half the proposed class—but not Page—signed employment agreements with arbitration provisions. Even according to Plaintiffs' counsel, this affects the value of arbitrable employee claims, which the settlement discounts in value by 75%. But differences in the defenses available against a class representative and other class members don't necessarily defeat typicality. "[A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 543 (6th Cir. 2012) (quoting *In re Am. Med. Sys.*, 75 F.3d at 1082).

**\*4** True, defenses may affect typicality when a defendant has "unique defenses against the proposed class representatives compared to its defenses against the rest of the class." NEWBERG & RUBENSTEIN § 3:33. Litigating a unique defense, the thinking goes, may "distract the named plaintiff to such an extent that its representation of the interests of the rest of the class will suffer." *Norfolk County Retirement System v. Community Health Systems, Inc.*, 332 F.R.D. 556, 568 (M.D. Tenn. 2019) (collecting cases); *see also Doster v. Kendall*, 54 F.4th 398, 438 (6th Cir. 2022) (rejecting "unique defenses" argument based on the issues' relative insignificance and citing RUBENSTEIN § 3:45) (vacated and remanded, *see* 144. S. Ct. 481 (2023), under *United States v. Munsingwear*, 340 U.S. 36 (1950)). That isn't a concern here, however: Papa John's doesn't have a unique (much less uniquely distracting) defense against Page's claim. Rather, it has a defense that potentially runs against many thousands —though not all—putative class members. Page's situation relative to these employees is hardly one of a kind, since thousands of others likewise faced a no-poach agreement but no arbitration provision. So her claim is at least typical of the class's claims—it arises from the same event, practice, and legal theory, *Beattie*, 511 F.3d at 561—and even the potential Papa John's defense doesn't isolate her within the class.

Even if it did, typicality still likely exists because the arbitration "defense" is a procedural one unrelated to the underlying claim. The Sixth Circuit has followed this distinction in a related context: a release from liability agreed to by some class members but not others. *Bittinger v. Tecumseh Products Co.*, 123 F.3d 877, 884 (6th Cir. 1997). That the defense was not uniformly held across the class

was "not enough to justify rejection of class certification" on typicality grounds. *Id.* Arbitration agreements provide a procedural defense but don't bear on the underlying claim. *See id.* (citing with approval *Finnan v. L.F. Rothschild*, 726 F. Supp. 460 (S.D.N.Y. 1989)) (certifying class "despite the fact that some but not all class members had signed arbitration agreements").[3] The same principle applies here to the "procedural defense" of an arbitration agreement.

**2. Adequacy.** A class representative must also "fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). The Sixth Circuit applies a two-pronged test for adequacy: "1) The representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 757 (6th Cir. 2013). If class members' interests "are not aligned" "in significant respects," one party cannot serve as the representative for all. *Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 429 (6th Cir. 2012). When a settlement class is at issue, courts must scrutinize adequacy "more closely, not less" because "the need for the adequacy of representation finding is particularly acute ...." *In re Dry Max Pampers Litigation*, 724 F.3d at 721.

The Court's prior opinion raised two adequacy concerns: Page's status as a manager (not a line employee) and the arbitration agreement (which applied to about half the putative class, but not to her). Opinion at 5–6.

The managerial position appeared potentially significant given caselaw rejecting managers as class representatives when they had been "charged with enforcing the allegedly anticompetitive No-Poach [policy]." *See Conrad v. Jimmy Johns*, No. 18-cv-133, 2021 WL 3268339, at \*6-7 (S.D. Ill. July 30, 2021). Page responded by attaching to her amended motion exhibits that indicate her managerial role does not render her inadequate to represent a class that includes cooks and drivers in addition to store managers. The sealed record indicates that franchise owners (rather than store managers like Page) enforced the no-poach agreements, which applied to managers and non-managers alike. *See* DNs 240-5 to 240-7. And, according to Page's interpretation, the agreements suppressed wages for both managers and non-managers. Amended Motion at 14–15. So store managers like Page and non-manager class members apparently share a "common interest" in proving that Papa John's suppressed wages in violation of the antitrust laws. Supplement at 5. And nothing in the record appears to overcome the

presumption that Page has "handled [her] responsibilities with the independent vigor that the adversarial process demands" based on her managerial position. *Int'l Union*, 497 F.3d at 628.

**\*5** The second adequacy concern—Page's lack of an arbitration agreement—poses a greater challenge. Page must demonstrate that her incentives align sufficiently with those of class members in different positions. Unlike the analysis above of Page's typicality, a requirement that "focuses on the similarities between the proposed class representative's claims and those of the class," the adequacy requirement "focuses on whether the proposed representative has incentives that generate disabling conflicts of interest." NEWBERG & RUBENSTEIN § 3:32.

At first glance, every class member—whether potentially subject to arbitration or not—shares the same interest: proving that Papa John's no-poach agreements unlawfully suppressed wages. *See* Supplement at 5. And, as Page puts it, she has "vigorously prosecute[d]" the interests of class members subject to arbitration agreements. Absent a classwide settlement, "those Class Members would recover not simply less—they would recover nothing" because classwide arbitration is apparently unavailable and individual arbitrations are presumably uneconomic to pursue. *Id.* at 7.

The concern here, however, is the amount rather than the fact of recovery. Under the proposed settlement, employees subject to an arbitration agreement would recover only a quarter for every dollar recovered by an employee (like Page) not subject to such an agreement. As discussed at the hearing, a rational actor in Page's situation would not necessarily have a reason to "vigorously prosecute" the interests of absent class members subject to arbitration agreements. Transcript (DN 247) at 44. After all, she is subject to a different damages calculation. If anything, her self-interest could push her toward sacrificing other class members' recovery to maximize that of herself and other class members not subject to arbitration agreements.

Notably, this action originally proposed two class representatives: Page and Jamiah Greer. Page was not subject to an arbitration agreement; Greer was. But Papa John's successfully knocked out Greer as a class representative by moving to dismiss her claims in favor of arbitration under her agreement with Papa John's. Order to Compel Arbitration (DN 90) at 9. Now, Page claims to adequately represent those like her without any risk of arbitration *and* those like Greer

who are potentially susceptible to arbitration. Potentially, not definitely, because Papa John's has chosen not to exercise arbitration clauses in other employee contracts and instead to settle those claims in litigation. It of course raises no objection to Page's adequacy and doesn't *have to* compel arbitration against any and all class members with arbitration agreements. Amended Motion for Preliminary Approval at 15–16.

The implication: Papa John's is willing to settle, but not litigate, arbitrable claims on a classwide basis. Yet the classwide agreement values the arbitrable claims at a steep discount. Page's role, at least in part, is to ensure the adequacy of representation and recovery for putative class members. The whole premise of class-action litigation presupposes that she, through counsel, can and will protect and maximize the legal interests of others who are similarly situated but absent. Who should represent the interest and maximize recovery for those absent class members with different interests, however?

The proposed settlement significantly discounts the value of claims held by employees bound by arbitration agreements. In support, counsel cite caselaw addressing claims valued differently because of the strength of the claims. Supplement at 6–7. But they don't cite authority for assessing the adequacy of representation and recovery when a subset of plaintiffs' claims are discounted without an independent representation or reason to justify the size and fairness of that discount. When a class contains claims of vastly different values, holders of the "more valuable" claims have "disparate interests" from the holders of the "less valuable" claims. *In re Literary Works in Electronic Databases Copyright Litigation*, 654 F.3d 242, 251 (2d Cir. 2011). And the owners of the more valuable claims may have an interest in "selling out" the owners of the less valuable claims. *Id.* at 252. "Only the creation of subclasses, and the advocacy of an attorney representing each subclass," some courts have held, "can ensure that the interests of that particular subgroup are in fact adequately represented." *Id.*; *see also Bittinger*, 123 F.3d at 884 ("It may be that the best remedy to both the purportedly atypical claims and defenses would be to create sub-classes.").

**\*6** For reasons unclear to the Court, the proposed settlement isn't structured around separately represented subclasses; surely it would be easier if it had been. This failure would appear to doom the settlement in, for example, the Second Circuit, which has held that "*[o]nly* the creation of subclasses ... can ensure that the interests of [a] particular subgroup are in fact adequately represented." *In re Literary*

*Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 252 (2d Cir. 2011).

But the Sixth Circuit hasn't adopted such a strict position on subclasses and (in)adequacy. To the contrary, precedent in this Circuit appears to presume a level of good faith from class representatives and counsel. It explains that when, as here, the class representative and class members have "suffered the same injury ... there is every reason to believe that the [class representative] will vigorously prosecute the interests of the class." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 563 (6th Cir. 2007). And the Sixth Circuit "demand[s] evidence of improper incentives for the class representatives" "before abandoning the presumption that the class representatives ... handled their responsibilities with the independent vigor that the adversarial process demands." *Int'l Union*, 497 F.3d at 628 (6th Cir. 2007).

On the other hand, risks of collusion call for "a more probing inquiry" in the class-settlement context "than may normally be required under Rule 23(e)." *Saucillo v. Peck*, 25 F.4th 1118, 1130 (9th Cir. 2022). And that scrutiny increases when disparate recovery aligns with divergent incentives that distinguish a group of plaintiffs represented by the named plaintiff from another group that doesn't enjoy such representation and is nevertheless bound. *See Amchem*, 521 U.S. at 625–28 ("The settling parties, in sum, achieved a global compromise with no structural assurance of fair and adequate representation for the diverse groups and individuals affected.").

At this stage, the Court can confidently assess the claims subject to arbitration as less valuable than those, like Page's, that are not subject to this procedural defense. Therefore the fact of a discounted recovery calculation seems reasonable—certainly reasonable enough not to call into question the adequacy of Page's representation of employees who otherwise might've recovered nothing in litigation *or* arbitration. But the amount of that discount is harder to assess absent any qualitative monitor (in the form of a subclass rep) or quantitative measurement (which doesn't appear to be included in the record before the Court). With these caveats, the Court preliminarily approves, dubitante, the adequacy of Page's representation and remains open to additional or contrary evidence or argument at the time of a final ruling.

**3. Predominance.** "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S.

at 623. It "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). "Rule 23(b)(3) requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen, Inc. v. Connecticut Retirement Plans & Trust Funds*, 568 U.S. 455, 459 (2013).

**\*7** Assessing whether such questions predominate "begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). Page asserts that Papa John's has unreasonably restrained trade in violation of § 1 of the Sherman Act. Amended Complaint ¶¶ 123–134. "To establish an antitrust claim, plaintiffs typically must prove (1) a violation of the antitrust laws, (2) an injury they suffered as a result of that violation, and (3) an estimated measure of damages." *Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 288 (N.D. Cal. 2016).

**a.** As for the first element, Page asserts that Papa John's no-poach agreements were the sort of naked non-solicitation agreements that are considered per se unlawful. Amended Motion at 19. This is a common question. And Page has demonstrated—through citations to the sealed portion of the record—that this question could be resolved through evidence common to the class. Page attached the franchise agreement as a sealed exhibit to her motion. DN 240-1. That agreement supports allegations that Papa John's restaurants (both corporate and franchises) viewed each other as competitors. Other sealed evidence supports allegations that the restaurants actually competed for employees. Amended Complaint at 3–4. So "virtually all class members would be relying on the same evidence that [Page] ha[s] submitted in support of class certification—namely the documents, emails, ... and other indirect evidence necessary to prove that Defendants conspired in violation of antitrust laws." *Kleen Products LLC v. Int'l Paper*, 306 F.R.D. 585, 594 (N.D. Ill. 2015).

Several related predominance concerns discussed in the prior opinion stemmed from uncertainty about what form of antitrust scrutiny—per se analysis or rule of reason—would apply based on Page's theory of the case. Opinion at 6. Page's new filings have clarified things. This evidence of inter-store competition for labor—and horizontal agreements amongst such competitors—supports (without necessarily proving) Page's argument for per se unlawfulness. Areeda &

Hovenkamp § 1910. And while this case was pending, the Seventh Circuit decided (in a similar fast-food no-poach case) that the per-se rule applied. *See Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 702 (7th Cir. 2023) ("[N]aked restraints ... are unlawful per se."). Given this evidence, Page's per-se theory—rather than the rule of reason—appears sufficiently likely to apply that the Court may assess the parties' compromise on the basis of the evidence they would use to contest that theory of the case. Correspondingly, they would *not* have to rely on the commonality and predominance of evidence Page submitted regarding monopsony power, which would not be relevant absent a rule-of-reason theory. That evidence of "market power is not essential to antitrust claims involving naked agreements among competitors." *Deslandes*, 81 F.4th at 703.

Papa John's of course disagrees that Page's evidence would carry the day, and earlier in the case pointed to countervailing evidence that it would rely on to contest these citations if the case went to trial. Motion to Dismiss (DN 59) at 7–12 (arguing that the restraints are not subject to the *per se* rule because they are vertical and ancillary). But the relevant questions at this stage are certification and common proof, not summary judgment and material factual disagreement. Courts in other no-poach cases have held that similar evidence demonstrates that antitrust violation is a common question that would be answered using common proof. *E.g.*, *Nitsch*, 315 F.R.D. at 289–90, 292 (emails between CEOs agreeing not to poach employees show that "common legal and factual issues will predominate as to whether Defendants maintained a conspiracy..."); *Seaman v. Duke University*, No. 1:15-cv-462, 2018 WL 671239, at *4 (M.D.N.C. Feb. 1, 2018) ("internal and external correspondence discussing recruitment" demonstrates that "the issue of antitrust violation is a common question that will be addressed with common proof for all proposed class members").

 ***8** Commentators have remarked that "whether a conspiracy exists is a common question that is thought to predominate over the other issues in the case and has the effect of satisfying the first prerequisite of Rule 23(b)(3)." 7AA CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1781 (3d ed. 2024). And "Rule 23(b)(3) ... does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." *Amgen*, 568 U.S. at 469 (cleaned up). But Page has also identified common evidence for the remaining two elements of her claim.

**b.** Antitrust injury asks simply "whether the plaintiffs were harmed," not "by how much"—which is the scope of the damages calculation. *Kleen Prods.*, 306 F.R.D. at 594. To establish antitrust injury, Page primarily relies upon economic theory and evidence that Papa John's linked pay for all employees. Amended Motion at 24–26. This evidence appears identical across the class, and Page asserts that it answers the common question whether the no-poach agreements class members were harmed. Amended Motion at 24. Whether this evidence would persuade a jury is beside the point: "[N]amed plaintiffs must show that *they will be able* to prove injury through common evidence, not that they have in fact proved that common injury." *Rikos v. Proctor & Gamble Co.*, 799 F.3d 497, 521 (6th Cir. 2015).

**c.** That leaves damages. "Although individual damages calculations do not preclude class certification under Rule 23(b)(3), a court must ensure at the class-certification stage that plaintiffs' formula calculates damages based only on their theory of liability." *Hicks v. State Farm Fire & Casualty Co.*, 965 F.3d 452, 460 (6th Cir. 2020). On this point, Page submitted a sealed declaration for her retained expert, Hal Singer. DN 254–1. Though Singer did not prepare an export report, his declaration describes a damages calculation based on a multiple-regression analysis of payroll data provided by Papa John's. ¶¶ 10–11. This analysis purportedly quantifies the effect of the no-poach agreements on employee compensation. ¶ 12. And Singer uses it to estimate aggregate damages. ¶¶ 19–20. So Page's model purports "to measure damages resulting from the particular antitrust injury on which [Papa John's] liability in this action is premised." *Comcast Corp v. Behrend*, 569 U.S. 27, 36 (2013). Regardless of whether that measurement would ultimately survive a challenge and persuade a jury, this amounts to common evidence that would likely predominate over individualized damages questions.

***

The additional information and arguments offered by Page in her briefs and at the hearing—while not overwhelming—suffice to allow the Court at this preliminary stage to hold that it "will likely be able to ... certify the class for purposes of judgment on the proposal." FED. R. CIV. P. 23(e)(1)(B)(ii).

**ORDER**

1. Unless otherwise defined, all terms that are capitalized shall have the meanings ascribed to those terms in the Settlement Agreement.

2. The Court finds on a preliminary basis pursuant to Rule 23 of the Federal Rules of Civil Procedure that the settlement ("Settlement") memorialized in the "Settlement Agreement" is fair, reasonable, and adequate.

3. The Court has considered the pleadings and arguments made by Plaintiff in support of the motion for preliminary approval and finds that the proposed Settlement Class described in the Settlement Agreement is proper and should be provisionally certified for settlement purposes. Solely for the purposes of the proposed Settlement, the following Settlement Class is hereby provisionally certified pursuant to Rule 23 of the Federal Rules of Civil Procedure:

 **\*9**  All individuals who were employed at a Papa John's branded restaurant located in the United States, whether owned by Defendants or a Papa John's franchisee, at any time between December 18, 2014 and December 31, 2021 and who received more than $200 in compensation during that time period.

4. Solely for the purposes of the proposed Settlement, the Court finds that: (1) the Settlement Class is so numerous (approximately 401,000 members) that joinder is impracticable; (2) questions of law and fact are common to the Settlement Class; (3) the claims of the Class Representative are typical of the claims of the Settlement Class; and (4) the Class Representative will fairly and adequately protect the interests of the Settlement Class. Further, for purposes of settlement only, the Court finds that the proposed Settlement Class meets the predominance and superiority requirements of Rule 23(b)(3) of the Federal Rules of Civil Procedure. The Court finds that certification of the Settlement Class for settlement purposes is the best means of protecting the interests of all of the Class Members.

5. Solely for the purposes of the proposed Settlement, the Court preliminarily approves Lin Y. Chan of Lieff Cabraser Heimann & Bernstein, LLP; Christian Levis of Lowey Dannenberg, P.C.; Richard McCune of McCune Wright Arevalo, LLP; and Michelle E. Conston of Scott+Scott Attorneys at Law LLP to be appointed as Class Counsel. The Court also hereby preliminarily approves Page as the Class Representative.

6. Per the request of the Parties, the Court appoints A.B. Data, Ltd., as the Claims Administrator.

7. The Court approves, as to form and content, the proposed Claim Form and Notice of Class Action Settlement with the following modifications: (1) the procedure must specify that the 100-day deadline for response will be calculated from the date emails and postcards are sent, and (2) once the content of the email notice is developed by Class Counsel and Defendants' Counsel, it must receive final approval from the Court. The Court finds that the procedures for notifying the Settlement Class about the Settlement as described in the Settlement Agreement provide the best notice practicable under the circumstances and therefore meet the requirements of the United States Constitution and specifically its Due Process Clause, Rule 23 of the Federal Rules of Civil Procedure, and any other applicable laws and rules mentioned in the parties' filings. The Court therefore directs distribution of the Notice Packet to Class Members as set forth in the Settlement Agreement.

8. A hearing, for purposes of determining whether the Settlement should be finally approved, shall be held before this Court on **January 7, 2026 at 9:30 a.m.** at the U.S. District Court for the Western District of Kentucky, Gene Snyder United States Courthouse, 601 West Broadway, Louisville, KY 40202. At the hearing, the Court will hear arguments concerning whether the proposed Settlement of the Action on the terms and conditions provided for in the Settlement Agreement is fair, reasonable, and adequate and should be approved by the Court. The Court will consider any objections that may be filed, as well as Class Counsel's request for an award of attorneys' fees and costs and for a Service Award to be made to Plaintiff.

 **\*10**  9. No later than thirty days after the Court enters the Preliminary Approval Order, Defendants shall transmit fifty percent (50%) of the payment required by the Settlement Agreement by wire transfer (or other appropriate means) to the Settlement Account. If the Court decides not to enter a Final Approval Order for any reason, then the entire amount in the Settlement Account, including any interest earned on that amount, will be returned to Defendants, less any Administrative Costs and taxes paid or reasonably incurred up to that point. No other funds shall be added to or comingled with the Settlement Account except as provided for by the Settlement Agreement. In no event shall the Claims Administrator withdraw, transfer, pledge, impair, or otherwise

make use of the funds in the Settlement Account except as expressly provided in the Settlement Agreement.

10. With respect to the Settlement Account, the Claims Administrator shall comply with all of the duties and requirements set forth in the Settlement Agreement and all applicable federal, state, and local law.

11. The Settlement Account, including all interest or other income generated therein, shall be in *custodia legis* and immune from attachment, execution, assignment, hypothecation, transfer, or similar process by any third party, including any Class Member.

12. Pending the Court's decision on final approval of the Settlement and entry of the Court's Final Approval Order, Plaintiff and all Class Members who do not timely submit valid Requests for Exclusion, and anyone acting on any of their behalf, shall be barred and enjoined from: (a) further litigation in this case; and (b) filing or taking any action directly or indirectly to commence, prosecute, pursue, or participate on an individual or class or collective action basis of any action, claim, or proceeding against any Defendant in any forum in which any of the claims released in the Settlement Agreement are asserted, or which in any way would prevent any such claims from being extinguished.

13. As of the Effective Date, each and every claim released in the Settlement Agreement by Plaintiff and Class Members who have not timely submitted valid Requests for Exclusion shall be deemed to be conclusively and forever released as against Defendants. As of the Effective Date, all Class Members who have not timely submitted valid Requests for Exclusion are hereby forever barred and enjoined from prosecuting the claims released in the Settlement Agreement against Defendants.

14. All Class Members who do not opt out of the Settlement by submitting a timely Request for Exclusion shall be bound by all determinations and judgments in the Action concerning the Settlement, whether favorable or unfavorable to the Settlement Class or Class Member.

15. To receive a Settlement Payment under the Settlement, Class Members must materially complete, execute, and submit the Claim Form to the Claims Administrator no later than the Claims Deadline as specified in the Settlement Agreement. Any Class Member who does not submit a timely and materially complete and executed Claim Form may not receive a Settlement Payment. Notwithstanding the foregoing, Class Counsel shall have the discretion, but not

the obligation, to accept late-submitted claims for processing by the Claims Administrator so long as distribution of the proceeds of the Gross Settlement Fund is not materially delayed.

16. All Class Members objecting to the terms of the Settlement must do so no later than 100 days following the entry of this order ("the Claims Deadline") and subject to the terms and conditions set forth in the Settlement Agreement. The written objection must be postmarked to the Claims Administrator on or before this date.

17. Any Class Member who wishes to be excluded ("Opt Out") from the Settlement Class and not participate in the proposed Settlement must complete and submit a Request for Exclusion to the Claims Administrator postmarked no later than the Claim Deadline, as specified in the Settlement Agreement.

 **\*11**  18. Any Class Member may enter an appearance in the Action, at his or her own expense, individually or through counsel of his or her own choice. Any Class Member who neither enters an appearance nor opts out of the Settlement Class will be represented by Class Counsel.

19. Any Class Member may appear at the Final Approval Hearing and show cause, if he or she has any, why the proposed Settlement of the Action should or should not be approved as fair, reasonable, and adequate, or why a judgment should or should not be entered thereon. No Class Member or any other person, however, shall be heard or entitled to contest the approval of the terms and conditions of the proposed Settlement, or, if approved, the Final Approval Order to be entered thereon approving the same, unless that Class Member has submitted a timely and valid Request for Exclusion to the Claims Administrator. All timely filed and served objections shall be considered and ruled upon by the Court at the Final Approval Hearing. Any Class Member who does not timely file and serve his or her objection in the manner provided in the Settlement Agreement shall be deemed to have waived such objection and shall forever be foreclosed from making any objection to the fairness or adequacy of the proposed Settlement as incorporated in the Settlement Agreement.

20. In the event that the Effective Date (as provided for in the Settlement Agreement) does not occur, the Settlement and the Settlement Agreement shall be deemed null and void and shall have no effect whatsoever.

21. The Parties must carry out the Settlement according to the terms of the Settlement Agreement.

22. The Court imposes the following schedule:

| Event | Date |
| --- | --- |
| Papa John's to Provide Database of Class Members' Identities and Corresponding Information to Claims Administrator | August 21, 2025 |
| Claims Administrator Shall Engage Credit Reporting Agency or Similar Service to Locate Class Members' Email Addresses | September 4, 2025 |
| Claims Administrator Will Email Notice Package, Publish Settlement Website, and Mail Postcards to Class Members Whose Email Addresses Cannot be Located | Following receipt of tracing Class Member Contact Information |
| Claims Administrator will Alert Parties if Direct Notice Unlikely to Reach More than 80% of Class Members | Following additional email and postcard notice to Class Members |
| Motion for Fees, Costs, and Plaintiff's Service Award | October 21, 2025 |
| Deadline for Claims, Objections, and Requests for Exclusion | November 15, 2025 |
| Motion for Final Approval and Claims Administrator Affidavit of Compliance with Notice Requirements | December 17, 2025 |
| Final Approval Hearing (Minimum of 130 days after Preliminary Approval) | January 7, 2026 |

**All Citations**

Slip Copy, 2025 WL 2255624

Footnotes

1    The complaint explains that the two corporate entities "operate as a single entity" "out of the same location" with "the same directors and executives." Amended Complaint (DN 54) ¶¶ 22–23. For purposes of this motion, the parties identify no relevant difference between the two Defendants and the remainder of the opinion refers to them collectively as Papa John's.

2    The arbitration agreements are relevant to both typicality and adequacy. To some extent, the concerns overlap: "The adequate representation requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members." *In re American Medical Systems, Inc.*, 75 F.3d 1069, 1083 (6th Cir. 1996). But the inquiries remain distinct: "[T]ypicality focuses on the similarities between the proposed class representative's claims and those of the class while adequacy focuses on whether the proposed representative has incentives that generate disabling conflicts of interest." NEWBERG & RUBENSTEIN § 3:32.

3    For instance, "unique defenses that are unlikely to play a substantial role in litigation usually will not defeat typicality." NEWBERG & RUBENSTEIN § 3:45. So "typicality will generally not be defeated by allegations that the proposed class

representative has released the defendants from the claims asserted, may face a statute of limitation defense, or owes prior unsettled debt to the defendant." *Id.*

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 5467530

United States District Court,
E.D. Pennsylvania.

In re PROCESSED EGG PRODUCTS
ANTITRUST LITIGATION.

This Document Applies to: All
Direct Purchaser Plaintiff Actions.

MDL No. 2002.
|
No. 08–md–2002.
|
Nov. 9, 2012.

*MEMORANDUM*

GENE E.K. PRATTER, District Judge.

**\*1** Direct Purchaser Plaintiffs move the Court for an award of attorneys' fees and reimbursement of litigation expenses from the common fund created by the settlement agreement between Plaintiffs and Defendants Moark, LLC, Norco Ranch, Inc., and Land O'Lakes, Inc. (collectively, "Moark"). For the reasons set forth below, the Court awards the attorneys' fees and most of the costs sought, and now satisfactorily explained, by Plaintiffs' counsel.

### I. Factual Background

This litigation encompasses numerous actions based upon an alleged conspiracy among egg producers and trade groups to manipulate the supply of egg products and thereby affect the domestic prices of those goods. *See In re Processed Egg Prods. Antitrust Litig.,* 588 F.Supp.2d 1366, 1367 (J.P.M.L.2008). The plaintiffs are direct purchasers (such as grocery stores, commercial food manufacturers, restaurants, other food service providers, and other entities who purchase directly from Defendants or other egg producers) and indirect purchasers (individual consumers who purchased from other parties along the distribution chain) of shell eggs, egg products, or both. The Direct Purchaser Plaintiffs are referred to in this memorandum as "Plaintiffs" and have brought a consolidated class action against various egg producers and trade groups.

The Plaintiffs accuse defendant egg producers, including Moark, of violating Section 1 of the Sherman Act and seek injunctive relief, treble damages, attorneys' fees and costs. In August 2009, Moark's counsel reportedly contacted Interim Co–Lead Counsel for the Plaintiffs about a potential settlement. Two months later, the parties had a meeting during which Moark provided Plaintiffs with sales data and other financial information. In March 2010, these parties began to engage in settlement negotiations. Over the course of the ensuing three months, the parties negotiated through telephone conferences and in-person meetings on multiple occasions. They discussed potential settlement terms, including possible settlement amounts and how Moark could cooperate with Plaintiffs. They also exchanged information. At the conclusion of these efforts, the parties reached an agreement and executed the Moark Settlement documents.

On July 15, 2010, the Court entered an Order preliminarily approving the proposed Moark settlement agreement. In a separate Order issued that same day, the Court approved the form of notice of the Moark Settlement. On July 16, 2012, the Court granted final approval of the settlement, which provided $25 million in monetary relief to class members and obligated Moark to cooperate with the Plaintiffs' preparation for and prosecution of their case.

On April 14, 2011, Plaintiffs' counsel filed their motion for attorneys' fees and reimbursement of expenses from the fund created by the Moark Settlement. The motion requested that the Court award attorneys' fees of $7.5 million, an amount equal to 30 percent (30%) of the settlement fund, and that it allow Interim Co–Lead Counsel for the Plaintiffs to control the distribution of the fees. Plaintiffs' counsel argued that an award of $7.5 million was appropriate based on several factors, but failed to discuss other factors that the Third Circuit Court of Appeals requires district courts to consider in approving attorneys' fees in a class action settlement based on the percentage-of-recovery method. Additionally, the motion requested reimbursement of $566,530.37 for litigation expenses.

**\*2** By way of its July 18, 2012 Order, the Court held its ruling on the motion for attorneys' fees in abeyance and required Plaintiffs' counsel to furnish additional information in support of their requests for fees and costs, and to more fully discuss certain factors that assist the Court in evaluating attorneys' fees in class action settlements. On August 15, 2012, the Court ordered the Garden City Group, the third

party administrator retained to assist with ministerial duties associated with the settlement, to post this supplemental brief online, and to send notice of the motion for attorneys' fees to class members by September 17, 2012. Class members were permitted to object to the motion for attorneys' fees until November 1, 2012, and the notice clearly established that class members must make such objections through a writing submitted to the Court and Plaintiffs' counsel. No class members have undertaken to so object to the proposed award.

Plaintiffs' counsel's supplemental brief in support of their motion for fees and costs includes dozens of declarations that identified the attorneys and staff who worked on the case, their experience, their hourly rates, and the number of hours they worked on the case. The declarations also included itemized expense reports for each of the law firms that represented the Plaintiffs. In their supplemental briefing, Plaintiffs' counsel seek $487,720.30 in litigation expenses, a downward revision of $78,810.07 from their initial request.

## II. Petition for Attorneys' Fees

### A. Percentage–of–Recovery Method

Courts must perform a "thorough judicial review of fee applications ... in all class action settlements." *In re GMC Pick–Up Truck Fuel Tank Prods. Liab. Litig,* 55 F.3d 768, 819 (3d Cir.1995). In assessing attorneys' fees, courts may use the percentage-of-recovery method or the lodestar method. The percentage-of-recovery method "applies a certain percentage to the settlement fund." *In re Diet Drugs Prod. Liab. Litig.,* 582 F.3d 524, 540 (3d Cir.2009) (citations and quotations omitted). When evaluating fees in a case where the attorneys' "efforts create, discover, increase, or preserve a fund to which others also have a claim ... the percentage-of-recovery method is generally favored ." *Id.* (citation omitted); *see also In re Auto. Refinishing Paint Antitrust Litig.,* MDL No. 1426, 2008 WL 63269, at *3 (E.D.Pa. Jan.3, 2008) ("In this Circuit, the percentage of recovery method is 'generally favored' in cases involving a common settlement fund[.]") (quoting *In re Cendant Corp. PRIDES Litig.,* 243 F.3d 722, 732 (3d Cir.2001)).

The Third Circuit Court of Appeals has held that district courts "must consider" ten factors "[i]n determining what constitutes a reasonable percentage fee award[.]" *In re Diet Drugs,* 582 F.3d at 541. The factors are:

(1) the size of the fund created and the number of beneficiaries;

(2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel;

**\*3** (3) the skill and efficiency of the attorneys involved;

(4) the complexity and duration of the litigation;

(5) the risk of nonpayment;

(6) the amount of time devoted to the case by plaintiffs' counsel;

(7) the awards in similar cases;

(8) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations;

(9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained; and

(10) any innovative terms of settlement.

*Id.* (citing *Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190, 195 n. 1 (3d Cir.2000), and *In re Prudential Ins. Co. Am. Sales Practice Litig. Against Agent Actions,* 148 F.3d 283, 336–40 (3d Cir.1998)). Here, the Court's analysis of these factors supports awarding the requested attorneys' fees.

### 1. The Size of the Fund and the Number of Beneficiaries.

Due to the Moark Settlement, a nationwide group of thousands of direct purchasers of egg products has obtained a $25 million recovery. Additionally, the terms of the settlement supplement the monetary size of the fund by obligating Moark to cooperate with the Plaintiffs in preparing their case against others. Such cooperation could help egg purchasers recover additional monies in the future. Therefore, the Court finds that this factor supports the fees request.

### 2. The Absence of Objections.

In their initial motion for an award of attorneys' fees, Plaintiffs' counsel noted that the class notice regarding the Moark Settlement stated that counsel would petition for an award of up to 30 percent of the cash value of the settlement, and that no class members objected to the

settlement. Nonetheless, cognizant of its duty to undertake a "thorough judicial review of fee applications," *GMC Pick–Up,* 55 F.3d at 819, the Court ordered the Garden City Group to send a separate notice of the fees motion to class members. The notice gave class members 45 days to object to the requested award and expressly established the procedure for making such an objection. Because the Court has received no objections to the proposed award, this factor favors granting the motion.[1]

### 3. The Skill and Efficiency of the Attorneys.

The Court previously stated that the Interim Co–Lead Counsel "have extensive documented experience in complex class action litigation," are "well-respected law firms in the plaintiffs class action bar," and have "capably managed this suit on behalf of Plaintiffs since the Court formally appointed them." *In re Processed Egg Prods.,* 2012 U.S. Dist. LEXIS 98301, at *39, 2012 WL 2885941. Moreover, the Court notes that "successful settlement negotiations ... demonstrate[ ] the significant skill and expertise of counsel." *Auto. Refinishing,* 2008 WL 63269, at *4. Here, the robust cash value obtained by the Moark Settlement and the cooperation procured from Moark indicate that, at least in this regard, Plaintiffs' counsel have handled their obligations to this point and their clients' interests skillfully.

**\*4** Additionally, Plaintiffs' counsel have used their supplemental briefing to discuss how they managed this litigation efficiently. Counsel note that they submitted monthly time and expense reports to Interim Co–Lead Counsel, who reportedly thoroughly reviewed those reports. Interim Co–Lead Counsel also held weekly conference calls to give assignments to other attorneys, monitor the progress of the performance of those assignments, and ensure that different lawyers did not perform duplicative work. Therefore, Plaintiffs' counsel have acted skillfully and efficiently, and this factor also supports the proposed award of 30 percent of the settlement fund.

### 4. The Complexity and Duration of the Litigation.

This litigation, "like most antitrust cases, has been exceedingly complex, expensive, and lengthy." *Id.* at *5 (citing *In re Linerboard Antitrust Litig.,* 296 F.Supp.2d 568, 577 (E.D.Pa.2003, and *In re Shopping Carts Antitrust Litig.,* MDL No. 451, 1983 U.S. Dist. LEXIS at *17, 1983 WL 1950 (S.D.N.Y. Nov. 18, 1983)). By the time the Court granted final approval of the Moark Settlement, the parties had engaged in over three years of consolidated MDL litigation. Among

other tasks, Plaintiffs' counsel investigated claims, briefed and argued motions to dismiss, negotiated this settlement, and successfully obtained its approval by the Court. Given the complexity that necessarily accompanies consolidated antitrust litigation and the duration of the case, the Court finds that this factor favors granting the motion.

### 5. The Risk of Nonpayment.

The Court recognizes that "[a]ny contingency fee [arrangement] includes a risk of non-payment." *O'Keefe v. Mercedes–Benz USA, LLC,* 214 F.R.D. 266, 309 (E.D.Pa.2003); *see also In re Processed Egg Prods.,* 2012 U.S. Dist. LEXIS 98301, at *75, 2012 WL 2885941 ("[A]ntitrust class action litigation is complex, and, especially at its early stages, inherently rife with risk and unpredictability in terms of ultimately prevailing to establish liability and damages and achieve class certification."). Here, Plaintiffs' counsel undertook their representation in a risky antitrust case on a purely contingent basis and thereby assumed a significant risk of nonpayment. Moreover, counsel have incurred hundreds of thousands of dollars in costs and expenses, and they ran the risk of not being reimbursed for any of these expenditures. Therefore, the Court finds that this factor supports the proposed award of attorneys' fees.

### 6. The Amount of Time Devoted to the Case.

In ordering Plaintiffs' counsel to provide supplemental information regarding their motion for attorneys' fees, the Court required counsel to identify the total number of hours that the lawyers and staff of each firm spent working on the case. Upon reviewing the declarations submitted by 35 different law firms,[2] it appears that these firms collectively spent 22,772.81 hours working on this matter through February 28, 2011, the date that the Court held a final fairness hearing for the Moark Settlement. As stated above, Plaintiffs have taken several steps to make their work on this litigation as efficient as possible. The amount of time spent on this case prior to final approval of the settlement most likely reflects the complexity of the Plaintiffs' claims, not the inefficiency of their counsel. Presumably, the thousands of hours counsel spent working on this matter prevented those individuals from litigating other cases. This factor thus strongly favors granting the motion for attorneys' fees.

### 7. Awards in Similar Cases.

**\*5** The initial motion for attorneys' fees cursorily noted that several district courts within the Third Circuit have awarded

In re Processed Egg Products Antitrust Litigation, Not Reported in F.Supp.2d (2012)

2012-2 Trade Cases P 78,126

fees ranging from 30 to 35 percent of a settlement fund. In their supplemental briefing, Plaintiffs' counsel have expanded their discussion of this factor. Counsel now note that many of the cases they initially cited resemble this matter because they involved complex issues and had few or no objectors, not merely because the litigants in those cases received awards that are similar to what Plaintiffs' counsel are seeking. *See, e.g., Auto. Refinishing,* 2008 WL 63269, at *4–5; *In re Ravisent Techs., Inc., Sec. Litig.,* No. 00–1014, 2005 WL 906361, at *10–11 (E.D.Pa. Apr.18, 2005); *In re Remeron Direct Purchaser Antitrust Litig.,* No. 03–0085, 2005 WL 3008808, at *12–13 (D.N.J. Nov.9, 2005). The supplemental briefing also identifies attorneys' fees awards in antitrust cases that Plaintiffs' counsel did not initially discuss. *See, e.g., McDonough v. Toys "R" Us, Inc.,* 834 F.Supp.2d 329, 340–43 (E.D.Pa.2011) (approving attorneys' fees of 33 percent of the settlement fund and noting that fees may range as high as 45 percent of a common fund). Given this expanded analysis, the Court finds that awards in similar cases support the proposed award here.

**8. The Value of Benefits Attributable to Class Counsel.**

The eighth factor the Court must consider is the degree to which the benefits of the settlement are attributable to Plaintiffs' counsel as opposed to the efforts of other actors, such as, for example, government investigators. *See In re Diet Drugs,* 582 F.3d at 541. Plaintiffs' counsel did not discuss this factor in their initial briefing. However, in his second declaration in support of the fees motion, Steven Asher, Interim Co–Lead Counsel for the Plaintiffs, confirms that "Designated Counsel filed the initial complaints in this matter ... without the benefit of a governmental investigation or related indictments." Furthermore, Plaintiffs' counsel state in their supplemental brief that their claims are "wholly unrelated" to public reports regarding a "narrow investigation" into the egg products industry. However, Plaintiffs' counsel do not elaborate on how their claims are "wholly unrelated" to other investigations. Given their failure to do so, this factor provides only limited or partial support for their proposed award.

**9. Private Contingent Fee Arrangement.**

Ninth, the Court must analyze "the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained." *Id* . Although Plaintiffs' counsel did not initially discuss this factor, they now argue that contingency fees of 30 percent or higher are standard in litigation. This contention finds support

in case law. *In re Merck & Co. Vytorin ERISA Litig.,* No. 08–285, 2010 U .S. Dist. LEXIS 12344, at *41–42, 2010 WL 547613 (D.N.J. Feb. 9, 2010) ("[T]he 33.33% fee award requested reflects commonly negotiated fees in the private marketplace."). Moreover, counsel for Susman Godfrey and Hausfeld LLP have now submitted affidavits stating that their firms routinely charge a contingency fee of at least 33 percent upon offering legal services in individual litigation. The Court thus finds that this factor favors granting the motion for attorneys' fees.

**10. Innovative Terms of Settlement.**

**\*6** In their supplemental brief, Plaintiffs' counsel admit that the Moark Settlement does not contain any particularly "innovative" terms. Therefore, "this factor neither weighs in favor nor detracts from a decision to award attorneys' fees." *Id.* at *42.

The Court finds that the factors it has analyzed collectively support granting the proposed award of 30 percent of the settlement fund.

**B. Lodestar Cross–Check**

The Third Circuit Court of Appeals has "suggested that district courts cross-check the percentage award at which they arrive against the 'lodestar' award method." *Gunter,* 223 F.3d at 195 n. 1. A lodestar award "is calculated by multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys ." *Chakejian v. Equifax Info. Servs., LLC,* 275 F.R.D. 201, 216 (E.D.Pa.2011) (internal quotation omitted). The reasonableness of an hourly rate depends on the experience and skill of the attorneys and staff who worked on the litigation. *See id.* The reasonableness of the number of hours worked requires counsel to not spend excessive time on a case and to not use top legal talent for routine work that associates or paralegals could perform. *See id.* at 217. In calculating a lodestar award to evaluate a settlement that occurs before the conclusion of a case, courts may include the time spent by counsel performing tasks that are not directly related to the settlement. *See In re Ins. Brokerage Antitrust Litig.,* 579 F.3d 241, 282–85 (3d Cir.2009).

The Court previously noted the high level of skill of the attorneys involved in this litigation. Moreover, the dozens of supplemental declarations filed by Plaintiffs' counsel indicate

the experience of the attorneys and staff who have worked on this case. Based on this information, the Court finds that the stated hourly rates of these attorneys and staff, some of whom are described as national leaders in the field of class action litigation, are reasonable.

As for the reasonableness of the hours worked by Plaintiffs' counsel, the Court noted above that counsel took several steps to litigate this case efficiently. Moreover, Plaintiffs' counsel appear to have reasonably divided their work between partners and other lawyers and staff. For instance, all but two of the firms who submitted supplemental declarations directed at least some of their work to associates or staff.[3] Additionally, the ratio of non-partner personnel who worked on the case to partners who did so is approximately 1.65:1.[4] Given the complexity of this litigation and the corresponding appropriate need for and use of heavy involvement by experienced attorneys, the Court finds that this ratio is reasonable, and that Plaintiffs' counsel sufficiently directed work to lower-level personnel.

Plaintiffs' counsel represent that, based on their hourly rates and hours worked, their total lodestar through the date of the final fairness hearing on the Moark Settlement amounts to $11,001,332.40. In performing an independent calculation of the lodestar, the Court calculates it as $10,817,088.90. The difference between these two figures is insignificant, as the lodestar of Plaintiffs' counsel generates a multiplier of 0.68, while that of the Court generates one of 0.69. Both multipliers indicate that the Court should approve the proposed award. *See Milliron v. T–Mobile USA, Inc.,* 423 F. App'x 131, 135 (3d Cir.2011) ("Although the lodestar multiplier need not fall within any pre-defined range, we have approved a multiplier of 2.99 in a relatively simple case.") (quotations and citations omitted). Because the lodestar cross-check supports the Court's analysis under the percentage-of-recovery method, the Court grants the motion and awards Plaintiffs' counsel attorneys' fees of 30 percent of the settlement fund.

### III. Petition for Reimbursement of Costs and Expenses

**\*7** In addition to an award of attorneys' fees, Plaintiffs' counsel also seek $487,720.30 for reimbursement of litigation expenses. The Court "may award reasonable attorney's fees and nontaxable costs" to Plaintiffs' counsel. Fed.R.Civ.P. 23(h); *see also In re Aetna Inc. Sec. Litig.,* MDL No. 1219, 2001 U.S. Dist. LEXIS 68, at *40, 2001 WL 20928 (E.D.Pa. Jan. 4, 2001) ("Attorneys who create a common fund for the benefit of a class are entitled to reimbursement of reasonable

litigation expenses from the fund."). Reimbursement is particularly appropriate in situations where, as here, no class members have objected to it. *See Auto. Refinishing,* 2008 WL 63269, at *6.

The plain language of Federal Rule of Civil Procedure 23(h) allows the Court to award only *nontaxable* costs. Although Plaintiffs' counsel identify several cases in which courts awarded taxable costs under Rule 23(h), none of those cases even attempt to reconcile such an award with the plain language of Rule 23(h). Indeed, in those cases no attention is paid to the language of the Rule. Moreover, while counsel try to distinguish *In re Apollo Grp. Inc. Sec. Litig,* No. 04–2147, 2012 U.S. Dist. LEXIS 55622, 2012 WL 1378677 (D.Ariz. Apr. 20, 2012), the district court in that case held without fanfare that "Rule 23(h) only allows the Court to award nontaxable costs." *Id.* at *29. In short, recognizing the role, import, and language of Rule 23(h), the Court discerns no reason to ignore or to try to avoid the Rule's provision, and declines to do so.

Because only nontaxable costs may be awarded to Plaintiffs' counsel by Rule, the Court has reviewed the dozens of declarations submitted by counsel to disentangle their nontaxable and taxable costs,[5] and to evaluate the reasonableness of their nontaxable costs. Based on this review, the Court finds that the nontaxable costs sought by Plaintiffs' counsel are reasonable, and therefore awards Plaintiffs' counsel $434,944.79, the amount of nontaxable costs that the Court calculates counsel has accrued.

### IV. Allocation of Fees

The motion also seeks to allow Interim Co–Lead Counsel to distribute the awarded attorneys' fees among counsel for the Plaintiffs. Courts "generally approve joint fee applications which request a single aggregate fee award with allocations to specific firms to be determined by Co–Lead Counsel," because such counsel "are most familiar with the work done by each firm and each firm's overall contribution to the litigation." *Id.* at *7. Additionally, such an approach to allocating fees "conserves the time and resources of the courts." *Id.* Therefore, the Court will allow Interim Co–Lead Counsel to distribute the fees awarded from the Moark Settlement Fund.

### V. Conclusion

For the foregoing reasons, the Court awards attorneys' fees of 30 percent of the settlement fund and a reimbursement

2012-2 Trade Cases P 78,126

of $434,944.79. An Order consistent with this Memorandum follows.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 5467530, 2012-2 Trade Cases P 78,126

Footnotes

1    The Court notes that "many of the class members are sophisticated entities with their own in-house counsel, and ostensibly have the resources and ability to assess the settlement agreement beyond the average layperson or enterprise." *In re Processed Egg Prods. Antitrust Litig.,* MDL No.2002, 2012 U.S. Dist. LEXIS 98301, at *65, 2012 WL 2885941 (E.D.Pa. July 16, 2012).

2    The Court notes that Klehr Harrison LLP has submitted a hard copy declaration that does not appear on ECF.

3    These two firms, Edelson & Associates, LLC and Giuliano Law Firm, P.C., only spent 35.4 hours working on the case.

4    For purposes of this calculation, the Court treats *of counsel* as partners.

5    As Plaintiffs' counsel admit in their briefing, costs for process and filing fees, copying, and court transcripts are all taxable under 28 U.S.C. § 1920.

---

End of Document                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Ⓐ Neutral

As of: January 20, 2026 7:45 PM Z

## *In re Ry. Indus. Emple. No-Poach Antitrust Litig.*

United States District Court for the Western District of Pennsylvania

August 26, 2020, Decided; August 26, 2020, Filed

Master Docket Misc. No. 18-798; MDL No. 2850

**Reporter**

2020 U.S. Dist. LEXIS 249904 *; 2020 WL 13852931

IN RE: RAILWAY INDUSTRY EMPLOYEE NO-POACH ANTITRUST LITIGATION. This Document Relates to: ALL ACTIONS

## Core Terms

Senior, Settlement, Compliance, Notice, final approval, class member, Weigh, class action

**Counsel:** **[*1]** For DAVID B. WHITE, Special Master: David B. White, LEAD ATTORNEY, Burns White LLC, Burns White Center, Pittsburgh, PA.

For DANIEL LIENEMANN, Plaintiff: Paul A. Lagnese, LEAD ATTORNEY, Berger & Lagnese, Pittsburgh, PA; Robert N. Kaplan, LEAD ATTORNEY, PRO HAC VICE, Kaplan, Kilsheimer & Fox, New York, NY.

For JASON T. ROOZEMOND, Plaintiff: Alexandra S. Bernay, LEAD ATTORNEY, PRO HAC VICE, Robbins Geller Rudman & Dowd LLP, San Diego, CA; Jessica H Meeder, Nicholas Adam Szokoly, LEAD ATTORNEYS, Murphy Falcon and Murphy, Baltimore, MD; William H Murphy, III, LEAD ATTORNEY, PRO HAC VICE, Murphy Falcon and Murphy, Baltimore, MD.

For DAVID ESCALERA, Plaintiff: Adam J. Pessin, LEAD ATTORNEY, PRO HAC VICE, Fine, Kaplan and Black, RPC, Philadelphia, PA; Joseph Goldberg, LEAD ATTORNEY, PRO HAC VICE, Freedman, Boyd, Hollander, Goldberg & Ives, P.A., Albuquerque, NM; Richard E. Donahoo, LEAD ATTORNEY, PRO HAC VICE, Donahoo & Associates, Pc, Tustin, CA; Yaman Salahi, LEAD ATTORNEY, PRO HAC VICE, Lieff Cabraser Heimann & Bernstein LLP, San Francisco, CA; Dean M. Harvey, Kelly M. Dermody, Lin Y. Chan, PRO HAC VICE, Lieff Cabraser Heimann & Bernstein, LLP, San Francisco, CA; Frank T. Davis, Jr., PRO HAC **[*2]** VICE, Freedman Boyd Hollander Goldberg Urias & Ward P.A., Albuquerque, NM; Gerard A. Dever, Roberta D Liebenberg, PRO HAC VICE, Fine, Kaplan and Black, Rpc, Philadelphia, PA; Kathleen M. Konopka, PRO HAC VICE, Lieff Cabraser Heimann & Bernstein, New York, NY; Kelly K. Iverson, Carlson Lynch, LLP, Pittsburgh, PA; Linda Nussbaum, PRO HAC VICE, Nussbaum Law Group PC, New York, NY; Michael Sheen, PRO HAC VICE, Lieff, Cabraser, Hiemann & Bernstein, LLP, San Francisco, CA; Vincent J. Ward, PRO HAC VICE, Freedman Boyd Hollander Goldberg Urias & Ward P.A., Albuquerque, NM.

For SONNY FRICIA, Plaintiff: Benjamin Howard Carney, LEAD ATTORNEY, Gordon, Wolf & Carney, Chtd, Towson, MD; Richard E. Donahoo, LEAD ATTORNEY, PRO HAC VICE, Donahoo & Associates, Pc, New York, NY; Yaman Salahi, LEAD ATTORNEY, PRO HAC VICE, Lieff Cabraser Heimann & Bernstein LLP, San Francisco, CA; Dean M. Harvey, PRO HAC VICE, Kelly M. Dermody, Lin Y. Chan, Lieff Cabraser Heimann & Bernstein, LLP, San Francisco, CA; Kathleen M. Konopka, PRO HAC VICE, Lieff Cabraser Heimann & Bernstein, New York, NY; Michael Sheen, Lieff, Cabraser, Hiemann & Bernstein, LLP, San Francisco, CA.

For DEREK JOHNSON, Plaintiff: Anne B Shaver, Yaman **[*3]** Salahi, LEAD ATTORNEYS, PRO HAC VICE, Lieff Cabraser Heimann and Bernstein LLP, San Francisco, CA; Benjamin Howard Carney, LEAD ATTORNEY, Gordon, Wolf & Carney, Chtd, Towson, MD; Brendan P. Glackin, Kelly M. Dermody, Lin Y. Chan, Richard M. Heimann, LEAD ATTORNEYS, Dean M. Harvey, Lieff Cabraser Heimann & Bernstein, LLP, San Francisco, CA; Judith Camilleri, Richard E. Donahoo, Sarah L Kokonas, LEAD ATTORNEYS, PRO HAC VICE, Donahoo and Associates PC, Tustin, CA; Michael Sheen, LEAD ATTORNEY, Lieff, Cabraser, Hiemann & Bernstein, LLP, San Francisco, CA; Kathleen M. Konopka, PRO HAC VICE, Lieff Cabraser Heimann & Bernstein, New York, NY.

For SHAWN SHEPHERD, Plaintiff: Benjamin Howard Carney, LEAD ATTORNEY, Gordon, Wolf & Carney, Chtd, Towson, MD; Joseph Goldberg, LEAD ATTORNEY, PRO HAC VICE, Freedman, Boyd, Hollander, Goldberg & Ives, P.A., Albuquerque, NM;

Richard E. Donahoo, LEAD ATTORNEY, PRO HAC VICE, Donahoo & Associates, Pc, Tustin, CA; Yaman Salahi, LEAD ATTORNEY, PRO HAC VICE, Lieff Cabraser Heimann & Bernstein LLP, San Francisco, CA; Dean M. Harvey, PRO HAC VICE, Kelly M. Dermody, Lin Y. Chan, Lieff Cabraser Heimann & Bernstein, LLP, San Francisco, CA; Frank T. Davis, Jr., Vincent **[*4]** J. Ward, PRO HAC VICE, Freedman Boyd Hollander Goldberg Urias & Ward P.A., Albuquerque, NM; Gerard A. Dever, PRO HAC VICE, Fine, Kaplan and Black, Rpc, Philadelphia, PA; Kathleen M. Konopka, PRO HAC VICE, Lieff Cabraser Heimann & Bernstein, New York, NY; Michael Sheen, Lieff, Cabraser, Hiemann & Bernstein, LLP, San Francisco, CA; Roberta D Liebenberg, PRO HAC VICE, Fine, Kaplan and Black, R.P.C., Philadelphia, PA.

For LUIS TARIN, Plaintiff: Elizabeth A. Chiappetta, LEAD ATTORNEY, D. Aaron Rihn, Robert Peirce & Associates, P.C., Pittsburgh, PA; Joseph Goldberg, LEAD ATTORNEY, PRO HAC VICE, Freedman, Boyd, Hollander, Goldberg & Ives, P.A., Albuquerque, NM; Richard E. Donahoo, LEAD ATTORNEY, PRO HAC VICE, Donahoo & Associates, Pc, Tustin, CA; Shana E. Scarlett, LEAD ATTORNEY, PRO HAC VICE, Hagens Berman Sobol Shapiro LLP, Berkeley, CA; Steve W. Berman, LEAD ATTORNEY, PRO HAC VICE, Hagens Berman Sobol Shapiro LLP, Seattle, WA; Yaman Salahi, LEAD ATTORNEY, PRO HAC VICE, Lieff Cabraser Heimann & Bernstein LLP, San Francisco, CA; Dean M. Harvey, PRO HAC VICE, Kelly M. Dermody, Lin Y. Chan, Lieff Cabraser Heimann & Bernstein, LLP, San Francisco, CA; Frank T. Davis, Jr., Gerard A. Dever, PRO **[*5]** HAC VICE, Freedman Boyd Hollander Goldberg Urias & Ward P.A., Albuquerque, NM; Kathleen M. Konopka, PRO HAC VICE, Lieff Cabraser Heimann & Bernstein, New York, NY; Michael Sheen, Lieff, Cabraser, Hiemann & Bernstein, LLP, San Francisco, CA; Roberta D Liebenberg, Vincent J. Ward, PRO HAC VICE, Fine, Kaplan and Black, R.P.C., Philadelphia, PA.

For JOHN BRAND, Plaintiff: Nicholas S. Cheolas, PRO HAC VICE, Jennifer Duncan Hackett, LEAD ATTORNEY, Zelle LLP, Washington, DC; Christopher T. Micheletti, Qianwei Fu, PRO HAC VICE, Zelle LLP, San Francisco, CA; Kelly K. Iverson, Carlson Lynch, LLP, Pittsburgh, PA.

For OMAR SEY, Plaintiff: Andrew David Freeman, LEAD ATTORNEY, Brown Goldstein and Levy LLP, Baltimore, MD; Christopher J. McDonald, Jay L. Himes, LEAD ATTORNEYS, PRO HAC VICE, Labaton Sucharow LLP, New York, NY; Gary F. Lynch, Kelly K. Iverson, LEAD ATTORNEYS, Carlson Lynch, LLP, Pittsburgh, PA; Gregory S. Asciolla, LEAD ATTORNEY, PRO HAC VICE, Labaton Sucharow LLP, Brooklyn, NY; Neel Lalchandani, LEAD ATTORNEY, Brown, Goldstein & Levy, Baltimore, MD; Steven J Durham, LEAD ATTORNEY, PRO HAC VICE, Labaton Sucharow LLP, Washington, DC; Brian Morrison, Jonathan S. Crevier, Karin E. Garvey, **[*6]** PRO HAC VICE, Labaton Sucharow LLP, New York, NY.

For DUSTIN THEOBALD, Plaintiff: Hollis L. Salzman, LEAD ATTORNEY, Robins Kaplan LLP, New York, NY; John C. Evans, LEAD ATTORNEY, Specter Specter Evans & Manogue, Pittsburgh, PA.

For KORY MARIETTA, Plaintiff: Hollis L. Salzman, LEAD ATTORNEY, Robins Kaplan LLP, New York, NY; Joel R. Hurt, LEAD ATTORNEY, Feinstein Doyle Payne & Kravec, LLC, Pittsburgh, PA.

For SLOAN STEWART, JOHN W. LUCAS, Plaintiffs: Daniel J. Walker, LEAD ATTORNEY, Berger Montague PC, Washington, DC; Eric R Harlan, Paul Mark Sandler, LEAD ATTORNEYS, Shapiro Sher Guinot and Sandler, Baltimore, MD; Jiamin Chen, Joseph Richard Saveri, Kyla J Gibboney, LEAD ATTORNEYS, PRO HAC VICE, Joseph Saveri Law Firm Inc., San Francisco, CA; Karissa Sauder, LEAD ATTORNEY, Berger Montague P.C., Philadelphia, PA; Michael C Dell Angelo, LEAD ATTORNEY, PRO HAC VICE, Berger Montague PC, Philadelphia, PA; Steven N. Williams, LEAD ATTORNEY, Joseph Saveri Law Firm, Inc., San Francisco, CA; Eric L. Cramer, PRO HAC VICE, Berger Montague PC, Philadelphia, PA.

For BYRON K. WELLS, Plaintiff: Nicholas A. Migliaccio, LEAD ATTORNEY, Migliaccio Law Firm PLLC, Washington, DC; Daniel C. Hedlund, PRO HAC VICE, **[*7]** Gustafson Gluek PLLC, Minneapolis, MN.

For PATRICIA LONERGAN, Plaintiff: Eric R Harlan, Paul Mark Sandler, LEAD ATTORNEYS, Shapiro Sher Guinot and Sandler, Baltimore, MD; Jiamin Chen, Joseph Richard Saveri, V Prentice, LEAD ATTORNEYS, PRO HAC VICE, Joseph Saveri Law Firm Inc., San Francisco, CA; Steven N. Williams, LEAD ATTORNEY, Joseph Saveri Law Firm, Inc., San Francisco, CA; Jason S. Hartley, Hartley LLP, San Diego, CA; Kelly K. Iverson, Carlson Lynch, LLP, Pittsburgh, PA.

For JANIS McNEAL, Plaintiff: Joseph H. Meltzer, Kimberly Justice, Zachary Arbitman, LEAD ATTORNEYS, PRO HAC VICE, Kessler Topaz Meltzer & Check, LLP, Radnor, PA.

For PAUL ARCURI, ASHLEY KERR, Plaintiffs: Adam E. Polk, Daniel C. Girard, LEAD ATTORNEYS, Girard Sharp LLP, San Francisco, CA; James P Ulwick, LEAD ATTORNEY, Kramon and Graham PA, Baltimore, MD.

For JOANN AGOSTINI, Plaintiff: Gary F. Lynch, LEAD ATTORNEY, Kelly K. Iverson, Carlson Lynch, LLP, Pittsburgh, PA.

For DANIEL CRAVER, TIMOTHY BACCO, Plaintiffs: Joel R. Hurt, Ruairi McDonnell, LEAD ATTORNEYS, Feinstein Doyle Payne & Kravec, LLC, Pittsburgh, PA.

For STEPHEN BALDASSANO, BRIAN LARA, Plaintiffs: Joel R. Hurt, Ruairi McDonnell, LEAD ATTORNEYS, Feinstein [*8] Doyle Payne & Kravec, LLC, Pittsburgh, PA; Kelly K. Iverson, Carlson Lynch, LLP, Pittsburgh, PA.

For JEFFREY J. OCHOA, Plaintiff: A. Patricia Diulus-Myers, LEAD ATTORNEY, A. Patricia Diulus-Myers, Attorney at Law, Rivertech Center, Pittsburgh, PA; Elizabeth R. Odette, Heidi M. Silton, LEAD ATTORNEYS, PRO HAC VICE, Lockridge Grindal Nauen P.L.L.P., Minneapolis, MN; W. Joseph Bruckner, LEAD ATTORNEY, PRO HAC VICE, Lockridge, Grindal, Nauen & Holstein, Minneapolis, MN.

For JASON CARON, Plaintiff: Arthur N. Bailey, LEAD ATTORNEY, PRO HAC VICE, Rupp Baase Pfalzgraf Cunningham, LLC, Jamestown, NY; Bruce C. Fox, LEAD ATTORNEY, Obermayer Rebmann Maxwell & Hippel LLP, BNY Mellon Center, Pittsburgh, PA; John E. Sindoni, Joshua D. Snyder, LEAD ATTORNEYS, PRO HAC VICE, Boni, Zack & Snyder LLC, Bala Cynwyd, PA; Michael J. Boni, LEAD ATTORNEY, PRO HAC VICE, Boni & Zack, Bala Cynwyd, PA.

For TRAVIS CARRUTH, Plaintiff: David B. Spear, LEAD ATTORNEY, Minto Law Group, LLC, Pittsburgh, PA; Jeanette M. Bayoumi, LEAD ATTORNEY, Hausfeld LLP, New York, NY; Joshua Grabar, LEAD ATTORNEY, Grabar Law Office, Philadelphia, PA; Sathya S. Gosselin, LEAD ATTORNEY, PRO HAC VICE, Hausfeld LLP, Washington, DC.

For EDWARD [*9] KUBIK, DEONDRA RANDLE, ALLYN BASORE, Plaintiffs: Chad A McGowan, LEAD ATTORNEY, McGowan Hood Felder and Johnson, Rock Hill, SC; Jason Scott Hartley, LEAD ATTORNEY, PRO HAC VICE, Hartley LLP, San Diego, CA; Russell Thomas Burke, LEAD ATTORNEY, McGowan Hood and Felder LLC, Columbia, SC; Vincent J. Esades, LEAD ATTORNEY, PRO HAC VICE, Heins Mills & Olson, P.L.C., Minneapolis, MN.

For JOSEPH CASTAGNO, Plaintiff: David B. Spear,

LEAD ATTORNEY, Minto Law Group, LLC, Pittsburgh, PA.

For WESTINGHOUSE AIR BRAKE CO., Defendant: Amanda R. Cashman, Melissa J. Tea, Thomas E. Birsic, K&L Gates, LLP, K&L Gates Center, Pittsburgh, PA.

For FAIVELEY TRANSPORT NORTH AMERICA INC., FAIVELEY TRANSPORT, S.A., Defendants: Jennifer Hess Thiem, LEAD ATTORNEY, K&L Gates LLP (Chas), Charleston, SC; Amanda R. Cashman, Melissa J. Tea, Thomas E. Birsic, K&L Gates, LLP, K&L Gates Center, Pittsburgh, PA; Brian J. Smith, Lauren N. Donahue, Michael E. Martinez, PRO HAC VICE, K&L Gates LLP, Chicago, IL; David C. Kiernan, PRO HAC VICE, Jones Day, San Francisco, CA; Peter Julian, PRO HAC VICE, Jones Day, San Francisco, CA.

For KNORR-BREMSE AG, Defendant: Mark H. Hamer, LEAD ATTORNEY, PRO HAC VICE, Baker McKenzie, Washington, [*10] DC; Steven Michael Chasin, LEAD ATTORNEY, Baker and McKenzie LLP, Washington, DC; Catherine Y. Stillman, PRO HAC VICE, Baker & McKenzie LLP, New York, NY; Graham R. Cronogue, PRO HAC VICE, Arlington, VA; Mark H. Hamer, Baker McKenzie LLP, Washington, DC.

For RICHARD BOWIE, Defendant: Mark H. Hamer, LEAD ATTORNEY, PRO HAC VICE, Baker McKenzie, Washington, DC; Steven Michael Chasin, LEAD ATTORNEY, Baker and McKenzie LLP, Washington, DC; Catherine Y. Stillman, PRO HAC VICE, Baker & McKenzie LLP, New York, NY; Graham R. Cronogue, PRO HAC VICE, Arlington, VA.

For WESTINGHOUSE AIR BRAKE TECHNOLOGIES CORPORATION, Defendant: Jennifer Hess Thiem, LEAD ATTORNEY, K&L Gates LLP (Chas), Charleston, SC; Brian J. Smith, Lauren N. Donahue, Michael E. Martinez, PRO HAC VICE, K&L Gates LLP, Chicago, IL; David C. Kiernan, Peter Julian, PRO HAC VICE, Jones Day, San Francisco, CA; Thomas E. Birsic, K&L Gates LLP, K&L Gates Center, Pittsburgh, PA.

For KNORR BRAKE COMPANY, Defendant: Catherine Y. Stillman, PRO HAC VICE, Baker & McKenzie LLP, New York, NY; Graham R. Cronogue, PRO HAC VICE, Arlington, VA.

**Judges:** Honorable Joy Flowers Conti, Senior United States District Judge.

**Opinion by:** Joy Flowers Conti

# Opinion

2020 U.S. Dist. LEXIS 249904, *10

## ORDER GRANTING FINAL APPROVAL [*11] OF CLASS ACTION SETTLEMENTS AND FINAL JUDGMENT AND ORDER OF DISMISSAL

WHEREAS, Plaintiffs Stephen Baldassano, John Brand, David Escalera, Brian Lara, and Patricia Lonergan brought claims on behalf of themselves and all similarly situated persons and have entered into Settlement Agreements with the Defendants;

WHEREAS, the Knorr Defendants and Wabtec Defendants have entered into Settlement Agreements dated October 16, 2019 and February 24, 2020, respectively;

WHEREAS, after a hearing held on March 18, 2020, the Court issued an Order on March 19, 2020 granting preliminary approval of the Settlement Agreements. Dkt. 262. In so doing, the Court, *inter alia*,

 i. Found that the Settlements were within the range of reasonableness meriting possible final approval;
 ii. Approved the retention of KCC LLC ("KCC") as Notice Administrator to handle any and all aspects of Settlement Administration and Notice of the Settlements;

 iii. Approved the forms of Notice to Class Members and the Notice Plan for disseminating those Notices as reasonable, constituting the best notice practicable under the circumstances, and consistent with the requirements of due process and *Fed. R. Civ. P. 23(e)*;

 iv. Conditionally certified a Settlement [*12] Class and found that, for settlement purposes only, the Settlement Class meets all prerequisites for class certification under *Rule 23(a)* and *(b) of the Federal Rules of Civil Procedure*, including that: (a) the Settlement Class is ascertainable; (b) the Settlement Class is so numerous that joinder of all members is impracticable; (c) there are questions of law and fact common to the Settlement Class; (d) Plaintiffs and their counsel are capable of fairly and adequately protecting the interests of the Settlement Class; (e) common questions of law and fact predominate over questions affecting only individual Settlement Class Members; and (f) certification of the Settlement Class is superior to other available methods for the fair and efficient resolution of the claims of Settlement Class Members;
 v. Preliminarily approved the plan of allocation

proposed by Plaintiffs; and,
 vi. Set procedures and schedules for Class Members to assert objections, request exclusion, or file claims.

WHEREAS, on July 17, 2020, Plaintiffs filed a Motion for Final Approval of Proposed Class Action Settlements and brief in support of same, seeking final approval of the Settlements pursuant to *Rule 23(e) of the Federal Rules of Civil Procedure*;

WHEREAS, on August 26, 2020, the Court held a final fairness hearing (the [*13] "Fairness Hearing" or "Final Approval Hearing") to adjudicate the fairness, reasonableness and adequacy of the Settlements;

WHEREAS, unless otherwise defined herein, all capitalized terms have the same meanings as set forth in the Settlement Agreements.

NOW, THEREFORE, THIS 26th DAY OF August, 2020, IT IS HEREBY ORDERED AS FOLLOWS:

1. The Court has reviewed the terms and conditions set forth in the two Settlement Agreements, including all exhibits thereto, and finds that they are fair, reasonable, and adequate under *Rule 23(e)(2) of the Federal Rules of Civil Procedure*. The Court finds that the Settlements are in full compliance with all requirements of the Federal Rules of Civil Procedure, the Class Action Fairness Act, the United States Constitution (including the *Due Process Clause*), and any other applicable law.

2. Pursuant to *In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 535 (3d Cir. 2004)*, the Court finds that a presumption of fairness applies because the Settlements were negotiated at arm's length; the Parties were represented by reputable counsel with substantial class action, antitrust, and complex litigation experience; there was sufficient formal and informal discovery and the Parties and counsel were knowledgeable about the facts of the case and potential risks of continued litigation; and no Class Member [*14] objected and only four Class Members opted out.

3. The Court also specifically considered the *Girsh* factors, including the complexity, expense, and likely duration of litigation; the favorable reaction of the Settlement Class; the stage of proceedings; the risks of establishing liability, damages, and class status; and the range of reasonableness of the Settlements in light of the best possible recovery and attendant risks of litigation. *Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975)*. The Court finds that these factors weigh in favor

2020 U.S. Dist. LEXIS 249904, *14

of approving the Settlements.

4. The Court finds that the distribution of Notice as set forth in the Declaration of Derek Smith of KCC was in compliance with the Court's March 19, 2020 Order approving proposed notices and the notice plan, and that notice has been given in an adequate and sufficient manner; constitutes the best notice practicable under the circumstances; and satisfies *Federal Rule of Civil Procedure 23(e)* and due process.

5. Defendants properly and timely notified the appropriate government officials of the Settlements pursuant to the *Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715*. Further, more than ninety (90) days have elapsed since Defendants provided notice of the Settlements pursuant to CAFA. Dkt. 251.

6. The Court has jurisdiction **[*15]** over the subject matter of this Action and over all parties to the Settlements, including all absent members of the Settlement Class certified for purposes of the Settlements.

7. Pursuant to *Rule 23 of the Federal Rules of Civil Procedure*, the Court grants final class certification, for settlement purposes only, of the Settlement Class that it preliminarily certified in paragraph 12 of its March 19, 2020 Order.

8. Pursuant to *Rule 23 of the Federal Rules of Civil Procedure*, the Court certifies, for settlement purposes only, the following Settlement Class: All natural persons who worked in job families in which railway industry experience or skills were valuable and were employed in the United States by one or more of the following: (a) from January 1, 2009 through April 3, 2018, Westinghouse Air Brake Technologies Corporation or its subsidiaries, including Wabtec Railway Electronics, Inc., Railroad Controls, L.P., and Xorail Inc.; (b) from January 1, 2009 through April 3, 2018, Knorr Brake Company LLC or New York Air Brake LLC; or (c) from June 1, 2010 through April 3, 2018, Faiveley Transport, S.A. or Faiveley Transport North America Inc. Excluded from the Settlement Class are senior executives and personnel in the human resources, recruiting, and legal departments of the Defendants. **[*16]** Attached hereto as Appendix A is the list of job titles in the Settlement Class.

9. For avoidance of doubt, the Settlement Class does not include employees of entities that are not specifically named in paragraph 8, even if they held job titles listed

in Appendix A.

10. The Court confirms the appointment of Stephen Baldassano, John Brand, David Escalera, Brian Lara, and Patricia Lonergan as Settlement Class representatives.

11. The Court confirms the appointment of Dean M. Harvey of Lieff Cabraser Heimann & Bernstein, LLP and Roberta D. Liebenberg of Fine, Kaplan and Black, R.P.C. as Co-Lead Counsel for the Settlement Class.

12. The Court grants final approval of the plan of allocation as being fair, reasonable, adequate, and in the best interest of the Settlement Class. The Court further finds that the plan of allocation "treats class members equitably relative to each other" as required by *Federal Rule of Civil Procedure 23(e)(2)(D)*.

13. Accordingly, the Court hereby grants Plaintiffs' Motion for Final Approval of Proposed Class Action Settlements. The Settlements are hereby approved in all respects, and the Parties are hereby directed to implement the Settlements.

14. Plaintiffs have notified the Court that four Class Members **[*17]** timely opted out of the Settlement Class. As set forth in Exhibit D to the Declaration of Derek Smith, they are David Corbin, Kyle S. Hagan, Richard Pecone, and Connie Cella. The releases and other provisions of the Settlement Agreements shall not apply to them. This listing satisfies the requirement for Class Counsel to set forth an opt-out list within seven (7) days of the Final Approval Hearing. Dkt. 262 at ¶ 22.

15. The Court hereby dismisses the Action as to all Defendants on the merits, with prejudice, and without taxation of fees or costs except as provided for in the Agreements.

16. This is the Final Judgment as defined in the Settlement Agreements. In the event that this Final Judgment is not otherwise final and appealable, pursuant to *Federal Rule of Civil Procedure 54(b)*, the Court finds and directs that there is no just reason for delaying enforcement or appeal and judgment should be entered.

17. Without affecting the finality of this Order and Final Judgment in any way, this Court hereby retains exclusive and continuing jurisdiction as to all matters relating to administration, consummation, implementation, enforcement and interpretation of the Settlements and this Order and Final Judgment, and for

2020 U.S. Dist. LEXIS 249904, *17

all matters **[*18]** ancillary thereto.

IT IS SO ORDERED.

BY THE COURT:

/s/ Joy Flowers Conti

The Honorable Joy Flowers Conti

Senior United States District Judge


**Appendix A**


**Wabtec Railroad Employees Class Titles List**

1 - Assembly

1 - Clean

1 - Inspection

1 - Line Leader

1 - Seal/Test

1 - Specialty Welder/Subarc

1 - Subarc/Lathe

1 - Subarc/Teardown

1 - Supervisor

1 - Teardown

1 - Technical Advisor

1 - Welder

2 - Buff & Clean

2 - Clean

2 - Supervisor

2 - Teardown

2nd Shift - Subarc/Lathe

ASCTD Manager

ASCTD Technician

ASCTD/G & B Install Technician

Account Receivables Manager

Accountant

Accountant, Cost

Accounting Analyst

Accounting Clerk

Accounting Manager

Accounting Payable

Accounting Specialist

Accounting Specialist/Hourly

Accounts Payable

Accounts Payable Clerk

Accounts Payable Specialist

Accounts Payable, Receivable

Accounts Receivable

Accounts Receivable Clerk

Accounts Receivable Coordinator

Accounts Receivable Specialist

Accounts Receivables Manager

Administrative Manager, RS

Administrator, PTC Field Service

After Market Sales Representative

Aftermarket Bid Estimator

Aftermarket Sales Representative

Air Compressor Technician

Air Compressor Technician Line Leader

Air Dryer TBCA

Airbrake - BC

Airbrake Foreman

Airbrake/Airdryer - Teardown

Airdryer - TD

Altoona, **[*19]** PA - FST

2020 U.S. Dist. LEXIS 249904, *19

| | |
|---|---|
| Analyst | Assistant Treasurer & Director, Finance |
| Analyst, Servicenow | Assistant Treasurer & Director, Tax |
| Application Developer II | Assistant Vice President, Construction |
| Application Engineer | Assistant Vice President, Engineering |
| Application Engineer - SFRTA | Assistant Vice President, IT & App Development |
| Application Engineering - Group Lead | Assistant Vice President, Information Service |
| Application Engineering Technician | Assistant Vice President, Validation |
| Area Coordinator | Assistant Wireman |
| Assembly | Associate Program Manager |
| Assembly & Test Operator | Audit Manager |
| Assembly - Material Handler Kitter | Audit Manager - Projects |
| Assembly I | Bid Engineer |
| Assembly II | Bids & Estimation Manager |
| Assembly III | Bms Engineer |
| Assembly Lead | Bore Operator |
| Assembly Specialist | Boring Foreman |
| Assembly Technician | Boring Operator |
| Assembly Technician I | Broing Operator |
| Assembly Technician II | Budget Analyst |
| Assembly Technician Lead | Budget Analyst Part Time |
| Assembly/Clean/TD/Test | Buff |
| Assembly/TD/Clean/Initial Inspection | Buff Or Piston |
| Assembly/Tester | Building Service Worker |
| Assistant Controller | Business Analyst [*20] |
| Assistant Corporate Controller | Business Analyst II |
| Assistant Manager, Sourcing | Business Analyst III |
| Assistant Program Manager | Business Intelligence Developer |
| Assistant Project Manager | Buyer |
| Assistant Signalman | Buyer/Expeditor |
| Assistant Team Lead | CAD Designer III |

2020 U.S. Dist. LEXIS 249904, *20

| | |
|---|---|
| CAD Engineer | Cell Operator |
| CAD Support Specialist | Certified Crane Operator |
| CAD Technician | Chemist |
| CAD Technician I | Clean |
| CAD Technician I - As In Service | Client Support Specialist |
| CAD Technician II | Client Support Specialist I |
| CAD Technician II - As In Service | Client Support Specialist II |
| CAD Technician III | Client Support Specialist III |
| CAD/Draftsperson | Commodity Buyer |
| CDL Truck Driver | Commodity Purchasing Manager |
| CNC Machine Operator | Communications Engineer |
| CNC Machine Operator I | Composite Technician |
| CNC Machine Operator II | Compressor Design Engineer |
| CNC Machine Operator III | Compressor Line |
| CNC Machine Operator/Assembly | Compressor Line Lead |
| CNC Machine Operator/Programer | Compressor Mechanic |
| CNC Machine Programmer | Compressor Teardown |
| CNC Machinist | Compressor Teardown & Sub Assembly |
| CNC Machnist Operator I | Compressor Teardown Line Leader |
| CNC Operator | Compressor Technician |
| CNC Operator Programmer | Compressor Technician Line Leader |
| CS Account Manager | Compressor Technician Trainer [*21] |
| CS Inside Sales Rep I | Compressor Technician, Head Assembly |
| Cable Locator | Compressor Technician, Teardown |
| Cable Locator Foreman | Compressor Technician/Special Projects |
| Calibration Technician | Compressor/Assembly |
| Cash Application Manager | Computer Systems Analyst |
| Cash Application Specialist | Contract Administrator |
| Category Manager | Contracts Manager |
| Cell Leader | Controller |

2020 U.S. Dist. LEXIS 249904, *21

Controller & Manager, Material

Controller, Wabtec Global Service

Coordinator, Accounting

Coordinator, Data Documentation

Coordinator, Facility

Coordinator, Maintenance

Coordinator, Material

Coordinator, Operations & Planning

Coordinator, PTC

Coordinator, Process Engineering

Coordinator, Production

Coordinator, Purchasing

Coordinator, QA & QPS

Coordinator, QPS

Coordinator, QPS & Quality

Coordinator, Quality

Coordinator, Remanufacturing

Coordinator, Safety

Coordinator, Sales & Marketing

Coordinator, Ship

Coordinator, Ship, Receive

Coordinator, Ship, Receive & Traffic

Coordinator, Warranty Returns

Corporate EHS Compliance Manager

Corporate EHS Training Manager

Cost Accountant

Cost Accounting Manager

Cost Estimator

Coupler Production & Overhaul Lead

Crane Operator

Crewman

Crewman (Lead Man)

Customer Sales & Service Representative

Customer Service Account Manager

Customer Service Administrator

Customer Service Representative

Cycle Counter III

Data Entry Clerk

Database Engineer

Demand Management Analyst

Deputy Project Manager

Deputy Supply [*22] Chain Director

Design Drafter

Design Engineer

Design Engineer, Couplers

Designer

Director

Director - Construction

Director Contracts Administration

Director Finance, Freight Service

Director Of Contracts

Director Of Fleet

Director Of In Service Testing

Director Of NPR & I Sourcing

Director Of Sourcing

Director Of Sourcing Electronics Group

Director Quality - Freight

Director Quality — Elastomers, Heat Exchangers & Turbochargers

Director Quality — Freight Service & Mexico

2020 U.S. Dist. LEXIS 249904, *22

Director, Aftermarket Operations

Director, Application Service

Director, Business Development

Director, Business Systems

Director, Construction

Director, Continuous Improvement

Director, Corporate Development

Director, Customer Support

Director, Electronics & PTC Aftermarket

Director, Engineering

Director, Engineering Process & Quality

Director, Engineering Quality

Director, Freight Wep/Lean

Director, Global Logistics

Director, Global Supply Chain

Director, In Service Testing

Director, Information Service

Director, Infrastructure & Operations

Director, International Business Development & Operations

Director, Locomotive OEM Sales

Director, Locomotive Service

Director, Marketing

Director, Marketing & Customer Service

Director, Material

Director, Material Management **[*23]**

Director, OE Sales

Director, Operations

Director, Operations & Support

Director, Product Evaluation

Director, Program Management

Director, Project Development

Director, Project Engineering

Director, Project Management

Director, Purchasing

Director, Purchasing & Supply Chain

Director, Quality

Director, Quality Control

Director, Quality, Training & Safety

Director, Safety

Director, Sales

Director, Sales & Marketing

Director, Sales & Marketing For Engine Cooling

Director, Software Development

Director, Software Engineering

Director, Spares & Trading Business Unit

Director, Supply Chain & Customer Service

Director, Supply Chain Logistics

Director, System Engineering

Director, Systems Engineering

Director, Systems Testing

Director, Tax

Director, Train Control & Communications

Director, Transit Marketing

Director, WGS Service Centers

Document Control/Planning Clerk

Drafter

Drafter II

Dynamometer Technician

EHS Coordinator

2020 U.S. Dist. LEXIS 249904, *23

EHS Technician

EHS/QPS Coordinator

EOCC - LAithe

EOCC - Shift 1

EOCC - Shift 2

EOCC Production Manager

EOCC Welder - Shift 1

EOT Technician

EPIC/FB Lead Technician

Electrical & Software Engineering - Group Lead

Electrical Designer

Electrical Engineer

Electronic Assembly I

Electronic Assembly II

Electronics Engineer

Electronics **[\*24]** Hardware Engineer

Electronics Supervisor

Electronics Technician

Electronics Technician I

Electronics Technician/Passenger Transit

Electronics Technician/TD - BC - Assembly - Test

Embedded Software Engineer

Employee

Engineer

Engineer - Hourly

Engineer, Rams

Engineering Aide

Engineering Analyst

Engineering Assistant

Engineering Assistant I

Engineering Assistant II

Engineering Assistant III

Engineering Change Support

Engineering Clerk

Engineering Designer

Engineering Project Admin I

Engineering Project Manager

Engineering Service Technician

Engineering Specialist

Engineering Support Associate

Engineering Support Coordinator

Engineering Support Specialist

Engineering Technician

Enterprise Architect

Estimator

Expediter

Expeditor

Fabricator

Facilities Manager/ME/Quality

Facilities Technician

Fellow Engineer

Field Sales Representative

Field Service - Salary

Field Service Engineer

Field Service Representative

Field Service Supervisor

Field Service Technician

Field Service Technician - Amtrak - Chicago

Field Service Technician - Amtrak - LA

Field Service Technician - Denver Eagle

Case 4:21-cv-00196-MWB    Document 261-1    Filed 01/20/26    Page 119 of 287

Page 12 of 48
2020 U.S. Dist. LEXIS 249904, *24

| | |
|---|---|
| Field Service Technician - MARC | GW |
| Field Service Technician - Metrolink | GW/TBAT |
| Field Signal Electronics Engineer I | GW/TBC |
| Field Signal Test Engineer | GW/TD - BC - Assembly |
| Field Signal Test Engineer III [*25] | GW/TD - BC - Assembly - Test |
| Field Technician | GW/TD - Buff & Clean |
| Field Test Engineer | General Accountant |
| Field Test Technician | General Supervisor |
| Finance Director, Global Treasury | Global Category Manager |
| Finance Director, Tax | Global Commodity Leader |
| Financial Analyst | Global Commodity Leader — Indirect Sourcing |
| Floater, Ship, Rec. | Global Project Manager |
| Foreman | Global Treasury Analyst |
| Foreman (Craftworker) | Group Controller |
| Foreman (Laborer) | Group Controller - Electronics Group |
| Foreman, Composite Technicians | Group Controller - Frieght Group |
| Foreman, Construction | Group Controller - Shared Service |
| Foundation Brake Lead | Group Leader |
| Freight & Locomotive Teardown | Group Leader, Operative |
| Freight Assembly | Group Leader, QPS |
| Freight CNC Machine Operator | HSE Supervisor |
| Freight CNC Machine Operator/Teardown | HVAC Lead Technician |
| Freight Line Manager | HVAC Mechanical Engineer III |
| Freight Teardown | HVAC Technician |
| Freight Teardown & Assembly | HVAC Technician III |
| Freight Teardown Line Leader | HW/SW Lead Engineer |
| Freight Teardown, Assembly & Test | Head Assembly |
| Freight Test Rack Operator | Head TD/Clean Head Assy |
| Freight Test Rack Operator Line Leader | Heat Exchanger Shop Foreman [*26] |
| Freight Test Rack Operator/Quality Assurance | Hoses |

2020 U.S. Dist. LEXIS 249904, *26

| | |
|---|---|
| Hydraulic Manufacturing Director | Lead Assembly |
| Hydraulics Design Engineer | Lead Assembly Technician |
| Hydraulics Lead Engineer | Lead Buyer |
| Hydraulics Lead Technician | Lead Composite Technician |
| Incoming Inspector | Lead Construction Inspector |
| Industrial Customer Service Manager | Lead Controls Engineer |
| Industrial Engineer | Lead Crewman |
| IngéNieur SystèMe | Lead Data Analyst |
| Inside Sales Account Manager | Lead Engineer |
| Inspector | Lead Engineer - Foundation Brakes |
| Inspector (Technicians) | Lead Engineer — Couplers |
| Inspector A | Lead Engineer — Pneumatic Controls |
| Inspector B | Lead Engineer, Advance Engineering |
| Integration Test Manager | Lead Engineer, Bogie Brakes |
| Internal Auditor | Lead Engineer, Test Lab |
| Inventory & Warehouse Clerk | Lead Engineering |
| Inventory Control Analyst | Lead Field Engineer |
| Inventory Control Clerk | Lead Field Service Technical Representative |
| Inventory Control Specialist | Lead Man |
| Inventory Coordinator | Lead Manufacturing Technician |
| Inventory Cost Manager | Lead Material Handler (Craft Workers) |
| Inventory Specialist | Lead Material Technician |
| Inventory Technician | Lead Mechanical Engineer |
| Junior Designer I | Lead PTC Installer - Shortline |
| LSTR Project Technician | Lead PTC [*27] Product Support Analyst |
| Laboratory Specialist A | Lead PTC Technician |
| Laboratory Technician | Lead Painter |
| Lathe | Lead Pneumatics Engineer |
| Lathe/Test | Lead Production Associate |
| Lead AGTU Engineer | Lead Project Coordinator |

| | |
|---|---|
| Lead Proposal Engineer | Logistics Coordinator |
| Lead Senior Systems Engineer | Logistics Coordinator/Supervisor |
| Lead Ship & Receive | Logistics Specialist |
| Lead Signal Test Engineer | MRR Coordinator |
| Lead Systems Analyst | Machine Operator |
| Lead Systems Engineer | Machine Programmer |
| Lead Systems Trainer | Machining Operations Manager |
| Lead Technician | Machining Performance Engineer |
| Lead Test Engineer | Machinist |
| Lead Tool & Die Technician | Machinist (Craft Workers) |
| Lead Wireman | Machinist (Operatives) |
| Lead, Engineering | Maintenance |
| Leadbuyer | Maintenance Assistant |
| Leader, Planner/Expediter A | Maintenance Associate |
| Line Lead | Maintenance Manager |
| Line Lead, Assembly | Maintenance Mechanic |
| Line Lead, Test Rack | Maintenance Operator |
| Line Lead, Test/Fail Analysis | Maintenance Supervisor |
| Line Leader Parts/Material Handler | Maintenance Technician |
| Loco/Buff & Clean | Maintenance Technician (Craft Workers) |
| Loco/Buff Or Piston | Maintenance Technician [*28] (Technicians) |
| Loco/TD - Buff & Clean | Maintenance Technician II |
| Locomotive Assembly | Maintenance Technician Leader |
| Locomotive Line Leader | Maintenance Worker (Craft Worker) |
| Locomotive Line Manager | Maintenance Worker (Operatives) |
| Locomotive Operator | Manager |
| Locomotive Teardown | Manager - Billing, Construction |
| Locomotive Teardown & Assembly | Manager - Hourly |
| Locomotive Test | Manager Of Accounting |
| Locomotive Test Rack Operator | Manager Of Construction Operations |

| | |
|---|---|
| Manager Tool Design | Manager, Design Engineering |
| Manager, Accounting | Manager, Drafting |
| Manager, Advanced Engineering | Manager, EHS |
| Manager, After Market Business | Manager, Electronic Product Service |
| Manager, After Market Engineering | Manager, Embedded Systems |
| Manager, Aftermarket Service | Manager, [*29] Embedded Systems Engineering |
| Manager, Assembly Operations | Manager, Engineering |
| Manager, Assembly Production | Manager, Engineering & Fields Service |
| Manager, Billing & Accounts Receivable | Manager, Engineering & Production |
| Manager, Brake Product Engineering | Manager, Engineering & QPS |
| Manager, Business Analyst | Manager, Engineering & Quality Assurance |
| Manager, Business Development | Manager, Engineering Service |
| Manager, Business Operations | Manager, Engineering Support |
| Manager, Business Planning & SC | Manager, Environmental, Health & Safety |
| Manager, CAD | Manager, Field Service |
| Manager, CS Inside Sales | Manager, Field Service & Training |
| Manager, CS Regional | Manager, Field Service Engineering |
| Manager, Communications | Manager, Financial Compliance |
| Manager, Communications Systems | Manager, Global Category |
| Manager, Construction | Manager, Global Enterprise Architecture |
| Manager, Contracts | Manager, Global Trade |
| Manager, Corporate Accounting | Manager, Health, Safety & Environmental |
| Manager, Corporate Communications | Manager, Hydraulics |
| Manager, Corporate Quality | Manager, Infrastructure - Americas |
| Manager, Coupler Product Engineering | Manager, Lab |
| Manager, Credit, Cost Estimator, Senior | Manager, Logistics |
| Manager, Customer Service | Manager, Logistics & Production |
| Manager, Customer Service & Pricing | Manager, Machine, Fabrication & Welding |
| Manager, Customer Service & Project Manager | Manager, Machining |
| Manager, Deputy Project | Manager, Machining Operations |

| | |
|---|---|
| Manager, Maintenance | Manager, Production Planning |
| Manager, Manufacturing | Manager, Production Shop |
| Manager, Manufacturing Engineering | Manager, Project Controlling |
| Manager, Manufacturing Engineering & Maintenance | Manager, Project Engineering |
| Manager, Marketing | Manager, Project Quality |
| Manager, Marketing Communication | Manager, Purchasing |
| Manager, Marketing/Sales Application | Manager, Purchasing - Hourly |
| Manager, Material | Manager, QPS |
| Manager, Material Control | Manager, QPS & Safety |
| Manager, Material Lab | Manager, Quality |
| Manager, Mechanical Engineering | Manager, Quality Assurance |
| Manager, Mfg. Engineering & Facilities | Manager, Quality Assurance/QPS |
| Manager, New Product Development | Manager, Quality Performance Systems |
| Manager, OEM Marketing | Manager, Rams/LCC |
| Manager, Operation | Manager, Regional Field Service |
| Manager, Operations | Manager, Regional Sales |
| Manager, Operations & Production | Manager, Reject |
| Manager, Operations [*30] & Support - West | Manager, Safety |
| Manager, PTC Operations | Manager, Safety & IP |
| Manager, Parts | Manager, Safety Assurance |
| Manager, Planning | Manager, Sales |
| Manager, Plant Engineering | Manager, Sales & Service |
| Manager, Pricing, Proposal & Customer Service | Manager, Sales Central Region |
| Manager, Process Improvement | Manager, Sales Eastern Region |
| Manager, Procurement | Manager, Sales Western Region |
| Manager, Product Design | Manager, Senior Project Manager |
| Manager, Product Line | Manager, Senior Supplier Quality |
| Manager, Production | Manager, Service Center |
| Manager, Production - VBI | Manager, Service Desk - Americas |
| Manager, Production Machining, Fabrication & Welding | Manager, Shop Operations |

2020 U.S. Dist. LEXIS 249904, *30

Manager, Signal Construction

Manager, Software Engineering

Manager, Software Test Engineering

Manager, Sourcing

Manager, Southeast Regional

Manager, **[*31]** Special Projects

Manager, Standards & Special Projects

Manager, Supplier Quality

Manager, Supply Chain

Manager, Supply Chain - Vapor Bus International & Ricon Corporation

Manager, System Engineering

Manager, Systems Engineering

Manager, Systems Infrastructure

Manager, Systems Safety Engineering

Manager, Systems Testing

Manager, Tax

Manager, Technical

Manager, Technical Documentation

Manager, Technical Project

Manager, Technical Sales & Marketing

Manager, Technical Sales & Service

Manager, Technical Service

Manager, Technical Support

Manager, Technical Training

Manager, Technician Pubs

Manager, Test Engineering

Manager, Transit PTC Operations

Manager, Transit Sales & Service

Manager, Transit Sales - North America

Manager, WGS Compressor Product Lines

Manager, WGS Transit Service

Manager, Wabtec Performance Systems

Manager, Warehouse

Manufacturing - Hourly Direct

Manufacturing Analyst

Manufacturing Engineer

Manufacturing Engineer/Coordinator, QPS

Manufacturing Engineering Analyst

Manufacturing Engineering Specialist

Manufacturing Engineering Technician

Manufacturing Supervisor

Manufacturing Technician

Manufacturing Technician - Lead

Manufacturing Tool Crib Technician

Marketing Analyst

Marketing Assistant

Marketing Specialist **[*32]**

Master Planner

Master Scheduler

Material & Planning Supervisor

Material Associate II

Material Clerk

Material Clerk II

Material Coordinator

Material Expediter

Material Expeditor

Material Handler

Material Handler (Craft Workers)

Material Handler (Laborer)

2020 U.S. Dist. LEXIS 249904, *32

| | |
|---|---|
| Material Handler (Operatives) | Midwest/Southwest Sales & Service Manager |
| Material Handler III | Mill Room Assistant |
| Material Handler Lead | Mill Room Operator |
| Material Handler Rec I | Mixer Operator |
| Material Handler Rec II | Mixer/Prep Operator Assistant (Punch, Flashcut Weigh - Up) |
| Material Handler Ship I | |
| Material Handler Ship II | Mixer/Prep Operator Assistant (Punch, Flashcut Weigh - Up, Std. Build) |
| Material Handler/Oiler | Mixer/Prep Operator Assistant (Punch, Flashcut, Standard Build, Weigh - Up) |
| Material Handler/Parts/Inventory | |
| Material Inventory Specialist | Mixer/Prep **[*33]** Operator Assistant (Punch, Flashcut, Weigh - Up) |
| Material Lead | |
| Material Manager I | Mixer/Prep Operator Assistant (Punch, Flashcut, Weigh - Up, Standard Build) |
| Material Planner | |
| Material Planning Specialist | Mixer/Prep Operator Assistant (Punch, Flashcut, Weigh - Up, Std. Build) |
| Material Technician | Mixer/Prep Operator Assistant Punch, Flashcut Weigh - Up) |
| Material Technicians | Mold Design Technician |
| Mechanic | Motor Pull/Paint |
| Mechanic (Craft Worker) | Multi Service Operator |
| Mechanic (Operatives) | NPR & I Buyer |
| Mechanic Fabricator | NPR Buyer |
| Mechanical Assembly I | Network Application Developer |
| Mechanical Assembly II | Network Engineer |
| Mechanical Assembly Senior | OBS |
| Mechanical Design Engineer | OBS - NICTD |
| Mechanical Designer | OBS - SFRTA |
| Mechanical Engineer | OBS - Sunrail |
| Mechanical Engineer II | OBS Technician - MARC |
| Mechanical Technician | Onboard Support Technician - Ace |
| Methods & Industrialization Manager | Onboard Support Technician - Caltrain |
| Methods Engineer | Onboard Support Technician - Regional PTC |

Onboard Support Technician - SFRTA

Operations & Maintenance Manager

Operations & Planning Coordinator

Operator

Operator (Craft Workers)

Oracle Application Developer II

Oracle Application Developer III

Oracle Application Lead Developer

Oracle Developer

Oracle Development Project Lead

Oracle Service Specialist

Order Correspondent A

PCB Design Lead

PTC Application Engineer

PTC Application Engineer Technician

PTC Application Engineer Technician - SFRTA

PTC FST - (Trainer)

PTC FST - Kansas City

PTC FST - Selkrik, Ny

PTC Field Service - CSX - TN

PTC Field Service Technician

PTC Help Desk Analyst

PTC Installation Manager

PTC Installation Manager - LA

PTC Installer

PTC Installer **[*34]** - Fort Worth

PTC Installer - LA

PTC Installer - LAJ

PTC Installer - MARC

PTC Installer - Regional PTC

PTC Installer - SFRTA

PTC Installer - Shortline

PTC Installer - Sunrail

PTC Intaller

PTC Intaller - Shortline

PTC Integration Engineer

PTC Integration Engineer - Brazil

PTC Integration Engineer - Hourly

PTC Integration Trainer

PTC Lead Installer

PTC Lead Installer - Shortline

PTC Lead Installer - Sunrail

PTC Manager

PTC Onboard Support Technician

PTC Operations Manager

PTC Product Support Analyst

PTC Project Manager

PTC Repair Technician

PTC Support Technician - NS Support

PTC System Integration Engineer

PTC Systems Instructor

PTC Technical Trainer

PTC Technician

PTC Technician - Regional PTC

PTC Technician - Shortline

PTS & Freight DB Supervisor

Packer

Paint/Final Inspection

Paint/Final Inspection/Clean

Painter

| | |
|---|---|
| Painter & Test | Plate Prep Operator |
| Painter (Craft Workers) | Portal/Web Developer III |
| Painter I | Power & Information Systems Leader |
| Painter II | Prep Operator (Calender, Extrude, Mixer, Mills) |
| Parts Coordinator - Compressor Line | Prep Operator (Calender, Extrude, Mixer, Mixer Mills) |
| Passenge Transit Teardown & Assembly | Press Brake Operator II |
| Passenger Test Rack Operator | Press Brake Operator III |
| Passenger Transit Assembly | Press Operator (1000T, 1650T, Stretch |
| Passenger Transit Teardown | Press Operator - (McNeil, Rdfl) |
| Passenger Transit Teardown & Assembly | Press Operator - (McNeil, Small Desma, Pentaject) |
| Passenger Transit Teardown Technician | Press Operator - 1000T, 1650T, Stretch |
| Passenger Transit Teardown/Assembly | Press Operator - 4 - Press, 5 - Press, Platen |
| Passenger Transit Technician | Press Operator - LArge Desma |
| Passenger Transit Test Rack Operator | Press Operator - McNeil, Small Desma, Pentaject |
| Piston TB | Press Operator - Rubber Demand Flow Line |
| Piston TBAT | Press Operator Check Valve |
| Piston Teardown [*35] Operator | Press Operator Hinge Press |
| Piston Test | Press Operator Large Injection |
| Piston/All | Press Operator Large Platen |
| Piston/Buff | Press Operator McNeil Small Desma Pentaject |
| Piston/TD - BC - Assembly | Press Operator Ring Lathe |
| Piston/TD - BC - Assembly - Test | Press Operator Rubber Demand Flow Line |
| Planner | Press Operator Small Injection |
| Planner/Expediter A | Press Operator Small Platen |
| Planner/Expediter B | Press Opertor Small Platen |
| Planner/Expeditor | Pricing Manager |
| Planner/Scheduler | Principal Architect |
| Planning Assistant | Principal Data Scientist |
| Plant Manager | Principal Engineer |
| Plant Performance Director | Principal Field Test Engineer |

2020 U.S. Dist. LEXIS 249904, *35

| | |
|---|---|
| Principal Mechanical Engineer **[*36]** | Production Line Leader |
| Principal Product Engineer Crb | Production Line Leader - 1st Shift |
| Principal Quality Engineer | Production Line Leader - MARC |
| Principal Safety Engineer | Production Line Supervisor/TD - BC - Assembly - Test |
| Principal Software Architect | Production Planner |
| Principal Software Engineer | Production Technician |
| Principal Software Test Engineer | Production Worker |
| Principal Systems Engineer | Production Worker (Operatives) |
| Principal Systems Safety Engineer | Production Worker A |
| Principal Test Engineer | Production Worker B |
| Process Engineer | Production/Planning Clerk |
| Process Quality Supervisor | Program Assistant |
| Procurement Agent | Program Manager |
| Product Application Specialist | Program Manager (Mid - Level Manager) |
| Product Data Analyst | Program Manager (Professional) |
| Product Engineer | Project Accountant |
| Product Engineering Technician | Project Administrator |
| Product Line Engineer | Project Administrator I |
| Product Line Manager | Project Analyst |
| Product Line Systems Engineer | Project Assistant |
| Product Manager | Project Buyer |
| Product Manager, HVAC | Project Controller |
| Product Support Manager | Project Controlling **[*37]** Manager |
| Production & Electronics Technician | Project Coordinator |
| Production Assembly | Project Engineer |
| Production Associate | Project Engineer - Ace |
| Production Clerk | Project Engineer - NICTD |
| Production Coordinator | Project Management |
| Production Lead | Project Management - Hourly Direct |
| Production Line Lead | Project Manager |

2020 U.S. Dist. LEXIS 249904, *37

| | |
|---|---|
| Project Manager (Mid - Level Manager) | Quality Analyst |
| Project Manager (Professional) | Quality Assurance Analyst |
| Project Manager - MARC | Quality Assurance Engineer |
| Project Manager - SFRTA | Quality Assurance Inspector |
| Project Manager - Sunrail | Quality Assurance Inspector - Caltrain |
| Project Manager - Track Service | Quality Assurance Inspector - MARC |
| Project Manager I | Quality Assurance Inspector - NICTD |
| Project Manager II | Quality Assurance Inspector - Sunrail |
| Project Manager III | Quality Assurance Specialist II |
| Project Manager Of In Service Testing | Quality Assurance Technician |
| Project Manufacturing Engineer | Quality Assurance Technician - MARC |
| Project Quality Engineer | Quality Assurance Technician(Operatives) |
| Project Scheduler | Quality Control Inspector/Auditor |
| Project Service | Quality [*38] Control Specialist |
| Project Specialist | Quality Engineer |
| Proposal Manager | Quality Manager |
| Proposal Specialist | Quality Specialist |
| Prototype Specialist/Product Development Eng Support | Quality Technician |
| Purchasing Agent | Quality Test Engineer |
| Purchasing Agent II | Quotes & Proposals Lead |
| Purchasing Specialist | Quotes & Proposals Manager |
| QA Analyst II | Quotes & Proposals Specialist |
| QA Manager | RMA Coordinator |
| QA Manager, WGS | Rams Engineer |
| QAI - SFRTA | Rams/LCC System Engineer |
| QPS Coordinator | Receive Clerk |
| QPS Engineer | Receive Clerk (Administrative Support) |
| QPS Technician | Receive Lead |
| Qualified Crewman | Receive, Airbrake |
| Qualified Crewman Foreman | Receive, UP |

2020 U.S. Dist. LEXIS 249904, *38

| | |
|---|---|
| Recor - Teardown | Senior Assembly, Wiring |
| Regional Vice President, International Sales | Senior Bonder |
| Relief Foreman | Senior Business Analyst |
| Report Developer | Senior Buyer |
| Research & Development Engineer | Senior CAD Design |
| Responsable Bureau D'Etude Cvs | Senior Communications Engineer |
| Rover/Paint | Senior Contract Administrator |
| SCM Engineer | Senior Cost Accountant |
| Safety & QAI - Sunrail | Senior Customer Service Administrator |
| Safety Engineer | Senior Design Engineer [*39] |
| Safety Manager | Senior Designer |
| Safety Manager Of AAF | Senior Director, Business Development |
| Safety/QPS Supervisor | Senior Director, Engineering |
| Sales & Service Representative | Senior Director, Office Product Line |
| Sales & Service Specialist | Senior Director, Operations & Customer Support |
| Sales Administrator | Senior Director, Program Management |
| Sales Director Freight Car | Senior Director, Systems Development |
| Sales Director Infrastructure | Senior Electrical Engineer |
| Sales Director Locomotive | Senior Electro Mechanical Assembly |
| Sales Director Train Control | Senior Electronic Assembly |
| Sales Engineer | Senior Electronics Engineer |
| Sales Regional Manager | Senior Electronics Engineer I |
| Sales Representative | Senior Electronics Engineer II |
| Scheduler | Senior Electronics Technician |
| Senior Accountant | Senior Engineer |
| Senior Accountant/Analysis | Senior Engineer, Coupler Design |
| Senior Advisory Engineer | Senior Engineer, Couplers |
| Senior Analyst | Senior Engineer, Pneumatics |
| Senior Analyst, Treasury | Senior Engineering Application Specialist |
| Senior Application Engineer | Senior Engineering Designer |

Senior Engineering Manager

Senior Engineering Support Specialist

Senior Field Service Representative

Senior Finance Director - Electronics Group

Senior Finance Director - Freight Group

Senior Finance Director - Freight Service Group

Senior Finance Director - Industrial Group

Senior Finance Director, Financial Planning & Analysis

Senior Finance Director, Treasury

Senior Financial Analyst

Senior Global Treasury Analyst

Senior Group Leader

Senior Internal Auditor

Senior Maintenance Technician

Senior Maintenance Test Rack Technician

Senior Manager, Accounting

Senior Manager, Corporate Accounting

Senior Manager, Corporate [*40] Tax

Senior Manager, Electronics Design

Senior Manager, Engineering

Senior Manager, Global Trade

Senior Manager, International Marketing

Senior Manager, Service Desk - Americas

Senior Manager, Software Engineering

Senior Manager, Tax

Senior Manager, Technical Project

Senior Manager, Treasury

Senior Manufacturing Engineer

Senior Manufacturing Engineering Analyst

Senior Manufacturing Engineering Specialist

Senior Material Clerk

Senior Material Estimator

Senior Material Planner

Senior Mechanical Assembly

Senior Mechanical Design Engineer

Senior Mechanical Engineer

Senior Network Engineer

Senior Planner

Senior Principal Engineer

Senior Product Line Engineer

Senior Production Planner

Senior Program Coordinator

Senior Program Manager

Senior Project Accountant

Senior Project Administrator

Senior Project Coordinator

Senior Project Manager (Professional)

Senior Project Manager, Communications

Senior Project Scheduler

Senior Purchasing Specialist

Senior Quality Engineer

Senior Signal Designer

Senior Signal Engineer

Senior Software Architect

Senior Software Design Engineer

Senior Software Engineer

Senior Software Engineer - Group Leader

Senior Software Specialist

Senior Software Test Engineer

Senior Software Test/Verification Engineer [*41]

2020 U.S. Dist. LEXIS 249904, *41

| | |
|---|---|
| Senior System Integration Test Engineer | Ship Clerk |
| Senior System Safety Engineer | Ship Clerk (Administrative Support) |
| Senior Systems & Communications Engineer | Ship Clerk (EEO - Administrative Support) |
| Senior Systems Architect | Ship Department Line Leader |
| Senior Systems Engineer | Ship Lead |
| Senior Systems Integration Engineer | Ship Lead - First Shift |
| Senior Systems Safety Engineer | Ship, Packer |
| Senior Tax Accountant | Ship, Receive |
| Senior Tax Analyst | Ship, Receive (Laborer) |
| Senior Technical Advisor | Ship, Receive (Operatives) |
| Senior Technical Project Manager | Ship, Receive Clerk |
| Senior Technician | Ship, Receive Manager |
| Senior Test Engineer | Ship, Receive, Kit, Final Pack |
| Senior Test Technician | Shop Foreman |
| Senior Web Application Engineer | Shop Painter |
| Senior Wiring Assembly | Shop Painter/Freight Teardown |
| Service Desk Lead | Shop Painter/Freight Test Rack Operator |
| Service Desk Specialist | Signal Construction Inspector |
| Service Director | Signal Designer |
| Service Manager | Signal Designer I |
| Service Manager - CSX | Signal Designer II |
| Service Manager - NS Support | Signal Engineer |
| Service Test Engineer | Signal Engineer I |
| Set Up Operator | Signal Engineer II [*42] |
| Set Up Technician | Signal Engineer III |
| Ship & Receive Clerk | Signal Inspector |
| Ship & Receive Clerk I | Signal Inspector II |
| Ship & Receive II | Signal Test Engineer |
| Ship & Receive III | Signal Test Technician |
| Ship Associate | Signalman |

2020 U.S. Dist. LEXIS 249904, *42

| | |
|---|---|
| Single Car Test, Teardown & Assembly | Sub Components |
| Site Accounting Lead | Sub Components Assy/Test |
| Small Parcel Ship | Subarc/Lathe |
| Software & Electrical Engineer | Subarc/Lathe - Shift 1 |
| Software Developer | Subarc/Test/Paint/Final Inspection |
| Software Engineer | Supervisor |
| Software QA Analyst I | Supervisor - 1st Shift |
| Software Quality Analyst | Supervisor - 2nd Shift |
| Software Quality Assurance Analyst II | Supervisor - BNSF |
| Software Technical Associate | Supervisor - Compressor Dept |
| Software Test Analyst | Supervisor - Electronics Dept |
| Software Test Engineer | Supervisor - Hourly |
| Solutions Engineer | Supervisor - Locomotive |
| Sourcing Specialist | Supervisor - PTC Support |
| Special Products Assembly | Supervisor - Passenger [*43] Transit |
| Special Products TBA | Supervisor - Small Freight, Piston & Slack Adjuster Line |
| Special Products TBC | Supervisor Cooler Lines |
| Special Products TD - BC - Assembly | Supervisor Parts/Inventory Dept |
| Special Products Teardown | Supervisor QA/Safety & Operations |
| Special Products Test | Supervisor Radiator Lines |
| Special Products/TD - Buff & Clean | Supervisor Ship & Receive |
| Special Projects Coordinator | Supervisor, Administration |
| Special Projects/Compressor Technician | Supervisor, CNC |
| Specialty Welder/Subarc 1st Shift | Supervisor, Compressor Line |
| Staff Accountant/AP Manager | Supervisor, Construction |
| Strategic Lead For Production & Test Engineering | Supervisor, Customer Service |
| Sub - Assembly Technician | Supervisor, DO/HVAC/APS |
| Sub - Contractor Technical Representative | Supervisor, EPIC |
| Sub Arc | Supervisor, Engineering |
| Sub Arc/TD/Final Inspection | Supervisor, Engineering Service |

2020 U.S. Dist. LEXIS 249904, *43

| | |
|---|---|
| Supervisor, Fabrication | Supplier Quality Engineer |
| Supervisor, Field Service | Supplier Quality [*44] Lead |
| Supervisor, Freight | Supply Chain - Salary |
| Supervisor, Lead | Supply Chain Admin |
| Supervisor, Locomotive & Transit | Supply Chain Engineer |
| Supervisor, Locomotive Service | Supply Chain Specialist |
| Supervisor, Mainenance | Support Engineer |
| Supervisor, Maintenance | Suprvisor, Durox |
| Supervisor, Operations | Surveyor I |
| Supervisor, PTC | Surveyor II |
| Supervisor, PTC Product Support Help Desk | System Integration Test Engineer |
| Supervisor, Piston/Slack Adjuster/SCTD | System Safety Engineer |
| Supervisor, Plant | System Test Engineer |
| Supervisor, Production | Systems Analyst II |
| Supervisor, Production Lead | Systems Engineer |
| Supervisor, Quality | Systems Engineering Manager |
| Supervisor, Quality Assurance | Systems Engineering Technician |
| Supervisor, Quality Test Engineering | Systems Field Inspector 1 |
| Supervisor, Receive | Systems Field Inspector I |
| Supervisor, Relays & Contactors | Systems Integration Engineer |
| Supervisor, Sash | Systems Integration Manager |
| Supervisor, Service Desk America | TBA & Test |
| Supervisor, Ship | TBA, Weld & Test |
| Supervisor, Ship & Receive | TD |
| Supervisor, Ship, Customer Service | TD - Assembly |
| Supervisor, Shop | TD - Assembly - Test |
| Supervisor, Shop - Hourly | TD - BC - Assembly - Test |
| Supervisor, Supplier Quality | TD - BC - Assembly - Test/Weld |
| Supervisor, Test Engineering | TD - Test |
| Supervisor, Warehouse | TD/Initial Inspection/Clean |

2020 U.S. Dist. LEXIS 249904, *44

| | |
|---|---|
| TDW Operator | Technical Writer **[\*45]** - Hourly |
| Tax Senior | Technician |
| Team Lead - Ship | Technician - HVAC |
| Team Lead Business Analyst | Technician I |
| Team Lead Software Engineer | Technician II |
| Team Lead Systems Engineer | Technician Service Rep |
| Team Leader | Tender Analyst |
| Team Leader (Craft Workers) | Test |
| Team Leader (Operatives) | Test Engineer |
| Team Leader I | Test Engineering Technician |
| Team Leader II | Test Rack Operator |
| Team Leader III | Test Rack Operator (Craft Workers) |
| Team Leader, Service Parts | Test Rack Operator - Special Projects |
| Tear Down/Cleaning Operator | Test Rack Operator Line Leader |
| Teardown | Test Technician |
| Teardown, Assembly & Test | Test/Final Inspection |
| Teardown/Initial Inspection | Test/TD/Clean/Paint/Final Inspection |
| Teardown/Lathe | Tester - Airbrake |
| Technical Advisor | Testing |
| Technical Analyst Service Delivery | Threader |
| Technical Director | Tool & Die Machinist |
| Technical Project Manager | Tool & Die Technician |
| Technical Sales Advisor | Tool & Model Maker III |
| Technical Service Manager | Tool & Mold Maker II |
| Technical Service Representative | Tool Room Technician |
| Technical Specialist | Trade Compliance Analyst |
| Technical Specialist B | Traffic & Material Control Operator |
| Technical Support Analyst | Trainer, Engineering |
| Technical Trainer | Treasurer & Vice President, Tax |
| Technical Writer | Treasury Analyst |

| | |
|---|---|
| Triangle TBA | Vice President, Corporate Strategy |
| Triangle/Locomotive Teardown | Vice President, Engineering |
| Triangle/TD - BC - Assembly | Vice President, Finance & Global Treasury |
| Trim (Hand Punch, Cryogenic, Paint Line) | Vice President, Finance & Group Controller |
| Trim (Hand, Punch, Cryogenic, Paint Line) | Vice President, Financial Planning & Analysis |
| Trim (Hand, Punch, Cryogenic, Paint Line) Operator | Vice President, Freight Customer Service |
| Trim Operator (Hand, Punch, Cryogenic, Paint Line) | Vice President, Freight Marketing & Sales |
| Truck Driver | Vice President, Integration & Strategy |
| UX Account Coordinator | Vice President, Internal Audit |
| Utility Engineer | Vice President, International Business Development |
| Utility Operator | Vice President, Investor Relations |
| Vice President | Vice President, Marketing |
| Vice President - Corporate Initiatives | Vice President, Marketing & Sales Freight Car |
| Vice President - Marketing & Product Planning | Vice President, Marketing & Sales Industrial |
| Vice President Customer Service, Freight Segment | Vice President, Marketing & Sales Infrastructure |
| Vice President Electronics Coe | Vice President, Marketing & Sales Locomotive |
| Vice President Government Relations & Public Affairs | Vice President, Marketing & Sales Train Control - Signaling - Analytics |
| Vice President Line Management/Sales Freight Car | |
| Vice President Locomotive [*46]  Serv | Vice President, Marketing Freight Segment |
| Vice President Of Compensation & Benefits | Vice President, Operations & Business Development |
| Vice President Of Finance, Finance Processes & Systems | Vice President, [*47]  Product Development |
| | Vice President, Program Management |
| Vice President Of Operations | Vice President, Project Management & Bid Governance |
| Vice President, CS & Freight Sales | Vice President, Quality & Training |
| Vice President, Claims Management & Bid Governance | Vice President, Quotes & Proposals |
| Vice President, Construction | Vice President, Rail Service |
| Vice President, Controller | Vice President, Regional Sales |
| Vice President, Corporate & Freight Quality | Vice President, Safety, Environment & Sustainability |
| Vice President, Corporate Quality | Vice President, Sales |
| Vice President, Corporate Safety & Environmental Compliance | Vice President, Sales & Marketing |

2020 U.S. Dist. LEXIS 249904, *47

Vice President, Sales & Marketing, Freight Segment

Vice President, Sales Motivepower

Vice President, Sales North America

Vice President, Train Control

Wabtrax Tester/Support

Warehouse & Distribution Supervisor

Warehouse Clerk

Warehouse Coordinator

Warehouse Lead

Warehouse Worker (Craft Worker)

Warehouse Worker (Laborer)

Warranty & Reliability Engineer

Warranty & Repair Manager

Warranty Administrator

Warranty Manager

Warranty Technician

Warranty Technician, Lead

Web Portal Developer Level II

Welder

Welder (Craft Workers)

Welder (Operatives)

Welder - 1st Shift

Welder - SFRTA

Welder I

Welder II

Welder/Assembly

West Coast Regional Manager

Wireman

Wiring Assembly II

Yard Controller

**Knorr Railroad Employees Class Titles List**

2nd Shift Supervisor

ABS Controller

ABS Sales & Site Manager

AM, Automation & Controlling Engineer 4

APO Bus Expert/SAP Prod Data Specialist

APU

APU Labor (Genset Builder)

 [*48] APU Lead

Account Coordinator

Account Manager

Accountant Clerk

Accounting & Tax Specialist

Accounting Clerk

Accounting Clerk 2

Accounting Clerk Sr

Accounts Payable & Receivable Manager

Accounts Payable Clerk

Accounts Payable Clerk 1

Accounts Payable Clerk 2

Accounts Payable Clerk I

Accounts Payable Lead

Accounts Payable Supervisor

Acting Director, Quality (KBC)

Acting Director, Rail Services

Acting Engineering Admin

Acting Program Manager

Adv Calibration

Adv Calibration (HS)

2020 U.S. Dist. LEXIS 249904, *48

| | |
|---|---|
| Advanced Manufacturing Engineer | Assy III |
| Advanced Manufacturing Engineer 3 | Assy III **[*49]** |
| Advanced Manufacturing Engr | BU Controller |
| Advanced Manufacturing Engr Jr | BU Manager IFE/HVAC |
| Advanced Manufacturing Manager | Batch System Operator |
| Aftermarket Sales Rep | Briquette System Operator |
| Aftermarket Sales Representative | Bus Proc Exp-Customs & Trade Compliance |
| Air Compressor | Business Process Expert - Materials Mgmt |
| Air Compressor Lead | Business Process Expert - Warehouse Mgmt |
| Air Compressor Sandblaster | Business Stream Manager |
| Air Compressor Tear Down Labor | Buyer |
| Air Compressor/Machine Shop Lead | Buyer 1 |
| Air Dryer | Buyer 2 |
| Air Dryer Lead | Buyer I |
| Applications Engineer | Buyer III |
| Applications Engineer 3 | Buyer Planner 2 |
| Applications Engineer/Dyno Dept. Manager | Buyer Std Commodities |
| Applications Engr | Buyer/Materials Planner |
| Assembly III | Buyer/Planner 1 |
| Assembly Test Technician | Buyer/Planner 1 (KC) |
| Assembly Test Technician - Cell Leader | Buyer/Planner 1 (Premtec) |
| Assistant Controller | Buyer/Planner 2 |
| Assistant Controller - Premtec | Buyer/Planner 3 |
| Assistant Controller SBU | Buyer/Simulator Support |
| Assistant Facility Manager | CAD Drafter 1 |
| Assistant Shop Coordinator | CAD Drafter 2 |
| Assistant Western Regional Manager | CAD Drafter 3 |
| Associate Manufacturing Engineer | CCB Loco A&T |
| Assy I | CCC Paid Repair Customer Srv |
| Assy II | CCC Warranty Administration |

2020 U.S. Dist. LEXIS 249904, *49

| | |
|---|---|
| Cad Drafter | Customer Service Administrator |
| Cell Expert | Customer **[\*50]**  Service Rep |
| Cell Leader | Customer Service Rep 1 |
| Certified Welder | Customer Service Rep 2 |
| Chief Engineer | Customer Service Rep 2, International |
| CoC Manager - Doors | Customer Service Rep 2, OE |
| CoC-Engineering Team Lead | Customer Service Rep 3 |
| Commodity Manager | Customer Service Rep 3, OE |
| Commodity Manager 1 | Customer Service Representative |
| Commodity Manager 2 | Customer Service Representative 1 |
| Commodity Manager 3 | Customer Service, Lead |
| Commodity Manager 3 - Electronics | Customer Service/Shipping Clerk |
| Commodity Manager Jr | Customer Srv Manager |
| Commodity Manager, Jr. | Cyl Machining |
| Configuration Management Spvr | Cylinder Machining |
| Configuration Management Supervisor | DB60 A&T |
| Contract Administrator | DB60 Machining |
| Controller | Data Coordinator |
| Controller NYAB | Demand Planner Analyst |
| Corporate Customs Compliance Supervisor | Dep Director of PUR & Demand Planning |
| Corporate Trans Customs Compliance Mgr | Deputy Director of OE Project Management |
| Cost Accountant/Financial Analyst | Deputy Director of OE Sales |
| Cost Analyst | Deputy Director of Purchasing |
| Cost Engineer | Deputy Director of Supply Chain |
| Cost Engineer 2 | Deputy Project Director, NYCT |
| Costing | Design Engr |
| Credit & Collections Lead | Design Validation Manager |
| Credit & Collections Manager | Designer/Checker |
| Customer SCM Manager | Director CoC Brakes |
| Customer Service /Sales Administrator | Director Engr Electrical Software |

Case 4:21-cv-00196-MWB    Document 261-1    Filed 01/20/26    Page 140 of 287

Page 33 of 48
2020 U.S. Dist. LEXIS 249904, *50

Director Engr Mechanical

Director Engr Product Owners

Director Engr RAMS

Director Engr Sales Systems

Director Engr Services

Director Engr Systems Dev

Director Engr TDS

Director Freight OE Sales

Director International & Loco OE Sales

Director International Sales

Director Marketing & Sales

Director OE Locomotive Sales

Director Of Engineering, TDS Division

Director Operations/Program Management

Director PMO

Director Project Managing & Operations

Director Rail Services

Director Sourcing

Director TDS

Director of Agile Practice

 [*51] Director of Agile Program Management

Director of Business Unit

Director of Continuous Improvement

Director of Controlling

Director of Controlling and Finance

Director of Doors Business Unit

Director of Finance

Director of Logistics

Director of Manufacturing

Director of Marketing

Director of Meta-Scrum Product Ownership

Director of Operational Excellence

Director of Operations

Director of Operations and Engineering

Director of Purchasing

Director of Quality

Director of Quality Systems

Director of Rail Services

Director of Sales

Director of Supply Chain Management

Director, Brakes Business Unit

Director, Business Development

Director, Customer Service

Director, Engineering

Director, Engineering Brakes

Director, Engr Systems Dev

Director, Finance

Director, HVAC Business Unit

Director, Programs

Director, Project Management

Director, Quality

Director, Rail Services

Director, Sales & Marketing

Director, Sales & Systems

Director, Sales & Systems - Engineering

Director, Sales & Systems - Sales

Director, Supply Chain

Document Control Specialist

Documentation Clerk

Domestic & Intl Transportation Clerk

2020 U.S. Dist. LEXIS 249904, *51

| | |
|---|---|
| Domestic & Intl Transportation Spec | Engineer, General |
| EP60 A&T | Engineer, General (PT) |
| Elec Technician (HS) | Engineering Manager |
| Electical Engineer 2 | Engineering Support Specialist |
| Electrical | Engr Logistics Coord |
| Electrical Engineer 2 | Engr Prod Data Mgt Supervisor |
| Electrical Engineer [*52] 3 | Engr Production Services Senior Spec |
| Electrical Engineer 4 | Engr Tools and Configuration Specialist |
| Electrical Engr 1 | Expediter |
| Electrical Engr 2 | Expediter / Buyer |
| Electrical Engr 3 | Fabrication Lead |
| Electrical Engr 4 | Facilities Maint Tech & Electrician |
| Electrical Engr 5 | Facilities Maintenance Technician |
| Electrical Lead | Facilities Manager |
| Electrical Technician | Facilities and Logistics Specialist |
| Electrician (HS) | Facilities and Warehouse Manager |
| Electro-Mechanical Engineer | Facilities and Warehouse Specialist |
| Electronic HW Engr 2 | Facility & HSE Lead |
| Electronic System Engineer | Facility Maintenance Electrician |
| Electronic Systems Engineer | Field Service Applications Specialist |
| Electronic Systems Engineer Team Leader | Field Service Applications Supervisor |
| Electronic Technician | Field Service Engineer |
| Electronics Systems Engineer | Field Service Engineer I |
| Electronics Systems Engineering Manager | Field Service Mechanic |
| Electronics Test Technician | Field Service Rep - Site [*53] Supervisor |
| Electronics Test Technician (PT) | Field Service Representative |
| Embedded Software Engineer Associate | Field Service Site Supervisor |
| Embedded Systems Developer | Field Service Specialist |
| Embedded Systyms Developer | Field Service Specialist 1 |
| Engineer | Field Service Specialist 2 |

2020 U.S. Dist. LEXIS 249904, *53

| | |
|---|---|
| Field Service Specialist Sr | Freight Control Valve A&T - Section Lead |
| Field Service Specialist, Senior | Freight OE Sales Manager |
| Field Service Supervisor | Freight OE Sales Manager, Sr |
| Field Service Technician | Fuel Crane |
| Field Service Technician I | Fuel Cranes Lead |
| Field Service Technician II | GIS Analyst 1 |
| Field Service and Sales Manager | GIS Analyst 2 |
| Field Service and Sales Specialist | GIS Analyst I |
| Field Services Specialist 2 | GIS Anaylst 1 |
| Field Srv Application Engr | General Maintenance (HS) |
| Field Srv Engr | General Maintenance 1 (HS) |
| Field Srv Project Mgr | General Maintenance Dyno |
| Field Srv Rep | General Maintenance Leadman |
| Field Srv Spec | General Maintenance Mechanic |
| Field Srv Spec/Inside Sales | General Maintenance-1 |
| Field Srv Technician | General Maintenance-2 |
| Field Support Coordinator | General Maintenance-Tooling **[*54]** Coord |
| Final Inspector | General Shop Labor Nixa |
| Finance Admin Generalist/Bookkeeper | Global Client Services Lead |
| Finance Admin Generalist/Bookkeeper 3 | Global Transportation Specialist |
| Financial Accountant | Graphic Designer 2 |
| Financial Analyst | Group Leader |
| Financial Analyst / IFE | HSE Manager |
| Financial Analyst 1 | HVAC Assembly Technician |
| Financial Analyst I | HVAC Assembly Test Technician |
| Fixed Asset & Cost Analyst | HVAC CoC Manager |
| Fixture Mechanic | HVAC Electrical System Engineer |
| Flex Production | HVAC Electrical Systems Engineer |
| Freight Control Valve | HVAC Electronics Repair Electrician (PT) |
| Freight Control Valve A&T | HVAC Engineering Coordinator |

2020 U.S. Dist. LEXIS 249904, *54

HVAC Engineering Support Specialist

HVAC General Assembler

HVAC Mechanical Assembler

HVAC Mechanical Designer

HVAC Mechanical Engineer

HVAC Power and Controls Engineer

HVAC Rail Services Manager

HVAC Repair Tech

HVAC Repair Technician

HVAC Strategic Purchasing Specialist

HVAC Supplier Development Specialist

HVAC System Validation Engineer

HVAC Systems Engineer

HVAC Tech - Assembler

HVAC Technician (HS)

HVAC Test Technician

HVAC Test Technician - Cell Leader

Hand Brake

Health Safety & Environmental Manager

Health Safety Environmental Specialist

Health and Safety Specialist - PREMTEC

Health and Safety Specialist - Watertown

Hose Lead

Hose Product Development

Hose Products Sales Manager

Hose Technician 1

Hose Technician 1B

Hose Technician 1C

Hose Technician 2

Hose Technician 2A

Hose Technician 2B

Hose Technician 3

Hose Technician 3A

Hose and Specialty Products Manager

IC Supply Chain Manager

IFE Sales [*55] and Systems Manager

IS Manager

Improvement Specialist

In Supply Analyst

In Supply Coordinator Sr

Indirect Buyer

Industrial Engineer

Inside Sales Manager

Inside Sales Representative

Inside Sales/Field Service Technician

Inspection

Interim Manager — Sales and Systems

International Sales & Support Supervisor

International Sales Account Manager

International Sales Representative

Inventory Control - Customer Srv Spec

Inventory Control Clerk

Inventory Control Specialist

Inventory Control Specialist 2

Inventory Spec/Material Coord

Inventory Specialist/Material Coord

Jr Quality Engineer/KPI Specialist

Junior Manufacturing Engineer

Junior Quality Engineer

Junior Technical Illustrator

2020 U.S. Dist. LEXIS 249904, *55

| | |
|---|---|
| Junior Technical Writer | Logistics Specialist |
| KC/KBL Assistant Controller | Logistics Specialist 2 |
| KPS Champion | Logistics Specialist I |
| KPS Leader | Logistics Specialist II |
| KPS Manager | Logistics and Material Analyst |
| Kitting Assembler | Logistics and Warehouse Supervisor |
| Lab Technician | Lube Mechanic |
| Lab Technician 1 | MRP Controller |
| Lab Technician 2 | Machine Repair |
| Lead HVAC Mechanical Engineer | Machine Repair (HS) |
| Lead HVAC Systems Engineer | Machine Shop |
| Lead Inspection | Machine Shop Lead |
| Lead Person | Machining (HS) |
| Lead Software Engr | Machinist |
| Lead System Engineer | Machinist II |
| Lead Systems Engineer | Machinist-Short Cycle |
| Leader, HVAC Mechanical Engineer | Maint Mech A-Electrician |
| Leader, Mechanical Design | Maint Mech A-Pipe/Plumb |
| Line Feeder | Maintenance |
| Line Worker | Maintenance Electrical Technician |
| Loco A&T | Maintenance Electrical Technician - 2nd |
| Locomotive | Maintenance Helper |
| Locomotive A&T | Maintenance Specialist |
| Locomotive OE Sales Rep | Maintenance Technician |
| Logistics & Trade Compliance Specialist | Maintenance Technician 2 |
| Logistics & Warehouse Manager | Maintenance and Reliability Engineer |
| Logistics Coordinator | Manager Aftermarket Sales |
| Logistics Manager | Manager Business Development |
| Logistics Order [*56] Administrator | Manager Corporate Trans Customs Complian |
| Logistics Spec | Manager Customer Service |

| | |
|---|---|
| Manager Electronic Engr | Manager of Business Dev/Tech Transfer |
| Manager Engineering Services | Manager of Electronics Engineering |
| Manager Engineering Test | Manager of PMO |
| Manager Engr ABS | Manager of Quality Assurance |
| Manager Engr Hardware | Manager of Sales and Project Management |
| Manager Engr Loco Sys Dev | Manager of Software Engineering |
| Manager Engr Mechanical | Manager, Accounting |
| Manager Engr Product Data Mgmt | Manager, Accounting and Reporting |
| Manager Engr Shared Services | Manager, Aftermarket Bus. Development |
| Manager Engr Software | Manager, Business Unit Controller-Brakes |
| Manager Engr Sustaining | Manager, Contracts & Logistics |
| Manager Engr Systems | Manager, Cost Accounting |
| Manager Engr Systems Quality | Manager, Document Control |
| Manager Engr Systems Verification | Manager, Engineering Services |
| Manager Engr TCS Dev | Manager, FS North America |
| Manager Engr Tech Pubs | Manager, FS Northeast |
| Manager Engr Test | Manager, FS Northeast & Central |
| Manager Facilities and Equip Maintenance | Manager, Facilities |
| Manager Field Service | Manager, Maintenance Services |
| Manager Freight Systems Engr | Manager, Manuals & Training |
| Manager In-Supply [*57] | Manager, Material Control |
| Manager Locomotive Sales | Manager, Mechanical Engineering |
| Manager NPI Programs | Manager, Merak Finance & IT Services |
| Manager OEM Freight Sales | Manager, Operations Brakes & Doors |
| Manager Quality HSE Systems | Manager, Planning & Logistics |
| Manager Sales OE Brakes | Manager, Project & Systems Eng. HVAC |
| Manager Sales and Systems Engr | Manager, Purchasing |
| Manager Systems Engr | Manager, Rail Services Sales Logistics |
| Manager of Accounting | Manager, Sales & Business Development |
| Manager of Adv Manuf Engr | Manager, Sales Logistics |

2020 U.S. Dist. LEXIS 249904, *57

Manager, Sales and Systems Engineering

Manager, Service

Manager, Shop Operations

Manager, Software & Electr. **[*58]**  Engineering

Manager, Supplier Quality

Manager, Supply Chain

Manager, Systems Engineering

Manager, Systems Engineering Doors

Manager, Systems Integration Verificatio

Manager, Tech Pubs & Document Control

Manager, Warehouse

Managing Team Leader

Manufacturing Electronics Engineer

Manufacturing Engineer

Manufacturing Engr

Manufacturing Engr Manager

Manufacturing Master Production Schedule

Manufacturing Services Manager

Marketing Analyst

Marketing Analyst, Senior

Marketing Coord

Marketing Coord 3

Master Scheduler

Material Acquisition Specialist

Material Coord

Material Coord Team Leader

Material Coordinator

Material Expediter

Material Expeditor

Material Handler

Material Handler (PT)

Material Handler 1

Material Handler 2

Material Handling

Material Hnd A

Material Planner

Material Planner Team Lead

Material Planning Team Lead

Material Requirements Planner 1

Material Requirements Planner 2

Material Requirements Planner 3

Materials & Planning Prod Supervisor

Materials Coord

Materials Coord 2

Materials Coord A

Materials Handler 1

Materials Handler 2

Materials Manager

Mechanical Design Engineer

Mechanical Designer

Mechanical Designer, HVAC

Mechanical Development Engr

Mechanical Engineer

Mechanical Engineer 1

Mechanical Engineer 2

Mechanical Engineer **[*59]**  Jr.

Mechanical Engineering Team Leader

Mechanical Engr 1

Mechanical Engr 2

Mechanical Engr 3

2020 U.S. Dist. LEXIS 249904, *59

| | |
|---|---|
| Mechanical Engr 4 | Owner |
| Mechanical Engr 5 | Paid Repair CSR |
| Mechanical Engr 5S | Paint |
| Mechanical Systems Engineering Manager | Painter |
| Mgr International Sales and Market Deve | Painter - Cell Leader |
| Mgr RAMS | Peripheral A&T |
| Mgr, Engineering & Strategic Purchasing | Peripheral A&T - Shift Lead |
| Mgr. Indust. Manufacturing Engineering | Peripheral A&T 1 |
| Mgr. Manufacturing Engineering | Peripheral A&T 2 |
| Mgr., HVAC Engineer & Strategic Planning | Peripherals A&T 2 |
| Millwright Maintenance | Physical Inventory Audit |
| Mold Press Oper A | Planner |
| Mold Press Operator | Planner & Production Supervisor |
| NC/PC Machinist (HS) | Planner/Buyer |
| Nozzle | Plant Manager |
| Nozzle Lead | Pneumatic Systems Engineering Team Lead |
| OE Customer Srv Rep | Preventative Maintenance Coordinator |
| OE Sales & PM Manager, LRV/Hydraulics | Pricing Analyst |
| OE Sales & PM Manager, Mainline | Principal Engr [*60] |
| OE Sales & PM Manager, Met/E&DMU/Com/HSR | Principal Systems Safety Engineer |
| OE/Spare Customer Service | Process Engineer |
| OE/Spare Customer Srv | Process Engineer - PREMTEC |
| Off Shift Supervisor | Process Engineer - Warehouse Operations |
| Oil Free Compressor (HS) | Process Engineer 2 |
| On-Board Systems PM Manager | Process Engineer 3 |
| On-Board Systems Production Manager | Process Engr |
| Operations Manager | Process Improvement Manager |
| Operations Manager - Brakes, KPS Manager | Process Quality Engr |
| Operations Services Supervisor & Planner | Procurement Project Manager |
| Operations Specialist | Procurement Specialist |

2020 U.S. Dist. LEXIS 249904, *60

| | |
|---|---|
| Product & Quality Systems Leader | Project Manager |
| Product Data Analyst | Project Manager - HVAC |
| Product Data Analyst 1 | Project Manager - NYCT |
| Product Designer | Project Manager - Selectron |
| Product Line Manager | Project Manager 1 |
| Product Line Manager Sr | Project Manager 2 |
| Product Line Mgr Sr | Project Manager Jr |
| Product Quality Engr | Project Manager Sr |
| Product Quality Engr Sr | Project Manager, Ops Planning & Dev |
| Product Quality Manager Sr | Project Manager/Planner |
| Product Quality Manager, Sr. | Project Mgr |
| Production Coordinator | Project Portfolio Coordinator |
| Production Line Manager, Jr. | Project **[*61]**  Quality Engineer |
| Production Manager | Project Quality Engineering Supervisor |
| Production Manager, Freight | Project Quality Manager |
| Production Requirements Scheduler | Proposal Manager |
| Production Specialist | Purchasing |
| Production Supervisor | Purchasing Manager |
| Production Supervisor, Locomotive | QA Administrator |
| Production Technician 2 | QA Improvement Associate |
| Production Technician 3 | QA Inspector/Warehouse Clerk |
| Program Coordinator | Quality Assistant |
| Program Manager | Quality Assurance Lead Auditor |
| Program Manager Sr | Quality Control |
| Program Manager, Ideas @ Work | Quality Coordinator |
| Project Administrator | Quality Coordinator 2 |
| Project Controller | Quality Data Analyst |
| Project Controller I | Quality Data Analyst 2 |
| Project Coordinator | Quality Engineer |
| Project Coordinator - NYCT | Quality Engineer - Brakes |

2020 U.S. Dist. LEXIS 249904, *61

| | |
|---|---|
| Quality Engineer - Doors & Brakes | RS Field Service Manager |
| Quality Engineer - HVAC | RS Field Support Engineer |
| Quality Engineer 2 | RS Material Coordinator |
| Quality Engineer 3 | RS Project Coordinator |
| Quality Engineer 4 | RS Project Manager |
| Quality Inspection Supervisor | RS Proposal Specialist |
| Quality Inspector | RS Regional Sales Manager |
| Quality Lab Technician | RS Sales Administration Coordinator |
| Quality Lab Technician 2 | RS Sales Engineer |
| Quality Lab Technician 3 | RS Sales Logistics Coordinator [*62] |
| Quality Manager | RS Sales Logistics Expeditor |
| Quality Support Specialist | RS Sales Representative |
| Quality Technician | RS Service Center Manager |
| RAMS Engineer 3 | RS Sr. Project Manager |
| RAMS Engr 1 | RS Technical Sales Specialist |
| RAMS Engr 2 | RS Technical Services Manager |
| RAMS Engr 3 | Rail Service Expeditor |
| RAMS Engr 4 | Rail Service Technician |
| RAMS LCC Electrical Engr | Rail Services Material Coordinator |
| RMA / NCR | Rail Services Sales Manager |
| RMA Coordinator | Receiving Inspection Team Lead |
| RMA Technician | Receiving Inspector |
| RMSH Eng Team Leader | Regional Manager SC FIT Americas |
| RMSH Engineering Manager | Regional Planning Specialist |
| RS Account Coordinator | Regional Quality Mgr Rail Srv |
| RS Account Manager | Regional Sales Manager |
| RS Bids & Proposals Manager | Regional Sales Manager Sr |
| RS Business Analyst | Regional Sales Manager, Senior |
| RS Business Development Manager | Reliability & Quality Manager |
| RS Engineering Manager | Reliability Engineer |

2020 U.S. Dist. LEXIS 249904, *62

Repair Cost & Inventory Analyst

Repair Shop Administrator

Repair Shop Cell Leader

Repair Shop Coordinator

Repair Shop Supervisor

Repair Shop Technician

Repair Shop Technician - Cell Leader

Repair Shop Test Technician

Repair Tech/Warehouse Worker

Repair Technician

Repair Technician 1

Repair Technician 2

Repair Technician 3

Repair Technician, Brakes

SAP Business Process & Innovation Mgr

SBU Business Process Manager

SBU Planning Manager

SBU Production Scheduling Manager

SBU Supply Chain Manager

SC Team Leader

SCE Manager

SCM Administrator

SCM Team Leader/Manager

Safety Manager

Sales & Marketing Coordinator

Sales Administration Coordinator

Sales Coordinator - Aftermarket

Sales Coordinator, OEM Brakes [*63]

Sales Engr

Sales Logistics Coordinator

Sales Manager

Sales Manager N. America - Sigma MID

Sandblaster

Scrum Business Analyst

Secondary Ops

Section Lead - Freight Control Valve A&T

Section Leader Freight Control Valve A&T

Section Leader Locomotive A&T

Section Leader Secondary Ops

Section Leader Warehousing

Segment Leader

Semi Metalic Hot Forming Operator

Semi Metalic Laborer / Operator

Semi Metalic Operator

Semi Metallic Laborer / Operator

Semi-Metallic Hot Forming Operator

Senior Advanced Manufacturing Engineer

Senior Cost & Business Analyst

Senior Cost Analyst

Senior Customer Srv Accts Payable Spec

Senior Design Engr

Senior Designer

Senior Director of Quality & HSE

Senior Electro Mech Packaging Engr

Senior Electronic Hardware Dev Engr

Senior Field Srv Spec

Senior Manager Planning & Logistics

Senior Manufacturing Engineer

Senior Process Engr

Senior Project Manager

2020 U.S. Dist. LEXIS 249904, *63

| | |
|---|---|
| Senior Project Manager - HVAC | Software Engineer 1 |
| Senior Quality & HSE Specialist - TDS | Software Engineer 2 |
| Senior Quality & HSE Systems Specialist | Software Engineer 3 |
| Senior Quality Engineer | Software Engineer 4 |
| Senior Quality Technician | Software Engineer 5 |
| Senior Software Engr | Software Engir 3 |
| Senior Staff Engineer | Software Engr |
| Senior Supplier Quality Assur Engr | Software Engr 1 |
| Senior Supply Chain Manager | Software Engr 2 |
| Senior Systems Engr | Software Engr 3 |
| Senior Tax Analyst | Software Engr 4 |
| Senior Techncial Writer | Software Engr 5 |
| Senior Technical Illustrator | Software Engr 6 |
| Senior Technical [*64] Writer | Software QA Engineer |
| Senior Technical Writer, Team Leader | Software Quality Assurance, Team Leader |
| Senior Test Engr | Software Safety Assurance Engr |
| Senior Test Technician | Sourcing Engineer |
| Senior Tool Engr | Sourcing Specialist |
| Service | Spares/Sales Administrator |
| Service Shop | Specialist 1, Quality Technician |
| Shift Supervisor | Specialist 2, Quality Technician |
| Shipping & Receiving Clerk | Specialist Buyer |
| Shipping Clerk | Specialist Lean |
| Shipping Coordinator | Specialist Maintenance |
| Shipping Coordinator, Team Lead | Specialist Quality Technician |
| Shipping Labor | Specialist, Quality Technician |
| Shipping Lead | Specialist; Shipping & Receiving |
| Shop Labor Nixa | Sr In Supply Coord |
| Six Sigma Black Belt Business Process Im | Sr Product Quality Engr |
| Software Engineer | Sr Project Manager |

2020 U.S. Dist. LEXIS 249904, *64

Sr Quality Manager

Sr Reliability & Quality Engr

Sr. Accountant

Sr. Buyer

Sr. Field Service Technician

Sr. Field Specialist

Sr. Manager, Locomotive OE Sales

Sr. Project Manager

Sr. Project Mgr

Sr. Quality & Reliability Engr

Sr. Regional Sales Manager

Sr. Supplier [*65] Quality Engr

Sr. Supply Chain Engineer

Staff Accountant

Staff Accountant - Merak & IFE

Staff Accountant / HVAC

Staff Accountant 1

Staff Accountant 2

Strategic Purchasing Manager

Sub-Project Manager

Sub-Project Manager/Mechanical Engineer

Supervisor

Supervisor Aftermarket Sales

Supervisor Srv Rep

Supervisor, Customer Service

Supervisor, Graphics & Documentation

Supervisor, Materials

Supervisor, Production

Supervisor, Repair Shop

Supervisor, Warehouse

Supplier Quality

Supplier Quality Assur Engr Sr

Supplier Quality Engineer

Supplier Quality Engineer 1

Supplier Quality Engineer 2

Supplier Quality Engineer Sr

Supplier Quality Engr

Supplier Quality Manager

Supply Chain Analyst

Supply Chain Business Process Manager

Supply Chain Business Process Spc

Supply Chain Business Process Spc-PTEC

Supply Chain Coordinator

Supply Chain Engineer

Supply Chain Engineer 2

Supply Chain Manager

Supply Chain Manager-PREMTEC

Supply Chain Material Planner

Supply Chain Supervisor

Supply Chain Tools & Processes Manager

Sustaining Engr

Sys Engr 3

System Test Engr 1

System Test Engr 2

System Test Engr 3

System Test and Commissioning Engineer

Systems Engineer

Systems Engineer 1

Systems Engineer 2

Systems Engineer 3

| | |
|---|---|
| Systems Engineer 4 | Team Lead - Goods Receiving |
| Systems Engineer 5 | Team Lead - High Rack Storage |
| Systems Engineer [*66] Doors | Team Lead - Kardex |
| Systems Engineer II | Team Lead - Material Handling |
| Systems Engineer Jr | Team Lead - Shipping |
| Systems Engr | Team Leader - Repair and Warranty CSR |
| Systems Engr 1 | Team Leader - Repair and Warrenty CSR |
| Systems Engr 2 | Team Leader CCB Systems Engr |
| Systems Engr 3 | Team Leader CCC |
| Systems Engr 4 | Team Leader Complaint Management |
| Systems Engr 4 Validation | Team Leader Enger IT Infrstructr Dev-Ops |
| Systems Engr 5 | Team Leader Engr |
| Systems Engr 6 | Team Leader Engr Air Supply |
| Systems Engr Manager | Team Leader Engr Mechanical |
| Systems Safety Assurance Engr | Team Leader Engr Services |
| Systems Team Mgr | Team Leader Engr Software |
| Systems Test Engineer 1 | Team Leader Engr Systems |
| Systems Test Engineer 2 | Team Leader Engr Test |
| Systems Test Engineer 3 | Team Leader PMO |
| Systems Test Engineer 4 | Team Leader Process Engr |
| Systems Test Engr 1 | Team Leader Sales Project Manager |
| Systems Test Engr 2 | Team Leader Test Engr |
| Systems Test Engr 3 | Team Leader, Brake Control Sys Test Eng |
| Systems Test Engr 4 | Team Leader, Mechanical Systems Engineer |
| Systems Test Lab Lead | Team Leader, [*67] Paint Cell |
| TDS Assistant Controller | Team Leader, Test Engineering |
| TDS Asst Controller | Team Leader, Warehouse |
| TDS Site Lead & Sr. Product Line Manager | Team Leaders Engr Mechanical |
| Tactical Purchasing Manager | Tech-Electronic |
| Tax Manager | Technical Documentation Spec |

2020 U.S. Dist. LEXIS 249904, *67

| | |
|---|---|
| Technical Documentation Spec 3 | Test Tech 2 |
| Technical Illustrator | Test Technician |
| Technical Publications Team Lead | Test Technician 1 |
| Technical Trainer | Testing Commissioning Manager |
| Technical Writer | Tool/Model Maker - Cell Leader |
| Technical Writer 2 | Toolmaker (HS) |
| Technical Writer 3 | Toolmaker/Model Maker |
| Technical Writer/Trainer | Toolmaker/Model Maker - Cell Leader |
| Technician 1 | Tools & Processes Manager |
| Technician 2 | Tools&Configuration Engineer Specialist |
| Technician 3 | Trans Export Clerk |
| Technician 4 | Trans/Customs Compliance Business Lead |
| Technician, Service | Transportation Compliance Specialist |
| Territory Manager, Mexico | Transportation Manager |
| Test & Commissioning Manager | Truck Driver/Material Handler |
| Test Engineer | VP Engineering |
| Test Engineer 1 | VP Finance & Controlling |
| Test Engineer 2 | VP Marketing and Sales |
| Test Engineer 3 | VP Operations |
| Test Engineer 4 | VP Quality & Program Mgt |
| Test Engineer 5 | VP of Operations |
| Test Engineer IV | Validation & Test Manager |
| Test Engr | Vice President, CoC Brakes |
| Test Engr 1 | Vice President, Contracts |
| Test Engr 2 | Vice President, [*68] Finance |
| Test Engr 3 | Vice President, On-Board Systems |
| Test Engr 4 | Warehouse & Shipping Specialist |
| Test Engr 5 | Warehouse Clerk 1 |
| Test Engr 5S | Warehouse Clerk 2 |
| Test Tech 1 | Warehouse Clerk Lead |

2020 U.S. Dist. LEXIS 249904, *68

Warehouse Labor

Warehouse Lead

Warehouse Logistics Spec

Warehouse Manager

Warehouse SAP Coord

Warehouse Shipping Lead

Warehouse Supervisor

Warehouse Supervisor II

Warehouse Supervisor, Alt Shift

Warehousing

Warehousing - 1st Shift

Warehousing - 2nd Shift

Warehousing - 3rd Shift

Warehousing - Shift Lead

Warehousing Lead (B-Core)

Warehousing Section Leader

Warranty Data Analyst

Warranty Data Analyst 2

Warranty Data Analyst 3

Watertown/Premtec Assistant Controller

Welder / Brazer

Western Regional Sales Manager

Wheatland Labor

Wheatland Shop Labor

**End of Document**

2005 WL 3008808
United States District Court, D. New Jersey.

In re REMERON DIRECT PURCHASER
ANTITRUST LITIGATION

No. Civ.03–0085 FSH.
|
Nov. 9, 2005.

**Attorneys and Law Firms**

Lisa J. Rodriguez, Trujillo Rodriguez & Richards, LLP, Haddonfield, NJ, Rebekah R. Conroy, Walder Hayden & Brogan, Roseland, NJ, Peter S. Pearlman, Cohn, Lifland, Pearlman, Herrmann & Knopf, LLP, Saddle Brook, NJ, for Plaintiffs.

Kevin J. McKenna, Mara E. Zazzali, Jennifer A. Hradil, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, PC, Newark, NJ, for Defendants.

*OPINION*

HOCHBERG, J.

**\*1** THIS DOCUMENT RELATES TO: ALL ACTIONS

This matter is before the Court upon a settlement agreement between the manufacturers of the anti-depressant drug Remeron, Organon U.S.A. and Akzo Nobel N.V. (collectively "Defendants" or "Organon"), and the direct purchasers of Remeron ("Plaintiffs"). The settling parties seek (1) final approval of their class action settlement agreement and plan of allocation and (2) award of attorneys' fees to Plaintiffs' Counsel, reimbursement of litigation expenses, and incentive awards to named Plaintiffs. The Court preliminarily approved the settlement at a hearing on August 30, 2005. The final Fairness Hearing was conducted on November 2, 2005.

I. BACKGROUND

A. The Litigation

1. *The Complaint*

In 2003, direct purchasers of Remeron ("Direct Purchasers") filed class action complaints against Defendants. The complaint alleges that Defendants violated Section 2 of the Sherman Act, 15 U.S.C. § 2, by: (a) using various illegal and deceptive means as part of an overall scheme to improperly create and extend patent protection for the drug mirtazapine, which Defendants sold under the brand-name Remeron, by manipulating the Hatch–Waxman statutory scheme; (b) committing affirmative misrepresentations and failing to disclose material prior art in the prosecution of U.S. Patent No. 5,977,099 (the "'099 patent") before the United States Patent and Trademark Office ("PTO"); (c) making false and misleading representations to the Food and Drug Administration ("FDA") to obtain the listing of the '099 patent in the FDA's Orange Book in a wrongful manner; (d) submitting the '099 patent for listing in the Orange Book approximately 14 months beyond the FDA-mandated deadline for patent listing; and (e) filing and prosecuting sham patent litigation against potential generic competitors.

The complaint alleges that Defendants' conduct delayed the market entry of less expensive generic versions of Remeron, thereby forcing Direct Purchasers to pay artificially inflated prices for both Remeron and its AB-rated generic equivalents (i.e. generic mirtazapine).

2. *Extensive Discovery and Litigation Prior to Settlement*

Plaintiffs' claims were the subject of extensive and contentious discovery. During three years of hotly contested litigation, Plaintiffs' Counsel composed and propounded four sets of document requests which, as ordered by the Court, were served on behalf of various coordinated direct and indirect purchaser plaintiffs, as well as subpoenas duces tecum directed to multiple third parties. Overall, more than 1 million pages of documents and data were produced by Defendants and third parties. Plaintiffs' Counsel conducted over 45 depositions of witnesses with knowledge of facts relevant to Plaintiffs' allegations. Subsequently, Plaintiffs' Counsel retained and worked closely with nearly a dozen experts in the areas of (i) patent prosecution process before the PTO and patent interpretation, (ii) the FDA regulatory regime regarding prescription drugs, (iii) the pharmaceutical industry, and (iv) antitrust economics and the calculation of damages. The opinion of these experts were necessary both to support the complex theories of liability and damages advanced by Plaintiffs, and to rebut the numerous defenses raised by Defendants.

**\*2** On September 8, 2004, the Court ruled on Defendants' motion to dismiss the complaints filed by Plaintiffs. Based on a prior opinion issued in the separate antitrust litigation between Defendants and generic drug manufacturers Mylan, Teva and Alphapharm (the "Generics"), the Court held that

In re Remeron Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2005)

2005-2 Trade Cases P 75,061

Plaintiffs were collaterally estopped from asserting claims arising from the alleged wrongful Orange Book listing and sham litigation. The Court also dismissed Plaintiffs' *Walker Process* claim for lack of standing. Following this opinion, every plaintiff group other than the Direct Purchasers, including the Generics and all other direct and indirect purchasers, chose to settle their claims.

This litigation further engendered significant dispositive motion practice in the form of motions for summary judgment filed by both sides. Plaintiffs filed three separate motions for partial summary judgment, including motions seeking findings that: (a) Defendants were estopped from relitigating certain findings from the prior patent litigation and, therefore, that the patent litigation was objectively baseless; (b) that the '099 patent was not eligible for listing in the Orange Book; and (c) that Defendants possessed monopoly power over mirtazapine.

In opinions dated September 7, 2004 and February 18, 2005, the Court denied the first and third of these motions, determining, respectively, that (i) Defendants would not be estopped from litigating the objective bases for the prior patent litigation, and (ii) that Plaintiffs could not prove Defendants' monopoly power based solely on "direct" evidence of Defendants' control over the price of mirtazapine.

On October 1, 2004, Defendants filed a single, omnibus motion for summary judgement, which attacked both the legal and factual bases for the "overarching scheme" and "late listing" claims. Defendants' motion also questioned Plaintiffs' ability to demonstrate the existence of monopoly power in a properly defined relevant market. Defendants' motion was pending at the time the Settlement was preliminarily approved, and even a partial finding in Defendants' favor could have severely limited, or barred entirely, the ability of the Direct Purchasers to recover.

On October 27, 2003, Plaintiffs filed their motion for class certification, together with a memorandum of law explaining, *inter alia,* Plaintiffs' theory of class-wide antitrust injury and proposed method of calculating Class damages, supported by the testimony of an expert economist. In preparation for and in furtherance of the class certification motion, Plaintiffs' Counsel engaged in a comprehensive review of numerous issues specific to the pharmaceutical industry, including the economic structure, pricing, and distribution practices of branded and generic manufacturers. Such preparations were necessary in order to support Plaintiffs' motion and rebut numerous defenses to class certification raised by Defendants, including their reliance on the Eleventh Circuit's decision in *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.,* 350 F.3d 1181 (11th Cir.2003), which came down during the pendency of this case, and engendered significant supplemental briefing and arguments on the issue of class certification. *See id.* Class certification was granted here only after the Settlement had been proposed, and the Defendants stipulated not to oppose Plaintiffs' certification request.

B. Mediation and Settlement

**\*3** In March 2003, the parties began to explore the possibility of settlement. This process eventually resulted in the Settlement now before the Court, but progress toward this agreement was slow, as each party had strong conviction in their respective claims or defenses. Additionally, throughout the course of this case, the parties participated in a lengthy and complex mediation procedure utilizing both skilled mediators and the good offices of the Court. This process encompassed multiple hearings and mediation sessions, the first of which was held in January 2004 before Judge Politan.

On August 24, 2005, after full discovery, significant motion practice and a lengthy negotiation process, Plaintiffs' Counsel entered into the Settlement with Defendants. The Settlement will settle all claims arising out of or relating in any way to any conduct alleged or which could have been alleged in the Class Action relating to any alleged delay in the marketing or selling of Remeron or its generic equivalents, in exchange for payment of $75 million in cash.

The Court preliminarily approved the Settlement and certified the class at a hearing on August 30, 2005. On September 19, 2005, copies of the Notice Of Proposed Class Action Settlement and Hearing Regarding Settlement (the "Notice") were timely disseminated by first-class mail to all Class members. The Notice informed Class members, among other things, that they could object to any or all terms of the Settlement, or opt-out of the Class entirely. The deadline for opting out was October 19, 2005. No Class member has objected to, or opted-out of the Settlement.

II. ANALYSIS

A. Final Approval of Class Action Settlement

1. *Settlements That Meet Certain Conditions Are Presumed Fair*

In re Remeron Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2005)

2005-2 Trade Cases P 75,061

The Third Circuit affords an initial presumption of fairness for a settlement "if the courts finds that: (1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *In re Remeron End–Payor Antitrust Litigation,* 2005 WL 2230314, *15 (D. N.J. Sep 13, 2005)* (hereinafter "End–Payor Opinion"), *quoting In re Cendant Corp. Litig.,* 264 F.3d 201, 233 n. 18 (3d Cir.2001).

Each of these factors weighs in favor of this presumption in the instant case. First, settlement negotiations were lengthy and formal, and included both formal presentations to the Court and to skilled mediators, as well as private mediation sessions attended by members of the Class. Second, as discussed in Part I above, both fact and expert discovery in this case was completed before the Settlement was reached, and included over one million pages of document discovery, and numerous expert reports. Third, both Plaintiffs' Counsel and Defendants' Counsel are skilled and experienced litigators. Fourth, not a single member of the Class has objected to, or opted-out of, the proposed Settlement. Thus, this Court determines that an initial presumption of fairness attaches, although such finding is not dispositive.

2. *Standard for Court Approval of Settlement*

**\*4**  A class action may be settled under Rule 23(e) upon a judicial finding that the settlement is "fair, reasonable, and adequate." Fed.R.Civ.P. 23(e)(1)(C). Under Rule 23(e), this Court must determine whether the settlement is within a range that responsible and experienced attorneys could accept considering all relevant risks and factors of litigation. *See Walsh v. Great Atlantic and Pacific Tea Co.,* 96 F.R.D. 632, 642 (D.N.J.1983). The range "recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Newman v. Stein,* 464 F.2d 689, 693 (2d Cir.1972).

Because a settlement represents an exercise of judgment by the negotiating parties, cases have consistently held that the function of a court reviewing a settlement is neither to rewrite the settlement agreement reached by the parties nor to try the case by resolving issues left unresolved by the settlement. *Bryan v. Pittsburgh Plate Glass Co.,* 494 F.2d 799, 801 (3d Cir.1974); *Bullock v. Administrator of Kircher's Estate,* 84 F.R.D. 1, 4 (D.N.J.1979). "The temptation to convert a settlement hearing into a full trial on the merits must be

resisted." *Bell Atlantic Corp. v. Bolger,* 2 F.3d 1304, 1315 (3d Cir.1993).

To determine whether the settlement is fair, reasonable and adequate under Rule 23(e), courts in the Third Circuit apply the nine-factor test enunciated in *Girsh v. Jepson,* 521 F.2d 153, 157 (3d Cir.1975), and recently reaffirmed in *Warfarin Sodium,* 391 F.3d at 534–35. These factors are:

(a) The complexity, expense, and likely duration of the litigation;

(b) the reaction of the class to the settlement;

(c) the stage of the proceedings and the amount of discovery completed;

(d) the risks of establishing liability;

(e) the risks of establishing damages;

(f) the risks of maintaining the class action through the trial;

(g) the ability of the defendants to withstand a greater judgment;

(h) the range of reasonableness of the settlement fund in light of the best possible recovery; and

(i) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Id.* (quoting *Girsh,* 521 F.2d at 156–57).

3. *Evaluation of the Settlement Under Applicable Standards*

a. The Complexity, Expense and Likely Duration of the Litigation

This factor requires examination of the additional cost, in time, money and judicial resources, of continued litigation. Courts must balance a proposed settlement against the enormous time and expense of achieving a potentially more favorable result through further litigation. *See, e.g., In re Sunbeam Securities Litigation,* 176 F.Supp.2d 1323, 1332 (S.D.Fla.2001) (more than three years of complex litigation before settlement reached).

The settlement of this complex antitrust action is clearly favored in view of the long litigation road yet to be traveled. *See, e.g., Behrens v. Wometco Enters., Inc.,* 118 F.R.D.

In re Remeron Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2005)

2005-2 Trade Cases P 75,061

534, 543 (S.D.Fla.1988), *aff'd* 899 F.2d 21 (11th Cir.1990) ("The law favors compromises in large part because they are often a speedy and efficient resolution of long, complex and expensive litigations.").

**\*5**  This case has already been long and hard-fought. Prior to the Settlement, the parties completed significant and voluminous fact and expert discovery, and fully litigated Defendants' motion to dismiss. Still pending are Plaintiffs' motion for class certification, and multiple motions for summary judgment. As this Court observed with respect to the end-payor settlement, "thousands of pages of materials were filed with this Court on summary judgment issues such as market definition, market power, and improper / late listing in the FDA Orange Book." End–Payor Opinion at \*17. Absent the Settlement, these motion would have required considerable additional work on the part of the parties and the Court to fully litigate.

Further, if the case were not concluded on summary judgment, a lengthy and expensive trial on liability and damages allegedly caused by Defendants' alleged violations of Sherman Act § 2 would likely have followed. Trial preparation on both sides would be necessary. Given Defendants' vigorous advocacy of their contention that they did not violate the Sherman Act, and the complex theories advanced for liability, it would be likely to expect appeals from any result reached on the question of liability or of damages. Avoidance of this expenditure of time and resources clearly benefits all parties. *See In re General Motors Pick–Up Trust Fuel Tank Products Liab. Litig.*, 55 F.3d 768, 812 (3d Cir.1995) (concluding that lengthy discovery and ardent opposition from the defendant with "a plethora of pretrial motions" were facts favoring settlement, which offers immediate benefits and avoids delay and expense); *Rolland v. Cellucci*, 191 F.R.D. 3, 10 (D.Mass.2000) (prospect of two week trial "would have imposed significant preparatory time on everyone and would likely have required the court several months to issue an opinion.").

Finally, even if a trial resulted in a judgment for Plaintiffs, such judgment might not equal the amount of the Settlement, while Plaintiffs would have incurred additional expense and delay, as well as the risk of non-recovery based on a verdict for Defendants or reversal of a verdict for Plaintiffs on appeal. Therefore, this factor weighs in favor of approving the Settlement.

b. The Reaction of the Class to the Settlement

The response of the Class to the proposed Settlement also supports approval. As described above in Part I, the Settlement Notice included a description of: (a) the allegations of the Class Action; (b) the Class certified by the Court; (c) Class members' rights to opt-out or object under Rule 23; (d) the proposed plan of allocation; (e) the attorneys' fees, reimbursement of expenses and incentive award that would be sought, and (f) the process for Court approval. All Class members were sent copies of the Notice. The deadline for serving objections to the Settlement was October 26, 2005. No Class members have objected to, or have chosen to opt out of, the Settlement. Moreover, as noted above, the three largest Class members have closely monitored the Class Action, with the assistance of their own outside counsel, by attending meditation sessions and court hearings. These Class members were informed of, and agreed to, the material terms of the Settlement Agreement prior to its execution.

**\*6**  Such acceptance of the Settlement on the part of the Class is convincing evidence of the Settlement's fairness and adequacy. *See Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118–119 (3d Cir.1990) ("only" 29 objections in 281 member class "strongly favors settlement"); *see generally In re Prudential Ins. Co. of America Sales Practices Litigation*, 148 F.3d 283, 318 (3d Cir.1998) (affirming conclusion that class reaction was favorable where 19,000 policyholders out of 8 million opted out and 300 objected). These factors weigh in favor of the Settlement.

Furthermore, where, as here, a class is comprised of sophisticated business entities that can be expected to oppose any settlement they find unreasonable, the lack of objections indicates the appropriateness of the Settlement. *See In re M.D.C. Holdings Securities Litigation*, 1990 WL 454747, \*10 (S.D.Cal. Aug 30, 1990) (lack of objections "is significant since the class includes sophisticated financial institutions ... who have counsel available to advise and represent them and submit objections to either the settlement or the fees and expenses"). The absence of objections from the sophisticated Class is particularly significant here because many Class members here have also been members of classes certified in other pharmaceutical antitrust actions (*see, e.g., In re Relafen Antitrust Litigation*, 231 F.R.D. 52, 2005 WL 2386119 (D.Mass. Sep.28, 2005); *In re Cardizem CD Antitrust Litig.*, No. 99–73259 (E.D.Mich. Nov. 25, 2002); *In re Buspirone Patent and Antitrust Litigation*, 210 F.R.D. 43 (S.D.N.Y.2002)), and are therefore well suited to evaluate a proposed settlement in an action of this type.

In re Remeron Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2005)

2005-2 Trade Cases P 75,061

c. The Stage of the Proceedings and the Amount of Discovery Completed

The purpose of this *Girsh* factor is to ensure that Class Counsel has an "adequate appreciation of the merits of the case before negotiating" a settlement. *In re Prudential,* 148 F.3d at 319, *quoting In re General Motors,* 55 F.3d at 813. In the present case, the Settlement comes only after the parties had sufficient time to understand and evaluate their respective positions.

As discussed in Part I, discovery in this case spanned more than a year, is complete, and has been extensive. This discovery included the entire record in the underlying patent litigation, numerous interrogatories and document requests, as well as third-party subpoenas to pharmaceutical manufacturers and consultants to the pharmaceutical industry. Direct Purchasers Plaintiffs reviewed over one million pages of documents and data produced by Defendants and third parties. Plaintiffs also answered extensive interrogatories and produced voluminous records, and both Plaintiffs' and Defendants' experts have been extensively deposed.

Given this vast amount of discovery obtained, and the volume of motion practice that enabled Plaintiffs' Counsel to preview some of the defenses that Defendants would advance, Plaintiffs' Counsel had a valid basis to negotiate a settlement. *See In re Lucent Technologies, Inc., Securities Litigation,* 307 F.Supp.2d 633, 638 (D.N.J.2004). Moreover, the mediation and negotiation process was itself rigorous and involved, giving the parties ample opportunity to assess the strengths of their respective claims and defenses before both learned mediators and the Court. *See In re Linerboard Antitrust Litig.,* 296 F.Supp.2d 568, 578 (E.D.Pa.2003) (noting positively that settlement talks involved "a number of face to face meetings and telephone conferences.").

 **\*7** As a result of the parties' efforts, the litigation had reached the stage where "the parties certainly [had] a clear view of the strengths and weaknesses of their cases." *Bonett v. Educational Debt Service, Inc.,* 2003 WL 21658267, \*6 (E.D.Pa. May 9, 2003), *quoting In re Warner Communications Sec. Litig.,* 618 F.Supp. 735, 745 (S.D.N.Y.1985). Thus, the final Settlement occurred only after the parties and the Court were able to assess its fairness adequately.

d. The Risks of Establishing Liability

This factor surveys the possible risks of litigation in order to balance the likelihood of success and potential damages against benefit of settlement. *In re Prudential,* 148 F.3d at 319. The history and current status of the litigation indicate that Plaintiffs face significant risk even before reaching trial. In an opinion dated September 8, 2004, this Court dismissed Plaintiffs' claims arising from allegations of fraud in connection with the prosecution of the '099 patent, wrongful listing of that patent in the Orange Book, and subsequent sham litigation. Therefore, without this Settlement, Plaintiffs would have to proceed on two claims: (1) the claim relating to the Defendants' decision to list the '099 patent 14 months after the deadline to do so established by FDA regulations (the "late listing claim"); and (2) Plaintiffs' claim that Defendants had engaged in an overarching scheme to delay competition, the net effect of which was anticompetitive, even if the individual acts of the scheme were not actionable under Section 2 of the Sherman Act (the "overarching scheme claim"). The risk to those surviving claims was immediate: pending before the Court at the time the Settlement was proposed was Defendants' omnibus motion for summary judgment, wherein Defendants argued that the late listing and overarching scheme claims were barred entirely by the Court's prior findings and Supreme Court precedent.

Finally, if Plaintiffs had succeeded in reaching trial, Plaintiffs would have had to prove that Defendants (1) possessed monopoly power, and (2) willfully acquired or maintained that power as distinguished from the growth or development of such due to a superior product, business acumen, or historic accident. *U.S. v. Grinnell Corp.,* 384 U.S. 563, 571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). Defendants raised numerous legal and factual defenses, including, *inter alia,* assertions that Direct Purchasers' claims: (1) involved no cognizable antitrust injury or damage; (2) were barred by the Noerr–Pennington doctrine; (3) were barred for failure to define properly an antitrust market; (4) described harm that was effectively "passed-on" to third parties; and (5) were time-barred by the applicable statute of limitations. Moreover, the Court's February 18, 2005 opinion denying Plaintiffs' motion for partial summary judgment on the issue of monopoly power would require Plaintiffs to prepare a complex and detailed analysis of the "relevant market" in which Remeron competed, in order to demonstrate the existence of antitrust liability. These risks of proving liability weigh in favor of approving this settlement.

e. The Risks of Establishing Damages

**\*8**  The fifth *Girsh* factor to be analyzed when considering the fairness of a settlement is "the risk of establishing damages." *Girsh,* 521 F.2d at 157. This factor "attempts to measure the expected value of litigating the action rather than settling it at the current time." *In re Cendant,* 264 F.3d at 239. To the extent that establishing damages is contingent upon liability, many of the same risks discussed in the previous section are also present here. Furthermore, there are substantial risks in proving damages, which the parties have avoided by virtue of the proposed settlement.

The determination of damages is a complicated and uncertain process. In the present case, the parties offered competing expert reports which included significantly different estimates of overcharge damages to which Plaintiffs would be entitled assuming liability could be proven at trial. Plaintiffs' expert economist estimates that the maximum antitrust damages (prior to trebling) ranged from $108 million to $133 million, while Defendants' expert, relying on a similar damage model but disagreeing on certain material assumptions, estimated the same range as $23.9 million to $29.7 million. It is by no means certain that Plaintiffs would have succeeded in recovering the maximum measure of damages estimated by Plaintiffs' expert. *See, e.g., In re Aetna Inc. Sec. Litig.,* 2001 WL 20928, \*10 (E.D. Pa. Jan 4, 2001) ("Plaintiffs' damages theories rested primarily on the testimony and reports of expert witnesses. Such experts would likely have been challenged on *Daubert* or other grounds. Plaintiffs, therefore, risked the rejection of its experts first by the Court pursuant to Federal Rule of Evidence 104(a), or by the jury in assessing credibility."); *In re Prudential Ins. Co. of America Sales Practices Litigation,* 962 F.Supp. 450, 539 (D.N.J.1997) ("a jury's acceptance of expert testimony is far from certain, regardless of the expert's credentials"); *In re Safety Components, Inc. Securities Litigation,* 166 F.Supp.2d 72, 90 (D.N.J.2001). Therefore, the risks of proving damages weigh in favor of approving the settlement.

f. The Risks of Maintaining the Class Action Through Trial
"Because the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the [class] action, this factor measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial." End–Payor Opinion at \*23, *quoting In re Warfarin Sodium Antitrust Litigation,* 391 F.3d 516, 537 (3d Cir.2004) (internal quotes and citation omitted). The Settlement here comes after Plaintiffs' motion for class certification has been fully briefed. The briefing submitted indicates that this is a hotly contested issue, with Defendants raising multiple factual and legal arguments in opposition to certification. Class certification was granted here only after the Settlement had been proposed, and the Defendants had stipulated not to oppose Plaintiffs' certification request. Thus, the risks faced by Plaintiffs with regard to class certification weigh in favor of approving the Settlement.

g. The Ability of the Defendants to Withstand a Greater Judgment
**\*9**  The parties do not contend that Defendants could not withstand a larger judgment. However, as this Court has noted, "many settlements have been approved where a settling defendant has had the ability to pay greater amounts." End–Payor Opinion at \*23, *citing Warfarin Sodium,* 391 F.3d at 538 ("[T]he fact that DuPont could afford to pay more does not mean that it is obligated to pay any more than what the ... class members are entitled to under the theories of liability that existed at the time the settlement was reached."); *Young Soon Oh v. AT & T Corp.,* 225 F.R.D. 142, 150–51 (D.N.J.2004); *In re Linerboard Antitrust Litig.,* 321 F.Supp.2d 619, 632 (E.D.Pa.2004); *Erie County Retirees Assoc. v. County of Erie, Pennsylvania,* 192 F.Supp.2d 369, 376 (W.D.Pa.2002); *Lazy Oil Co. v. Witco Corp.,* 95 F.Supp.2d 290, 318 (W.D.Pa.1997). This factor does not favor nor disfavor the Settlement.

h. The Range of Reasonableness of the Settlement In Light of the Best Possible Recovery
An assessment of the reasonableness of a proposed settlement seeking monetary relief requires analysis of the present value of the damages a plaintiff would likely recover if successful, appropriately discounted for the risk of not prevailing. *See In re Prudential,* 148 F.3d at 322. As this Court previously noted, "[i]n order to evaluate the propriety of an antitrust class action settlement's monetary component, a court should compare the settlement recovery to the estimated single damages. Although in certain circumstances a plaintiff class may recover treble damages if it prevails at trial, that result is far from certain." End–Payor Opinion at \*24, *citing In re Ampicillin Antitrust Litig.,* 82 F.R.D. 652, 654 (D.D.C.1979); *Detroit v. Grinnell Corp.,* 495 F.2d 448 (2d Cir.1974).

In the present case, Plaintiffs' expert economist estimates that the maximum antitrust single damages ranged from $108 million for the "late listing" claim, to $133 million for the "overarching scheme" claim. Accordingly, the Settlement represents 56% to 69% of the maximum single damages Plaintiffs could hope to recover, provided that liability was proven at trial. This is above the range of settlements

In re Remeron Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2005)

2005-2 Trade Cases P 75,061

routinely granted final approval. *See* End–Payor Opinion at *24 ("[A]n antitrust class action settlement may be approved even if the settlement amounts to a small percentage of the single damages sought, if the settlement is reasonable relative to other factors"); *see also In re Cendant Corp. Litig.,* 264 F.3d 201, 231 (3d Cir.2001) (approving settlement of 36% of total damages and noting that typical recoveries in complex securities class actions range from 1.6%—14% of estimated damages); *In re Linerboard Antitrust Litig.,* 2004 WL 1221350, *5 (E.D.Pa. June 2, 2004) (collecting cases in which courts have approved settlements of 5.35% to 28% of estimated (single) damages in complex antitrust actions); *In re Aetna,* 2001 WL 20928, *4 (approving settlement of approximately 10% of total damages of $830 million); *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.,* 2005 WL 1213926 (E.D.Pa. May 19, 2005) (Recovery of 11.4% of estimated single damages "compares favorably with the settlements reached in other complex class action lawsuits.")

**\*10** Moreover, in light of the highly contested nature of liability, it is likely that any judgment entered would have been the subject of post-trial motions and appeals, further prolonging the litigation and delaying the value of any recovery. *See, e.g., Parks v. Portnoff Law Associates, Ltd.,* 243 F.Supp.2d 244, 253 (E.D.Pa.2003). An appeal of a damage award could seriously and adversely affect the scope of an ultimate recovery, if not the recovery itself. *See Backman v. Polaroid Corp.,* 910 F.2d 10 (1st Cir.1990) (class won a jury verdict and a motion for judgment N.O.V. was denied, but on appeal the judgment was reversed and the case dismissed); *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263 (2d Cir.1979) (reversal of multimillion dollar judgment obtained after protracted trial); *Trans World Airlines, Inc. v. Hughes,* 312 F.Supp. 478, 485 (S.D.N.Y.1970), *modified,* 449 F.2d 51 (2d Cir.1971), *rev'd* 409 U.S. 363, 366, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973) ($145 million judgment overturned after years of litigation and appeals). Thus, the range of reasonableness of the settlement in light of the best possible recovery favors the Settlement.

i. The Range of Reasonableness of the Settlement to a Possible Recovery In Light of all the Attendant Risks of Litigation

This factor requires the Court to examine the terms of settlement from a "slightly different vantage point[ ]" than reasonableness in light of the best recovery. *In re General Motors,* 55 F.3d at 806. As this Court noted, "a court evaluating a proposed class action settlement should also consider 'whether the settlement represents a good value for

a weak case or a poor value for a strong case.' " End–Payor Opinion at *23, *quoting Warfarin Sodium,* 391 F.3d at 538; *see also Girsh,* 521 F.2d at 157 (court must examine the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation).

As discussed above, this litigation involves difficult legal and factual issues regarding a claim for damages resulting from Defendants' alleged violation of Section 2 of the Sherman Act. Thus, in light of the significant size of the settlement fund relative to the potential recoverable damages, the Settlement represents a good value for a strong case, albeit one where numerous critical legal issues have not been determined and are therefore uncertain. In addition, even if Plaintiffs successfully prevailed on those issues at trial, Defendants would likely appeal, resulting in further delaying any recovery for the Class. The Court is satisfied that the Settlement accounts for the risks inherent in this complex litigation and provides appropriate relief in light of these risks.

j. Conclusion

Given this Court's analysis, the Court concludes that the nine-factor test utilized by the Third Circuit is satisfied. The settlement is fair, adequate, and reasonable under Federal Rule of Civil Procedure 23(e).

B. Approval of the Plan of Allocation

**\*11** "As with settlement agreements, courts consider whether distribution plans are fair, reasonable, and adequate." *In re Lorazepam & Clorazepate Antitrust Litig.,* 205 F.R.D. 369, 381 (D.D.C.2002); *see also In re Vitamins Antitrust Litig.,* 2000 WL 1737867, at *6 (D.D.C. Mar.31, 2000). "[I]n evaluating the formula for apportioning the settlement fund, the Court keeps in mind that district courts enjoy broad supervisory powers over the administration of class action settlements to allocate the proceeds among the claiming class members equitably." *Hammon v. Barry,* 752 F.Supp. 1087, 1095 (D.D.C.1990) (internal quotation marks and citations omitted); *accord In re "Agent Orange" Prod. Liability Litig.,* 818 F.2d 179, 181 (2d Cir.1987).

Plaintiffs propose to allocate the Settlement funds, net of Court approved attorneys' fees, incentive award, and expenses ("Net Settlement Fund"), in proportion to the overcharge damages incurred by each Class member due to Defendants' alleged conduct in restraint of trade. Such a method of allocating the Net Settlement Fund is inherently reasonable. *See In re Lucent Technologies, Inc., Securities Litigation,* 307

F.Supp.2d 633, 649 (D.N.J.2004) ("A plan of allocation that reimburses class members based on the type and extent of their injuries is generally reasonable."); *In re Corel Corp. Inc. Securities Litigation,* 293 F.Supp.2d 484, 493 (E.D.Pa.2003) (Courts "generally consider plans of allocation that reimburse class members based on the type and extent of their injuries to be reasonable.") *quoting Aetna Inc. Sec. Litig.,* 2001 WL 20928, *12 (E.D.Pa. Jan.4, 2001).

The Plan of Allocation provides a method for determining each Class member's pro-rata share of the Net Settlement Fund. Specifically, the Plan of Allocation describes: 1) the method of calculating each Class member's overcharge damages and pro-rata share of the Net Settlement Fund; 2) the contents and method of disseminating a Claims Notice form; 3) the manner in which claims will be initially reviewed and processed; 4) the method of notifying Class members of the amount that each Class member will receive from the Net Settlement Fund ("Notice of Class Member Distribution Amount"); and 5) the process for handling and resolving challenged claims.

The Plan of Allocation also includes the deadlines for completing the following tasks related to distributing each Class member's pro-rata share of the Net Settlement Fund: 1) preparation and dissemination of the Claims Notice form; 2) receipt by Claims Administrator of completed Claims Notice form and supporting documentation; 3) curing deficiencies in any Claims Notice form or supporting documentation submitted by Class member; 4) disseminating the Notice of Class Member Distribution Amount; and, 5) challenging and resolving disputes over the Claims Administrator's determination of each Class member's distribution amount.

As the Plan of Allocation appears fair based on Plaintiffs' expert economist's calculations, and the three largest Class members support it, and the lack of any objections to it, this Court gives the plan final approval.

### C. Plaintiffs' Motion for Award of Attorneys' Fees, Interest, Reimbursement of Expenses and Incentive Awards

**\*12** Class Counsel requests that the Court award attorneys' fees in the amount of $25 million plus interest accrued on that amount since it has been held in escrow. The $25 million requested fee represents 33 1/3 % of the $75 million Settlement Fund. Class Counsel also requests recovery of litigation expenses and incentive awards to named Plaintiffs.

### 1. Attorneys' Fees and Interest

This Court first finds that the percentage of fund method is the proper method for compensating Plaintiffs' Counsel in this common fund case. *See, e.g., In re Prudential Ins. Co. Of America Sales Practices Litig.,* 148 F.3d 283, 333 (3d Cir.1998) (stating "the percentage of recovery method is generally favored in cases involving a common fund, and is designed to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure"); *In re Cendant Corp. PRIDES Litig.,* 243 F.3d 722, 734 (3d Cir.2001) (stating "the percentage-of-recovery method has long been used in this Circuit in common-fund cases").

The Third Circuit set forth with specificity the factors that a court should consider in evaluating such requested attorneys' fees in *Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190, 195 (3d Cir.2000) (overturning a decision that reduced a requested fee of 25% of the recovered fund to 18%). The *Gunter* factors "need not be applied in a formulaic way, and their weight may vary on a case-by-case basis." *Oh v. AT & T Corp.,* 225 F.R.D. 142, 146 (D.N.J.2004) (citing *Gunter,* 223 F.3d at 195). The *Gunter* factors include (a) the size of the fund created and number of persons benefitting from the settlement, (b) the presence/absence of substantial objections to the fee, (c) the skill of Plaintiffs' counsel, (d) complexity and duration of the litigation, (e) the risk of nonpayment, (f) amount of time devoted to the litigation, (g) awards in similar cases. *See Gunter,* 223 F.3d at 195; *In re Aremissoft Corp. Sec. Litig.,* 210 F.R.D. 109, 129 (D.N.J.2002).

### a. The Size and Nature of the Common Fund Created, and the Number of Class Members Benefitted by the Settlement

The Class here is comprised of approximately 70 business entities, as identified from Defendants' sales records. These entities will share in a settlement worth $75 million in cash, less attorneys' fees, expenses and incentive award as granted by the Court. The magnitude of this recovery is significant when measured against the estimates as to the potential values of Plaintiffs' claims made by the parties' experts during the course of this litigation. *See, e.g., In re General Instrument Securities Litig.,* 209 F.Supp.2d 423 (E.D.Pa.2001) (awarding a one-third fee, and finding that a $48 million fund to be shared by a class of thousands is "quite large" and exceeds "twice the amount that defendants' expert claimed plaintiffs could recover under the best circumstances."); *In re Linerboard Antitrust Litig.,* 2004 WL 1221350 (E.D.Pa. June 2, 2004) ($202 million settlement valued at 42 percent

of damages (prior to trebling) is "highly favorable" factor in granting counsel's 30% fee request).

**b. The Absence of Objections**

**\*13**  Following preliminary approval of the Settlement and the form and manner of notice to the Class, individual notice was mailed to Class members and posted on Co–Lead Counsel's websites. The notice informed potential Class members that Class Counsel would be seeking fees of up to 33 1/3% of the Settlement Fund, reimbursement of expenses, plus interest thereon, and incentive awards for each of the named plaintiffs in the Class Action.

Class Counsel have received no objections from the Class.[1] The lack of objections from the Class supports the reasonableness of the fee request. *See Stoetzner v. United States Steel Corp.,* 897 F.2d 115, 11–19 (3d Cir.1990) (even when 29 members of a 281 person class (i.e. 10% of the class) objected, the response of the class as a whole "strongly favors [the] settlement"); *In re Rite Aid,* 396 F.3d at 305 (stating that the fact that only two class members objected to the fee request supports approval of the fee); *In re Rent–Way Sec. Litig.,* 305 F.Supp.2d 491, 514 (W.D.Pa.2003) ( "[t]he absence of substantial objections by other class members to the fee application supports the reasonableness of Lead Counsel's request"), thus indicating the strong support of the Class for the award of fees and expenses requested.

**c. The Skill and Efficiency of Plaintiffs' Counsel**

Class Counsel include some of the preeminent antitrust firms in the country with decades of experience in prosecuting and trying complex actions. Class Counsel also include firms with extensive patent experience, who are intimately involved in numerous lawsuits involving antitrust violations based on the improper use of patents. Class Counsel have significant experience in FDA regulatory matters. The settlement entered with Defendants is a reflection of Class Counsel's skill and experience. *See In re Warfarin Sodium Antitrust Litig.,* 212 F.R.D. 231, 261 (D.Del.2002) (class counsel "showed their effectiveness through the favorable cash settlement they were able to obtain"); *see also In re Ikon Office Solutions, Inc. Sec. Litig.,* 194 F.R.D. 166, 194 (E.D.Pa.2000) (awarding 30% fee and stating "the most significant factor in this case is the quality of representation, as measured by the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel

prosecuted the case and the performance and quality of opposing counsel") (internal quotes omitted).

**d. The Complexity and Duration of the Litigation**

"As to the complexity of the case, '[a]n antitrust class action is arguably the most complex action to prosecute." ' *In re Linerboard Antitrust Litig.,* 2004 WL 1221350 at \*10, *quoting In re Motorsports Merchandise Antitrust Litig.,* 112 F.Supp.2d 1329, 1337 (N.D.Ga.2000). This antitrust action is no different. As discussed above, this matter is extremely complicated, involving the patent, regulatory and antitrust laws, including interpretation of complex provisions of the Hatch–Waxman Act.

**\*14**  The discovery process was lengthy and difficult. Class Counsel (a) reviewed over one million pages of documents, (b) conducted over 45 depositions of fact witnesses, and (c) spent thousands of hours researching, analyzing and consulting with experts on the complex issues of fact and law put at issue in this case.

Finally, as noted by this Court in the End–Payor Opinion, "the circumstances surrounding a difficult settlement increase the complexity of a case." *See* End–Payor Opinion at \*29, *citing In re Lucent Technologies, Inc. Sec. Litig.,* 327 F.Supp. 426, 434 (D.N.J.2004). Here, the Court is well aware of the long and difficult road that led to the proposed Settlement, as the Court itself frequently lent its good offices to settlement hearings and mediation sessions. Thus, the complexity of the issues involved in Class Counsel's prosecution of this litigation supports the requested fee.

**e. The Risk of Nonpayment**

A determination of a fair fee must include consideration of the sometimes undesirable characteristics of a contingent antitrust actions, including the uncertain nature of the fee, the wholly contingent outlay of large out-of-pocket sums by plaintiffs, and the fact that the risk of failure and nonpayment in an antitrust case are extremely high. *See, e.g., The Stop & Shop Supermarket Company v. SmithKline Beecham Corp.,* 2005 WL 1213926, \*11 (E.D.Pa.2005) (risk of overcoming *Noerr–Pennington* defense, among others, "favors approval of the percentage of recovery requested as a fee in this case"); *In re Linerboard Antitrust Litig.,* 2004 WL 1221350 at \*12 (risk posed by Defendants' vigorous legal and factual defenses counsel in favor of 30% fee award).

In re Remeron Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2005)

2005-2 Trade Cases P 75,061

This case is no exception to the rule. When Class Counsel undertook the representation of the named plaintiffs and the Class, there were no assurances that any fees would be received. The outcome of various motion practice in this case further increased Plaintiffs' risks. In its September 8, 2004 decision on Defendants' motion to dismiss, the Court dismissed (a) Plaintiffs' claims arising from the alleged *Walker–Process* fraud, (b) wrongful Orange Book listing and (c) sham litigation associated with the prosecution and enforcement of the '099 Patent. Following this opinion, every plaintiff group other than the Direct Purchaser Class, including the Generics and all other direct and indirect purchasers, chose to settle their claims.

Thereafter, Plaintiffs proceeded against Defendants on two theories of liability: (1) claims arising from the late-listing of the '099 patent in the Orange Book; and (2) Defendants' alleged overarching scheme to delay generic competition. The risk to those surviving claims was immediate: pending before the Court at the time the Settlement was proposed was Defendants' omnibus motion for summary judgment, wherein Defendants argued that the late listing and overarching scheme claims were barred entirely by the Court's prior findings and Supreme Court precedent, and refuted by documentary evidence and testimony from Defendants' own employees. The prospect of prosecuting such untested theories through to trial presented undeniable risk. Accordingly, the risk of non-payment in this case weigh heavily in favor of approving the fee requested.

f. The Time Devoted to this Case by Plaintiffs' Counsel was Significant

**\*15** Class Counsel has expended over 35,000 hours and advanced over $1.9 million in expenses on this case. Class Counsel has analyzed over a million pages of document discovery and has taken dozens of depositions. Class Counsel also retained and worked closely with multiple experts in the complex areas of patent law, FDA regulation and the pharmaceutical industry implicated in this case. Class Counsel fought Defendants' motion to dismiss, prepared Plaintiffs' motion for class certification, and represented the Class in the multiple mediation sessions and settlement conferences necessary to reach the Settlement. *See* End Payor Opinion at \*29 ("Class Counsel's 'efforts in posturing this case for trial ... played a role in spurring the settlement [and] produced a substantial payout to the class." ') *quoting In re Newbridge Networks Securities Litigation,* 1998 WL 765724, \*3 (D. D.C. Oct 23, 1998).

Moreover, Class Counsel will likely incur hundreds of additional hours in connection with administering the settlement, without prospect for further fees. *See Varacallo,* 226 F.R.D. at 252 (fee award will be sole compensation for counsel "despite the continuing responsibilities [counsel] will have in responding to Class Member inquiries, assisting the Claim Evaluator, consulting on individual cases, and any post-judgment proceedings and appeals.").

g. Awards in Similar Cases

The seventh and final *Gunter* factor—a comparison with attorneys' fees awarded in similar cases—also supports the fee requested by Class Counsel in the present case.

i. The requested 33 1/3% fee is within the applicable range of percentage-of-the-fund awards

"Courts within the Third Circuit often award fees of 25% to 33% of the recovery." End–Payor Opinion at \*30, *citing In re Linerboard Antitrust Litig.,* 2004 WL 1221350 (E.D.Pa. June 2, 2004) (approving 30% fee of a $202 million settlement in an antitrust class action); *Nichols v. SmithKline Beecham Corp.,* 2005 WL 950616 (E.D.Pa.2005) (approving 30% fee of the $65 million settlement in similar pharmaceutical antitrust action). A one third fee from a common fund has been found to be typical by several courts within this Circuit which have undertaken surveys of awards within the Third Circuit and others. End–Payor Opinion at \*30, *citing In re Rite Aid Corp. Sec. Litig.,* 396 F.3d 294, 306–07 (3d Cir.2005) (review of 289 settlements demonstrates "average attorney's fees percentage [of] 31.71%" with a median value that "turns out to be one-third"). *See also In re General Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 822 (3d Cir.1995) (In common fund cases "fee awards have ranged from nineteen percent to forty-five percent of the settlement fund"); *Cullen v. Whitman Medical Corp.,* 197 F.R.D. 136, 150 (E.D.Pa.2000) ("the award of one-third of the fund for attorneys' fees is consistent with fee awards in a number of recent decisions within this district"); *In re Linerboard Antitrust Litig.,* 2004 WL 1221350 at \*14 (citing with approval "a recent Federal Judicial Center study that found that in federal class actions generally median attorney fee awards were in the range of 27 to 30 percent.").

**\*16** Moreover, the requested fee is consistent with awards in other complex antitrust actions involving the pharmaceutical industry. *See In re Relafen Antitrust Litig.,* No. 01–12239–WGY (D. Mass. April 9, 2004) (awarding 33a % fee of a $175 million settlement); *In re Buspirone Antitrust Litig.,* No. 01–

In re Remeron Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2005)

2005-2 Trade Cases P 75,061

CV–7951 (JGK) (S.D.N.Y. April 1, 2003) (awarding a 33a % fee of a $220 million settlement); *North Shore Hematology– Oncology Associates, P.C. v. Bristol Myers Squibb Co.,* No. 1:04cv248 (EGS) (D.D.C. Nov. 30, 2004) (awarding a 33a % fee of a $50 million settlement); *In re Terazosin Hydrocholride Antitrust Litig.,* No. 99–MDL–1317 (S.D.Fla. Apr. 19, 2005); (awarding a 33a % fee of a $72.5 million settlement). *Cf. In re Cardizem CD Antitrust Litig.,* No. 99– 73259 (E.D.Mich. Nov. 26, 2002) (awarding 30% of a $110 million settlement).

ii. The requested 33 1/3% fee reflects the market rate in other litigation of this type

The percentage-of-the-fund method of awarding attorneys' fees in class actions should approximate the fee which would be negotiated if the lawyer were offering his or her services in the private marketplace. "The object ... is to give the lawyer what he would have gotten in the way of a fee in an arm's length negotiation." *In re Continental Illinois Sec. Litig.,* 962 F.2d 566, 572 (7th Cir.1992); *see also Missouri v. Jenkins,* 491 U.S. 274, 285–86, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989); *In re Synthroid Marketing Litig.,* 264 F.3d 712, 718 (7th Cir.2001) ("when deciding on appropriate fee levels in common-fund cases, courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time"); *see also Thirteen Appeals,* 56 F.3d at 307; *In re RJR Nabisco, Inc. Sec. Litig.,* 1992 WL 210138, *7 (S.D.N.Y. Aug.24, 1992).

In determining the market price for such services, evidence of negotiated fee arrangements in comparable litigation should be examined. *See Continental Illinois Sec. Litig.,* 962 F.2d at 573 (the judge must try to simulate the market "by obtaining evidence about the terms of retention in similar suits, suits that differ only because, since they are not class actions, the market fixes the terms"); *Synthroid Marketing Litig.,* 264 F.3d at 719 (court should evaluate fee contracts and other data from similar cases where fees were privately negotiated). Attorneys regularly contract for contingent fees between 30% and 40% with their clients in non-class, commercial litigation. *See, e.g., In re Ikon Office Solutions, Inc.,* 194 F.R.D. at 194 ("[I]n private contingency fee cases, particularly in tort matters, plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery."); *In re Orthopedic Bone Screws Products Liability Litig.,* 2000 WL 1622741, *7 (E.D.Pa. Oct.23, 2000) ("... the court notes that plaintiffs' counsel in private contingency fee cases regularly negotiate agreements providing for thirty to forty

percent of any recovery"); *Durant v. Traditional Investments, Ltd.,* 1992 WL 203870, *4 n. 7 (S.D.N.Y. Aug.12, 1992) ("contingent fee agreements up to 40 percent have been held reasonable"); *Phemister v. Harcourt Brace Jovanovich, Inc.,* 1984 WL 21981, *15 (N.D.Ill. Sept.14, 1984) ("[t]he percentages agreed on [in contingent fee arrangements in non-class action damage lawsuits] vary, with one-third being particularly common").

h. Lodestar Cross–Check

**\*17** In addition to the percentage-of-the-fund approach, the Third Circuit has suggested that it is "sensible" for district courts to "cross-check" the percentage fee award against the "lodestar" method. *Prudential,* 148 F.3d at 333. A lodestar cross-check is not a *Gunter* factor but is a "suggested practice." *In re Cendant Corp., PRIDES Litig.,* 243 F.3d at 735 (3d Cir.2001). The Third Circuit has recognized that " 'multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." ' *Id.,* at 341, *quoting* 3 Herbert Newberg & Albert Conte, Newberg on Class Actions, § 14.03 at 14–5 (3d ed.1992). "The district courts may rely on summaries submitted by the attorneys and need not review actual billing records." *In re Rite Aid,* 396 F.3d at 306–07 (footnote omitted).

The records demonstrates that Class Counsel's lodestar in this case is $13,419,645.71, resulting in a multiplier of 1.8. An examination of recently approved multipliers reveals that the multiplier requested here "is on the low end of the spectrum." End–Payor Opinion at *33, (approving multiplier of 1.73) *citing Nichols v. SmithKline Beecham Corp.,* 2005 WL 950616, *24 (E.D.Pa. Apr.22, 2005) (approving multiplier of 3.15); *In re Linerboard Antitrust Litig.,* 2004 WL 1221350, *4 (E.D.Pa. June 2, 2004) (approving a 2.66 multiplier); *Weiss v. Mercedes–Benz of N. Am., Inc.,* 899 F.Supp. 1297, 1304 (D.N.J.1995), *aff'd,* 66 F.3d 314 (3d Cir.1995) (approving a 9.3 multiplier); *In re Rite Aid Corp. Secs. Litig.,* 146 F.Supp.2d 706, 736 (E.D.Pa.2001) (multiple of over 6). This lodestar cross-check corroborates the result of the percentage-of-the-fund method.

i. Conclusion

Taking into consideration the above factors, this Court awards Plaintiffs' Counsel $25 million of the Settlement Fund, plus 33 1/3 % of the accrued interest on the Settlement Fund.

2. *Reimbursement of Reasonable Expenses*

In re Remeron Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2005)

2005-2 Trade Cases P 75,061

In addition to their request for attorneys' fees, Plaintiffs' Counsel seeks reimbursement of $1,925,667.53 in expenses. "Counsel in common fund cases are entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the case." *In re Cendant Corp.,* 232 F.Supp.2d 327, 343 (D.N.J.2002), *quoting In re Safety Components Int'l, Inc.,* 166 F.Supp.2d 72, 104 (D.N.J.2001).

Upon review of the affidavits submitted in support of this request, the Court finds the requested amount to be fair and reasonable. Plaintiffs' Counsel's expenses reflect costs expended for purposes of prosecuting this litigation, including substantial fees for experts; substantial costs associated with creating and maintaining an electronic document database; travel and lodging expenses; copying costs; and the costs of court reporters and deposition transcripts. Reimbursement of similar expenses is routinely permitted. *See* End–Payor Opinion at *32, *citing Oh v. AT & T Corp.,* 225 F.R.D. 142, 154 (D.N.J.2004) (finding the following expenses to be reasonable: "(1) travel and lodging, (2) local meetings and transportation, (3) depositions, (4) photocopies, (5) messengers and express services, (6) telephone and fax, (7) Lexis/Westlaw legal research, (8) filing, court and witness fees, (9) overtime and temp work, (10) postage, (11) the cost of hiring a mediator, and (12) NJ Client Protection Fund-pro hac vice.").

3. *Incentive Awards to Named Plaintiffs*

 **\*18** Finally, Plaintiffs' Counsel request the approval of an incentive award in the amount of $60,000, in total, for the two named plaintiffs, LWD and Meijer. The named plaintiffs spent a significant amount of their own time and expense litigating this action for the benefit of the Class. As recognized by numerous courts, such efforts should not go unrecognized. *See* End–Payor Opinion at *32, *citing In re Lorazepam & Clorazepate Antitrust Litig.,* 205 F.R.D. 369, 400 (D.D.C.2002) ("Incentive awards are not uncommon in class action litigation and particularly where ... a common fund has been created for the benefit of the entire class.... In fact, [c]ourts routinely approve incentive awards to

compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation") (internal quotations and citation omitted).

The Settlement Notice advised Class members that Class Counsel would apply for such an incentive award. No Class member objected. Moreover, the amount requested here is similar to amounts awarded in comparable settlements. *See* End–Payor Opinion at *33 (granting incentive awards of $30,000 each to two third party payor plaintiffs); *In re Linerboard Antitrust Litig.,* 2004 WL 1221350 at *18 (approving $25,000 to each representative of the classes); *see also, Yap v. Sumitomo Corp. of America,* 1991 WL 29112, *9 (S.D.N.Y. Feb.22, 1991) ($30,000 incentive awards to the named plaintiffs); *Van Vranken v. Atlantic Richfield Co.,* 901 F.Supp. 294, 300 (N.D.Cal.1995) ($50,000 incentive award to named plaintiff); *In re Dun & Bradstreet Credit Services Customer Litig.,* 130 F.R.D. 366, 373–74 (S.D.Ohio 1990) (two incentive awards of $55,000 and three incentive awards of $35,000); *In re Revco Sec. Litig.,* 1992 WL 118800, *7 (N.D.Ohio May 6, 1992) ($200,000 incentive award to named plaintiff); *Enterprise Energy Corp. v. Columbia Gas Transmission Corp.,* 137 F.R.D. 240, 250–51 (S.D.Ohio 1991) ($50,000 incentive awards to each of the six named plaintiffs); *Bogosian v. Gulf Oil Corp.,* 621 F.Supp. 27, 32 (E.D.Pa.1985) (incentive awards of $20,000 to each of two named plaintiffs). The requested incentive awards are both appropriate and reasonable.

III. CONCLUSION

For the foregoing reasons, (a) Direct Purchasers Plaintiffs' motion for final approval of the Settlement, and (b) Class Counsel for Direct Purchasers Plaintiffs' motion for attorneys' fees of $25 million (plus accrued interest), litigation expenses, and incentive awards to Named Plaintiffs are granted.

**All Citations**

Not Reported in Fed. Supp., 2005 WL 3008808, 2005-2 Trade Cases P 75,061

**Footnotes**

1    The support of the fee request by Class members here is even more significant. When a class is comprised of sophisticated business entities that can be expected to oppose any request for attorney fees they find unreasonable, the lack of objections "indicates the appropriateness of the [fee] request." *Cimarron Pipeline Construction, Inc. v. Nat'l Council on Compensation Ins.,* 1993 WL 355466, *1–2 (W.D.Ok. June 8, 1993); *In re Sequoia Systems, Inc. Sec. Litig.,* 1993 WL 616694, *1 (D.Mass. Sept.10, 1993) (finding "influential" the fact that no class member had objected to the fee request

In re Remeron Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2005)

2005-2 Trade Cases P 75,061

of one-third); *In re M.D.C. Holdings,* 1990 WL 45474 at *10 n. 5 (lack of objections "is significant since the class includes sophisticated financial institutions ... who have counsel available to advise and represent them and submit objections to either the settlement or the fees and expenses"). Courts have reasoned that favorable responses by sophisticated Class members is persuasive, since those class members are capable, independent of the assistance of Class Counsel, of evaluating the reasonableness of all aspects of a class action settlement. *See, e.g., Muehler v. Land O'Lakes, Inc.,* 617 F.Supp. 1370, 1374 (D.Minn.1985) ("The turkey growers in this class are sophisticated businesspeople, who possessed the degree of knowledge and ability sufficient to raise an objection if they believed the fee application was excessive").

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 2530418
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

IN RE REMICADE
ANTITRUST LITIGATION

CIVIL ACTION No. 17-cv-04326
|
Filed March 15, 2023

**MEMORANDUM**

MARSTON, District Judge

**\*1** This is a consolidated, putative class indirect-purchaser antitrust action in which Named Plaintiffs Local 295 Employer Group Welfare Fund and National Employees Health Plan allege that Defendants Johnson & Johnson and Janssen Biotech, Inc. engaged in anticompetitive conduct related to their infliximab biologic, Remicade, in violation of federal and state antitrust laws and state consumer protection laws. Presently before the Court is Plaintiffs' Motion for Final Approval of Settlement, Plan of Allocation and Distribution, Award of Attorneys' Fees and Expenses, and Service Awards (the "Motion"). (Doc. No. 195.) The Court held a final approval hearing on February 27, 2023. For the reasons below, the motion is granted.

## I. Background

The Court set forth the facts of the background litigation and Settlement Agreement at length in its August 2, 2022 Memorandum preliminarily approving the Settlement (*see* Doc. No. 177) and therefore need not repeat them here.[1] Below, the Court outlines the additional facts and procedural history that have arisen since then.

### *A. Preliminary Approval and the Notice Period*

On August 2, 2022, the Court preliminarily approved the Settlement, the Notice Plan, and the Plan of Distribution and Allocation, and it appointed Gilardi & Co., LLC ("Gilardi") to serve as the Settlement Administrator. (Doc. Nos. 177, 178.)

Gilardi commenced the Notice Plan on August 30, 2022. (Doc. No. 195-2 at ¶ 10.) "The Notice Plan used a combination of individual mailed notice and paid notice placements in industry-related trade media to reach the third-party payor ('TPP') portion of the Settlement Class, as well as a combination of notice placements in a well-read consumer publication and digital notices placed on a variety of websites to reach the consumer portion of the Settlement Class." (Doc. No. 195-4 at ¶ 5.) "The Notice Plan reached virtually all TPP Settlement Class members and approximately 80% of likely consumer Settlement Class members." (*Id.*)

*TPP Mailing.* On September 9, 2022, Gilardi mailed the Postcard Notice to 23,509 TPP entities contained in its proprietary database via the United States Postal Service ("USPS"). (*Id.* at ¶ 9.) Before mailing the notice, the addresses were checked against the National Change of Address ("NCOA") database, certified via the Coding Accuracy Support System ("CASS"), and verified through Delivery Point Validation ("DPV"). (*Id.* at ¶ 10.) Notices that were returned as undeliverable were re-mailed to any address available through postal service information. (*Id.* at ¶ 11.) Mailings that were returned and "did not contain an expired forwarding order with the new address indicated," were "researched through standard skip tracing" and notice was "re-mailed if a new address was obtained." (*Id.*)

**\*2** Gilardi also emailed the contents of the Postcard Notice to 1,797 TPP entities with available email addresses. (*Id.* at ¶ 9.)

*TPP Paid Media.* Gilardi also advertised on trade websites and in digital trade e-newsletters. (*Id.* at ¶ 13.) Specifically, Gilardi had "approximately 75,000 impressions" distributed on the Society for Human Resource Management ("SHRM") website for 30 days, from September 1 to 30, 2022. (*Id.*) During that same time frame, Gilardi also "caused approximately 60,000 impressions to be delivered on Think Advisor's Life/Health channel of their website." (*Id.*) Additionally, Gilardi arranged for digital notice to appear in SHRM's HR Daily e-newsletter[2] on August 30, 2022 and September 22, 2022, and in ThinkAdvisor Life/Health Daily's e-newsletter[3] on September 5, 6, 7, 8 and 9, 2022. (*Id.* at ¶ 14.) Further, on August 16, 2022, Gilardi distributed a press release to media outlets nationwide via PR Newswire. (*Id.* at ¶ 15.)

*Consumer Media.* As for the consumer portion of the Settlement Class, Gilardi arranged for the Summary Notice to be published in the nationwide print edition and online digital replica of the September 26, 2022 issue of *People* magazine.

(*Id.* at ¶ 16.) In addition, Gilardi "purchased approximately 72,800,000[4] impressions programmatically to be distributed on desktop and mobile devices via various websites and on Facebook from August 16, 2022 through September 30, 2022." (*Id.* at ¶ 17.) These "were geographically targeted to adults 18 years of age and older nationwide and in Puerto Rico, Guam, the U.S. Virgin Islands, the Northern Mariana Islands, and in American Samoa." (*Id.*) Furthermore, Gilardi contacted several organizations and support groups for assistance in sharing information with their members and audiences. (*Id.* at ¶ 18.) The organizations included Crohn's & Colitis Foundation, The Arthritis Foundation, American Juvenile Arthritis Foundation, and Rheumatoid Arthritis Foundation, and the support groups included the REMICADE (infliximab) Users and Support and Remicade Moms groups on Facebook, as well as the Crohn's Forum, My Crohn's and Colitis Team, and My RATeam online groups. (*Id.*)

*Response Mechanisms.* On September 2, 2022, the informational settlement website www.RemicadeSettlement.com went live. (*Id.* at ¶ 19.) Consumer and TPP Settlement Class members were able to file claim forms online via that website and obtain additional information and court documents. (*Id.*) A week later, on September 9, the toll-free number went live. (*Id.* at ¶ 21.) Settlement Class members were able to call the number to learn more about the Settlement and ask questions. (*Id.*) As of October 27, 2022, the settlement website had received 80,064 hits, and the toll-free number had received a total of 116 calls. (*Id.* at ¶¶ 20, 22.) The toll-free line also received six requests for Consumer Notice Packets and two requests for TPP Notice Packets to be mailed. (*Id.* at ¶ 22.)

**\*3** *Responses.* As of October 27, 2022, Gilardi had received 2,222 claims filed through the postal mail and the case website. (*Id.* at ¶¶ 20, 23.) 195 claims were submitted by TPPS and 2,027 were submitted by consumers. (*Id.* at ¶ 23.) As of January 9, 2023, Gilardi received approximately 160,227 claims filed through postal mail and the case website; 1,771 were submitted by TPPs and 158,506 were submitted by consumers. (Doc. No. 207-11 at ¶ 9.) Gilardi did not receive any exclusion requests. (*Id.* at ¶ 10.)

### B. Illinois's and Massachusetts's Attorney General's Motion to Intervene

On September 19, 2022, the Attorneys General for Massachusetts and Illinois filed a Motion to Intervene for

a limited purpose. (Doc. No. 183.) Namely, the Attorneys General objected to how their states were categorized in the Plan of Allocation and Distribution.

As outlined in the Notice and original Plan of Allocation and Distribution, a class member's claim will be calculated based on which of the three categories they fall into:

(1) Class Members who reside or have their principal place of business in a Selected State will have a claim on the Net Settlement Fund equal to that Class Member's total Remicade purchases and reimbursements;

(2) Class Members who do <u>not</u> reside or have their principal place of business in a Selected State, but who <u>did</u> purchase or reimburse for Remicade in one or more of the Selected States, will have a claim on the Net Settlement Fund equal to the sum of that Class Members total Remicade purchases and reimbursements in the Selected States, plus 1% of that Class Member's total Remicade purchases and reimbursements outside of those states";

(3) Class Members who do not reside or have their principal place of business in a Selected State and who did not purchase or reimburse for Remicade in any of the Selected States, will have a claim on the Net Settlement Fund equal to 1% of that Class Member's total Remicade purchases and reimbursements.

(Doc. No. 172-8 at 3–4 (emphasis in original).)[5] The Settlement Agreement defined "Selected States" as encompassing Arizona, Arkansas, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin. (Doc. No. 172-4 at ¶ 1.31.)

**\*4** Acting as *parens patriae* on behalf of indirect purchasers and reimbursers of Remicade in Illinois and Massachusetts, the Attorneys General argued that Illinois and Massachusetts should be included as Selected States because their respective state laws allow indirect purchasers to recover antitrust damages. (Doc. No. 183.) Plaintiffs and Defendants opposed the motion to intervene. (Doc. Nos. 186, 187.) The Court held oral argument on November 29, 2022, which was adjourned midway through so that the parties and Attorneys General could engage in negotiations.[6]

Following these discussions, on December 8, 2022, the parties filed an Amended Plan of Allocation and Distribution, which the Court approved that same day.[7] (Doc. Nos. 202, 203.) The Court also directed Plaintiffs to post the Order and Amended Plan of Allocation and Distribution to the case website. (Doc. No. 204.) The following day, December 9, the Attorneys General withdrew their motion to intervene. (Doc. No. 205.)

### C. Amended Plan of Distribution and Allocation

Under the Amended Plan of Allocation and Distribution (the "Amended Plan"), the Selected States were amended to also include Illinois and Massachusetts. (*See* Doc. No. 202-1 at 4 n.2 (" 'Selected States' include the states or commonwealths in the Settlement Agreement, but shall also include Illinois and Massachusetts.").) Massachusetts, however, is only considered a Selected State with respect to "claims filed by consumers whose Remicade purchases were made only for personal use." (*Id.*) The three categories set forth in the Amended Plan for determining Class Members' *pro rata* allocations are identical to the categories set forth in the original Plan of Allocation and Distribution. (*Compare* Doc. No. 172-5 at 4–5 & *supra* n.5, *with* Doc. No. 202-1 at 4 ¶ 5.)

Although the claims period ended for Settlement Class on November 30, 2022, the Amended Plan extended the Notice and claim filing period for Massachusetts consumer and Illinois Settlement Class members. (*See* Doc. No. 202-1 at 3 n.1 ("With the exception of Settlement Class Members in Illinois and Massachusetts, the claims period for the Settlement Class ended on November 30, 2022. For Massachusetts consumer Settlement Class Members and Illinois Settlement Class Members, however, this claim submission period shall be extended for an additional three weeks from the Notice Date, and any claims made before the last date of that period shall be considered timely. The 'Notice Date' shall be the date on which Class Counsel initiates a new, targeted digital notice campaign targeted Massachusetts consumer Class Members and Illinois Class Members. Such notice will be provided as soon as practicable after the date on which this Amended Plan of Allocation is filed with the Court.").)

### D. Additional Notice Plan Implementation

In line with the Amended Plan, Gilardi caused additional notice to be issued to Massachusetts consumer and Illinois class members in December 2022. (*See* Doc. No. 207-11.)

Specifically, on December 6,[8] Gilardi mailed additional Postcard Notices to 1,237 Illinois-based TPP entities that were contained in Gilardi's proprietary database.[9] (*Id.* at ¶ 5.) "To extend notice among the Illinois TPP and Illinois and Massachusetts consumer portions of the Settlement Class," Gilardi advertised on the *Chicago Tribune* and *Boston Globe* websites. (*Id.* at ¶ 7; *see also id.* ("Gilardi caused 85,005 impressions on the Chicago Tribune and 161,720 impressions on the Boston Globe website from December 8, 2022 through December 24, 2022").) In addition, Gilardi had 37,939,514 impressions programmatically distributed on desktop and mobile devices (e.g., tablets and smartphones) via various websites from December 7 to December 21, 2022; these were targeted to adults 18 years of age and older in Illinois and Massachusetts. (*Id.*)

**\*5** As noted *supra* Section I.A., as of January 9, 2023, Gilardi received "approximately 160,277 claims filed through both postal mail and the case website, of which 1,771 were submitted by TPPS and 158,506 were submitted by consumers." (*Id.* at ¶ 9.) "This number includes 41 Illinois TPP submissions, and 8,742 Illinois and Massachusetts consumer submissions. Of those, 15 of the Illinois TPP submissions and 198 of the Illinois and Massachusetts consumer submissions were submitted during the December claim period."[10] (*Id.*)

### E. Gomez Files an Objection

In November 2022,[11] Jose Gomez sent a letter to the Court in which he outlined nineteen objections to the Settlement. (Doc. No. 201.) Gomez states that he is a member of the class because he purchased Remicade in 2016[12] in Florida for chronic conditions. (*Id.* at 1.) Gomez did not opt out of the class or file a claim by the respective November 30, 2022 deadlines. (*Id.* ("I did not file a claim because I object to the content of the claim form as explained below and the terms. I also did not opt out because I want the settlement to change as stated below. I will file a claim or I will opt out after this Court renders final terms of the settlement and the payment provisions."); Doc. No. 178 at ¶ 7 (August 2, 2022 Order stating "all claim forms, opt-out requests and objections shall be due within 120 days after the date of this Order," i.e., November 30, 2022.)

The Court briefly summaries each of Gomez's nineteen objections below.

• **Objection 1**. Gomez objects to the November 30, 2022 opt-out deadline, arguing that it is improper to require class members to opt out before the Court grants final approval of the settlement. (*See id.* at 2 ("The requirement that people opt out PRIOR to this Court setting the terms of the settlement is not appropriate.").)

• **Objection 2**. For similar reasons, Gomez objects to the November 30, 2022 deadline for filing a claim. (*See id.* ("Claimants should not have to file a claim until the terms of the settlement are approved and they can decide if they want to participate or not.").)

• **Objection 3**. Gomez objects to the claim form, alleging that it does not allow claimants to submit a claim with a foreign address. (*See id.* at 2–3 ("I was unable to submit a claim because although I purchased Remicade in Florida, my address is in Costa Rica. Therefore, I object to the requirement that a person list a United States address as their mailing address on the claim form[.]").)

• **Objection 4**. Gomez objects to the manner in which the Net Settlement Fund will be distributed among class members, claiming that the payment amount is improperly determined based on which state the class member resides in. (*See id.* at 3 ("The payment table appears to imply they are basing payment on the state of residency.... This is an antitrust case and the location of residence has no relevance—especially when the 'present' residence is considered and not the residence at the time of the purchase of the medication.... Therefore, I object on the basis that the present residence is used, not the residence at the time of treatment or the location of the purchase.").)

**\*6**  • **Objection 5**. Gomez objects to the requirement that a class member provide their social security number when completing the claim form. (*See id.* at 3–4.)

• **Objection 6**. Gomez objects to the lack of a privacy policy governing the data provided in the claim forms. (*See id.* at 4.)

• **Objection 7**. Gomez objects to the $25 million settlement figure, arguing that it is unreasonably low. (*See id.*)

• **Objection 8**. Gomez objects to the requirement that a person provide documentation to file a claim for purchases exceeding $1,000. (*See id.* (arguing that the

"$1000 claim limitation is arbitrary and capricious as it reflects only 1/5th of the cost of a single dose" of Remicade).)

• **Objection 9**. Gomez appears to object on the basis that the checks will not remain valid for long enough, impeding the distribution of funds. (*See id.* ("Validity of checks: Any settlement by this Court should be approved with a requirement that checks be valid for the normal 180 day period. Class action administrators have been placing low stale dates on the checks such as 60 or 90 days and by the time a person receives the check – especially if a forwarder is on the address, can exceed that period. This results in funds not being distributed to the recipients and burdensome measures to have a check reissued.").)

• **Objection 10**. Gomez's tenth objection pertains to the treatment of "unclaimed property." (*See id.* at 4–5.) He "object[s] to the claims administrator not properly administering uncashed checks or unclaimed funds through ordinary unclaimed property programs as required by the laws of almost every state." (*Id.* at 5.)

• **Objection 11**. Gomez objects to the claim form again, alleging that it did not permit him to request that his settlement check be sent via ACH direct deposit or Zelle, two of the payment options listed in the Plan of Distribution. (*Id.*)

• **Objection 12**. Gomez objects to the lack of clarity on how a class member can notify the Settlement Administrator of a change in address or preferred payment type. (*See id.* ("There needs to be a simple way for claimants to change their address especially since I will most probably have to appeal this settlement and it could be years until a distribution.").)

• **Objection 13**. Gomez appears to object on the basis that PayPal, Venmo, and Zelle (payment options) may reject payments and class members may not receive notification of that event. (*See id.* ("Paypal, Venmo (and if they add it Zelle) sometimes reject payments.... The claims administrators have been doing nothing to notify claimants when Paypal etc. rejects a payment. They simply act like nothing happened and then keep or redistribute the funds. The claimant often does not receive notification of this type of event.").)

• **Objection 14**. Gomez objects on the basis that the settlement agreement is not on the website. (*See id.*)

Case 4:21-cv-00196-MWB    Document 261-1    Filed 01/20/26    Page 173 of 287

In re Remicade Antitrust Litigation, Not Reported in Fed. Supp. (2023)

• **Objection 15**. Gomez objects to the amount of expenses incurred in this litigation, arguing that it is excessive relative to the settlement amount and that there is no way for class members to discern what the expenses were. (*See id.* at 6.)

• **Objection 16**. Gomez objects to the amount of attorneys' fees requested, claiming that class counsel are receiving a "windfall." (*See id.*; *see also id.* ("This Court should not award counsel this amount of fee considering the amount of hours spent and what appears to be bloat.").)

**\*7**  • **Objection 17**. Gomez objects to the content of the short and long form notice, claiming neither "provides any real information to a potential objector." (*See id.* ("The information provided to the public through these notifications are full of legalese without even providing basic information to inform a class member. The website announcing the settlement contains basically no information and a class member has to dig through the incomplete court documents on the website to try to obtain more information.").)

• **Objection 18**. Gomez objects to the requirement that class members file their objections with the Court and class counsel by mail, arguing that it is too burdensome, and objects to the alleged requirement that objectors appear at the final approval hearing. (*See id.*)

• **Objection 19**. Gomez objects to the *pro hac vice* requirements. (*See id.* ("[T]his Court should have waived the pro hac vice requirements for class members to have attorneys appear on their behalf and file objections. When I called attorneys, some were willing to file my objections for me, but stated that there is a $200 pro hac vice fee which simply is not appropriate in this type of nationwide case. The fee for *pro hac vice* probably exceeds what I would receive through my claim.").)

### F. Gomez Amends His Objections

On January 9, 2023, Gomez filed amended objections. (Doc. No. 206-1.) In this letter, Gomez raised new objections pertaining to the Court's December 8, 2022 Order approving the Amended Plan of Allocation and Distribution, clarified his original objections, and removed resolved objections. (*Id.* at 2.)

*Withdrawn Objections.* Gomez withdrew Objection 14. (*Id.* at 7 n.6 ("Originally, Objector could not locate the settlement agreement on the website. Class Counsel advised Objector that it is in the documents section. Therefore, the objection is withdrawn.").) As to Objection 18, while he still objects to the requirement that class members file their objections by mail, he withdraws the remainder of that objection, noting that class counsel advised him that objectors need not appear at the final approval hearing. (*Id.* at 8.)

*Modified Objections.* Gomez modified Objections 3, 6, 11, 12, 15, and 19 based on conversations he had with Class Counsel.

As to Objection 3, Gomez no longer objected on the basis of his mistaken belief to that the claim form did not permit him to enter a foreign address. (*Id.* at 4 & n.4 ("The original objections stated there was no ability to enter a foreign address. This was mistaken as there is a drop down menu that Objector did not see during his attempt at filling out the form.").) Instead, he modified his objection to state, "While the claim form has a drop down box for foreign addresses, it is unclear how a person will be paid if they bought the item from a repealer state but presently live outside of the United States." (*Id.* at 4.)

As to Objection 6, Gomez modified his objection to indicate that he spoke with Class Counsel, who referred him to Gilardi's general privacy policy. Gomez now objects on the basis that the general privacy policy's terms are "not specific to [this] case, do not discuss how the documents will be used, and contain no discussion of the sensitive medical documentation that is involved in this case." (*Id.* at 5; *see also id.* at 5 n.5 ("The original objections stated that there was no privacy policy. The general website privacy policy cited by Class Counsel does not discuss the data submitted by a claimant in this case, chilling submissions.").) He also appears to have withdrawn his unsupported assertion that "claims administrators have been allowing attorneys in other class actions to peruse the data from one case to another." (*See* Doc. No. 207-1 at 9 n.7; Doc. No. 207-9 at 5–6.)

**\*8**  As to Objection 11, Gomez reiterates that the distinction between the payment options offered in the Plan Allocation and Distribution and the claim form persists with the Amended Plan. (*See id.* at 6 ("NOTE: The revised terms of distribution [the Amended Plan] still state payment will be made by Zelle, Paypal, Venmo, or ACH direct deposit. However, the claims website never offered Zelle or ACH.").)

As to Objection 12, Gomez continues to object on the basis that "[t]here is no simple method to change the address or paypal address or payment type." (*Id.* at 7.) Gomez notes that Class Counsel advised him that a claimant could contact the claims administrator to change their information. (*Id.*) However, Gomez maintains that there should be a way for a claimant to easily submit a form on the website to change their information. (*See id.* ("In this case, Class Counsel's refusal to make a simple form has no rational basis other than laziness and a refusal to be flexible and improve their hectic, unclear website.").)

As to Objection 15, Gomez adds, "While Class Counsel advised Objector that the expenses are broken down on the website, he has yet to locate it." (*Id.*)

As to Objection 19, Gomez continues to object to *pro hac vice* requirements. (*Id.* at 8.) He adds, "Class Counsel advised me that this is not under their control and a judicial decision.... [T]here usually exists a waiver of the fees and *pro hac vice* requirements. This is because parties from all over the United States are being made to litigate in a Court that is outside their jurisdiction. Nobody is going to pay a *pro hac vice* fee to advocate for their small payment, especially if they reside in a non-repealer state." (*Id.*)

*New Objections.* Gomez also raised two new objections in his January 9 letter. (*Id.* at 2–3.) First, Gomez objects to the Court's December 8, 2022 approval of the Amended Plan the parties submitted, by which the deadline for Illinois and Massachusetts class members was extended. (*Id.* at 2.) Gomez objects that class members were not provided notice and that the opportunity to file an objection was not extended for everyone. (*Id.*) Gomez writes, *inter alia*, "I object to the recent actions by the Court approving an extended deadline for Illinois and Massachusetts residents. The Court took this action with no notice to class members. Illinois and Massachusetts Attorney Generals had valid objections to the manner of notice and the deadlines. Many of these objections apply to all claimants in most states. These objections apply to all class members. The deadlines should be extended for all class members." (*Id.*)

Gomez also objects to the fact that the address to mail objections is "buried on page four of the PDF on the [settlement] website," stating this is "not fair or reasonable."[13] (*Id.* at 2–3.)

* * *

**\*9**  On October 31, 2022, Plaintiffs filed their Motion for Final Approval of Settlement, Plan of Allocation and Distribution, and Award of Attorneys' Fees and Expenses and Service Awards. (Doc. No. 195.) Plaintiffs supplemented their motion on January 9, 2023 in order to address Gomez's objections. (Doc. No. 207.)

**II. The Settlement**

*A. The Settlement Class Is Certified*
Before considering the merits of the Settlement, the Court must determine whether to certify the Settlement Class. "For a class action to have preclusive effect and bind absent class members, a class must first be certified." *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 370 (E.D. Pa. 2015). A court may certify class actions for the sole purpose of settlement. *In re CertainTeed Corp. Roofing Shingle Prods. Liab. Litig.*, 269 F.R.D. 468, 476 (E.D. Pa. 2010) (citing *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 786 (3d Cir. 1995)). In these situations, the court "approves preliminary certification of the class," but reserves "[f]inal certification" until it "rules on whether the final settlement agreement is to be approved." *Id.* When a court certifies a class for settlement, "it must first find that the class satisfies all the requirements of Rule 23." *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 300 (3d Cir. 2005). The "central inquiry ... is the adequacy of representation." *Id.*

Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure set forth the requirements for class certification. Under Rule 23(a), a class action is allowable only if:

> (1) the class is so numerous that joinder of all members is impracticable;

> (2) there are questions of law or fact common to the class;

> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *see also Reyes v. Netdeposit, LLC*, 802 F.3d 469, 482 (3d Cir. 2015) ("All potential classes must initially satisfy four prerequisites to be certified: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation.").

If the Rule 23(a) conditions are met, then a case may proceed as a class action if one of the conditions of Rule 23(b) is also satisfied. Here, Class Counsel seek certification for a class under Rule 23(b)(3) (*see* Doc. No. 177 at 9–10; Feb. 27, 2023 Hr'g Tr. at 10), which requires that "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see also* Reyes, 802 F.3d at 482 (explaining that the plaintiff must demonstrate "predominance and superiority" for certification under Rule 23(b)(3)).

The Settlement Class consists of "[a]ll persons and entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of Defendants' infliximab between April 5, 2016 and February 28, 2022."[14] (Doc. No. 172-4 at ¶ 1.6). For the same reasons stated in this Court's August 2, 2022 Memorandum preliminarily approving the Settlement (*see* Doc. No. 177), which the Court finds are still applicable at this stage, the Court concludes that this Class continues to satisfy the requirement set forth in Rules 23(a) and 23(b). Because the requirements of Rules 23(a) and 23(b)(3) are satisfied, we will certify the Settlement Class.

### 1. Rule 23(a) Requirements

 **\*10**  As noted above, Rule 23(a) sets forth four preliminary requirements for a class to be certified: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. *See* Reyes, 802 F.3d at 482. The Settlement Class satisfies all four requirements.

*Numerosity.* While "[t]here is no magic number of class members needed for a suit to proceed as a class action," the Third Circuit has held that "numerosity is generally satisfied if there are more than 40 class members." *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 426 (3d Cir. 2016); *see also In re Modafinil Antitrust Litig.*, 837 F.3d 238, 249–50 (3d Cir. 2016). Here, Plaintiffs say that the class includes thousands of people. (Doc. No. 172-1 at 15 ("The Settlement Class includes thousands of consumer and [third-party payor] TPP members who are geographically dispersed across the country."); Feb. 27, 2023 Hr'g Tr. at 9:17–19 ("Numerosity, there [are] many thousands of third-party payers and consumers. We know this already from the number

of claims we have received.").) Accordingly, the Court finds that the Settlement Class is sufficiently large to satisfy Rule 23(a)'s numerosity requirement.

*Commonality.* "A putative class satisfies Rule 23(a)'s commonality requirement if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *In re Nat'l Football League Players*, 821 F.3d at 426–27 (quoting *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013)). It is "easy enough" to meet the requirement, provided all members of the class have claims that are capable of class-wide resolution. *Id.* This case presents sufficient commonality because each Class Member's claim depends on whether Defendants engaged in anticompetitive conduct with respect to Remicade. (*See* Feb. 27, 2023 Hr'g Tr. at 9:21–24 ("Here every member of the class [indirectly] purchased Remicade, and they charged that they overpaid for the drug due to allegations of anticompetitive conduct by the Defendants.").) Thus, the commonality requirement is met here.

*Typicality.* "To evaluate typicality, we ask whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class." *Beck v. Maximus*, 457 F.3d 291, 295–96 (3d Cir. 2006) (cleaned up). There is a " 'low threshold' for typicality"; provided "the interests of the class and the class representative are aligned," courts will find typicality even when class members' claims are only legally similar, and not factually similar. *In re Nat'l Football League Players*, 821 F.3d at 427–28 (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 182–83 (3d Cir. 2001)); *see also Beck*, 457 F.3d at 296 ("Factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." (cleaned up)).

Here, the Named Plaintiffs' and Class Members' claims arise out of the exact same conduct (namely, Defendants' alleged anticompetitive behavior related to Remicade) and the same legal theories (specifically, whether Defendants violated antitrust and consumer protection laws by using their dominant market position to suppress competition in the infliximab market). (*See* Feb. 27, 2023 Hr'g Tr. at 10:1–3 (explaining that the claims are factually and legally similar because the Named Plaintiffs and Class Members "bought Remicade" and "claim they paid too much because of the practices of the Defendants").) Thus, the Court concludes

the typicality factor is satisfied. *See In re Fasteners Antitrust Litig.*, Civil Action No. 08-md-1912, 2014 WL 285076, at *6 (E.D. Pa. Jan. 24, 2014) ("The claims of each of the class members arise from the alleged conspiracy to price-fix and allocate customers and markets in the United States for fasteners. In a case like this one where it is alleged that the defendants engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical of the absent class members. The typicality requirement is met here." (cleaned up)).

   **\*11** *Adequacy of the Representation.* Courts considering adequacy of representation examine both "the qualifications of class counsel and the class representatives." *In re Nat'l Football League Players*, 821 F.3d at 428; *see also In re Viropharma Inc. Secs. Litig.*, Civil Action No. 12-2714, 2016 WL 312108, at *7 (E.D. Pa. Jan. 25, 2016) ("Adequacy of representation is met by a two-fold showing: that (1) class counsel is competent and qualified to conduct the litigation; and (2) class representatives have no conflicts of interests.") The Court finds this requirement is met on both fronts. "Where, as here, settlement precedes class certification, 'collusion, inadequate prosecution and attorney inexperience are the paramount concerns.' " *Rougvie v. Ascena Retail Grp., Inc.*, Civil Action No. 15-724, 2016 WL 4111320, at *12 (E.D. Pa. July 29, 2016) (citation omitted).

As to the class representatives, no conflicts of interests have been identified between Named Plaintiffs and the Settlement Class. Named Plaintiffs have standing, and Named Plaintiffs and the rest of the Settlement Class all hold a common interest in establishing Defendants' liability for alleged anticompetitive conduct, as they are all indirect purchasers or reimbursers of Remicade. (*See* Feb. 27, 2023 Hr'g Tr. at 10:4–8.) *See In re Flonase Antitrust Litig.*, 284 F.R.D. at 218 (" 'A class representative must be part of the class and possess the same interest and suffer the same injury as the class members.' Each class member purchased and/or reimbursed for FP at some point during the Class Period at a supracompetitive price. Each class member holds a strong common interest in establishing GSK's liability for these alleged overcharges." (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 625–26 (1997))).

Named Plaintiffs have also represented the class capably and diligently. Named Plaintiffs participated in regular conference calls and Board meetings with Class Counsel "concerning the status and direction of the case, the investigation and

filing of the complaints, discovery, class certification and summary-judgment related issues, and settlement. (Doc. No. 195-12 at ¶ 3; Doc. No. 195-13 at ¶ 3.) Named Plaintiffs also actively participated in extensive discovery. (Doc. No. 195-13 at ¶ 4 ("I and others acting at NEHP's direction ... searched for and provided information and data in response to discovery requests from Defendants, and prepared for and sat for deposition [sic] on January 20, 2022.") Doc. No. 195-12 at ¶ 4 (same as to Local 295).) *See Wood v. Saroj & Manju Inves. Phila. LLC*, Civil Action No. 19-2820-KSM, 2020 WL 7711409, at *5 (E.D. Pa. Dec. 28, 2020) (finding that the class representative adequately represented the interests of his fellow members where he "provided counsel with the paperwork and information they needed to initiate [the] case and substantiate his claims" and was " 'instrumental' in the mediation sessions that led to the settlement agreement").

As to class counsel, the important factors are whether the attorneys "(1) possessed adequate experience; (2) vigorously prosecuted the action; and (3) acted at arm's length from the defendant." *In re Gen. Motors Corp.*, 55 F.3d at 801. The Third Circuit has indicated that courts should consider the non-exhaustive list of factors in Rule 23(g) for appointing counsel in determining the adequacy of representation. *See In re Nat'l Football League Players*, 821 F.3d at 429; *see also Sheinberg v. Sorensen*, 606 F.3d 130, 132 (3d Cir. 2010). Those factors include counsel's work in the instant class action, experience in handling class actions or other kinds of complex litigation, knowledge of the applicable laws, and resources available for representing the class. Fed. R. Civ. P. 23(g)(1)(A). Additionally, the court "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

   **\*12** Under each of the Rule 23(g)(1)(A) factors, Class Counsel—Robbins Geller Rudman & Dowd LLP—is qualified to "fairly and adequately represent the interests of the class." Robbins Geller has extensive expertise in the antitrust class action context (*see* Doc. No. 195-21) and has zealously pursued and litigated this class action lawsuit. Class Counsel engaged in extensive discovery, "analyzed a large quantity of complex, jargon-laden documents concerning pharmaceutical drug pricing and marketing, [and] secured key admissions in depositions of Defendants' executives." (Doc. No. 195-1 at 34.) Class Counsel also engaged in extensive arms-length negotiations with Defendants' counsel. (*Id.* at 20.)

In sum, the Settlement Class's interests have been advanced by experienced, dedicated counsel, working at arm's length from Defendants. The Court finds Rule 23(a)(4) is satisfied.

## 2. Rule 23(b) Requirements

In addition to meeting the requirements of Rule 23(a), a named plaintiff must also satisfy Rule 23(b)(3), which requires the Court find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

*Predominance.* The key issue under the predominance factor is "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Windsor*, 521 U.S. at 623. Third Circuit "precedent provides that the focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 298 (3d Cir. 2011) (en banc). The Third Circuit has counseled that courts should be "more inclined to find the predominance test met in the settlement context."[15] *In re Nat'l Football League Players*, 821 F.3d at 434 (quoting *Sullivan*, 667 F.3d at 304 n.29). Further, the Supreme Court has stated that "predominance is a test readily met in certain cases alleging ... violations of the antitrust laws." *Windsor*, 521 U.S. at 625; *see also In re Fasteners Antitrust Litig.*, 2014 WL 285076, at *7 ("In antitrust cases, the requirement of predominance is often easily met."); *In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249, 263 (E.D. Pa. 2012).

Predominance is satisfied here. Each Class Member's claim involves similar operative facts and legal theories. Plaintiffs allege that Defendants took advantage of Remicade's dominant market position and suppressed competition, resulting in a common injury to all Class Members—the inflated price of Remicade—in violation of federal and state antitrust laws and state consumer protection laws. *See Sullivan*, 667 F.3d at 300 (finding predominance factor met where the plaintiffs alleged that "De Beers engaged in anticompetitive conduct by exploiting its" dominant position in the diamond market to "impose rigid constraints on the sale and resale of [ ] diamonds," "result[ing] in a common injury as to all class members—inflated diamond prices—in violation of federal antitrust, consumer protection, or unjust

enrichment laws of every state"); *see also In re Comcast Corp. Set-Top Cable Television Box Antitrust Litig.*, 333 F.R.D. 364, 377 (E.D. Pa. 2019) ("Here, the allegation is that Comcast engaged in a common course of conduct—it unlawfully tied the sale of its Premium Cable to the rental of a Comcast Set-Top Box—and putative Class Members suffered the same injury—the payment of supracompetitive prices for their Set-Top Boxes. Accordingly, Plaintiffs satisfy the predominance requirement."); *In re Fasteners Antitrust Litig.*, 2014 WL 285076, at *7 ("Here, the same operative facts and legal arguments surrounding Defendants' conduct in conspiring to fix, raise, maintain, or stabilize prices of fasteners in the United States, apply to each class member. We are satisfied that questions of law or fact common to class members predominate over any questions affecting only individual members."). These common issues of law and fact predominate over any individual differences, such as the amount of compensation that each member will be entitled to under the Amended Plan of Allocation and Distribution.

**\*13** *Superiority.* The last requirement for certifying a class is that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). When evaluating this requirement, courts consider "the class members' interests in individually controlling litigation, the extent and nature of any litigation, the desirability or undesirability of concentrating the litigation, and the likely difficulties in managing a class action." *In re Nat'l Football League Players*, 821 F.3d at 435 (citing Rule 23(b)(3)(A)–(D)). Superiority can be satisfied where the settlement prevents "duplicative lawsuits and enables fast processing of a multitude of claims." *Id.* (quoting *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 382); *see also Sullivan*, 667 F.3d at 312.

The superiority factor weighs in favor of granting final class certification. No Class Members have opted out of the Settlement, and only one has objected to it. (*See* Doc. No. 207-11 at ¶ 10 ("The deadline for Settlement Class members to request to be excluded from the settlement was November 30, 2022. As of today's date, Gilardi has not received any exclusion requests."); Doc. No. 207 at 5 (noting there is only one objector); *see also* Feb. 27, 2023 Hr'g Tr. at 11:4–8 ("Superiority is also easily met here. No class members have tried to opt out in any way, and this indicates the class treatment is superior, because none of those sophisticated entities have shown any interest in individually controlling the litigation.").) The lack of opt-outs illustrates

the superiority of adjudicating this controversy through a class action.

* * *

Because the requirements of Rules 23(a) and 23(b)(3) are satisfied, the Court certifies the Settlement Class.

### B. Notice to the Settlement Class Was Adequate

Having certified the Settlement Class, we must now evaluate the adequacy of notice to the Class Members. *Fein v. Ditech Fin., LLC*, No. 5:16-cv-00660, 2017 WL 4284116, at *6 (E.D. Pa. Sept. 27, 2017). Rule 23(c)(2)(B) requires that the class receive "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Due process also requires that "notice be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.' " *In re Nat'l Football League Players*, 821 F.3d at 435 (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).

Notice may be delivered through United States mail, electronically, or other means and must "clearly and concisely state":

(i) the nature of the action;

(ii) the definition of the class certified;

(iii) the claims, issues, or defenses;

(iv) that a class member may enter an appearance through an attorney if the member so desires;

(v) that the court will exclude from the class any member who requests exclusion;

(vi) the time and manner for requesting exclusion; and

(vii) the binding effect of a class judgment on members under Rule 23(c)(3).

*Id.*

In granting preliminary approval, the Court found that the parties' notice plan satisfied these requirements (Doc. No. 177 at 23–25), and we find no reason to change that conclusion following the plan's execution (Doc. No. 195-1 at 13–14; Doc. No. 218). As noted more extensively above,

Gilardi mailed the Postcard Notices to 23,509 TPP entities via USPS and emailed the contents of the Postcard Notice to 1,797 TPP entities with available email addresses. (Doc. No. 195-4 at ¶ 9.) Gilardi also advertised on trade websites and in e-newsletters to reach TPPs and had a press release distributed on PR Newswire. (*Id.* at ¶¶ 13–15.) As for consumers, Gilardi had the Summary Notice published in an issue of *People* magazine in-print and online, had millions of impressions distributed on websites and Facebook that were targeted to adults over 18, and reached out to several organizations and support groups to share the information with their audiences. (*Id.* at ¶¶ 16–18.) In addition, the case website, www.RemicadeSettlement.com, provided the Consumer Notice and TPP Notice. (Doc. No. 195-4 at ¶ 19.)

**\*14** As for Massachusetts and Illinois, Gilardi mailed 1,237 postcard notices to Illinois-based TPP entities, advertised on the *Chicago Tribune* and *Boston Globe* websites, and had impressions distributed via various websites that were targeted to adults 18 years of age and older in those states. (Doc. No. 207-11.)

During the final approval hearing, Class Counsel stated nearly all TPPs, and about 80% of consumers, were reached through the notice. (*See* Feb. 27, 2023 Hr'g Tr. at 15:12–16 ("They believed that nearly all of the third-party payer class was reached, and 80 percent of the consumer class, which is right in line, you know, with the 79 to 90 percent aim that the judicial council recommends.").)

The Court finds that the notice to Class Members was adequate and constitutes the best notice practicable under Rule 23(c)(b)(2). *See In re Viropharma Inc. Secs. Litig.*, Civil Action No. 12-2714, 2016 WL 312108, at *5-6 (E.D. Pa. Jan. 25, 2016) (finding that notice met the requirements of Rule 23 where copies of the notice were mailed to potential settlement class members, a summary of the notice was published in Investor's Business Daily, a summary of the Notice was published over PR Newswire, and the notice and all relevant settlement documents were posted on a case-specific website).

### C. The Settlement Is Fair, Reasonable, and Adequate

Under Rule 23, a court may approve a settlement "only on a finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). District courts have discretion to decide whether to grant final approval to a proposed settlement. *Girsh v. Jepson*, 521 F.2d 153, 156 (3d Cir. 1975). Settlements are entitled to "an initial presumption of fairness" if "the court finds that:

Case 4:21-cv-00196-MWB    Document 261-1    Filed 01/20/26    Page 179 of 287

In re Remicade Antitrust Litigation, Not Reported in Fed. Supp. (2023)

(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *In re Gen. Motors Corp.*, 55 F.3d at 785. However, where, as here, the parties seek settlement approval and final class certification simultaneously, the Court must examine the fairness of the settlement agreement "even more scrupulous[ly] than usual." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534 (3d Cir. 2004).

The Settlement is entitled to an initial presumption of fairness. The parties negotiated the settlement at arm's length. (Doc. No. 195-1 at 12 n.3, 20.) Class Counsel has experience with similar litigation. (*Id.* at 18 n.7.) And, critically, *only one* class member objects to the Settlement.[16] (*See* Doc. Nos. 201, 206, 207.)

Although the Settlement is entitled to an initial presumption of fairness, we must consider the following *Girsh* factors to confirm that the settlement is fair, reasonable and adequate:

(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risk of establishing damages; (6) the risk of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

**\*15** *See Girsh*, 521 F.2d at 157. We consider each of these factors in turn.

*Complexity, Expense, and Likely Duration of the Litigation.* This is a complicated antitrust litigation that has been in the works for the past five years. (Doc. No. 195-1 at 34; Doc. No. 195-2 at ¶ 32.) Plaintiffs faced obstacles in terms of "overcoming a challenging motion to dismiss and extensive discovery practice, including massive document discovery and dozens of depositions." (Doc. No. 195-1 at 34; *see also* Doc. No. 195-2 at ¶ 32.) As to factual complexity, Plaintiffs' counsel "analyzed a large quantity of complex, jargon-laden documents concerning pharmaceutical drug pricing and marketing." (*Id.*) Courts routinely recognize that antitrust actions are particularly complex. *See, e.g., In re Comcast Corp. Set-Top Cable Television Box Antitrust Litig.*, 333 F.R.D. 364, 380 (E.D. Pa. 2019) ("Antitrust class actions are

particularly complex to litigate and therefore quite expensive. An antitrust class action is arguably the most complex action to prosecute." (cleaned up)); *In re Flonase Antitrust Litig.*, 291 F.R.D. 93, 99, 104 (E.D. Pa. 2013) (same). This first factor weighs in favor of approval.

*Reaction of the Class to the Settlement.* The Settlement Class reacted very favorably to the Settlement. No Class Members opted out of the Settlement, and only one Class Member objected. (Doc. No. 207 at 6.) This factor weighs heavily in favor of approval. *See, e.g., In re Cendent Corp. Litig.*, 264 F.3d 201, 235 (3d Cir. 2001) ("The vast disparity between the number of potential class members who received notice of the Settlement and the number of objectors creates a strong presumption that this factor weighs in favor of the Settlement."); *Remick v. City of Philadelphia*, Civil Action No. 20-1959, 2022 WL 2703601, at \*4 (E.D. Pa. July 12, 2022) (finding that the second factor weighed in favor of settlement approval because "[a] low number of objectors compared to the potential number of class members creates a strong presumption in favor of approving the settlement"); *In re Wawa, Inc. Data Security Litig.*, Civil Action No. 16-6019, 2022 WL 1173179, at \*5 (E.D. Pa. Apr. 20, 2022) ("The Court finds that the low number of objections and the lack of strong arguments regarding a negative reaction weigh in favor of final approval.").

*Stage of Proceedings and Amount of Discovery Completed.* This case has spanned five years. (Doc. No. 195-1 at 21.) The parties conducted substantial discovery. (*See id.* at 19.) There is no doubt Class Counsel knew the case well before negotiating the Settlement with Defendants. (*Id.* at 19–20.) This factor weighs in favor of approving the Settlement.

*Risks of Establishing Liability and Damages.* There are risks with establishing liability and damages. Defendants contest liability and damages. (*See* Doc. No. 172-4 at 4 ("Defendants contend that the claims and allegations of wrongdoing or liability by the Named Plaintiffs and the Class in the Action are without merit. Defendants expressly deny all allegations of wrongdoing or liability."); *see also* Doc. No. 195-1 at 21–22; Feb. 27, 2023 Hr'g Tr. at 50:15–18 (defense counsel reiterating that the settlement agreement is not an admission of liability).) Given these risks, both of these factors weigh in favor of approving the Settlement.

**\*16** *Risks of Maintaining a Class Action Through Trial.* There are also risks with maintaining a class action through trial. Were the Settlement rejected, Defendants would hotly

contest the propriety of certification. (*See* Doc. No. 172-4 at 4–5; Doc. No. 195-1 at 21–24.) Even if the Court were to certify a class, Defendants would have almost certainly appealed, which would have further extended the litigation. (Doc. No. 195-1 at 24.) Given the risks of achieving certification and maintaining a class throughout trial (and given the likelihood that the fight over class certification would further delay the resolution of this case), this factor also weighs in favor of approval.

*Ability of Defendants to Withstand a Greater Judgment.* "This factor assesses the ability of defendants to withstand a greater judgment, and is 'most clearly relevant where a settlement in a given case is less than would ordinarily be awarded but the defendant's financial circumstances do not permit a greater settlement.' " *In re Nat'l Football League Players*, 307 F.R.D. at 394 (quoting *Reibstein v. Rite Aid Corp.*, 761 F. Supp. 2d 241, 254 (E.D. Pa. 2011)). "However, when there is no 'reason to believe that [d]efendants face any financial instability[,] ... this factor is largely irrelevant.' " *Id.* There is no reason to believe Defendants are financially unstable, but the fact that it could withstand a larger judgment weighs neither in favor of nor against approving the Settlement.

*The Reasonableness of the Settlement in Light of the Best Possible Recovery and All the Attendant Risks of Litigation.* The Settlement is reasonable in light of the best possible recovery and attendant risks of litigation. Defendants will pay the Settlement Class $25,000,000. As discussed above, there is no guarantee the Settlement Class would be awarded the maximum possible recovery.[17] There are a number of risks attendant with continuing the litigation, including the chance the class would not be certified and obstacles to proving liability and damages. Given the possibility that the Class would attain less than the settlement amount (and perhaps even nothing), and the likelihood that the Settlement Class would not receive the maximum amount of recovery, the Court finds that the monetary value of the Settlement falls well within the range of reasonableness.

Given the value of the Settlement and the undeniable risks with continuing the litigation, the final two factors both weigh in favor of approval.

\* \* \*

**\*17**  The Settlement is fair, reasonable, and adequate. It is entitled to a presumption of fairness, and that presumption is

supported by the *Girsh* factors, eight of which weigh in favor of approval and one of which is neutral.

### D. Gomez's Objections to the Settlement are Overruled

The Court addresses each of Gomez's objections, as amended,[18] in turn below.[19]

*Objections 1 and 2.* In Objections 1 and 2, Gomez takes issue with the deadlines set for opting out of the Settlement Class and for filing claim forms. Namely, Gomez objects to the fact that class members must opt out of the Class or file a claim form prior to final approval of the Settlement. (*See* Doc. No. 206-1 at 3–4.) But this is how class actions are commonly structured. *See, e.g., generally Erby v. Allstate Fire & Cas. Ins. Co.*, Civil Action No. 18-4944-KSM, 2022 WL 14163069 (E.D. Pa. Oct. 24, 2022) (reflecting that the opt out and claiming file deadlines occurred prior to final approval); *Stechert v. Travelers Home & Marine Ins. Co.*, Civil Action No. 17-0784-KSM, 2022 WL 2304306 (E.D. Pa. June 27, 2022) (same). Further, he does not identify any serious fault with this process.[20] *See In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d 985, 998 (N.D. Ohio 2016) ("Andrews also challenges the requirements for opting-out. For example, Andrews asks (1) Why can't opt-outs file their form online instead of having to mail it in?; and (2) Why are opt-outs asked to provide 'unnecessary' information, such as which particular settlements they want to opt out of, and what foam-products they bought? It suffices to say, again, there are good answers to these questions and Andrews does not identify any serious faults in the opt-out process. Indeed, even if the occasional suggestion Andrews offers is reasonable, he does not show the existing format is *unreasonable*. And, so long as the settlement agreements and the processes used to effectuate them are 'fair, reasonable, and adequate,' this Court has no reason to disapprove them." (citation omitted)). Accordingly, the Court overrules Gomez's objections as to the timing of opting out and filing claims.[21]

**\*18**  *Objections 3 and 4.* In amended Objection 3, Gomez argues that it is unclear how "a person will be paid if they bought the item from a repealer state but presently live outside of the United States," (Doc. No. 206-1 at 4), and in Objection 4, Gomez claims it is "unclear how the claims are calculated based on state" (*id.*). A plain reading of the Amended Plan of Allocation and Distribution shows that these are meritless challenges. (*See* Doc. No. 201-1 at ¶ 5 (The Amended Plan of Allocation, which states: "The Recognized Claims of Settlement Class Members that have indirectly

Case 4:21-cv-00196-MWB    Document 261-1    Filed 01/20/26    Page 181 of 287

In re Remicade Antitrust Litigation, Not Reported in Fed. Supp. (2023)

purchased or provided reimbursement for some or all of the purchase price of Remicade and that reside or have their principal place of business in one of the Selected States shall be calculated entirely and solely under ¶ 5(a), the Recognized Claims of Settlement Class Members that have indirectly purchased or provided reimbursement for some or all of the purchase price of Remicade in one or more of the Selected States, but do not reside or have their principal place of business in one of the Selected States shall be calculated entirely and solely under ¶ 5(b), and the Recognized Claims of Settlement Class Members that have not indirectly purchased or provided reimbursement for some or all of the purchase price of Remicade in one of the Selected States, and neither reside nor have their principal place of business in one of the Selected States shall be calculated entirely and solely under ¶ 5(c).'); *see also* Doc. No. 207 at 11 ("The Amended Plan of Allocation, [sic] explains that ... Class Members who do not reside or have a principal place of business in a Selected State but who did indirectly purchase Remicade in a Selected State will be in a second category. A Class Member who does not reside or have a principal place of business in a Selected State and did not purchase Remicade in a Selected State will be in a third category. Assuming Mr. Gomez accurately described his purchases in Florida and assuming the purchases were made during the Class Period, his claim would likely have fallen under the second category.").)

*Objection 5.* Gomez challenges "the requirement on the claim form that a person list their Social Security Number." (Doc. No. 206-1 at 5.) But this is largely a standard practice. *See In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d at 998 (overruling objections and finding that none of the issues the objector raised, including his question about the social security number requirement, "suggest[ed] the design of the claim forms or the claims administration process carrie[d] any meaningful or serious faults"); *see also Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 568, 601 (N.D. Ill. July 29, 2011) (granting final approval of settlement where the claim form required class members to provide their social security number or tax identification number). And, as at least one court has recognized, there is a "good answer" as to why claimants have to provide their social security number during the claims process and on claim forms—"to prevent fraud and comply with potential tax requirements."[22] *In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d at 998. Thus, the Court also rejects Objection 5.[23]

*Objection 6.* In Objection 6, Gomez takes issue with the terms of Gilardi's privacy policy, arguing that they are not

sufficiently specific to this case. (*See* Doc. No. 206-1 at 5 ("[T]hese terms are not specific to the case, do not discuss how the documents submitted will be used, and contain no discussion of the sensitive medical documentation that is involved in this case. There exists no discussion of HIPPA or the rights of a claimant to privacy."); *see also id.* at 5 n.5 ("The original objections stated that there was no privacy policy. The general website privacy policy cited by Class Counsel does not discuss the data submitted by a claimant in this case, chilling submissions.").)

In response to this objection, Plaintiffs provided a declaration from Gilardi's Director of Class Action Services, Derek Smith. (*See* Doc. No. 207-11 at ¶¶ 12–14.) Gilardi's privacy policy is publicly available on its website and the Remicade Settlement website. (*Id.* at ¶ 12.) Gilardi "maintains extensive data security and privacy safeguards in its operations, including when serving as a class action settlement claims administrator." (*Id.* at ¶ 13.) Gilardi uses "settlement-related data only as necessary to effectuate its settlement administrative service consistent with federal and state law." (*Id.*) Gilardi does not perform any procedures on personal data provided or obtained as part of its services as Claims Administrator, nor does it use "information provided by Class Members for any purpose other than Settlement Class administration." (*Id.*; *see also id.* ("Specifically, "no such information is used, disseminated, or disclosed by or to any other person or entity for any other purpose.").) Gilardi also maintains controls to comply with array of privacy regulations, including HIPPA. (*Id.* at ¶ 14.) These controls are designed to ensure that information is available only to authorized employees, class member data is segregated and protected via encryption, private information is not modified or disclosed without authorization, among other things. (*Id.*) Given these privacy safeguards, the Court finds that Gomez's objection is unfounded.

**\*19** *Objection 7.* Next, Gomez argues that the settlement amount is unreasonable in light of Remicade's annual sales. (*See* Doc. No. 206-1 at 5 ("The annual sales of Remicade are over $4,000,000 (4 billion dollars) and this settlement spans six years, yet the payment is only $25,000,000. That is about $1 per $1000 in sales of the product, but the antitrust damages was [sic] much more. Therefore, the settlement appears unreasonable and meant solely to enrich legal counsel.").) As Plaintiffs point out, however, the "total sales figure [is] not the proper measure of damages" (Doc. No. 207 at 12; *see also* Feb. 27, 2023 Hr'g Tr. at 45:6–10), and the $25 million settlement amount is congruent with the settlement amounts

in other indirect purchaser actions in this Circuit and beyond (*see* Doc. No. 207 at 12; Doc. No. 172-2; Feb. 27, 2023 Hr'g Tr. at 45:11–15). For the reasons discussed above in Section II.C, and in light of the risks attendant with pursuing this class action further into class certification, summary judgment, and trial, the Court reiterates that the $25 settlement amount is reasonable.

*Objection 8.* Gomez argues that the requirement that class members provide documentation to the extent they file a claim for over $1,000 amounts to a claim limitation and "arbitrary and capricious." (Doc. No. 206-1 at 5–6.) The Court disagrees. Courts have overruled objections to settlements where the objector challenges a proof of purchase requirement, citing fraud concerns.[24] *See, e.g., Yaeger v. Subaru of Am., Inc.*, No. 1:14-cv-4490 (JBS-KMW), 2016 WL 4541861, at *13 (D.N.J. Aug. 31, 2016) ("[S]everal objectors oppose the requirement for documentation of past repairs for which reimbursement is sought.... The settlement's requirement for documentation 'Proof of Purchase must be submitted,' is reasonable to prevent fraudulent claims.... The proof can be 'anything that can be used to corroborate that an individual paid for a repair.' This is a reasonable requirement for documentation triggering compensation, and this objection is overruled." (citations omitted)); *cf. Rougvie v. Ascena Retail Grp., Inc.*, Civil Action No. 15-724, 2016 WL 4111320, at *15 (E.D. Pa. July 29, 2016) (overruling objection as to the adequacy of class counsel's representation to those without proof of purchase, noting "It is a patently difficult to award damages to cash purchasers without proof of purchase, as these claims would be ripe for abuse. Given a significant potential for fraud in submitting cash claims by affidavit, we find Class Counsel addressed the subclass of cash purchasers in a fair manner").

Documentation is defined in the Amended Plan as "itemized receipts, cancelled checks, invoices, statements, or other business or transaction records documenting payment for purchases or reimbursement paid for Remicade during the settlement Class Period." (Doc. No. 202-1 at ¶ 7.) Class Counsel has explained this list is not exhaustive. (*See* Feb. 28, 2023 Ltr. to Ct. *Cf.* Feb. 27, 2023 Hr'g at 18:17–19:4 (explaining that the Class Administrator has discretion as to whether to accept a claim and could find other proof sufficient and "[f]or example, somebody could get note from their doctor saying yes, this person did 12 rounds of Remicade during the class period" and that "could be sufficient" proof); *id.* at 19:11–13 ("[T]here's a list, but they are not – there is no hard and fast this is what we must require from you.").)

Class Counsel has also explained that the drug costs $5,000, which played into their decision to require documentation for claims above $1,000. (*See id.* at 17:14–24 ("In our view, if somebody is outlaying $5,000, we think that it is likely that they would keep receipts or be able to get receipts if it was something quite that large. So it's not an arbitrary number.... [I]t is our understanding that for the most part, the this drug cost[s] about $5,000."), 18:6–11.) Significantly, this is an infusion drug, meaning it is not self-administered; rather, the class members would have had to go to a hospital or a clinic for the infusion. (*Id.* at 50:22–51:10.) Therefore, not only would there be records of the infusion from the class member's prescribing physician, but also from the hospital or clinic at which it was administered. (*Id.*)

**\*20** Finally, any claims for less than $1,000 do not require documentation, unless "the Settlement Administrator disputes a material fact concerning the Claim Form." (Doc. No. 202-1 at ¶ 6.)

The Court concludes that the $1,000 threshold is reasonable, particularly given the cost of the drug, the non-exhaustive ways in which a class member can show documentation, and the fact that the drug is an infusion drug and therefore there must be clinic and hospital records of a class member receiving the drug.[25]

*Objection 9.* Gomez argues that that the settlement should include a requirement that checks are valid for 180 days. (Doc. No. 206-1 at 6.) In their reply, "Plaintiffs agree that 180 days is a reasonable time period for any settlement check to remain valid." (Doc. No. 207 at 10; *see also id.* (noting that this would be consistent with other methods of distribution, where the settlement contemplates that payment would be valid for 180 days); Doc. No. 202-1 at ¶ 10 ("Authorized Claimants choosing Zelle, PayPal or Venmo shall be provided 180 days from issuance to take custody of the funds.").)

*Objection 10.* Gomez makes an objection about "unclaimed property." (Doc. No. 206-1 at 6.) He "object[s] to the claims administrator not properly administering uncashed checks or unclaimed funds through ordinary unclaimed property programs as required by the laws of almost every state." (*Id.*; *see also id.* (stating that unclaimed checks "are to be turned over to state unclaimed property administrators, not 'redistributed' or given for *cy pres* or for attorney fees").) Gomez cites no support for his contention that the class action administrator will not properly administer unclaimed funds or uncashed checks. The Court finds this objection baseless.

Case 4:21-cv-00196-MWB    Document 261-1    Filed 01/20/26    Page 183 of 287

In re Remicade Antitrust Litigation, Not Reported in Fed. Supp. (2023)

The Court also notes that the settlement agreement provides that excess funds after distribution (and additional re-distributions) "will be contributed to the Crohn's & Colitis Foundation, or one or more other non-sectarian, not-for-profit, 501(c)(3) organization(s) to be determined by Class Counsel and approved by the Court." (Doc. No. 202-1 at ¶ 10; *see also* Doc. No. 207 at 9 n.7 ("He also makes an objection regarding unclaimed property. Here, there is a specific *cy pres* recipient (the Crohn's & Colitis Foundation, or one or more other non-sectarian, not-for-profit, 501(c)(3) organization(s) approved by the Court) should there be funds remaining after distribution.").) To the extent that Gomez argues that the court may not finally approve a settlement that includes a *cy pres* component for excess settlement funds, he is mistaken.[26] *See In re Baby Prods. Antitrust Litig.*, 708 F.3d at 172–73 ("We join other courts of appeals in holding that a district court does not abuse its discretion by approving a class action settlement agreement that includes a *cy pres* component directing the distribution of excess settlement funds to a third party to be used for a purpose related to the class injury.... That approval is warranted when the court finds that the settlement, taken as a whole, is fair, reasonable, and adequate from the perspective of the class. Inclusion of a *cy pres* provision by itself does not render a settlement unfair, unreasonable, or inadequate." (cleaned up)).

**\*21** *Objection 11.* Next, Gomez lodges an objection as to how payments will be made and alleges there are discrepancies between the Plan of Distribution, claims website, and claim form. (Doc. No. 206-1 at 6.) He also argues that checks are "not feasible because [when] the claims administrators mail them to foreign addresses by regular mail that takes between six weeks and three months to receive" and that "Paypal and Venmo ... are not banks, have burdensome requirements, and often block payments." (*Id.*) As to the mailing of settlement checks, the Court notes that the Amended Plan of Allocation contemplates electronic distribution. (*See* Doc. No. 202-1 at ¶ 10 ("Settlement Benefits shall be paid via Zelle, PayPal, Venmo, or other direct deposit via ACH, as selected by the Authorized Claimant when submitting a claim.").) Further, Gomez does not cite any support for his assertion that it may take up to three months for a Class Member to receive their check if they have a foreign address. To the contrary, the USPS website shows that the lowest mail class for international mail (first class mail international (letters)) has a delivery speed of 6 to 20 business days. *See* USPS Delivery Times, USPS, https://www.stamps.com/usps/usps-delivery-times/ (last visited Feb.

15, 2023). To the extent Gomez rests his objection on mailing delays, the Court finds this is not a valid objection. Gomez's objection that Paypal and Venmo "often block payments" is also unsupported.

Further, at the final approval hearing, Class Counsel clarified that the fact that the claim form did not ask for a Zelle e-mail address or bank routing account number for ACH distribution does not mean that those methods of distribution (e.g., Zelle and ACH) are unavailable or off limits; rather, at this early stage, the administrator does not seek specifics. (Feb. 27, 2023 Hr'g Tr. at 36:11–37:3.)

*Objection 12.* Gomez claims there is no easy way for a Class Member to change their address or preferred payment method. (Doc. No. 206-1 at 6–7.) This objection lacks merit. Although the website does not have a change of address form *per se*,[27] *see* https://www.remicadesettlement.com/, the website provides three different means by which to contact the Settlement Administrator with any questions or concerns, which would reasonably include requests on updating an address.[28] *See* https://www.remicadesettlement.com/contact-us.aspx ("Contact Us" page of the settlement website, providing Gilardi's mailing address, email address, and a toll free phone number). (*See also* Doc. No. 207 at 8 ("The website provides three methods to contact the claims administrator including by mail, email, and telephone.... Through any of these avenues, a Class Member is able to update their mailing address, if necessary.").)

*Objection 13.* Gomez claims that PayPal, Venmo, and Zelle "sometimes reject payments" and that claims administrators "do[ ] nothing" to notify claimants" when this happens. (Doc. No. 206-1 at 7.) Gomez cites no support for this assertion (*see id.*), and the Court finds it entirely theoretical at this point. The mere fact that something could potentially happen in the claims administration process does not mean it will happen, or that it is even likely to happen. The Court overrules this objection as lacking in support and merit.

*Objection 15.* Next, Gomez objects to the amount of expenses, arguing that $2,288,388.90 in expenses appears quite excessive where the settlement is only for $25 million settlement. (Doc. No. 206-1 at 7.) He also objects on the basis that he is unable to locate a breakdown of the expenses.[29] (*Id.*) For the reasons discussed *infra* Section III, the Court finds the expenses, while high, to still be reasonable and overrules this objection.

**\*22** *Objection 16.* Gomez objects to the attorneys' fees Class Counsel seeks, arguing that it "appears to be a windfall" and that the hours are "bloat[ed]." (Doc. No. 206-1 at 7.) For the reasons discussed *infra* Section III, the Court finds the attorneys' fees to be reasonable and overrules this objection.

*Objection 17.* Gomez objects that the notices did not "provide[ ] any real information" about the amount of attorneys' fees, how much claimants would receive, or the potential number of claimants. (Doc. No. 206-1 at 7–8.) This objection also lacks merit. First, the notice on the website makes clear that "Class Counsel will ask the Court to award attorneys' fees in an amount not to exceed one-third of the Settlement Fund." *See* https://www.remicadesettlement.com/media/4003442/notice.pdf at 1. Given that the notice also states that the Settlement Fund is $25 million, *see id.*, it can plainly be deduced that the amount of attorneys' fees sought will be no greater than approximately $8.3 million. Further, Plaintiffs' motion for attorneys' fees, which includes a precise breakdown of attorneys' fees sought, is publicly available on the Court's docket (*see* Doc. No. 195) as well as the settlement website, *see* https://www.remicadesettlement.com/case-documents.aspx. (*See also* Doc. No. 207 ("The notice explains the maximum amount of fees that could be sought and the settlement website contains declarations from Plaintiffs' counsel explaining and detailing the work done in this case.").) Second, although the notice does not include precise amounts that claimants may receive (which is impossible to do prior to processing all claim forms), it does clearly explain how each Class Member's payment will be determined and provides an equation to that effect. *See* https://www.remicadesettlement.com/media/4003442/notice.pdf at 2. To the extent that Gomez complains that the notice does not state the potential number of claimants, the Court finds that objection meritless, as the administrator would not have a precise estimate available before the claims process began and Plaintiffs stated in their motion for preliminary approval (which is available on the settlement website) that the class includes thousands of consumers and TPPs.[30]

*Objection 18.* Gomez objects to the requirement that class members filed objections by mail, arguing it is too burdensome. (Doc. No. 206-1 at 8.) The Court does not find the mailing requirement burdensome and overrules this objection. *See McDermid v. Inovio Pharma., Inc.,* Civil Action No. 20-01402, 2023 WL 227355, at \*10 (E.D. Pa. Jan. 18, 2023) ("Green claims that the objection procedures were overly burdensome ... he complains that the objectors were required to mail their objections and could use the PACER electronic filing system ... Each of these objections is frivolous.... As a specific example of an overly burdensome procedure, Green cites the requirement that objectors mail their objections instead of using PACER. Using the postal system does not burden potential objectors."); *Wright v. Nationstar Mortgage LLC,* No. 14 C 10457, 2016 WL 4505169, at \*13 (N.D. Ill. Aug. 29, 2016) ("Youngblood also contends that the exclusion process was burdensome because requests had to be submitted by mail rather than through the website. But the opt-out requirements were minimal: the request had to be signed, and include the individual's name, address, telephone number, case caption, and a statement that the individual is a class member who wishes to opt-out. Gathering these documents and paying for postage requires minimal time and financial burden, and courts have approved even more cumbersome requirements, including submitting proof of class membership.").

**\*23** *Objection 19.* Gomez objects that there was no waiver of *pro hac vice* requirements and fees. (Doc. No. 206-1 at 8.)

The Court notes that *pro hac vice* requirements in this District are set by the Local Rules of Civil Procedure. Under Local Rule 83.5.2, "[a]n attorney who is not a member of the bar of this Court shall not actively participate in the conduct of any trial or pre-trial or post-trial proceeding before this Court unless, upon motion of a member of the bar of this Court containing a verified application, leave to do so shall have been granted. A fee established by this court shall be assessed for all such applications. No admission shall be effective until such time as the fee has been paid[.]" E.D. Pa. Local Civ. R. 85.3.2.

Gomez claims that in this type of nationwide case, the *pro hac vice* requirements are not appropriate, since the fee an attorney must pay to proceed *pro hac vice* could exceed the payout a class member receives on their claim. (*See id.* at 8 ("[T]his Court should have waived the *pro hac vice* requirements for class members to have attorneys appear on their behalf and file objections. When I called attorneys, some were willing to file my objections for me, but stated there is a $200 *pro hac vice* fee which simply is not appropriate in this type of nationwide case. The fee for *pro hac vice* probably exceeds what I would receive through my claim.").) Gomez does not cite any authority for his position that the attorney *pro hac vice* requirements should be waived, nor does he specify the basis on which he is challenging the requirements (i.e., that they are unconstitutional). And Gomez fails to even argue that he or his attorney (or anyone else) ever sought to

Case 4:21-cv-00196-MWB    Document 261-1    Filed 01/20/26    Page 185 of 287

In re Remicade Antitrust Litigation, Not Reported in Fed. Supp. (2023)

have the *pro hac vice* requirements waived in this case. As such, the Court is unpersuaded by the merit of this objection.

\* \* \*

In sum, the Court finds that the Settlement is fair, reasonable, and adequate, overrules Gomez's objections, and approves the Settlement.

### III. Attorneys' Fees, Costs, and Service Awards

Class Counsel requests the Court award attorneys' fees of $7 million and costs of $2,288,388.90, and Plaintiffs request the Court grant each Class Representative a service award. (Doc. No. 195-1 at 30–39, Doc. No. 195-2 at ¶¶ 38, 40, 47.) We consider each request in turn.

#### *A. Attorneys' Fees*

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). Attorneys' fees may be calculated using either the percentage-of-recovery method or the lodestar method. *See Halley v. Honeywell Int'l, Inc.*, 861 F.3d 481, 496 (3d Cir. 2017). Where, as here, the settlement funds come from a common fund, courts generally evaluate the attorneys' fees' reasonableness using the percentage-of-recovery method, with a lodestar crosscheck. *Id.*; *see also Glaberson v. Comcast Corp.*, Civil Action No. 03-6604, 2015 WL 5582251, at \*11 (E.D. Pa. Sept. 22, 2016) ("The Third Circuit favors the percentage-of-recovery method of calculating fee awards in common fund cases. Courts within the Third Circuit and elsewhere routinely use this method in antitrust class actions.") (collecting cases).

#### 1. Percentage-of-Recovery Method

**\*24** "The percentage-of-recovery approach compares the amount of attorneys' fees sought to the total size of the fund." *Id.* Courts consider the following factors in assessing the reasonableness of a request for attorneys' fees:

(1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or the fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6)

the amount of time devoted to the case by counsel; and (7) awards in similar cases.

*Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000). Courts also generally consider three additional factors:

(8) [T]he value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations, (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained, and (10) any innovative terms of settlement.

*In re Diet Drug*, 582 F.3d 524, 541 (3d Cir. 2009) (citing *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 338 (3d Cir. 1998)).

Class Counsel requests $7 million in attorneys' fees, representing approximately 28% of the monetary distribution to the Settlement Class. (Doc. No. 195-1 at 30.) Each of the *Gunter/Prudential* factors supports a finding that the requested fees are reasonable.

*Size of the Fund Created and Number of Beneficiaries.* "The first *Gunter* factor considers the fee request in comparison to the size of the fund created and the number of class members to be benefited." *Harshbarger v. Penn Mutual Life Ins. Co.*, Civil Action No. 12-6172, 2017 WL 6525783, at \*3 (E.D. Pa. Dec. 20, 2017) (cleaned up). Here, the Settlement Fund is $25,00,000. This is a sizeable fund, which will benefit a large class likely consisting of thousands of TPPs and consumers. (*See* Doc. No. 195-1 at 32; *see also* Doc. No. 207-11 at ¶ 9 (showing that over 160,000 claims were filed as of January 9, 2023).) This factor supports the award of the requested fees.

*Presence or Absence of Objections.* As noted above, the Notice alerted the Settlement Class that Class Counsel would request attorneys' fees and expenses not to exceed one-third of the Settlement Fund. Only one Class Member, Gomez, has objected to the Settlement, including to the carveout for attorneys' fees. (*See* Doc. No. 206-1 at 7.) This factor also weighs in favor of approval. *See In re AremisSoft Corp. Secs. Litig.*, 210 F.R.D. 109, 131 (D.N.J. 2002) (holding that the "reaction of the Class confirm[ed] the reasonableness of the requested fee" where "only one member of the Class [ ] objected to Plaintiffs' Counsel's request for an award of attorney's fees or reimbursement of expenses" and the objection was "vague and conclusory"); *see also In re Schering-Plough Corp. Enhance Secs. Litig.*, Civil Action Nos. 08-397 (DMC)(JAD), 08-2177 (DMC)(JAD), 2013 WL

Case 4:21-cv-00196-MWB    Document 261-1    Filed 01/20/26    Page 186 of 287

In re Remicade Antitrust Litigation, Not Reported in Fed. Supp. (2023)

5505744, at *25 (D.N.J. Oct. 1, 2013) (finding that the "overwhelming positive reaction [of the class] ... strongly support[ed] approval of the requested fee" where the court only received a single objection to the fee application). *Cf. In re Veritas Software Corp. Secs. Litig.*, 396 F. App'x 815, 819 n.2 (3d Cir. 2010) (affirming approval of fee award of 30% and "not[ing] that, while certainly not dispositive, not a single other member out of the hundreds of thousands of known class members in this litigation objected to the award of attorneys' fees").

**\*25** *Skill and Efficiency of Attorneys Involved.* Class Counsel is skilled, efficient, and vigorously litigated this matter. In preliminarily approving the Settlement, the Court found the law firm Robbins Geller Rudman & Dowd competent to serve as Class Counsel (*see* Doc. No. 177 at 15–16), and nothing has changed to undermine the Court's confidence in their ability.

In their motion, Class Counsel notes that they "worked with a group of other counsel appearing in the Action, 'Plaintiff's counsel[.]' " (Doc. No. 195-1 at 33.) These firms include Freedman Hollander & Goldberg, PA, Gustafson Gluek PLLC, and Miller Shah, LLP.[31] (Doc. No. 195-2 at n.3.) As with Robbins Geller, these firms and their attorneys have experience litigating similar complex antitrust class actions. (*See* Doc. No. 195-27 (Freedman Boyd Hollander Goldberg Urias & Ward P.A. resume, which shows that David A. Freedman's practice "includes significant class action litigation across the country, principally involving antitrust, securities, and contract matters"); Feb. 27, 2023 Hr'g Tr. at 27:8–17 (representing that Joe Goldberg of the Boyd Hollander firm is "one of the leading antitrust authorities, particularly related to expert issues" and has written textbooks regarding antitrust damages and expert issues); Doc. No. 195-31 (Gustafson Gluek resume, which shows that the firm specializes in "complex litigation" and was ranked as one of the Top 25 Lead Counsel in antitrust complaints in the 2020 Antitrust Annual Report and that Michelle Looby is Co-Chair of the firm's antitrust litigation team and has served as co-lead counsel in numerous class actions); Doc. No. 195-37 (Miller Shah resume, which states that its lawyers "have successfully represented plaintiffs and defendants in major civil antitrust matters throughout the United States" and that the firm has been appointed lead counsel in over 75 cases in antitrust, competition, consumer protection and trade regulation cases).) Alexandra Bernay of Robbins Geller oversaw the group to "ensure that work

assignments were not duplicative and that resources were efficiently allocated." (Doc. No. 195-2 at ¶ 38.)

Defendants were likewise represented by experienced counsel from high-quality and well-regarded law firms Ballard Spahr LLP, Patterson Belknap Webb & Tyler LLP, and Covington Burlington LLP. (Doc. No. 195-2 at ¶ 44.)

The attorneys representing both parties are well-credentialed, highly qualified, and have years of experience litigating similar matters, so this factor weighs in favor of finding the requested fees reasonable.

*Complexity and Duration of Litigation.* As discussed above, Class Counsel have been preparing for and litigating this case for five years. (Doc. No. 195-2 at ¶ 32.) They have investigated claims against Defendants, briefed a motion to dismiss, engaged in years of complex document and written discovery, and "deposed dozens of party and non-party witnesses." (*Id.* at ¶¶ 32–33; *see also id.* at ¶ 10 (explaining that they have retained experts, reviewed and analyzed approximately 18 million party and non-party documents, took and defended 32 depositions, and underwent extensive motion practice).) And courts acknowledge that antitrust class actions are among the most complex to litigate. *See, e.g., In re Flonase Antitrust Litig.*, 291 F.R.D. at 99, 104; *see also In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d at 1011 ("Antitrust class actions are inherently complex. The legal and factual issues are complicated and highly uncertain in outcome."). Given the length and complexity of this litigation, this factor weighs in favor of approving the fee request.

**\*26** *Risk of Nonpayment.* Class Counsel undertook this case on a contingent basis. (Doc. No. 195-2 at ¶ 37.) "Courts routinely recognize the risk created by undertaking an action on a contingency fee basis militates in favor of approval." *Whiteley v. Zynerba Pharms., Inc.*, CIVIL ACTION NO. 19-4959, 2021 WL 4206696, at *12 (E.D. Pa. Sept. 16, 2021) (quoting *In re Schering-Plough Corp. Enhance ERISA Litig.*, Civil Action No. 08–1432 (DMC)(JAD), 2012 WL 1964451, at *7 (D.N.J. May 31, 2012)). Class Counsel have worked on this litigation for five years but have not been paid a cent to date. (*See* Doc. No. 195-2 at ¶ 37.) They took the risk they would never be able to recoup fees for any of their efforts, so this factor weighs in favor of awarding the fees requested.

*Time Devoted by Class Counsel.* Altogether, Class Counsel, together with Plaintiffs' Counsel, have devoted over 23,600 hours of attorney time to this litigation. (*See* Doc. No. 195-2

at ¶ 38 (showing that Class Counsel billed 20,380.80 hours and that together with Plaintiffs' Counsel, they billed a total of 23,698.55 hours).) As noted above, this is a complex antitrust litigation that involved lengthy discovery. The amount of time Class Counsel put into this litigation also weighs in favor of approving the fee request.

*Awards in Similar Cases.* "Courts within the Third Circuit often award fees of 25% to 33% of the recovery." *In re Insurance Brokerage Antitrust Litig.*, 297 F.R.D. 136, 155 (D.N.J. 2013) (cleaned up); *see also In re Comcast Corp. Set-Top Cable Television Box Antitrust Litig.*, 333 F.R.D. at 388 ("In this District, fee awards generally range between nineteen and forty-five percent of the common fund."). "A one-third fee award is *standard in complex antitrust cases.*" *In re Flonase Antitrust Litig.*, 291 F.R.D. at 104 (emphasis added). The fees Class Counsel have requested represent roughly 28% of the distribution to the Settlement Class, which is less than the one-third usually granted in complex antitrust cases and less than the amount Class Counsel were entitled to seek under the Settlement and pursuant to the Notice. Courts regularly approve fee awards around this size. *See, e.g., In re Flonase Antitrust Litig.*, 291 F.R.D. at 103–04 (granting a one-third fee award where there was a $35 million settlement fund); *In re Insurance Brokerage Antitrust Litig.*, 297 F.R.D. at 155 (approving award of 33% of recovery in common fund antitrust action). *Cf. In re Veritas Software Corp. Secs. Litig.*, 396 F. App'x at 818 (affirming fee award of 30%, noting that the "District Court took into account that class counsel spent four years, and thousands of hours of attorneys' labor, litigating [the] case"). This factor weighs in favor of approval as well.

*Value of Benefits Attributable to Class Counsel's Efforts.*[32] There is no evidence that that class counsel was assisted by governmental investigation,[33] so this factor weighs in favor of awarding the fees requested. *See In re Flonase Antitrust Litig.*, 291 F.R.D. at 104–05 (finding the factor weighed in favor of approval where class counsel was not assisted by a government investigation).

**\*27** *Percentage that Would Have Been Awarded in Private Contingency Arrangement.* Class Counsel requests fees that represent approximately 28% of the distribution to the class. (Doc. Nos. 195-1, 195-2.) 33%—which is higher than the requested 28%—is a standard contingency award. *See Boone v. City of Philadelphia*, 668 F. Supp. 2d 693, 714 (E.D. Pa. 2009) (explaining that the median attorneys' fee award in class actions is one-third, or 33%); *see also*

*In re Ins. Brokerage Antitrust Litig.*, 297 F.R.D. at 156 ("Attorneys regularly contract for contingent fees between 30% and 40% with their clients in non-class, commercial litigation. Accordingly, Class Counsel's requested 33% fee amount is within the range of privately negotiated contingent fees." (cleaned up)). (*See* Feb. 27, 2023 Hr'g Tr. at 26:1–9.) This factor also weighs in favor of approval.

*Innovative Terms of Settlement.* Because there is no evidence here that the Settlement Terms are particularly innovative, the Court finds this factor to have a neutral effect. *See, e.g., Pinnell*, 2021 WL 5609864, at *1 n.2 ("There is no evidence that the Settlement Terms are remarkable. In the absence of any innovative terms, this factor neither weighs in favor nor against the proposed fee request." (cleaned up)); *In re Flonase Antitrust Litig.*, 291 F.R.D at 105 ("The terms of this settlement are relatively standard. In the absence of any innovative terms, this factor neither weighs in favor nor against the proposed fee request.").

\* \* \*

Considering these factors together, the Court finds the requested attorneys' fees reasonable under the percentage-of-recovery method.

**2. Lodestar Crosscheck**

The Third Circuit has recommended that courts crosscheck the reasonableness of the attorneys' fees request using the lodestar method. *Gunter*, 223 F.3d at 195 n.1. "The purpose of the cross-check is to ensure that the percentage approach does not result in an 'extraordinary' lodestar multiple or windfall." *Whiteley*, 2021 WL 4206696, at *13 (quoting *In re Cendant Corp. Litig.*, 264 F.3d 201, 285 (3d Cir. 2001)). "The lodestar method 'multiplies the number of hours counsel worked on the case by a reasonable hourly billing rate for such services,' and compares that amount to the attorneys' fees sought." *Halley*, 861 F.3d at 496 (quoting *Sullivan*, 667 F.3d at 330).

As detailed in the chart below, Class Counsel have expended 20,380.80 hours on this case, which correlates to a lodestar of $10,074,155.25. (Doc. No. 195-15.) Class Counsel, together with Plaintiffs' Counsel, have expended 23,698.55 hours on this case, which correlates to a lodestar of $11,811,010.25. We include breakdowns for each of the firms below, which include attorney time and paraprofessional (e.g., paralegal) time.

In re Remicade Antitrust Litigation, Not Reported in Fed. Supp. (2023)

| Attorney | Hours Worked | Robbins Geller Hourly Rate | Individual Lodestar |
|---|---|---|---|
| Alexandra S. Bernay | 1,357.20 | $925 | $1,255,410.00 |
| Carmen Anthony Medici | 1,006.60 | $850 | $855,610.00 |
| David W. Mitchell | 89.60 | $955 | $855,568.00 |
| Lonnie A. Brown | 33.60 | $580 | $19,488.00 |
| Armen Zohrabian | 35.10 | $630 | $22,113.00 |
| Randi D. Bandman | 14.10 | $1,080 | $15,228.00 |
| Patrick J. Coughlin | 68.60 | $1,325 | $90,895.00 |
| Arthur L. Shingler | 2,364.50 | $1,025 | $2,423,612.50 |
| Jennifer E. Daniel-Duckering | 25.55 | $445 | $11,369.75 |
| Daniel Baig | 4,200.20 | $350 | $1,470,070.00 |
| Joseph S. Capobianco | 4,196.60 | $350 | $1,468,810.00 |
| Charles T. McCue | 167.00 | $445 | $74,315.00 |
| Joshua A. Youngkin | 4,283.70 | $350 | $1,499,295.00 |
| Litigation Support | 826.60 | $150-440 | $198,766.00 |
| Paralegals | 1,502.45 | $325-375 | $552,745.00 |
| Document Clerks | 209.40 | $100-150 | $30,745.00 |
| **Total** | 20,380.80 | | $10,074,155.25 |

(Doc. No. 195-15.)

| | | Freedman Boyd Hollander & Goldberg, P.A. | |
|---|---|---|---|
| Attorney | Hours Worked | Hourly Rate | Individual Lodestar |

| Joseph Goldberg | 238.50 | $650 | $155,025.00 |
|---|---|---|---|
| Vincent Ward | 3.00 | $300 | $900.00 |
| Frank Davis | 7.80 | $225 | $1,755.00 |
| Nicholas Hart | 108.00 | $225 | $24,300.00 |
| Larissa Lozano | 99.50 | $225 | $22,387.50 |
| Christopher Dodd | 17.70 | $225 | $3,982.50 |
| Deborah Tope | 75.45 | $115 | $8,676.75 |
| David Harrigan | .20 | $115 | $23.00 |
| Michael Goldberg | 87.15 | $450 | $39,217.50 |
| **Total** | 637.3 | | $256,267.25 |

**\*28**  (Doc. No. 195-23.)

| Gustafson Gluek PLLC | | | |
|---|---|---|---|
| *Attorney* | *Hours Worked* | *Hourly Rate* | *Individual Lodestar* |
| Daniel E. Gustafson | 2.00 | $1,200 | $2,400.00 |
| Dennis J. Stewart | 32.00 | $1,100 | $25,200.00 |
| Karla M. Gluek | 1.75 | $1,000 | $1,750.00 |
| Jason S. Kilene | 19.00 | $950 | $18,050.00 |
| Daniel C. Hedlund | 0.75 | $1,000 | $750.00 |
| Cathy K. Smith | 138.50 | $700 | $96,950.00 |
| Michelle J. Looby | 154.00 | $775 | $119,350.00 |
| Ling S. Wang | 288.75 | $500 | $144,375.00 |
| Abou B. Amara | 0.50 | $375 | $187.50 |

| | | | |
|---|---|---|---|
| Mickey L. Stevens | 190.75 | $525 | $100,143.75 |
| Gabrielle O. Sliwka | 212.75 | $315 | $67,016.25 |
| Sarah A. Moen | 1.25 | $325 | $406.25 |
| Diana Jakubauskiene | 27.75 | $300 | $8,325.00 |
| *Total* | 1,069.75 | | $594,903.75 |

(Doc. No. 195-29.)

<u>**Miller Shah LLP**</u>

| Attorney | Hours Worked | Hourly Rate | Individual Lodestar |
|---|---|---|---|
| Alec Berin | 1.40 | $475 | $665.00 |
| Anna D'Agostino | 37.20 | $375 | $13,950.00 |
| Betsy Ferling | 1.60 | $250 | $400.00 |
| Emily Finestone | 37.40 | $475 | $17,765.00 |
| Natalie Finkelman | 336.30 | $950 | $319,485.00 |
| Jayne A. Goldstein | 166.10 | $950 | $157,795.00 |
| Henry Graney | 226.60 | $215 | $48,719.00 |
| Christine Mon | 33.60 | $225 | $7,560.00 |
| Sue Moss | 51.80 | $250 | $12,950.00 |
| Michael Ols | 434.80 | $475 | $206,530.00 |
| Casey Yamasaki | 10.00 | $400 | $4,000.00 |
| Pam Cholden | 273.90 | $350 | $95,865.00 |
| *Total* | 1,610.70 | | $885,684.00 |

(Doc. No. 195-33.)

The Court finds both the hourly rate and the number of hours worked reasonable. Plaintiffs' Counsel have many years of experience and are highly skilled in antitrust and other complex litigations such as this. (*See, e.g.*, Feb. 27, 2023 Hr'g Tr. at 27:8–25, 32:5–17.) And their hourly rates, which range from $115 to $1,325,[34] fall well within the range of rates charged by other attorneys in this market. *See Whiteley*, 2021 WL 4206696, at *14 (finding that hourly rates ranging from

$110 to $1,100 "well within the range of what is reasonable and appropriate in this market"). The number of hours worked was also reasonable, especially in light of the circumstances and complexity of this case. *See In re Flonase Antitrust Litig., 291 F.R.D. at 105–06* (approving fee award and finding hours reasonable where class spent over 30,000 hours working on the case over five years).

The lodestar is $11,811,010.25, which results in a lodestar multiplier of 0.59 ($7,000,000 ÷ $11,811,010.25). *See In re Flonase Antitrust Litig., 291 F.R.D. at 106* ("The lodestar multiplier is calculated by dividing the attorneys' fees sought by class counsel ... by the total amount of hours class counsel devoted to the litigation times class counsel's hourly rates.").

**\*29** "The Third Circuit has recognized that multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." *Id.* (cleaned up); *see also Prudential, 148 F.3d at 341* ("Multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied...." (internal citation omitted)). Where, as here, there is a negative multiplier (i.e., the multiplier is less than 1), it means that class counsel "receive *less* under a percentage fee award than their regular billing rates." *Id.*; *see also In re Ins. Brokerage Antitrust Litig., 579 F.3d 241, 284 (3d Cir. 2009)* ("The lodestar multiplier the District Court calculated was less than one and thus reveals that Class Counsel's fee request constitutes only a fraction of the work that they billed in conjunction with the Zurich Settlement."); *In re Fasteners Antitrust Litig., Civil Action No. 08-md-1912. 2014 WL 296954, at \*8 (E.D. Pa. Jan. 27, 2014)* ("A negative multiplier results when the aggregate lodestar value, or the amount of money spent by all the attorneys, is greater than the actual award of fees requested.... Since the multiplier here is less than one, which means that the requested fee is less than the amount that would be awarded using the lodestar method, we are satisfied that a lodestar cross-check confirms the reasonableness of Co-Lead Counsel's request for attorney's fees."). Thus, because the lodestar multiplier is 0.59, the lodestar crosscheck confirms the reasonableness Class Counsel's fee request.

\* \* \*

In sum, the requested attorneys' fees are reasonable under both the percentage-of-recovery method and the lodestar crosscheck, and the Court awards Class Counsel $7,000,000 in fees.

#### B. Expenses

Plaintiffs' Counsel have requested reimbursement for $2,288,388.90 in litigation expenses. (Doc. No. 195-2 at ¶ 38 (showing Plaintiffs' Counsel seeks reimbursement $2,288,388.90, where Class Counsel incurred $2,067,209.83 of that sum); Doc. No. 195-1 at 37.) These expenses include filing, witness, and service of process fees; travel fees; fees to pay a consultant, Info Tech, Inc.; legal and financial research fees; document hosting and production; and administrative expenses such as making photocopies. (*See, e.g.*, Doc. No. 195-1 at 37.) These expenses are well documented. (*See* Doc. Nos. 195-14 at ¶¶ 6(a)–(g); 195-16, 195-17, 195-18, 195-19, 195-20; *see also* Doc. Nos. 195-22 at ¶¶ 5–6; 195-24, 195-25, 195-26; 195-28 at ¶¶ 5–6; 195-30; 195-32 at ¶¶ 5–6; 195-34, 195-35, 195-36.)

The Court notes that courts in this Circuit have routinely reimbursed similar fees. *See, e.g., In re Remeron Direct Purchaser Antitrust Litig., No. Civ. 03-0085, 2005 WL 3008808, at \*17 (D.N.J. Nov. 9, 2005)* (granting reimbursement of $1.93 million in expenses, which reflected "costs expensed for purposes of prosecuting this litigation, including substantial fees for experts; substantial costs associated with creating and maintaining an electronic document database; travel and lodging expenses; copying costs; and the costs of court reporters and deposition transcripts"). Further, only one Class Member objected to the reimbursement. (*See* Doc. No. 206-1 at 7.) The Court finds that these expenses are reasonable, and we will grant Class Counsel's request for reimbursement. *See In re Flonase Antitrust Litig., 291 F.R.D. at 106* (granting reimbursement request for $1,848,720.15 for expenses that included expert fees, payments to the litigation fund co-counsel established for common expenses, etc. and noting that counsel "had a strong incentive to conserve their expenses, given that they were incurred with no guaranteed recovery"); *see also Lincoln Adventures LLC v. Those Certain Underwriters at Lloyd's, London Members, Civil Action No. 08-00235 (CCC), 2019 WL 4877563, at \*8 (D.N.J. Oct. 3, 2019)* (finding $1.85 million in expenses to be reasonable).

#### C. Class Representative Service Awards

Plaintiffs have also asked the Court to grant NEHP a $15,000 service award and Local 295 a $15,600 service award. (Doc. No. 195-1 at 30.) Service awards are regularly granted to "compensate named plaintiffs for the services they provided and the risks they incurred during the course of the

class action litigation and [ ] reward the public service of contributing to the enforcement of mandatory laws." *Sullivan,* 667 F.3d at 333 n.65.

**\*30** The proposed service awards are appropriate here. Local 295 and NEHP filed lawsuits against Defendants, both of which were eventually consolidated with related indirect-purchaser actions. (Doc. No. 195-12 at ¶ 2; Doc. No. 195-13 at ¶ 2.) NEHP and Local 295 have been involved in the case since its inception, including having "regular correspondence, conference calls, Board meetings, and in-person meetings" with counsel "concerning the status and direction of the case, the investigation and filing of the complaints, discovery, class certification and summary judgment-related issues, and settlement. (Doc. Nos. 195-12 at ¶¶ 2–3; Doc. No. 195-13 at ¶¶ 2–3.) They "searched for and provided significant information and data in response for discovery requests from Defendant" and reviewed major pleadings and filings in the case. (Doc. No. 195-12 at ¶¶ 4–5; Doc. No. 195-13 at ¶¶ 4–5; *see also* Feb. 27, 2023 Hr'g Tr. at 6:8–12 ("Ms. Kellner has encyclopedic knowledge of the Funds, so she was really able to direct in many ways the entire process of gathering documents, more than I at least have seen in other cases, very involved."); *id.* at 6:17–21 ("As I said, [they were] not only gathering documents, but also responding to the Defendant's [sic] interrogatories and document requests. Some of those were quite extensive and took quite a bit of time, more than I would say for many other cases.").) Linda Kellner "prepared for and sat for [a] deposition December 15, 2021" and attended the final approval hearing on behalf of Local 295; in addition, Local 295 "expended $600.00 in unreimbursed out-of-pocket expenses for legal services ... from Local 295's outside fund counsel, Cary Kane PLLC." (Doc. No. 195-12

at ¶¶ 4–5; *see also* Feb. 27, 2023 Hr'g Tr. at 5:16–6:4 (stating that Kellner's deposition was "quite lengthy" and that Class Counsel considered it to be a full day deposition).) Steven Nobles prepared for and sat for a deposition on behalf of NEHP January 20, 2022. (Doc. No. 195-13 at ¶ 4 *see also* Feb. 27, 2023 Hr'g Tr. at 5:16–6:4 (representing that Nobles sat for what a full day deposition).)

Accordingly, the Court grants the request to award NEHP $15,000 and Local 295 $15,600. *See Lincoln Adventures,* 2019 WL 4877563, at \*9 (finding the proposed service awards of $15,000 to each of the two named plaintiffs "to be fair and reasonable, and not excessive" where the class representatives "diligently and patiently monitored [the] case for over a decade, provided documents and information requested by Defendants; reviewed with their counsel important pleadings; sat for full-day depositions" and participated in mediation sessions); *see also Vista Healthplan, Inc. v. Cephalon, Inc.,* CIVIL ACTION No. 2:06-cv-1833, 2020 WL 1922902, at \*33 (E.D. Pa. Apr. 21, 2020) (granting $50,000 service awards to each of four TPP plaintiffs and a $15,000 service award to the consumer plaintiff) (collecting cases).

### IV. Conclusion

The Court is satisfied that final approval is appropriate. Accordingly, Plaintiffs' motion is granted.

An appropriate Order follows.

### All Citations

Not Reported in Fed. Supp., 2023 WL 2530418

Footnotes

1   In short: Certain exclusions aside, the Settlement Class consists of "[a]ll persons and entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of Defendants' infliximab between April 5, 2016 and February 28, 2022." (Doc. No. 172-4 at ¶ 1.6.) Defendants will deposit $25 million into a Settlement Fund for the benefit of the Class. (*Id.* at 5.) The Net Settlement Fund (which is the Settlement Fund, less attorneys' fees and expenses, service awards, settlement administration costs, and taxes) will be distributed to the Class pursuant to the (now Amended) Plan of Allocation and Distribution. (*See* Doc. No. 177 at 4–5; Doc. Nos. 202, 204.)

2   The SHRM HR Daily e-newsletter has approximately 458,000 subscribers. (*See id.* at ¶ 14 (noting that the notice was "delivered to approximately 458,000 subscribers each weekday").)

3   The ThinkAdvisor Life/Health Daily e-newsletter has 37,000 opt-in subscribers. (*See id.* (noting that the notice was "sent to approximately 37,000 subscribers each weekday.").)

Case 4:21-cv-00196-MWB    Document 261-1    Filed 01/20/26    Page 193 of 287

In re Remicade Antitrust Litigation, Not Reported in Fed. Supp. (2023)

4    Ultimately, 73,186,129 impressions were delivered, meaning an additional 386,129 impressions were delivered at no extra charge. (*Id.* at ¶ 17.)

5    (*See also* Doc. No. 172-5 at 4–5 ("Settlement Class Members' Recognized Claims are subject to calculation under only one of ¶¶ 5(a), 5(b), or 5(c) below.... (a) The Recognized Claim of Class Members that reside or have their principal place of business in one of the Selected States shall be the total dollars spent by that member to indirectly purchase or provide reimbursement for some or all of the purchase price of Remicade. (b) The Recognized Claim of Class Members that do not reside or have their principal place of business in one of the Selected States but indirectly purchased or provided reimbursement for some or all of the purchase price of Remicade in one or more of the Selected States shall be the sum of: (i) The total dollars spent to indirectly purchase or provide reimbursement for some or all of the purchase price of Remicade in any of the Selected States; and (ii) The total dollars spent to indirectly purchase or provide reimbursement for some or all of the purchase price of Remicade outside of the Selected States multiplied by 0.1. (c) The Recognized Claims of Class Members of [sic] that do not reside or have their principal place of business in one of the Selected States and did not indirectly purchase or provide reimbursement for some or all of the purchase price of Remicade in any of the Selected States shall be the total dollar spent to indirectly purchase or provide reimbursement for some or all of the purchase price of Remicade multiplied by 0.1.").)

6    As noted *infra* n.13, this was a public hearing.

7    *Pro se* objector Gomez filed two motions for reconsiderations concerning the December 8, 2022 Order (*see* Doc. Nos. 211, 219), which the Court denied on February 8, 2023 (Doc. No. 220).

8    During the final approval hearing, Class Counsel explained that December 6 was a typographical error; because the Court did not issue its Order approving the Amended Plan until December 8, she believed that the notice to Illinois and Massachusetts class members commenced on December 9. (*See* Feb. 27, 2023 Hr'g Tr. at 13:21–14:14.)

9    As with prior notice efforts, the postcards were mailed via USPS, and the addresses were checked against the NCOA database, certified via CASS, and verified through DPV. (*Id.* at ¶ 5.)

10    Gilardi noted that several claims were submitted from outside of Illinois and Massachusetts in the December claim period. (*Id.*)

11    The letter is dated November 14 and was docketed on November 28. (*See* Doc. No. 201.) This letter was sent prior to the parties' filing, and the Court's approval of, the Amended Plan of Allocation and Distribution.

12    The class period is April 5, 2016 to February 28, 2022 (Doc. No. 172-4 at ¶ 1.6); however, Gomez does not specify *when* in 2016 he purchased Remicade or provide any documentation (*see* Doc. No. 201).

13    Although not raised as a formal objection, in his communications with counsel, Gomez voiced concerns about alleged sealing of "hearing notes." (*See* Doc. No. 207-7 at 2 ("Furthermore, the Court sealed the hearing notes and the public cannot see it. This is a brazen abuse of discretion.").) The November 30, 2022 hearing to which Gomez is referring was open to the public. Moreover, the Court never sealed the transcript for the hearing; although it is not on the docket, anyone can order a copy of the transcript. Furthermore, Gomez has not cited to any authority that he is entitled to a free transcript. *Cf. Walker v. People Exp. Airlines, Inc.,* 886 F.2d 598, 600 (3d Cir. 1989) ("By its express terms, section 753(f) allows litigants to receive transcripts at public expense only if they are proceeding *in forma pauperis,* regardless of whether their case involves criminal, habeas, section 2255, or 'other' proceedings.") (emphasis added); *cf. Schaeffer v. Consoli,* No. 91-CV-4274, 1991 WL 155290, at *1 (E.D. Pa. July 31, 1991) ("A request for a trial transcript is not a matter of right unless an individual is pursuing a direct appeal of his criminal conviction. If a plaintiff is seeking these transcripts for a collateral attack on his conviction, he must demonstrate need."). To the extent Gomez is referring to the minute entry for the hearing (Doc. No. 200), minute entries are administrative in nature and therefore not publicly accessible.

14    Certain identified groups are excluded from the Settlement Class. (*See* Doc. No. 177 at 3–4.)

15    To be clear, the fact that all members of the proposed class have an interest in the settlement itself does not help establish predominance. *See Windsor,* 521 U.S. at 622–23. Nonetheless, the fact that Defendants have agreed to settle not just

Case 4:21-cv-00196-MWB    Document 261-1    Filed 01/20/26    Page 194 of 287

In re Remicade Antitrust Litigation, Not Reported in Fed. Supp. (2023)

with the Named Plaintiffs, but with thousands of similarly situated indirect purchasers/third-party payors and consumers, is a strong signal of the predominance of common factual and legal questions among the class members' claims.

16    As discussed *infra* Section II.D, Gomez's objections lack merit.

17    On August 1, 2022, Plaintiffs submitted for *in camera* review a letter detailing an expected range of Class-wide potential damages, as well as information regarding what percentage of damages the proposed Settlement represented based on preliminary figures. (Doc. No. 195-1 at 24; Doc. No. 224.) Following a telephonic conference on March 15, 2023, the parties agreed that the letter could be filed on the docket. (Doc. No. 224.) At the outset of the litigation, "Plaintiffs estimated damages to range from approximately $33.6 million to $89.7 million annually, which would be expected to decrease annually with any increase in competitive price pressure in the following years." (*Id.*) The letter continued, "Over the course of litigation, with the assistance of expert analysis that was, at settlement, still preliminary, these figures were generally in line with prior expectations." (*Id.*) The letter also explains the total potential damages range and what percentage of the $25 million settlement recovery represented of those estimates. (*Id.*) The Court agrees that those preliminary figures support a finding that the $25 million settlement is reasonable in light of the best possible recovery.

18    The Court does not address Objection 14, which Gomez withdrew in his amendments. (*See* Doc. No. 206-1.)

19    The Court notes that Gomez did not follow the requirements the Notice delineated for objecting. *See* https://www.remicadesettlement.com/media/4003442/notice.pdf. Specifically, Gomez did not provide "documentation sufficient to prove [his] membership in the Settlement Class (such as evidence of [his] Remicade purchases or payments)" nor did he provide "a list of all class action settlements to which [he] and/or [his] counsel have previously objected." *Id.* (*See also* Feb. 27, 2023 Hr'g Tr. at 40:3–19.)

20    Gomez's contention that a class member cannot choose whether to opt out or file a claim form until final approval undermines principles of finality and ignores the analysis a court must undergo in determining whether to grant final approval of a settlement. For example, a court would have much difficulty evaluating whether a class has responded favorably to the settlement if the deadline for opting out or filing a claim had not already passed.

21    The Court also notes that neither Class Counsel nor the Claims Administrator received any complaints from Class Members about needing more time to file their claims. (*See* Feb. 27, 2023 Hr'g Tr. at 42:16–19, 43:9–10.)

22    As Class Counsel noted during the final approval hearing, Gilardi has strict data protections in place, which would protect sensitive information such as social security numbers (*see* Feb. 27, 2023 Hr'g Tr. at 44:14–15), and to the extent Gomez did want to include his social security number, he could have asked the Claims Administrator for an exception (*see id.* at 44:12–14 ("He could have probably asked to not use his social security number. There is no evidence he did.")).

23    Gommez relies upon 5 U.S.C. § 552(a) for in support of his argument. But this statute involves agencies and is inapplicable here. (*See* Doc. No. 206-1 at 5.)

24    As to fraud concerns, Class Counsel explained that based on her review of the claims, which "has been somewhat extensive," "it seems ... that the $1,000 [threshold] has been a dividing line in terms of claims that, at least to [her] eye, look a little bit fishy, and those that seem plainly to be from people who bought the drug." (Feb. 27, 2023 Hr'g Tr. at 20:2–7.)

25    In making this determination, the Court notes that this case is distinguishable from the Third Circuit's decision *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163 (3d Cir. 2013). There, the Third Circuit remanded the case back to the district court to reconsider the fairness of the settlement where the settlement required a valid proof of purchase and the claimants without a valid proof of purchase would only receive a $5 payout. *Id.* at 174–76. As a result of the proof of purchase requirement, only a small percent of the settlement would actually be distributed to class members, with the remainder going to cy pres recipients. *Id.* The Court noted that on remand, the parties may wish to alter the terms of the settlement by increasing the $5 payout or by lowering the evidentiary bar in order to receive a higher award. *Id.* Here, the threshold is much higher (claimants without a valid proof of purchase may still file a claim for under $1,000) and there is no evidence that the majority of the settlement would go to *cy pres* recipients. To the contrary, the TPP claims submitted are "large and significant and from well-known healthcare entities and health and welfare funds, like Local 295, that are quite

large." (Feb. 27, 2023 Hr'g Tr. at 38:23–39:8.) Thus, a large percentage of the settlement will directly be distributed to class members. (*See id.*)

26    The Court is mindful that "direct distributions to the class are preferred over *cy pres* distributions," *In re Baby Prods. Antitrust Litig.*, 708 F.3d at 173, and notes that here the Amended Plan of Allocation provides for a *cy pres* distribution only after additional re-distributions have been made to Class Members (so long as it is cost effective to do so), which in turn occurs only after a certain amount of time has passed (which ensure that Class Members have received their initial distributions). (*See* Doc. No. 202-1 at ¶ 10 ("After the initial Distribution of the Net Settlement Fund, to the extent any monies remain in the Net Settlement Fund after the initial Distribution, if Class Counsel, in consultation with the Settlement Administrator, determines that it is cost-effective to do so, the Settlement Administrator, no less than 7 months after the initial Distribution, will conduct a redistribution of the funds remaining after payment of any unpaid fees and expenses incurred in administering the Settlement, including for such re-distribution, to the Authorized Claimants who have received initial distributions and would receive at least $10.00 from such re-distribution. Additional re-distributions to Authorized Claimants who have received re-distributions and who would receive at least $10.00 on such additional re-distributions may occur thereafter if Class Counsel, in consultation with the Settlement Administrator, determines that additional re-distributions, after the deduction of any additional fees and expenses incurred in administering the Settlement, including for such re-distributions, would be cost-effective. At such time as it is determined that the re-distribution of funds remaining in the Net Settlement Fund is not cost-effective, the remaining balance will be contributed to the Crohn's & Colitis Foundation, or one or more other non-sectarian, not-for-profit, 501(c)(3) organization(s) to be determined by Class Counsel and approved by the Court.").)

27    Gomez claims that Class Counsel refused to add a change of address form. (Doc. No. 206-1 at 7 ("In this case, Class Counsel's refusal to make a simple form has no rational basis other than laziness and a refusal to be flexible and improve their hectic, unclear website.").) Class Counsel states they did not refuse. (Doc. No. 207 at 8 ("Contrary to his assertion, Counsel never 'refused' to add a form for changes of address (although no such form is required).").)

28    In his amended objection, Gomez writes, "While Class Counsel aver that the claimant can contact the claims administrator, this type of requirement discourages contact." (Doc. No. 206-1 at 7.) To the extent Gomez means a change of address form on the website would "discourage contact" between Gilardi and Class Members, Gomez fails to show why such contact needs to be discouraged, or that there would be so many change of address requests as to overwhelm the administrator. The Court finds it unnecessary to eradicate contact between the Gilardi, the administrator, and class members.

29    Gomez is mistaken. Plaintiffs' motion for attorneys' fees and expenses, which includes the categories for which expenses are sought and affidavits breaking down the various expenses, is publicly available on the Court's docket (*see* Doc. No. 195) as well as the settlement website, *see* https://www.remicadesettlement.com/case-documents.aspx.

30    For the same reasons, it would have been impossible to inform Class Members at this point (or earlier) the amount of money each claimant will receive. (*See* Feb. 27, 2023 Hr'g Tr. at 47:25–48:8 ("We can't yet know the amounts that class members will receive ... There's multiple inputs into that math problem, right? You have to say you said you lost this much money, we had 5,000 claims and divided by the pot of money that's there. So we were unable to determine that. We have to look at where do they fit under the three-part allocation standard, et cetera.").)

31    Freedman Hollander & Goldberg, P.A. is counsel of record for Named Plaintiff The Welfare Fund of Plumbers Local Union No. 200, and Gustafson Gluek PLLC is counsel of record for Named Plaintiff Local 295 IBT Employer Group Welfare Fund. (*See* Doc. No. 195-22 at ¶ 2; Doc. No. 195-28 at ¶ 2.) Miller Shah, LLC is Liaison counsel of record for Plaintiffs. (Doc. No. 195-32 at ¶ 2; *see also* Doc. No. 50 at 1–2 (January 23, 2018 Order appointing Miller Shah Liaison Counsel).)

32    During the final approval hearing, Class Counsel explained the procedural history of this case. (*See* Feb. 27, 2023 Hr'g Tr. at 25:7–12 ("So in this case, it started with a case against Pfizer versus Johnson & Johnson and then we brought sort of what I guess would consider a follow-along case. Although we wound up litigating this case for at least another year after they settled and pushed the case forward on our own.").)

33    Following the hearing, Defendants' counsel sent a letter to the Court, which stated that "[i]n July 2019, J & J disclosed in its second-quarter 10-Q that the FTC had issued a civil investigative demand ('CID') in connection with an investigation

of contracting practices related to Remicade." (Doc. No. 222.) However, because the FTC's CID and J & J's disclosure "came nearly two years after the first class plaintiff filed its complaint in September 2017," class counsel "could not have relied on the existence of the CID in bringing claims." (*Id.*) During the hearing, Class Counsel represented that they were not aware of any governmental investigations. (*See* Feb. 27, 2023 Hr'g Tr. at 25:21–25; *see also* Doc. No. 222 (noting that "class counsel confirmed to the court that she was unaware of the investigation").)

34    The Court inquired into the $1,325 rate for Patrick Coughlin during the final approval hearing. (Feb. 27, 2023 Hr'g Tr. at 30:1–17.) Class Counsel represented that the rate reflects his exceptionally high level of expertise, and the Court found this response to support the reasonableness of his rate. (*Id.* ("He is one of the preeminent trial lawyers, antitrust trial lawyers. He has done more than 50 trials. I believe he has not that many hours in the case, and he was absolutely essential ... in getting this case settled. So I think that for him, obviously he is sort of an extraordinary outlier.").)

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

1998 WL 151804
United States District Court, E.D. Pennsylvania.

In re RESIDENTIAL DOORS
ANTITRUST LITIGATION.
THIS DOCUMENT RELATES TO:

Lumco Industries, Inc., et al. v. Jeld–
Wen, Inc., Michigan Birch Door
Manufacturers, Inc., and Young Door Co.

No. 94–3744, Civ.A. 96–2125, MDL 1039.
|
April 2, 1998.

*MEMORANDUM*

RAYMOND J. BRODERICK, J.

 **\*1** Plaintiffs in this consolidated class action have filed a motion for final approval of the proposed settlement between Plaintiffs and Defendants Jeld–Wen, Inc., Michigan Birch Door, Inc. and Young Door Co. (the "Jeld–Wen Defendants"), pursuant to Federal Rule of Civil Procedure 23(e). Under the terms of the proposed settlement, the Jeld–Wen Defendants will pay $1.44 million in cash and $2.4 million in discount certificates which may be applied toward the purchase of qualifying residential flush doors, for a total of $3.84 million in cash and certificates to the Class. In addition, Plaintiff Class counsel has applied to the Court for an award of attorneys' fees in the amount of $1.13 million and reimbursement of out-of-pocket expenses in the amount of $175,954.11. Class counsel has also asked that the Court award a $10,000 incentive payment to each of the four named Plaintiffs who have represented the Plaintiff Class. For the reasons which follow, the Court will grant final approval of the settlement between Plaintiffs and the Jeld–Wen Defendants. Furthermore, the Court will award Plaintiffs' counsel $1.3 million in attorneys fees and $175,954.11. in out-of-pocket expenses. The Court will also award an incentive award of $10,000 to each of the four Class representatives, Lumco Industries, Inc., DuBell Lumber Co., Norwood Sash & Door Manufacturing Co., and Tonka Building Supplies, Inc.

*Factual Background*

The instant action arises out of a conspiracy to fix prices by certain manufacturers of residential flush doors, in violation of federal antitrust laws. In 1994, the Justice Department began an investigation into price-fixing activities between 1990 and 1994 among manufacturers of residential flush doors. As a result of this investigation, the Justice Department filed separate one count criminal informations against flush door manufacturers Premdor Corp., Steves & Sons, Inc., Illinois Flush Door and Ledco, Inc. The criminal informations charged that, during the period from January 1, 1993 through and including December 31, 1993, these manufacturers entered into and engaged in a combination and conspiracy to fix, maintain and stabilize the price of residential flush doors sold throughout the United States, in violation of Section One of the Sherman Act, 15 U.S.C. § 1. Each of these manufacturers pled guilty to the criminal informations, and separate judgment and convictions were entered against each manufacturer. The Justice Department's investigation remained open.

Following the manufacturers' guilty pleas, four civil anti-trust class actions were initiated by purchasers of residential flush doors. Two of these actions were brought in the Eastern District of Pennsylvania, *Lumco Industries, Inc. v. Premdor Corporation, et al.,* 94cv3744; *DuBell Lumber Co. v. Premdor Corporation, et al.,* 94cv4174. Two of the actions were initiated in the Middle District of Florida, *Norwood Sash & Door Manufacturing Co. v. Premdor Corporation, et al.,* 94–975–CIV–T–23A; *Tonka Building Supplies, Inc. v. Premdor Corporation, et al.,* 94–1127–CIV–T–23C. On December 1, 1994, the Judicial Panel on Multidistrict Litigation transferred the two actions from the Middle District of Florida to this Court for coordination and consolidation of pretrial proceedings. On December 13, 1994, Plaintiffs Lumco, Inc., DuBell Lumber Co., Norwood Sash & Door Manufacturing Co., and Tonka Building Supplies, Inc. filed an amended consolidated complaint naming as Defendants Premdor, Steves & Sons, Illinois Flush Door and Ledco (the manufacturers who had pled guilty to the criminal informations), as well as Arrow Door, Inc. and Arrow's president, Jeffrey Gottlieb (which Defendants were never the subject of a criminal information). Plaintiffs complaint alleged that, between 1990 and 1994, these Defendants had participated in a nation-wide conspiracy to fix prices of residential flush doors.

In re Residential Doors Antitrust Litigation, Not Reported in F.Supp. (1998)

1998-1 Trade Cases P 72,113

**\*2** In March, 1996, Plaintiffs initiated a separate anti-trust action against another residential door manufacturer, Jeld–Wen, Inc., and two of its wholly owned subsidiaries, Michigan Birch Door Manufacturers, Inc. and Young Door Company. Plaintiffs' complaint in this action (the "Jeld–Wen action") alleged that the Jeld–Wen Defendants had participated in the nationwide price-fixing conspiracy, along with the previously named Defendant door manufacturers. In July, 1996, this Court consolidated the Jeld–Wen action with the ongoing action against the previously named Defendants.

In August, 1996, Michigan Birch Door Manufacturers, Inc. pleaded guilty to a violation of Section One of the Sherman Act, 15 U.S.C. § 1, in that Michigan Birch engaged in certain price-fixing activities in 1993 (before it was acquired by Jeld–Wen, Inc.) involving "certain customers for residential doors, specifically Lauan Flush doors, in limited geographic areas in Northeastern and Mid–Atlantic states." After Michigan Birch entered its plea, the Justice Department announced that it had completed its investigation into the residential flush door industry.

In September, 1996, the Court preliminarily approved settlements which Plaintiffs had entered into with Defendants Premdor, Steves & Sons, Ledco, Illinois Flush, Arrow and Gottlieb, and ordered that notice of the class action and notice of the proposed settlements be distributed. Under the terms of the settlements, Premdor agreed to pay $11,250,000.00, Steves & Sons agreed to pay $1,000,000.00, Illinois Flush Door agreed to pay $250,000.00, Ledco agreed to pay $250,000.00, and Arrow and Gottlieb agreed to pay $1,800,000.00. Together, the settlement fund totaled $14.55 million.

On December 18, 1996, the Court held a hearing to determine whether the settlements merited final approval. On December 31, 1996, the Court issued a written memorandum and order which approved the settlements, and awarded attorneys fees and costs to Plaintiff Class counsel. Because the parties had entered into settlement agreement before the Court could certify a Plaintiff Class, the Court in its written memorandum certified a Settlement Class, as required by Fed.R.Civ.P. 23. The Settlement Class consisted of:

All persons, firms, corporations, partnerships, groups, or other entities in the United States and its territories (excluding (a) federal, state, and local governmental entities, and (b) defendants and their parent companies, predecessors, successors, subsidiaries, affiliates and co-conspirators) that purchased residential flush doors in the United States directly from any of Premdor Corporation, Steves & Sons, Inc., Illinois Flush door, Inc., Ledco, Inc., Arrow Door Co., Inc., Jeld–Wen, Inc., Michigan Birch Door Manufacturers, Inc. or Young Door Company, or their co-conspirators, or any parent, predecessor, successor, subsidiary or affiliate of any defendant or co-conspirator, at any time during the period from June 1, 1990 to December 31, 1994.

**\*3** Although the Settlement Class included purchasers who had purchased doors from the Jeld–Wen Defendants, the Court made clear that certification of the Settlement Class did not affect Plaintiffs ongoing action against the Jeld–Wen Defendants. The Court stated in its memorandum:

Plaintiffs' action against these non-settling defendants remains pending in this Court, and is unaffected by the proposed settlements herein under consideration, with the sole exception that the amounts received by the Settlement Class in connection with such settlements will be deducted from any judgment that Plaintiffs may ultimately receive with respect to the Jeld–Wen litigation.

Plaintiff Class counsel did not distribute the $14.55 million settlement award to the Settlement Class immediately following this Court's approval of settlement. Instead Class counsel put the money in an interest bearing account pending disposition of the Jeld–Wen action, in the hopes that a single settlement award could be distributed to a single settlement class.

Litigation in the ongoing Jeld–Wen action was far-reaching and hard fought. The Court set an August 1997 discovery deadline and set a trial date for January 1998. In October, 1996, Plaintiff Class counsel filed a motion to certify a Plaintiff Class identical to the Settlement Class which the Court had certified in its December 31, 1996 memorandum. The Jeld–Wen Defendants strongly opposed the motion, and the parties engaged in extensive briefing on the issue. On March 18, 1997, following an evidentiary hearing, the Court granted Plaintiffs' motion for class certification, and certified a Plaintiff Class identical to the Settlement Class defined above.

Although Plaintiffs and the Jeld–Wen Defendants began settlement negotiations in 1996, the parties remained far apart in their settlement proposals, and continued to vigorously litigate the case. The parties became embroiled in discovery disputes which eventually resulted in a stipulation regarding the confidentiality of documents produced by the Jeld–Wen

In re Residential Doors Antitrust Litigation, Not Reported in F.Supp. (1998)

1998-1 Trade Cases P 72,113

Defendants. Additional discovery disputes arose following the Court's certification of the Plaintiff Class.

The parties renewed settlement discussions in early June 1997. By this time, Plaintiffs' counsel had reviewed tens of thousands of documents and had deposed more than a dozen present or former officials of the Jeld–Wen Defendants—in Michigan, Indiana, Oregon and elsewhere.

On June 13, 1997, following several days of face-to-face meetings between Plaintiffs' counsel, Jeld–Wen Defendants' counsel and a senior executive of Jeld–Wen, a tentative settlement was reached. Despite this tentative agreement, however, the parties worked for several months to arrive at the final written settlement agreement which is currently before the Court for approval. The Court granted several continuances of the discovery deadline, and ordered that the distribution of the notice of class action be deferred in order to allow the parties to arrive at a final settlement. On September 10, 1997, the parties entered into a written settlement agreement. The agreement was filed with the Court on September 11, 1997.

*The Proposed Jeld–Wen Settlement*

 **\*4**  The proposed settlement between Plaintiffs and the Jeld–Wen Defendants ("the Jeld–Wen settlement") provides that, in exchange for a payment of $3.84 million in cash and certificates, there will be a full and complete release of all Class claims against the Jeld–Wen, Michigan Birch and Young Door. Under the agreement, Defendant Michigan Birch Door has agreed to pay $1.44 million in cash, and issue $2.4 million in discount certificates. Defendant Jeld–Wen has not agreed to pay any money or issue any certificates. However, Jeld–Wen has agreed to guarantee the obligations of its wholly-owned subsidiary Michigan Birch. Defendant Young Door has not agreed to pay any money or issue any certificates.

Michigan Birch has already paid $50,000 in cash, and has agreed to pay an additional $1.39 million after the Court has approved the settlement, and the requisite time for appeals has expired. In addition, Michigan Birch has agreed to issue $2.4 million worth of certificates that Class members will be able to redeem to receive discounts on the purchase of qualifying residential doors from Jeld–Wen or any of its subsidiaries, as well as certain approved distributors. The terms and conditions of the certificate program are fully set forth in the written settlement agreement entered into by Plaintiffs and the Jeld–Wen Defendants.

The discount certificates will be issued in denominations of up to, but not in excess of, $1,000.00 each. The certificates will be freely transferable except to the other Defendants in the instant action (Premdor, Steves & Sons, Illinois Flush Door, Ledco, Arrow and Gottlieb), or any other United States residential flush door manufacturer or affiliate thereof. Discounts from redeeming certificates shall not exceed $1,000 per standard truckload purchase of doors, or $500 per standard half truckload purchase (approximately 5% of the cost of purchase). The certificates may only be redeemed in connection with the purchase of either a standard truckload or a half-truckload shipment of doors, and may only be redeemed on the purchase of hollow core residential flush doors manufactured with Lauan, birch, oak or Elite® molded door skins (which are slab doors of a frame style and construction commonly available to customers of Michigan Birch or Jeld–Wen). The certificates will be redeemable for a period of approximately fifteen months which period begins at the time the certificates are distributed to Class members.

On October 31, 1997, this Court provisionally approved the proposed Jeld–Wen settlement, finding that it was sufficiently fair, reasonable and adequate for the purpose of disseminating Notice of the Class Action and Proposed Settlement, and the Proof of Claim and Release forms (the "Notice"). The Court ordered that the Notice be distributed to potential class members on or about November 15, 1997. The Court further ordered that Plaintiff Class counsel publish a Summary Notice of settlement in the *Wall Street Journal* on or before November 26, 1997. The Court ordered that all Class members submit objections to the proposed settlement or requests for exclusion from the Class by January 15, 1998, and submit proof of claim forms by February 14, 1998. Additionally, the Court scheduled a hearing on March 5, 1998 in order to determine whether the proposed settlement was fair, reasonable and adequate enough to merit final approval.

 **\*5**  On November 14, 1997, 11,896 Notices were mailed to customers of Premdor Corporation, Steves & Sons, Inc., Illinois Flush Door, Inc., Ledco, Inc. and Arrow Door Co. (the Defendants who had previously settled with Plaintiffs), as well as customers of Jeld–Wen, Michigan Birch and Young Door. In addition, a Summary Notice was published in the national edition of *The Wall Street Journal* on November 25, 1997. Following the initial distribution of Notice and publication of Summary Notice, an additional 369 Notices

In re Residential Doors Antitrust Litigation, Not Reported in F.Supp. (1998)

1998-1 Trade Cases P 72,113

were sent out after counsel obtained recent addresses for some potential members, and received some requests for Notice following publication of the Summary Notice. Plaintiffs' Counsel has filed an Affidavit attesting to the mailing of the Notice and publication of the Summary Notice.

Both the Notice and Summary Notice stated that counsel for the Plaintiff Class intended to apply to the Court for an award of attorneys' fees, reimbursement of out-of-pocket expenses, and incentive awards for each of the class representatives. The Notice specifically stated that class counsel would request an award of attorneys fees not to exceed thirty percent of the settlement fund, and would request a $10,000 incentive award for each of the four class representatives. Both the Notice and Summary Notice informed potential Class members of the deadline for submitting objections to the proposed settlement or fees, as well as the deadline for requesting exclusion from the Class. The Notice included proof of claim and release forms, and informed potential class members when and how to submit these forms. Both the Notice and the Summary Notice informed potential Class members of the scheduled March 6, 1998 hearing before this Court.

According to Class counsel, no Class members have objected to the Jeld–Wen Settlement, and only two members— Compton Lumber & Hardware, Inc. and T.M. Cobb Co.— have asked to be excluded from the Settlement Class. On March 6, 1998, this Court held a hearing on the proposed Jeld–Wen settlement, and Class counsel's application for attorneys' fees, expenses, and incentive awards. No one appeared at the hearing asserting any objection to the proposed settlement or to the award of attorneys' fees, costs or incentive awards.

*Approval of the Proposed Jeld–Wen Settlement*

Rule 23(e) of the Federal Rules of Civil Procedure requires court approval of a class action settlement. Fed.R.Civ.P. 23(e) provides:

A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such a manner as the court directs.

As the Third Circuit has recognized, "the law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved

by avoiding formal litigation." *In Re General Motors Corp. Pick-up Truck Fuel Tank Products Liability Litigation,* 55 F.3d 768, 784 (3d Cir.1995), *cert. denied, General Motors Corp. v. French,* 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995). Nevertheless, the district court has a duty to scrutinize a class action settlement before entering final approval under Fed.R.Civ.P. 23(e). The Third Circuit has directed that the district court must act "as a fiduciary who must serve as a guardian of the rights of absent class members." *Id.* at 784 (quoting *Grunin v. International House of Pancakes,* 513 F.2d 114, 123 (8th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975)).

**\*6** Accordingly, a settlement should be approved by the Court only if it is fair and reasonable and adequately protects the members of the class. *General Motors,* 55 F.3d at 785; *Walsh v. Great Atlantic & Pacific Tea Co.,* 726 F.2d 956, 965 (3d Cir.1983). The settlement should be substantively reasonable and the result of good faith, arms-length negotiations. *Weinberger v. Kendrick,* 698 F.2d 61, 74 (2d Cir.1982), *cert. denied,* 464 U.S. 818 (1983). The "essence of a settlement is compromise. A just result is often no more than an arbitrary point between competing notions of reasonableness." *In re Corrugated Container Antitrust Litig.,* 659 F.2d 1322, 1325 (5th Cir.1981), *cert. denied,* 456 U.S. 998 and 1012, 102 S.Ct. 2283, 73 L.Ed.2d 1294 (1982).

The Court begins its examination of the proposed Jeld–Wen Settlement with a presumption that it is valid and correct. A "presumption of correctness is said to attach to a class settlement reached in arms-length negotiations between experienced, capable counsel after meaningful discovery." Manual for Complex Litigation, Second § 30.41 (1985). In the instant case, the Plaintiff Class and the Jeld–Wen Defendants were represented by law firms with national reputations in the area of class action litigation. As noted above, the settlement negotiations, which concluded after ample discovery, were protracted, hard-fought, and conducted in good faith at arms-length. Counsel for both parties consider the Settlement to be fair and reasonable. In light of counsel's experience, the Court accords their assessment considerable weight.

The Third Circuit has adopted a nine-factor test to guide a district court in its determination of whether a class action settlement is fair, reasonable and adequate: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the litigation; (3) the stage of the proceeding and the amount of discovery completed; (4) the risks of not establishing liability; (5) the risks of not

establishing damages and other relief; (6) the risks of not maintaining the class action through trial; (7) the defendants' ability to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *Girsh v. Jepson,* 521 F.2d 153, 157 (3d Cir.1975).

Applying these factors to the instant case, the Court finds that the settlement between Plaintiffs and the Jeld–Wen Defendants is fair, adequate and reasonable.

First, there is no doubt that continued litigation in this case would present issues that are complex, that would be costly to resolve, that would result in protracted proceedings, and would pose risks for all concerned. Although most discovery has been completed in this action, without settlement there would be substantial time and expense devoted to motions practice, trial preparation and the trial itself, which could last several weeks. In light of the highly contested nature of this action, it is likely that a judgment for either party would be appealed, which would further delay any potential payment to class members. A guaranteed recovery at this stage in the proceedings is in the best interest of the Plaintiff Class.

  **\*7** Second, the reaction of the Plaintiff Class to the proposed settlement weighs heavily in favor of settlement. As set forth in detail above, Plaintiffs' counsel sent out Notice to over twelve thousand potential Class members, as well as printing a Summary Notice in the *Wall Street Journal.* Out of the thousands of potential Class members, no one objected to the settlement and only two members requested exclusion from the Class. No one appeared at the March 6, 1998 hearing to voice any objection to the settlement. The small number of exclusions from the Class and the absence of objections to the settlement militates strongly in favor of approval.

Third, the stage of the proceedings and the amount of completed discovery favors approval of the settlement. At the time of the proposed settlement in this case, the parties had engaged in substantial discovery. Plaintiff Class counsel had expended almost 5,800 hours in connection with the Jeld–Wen action, after having spent almost 8,000 hours litigating the related action against defendants Premdor, Steves & Sons, Illinois Flush Door, Ledco, Arrow and Gottlieb. Accordingly, there is little reason to believe that further discovery would generate significantly more new and worthwhile information. At the hearing, Plaintiff Class

counsel represented to the Court that it was in a position to accurately assess the strengths and weaknesses of its case against the Jeld–Wen Defendants. The Court has no doubt as to Class counsel's ability to make an informed and reasoned judgment concerning settlement with the Jeld–Wen Defendants.

The Court has considered the fourth, fifth and sixth factors set forth in *Girsh,* and has determined that the benefits afforded by settlement outweigh the risks of establishing liability and damages. Although Plaintiffs believe they could prevail in their claims against the Jeld–Wen Defendants, they have conceded that the task would not be easy. The Jeld–Wen Defendants have vigorously denied liability and would continue to deny liability if the case were to go to trial. In their opposition to class certification, the Jeld–Wen Defendants argued that the residential flush door industry is regional in nature and not conducive to an effective national conspiracy. They have made clear that they would continue to make this argument were the case to go to trial. The Jeld–Wen Defendants would further argue that the price-fixing conspiracy which was the basis of the Justice Department's investigation and prosecution was temporally and geographically limited, and was not national in scope as Plaintiffs contend.

The Jeld–Wen Defendants are represented by experienced and skilled attorneys who would mount effective defenses, and present serious challenges to Plaintiffs' attempts to prove liability and damages. The instant case is one which has been and, except for this settlement, would continue to be fiercely contested by both parties. Any trial would last for some time, and considering post-trial motions and the appellate process, it is likely that the Class members would have to wait years for any recovery.

  **\*8** The Court has also considered the seventh factor set forth in *Girsh,* and has determined that there is a substantial question whether the Jeld–Wen Defendants could withstand a greater judgment. Plaintiffs have represented that its case is strongest with respect to Defendant Michigan Birch. It is clear, however, that Michigan Birch does not have the financial resources standing alone to withstand a substantial judgment. Accordingly, the Plaintiffs could be faced with winning their case against Michigan Birch, but not being able to recover as much as the Jeld–Wen Defendants have agreed to pay. Although Defendant Jeld–Wen would be financially able to withstand a substantial verdict, Plaintiffs concede that there is some question whether Plaintiffs could establish Jeld–

Wen's participation in a nationwide price-fixing conspiracy involving all residential flush door products during a four and one-half year period, as alleged in Plaintiffs' complaint.

Finally, the Court has evaluated the range of reasonableness of the settlement in light of the best possible recovery, and the attendant risks of further litigation. The Court has already noted many of the risks associated with further litigation. The possibility of trial producing a recovery that is substantially more favorable than the proposed Jeld–Wen Settlement is tenuous at best given the complex legal and factual difficulties of this case, the severe obstacles associated with establishing liability and damages, and the inherent unpredictability of trial.

Additionally, the Court wishes to note that the Jeld–Wen Settlement is markedly different from the proposed settlement at issue in *General Motors,* which, according to the Third Circuit, "arguably didn't maximize class members interest." 55 F.3d at 803. The parties in *General Motors* had negotiated a settlement in which General Motors would issue $1000 discount certificates to each class member which could be redeemed toward the purchase of a GMC truck or a Chevrolet light truck. These certificates contained significant limitations as to transferability. Although the GM settlement provided that a class member could instead receive a $500 discount certificate which could be redeemed toward the purchase of another General Motors vehicle, the class member had to send GM a written notarized request in order to receive said certificate. Moreover, the GM discount certificates constituted the entire settlement award, which, according to the Third Circuit "is recognized as a prime indicator of suspect settlements." *Id.*

In the instant case, the discount certificates will be of value to the Plaintiff Class members who, as distributors of residential flush doors, will have frequent occasion to buy residential flush doors such as those manufactured by Jeld–Wen and its subsidiaries. Moreover, there are few limitations on the transferability of the Michigan Birch discount certificates. Most significantly, the certificates constitute only a small part of the settlement fund in the instant action. The Jeld–Wen Defendants themselves have agreed to pay $1.44 million. Moreover, the Plaintiff Class has already been awarded over $14.55 million, less attorneys fees and costs, as a result of the related settlements previously approved by this Court. As noted above, the award from the prior settlements has not yet been distributed, and will be distributed along with the award from Jeld–Wen settlement. Counsel for the

Plaintiff Class has represented to this Court that each Class member who has filed a claim will receive a single envelope which will include cash and discount certificates. Counsel has further represented that each member's award will have approximately a four-to-one or five-to-one ratio of cash to certificates.

 **\*9** In summary, the Court believes the proposed settlement with the Jeld–Wen Defendants is favorable to the Plaintiff Class. The Court is satisfied that the settlement has resulted from good faith, arm's length bargaining among experienced counsel possessing all pertinent information. Moreover, the Court believes that the proposed settlement is fair and reasonable and that it adequately protects the members of the Plaintiff Class.

Accordingly, the Court will approve the Jeld–Wen Settlement and will dismiss all complaints and claims in the instant action against the Defendants Jeld–Wen, Michigan Birch and Young Door in their entirety, on the merits and with prejudice, without costs to any party.

*Attorneys Fees, Expenses & Incentive Awards*

Plaintiff Class counsel has requested an award of $1.13 million in attorneys fees. This amount represents approximately 29.43% of the $3.84 million value of the Jeld–Wen Settlement. Plaintiffs' counsel also requests reimbursement for out-of-pocket expenses in the amount of $175,954.11, and a $10,000.00 incentive award for each of the four named Plaintiffs who represented the Plaintiff Class.

For the reasons set forth below, the Court will award class counsel $1.13 million in fees, and will allow reimbursement of $175,954.11 for out-of-pocket expenses. Moreover, the Court will grant each named class representative an incentive award in the amount of $10,000.00.

There were a total of seven law firms who spent a total of 5,791.16 hours working on behalf of the Plaintiff Class in the Jeld–Wen action. The majority of those hours were billed by four law firms who were co-lead counsel for the Plaintiffs: Kohn, Swift & Graf, P.C. (2,047.95 hours); Barrack, Rodos & Bacine (1,590.50 hours); Lockridge, Grindal, Nauen & Holstein, P.L.L.P. (1,068.50 hours); and Keating, Muething & Klekamp, P.L.L. (882.26 hours). The remaining hours were billed by three firms: Cohen, Todd, Kite & Stanford, L.L.C.; Fine, Kaplan and Black; and Berger & Montague, P.C.

In re Residential Doors Antitrust Litigation, Not Reported in F.Supp. (1998)

1998-1 Trade Cases P 72,113

As the Court noted above, the Notice of Class Action and Proposed Settlement which was disseminated to potential class members advised them that Plaintiff Class counsel intended to apply for an award of attorneys' fees from the settlement fund in an amount not to exceed one-third of the fund. No class members have objected to the request for attorneys' fees.

The Supreme Court has recognized that a "litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980). This common fund doctrine "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense." *Id.* An award from the common fund "prevent[s] this inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit." *Id.*

**\*10**  As the Third Circuit noted in *General Motors,* "[a] thorough judicial review of fee applications is required in all class action settlements." 55 F.3d at 819. The two most common methods which a court employs in order to arrive at a reasonable attorneys' fee to be awarded from a common fund are the lodestar method, which requires the court to multiply the hours reasonably expended by a reasonable hourly rate, and the percentage of recovery method, under which an attorney receives a fixed and reasonable percentage of the settlement fund.

The Third Circuit has recognized the propriety of using the percentage of recovery method in common fund class actions. *General Motors,* 55 F.3d at 821–22. The Third Circuit has recommended, however, that, even when using the percentage of recovery method, the court should double check the resulting fee against the lodestar method "to assure that the precise percentage awarded does not create an unreasonable hourly fee." *Id.* at 822.

There is no established percentage of recovery which courts have found to be reasonable in common fund cases. Fee awards have ranged from nineteen percent to forty-five percent, although the normal range is from twenty to thirty percent. *Id.* (quoting *In re Smithkline Beckman Corp. Securities Litig.,* 751 F.Supp. 525 (E.D.Pa.1990)).

The Court has examined both the fee petition submitted by Plaintiffs' counsel and the record of this litigation and has determined that a fee award of $1.13 million which is 29.43% of the $3.84 million value of the Jeld–Wen Settlement Fund, is a reasonable attorneys' fee. The Court's review reveals that the Plaintiff Class members were well served by attorneys who are highly experienced and nationally recognized in class action litigation generally and anti-trust litigation in particular. Plaintiff Class counsel expended 5,791.16 hours on this litigation, and their work was efficiently conducted. Counsel diligently developed the facts and legal issues, analyzed a multitude of documents, were steadfast in settlement negotiations with the Jeld–Wen Defendants, and, ultimately, achieved an excellent result.

As recommended by the Third Circuit in *General Motors,* the Court will employ the lodestar method in order "to assure that the precise percentage awarded is not unreasonable." 55 F.3d at 22. Counsel's petition under the lodestar method is calculated at current billing rates rather than historic billing rates. Counsel represents that "applying the normal rates charged by counsel" the total lodestar is $1,482,449.25. Plaintiffs' counsel's request for $1.13 million is therefore approximately 76% of the total lodestar amount.

The Third Circuit has held that the lodestar may be increased or decreased by the Court after considering (1) "the contingent nature of success" and (2) "the quality of the attorney's work." *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corporation,* 487 F.2d 161, 168 (3d Cir.1975) ( "*Lindy I* "). Federal Courts have often multiplied normal hourly rates up to four times or more. *See, e.g., In re Water Heater Antitrust Litigation,* M.D.L. 379 (E.D.Pa. Aug. 8, 1980).

**\*11**  The Court awarded attorneys fees in the amount of $4.5 million in connection with the related settlements between Plaintiffs and Defendants Premdor, Steves & Sons, Illinois Flush Door, Ledco, Arrow and Gottlieb. That amount represented approximately 30% of the common fund of $14.55 million, and was approximately 2.48 times the lodestar amount of $1,810,162.40. As explained above, the Court's award of attorneys fees in connection with the instant Jeld–Wen Settlement is $1.13 million, which represents 29.43% of the $3.84 million award, and is approximately 76% of the lodestar amount of $1,482,449.25. Accordingly, viewing the settlement in the Jeld–Wen action together with the related settlements in this case, the total amount of attorneys fees awarded in this action is $5.63 million.

In re Residential Doors Antitrust Litigation, Not Reported in F.Supp. (1998)
1998-1 Trade Cases P 72,113

This amount represents approximately 30% of the $18.39 million value of the total settlement, and approximately 1.7 times the total lodestar amount of $3,292,611.65. Considering the complexity of the instant action, and the considerable skill which Plaintiffs' counsel demonstrated in achieving settlement with all of the Defendants in this action, the Court believes that this amount is a reasonable fee award.

Plaintiffs' counsel has also moved for reimbursement of $175,954.11 in out-of-pocket expenses. These expenses include filing fees, costs incurred in photocopying, computer research, telephone calls and postage, and travel expenses. Counsel which incurred these costs have submitted affidavits to the Court which specifically attest to how this money was spent. The Court has determined that counsel's expenses are adequately documented, proper and reasonable. The Court will thus permit reimbursement of these expenses from the Settlement Fund.

Plaintiff Class counsel has also requested an incentive award of $10,000 for each of the four Class representatives. Throughout this action, the Class representatives cooperated in producing documents, answering interrogatories, and presenting representatives for depositions. Their actions have resulted in a significant benefit to the Class, and the Court finds that a $10,000.00 award is appropriate for each of the four Class representatives—Lumco, Inc., DuBell Lumber Co., Norwood Sash & Door Manufacturing, Co., and Tonka Building Supplies, Inc.

*Conclusion*

In summary, the Court finds that the proposed settlement between Plaintiffs and the Jeld–Wen Defendants is fair, adequate, and reasonable. Accordingly, the Court will approve the Jeld–Wen Settlement and will dismiss all complaints and claims in the instant action against Jeld–Wen, Michigan Birch, and Young Door in their entirety, on the merits and with prejudice, and without costs to any party. In approving this settlement, the Court brings final closure to this action after more than three and a half years of litigation, and clears the way for the distribution of over $12 million to the Plaintiff Class. Moreover, the Court will grant Plaintiff Class counsel's application for $1.13 million in attorneys fees and reimburse counsel $175,954.11 for out-of-pocket expenses. The Court will also approve payment of $10,000.00 for each of the four class representatives.

**\*12**  An appropriate Order follows.

*FINAL JUDGMENT AND BAR ORDER*

AND NOW, this 2nd day of April, 1998; the Court having considered Plaintiff Class' motion for final approval of the settlement agreement between Plaintiffs and Defendants Jeld–Wen, Inc., Michigan Birch Door Manufacturers, Inc. and Young Door Co. (hereinafter the "Settling Defendants"); the Court having also considered Plaintiff Class counsel's motion for fees, reimbursement of expenses and incentive awards; on March 6, 1998, the Court having held a hearing on both motions; and for the reasons set forth in the Court's accompanying Memorandum;

IT IS ORDERED:

The Settlement of this action, on the terms and conditions set forth in the Agreement of Settlement filed by Plaintiffs on September 11, 1997 is hereby APPROVED pursuant to Fed.R.Civ.P. 23(e);

IT IS FURTHER ORDERED:

This action has been certified as a class action on behalf of the following Class (hereinafter the "Settlement Class"):

> All persons, firms, corporations, partnerships, groups, or other entities in the United States and its territories (excluding (a) federal, state, and local governmental entities, and (b) defendants and their parent companies, predecessors, successors, subsidiaries, affiliates and co-conspirators) that purchased residential flush doors in the United States directly from any of Premdor Corporation, Steves & Sons, Inc., Illinois Flush door, Inc., Ledco, Inc., Arrow Door Co., Inc., Jeld–Wen, Inc., Michigan Birch Door Manufacturers, Inc. or Young Door Company, or their co-conspirators, or any parent, predecessor, successor, subsidiary or affiliate of any defendant or co-conspirator, at any time during the period from June 1, 1990 to December 31, 1994.

IT IS FURTHER ORDERED:

The Settlement Class shall not include Compton Lumber & Hardware, Inc. and T.M. Cobb Co., which companies timely submitted a request to be excluded from the Settlement Class,

pursuant to Fed.R.Civ.P. 23(c)(2), and are therefore not bound by any of the terms of this Order;

IT IS FURTHER ORDERED:

This entry of final judgment and approval of Settlement shall settle all claims alleged in this action between Plaintiffs and the Settlement Class on the one hand and the Settling Defendants on the other;

IT IS FURTHER ORDERED:

All claims alleged against the Settling Defendants are DISMISSED in their entirety on the merits, with prejudice, as to all Settling Defendants, and without costs to any party;

IT IS FURTHER ORDERED:

Plaintiffs, each member of the Settlement Class (other than persons or entities who have duly requested exclusion from the Settlement Class), each of their predecessors, successors and legal representatives, each present, former and future parent, subsidiary, division, affiliate, assign (whether express or by implication or by operation of law), partner, officer, director, employee, shareholder, attorney, agent, controlling party, controlling stockholder and controlling entity of each entity Plaintiff or entity Settlement Class member, each present, former and future partner, heir, executor, administrator, representative, custodian, assign (whether express or by implication or by operation of law) and trustee of each individual Plaintiff or individual Settlement Class member, any entity now, in the past or hereafter controlled by or controlling any of the foregoing (collectively "Releasors") for good, sufficient and adequate consideration received by the Releasors, hereby fully, finally, completely and forever release and discharge each of the Settling Defendants, their present and past parent and subsidiary corporation sand companies, and their respective predecessors, subsidiaries, division, affiliates, officers, directors, stockholders, employees, agents and all of their respective successors, assigns or legal representatives (collectively, the "Releasees"), from any and all claims, demands, causes of action, obligations of any kind, including costs, expenses and attorneys' fees, arising out of, or having connection in any way whatsoever with, any act, omission, cause, matter or allegation that is in whole or in part the subject of or asserted in any of the complaints filed in the above-captioned action, or in the action previously settled as provided by this Court's Order of December 31,

1996 ("Previously Settled Action"), as will as any claims, demands, causes of action, obligations, damages and liability of any kind, whether known or unknown, including costs, expenses and attorneys' fees, that could have been asserted against any of the Settling Defendants, their present and past parent and subsidiary corporations and companies, and their respective predecessors, subsidiaries, divisions, affiliates, officers, directors, stockholders, employees, agents and all of their respective successors, assigns or legal representatives, arising out of any of the facts alleged in such complaints, or based upon the defense of these actions (such matters being hereinafter collectively referred to as the "released claims"). The released claims shall be binding on every member of the Settlement Class without regard to whether they file a Proof of Claim and Release or receive a distribution from the Settlement Fund. The released claims shall not include any claims or causes of action the Class Plaintiffs or members of the Settlement Class may have against any of the Settling Defendants relating solely to any defense or claim for money owed for product purchased;

**\*13** IT IS FURTHER ORDERED:

Settling Defendants and each of their predecessors, successors and legal representatives, each present, former and future parent, subsidiary, division, affiliate, assign (whether express or by implication or by operation of law), partner, officer, director, employee, shareholder, attorney, agent or controlling party hereby, for good, sufficient and adequate consideration received by Settling Defendants, release and discharge Class Plaintiffs and every member of the Settlement Class; and each of their present and past parents predecessors, subsidiaries, division, affiliates, officers, directors, stockholders, employees, agents, and their respective successors, assigns or legal representatives, from any and all claims, demands, causes of action, obligations of any kind, including costs, expenses and attorneys fees, arising out of, or having connection in any way whatsoever with, any omission, cause, matter or allegation that is in whole or in part the subject of or asserted in the complaints filed in the above-captioned action or the Previously Settled Action, as well as any and all claims, demands, causes of action, obligations, damages and liabilities of any kind, whether known or unknown, that could have been asserted against Class Plaintiffs or any member of the Settlement Class, arising out of any of the facts alleged in such complaints, or based upon commencement and prosecution of this action or the Previously Settled Action ("Settling Defendants' Released Claims"). The Settling Defendants' Released Claims shall not

In re Residential Doors Antitrust Litigation, Not Reported in F.Supp. (1998)

1998-1 Trade Cases P 72,113

include any claims or causes of action the Settling Defendants may have against any Class Plaintiff or member of the Class relating to the sale of any product or service, including, without limitation, any claim for money due in connection with any such sale.

IT IS FURTHER ORDERED:

Any and all claims that arise from or are related to the subject matter of this action and that seek recovery by contribution, indemnity or any other grounds of law or equity for all or any part of the settling Defendants' payments, or the respective payments of those Defendants whose settlement was approved by this Court in its Order of December 31, 1996 in settlement of, or their expenses in, defending this action or the Previously Settled Action are discharged and extinguished, to the end that all disputes among the parties that arise from or are related to the subject matter of this action or the Previously Settled Action are fully and finally concluded;

IT IS FURTHER ORDERED:

This Judgment, the Settlement Agreement and any proceedings taken pursuant thereto are not, and should not in any event be: (i) offered or received as evidence of a presumption, concession or an admission of any misrepresentation or omission in any statement or written document approved or made by any party to this action, or (ii) offered or received as evidence of a presumption, concession or any admission of any liability, fault, wrongdoing or other dereliction of duty, or (except with written consent of the parties to this action ) in any way referred to for any other reason in this action or the Previously Settled Action or in any other civil, criminal, bankruptcy or administrative action or proceeding; provided, however, that reference may be made to the Settlement Agreement in such proceedings as may be necessary to effectuate the provisions of the Settlement Agreement and any proceedings relating to the notice and proof of claim and release forms provided to the Settlement Class;

 **\*14**  IT IS FURTHER ORDERED:

Each and every Releasor, and anyone claiming through or on behalf of any of them, is forever barred and enjoined from commencing, instituting, maintaining or prosecuting against any of the releasees any action, claim, counterclaim, cross-claim or other proceeding in any forum, including any court

of law or equity, arbitration tribunal or administrative forum, whether directly, indirectly representatively, derivatively or in any other capacity, that relates in any way to or constitutes any of the released claims;

IT IS FURTHER ORDERED:

Without affecting the finality of this Judgment, the Court hereby reserves and retains continuing jurisdiction over all matters relating to the administration and effectuation of the stipulations of settlement, including the decision of all disputed question of law and fact with respect to the validity of any claim or right of any person to participate in the settlement fund established thereby;

IT IS FURTHER ORDERED:

Plaintiff Class Counsel are hereby awarded an attorneys' fee of $1.13 million from the Jeld–Wen settlement fund;

IT IS FURTHER ORDERED:

Plaintiff Class counsel are further awarded reimbursement of costs in the amount of $175,954.11 from the Jeld–Wen settlement fund;

IT IS FURTHER ORDERED:

Each of the four class representatives—Lumco, Inc., DuBell Lumber Co., Norwood Sash & Door Manufacturing Co., and Tonka Building Supplies, Inc.—is awarded an incentive payment of $10,000 from the settlement fund;

IT IS FURTHER ORDERED:

The fee, reimbursement of costs and incentive awards shall be paid from the settlement fund thirty-one days following the entry of this Order. In the event of an appeal from this Order, the fee and reimbursement of costs shall bear interest, beginning thirty-one days from the entry of this Order, at the same rate as the settlement fund, until paid; and

IT IS FURTHER ORDERED:

This Order shall be entered as of this date pursuant to Rule 54(b) of the Federal Rules of civil Procedure, the Court finding that there is no just reason for delay.

1998-1 Trade Cases P 72,113

**All Citations**

Not Reported in F.Supp., 1998 WL 151804, 1998-1 Trade
Cases P 72,113

---

**End of Document**
© 2026 Thomson Reuters. No claim to original U.S.
Government Works.

2013 WL 6185607
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

William F. JOHNSON and April
Johnson, on Behalf of Themselves and
All Others Similarly Situated, Plaintiffs,

v.

COMMUNITY BANK, N.A. and First
Liberty Bank and Trust, a division of
Community Bank, N.A., Defendants.

No. 3:12–CV–01405.
|
Nov. 25, 2013.

### Attorneys and Law Firms

Jason H. Alperstein, Jeffrey M. Ostrow, Kopelowitz Ostrow P.A., Fort Lauderdale, FL, Kenneth J. Grunfeld, Ruben Honik, Golomb & Honik, P.C., Philadelphia, PA, Marion K. Munley, Munley, Munley & Cartwright, Scranton, PA, for Plaintiffs.

James C. Oschal, Rosenn, Jenkins & Greenwald, Wilkes Barre, PA, Jonathan B. Fellows, Suzanne O. Galbato, Bond, Schoeneck & King, LLP, Syracuse, NY, for Defendants.

### *MEMORANDUM OPINION*

ROBERT D. MARIANI, District Judge.

#### I. *Procedural History*

**\*1** Presently before the Court is Plaintiffs' and Class Counsel's Unopposed Motion for Final Approval of Class Settlement, and Application for Service Awards, Attorneys' Fees, and Expenses (Doc. 32). The settlement stems from a class action lawsuit that alleged "unfair and unconscionable assessment and collection of excessive overdraft fees" by Defendants, collectively referred to as "Community Bank." (*See* Compl., Doc. 1, at ¶ 1.) Essentially, Plaintiffs alleged that Community Bank re-sequenced the order of debit card transactions on the debit cards that it issued to customers so as to unfairly maximize overdraft fees. (*See* Mot. for Final Approval of Class Settlement, etc., Doc. 32, at 2.) The bank

assesses overdraft fees if a cardholder charges or withdraws more money using his or her debit card than exists in the corresponding account. (Compl. at ¶ 7.) So, for instance, if a customer makes ten deductions of $10 and followed by an eleventh deduction of $101 from a $100 account, the bank would re-sequence the transaction to deduct the $101 first. This would immediately overdraw the account, so that each of the eleven charges would incur an overdraft charge. If, however, the bank processed the transactions chronologically, only the last one (for $101) would be overdrawn, so the customer would only incur one fee.

Plaintiffs filed this action in July 2012 on behalf of a settlement class defined as "all Community Bank customers in the United States who had one or more Accounts and who, during the [time period from July 20, 2006 to August 15, 2010], incurred an Overdraft Fee as a result of Community Bank's Debit Re–Sequencing." (Settlement Agreement, Doc. 32, Ex. A, at ¶ 37.) At least 48,976 individual account holders are known to be members of the class and were mailed notice of the class action. (*See* Cameron R. Azari Decl., Doc. 32, Ex. D, at ¶ 16.)

The parties subsequently began settlement negotiations in September 2012. (Doc. 32 at 5.) After one day of mediation, held on January 14, 2013, they produced the settlement agreement presently under review, which they signed on March 2. (*Id.* at 5–6; *see also id.,* Ex. A (settlement agreement itself).)

The agreement created a settlement fund of $2,500,000, which "shall be used to pay all distributions to Settlement Class Members, any Service Awards to Plaintiffs, and all attorneys' fees, costs and expenses awarded to Class Counsel." (*Id.,* Ex. A, at ¶¶ 41, 44.) Community Bank also agreed not to oppose requests for an additional $5,000 service award for each named Plaintiff, (*id.,* Ex. A, at ¶ 95); for attorneys' fees totaling 33% of the value of the settlement fund, (*id.,* Ex. A, at ¶ 91); or for reimbursement for attorneys' costs and expenses, (*id.*). The remainder of the settlement fund is required to be distributed *pro rata* to the settlement class members by direct deposit to those whose accounts may feasibly be so credited Community Bank customers and by mail to all others. (*See id.,* Ex. A, at ¶¶ 68, 72.)

**\*2** Finally, the settlement agreement yielded certain nonmonetary compensation. For at least the next two years, Community Bank agreed to maintain its current practices of following either a low-to-high or a chronological posting

order for debit card transactions, (*id.,* Ex. A, at ¶¶ 77–78); of charging no more than four overdraft fees per account per day, (*id.,* Ex. A, at ¶ 79–80); and of refraining from charging overdraft fees for accounts that are overdrawn by less than $5.00, (*id.*). Counsel for the Defendant testified that the parties agreed to the two year limitation because Defendant does not "know where [the government] regulators will be in two years" and "want[s] the right to review this policy ... should the regulatory field change." (*See* Doc. 36 at 10:20–11:4.)

Plaintiffs and class counsel now submit the settlement for Court approval. They request that the Court;

1. Grant final approval to the settlement;

2. Certify for settlement purposes the Settlement Class;

3. Appoint Plaintiffs William Johnson and April Johnson as class representatives;

4. Appoint as class counsel Jeffrey M. Ostrow and Jason H. Alperstein of Kopelowitz Ostrow P.A. and Ruben Honik and Kenneth J. Grunfeld of Golomb & Honik, P.C.;

5. Approve service awards to the named plaintiffs;

6. Award class counsel attorneys' fees and reimbursement of expenses; and

7. Enter final judgment dismissing the action with prejudice.

(Doc. 32 at 4–5.)

This Court has already granted requests (2), (3), and (4). (*See* Order Preliminarily Approving Class Settlement and Certifying Settlement Class, Doc. 31, at ¶¶ 4–8.) To the extent that it is necessary to do so, the Court now reaffirms the reasons for its rulings on those requests, which are laid out in Document 31 on the case docket.

As to the other requests, requests (1), (5), (6), and (7) will be granted for the reasons discussed below.

## II. *Settlement Approval*
"A class action [whose settlement will bind class members] may not be settled under [Federal Rule of Civil Procedure] 23(e) without a determination by the district court that the proposed settlement is 'fair, reasonable and adequate.' " *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 534

(3d Cir.2004) (quoting *In re Gen. Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 785 (3d Cir.1995)); *see also* Fed. R. Civ. P. 23(e)(2).

The Third Circuit "has identified nine factors to be considered when determining whether a proposed class action settlement is fair, reasonable and adequate," *In re Warfarin,* 55 F.3d at 785. These factors are laid out in the case *Girsh v. Jepson,* 521 F.2d 153 (3d Cir.1975), as follows:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

**\*3** *Girsh,* 521 F.2d at 157 (quoting *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir.1974) (internal quotations and alterations omitted). As the Court will now discuss, all of the *Girsh* factors weigh in favor of settlement approval.

### 1. Complexity, Expense, and Likely Duration of Litigation
The litigation in this case could be very complex, expensive, and protracted, even compared to other class actions, which are known to exhibit such qualities. The case involves approximately 50,000 class members contesting an area of financial regulatory law that, as discussed below, is unclear and in the process of development. Plaintiffs testify that, if this case were to proceed to trial, they would need to retain data analysts and experts in the fields of marketing and banking. (*See* Joint Decl. of Jeffrey M. Ostrow and Kenneth J. Grunfeld in Supp. of Mot. for Final Approval of Class Settlement, Etc., Doc. 32, Ex. B, at ¶ 28.) The Court finds such testimony credible, as the issue of how banks structure their debit card transactions—and why they chose one structure over others—is well outside the knowledge of the average lay juror. Moreover, as discussed below, (*see* part V., *supra* ), the Plaintiffs have already spent nearly $23,000 on retained experts, despite the fact that this case settled in the very early stages of litigation.

Finally, the litigation would very likely continue on for many years in the absence of settlement. This action was filed in

July 2012, nearly a year and a half from the date of this Opinion. The class was not even certified until June 2013. (*See generally* Doc. 31.) Accordingly, it is quite likely that, without settlement, the class members would have to wait through years of pretrial motions, trial, and appeals before they saw any remuneration. This factor, then, clearly weighs in favor of approval.

### 2. Reaction of the Class to Settlement

Notice of settlement was mailed to 48,976 individual account holders. (*See* Doc. 32, Ex. D, at ¶ 16.) Notice by publication was made in local newspapers and on a website created for this case in order to reach other members not included in the original 48,976. (*See id.* at ¶¶ 22, 25.) Thus, a large number of people were aware of the settlement. But despite the size of the class, counsel testified that not a single class member has objected. (*See* Official Settlement Approval Hr'g Tr., Nov. 12, 2013, Doc. 36, at 14:23–15:3.) Moreover, at the time of the most recent ling to this Court, only five class members have opted out of the class. (*See* Proposed Order Granting Mot. for Final Approval of Class Settlement, Etc., Doc. 37, Ex. 1, at 14 (listing individuals who opted out of the settlement); *see also* Doc. 36 at 15:3–4.) This manifest lack of objection to the settlement weighs heavily in favor of approval.

### 3. Stage of Proceedings and Amount of Discovery Completed

Though this case settled at an early stage, the parties had the opportunity for informal discovery. (*See* Doc. 36 at 8:19–9:5.) The parties testify that the information obtained through discovery allowed Class Counsel to intelligently evaluate the strengths and weaknesses of their case. (*See id.;* Doc. 32, Ex. B, at ¶ 31.) They also testify that discovery was very influential in calculating damages, which ultimately helped foster settlement. (*See* sources cited *id.*) Settlement, meanwhile, was reached after a full day of mediation by an impartial mediator, thus giving the parties more opportunity to objectively evaluate the strengths and weaknesses of their respective case. (*See* Doc. 32, Ex. B, at ¶¶ 7–8.)

**\*4** All of this means that the parties had sufficient information to come to an informed settlement. The fact that class counsel has litigated many of these overdraft-fee class actions before, (*see* Doc. 36 at 5:16–6:18), further indicates that they were able to approach settlement in an informed manner.

### 4. Risks of Establishing Liability

Absent settlement, Plaintiffs faced serious risks of establishing liability. At the outset, there are the inherent risks and uncertainties that any plaintiff faces in litigating a case all the way through trial and appeal. But even aside from that, Defendants could and did rely on substantial legal arguments to prevent Plaintiffs' recovery. First, Defendants argued that their practice of Debit Re–Sequencing had been adequately disclosed to the Plaintiffs and that Plaintiffs had ratified the practice by failing to object. (*See generally* Answer, Doc. 19, at ¶¶ 137, 139–144.) Second, in the recent case of *Gutierrez v. Wells Fargo Bank, NA,* 704 F.3d 712 (9th Cir.2012), the Ninth Circuit found that the National Bank Act preempted state law attempts to regulate the posting order of debit card transactions, thus potentially precluding Plaintiffs' recovery, which was based on state statutes and common-law claims. *See Gutierrez,* 704 F.3d at 724–25. Both sides in the present case agree that *Gutierrez* would be raised if the matter proceeded forward, and that no other circuits have directly addressed this matter. (*See* Doc. 36 at 10:2–17, 21:11–22:19.) Though the Court expresses no opinion as to the merits of these defenses, it is clear that they are substantial and imposed a level of risk in establishing liability that weighs in favor of settlement.

### 5. Risks of Establishing Damages

Because Plaintiffs face significant risks in establishing liability, it follows that they would also face significant risks in establishing damages. The same arguments that could preclude liability could likewise serve to preclude or drastically reduce damages. Therefore, this factor weighs in favor of settlement as well.

### 6. Risks of Maintaining Class Action throughout Trial

The risk of not maintaining the class action throughout trial was also significant. Class certification was only granted for settlement purposes and would have been an issue of contention in the absence of settlement. Class Counsel testified that he believed that Defendants would contest all the bases for class certification except numerosity. (Doc. 36 at 23:16–23.) Losing class certification would have been another barrier to Plaintiffs' recovery, and settlement was a reasonable means of alleviating that risk. Therefore, this factor also weighs in favor of settlement.

**7. Ability of Defendants to Withstand a Greater Judgment**

The parties have not informed the Court with specificity whether the Defendant could withstand a greater judgment. (*See* Doc. 36 at 23:24–25 ("This factor isn't readily known, at least, to me [i.e ., Class Counsel]....").) Defendant is a small regional bank, and should not therefore be automatically assumed to be able to pay a greater settlement. However, even assuming that the bank could pay a greater settlement, the Court finds it reasonable to settle because, as discussed below, this settlement represents a victory for the class members in light of the best possible recovery.

**8. Range of Reasonableness of Settlement Fund in Light of Best Possible Recovery**

**\*5** Plaintiffs' recovery is $2,500,000 under the settlement agreement from an estimated $5,000,000 in most likely recoverable damages at trial. (*See* Doc. 32, Ex. B, at ¶ 42.) Class Counsel testified that "50 percent [of most likely recoverable damages] ... is right around the upper limit that we settle these cases for." (Doc. 36 at 24:6–8.) He added that this "is a big deal for us, because of the fact that we settled it after [*Gutierrez v. Wells Fargo* ] and still were able to sustain the percentages that we required for settlement." (*Id.* at 24:9–11.) The Court has no reason to doubt these representations. The Court also agrees that the *Gutierrez* decision added an element of uncertainty that reduced the likelihood of recovery. Fifty percent of the recoverable damages at trial is therefore reasonable and weighs in favor of settlement.

**9. Range of Reasonableness of Settlement Fund in Light of Ail Attendant Risks of Litigation**

This final factor weighs in favor of approval for all the reasons discussed above. Litigation in this matter would have been costly and protracted. It would also involve a complicated area of law that would require significant expert testimony and that would be far beyond the knowledge of the average lay juror. Finally, it would be subject to serious and significant legal defenses at the class certification, summary judgment, trial, and appellate stages, which could drastically reduce if not utterly preclude Plaintiffs' recovery. At each successive stage of litigation, the class would be subject to a great number of risks, many of which may not be apparent now but would only come to light as litigation progresses. In light of this, a settlement for half of the most likely recoverable damages is certainly reasonable and represents a respectable victory for the Plaintiffs.

**III.** *Service Awards to the Named Plaintiffs*

Next, Class Counsel requests a $5,000 award to be given to each of the two Named Plaintiffs. (*See* Doc. 32 at 29.)

Factors to consider when assessing incentive awards are: (a) the risk to the plaintiff in commencing suit, both financially and otherwise; (b) the notoriety and/or personal difficulties encountered by the representative plaintiff; (c) the extent of the plaintiffs personal involvement in the suit in terms of discovery responsibilities and/or testimony at depositions or trial; (d) the duration of the litigation; and (e) the plaintiffs personal benefit (or lack thereof) purely in his capacity as a member of the class.

*Godshall v. Franklin Mint Co.,* 2004 WL 2745890, at \*6 (E.D.Pa.2004) (citing *In re Plastic Tableware Antitrust Litig.,* 1995 WL 723175, at \*2 (E.D.Pa.1995)). This is not a formal test, but merely represents some of "the reasons courts cite for approving such awards." *In re U.S. Bioscience Sec. Litig.,* 155 F.R.D. 116, 121 (E.D.Pa.1994).

The Johnsons' award was agreed upon in paragraph 95 of the Settlement Agreement. (*See* Doc. 32, Ex. A, at ¶ 95.) According to Class Counsel, the Named Plaintiffs provided assistance to counsel and to the class by "(1) submitting to interviews with Class Counsel; (2) locating and forwarding responsive documents and information; and (3) participating in conferences with Class Counsel." (*Id.,* Ex. B, at ¶ 44.) They were also prepared to assist in formal discovery and to appear and testify at trial, neither of which became necessary. (*Id.*)

**\*6** These services appear somewhat minor. There is also no evidence that Named Plaintiffs took on any personal risks through their role in this action.

Nonetheless, it is undeniable that the class action itself brought benefits to the class, and it is quite likely that the Named Plaintiffs meetings with Class Counsel helped counsel investigate and litigate this matter. For helping the other class members realize these benefits, the Named Plaintiffs deserve some kind of award. Moreover, the Court does not believe that the proposed total award of $10,000 (or 0.4%) of a $2,500,000 settlement fund is unreasonable. Such an award would not significantly reduce compensation for the other class members, nor is it out of the mainstream for class action service awards in the Third Circuit. *See, e.g., Craig v. Rite Aid Corp.,* 2013 WL 84928, at \*13 (M.D.Pa.2013) (collecting cases).

#### IV. *Attorneys' Fees*

Finally, Class Counsel seeks attorneys' fees and reimbursement for costs and expenses. The Settlement Agreement provides that "Community Bank agrees not to oppose Class Counsel's request for attorneys' fee of up to thirty-three percent (33%) of the value of the Settlement, as well as reimbursement of costs and expenses incurred in connection with the Action." (Doc. 32, Ex. A, at ¶ 91.) Structuring attorneys' fees via this "percentage-of-recovery method is generally favored in common fund cases because it allows courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure.' " *In re Rite Aid Corp. Sec. Litig.,* 396 F.3d 294, 300 (3d Cir.2005) (quoting *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,* 148 F.3d 283, 333 (3d Cir.1998)).

The Third Circuit has held that a "district court should consider seven factors when analyzing a fee award in a common fund case." *In re Rite,* 396 F.3d at 301. These factors are:

(1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

*Id.* (citing *Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190, 195 n. 1 (3d Cir.2000)). "The factors listed above need not be applied in a formulaic way. Each case is different, and in certain cases, one factor may outweigh the rest." *Gunter,* 223 F.3d at 195 n. 1. As discussed below, all factors weigh in favor of approval in the present case.

#### 1. Size of the Fund and Number of Persons Benefitted

The Settlement Fund is approximately $2,500,000, (*see* Doc. 32, Ex. A, at ¶ 41), to be distributed *pro rata* to approximately 50,000 class members, (*see id.,* Ex. D, at ¶ 16). As discussed above, the Settlement Fund is estimated at 50% of the most likely recovery. This in itself is a meaningful benefit. Given the natural economic preference for certain and immediate recovery over payments that are speculative and delayed, settling for $2,500,000 in the present may certainly be preferable to most class members than risking years of uncertain litigation in order to potentially double their money.

**\*7** Settlement confers certain nonmonetary benefits on both class members and non-class members as well. The class's nonmonetary benefits are discussed at page 3, *supra.* But all account holders, whether class members or not, benefit from the changes that this lawsuit and others similarly positioned have wrought in the broader banking industry. Seemingly as a result of the environment created by these class actions, banks are increasingly abandoning their high-to-low sequencing policies. (*Cf.* Doc. 36 at 9:6–12, 11:10–24.) Despite the fact that Community Bank had discontinued its offending policies before this particular action was commenced, (*see generally id.*), the general willingness of classes like the present one to commence class action lawsuits is undoubtedly a factor in influencing banks to change their policies for the benefit of all customers. Therefore, this factor weighs in favor of approval.

#### 2. Absence of Substantial Objections by Members of the Class

As discussed above, despite the large number of class members, not a single class member has objected to settlement, (*see* Doc. 32, Ex. B, at ¶ 49), and only five class members have opted out, (*see* Doc. 37, Ex. 1, at 14.) Accordingly, this factor weighs heavily in favor of approval.

#### 3. Skill and Efficiency of the Attorneys Involved

As to the skill and efficiency of the attorneys involved, the Court's statement in a recent class action settlement opinion, *Creed v. Benco Dental Supply Co.,* 2013 WL 5276109 (M.D.Pa.2013), applies equally here:

Considering the potential for this case to turn into a multi-year litigation, class counsel [have] done a good job of negotiating a quick settlement that more than adequately compensates the class. This indicates that class counsel [are] in fact both skilled and efficient. [They have] navigated an unclear area of law to produce an award for the class that comes close to the full extent of [Community Bank's] liability and that led to the creation of better [debit card transaction policies for all Community Bank's customers], whether they [are class members] or not. Accordingly, this factor weighs in favor of approval.

*Creed,* 2013 WL 5276109, at *5.

#### 4. Complexity and Duration of Litigation

This case involves a complicated area of law. It is complicated both in the sense that issues of banking and financial regulation are naturally complex, and also in the sense

that the Circuit Court opinions in the field are still in the nascent stages of development, as illustrated by the *Gutierrez* decision, discussed *supra*. Though this case settled relatively quickly, a speedy settlement was never a certainty. Indeed, the potential for settlement to not occur at all—or to only occur after months or years of expensive and time-consuming litigation—is a risk that class counsel assumed when they decided to take this case. By the same token, counsel risked not only losing out on settlement but, after protracted litigation, losing out on any recovery at all, or only receiving a recovery that would not adequately compensate either themselves or the class for the significant efforts expended. Counsel should not be penalized for avoiding these pitfalls and settling the case early. Indeed, they deserve compensation for incurring these risks from the outset. Accordingly, this factor also weighs in favor of approval.

#### 5. Risk of Nonpayment

**\*8** Class Counsel represent that they undertook "to prosecute this complex case entirely on a contingent fee basis." (Doc. 32, Ex. B, at ¶ 55.) Again, this presents a significant risk, for all the factors discussed in the immediately preceding section. In light of the complexity of the case and the defenses available to Community Bank, it is not difficult to imagine scenarios in which recovery could be drastically reduced or precluded altogether—whether at the class certification, summary judgment, trial, or appellate stages. Consistent with this Court's Opinion in *Creed v. Benco, supra,* the Court finds that a "fee of one-third of the settlement is appropriate to compensate counsel for risks [they] took to secure significant benefits for the class." *See Creed,* 2013 WL 5276109, at \*6. Accordingly, this factor weighs in favor of approval.

#### 6. Amount of Time Devoted to the Case by Class Counsel

Class Counsel represent that they spent 591.90 hours of work on this case. (*See* Doc. 32, Ex. B, at ¶ 66.) So receiving 33% of the Settlement Fund (or $825,000) would result in an aggregate hourly rate of $1,393.82 for class counsel. This is a high ratio of compensation sought to hours worked. However, the Court agrees with class counsel that the Court's reasoning on this issue in *Creed v. Benco* applies to the present case. (*See* Doc. 36 at 32:9–33:14 .) In *Creed,* the Court wrote:

> Class counsel represents that his office has spent 350.9[1] hours working on the case. While this results in a high hourly rate of compensation, this factor does not militate

against settlement given the risks that counsel incurred when accepting this case, as discussed above,

Moreover, simply judging the attorney's settlement award by the amount of hours that class counsel worked overlooks the fact that the class itself has an interest in speedy litigation. Even if settlement had been effected six months after the time at which it actually was effected, it is unlikely that the class members would have received a greater recovery, whereas counsel's expenses and time expended would only have increased. This would allow a calculation producing a lower hourly rate for counsel, but it would not confer any additional benefit on the class. Counsel should therefore not be penalized for settling early—when the ratio of attorney's award to time spent is relatively high—if delaying settlement would lower his hourly rate but would not result in gains to the class that counsel serves. *Creed,* 2013 WL 5276109, at \*6. Accordingly, this factor does not weigh against settlement.

#### 7. Awards in Similar Cases

An award of one-third of the settlement is consistent with this Court's prior decisions and with cases decided throughout the Third Circuit. *See id.* at \*6; *see also Martin v. Foster Wheeler Energy Corp.,* 2008 WL 906472, at \*5 (M.D.Pa.2008) (collecting cases). Accordingly, this final factor weighs in favor of approval as well.

#### 8. Lodestar Cross–Check

**\*9** Even after analyzing the above factors, the Third Circuit suggests that "it is 'sensible' for district courts to 'cross-check' the percentage fee award against the lodestar' method." *In re Rite Aid,* 396 F.3d at 305 (citing *In re Prudential,* 148 F.3d at 333). "The lodestar method multiplies the number of hours class counsel worked on a case by a reasonable hourly billing rate for such services." *In re AT & T Corp. Sec. Litig.,* 455 F.3d 160, 164 (3d Cir.2006). "The crosscheck is performed by dividing the proposed fee award by the lodestar calculation, resulting in a lodestar multiplier." *Id.*

In this case, class counsel testify to an aggregate lodestar hourly billing rate of $471.08 for 591.90 hours of work. (Doc. 32, Ex. B, at ¶ 66.) This hourly billing rate—which the Court finds reasonable based on counsel's demonstrated skill and experience[2]—results in a lodestar of $278,832.25. The settlement agreement of $825,000 gives a lodestar multiplier of 2.96: that is, the settlement gives class counsel 2.96 times the lodestar amount.

The Third Circuit has stated "the principle that 'multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied.' " *In re Cendant Corp. PRIDES Litig.,* 243 F.3d 722, 742 (3d Cir.2001) (quoting *In re Prudential,* 148 F.3d at 341). For all the reasons discussed above, the Court does not find that class counsel's requested fees—which result in a multiplier slightly higher than the median of the Circuit's identified common fund cases—are unreasonable. Those reasons have been discussed at length, but, briefly summarized, include (1) the inherent complexity of Overdraft Fee litigation in general; (2) the uncertainty injected into Overdraft Fee litigation by the Ninth Circuit's *Gutierrez* decision; (3) the concomitant risks to counsel, who agreed to compensation on a contingent-fee basis; (4) the high recovery by the settlement class, evaluated both at its face value and as a percentage of the most likely recovery at trial; and (5) the benefits to all non-class-member bank customers nationwide whose banks have changed their ordering policies as a result of the environment created by litigation such as the present one.

Accordingly, the Court believes that counsel's lodestar multiplier is reasonable under the facts of this case, and therefore weighs in favor of approval of counsel's requested fees.[3]

### V. *Expenses*

In addition to attorneys' fees, counsel request $36,366.49 as reimbursement for "certain litigation costs and expenses." (Doc. 32 at 44.) Counsel represent that these expense consist of:

1. $22,825.00[4] "in fees and expenses for experts, including Kevin G. Jewell, whose analysis was necessary to determine the damages for the Settlement Class in the Action and to properly identify members of the Settlement Class and allocate the Settlement Fund;

2. $6,575.00 in mediation costs;

   **\*10** 3. $6,416.49 in travel costs; and

4. $550.00 for the Court's filing fee.
(Doc. 32, Ex. B, at ¶ 47.)

"Counsel for a class action is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the class

action." *In re Safety Components, Inc. Sec. Litig.,* 166 F.Supp.2d 72, 108 (D.N.J.2001) (citing *Abrams v. Lightolier, Inc.,* 50 F.3d 1204, 1225 (3d Cir.1995)).

The Court finds that these fees are reasonably and appropriately incurred in the course of litigation. Counsel seeks reimbursement only for necessary large expenses and does not try to squeeze money out of the class by charging for things like photocopies, Westlaw and Lexis usage, or telephone bills, even though they would be legally entitled to do so. *See, e.g., id.* Moreover, the expenses incurred were not out of line with the reasonable market prices of the services procured, nor do they take up a large percentage of the settlement fund. *Cf. id* (approving expenses totaling approximately 4% of settlement fund); *Cullen v. Whitman Med. Corp.,* 197 F.R.D. 136, 151 (E.D.Pa.2000) (approving expenses totaling approximately 1% of settlement fund, which is equivalent to the present reimbursement). The fees were also adequately documented in the Joint Declaration by class counsel. (Doc. 32, Ex. B, at ¶ 47.)

### VI. *Conclusion*

For the reasons discussed above, the Motion to Approve the Settlement, and Application for Service Awards, Attorneys' Fees, and Expenses (Doc. 32) is **GRANTED.** A separate Order follows.

### ORDER

The Court, having entered its Memorandum Opinion granting Final Approval of Settlement, authorizing Service Awards, and granting Application For Attorneys' Fees on November 25, 2013, hereby **ORDERS AND ADJUDGES** as follows:

1. The Court incorporates herein by reference its Memorandum Opinion.

2. Except as specifically modified by the Memorandum Opinion, all capitalized terms used herein shall have the meaning set forth in the Settlement Agreement and Release between the Parties (collectively, the "Settlement").

3. This Court has personal jurisdiction over all of the Settlement Class Members because they received the best practicable notice of the Settlement, which notice was reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the Action and the

terms of the Settlement, and to afford them an opportunity to present their objections or to request exclusion from the Settlement. The Court also has jurisdiction over Community Bank, N.A. and First Liberty Bank and Trust, a division of Community Bank, N.A (collectively "Community Bank"), and over the Plaintiffs, who have personally appeared in the Action pending before this Court. The Court has subject matter jurisdiction over the Action pursuant to 28 U.S.C. §§ 1332(d)(2) and (6).

4. For purposes of effectuating the Settlement, and in accordance with Federal Rules of Civil Procedure 23(a) and 23(b)(3), the Court certifies the Settlement Class defined as:

 **\*11** All Community Bank customers in the United States who had one or more Accounts and who, during the Class Period, incurred an Overdraft Fee as a result of Community Bank's Debit Re-sequencing.

Agreement ¶ 37.

5. The Action is hereby dismissed with prejudice, each side to bear its own fees and costs, except as otherwise provided in the Memorandum Opinion. The Action, as defined in the Settlement, means *Johnson v. Community Bank, N.A., et al;* 3:12–cv–01405–RDM (M.D.Pa.).

6. Without limiting the scope of Section XV of the Settlement, as of the Effective Date, Plaintiffs and each Settlement Class Member, each on behalf of himself or herself and on behalf of his or her respective individual heirs, assigns, beneficiaries and successors, shall automatically be deemed to have fully and irrevocably released and forever discharged Community Bank and each of its present and former parents, subsidiaries, divisions, affiliates, predecessors, successors and assigns, and the present and former directors, officers, employees, agents, insurers, shareholders, attorneys, advisors, consultants, representatives, partners, joint venturers, independent contractors, wholesalers, resellers, distributors, retailers, predecessors, successors and assigns of each of them, of and from any and all liabilities, rights, claims, actions, causes of action, demands, damages, costs, attorneys' fees, losses and remedies, whether known or unknown, existing or potential, suspected or unsuspected, liquidated or unliquidated, legal, statutory, or equitable, that result from, arise out of, are based upon, or relate to the conduct, omissions, duties or matters during the Class Period that were or could have been alleged in the Action, including, without limitation, any claims, actions, causes of action, demands, damages, losses, or remedies relating to, based upon, resulting from, or arising out of (a) the assessment of one or multiple

Overdraft Fees on a Community Bank Account or the amount of one or more Overdraft Fees assessed on an Account, or (b) Debit Re–Sequencing or posting order. The foregoing release includes, by way of example but not limitation, any and all of the following to the extent they involve, result in, or seek recovery or relief for Overdraft Fees or Debit Re-sequencing or posting order: (1) the authorization, approval or handling of any Debit Card Transaction, (2) any failure to notify or to obtain advance approval when a Debit Card Transaction would or might cause a Community Bank Account to become overdrawn or further overdrawn or an Overdraft Fee to be assessed, (3) any failure to allow the holder of any Community Bank Account to opt-out of overdrafts, or to publicize or disclose the ability of the holder of any Community Bank Account to opt-out of overdrafts, (4) any failure to adequately or clearly disclose, in one or more agreements, posting order, Debit Re-sequencing, overdrafts, Overdraft Fees, or the manner in which Debit Card Transactions are or would be approved, processed, or posted to Community Bank Accounts; (5) any conduct or statements encouraging the use of Community Bank Debit Cards, (6) the assessment of any continuing overdraft fee, and (7) any advertisements relating to any of the foregoing.

 **\*12** 7. Those five (5) persons identified on the List of Exclusions attached hereto as ***Exhibit A*** are hereby excluded from the Settlement and the Release provisions contained in paragraph 6 of this Order, shall not receive any distribution from the Settlement, and are not bound by this Order.

8. The Parties to the Settlement submit to, and this Court expressly reserves and retains, exclusive jurisdiction over the Action and the Parties, including Community Bank, Plaintiffs, and all Settlement Class Members, to administer, implement, supervise, construe, enforce and perform the Settlement in accordance with its terms, and to enforce its Memorandum Opinion. Without limiting the foregoing, and by way of example only, the Court retains jurisdiction to: (i) address, determine and approve the distribution of residual funds, if any, provided for in paragraph 75 of the Settlement; and (ii) adjudicate any suit, action, proceeding or dispute arising out of the Settlement. The Court shall also retain jurisdiction over all questions and disputes related to the Settlement Administrator.

9. Nothing in the Settlement, the Memorandum Opinion, or this Order shall be deemed to be an admission, or to constitute an adjudication by the Court, of the truth or falsity of any claims or defenses heretofore made, or an acknowledgment

or admission by Community Bank or any party of any fault, liability or wrongdoing of any kind whatsoever or of any violation of statute, regulation or law. Community Bank does not consent to the use of the Settlement, the Memorandum Opinion, or this Order by any party in any other proceeding.

10. Plaintiffs and all Settlement Class Members are hereby barred and enjoined from asserting any of the Released Claims, including, but without limitation, during any appeals from the Memorandum Opinion and this Order.

DONE AND ORDERED.

*EXHIBIT A—List of Exclusions*

1. William J. Repsher, Jr.

2. Dustin L. Austin

3. Matthew Bufano

4. Mariel Bufano

5. Janette V. Orvis

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 6185607

Footnotes

1    It should be noted that even though class counsel in *Creed* spent fewer hours on the case, counsel's effective hourly rate was also slightly lower. Class counsel in *Creed* sought $333,333, which results in an effective hourly rate of $949.94. However, the Court finds that the same reasoning applies in both cases. To the extent that the two cases differ factually, their differences are slight and do not call the underlying principles into question.

2    For a discussion of counsel's experience in Overdraft Fee litigation, see generally Doc. 36 at 7:4–23, 24:12–23. The Court has already discussed the factors relevant to analyzing counsel's skill in this Opinion at part IV.3, *supra*.

3    The Court's approval of attorney's fees based on the unique facts of this case should not be understood as the expression of an opinion that a motion for attorney's fees premised on an hourly rate in this range, either by way of fee agreement or lodestar calculation, will always be deemed reasonable or will always be approved by this Court. Rather, as this Court stated in *Creed v. Benco:*

    In every case where the filing of a motion for attorney's fees is authorized, whether the case is brought on behalf of an individual or is one where class certification is granted, each such request for attorney's fees must be evaluated in light of the nature, complexity, and duration of the case and the time and effort expended by counsel in achieving a successful resolution, together with the Third Circuit's seven-factor test, laid out above.

    *Creed,* 2013 WL 5276109, at *7 n. 1.

4    Though the Joint Declaration lists expert expenses as "$22,825,000," (*see* Doc. 32, Ex. B, at ¶ 47), the Motion for Settlement Approval lists it as $22,825.00, (*see* Doc. 32 at 44.) The Court interprets the number in the Joint Declaration as a typographical error. It does so for obvious reasons, including the fact that the $22.8 million sum would result in a wildly different calculation of expenses from the $36,366.49 requested in both documents.

End of Document                              © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 1320827
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

David KANEFSKY, Individually
and on Behalf of all Others
Similarly Situated, Plaintiffs,

v.

HONEYWELL INTERNATIONAL
INC., Darius Adamczyk, and
Thomas A. Szlosek, Defendants.

Docket No.: 18-cv-15536 (WJM)
|
Signed 05/03/2022

**Attorneys and Law Firms**

Vincent M. Giblin, DeCotiis, Fitzpatrick, Cole & Giblin, LLP, Paramus, NJ, Jonathan David Lindenfeld, Fegan Scott LLC, New York, NY, for Plaintiff David Kanefsky.

Vincent M. Giblin, DeCotiis, Fitzpatrick, Cole & Giblin, LLP, Paramus, NJ, for Plaintiffs Charles Francisco, Iron Workers Local 580 - Joint Funds.

Brian M. English, William H. Trousdale, Jared Paul Duvoisin, Tompkins, McGuire, Wachenfeld & Barry, LLP, Roseland, NJ, for Defendants.

**OPINION**

WILLIAM J. MARTINI, United States District Judge:

**\*1** Presently before the Court in this securities fraud class action against Defendant Honeywell International Inc. ("Honeywell" or the "Company"), Darius Adamczyk, and Thomas A. Szlosek (collectively, "Defendants") are two motions by Plaintiffs: 1) for final approval of a class action settlement; and 2) for an award of attorneys' fees and expenses and compensatory awards for the lead Plaintiffs, Charles M. Francisco ("Francisco") and Iron Workers Local 580 – Joint Funds ("Iron Workers") (collectively, "Plaintiffs"). ECF No. 182. For the reasons stated below, the motions are **GRANTED** and the settlement is finally **APPROVED.**

## I. BACKGROUND

### A. Facts and Procedural History

Honeywell is a multinational conglomerate that produces a wide range of consumer and industrial products. ECF No. 80, Amended Compl., ¶ 26, ECF No. 22. Defendant Darius Adamczyk at all relevant times was the Company's President and Chief Executive Officer. *Id.* at ¶ 27. Defendant Thomas A. Szlosek served as the Company's Senior Vice President and Chief Financial Officer until his retirement on August 3, 2018. *Id.* at ¶ 28. In 1999, Honeywell acquired Bendix Friction Materials ("Bendix"). *Id.* at ¶ 2. As a result of the Bendix acquisition, Honeywell faced substantial liabilities due to Bendix's use of asbestos in the automobile brakes it manufactured. *Id.* In this putative securities class action, Plaintiffs contend that Honeywell materially understated its Bendix-related asbestos liabilities and misrepresented its internal controls over financial reporting and public disclosures in violation of §§ 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. *See id.* at ¶¶ 1, 132-42.

A more detailed recitation of the factual allegations of this case need not be reiterated here as they are set forth in the Court's May 18, 2020 Opinion denying Defendant's motion to dismiss the amended complaint, the July 21, 2020 Order reopening the Private Securities Litigation Reform Act ("PSLRA") lead-plaintiff selection process, and the December 3, 2020 Opinion granting Iron Workers' motion to serve as co-lead plaintiff and approving appointment of co-lead counsel. *See* ECF Nos. 106, 128, 146.

### B. The Proposed Settlement

After more than three years of litigation, the parties agreed on the terms of a settlement (the "Settlement"). *See* Stipulation of Settlement ("Stipulation"), ECF No. 175; *see also* Settlement Term Sheet attached as Ex. A, ECF No. 172. On December 7, 2021, the parties sought preliminary approval of the Settlement which would resolve all outstanding claims and issues in this case for $10,000,000 ("Settlement Amount") and result in the voluntary dismissal, with prejudice, of this action. The Stipulation defines[1] the Class as:

All those who purchased the common stock of Honeywell International Inc. during the period from February 9, 2018, through and including October 19, 2018 (the "Class Period"), and were damaged thereby, excluding

Defendants, officers and directors of Honeywell, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

**\*2** Stipulation, ¶ 1.17.

On January 18, 2022, this Court granted preliminary approval of the Settlement, ("Preliminary Approval Order"), finding that it "resulted from arm's-length negotiations between highly experienced counsel and falls within the range of possible approval" and "raises no obvious reasons to doubt its fairness and raises a reasonable basis for presuming that it satisfies the requirements under Fed. R. Civ. P. 23 and due process." Preliminary Approval Order ¶ 2, ECF No. 179. The Court also preliminarily certified the Class for settlement purposes only and approved the proposed Settlement notice documents and notice plan. *Id.* at ¶¶ 3, 6.

A hearing on the final approval of the Settlement (the "Fairness Hearing") was held on May 3, 2022.

### C. Notice

As of March 30, 2022,[2] the Postcard Notice approved in the Preliminary Approval Order was mailed or e-mailed to 494,035 potential Class Members. *See* Joseph Mahan Supplemental Decl. ("Mahan Suppl. Decl."), ¶ 4 attached as Ex. A to Kim E. Miller Decl. ("Miller Decl."), ECF No. 182-4; Joseph Mahan Decl. ("Mahan Decl."), ¶ 6 attached as Ex. 1 to Vincent M. Giblin Decl. Regarding Mailing and Publication, ECF No. 180-1.

The Postcard Notice advises of the Settlement and includes a Settlement website (www.honeywellsecuritieslitigation.com) that provides detailed information concerning the Settlement including access to downloadable copies of the Proof of Claim form, Notice of Pendency, the Stipulation, the Preliminary Approval Order, and the Amended Complaint in this Action. *See* Mahan Decl., Ex. A; Mahan Suppl. Decl., ¶ 7. The Postcard Notice also includes a toll-free number, 1-855-604-1686, which was established and maintained to respond to inquiries from Class Members regarding the Settlement. *See* Mahan Suppl. Decl., ¶ 6. Finally, on February 7, 2022, Summary Notice was also published in the *Investor's Business Daily* and over *PR Newswire*. *See* Mahan Decl., ¶ 10, Ex. B.

The deadline for any objections to the Settlement was set for April 4, 2022. Miller Decl., ¶ 39. As of April 26, 2022,

97,825 Proofs of Claim forms were submitted by potential Class Members, but no objections to the Settlement were filed. *See* Mahan April Decl., ¶¶ 18, 19. As of April 26, 2022, eleven requested opt-out from the Settlement. *Id.* at ¶ 16, Ex. A. Of those requests, only one is from a Class Member (Exclusion Request 10), five are from Honeywell investors who did not purchase during the Class Period and thus are not Class Members (Exclusion Requests 3, 5, 6, 7, 11), two are from administrators of the same deceased investor's estate (Exclusion Requests 1, 2), and three are from individuals that did not provide transactional information as required to ascertain whether they are Class Members (Exclusion Requests 4, 8, 9). *Id.* at Ex. A. At the Fairness Hearing, Co-Lead Counsel stated that an additional opt-out request was received on May 2, 2022.

### D. Plan of Allocation

**\*3** The Plan of Allocation provides for the distribution of $10,000,000 cash Settlement Amount and the interest earned thereon (the gross "Settlement Fund"), less all taxes and approved costs, fees, and expenses (the "Net Settlement Fund") to Members of the Class who submit acceptable Claim Forms ("Authorized Claimants"). *See* Notice of Pendency at 12, attached as Ex. A-1 to Stipulation, ECF No. 175-2. The Net Settlement Fund is to be distributed to Authorized Claimants on a *pro rata* basis, calculated according to each Authorized Claimant's recognized loss attributable to the alleged fraud relative to the total of all Authorized Claimants' recognized losses. *Id.*

## II. DISCUSSION

Plaintiffs' motion to approve settlement asks this Court to: (1) find that the notice of the Settlement given to potential Class Members was adequate; (2) approve the Settlement as fair, reasonable, and adequate; (3) certify the Class under Rule 23 to effectuate the class settlement; and (3) approve the Plan of Allocation for the disbursement of the proceeds among Class Members. Plaintiffs also request an award of attorneys' fees, expenses, and compensatory awards for the lead Plaintiffs. Each issue is addressed in turn.

### A. Motion to Approve Settlement

### 1. Adequacy of Notice

Before approving the settlement of a class action, the Court must "direct notice in a reasonable manner to all class

members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). Rule 23(c)(2) requires notice of: "(i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)." In addition, notice of the settlement must be the best that is "practicable under the circumstances," and "clearly and concisely state in plain, easily understood language." Fed. R. Civ. P. 23(c)(2). The form and manner of the notice must satisfy the requirements of due process. *Shapiro v. Alliance MMA, Inc.*, No. 17-2583, 2018 WL 3158812, at *7 (D.N.J. June 28, 2018). Moreover, any proposed settlement agreement in a securities action that is published or otherwise disseminated to the class must also comply with the requirements of PSLRA; 15 U.S.C. § 78u-4(a)(7).

Here, the notice provided to Class Members satisfies the requirements of Fed. R. Civ. P. 23, the PSLRA, and due process. The notices were provided to Class Members by a third-party claims administration under Co-Lead Counsel's supervision and describe: (1) the nature of the action and the legal and factual bases for the claims, (2) the definition of the certified class, (3) the key terms of the Settlement, including the Settlement Amount, the process for each Class Member to receive a Settlement payment, and the release of claims against Honeywell, (4) the binding nature of the Settlement on each Class Member, and (5) the rights of each Class Member to retain separate legal counsel, object to the Settlement, opt-out of the Class, or appear at the Fairness Hearing, as well as the deadlines by which to do so. *See* Miller Decl. at ¶ 40; Stipulation and attached Exhibits. Such notice "contain[ed] sufficient information to enable class members to make informed decisions on whether they should take steps to protect their rights." *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 180 (3d Cir. 2013).

Likewise, the manner in which Members were notified was the best practicable under the circumstances and also satisfies the requirements of Rule 23 and due process. Potential Class Members were notified by mail, email, and publication in accordance with the Court's Preliminary Approval Order. *See supra*, I.C.

## 2. *Girsh* and *Prudential* Considerations of Settlement

**\*4** Fed. R. Civ. P. Rule 23(c) requires court approval of any proposed settlement of a class action. A court may, in its discretion, approve a proposed class action settlement "only on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(c); *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, ("*Prudential*"), 148 F.3d 283, 299, 316 (3d Cir. 1998). The law encourages and favors the settlement of civil actions in federal court, particularly in complex class actions where, as here, the settlement is the result of arm's-length negotiations between experienced counsel after meaningful discovery. *In re Gen. Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.*, ("*General Motors*"), 55 F.3d 768, 784 (3d Cir. 1995); *see also In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004) ("*Warfarin*"). However, notwithstanding the general presumption in favor of a settlement in the class action context, the Court also "acts as a fiduciary who must serve as a guardian of the rights of absent class members." *General Motors*, 55 F.3d at 785 (citations and quotations omitted).

The Third Circuit has identified nine factors for evaluating a class action settlement: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *Girsh v. Jepson*, 531 F.2d 153, 157 (3d Cir. 1975).

Beyond these nine *Girsh* factors, additional factors the Court may consider when appropriate and relevant, include: the maturity of the underlying substantive issues; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved-or likely to be achieved-for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable. *Prudential*, 148 F.3d at 323.[3] "These

Case 4:21-cv-00196-MWB    Document 261-1    Filed 01/20/26    Page 220 of 287

**Kanefsky v. Honeywell International Inc., Not Reported in Fed. Supp. (2022)**

factors are a guide and the absence of one or more does not automatically render the settlement unfair." *In re Am. Family Enters.*, 256 B.R. 377, 418 (D.N.J. 2000) (quotations omitted). Instead, the Court "must look at all the circumstances of the case and determine whether the settlement is within the range of reasonableness under *Girsh*." *In re Valeant Pharms. Int'l Inc. Sec. Litig.*, No. 15-07658, 2020 WL 3166456, at *7 (D.N.J. June 15, 2020) ("*Valeant*"). The Court addresses each *Girsh* factor, and, where appropriate, *Prudential* factor, in turn.

**i. The complexity, expense and likely duration of the litigation**

Analysis of the first *Girsh* factor "captures the probable costs, in both time and money, of continued litigation." *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 437 (3d Cir. 2016) ("*NFL Players Litig.*"). Here, the costs, complexity and likely duration of this case strongly favor settlement. "Federal securities class actions by definition involve complicated issues of law and fact." *In re Royal Dutch/Shell Transp. Sec. Litig.*, No. 04-374, 2008 WL 9447623, at *17 (D.N.J. Dec. 9, 2008). This action is even more complex as it involves thorny issues regarding the accounting for asbestos liabilities. In the three years that this case has been pending, the parties have gone through extensive discovery, participated in case management and discovery conferences, and engaged in considerable motion practice. Nonetheless, significant expense and discovery remain, including taking more than a dozen depositions, retaining multiple experts, and producing expert reports on complex issues. The time and expense of a securities class action trial is substantial and would very likely lead to post-trial motions and subsequent appeals that could extend this case for several more years, particularly given the COVID-19 pandemic, which has undeniably slowed the litigation process.

**ii. The reaction of the class to the settlement**

**\*5** "The second *Girsh* factor 'attempts to gauge whether members of the class support the settlement.' " *Warfarin*, 391 F.3d at 536 (quoting *Prudential*, 148 F.3d at 318). The absence of any objections by Class Members and the small number of opt-outs relative to the apparent size of the Class strongly weigh in favor of approval of the Settlement, *See e.g.*, *NFL Players Litig.*, 821 F.3d at 438; *Little-King v. Hayt Hayt &*

*Landau*, No. 11-5621, 2013 WL 4874349, at *21 (D.N.J. Sept. 10, 2013) (collecting cases).

**iii. The stage of the proceedings and the amount of discovery completed**

The third *Girsh* factor "captures the degree of case development that class counsel have accomplished prior to the settlement. Through this lens, courts can determine whether class counsel had an adequate appreciation of the merits of this case before negotiating." *In re Cendant Corp. Litig.*, 264 F.3d 201, 235 (3d Cir. 2001) (quotations omitted). As noted above, this case has been pending and actively litigated before this Court for over three years. By the time the Settlement was reached, the parties had ample opportunity to develop thoughtful and thorough evaluations of the relative strengths and weaknesses of their claims or defenses. This factor undoubtedly favors approval of the Settlement.

**iv. The risks of establishing liability and damages**

Together, the fourth and fifth *Girsh* factors "survey the potential risks and rewards of proceeding to litigation in order to weigh the likelihood of success against the benefit of an immediate settlement." *Warfarin*, 391 F.3d at 537. In other words, the Court must consider "what the potential rewards (or downside) of litigation might have been had class counsel elected to litigate the claims rather than settle them." *General Motors*, 55 F.3d at 814. The Court weighs the value of an immediate guaranteed settlement against the challenges that remain in proceeding with litigation. Even if the class is certified, which Defendants would likely oppose, and Plaintiffs survive a summary judgment motion, there is no guarantee that Plaintiffs would be successful in convincing a jury to hold Honeywell liable. Plaintiffs would need to present expert testimony of expensive financial economic experts using complex methodologies and would face significant risks in trying to prove falsity, materiality, scienter, loss causation, and damages. While Plaintiffs certainly may ultimately succeed in establishing liability and damages at trial, there is no reasonable certainty that such a result is likely. Even assuming a favorable trial outcome, Defendants might appeal, further delaying any benefit to the Class. Accordingly, this factor also weighs in favor of approving the Settlement.

#### v. The risks of maintaining the class action through the trial

The sixth *Girsh* factor "measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial." *Warfarin*, 391 F.3d at 537 (citations omitted). Plaintiffs expect that Defendants would vigorously oppose class certification, where mixed evidence of price impact could pose substantial challenges to establishing market efficiency under *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283 (2014), and would entail a battle of experts. Hence, since the class has yet to be certified, this factor favors supporting the Settlement.

#### vi. The ability of the defendants to withstand a greater judgment

 **\*6** Neither party has suggested that the Settlement Amount was in any way related to Honeywell's ability to pay. Thus, this factor is not relevant to the Court's analysis.

#### vii. The range of reasonableness of the settlement fund in light of the best possible recovery and all attendant risks of litigation

The eighth and ninth *Girsh* factors analyze "whether the settlement represents a good value for a weak case or a poor value for a strong case." *Warfarin*, 391 F.3d at 538. "The factors test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." *Id.* Here, the Settlement provides a guaranteed recovery of $10 million, which is approximately 12% of the $80,5 million that Plaintiffs, after consulting with their experts, believe is the largest probable recovery if they were to prevail at trial. This figure exceeds the median settlement of class action cases with comparable damages in 2021 (7.4%) and between 2012-2020 (4.9%). Laarni T. Bulan, and Laura E. Simmons, Cornerstone Research, *Securities Class Action Settlements – 2021 Review and Analysis*, at 6,[4] (noting that median settlement for securities class actions in 2021 was $8.3 million). In light of the risks of proceeding with litigation discussed above, and the certainty of the benefits provided by the Settlement, these factors weigh in favor of approving the Settlement.

#### viii. The *Prudential* Factors

In addition to the *Girsh* factors, the relevant *Prudential* factors favor approving the Settlement. As has already been determined under analysis of the *Girsh* factors, during the three years of active litigation, Plaintiffs have had the chance to make an informed decision about the appropriate settlement value of their claims. Class Members have had ample opportunity to object or opt-out of the Settlement and were provided clear instructions on how to do so. The procedures for processing individual claims are entirely fair and reasonable, requiring only the submission of a Proof of Claim and Release form. *See* Proof of Claim attached as Ex. A-2 to Stipulation, ECF No. 175-3. Finally, as explained in more detail below, the attorneys' fees requested are also fair and reasonable. *See infra* II.B.1.

### 3. Plan of Allocation

"Approval of a plan of allocation of a settlement fund in a class action is governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable, and adequate." *In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 126 (D.N.J. 2002) (citing *In re Computron, Inc.*, 6 F. Supp. 2d 313, 321 (D.N.J. 1998)); *see also In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 235, 264 (D.N.J. 2000), *aff'd sub nom. In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001). "In general, a plan of allocation that reimburses class members based on the type and extent of their injuries is reasonable." *In re Ikon Off. Sols., Inc., Sec. Litig.*, 194 F.R.D. 166, 184 (E.D. Pa. 2000). The present plan, which was developed in consultation with an economic expert, provides for each Authorized Claimant to be reimbursed based on a *pro rata* share of the Net Settlement Fund based upon each Claimant's recognized loss. The allocation plan is fair, reasonable, and adequate.

### 4. Class Certification

 **\*7** In order to approve a class settlement agreement as fair under Fed. R. Civ. P. 23(c), the Court must additionally determine that the requirements for class certification under Rules 23(a) and (b) are also met. *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 257 (3d Cir. 2009). Each

Rule 23 requirement must be established by a preponderance of the evidence. *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015). While the class certification analysis may "entail some overlap with the merits of the plaintiff's underlying claim," the court considers merits questions only to the extent they are relevant to performing the "rigorous analysis" required to determine whether the Rule 23 prerequisites are met. *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 351 (2011).

#### i. Rule 23(a) Factors

Rule 23(a) provides that class may be certified if: (1) the class is so numerous that joinder is impracticable ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ("typicality"); and (4) the representative parties will fairly and adequately protect the interests of the class ("adequacy"). *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 780 (3d Cir. 2009) (quoting Fed. R. Civ. P. 23(a)). As discussed below, the Rule 23(a) requirements for class certification are satisfied.

#### a. Numerosity

Numerosity is satisfied when joinder of all putative class members is impracticable. Fed. R. Civ. P. 23(a)(1). Where the number of potential plaintiffs exceed forty, the numerosity requirement is generally fulfilled. *Stewart v. Abraham,* 275 F.3d 220, 227 (3d Cir. 2001). Moreover, courts in this Circuit "have recognized a presumption that the numerosity requirement is satisfied when a class action involves a nationally traded security." *Pope v. Navient Corp.*, No. 17-8373, 2021 WL 926611, at *6 (D.N.J. Mar. 11, 2021) (internal quotation and cites omitted). Here, not only does the class action involve nationally traded security, the proposed Class well exceeds forty members as evidenced by the 97,825 Proofs of Claim that have been received. Numerosity is therefore satisfied.

#### b. Commonality

Commonality requires that the members of the class must assert a common contention that is capable of classwide resolution such that the "determination of its truth or falsity

will resolve an issue that is central to the validity of each one of the claims in one stroke." *Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 489–90 (3d Cir. 2018) (quoting *Dukes,* 564 U.S. at 350); *see also Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 597 (3d Cir. 2012) (noting that the "commonality requirement 'does not require identical claims or facts among class member[s]' " (citations omitted)). "[C]ourts in this circuit ... have recognized that securities fraud cases often present a paradigmatic common question of law or fact of whether a company omitted material information or made misrepresentations that inflated the price of its stock." *Bing Li v. Aeterna Zentaris, Inc.*, 324 F.R.D. 331, 339 (D.N.J. 2018) (internal quotation and citation omitted), *aff'd sub nom. Vizirgianakis v. Aeterna Zentaris, Inc.*, 775 F. App'x 51 (3d Cir. 2019).

In this case, as in most securities class actions, the dispute involves common issues relating to alleged violations of federal securities laws, specifically whether Defendants: made misrepresentations and omissions of material fact to the market as a whole, acted with scienter, artificially inflated Honeywell security prices, and damaged the Class. Commonality is thus satisfied.

#### c. Typicality

**\*8** "The concepts of commonality and typicality are broadly defined and tend to merge." *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994) (citation omitted). "The typicality inquiry centers on whether the interest of the named plaintiffs align with the interests of the absent members." *Stewart,* 275 F.3d at 227 (citation omitted). Thus, the typicality requirement ensures "that the class representatives are sufficiently similar to the rest of the class—in terms of their legal claims, factual circumstances, and stake in the litigation—so that certifying those individuals to represent the class will be fair to the rest of the proposed class." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 597 (3d Cir. 2009). "Factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the [absent] class members, and if it is based on the same legal theory." *Stewart,* 275 F.3d at 227–28 (quoting *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 923 (3d Cir. 1992)). For the typicality inquiry, a court thus compares "the attributes of the plaintiff, the class as a whole, and the similarity between the plaintiff and the class." *Marcus,* 687 F.3d at 598.

Plaintiffs' claims here are typical because both Plaintiffs and Class Members were injured by the same common course of conduct by Defendants—misrepresentations and omissions regarding Honeywell's Bendix-related asbestos liabilities—and Plaintiffs assert violations of §§ 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder, just as Class Members would have. *See Pope*, 2021 WL 926611, at *7. Nor is either Plaintiff "subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation." *In re Schering Plough Corp.*, 589 F.3d at 599. Thus, Plaintiffs stand in precisely the same position as the putative Class Members. Accordingly, Plaintiffs meet the requirements of typicality.

**d. Adequacy**

Adequacy "encompasses two distinct inquiries designed to protect the interests of absentee class members." *Prudential*, 148 F.3d at 312. "First, [it] tests the qualifications of the counsel to represent the class." *Id.* "Second, it 'serves to uncover the conflicts of interest between named parties and the class they seek to represent.' " *Id.* (quoting *Amchem*, 521 U.S. at 625).

As this Court has previously noted, both firms selected by Plaintiffs – Kahn Swick & Foti, LLC ("KSF") and Pomerantz LLP ("Pomerantz") are highly experienced. *See* Dec. 17, 2019 Op. at 3, ECF No. 75 ("KS&F is highly experienced and has previously represented classes in asbestos-reserve litigation."); *see also* Dec. 3, 2020 Op. at 4, ECF No. 146 ("Pomerantz has substantial experience litigating class actions brought under the federal securities laws."). KSF and Pomerantz have served as lead counsel in securities class actions in federal courts across the country and have each won substantial recoveries for classes represented by their firms in other securities class actions and complex litigation. *See* ECF Nos. 55-6 (KSF) and 136-2 (Pomerantz). Moreover, both are very familiar with the applicable legal issues, and have devoted considerable resources to advancing the Class's interests. Plaintiffs' counsel are qualified to represent the Class.

Regarding the second prong, there is no conflict of interest between the named parties and the Class. *Amchem*, 521 U.S. 591, 625–26. Plaintiffs, having suffered the same injury as the Class Members, possess the same interest and will adequately represent the interests of the Class. Accordingly, the adequacy requirement is met.

**ii. Rule 23(b)(3) Factors**

Next, in addition to Rule 23(a), class certification requires that a plaintiff also meet one of the requirements set forth in Rule 23(b). Plaintiffs here specifically seek certification of a settlement class under Rule 23(b)(3), which permits certification only if (1) questions of law or fact common to class members predominate over individual questions ("predominance"), and (2) a class action is the superior method for fairly and efficiently adjudicating the controversy ("superiority"). Fed. R. Civ. P. 23(b)(3). To determine predominance and superiority, the Court considers; "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 615–16 (1997). As set forth below, the predominance and superiority requirements of Rule 23(b)(3) are satisfied.

**a. Predominance**

**\*9** Predominance requires the court to evaluate whether "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The inquiry, while similar to the considerations under Rule 23(a)'s commonality requirement, is a "far more demanding" standard that requires the Court to determine if the proposed class is sufficiently cohesive that members of the class may use the same evidence to make a *prima facie* showing of their claims and those claims are subject to class-wide proof. *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016). "[T]he focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 298 (3d Cir. 2011); *see also Warfarin*, 391 F.3d at 528 (finding predominance in "broad-based" campaign to deceive providers and patients regarding a generic equivalent). The mere existence of individual questions does not preclude a finding of predominance, nor does the possibility that some individualized inquiry as to damages may be required. *Neale*

Case 4:21-cv-00196-MWB    Document 261-1    Filed 01/20/26    Page 224 of 287

Kanefsky v. Honeywell International Inc., Not Reported in Fed. Supp. (2022)

*v. Volvo Cars of North America, LLC*, 794 F.3d 353, 371 (3d Cir. 2015). Rather, the Court engages in a qualitative examination of both common and individual issues. *Id.* (citing *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 468 (2013)).

Here, Defendants' alleged omissions or misrepresentations provide the basis for liability as to all potential Class Members. Damages will be calculated on a class-wide basis. Thus, as in many securities fraud class actions, the predominance requirement is "readily met." *Amchem*, 521 U.S. at 625. No individual inquiry will be necessary regarding Defendants' liability to each Class Member. Predominance is satisfied.

**b. Superiority**

Finally, to establish superiority, a plaintiff must demonstrate that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). This inquiry requires the Court to "balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *Danvers Motor Co. v. Ford Motor Co.*, 543 F.3d 141, 149 (3d Cir. 2008) (citation omitted). Factors relevant to a finding of superiority include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Here, many of the putative Class Members are individuals for whom prosecution of a costly individual action for relatively minor damages is not a realistic or efficient alternative. No Class Member has brought a separate claim, which would likely be consolidated into this action anyway. Moreover, with respect to securities fraud claims, without class actions, defrauded investors whose losses do not run into several millions of dollars would have no practical recourse. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) ("most of the plaintiffs would have no realistic day in court if a class action were not available"). Litigating these claims separately would further unduly burden the judicial

system. *Warfarin*, 391 F.3d at 534. Fairness and efficiency accordingly weigh in favor of a finding that a class action is the superior method of adjudicating these claims. *See In re Tropicana Orange Juice Mktg. & Sales Practices Litig.*, No. 11-07382, 2019 WL 2521958, at *6 (D.N.J. June 18, 2019). Hence, a class action is the superior method of adjudication in this matter.

**5. Approval of Co-Lead Counsel as Class Counsel**

A court that certifies a class must also appoint class counsel whose duty is to fairly and adequately represent the interests of the class. *See* Fed. R. Civ. P. 23(g) and (d). In determining class counsel, the Court must consider: (i) the work undertaken by counsel in identifying or investigating the potential claims; (ii) counsel's experience in handling class actions, other complex litigation, and similar claims; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A). Both firms selected by Plaintiffs – KSF and Pomerantz – have actively advanced the Class's claims, have committed considerable time, resources, and skills to the successful representation of the Class, and as noted earlier, are qualified to fairly and adequately represent the interests of the Class. KSF and Pomerantz are approved as Class Counsel.

**B. Motion for Attorneys' Fees**

**\*10** Co-Lead Counsel request an award of attorneys' fees of 29.2% of the total recovery of $10,000,000 for a fee of $2,920,000, reimbursement of expenses in the amount of $149,453.67 plus interest, compensatory awards of $10,000 to each of the two lead Plaintiffs, and a limited award of attorneys' fees and reimbursement of litigation expenses for Franciso's terminated counsel Levi & Korsinsky ("L&K").

**1. Attorney's Fees for Co-Lead Counsel**

Pursuant to Rule 23(h), the Court "may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h), Although the decision to award attorneys' fees and expenses is within the Court's discretion, the Court must carefully review the negotiated award to ensure that it is fair, reasonable, and adequate. *Little-King*, 2013 WL 4874349, at *18; *see also In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d

Case 4:21-cv-00196-MWB    Document 261-1    Filed 01/20/26    Page 225 of 287

Kanefsky v. Honeywell International Inc., Not Reported in Fed. Supp. (2022)

Cir. 2005), In evaluating an award of attorneys' fees, courts typically apply one of two methodologies: (1) the lodestar method in which the number of hours worked by Class Counsel is multiplied by a reasonable hourly billing rate for such services; or (2) the percentage-of-recovery method in which Class Counsel is awarded a certain percentage of the Settlement Amount. *In re AT&T Corp., Sec. Litig.*, 455 F.3d 160, 164 (3d Cir. 2006). Where, as here, the Settlement provides for the payment of attorneys' fees from the same source as the pool of settlement funds available to Class Members, the arrangement "is, for practical purposes, a constructive common fund" that is best analyzed using the percentage-of-recovery methodology. *See Dewy v. Volkswagen AG*, 558 F. App'x 191, 197 (3d Cir. 2014); *see also General Motors*, 55 F.3d at 820-21.

### i. Percentage of Recovery Analysis

The Third Circuit has identified a number of factors for the Court to consider in determining whether a fee award is reasonable under the percentage-of-recovery analysis: (1) the size of the fund created and the number of persons benefited; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases. *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000). In addition to these seven factors, a court may evaluate these three additional factors: (8) the value of benefits attributable to efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations; (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained; and (10) any innovative terms of settlement. *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prods. Liab. Litig.*, 582 F.3d 524, 541 (3d Cir. 2009).

Several of these factors overlap considerably with those already considered by the Court in approving the Settlement as fair, reasonable, and adequate. For example, the Court has already decided that the duration and complexity of this case (factor 4) were both substantial. *See supra*, II.A.2.i. Similarly, the Court has already noted the lack of any objections to the Settlement (factor 2), notice of which included specific information about the fees and expenses requested by Co-

Lead Counsel. *See supra*, II.A.2.ii; Notice of Pendency at 5, 9; *see also Valeant*, 2020 WL 3166456, at *12. Finally, the Court has already analyzed the risk of nonpayment (factor 5) by noting the various risks, including the risk of an unsuccessful trial or appeal, that would render Plaintiffs, and their contingency-fee based counsel unable to recover anything at all. *See supra*, II.A.2.iv.; *In re Merck & Co., Inc. Vytorin ERISA Litig.*, No. 08-CV-285, 2010 WL 547613, at *11 (D.N.J. Feb. 9, 2010) ("*Merck*"). Accordingly, as with the Settlement, each of these factors weighs strongly in favor of approving the request for an award of attorneys' fees and expenses.

**\*11** The remaining factors also support the award of attorneys' fees and expenses. The first factor supports the requested award because the $10 million Settlement Amount benefits thousands of investors and is all cash.

Likewise, the third factor supports approving the requested fee award. This factor measures the "quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel." *Valeant*, 2020 WL 3166456, at *12 (quotations omitted). Here, as already noted, the $10 million Settlement is immediate and substantially benefits the Class particularly in light of the length of this case, the complex issues involved, and the zealous advocacy on both sides by Plaintiffs' counsel and Defendants' counsel, both highly reputable firms with experience in complex class actions and civil litigation.

The sixth factor weighs in favor of approving the requested fee award. Over the course of this complex litigation, Co-Lead Counsel have devoted a combined 6,129 hours to this case. Miller Decl. ¶ 63. Furthermore, Co-Lead Counsel will likely be expending additional hours and resources assisting Class Members with the claims process.

In evaluating the reasonableness of a requested fee award, the seventh factor requires the Court to compare the requested award to those approved in similar cases. The Third Circuit has found that, in common fund cases such as this one in which the percentage-of-recovery methodology is used, the fees typically awarded to class counsel generally range between 19% to 45% of the settlement fund. *General Motors*, 55 F.3d at 822. Here, the total requested award of fees and expenses of $2,920,000 is exactly 29.2% of the Settlement Amount. Thus, the requested award of attorneys' fees and

expenses is well within the reasonable range of awards approved by the Third Circuit and is consistent with similar class action settlements. *Compare In re Ins. Brokerage Antitrust Litig.*, 297 F.R.D. 136, 155 (D.N.J. 2013) (approving fee award equal to 33.33% of $10.5 million settlement); *Merck*, 2010 WL 547613, at *11 (approving fees equal to 33.33% of $41.5 million settlement fund); *Milliron v. T-Mobile USA, Inc.*, No. 08-4149, 2009 WL 3345762, at *14 (D.N.J. Sept. 10, 2009) (approving fees equal to 33.33% of $13.5 million settlement fund). Accordingly, this factor also supports approval of the requested fee award.

The eighth factor also weighs in favor of approving the requested award for attorneys' fees and expenses. The claims in this case were independent of any investigative reports or enforcement actions by any governmental entity. Thus, the value of the Settlement achieved is directly attributable to the efforts of Co-Lead Counsel and supports the reasonableness of the requested fee award. *See Valeant*, 2020 WL 3166456, at *14.

The requested award of fees and expenses relative to the size of the recovery and constructive common fund is also in line with contingent fees that are routinely negotiated in the private marketplace. *Merck*, 2010 WL 547613, at *12 (citing cases). As such, the ninth factor also supports approval of the requested award.

 **\*12** As to the final factor, Plaintiffs have not identified any innovative terms of the Settlement for the Court to consider that weighs in favor of approving the requested award of fees and expenses.

**ii. Lodestar Cross-Check**

Courts in this District are encouraged to "cross-check" the reasonableness of percentage fee awards against the lodestar method. *See Rite Aid Corp. Sec. Litig.*, 396 F.3d at 305-06. Here, the total lodestar amount for Co-Lead Counsel is $3,484,777.50. Miller Decl. ¶ 63. When combined with L&K's requested fee of $243,544.37, *see* discussion *infra*, the lodestar multiplier is 0.78, which is below the reasonable range approved by the Third Circuit and courts in this District. *See Prudential*, 148 F.3d at 341 ("Multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." (quotations omitted)). The requested fee award is thus reasonable when cross-checked under the lodestar method.

**2. Expenses**

In addition to the $2,920,000 fee award, Co-Lead Counsel request payment of $149,453.67 (plus interest earned at the same rate as that earned by the Settlement Fund[5]), which is the sum of all unreimbursed litigation expenses incurred as follows: 1) $93,972.67 by KSF, *see* Miller Decl., ¶ 81; 2) $47,114.15 by Pomerantz, *see* Joshua B. Silverman Decl., ¶ 5 attached as Ex. B to Miller Decl.; 3) $514.80 by Liaison Counsel DeCotiis, Fitzpatrick, Cole & Giblin, *see* Vincent M. Giblin Decl. Regarding Fees and Expenses, ¶ 5 attached as Ex. C to Miller Decl.; and 4) $7,852.05 by L&K, *see* Adam M. Apton Decl. ("Apton Decl."), ¶ 5 attached as Ex. D to Miller Decl. Class Counsel is "entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the class action." *In re Safety Components, Inc. Sec. Litig.*, 166 F. Supp. 2d 72, 108 (D.N.J. 2001). Here, Co-Lead Counsel has produced an itemized list of expenditures. Miller Deck, ¶¶ 78, 81. These expenditures, which are for expert or consultants, computer research, and travel, "are the type of expenses routinely charged to hourly paying clients and, therefore, should be reimbursed out of the common fund." *In re Ocean Power Techs., Inc.*, No. 14-3799, 2016 WL 6778218, at *29 (D.N.J. Nov. 15, 2016). Moreover, no objections have been filed to the expense request. Accordingly, Co-Lead Counsel's request for reimbursement of $149,453.67 in expenses plus interest is approved.[6]

**3. Case Contributions to Representative Plaintiffs**

Co-Lead Counsel seek an award of $10,000 for each of the two Co-Lead Plaintiffs – Charles Francisco and Iron Workers. The Court finds the requested case contribution awards to be fair and reasonable. Both Co-Lead Plaintiffs devoted substantial time and effort to prosecuting this litigation including: reviewing pleadings, motions, and other documents; producing discovery documents and responses; communicating with counsel; and staying apprised of developments such as settlement discussions. Accordingly, the Court approves the case contribution awards of $10,000 for each of the two named Class representatives.

**4. Attorneys' Fees for Terminated Counsel**

**\*13**  Finally, Plaintiffs (through Co-Lead Counsel) do not contest L&K's limited fee request of $190,742.53, which is calculated as follows: 1) taking L&K's total lodestar of $243,544.38 (derived from the sum of $197,367.50 for work performed on dates prior to May 12, 2019 plus $46,176.88, which is 50% of $92,353.75 for work performed from May 13, 2019 to August 18, 2019), *see* Apton Decl., ¶¶ 3, 4; and 2) applying the same 0.78 multiplier applicable to Co-Lead Counsel to the L&K lodestar. Co-Lead Counsel do not contest L&K fees being awarded from its 29.2% fee request so that overall fees for all counsel are within the fees identified in the notice to Class Members. This limited award sought by L&K is reasonable and is therefore approved.

**III. CONCLUSION**

In sum, the Settlement, which has no objectors, is fair, reasonable, and adequate under Fed. R. Civ. P. 23(c), notice was adequate, and certification of the proposed Class is appropriate under Rules 23(a) and (b), Thus, Plaintiffs' unopposed motion to certify the Class, for approval of Co-Lead Counsel as Class Counsel, and for final approval of the Class Action Settlement is **GRANTED.** Plaintiffs' request for attorneys' fees, expenses, and awards for the lead Plaintiffs is also fair and reasonable, and accordingly, is also **GRANTED.** An appropriate Order follows.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 1320827

**Footnotes**

1    All capitalized terms not otherwise defined herein are defined in the Stipulation of Settlement.

2    As of April 26, 2022, over 500,000 Postcard Notices were mailed to potential Class Members. *See* Mahan Decl. of April 26, 2022 ("Mahan April Decl."), ¶ 7 attached as Ex. A to Giblin Decl. in Further Support of Mot. for Final Approval, ECF No. 183-2. Note, however, that the deadline for submitting any objections or exclusion requests was April 4, 2022.

3    Rule 23(e)(2) was amended in 2018 to include a list of factors for courts to consider in evaluating a proposed settlement of a class action. The Third Circuit has, however, continued to apply the *Girsh* and *Prudential* factors. *See In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 934 F.3d 316, 329 (3d Cir. 2019). Accordingly, this Court likewise focuses its analysis on the appropriate *Girsh* and *Prudential* factors.

4    Available at:  www.cornerstone.com/wp-content/uploads/2022/03/Securities-Class-Action-Settlements-2021-Review-and-Analysis.pdf

5    The Notice of Pendency states that Co-Lead Counsel may seek interest on reimbursement of expenses. Notice of Pendency at 9.

6    Interest is calculated from the date of the final Opinion and Order rather than from the date of the Fairness Hearing, although here those dates are the same. *See In re Safety Components*, 166 F. Supp. 2d at 109.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 906472
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

Sarah MARTIN and Jeffrey S. Martin, w/
h, and William Heverly, individually and on
behalf of all others similarly situated, Plaintiffs,

v.

FOSTER WHEELER ENERGY
CORPORATION, Defendant.

No. 3:06-CV-0878.
|
March 31, 2008.

**Attorneys and Law Firms**

J. Christopher Munley, Munley, Munley & Cartwright, P.C.,
Scranton, PA, John Krisa, Krisa, McDonough, Cosgrove &
Krisa, P.C., Blakely, PA, Thomas W. Grammer, Thomas
More Marrone, Feldman, Shepherd, Wohlgelernter, Tanner &
Weinstock, Philadelphia, PA, for Plaintiffs.

Kerry A. Dziubek, Nelson Johnson, Arnold & Porter LLP,
New York, NY, Lester Sotsky, Arnold & Porter LLP,
Washington, DC, Marianne J. Gilmartin, Stevens & Lee, PC,
Scranton, PA, for Defendant.

*MEMORANDUM*

A. RICHARD CAPUTO, District Judge.

 **\*1** Presently before the Court is Plaintiffs' motion for
attorneys' fees and costs for Class Counsel. (Doc. 55.) Also
before the Court is a motion for attorneys' fees and costs by
the Objector Plaintiffs to the Settlement. (Doc. 63.) For the
reasons set forth below, the Court will grant in part and deny
in part Plaintiffs' motion for Class Counsel's fees and costs.
Class Counsel for Plaintiffs will receive thirty percent (30%)
of the Settlement fund, or $480,000.00 in attorneys' fees, and
$6,116.81 in costs. The Court will grant Plaintiffs' request
for an award to the Class Representatives. Sarah Martin will
receive $4,000.00, Jeffrey S. Martin will receive $4,000 .00,
and William Heverly will receive $2,000.00 as an incentive
award from the Fund. (Doc. 55.) Likewise, the Court will

deny the Objector Plaintiffs' motion, as the Objector Plaintiffs
did not confer a substantial benefit on the class. (Doc. 63.)

**BACKGROUND**

The present motion requests attorneys' fees and costs
for Plaintiffs' Class Counsel. The facts of the case were
previously discussed in detail in this Court's Order of
December 14, 2007. (Doc. 62.) Therefore, only the facts
relevant to this motion will be discussed here. The Class
Members sued based upon water problems they believed were
traceable to amounts of trichloroethylene ("TCE") caused
by Defendant in the Class Members' private wells. The
parties conducted settlement negotiations which led to a
Settlement presented to the Court on April 16, 2007 as a Joint
Motion for Preliminary Approval of Class Action Settlement.
(Doc. 41.) The Settlement included an agreement by Foster
Wheeler to pay one million, six hundred dollars ($1.6
million) to the class for settling and releasing their claims.
(Doc. 41.) The Settlement also included a forty-thousand
dollar ($40,000) Alleged Water-Related Fund for purposes
of funding solutions for Class Members with specific water
related problems traceable to the abandonment of the Class
Members' wells. (Doc. 41.) The Court approved this Joint
Motion on April 19, 2007. (Doc. 43.) Objections to the
Settlement were filed by a group of Objector Plaintiffs on July
23, 2007. (Doc. 49.) A Fairness Hearing was held on August
7, 2007. (Doc. 58.) The Settlement was approved by the Court
on December 14, 2007. (Doc. 62.)

On July 31, 2007, Plaintiffs made this motion for attorneys'
fees and costs for Class Counsel, requesting a fee of thirty-
three and one-third percent (33⅓%) of the Settlement Fund.
(Doc. 55.) Class Counsel also requested a division of the ten-
thousand dollar ($10,000) award to the Class Representatives.
(Doc. 55.) The Objector Plaintiffs filed a motion for attorneys'
fees and costs on December 20, 2007 in the amount of
$36,510.47. (Doc. 63.) These motions are fully briefed and
ripe for disposition.

**DISCUSSION**

**I. Motion for Attorneys' Fees by Plaintiffs for Class
Counsel**

"There are two basic methods for calculating attorneys' fees-
the percentage-of-recovery method and the lodestar method."
*In re Prudential Ins. America Sales Practice Litig. Agent*

*Actions,* 148 F.3d 283, 333 (3d Cir.1998). The percentage-of-recovery method is generally used in cases involving a common fund, and allows courts to award attorneys' fees from the fund based upon a percentage of the plaintiffs' recovery. *Id.* (citing *In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F.3d 768, 821 (3d Cir.1995)). In contrast, the lodestar method is more often used in statutory fee-shifting cases. *Id.* (citing *In re General Motors,* 55 F.3d at 821.) The lodestar method may also be used when "the nature of the recovery does not allow the determination of the settlement's value necessary for application of the percentage-of-recovery method." *Id.* Although each method is generally applied to certain types of cases, it is recommended that courts use a second method of fee calculation to cross-check the fee calculation. *Id.*

**\*2** In this case, the percentage-of-recovery method is the appropriate vehicle for calculating attorneys' fees in light of the common settlement fund. *Id.* at 333-34; *Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190, 195 n. 1 (3d Cir.2000); *Brytus v. Spang & Co.,* 203 F.3d 238, 243 (3d Cir.2000); *In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F.3d 768, 821 (3d Cir.1995).

*A. Percentage-of-Recovery*

In determining the appropriateness of the fee award in a common fund class action, the Court, in determining the percentage-of-recovery, should consider a list of non-exclusive factors: (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases. *Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190, 195 n. 1 (3d Cir.2000) (citing *In re Prudential,* 148 F.3d at 336-40). "These factors need not be applied in any formulaic way. Since each case is unique, certain factors may outweigh others." *In re Rent-Way Sec. Litig.,* 305 F.Supp.2d 491, 513 (W.D.Pa.2003). The Court will consider each of these factors in turn.

*1. Size of the Fund and Number of Persons Benefitted*

The size of the Settlement Fund in this case is one-million, six-hundred and forty thousand dollars ($1.64 million). However, Class Counsel does not seek a fee from the forty-thousand dollar ($40,000.00) Alleged Water-Related Fund.

Generally, the larger the size of the settlement fund, the smaller the percentage-of-recovery award is for class counsel. *In re Prudential Ins.,* 148 F.3d at 339. In this case, the size of the class and the fund is not particularly large, and therefore there is little danger for an inflated fee based upon a very large class or recovery. *See Erie County Retirees Ass'n v. County of Erie, Pennsylvania,* 192 F.Supp.2d 369, 379 (W.D.Pa.2002).

As noted in *Erie,* as the size of the settlement fund decreases, so does the size of each class member's recovery. In this case, Category 1 members would receive approximately four percent (4%) of their assessed property value, an average of $4,800 per parcel, and an additional $20,200 per designated parcel for damages other than diminution in property value. Category 2 members would receive approximately four percent (4%) of their assessed property value, an average of $4,800 per parcel. Category 3 members would receive approximately two percent (2%) of their assessed property value, an average of $3,000 per parcel.

Here, a recovery of attorneys' fees of thirty-three and one third percent (33⅓%) would greatly decrease the recovery of the Class Members. Such a recovery would grant the Class Counsel over one half-million dollars in fees. Such a recovery would be inordinately large, given the recovery of the class and the early settlement of this case.

**\*3** Overall, this factor weighs heavily against Class Counsel's petition for an attorneys' fee of thirty-three and one-third percent (33⅓%), as the recovery would be unduly large given the size of the Fund.

*2. Substantial Objections*

The Court previously addressed the reaction of the Class to the settlement in its December 14, 2007 Order. (Doc. 62.) At that time, it was noted that out of the approximately one-hundred and forty-seven (147) parcels that fall within the affected area, twenty (20) have indicated that they wish to be excluded from the Settlement. (Doc. 62.) Therefore, approximately 85% has opted in to the settlement, or otherwise expressed no issues with the settlement. Of the 85% of the settlement class, four (4) class members objected to the property valuation, and the other objectors were opposed to the settlement based on a variety of other reasons. (Doc. 62.)

The Court-appointed Class Administrator, A.B. Data, Ltd. mailed Notices to class members. (Verkhovskaya Aff. ¶¶ 8-12, Doc. 61 Ex. B.) A.B. Data also provided website and telephone services to respond to Class Member Inquiries.

(Verkhovskaya Aff. ¶¶ 13-16, Doc. 61 Ex. B.) The Notices advised class members that Class Counsel would seek attorneys' fees of forty percent (40%) and reimbursement for costs, as well as an award for the Class Representatives. (Doc. 61 Ex. C.) There have been no objections on the basis of this notice.

At the Fairness Hearing, Mr. David A. Garrison, Esq., on behalf of the Objecting Plaintiffs, stated that the Objecting Plaintiffs objected to the fee petition filed by Class Counsel. (Fairness Hr'g Tr. 255-57, Aug. 7, 2007, Doc. 71.) However, the Court specifically told the Objecting Plaintiffs that "I'll hear you making an objection. I'm not going to count this as an objection unless you file a paper because there's-that triggers a briefing requirement under the local rules." (Fairness Hr'g Tr. 257, Aug. 7, 2007, Doc. 71.) Mr. Garrison stated that he was authorized to object to the fee petition at the Fairness Hearing. (Fairness Hr'g Tr. 257, Aug. 7, 2007, Doc. 71.) The Court responded that "[A]uthorized to object to it but maybe not file a brief is going to fail for the lack of a brief. So, file it. If you're going to file objections to the fee petition, they must be in writing, the objections, and you must follow the local rules as far as the briefing schedule. Let me make that clear." (Fairness Hr'g Tr. 257, Aug. 7, 2007, Doc. 71.) The Court noted a third time that "[I]t's of no consequence until you file a document, objection and then file a brief." (Fairness Hr'g Tr. 257, Aug. 7, 2007, Doc. 71.) The Court was abundantly clear that to file objections to the fee petition, the Objector Plaintiffs would be required to file a brief. However, no objections or brief were filed by the Objector Plaintiffs, so the Court notes that they no longer object to the fee petition.

As there have been no substantial objections to the attorneys' fees by Class Counsel, this factor weighs in favor of granting Class Counsel's petition for attorneys' fees.

### 3. Skill and Efficiency of Attorneys

**\*4** The skill and efficiency of the attorneys is "measured by 'the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel.' " *In re Ikon Office Solutions, Inc., Sec. Litig.,* 194 F.R.D. 166, 194 (E.D.Pa.2000) (quoting *In re Computron Software, Inc.,* 6 F.Supp.2d 313, 323 (D.N.J.1998)). Class Counsel has submitted the affidavit of Mr. Marrone detailing the experience and qualifications of the attorneys working on behalf of the Class Members. (Marrone Aff., Doc. 61 Ex. A.) The attorneys are well-qualified in

the field of complex litigation matters, including class action litigation. The attorneys for the Class Members also worked diligently to reach a settlement early in the litigation process, therefore avoiding high costs. Therefore, this factor also weighs in favor of approving the fee request.

### 4. Complexity and Duration of Litigation

The complexity and duration of this litigation weigh in favor of granting Class Counsel's request for attorneys' fees of thirty-three and one-third percent (33⅓ %). The Complaint was filed on April 26, 2006. (Doc.1.) The Joint Motion for Preliminary Approval of the Class Action was filed approximately one (1) year later, on April 16, 2007. (Doc. 41.) As noted in the Court's Order approving Settlement, the litigation is complex, expensive, and likely to last a long amount of time. (Doc. 62.) This is due to the nature of pollution from TCE. Furthermore, there are complicated issues of fact and science concerning the source of TCE and its impact on the various Class Members. Such a claim would require extensive discovery and scientific evidence, requiring the Plaintiffs to prove that the Defendant was the source of the TCE, that Plaintiffs' property was decreased in value, among other liability concerns. The Court further noted in its December 14, 2007 Order that complicated issues of medical monitoring exist, which is an unsettled area of the law. (Doc. 62.) Due to the complexity and potential duration of the case, this factor weighs in favor of the Class Counsel.

### 5. Risk of Nonpayment

The fifth factor considers "the risk of nonpayment" by the defendant. *Gunter,* 223 F.3d at 195 n. 1. Such a risk is high when a defendant is near insolvency. *Id.* at 199. Furthermore, the risk of nonpayment is "acute" where a defendant lacks "significant unencumbered hard assets against which plaintiffs could levy had a judgment been obtained." *Cullen,* 197 F.R.D. at 150. The chance of bankruptcy or nonpayment by Foster Wheeler is small, and this Court previously held that "[t]here is no doubt Foster Wheeler could withstand a greater judgment." (Doc. 62.) Therefore, the risk of nonpayment is quite low in that regard.

However, Class Counsel undertook this action on a contingent fee basis. Therefore, they "assum[ed] a substantial risk that they might not be compensated for their efforts." *In re Datatec Sys., Inc. Sec. Litig.,* No. 04-CV-525 (GEB), 2007 WL 4225828, at \*7 (D.N.J. Nov.28, 2007). The *Datatec* court noted that " '[c]ounsel's contingent fee risk is an important factor in determining the fee award. Success is

never guaranteed and counsel faced serious risks since both trial and judicial review are unpredictable.' " *Id.* (quoting *In re Prudential-Bache Energy Income P'ship Sec. Litig.,* No. 888, 1994 WL 202394, at *16 (E.D.La. May 18, 1994)). Therefore, because Class Counsel took this case on a contingency basis, the risk of nonpayment favors the granting of the petition to Class Counsel.

*6. Amount of Time Devoted to Case by Plaintiffs' Counsel*
**\*5**  As discussed below in the calculation of the Lodestar, Plaintiffs' Class Counsel billed a total of five-hundred and ninety-nine (599) hours for work done by partners, associates, and paralegals. As stated in the Court's December 14, 2007 Order, there has been little discovery from what the Court can determine. (Doc. 62.) However, there has been an extensive amount of investigation performed by Class Counsel. As stated in Mr. Marrone's Affidavit, the time spent on the case included initial case fact research and investigation; initial consultation with experts; extensive document review and analysis; research and drafting the Complaint; research and drafting the Motion to Amend Complaint; responding to defendant's opposition to the Motion to Amend Complaint and conducting argument on the Motion before this Court; inquiring with the U.S. Environmental Protection Agency and with the Pennsylvania Department of Environmental Protection on behalf of the Class; attending "town hall" meetings with Class Members; responding to inquiries from Class Members with requests and other advocacy with defendant, the U.S. Environmental Protection Agency, and the Pennsylvania Department of Environmental Protection; and negotiating and implementing the settlement of this action. (Marrone Aff. Doc 61 Ex. A ¶ 2.) The time that Class Counsel devoted to this case represents a substantial commitment to this litigation and its Settlement, and this factor weighs in favor of an award of thirty percent (30%).

*7. Awards in Similar Cases*
The Settlement Fund in this case amounts to one-million, six-hundred and forty thousand dollars ($1.64 million). District courts within the Third Circuit have typically awarded attorneys' fees of 30% to 35% of the recovery, plus expenses, in settlements of this size. *In re Ravisent Tech., Inc. Sec. Litig.,* No. Civ. A. 00-CV-1014, 2005 WL 906361, at *11 (E.D.Pa. Apr.18, 2005) (citing *In re CareSciences, Inc. Sec. Litig.,* Civ. A. No. 01-5266 (E.D.Pa. Oct. 29, 2004) (awarding one-third recovery of $3.3 million settlement fund, plus expenses); *In re Penn Treaty Am. Corp.,* Civ. A. No. 01-1896 (E.D.Pa. Feb.5, 2004) (awarding 30% of $2.3 million settlement fund);

*In re Corel Corp. Sec. Litig.,* 293 F.Supp.2d 484, 495-98 (E.D.Pa.2003) (awarding one-third of $7 million settlement fund, plus expenses); *Erie Forge and Steel, Inc. v. Cyprus Minerals Co.,* Civ. Action No. 94-404 (W.D.Pa.1996) (33.3% fee from $3.6 million recovery)). *See also Sala v. Nat'l R .R. Passenger Corp.,* 128 F.R.D. 210 (E.D.Pa.1989) (awarding 33% of the first million dollars of settlement, plus 30% of the remainder between one and two million dollars of a $1.79 million fund). Although an award of thirty percent (30%) to thirty-five (35%) is warranted in a case this size, the smaller cases of less than $2.5 million generally award closer to thirty percent (30%). Therefore, an award of thirty percent (30%) is warranted in this type of case, where the recovery by the Class is $1.64 million.

*8. Other Factors*
**\*6**  In *Prudential,* the Third Circuit Court of Appeals considered three (3) other factors that may be relevant to consider in an attorneys' fees case. First, the Court considered the value of benefits to class members attributable to Class Counsel as compared to other groups, such as government agencies conducting investigations. *In re Prudential,* 148 F.3d at 338. Second, the court considered the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained. *Id.* at 340. Third, the court looked for "innovative" terms of settlement. *Id.* at 339. The *Prudential* court held that attorneys' fees in class action cases requires the district court to consider "what class counsel actually did and how it benefitted the class." *Id.* at 342.

To the extent these factors are applicable to this case, they also weigh in favor of a thirty percent (30 %) recovery for Class Counsel. In this case, the Class Counsel negotiated a contingent fee agreement with Class Representative Sarah Martin for forty percent (40%), which is larger than the percent fee requested. Furthermore, the Settlement terms have created an Alleged Water-Related Fund for purposes of funding solutions for class members with specific water related problems traceable to the abandonment of the class members' wells. Such a term is "innovative," as mentioned in *Prudential.* Thus, the *Prudential* factors further weigh in favor of granting Class Counsel an award of attorneys' fees.

*9. The Award*
After the balancing of the *Gunter* and *Prudential* factors, the Court finds that Plaintiffs' counsel is entitled to attorneys' fees. However, the Court will award thirty percent (30%),

rather than the requested thirty-three and one-third percent (33⅓%). This decision is largely based upon the size of the award ($1.64 million for all class members). Furthermore, as discussed previously, cases of this size generally award thirty percent (30%) recovery in fees, because the recovery for the Class Members is greatly affected by a large percentage recovery of attorneys' fees. Because of the modest size of the recovery for the Class Members, a small change in percentage recovery creates a large difference in the amount received by each Class Member. As the first *Gunter* factor, the size of the award, has great weight in the recovery of this size, the Court will reduce the fees to thirty percent (30%), or $480,000.00.

### B. Lodestar Methodology

In addition to using the percentage-of-recovery calculation, the Third Circuit Court of Appeals has suggested that it is "sensible" for a district court to cross-check the percentage-of-recovery calculation with a lodestar calculation. *In re Prudential,* 148 F.3d at 333. In calculating the lodestar, the "initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on litigation times a reasonable hourly rate." *Blum v. Stetson,* 465 U.S. 886, 888, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).

**\*7** In calculating the reasonable rate, the Court looks to the prevailing market rates in the relevant community. *Loughner v. Univ. of Pittsburgh,* 260 F.3d 173, 180 (3d Cir.2001). The Court should considered the experience and skill of the prevailing party's attorney, and compare the rates to those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation. *Maldonado v. Houstoun,* 256 F.3d 181, 184 (3d Cir.2001). The prevailing party bears the burden of demonstrating that the requested hourly rates are reasonable. *Id.*

The Court must also determine whether the number of hours spent on the litigation was a reasonable number of hours. The Court "should review the time charged, decide whether the hours claimed were reasonably expended for each for the particular purposes described, and then exclude those that are 'excessive, redundant, or otherwise unnecessary.' " *Public Interest Research Group of N.J., Inc. v. Windall,* 51 F.3d 1179, 1188 (3d Cir.1995) (citations omitted). Thus, a trial court will "exclude from this initial fee calculation hours that were not reasonably expended on the litigation." *Hensley v. Eckerhart,* 461 U.S. 424, 434, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Thus, using the lodestar methodology, the Court can cross-check the percentage-of-recovery method for reasonableness.

In Thomas More Marrone's Affidavit in support of the application for attorneys' fees, Mr. Marrone indicated the hourly rate and number of hours worked for each partner, associate, and paralegal for Feldman Shepherd Wohlgelernter Tanner & Weinstock. (Marrone Aff. Doc 61. Ex. A-1.) Mr. Alan M. Feldman, a partner, billed one and one-half (1.5) hours at a rate of five-hundred and fifty dollars ($550.00) per hour for a total of eight-hundred and twenty-five dollars ($825.00). Mr. Ezra Wohlgelernter, also a partner, billed six and nine-tenths (6.9) hours, at a rate of five-hundred dollars ($500.00) per hour, for a total of three-thousand, four-hundred and fifty dollars ($3,450.00). Mr. Danile S. Weinstock, also a partner, billed fifty-six and one-tenth hours (56.1), at a rate of five-hundred dollars per hour, for a total of twenty-eight thousand and fifty dollars ($28,050.00). Mr. Marrone himself billed one-hundred and fifty-three and eight-tenths hours (153.8) at a rate of five-hundred dollars ($500.00) per hour, for a total of seventy-six thousand, nine-hundred dollars ($76,900.00). Mr. Thomas W. Grammar, an associate, billed three-hundred twelve and four-tenths (312.4) at a rate of three-hundred and thirty-five dollars ($335.00) for a total of one-hundred and four thousand, six-hundred and fifty-four dollars ($104,654.00). Finally, two paralegals, Mr. Robert S. Hrouda and Ms. Wanda Brown, billed fifty-seven (57) and eleven and three-tenths (11.3) hours respectively, each at a rate of one-hundred and ten dollars ($110.00) per hour. Mr. Hrouda billed a total of six-thousand, two-hundred and seventy dollars ($6,270.00), and Ms. Brown billed a total of one-thousand, two-hundred and forty-three dollars ($1,243.00). The work amounted to a total of five-hundred and ninety-nine (599) hours, for a bill of two-hundred, twenty-one thousand, three-hundred and ninety-two dollars ($221,392.00).

**\*8** Mr. Marrone's affidavit also includes the qualifications and experience of each attorney who worked on this matter. Based upon the qualifications and experience of these attorneys in complex litigation and class action work, the Court finds that the rates for the partners and associates, which range from three-hundred and thirty-five dollars ($335.00) per hour to five-hundred and fifty ($550.00) per hour is reasonable for a Philadelphia law firm. Furthermore, the number of hours spent by Class Counsel on this litigation is reasonable, considering the early Settlement of the case. Therefore, the lodestar is equal to two-hundred, twenty-one thousand, three-hundred and ninety-two dollars ($221,392.00).

The Court must also consider the lodestar multiple in its cross-check of the attorneys' fees. The lodestar multiplier is calculated by dividing the attorneys' fees that Class Counsel seeks, by the total number of hours Class Counsel expended on litigation multiplied by Class Counsel's hourly rates. *Cullen,* 197 F.R.D. at 151 n. 6. Lodestar multiples of less than four (4) are well within the range awarded by district courts in the Third Circuit. *See In re Prudential,* 148 F.3d at 341 (holding that lodestar "[m]ultiples ranging from one to four are frequently awarded in common fund cases where the lodestar method is applied"). In this case, the Court's award of thirty percent (30%) Class creates a lodestar multiple of 2.17[1], which is within the acceptable range awarded by district courts in the Third Circuit. Therefore, the cross-check also supports the award of thirty percent (30%) of the Settlement fund. As the *Gunter* factors and Lodestar cross-check weigh in favor of granting the Class Counsel's petition for fees, the Court will award thirty percent (30%) of the Settlement fund, or $480,000.00.

### C. Costs

Class Counsel has also requested reimbursement of litigation costs in the amount of $6,116.81. These expenses include, but are not limited to copying, medical records, expert witnesses, transcripts, on-line research, travel, fees to the Environmental Protection Agency, postage and delivery services. A large percentage of these litigation costs are attributable to copying and transportation. These expenses are both proper and reasonable. Therefore, Class Counsel will be awarded reimbursement of these expenses from the Settlement Fund.

### II. Award to the Class Representatives

The Class Representatives seek an incentive award of ten-thousand dollars ($10,000). Class Counsel requests that Mr. Heverly be awarded status as a Class Representative for purpose of the incentive award, as he was added as a Class Representative after the Martins became Objectors to the Settlement.

"Incentive awards are 'not uncommon in class action litigation and particularly where, as here, a common fund has been created for the benefit of the entire class.' " *Cullen v. Whitman Med. Corp.,* 197 F.R.D. 136, 145 (E.D.Pa.2000) (quoting *In re S. Ohio Corr. Facility,* 175 F.R.D. 270, 272 (S.D.Ohio 1997)).

**\*9** Additionally, the Notice mailed to Class Members informed them of the requested incentive awards, and no one has objected. *See Mehling v. New York Life Ins. Co.,* Civ. A. No. 99-5417, 2008 WL 597725, at \*11 (E.D.Pa. Mar.4, 2008) (noting that there had been no objections to the Class Representatives' incentive award).

Mr. Heverly was added as a Class Representative after the Martins became Objector Plaintiffs. Since that time, Mr. Heverly was involved in several ways, such as speaking to Class Counsel on the telephone regarding concerns of the Class prior to the need for another Class Representative. He also talked over the Settlement with Class Counsel, spent time preparing with the hearing with Counsel, and took a day to attend the hearing, ready to testify if necessary. For his work as an additional Class Representative, Mr. Heverly will be awarded $2,000.00. The remainder will be divided between Sarah and Jeffrey Martin, for their work as Class Representatives from the inception of the litigation. Therefore, Plaintiffs' motion for an award to the class representatives will be granted so that Sarah Martin will receive $4,000.00, Jeffrey S. Martin will receive $4,000.00, and William Heverly will receive $2,000.00 as an incentive award from the Fund. (Doc. 55.)

### III. Motion for Attorneys' Fees by Objector Plaintiffs

An objector to a class action settlement is generally not entitled to an award of attorneys' fees. *In re Rent-Way Sec. Litig.,* 305 F.Supp.2d 491, 520 (W.D.Pa.2003). However, objectors may recover " 'attorneys' fees and expenses if the settlement was improved as a result of their efforts.' " *Id.* (quoting *Spark v. MBNA Corp.,* 289 F.Supp.2d 510, 513 (D.Del.2003)). "Absent a showing that the objector substantially enhanced the benefits to the class under the settlement, the objector is not entitled to a fee." *Id.*

In this case, counsel for Objector Plaintiffs submitted Objections prior to the Fairness Hearing on July 23, 2007. (Doc. 49 .) The Objections outlined nine (9) potential issues regarding the proposed Settlement. Objector Plaintiffs argue that counsel is entitled to attorneys' fees because they raised a number of issues in their Objections which contributed to the Court's analysis of the Settlement, and therefore the Plaintiffs were benefitted. Objector Plaintiffs specifically note that they objected to the language in the release of liability, which noted that the released claims shall not include claims arising "solely" due to result of exposure to trichloroethylene ("TCE"). The Objector Plaintiffs also raised concerns regarding medical monitoring.

Other district courts have held that attorneys' fees for objectors does not require that an economic benefit to the class occur, or even that the objection influenced the court's decision. *In re AOL Time Warner ERISA Litig.,* No. 02 CV 8853(SWK), 2007 WL 4225486, \*2 (S.D.N.Y. Nov.28, 2007). The district court for the Southern District of New York noted that "some courts have rewarded objectors' counsel for advancing non-frivolous arguments and 'transform[ing] the settlement hearing into a truly adversarial proceeding.' " *Id.* (quoting *Frankenstein v. McCrory Corp.,* 425 F.Supp. 762, 767 (S.D.N.Y.1977)).

**\*10** Although the Objector Plaintiffs did contribute to the Fairness Hearing through their Objections, the Objector Plaintiffs have not shown that they have "substantially enhanced the benefits to the class." The district courts in the Third Circuit have not adopted a view like that of the Southern District of New York in considering what constitutes a "benefit" to the class. *See In re Rent-Way,* 305 F.Supp. at 520 (finding that the objectors were not entitled to attorneys' fees when lead counsel's reduction of attorneys' fees were not premised on their objections); *Spark,* 289 F.Supp.2d at 513. The *Sparks* court noted that objectors attorneys' fees are unusual. "[C]ases in which objectors are awarded attorney's fees are few and far between. In such cases, the objectors expended large amounts of time, money and resources, aided the court considerably in its consideration of proposed settlement and fee awards, and the class members were ultimately benefitted as a result of the objectors' efforts. *Spark,* 289 F.Supp.2d at 514-15 (citing *In re Harnischfeger Indus., Inc. Sec. Litig.,* 212 F.R.D. 400, 413-15 (E.D.Wis.2002), *In re Horizon/CMS Healthcare Corp. Sec. Litig.,* 3 F.Supp.2d 1208, 1214 (D.N.M.1998)). In *Sparks,* the court noted that the objector had done nothing more than propose an alternative fee scheme. *Id.* In this case, the objectors provided several objections, but none of these objections were adopted by the Court. These objections do not provide the substantial benefit required to overcome the presumption that they are not entitled to attorneys' fees. *Id.* Therefore, the Court will deny Objector Plaintiffs' motion for attorneys' fees and costs. (Doc. 63.)

**CONCLUSION**

For the reasons stated above, the Plaintiffs' motion for attorneys' fees and costs for class counsel will be granted in part and denied in part. (Doc. 55.) Class Counsel for Plaintiffs will receive $480,000.00 in attorneys' fees and $6,116.81 in costs. Plaintiffs' motion for an award to the Class Representatives will be granted so that Sarah Martin will receive $4,000.00, Jeffrey S. Martin will receive $4,000.00, and William Heverly will receive $2,000.00 as an incentive award from the Fund. (Doc. 55.) The motion for attorneys' fees and costs for the Objector Plaintiffs will be denied. (Doc. 63.)

An appropriate Order follows.

*ORDER*

**NOW,** this *31st* day of March, 2008, **IT IS HEREBY ORDERED** that Plaintiffs' motion for attorneys' fees and costs for Class Counsel (Doc. 55) is **GRANTED IN PART** and **DENIED IN PART** as follows:

(1) Class Counsel for Plaintiffs are granted a fee of 30% from the Settlement Fund, excluding the Alleged Water-Related Fund, which is calculated as $480,000.00 from the Settlement Fund.

(2) Class Counsel for Plaintiffs are granted $6,116.81 from the Settlement Fund for costs.

The motion to grant an award to the Class Representatives (Doc. 55) is **GRANTED** as follows:

**\*11** (1) Sarah Martin receives $4,000.00 as an incentive award from the Fund.

(2) Jeffrey S. Martin receives $4,000.00 as an incentive award from the Fund.

(3) William Heverly receives $2,000.00 as an incentive award from the Fund.

The motion for attorneys' fees and costs by the Objector Plaintiffs (Doc. 63) is **DENIED.**

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 906472

Footnotes

1     In the Court's calculation, 30 % of $1.6 million is equal to $480,000.00. $480,000.00 divided by $221,392.00 equals 2.17, which is the lodestar multiplier.

**End of Document**                                                  © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 3204044
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.

Timothy O'HERN, et al., Individually
and on Behalf of All Others
Similarly Situated, Plaintiffs,

v.

VIDA LONGEVITY FUND,
LP, et al., Defendants.

C.A. No. 21-402-SRF
|
Signed May 2, 2023

**Attorneys and Law Firms**

Seth Rigrodsky, Gina M. Serra, Rigrodsky Law, P.A., Wilmington, DE, Alan L. Rosca, Pro Hac Vice, Paul J. Scarlato, Pro Hac Vice, for Plaintiff Timothy O'Hern.

Seth Rigrodsky, Gina M. Serra, Rigrodsky Law, P.A., Wilmington, DE, for Plaintiffs Dominic Cardinale, Semyon Rodkin.

Matthew William Murphy, Cathrine G. Dearlove, Richards, Layton & Finger, PA, Wilmington, DE, for Defendants Vida Longevity Fund, LP, Vida Management I, LLC, Vida Capital Management, LLC, Vida Capital, Inc., Vida Capital, LLC, Jeffrey R. Serra.

**MEMORANDUM OPINION**

Sherry R. Fallon, United States Magistrate Judge

**\*1** Plaintiffs Timothy O'Hern, Semyon Rodkin, and Dominic Cardinale ("Plaintiffs") bring this action on behalf of themselves and all other similarly situated individuals against the Vida Longevity Fund, LP ("VLF" or the "Fund"), an open-ended investment fund that uses money raised from investors to purchase life settlements. On March 19, 2021, Plaintiffs filed a class action complaint against VLF and defendants Vida Management I, LLC; Capital Management, LLC; Vida Capital, Inc.; and Jeffrey R. Serra (collectively, "Defendants"), alleging that VLF misled investors by attributing its declining performance to one-time or extrinsic events. (D.I. 1)

The court granted preliminary certification of the settlement class and preliminary approval of the settlement on November 21, 2022. (D.I. 31) Presently before the court is Plaintiffs' uncontested motion for final approval of class action settlement and plan of allocation (D.I. 35), and the motion of Rosca Scarlato LLC ("Class Counsel") for an award of attorneys' fees, payment of expenses, and for incentive awards (D.I. 36). For the reasons that follow, the court grants final certification of the settlement class, approves the settlement agreement, and awards attorneys' fees, expenses, and incentive awards as detailed below.

**I. BACKGROUND**

Plaintiffs invested in the VLF, which bought life insurance policies at a discount with the goal of producing annualized returns of 8-12% and a return of capital with low volatility. (D.I. 1 at ¶ 3) The VLF achieved the targeted rate of return from its inception though 2017, but its performance began to decline in 2018. (*Id.* at ¶ 4) The class action complaint alleges that the VLF misled investors by attributing its deteriorating performance to one-time or extrinsic events. (*Id.* at ¶ 5) At the close of the third quarter in 2020, the VLF disclosed that its losses were caused by weaknesses in its internal processes and procedures used to evaluate and price the VLF's investments. (*Id.*) Plaintiffs allege that the failure to disclose these weaknesses and the material conflicts of interests of its founder, Jeffrey Serra, amounted to violations of the Texas Securities Act. (*Id.*)

After Plaintiffs filed this action on March 19, 2021, the VLF's financial performance began to improve, generating positive returns under new owners and management. (D.I. 35 at 2) The parties engaged in mediation on October 14, 2021, and they reached an agreement in principle on January 5, 2022. (*Id.* at 2-3) On July 8, 2022, the parties entered into a stipulation setting forth the negotiated terms of the proposed settlement. (D.I. 30, Ex. 2) The proposed settlement requires Defendants to pay $1.4 million to satisfy Plaintiffs' claims in exchange for a release of class claims. (*Id.*, Ex. 2 at Ex. B at ¶ 22) The stipulation allowed Plaintiffs to conduct due diligence discovery before submitting the proposed settlement to the court for final approval. (*Id.*, Ex. 2 at 19-20)

Plaintiffs reviewed an extensive number of documents produced by Defendants during discovery and, on September 12, 2022, informed Defendants that they intended to proceed with the settlement. (D.I. 37 at ¶¶ 16-20) On November 21, 2022, the court preliminarily certified the settlement class

Case 4:21-cv-00196-MWB   Document 261-1   Filed 01/20/26   Page 237 of 287

O'Hern v. Vida Longevity Fund, LP, Not Reported in Fed. Supp. (2023)

and granted preliminary approval of the proposed settlement agreement. (D.I. 31)

 **\*2**  The record before the court confirms that Plaintiffs have fully complied with the court's order preliminarily approving the proposed settlement. (D.I. 37 at ¶ 24) The court-appointed claims administrator, Strategic Claims Services ("SCS") disseminated the Postcard Notice to 5,765 prospective class members, and the Summary Notice was published via *Globe Newswire* on the internet on January 30, 2023. (*Id.*, Ex. 4 at ¶¶ 4-7) A small percentage of the Postcard Notices were returned as undeliverable, and SCS mailed Postcard Notices to forwarding addresses when such addresses were available. (D.I. 46 at ¶ 4) SCS estimates that approximately 94% of the class received the Postcard Notice. (*Id.*)

To date, SCS has not received any objections or requests for exclusion from the class. (D.I. 37, Ex. 4 at ¶ 10) Likewise, no prospective class member has objected to the request for attorneys' fees or expenses. (*Id* at ¶¶ 67-68)

The net settlement amount, after deduction of taxes, notice and administrative expenses, and attorneys' fees and expenses from the allocated amount of $1.4 million, is to be distributed to all class members on a *pro rata* basis. (D.I. 37, Ex. 4 at Ex. C at ¶¶ 40-45) The settlement agreement provides that Plaintiffs' counsel will apply for an award of attorneys' fees in an amount not to exceed 30% of the settlement amount, and the amount of expenses paid or incurred shall not exceed $50,000. (*Id.*, Ex. 4 at Ex. C at ¶ 62) Incentive awards for Plaintiffs shall not exceed $30,000 total, or $10,000 per Plaintiff. (*Id.*)

## II. CLASS CERTIFICATION

Under Rule 23 of the Federal Rules of Civil Procedure, the court must engage in a two-step analysis to determine whether to certify a class action for settlement purposes. First, the court must determine whether Plaintiffs have satisfied the prerequisites of numerosity, commonality, typicality, and adequacy of representation as required under Rule 23(a). If the Rule 23(a) criteria are satisfied, the court next considers whether the predominance and superiority requirements of Rule 23(b) are met.

The court conducted an analysis regarding settlement class certification under Rule 23 at the preliminary certification stage, and no material facts have changed since the preliminary certification. (D.I. 31) The proposed class is defined as "all persons and entities who, during the

Class Period [from January 1, 2017 through March 19, 2021], purchased or otherwise acquired VLF Interests, either directly, or indirectly through Life Assets Trust S.A. Compartments VII and/or VIII, pursuant to an offering of those partnership interests." (D.I. 30, Ex. 2 at § I.A.12-13) These objective and administratively feasible criteria for class membership render the proposed class ascertainable.

### A. Rule 23(a) Requirements

The four prerequisites under Rule 23(a) are: "(1) numerosity: the class is so numerous that joinder of all members is impracticable; (2) commonality: there are questions of law or fact that are common to the class; (3) typicality: the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) adequacy of representation: the representative parties will fairly and adequately protect the interests of the class." *Schuler v. Medicines Co.*, 2016 WL 3457218, at \*3 (D.N.J. June 24, 2016).

### 1. Numerosity

There is no minimum number of individuals necessary for certification of a class, and a prospective class that includes more than forty members will generally satisfy the numerosity requirement. *See Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001). Here, there are 5,765 class members who will receive payment under the terms of the settlement agreement. (D.I. 37, Ex. 4 at ¶ 4) Thus, the numerosity requirement is satisfied here.

### 2. Commonality

 **\*3**  "The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Stewart*, 275 F.3d at 227 (internal citations and quotation marks omitted). "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury," such that the "determination of [the common contention's] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *WalMart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The commonality requirement is satisfied in this case because there are common questions of law and fact, such as whether Defendants made material misrepresentations and omissions about VLF's underwriting and risk assessment procedures. (D.I. 1 at ¶¶ 40-43, 50)

### 3. Typicality

"The typicality requirement is designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals." *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 141 (3d Cir. 1998). "If the claims of the named plaintiffs and class members involve the same conduct by the defendant, typicality is established...." *In re Ins. Brokerage Antitrust Litig.*, 297 F.R.D. 136, 149 (D.N.J. 2013). The typicality requirement is satisfied even if class members do not have identical claims or underlying factual circumstances, so long as the claims arise from the same practice or course of conduct or are based on the same legal theory. *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 311-12 (3d Cir. 1998).

Plaintiffs' claims arise out of the same alleged misrepresentations and omissions by Defendants. The claims are based on Defendants' alleged misrepresentations and failure to disclose material information about weaknesses in VLF's internal processes and procedures used to evaluate and price the VLF's investments, as well as the existence of material conflicts of interest. (D.I. 1 at ¶ 5) Because Plaintiffs allege the same course of conduct and seek the same type of relief, the interests of the class members are sufficiently aligned to satisfy the typicality requirement.

### 4. Adequacy of representation

To determine the adequacy of class representation, the court must consider the ability of both the named plaintiffs and counsel to fairly and adequately represent class interests. *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 532 (3d Cir. 2004). Here, Plaintiffs invested in the VLF and were allegedly injured in the same manner as prospective class members as a result of Defendants' alleged misrepresentations and omissions. (D.I. 1 at ¶¶ 7-9, 22-43) There is no indication on the present record that Plaintiffs' interests conflict with the interests of other class members. *See Rossini v. PNC Fin. Servs. Grp., Inc.*, 2020 WL 3481458, at *9 (W.D. Pa. June 26, 2020) (finding $10,000 incentive awards to named plaintiffs were reasonable and did not give rise to a conflict between class representatives and other class members).

Moreover, Class Counsel is well equipped to adequately represent the members of the class. The record before the court confirms that Class Counsel has substantial experience in litigating complex class action lawsuits and has diligently negotiated a favorable settlement for class members. (D.I. 37, Ex. 3) Consequently, the requirements of Rule 23(a)(4) are met. Fed. R. Civ. P. 23(a)(4).

### B. Rule 23(b)(3) Requirements

After determining that the putative class satisfies the Rule 23(a) requirements, the court must decide whether the putative class may be certified under Rule 23(b)(3), which provides that

A class action may be maintained if Rule 23(a) is satisfied and if the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

**\*4** Fed. R. Civ. P. 23(b)(3). These requirements are known as "predominance" and "superiority." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310 (3d Cir. 2008).

### 1. Predominance

"The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation, and assesses whether a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated." *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 297 (3d Cir. 2011) (internal citations and quotation marks omitted). This analysis is more rigorous than the commonality requirement under Rule 23(a). *See id.* Nonetheless, where Plaintiffs have alleged a common course of conduct by Defendants, the predominance requirement will likely be satisfied. *Id.* at 297-98. The Third Circuit is "more inclined to find the predominance test met in the settlement context." *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d

410, 434 (3d Cir. 2016) (quoting *Sullivan*, 667 F.3d at 304 n.29).

In this case, common questions of law and fact predominate over any questions that may affect individual class members. The issue of whether Defendants are liable for material misrepresentations and omissions is common to all class members and is subject to generalized proof. Nothing in the record before the court suggests factual differences between the claims of various class members, and the settlement agreement provides for the *pro rata* distribution of funds among class members. Therefore, the predominance requirement is satisfied.

**2. Superiority**

The superiority analysis requires the court to "balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *Prudential*, 148 F.3d at 316 (internal citations and quotation marks omitted). The court must "consider the class members' interests in individually controlling litigation, the extent and nature of any litigation, the desirability or undesirability of concentrating the litigation, and the likely difficulties in managing a class action." *In re NFL*, 821 F.3d at 434-35.

The superiority requirement is met because the proposed settlement will allow class members to obtain prompt, efficient relief and will avoid a multitude of individual litigations on the same issues and facts. *See In re Warfarin*, 391 F.3d at 534 (explaining that individual class members may have little interest in individually controlling separate litigations because each consumer's claim is proportionally small in relation to the cost of prosecuting a lawsuit). In addition, class members were given an opportunity to opt out of the settlement class if they wished to bring their claims separately. *Id.* The fact that the case is being resolved via settlement negates any concerns about the difficulty of managing a class action suit. *See Sullivan*, 667 F.3d at 302-03.

Having determined that Plaintiffs have satisfied the Rule 23 requirements to obtain class certification, the court will certify Plaintiffs' proposed class for purposes of final settlement approval.

**III. FINAL APPROVAL OF THE SETTLEMENT**

**\*5** Having certified the proposed class action under Rule 23, the court must evaluate the fairness of the class action settlement under Rule 23(e), which provides that approval of a class settlement should occur only if the settlement is "fair, reasonable, and adequate" after consideration of four factors: (A) whether the class representatives and class counsel have adequately represented the class; (B) whether the proposal was negotiated at arm's length; (C) whether the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreements between the settling parties; and (D) whether the proposal treats class members equitably relative to each other. Fed. R. Civ. P. 23(e)(2); *see In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 258 (3d Cir. 2009). The Advisory Committee's Note to the 2018 Amendment identifies these four factors as the "core concerns" that should guide the court's decision regarding whether to approve the proposed settlement.

Courts in the Third Circuit also continue to apply the *Girsh* factors, which include procedural and substantive considerations similar to those in the 2018 amendments to Rule 23(e). *See In re Innocoll Holdings Public Ltd. Co. Sec. Litig.*, 2022 WL 16533571, at \*4 n.1 (E.D. Pa. Oct. 28, 2022). The nine *Girsh* factors include: (1) the complexity, expense, and likely duration of litigation; (2) the reaction of the class to the settlement; (3) the stage of proceedings and amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of the attendant risks of litigation. *See Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975).

"[T]he decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court," and the court's decision is given "great deference." *Vista Healthplan, Inc. v. Cephalon, Inc.*, 2020 WL 1922902, at \*16 (E.D. Pa. Apr. 21, 2020). Courts generally favor settlements to avoid lengthy litigation. *See Somogyi v. Freedom Mortg. Corp.*, 495 F. Supp. 3d 337, 349 (D.N.J. 2020). Here, all four factors under Rule 23(e)(2) and the corresponding *Girsh* factors weigh in favor of final approval

of the settlement agreement, and the court finds that the proposed settlement is fair, reasonable, and adequate.

### A. Plaintiffs and Class Counsel Adequately Represented the Class

Class Counsel has adequately represented the class in satisfaction of Rule 23(e)(2)(A). The record before the court establishes that Class Counsel has extensive experience in litigating complex securities cases and class actions. (D.I. 37, Ex. 5 at Ex. 3; Ex. 6 at Ex. 3) Moreover, Class Counsel's filings confirm that Class Counsel thoroughly investigated the claims, defenses, and events underlying this action. (*See, e.g.*, D.I. 1; D.I. 30; D.I. 37 at ¶¶ 6, 15) Class Counsel also engaged in extensive settlement negotiations and a private mediation, culminating in the stipulation and proposed settlement. (D.I. 37 at ¶¶ 7-15) After the court's order preliminarily approving the settlement, Class Counsel engaged in due diligence discovery to ensure that the terms of the proposed settlement were fair, reasonable, and adequate for class members. (*Id.* at ¶¶ 16-20) These facts confirm the adequacy of Class Counsel's actual performance in representing the interests of the class. *See Utah Ret. Sys. v. Healthcare Servs. Grp., Inc.*, 2022 WL 118104, at *7 (E.D. Pa. Jan. 12, 2022).

Plaintiffs' representation of the interests of the class also satisfies Rule 23(e)(2)(A). The proposed settlement establishes that Plaintiffs' claims are typical of the claims of the settlement class. Specifically, Plaintiffs invested in the VLF and were allegedly injured in the same manner as prospective class members as a result of Defendants' alleged misrepresentations and omissions. (D.I. 1 at ¶¶ 7-9, 22-43) There is no indication on the present record that Plaintiffs' interests conflict with the interests of other class members. *See Rossini v. PNC Fin. Servs. Grp., Inc.*, 2020 WL 3481458, at *9 (W.D. Pa. June 26, 2020) (finding $10,000 incentive awards to named plaintiffs were reasonable and did not give rise to a conflict between class representatives and other class members).

### B. The Settlement Was Negotiated at Arm's Length

**\*6** All evidence points to an arm's length negotiation of the settlement in satisfaction of Rule 23(e)(2)(B). The parties retained a neutral mediator with experience in securities class actions. (D.I. 37 at ¶¶ 9-11) The Advisory Committee's note to the 2018 amendment to Rule 23(e)(2) confirms that "the involvement of a neutral or court-affiliated mediator or facilitator in those negotiations may bear on whether they were conducted in a manner that would protect and further the

class interests." Although the all-day mediation did not result in a negotiated resolution, the parties continued negotiating over the ensuing weeks and reached agreement less than three months later. (*Id.*) This factor supports final approval of the settlement.

### C. The Settlement Provides Substantial Relief to the Class

The third factor under Rule 23(e)(2) regarding the adequacy of the relief provided for the class is related to many of the *Girsh* factors. *See Utah Ret. Sys.*, 2022 WL 118104, at *8. The court's analysis under Rule 23(e)(2)(C) also addresses the first, fourth, fifth, eighth, and ninth *Girsh* factors.

The cost and risks of continued litigation favor final approval of the settlement, which creates a cash recovery of $1.4 million. This settlement amount provides a substantial benefit to class members given the inherent risks posed by continued litigation. *See Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 323 (3d Cir. 2011) (noting the importance of weighing "the realistic, rather than theoretical, potential for recovery after trial" in comparing the value of settlement versus trial). Plaintiffs acknowledge the hurdles they would face in litigation to prove liability, damages, and loss causation in light of the parties' competing narratives about why the VLF underperformed, and whether and how conflicts of interest were disclosed. (D.I. 37 at ¶ 21) Plaintiffs would need to rely on expert witnesses to establish damages in litigation, and their claims could be significantly reduced if a jury were to credit Defendants' experts. Moreover, litigating the case in lieu of settlement would likely result in years of delay and significant expenditures. *See In re Healthcare Servs. Grp., Inc. Derivative Litig.*, 2022 WL 2985634, at *5 (E.D. Pa. July 28, 2022) (describing public policy favoring settlement of class actions and other complex litigation "that otherwise could linger for years"). Thus, the proposed settlement satisfies the requirements of Rule 23(e)(2)(C)(i).

Plaintiffs' damages expert estimates that the aggregate out-of-pocket loss caused by Defendants' conduct was about $26 million. (D.I. 37 at ¶ 22) Thus, the proposed settlement would result in recovery of about 5.4% of those losses without risk. (*Id.* at ¶ 23) This is in line with recoveries in comparable settlement agreements approved by courts. *See Utah Ret. Sys.*, 2022 WL 118104, at *8 & n.5 (identifying the Third Circuit's median recovery of 5.2% in similar securities class action settlements); *Schuler v. Meds. Co.*, 2016 WL 3457218, at *8 (D.N.J. June 24, 2016) (finding recovery of 4.0%

of estimated recoverable damages fell within the range of previous settlement approvals).

Rule 23(e)(2)(C)(ii) requires the court to analyze "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." Fed. R. Civ. P. 23(e)(2)(C)(ii). Here, notice was sent to 5,765 potential class members by an experienced and qualified claims administrator. Of those that received notice, 1,365 claims were received, representing a claim filing rate of about 24%. (D.I. 43 at ¶ 5) This rate is consistent with other class action settlements that have been approved in the Third Circuit. *See, e.g.,* Kanefsky v. Honeywell Int'l Inc., 2022 WL 1320827, at *2 (D.N.J. May 3, 2022) (approving class action settlement where 494,035 potential class members were notified, 97,825 proofs of claim were submitted by class members, and no objections were filed). SCS provides additional evidence showing that the claim filing rate of 24% is on par with or higher than eight other settlements of a similar size. (D.I. 46 at ¶ 5)

 **\*7** The notice provides that the settlement amount will be distributed to class members who submit valid claim forms and includes a proof of claim form as an attachment with instructions on how to complete the form. (D.I. 37, Ex. 4 at Ex. C at ¶¶ 41, 49-50) On this record, the effectiveness of Class Counsel's methods of distributing relief to class members is adequate and not overly burdensome. *See Somogyi v. Freedom Mortg. Corp.,* 495 F. Supp. 3d 337, 350 (D.N.J. 2020) (finding settlement did not impose an onerous burden on class members where, as here, they simply needed to complete a proof of claim form).

Rule 23(e)(2)(C)(iii) requires consideration of the terms of any proposed award of attorneys' fees. Fed. R. Civ. P. 23(e)(2)(C)(iii). Class Counsel seeks not more than 30% of the settlement amount, plus accrued interest, and litigation expenses of no more than $50,000. The requested fee is within the range of reasonable attorneys' fees awarded in the Third Circuit, as discussed in more detail at § IV.A.1, *infra. See, e.g.,* In re Veritas Software Corp. Sec. Litig., 396 F. App'x 815, 818-19 (3d Cir. 2010) (affirming district court's award of class counsel's 30% fee request).

Rule 23(e)(2)(C)(iv) and Rule 23(e)(3) require the parties seeking approval of the settlement to file a statement identifying any agreement made in connection with the proposal. Fed. R. Civ. P. 23(e)(2)(C)(iv) & (e)(3). Plaintiffs represent that the stipulation executed on July 8, 2022, along

with its exhibits, is the only agreement between the parties, aside from a standard non-disclosure agreement allowing Defendants to terminate the settlement if the exclusion requests exceed a specific threshold. (D.I. 35 at 19; D.I. 30, Ex. 2) This requirement is therefore satisfied.

### D. The Proposed Plan of Allocation Treats Class Members Equally

The settlement provides that all class members, including Plaintiffs, will receive a *pro rata* share of the net settlement amount based on their "Recognized Loss Amount" in accordance with a court-approved plan of allocation. (D.I. 30, Ex. 2 at Ex. E at ¶¶ 50, 52, 56-57) Thus, there can be no dispute that the settlement treats all class members equitably based on the relative losses they sustained, in accordance with Rule 23(e)(2)(D).

### E. The Remaining *Girsh* Factors

#### 1. Reaction of the Class to the Settlement

When there are many class members and few objectors, there is a strong presumption in favor of approving the class action settlement under the second *Girsh* factor. *See* In re Cendant Corp. Litig., 264 F.3d 201, 235 (3d Cir. 2001). In this case, notice was sent to 5,765 prospective class members, about 94% of the prospective class actually received the notice, and no class member objected to or opted out of the settlement. (D.I. 42 at 2; D.I. 46 at ¶ 4) This factor therefore weighs in favor of final approval of the settlement.

#### 2. Amount of Discovery

Under the third *Girsh* factor, the court must consider whether the parties' attorneys had an "adequate appreciation of the merits of the case before negotiating" the settlement. *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 813 (3d Cir. 1995). Here, Class Counsel had undertaken significant informal discovery by the time settlement negotiations began, including a review of many documents regarding the VLF and related entities from a variety of sources. (D.I. 37 at ¶ 5) Class Counsel also spoke with several investors in the VLF and other individuals with relevant knowledge, and obtained non-public documents relevant to the issues in this litigation. (*Id.*) This informal, pre-suit discovery was sufficient to allow Class Counsel to

assess the strengths and weaknesses of the case. *See In re NFL*, 821 F.3d at 436-37 ("In some cases, informal discovery will be enough for class counsel to assess the value of the class' claims and negotiate a settlement that provides fair compensation."); *Schuler v. Meds. Co.*, 2016 WL 3457218, at *7 (D.N.J. June 24, 2016) (finding class counsel had ample information to evaluate the prospects for the litigation and assess the fairness of the settlement despite the fact that no formal discovery was taken). Extensive due diligence discovery taken after the parties' settlement negotiations further confirmed that the settlement was fair, reasonable and adequate. (D.I. 37 at ¶¶ 16-20) This factor weighs in favor of approval of the settlement.

### 3. Risks of Maintaining a Class Action Through Trial

**\*8** The sixth *Girsh* factor is neutral. Plaintiffs present no evidence or argument to suggest that the settlement class could not be maintained throughout the case. *See Ripley v. Sunoco, Inc.*, 287 F.R.D. 300, 313 (E.D. Pa. 2012) (finding the sixth *Girsh* factor was neutral where "there [was] no apparent reason why the Court would decertify or modify [a] class at any time during the litigation.").

### 4. Ability of Defendants to Withstand a Greater Judgment

The seventh *Girsh* factor is neutral, as there is no evidence on the present record that Defendants would not be able to pay a greater judgment. But the neutrality of this factor does not weigh against final approval of the settlement where, as here, the other *Girsh* factors support a conclusion that the settlement is fair, reasonable, and adequate. *See In re Warfarin*, 391 F.3d at 538. Plaintiffs acknowledge that continuing the action to trial might result in a larger award for class members, but this possibility does not outweigh the risks of establishing liability, damages, and loss causation. (D.I. 35 at 17)

Based on the foregoing analysis of the Rule 23(e)(2) factors and the *Girsh* factors, the court concludes that final approval of the settlement is proper.

## IV. ATTORNEYS' FEES, PAYMENT OF EXPENSES, AND INCENTIVE AWARDS

Class Counsel moves for an award of: (1) attorneys' fees in the amount of 30% of the $1.4 million settlement; (2) payment

of litigation expenses incurred in prosecuting and settling the litigation, in the amount of $15,837.60; and (3) incentive awards to Plaintiffs in the amount of $10,000 each, or $30,000 in the aggregate, for the time and expenses they incurred in representing the settlement class. (D.I. 36) For the following reasons, the motion is granted.

### A. Attorneys' Fees

Rule 23(h) states that the court "may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). Although the decision to award attorneys' fees and expenses is within the court's discretion, "a thorough judicial review of fee applications is required for all class action settlements." *In re Prudential*, 148 F.3d at 333 (internal quotation marks omitted). Courts assessing attorneys' fees typically apply either the percentage-of-recovery method, which awards a certain percentage of the settlement amount, or the lodestar method, which multiplies the number of hours worked by a reasonable hourly billing rate for the services. *In re Rite Aid*, 396 F.3d at 300.

### 1. Percentage-of-recovery analysis

In common fund cases such as this one, it is typical for Class Counsel to request a percentage of the recovery. *See In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005) ("The percentage-of-recovery method is generally favored in common fund cases because it allows courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure." (internal quotations and citations omitted)). To evaluate the fairness of the requested fees under this method, the court weighs the following factors:

(1) the size of the fund created and the number of persons benefited; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

**\*9** *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000). Application of these factors is flexible, and "one factor may outweigh the rest." *In re Rite Aid*, 396 F.3d at 301.

Regarding the first and second factors, the $1.4 million settlement, representing approximately 5.4% of the estimated damages alleged, conforms with averages in this region and will benefit a significant number of claimants because there were no objections to the settlement or to Class Counsel's fee request. (D.I. 37 at ¶¶ 22-23; D.I. 44); *see Utah Ret. Sys., 2022 WL 118104, at \*8 & n.5* (identifying the Third Circuit's median recovery of 5.2% in similar securities class action settlements); *Schuler, 2016 WL 3457218, at \*8* (finding recovery of 4.0% of estimated recoverable damages fell within the range of previous settlement approvals).

As previously discussed at §§ II.A.4 and III.A, *supra*, the third *Gunter* factor supports an award of fees because Class Counsel are skilled in litigating securities class actions and expended significant time on a contingency basis. (*See also* D.I. 37 at ¶¶ 47, 58-59) In addition, Class Counsel overcame substantial challenges to obtain the proposed settlement because the VLF's performance improved sharply soon after the complaint was filed, and Defendants claim that the material information alleged to be omitted by Plaintiffs was disclosed in other public documents. (*Id.* at ¶¶ 8, 47-48)

The fourth factor supports an award of fees because "securities litigation is inherently complex, expensive, and lengthy, usually requiring expert testimony on a variety of issues. Without a settlement, a significant amount of time and resources would be necessary to bring the case to a close." *Utah Ret. Sys., 2022 WL 118104, at \*12.* Here, Plaintiffs allege violations of the Texas Securities Act that would require a showing of scienter in the face of competing narratives and expert testimony. (D.I. 37 at ¶¶ 6, 21)

The fifth factor weighs in favor of an award of attorneys' fees because Class Counsel took this case on a contingency basis, assuming the risk that there would be no recovery. (D.I. 37 at ¶ 47) The uncertainty of the recovery, the general difficulty in prevailing in securities cases, and the legal obstacles of establishing scienter, damages, and loss causation support an award of fees. *In re Valeant Pharms. Int'l, Inc. Sec. Litig., 2020 WL 3166456, at \*13 (D.N.J. June 15, 2020).*

The time and effort expended by Class Counsel in this action further supports an award of fees under the sixth *Gunter* factor. Class Counsel has devoted 654.70 hours to the prosecution and resolution of this case. (D.I. 37 at ¶ 57)

With respect to the seventh factor, the Third Circuit has stated that fee awards in common fund cases typically range from 19% to 45% of a settlement fund. *See In re Gen. Motors Corp., 55 F.3d at 822.* The requested fee of 30% is reasonable and falls within the typical range of fee awards in securities class action settlements such as this one. *See, e.g., In re Veritas Software Corp. Sec. Litig., 396 F. App'x 815, 818-19 (3d Cir. 2010)* (affirming district court's award of class counsel's 30% fee request); *Kanefsky v. Honeywell Int'l Inc., 2022 WL 1320827, at \*11 (D.N.J. May 3, 2022)* (approving a fee award equal to 29.2% of the settlement amount).

**\*10** Courts may also consider three additional factors set forth in *Prudential*, including (1) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations; (2) the percentage fee that would have been negotiated if the case were subject to a private contingent fee arrangement when counsel was retained; and (3) any innovative terms of settlement. *See In re Diet Drugs, 582 F.3d 524, 541 (3d Cir. 2009)* (citing *In re Prudential, 148 F.3d at 331-32*). Here, the entire value of the settlement is attributable to the efforts of Class Counsel because there is no governmental investigation. A fee of 30% is also consistent with the percentage fee that would have been negotiated if the case were subject to a private contingent fee agreement at the time counsel was retained. *See In re AT&T Corp., 455 F.3d 160, 165 (3d Cir. 2006); In re Ikon Office Sols., Inc. Sec. Litig., 194 F.R.D. 166, 194 (E.D. Pa. 2000)* (observing that private contingency fees in tort matters are typically between 30 and 40% of any recovery). Finally, the record before the court does not suggest any innovative terms in the settlement, so this factor weighs neither in favor of or against the fee request. *See In re Comcast Corp. Set-Top Cable Television Box Antitrust Litig., 333 F.R.D. 364, 389 (E.D. Pa. 2019)* ("In the absence of any innovative terms, this factor neither weighs in favor nor against the proposed fee request.").

## 2. Lodestar cross-check

The reasonableness of the percentage-of-recovery amount is generally confirmed using the lodestar calculation method, which is performed by "multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys." *In re Rite Aid, 396 F.3d at 305-06.* Here, Class Counsel represents that the total lodestar amount is $505,967.50, based on 654.70 hours of work at a variety of hourly billing rates for attorneys, paralegals, and other

professional support staff. (D.I. 37 at ¶ 57; Ex. 5 at ¶ 6 & Ex. 1; Ex. 6 at ¶ 6 & Ex. 1) When calculated against the requested fee of $420,000, the lodestar multiplier is 0.83. (*Id.*) In other words, Class Counsel will receive only 83% of what they would have received at the regular billing rates. This is lower than lodestar multipliers generally awarded in the Third Circuit. *See In re Prudential Ins.*, 148 F.3d at 341 (observing that multipliers "ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied."). A negative multiplier of 0.83 "is well under the generally accepted range and provides strong additional support for approving the attorneys' fee request." *Stagi v. Nat'l R.R. Passenger Corp.*, 880 F. Supp. 2d 564, 572 (E.D. Pa. 2012).

### B. Attorneys' Expenses

Class Counsel requests reimbursement of $15,837.60 in expenses incurred in connection with the litigation and settlement of this action. (D.I. 37, Ex. 5 at ¶ 8 & Ex. 2; Ex. 6 at ¶ 8 & Ex. 2) "Counsel in common fund cases is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the case." *In re Cendant Corp. Deriv. Litig.*, 232 F. Supp. 2d 327, 343 (D.N.J. 2002). The largest portion of Class Counsel's expenses was $13,150 paid for mediation costs. (D.I. 37 at ¶ 62) The class action notices informed prospective class members that Class Counsel would seek reimbursement of litigation expenses not to exceed $50,000. There were no objections to this amount, and the actual amount of expenses requested is well below the amount listed in the notices. The court finds that Class Counsel's expenses are reasonable and will grant the request for reimbursement of $15,837.60.

### C. Incentive Awards

Class Counsel seeks an award of $10,000 for each of the three Plaintiffs, for a total of $30,000. The court finds the requested incentive awards to be fair and reasonable. *See Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 145 (E.D. Pa. 2000) ("Incentive awards are not uncommon in class action litigation and particularly where, as here, a common fund has been created for the benefit of the entire class."). Plaintiffs devoted substantial time and effort to prosecuting and settling the case, including frequently communicating with Class Counsel about the status of the case, reviewing pleadings and motions, discussing mediation strategy and evaluating settlement proposals, and participating directly in the mediation session. (D.I. 37, Exs. 1-3) The class action notices informed prospective class members that Class Counsel would seek an incentive award for Plaintiffs not to exceed $30,000 for time and expenses incurred in representing the settlement class. There were no objections to this amount. Consequently, the court approves the incentive awards of $10,000 for each of the three Plaintiffs.

### V. CONCLUSION

**\*11**  For the foregoing reasons, the court certifies the Rule 23 class action, approves the proposed settlement in full, awards attorneys' fees, expenses, and for incentive awards, and dismisses the action with prejudice. Appropriate Orders shall follow.

### All Citations

Not Reported in Fed. Supp., 2023 WL 3204044

---

**End of Document**  <span style="float:right">© 2026 Thomson Reuters. No claim to original U.S. Government Works.</span>

2020 WL 1922902
United States District Court, E.D. Pennsylvania.

VISTA HEALTHPLAN, INC., et al., Plaintiffs,

v.

CEPHALON, INC., et al., Defendants.

CIVIL ACTION No. 2:06-cv-1833
|
Signed 04/20/2020
|
Filed 04/21/2020

**Attorneys and Law Firms**

Joseph H. Meltzer, Terence S. Ziegler, Donna Siegel Moffa, Kessler Topaz Meltzer & Check, LLP, Radnor, PA, Kevin B. Love, Hanzman Criden & Love, P.A., South Miami, FL, Lawrence Kendall Satterfield, Michael G. McLellan, Finkelstein Thompson LLP, Washington, DC, Theodore M. Lieverman, Jeffrey L. Kodroff, John A. Macoretta, Spector Roseman Kodroff & Willis, P.C., Philadelphia, PA, Robert W. Sink, Law Offices of Robert W. Sink, Fort Washington, PA, for Plaintiff Vista Healthplan, Inc.

Joseph H. Meltzer, Terence S. Ziegler, Donna Siegel Moffa, Kessler Topaz Meltzer & Check, LLP, Radnor, PA, Kevin B. Love, Hanzman Criden & Love, P.A., South Miami, FL, Theodore M. Lieverman, John A. Macoretta, Spector Roseman Kodroff & Willis, P.C., Philadelphia, PA, Lawrence Kendall Satterfield, Finkelstein Thompson LLP, Washington, DC, Robert W. Sink, Law Offices of Robert W. Sink, Fort Washington, PA, for Plaintiff Pennsylvania Turnpike Commission.

Jeffrey L. Kodroff, John A. Macoretta, Mary Ann Geppert, Spector Roseman & Kodroff PC, Philadelphia, PA, Kevin B. Love, Hanzman Criden & Love, P.A., South Miami, FL, Terence S. Ziegler, Donna Siegel Moffa, Joseph H. Meltzer, Kessler Topaz Meltzer & Check, LLP, Radnor, PA, Lawrence Kendall Satterfield, Finkelstein Thompson LLP, Washington, DC, Robert W. Sink, Law Offices of Robert W. Sink, Fort Washington, PA, for Plaintiffs Pennsylvania Employees Benefit Trust Fund, District Council 37 Health & Security Plan.

Donna Siegel Moffa, Joseph H. Meltzer, Terence S. Ziegler, Kessler Topaz Meltzer & Check, LLP, Radnor, PA, John A.

Macoretta, Spector Roseman & Kodroff, P.C., Philadelphia, PA, for Plaintiff Shirley Panebianco.

William Richard Restis, Finkelstein and Krinsk, San Diego, CA, for Plaintiff Jeffrey R. Krinsk.

Gregory P. Teran, Peter J. Kolovos, Mark A. Ford, Michelle D. Miller, Emily R. Whelan, Peter A. Spaeth, Wilmer Cutler Pickering Hale & Dorr LLP, Boston, MA, Robert J. Gunther, Jr., Wilmer Cutler Pickering Hale Dorr LLP, New York, NY, James Douglas Baldridge, Venable LLP, Washington, DC, Kevin T. Vanwart, Kirkland & Ellis LLP, Chicago, IL, Nancy J. Gellman, Conrad O'Brien, PC, Philadelphia, PA, for Defendant Cephalon, Inc.

Jay P. Lefkowitz, Kirkland & Ellis, New York, NY, John C. O'Quinn, Karen N. Walker, Kirkland Ellis LLP, James Douglas Baldridge, Venable LLP, Washington, DC, Lathrop B. Nelson, III, Montgomery McCracken Walker and Rhoads, L.L.P., Richard L. Scheff, Armstrong Teasdale, LLP, Philadelphia, PA, for Defendant Barr Laboratories, Inc.

C. Fairley Spillman, Catherine E. Creely, Paul B. Hewitt, Akin Gump Strauss Hauer & Feld LLP, James Douglas Baldridge, Venable LLP, Washington, DC, David L. Comerford, Jeffery A. Dailey, Katherine M. Katchen, Akin Gump Strauss Hauer & Feld LLP, Philadelphia, PA, David R. Marriott, Evan R. Chesler, Daniel P. Margolskee, Lindsay J. Timlin, Cravath Swaine & Moore LLP, New York, NY, Reginald D. Steer, Akin Gump Strauss Hauer & Feld LLP, San Francisco, CA, for Defendant Mylan Laboratories, Inc.

Jeffrey B. Korn, William H. Rooney, Willkie Farr Gallagher LLP, New York, NY, Joseph E. Wolfson, Stevens & Lee, Philadelphia, PA, James Douglas Baldridge, Venable LLP, Washington, DC, Laurence Schoen, Mintz Levin Cohn Ferris Glovsky & Popeo PC, Boston, MA, for Defendants Teva Pharmaceutical Industries, Ltd., Teva Pharmaceuticals USA, Inc.

Danielle R. Foley, James Douglas Baldridge, Lisa Jose Fales, Vincent E. Verrocchio, Venable LLP, Washington, DC, Brett Alan Kratz, Neill C. Kling, Harkins Cunningham LLP, Philadelphia, PA, for Defendants Ranbaxy Laboratories, Ltd., Ranbaxy Pharmaceuticals, Inc.

Catherine E. Creely, C. Fairley Spillman, Akin Gump Strauss Hauer & Feld LLP, James Douglas Baldridge, Venable LLP, Washington, DC, David R. Marriott, Evan R. Chesler, Daniel P. Margolskee, Lindsay J. Timlin, Cravath Swaine & Moore LLP, New York, NY, Katherine M. Katchen, Akin Gump

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

Strauss Hauer & Feld, LLP, Philadelphia, PA, Reginald D. Steer, Akin Gump Strauss Hauer & Feld LLP, San Francisco, CA, for Defendant Mylan Pharmaceuticals, Inc.

Monica L. Kiley, Hangley Aronchick Segal Pudlin & Schiller, Harrisburg, PA, Steve D. Shadowen, Hilliard & Shadowen LLP, Austin, TX, for Defendant Eckerd Corporation.

## MEMORANDUM

Goldberg, J.

**\*1** This case arises out of a set of antitrust actions which involve reverse settlement payments involving the drug Provigil®. The parties included a brand-name drug manufacturer, numerous generic drug companies, retail drug distributors, the Federal Trade Commission, States Attorneys General, direct purchasers, and end-payors. The End-Payor Plaintiff ("EPP") action, captioned under Vista Healthplan et al. v. Cephalon, et al., Civ. A. No. 06-1833, culminated in a settlement for which the EPPs now seek approval. On August 8, 2019, I granted preliminary approval of the settlement and preliminarily certified two classes for settlement purposes.

The EPPs now move for final approval of the settlement. Upon review of the parties' briefing and considering the arguments at the final fairness hearing on February 26, 2020, I will certify a settlement class, grant final approval of the class action settlement, and award attorneys' fees, costs, and incentive payments as requested.

## I. FACTUAL HISTORY

### A. Background of the EPPs' Claims

In May and June 2006, several now-consolidated cases were filed on behalf all persons who paid for Provigil and/or generic modafinil in twenty-seven states and the District of Columbia, against Defendants Cephalon, Inc., Barr Laboratories, Inc., Teva Pharmaceutical Industries Ltd., Teva Pharmaceuticals USA, Inc. (collectively, the "Cephalon Parties"),[1] Mylan Inc., Mylan Pharmaceuticals Inc. (collectively "Mylan"), and Sun Pharmaceutical Industries, Ltd. as successor-in-interest to Ranbaxy Laboratories, Ltd. and Ranbaxy Pharmaceuticals, Inc. ("Ranbaxy") (all of the foregoing collectively referenced as "Defendants").

The lawsuit alleged that, in April 1997, the Patent and Trademark Office issued U.S. Patent No. 5,618,845 ("the '845 patent") to Cephalon, Inc., which patented a specific formulation of modafinil known as Provigil, a wakefulness-promoting drug. In 2002, Cephalon, Inc. was granted a reissue patent on Provigil, U.S. Patent No. RE 37,516 ("the RE '516 patent"), which was scheduled to expire October 6, 2014. As a result of studying the drug's effects on children, Cephalon, Inc. received an additional six months of pediatric exclusivity on Provigil, extending Cephalon, Inc.'s exclusivity period through April 6, 2015.

On December 24, 2002, four generic drug manufacturers —Barr Laboratories, Inc., Teva Pharmaceutical Industries Ltd./Teva Pharmaceuticals USA, Inc., Mylan Inc./Mylan Pharmaceuticals Inc., and Ranbaxy Pharmaceuticals, Inc. (collectively, the "Generics")— filed Abbreviated New Drug Applications ("ANDAs") for generic Provigil, each certifying that Cephalon Inc.'s patent was either invalid or would not be infringed by their generic modafinil product. As first-filers, all of the Generics, upon FDA approval, were entitled to share in 180 days of exclusive marketing, a characteristic of the Hatch-Waxman Act, Pub. L. No. 98-417. On March 28, 2003, following the Generics' ANDA filings, Cephalon, Inc. sued the Generics for patent infringement.

**\*2** All of the litigation between Cephalon, Inc. and the Generics was settled between December 2005 and February 2006, while motions for summary judgment were pending. The settlements each permitted the Generics to launch their generic Provigil product on April 6, 2012, prior to the expiration of the RE '516 patent. The agreements further contained "contingent-launch provisions," which permitted each Generic to market generic Provigil prior to that date if any other company marketed generic Provigil, whether through a license or at-risk, or if the RE '516 patent was declared invalid, unenforceable, or not infringed by generic Provigil. Each of these settlement agreements contained provisions for and/or were signed alongside licenses for intellectual property, active pharmaceutical ingredient supply agreements, and pharmaceutical development agreements. Cephalon, Inc. agreed to pay a total of approximately $300 million to the Generics as a result of these agreements.

In subsequently-filed litigation, various groups—including direct purchasers, end-payors, a generic drug companies, retail drug distributors, the Federal Trade Commission, and States Attorneys General—alleged that these settlement transactions between Cephalon, Inc. and the Generics were anticompetitive "reverse-settlement" payments that violated antitrust laws. Specifically, they contended that but for these

payments, the Generics would have launched generic Provigil at risk, and thus lower-cost generic competition would have been brought to the relevant market by June 2006.

### B. Brief Procedural History of the Litigation

Multiple end-payor plaintiffs, or EPPs—including both consumers and large Third-Party payors ("TPPs") who paid for Provigil and/or modafinil in twenty-seven states and the District of Columbia—filed antitrust complaints against Defendants. By way of an August 8, 2006 Court Order, all actions that had been filed alleging claims against Defendants and seeking damages and other relief for injuries allegedly sustained as a result of Defendants' anti-competitive conduct were consolidated for pre-trial purposes.

On April 6, 2009, the consolidated cases were transferred from the Honorable R. Barclay Surrick to my docket for all further proceedings. The same day I entered an order vacating the previous case management orders, and consolidating all EPP actions for all purposes under the caption of Vista Healthplan Inc. v. Cephalon, Inc. et al., Civ. A. No. 06-1833.

An Amended Consolidated Class Action Complaint was filed in August 2009 on behalf of all of the EPPs. On August 18, 2009, I entered an order formally appointing Kessler Topaz Meltzer & Check, LLP, Spector Roseman & Kodroff, P.C. and Criden & Love, P.A. as Interim Co-Lead Class Counsel to act on behalf of all plaintiffs in the EPP putative class action.

At the end of August 2009, Defendants filed renewed motions to dismiss. Following oral argument, I substantially denied the motions to dismiss. Thereafter, over the next several years, the parties engaged in extensive discovery involving written discovery, more than 180 depositions, significant expert discovery, and extensive motion practice.

In 2013, the parties filed summary judgment motions. In March and June 2014, I granted in part and denied in part the EPPs' motion, and granted Defendants' motions on the EPPs' allegations of an overall conspiracy.

In the interim, the United States Supreme Court issued a decision in F.T.C. v. Actavis, Inc., 570 U.S. 136 (2013), which recognized that settlements in which a holder of a pharmaceutical patent makes a payment to an alleged patent infringer to resolve a challenge to the patent—i.e., a reverse payment settlement—"can sometimes violate the antitrust laws." Id. at 141. In light of the guidance provided by Actavis,

Defendants filed motions for summary judgment on the EPPs' claims, which I denied.

The EPPs moved for class certification on May 12, 2014. Following extensive briefing and a certification hearing, I denied class certification on June 10, 2015. Vista Healthplan, Inc. v. Cephalon, Inc., No. 06-1833, 2015 WL 3623005 (E.D. Pa. June 10, 2015). Specifically, I found that the EPPs had not met their burden of proving ascertainability for any class, predominance as to antitrust impact for the proposed antitrust class, or predominance and superiority as to the proposed unjust enrichment/consumer protection class. Id. Class Counsel sought immediate review of this decision under Federal Rule of Civil Procedure 23(f), but the United States Court of Appeals for the Third Circuit denied the petition.

### C. Preliminary Negotiations and Settlement

**\*3**  In January 2014, settlement discussions among the EPPs and Defendants began before United States Magistrate Judge David R. Strawbridge and two Special Masters, Robert Heim and Constantine Canon. Following two full days of mediation, Class Counsel continued to engage in settlement negotiations with Defendants.

The EPPs first reached a settlement with Mylan, which was announced at the class certification hearing on March 24, 2015. Mylan agreed to pay the EPPs a total of $14,377,600 to fully resolve all claims against it ("Mylan Settlement Agreement").

In October 2015, following the Cephalon Defendants' $1.2 billion settlement with the Federal Trade Commission ("FTC"), the Cephalon Defendants orally agreed to a settlement with the EPPS and a separate group of over forty health plans (the "Settling Health Plans" or "SHPs"), who opted to proceed separately from the class proceedings following the denial of class certification. The EPPs, SHPs, and the Cephalon Defendants entered a Memorandum of Understanding ("MOU") in December 2015, providing for Cephalon to pay $125 million—$48 million to the EPPs and $77 million to the SHPs—in exchange for releases ("Cephalon Settlement Agreement").

The Cephalon Settlement Agreement was delayed when United Health Care ("United"), one of the SHPs that signed the MOU, renounced its agreement to settle and initiated its own litigation against the Cephalon Defendants, Ranbaxy, and Mylan under Civil Action No. 17-555. The Cephalon Defendants then sued United, under Civil Action

No. 16-4870, to enforce the MOU. Following summary judgment briefing and a non-jury trial, I determined, on September 19, 2018, that United was bound by the terms of the MOU. While that litigation was pending, however, the EPPs, SHPs, and the Cephalon Defendants executed a May 2018 settlement agreement, which created a carve-out for United, while acknowledging the existence and lack of impact of the MOU litigation.

The EPPs and Ranbaxy reached a settlement on the eve of trial in September 2018. The settlement with Ranbaxy is for $3.5 million ("Ranbaxy Settlement Agreement").

### D. Preliminary Approval of the Settlement and Notice

On August 8, 2019, I entered an order for preliminary approval of the proposed settlements (collectively, the "Settlement"), for preliminary certification of the Settlement Classes, and for permission to disseminate notice of the proposed Settlement to members of the Settlement Classes ("Preliminary Approval Order"). The Preliminary Approval Order certified the following classes:

**State Antitrust/Consumer Protection Class**

All persons or entities in Arizona, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin who purchased Provigil and/or its generic equivalent intended for consumption by themselves, their families or their members, employees, plan participants beneficiaries or insureds between June 24, 2006 and August 8, 2019.

**State Unjust Enrichment Class**

All persons or entities in Alabama, Arizona, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin who purchased Provigil and/or its generic equivalent modafinil, intended for consumption by themselves, their families or their members, employees, plan participants, beneficiaries or insureds between June 24, 2006 and August 8, 2019.

**\*4**  (ECF No. 592.)

The following persons or entities were excluded from the proposed Settlement Classes: (i) the Defendants and their respective subsidiaries, affiliates and employees; (ii) all governmental entities (except for government funded employee benefit plans); (iii) insured individuals covered by plans imposing a flat dollar co-pay that was the same dollar amount for generic as for brand generic purchases; (iv) insured individuals who purchased only generic modafinil (not branded Provigil) pursuant to a fixed co-pay applicable to generic drugs; (v) United Healthcare Services, Inc. ("United Healthcare"), including its subsidiaries; and (v) fully-insured health plans, i.e. plans that purchased insurance from another third-party payor covering 100% of the plan's reimbursement obligations to its members. In addition, the Settling Health Plans ("SHPs"), identified in Schedule A to the Cephalon Settlement, are excluded from the Cephalon Settlement.

Following entry of the Preliminary Approval Order, Class Counsel worked with Settlement Administrator A.B. Data, Ltd. ("A.B. Data") to implement the approved notice program ("Notice Program"). The EPPs coordinated notice with the California State Attorney General, who filed a separate action in this Court for approval of its own settlement with Cephalon under Civil Action No. 19-3281 (the "California Settlement"). As described by the EPPs, the Notice Program consisted of:

- Direct notice to potential Class Members identified through subpoenas to twenty-five providers of retail pharmacy services and pharmacy benefits managers, including mail-order pharmacies;

- Direct notice to potential members of the Settlement Class identified through the States' Attorneys General Provigil Settlement;

- Publication notice in national consumer magazines;

- Internet banner and newsfeed ads on multiple networks, including social media and targeted websites;

- Distributing notice via PR Newswire's US1 Newsline;

- Developing and launching a dedicated information website for the Settlement at ProvigilSettlement.com; and

- Establishing a dedicated toll-free telephone number with an interactive voice response system and live operators.

(Decl. of Joseph Meltzer ("Meltzer Decl."), Ex. 4, ¶¶ 3, 6–19.)

As described in the Notice, in order to submit claims, Class Members need only provide information regarding the total amount they paid for Provigil or modafinil from June 24, 2006 through August 8, 2019, with only one proof of purchase, which can take any number of forms including pharmacy records, an insurance EOB (explanation of benefits) form, or letter from the claimant's doctor. (Decl. of Eric Miller ("Miller Decl."), Ex. C.) Absent a proof of purchase, a Class Member can seek help from the Settlement Administrator to file a valid claim. (Id.) As then explained in the End-Payors' Plan of Allocation, the Settlement Administrator will review and process all submitted claims to determine whether there are any deficiencies and, if so, to notify the Claimant how to cure the deficiency. (Meltzer Decl., Ex. 5.) Once all non-deficient claims are collected, the Settlement Administrator will review the claims to determine which claims are authorized for approval or are ineligible. (Id.)

**\*5**  The proposed Plan of Allocation then calls for payment of any approved attorneys' fees, litigation costs, settlement administration costs, escrow administration costs, and incentive payments from the settlement funds received from each of the three settlements. Following those disbursements, the net settlement funds ("Net Class Settlement Fund") will be used to pay class claims that have been approved and authorized. The Net Class Settlement Fund will be disbursed to "Authorized Consumer Claimants" (who will receive 14% of the net Class Settlement Fund) and "Authorized Third Party Payor (TPP) Claimants" (who will receive 86% of the Net Class Settlement Fund) by the Settlement Administrator, under the supervision of Class Counsel and upon Court approval. If there are sufficient funds, each Authorized Consumer Claimant shall receive 100% of their Authorized Consumer Claim (reduced by money that the Authorized Consumer Claimant has received in any other modafinil settlement). If there are insufficient funds to pay each Authorized Consumer Claimant 100% of their Authorized Consumer Claim, then each Authorized Consumer Claimant shall receive a *pro rata* share of the fund. If, after all Authorized Consumer Claimants are paid 100% of their claims, funds remain in the Consumer Distribution Fund, those remaining funds shall be added to the TPP Settlement Fund and paid out to Authorized TPP Claimants.

As of February 2020, there were a total of eighteen potential Class Members who sought exclusion from the Class. (Supp. Decl. of Eric Miller (Supp. Miller Decl.) ¶¶ 5–6.) Nearly 40,000 Settlement Class Members had responded by filing claims to participate in the Settlement. (Id. ¶ 7.) Finally, there

were objections from three potential Class Members—Barry Balach, Carlton Davis, and Daniel Dunham—each of whom submitted a one to two page letter.

### E. Motion for Final Approval

In December 2019, Class Counsel filed the present Motion for Approval of Proposed Settlements with All Defendants, for Certification of Settlement Classes, and for Final Approval of the Plan of Allocation. Class Counsel also filed a Motion for an Award of Attorneys' Fees, for Reimbursement of Litigation Expenses, and for Incentive Awards for the Class Representatives.

I held a final fairness hearing on February 26, 2020 on both this $65,877,600 Settlement and the $25.25 million California Settlement.

## II. LEGAL STANDARDS

Class actions settlements are distinguished from those in most normal suits because Federal Rule of Civil Procedure 23(e) mandates that "[a] class action shall not be dismissed or compromised without the approval of the court." Fed. R. Civ. P. 23(e); see also In re GMC Pick–Up Truck Fuel Tank Prods. Liab. Litig. ("G.M. Trucks"), 55 F.3d 768, 785 (3d Cir. 1995). This rule "imposes on the trial judge the duty of protecting absentees, which is executed by the court's assuring the settlement represents adequate compensation for the release of the class claims." In re Prudential Ins. Co. Am. Sales Litig., 148 F.3d 283, 316 (3d Cir. 1998) (quoting G.M. Trucks, 55 F.3d at 805). A district court may approve a settlement agreement only "after a hearing and on finding that it is fair, reasonable, and adequate." In re Nat'l Football League Players Concussion Injury Litig. ("In re NFL"), 775 F.3d 570, 581 (3d Cir. 2014) (quoting Fed. R. Civ. P. 23(e) (2)). The factual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence. In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 320 (3d Cir. 2008).

In order to fulfill this duty, the court is required to "independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims would be extinguished." In re Cendant, 264 F.3d 201, 231 (3d Cir. 2001). "The court cannot accept a settlement that the proponents have not shown to be fair, reasonable, and adequate." G.M. Trucks, 55 F.3d at 785 (quotations omitted). While the court is to employ a vigorous analysis in fulfilling

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

its fiduciary duty to protect the rights of absent class members, it must also "guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." In re Prudential, 148 F.3d at 317 (quoting G.M. Trucks, 55 F.3d at 806). "The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." Id. at 299 (quoting Girsh v. Jepson, 521 F.2d 153, 156 (3d Cir. 1975)).

**\*6** Where, as here, the court has not already certified the class prior to evaluating the settlement, the court must determine whether the proposed settlement class satisfies the requirements of Rule 23(a) and (b), and then separately determine whether the settlement is fair to the class under Rule 23(e). In re NFL, 775 F.3d at 581; In re Pet Food Prods. Liab. Litig., 629 F.3d 333, 341 (3d Cir. 2010).

Under Rule 23(h), at the conclusion of a successful class action, class counsel may apply to a court for an award of attorney's fees. The amount of an attorney's fee award "is within the district court's discretion so long as it employs correct standards and procedures and makes finding of fact not clearly erroneous[.]" Sullivan v. DB Invs., Inc., 667 F.3d 273, 329 (3d Cir. 2011) (en banc) (internal quotation marks omitted).

## III. CERTIFICATION OF A SETTLEMENT CLASS
Prior to inquiring into the fairness of the Settlement, I must first ensure that the certification requirements set forth in Federal Rule of Civil Procedure 23(a) and (b) have been satisfied. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 619 (1997); In re NFL, 775 F.3d at 581. The Supreme Court has made clear that "[s]ettlement is relevant to a class certification." Amchem Prods., 521 U.S. at 619. Consequently, a district court "may take the proposed settlement into consideration when examining the question of certification." In re Prudential Ins. Co., 148 F.3d at 308. Specifically, the Supreme Court has explained:

Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial. But other specifications of [Rule 23]—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context. Such attention is of vital

importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold.

Amchem, 521 U.S. at 620 (citations omitted). The court should put particular emphasis on the Rule 23(a)(4) requirement that the representative will fairly and adequately protect the interests of the class. In re Pet Food Prods., 629 F.3d at 341–42.

To obtain certification, a class must satisfy the requirements of Federal Rule of Civil Procedure 23(a), which sets forth four prerequisites to class certification:

(1) the class is so numerous that joinder is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Following consideration of these four prerequisites—often referred to as numerosity, commonality, typicality, and adequacy of representation—the court must examine whether the class falls within one of the three categories of class actions set forth in Federal Rule of Civil Procedure 23(b). In re Cmty. Bank of N. Va., 418 F.3d 277, 302 (3d Cir. 2005). The EPPs move for class certification under Rule 23(b)(3), which provides for certification when:

**\*7** [T]he court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)
2020-1 Trade Cases P 81,190

Fed. R. Civ. P. 23(b)(3). Stated differently, to satisfy Rule 23(b)(3), the court must find "predominance" and "superiority." In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 527 (3d Cir. 2004).

Finally, the Third Circuit has recognized that Rule 23(b)(3) carries with it an "ascertainability" requirement. Byrd v. Aaron's Inc., 784 F.3d 154, 161–62 (3d Cir. 2015). "The ascertainability requirement as to a Rule 23(b)(3) class is consistent with the general understanding that the class-action deviates from the normal course of litigation in large part to achieve judicial economy." Id. at 162. It "ensures that a proposed class will actually function as a class." Id. The Third Circuit has explained that "[t]he ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is defined with reference to objective criteria, and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." Id. at 163 (internal quotation marks omitted).

Ultimately, a court's class certification analysis must be "rigorous." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350–51 (2011). "[T]he decision to certify a class calls for findings by the court, not merely a 'threshold showing' by a party, that each requirement of Rule 23 is met," and that "[f]actual determinations supporting Rule 23 findings must be made by a preponderance of the evidence." Hydrogen Peroxide, 552 F.3d at 307. Thus, "to certify a class the district court must find that the evidence more likely than not establishes each fact necessary to meet the requirements of Rule 23." Id. at 320.

**A. Rule 23(a) Requirements**

1. Numerosity

A plaintiff seeking certification must first demonstrate that the class is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). "In recent years, the numerosity requirement has been given 'real teeth.' " Mielo v. Steak 'n Shake Operations, Inc., 897 F.3d 467, 484 (3d Cir. 2018). Third Circuit precedent demands that a court "make a factual determination, based on the preponderance of the evidence, that Rule 23's requirements have been met." Id. (quoting Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 596 (3d Cir. 2012)).

The first part of the numerosity inquiry is the size of the class. "No magic number exists satisfying the numerosity requirement, nor must plaintiff allege the exact number or identity of class members." Moskowitz v. Lopp, 128 F.R.D. 624, 628 (E.D. Pa. 1989); see also Chakejian v. Equifax Info. Servs., LLC, 256 F.R.D. 492, 497 (E.D. Pa. 2009). As a general rule, "if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." Stewart v. Abraham, 275 F.3d 220, 226–27 (3d Cir. 2001). On the other hand, a class of fifteen to twenty is likely too small to meet the numerosity requirement. In re Modafinil Antitrust Litig., 837 F.3d 238, 250 (3d Cir. 2016). Classes with between twenty-one and forty members are given varying treatment, depending on the circumstances of each case. Id.

**\*8** The second half of the numerosity inquiry looks at the impracticability of joinder. Whether joinder of all of the class members would be impracticable depends on the circumstances surrounding the case and not merely on the number of class members. In re Modafinil, 837 F.3d at 249. The Third Circuit has enumerated a non-exhaustive list of factors to consider, including: judicial economy, the claimants' ability and motivation to litigate as joined plaintiffs, the financial resources of class members, the geographic dispersion of class members, the ability to identify future claimants, and whether the claims are for injunctive relief or for damages. Id. at 253. Of those factors, both judicial economy and the ability to litigate as joined parties are of primary importance. Id.

Where, as here, plaintiffs seek a to certify a class of thousands of Consumer Class Members and TPP Class Members, numerosity is easily satisfied. See In re Wellbutrin XL Antitrust Litig., 282 F.R.D. 126, 137 (E.D. Pa. 2011) (finding numerosity met where plaintiff class involved hundreds of thousands of consumer class members and thousands of TPP class members). In my prior Opinion denying certification of a litigation class, I noted that the EPPs' expert had identified in excess of five million total Provigil prescriptions filled in the relevant jurisdictions from 2006 through January 2011. Vista Healthplan, Inc. v. Cephalon, Inc., 06-1833, 2015 WL 3623005, at *13 (E.D. Pa. June 10, 2015) ("Prior Certification Opinion"). Consistent with that prior decision, I again find numerosity satisfied.

2. Commonality

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

Rule 23(a)(2) next requires Plaintiffs to demonstrate that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "[C]ommonality does not require perfect identity of questions of law or fact among all class members. Rather, 'even a single common question will do.' " Reyes v. Netdeposit, LLC, 802 F.3d 469, 486 (3d Cir. 2015) (quoting Dukes, 564 U.S. at 359). "The focus of the commonality inquiry is not on the strength of each plaintiff's claim, but instead is on whether the defendant[s'] conduct was common as to all of the class members." Rodriguez v. Nat'l City Bank, 726 F.3d 372, 382 (3d Cir. 2013) (internal quotation and citations omitted). All plaintiffs need not suffer the same injury. The fact that the plaintiffs were subjected to the injury or faced the immediate threat of these injuries suffices for Rule 23. Baby Neal for and by Kanter v. Casey, 43 F.3d 48, 57 (3d Cir. 1994); see also Rodriguez, 726 F.3d at 383 ("[T]here may be many legal and factual differences among the members of a class, as long as all were subjected to the same harmful conduct by the defendant."). "Even where individual facts and circumstances become important to the resolution, class treatment is not precluded." Baby Neal, 43 F.3d at 57.

Ultimately, the commonality bar is not a high one. Rodriguez, 726 F.3d at 382. To satisfy Rule 23(a)(2), the resolution of the common question of law or fact must "resolve an issue that is central to the validity of each one of the claims in one stroke." Dukes, 564 U.S. at 350. Commonality exists in cases where "[e]ach putative class member alleges that Defendants caused overcharges by engaging in an anticompetitive scheme to delay and suppress generic competition." In re Loestrin 24 Fe Antitrust Litig., No. 13-2472, 2019 WL 3214257, at *11 (D.R.I. July 2, 2019); see also In re Flonase Antitrust Litig., 284 F.R.D. 207, 217 (E.D. Pa. 2012) ("Resolving the allegations surrounding [defendant's] alleged conduct in delaying generic entry will resolve issues that are 'central to the validity of each one of the claims in one stroke.' ")

In my Prior Certification Decision, I noted that the Class Members' claims here depend on common evidence of whether or not Defendants engaged in anticompetitive behavior to limit the entry of generic competitors. Vista Healthplan, 2015 WL 3623005, at *14. At this stage, that common question remains. Accordingly, I find that commonality has been satisfied.

3. Typicality

*9 The third Rule 23(a) factor considers typicality. "Typicality" aids a court in determining whether "maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Marcus, 687 F.3d at 597–98 (citing Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 158 n.13 (1982)). Typicality "screen[s] out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present." Id. at 598. To determine whether a named plaintiff is markedly different from the class as a whole, the court must address three distinct concerns: "(1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class." Id. at 598 (quoting In re Schering Plough Corp. ERISA Litig., 589 F.3d 585, 599 (3d Cir. 2009)).

The Third Circuit has set a "low threshold" for typicality, such that "[e]ven relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct." In re NFL, 821 F.3d at 428 (internal quotation marks omitted). "[I]n instances wherein it is alleged that the defendants engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical of the absent class members." In re Linerboard Antitrust Litig., 203 F.R.D. 197, 207 (E.D. Pa. 2001) (quotations omitted).

In my Prior Certification Opinion, I noted that typicality was established because both the named and absent Class Members maintained the same claims and legal theories —that the allegedly anticompetitive conduct of Cephalon and the Generic Defendants constituted a violation of state antitrust, consumer protection and unjust enrichment laws. Vista Healthplan, 2015 WL 3623005, at *14. I also found that there were no potential conflicts of interest. Nothing in the record before me suggests anything to undermine these findings. As such, I deem typicality satisfied.

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

4. Adequacy of Representation

The last Rule 23(a) factor considers adequacy of representation. "The principal purpose of the adequacy requirement is to determine whether the named plaintiffs have the ability and the incentive to vigorously represent the claims of the class." In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig., 795 F.3d 380, 393 (3d Cir. 2015). The adequacy requirement has two components: (1) the interests and incentives of the representative plaintiffs; and (2) the experience and performance of class counsel. Dewey v. Volkswagen Aktiengesellschaft, 681 F.3d 170, 181 (3d Cir. 2012) (citation omitted).

Questions concerning the adequacy of class counsel are governed by Federal Rule of Civil Procedure 23(g), which requires a court to consider the following: (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources counsel will commit to representing the class. Fed. R. Civ. P. 23(g); see also Dewey, 681 F.3d at 181 n.13 (noting that adequacy of class counsel must be considered under factors in Fed. R. Civ. P. 12(g)).

As I found in my Prior Certification Opinion, there is no valid challenge to the adequacy of Class Counsel, all of whom have extensive experience handling complex class action litigation, particularly in the antitrust context. Vista Healthplan, 2015 WL 3623005, at *15. Class Counsel was appointed as Interim Class Counsel in August 2009, and has managed the case with efficiency and professionalism ever since.

**\*10** As to the adequacy of the class representatives, I likewise harbor no doubts. Again, as I found in my Prior Certification Opinion, there is no real probability of a conflict of interest among Class Members and "[a]ll [C]lass [M]embers have a common interest in maximizing classwide damages." Id. at *16. Any speculative concerns about damages allocation that presented during the litigation class certification proceedings are no longer a concern at this settlement stage of the case.

**B. Rule 23(b)(3) Requirements**

1. Predominance

The predominance requirement is similar to commonality and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997). While commonality and predominance present similar considerations, the predominance standard is "far more demanding." In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 311 (3d Cir. 2008), as amended (Jan. 16, 2009) (quotations omitted). The plaintiff need not prove his claims for purposes of the predominance inquiry. He must only show that he can establish the elements of his claim at trial by common, and not individualized, proof. Sullivan v. DB Invs., Inc., 667 F.3d 273, 305 (3d Cir. 2011).

"Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those *questions* will be answered, on the merits, in favor of the class." Amgen, Inc. v. Connecticut Retirement Plans and Trust Funds, 568 U.S. 455, 459 (2013) (emphasis in original). The merits underlying the cause of action need be considered only to the extent that they are "enmeshed" with the certification inquiry. Comcast Corp. v. Behrend, 569 U.S. 27, 34 (2013) (citations omitted). "Put another way, what matters for purposes of the predominance determination is whether there are common questions, not common answers." In re Mushroom Direct Purchaser Antitrust Litig., 319 F.R.D. 158, 187–88 (E.D. Pa. 2016). As such, to decide whether class-action treatment is appropriate, the court must "give careful scrutiny to the relation between common and individual questions." Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1045 (2016). Common questions are those "where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." Id. (quotation and alterations omitted). Individual questions are those "where members of a proposed class will need to present evidence that varies from member to member ..." Id. (quotation omitted).

To assess predominance at the certification stage, a court must examine each element of the asserted legal claim "through the prism" of Rule 23(b)(3). Marcus, 687 F.3d at 600 (quoting In re DVI, Inc. Sec. Litig., 639 F.3d 623, 630 (3d Cir. 2011)). The plaintiff must "demonstrate that the element of [the legal claim] is capable of proof at trial through evidence that is common to the class rather than individual to its members." Id. (quoting Hydrogen Peroxide, 552 F.3d at 311). Thus, a

court must predict how these issues will play out at trial "in order to determine whether common or individual issues predominate in a given case." Malack v. BDO Seidman, LLP, 617 F.3d 743, 746 (3d Cir. 2010) (quoting Hydrogen Peroxide, 552 F.3d at 311).

Here, the EPPs set forth antitrust violations and state consumer protection claims. I address each individually.

*a. Antitrust Class*

For the antitrust class, the EPPs must show that common issues predominate with respect to their ability to prove: (1) a violation of the antitrust laws; (2) antitrust impact from the violation, *i.e.* causation; and (3) measurable damages. See Hydrogen Peroxide, 552 F.3d at 311.

**\*11** With respect to the first element—antitrust violation—my Prior Certification Opinion found that predominance clearly existed. Vista Healthplan, 2015 WL 3623005, at \*16. This finding continues to hold true at the settlement stage. The United States Supreme Court has noted that "[p]redominance is a test readily met in certain cases alleging consumer [ ] fraud or violations of antitrust laws." Amchem, 521 U.S. at 625; see also In re Warfarin, 391 F.3d 516, 528 (3d Cir. 2004). As a general rule, liability for anticompetitive conduct focuses on the defendants' actions, not the conduct of individual class members. In re Warfarin, 391 F.3d at 528. "The issues of relevant market, monopoly power, and exclusionary conduct can be proven using common, class-wide evidence because such issues focus on the defendants' conduct rather than individual class members." In re Wellbutrin, 282 F.R.D. at 140. Accordingly, I deem predominance satisfied on this element.

With respect to the third element of damages, the EPPs need to demonstrate that common issues predominate as to the element of "measurable damages" on a classwide basis. Hydrogen Peroxide, 552 F.3d at 311–12 (citing 15 U.S.C. § 15). "[T]he plaintiffs are not required to prove damages by calculating specific damages figures for each member of the class, but rather they must show that a reliable method is available to prove damages on a class-wide basis." In re Wellbutrin, 282 F.R.D. at 144. Variation of damages between and among class members does not necessarily defeat predominance. In re Processed Egg Prods. Antitrust Litig., 312 F.R.D. 171, 203 (E.D. Pa. 2015).

In my Prior Certification Opinion, I found that the EPPs had demonstrated predominance with respect to antitrust damages. Vista Healthplan, 2015 WL 3623005, at \*22–25. I noted that Plaintiff's economist, Dr. Hartman, presented a formulaic and well-established methodology by which to calculate damages on a class-wide basis. Id. at \*25. As that is the same measure of damages to be used with the Settlement Class, I find that predominance is satisfied.

Finally, with respect to the second element of antitrust impact, the EPPs must demonstrate that they can prove by common evidence that the Class Members suffered an injury, or antitrust impact, from the antitrust violation. In re Processed Egg Prods., 312 F.R.D. at 183. As to this element —unlike with the previous elements—my Prior Certification Opinion declined to find that the EPPs had established predominance. Vista Healthplan, 2015 WL 3623005, at \*21. Specifically, I credited the testimony of Defendants' expert that numerous groups of uninjured persons remained within the class definition, including, for example: TPPs that were uninjured due to capitation agreements[2] between the TPPs and pharmacies; TPPs that paid more for the generic than branded Provigil because they aggressively promoted generic substitution through their copayment structure; consumers with no out-of-pocket payment; and consumers who received no cost-benefit from switching to the generic. Id. at \*19–20. I further noted that the EPPs had put forth no methodology using common evidence to identify these uninjured persons, meaning that every Class Member would need to be reviewed on an individualized basis to see if they were impacted by Defendants' anticompetitive actions. Id. at \*19.

These concerns are no longer at issue for several reasons.

First, the EPPs have redefined the Settlement Classes to specifically exclude: (1) insured individuals covered by plans imposing a flat dollar co-pay that was the same dollar amount for generic as for brand drug prices, and (2) insured individuals who purchased only generic modafinil pursuant to a fixed co-pay applicable to generic drugs. These exclusions are specified on the Consumer Claim form, and in order to participate in the Settlement, Class Members must swear in their claim forms, under penalty of perjury, that they do not fall within such exclusions. (Meltzer Decl., Ex. 4, at exhs. C and D.) This process carves out the uninjured individuals and eliminates some of my prior concerns about the inclusion of uninjured persons or entities.

**\*12**  Second, as defined, the Settlement Classes condition class membership on a Provigil or modafinil "purchase," which requires claiming Class Members to verify that they paid for such a purchase or purchases. (Id.) This refined definition excludes consumers with no out-of-pocket payment for Provigil or modafinil.

Finally, the EPPs have produced the report of W. Paul DeBree, an expert in the Pharmacy Benefit Manager ("PBM") Industry, to address my previous concerns that the proposed litigation class included uninjured TPPs, such as (a) those with capitation agreements with pharmacies and (b) those that pay more for the generic than branded Provigil because they aggressively promote generic substitution through their co-payment structure. At the time of the prior certification proceedings, the EPPs had no information about or response to the inclusion of these TPPs. Mr. DeBree now explains that, with respect the first possible category of uninjured TPPs, capitation agreements have not existed in the TPP marketplace for over a decade and were not in place "in any meaningful way" during any part of the class period, making the existence of TPP Class Members with such plans very unlikely. (Expert Report of W. Paul DeBree ("DeBree Report"), ECF No. 586-11, ¶ 35.) As to second proposed category of uninjured TPPs, Mr. DeBree opines that "the theoretical possibility that a TPP would pay more for the generic modafinil than for the branded Provigil version of modafinil due to a co-pay structure is virtually non-existent. As a practical matter the differential between branded and generic prices for expensive drugs, like Provigil, so substantially exceed the differential between the co-pays for each that the amount paid by the TPP for the branded drug will always be greater." (Id. ¶ 47.)

Given this enhanced record with a new expert opinion, together with refined class definitions, I find that the EPPs have cured the problems of predominance found within the proposed litigation class. Indeed, unlike previously "where the certification inquiry was set against the backdrop of an impending trial, here we are not as concerned with 'formulat[ing] some prediction' as to how this element of [an antitrust] violation would 'play out' at trial ... 'for the proposal is that there be no trial,' ... and instead our inquiry into the element of antitrust injury is solely for the purpose of ensuring that issues common to the class predominate over individual ones." In re Ins. Brokerage Antitrust Litig., 579 F.3d 241, 269 (3d Cir. 2009) (internal quotations omitted). Accordingly, for purposes of certifying a settlement class, I find that the element of predominance is satisfied.

*b. State Unjust Enrichment/Consumer Protection Class*

With respect to the state unjust enrichment/consumer protection claims, I previously found that predominance could not be satisfied due to material differences in state law. Vista Healthplan, 2015 WL 3623005, at *33–34. Specifically, I remarked that because of the variations in state law, combined with the EPPs' inability to account for those differences during trial, common issues did not predominate. Id.

This concern is no longer relevant at the settlement class stage. "Confronted with a request for settlement-only class certification, a district need not inquire whether the case, if tried, would present intractable management problems." Amchem Prods., 521 U.S. at 620. "[V]ariations [in state laws] are irrelevant to certification of a settlement class since a settlement would eliminate the principal burden of establishing the elements of liability under disparate laws." Sullivan, 667 F.3d at 303 (internal quotations omitted) (alterations in original). Accordingly, I find that the state law variations do not defeat predominance as to the state unjust enrichment/consumer protection class.

## 2. Superiority

**\*13**  In addition to predominance, plaintiffs seeking certification under Rule 23(b)(3) must show that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b) (3). To determine whether plaintiffs have met their burden on superiority, courts consider "class members' interests in pursuing separate actions, the extent of any independent litigation already begun by class members, the desirability of concentrating the litigation in this forum, and the difficulties likely to be encountered in the management of a class action." In re Mushroom, 319 F.R.D. at 208 (quotations omitted). "In settlement situations, the superiority requirement arguably translates into the question whether the settlement is a more desirable outcome for the class than individualized litigation, and may assure that the settlement has not grossly undervalued plaintiffs' interests." Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 192 (3d Cir. 2001) (citing G.M. Trucks, 55 F.3d at 796).

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

In my Prior Certification Opinion, I found that superiority was not met because the EPPs had failed to offer a manageable and efficient way to instruct the jury on the important substantive differences in the various states' laws. As noted above, however, that litigation manageability concern is no longer an issue as the Settlement resolves the case without trial. Moreover, and perhaps more importantly, I note that many of the individual Class Members have smaller damage awards, which they would likely not individually litigate against the behemoth pharmaceutical companies that comprise the Defendants. See In re Namenda Direct Purchaser Antitrust Litig., 331 F. Supp. 3d 152, 220 (S.D.N.Y. 2018) ("Class treatment is appropriate in such 'negative value cases,' in which each class members' interest in the litigation is less than the cost to maintain an individual action."). The Settlement therefore provides monetary remuneration for individuals and small health plans who would likely otherwise have no recovery. Accordingly, I deem the superiority element satisfied.

### C. Ascertainability

The final element that I must consider regarding certification of the Settlement Classes is whether the classes are ascertainable.

"[A]scertainability" is closely tied to the requirement that plaintiffs provide a proper class definition. Byrd v. Aaron's, Inc., 784 F.3d 154, 164 (3d Cir. 2015). "A trial court ... needs a class to be 'defined with reference to objective criteria' and some assurance that there can be 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition,' in order to rigorously analyze the explicit Rule 23(a) and (b) certification requirements." Id. at 164–65 (internal citations omitted). The separate ascertainability requirement ensures that class members can be identified after certification and, therefore, "prepares a district court to direct to class members the best notice that is practicable under the circumstances." Id. at 165 (internal quotation marks omitted). "If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." Marcus, 687 F.3d at 593.

The Third Circuit has clarified that the ascertainability inquiry is "narrow." Byrd, 784 F.3d at 165. "If defendants intend to challenge ascertainability, they must be exacting in their analysis and not infuse the ascertainability inquiry with other class-certification requirements." Id. "[A]scertainability only requires the plaintiff to show that class members can be

identified." Carrera v. Bayer Corp., 727 F.3d 300, 308 n.2 (3d Cir. 2013). The proposed method for identifying class members must be "administratively feasible," meaning that "identifying class members is a manageable process that does not require much, if any individual factual inquiry." Carrera, 727 F.3d at 307–08 (quotations omitted).

**\*14** In my Prior Certification Opinion, I found that the EPPs had failed to present a clear methodology to identify Class Members and distinguish Class Members from persons that fell within an exclusion. Vista Healthplan, 2015 WL 3623005, at \*10. I further found that the EPPs had not established any administratively feasible approach that would be effective without extensive individualized inquiry and mini-trials. Id.

Here, the revised class definitions and Notice Program obviate all of my previous ascertainability concerns. As detailed above, the Classes were re-defined to exclude (1) insured individuals covered by plans imposing a flat dollar co-pay that was the same dollar amount for generic as for brand drug prices, and (2) insured individuals who purchased only generic modafinil pursuant to a fixed co-pay applicable to generic drugs. These exclusions are specified on the Consumer Claim form and, in order to participate in the Settlement, Class Members must swear in their claim forms, under penalty of perjury, that they do not fall within such exclusions. (Miller Decl., Exs. C & D.) The proposed Settlement Classes specifically condition class membership on a Provigil or modafinil "purchase" and require claiming Class Members to verify that they paid for such a purchase. (Id.)

Moreover, the Notice Program has borne out the desired results of identifying Class Members. As set forth above, the Notice Program consisted of (a) direct notice to potential Class Members identified through subpoenas to twenty-five providers of retail pharmacy services and pharmacy benefits managers, including mail-order pharmacies; (b) direct notice to potential members of the Settlement Class identified through the A.G. Provigil Settlement; (c) publication notice in national magazines; (d) internet banner and newsfeed ads on multiple networks; (e) distributing notice via PR Newswire's US1 Newsline; (f) developing and launching a dedicated informational website for the Settlement at ProvigilSettlement.com; and (g) establishing a dedicated toll-free telephone number. As a result of this Notice Program, over 40,000 eligible claimants have been identified. As represented by the EPPs' Class Counsel, all money obtained from the Settlement will be distributed, leaving no surplus.

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

Ultimately, I find that the EPPs have met their burden of setting forth objective criteria by which the Settlement Classes are defined and providing reasonable assurance of a reliable and administratively feasible mechanism for determining whether putative Class Members fall within the class definition. My previous concerns about the need for individualized fact-finding or mini-trial to identify Class Members has been adequately addressed by the EPPs.

#### D. Conclusion as to Class Certification

Following a "rigorous analysis," I find that the EPPs have proven that class certification is warranted and proper. The EPPs have established all of the Rule 23(a) elements of numerosity, commonality, typicality, and adequacy of class representation. Moreover, common, class-wide issues will predominate, and the EPPs have adduced sufficient classwide evidence to prove anticompetitive conduct, antitrust impact, and damages. Finally, I conclude that a class action is a superior method to fairly and efficiently adjudicate this controversy, and that the class is ascertainable. Accordingly, the EPPs' Motion for Class Certification of the Settlement Classes will be granted.

#### E. Appointment of Interim Class Counsel as Class Counsel

**\*15** Having certified the Settlement Class, I must now appoint Class Counsel.

Questions concerning the adequacy of class counsel are governed by Federal Rule of Civil Procedure 23(g), which requires a court to consider the following: (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources counsel will commit to representing the class. Fed. R. Civ. P. 23(g); see also Dewey v. Volkswagen Aktiengesellschaft, 681 F.3d 170, 181 n.13 (3d Cir. 2012) (noting that adequacy of class counsel must be considered under factors in Fed. R. Civ. P. 23(g)).

I have already twice determined that the three firms that were appointed as Interim Class Counsel—Spector Roseman & Kodroff, Kessler Topaz Meltzer & Check, and Criden & Love—are qualified under Rule 23(g) factors. I have again reviewed these factors in the course of the adequacy of representation factor of Rule 23 and found that these

firms have actively, efficiently, and competently litigated this case for over twelve years. They have applied their past experience in handling antitrust class actions and their extensive knowledge of the applicable law, and they have committed extraordinary resources to this matter. Having no reason to doubt the collective experience of Interim Class Counsel, I appoint these firms as Class Counsel.

#### IV. FAIRNESS OF THE SETTLEMENT

After determining that a proposed settlement class may properly be certified under Rule 23, the court must evaluate the fairness of a proposed class action settlement under Rule 23(e). See In re Ins. Brokerage Antitrust Litig., 579 F.3d 241, 258 (3d Cir. 2009) (" 'Even if it has satisfied the requirements for certification under Rule 23, a class action cannot be settled without the approval of the court and a determination that the proposed settlement is fair, reasonable and adequate.' ") (quoting In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 316 (3d Cir. 1998)).

Where, as here, "settlement negotiations precede class certification, and approval for settlement and certification are sought simultaneously," the court must protect absentee class members by applying an "even more rigorous, heightened standard." In re Pet Food Prods. Liab. Litig., 629 F.3d 333, 350 (3d Cir. 2010) (internal quotation marks omitted) (In re Warfarin, 391 F.3d 516, 534 (3d Cir. 2004)). However, the Third Circuit, in In re Cendant Corp. Litigation, 264 F.3d 201 (3d Cir. 2001), has directed a district court to apply an initial presumption of fairness when reviewing a proposed settlement where: "(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." Id. at 232 n.18; see also In re Warfarin, 391 F.3d at 535.

In Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975), the Third Circuit "identified certain factors which district courts may employ in informing their discretion before granting final approval to the class action settlement." Schwartz v. Dallas Cowboys Football Club, Ltd., 157 F. Supp. 2d 561, 571 (E.D. Pa. 2001) (citing Girsh). "[T]he district court must make findings as to each of the nine Girsh factors in order to approve a settlement as fair, reasonable, and adequate, as required by Rule 23(e)." In re Pet Food Prods., 629 F.3d at 350. The Girsh factors include:

**\*16** (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3)

Case 4:21-cv-00196-MWB    Document 261-1    Filed 01/20/26    Page 258 of 287

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

Girsh, 521 F.2d at 157.

Subsequently, in In re Prudential Insurance Company America Sales Practice Litigation Agent Actions, 148 F.3d 283 (3d Cir. 1999), the Third Circuit cited a "sea-change in the nature of class actions" and advised that "it may be useful to expand the traditional Girsh factors" when appropriate. Id. at 323. The additional factors for consideration cited by the Prudential Court include:

[T]he maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

Id. These Prudential factors are "illustrative of additional inquiries that in many instances will be useful for a thoroughgoing analysis of a settlement's terms." In re Pet Food Prods., 629 F.3d at 350.

Finally, in In re Baby Products Antitrust Litigation, 708 F.3d 163 (3d Cir. 2013), the Third Circuit added that "one of the additional inquiries for a thorough analysis of settlement terms is the degree of direct benefit provided to the class."[3] Id. at 174. "In making this determination, a district court may consider, among other things, the number of individual awards compared to both the number of claims and the estimated number of class members, the size of the individual awards compared to claimants' estimated damages, and the claims process used to determine individual awards." Id.

Ultimately, the "decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court," and the appellate court gives great deference to the district court's factual findings. Girsh, 521 F.2d at 156. There is an overriding public interest in settling class action litigation, and it should therefore be encouraged. See G.M. Trucks, 55 F.3d at 784 ("The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation"); In re Sch. Asbestos Litig., 921 F.2d 1330, 1333 (3d Cir. 1990) (noting that the court encourages settlement of complex litigation "that otherwise could linger for years"). As a result, "when evaluating a settlement, a court should be 'hesitant to undo an agreement that has resolved a hard-fought, multi-year litigation.' " In re Comcast Corp. Set-Top Cable TV Box Antitrust Litig., No. 09-md-2034, 2019 WL 4645331, at *10 (E.D. Pa. Sept. 24, 2019) (quoting In re Baby Prods., 708 F.3d at 175).

**\*17** With these standards in mind, my review of the Settlement here entails several steps. I will first address whether the Settlement is entitled to a presumption of fairness as described in the Cendant case. I will then individually address the Girsh, Prudential and Baby Products factors.

**A. Presumption of Fairness**

As set forth above, a proposed settlement is entitled to an initial presumption of fairness where: "(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." In re Cendant, 264 F.3d at 232 n.18; see also In re NFL, 821 F.3d at 436.

All of these factors are satisfied here. First, it is undisputed that the settlement negotiations occurred at arm's length. The parties began settlement negotiations through two full days of mediation conducted by United States Magistrate Judge David R. Strawbridge and the two Special Masters he selected. (Meltzer Decl. ¶ 28.) Over the ensuing pendency of the litigation, settlement discussions occurred intermittently, ultimately culminating in the Settlement after the denial of class certification. (Id. ¶¶ 29–32.)

Second, sufficient discovery unequivocally occurred here. Discovery took place over the course of over twelve years and involved the review and analysis of more than five million pages of documents, over 180 depositions including those of

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

all five named Plaintiffs, court hearings on discovery, and extensive motion practice. (Id. ¶¶ 22–24.)

Third, as noted above, Class Counsel, who are the proponents of the Settlement, are highly experienced in similar class litigation. As I found in my Prior Certification Opinion, Class Counsel has extensive experience handling complex class action litigation, particularly in the antitrust context. Vista Healthplan, 2015 WL 3623005, at *15.

Finally, as will be discussed in more detail below, the response to the Class Settlement has been overwhelmingly favorable. Nearly 40,000 Settlement Class Members have filed claims to participate in the Settlement, only eighteen potential Class Members have sought exclusion from the Class, and only three individuals have filed generalized objections.

In light of these factors, I find that the proposed Settlement is entitled to a presumption of fairness. While this presumption does not obviate the need for scrupulous analysis under the Girsh, Prudential, and Baby Product factors, it does skew the analysis in favor of approving the Settlement.

## B. Application of the *Girsh* Factors

### 1. Complexity, Expense, and Likely Duration of the Litigation (Factor 1)

"The first factor 'captures the probable costs, in both time and money, of continued litigation.' " In re Warfarin, 391 F.3d 535–36 (quoting In re Cendant, 264 F.3d at 233); see also In re NFL, 821 F.3d at 437.

This suit involves complicated antitrust and patent issues in the realm of pharmaceutical manufacturing. "An antitrust class action is arguably the most complex action to prosecute ..." In re Linerboard Antitrust Litig., 296 F. Supp. 2d 568, 577 (E.D. Pa. 2003) (quotations omitted); see also In re Flonase Antitrust Litig., 951 F. Supp. 2d 739, 743 (E.D. Pa. 2013) ("Antitrust class actions are particularly complex to litigate and therefore quite expensive."). The Settlement therefore avoided the need for a difficult and expensive multi-week trial involving numerous Daubert motions, multiple motions *in limine*, fact witness testimony, and costly expert witness testimony in scientific and regulatory areas. Moreover, given the significant amount of money at stake, the likelihood of appeal by either side was high, further multiplying the projected expenditures. Because such private

resolution of the conflict "reduces expenses and avoids delay," this factor weighs heavily in favor of approving the Settlement. McDonough v. Toys R Us, Inc., 80 F. Supp. 3d 626, 640 (E.D. Pa. 2015).

### 2. Reaction of the Potential Class Members to the Settlements (Factor 2)

**\*18** The second Girsh factor—the reaction of the classes to the settlement—"attempts to gauge whether members of the class support the settlement." In re Warfarin Sodium Antitrust Litig., 212 F.R.D. 231, 254 (D. Del. 2002) (quoting In re Prudential, 148 F.3d at 318).

Here, the Notice to potential Class Members stated that Requests for Exclusions had to be mailed to the Settlement Administrator so that they were received by December 6, 2019. (Miller Decl., ECF 600-4, ¶ 21 & Ex. C, ¶ 15.) The Settlement Administrator received a total of eighteen Requests for Exclusion. (Supp. Miller Decl. ¶ 6.) By contrast, nearly 40,000 Settlement Class Members have filed claims to participate in the Settlement.

Three objections to the proposed Settlement were filed, none of which I find warrants non-approval of the Settlement.

First, Mr. Barry Balach challenges the Cephalon Settlement because it does not include Nuvigil purchases in those for which Class Members may recover. He asserts that any settlement that does not take into account his out-of-pocket costs for Nuvigil is inadequate. He also believes the amount of the Settlement is insufficient. (Barry Balach Obj., ECF No. 601.)

I note that the EPPs' Amended Complaint originally alleged that Cephalon's launch of Nuvigil was part of an illegal "product hop" and that Nuvigil purchases should be recoverable damages. The EPPs' Class Counsel, however, averred that evidence received during discovery revealed the weakness of the product hop allegations, and that damages related to Nuvigil purchases "would be low if not impossible to prove." (EPPs' Suppl. Br. 4.) Indeed, Nuvigil purchases were not recoverable in either the Direct Purchaser Settlement or the States' Attorneys General Settlement. As I find the decision to exclude Nuvigil purchases from the Settlement to be reasonable, I will overrule Mr. Balach's objection.

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

The second objection comes from Mr. Carlton Davis, who contends that the Cephalon Settlement will be an insufficient deterrent because he understood that Cephalon "accrued as much as $47.25 billion in overcharges" and that the Settlement amount will not impede the illicit conduct because it is a "mild slap on the wrist to a greed-addicted company." He also believes that the Settlement "does nothing to address the real cost inflicted" on society and is "woefully inadequate to compensate consumers" because only $20 million is going to be paid out to the class. He urges that he should be compensated for his time and expenses in pursuing his claim, in the amount of $8,000. (Carlton Davis Obj. ECF No. 602.)

I find no basis to sustain the objection for several reasons. First, Mr. Davis's objection relies on an overly-inflated overcharge number. As noted by the EPPs, the overcharge damages were not calculated to be $47.25 billion, as Mr. Davis believes, but rather were calculated, by the EPPs' expert, to be approximately $1.244 billion. (Meltzer Decl. for Preliminary Approval, ECF No. 586, Ex. 18.) Moreover, the Settlement amount itself is substantial. It gives approximately $66 million to the EPP class, which, combined with $77 million obtained from the separate group of Settling Health Plans ("SHP's"), results in a total settlement of $143 million to the entire group of end-payors for whom the litigation was originally commenced. The amount of the Settlement is even more substantial when viewed in light of the fact that the EPPs were denied class certification, meaning that a collective recovery through litigation would have been impossible. Finally, Mr. Davis's concerns as to the amount of attorneys' fees are unfounded, as I will discuss later in this Opinion.

**\*19** Mr. Davis's request for $8,000 in personal attorneys' fees—unaccompanied by any documentation—has no legal basis. "Absent a showing that the objector substantially enhanced the benefits to the class under the settlement, the objector is not entitled to a fee." In Rent-Way Secs. Litig., 305 F. Supp. 2d 491, 520 (W.D. Pa. 2003). As Mr. Davis has not demonstrated that his participation has enhanced the benefits to the class under the settlement, he is not entitled to any fees. Accordingly, I will overrule Mr. Davis's objection as well.

Finally, Mr. Daniel Dunham[4] generally objects that "[t]he actions alleged, if true, would require penalties in excess of profit to have any deterring effect" and suggests that "the fund to be distributed be much larger, since victims can obtain nothing more than what was lost due to the alleged behavior, and the total judgment has a finite limit." He believes that "there is no reason a company should retain any of the profit that is earning using unlawful methods." (Daniel Dunham Obj., ECF No. 607-4.)

This objection is meritless for the same reasons applied to Mr. Davis's objection. Moreover, Mr. Dunham has, contrary to his objection, filed a claim form to participate in the Settlement. Accordingly, I will overrule this objection as well.

While I appreciate and carefully consider the objections of those who take the time to participate in what is generally a lawyer-driven settlement, I do not find that any of the three objections before me raise valid concerns as to the fairness and adequacy of the EPP Settlement. By contrast, the fact that approximately 40,000 individuals have filed forms to participate in the Settlement reflects significant support for the Settlement. As a "small proportion of objectors does not favor derailing [the] settlement," Bell Atl. v. Bolger, 2 F.3d 1304, 1314 (3d Cir. 1993), I find that this factor weighs in favor of approval.

3. Stage of Proceedings and Amount of Discovery Completed (Factor 3)

Through the "lens" of the third Girsh factor—the stage of the proceedings and the amount of discovery competed—"courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." In re Prudential, 148 F.3d at 319 (quoting G.M. Trucks, 55 F.3d at 813). "[P]ost discovery settlements are more likely to reflect the true value of the claim and be fair." Lazy Oil Co. v. Witco Corp., 166 F.3d 581, 588 (3d Cir. 1999) (citing Bell Atl. v. Bolger, 2 F.3d 1304, 1314 (3d Cir. 1993)).

Here, twelve years of active litigation transpired during which extensive discovery was exchanged, over 180 depositions were taken, expert reports were obtained and exchanged, and vigorous motion practice was pursued. Only after the denial of class certification and rulings on summary judgment were issued did the parties reach the Settlement. Moreover, the parties had the benefit of rulings in the related cases by the States' Attorneys General and the Direct Purchasers, as well as my ruling in the patent infringement case brought by Apotex. Given this record, I find that the parties had a well-developed appreciation of the merits of the case prior to negotiation.

Case 4:21-cv-00196-MWB    Document 261-1    Filed 01/20/26    Page 261 of 287

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

4. Risks of Establishing Liability & Damages (Factors 4 and 5)

"These factors survey the potential risks and rewards of proceeding to litigation in order to weigh the likelihood of success against the benefits of an immediate settlement." In re Warfarin, 391 F.3d at 537.

**\*20** As I have repeatedly noted over the twelve-year litigation period, a favorable outcome was far from guaranteed to the EPPs. The EPPs put forth novel theories of antitrust liability in an ever-changing legal landscape. Defendants—three large pharmaceutical companies—had immeasurable resources to proceed to and through trial. Even if the EPPs were successful in establishing an unlawful reverse-settlement payment Actavis scheme with respect to Provigil, they faced an uncertain battle in establishing causation and damages. "The dispute over damages would likely have resulted in an expensive battle of the experts and there was no way to anticipate a jury's response to intricate economic data." McDonough, 80 F. Supp. 3d at 644.

By the same token, I note that while the EPPs' likelihood of prevailing was far from certain, "there is no indication that this case was brought in bad faith simply to generate attorneys' fees, or that the case [was] too weak to succeed under most circumstances." Reibstein v. Rite Aid Corp., 761 F. Supp. 2d 241, 253 (E.D. Pa. 2011). Ultimately, the Settlement provided the certainty of a $66 million immediate recovery without subjecting the EPPs to the rigors of a difficult trial. As such, I find these factors weigh in favor of the Settlement.

5. Likelihood of Obtaining and Keeping Class Certification Through Trial (Factor 6)

The sixth Girsh factor "measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial" in light of the fact that "the prospects for obtaining certification have a range impact on the range of recovery one can expect to reap from the class action." In re Warfarin, 391 F.3d at 537 (internal quotations & citation omitted). Class certification is tenuous, as a "district court retains the authority to decertify or modify a class at any time during the litigation if it proves to be unmanageable." Id. (citation omitted).

This factor weighs heavily in favor of approval. As noted above, I had already denied class certification to the EPPs, meaning that any trial in this case would have been only on behalf of the five individual EPPs and any recovery would have been limited to their individual damages. Depending on the outcome of that trial, either the named Plaintiffs would have had to appeal my class certification decision, or the non-named potential Class Members would have had to decide whether to pursue their own costly individual cases against the Defendants. Given the relatively small amounts of damages that these individual plaintiffs each sustained, individual litigation would not likely be feasible.

By contrast, the Settlement here guarantees some recovery to all of the potential Class Members, both named and unnamed. As such, this factor weighs in favor of approving the Settlement.

6. Ability of Defendants to Withstand a Greater Judgment (Factor 7)

The ability of the Defendants to withstand a greater judgment generally only comes into play when "a settlement in a given case is less than would ordinarily be awarded but the defendant's financial circumstances do not permit a greater settlement." Reibstein, 761 F. Supp. 2d at 254. The Third Circuit has noted that simply because a defendant "could afford to pay more does not mean that it is obligated to pay any more than what the Consumer and TPP Class Members are entitled to under the theories of liability that existed at the time the settlement was reached." In re Warfarin, 391 F.3d at 538.

Here, there is no question that the Defendants' total resources far exceed the Settlement amount, and Defendants did not profess any inability to pay during settlement negotiations. That factor does not appear to have come into play during the settlement negotiations. Defendants' ability to pay is therefore irrelevant in determining the fairness of the Settlement and I decline to give it any weight.

7. Range of Reasonableness of Settlement Fund in Light of Best Possible Recovery and to a Possible Recovery in Light of All Attendant Risks of Litigation (Factors 8 & 9)

**\*21** "The last two Girsh factors evaluate whether the settlement represents a good value for a weak case or a poor

Case 4:21-cv-00196-MWB    Document 261-1    Filed 01/20/26    Page 262 of 287

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

value for a strong case. The factors test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." In re Warfarin, 391 F.3d at 538 (citations omitted). In order to assess the reasonableness of a settlement in cases seeking primarily monetary relief, "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement." In re Prudential, 148 F.3d at 322 (quoting G.M. Trucks, 55 F.3d at 806). In conducting this evaluation, it is recognized "that settlement represents a compromise in which the highest hopes for recovery are yielded in exchange for certainty and resolution and [courts should] guard against demanding too large a settlement based on the court's view of the merits of the litigation." In re Aetna Sec. Litig., No. MDL 1219, 2001 WL 20928, at *11 (E.D. Pa. Jan. 4, 2001). "The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved. The percentage recovery, rather must represent a material percentage recovery to plaintiff in light of all the risks considered under Girsh." In re Cendant Corp. Sec. Litig., 109 F. Supp. 2d 235, 263 (D.N.J. 2000) (citations omitted) (internal quotations marks omitted), aff'd, 264 F.3d 201 (3d Cir. 2001).

The Settlement here is reasonable in light of the best possible recovery. As set forth above, the Settlement provides $65,877,600 for Class Members, which amount was negotiated simultaneously with the $77 million settlement from the Cephalon Parties for the Settling Health Plans. The EPPs' expert, Dr. Hartman, calculated the total overcharge damages as $1.244 billion. (Meltzer Decl., ECF No. 586, Ex. 18 ¶ 44.) The total EPP Settlement of $142,877,300 is approximately 11.5% of that best possible recovery situation. Courts have approved settlements in and around this range. See In re Linerboard Antitrust Litigation, 321 F. Supp. 2d 619, 633 (E.D. Pa. 2004) (citing in part In re Domestic Air Transp. Antitrust Litig., 148 F.R.D. 297, 325 (N.D. Ga. 1993) (approving a settlement in the appropriate amount of 12.7 to 15.3 percent of the estimated $2 billion minimum possible trebled recovery); Erie Forge and Steel, Inc. v. Cyprus Minerals Co., No. 94-404, 1994 WL 485803 (W.D. Pa. Dec. 23, 1996) (approving settlement of $3.6 million where plaintiffs' expert estimated damages of $44.4 million); Fox v. Integra Financial Corp., No. 90-1504 (W.D. Pa. July 9, 1996) (approving a settlement of $6.5 million where plaintiffs' best estimate of provable damages was $33 million); In re Four

Seasons Sec. Litig., 58 F.R.D. 19, 36–37 (W.D. Okla. 1972) ($8 million settlement approved although claims exceeded $100 million)).

**\*22**  The Settlement becomes even more reasonable when considered in light of the attendant risks of litigation. The combined Settlement of almost $143 million (EPP Class plus SHPs) was achieved after twelve years of litigation. As noted above, class certification had been denied, meaning that the best case recovery scenario—which accounted for damages to an entire class—could not be obtained through a singular trial. And Defendants had their own competing economic experts who would have challenged the EPPs' damages calculation at every angle, potentially lowering the amount of recoverable damages. "After considering the present-day-value of money, the likelihood that the class would recover less than its maximum actual damages, all of the attendant risks of litigation, and the interests in resolution, such a recovery is well within the range of reasonableness." Jackson v. Wells Fargo Bank, N.A., 136 F. Supp. 3d 687, 706 (W.D. Pa. 2015); see also In re NFL, 821 F.3d 410, 440 (3d Cir. 2016) (holding that, in considering the eighth and ninth Girsh factors, "we must take seriously the litigation risks inherent in pressing forward with the case" including the possibility that litigation could leave class members with "no recovery at all").

Taking all of this into consideration, I find that the eighth and ninth Girsh factors weigh in favor of approval of the Settlement.

8. Summary of the *Girsh* Factors

In sum, Girsh factors one through six, eight, and nine favor approval of the EPP Settlement. Factor seven—the ability of the Defendants to withstand a greater settlement—is neutral and does not persuade me either way. Although the Girsh factors are simply a guide, I find that, under these considerations, the Settlement is fair and reasonable.

**C. The *Prudential* Factors**
The Prudential factors involve multiple additional considerations, including: (1) "the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

on the merits of liability and individual damages"; (2) "the existence and probable outcome of claims by other classes and subclasses"; (3) "the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved— for other claimants"; (4) "whether class or subclass members are accorded the right to opt out of the settlement"; (5) "whether any provisions for attorneys' fees are reasonable"; and (6) "whether the procedure for processing individual claims under the settlement is fair and reasonable." In re Prudential, 148 F.3d at 323. Only the Prudential factors relevant to the litigation in question need be addressed. Id. 323–24; In re Cigna-American Specialty Health Admin. Fee Litig., No. 16-3967, 2019 WL 4082946, at *3 (E.D. Pa. Aug. 29, 2019).

The first factor—maturity of the underlying substantive issues—substantially mirrors Girsh factor three, the stage of the proceedings. Under this factor, the advanced development of the record weighs in favor of approval. See Chakejian v. Equifax Info. Servs., LLC, 275 F.R.D. 201, 215 (E.D. Pa. 2011) (finding settlement reasonable where underlying substantive issues were "mature in light of the experience of the attorneys, extent of discovery, posture of case, and mediation efforts undertaken."). The Settlement here came on the heels of twelve years of active litigation during which extensive discovery was exchanged, over 180 depositions were taken, expert reports were obtained and exchanged, and vigorous motion practice was pursued. Class Counsel had the benefit of assessing the strength and weaknesses of the case based on this discovery, the Defendants' motions, and the Supreme Court ruling in Actavis. Moreover, the Settlement resulted from extensive negotiations with multiple mediators who had the benefit of an expansive overview of the case. Accordingly, I find that the Settlement was premised on a significantly mature record.

**\*23** Factors two and three look at the outcomes of claims by other classes and other claimants. Defendants here faced antitrust claims from multiple other claimants and classes including the Federal Trade Commission, generic manufacturer Apotex, a group of retailer pharmacy chains, a class of direct purchaser plaintiffs, and several States' attorneys general, all of whom reached settlements allowing for the recovery of overcharge damages. In addition, the State of California has a pending settlement that allows its claimants to recover full reimbursement for their purchases of Provigil and/or modafinil. Consistent with these settlements, the Settlement here likewise permits Class Members to

potentially recover the full amount of overcharge damages they suffered as a result of the alleged anticompetitive conduct. Thus, there do not appear to be any disparities in the success of the settlements obtained by the various claimants.

Factor four considers whether class or subclass members are accorded the right to opt out of the settlement. The Settlement here specifically advised potential class members that they had the option to be excluded from the class. (Miller Decl., Exs. C & D.) As of the date of the Final Fairness Hearing, only eighteen class members had opted out of the Settlement. (Supp. Miller Decl. ¶¶ 5–6.) The release of claims against Defendants does not apply to those Plaintiffs who opt out.

Pursuant to the fifth factor—the reasonableness of attorneys' fees—the Notice Program specifically advised potential Class Members that:

> Class Counsel will request an award from the Court for attorneys' fees of up to one-third of the total amount of the Settlement funds plus any accrued interest, plus reimbursement for the costs and expenses they advanced in litigating the case. All awards for attorneys' fees and expenses shall be paid from the Settlement Funds after the Court approves them. In addition, pursuant to an agreement between Class Counsel and the lawyers for the Settling Health Plans or SHPs (a group of TPPs who separately settled with the Cephalon Defendants), Class Counsel received 40% of the fees paid to the SHP's lawyers from their separate agreement with the Cephalon Defendants. The fees paid pursuant to this agreement are separate from any attorney fees the Court awards to Class Counsel from the Settlement Funds in this case. Further, also pursuant to the agreement between the SHPs' lawyers and Class Counsel, Class Counsel will pay the SHPs' lawyers approximately 32.2% of any fees awarded by the Court in connection with the settlement with the Cephalon Defendants.

(Miller Decl., Exs. C & D.) While the reasonableness of these requested fees is discussed in more detail below, I find—for purposes of approving the fairness of the Settlement—that the notice to the Class Members about the requested fees is reasonable.

Finally, under the sixth factor, I find that the procedure for processing individual claims is both fair and reasonable. In order to submit claims, Class Members need only provide information regarding the total amount they paid for Provigil or modafinil from June 24, 2006 through August 8, 2019, with only one proof of purchase, which can take any

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

number of forms including pharmacy records, an insurance EOB (explanation of benefits) form, or letter from the claimant's doctor. (Miller Decl., Ex. C.) Absent a proof of purchase, a Class Member can seek help from the Settlement Administrator to file a valid claim. (Id.) The Settlement Administrator will then process all submitted claims to determine whether there are any deficiencies and, if so, to notify the Claimant how to cure the deficiency. (Meltzer Decl., Ex. 5.) Once all non-deficient claims are collected, the Settlement Administrator will review the claims to determine which ones are authorized for approval and which ones are ineligible. (Id.) Upon final approval of the Settlement, the approved Settlement Notice Costs, Settlement Administration Costs, Escrow Administration Costs, taxes, approved attorneys' fees and costs, and lead plaintiff incentives shall be paid from the settlement funds. The Settlement Administrator shall then pay all authorized Consumer Claims from the final Consumer Distribution Fund allowing claimants to receive up to 100% of their authorized Consumer Claim, depending on the sufficiency of the funds available and whether the claimant has received reimbursements from either the State Attorney General settlement or the California Attorney General settlement.

 **\*24**  Overall, the Prudential factors raise no concerns regarding the fairness of the Settlement. The Settlement was reached at mature stage of the litigation, and the Settlement's terms appropriately set forth how to file a claim, how the monies will be distributed, how to opt out of the Settlement, and what the potential attorneys' fees and costs awards could be. Ultimately, the Settlement is consistent with those obtained by the other claimants in the related actions. As such, I find that the Prudential factors favor approval of the Settlement.

### D. *Baby Products* Direct Benefit Factor

The final factor I must consider in my analysis of the Settlement's fairness is "the degree of direct benefit provided to the class." In re Baby Products Antitrust Litig., 708 F.3d 163, 174 (3d Cir. 2013). As noted above, "[i]n making this determination, a district court may consider, among other things, the number of individual awards compared to both the number of claims and the estimated number of class members, the size of the individual awards compared to claimants' estimated damages, and the claims process used to determine individual awards." Id.; see also In re Google Inc. Cookie Placement Consumer Privacy Litig., 934 F.3d 316, 329 (3d Cir. 2019).

Here, the Plan of Allocation provides that:

- The separate settlement funds provided by each of the Cephalon Settlement, the Mylan Settlement, and the Ranbaxy Settlement shall be deposited into three separate accounts.

- From those accounts, there will be several deductions made on a *pro rata* basis:

  − Any and all allowed costs (including Settlement Notice costs, Settlement Administration costs, Escrow Administration costs, and taxes).

  − Any allowed class attorneys' fees and costs.

  − Court-authorized incentive awards to the named Plaintiffs.

  − Any future Settlement Administration Costs, Escrow Administration costs, and taxes likely to be incurred through completion of the claims process.

- Following these disbursements, the Settlement Administrator shall combine the remaining funds in the three accounts (the "Net Class Settlement Fund"), which will be used to pay Consumer and TPP claims that have been processed and authorized by the Settlement Administrator in accordance with the Plan of Allocation.

- The Net Class Settlement Fund will be so allocated and disbursed to "Authorized Consumer Claimants" (who will receive 14% of the net Class Settlement Fund) and "Authorized TPP Claimants" (who will receive 86% of the Net Class Settlement Fund) by the Settlement Administrator, under the supervision of Class Counsel and upon Court approval.

- If there are sufficient funds, each Authorized Consumer Claimant shall receive 100% of their Authorized Consumer Claim (reduced by money that Authorized Consumer Claimant has received in any other modafinil settlement).

- If there are insufficient funds to pay each Authorized Consumer Claimant 100% of their Authorized Consumer Claim, then each Authorized Consumer Claimant shall receive a *pro rata* share of the fund.

- If, after all Authorized Consumer Claimants are paid 100% of their claims, funds remain in the Consumer Distribution Fund, those remaining funds shall be added

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

to the TPP Settlement fund and paid out to Authorized TPP Claimants.

As discussed above, Class Members will be entitled to recover up to 100% of their purchase price if sufficient funds are available. Potential Class Members have already received sufficient notice with detailed information and an easy-to-complete claim form. Ultimately, this Settlement prioritizes the maximum number of potential Class Members receiving a direct benefit from the litigation. In re Comcast Corp. Set-Top Cable Television Box Antitrust Litig., 333 F.R.D. 364, 385 (E.D. Pa. 2019) (approving class settlement where, "[d]espite a weak case, Class Counsel continued to prioritize obtaining a direct benefit for potential Class Members and ultimately achieved a Settlement with the potential to directly benefit an estimated 3.5 million consumers.").

### E. Conclusion as to Fairness of the Settlement

**\*25** In light of the foregoing, I find that the EPP Settlement is fair, reasonable, and adequate. Lending the Settlement the requisite presumption of fairness, I note that all but one of the Girsh factors, all of the Prudential factors, and the Baby Products direct benefit consideration weigh in favor of approval. Accordingly, I will grant final approval to Settlement.

## V. APPROVAL OF THE PLAN OF ALLOCATION

When assessing proposed plans of allocation, courts use the same standard for determining whether to approve the settlement itself. McDonough v. Toys R Us, Inc., 80 F. Supp. 3d 626, 648 (E.D. Pa. 2015). "Therefore, the proposed plan needs to be fair, reasonable and adequate." Id. (citing In re Baby Prods., 708 F.3d at 174). "A district court's 'principal obligation' in approving a plan of allocation 'is simply to ensure that the fund distribution is fair and reasonable as to all participants in the fund.' " Sullivan v. DB Investments, Inc., 667 F.3d 273, 326 (3d Cir. 2011) (quoting Walsh v. Great Atl. & Pac. Tea Co., Inc., 726 F.2d 956, 964 (3d Cir. 1983)).

"In general, a plan of allocation that reimburses class members based on the type and extent of their injuries is reasonable." In re Ikon Office Solutions, Inc., Secs. Litig., 194 F.R.D. 166, 184 (E.D. Pa. 2000). Repeatedly, courts have approved of similar plans of allocation. See, e.g., In re Flonase Antitrust Litig., 951 F. Supp. 2d 739, 752 (E.D. Pa. 2013) (approving plan of allocation as fair, reasonable, and adequate where, in antitrust action against brand name drug manufacturer, each class member receives their *pro rata* share

of the net settlement fund, based on their share of qualifying purchases of the brand name drug); Bradburn Parent Teacher Store, Inc. v. 3M (Minnesota Mining and Manufacturing Company), 513 F. Supp. 2d 322, 335 (E.D. Pa. 2007) (approving as reasonable a distribution plan that allocated settlement funds to class members based upon their *pro rata* share of the class's total transparent tape purchases during the damage period, net of invoice adjustments and rebates paid as of the date of the settlement); In re Remeron Direct Purchaser Antitrust Litig., No. 03-0085, 2005 WL 3008808, at \*11 (D.N.J. Nov. 9, 2005) ("Plaintiffs propose to allocate the Settlement funds, net of Court approved attorneys' fees, incentive award, and expenses ... in proportion to the overcharge damages incurred by each Class member due to Defendants' alleged conduct in restraint of trade. Such a method of allocating the Net Settlement Fund is inherently reasonable."); see also In re Corel Corp. Inc. Secs. Litig., 293 F. Supp. 2d 484, 493 (E.D. Pa. 2001) (noting that courts "generally consider plans of allocation that reimburse class members based on the type and extent of their injuries to be reasonable.").

Here, the proposed Plan of Allocation is fair, reasonable, and adequate as it provides a straightforward method for determining each Class Member's *pro rata* share of the Net Settlement Fund and then reimburses Class Members based on the type and extent of their injuries. As set forth in more detail above, the process for submission of claims is simple as Class Members need only provide information regarding the total amount they paid for Provigil or modafinil from June 24, 2006 through August 8, 2019, with only one proof of purchase, which can take any number of forms. Once all non-deficient claims are collected, the Settlement Administrator will review the claims to determine which claims are authorized for approval or are deemed ineligible.

**\*26** The Settlement funds from each of the three Defendants will be subject to deductions for approved attorneys' fees, administrative costs, litigation costs, and incentive payments. The net amounts will then be combined into a single Class Settlement Fund. Authorized Consumer Claimants will receive 14% of Net Settlement Fund and Authorized TPP Claimants will receive 86% of the Net Settlement Fund. The amounts will be allocated on a *pro rata* basis and all Class Members will receive a proportionate award based on the amounts they paid for Provigil and modafinil during the class period, up to 100% depending on the number of claims. All of the net settlement amounts will be reimbursed to Class Members.

I will therefore approve the proposed Plan of Allocation.

## VI. MOTION FOR ATTORNEYS' FEES, LITIGATION EXPENSES, AND INCENTIVE AWARDS

The final portion of my review of the Settlement requires consideration of the EPPs' Motion for (1) an award of attorneys' fees, (2) reimbursement of litigation expenses, and (3) incentive awards for the class representatives.

### A. Attorneys' Fees

The EPPs first seek an award of attorneys' fees in the amount of $21,959,200 plus accrued interest—approximately one-third of the Class Settlement Fund—on behalf of Class Counsel and two other participating firms (Finkelstein Thompson and the Law Offices of Robert Sink).[5]

Under Federal Rule of Civil Procedure 23(h), at the conclusion of a successful class action, class counsel may apply to a court for an award of attorneys' fees. The amount of an attorneys' fee award "is within the district court's discretion so long as it employs correct standards and procedures and makes finding of fact not clearly erroneous[.]" Sullivan v. DB Invs., Inc., 667 F.3d 273, 329 (3d Cir. 2011) (en banc) (internal quotation marks omitted). " '[A] private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation, including attorneys' fees.' " In re Cendant, 404 F.3d at 187 (quoting G.M. Trucks, 55 F.3d 768, 820 n.39).

In assessing attorneys' fees, courts typically apply either the percentage-of-recovery method or the lodestar method. The percentage-of-recovery method is generally favored in common fund cases, such as the one here, because it allows courts to award fees from the fund "in a matter that rewards counsel for success and penalizes it for its failure." Prudential, 148 F.3d at 333 (internal quotations omitted); see also In re Rite Aid Sec. Litig., 396 F.3d 294, 300 (3d Cir. 2005) (finding that the "percentage of the fund" method is the proper method for calculating attorneys' fees in common fund class actions in this Circuit); Kirsch v. Delta Dental of New Jersey, 534 F. App'x 113, 115 (3d Cir. 2013) ("The percentage of recovery method is generally favored in common fund cases ...") (quotations omitted).

In Gunter v. Ridgewood Energy Corp., 223 F.3d 190 (3d Cir. 1990), the Third Circuit directed that, when analyzing a fee award in a common fund case, a district court must consider several factors, including:

**\*27** (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases. Id. at 195 n. 1. This list was not intended to be exhaustive. Id.

In In re Prudential, the Third Circuit identified three other factors that may be relevant and important to consider: (1) the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to the efforts of other groups, such as government agencies conducting investigations, (2) the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained, and (3) any "innovative" terms of settlement. Id. at 336–40.

Ultimately, in reviewing an attorneys' fees award in a class action settlement, a district court should consider the Gunter factors, the Prudential factors, and any other factors that are useful and relevant with respect to the particular facts of the case. The fee award reasonableness factors "need not be applied in a formulaic way" because each case is different, "and in certain cases, one factor may outweigh the rest." In re Rite Aid, 396 F.3d at 301 (quoting Gunter, 223 F.3d at 195 n.1). In cases involving extremely large settlement awards, district courts may give some of these factors less weight in evaluating a fee award. See In re Cendant Corp. Litig., 264 F.3d 201, 283–84 (3d Cir. 2001); In re Prudential, 148 F.3d at 339. What remains important is that, in all cases, the district court "engage in robust assessments of the fee award reasonableness factors," In re Rite Aid, 396 F.3d at 302, recognizing "an especially acute need for close judicial scrutiny of fee arrangements in class action settlements." In re Cendant Corp. PRIDES Litig., 243 F.3d 722, 730 (3d Cir. 2001) (internal quotations omitted); see also In re AT&T Corp., 455 F.3d 160, 165–66 (3d Cir. 2006).

Once all of the Gunter and Prudential factors have been considered, the Third Circuit has suggested that it is "sensible" for district courts to "cross-check" the percentage fee award against the "lodestar" method. In re Prudential, 148 F.3d at 333. More specifically, the district court should apply the percentage-of-recovery method and then do "an

Case 4:21-cv-00196-MWB    Document 261-1    Filed 01/20/26    Page 267 of 287

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

abridged lodestar analysis"— multiplying the number of hours reasonably worked on a case by a reasonable billing rate —and compare it against the percentage-of-recovery method. In re Rite Aid, 396 F.3d at 305–06. In doing so, the court can ensure that the percentage-of-recovery method does not yield too high or low of an award. Id. at 306.

With these standards in mind, I consider each of the Gunter and Prudential factors and then cross-check the percentage-of-recovery amount against a lodestar analysis to provide an overall assessment of the reasonableness of the requested attorneys' fees.

### 1. Gunter/Prudential Factors

#### a. Size of the Fund Created & Number of Persons Benefitted

**\*28**  The Settlement Agreement establishes a total recovery of $65,877,600, from which administrative expenses, attorneys' fees, and costs must be paid. See Jackson v. Wells Fargo Bank, N.A., 136 F. Supp. 3d 687, 713 (W.D. Pa. 2015) (noting that "size of the fund" should include attorneys' fees, and administration expenses); Lake Forest Partners, L.P. v. Sprint Comm'ns Co. L.P., No. 12-0999, 2013 WL 3048919, at *2 (W.D. Pa. June 17, 2013) (the size of the fund should include the "separate payment of attorney's fees and expenses, and the expenses of administration") (citing Boeing Co. v. Van Gemert, 444 U.S. 472, 479 (1980)). Notice has been disseminated to thousands of potential Class Members through the Notice Program as described above, and nearly 40,000 Class Members have filed claims to date.

Class Counsels' requested fees in this case represent 33 1/3 % of the total recovery, which is well within the range of reasonable fees, on a percentage basis, in the Third Circuit. See, e.g., Esslinger v. HSBC Bank Nevada, No. 10-3213, 2012 WL 5866074, at *12 (thirty percent fee award reasonable considering size of the fund); In re Processed Egg Prods. Antitrust Litig., No. 08–2002, 2012 WL 5467530, at *7 (E.D. Pa. Nov. 9, 2012) (approving a thirty percent (30%) fee award for $25,000,000.00 settlement); In re Flonase Antitrust Litig., 291 F.R.D. 93, 104 (E.D. Pa. 2013) (citing cases and remarking that "[a] one-third fee award is standard in complex antitrust cases of this kind" and "is consistent with awards in other complex antitrust actions involving the pharmaceutical industry") (quotations omitted). Accordingly, this factor weighs in favor of finding the fee request reasonable.

#### b. Presence or Absence of Substantial Objections

The Notice Program specifically advised potential Class Members that Class Counsel would request an award of attorneys' fees of up to one-third of the total amount of the Settlement funds, plus costs, all of which would be paid from the Settlement funds. Despite this widespread notice, only three individuals filed objections. Of those, only one objector —Carlton Davis—challenged the amount of the requested attorneys' fees. Specifically, he stated that the Settlement was inequitable because "[o]ver 50% of [the settlement funds] is allocated to the state and private litigators to compensate for replenishing funds, for time spent, and expenses incurred." He believed that "[f]unds need to be provided to us consumers for our time and expenses researching our cost, calculating our time, and our damages." (Carlton Davis Obj., ECF No. 602.)

This singular objection, standing alone, would not be sufficient for me to deny the requested fees. Moreover, I note that, in their Supplemental Filing, the EPPs represented that a member of Class Counsel spoke with Mr. Davis by phone on January 27, 2000, to further explain the details of the Settlement. During that phone call, Class Counsel addressed some of Mr. Davis's concerns. Mr. Davis expressed appreciation for the call and advised that he had no objection to a one-third attorneys' fee award, indicating that he was aware that such amount was common in contingent fee cases. (EPPs' Supp. Br., ECF No. 607, p. 6 n.6.) Finally, I remain cognizant that nearly 40,000 individuals have submitted claims, thus tacitly indicating their approval for the Settlement and requested attorneys' fees.

#### c. Skill and Efficiency of Attorneys' Involved

The Third Circuit has explained that the goal of the percentage fee-award device is to ensure "that competent counsel continue to undertake risky, complex, and novel litigation." Gunter, 223 F.3d at 198 (quotations omitted). "The single clearest factor reflecting the quality of class counsels' services to the class are the results obtained." Cullen v. Whitman Med. Corp., 197 F.R.D. 136, 149 (E.D. Pa. 2000) (quotations omitted).

**\*29**  As repeatedly discussed above, both in regard to class certification and with respect to the fairness of the Settlement, Class Counsel are skilled and effective class action litigators

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

that have obtained a highly favorable settlement in an extremely complex case despite the fact that an end-payor litigation class was not certified. I need not reiterate those same considerations again here. This factor therefore supports a 33 1/3% attorney fee award.

### d. Complexity and Duration of the Litigation

"[C]omplex and/or novel legal issues, extensive discovery, acrimonious litigation, and tens of thousands of hours spent on the class by class counsel" are factors which "increase the complexity of class litigation." In re Cendant Corp. PRIDES, 243 F.3d at 741. All of those factors favor the requested fee award here.

First, the legal issues involved here were novel and complex, implicating both patent and antitrust issues. Various groups of plaintiffs proceeded against Defendants under a reverse-payment settlement antitrust theory. Several years into the litigation, that theory was significantly altered and shaped in the wake of the Supreme Court decision in FTC v. Actavis, Inc., 570 U.S. 136 (2013). To further complicate matters, the case against Defendants involved complex patent issues under the Supreme Court case of Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172 (1965).

Second, discovery was extensive and far-reaching. The parties proceeded through years of certification, fact, and expert discovery involving approximately five million pages of documents, over 180 depositions, and depositions of numerous experts.

Third, the case was hard-fought on both sides. The parties briefed multiple, highly-contested motions, including motions to dismiss, discovery motions, certification motions, and motions for summary judgment. Counsel spent approximately 41,000 hours on the litigation.

Finally, the case was subject to numerous delays that were out of the EPPs' control. I first delayed the matter to conduct a patent infringement trial and resolve the underlying patent issues before reaching the antitrust issues. Thereafter, the matter was delayed by the Supreme Court's impending ruling in Actavis. Finally, after the Settlement was reached, one of the members of the SHPs group—United Healthcare Corporation—attempted to withdraw from the Settlement, resulting in additional litigation and further delay of the resolution of this case.

In short, the litigation has been more than sufficiently lengthy and complex to justify the requested amount of attorneys' fees.

### e. Risk of Nonpayment

The risk of nonpayment in this matter was not negligible. Counsel began this litigation in 2006 on a contingent fee basis. See In re Flonase, 291 F.R.D. at 104 ("[A]s a contingent fee case, counsel faced a risk of nonpayment in the event of an unsuccessful trial. Throughout this lengthy litigation, Class Counsel have not received any payment. This factor supports approval of the requested fee."). Over the next twelve years, Class Counsel devoted extensive amounts of time and resources to litigating this case, all while pursuing complex legal theories which brought with them no guarantee of recovery at trial. Even in the event of recovery, the EPPs faced the substantial likelihood of challenge on appeal. The risk of nonpayment was then significantly heightened by the denial of class certification. Given Class Counsels' diligent pursuit of this case for more than a decade with significant risk and no immediate financial reward in sight, I find that this factor weighs in favor of the requested fee award.

### f. Amount of Time Devoted to the Case by Counsel

**\*30** According to the Declaration submitted in support of Class Counsels' Motion for Attorneys' Fees, Class Counsel has spent 41,000 hours prosecuting this case, all without any guarantee of payment. (Meltzer Decl. ¶¶ 46–52 & Exs. 6, 7, 8 & 10.) Such expenditure of time at such great risk warrants the requested 33 1/3 % fee award. See In re Ikon Office Solutions, Inc., Secs. Litig., 194 F.R.D. 166, 194 (E.D. Pa. 2000) (granting a 30% fee request because "[c]ounsel expended more than 45,000 hours on this case and paid out expenses of more than $4 million with no guarantee of recovery" and the case presented "the legal obstacles of establishing scienter, damages, causation, and the like."); Cullen, 197 F.R.D. at 149–50 (finding that counsel's expenditure of 3,899.84 hours on litigation represented a "substantial commitment to this litigation" that warranted a counsel fee of 33 1/3 % of the settlement fund); Wallace v. Powell, 288 F.R.D. 347, 375 (finding that counsel's expenditure of 34,900.48 hours on prosecuting the matter reflected a "substantial commitment to this litigation" and "the complexity of Plaintiffs' claims").

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

*g. Awards in Similar Cases*

"While there is no benchmark for the percentage of fees to be awarded in common fund cases, the Third Circuit has noted that reasonable fee awards in percentage-of-recovery cases generally range from nineteen to forty-five percent of the common fund." Stevens v. SEI Invs. Co., No. 18-4205, 2020 WL 996418, at *12 (E.D. Pa. Feb. 26, 2020) (citing G.M. Trucks, 55 F.3d at 822). Courts have consistently approved such awards. See, e.g., Myers v. Jani-King of Philadelphia, Inc., No. 09-1738, 2019 WL 4034736, at *11 (E.D. Pa. Aug. 26, 2019) (citing cases and noting that "the requested fee of one-third (1/3) of the settlement amount is reasonable in comparison to awards in other cases."); In re Fasteners Antitrust Litig., No. 08-md-1912, 2014 WL 296954, at *7 (E.D. Pa. Jan. 27, 2014) ("Co-Lead Counsel's request for one third of the settlement fund is consistent with other direct purchaser antitrust actions") (citing cases); Stagi v. Nat'l R.R. Passenger Corp., 880 F. Supp. 2d 564, 571 (E.D. Pa. 2012) (noting that this District's fee awards generally range between nineteen and forty-five percent of the common fund); In re Merck & Co., Inc. Vytorin Erisa Litig., No. 08-285, 2010 WL 547613, at *11 (D.N.J. Feb. 9, 2010) ("review of 289 settlements demonstrates "average attorney's fee percentage [of] 31.71% with a median value that turns out to be one-third") (quoting In re Remeron Direct Purchaser Antitrust Litig., No. 03-0085, 2005 WL 3008808, at *15 (D.N.J. Nov. 9, 2005)); SmithKline Beecham Corp., No. 00-6222. 2005 WL 950616, at *24 (E.D. Pa. Apr. 22, 2005) (approving 30% fee of the $65 million settlement in pharmaceutical antitrust class action); In re Linerboard Antitrust Litig., No. MDL 1261, 2004 WL 1221350, at *16 (E.D. Pa. June 2, 2004) (approving 30% fee of a $202 million settlement in an antitrust class action).

Given the magnitude of this case, the efforts of Class Counsel, the risks borne, and the positive outcome, I find that the requested fee of 33 1/3 % recovery remains consistent with the awarded fee in other, similar cases.

*h. Value of Benefits Accruing to Class Members Attributable to the Efforts of Class Counsel as Opposed to the Efforts of Other Groups, Such as Government Agencies*

A significant factor to consider is whether Class Counsel was aided by a government investigation. In re AT&T Corp., 455 F.3d 160, 173 (3d Cir. 2005). "Allowing private counsel to receive fees based on the benefits created by public agencies would undermine the equitable principles which underline the concept of the common fund, and would create an incentive for plaintiff[s] attorneys to 'minimize the costs of failure ... by free riding on the monitoring efforts of others.' " In re Prudential, 148 F.3d at 337 (further quotations omitted).

Here, the EPPs filed suit almost two years before the Federal Trade Commissions ("FTC") initiated suit in FTC v. Cephalon, Inc., Civ. A. No. 08-2141 (Feb. 13, 2008). Prior to the FTC suit, the EPPs had already engaged in their own investigation of the Provigil market and developed their own antitrust theories regarding the reverse-payment settlements between Cephalon and the generic modafinil manufacturers. Class Counsel were subsequently able to coordinate discovery and the exchange of information with other classes and claimants, including the FTC, generic manufacturer Apotex, a group of large pharmacy chains, a direct purchaser class, and a group of state attorneys general. Such cooperation, however, does not detract from the exorbitant time and effort expended by Class Counsel on this matter and does not impact the percentage fee to which they are entitled.

*i. The Percentage Fee that Would Have Been Negotiated Had the Case Been Subject to a Private Contingent Fee Agreement at the Time Counsel Was Retained*

**\*31**  "In making a common benefit award, we must try to ascertain what the market would pay for the attorneys' efforts. That is, we must consider 'the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained.' " In re Diet Drugs Prods. Liab. Litig., 553 F. Supp. 2d 442, 482 (E.D. Pa. 2008) (quoting AT & T, 455 F.3d at 165). While not an easy calculation, it is an important exercise because "the goal of the fee setting process [is] to 'determine what the lawyer would receive if he were selling his services in the market rather than being paid by Court Order.' " In re Linerboard Antitrust Litig. ("Linerboard II"), 333 F. Supp. 2d 343, 351 (E.D. Pa. 2004) (quoting In re Continental Ill. Sec. Litig., 962 F.2d 566, 568 (7th Cir. 1992)). "[I]n private contingency fee cases ... plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery. In re Ikon Office Solutions, 194 F.R.D. at 194 (E.D. Pa. 2000); see also In re Remeron Direct Purchaser Antitrust Litig., No. 03-0085, 2005 WL

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

3008808, at *16 (D.N.J. 2005) ("Attorneys regularly contract for contingent fees between 30% and 40% with their clients in non-class commercial litigation.")

The requested fees here fall squarely within that range, as Class Counsel seeks an award of 33 1/3% of the Settlement Fund. Therefore, this factor supports the requested fees.

### j. Innovative Terms of Settlement

In certain cases, a district court may find that "class counsels' representation and the results achieved [by the settlement agreement] were 'nothing short of remarkable.'" In re Prudential, 148 F.3d at 339 (quotations omitted). Such a finding may be warranted where a settlement involved "innovative" or unique terms. Id. (describing the findings of the lower court regarding plaintiffs' counsels' work on the settlement, including "the availability of full compensatory relief, the extensive and comprehensive outreach, and the multi-tiered review process designed to ensure fair scoring of claims," among other characteristics).

Nothing in the Settlement here is particularly remarkable or innovative. Accordingly, there is no indication that this factor should bear on an attorney fee award.

### k. Overall Review of the Gunter and Prudential Factors

All of the Gunter and Prudential factors—except one, which weighs neither for nor against approval—supports the award of an attorneys' fees in the amount of 33 1/3 % of the Settlement. Taking them as a whole, I find that the scale is heavily tipped in favor of the requested attorneys' fee award.

### 2. Cross-Check Against Class Counsels' Lodestar

The Third Circuit has suggested that it is "sensible" for district courts to cross check the percentage fee award against the "lodestar" method. In re Rite Aid, 396 F.3d at 305. The lodestar award is calculated by multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys. Id. The court must then use a multiplier, which is a device that "attempts to account for the contingent nature or risk involved in a particular case and the

quality of the attorneys' work." Id. at 305–06. "The lodestar cross-check serves the purpose of alerting the trial judge that when the multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method, with an eye toward reducing the award." Id. at 306. Even when used as a cross-check, courts should "explain how the application of a multiplier is justified by the facts of a particular case." In re Prudential, 148 F.3d at 340–41.

Here, as noted above, Class Counsel spent 41,000 working on this case on behalf of the class, which hours included preparing the initial Complaint and the Consolidated Amended Class Action Complaint, conducting legal research, engaging in extensive discovery, briefing multiple motions or responses to motions for summary judgment, pursuing class certification, engaging and working with experts, preparing for trial, and pursuing settlement negotiations and settlement document drafting. (Meltzer Decl. ¶¶ 50, 52 & Exs. 6–8.) In addition, Class Counsel will undoubtedly need to spend additional hours in order to monitor and administer the Settlement and final closing of this case.

**\*32**  Rates for counsel appear to be well within the reasonable range for Counsels' experience and for the region. At the firm of Spector Roseman and Kodroff, rates ranged from $140 per hour for a paralegal to $880 per hour for the most senior partner, with a great deal of the work being done at the contract attorney level. (Meltzer Decl., Ex. 6.) At the firm of Criden & Love, rates ranged from $425 per hour for an associate to $800 for a partner. (Meltzer Decl., Ex. 7.) Finally, at the firm of Finkelstein Thompson LLP, rates ranged from $150 for a law clerk, and $220 for a paralegal, to $850 for a partner. (Meltzer Decl., Ex. 8.) The rates of the lawyers from the two assisting firms are consistent. (Meltzer Decl., Exs. 9 & 10.)

Courts have considered similar rates reasonable in the past. Fulton-Green v. Accolade, Inc., No. 18-274, 2019 WL 4677954, at *12 (E.D. Pa. Sept. 23, 2019) (approving class counsel's rates that ranged from $202 to $975 per hour); In re Viropharma Inc., Sec. Litig., No. 12-2714, 2016 WL 312108, at *18 (E.D. Pa. Jan. 25, 2016) ("The hourly billing rates of all of Plaintiff's Counsel range from $610 to $925 for partners, $475 to $750 for of counsels, and $350 to $700 for other attorneys."); In re Avandia Mktg., Sales Practices and Prods. Liab. Litig., No. 07-1871, 2012 WL 6923367, at * 10 (E.D. Pa. Oct. 19, 2012) (concluding a top hourly rate of $595 was "particularly reasonable in comparison" to the hourly rates of top Philadelphia firms).

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

Multiplying the reasonable hours by the reasonable hourly rates yields a total lodestar of $22,823,274. Where there has been a class settlement, this lodestar "is usually multiplied by a factor to reflect the degree of success, the risk of non-payment the attorneys faced and perhaps the delay in payment that they encountered." Brown v. Esmor Corr. Servs., No. 98-1282, 2005 WL 1917869, at *13 (D.N.J. Aug. 10, 2005); see also In re Prudential, 148 F.3d 283, 340 (3d Cir. 1998) ("Multipliers may reflect the risks of nonrecovery facing counsel, may serve as an incentive for counsel to undertake socially beneficial litigation, or may reward counsel for an extraordinary result."). The Third Circuit has recognized that lodestar multipliers from one to four "are frequently awarded" in class cases. In re Prudential Ins. Co., 148 F.3d at 341 (citing 3 Herbert Newberg & Albert Conte, Newberg on Class Actions § 14.03 at 14-5 (3d ed. 1992)).

Here, no such multiplier is necessary as the lodestar amount is even higher than the $21,959,200 percentage-of-recovery amount sought here. In other words, Class Counsel is requesting less than their total lodestar, making it within the accepted range in the Third Circuit.

3. Conclusion as to Attorneys' Fees

Having thoroughly considered all of the Gunter and Prudential factors and having cross-checked the requested fee against the lodestar amount, I find nothing that would warrant denying or reducing the fee requested by Class Counsel. Indeed, by all measures, the requested fee is fair, reasonable, and commensurate with the skill of the attorneys, the amount of work they expended on this complicated litigation, and the results they achieved. Accordingly, I will grant attorneys' fees in the amount of $21,959,200.

B. Reasonable Litigation Expenses

"Counsel for a class action is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the class action." In re Safety Components, Inc. Sec. Litig., 166 F. Supp. 2d 72, 108 (D.N.J. 2001); Careccio v. BMW of N. Am. LLC, No. 08-2619, 2010 WL 1752347, at *7 (D.N.J. Apr. 29, 2010). The court must consider whether the expenses were adequately documented and reasonably and appropriately incurred in the prosecution of the case. Demmick v. Cellco

P'ship, No. 06-2163, 2015 WL 13646311, at *4 (D.N.J. Apr. 30, 2015)

**\*33** Class Counsel here has adequately documented their expenses, which include, among other things, litigation fund, professional fees (expert, investigator, accountant, etc.), computer research, copying, travel, court fees, and phone and messenger services. (Meltzer Decl., Exs. 6–10.) During the Final Fairness Hearing, I questioned counsel on the nature of the "litigation fund" expense, and Class Counsel adequately explained that it was a fund of money donated by each participating Class Counsel firm from which day-to-day expenses were drawn. Finding that these expenses were appropriately incurred in the prosecution of the class action, I award Class Counsel the requested fees in the amount of $2,663,468.

C. Class Representative Incentive Awards

Incentive awards are "not uncommon in class action litigation and particularly where, as here, a common fund has been created for the benefit of the entire class." McDonough v. Toys R Us, Inc., 80 F. Supp. 3d 626, 665 (E.D. Pa. 2015) (quotations omitted). Generally, "[c]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." Cullen v. Whitman Med. Corp., 197 F.R.D. 136, 145 (E.D. Pa. 2000) (quotation omitted); see also First State Orthopaedics v. Concentra, Inc., 534 F. Supp. 2d 500, 524–25 (E.D. Pa. 2007) (citing Nichols v. SmithKline Beecham Corp., No. 00-6222. 2005 WL 950616, at *24 (E.D. Pa. Apr. 22, 2005); Godshall v. Franklin Mint Co., No. 01-5639, 2004 WL 2745890 (E.D. Pa. Dec. 1, 2004)). Factors to be considered when deciding to give incentive awards include "the risk to the plaintiff in commencing litigation, both financially and otherwise; the notoriety and/or personal difficulties encountered by the representative plaintiff; the extent of the plaintiff's personal involvement in the lawsuit in terms of discovery responsibilities and/or testimony at depositions or trial; the duration of the litigation; and the plaintiff's personal benefit (or lack thereof) purely in her capacity as a member of the class." McGee v. Ann's Choice, Inc., No. 12-2664, 2014 WL 2514582, at *3 (E.D. Pa. June 4, 2014) (citing In re Plastic Tableware Antitrust Litig., No. 94-3564, 1995 WL 723175, at *2 (E.D. Pa. Dec. 4, 1995)).

Here, Class Counsel requests incentive awards in the amount of $15,000 for Consumer Plaintiff Shirley Paneianco, and $50,000 for each of the four TPP Plaintiffs, Vista

Case 4:21-cv-00196-MWB    Document 261-1    Filed 01/20/26    Page 272 of 287

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,190

Healthplan, Inc. (n/k/a Coventry Health Care of Florida, Inc.), District Council 37 Health & Security Plan, Pennsylvania Employees Benefit Trust Fund, and Pennsylvania Turnpike Commission, all of which are to be paid from the Class Settlement Fund. Class Counsel note that each of the five named Plaintiffs provided significant assistance to the case, including responding to written discovery, producing documents, and sitting for a deposition by Defendants. In addition, each named Plaintiff actively monitored the litigation and reviewed the Complaint and other substantive pleadings. Finally, the named Plaintiffs participated in mediation talks and were responsible for reviewing and approving the Settlement.

As noted by the EPPs, these requested incentive awards fall in line with those that have been approved in other cases. See, e.g., King Drug Co. of Florence, Inc. v. Cephalon, Inc., No. 06-1797, 2015 WL 12843830, at *6 (E.D. Pa. Oct. 15, 2015) (approving $100,000 incentive award for four class representatives, and $50,000 incentive awards for two other class representatives); Drywall, No. 13-md-2437, 2018 WL 3439454, at *20 (E.D. July 17, 2018) (approving incentive awards to the four named Plaintiffs in the amount of $50,000); Marchbanks Truck Serv. v. Comdata Network, Inc., No. 07-1078, 2014 WL 12738907, at *3–4 (E.D. Pa. July 14, 2014) (awarding incentives in the amount of $150,000 to one class representative, $75,000 each to two others, and $15,000 to the fourth).

**\*34** For these reasons, I will grant the requested incentive awards of $15,000 to Shirley Panebianco, and $50,000 to the three TPP Class Representatives.

## VII. CONCLUSION

In light of the foregoing, I will certify the Settlement Classes set forth above and grant Final Approval to the Settlement. I will further appoint interim Class Counsel as Class Counsel, and approve the Plan of Allocation. In addition, I will (a) award End-Payor Co-Lead Counsel for the Settlement Classes attorneys' fees in the amount of $21,959,200, plus one-third of the accumulated interest on the Class Settlement Fund; (b) reimburse Class Counsel $2,663,468 in litigation costs and expenses; and (c) award Consumer Plaintiff Shirley Panebianco an incentive award of $15,000, and each TPP Plaintiff—Vista Healthplan, Inc. (n/k/a Coventry Health Care of Florida, Inc.), District Counsel 37 Health & Security Plan, Pennsylvania Employees Benefit Trust Fund, and Pennsylvania Turnpike Commission—an incentive award of $50,000 to be paid from the Class Settlement Fund.

An appropriate Order follows.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 1922902, 2020-1 Trade Cases P 81,190

## Footnotes

1    During the pendency of this litigation, Barr Laboratories, Inc. Teva Pharmaceutical Industries Ltd., and Teva Pharmaceuticals USA, Inc. merged with Cephalon, Inc. making them all one entity, which, for purposes of this Opinion, I collectively refer to as "the Cephalon Parties."

2    According to the EPPs' expert, W. Paul DeBree, a "capitation contract" is an agreement that provides for the payment of a flat fee for each covered individual. (Expert Report of W. Paul DeBree ("DeBree Report"), ECF No. 586-11, ¶ 35.)

3    In In re Baby Products, the Third Circuit was addressing a proposed settlement with a *cy pres* distribution. It is not entirely clear whether this factor applies only to those settlements that include *cy pres* distributions or whether it should be considered in all class settlements. Although the Settlement here does not include a *cy pres* component, for the sake of comprehensiveness, I will address the Baby Products direct benefit consideration here.

4    Mr. Dunham filed an objection on the docket of the related case brought by the California Attorney General, but clearly intended to address the EPP Settlement.

5    I note that Class Counsel has an agreement with the SHPs to share fees related to the Cephalon Settlement. Specifically, under the agreement, Class Counsel has already received forty percent of the SHP Counsels' fee from that settlement, for a total of $4,960,000. In exchange for this advanced payment, Class Counsel is obligated to provide SHP's Counsel

32.21% of the fees awarded in this matter related solely to the Teva portion of the settlement. This private agreement has no impact on my decision here.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 4206696
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Scott WHITELEY and Harry Berer,
individually and on behalf of all
others similarly situated, Plaintiffs

v.

ZYNERBA PHARMACEUTICALS,
INC., et al., Defendants

CIVIL ACTION NO. 19-4959
|
Filed 09/16/2021

**Attorneys and Law Firms**

Michael S. Doluisio, Jeffrey J. Masters, Tiffany Ellen Engsell, Dechert LLP, Philadelphia, PA, David H. Kistenbroker, Dechert LLP, Chicago, IL, for Defendants.

**MEMORANDUM OPINION**

NITZA I. QUIÑONES ALEJANDRO, District Judge

**INTRODUCTION**

 **\*1** Before this Court is a *motion for final approval of class action settlement and final determination that class certification for settlement purposes is appropriate,* [ECF 45], and a *motion for an award of attorneys' fees, reimbursement of expenses, and compensatory awards to lead plaintiffs,* [ECF 46], both filed by Plaintiffs Scott Whiteley and Harry Berger pursuant to Federal Rule of Civil Procedure ("Rule") 23. Previously, this Court granted preliminary approval to the underlying class action settlement agreement (the "Settlement Agreement"). [ECF 44]. A hearing was held on August 31, 2021 (the "Fairness Hearing"), at which the Court heard oral argument on Plaintiffs' unopposed motion for final approval of the Settlement Agreement. Counsel for all parties appeared. For the reasons stated herein, the motion for final approval of the class action settlement and motion for attorneys' fees and expenses are both granted.

**BACKGROUND**

Plaintiffs Scott Whiteley and Harry Berger, on behalf of themselves and all others similarly situated, brought this class action against Defendants Zynerba Pharmaceuticals, Inc. ("Zynerba"), Armando Anido, and James E. Fickenscher (collectively, "Defendants"), asserting various claims for alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b), and 78t(a), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission. Specifically, Plaintiffs alleged that during the Settlement Class Period, Zynerba conducted Phase II clinical testing of Zygel to assess its efficacy and safety for treatment of child and adolescent patients with developmental and epileptic encephalopathies via a clinical trial called the "BELIEVE 1" trial. Zygel is a transdermal cannabinoid-based treatment, and Zynerba's only product in development. In the amended complaint, Plaintiffs alleged that Defendants knew about but failed to timely disclose adverse events experienced by participants during the BELIEVE 1 trial. When this material information was reported on September 18, 2019, Zynerba's stock price fell $2.46 per share (21.77%).

From the outset of this litigation, Defendants have denied any wrongdoing and vigorously defended this action. Initially, Defendants filed a motion to dismiss, which this Court granted, in part, and denied, in part. Defendants filed a motion for reconsideration, which this Court denied. After Defendants file an answer to the amended complaint, the parties participated in a full-day mediation with a private mediator. The parties reached an agreement in principle, which was eventually memorialized in a settlement agreement on April 30, 2021.

**The Terms of the Settlement**

The Settlement, the full terms of which are set forth in the Settlement Agreement, provides substantial economic benefits to the certified class (the "Class").[1] The Settlement creates a total settlement fund of $4.0 million (the "Settlement Fund"), to be reduced by any amount approved by this Court for attorneys' fees and costs, and for the class representative service awards.

**Preliminary Approval and Class Notice**

 **\*2** By Order dated May 12, 2021, this Court granted preliminary approval to the proposed Settlement and provisionally certified the proposed class. Pursuant to

Case 4:21-cv-00196-MWB    Document 261-1    Filed 01/20/26    Page 275 of 287

*Whiteley v. Zynerba Pharmaceuticals, Inc.*, Not Reported in Fed. Supp. (2021)

this Court's Preliminary Approval Order, Strategic Claims Services ("SCS") was appointed to serve as the Settlement Administrator. As part of its responsibilities, SCS sent notice to the relevant governmental officials under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715, *et seq.*, effected publication notice, and sent direct notice to Class Members in accordance with the plan for notice, which this Court found to be the best notice practicable under the circumstances and consistent with the requirements of due process. SCS mailed notices to thirty-seven (37) individuals and organizations identified in the transfer agent records. SCS also mailed a letter to 1,224 nominees contained in its proprietary master mailing list, which notified the recipients of the settlement and requested that within ten (10) calendar days that they either: (a) send a postcard notice to their customers who may be beneficial purchasers/owners; (b) email either an electronic version of the Summary Notice of Pendency and Proposed Settlement of Action and Final Approval Hearing ("Publication Notice") or a direct link to the Notice of Proposed Settlement of Class Action, Motion for Attorneys' Fees and Expenses, and Settlement Fairness Hearing ("Long Notice") and Proof of Claim and Release Form ("Claim Form") supplied by SCS to their beneficial purchasers/owners; or (c) provide SCS with a list of the names, mailing addresses, and email addresses, to the extent email addresses were available, of such beneficial owners so that SCS could promptly mail the Postcard Notice or email the links to the Long Notice and Claim Form directly to them. As a result of this notice procedure, SCS mailed 24,807 Postcard Notices. In addition, Certain Nominee Account Holders notified SCS that they collectively emailed 15,805 potential Settlement Class Members to notify them of the Settlement and provide either the Publication notice or direct links to the Long Notice and Claim form on the Settlement webpage. SCS also sent the Depository Trust Company a Long Notice and Claim Form to post on its Legal Notice system and arranged for the Publication Notice to be published electronically once on the *GlobeNewswire* and in print in the *Investor's Business Daily.*

The deadline for filing objections and requests for exclusion was August 10, 2021. As of the date of the Fairness Hearing, there were no objections, and only two (one invalid) requests for exclusion.

## DISCUSSION

When granting final approval of a class action settlement, a district court must hold a hearing and conclude that the proposed settlement is fair, reasonable, and adequate. *See* Fed. R. Civ. P. 23(e)(2); *Sullivan v. DB Invs., Inc.*, 667

F.3d 273, 295 (3d Cir. 2011); *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 258 (3d Cir. 2009). Although there is a strong judicial policy in favor of voluntary settlement agreements, *Pennwalt Corp. v. Plough*, 676 F.2d 77, 79-80 (3d Cir. 1982), courts are generally afforded broad discretion in determining whether to approve a proposed class action settlement. *Eichenholtz v. Brennan*, 52 F.3d 478, 482 (3d Cir. 1995). "The law favors settlement particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab.*, 55 F.3d 768, 784 (3d Cir. 1995). In addition to conservation of judicial resources, "[t]he parties may also gain significantly from avoiding the costs and risks of a lengthy and complex trial." *Id.*

In *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975), the United States Court of Appeals for the Third Circuit (the "Third Circuit") set forth factors (often called the "*Girsh* factors") that a district court should consider when reviewing a proposed class action settlement. The *Girsh* factors are the following:

(1) the complexity, expense and likely duration of the litigation;

(2) the reaction of the class to the settlement;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the risks of establishing liability;

(5) the risks of establishing damages;

(6) the risks of maintaining the class action through the trial;

(7) the ability of the defendant to withstand a greater judgment;

(8) the range of reasonableness of the settlement fund in light of the best possible recovery; and

(9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*In re Ins. Brokerage Antitrust Litig.*, 579 F.3d at 258 (citing *Girsh*, 521 F.2d at 157). No one factor is dispositive. *Hall v. Best Buy Co.*, 274 F.R.D. 154, 169 (E.D. Pa. 2011). Further, a "court may approve a settlement even if it does not find that each of [the *Girsh*] factors weighs in favor of approval." *In*

*re N.J. Tax Sales Certificate Antitrust Litig.*, 750 F. App'x 73, 77 (3d Cir. 2018).

In *Krell v. Prudential Ins. Co. of Am. (In re Prudential)*, 148 F.3d 283 (3d Cir. 1998), the Third Circuit identified additional nonexclusive factors (the "*Prudential* factors") for courts to consider for a "thorough going analysis of settlement terms." *See also In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 350 (3d Cir. 2010). The *Prudential* factors often overlap with the *Girsh* factors, and include:

  **\*3** (1) the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages;

(2) the existence and probable outcome of claims by other classes and subclasses;

(3) the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved or likely to be achieved for other claimants;

(4) whether class or subclass members are accorded the right to opt-out of the settlement;

(5) whether any provisions for attorneys' fees are reasonable; and

(6) whether the procedure for processing individual claims under the settlement is fair and reasonable.

*In re Pet Food*, 629 F.3d at 350. Only the *Prudential* factors relevant to the litigation in question need be addressed. *In re Prudential*, 148 F.3d at 323-24.

With these principals in mind, this Court will consider each of the *Girsh* factors and the relevant *Prudential* factors in its review of the proposed class action settlement.

### *Girsh* Factors

#### *1. The complexity, expense, and likely duration of the litigation*

This case raised significant and complex factual and legal questions regarding Defendants' purported omissions and/or misrepresentations in SEC filings regarding a pharmaceutical product in development. Needless to say, had the Settlement not been reached, this matter would likely have proceeded to trial on the issues of liability and determination of damages. The continued prosecution of Plaintiffs' claims against Defendants would have required significant additional expense to the Class, including additional discovery and the employment of experts, resulting in a substantial delay before any potential recovery. Further, no matter the outcome of dispositive motions or a trial, it is likely that one or all of the parties would have appealed, leading to further litigation costs and delay in any realized recovery. Thus, the avoidance of unnecessary expenditure of time and resources benefits all parties and weighs in favor of approving the settlement. *See In re Gen. Motors*, 55 F.3d at 812 (concluding that lengthy discovery and potential opposition by the defendant were factors weighing in favor of settlement).

#### *2. The reaction of the class to the settlement*

"The Third Circuit has looked to the number of objectors from the class as an indication of the reaction of the class." *In re Certainteed Corp. Roofing Shingle Prods. Liab. Litig.*, 269 F.R.D. 468, 485 (E.D. Pa. 2010) (citing *In re Cendant Corp. Litig.*, 264 F.3d 201, 234-35 (3d Cir. 2001)). "Courts have generally assumed that 'silence constitutes tacit consent to the agreement.' " *In re Gen. Motors*, 55 F.3d at 812 (quoting *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1313 n.15 (3d Cir. 1993)). A low number of objectors or opt-outs is persuasive evidence that the proposed settlement is fair and adequate. *Serrano v. Sterling Testing Sys., Inc.*, 711 F. Supp. 2d 402, 415 (E.D. Pa. 2010) (citing *In re Cendant*, 264 F.3d at 234-35).

Here, Defendants identified more than 24,000 individuals who meet the Class definition. Those individuals identified as potential Class members were mailed and/or emailed notices and Class forms. As of the date of the final approval hearing, no Class Member had objected to the terms of the proposed settlement or the request for attorneys' fees, and only two persons requested exclusion. This factor is persuasive evidence of the fairness and adequacy of the proposed settlement, and weighs in favor of a final approval. *See In re Cendant*, 264 F.3d at 234-35.

#### *3. The stage of the proceedings and the amount of discovery completed*

**\*4** The third *Girsh* factor "captures the degree of case development that class counsel [had] accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *In re Cendant*, 264 F.3d at 235. When evaluating this third *Girsh* factor, courts must evaluate the procedural stage of the case at the time of the proposed settlement to assess whether counsel adequately appreciated the merits of the case while negotiating. *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 537 (3d Cir. 2004). "[C]ourts generally recognize that a proposed class settlement is presumptively valid where ... the parties engaged in arm's length negotiations after meaningful discovery." *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 144-45 (E.D. Pa. 2000). Settlements reached following discovery "are more likely to reflect the true value of the claim." *Boone v. City of Phila.*, 668 F. Supp. 2d 693, 712 (E.D. Pa. 2009) (citing *Bell Atl. Corp.*, 2 F.3d at 1314).

As set forth above, this case has been actively litigated from its commencement. Although the parties had not completed discovery, Plaintiffs' counsel had ample information to evaluate the prospects for the Class and to assess the fairness of the settlement. By the time the settlement was reached, Plaintiffs' counsel had: (1) reviewed and analyzed Class Period and pre-Class Period public filings, annual reports, press releases, quarterly-earnings-call and industry-conference transcripts, and other public statements; (2) reviewed and analyzed stock trading data relating to the Company as well as analyst reports and major financial news service reports; (3) consulted with experts; (4) drafted the initial complaint and an amended complaint to comply with the Private Securities Litigation Reform Act of 1995 (the "PSLRA"); (5) researched and drafted an opposition to Defendants' motion to dismiss and subsequent motion for reconsideration; (6) prepared for and engaged in a mediation; and (7) negotiated the final terms of the settlement. As a result of these pre-settlement efforts, the parties had ample opportunity to identify and grasp the strengths and weaknesses of each party's case. Consequently, this Court finds that this factor weighs in favor of approval.

### 4. The risks of establishing liability

This *Girsh* factor weighs the likelihood of ultimate success against the benefits of an immediate settlement. The existence of obstacles, if any, to the plaintiff's success at trial weighs in favor of settlement. *In re Warfarin*, 391 F.3d at 537;

*In re Prudential*, 148 F.3d at 319. This factor should be considered to "examine what potential rewards (or downside) of litigation might have been had class counsel decided to litigate the claims rather than settle them." *In re Cendant*, 264 F.3d at 237 (quoting *GM Trucks*, 55 F.3d at 814). "The inquiry requires a balancing of the likelihood of success if 'the case were taken to trial against the benefits of immediate settlement.' " *Wallace v. Powell*, 288 F.R.D. 347, 369 (M.D. Pa. 2012) (quoting *Prudential II*, 148 F.3d at 319).

In this case, the outcome of this matter with respect to liability is far from certain. Defendants have denied any liability throughout this litigation. The proposed settlement avoids the risk that Defendants be found not liable. Thus, this Court finds that this factor weighs in favor of approval.

### 5. The risks of establishing damages

This factor "attempts to measure the expected value of litigating the action rather than settling it at the current time." *In re Cendant*, 264 F.3d at 238-39. The Court looks at the potential damage award if the case were taken to trial against the benefits of immediate settlement. *Prudential II*, 148 F.3d at 319. In *Warfarin Sodium I*, the trial court found that the risk of establishing damages strongly favored settlement, observing that "[d]amages would likely be established at trial through a 'battle of experts,' with each side presenting its figures to the jury and with no guarantee whom the jury would believe." *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 256 (D. Del. 2002), *aff'd* 391 F.3d 516, 537 (3d Cir. 2004). Similarly, in *In re Cendant*, the Third Circuit reasoned that there was no compelling reason to think that "a jury confronted with competing expert opinions" would accept the plaintiff's damages theory rather than that of the defendant and, thus, the risk in establishing damages weighed in favor of approval of the settlement. 264 F.3d at 239. The same is likely true here. Accordingly, this factor weighs in favor of approval.

### 6. The risks of maintaining the class action through trial

**\*5** Because "the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the [class] action," *In re Gen. Motors*, 55 F.3d at 817, this factor measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial. As noted above, this action has been vigorously litigated by both

sides from the outset. As such, it is likely that the issue of class certification would have been the subject of vigorous dispute. Further, even if class certification were granted in this matter, class certification can always be reviewed or modified before trial, so "the specter of decertification makes settlement an appealing alternative." *Skeen v. BMW of N. Am., Ltd. Liab. Co.*, 2016 WL 4033969, at *15 (D. N.J. July 26, 2016). Accordingly, this factor weighs in favor of approval.

### 7. The ability of defendants to withstand a greater judgment

This factor considers "whether the defendants could withstand a judgment for an amount significantly greater than the settlement." *In re Cendant*, 264 F.3d at 240. Here, a significant source of the settlement proceeds is Zynerba's directors' and officers' liability insurance policies, which continued litigation would have dissipated. Zynerba has no FDA approved products generating revenue, and Zygel is the only product in Zynerba's pipeline. Zygel has not been approved by the FDA and, therefore, has not been commercialized. The Company has no revenue. Accordingly, there is significant risk that Zynerba could not have withstood a greater judgment. This factor favors approval.

### 8-9. The range of reasonableness of settlement in light of best possible recovery and all attendant risks of litigation

The last two *Girsh* factors, often considered together, evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case. *In re Warfarin*, 391 F.3d at 538. In order to assess the reasonableness of a settlement in cases seeking monetary relief, "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement." *In re Prudential*, 148 F.3d at 322.

In light of the questions of fact and law present in this litigation, the value of the proposed settlement substantially outweighs the mere possibility of future relief. Here, the Class is receiving a significant settlement amount that offers real and immediate economic benefits to Class Members. The $4,000,000 cash settlement represents approximately 10.4% of estimated damages and is well above similar average settlements in securities litigation. *See, e.g., In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 715 (E.D. Pa. 2001) (noting that since 1995, class action settlements have

typically "recovered between 5.5% and 6.2% of the class members' estimated losses"); *In re PNC*, 440 F. Supp. At 435-36 (approving settlement amount that represented 12% of estimated losses because it "constitute[d] a very reasonable range of settlement when compared to the best possible recovery discounted by the attendant risks of proceeding to trial"). As previously noted, the expense of a trial and use of the parties' resources would have been substantial, especially in conjunction with the post-trial motions and appeals that would have likely followed a trial on the merits. Thus, a settlement is advantageous to all parties. Therefore, these factors weigh in favor of approval.

### Relevant *Prudential* Factors

### 1. Factors that bear on the maturity of the underlying substantive issues

**\*6** This case was settled at a relatively mature point in the proceedings. As discussed above, Class Counsel obtained and reviewed substantial documentation prior to commencing this action and the parties fully litigated Defendants' motion to dismiss and motion for reconsideration. In addition, the parties participated in a successful private mediation. As such, the litigants were in a position to fully evaluate the strengths, weaknesses, and merits of their case. The advanced development of the record weighs in favor of approval. *See Chakejian v. Equifax Info. Servs., LLC*, 275 F.R.D. 201, 215 (E.D. Pa. 2011) (finding settlement reasonable where underlying substantive issues were "mature in light of the experience of the attorneys, extent of discovery, posture of case, and mediation efforts undertaken.").

### 2. Results achieved by settlement for individual class members versus the results achieved—or likely to be achieved—for other claimants

This factor weighs in favor of approval since only two class members elected to be excluded and most Settlement Class Members will receive Settlement benefits automatically without having to take any further action.

### 3. Whether class or subclass members are afforded the right to opt out of the settlement

As part of the Class notice process approved by this Court, Settlement Class Members were provided robust notice and the opportunity to file objections to the Settlement and/or requests for exclusion. No members filed any objections, and only two members filed requests for exclusion. Thus, this factor weighs in favor of approval.

*4. Whether any provisions for attorneys' fees are reasonable*

As part of the Class notice process approved by this Court, Class members were advised that Plaintiffs would seek an award of attorneys' fees of up to one-third of the settlement amount. For the reasons discussed in greater detail below, the attorneys' fees and expenses sought and agreed to in this case are reasonable. Thus, this factor weighs in favor of approval.

*5. Whether the procedure for processing individual claims under the class action settlement is fair and reasonable*

The claims processing procedures put in place by the Settlement are fair and reasonable. The Plan of Allocation provides for distribution of the Net Settlement Fund among Authorized Claimants on a *pro rata* basis based upon each Authorized Claimant's Recognized Loss attributable to the alleged fraud. Such *pro rata* distributions are consistently utilized and upheld. *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 326 (3d Cir. 2011). This factor supports approval of the settlement.

In summary, in light of the presumption of fairness that attaches to the Settlement, *see In re Warfarin*, 391 F.3d at 539, and upon consideration of each of the *Girsh* factors and the relevant *Prudential* factors, this Court finds that the proposed class action settlement is fair and reasonable.

**Class Certification**

As noted, by Order dated May 12, 2021, this Court provisionally certified the following proposed class:

> all Persons (including, without limitation, their beneficiaries) who purchased or otherwise acquired Zynerba securities from March 11, 2019 through September 17, 2019, both dates inclusive. Excluded from the Class are (i) the Defendants; (ii) the officers and directors of Zynerba during the Class Period; (iii) the

immediate family members, legal representatives, heirs, successors or assigns of such excluded persons; (iv) any entity in which any Defendant has or had a controlling interest during the Settlement Class Period; and (v) all putative members of the Settlement Class who exclude themselves by filing a valid and timely request for exclusion.

Although this Court previously certified the Class, it must again determine whether class certification is appropriate under Rule 23. *In re Prudential*, 148 F.3d at 308.

**\*7** A plaintiff seeking class certification must satisfy all requirements of Rule 23(a) and at least one of the requirements of Rule 23(b). *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 465 (2013); *see also Marcus v. BMW of North America*, 687 F.3d 583, 590 (3d Cir. 2012). "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). A district court's analysis of a motion for class certification "must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim.'" *Amgen Inc.*, 568 U.S. at 465-66 (quoting *Wal-Mart*, 564 U.S. at 351). However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether Rule 23 prerequisites for class certification are satisfied." *Id.* "Factual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3d Cir. 2008).

To satisfy the Rule 23(a) requirements:

> (1) the class must be "so numerous that joinder of all members is impracticable" (numerosity); (2) there must be "questions of law or fact common to the class" (commonality); (3) "the claims or defenses of the representative parties" must be "typical of the claims or defenses of the class" (typicality); and (4) the named plaintiffs must "fairly and adequately protect the interests of the class" (adequacy of representation, or simply adequacy).

*Marcus*, 687 F.3d at 590-91 (citations omitted).

Here, Plaintiffs seek certification of the proposed class, as provisionally certified, pursuant to Rule 23(b)(3). This Rule permits certification when the court finds that "the questions of law or fact common to class members predominate over

any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Fed. R. Civ. P. 23(b)(3).*

*Rule 23(a) Requirements*

*1. Numerosity*

Under *Rule 23(a)(1),* the court must determine whether the potential class is "so numerous that joinder of all members is impracticable." *Fed. R. Civ. P. 23(a)(1).* "No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of *Rule 23(a)* has been met." *Stewart v. Abraham,* 275 F.3d 220, 226-27 (3d Cir. 2001). Although "*Rule 23(a)(1)* does not require a plaintiff to offer direct evidence of the exact number and identities of the class members ... in the absence of direct evidence, a plaintiff must show sufficient circumstantial evidence specific to the products, problems, parties, and geographic areas actually covered by the class definition to allow a district court to make a factual finding." *Hayes,* 725 F.3d at 357. "Only then may the court rely on 'common sense' to forgo precise calculations and exact numbers." *Id.*

Here, Zynerba's common stock was listed on the NASDAQ with an average of over 21 million shares of common stock outstanding. Courts generally presume that the numerosity requirement has been satisfied "when a class action involves a nationally traded security." *In re Cigna Corp. Sec. Litig.,* 2006 WL 2433779, at *2 (E.D. Pa. Aug. 18, 2006). In addition, more than 24,000 potential class members have been identified. Given the number and likely geographic distribution of the Settlement Class Members, joinder of all Settlement Class Members would be impracticable. Thus, the proposed Settlement Class satisfies *Rule 23*'s numerosity requirement for settlement purposes. *Liberty Lincoln Mercury Inc. v. Ford Marketing Corp.,* 149 F.R.D. 65, 73 (D.N.J. 1993).

*2-3. Commonality and Typicality*

**\*8** Pursuant to *Rule 23(a)(2),* a court must determine whether "there are questions of law or fact common to the class," ordinarily known as "commonality." *Fed. R. Civ. P. 23(a)(2).* Under the Rule, commonality "requires the plaintiff to demonstrate that the class members 'have suffered the same injury.' " *Wal-Mart,* 564 U.S. at 350. It "does not require identical claims or facts among class member[s]." *Marcus,* 687 F.3d at 597 (citations omitted). "For purposes of *Rule 23(a)(2),* even a single common question will do." *Id.* Claims common to the entire class "must depend on a common contention ... [that is] of such a nature that it is capable of classwide resolution ... [and] that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart,* 131 S. Ct. at 2551.

Under *Rule 23(a)(3),* a court must also determine whether "the claims or defenses of the representative parties are typical of the claims or defenses of the class." *Fed. R. Civ. P. 23(a)(3).* Typicality and commonality are closely related and often merge. *Marcus,* 687 F.3d at 597. Typicality, however, "derives its independent legal significance from its ability to 'screen out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present.' " *Id.* at 598. "If a plaintiff's claim arises from the same event, practice, or course of conduct that gives rise[ ] to the claims of the class members, factual differences will not render that claim atypical if it is based on the same legal theory as the claims of the class." *Id.*

Typicality ensures that the putative class members' and the representative's interests "are aligned 'so that the latter will work to benefit the entire class through the pursuit of [his or her] own goals.' " *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 183 (3d Cir. 2001) (citations omitted). Typicality is met "when the named plaintiffs and the proposed class members 'challenge [ ] the same unlawful conduct.' " *Thomas v. SmithKline Beecham Corp.,* 201 F.R.D. 386, 394 (E.D. Pa. 2001) (quoting *Baby Neal for and by Kanter v. Casey,* 43 F.3d 48, 58 (3d Cir. 1994)). Complete "factual similarity is not required; just enough factual similarity so that maintaining the class action is reasonably economical and the interests of other class members will be fairly and adequately protected in their absence." *In re Schering Plough Corp. ERISA Litig.,* 589 F.3d 585, 598 (3d Cir. 2009).

Here, a single overarching common question—whether Defendants omitted material information and/or made misrepresentations that inflated the price of Zynerba's stock

—cuts across every claim of every Settlement Class Member. *Rodriquez v. Nat'l City Bank*, 726 F.3d 372, 832 (3d Cir. 2013) ("[T]here may be many legal and factual differences among the members of a class, as long as all were subjected to the same harmful conduct by the defendant."). As such Rule 23(a) (2) and (3)'s requirements of common question of law or fact and typicality are satisfied.

*4. Adequacy*

Under Rule 23(a)(4), a court must determine whether the proposed class representative "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To meet the adequacy requirement, a finding must be made that (1) plaintiff's interests do not "conflict with those of the class" and (2) the proposed class counsel are "capable of representing the class." *Newton*, 259 F.3d at 185. The Third Circuit has "recognized that the linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class," *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 183 (3d Cir. 2012), and "not proof of vigorous pursuit of the claim." *In re Cmty. Bank of N. Virginia*, 418 F.3d 277, 307 (3d Cir. 2005). This requirement serves "to ensure that the putative named plaintiff has the incentive to represent the claims of the class vigorously." *Dewey*, 681 F.3d at 184.

 **\*9** Here, there is no conflict between the proposed Class Representatives and the Class because, as with all members of the Class, Plaintiffs seek compensation for the same claims from the same Defendants. Plaintiffs have no interests that are antagonistic to or in conflict with the Class they seek to represent and their alleged injuries are identical to those suffered by Settlement Class Members. In addition, Class Counsel have substantial experience prosecuting large-scale class actions, including class actions involving securities claims. Accordingly, both prongs of the adequacy inquiry are met.

*Rule 23(b)(3) Requirements*

Having found that Plaintiffs have satisfied each of the Rule 23(a) prerequisites, this Court must determine pursuant to Rule 23(b) whether "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating

the controversy." Fed. R. Civ. P. 23(b)(3). These two requirements are generally referred to as the "predominance and superiority" factors.

*1. Predominance*

The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Issues common to the class must "predominate" over individual issues. *In re Prudential Ins. Co. Am. Sales Practice Litig.*, 148 F.3d 283, 313-14 (3d Cir. 1998). "Because the 'nature of the evidence that will suffice to resolve a question determines whether the question is common or individual,' 'a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case.' " *In re Hydrogen Peroxide*, 552 F.3d at 311 (quoting *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005)).

The predominance requirement is met here. Plaintiffs allege that each Settlement Class member purchased Zynerba stock in reliance on the same alleged misrepresentations and/ or omissions in Zynerba's SEC filings. As such, common questions of law and fact predominate over individual issues.

*2. Superiority*

Under the second criterion of Rule 23(b), this Court must find that a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b). The superiority element requires courts "to balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods of adjudication.' " *Community Bank of Northern Virginia*, 418 F.3d at 309 (citations omitted). A "nonexhaustive list of factors pertinent to a court's 'close look' " at the superiority requirement is found in the text itself. *Amchem*, 521 U.S. at 615-16. The list includes:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular

Case 4:21-cv-00196-MWB   Document 261-1   Filed 01/20/26   Page 282 of 287

Whiteley v. Zynerba Pharmaceuticals, Inc., Not Reported in Fed. Supp. (2021)

forum; and (D) the difficulties likely to be encountered in the management of a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D). The superiority inquiry is simplified in the settlement context, because when certifying a settlement only class, the Court need not inquire whether the case, if tried, would pose intractable management problems, for the purpose of the settlement is to not have a trial. Amchem, 521 U.S. at 620. In making this analysis, the district court may take the proposed settlement into consideration. Prudential II, 148 F.3d at 308; Warfarin Sodium II, 391 F.3d at 529 ("When dealing with variations in state laws, the same concerns with regards to case manageability that arise with litigation classes are not present with settlement classes, and thus those variations are irrelevant to certification of a settlement class.").

 **\*10** Here, a class action is the superior method of resolving the Settlement Class Members' claims. All of the Settlement Class Members' claims are based upon the same basic operative facts and legal standards. It would be a far better use of judicial resources to adjudicate all of these identical issues once, on a common basis. In addition, the Settlement provides Settlement Class Members the ability to obtain predictable, certain, and definite compensatory relief promptly. By contrast, individualized litigation carries with it great uncertainty, risk, and costs, and provides no guarantee that injured Settlement Class Members will obtain timely compensatory relief at the conclusion of the litigation. Accordingly, this Court finds that consideration of the Rule 23(b) factors weighs favorably for certification. Because of the number and nature of potential class plaintiffs and the fact that each member's potential recovery is likely to be small compared to the cost of litigating an individual case, maintaining this matter as a class action is judicially advisable and superior to other available methods.

After carefully concluding the requisite "vigorous analysis" of the factors in Rules 23(a) and (b), this Court finds that the requirements of Rule 23 have been met and that certification of Plaintiffs' proposed class is proper.

## Request for Attorneys' Fees and Expenses

As compensation for their legal services and efforts, Class Counsel have requested that this Court approve the portion of the settlement that provides for reimbursement of attorneys' fees in an amount equal to one-third of the total settlement amount, or $1,333,333.00, and litigation expenses in the

amount of $37,259.11. This amount was contemplated and agreed to in the Settlement Agreement and disclosed to Class Members. The notice provided to potential Class Members expressly informed them that Class Counsel would apply for an award of attorneys' fees in an amount not to exceed one-third of the total settlement amount, reimbursement of costs, and a $7,500.00 service award for each of the two Class Representatives in recognition of their services as class representatives. To date, no Class Member has objected to the terms of the Settlement, including the provisions for attorneys' fees and costs and class representative awards. In support of their request for fees and reimbursement of costs and expenses, counsel rely upon two declarations of counsel summarizing their time and the expenses incurred on behalf of the Class. (See Decls. of Tamar A. Weinrib and Jacob Goldberg).

Rule 23(h) provides that "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." "[A] thorough judicial review of fee applications is required in all class action settlements. Gen. Motors, 55 F.3d at 819. Awarding fees is within the discretion of the court, so long as the court employs the proper legal standards, follows the proper procedures, and makes findings of fact that are not clearly erroneous. In re Cendant Corp. PRIDES Litig., 243 F.3d 722, 727 (3d Cir. 2001).

## Attorneys' Fees

There are two methods of calculating attorneys' fees in class actions—the percentage-of-recovery method and the lodestar method. In re Prudential, 148 F.3d at 332-33. The percentage-of-recovery approach "applies a certain percentage to the settlement fund," while the lodestar method "multiplies the number of hours class counsel worked on a case by a reasonable hourly billing rate for such services." Sullivan v. DB Inv. Inc., 667 F.3d 273, 330 (3d Cir. 2011). The percentage-of-recovery approach is more appropriate where, as here, there is a common fund. In re AT&T Corp. Sec. Litig., 455 F.3d 160, 164 (3d Cir. 2006) (finding that the percentage method is "generally favored" in common fund cases because it "allows courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure."); Harshbarger v. Penn Mut. Life Ins. Co., 2017 WL 6525783, at *2 (E.D. Pa. Dec. 20, 2017) ("The reasonableness of attorneys' fee awards in common fund cases ... is generally

evaluated using a [percentage of recovery] approach followed by a lodestar cross-check.").

 **\*11**  In determining what constitutes a reasonable award under the percentage-of-recovery approach, the Third Circuit has directed district courts to consider the ten factors identified in *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190 (3d Cir. 2000) and *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998) (the "*Gunter/Prudential* factors"); *to wit*:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiff's counsel; (7) the awards in similar cases; (8) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations; (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained; and (10) any innovative terms of settlement.

*Gunter*, 223 F.3d at 195 n.1; *see also Prudential*, 148 F.3d at 336-40; *Diet Drugs*, 582 F.3d at 541. Although district courts should "engage in robust assessments of the [*Gunter/Prudential* factors] when evaluating a fee request," these factors are not exhaustive and should not be applied in a formulaic way. *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 301-02 (3d Cir. 2005). This Court will apply each factor to determine the reasonableness of the attorneys' fees request.

*1. The size of the fund created and the number of persons benefitted*

The first *Gunter* factor "consider[s] the fee request in comparison to the size of the fund created and the number of class members to be benefitted." *In re Ocean Power Techs., Inc.*, 2016 WL 6778218, at \*26 (D.N.J. Nov. 15, 2016) (quoting *Rowe v. E.I. DuPont de Nemours & Co.*, 2011 WL 3837106, at \*18 (D.N.J. Aug. 26, 2011)). Here, the parties negotiated a settlement with a common fund of $4 million, which represents a 10.4% recovery of estimated, alleged damages. This percentage recovery exceeds the median recovery for similar securities class actions in 2020. *See* Laarni T. Bulan and Laura E. Simmons, *Securities Class*

*action Settlements: 2020 Review and Analysis* (Cornerstone Research 2021); *see also In re Cendant Corp. Litig.*, 264 F.3d 201, 241 (3d Cir. 2001) (noting that typical recoveries in securities class actions range from 1.6% to 14% of total losses); *In re AT&T Corp.*, 455 F.3d 160, 169 (3d Cir. 2006) (affirming settlement for 4% of total damages). This factor supports approval of the requested fees.

*2. The presence or absence of substantial objections by members of the class*

*Gunter* advises that a court should consider "the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel." *Gunter*, 223 F.3d at 195 n.1. More than 24,000 potential Class members were provided notice of the settlement, which included notice of the agreed upon attorneys' fees, expenses, and class representative service awards. No objections to the Settlement were filed. The lack of any objections is strongly indicative of approval by the Class. Accordingly, this factor weighs in favor of approved of the requested fees.

*3. The skill and efficiency of the attorneys involved*

 **\*12**  Class Counsel's skill and efficiency is "measured by the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel." *In re Viropharma Inc. Secur. Litig.*, 2016 WL 312108, at \*16 (E.D. Pa. Jan. 25, 2016) (quoting *In re Computron Software, Inc.*, 6 F. Supp. 2d 313, 323 (D.N.J. 1998)). Here, Class Counsel have substantial experience prosecuting large-scale class actions, including securities class actions like the case *sub judice*. This experience undoubtedly contributed to the favorable outcome negotiated with equally experienced opposing counsel. Therefore, this factor also weighs in favor of approval.

*4. The complexity, expense, and likely duration of the litigation*

The fourth *Gunter* factor is intended to capture "the probable costs, in both time and money, of continued litigation." *In re Gen. Motors*, 55 F.3d at 812 (quoting *Bryan v.*

*Pittsburgh Plate Glass Co.*, 494 F.2d 799, 801 (3d Cir. 1974)). Securities litigation is regularly acknowledged to be particularly complex and expensive litigation, often requiring expert testimony on questions of causation and damages. *See, e.g., In re Par Pharm. Sec. Litig.*, 2013 WL 3930091, at 84 (D. N.J. July 29, 2013) ("Securities fraud class actions are notably complex, lengthy, and expensive cases to litigate.").

As noted, the claims in this action have been the subject of hard-fought litigation since its commencement. Notwithstanding the parties' progress in this matter prior to reaching settlement, if this case were to go to trial, it would involve substantial additional discovery and motion practice at great expense to the parties. Moreover, even if Plaintiffs would have recovered a larger judgment at trial on behalf of the Settlement Class Members, their actual recovery would have likely been postponed for years. There is also the possibility that Plaintiffs would not have recovered anything. The Settlement Agreement secures a recovery for the Settlement Class now, rather than the "speculative promise of a larger payment years from now." *In re Viropharma Inc.*, 2016 WL 312108, at *16. This factor, therefore, weighs in favor of approval.

### 5. The risk of non-payment

Class Counsel undertook this action on an entirely contingency fee basis. "Courts routinely recognize that the risk created by undertaking an action on a contingency fee basis militates in favor of approval." *In re Schering-Plough Corp. Enhance ERISA Litig.*, 2012 WL 1964451, at *7 (D.N.J. 2012); *see also In re Ocean Power Techs, Inc.*, 2016 WL 677218, at *28. Class Counsel has litigated this case without pay from the inception and has shouldered the risk that the litigation would yield little-to-no recovery. Accordingly, the fifth *Gunter/Prudential* factor weighs in favor of approving the attorneys' fees request.

### 6. The amount of time devoted to the case by plaintiff's counsel

The sixth *Gunter/Prudential* factor considers the amount of time Class Counsel devoted to the litigation. *Gunter*, 223 F.3d at 199. Class Counsel estimates that over 800 hours of attorney and other professional and paraprofessional time were expended on this case. These hours are reasonable for a complex class case such as this.[2] Thus, the sixth *Gunter/*

*Prudential* factor weighs in favor of approving the attorneys' fees request.

### 7. The awards in similar cases

While there is no benchmark for the percentage of fees to be awarded in common fund cases, the Third Circuit has noted that reasonable fee awards in percentage-of-recovery cases generally range from nineteen to forty-five percent of the common fund. *In re Gen. Motors*, 55 F.3d at 822. The requested fee here falls in the middle of the range of fees that have been granted in comparable securities class actions in the Third Circuit. *See, e.g., Milliron v. T-Mobile USA, Inc.*, 2009 WL 3345762 (D. N.J. Sept. 14, 2009) (awarding 33% of $13.5 million settlement). Accordingly, this factor weighs in favor of approval.

### 8. Value of benefits attributable to the efforts of class counsel relative to the efforts of others

**\*13**  Class Counsel were the only ones investigating the claims at issue in this case, and they alone initiated and actively litigated this federal action. Because Class Counsel were the only attorneys pursuing the claims at issue in this case, this factor weighs in favor of approval.

### 9. Percentage fee that would have been negotiated

Class Counsel agreed to litigate this case on a contingency fee basis and successfully negotiated a settlement. Were this case brought on behalf of an individual, the customary contingency fee would likely range between thirty and forty percent of the recovery. *Wallace v. Powell*, 288 F.R.D. 347, 375 (M.D. Pa. 2012) ("In private contingency fee cases, attorneys routinely negotiate agreements for between thirty percent and forty percent of the recovery."); *In re Ikon Ofc. Sols., Inc. Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000) ("[I]n private contingency fee cases, particularly in tort matters, plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery."). Here, Class Counsel's requested percentage is commensurate with customary percentages in private contingency fee agreements. Thus, this factor supports approval.

Case 4:21-cv-00196-MWB    Document 261-1    Filed 01/20/26    Page 285 of 287

Whiteley v. Zynerba Pharmaceuticals, Inc., Not Reported in Fed. Supp. (2021)

*10. Innovative terms of the settlement*

The Settlement Agreement does not contain any innovative terms. This factor is neutral as it neither weighs in favor of, nor against, approval.

### Lodestar Cross-Check

In common fund cases such as this one, the lodestar method is sometimes used to "cross-check the reasonableness of a percentage-of-recovery fee award." *Sullivan*, 667 F.3d at 330. The purpose of the cross-check is to ensure that the percentage approach does not result in an "extraordinary" lodestar multiple or a windfall. *See In re Cendant*, 264 F.3d at 285. The Third Circuit has stated that a lodestar cross-check entails an abridged lodestar analysis that requires neither "mathematical precision nor bean counting." *In re Rite Aid*, 396 F.3d at 305. The Court need not receive or review actual billing records when conducting this analysis. *Id.* at 307.

Under the lodestar method, a court begins the process of determining the reasonable fee by calculating the "lodestar," *i.e.*, the "number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *see also McKenna v. City of Phila.*, 582 F.3d 447, 455 (3d Cir. 2009). Once the lodestar is determined, the court must then decide whether additional adjustments are appropriate. *McKenna*, 582 F.3d at 455. A reasonable hourly rate in the lodestar calculation is "[g]enerally ... calculated according to the prevailing market rates in the relevant community," taking into account "the experience and skill of the ... attorney and compar[ing] their rates to the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Maldonado v. Houstoun*, 256 F.3d 181, 184 (3d Cir. 2001). The prevailing market rate is usually deemed reasonable. *Pub. Interest Research Grp. v. Windall*, 51 F.3d 1179, 1185 (3d Cir. 1995).

"In calculating the second part of the lodestar determination," *i.e.*, the time reasonably expended, a district court should "review the time charged, decide whether the hours set out were reasonably expended for each of the particular purposes described and then exclude those that are excessive, redundant, or otherwise unnecessary." *Pa. Envtl. Def. Found. v. Canon-McMillan Sch. Dist.*, 152 F.3d 228, 232 (3d Cir. 1998). As noted in *Hensley*, lawyers are required to use

judgment when billing their clients so as not to bill clients for "excessive, redundant, or otherwise unnecessary" hours. *Id.* at 434. "Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority." *Id.* at 434 (citations omitted). Ultimately, district courts have "substantial discretion in determining what constitutes ... reasonable hours." *Lanni v. New Jersey*, 259 F.3d 146, 149 (3d Cir. 2001).

**\*14** Attached to the Weinrib and Goldberg Declarations, Class Counsel included a summary of the hours worked by the partners, associates, and professional support staff involved in this litigation. These summaries were prepared from contemporaneous, daily time records that are regularly prepared and maintained by the respective firms. Class Counsel and support staff are claiming 862.99 hours for work done at hourly rates ranging from $110 to $1,100. After reviewing the Attorney Declarations, it appears that Class Counsel is not requesting compensation for any time that was "excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 434. These hourly rates are also well within the range of what is reasonable and appropriate in this market. That is, the hourly charged rates for the attorneys are the same as the regular current rates charged for their services in standard non-class matters, including contingent and non-contingent matters. The attorneys have substantial experience in complex class action litigation, and their hourly rates are within the range charged by attorneys with comparable experience levels for litigation of a similar nature.

Having found the hourly rates and hours expended to be reasonable, the aggregate lodestar calculation, as of July 27, 2021, is $679,844 for the 862.99 hours of attorney and support staff work. Class Counsel's request for $1,333,333 (one-third of the settlement amount) will result in Class Counsel receiving approximately 1.96 times the lodestar. Courts frequently approve attorneys' fees awards for amounts in excess of the calculated lodestar. Indeed, multiples ranging from 1 to 8 are often used in common fund cases. *See In re Rite Aid Sec. Litig.*, 362 F. Supp. 2d 587, 590 (E.D. Pa. 2005) (approving a 6.96 multiplier); *Steiner v. Am. Broadcasting Co.*, 248 F. App'x 780, 783 (9th Cir. 2007) (holding a 6.85 multiplier "falls well within the range of multipliers that courts have allowed"); *Viafara v. MCIZ Corp.*, 2014 WL 1777438, at \*14 (S.D.N.Y. May 1, 2014) ("Courts award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers."). Such multipliers are necessary to compensate counsel for the risk of assuming the representation on a contingency fee basis. *City of Detroit v.*

*Grinnell*, 495 F.2d 448, 470 (2d Cir. 1974). Moreover, Class Counsel is expected to perform additional work in connection with this case following this Court's approval. As such, the multiplier will likely be lower by the time this matter is closed and Class Counsel's work is completed.

Therefore, having considered the relevant *Gunter/Prudential* factors and performed the lodestar cross-check, this Court approves the reasonable amount of attorneys' fees requested.

### Reimbursed Litigation Expenses

Class Counsel also seeks approval of the portion of the Settlement Agreement which entitles them to reimbursement of their litigation expenses. Courts recognize that " '[t]here is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of ... reasonable litigation expenses from that fund.' " *In re Corel Corp. Inc. Sec. Litig.*, 293 F. Supp. 2d 484, 498 (E.D. Pa. 2003) (quoting *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 179 (E.D. Pa. 2000)).

Class Counsel claims that they incurred $37,259.11 in such expenses during the pendency of this litigation. This amount includes filing fees and fees for the mediation, legal and factual research, an investigator, and other incidental expenses incurred in the course of the litigation. After carefully reviewing the documentation supporting the reimbursement request, this Court finds that the litigation and administrative expenses listed by Class Counsel are reasonable and expected in this type of case. In addition, the Notice to Class Members advised that Plaintiffs' Counsel may seek reimbursement of expenses not to exceed $125,000. Accordingly, this Court finds the request for reimbursement of $37,259.11 reasonable.

### Service Award

Class Counsel also seek this Court's approval of a service award, in the amount of $7,500, to each of the two Class Representatives, for their willingness to undertake the risks and the burden as a class representative in this litigation. "Incentive awards are not uncommon in class action litigation[.]" *Cullen v. Whitman Med. Corp.*, 197 F.R.D.

136, 145 (E.D. Pa. 2000). These payments "compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation[.]" *Bredbenner v. Liberty Travel, Inc.*, 2011 WL 1344745, at *22 (D.N.J. Apr. 8, 2011) (internal citations and quotations omitted). Incentive awards also " 'reward the public service' of contributing to the enforcement of mandatory laws." *Id.* (quoting *In re Cendant*, 232 F. Supp. 2d at 344).

**\*15** This Court recognizes that there would be no benefit to the Settlement Class Members if Plaintiffs had not stepped forward and prosecuted this matter to the current resolution. In doing so, Mr. Whiteley and Mr. Berger devoted time and energy to the litigation, including assisting Class Counsel with discovery and mediation. The requested award is well within the range of awards made in similar cases. *See, e.g., Barel v. Bank of America*, 255 F.R.D. 393, 402-03 (E.D. Pa. Jan. 16, 2009) (awarding $10,000.00 incentive award); *Brown v. Progressions Behavioral Health Servs., Inc.*, 2017 WL 2986300, at *7 (E.D. Pa. July 13, 2017) (awarding $10,000 to each named plaintiff because they "were actively involved in the litigation since before it was commenced, they provided the information and documents that formed the basis for the lawsuit" and "the service award payments represent a small fraction of the $452,586 Settlement Fund."). Settlement Class Members were also notified that Class Counsel would request these individual awards for each of the Class Representatives. Notably, no Settlement Class Member objected to the proposed service awards. Accordingly, this Court approves the requested award of $7,500.00 to each of the Class Representatives.

### CONCLUSION

For the reasons stated herein, this Court: (1) grants final approval of the proposed class action settlement; (2) awards Class Counsel reasonable attorneys' fees in the amount of $1,333,333.00 and the reimbursement of litigation and administrative expenses in the amount of $37,259.11; and (3) awards the sum of $7,500.00 to each of the Class Representatives. An Order consistent with this Memorandum Opinion follows.

### All Citations

Not Reported in Fed. Supp., 2021 WL 4206696

Footnotes

Whiteley v. Zynerba Pharmaceuticals, Inc., Not Reported in Fed. Supp. (2021)

1    Unless otherwise defined herein, all capitalized terms shall have the meanings provided in the Settlement Agreement.

2    The hours expended in this case are further discussed in the lodestar crosscheck below.

---

End of Document                                    © 2026 Thomson Reuters. No claim to original U.S.
                                                   Government Works.